**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LINDY G. WRIGHT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3:06-cv-1087-WKW** |
| **v.** | ) | |
| | ) | |
| **CHATTAHOOCHEE VALLEY** | ) | |
| **COMMUNITY COLLEGE (CVCC),** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW the Defendants, Chattahoochee Valley Community College, ("CVCC"), Dr. Laurel Blackwell, Dr. James Lowe and Mrs. Dixie Peterson and file this Motion for Summary Judgment, and as grounds therefor, these Defendants aver as follows:

There are no genuine issues of material fact in this case relative to any of the pled theories of action and these Defendants are entitled to Summary Judgment as a matter of law. In support of this Motion for Summary Judgment, these Defendants submit herewith the Defendants' Brief in Support of Motion for Summary Judgment and the Defendants' Book of Exhibits.

WHEREFORE, the premises considered, these Defendants request that the Court issue Summary Judgment in their favor.

Respectfully submitted,

/s/ H.E. NIX, JR.
H.E.Nix, Jr. (NIX007)
Brandy F. Price (PRI 079)

1

OF COUNSEL:
Nix, Holtsford, Gilliland, Higgins & Hitson, P.C.
Post Office Box 4128
Montgomery, Alabama 36103-4128
(334) 215-8585
(334) 215-7101 facsimile

## CERTIFICATE OF SERVICE

I hereby certify that an exact copy of the foregoing instrument has been served on the following individual(s) either by email from the Court Clerk or by placing a copy of same in the United States Mail, postage prepaid and properly addressed on this 15th day of October, 2007.

Jennifer B. Cooley, Esq.
Parker & Cooley, LLC
1507 Broad Street
Phenix City, Alabama 36867

Peter A. Dumbuya, Esq.
Post Office Box 3302
Phenix City, Alabama 36868

Joan Davis, Esq.
Dept. Of Post Secondary Education
401 Adams Avenue, Suite 280
Montgomery, AL 36130

/s/ H. E. NIX, JR.
OF COUNSEL

2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

LINDY G. WRIGHT,                          )
                                          )
        Plaintiff,                        )
                                          )
v.                                        )    Civil Action No. 3:06-CV-1087-WKW
                                          )
CHATTAHOOCHEE VALLEY                      )
COMMUNITY COLLEGE (CVCC),                 )
et al.,                                   )
                                          )
        Defendants.                       )

## DEFENDANTS' BRIEF IN SUPPORT
## OF THEIR MOTION FOR SUMMARY JUDGMENT

COME NOW the Defendants, Chattahoochee Valley Community College, Dr. Laurel Blackwell, Dr. James Lowe and Dr. Dixie Peterson, and in support of their Motion for Summary Judgment filed simultaneously herewith, submit this brief with exhibits.

## SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the *Federal Rules of Civil Procedure,* Summary Judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a Judgment as a matter of law." *Fed. R.Civ.P.* 56(c). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. Al Transp.,* 229 F.3d 1012, 1023 (11th Cir.2000) (*en banc*)(quoting *Haves v.*

1

*City of Miami,* 52 F.3d 918, 921 (11th Cir. 1995) [(internal quotation marks and citations omitted)].

The party seeking Summary Judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, *Rule* 56(e), "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid Summary Judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. V. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a Motion for Summary Judgment must believe the evidence of the nonmovant and must draw all justifiable inferences from the evidence in the nonmoving party's favor. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *McCormick v. City of Fort Lauderdale,* 333 F. 3d 1234, 1243 (11th Cir. 2003) (the evidence and all reasonable inferences from the evidence must be viewed in the light most favorable to the nonmovant). After the nonmoving party has responded to the Motion for

Summary Judgment, the Court must grant Summary Judgment if there is no genuine issue of material fact and the moving party is entitled to Judgment as a matter of law. *See Fed.R.Civ.P.* 56(c).

## STATEMENT OF UNDISPUTED FACTS

### PARTIES
### (Defendants)

### Chattahoochee Valley Community College

Chattahoochee Valley Community College (hereinafter "CVCC") is a two-year college managed and operated by the Alabama Department of Post Secondary Education pursuant to §16-60-110 *Code of Alabama* (1975) through § 16-60-114 *Code of Alabama* (1975). These sections comprise an act of the Legislature entitled "Management and Control of Trade Schools and Junior Colleges." CVCC is a junior college. CVCC was initially managed and controlled by the State Superintendent of Education and the Alabama State Board of Education. Minutes of meetings of the Alabama State Board of Education reflect that CVCC was initially named Chattahoochee Valley State Junior College. In 1996, Dr. Richard J. Federincko, the President of CVCC at that time, requested that the name of the college be changed to Chattahoochee Valley Community College. This name change was granted by Fred Gainous, the Chancellor of the Alabama Department of Post Secondary Education at that time. Prior to 1996 (in 1982) an enactment of the State Legislature had required the State Board of Education to delegate to the Chancellor of the Alabama Department of Post Secondary Education the authority to act and make decisions concerning the management and operation of the State's junior colleges, including CVCC. (§16-60-111.6 *Code of Alabama* (1975) and §16-60-114 *Code*

3

*of Alabama* (1975)).  Post Secondary Education is a parallel organization to the State Department of Education. (§16-60-110(6) *Code of Alabama* (1975)).  The State Board of Education acts directly upon the recommendation of the Chancellor with regard to some aspects of junior college operation and management.  Those direct actions include the making of rules and regulations for the government of each junior college and, upon recommendation of the Chancellor, appointment of the President of each junior college who serves at the pleasure of the Board of Education. (§16-60-111.4 *Code of Alabama* (1975)).

### Dr. Laurel Blackwell

Dr. Blackwell was, at all times material to this case, and currently is, the President of CVCC. (Book of Exhibits, Exhibit I and Exhibit N, 11:2-3.) Dr. Blackwell holds a Doctorate in Administration of Higher Education from the University of Alabama, which she obtained in 1994. (Book of Exhibits, Exhibit N, 17:7-11.)  Dr. Blackwell has been employed at several colleges in the State Junior College System, including Wallace Community College, Southern Union Community College, and CVCC. (Book of Exhibits, Exhibit N, 13:6-11.)   Almost all of her prior work experience with these institutions has been in administration. (Book of Exhibits, Exhibit N, 16:19-20.)   Dr. Blackwell's duties involve management and administration of the college. (Book of Exhibits, Exhibit N, 12:14-19.) Dr. Blackwell has two Deans who report directly to her (Book of Exhibits, Exhibit N, 29:14 and 30:18-20.): Dean James Lowe, who was, at all times material to this case, the Dean of Instruction (Book of Exhibits, Exhibit N, 30:18-19.) ; and, Dr. David N. Hodge who was,

4

at all times material to this case, and currently is, the Dean of Student and Administrative Services. (Book of Exhibits, Exhibit N, 30:19-20.)

### CVCC Staff and Faculty

The Staff and Faculty of CVCC who are Defendants in this case are the following:

1.    **DR. JAMES LOWE.**  Dr. James Lowe is currently the Interim President of Bishop State Community College in Mobile, Alabama. (Book of Exhibits, Exhibit K, p. 1.) He served as Dean of Instruction at CVCC from January 2004 to July 2, 2007. (Book of Exhibits, Exhibit K, p 1.)  Prior to being Dean of Instruction at CVCC he served as Interim President of Northwest-Shoals Community College in Muscle Shoals, Alabama. (Book of Exhibits, Exhibit K, p. 1.)  Dr. Lowe holds a Ph.D. in Education Administration from San Francisco Technical University in San Francisco, California. (Book of Exhibits, Exhibit K, p. 1.)  As Dean of Instruction at CVCC, Dr. Lowe was responsible for certain processes related to the instructional units of CVCC including career/technical, occupational and academic. (Book of Exhibits, Exhibit K, p. 2.)  He also oversaw certain instructional support services. (Book of Exhibits, Exhibit K, p. 2.)  One of Dr. Lowe's responsibilities at CVCC was to consider and make rulings on student Grade Appeals. (Book of Exhibits, Exhibit K, p. 2.)

2.    **MRS. DIXIE PETERSON.**  At all times material to this case, Mrs. Peterson was the Division Chairperson of Health Sciences/Public Service Technologies at CVCC. (Book of Exhibits, Exhibit G.) Her responsibilities in this role included the management and administration related to the Nursing Program at CVCC. (Book of Exhibits, Exhibit M, 8:7-9:11.)  Mrs. Peterson graduated in 1981 from Samford University with a Bachelor of

5

Science degree in Nursing, *cum laude*. (Book of Exhibits, Exhibit Q, CVCC00897.)    She

holds a Master of Science in Nursing with concentration in Cardiovascular Nursing from

Troy State University. (Book of Exhibits, Exhibit Q, CVCC00897.)    She obtained her

Master's Degree in 1988. (Book of Exhibits, Exhibit Q, CVCC00897.)    Mrs. Peterson has

been a faculty member at CVCC in the Nursing Program since 1984. (Book of Exhibits,

Exhibit M, 6:17-21.)

### (Plaintiff)

1.    **LINDY GALE WRIGHT.** The Plaintiff, Lindy Gale Wright, is 36 years of age.

Her date of birth is January 28, 1971. (Book of Exhibits, Exhibit _, CVCC00495.)    At the

time of her first class in the Nursing Mobility ADN Program, Ms. Wright was 34 years of

age.    She had previously attended CVCC and received a Certificate from CVCC in

Practical Nursing. (Book of Exhibits, Exhibit L, 51:1-19.)    This Program of study is within

the Nursing Program. (Book of Exhibits, Exhibit A, CVCC000112.) Ms. Wright obtained her

certificate in Practical Nursing in 2002. (Book of Exhibits, Exhibit L, 51:1-19.)    She passed

the Alabama Board of Nursing Practical Nursing Licensure test on the second attempt

(Book of Exhibits, Exhibit L, 54:6-13.) and her first job as a Licensed Practical Nurse (LPN)

was at Doctor's Hospital in Columbus, Georgia.    (Book of Exhibits, Exhibit L, 50:20-23.)

She worked in Patient Care for approximately two-and-a-half to three years at Doctor's

Hospital.

Ms. Wright was admitted into the Nursing Mobility or ADN Program at CVCC in the

Spring of 2005 (Book of Exhibits, Exhibit _, CVCC00856.) and took her first class in the

6

Nursing Program in May 2005. (Book of Exhibits, Exhibit A, CVCC000011 and Exhibit L, 38:11-23.)

<u>**Non-Party Instructors, Staff, and Faculty**</u>

The following two persons taught Nursing courses that were failed by Ms. Wright in the CVCC Nursing Program:

1.     **LYNN HARRIS.** Ms. Harris received an Associate Degree in Nursing in 1980 from LaGrange College and a Bachelor of Arts in Psychology from LaGrange College in 1983. (Book of Exhibits, Exhibit J, p. 1.) In 1984, she received a Bachelor of Science in Nursing from the Medical College of Georgia and in 1985 she received a Master of Science in Nursing at the Medical College of Georgia. (Book of Exhibits, Exhibit J, p. 1.) Additionally, in 1999, Ms. Harris received a Post-Master Nurse Practitioner Degree at the Medical College of Georgia. (Book of Exhibits, Exhibit J, p. 1.) Prior to becoming a nursing instructor at CVCC in September 2005, Ms. Harris had twelve years experience as a full-time nursing instructor. (Book of Exhibits, Exhibit J, p. 3.) She had also been chair of the Nursing Department at Southern Union for five years prior to coming to CVCC. (Book of Exhibits, Exhibit J, p. 3.)

Ms. Harris taught Lindy Wright in the following courses: NUR 252, Fall 2005; NUR 200, Spring 2006; and NUR 272, Spring 2006. (Book of Exhibits, Exhibit J, p. 3-4.)

2.     **TAWYNA CASH.** Ms. Cash taught at CVCC for one semester on loan from Southern Union Community College in Opelika, Alabama, where she was a nursing instructor. (Book of Exhibits, Exhibit I, p. 1-2.) Ms. Cash taught NUR 271 at CVCC in the Fall 2005 semester. (Book of Exhibits, Exhibit L, p. 81:20-82:3.) Ms. Wright was one of her

7

students. (Book of Exhibits, Exhibit L, 81:20-82:3.)  Ms. Wright made a failing grade of "D" in Ms. Cash's NUR 271 course. (Book of Exhibits, Exhibit L, 81:20-82:3.)

Ms. Cash received a Bachelor of Science in Nursing in 1983 from the University of Alabama, Birmingham, and a Master of Science in Nursing from Troy State University in 2002. (Book of Exhibits, Exhibit I, Attachment 1.)  After the Fall 2005 semester, Ms. Cash taught nursing courses on a full-time basis, again, at Southern Union Community College. (Book of Exhibits, Exhibit N, 49:17-20.)

3.   **DAVID N. HODGE.** David N. Hodge was, at all times material to this case, and is currently the Dean of Student and Administrative Services at Chattahoochee Valley Community College.  See Book of Exhibits, Exhibit "H", p. 1.  He has held this position since March of 2004.  Id.  Dean Hodge holds a Doctorate in Education which he received from Auburn University in 2004.  Id.  One of his responsibilities as Dean of Student and Administrative Services is to oversee the processes of the Admissions Department.  Id.  This includes overseeing the application and admission of students and maintaining documentation concerning academic performance and the process of graduation including student application for graduation, evaluation of student transcripts for to ensure students have completed the courses necessary for graduation, and notifying students concerning their graduation status.  Id., at pp. 1 - 2. Additionally, he also administers certain CVCC policies such as the "Course Forgiveness" policy.  Id., p. 2.

**FACTS**

8

CVCC started its Nursing Program in the 1980s. Lindy Wright first enrolled in a Nursing Program at CVCC in or around 1999 and received her Practical Nursing Certificate in or around the Summer of 2002. (Book of Exhibits, Exhibit "L", 51:1-19.)

The Chattahoochee Valley Community College ("CVCC") Associate Degree Nursing ("ADN") program[1] is designed to allow a Licensed Practical Nurse ("LPN") to obtain an associate degree in Nursing and become a Registered Nurse ("RN"). (Book of Exhibits, Exhibit "A", CVCC000109, ¶¶ 2-3.) Ms. Wright applied at CVCC for admission into the Nursing Mobility or Associate Degree in Nursing Program, and she was advised of her admission into this program by way of a letter dated April 29, 2005 from Katie Lackey, a Health Sciences Coordinator. (Book of Exhibits, Exhibit "R", CVCC00856).

Ms. Wright entered the CVCC ADN program under the Nursing Program Admissions Criteria and Requirements as set forth in the 2004-2005 Chattahoochee Valley Community College Catalog and Student Handbook. (Book of Exhibits, Exhibit "A", CVCC000110.) According to paragraph 11 of the CVCC Nursing Program Admissions Criteria, "Students enrolled in the Nursing Mobility Program must earn a "C" or higher in all required courses in the nursing curriculum, in both nursing and non-nursing courses. This includes satisfactory completion of the clinical components of each course. Failure of clinical components results in failure of the course." (Book of Exhibits, Exhibit "A", CVCC000110.)

---

[1] The ADN program at CVCC is also referred to at times as the Nursing Mobility Program because it is a "bridging program" for students who are already Licensed Practical Nurses (LPN) wanting to become Registered Nurses (RN). A person who is already a LPN and who successfully completes the ADN program at CVCC would receive an Associate Degree in Nursing and be eligible to take the national boards in order to be licensed as a RN.

9

Additionally, the applicable 2004 - 2005, CVCC Nursing Mobility Program Admissions Criteria further states that "Nursing courses NUR 252, 271, 272, 279, 291 and 292 may be repeated only once and are to be taken the next semester a course is offered provided space is available. If the student does not pass the nursing course on the second attempt, that student shall be excluded from the nursing program, but not the college." (Book of Exhibits, Exhibit "B", CVCC000110, ¶ 13.)

The Nursing Mobility Admissions Criteria and Requirements governing Ms. Wright's admission to the nursing program allowed a student 24 months to complete the entire nursing program. These Requirements also stated, "If a nursing student fails two different nursing courses within the twenty-four month period, he/she will be excluded from the program and CANNOT reapply."[2] (Book of Exhibits, Exhibit "A", CVCC000110, ¶14.)

Once admitted to the Nursing Program, Ms. Wright received a copy of the CVCC Student Handbook and Catalog containing the Nursing Program Admissions Criteria with the above referenced requirements. (Book of Exhibits, Exhibit "K", Attachment 12, CVCC000864.) Additionally, Ms. Wright admitted in her deposition that she was aware of the policy that two failures resulted in exclusion from the Nursing Program. (Book of

---

[2] In the summer of 2006, a new statewide curriculum was initiated at public two-year college system institutions for all LPN and ADN programs. Prior to the 2006-2007 school year, once a student was dismissed or excluded from the Associate Degree Nurse's Program, as indicated above, the student could not reapply for admission to the Nursing Program. However, under the new curriculum implemented in the fall 2006-2007 school year, a student who had been dismissed from a Nursing Mobility Program could reapply for admission to the program. (See the Alabama College System Nursing Education Program Progression Policy contained in the 2006-2007 Chattahoochee Valley Community College Catalog and Student Handbook, attached as Exhibit "J"). This new policy also states that after a student has been dismissed from a specific Nursing Program, that student may apply for admission as a new student provided that two academic years have elapsed since the student's dismissal from that program.

The Fall Academic term of 2005 began on August 22, 2005. (Book of Exhibits, Exhibit "J", Attachment "1".) The Classroom portion of NUR 252 and NUR 271 was taught each Wednesday. On the second class meeting of the Fall 2006 term, August 31, 2005, the instructors for NUR 252 and NUR 271 resigned. (Book of Exhibits, Exhibit "N", 43:5-15.)

Dr. James Lowe, Dr. Laurel Blackwell filled these positions as soon as possible with qualified instructors. (Book of Exhibits, Exhibit "K", p. 3; Exhibit I, p.2.) Ms. Lynn Harris was hired to be the instructor of NUR 252 and Ms. Tawyna Cash was hired to be the instructor of NUR 271. Ms. Harris' qualifications are fully set forth in her Affidavit, attached as Exhibit "J". Ms. Cash's resume is Attachment "1" to Dr. Laurel Blackwell's Affidavit (Book of Exhibits, Exhibit I.)

Tawyna Cash, the nursing instructor for NUR 271 was a full time nursing faculty member at another two year college, Southern Union State Community College in Wadley, Alabama. (Book of Exhibits, Exhibit "I", Attachment "1".)    CVCC had arranged with Southern Union (and Ms. Cash) for Ms. Cash to teach NUR 271 after the sudden and unexpected resignation of two nursing faculty members shortly after the beginning of the Fall semester at CVCC. (Book of Exhibits, Exhibit "K", p. 3.)  Ms. Lynn Harris, the nursing instructor for NUR 252 during Fall 2005, was hired by CVCC as the nursing instructor to replace the other nursing instructor who had resigned. (Book of Exhibits, Exhibit "K", p. 3.)

After Ms. Wright filed and discussed her contested grade with Ms. Cash prior to the holiday break, Ms. Wright was not satisfied with her grade appeal at the instructor level. (Book of Exhibits, Exhibit "K", p. 5.)    As a result, she appealed the issue to Ms. Dixie Peterson prior to the holiday break. (Book of Exhibits, Exhibit "M", 137:18-140:1 and Exhibit

12

Exhibits, Exhibit "L",148:12-16.) She also stated in her deposition that she was aware that a grade of "D" was considered a failure in the nursing program. (Book of Exhibits, Exhibit "L", 83:1-16.)

Ms. Wright began her studies in the 12 month ADN/Nursing Mobility program on May 26, 2005, which was the first day of class for the 2005 summer semester. (Book of Exhibits, Exhibit "S", CVCC000799.) CVCC scheduled the first semester of entering Nursing Mobility students for the Summer semester of each academic year.

Ms. Wright successfully completed her Summer courses in the Nursing Mobility Program although she was on the borderline in at least one of those courses according to the opinion of a substitute instructor who advised the Division Chairperson over the nursing program of this fact in the Summer of 2005. (Book of Exhibits, Exhibit "M", 67:13-68:23.) Nevertheless, Lindy Wright passed all courses in the Summer semester. Ms. Wright progressed to the Fall semester 2005 and was notified at the conclusion of that semester that she had failed two Nursing courses and was therefore excluded from the Nursing Program at CVCC. (Book of Exhibits, Exhibit "T", CVCC000381.) Exhibit "T" is a copy of a letter dated December 20, 2005 from Dixie Peterson, Division Chair/Health Sciences to Lindy Wright. This letter notifies Ms. Wright that she had failed both NUR 252, Adult Nursing II, and NUR 271, Pediatrics. This letter further reiterates paragraph 14 of the CVCC ADN Admissions Criteria. The letter states, "Policy states that a student is allowed a maximum of two failures in the LPN or ADN program before he/she is dismissed from the program... " Additionally, this letter states that Ms. Wright may not reenter the Nursing Program.

11

"K", p. 5.) Ms. Cash did not timely follow the appeals policy regarding Ms. Wright's appeal of her grade in NUR 271. (*Id.*)    Therefore, Dixie Peterson, Department Chair, recommended that Ms. Wright's grade be changed. (*Id.*)  The Dean of Instruction, at Ms. Peterson's recommendation, approved Ms. Peterson recommendation and ruled that Ms. Wright's grade in NUR 271 would be changed from a "D" to a "C", not on the basis of substantive merit, but instead, on the basis of the lack of a timely response from Ms. Cash. (See Book of Exhibits, Exhibit "M",pp. 135-141 and Exhibit "K, p. 5 and Attachment "5".)

In NUR 252, Ms. Harris first met with the Nursing students on September 14, 2005. (Book of Exhibits, Exhibit "J", p. 3.) Ms. Harris used the classroom and clinical syllabus that had been developed by the prior instructor. (Book of Exhibits, Exhibit "J", p. 4.)  See also NUR 252 Classroom Syllabus, Exhibit "C" and NUR 252 Clinical Syllabus, Exhibit "D" contained in the Book of Exhibits.  The classroom syllabus provided a course description and listed all required textbooks. (Book of Exhibits, Exhibit "C", Wright00114.)   The classroom syllabus also clearly lists a number of secondary textbooks, articles and sources of information that are recommended materials for further study and reference. (Book of Exhibits, Exhibit "C", Wright00114-115.)   The classroom syllabus also provides that students "must be able to correctly perform simple mathematical computations for administering drugs." (Book of Exhibits, Exhibit "C", Wright00116.)

Moreover, the syllabus provided that in order for a student to satisfactorily complete NUR 252, the student, must, in the professional judgment of the instructor, have a reasonable mastery of fourteen specifically described competencies.  (Book of Exhibits, Exhibit "C", Wright00116.) Ms. Harris evaluated her students through the use of written exams, clinical performance evaluations, clinical nursing care plans, computer

13

assignments, class participation, take home quizzes, and a case study. (Book of Exhibits, Exhibit "J", p. 6.)

A student's final grade was calculated on a point scale worth a total of 1000 points. Ms. Harris gave four unit exams or tests. (Book of Exhibits, Exhibit "J", p. 6.) Each test was worth a total of 125 possible points. (Book of Exhibits, Exhibit "J", p. 6 and Exhibit "C", Bates I.D. Wright00120.) She gave her students their test grades once those tests had been graded. (Book of Exhibits, Exhibit "J", p. 8.) Ms. Wright failed all four of her tests/exams. On her first exam, Ms. Wright received a total of 76.6 points. (Book of Exhibits, Exhibit "J", p. 7.) She received 77.77 points on her second test/exam, 75 points on her third test/exam, and 82.5 points on her fourth test/exam. (*Id.*) Ms. Wright's total points for the four test/exams in NUR 252 was 311.57 out of the possible 500 total points available. (*Id.*)

Ms. Harris was available the entire semester for any student to schedule an appointment with her to discuss any questions students might have. (Book of Exhibits, Exhibit "J", p. 8.) Ms. Wright never made an appointment with Ms. Harris. (*Id.*) Prior to the final exam, Ms. Wright conducted two separate sessions of review for the final. (*Id.*) These sessions occurred on December 13, 2005. (*Id.*) Each session covered approximately one-half of the course material upon which the final would be based. (*Id.*) Ms. Wright attended only a portion of one of these final exam review sessions. (*Id.*)

The final exam was given on December 14, 2005, which was the last day of classes. (*Id.*) The final exam was given in such a way that it could be graded very quickly. Ms. Harris gave each student a Scantron sheet for the student to record their answers to the

final exam. (Book of Exhibits, Exhibit "J", p. 7.)    At the end of the exam, Ms. Harris

collected all the Scantron sheets and then these sheets were quickly graded by computer.

(*Id.*) On the afternoon December 14, 2007, after the final exams were graded, Ms. Harris

met with the students to give them their final exam and final course grades. (Book of

Exhibits, Exhibit "J", p. 8.)

Throughout the course of the Fall 2005 semester, Ms. Wright received the following

points in NUR 252:

|  | Points Received By Lindy Wright | Total Possible Points |
|---|---|---|
| Unit Exam I | 76.6 points | 125 |
| Unit Exam 2 | 77.77 | 125 |
| Unit Exam 3 | 75 | 125 |
| Unit Exam 4 | 82.5 | 125 |
| Computer Programs | 50 | 50 |
| Home Quizzes | 100 | 100 |
| Care Plan 1 | 23 | 25 |
| Care Plan 2 | 23 | 25 |
| Case Study | 50 | 50 |
| Final Examination | 173.52 | 250 |
| Total | 741.4 | 1000 |

(Book of Exhibits, Exhibit "J", Attachment "2".) .  As was outlined in the syllabus, a student

must have at least 750 points to pass the course. (Book of Exhibits, Exhibit "C",

Wright00120.)  Ms. Wright only had 741.4 points, or a "D" according to the Classroom

Syllabus, which was a failure. (Book of Exhibits, Exhibit "C", Wright00120.) Ms. Wright and

one other student failed NUR 252. (Book of Exhibits, Exhibit "J", p. 11.)

After December 14, 2005, Ms. Harris scheduled several appointments with Ms.

Wright, at Ms. Wright's request. (Book of Exhibits, Exhibit "J", pp. 8-9.) Ms. Harris and Ms.

Wright met several times and reviewed the exams that were given throughout the semester

and the final exam. (*Id.*) At the conclusion of all of these meetings Ms. Harris advised Ms. Wright that her failing grade of "D" would not be changed. (*Id.*) In Ms. Harris' professional judgment, Ms. Wright did not have a strong grasp of the course material and that a "D" was the proper grade in the course for Ms. Wright. (*Id.*) Ms. Wright, nevertheless, was very persistent with Ms. Harris in contending that she should be given a passing grade in NUR 252; however, Ms. Harris informed her that, in Ms. Harris' judgment Ms. Wright's grade should not be changed. (*Id.*)

Ms. Wright filed a formal Grade Appeal in NUR 252 on December 20, 2005. (Book of Exhibits, Exhibit "J", p. 9 and Attachment "3"; Book of Exhibits, Exhibit "K", p. 6.) This formal Grade Appeal was filed with Dixie Peterson the Division Chair. (Book of Exhibits, Exhibit "K", p. 6.) CVCC closed for the holidays on December 22, 2005 and re-opened on January 3, 2006. (Book of Exhibits, Exhibit "J", p. 9.) Ms. Harris responded in writing on January 4, 2005, after CVCC had reopened from the Christmas Holidays. (Book of Exhibits, Exhibit "J", Attachment"3".) Ms. Peterson then reviewed the Grade Appeal and the written response of Ms. Harris. (Book of Exhibits, Exhibit "M", 123:23-125:23.) In Ms. Peterson's professional judgment the grade of "D" should not be changed in NUR 252. (Book of Exhibits, Exhibit "M", 123:23-125:23; Exhibit "K", p. 6 and Attachment "8".) Ms. Peterson provided her opinion and assessment to Dean James Lowe. (*Id.*) Dean Lowe decided that he would benefit from an independent review of the course as taught, the Grade Appeal of Ms. Wright with the extensive complaint attached to it, and the response of Ms. Harris. (Book of Exhibits, Exhibit "K", p. 7.) Dean Lowe had an assistant contact two Masters level Nursing instructors from Wallace Community College in Dothan,

16

Alabama who taught the same course material that was taught in NUR 252. *Id.* Those two nurses went to Phenix City, Alabama and the campus of CVCC and reviewed Ms. Harris' file along with the Grade Appeal, Ms. Harris' response and other materials related to NUR 252. *Id.* These two nursing instructors expressed in writing their opinion that Ms. Wright's grade should not be changed and that Ms. Wright should receive a failing grade in NUR 252. (Book of Exhibits, Exhibit "K", Attachment "9", CVCC00357.)

Dean Lowe considered all of the material available to him with regard to Ms. Wright's Grade Appeal in NUR 252 including the written opinion of the two nurses and concluded that there was no reason to change Ms. Wright's grade in that course and that the failing grade of "D" would stand. (Book of Exhibits, Exhibit "K", p. 7.) Dean Lowe notified Ms. Wright of his ruling in a letter dated January 17, 2006. (Book of Exhibits, Exhibit "K", p. 8.)

Ms. Wright did hire attorney Connie Cooper to assist her with this grade appeal. (Book of Exhibits, Exhibit "K",p. 6.) Ms. Cooper spoke with Dean Lowe on one occasion as confirmed in a letter to Dean Lowe from Ms. Cooper. (Book of Exhibits, Exhibit "K", Attachment "11.) Ms. Cooper's letter indicated that at the time she and Dean Lowe spoke, no decision regarding the ruling on Ms. Wright's grade appeal had been made by Dean Lowe. (*Id.*)

Ms. Wright would have been excluded from the Nursing Mobility Program and unable to reapply to the program at that time, based on the earned grades of "D" in both NUR 252 and NUR 271 pursuant to paragraphs 11 and 14 of the Nursing Mobility Program Academic Criteria set forth in the CVCC Catalog and Handbook. (Book of Exhibits, Exhibit "A", CVCC000110). However, after the appeal process, because the failing grade she

17

earned in NUR 271 was administratively changed, Ms. Wright's transcript reflected that she had only failed one nursing course. Ms. Wright, therefore, remained in the ADN program and moved forward with her class to the spring 2006 semester as a result of CVCC's generous ruling in her favor on the basis of a technical point. (Book of Exhibits, Exhibit "K", p. 8.)

One failure alone in the Nursing Program is not held against a student for purposes of graduating if that student successfully repeats the course failed and successfully completes the remaining course requirements of the Nursing Program. (Book of Exhibits, Exhibit "A", CVCC000109-110.) Nursing Program policy required that Ms. Wright retake NUR 252 and make a passing grade in the course. (Book of Exhibits, Exhibit "A", CVCC000110, ¶ 13; and Exhibit "T".) Ms. Wright had failed to satisfactorily complete the course work in NUR 252 and, having lost her grade appeal on that course, had to complete and receive academic credit for the substance of this course work before she could receive an Associate's Degree in Nursing from CVCC. (Book of Exhibits, Exhibit "A", CVCC000110; Exhibit "K", p. 8; and Exhibit "M", 144:22-145:18.)

However, due to a statewide curriculum change for all Nursing Programs, NUR 252 would not be offered as a course again at CVCC or any other Alabama State Education Institution. (Book of Exhibits, Exhibit "K", pp. 8-9.) In other words, the Nursing curriculum and course of study would be the same at every college or university where nursing was taught. (Book of Exhibits, Exhibit "M", 93:1-96:14.) One of the changes in the new curriculum that was being implemented at CVCC in the Fall of 2006, involved the termination of the course NUR 252. (*Id.*) The design of the new curriculum was different from the design of the curriculum being taught at CVCC at the time Ms. Wright attended

18

CVCC. (*Id.*) For that reason, NUR 252 was obsolete after December 2005 and would not be taught again. (*Id.*)

Therefore, Dean Lowe and Dixie Peterson decided to allow Ms. Wright to take a new course that students would typically take in preparation for the Associate Degree in Nursing Program using the new curriculum. (Book of Exhibits, Exhibit "K", pp. 8-9.) This course was NUR 200. It was well-suited to be a substitution course for the now obsolete NUR 252 because it could be adapted by the instructor to fit and to teach the same or similar course material as the material studied in NUR 252. (Book of Exhibits, Exhibit "M", 143:7-145:18.) Ms. Wright was advised of this decision in early January 2006. (Book of Exhibits, Exhibit "K", p. 9.)

Ms. Wright testified that she met with Dean Lowe and Dixie Peterson regarding her failure of NUR 252 and the fact she had to repeat the course content of NUR 252. (Book of Exhibits, Exhibit "L", 147:5-20.) Ms. Wright explained that she was told that because NUR 252 was no longer being offered, she was being offered NUR 200 as a substitute. (*Id.*) She also stated regarding her understanding of this meeting that the D she earned in NUR 252 would not come off her transcript, but that it would not be held against her. (*Id.*)

Dean Lowe officially approved the substitution of NUR 200 for NUR 252. (Book of Exhibits, Exhibit "K", p. 9.) Dixie Peterson asked Lynn Harris to use NUR 200 as a course platform and to structure NUR 200 to comport with the content of NUR 252 so that NUR 200 would be Ms. Wright's "repeat" of NUR 252 so that Ms. Wright's had the opportunity to progress in the ADN program. (Book of Exhibits, Exhibit "J", p. 11.) Therefore, in the

19

Spring semester 2006, Ms. Wright took NUR 200 with the other student who had failed NUR 252 under Ms. Harris. (*Id.*)

Ms. Wright made an "A" in NUR 200. (*Id.*)

In the Spring Semester of 2006, Ms. Wright was also enrolled in NUR 272 which was taught by Ms. Harris. (*Id.*)

NUR 272 was a the course on Pediatric Nursing. (*Id.*)  The focus of NUR 272 was to provide students with a "family-centered approach to the nursing care of children through adolescence." (Book of Exhibits, Exhibit "E" and Exhibit "J".)  The Course Syllabus for NUR 272 was written by Lynn Harris.  It listed seventeen course competencies that were necessary for students to master. (*Id.*)  The Syllabus for NUR 272 also set forth the evaluation methods in which Ms. Harris would be evaluating the competency of the students.    Students were evaluated by written examinations, clinical performance evaluations, written assignments, clinical nursing care plans, and class participation. (Book of Exhibits, Exhibit "E", Wright00065).

There were a possible 1000 points available to the students in NUR 272 to receive throughout the course of the semester. (Book of Exhibits, Exhibit "E", Wright00066.)  A student had to receive at least 750 points in order to pass the course. (*Id.*)  A student receiving 749.9 points or less failed the course. (*Id.*)

Ms. Wright failed three of her unit tests/exams given throughout the semester. (Book of Exhibits, Exhibit "J", p. 12.)  The tests/exams were multiple choice and students recorded their answers on Scantron Sheets.  The Scantron sheets were then graded by Scantron machine. (*Id.*)

In addition to her tests, Ms. Wright also completed computer programs, a teaching project and two care plans. Ms. Wright's performance on these assignments also were calculated in her final grade. (*Id.*)

The Care Plans required by Ms. Wright and the other students were done in the clinical setting, not classroom setting. (Book of Exhibits, Exhibit "J", p. 13.) Each student was assigned a clinical instructor who assisted the students and reviewed them in a clinical setting at a medical facility so that the student could get hands-on experience. (*Id.*) Each student was required to prepare two Care Plans in NUR 272. (*Id.*) A Care Plan is an assessment of a patient's condition and short term and long term needs. (*Id.*) After assessing a patient in a clinical setting, the student would determine the patient's problem areas and establish goals for that particular patient's care. (*Id.*) The student would also determine specific interventions for that patient so that patient could meet the established patient goals. (Book of Exhibits, Exhibit "J", p. 14.) The clinical instructor would also assess the patient. (*Id.*) Based on the Clinical instructor's assessment of the patient, the clinical instructor then would provide an evaluation and give the student a grade on the student's care plan. (*Id.*)

Ms. Wright prepared two Care Plans for NUR 272.(*Id.*) On her first Care Plan, she received only 7 points out of the possible 25 points available. (*Id.*) On her second Care Plan, she received 20.1 points out of the possible 25 points available. (*Id.*) Ms. Wright and the other students in NUR 272, were given the opportunity by the clinical instructors to "redo" their Care Plans if they chose. (*Id.*) Students had to redo their Care Plans prior to the final examination. (*Id.*) Ms. Wright chose to "redo" her first Care Plan in which she had

only received 7 of the 25 points available. (*Id.*)  On her "redo", Ms. Wright received 20 points.  She chose not to redo her second Care Plan. (*Id.*)

Ms. Wright took her final examination in NUR 272 on May 10, 2006. (Book of Exhibits, Exhibit "J", p. 13.)  The final examination consisted of two parts, Part A and Part B.  The final was multiple choice, the students recorded their answers to the questions on the final on a Scantron sheet, and the Scantron sheet was then graded the same day with the Scantron machine. (*Id.*)

Throughout the semester and prior to the final examination in NUR 252, Ms. Harris provided Ms. Wright and all the other students in this class with their grades.  Prior to the final, Ms. Wright had failed three of her four unit tests and only accumulated a total of 565.53 points of the possible 1000 points available.  As stated before, a student had to have 750 points to pass the course.

Ms. Wright received the following number of points throughout the semester:

|  | Points Received By Ms. Wright | Total Number of Possible |
|---|---|---|
| Exam I | 96.87 | 150 |
| Exam II | 120.65 | 150 |
| Exam III | 104.79 | 150 |
| Exam IV | 103.12 | 150 |
| Computer Assignments | 50.00 | 50 |
| Teaching Project | 50.00 | 50 |
| Care Plan I | 20.00 | 25 |
| Care Plan II | 20.10 | 25 |
| Final Examination | 181.72 | 250 |
| Total | 747.25 | 1000 |

22

(Book of Exhibits, Exhibit "J", p. 13.)  Ms. Wright only received 181.72 points on her final examination. (*Id.*)  This gave Ms. Wright a total of 747.25 points for the semester, which was not enough for her to pass the course. (Book of Exhibits, Exhibit "J", p. 14.)

After learning that she failed the final examination and the course, Ms. Wright forwarded a letter to Lynn Harris requesting that Ms. Harris re-grade her Care Plans. (Book of Exhibits, Exhibit "J", p. 15 and Attachment "7".)  Ms. Harris considered Ms. Wright's request; however, it was Ms. Harris professional judgment not to re-grade these Care Plans because Ms. Wright had the opportunity, as all other students did, to "redo" both of her Care Plans prior to the final examination. (Book of Exhibits, Exhibit "J", pp. 15-16.) Moreover, Ms. Wright had failed three of her unit tests and final exam.  Based on this, it was Ms. Harris' professional judgment as Ms. Wright's instructor that Ms. Wright's overall grade of "D" in NUR 272 was "appropriate and commensurate with Ms. Wright's understanding and grasp of the course materials and their application." (*Id.*)

After failing NUR 272 in the Spring of 2006, Ms. Wright now had two failing grades on her transcript.  The course substitution of NUR 200 for NUR 252 only allowed Ms. Wright to repeat the course materials of NUR 252 as required by the Nursing Admissions Criteria.  It did not remove the failing grade of Ms. Wright from her transcript. (Book of Exhibits, Exhibit "K", p. 9.) The failing grade made by Ms. Wright in NUR 252 remained on her transcript and was considered one failure of a course for purposes of determining compliance with CVCC ADN graduation consideration. (Book of Exhibits, Exhibit "H" and Exhibit "K", p. 9.) Ms. Wright's failure of NUR 272 was her second failure. (Book of Exhibits, Exhibit "K", p. 11.)

According to the nursing academic policies that were in effect at the time, Ms. Wright would be excluded from the program unless, once again, she appealed NUR 272 and won the appeal. (Book of Exhibits, Exhibit "K", 11.)   Ms. Wright did not file a formal appeal in NUR 272. (*Id.*)

On May 19, 2006, Ms. Wright hand-delivered a request for course forgiveness to Dean David Hodge. Her letter stated: "The student handbook states, 'if [sic] a student repeats the [sic] course, the last grade awarded [sic] replaces the previous grade earned."[3] (Book of Exhibits, Exhibit "H".)

Dean Hodge met with Ms. Wright who discussed her request for course forgiveness regarding NUR 252. (*Id.*)   Dean Hodge discussed the general subject of "course forgiveness" with Ms. Wright, as he was not familiar with her specific situation at that time. (*Id.*)

Course forgiveness is defined as follows:

"If a student repeats a course, the last grade awarded (excluding grades of W) replaces the previous grade *in the computation of the cumulative grade point average.*" (emphasis added).

(Book of Exhibits, Exhibit "A", CVCC 000055.)   Dean Hodge pointed out that Ms. Wright incorrectly stated the "Course Forgiveness Policy" in that she failed to quote that it only

---

[3]Ms. Wright referred to the Course Forgiveness policy in the 2005-2006 Handbook.  The 2004 Handbook was applicable to Ms. Wright because she entered the Nursing Program seeking an Associate Degree in the Nursing Program in May of 2005 which was the summer semester of 2004/2005 academic year.  Book of Exhibits, Exhibit "H", pp. 2 - 3.  However, the Course Forgiveness policy contained in the 2004/2005 Student Catalog and Handbook (Book of Exhibits, Exhibit "A", p. 47) is identical to the 2005/2006 Course Forgiveness policy incompletely quoted by Ms. Wright in her letter to Dean Hodge.  See attachment to Hodge Affidavit contained in Book of Exhibits, Exhibit "H", Attachment "_", Bates I.D. CVCC _____.

affected the cumulative grade point average. (Book of Exhibits, Exhibit "H", p. 4.) "Course

forgiveness" relates only to the manner in which the grade earned on the student's second

attempt at a failed course would be viewed for GPA purposes.  Moreover, the policy of

"Grade Reports and Grade Point Averages" also clearly states:

> "Once grades have been recorded, they cannot be expunged from the
> student's permanent record."

(Book of Exhibits, Exhibit "A", CVCC000052 and Exhibit "H", p. 4.)  Course forgiveness

does not "erase" a failed course from a student's transcript.  (Book of Exhibits, Exhibit

"A",CVCC000052; Exhibit "L", 169:13-21; and, Exhibit "H", p. 3.)

After Dean Hodge's initial review, Ms. Wright was not granted course forgiveness

for purpose of NUR 252.   Because Ms. Wright did not qualify for graduation because of

her two failing grades, the issue of Course Forgiveness was not pursued. (Book of Exhibits,

Exhibit "H", p. 6.)

Because Ms. Wright had two failed courses, CVCC policy required that she be

excluded from the nursing program.  Accordingly, Ms. Wright was, therefore, excluded.

After being excluded from the nursing program, Ms. Wright filed this action.  She

alleges that Defendants violated her Fourteenth Amendment Due Process Rights as

guaranteed by federal law, particularly 42 USC §1981 and §1983, Alabama contract and

tort laws and that Defendants engaged in a civil conspiracy against her.  In support of her

claims, she alleges that other Chattahoochee Valley nursing students, whom she believes

also failed courses and had "similar" academic experiences to those she had, were given

special and/or preferential treatment allowing them to continue in the program and

graduate.

**ARGUMENT**

## CHATTAHOOCHEE VALLEY COMMUNITY COLLEGE, AN AGENCY OF THE STATE OF ALABAMA, IS PROTECTED FROM SUIT BY ABSOLUTE OR SOVEREIGN IMMUNITY

Chattahoochee Valley Community College ("CVCC") is a State Junior College, managed and controlled pursuant to §16-60-110 *Code of Alabama* (1975) through §16-60-114, *Code of Alabama* (1975). (Exhibit "F," Affidavit with Attachments of Bradley Byrne.) CVCC is entitled to absolute immunity under Alabama law. *Ex Parte Troy University and Dr. Cameron J. Martindale,*2006 So. 2d 1051318 (Ala. Dec. 22, 2006); *Shoals Community College and Dr. Larry McCoy v. John T. Collagross,* 674 So. 2d 1311; (1995 Ala. Civ. App.); *Williams v. John C. Calhoun Community College,* 646 So. 2d 1 (Ala. 1994).

Article I, Section 14, of the Alabama Constitution of 1901 provides that, "the State of Alabama shall never be made a defendant in any court of law or equity." The Alabama Supreme Court has recognized that, "the wall of immunity erected by Section 14 is nearly impregnable and bars (1) claims against the State, (2) claims against a State agency, (3) claims against a State official or employee sued in his official capacity as agent for the State, and (4) claims against a State official or employee sued in his individual capacity." *Ex Parte Davis,* 930 So. 2d 497 at p. 500 (Ala. 2005). These four categories of application of Section 14, however, are stated quite broadly and require further explanation. There is no doubt that the State of Alabama is absolutely immune from suit for any theory of action in tort or contract under State law. There are four categories of matters, however, that have historically been listed as areas where the State is subject to suit. None of those categories comport with the allegations in the instant case. In *Milton v. Espey,* 356 So. 2d

26

1201 (Ala. 1978), the court discussed and quoted *Aland v. Graham,* 250 So. 2d 671 (Ala.

1971) which sets forth these four categories as follows:

> "Without professing to cover every situation that has arisen, there are four
> general categories of action that we have held do not come within the
> prohibition of Sec. 14. (A) Actions brought to compel State officials to
> perform their legal duties. *Department of Industrial Relations v. West
> Boylston Manufacturing Co.,* 253 Ala. 67, 42 So. 2d 787; *Metcalf v.
> Departmetn of Industrial Relations*, 245 Ala. 299, 16 So. 2d 787. (2) Actions
> brought to enjoin State officials from enforcing an unconstitutional law.
> *Glass v. Prudential Insurance Co. Of America,* 246 Ala. 579, 22 So. 2d 13;
> *Southall v. Stricos Corp.,* supra. (3) Actions to compel State officials to
> perform ministerial acts. *Curry v. Woodstock Slag Corp.,* 242 Ala. 379, 6 So.
> 2d 479, and cases there cited. (4) Actions brought under the Declaratory
> Judgments Act, Tit. 7, §156 *et seq, Code* 1940, seeking construction of a
> statute and how it should be applied in a given situation. *Curry v. Woodstock
> Slag Corp.,* supra, and cases there cited." 287 Ala. at 229-230, 250 So. 2d
> at 679.

The *Aland* case does not purport to list all categories of cases that do not fall within

the prohibition of Section 14. In *Unzicker v. State,* 346 So. 2d 931 (Ala. 1977), this court

observed that:

> "While the State itself may not be made a party to such action, it does not
> necessarily follow that its officers, Ray Bass, Claude Kelley and Governor
> Wallace, in their respective capacities, are also immune. The essence of
> plaintiffs' complaint is that these officers of the State acted fraudulently, in
> bad faith, *beyond their authority,* or acted under a mistaken interpretation of
> the law. Such allegations bring this case within those not protected by
> Section 14 of the Constitution. *Wallace v. Board of Education of
> Montgomery Co.,* 280 Ala. 635, 197 So. 2d 428 (1967); *Engelhardt v.
> Jenkins,* 273 Ala. 352, 141 So. 2d 193 (1962); *Finnell v. Pitts,* 222 Ala. 290,
> 132 So. 2 (1930)." (Emphasis added.) (*Unzicker* was not a suit for damages
> against these State officials.)

Section 14 does not necessarily immunize State officers or agents from individual

civil liability. See also *B. McCrary Co. v. Phillips,* 222 Ala. 117, 130 So. 805 (1930) and

*Elmore v. Fields,* 153 Ala. 345, 45 So. 66 (1907).

27

The case law is clear, however, that the State does have absolute or sovereign immunity from suit, unless the suit is to obtain relief pursuant to the above exceptions, all of which are equitable in nature.   The State cannot be sued in tort for damages, irrespective of allegations of malice or intent.  Therefore, CVCC, being an agency of the State, should be granted Summary Judgment in this matter.

## IMMUNITY OF STATE OFFICIALS AND EMPLOYEES

A.     DR. LAUREL BLACKWELL - Dr. Laurel Blackwell is the President of Chattahoochee Valley Community College and at all times material to this case was the President of the college.  Dr. Blackwell had almost no involvement in this matter and the very slight involvement by her was in the line and scope of her employment and in good faith. (Exhibit "I," Affidavit of Laurel Blackwell with Attachment.)  Laurel Blackwell has been sued in her official and in her individual capacities.  Dr. Blackwell's primary responsibility is to provide direction to the institution and to ensure that policy and procedure established by the State Board of Education and the Chancellor are implemented.  (Blackwell Depo., page 12, lines 12 - 19.)  The only time she spoke with or met with the Plaintiff in this case was one day when Lindy Wright appeared without an appointment and asked to see Dr. Blackwell.  (Wright Depo., page 168, lines 1 - 9.)  Dr. Blackwell spoke with her, and according to Ms. Wright, Dr. Blackwell told Ms. Wright, "she had nothing to do with academics, that it was their decision, and that was the extent of that."   Additionally, Dr. Blackwell responded to a letter from a lawyer named Connie Cooper representing Ms. Wright.  The letter from Ms. Wright's lawyer was dated June 7, 2006. (Exhibit "U," CVCC 000388 - 000390.) Dr. Blackwell's response was dated June 13, 2006. (Exhibit "V," CVCC 000420 - 000424.)  The information provided in Dr. Blackwell's response was obtained

28

from staff and faculty members. Dr. Blackwell's entire involvement in this matter was a very brief meeting with Ms. Wright, where no substantive conversation occurred, and Dr. Blackwell's June 13, 2006 letter. Dr. Blackwell subsequently received a letter from another lawyer for Ms. Wright, but she hired counsel to respond.

While there is no valid theory of liability relative to Dr. Blackwell, Dr. Blackwell should be afforded absolute immunity with the State of Alabama as to any and all tort claims for damages. State agents enjoy absolute immunity from suit in their official capacities when a result favorable to the Plaintiff would directly affect a contract or property right of the State. *Milton v. Espey,* 356 So. 2d 1201 (Ala. 1978); *Ex Parte Troy University and Dr. Cameron J. Martindale,* 2006 So. 2d 1051318 (Ala. 2006).

Therefore, in order to determine whether Dr. Blackwell is entitled to immunity here, we must determine whether a favorable result to the Plaintiff would directly affect a contract or property right of the State. These Defendants respectfully submit to the Court that any Judgment in favor of Ms. Wright would adversely affect the property rights of this State agency, Chattahoochee Valley Community College, and the property rights of the State of Alabama itself. Any finding for the Plaintiff erodes CVCC's and the State's academic freedom to make these vital decisions concerning whether a student should or should not graduate from a professional school, like a school of nursing. It is the faculty of the college, the college and the State who have the responsibility and the corresponding right to protect its citizens and to perform these functions. It is the faculty and the college who are charged with and have the right to protect the academic freedom and integrity of the school.

This becomes doubly important when considering the fact that the State of Alabama defines nursing as a profession and the fact that the State has developed an elaborate design for the protection of the public and for assuring safe and effective medical care through well-educated and qualified nurses. Section 34-21-1, *et seq., Code of Alabama* (1975), establishes the Alabama Board of Nursing. Section 34-21-1(3), *Code of Alabama* (1975), makes the following statement, "Nursing is a profession. . ." Two different levels of nursing are defined, including professional nursing and practical nursing. Professional nursing is the type of nursing Lindy Wright would currently be practicing if she had passed the requirements of CVCC <u>and</u> the licensure examination given by the State Board of Nursing. Ms. Wright was already a Licensed Practical Nurse at the time she entered CVCC for the purpose of participating in the Nursing Mobility Program and obtaining an Associate Degree in Nursing (ADN). A requirement of the ADN Program is that a candidate must already be a Licensed Practical Nurse.

Section 34-21-5, *Code of Alabama* (1975), sets forth the Alabama law with regard to Nursing Educational Programs [Exhibit "W," Section 34-21-1-34-21-7, *Code of Alabama* (1975.) The State Board of Nursing, pursuant to these Code provisions, oversees nursing schools in the State, including CVCC, which must meet certain Board of Nursing standards. (Exhibit "M," Peterson Depo., pages 10 - 15; p. 52, lines 12 -18.) Attached hereto is a copy of the Alabama Board of Nursing Regulation, Chapter 610-X-3, entitled "Nursing Education Programs". (Exhibit "X") These regulations apply to CVCC's Nursing Program. In addition to these regulations, the CVCC Nursing Program must comply with the requirements of the State Board of Education as per the statute which is referenced

in the Affidavit of Bradley Byrne, Chancellor, PostSecondary Education, which are Section 16-60-110, *Code of Alabama* (1975) through Section 16-60-114, *Code of Alabama* (1975). (Exhibit "F.")

The United States Supreme Court in *Regents of the University of Michigan v. Ewing,* 474 US 214 (1985), deals with the academic dismissal of a student. The student contested this dismissal based upon academic grounds and the case was ultimately considered by the Supreme Court. The Court discussed the ramifications of injecting itself into the academic arena making the following observation:

> "Added to our concern for lack of standards is a reluctance to trench on the
> prerogatives of state and local educational institutions and our responsibility
> to safeguard their academic freedom, 'a special concern of the First
> Amendment.'" *Keyishian v. Board of Regents,* 285 US 589 (1967); *Regents*
> *of the Univ. of Michigan v. Ewing,* 474 U.S. 214 (1985).

The Alabama courts, while stating this right of States and State institutions of higher learning somewhat differently, still appear to recognize this vital interest in the academic freedom of its colleges. The case of *Mustel v. Rose,* 211 So. 2d 489 (Ala. 1968) in considering a student's challenge to academic dismissal from the Medical College of the University of Alabama makes the following statement,

> "The effect of these decisions is to give the school authorities absolute
> discretion in determining whether a student has been delinquent in his
> studies, and to place the burden on the student of showing that his dismissal
> was motivated by arbitrariness, capriciousness or bad faith."

> "The reason for this rule is that, in matters of scholarship, the school
> authorities are uniquely qualified by training and experience to judge the
> qualifications of a student, and efficiency of instruction depends in no small

31

degree upon the faculty's freedom from interference from other noneducational tribunals. It is only when the school authorities abuse this discretion that a court may interfere with their decision to dismiss a student."

"The rule of judicial nonintervention in scholastic affairs is particularly applicable in the case of a medical school. A medical school must be the judge of the qualifications of its students to be granted a degree; courts are not supposed to be learned in medicine and are not qualified to pass opinion as to the attainments of a student in medicine."

The same considerations apply with respect to a Nursing Educational Program. Therefore, a decision in favor of the student in this matter would adversely affect the rights of this State Agency, CVCC, and the State itself with regard to their right to First Amendment Academic Freedom and the ability, therefore, to make vital decisions about students. Property can be both tangible and intangible. In this situation, it is an intangible property interest in the ability to have professionals in this Nursing Program use their professional judgment in assuring the quality of graduates. Absolute immunity should apply to Dr. Blackwell in her official capacity because this case fits the model for its application.

These same considerations allow for the application of absolute immunity with respect to Dr. James Lowe, Dean of Instruction, in his official capacity, and Mrs. Dixie Peterson, Division Chair of Health Sciences and head of the Nursing Program at CVCC. All individuals sued in this case in their official capacities enjoy absolute immunity with regard to State law tort actions. The Alabama Supreme Court in the recently decided case of *Ex Parte Walley,* 950 So. 2d 1172 (Ala. 2006), made the following statement,

"Regarding immunity for State officers who are sued in their official capacities, this Court has held that the wall of immunity 'erected by Section 14 is nearly impregnable.'" *Patterson v. Gladwin Corp.,* 835 So. 2d 137 (Ala. 2002).

32

## STATE OFFICIALS SUED IN THEIR INDIVIDUAL CAPACITY

The case of *Ex Parte Cranman*, 792 So. 2d 392 (Ala. 2000) has clarified the Rule

with regard to the immunity of a State agent or officer who has been sued in a civil case

in a personal capacity.  The case makes the following statement,

"We therefore restate the rule governing State-agent immunity:

[4] A State agent *shall* be immune from civil liability in his or her personal
capacity when the conduct made the basis of the claim against the agent is
based upon the agent's

(1) formulating plans, policies, or designs; or

(2) Exercising his or her judgment in the administration of a department or
agency of government, including, but not limited to, examples such as:

    (A) making administrative adjudications;
    (b) allocating resources;
    (c) negotiating contracts;
    (d) hiring, firing, transferring, assigning, or supervising personnel; or

(3) discharging duties imposed on a department or agency by statute, rule,
or regulation, insofar as the statute, rule, or regulation prescribes the manner
for performing the duties and the State agent performs the duties in that
manner; or

(4) exercising judgment in the enforcement of the criminal laws of the State,
including, but not limited to, law-enforcement officers' arresting or attempting
to arrest persons; or

(5) exercising judgment in the discharge of duties imposed by statute, rule
or regulation in releasing prisoners, counseling or releasing persons of
unsound mind, or educating students.

[5] Notwithstanding anything to the contrary in the foregoing statement of the
rule, a State agent *shall not* be immune from civil liability in his or her
personal capacity

(1) when the Constitution or laws of the United States, or the Constitution of this
State, or laws, rules or regulations of this State enacted or promulgated for the
purpose of regulating the activities of a governmental agency require otherwise; or

33

(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."

Therefore, in accordance with the rules set forth above, Dr. Blackwell, Dr. Lowe and Mrs. Peterson are entitled to State Agent immunity in accordance with the *Cranman* case, supra., for the following reasons:

1.      They were <u>exercising their judgment</u> in the administration of a department or agency of government.

2.      They were making <u>administrative adjudications</u>.

3.      They were discharging their duties imposed on a department or agency by statute, rule or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the <u>State Agent performs the duties in that manner</u>.

4.      They were <u>exercising judgment in the discharge of their duties</u> imposed by statute, rule or regulation <u>in . . . educating students</u>.

The exception to the applicability of State Agent immunity to these individuals in their personal capacities does not apply here.  The Plaintiff says that these Defendants fall within the exception below:

"When the State agent acts willfully, maliciously, fraudulently, in bad faith,

beyond his or her authority or under mistaken interpretation of law."

In no way, however, does the evidence in this case support a finding or create an issue of fact concerning conduct by the three individuals sued that would constitute willfulness, maliciousness, fraud, bad faith, action beyond authority or under mistaken interpretation of law.  The three individual Defendants in their personal capacity should be granted Summary Judgment.

34

## THE DUE PROCESS RIGHTS OF THE PLAINTIFF WERE NOT VIOLATED

Count I of the Complaint seeks to state a cause of action pursuant to 42 USCA 1983 to the effect that CVCC, Dr. Blackwell, Dr. Lowe and Mrs. Peterson violated Ms. Wright's due process rights. Assuming that Ms. Wright does have substantive due process rights under the 14th Amendment with regard to her continued attendance in school at CVCC, there were no due process rights violated and Ms. Wright received quite adequate procedural due process with regard to her grades and other academic work at CVCC. In fact, Ms. Wright failed two courses in the Nursing Program in the fall semester of 2005 and filed grade appeals with regard to those courses. Ms. Wright received correspondence from Dixie Peterson dated December 20, 2005, (Exhibit "Y," CVCC 000381), advising Ms. Wright that she was excluded from the Nursing Program because she had failed two nursing courses. Ms. Wright had notice of the fact that she was no longer a student at CVCC on December 20, 2005 for the very reason she was later excluded on a final basis in May 2006.

Ms. Wright submitted grade appeals in December 2005 and the process of the grade appeal continued through January 23, 2006, at which time Dean Lowe sent a letter to Ms. Wright officially advising her that he had ruled in her favor on the grade appeal in NUR 271. The rulings by Dean Lowe on the grade appeals were split. The grade of "D," which is a failing grade in the Nursing Program, was not changed in NUR 252 based upon the evidence reviewed. Ms. Wright's failing grade of "D" in NUR 271 was changed to a "C" as per Dean Lowe's letter to Ms. Wright of January 23, 2006. The reason for this grade change was Dean Lowe's inability to obtain pertinent information from the instructor, Tawyna Cash, that would allow for a review by him of the merits of that grade appeal.

35

Therefore, Dean Lowe ruled in favor of Ms. Wright with regard to NUR 271 on a technicality, not on the merits of Ms. Wright's work.

This ruling regarding the change of the grade in NUR 271 allowed Ms. Wright to register for the spring semester 2006 and, potentially, complete the nursing curriculum and graduate with her class. Ms. Wright spoke with Dixie Peterson and Dean Lowe about retaking NUR 252 because the Nursing Program requires that a failed course be retaken so the student can learn the subject matter of that course and, thereby, be better able to know and apply the material in the clinical setting. Because the State nursing curriculum was being standardized and changed and NUR 252 would no longer be available, Dixie Peterson asked Lynn Harris, Ms. Wright's instructor in NUR 252, to retool NUR 200 to fit the material in NUR 252. Ms. Wright was awarded the grade of "A" by Ms. Harris in NUR 200. Unfortunately, however, Ms. Wright did not pass NUR 272, Pediatrics. Lynn Harris was the teacher of NUR 272. Ms. Wright asked Ms. Harris to regrade or review her clinical Care Plans. Ms. Harris ultimately determined that Ms. Wright did not have an adequate grasp of the subject matter for her to pass the course and, therefore, Ms. Harris did not change the failing grade of "D" to a passing grade of "C" in NUR 272. This gave Ms. Wright two failed nursing courses and she was, again, excluded from the program.

Ms. Wright says that she attempted to make plans to retake NUR 272 because she had heard that a course was being created so those who failed NUR 272 in the spring of 2006 could take a course in summer 2006 that would qualify as the retaking and passing of the substantive material in NUR 272. Lynn Harris was teaching such a course for students who failed NUR 272 in the spring of 2006. However, because Lindy Wright had failed two nursing courses, she could not register for it. She had been excluded from the

36

nursing school because of two failures.  Ms. Wright did not file a grade appeal with Dean
Lowe on NUR 272.

In the case of *The Board of Curators of the Univ. of Missouri, et al., v. Horowitz*, 435
US 78 (1977), the plaintiff was not allowed to graduate from medical school because of the
faculty's dissatisfaction with her clinical performance.  The faculty also was dissatisfied with
the plaintiff's appearance and patient relations, personal hygiene and ability to accept
criticism.  A letter was provided to the plaintiff in this regard from the faculty.  The plaintiff
advanced to her last year of medical school on a probationary status.  Ultimately, the
plaintiff was dismissed from medical school because of her failure to meet academic
standards.

The court in *Horowitz* did not determine that the plaintiff had either a property or a
liberty interest in continued attendance or enrollment at school.  Instead, the court
assumed the substantive due process right and determined that the plaintiff had received
all of the procedural due process to which she was entitled in an academic-related matter
decided by the college that she was attending.  The court in *Horowitz* found that, not only
did the plaintiff receive procedural due process, but that, in fact, the school went beyond
the requirements of procedural due process by affording the plaintiff an opportunity to be
examined by seven independent physicians in order to be absolutely certain that their
grading of the respondent in her medical skills was correct.

In the instant case, Ms. Wright filed two grade appeals and lost only one of them.
With regard to NUR 252, the grade appeal that she lost, Dean Lowe had two nursing
instructors from Wallace Community College in Dothan come to Phenix City and review all
of the material necessary to their giving an opinion as to whether Ms. Wright had been

37

graded fairly. These two instructors found that she had indeed been graded fairly. In all other respects, the grade appeal process was handled in accordance with the procedural policy of the school and carefully and deliberately by the individuals handling this process. Ms. Wright was afforded procedural due process with regard to NUR 252 and, actually, more procedural due process than required.

Ms. Wright appealed her grade in NUR 271 and was given a passing grade because the instructor did not provide Dean Lowe material for his review in making a decision on the grade appeal. Her grade was changed from a failing grade of "D" to a passing grade of "C". One is tempted to think that perhaps Ms. Wright was afforded, not just due process, but grace in the changing of her NUR 271 grade from "D" to "C". This amounted to a considerable windfall for Ms. Wright.

In *Regents of the Univ. of Michigan v. Ewing*, 474 US 214 (1985), the court considered another academic decision made by a faculty regarding a student. Again, the decision of the faculty was adverse to the student. The Ewing court, like the Horowitz court, honored the school's decision. In this case, the court considered the dismissal of Scott Ewing from the University of Michigan. Mr. Ewing failed an important written examination. The school refused to allow him to retake it. The question decided by the court was whether the University's action deprived Ewing of property without due process of law because of its refusal to allow him to retake the examination. The court considered whether this refusal was an arbitrary departure from the University's past practice. The U.S. Court of Appeals held that Mr. Ewing's constitutional rights were violated. The United States Supreme Court disagreed.

38

The Court described the process followed by the school in evaluating Mr. Ewing. Mr. Ewing was a medical student.

The Court found that the University's refusal to allow Ewing to retake the exam was not actionable in and of itself. The Court stated that Ewing must prove that his dismissal from school was the product of arbitrary State action. Therefore, the Court stated that the question at issue was whether the University acted arbitrarily in dropping Ewing without permitting a re-examination. The Court made the following statement in finding in favor of the University: "When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."

The Alabama Supreme Court in *Mustel v. Rose*, 211 So. 2d 489 (Ala. 1968), refused to reverse the decision of the Medical College of the University of Alabama in a similar academic matter, where the student sought equitable relief only, and not damages. The court distinguished between a dismissal for disciplinary reasons and a dismissal for academic reasons. The court stated that due process standards for the two were entirely different. In ruling in favor of the medical school, the court made the following statement,

> "The rule of judicial nonintervention in scholastic affairs is particularly applicable in the case of a medical school. A medical school must be the judge of the qualifications of its students to be granted a degree; courts are not supposed to be learned in medicine and are not qualified to pass opinion as to the attainments of a student in medicine."

> "In the absence of an improper motive, an academic dismissal must be such a substantial departure from accepted academic norms as to demonstrate that the faculty did not exercise professional judgment before it will be

39

overturned on substantive due process grounds." *Haberle v. University of Alabama,* 803 F.2d 1536 (11 CCA 1986)

There is no evidence of any improper motive with regard to Ms. Wright and there certainly is no substantial departure from accepted academic norms with regard to Ms. Wright's poor performance in nursing school and her ultimate failure of two courses causing her to be excluded from the program. To the contrary, Ms. Wright was given the benefit of any doubt when Dr. Lowe ruled in Ms. Wright's favor in NUR 271. Ms. Wright testified that Dixie Peterson told her that it was within Mrs. Peterson's discretion, based upon the failure of any written submission by Tawyna Cash, the instructor of NUR 271, to change the grade to a "C". (Exhibit "M," Peterson Depo, p. 82, lines 15-20.) Mrs. Peterson recommended this to Dr. Lowe and the grade was ultimately changed to a "C," allowing Ms. Wright to register for the spring semester 2006 and to potentially graduate. Without this action on the part of Dixie Peterson and Dr. Lowe, Ms. Wright would have been excluded from school in December 2005. Certainly, this is not improper behavior toward Ms. Wright.

Not only that, but Ms. Peterson, Dr. Lowe and Lynn Harris, Ms. Wright's instructor for NUR 252, allowed Ms. Wright to take NUR 200 as a substitute for NUR 252 in the spring of 2006. This gave Ms. Wright an opportunity to graduate with her class in May 2006. NUR 252 had been made obsolete by the new nursing curriculum. NUR 252 would not be taught again. Mrs. Peterson issued an email on January 17, 2006 explaining the course of action that would be taken with regard to course substitution for Ms. Wright. (Exhibit "M," Peterson Depo. Exh. 47.) This email completely explains the manner in which NUR 200 would be substituted for NUR 252. While the Admissions Office did not pick up on the need to make this substitution in May or June 2006 because Ms. Wright was

40

excluded from the Program, the Affidavit of Dean Hodge explains that this would have been taken care of if Ms. Wright had not failed NUR 272 and she had proceeded on to graduation. (Exhibit "H," Affidavit of Dr. David Hodge.)

Ms. Wright acknowledges that she failed NUR 272 in a May 19, 2006 letter to Dean Hodge. (Exhibit "H," Affidavit of Dean Hodge, Attachment 1.) In this May 19, 2006 letter to Dean Hodge, she requests "Course Forgiveness" for NUR 252 based upon her passing NUR 200. In this letter, Ms. Wright states that Mrs. Peterson offered NUR 200 to Ms. Wright as a substitution course and that Ms. Wright made an "A" in the course. Additionally, the last paragraph of this May 19, 2006 letter makes the following statement,

> "I have since finished the last semester of the Associate Degree of Nursing
> Program. Unfortunately, I earned a 'D' in Pediatric Nursing. I am asking for
> course forgiveness so that I can participate in a summer class to earn the
> credit to finish this program."

Ms. Wright acknowledges in this letter that she failed NUR 272, even though now she claims in her Complaint that Ms. Harris did not fulfill her duty to meet with Ms. Wright, go over exams and to regrade her Care Plans.

Additionally, in deposition, Ms. Wright admits that she did not even hear the term "Course Forgiveness" until sometime after she had failed NUR 272. (Exhibit "L," Wright Depo., page 146, lines 4-14.) This would have been in May 2006. Yet, on May 19, 2006, she took the "Course Forgiveness" request to Dean Hodge and gave it to him as though it had been the plan the entire time. In reality, Ms. Wright knew that NUR 252 would not come off of her transcript, even If she did pass NUR 200, its substitute. (Exhibit "L," Wright Depo., page 147, lines 8-16.)

41

On May 28, 2006, Ms. Wright sent two clinical care plans to Ms. Harris and asked Ms. Harris to regrade or review these plans. Ms. Wright had previously asked Dixie Peterson to "help her," but Mrs. Peterson told Ms. Wright that, while she would like to help her, she could not because Lynn Harris had been her instructor. Mrs. Peterson told Ms. Wright to go back to Ms. Harris. (Exhibit "M," Peterson Depo., page 100, line 21.) Ms. Harris determined that, on the basis of Ms. Wright's poor performance in NUR 272, her grade should not be changed and that a failing grade of "D" was the right grade. (Exhibit "J," Harris Affidavit.)

Ms. Wright was in possession of and had access to the CVCC Catalog and Handbook for the years 2004/2005 and the 2005/2006. (Exhibit "K.") All of the procedures of CVCC were explained in this Catalog. "Course Forgiveness" is clearly defined and does not have any relationship to erasing or expunging a grade in a course from a person's record. A person's academic record is not changed when "Course Forgiveness" is applied. (Exhibit "H," Affidavit of Dr. Hodge.)

Further, the Nursing Program, itself, had special and specific criteria which appear in the Catalog. Ms. Wright knew these requirements, including the fact that, in the Nursing Program, a "D" was a failing grade and that the failure of two nursing courses meant that the student would be excluded from the Nursing Program. In May 2006 when Ms. Wright failed NUR 272 and was excluded, the rule was that a student who flunked two courses in the Nursing Program could not reapply. However, the new curriculum changed this rule. Now a student is allowed to apply as a new student. (Exhibit "M," Peterson Depo.); (Exhibit "H," Hodge Affidavit, Attachment 7.) Ms. Wright can reapply at the appropriate time to CVCC.

42

The Plaintiff cannot and has not shown any basis for a claim that her due process rights have been violated. All Defendants should be granted Summary Judgment on this Count.

## THE DEFENDANTS ARE ENTITLED TO
## SUMMARY JUDGMENT AS TO ANY CLAIM UNDER SECTION 1981

The Plaintiff's second count seeks to state a cause of action under 42 USCA 1981. However, Section 1981 is reserved for lawsuits related to racial discrimination. The aim of Section 1981 when enacted was to deal specifically with issues of race. In 1991, Congress did make certain amendments to Section 1981 and certain other civil rights statutes, however, none of the amendments changed the focus of 1981 with regard to the fact that Section 1981 relates to race.   See 42 USCA 1981.

Additionally, the language of Count II of the Complaint refers to "conspiracy". The Complaint makes no reference to any federal conspiracy statute. Therefore, the count appears to be a count filed pursuant to the Alabama common law of conspiracy. Alabama conspiracy law does not support a cause of action based upon the facts of this case. The Plaintiff avers that the Defendants, acting under color of law, custom, regulation or usage of the State of Alabama conspired to deny the Plaintiff the right to make and enforce contracts as a full-time student at CVCC, presumably, in violation of Section 1981. Of course, Section 1981 does not support a cause of action in this case. Race discrimination is not alleged. Further, a conspiracy cannot exist in the absence of an underlying tort. *Willis v. Parker,* 814 So. 2d 857 (Ala. 2001). Paragraph 41 on page 9 of the Complaint makes the allegation that, "the Defendants engaged in a civil conspiracy to deny her a nursing degree, and that her ability to make and enforce contracts at CVCC pursuant to

43

42 USCA 1981 was impaired under color of law, regulation, custom and usage of the State of Alabama." As previously stated, however, Section 1981 does not apply to this case. Therefore, conspiracy cannot apply regarding an alleged violation of §1981.

"Liability for civil conspiracy rests upon the existence of an underlying wrong and, if the underlying wrong provides no cause of action, then neither does the conspiracy." *Jones v. BP Oil Co., Inc.,* 632 So. 2d 435 (Ala. 1993). In *Jones,* supra., the plaintiffs sued over the death of a teenage boy who was killed in an automobile accident. A vehicle driven by a teenager who had been given beer purchased by a friend hit the car being driven by the deceased. The underlying theories of action included a Dram Shop Act and negligence. The court ruled that no Dram Shop Act case could be made. The court determined there was no direct sale of alcohol to the driver and that the statute did not apply because there was no evidence that the BP Oil employee who sold the beer was aware that the beer purchased by Kelly would be shared with another minor.

Additionally, with regard to the negligence count in the above case, the court stated that Alabama has refused for over a century to recognize an action based on negligence in the distribution of alcohol. Therefore, because neither of the two torts pled by the plaintiffs in *Jones,* supra., were valid causes of action, the conspiracy theory pled by the plaintiffs was also dismissed. The court stated that, "Conspiracy rests upon the existence of an underlying wrong." In the instant case, as has been demonstrated, there has been no underlying wrong.

With regard to Count II, counsel for the Defendants feels compelled to note that paragraph 37 of the Complaint is inserted in the Complaint in such a way that it appears Dr. Blackwell wrote to the Plaintiff for a purpose not explained before the time frame when

44

the Plaintiff was actively seeking to have her prior grade in NUR 252 erased or expunged from her record. However, Dr. Blackwell's letter was written in June 2006 in response to a letter from the Plaintiff's lawyer. The letter was not written to Ms. Wright. It was written to her lawyer. Dr. Blackwell had nothing to do with the specifics of any decision made regarding Ms. Wright's grade appeal of 252, her being allowed to take NUR 200 as a substitute course or any other part of Ms. Wright's academic failures or the decisions related thereto.

Additionally, paragraph 38 of the Complaint states that, "In the summer of 2006, prior to taking NUR 272, Peterson conspired with Defendants and other nursing instructors to flunk Plaintiff because Peterson felt she was weak and was not going to pass the Nursing Board Exams." This is obviously wrong. NUR 272 was taken in the spring semester of 2006. The Plaintiff is attempting to make a conversation that allegedly occurred in the summer of 2005 relevant in this case, even when the conversation, if it occurred, did not involve any nursing faculty member at CVCC who taught Ms. Wright in any of the courses that she failed.

Paragraph 39 of the Complaint states that, "Peterson's decision to instruct instructors to flunk her in NUR 272 was motivated by a desire to secure recertification for the Nursing Program at CVCC." The Plaintiff, however, has utterly failed to show that any conversations or communications occurred between Mrs. Peterson and any nursing instructor regarding failing Ms. Wright. Lynn Harris is the instructor who taught the courses that were failed by Ms. Wright with the exception of NUR 271, a course that no longer reflects a failing grade. NUR 252 was appealed by Ms. Wright, however, this appeal was denied and her failing grade of "D" in NUR 252 was one of the two failed nursing courses

45

by Ms. Wright which caused her to be excluded from the program. NUR 272 was taught

by Ms. Harris in the spring of 2006. Ms. Wright failed NUR 272. Even though she asked

Ms. Harris to review or regrade her care plans, there was no grade appeal filed in that

course. Still, however, the Plaintiff has utterly failed to prove that Mrs. Peterson instructed

Ms. Harris to fail Ms. Wright or that Mrs. Peterson even discussed the possibility of Ms.

Wright failing this course with Ms. Harris. Mrs. Peterson categorically denied any conduct

like this in her deposition. (Exhibit "M," Peterson Depo., page 132-133.) Ms. Harris states

in her Affidavit that there were no such conversations or instructions. (Exhibit "J," Harris

Affidavit.) The evidence simply does not support the allegation made by the Plaintiff in this

regard.

For all of the above reasons, the Defendants should receive Summary Judgment

on the allegations of Count II.

## SUMMARY JUDGMENT SHOULD BE
## GRANTED ON THE CHARGE OF OUTRAGE

Count III of the Complaint seeks to state a cause of action for the tort of outrage.

The Alabama Supreme Court has not recognized a cause of action for the tort of outrage

in a case involving a college student failing out of school. In *Tinker v. Beasley,* 429 S. 3d

1324 (Fla. 2005), the court considered the state of the Alabama law regarding the tort of

outrage. The Florida Appellate Court made the following observation:

"The Alabama Supreme Court has not yet addressed the question of
whether a tort of outrage would lie given such facts as these, but has
generally acknowledged only three types of cases that constitute successful
outrage claims: (1) cases involving 'wrongful conduct in the context of family
burials,' (2) cases in which insurance agents employ heavy-handed, barbaric
means . . . to coerce. . . insureds into settling . . . insurance claims, and (3)
cases involving particularly egregious sexual harassment."

46

The Florida Court cited *Stabler v. City of Mobile,* 844 So. 2d 555, 560 (Ala. 2002) for the same set of recognized outrage categories.

The elements of the tort of outrage are: (1) that the plaintiff either intended to inflict emotional distress or knew or should have known that emotional distress was likely to result from the conduct involved, and (2) the conduct in question was extreme and outrageous and, (3) the conduct caused emotional distress so severe that no reasonable person could be expected to endure it. *Stabler v. City of Mobile,* 844 So. 2d 555, 560 (Ala. 2002). Extreme means that the conduct is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society. *American Road Service Co., v. Inmon,* 394 So. 2d 361 (Ala. 1981). The tort of outrage is very limited in its application and is available only in the most egregious circumstances. *Thomas v. BSE Industrial Contractors, Inc.*, 624 So. 2d 1041 (Ala. 1993).

In her deposition testimony, Lindy Wright testified that she had not been to a doctor or a hospital, a counselor, psychologist or psychiatrist for emotional distress as a result of the events that she says happened to her in this case. (Wright Depo., page 35, lines 12-17) Ms. Wright does not claim any medical bills for any injuries like emotional distress or any other physical or emotional or mental injury. (Wright Depo., page 35, lines 18-page 36, line 2) She has not been treated for emotional problems. (Wright Depo., page 36, lines 3-5.) When asked about her damages claimed for humiliation, Ms. Wright made the following statement:

> "The humiliation of the class, having to explain - - I mean, because you can't
> - - people say, are you going to go back to RN school? Well, what do you tell

47

them?  You have to tell them.  I don't go into detail, but I tell them briefly."
(Wright Depo., page 143, line 18 through page 144, line 3.)

Toward the conclusion of questioning about damages, the following question and
answer were stated:

"Q:    Are there any other damages that you have sustained, other than
       emotional distress, embarrassment - - humiliation, and lost
       opportunity to make the pay of an RN?"

"A:    No sir."

(Wright Depo., page 213, lines 4 - 8.)

Therefore, the emotional damage claimed by the Plaintiff is not extreme in any way.
The third element of the cause of action is that the "conduct caused emotional distress so
severe that no reasonable person could be expected to endure it."  Clearly, the Plaintiff
cannot meet this element of the cause of action.

Further, there is no proof and there are no facts that would even raise an inference
that the Defendants intended to inflict any emotional distress or that they knew or should
have known that emotional distress was likely from their conduct.  Additionally, the conduct
of the Defendants was not rude, was not insulting and certainly was not extreme or
outrageous.  The second element of the cause of action is that the conduct in question
"was extreme and outrageous."

For the above reasons, Count III of the Complaint which seeks to set forth a cause
of action for outrage should be dismissed.

## CONCLUSION

48

These Defendants respectfully request that the Court grant their Motion for Summary Judgment.

Respectfully submitted,

/s/ H.E. NIX, JR.
H.E.Nix, Jr. (NIX007)
Brandy F. Price (PRI 079)

OF COUNSEL:
Nix, Holtsford, Gilliland, Higgins & Hitson, P.C.
Post Office Box 4128
Montgomery, Alabama 36103-4128
(334) 215-8585
(334) 215-7101 facsimile

49

## CERTIFICATE OF SERVICE

I hereby certify that an exact copy of the foregoing instrument has been served on the following individual(s) either by email from the Court Clerk or by placing a copy of same in the United States Mail, postage prepaid and properly addressed on this 15th day of October, 2007.

Jennifer B. Cooley, Esq.
Parker & Cooley, LLC
1507 Broad Street
Phenix City, Alabama 36867

Peter A. Dumbuya, Esq.
Post Office Box 3302
Phenix City, Alabama 36868

Joan Davis, Esq.
Dept. Of Post Secondary Education
401 Adams Avenue, Suite 280
Montgomery, AL 36130

/s/ H. E. NIX, JR.
OF COUNSEL

50