**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **LINDY G. WRIGHT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:06-CV-1087-WKW** |
| | ) | |
| **CHATTAHOOCHEE VALLEY** | ) | |
| **COMMUNITY COLLEGE (CVCC),** | ) | |
| ***et al.,*** | ) | |
| | ) | |
| **Defendants.** | ) | |

## NOTICE OF FILING

COME NOW the Defendants, Chattahoochee Valley Community College, Dr. Laurel Blackwell, Dr. James Lowe and Dr. Dixie Peterson, and file this Notice of Filing regarding the attached documents in support of Defendants' Motion for Summary Judgment and Brief in support thereof.

Respectfully submitted,

/s/ H.E. NIX, JR.
H.E. Nix, Jr. (NIX007)
Brandy F. Price (PRI 079)

OF COUNSEL:
Nix, Holtsford, Gilliland, Higgins & Hitson, P.C.
Post Office Box 4128
Montgomery, Alabama 36103-4128
(334) 215-8585
(334) 215-7101 facsimile
cnix@nixholtsford.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that an exact copy of the foregoing instrument has been served on the following individual(s) either by email from the Court Clerk or by placing a copy of same in the United States Mail, postage prepaid and properly addressed on this 15th day of October, 2007.

Jennifer B. Cooley, Esq.
Parker & Cooley, LLC
1507 Broad Street
Phenix City, Alabama 36867

Peter A. Dumbuya, Esq.
Post Office Box 3302
Phenix City, Alabama 36868

Joan Davis, Esq.
Dept. Of Post Secondary Education
401 Adams Avenue, Suite 280
Montgomery, AL 36130

/s/ H. E. NIX, JR.
OF COUNSEL

# Chattahoochee Valley Community College

ORIGINAL

2004 – 2005

One Place – Endless Possibilities

## Catalog & Student Handbook

EXHIBIT

A

CVCC 000001

# CATALOG/STUDENT HANDBOOK
# 2004-2005

# CHATTAHOOCHEE VALLEY
# COMMUNITY COLLEGE
## 2602 COLLEGE DRIVE
## PHENIX CITY, ALABAMA 36869
## (334) 291-4900

## ACCREDITATION

Chattahoochee Valley Community College is accredited by the Commission on Colleges of the Southern Association of Colleges and Schools (1866 Southern Lane, Decatur, Georgia 30033-4097/Telephone number: 770-679-4501) to award the Associate in Arts, Associate in Science, and Associate in Applied Science degrees.

The Associate Degree Nursing (RN) is accredited by the National League for Nursing Accrediting Commission, 61 Broadway, New York, NY 10006, Telephone number 212-363-5555, ext. 153.

The Practical Nursing and Associate Degree Nursing Programs are approved by the Alabama State Board of Nursing.

## MEMBER OF

Alabama College Association
League of Innovation
American Association Community Colleges
National Council for Workforce Education

This Catalog & Student Handbook, which becomes effective September 1, 2004, is for information only and does not constitute a contract. **The College reserves the right to change, modify, or alter without notice policies, fees, charges, expenses, and costs of any kind and further reserves the right to add or delete without notice any course offerings or information in this Catalog/Student Handbook.**

**Policy statements and program requirements in this catalog are subject to change.** Except when students change their programs of study, they may follow requirements of the catalog under which they enter the College for a period of four years at which time, if they have not completed their program of study, they must change to the current catalog. Exceptions must be approved by the Dean of Student and Administrative Services. **When students change their programs of study, they must change to the catalog that is current at the time of the program change.**

CVCC 000003



# CAMPUS BUILDINGS AND FACILITIES

| A | **WALLACE HALL:** Administrative offices, admissions, business office, management information center, computer laboratories, general classrooms, Student Government Association office, Phi Theta Kappa office, and faculty offices. |
|---|---|
| B | **WILSON HALL:** Information and switchboard, student center, counseling and advising services, financial aid, career resources, job placement, and student activities. |
| C | **BRASSELL HALL:** Science laboratories, general classrooms, and faculty offices. |
| D | **OWEN HALL:** Estelle Bain Owen Learning Resource Center, printed materials, genealogy and local history collection, audio-visual materials and equipment, student learning labs (writing, reading, and mathematics laboratories), computer and testing labs, large and small group study areas, college and community relations, Educational Talent Search office, and community relations and student outreach services. |
| E | **TENNIS COURTS:** Tennis courts and spectator area. |
| F | **BASEBALL FIELD AND SOFTBALL FIELD** |
| G | **FINE ARTS HALL:** Art studio, kiln and galleries, photography dark room, music performance practice room, choral concert and recording studio, general classrooms, and faculty offices. |
| H | **KEY HALL:** Phenix City Room, gymnasium, classrooms, weight room, nursing and EMS classrooms, and laboratories. |
| I | **STUDENT PARKING** |
| J | **RESERVED PARKING:** Reserved for faculty, staff, guests, and persons with disabilities. |
| K | **MAINTENANCE BUILDING** |
| L | **SECURITY KIOSK** |

CVCC 000004

# TABLE OF CONTENTS
# CATALOG

I.   Academic Calendar 2004-2005...............................................................................9

II.  The College ..........................................................................................................13
     History ..............................................................................................................13
     Purpose .............................................................................................................13
     Institutional Goals ...........................................................................................13
     Associate Degree Outcomes .............................................................................14
     CVCC Foundation ...........................................................................................14

III. Admissions ..........................................................................................................15
     Admissions Eligibility .....................................................................................17
     Admissions Procedures ....................................................................................19
     Admissions Status ...........................................................................................20
     Selection of Programs ......................................................................................21
     Student Assessment and Placement..................................................................21
     Veterans ...........................................................................................................23

IV.  Financial Information...........................................................................................25
     Tuition and Fees ...............................................................................................27
     Residency .........................................................................................................28
     Financial Aid and Scholarships .......................................................................31

V.   Student Services ...................................................................................................36
     Records .............................................................................................................37
     Counseling ........................................................................................................39
     Student Activities .............................................................................................42
     Student Honors .................................................................................................42
     Learning Resources ..........................................................................................43
     Services for Persons with Disabilities..............................................................44

VI.  Academic Policies ................................................................................................45
     Classification of Students .................................................................................47
     Course Load ......................................................................................................47
     Registration Information ...................................................................................47
     Calendar System...............................................................................................47
     Grades and Quality Points................................................................................50
     Final Examinations...........................................................................................50
     Academic Standards of Progress ......................................................................50
     Academic Bankruptcy ......................................................................................52
     Change of Curriculum ......................................................................................52
     Course Forgiveness ..........................................................................................52
     Independent Study ............................................................................................53
     Course Cancellations ........................................................................................53
     Class Instructors ...............................................................................................53
     Transfer Credits ................................................................................................53
     Transcripts ........................................................................................................54
     Non-traditional Credit ......................................................................................54
     Graduation Requirements .................................................................................57
     Graduation Honors ...........................................................................................57

3

CVCC 000005

Cooperative Agreements ................................................................................ 60

VII. Programs of Study................................................................................................ 63
              Program Defined .................................................................................... 65
              Program Requirements .......................................................................... 65
      Degrees Offered ............................................................................................. 65
      Certificate Programs ..................................................................................... 65

VIII. Course Descriptions ............................................................................................ 109

IX. Workforce Development and Community Service ................................................ 162

X. Administration, Faculty, and Staff ...................................................................... 166

XI. Advisory Committees ........................................................................................... 173

STUDENT HANDBOOK ................................................................................................. 176

4

CVCC 000006

ACADEMIC CALENDAR

CVCC 000008



CVCC 000009

# ACADEMIC CALENDAR
## 2004-2005

**Fall Semester, 2004 (August 16, 2004-December 21, 2004)**
**88 Faculty Duty Days; 78 Instructional Days**

August 16, 17 .................................Local Professional Development (No Classes)
August 18-19 ...................................Registration
August 20 .......................................Faculty Duty Day
August 23 .......................................Regular Term and Term I Classes Begin
August 23-25 ...................................Late Registration/Schedule Adjustment
September 6......................................Labor Day (College Closed)
September 24 ....................................Last Day to Withdraw with a Grade of "W" from Term I
October 15 ......................................Mid-Term/Term I classes end
October 18 ......................................Term II Classes Begin
October 29 ......................................Last Day to Withdraw with a Grade of "W" from
                               Regular Term
November 5 ......................................Faculty Duty Day (No Classes)
November 11 ....................................Veterans Day Holiday (College Closed)
November 8-10, 12.............................Advisement/Advance Registration
November 15-19................................Advisement/Advance Registration
November 17 ...................................Last Day to Withdraw with a Grade of "W" from Term II
November 22-24.................................State Professional Development
                               (Faculty Duty Days; No Classes)
November 25-26................................Thanksgiving Holidays (College Closed)
November 29 ...................................Classes Resume
November 29-December 3 ..............Advisement/Advance Registration
December 15.....................................Last Day of Classes
December 16-17, 20 .........................Final Examinations
December 21.....................................Faculty Duty Day (Final Grades due by 2:00 p.m.)
December 23-January 3 ....................Christmas Holidays (College Closed)

**Spring Semester, 2005 (January 4, 2005-May 13, 2005)**
**87 Faculty Duty Days; 78 Instructional Days**

January 4...........................................College Reopens
January 5...........................................Faculty Duty Day (No Classes)
January 6-7 .......................................Local Professional Development (No Classes)
January 10-11 ...................................Registration
January 12.........................................Faculty Duty Day
January 13.........................................Regular Term and Term I Classes Begin
January 13-14, 18 .............................Late Registration/Schedule Adjustment
January 17.........................................Martin Luther King, Jr., Comm. Holiday (College Closed)
February 18.......................................Last Day to Withdraw with a Grade of "W" from
                               Term I
March 11 ..........................................Mid-Term
March 14...........................................Term II Classes Begin
March 21-25 .....................................Spring Break (No Classes)
March 28...........................................Classes Resume
March 31...........................................Last Day to Withdraw with a Grade of "W" from
                               Regular Term

CVCC 000010

April 8...........................................Faculty Duty Day (No Classes)
April 11-22 ....................................Advisement/Advance Registration
April 15..........................................Last Day to Withdraw with a Grade of "W" from Term II
May 6.............................................Last day of Classes
May 9-11 .......................................Final Examinations
May 11............................................Graduate Grades due by 12:00 noon
May 12............................................Faculty Duty Day (Final Grades due by 2:00 p.m.)
May 13............................................Graduation (Faculty Duty Day)

**Summer Term, 2005 (May 23, 2005-August 8, 2005)**
**54 Duty Days; 54 Instructional Days**

May 23............................................Registration
May 24............................................Faculty Duty Day (No Classes)
May 25............................................Regular Term and Term I Classes Begin
May 25-26 ......................................Late Registration/Schedule Adjustment
May 30............................................Memorial Day Holiday (College Closed)
June 15............................................Last Day to Withdraw with a Grade of "W" from Term I
June 29............................................Mid-Term
June 30............................................Mini-Term II Classes Begin
July 4 ..............................................Independence Day Holiday (College Closed)
July 6 ..............................................Last Day to Withdraw with a Grade of "W" from Regular
                                                                Term
July 8 ..............................................Faculty Duty Day (No Classes)
July 11-29 ......................................Advisement/Advance Registration for Fall Semester
July 21 ............................................Last Day to Withdraw with a Grade of "W" from Term II
August 2 .........................................Last Day of Classes
August 3-5 ......................................Final Examinations
August 8 .........................................Faculty Duty Day (Final Grades due by 2:00 p.m.)

10

CVCC 000011



THE COLLEGE

ama
citi-
s as
net-
onal

its
ely
ld-
c-

e
d
c

CVCC 000012

# HISTORY

Chattahoochee Valley Community College was established in 1973 by an Act of the Alabama State Legislature. Located in Phenix City, Alabama, the College was created to serve the citizens of Russell County and parts of Bullock, Lee, Macon, and Barbour counties. It serves as well the citizens of the Phenix City, Alabama, and the Fort Benning-Columbus, Georgia, metropolitan area. Because this service area contains both rural and urban areas, the educational needs of the citizens are varied.

The College opened in temporary quarters in January 1974. In 1976, the College moved to its present permanent location at 2602 College Drive. Each fall the College enrolls approximately 2000 students. The 103-acre site on which the College is located includes eight permanent buildings: an administration/classroom building, one general purpose classroom building, a learning resource center, a fine arts building, a health and physical education building, a student services center, a security kiosk, and a maintenance building.

# PURPOSE

The purpose of Chattahoochee Valley Community College, a member of the Alabama College System, is to meet the higher education needs of the citizens of the Chattahoochee Valley and others who can benefit from the courses, programs, and services of the College. In order to accomplish its purpose, the College provides:

- General Education and collegiate programs at the freshman and sophomore levels that are designed to prepare individuals for transfer to other colleges and universities.

- Occupational and technological programs and other training that are designed to prepare individuals for immediate employment or job advancement and/or promote local economic development.

- Developmental education that is designed to assist individuals in improving learning skills.

- Life-long learning programs and activities that are designed to provide personal enrichment and improve the quality of life in the community.

- Student services and activities that are designed to assist individuals in formulating and achieving educational goals.

- Administrative and academic support services that facilitate the delivery of educational programs and training.

# INSTITUTIONAL GOALS

To aid in the achievement of its purpose, the College has developed the following goals:

- To offer quality educational programs that provides opportunities for excellence in learning.

- To expand and strengthen program offerings which prepare students for direct entry into jobs at technical, paraprofessional, and entry-level management positions.

- To provide educational and support programs that reduce factors inhibiting student success.

- To develop community service and continuing education programs, strengthen links with high schools and community agencies, and promote the economic, educational, and cultural development of the service area.

- To provide and maintain a comprehensive program of advising, counseling, and testing services and extracurricular activities that contribute to the cultural, social, physical, and intellectual development of students.

13

CVCC 000014

STUDENT SERVICES

CVCC 000038

# STUDENT SERVICES

Chattahoochee Valley Community College contributes to the total development of students by assisting them in pursuing both personal and educational goals. A variety of services is available to the student: testing, orientation, counseling and guidance services, academic advisement, student activities and organizations, career development, and job placement assistance.

## RECORDS

The Admissions Office maintains student records and, upon written request from the student, will issue transcripts. The Family Educational Rights and Privacy Act (FERPA) of 1974 defines the rights of the student with regard to records and other information that might be maintained and/or released.

### Release of Student Records

In compliance with and pursuant to the Family Educational Rights and Privacy Act of 1974, known as the Buckley Amendment, student records shall not be released by college personnel except on the written consent of the respective student, a written request in the form of a Court Order, and/or as otherwise expressly provided in the Family Educational Rights and Privacy Act of 1974.

Student records that are held by the College shall be accessible to students when requested. College personnel who are knowledgeable of the individual's record (normally the Dean of Student and Administrative Services) shall be present to explain the contents of the file.

Upon receipt of a written request from a student to review his/her college record, the Dean of Student and Administrative Services shall arrange, as promptly as is reasonably possible, a time when the records may be reviewed in the presence of appropriate college personnel. The student is not permitted to remove the file or remove any of its contents for purposes of reproducing materials within the file unless permission is granted by the Dean. In order to review a file, the student must present proper identification and complete appropriate form(s) certifying that he/she has requested to review his/her records and that Chattahoochee Valley Community College has complied with the request.

Challenges concerning the contents of student records shall first be made to the Dean of Student within a minimum of five days from the date of the review of the record. The challenge may be made orally or in writing and shall follow essentially the procedures outlined in the Institutional Policy Manual for resolving grievances, beginning at the Admissions Office as Level One, with the objective of resolving the matter informally at the lowest level position. If as a result of the procedure outlined in Level One the matter is not resolved, then within five (5) working days the procedure outlined in Level Two may be followed, with the challenge being filed in writing specifying the following: (a) the specific records being challenged; (b) results of previous discussions; and (c) dissatisfaction with previous decisions.

### Directory Information

A student has the right to have his/her name and directory information concerning him/her deleted from any directory published and distributed on or off campus. Directory information consists of **name, address, date and place of birth, participation in officially recognized activities and sports, weight and height for athletic team members, telephone number, class standing, curriculum, degrees or certificates, awards received, and dates attended.**

When a student requests that any part of his/her directory information be withheld, all directory information concerning him/her will be deleted from all publications. Students desiring to have any directory information withheld must make such a request each semester by completing the proper form in the Admissions Office.

38

CVCC 000039

No information from records, files or data directly related to a student, other than "directory" information, shall be disclosed to individuals or agencies outside the College without the written consent of the student, except pursuant to a lawful subpoena or court order, or in a case where educational or governmental officials have a lawful need for information, or as otherwise specifically authorized by the Buckley Amendment. However, information contained in such records may be disclosed within the College to officials and staff members with a need for that particular information.

Students shall be afforded the opportunity to have access to all such information on themselves, with the exceptions set forth in accordance with procedures outlined within this policy statement.

# COUNSELING AND ADVISING SERVICES

Counseling and advising services are available to all day and evening students. Students can receive assistance with problems concerning choice of curriculum (program), career planning, student orientation, transfer advising, college adjustment or coping with daily demands. Referrals are available for problems of a personal nature. Students are encouraged to visit the Office of Counseling and Advising located in Wilson Hall. Appointments can also be made. Office hours are as follows.

| Monday - Thursday | 8:00 a.m. - 8:00 p.m. |
| Friday | 8:00 a.m. - 12 noon |

# NEW STUDENT ORIENTATION

New Student Orientation at Chattahoochee Valley Community College is designed to introduce students to college life at CVCC.

In addition to attending the orientation/academic assessment, all new students (except transfer students who have earned twelve or fourteen hours of college credit) will be required to enroll in ORI 101 (Orientation) during their first semester of enrollment unless specifically waived by the College.

# ACADEMIC ADVISEMENT

Upon admission to the College, each student will be assigned an advisor who will assist the student in planning a program of study commensurate with the student's interests and abilities. A student may also consult with an advisor concerning scheduling. It is the student's responsibility to make an appointment and meet with the advisor during the advisor's scheduled office hours to plan his/her total program and courses for each semester. Unclassified students who are interested in exploring the various program options available at the College may also contact the office of Counseling and Advising in Wilson Hall.

# ACADEMIC ADVISING PHILOSOPHY

Chattahoochee Valley Community College recognizes academic advising as an essential part of the educational process.

The primary focus of academic advising at CVCC is to facilitate the student's pursuit of realistic academic and career goals by providing them with both accurate information and guidance to support them in the decision-making process. Furthermore, academic advising should assist students in recognizing and accepting responsibility for making choices about their educational program.

To be effective, academic advising must be taken seriously by students, advisors, and the institution with an understanding that academic advising is more than completion of simple clerical functions. Effective academic advising requires an open environment in which the advisor is concerned about the student's welfare in pursuit of academic and career goals. Effective academic advising is concerned with student development and assists students in establishing an

39

CVCC 000040

educational plan consistent with life goals, as well as assisting students in evaluation and re-evaluation of progress toward established goals.

The institution, advisor, and each student have responsibilities that must be accepted and fulfilled if students are to receive the benefits of an efficient and effective academic advising process.

## RESPONSIBILITIES OF THE INSTITUTION

1. Provide advisors with accurate and complete information on institutional policies and procedures, program of study requirements, courses of instruction, graduation requirements, and available institutional resources.

2. Provide advisors with all student data needed, accurate current student transcripts, and evaluation of transfer credit.

3. Provide advisors with forms and reference materials needed in the advising process.

4. Assign advisors and inform students of the identity, office location, and office telephone number of their respective advisors and times advisors may be contacted to make appointments.

5. Provide new students with academic orientation.

6. Administer placement tests to new students upon admission, including partial batteries of placement tests to transfer students when needed.

7. Provide advising services to students with special needs, particularly those students covered by the Americans with Disabilities Act.

8. Conduct advising orientation for new advisors and workshops for training and updating all advisors periodically.

## RESPONSIBILITIES OF THE ADVISOR

1. Be accessible to students.

2. Maintain accurate records of information relative to each advisee's academic activities and progress.

3. Be aware of each advisee's educational and career goals, and when needed, assist students in formulation and clarification of these goals.

4. Guide students in obtaining accurate information about transfer institutions.

5. Provide students with information about alternatives and limitations of and possible long- and short-range consequences of academic choices.

6. Refer students to appropriate college services or off-campus agencies.

7. Assist students in course selection appropriate to their respective educational and career goals and in evaluating progress toward these goals.

8. Schedule appointments with advisees to ensure adequate time may be given to discussion of each advisee's academic progress.

9. As much as possible, assist students in making long-range plans concerning courses to be scheduled.

10. Focus on why particular courses should be taken as well as what courses should be taken.

11. Before signing the registration form (student class schedule), verify accuracy of all schedule information (course numbers, section numbers, and class meeting days, times, and locations).

40

CVCC 000041

# RESPONSIBILITIES OF THE STUDENT ADVISEE

1. When appropriate, be certain that academic records from other educational institutions have been sent to CVCC.

2. Know his/her advisor's identity, office location, office telephone number, and office hours.

3. Schedule an advising appointment at least once per term with his/her advisor apart from the scheduling and registration process.

4. Promptly keep appointments. If unable to keep appointments, notify the advisor as soon as possible and schedule a new appointment.

5. Discuss educational and career goals with his/her academic advisor and other resource persons.

6. Develop educational and career goals.

7. Be aware of institutional policies and procedures, program of study requirements, and graduation requirements of both CVCC and the institution to which the student may plan to transfer.

8. Be prepared for the advising appointment for the scheduling of classes before meeting with the advisor. Students should study the class schedule, know courses needed, have a list of alternatives, know which courses are offered at times they can attend, and have a list of any questions for the advisor.

9. Accept responsibility for academic choices. The advisor may discuss options with the student, but the student must make the decisions.

10. Maintain personal records of academic activities and progress.

11. Seek help from the advisor when needed. Consult with the advisor whenever the student is not certain of the best academic action to take and before making any changes in the program of study. Academic advising is a continuous process throughout a student's stay at the institution ... not just when selecting courses to take.

12. When completing and before signing the registration form (student class schedule), verify accuracy of all schedule information (course numbers, section numbers, and class meeting days, times, and locations).

# TESTING

A variety of interest, aptitude, and proficiency tests are available to assist students in examining their educational and vocational objectives. Anyone interested in taking advantage of the testing services available should contact the office of Counseling and Advising located in Wilson Hall.

- GED *Test Center*. Chattahoochee Valley Community College has been designated a General Educational Development testing center by the State of Alabama. Information relative to test dates may be obtained by calling 334-291-4921.

- ACT *Test Center*. Chattahoochee Valley Community College has been designated as a test center for the administration of the American College Testing Program. Registration packets may be picked up from the Switchboard or the Counseling & Advising office located in Wilson Hall.

- DISCOVER. A career guidance questionnaire that identifies interests, experiences and abilities to help users make important career and educational decisions.

- COMPASS - A comprehensive, computer-adaptive assessment that assists in determining a student's placement into appropriate courses to maximize success in college.

- ASSET - A pencil and paper version of academic assessment that assists in determining a student's placement into appropriate courses to maximize success in college.

41

CVCC 000042

# JOB PLACEMENT

Students and alumni seeking job placement assistance are encouraged to visit the office of Counseling and Advising located in Wilson Hall. Listings of part-time and full-time positions are on file.

# STUDENT ACTIVITIES

Student activities are important to the educational experience at Chattahoochee Valley Community College, and a comprehensive program of activities is provided through the campus organizations recognized by the Student Government Association.

Students are provided with opportunities to participate in student government, service organizations, special interest clubs, choir, band, theater, athletics, and other related activities. Students interested in learning more about clubs and organizations on campus should refer to the Student Handbook or contact the Office of Student Activities in Wilson Hall.

- *Athletics.* Chattahoochee Valley Community College is a member of the National Junior College Athletic Association and the Alabama Junior College Athletic Conference. The College participates in varsity competition in men's baseball, women's softball, and men's basketball. Women's basketball will be returning in 2005-2006. The College competes with other members of its conference and junior colleges from other states. Chattahoochee Valley Community College does not discriminate in its athletic programs on the basis of race, color, national origin, or sex.

- *Student Government Association.* All students attending Chattahoochee Valley Community College are afforded the opportunity to participate in the activities of the College through the Student Government Association (SGA). SGA provides students with the opportunity to be involved in leadership and student decision-making by acting as the governing body for student organizations on campus.

# STUDENT HONORS

- *The James B. Allen Award.* This award is presented at commencement annually to a student who is outstanding in community and college activities and in scholarship. Selection of the recipient is made by an appointed college committee.

- *Who's Who Among Students in American Junior Colleges.* The Office of Student Services annually submits names of students who have distinguished themselves in different areas of campus life for inclusion in this publication.

- *President's Award.* This award is given annually to the student who has the highest cumulative grade point average at Chattahoochee Valley Community College and who is completing a two-year degree program with all courses taken at Chattahoochee Valley Community College.

- *Faculty Award of Excellence.* This award is given annually to an outstanding student selected by the faculty. Criteria for selection include a cumulative grade point average of 3.50 or higher, attitude, citizenship and completion of a two-year degree program with at least forty semester hours of credit completed at Chattahoochee Valley Community College.

- *The Outstanding Nursing Student of CVCC Award.* This award is presented annually to the nursing student selected by the nursing class as the individual who most exemplifies its concept of the model nurse.

42

CVCC 000043

- *Phi Theta Kappa.* The purpose of this organization is the recognition and encouragement of scholarship among community and junior college students by providing the opportunity for development of leadership, service, and fellowship and for stimulation of interest in continuing academic excellence. Invitations for membership are dependent upon the student's achieving a sufficiently high academic grade point average. An induction ceremony is held each semester.

- *Nursing Faculty Award of Excellence.* Presented annually by the nursing faculty to a nursing student for outstanding academic, clinical, and interpersonal performance.

- *President's List.* The President's List recognizes students who were enrolled for a minimum of twelve semester hours (excluding institutional credit hours) during a semester and earned a grade point average of 4.00 (A).

- *Dean's List.* The Dean's List recognizes students who were enrolled for a minimum of twelve semester hours excluding institutional credit hours) and earned a grade-point-average of 3.50 to 3.99.

# THE LEARNING RESOURCE CENTER

The Learning Resource Center (LRC) at Chattahoochee Valley Community College offers students, staff, faculty, and community patrons the facilities, environment, and guidance for pursuing individual interests and educational goals through a variety of services.

The LRC is located in Owen Hall. It houses more than 53,000 volumes of books, subscribes to 220 periodical titles, and provides access to many online databases through the Alabama Virtual Library and Troy State University remote services. The LRC also maintains special collections on genealogy and southern history.

The LRC offers many services to patrons. Some of these services include the online public access catalog (OPAC), circulation, reference, interlibrary loan service, and other customized services to meet the special needs of patrons.

The Learning Resource Center operates with the following objectives:

- Conducting library orientation for students and other members of the community to encourage an understanding and appreciation of a wide range of resource materials and their use.

- Strategically developing, implementing, and managing quantitative and qualitative improvements to the library's resources to support the college's academic, administrative, and community-based programs and initiatives.

- Conducting the systematic assessment of the usability, adequacy, and accessibility of the library's resources to support the College's academic, administrative, and community-based programs and initiatives.

The Learning Resource Center operational hours are:

| | |
|---|---|
| Monday - Thursday | 8:00 a.m. - 9:00 p.m. |
| Friday | 8:00 a.m. - 12:00 noon |
| Saturday | Closed |
| Sunday | 1:00 p.m. - 6:00 p.m. |
| Holidays | Closed |

CVCC 000044

# LEARNING LABORATORIES

- **Computer Laboratory**. Computer resources are provided in open laboratories throughout the Learning Resource Center. Software programs for word processing, spreadsheets, and similar applications are available for student and community use.

- **Mathematics Laboratory**. Students who need assistance in mathematics and/or additional help in mathematics courses may receive that assistance in the Mathematics Laboratory. The lab is staffed by instructors at various times during the week. A schedule is distributed at the beginning of each semester.

- **The Writing Lab**. Students who need assistance in improving their writing skills will find instructors available to help them in the Writing Lab. A Writing Lab schedule is published and distributed at the beginning of each semester.

# SERVICES FOR STUDENTS WITH DISABILITIES

The College is committed to assisting students with various disabilities in accordance with the guidelines of the Americans with Disabilities Act (A.D.A.). Any student who has a documented disability (physical, emotional, or learning) and who is in need of assistance with admission, registration, orientation, or any other phase of college life should contact the ADA Coordinator at 214-4845.

44

CVCC 000046

# ACADEMIC AFFAIRS

CVCC 000048



CVCC 000049

# CALENDAR SYSTEM AND CREDITS

Chattahoochee Valley Community College operates on a semester calendar system consisting of two semesters and a summer term. The semesters ordinarily begin in August and January, and the summer term in May. Credits are earned at the College in terms of semester hours. Grade reports are mailed to students at the end of the semester and/or term.

# COURSE LOAD

A student enrolled for twelve or more credit hours will be considered a full-time student. A student enrolled for fewer than twelve credit hours will be considered a part-time student.

Most degree programs are designed so that students taking a normal load of 15-18 credit hours per semester may graduate in two academic years. Some students may find it desirable to schedule fewer hours per semester depending upon workload or other personal responsibilities. Students having difficulty determining a proper course load should consult their advisors.

The maximum course load is nineteen hours. Any student wishing to enroll for more than nineteen semester hours must receive approval of the Dean of Instruction. Under no circumstance will a student be allowed to exceed 24 semester hours.

**NOTE: Any student enrolled in two or more college preparatory courses (developmental studies) is prohibited from enrolling for more than twelve total credit hours. Exceptions must be approved by the Dean of Instruction.**

# CLASSIFICATION OF STUDENTS

- Freshman: A student who has earned fewer than 31 semester hours of credit.
- Sophomore: A student who has earned 31 or more hours of credit.

# REGISTRATION INFORMATION

A student must be officially registered for every class he/she attends. If the student's name does not appear on the class roll, credit will not be granted.

Details of the dates and times of registration for each semester will be published in the Schedule of Classes. Students may obtain a Schedule of Classes at the Admissions Office, Wilson Hall or Learning Resource Center. In all cases, registration becomes official when students have paid all tuition and fees.

## LATE REGISTRATION

A late registration period is provided during the first three (3) class days of the semester. Students registering late will be expected to assume responsibility for making up all required course work. Students registering late will be required to pay the Late Registration Fee of $25.00.

## SCHEDULE ADJUSTMENT

After a student's registration is completed, he/she may, within the first three (3) class days of the semester, change his/her schedule through the process of adding and/or dropping courses. The student will be required to report to the designated office as specified in the Schedule of Classes to complete the necessary forms. A student will not be allowed to add a class after the schedule adjustment period except with the Dean's approval.

47

CVCC 000050

# GRADES AND QUALITY POINTS

A letter grade is assigned in each course in which the student is enrolled at the end of the semester. A quality point value per semester hour is assigned to each letter grade.

| Letter Grade | Meaning | Quality Points |
|---|---|---|
| A | Excellent | 4.00 |
| B | Good | 3.00 |
| C | Average | 2.00 |
| D | Poor | 1.00 |
| F | Failing | 0.00 |
| WF | Withdrawal Failing | 0.00 |
| WP | Withdrawal Passing | NONE |
| S | Satisfactory completion of Institutional Credit Course | NONE |
| U | Unsatisfactory completion of Institutional Credit Course | NONE |
| W* | Withdrawal | NONE |
| AU | Audit | NONE |
| I | Incomplete | |

*A student may not be assigned a "W" after the deadline published in the official college calendar.

# WITHDRAWAL FROM A COURSE
# OR FROM THE COLLEGE

After the schedule adjustment (drop/add) period, the following withdrawal policy is in effect.

**FROM A COURSE** - a student must obtain the appropriate form from the Admissions Office or instructor, get the instructor's signature, obtain the financial aid officer's signature, and return the form to the Admissions Office for processing. A scholarship student must also secure the signature of the scholarship supervisor. Withdrawal is not official until all steps are completed.

**FROM THE COLLEGE** - a student must obtain the appropriate form from the Admissions Office and get signatures from all instructors, financial aid, LRC, and business office. A scholarship student must also secure the signature of the scholarship supervisor. When the student has all the required signatures, the form must be returned to the Admissions Office for processing. Withdrawal is not official until all steps are completed. Note: Withdrawals will not be processed if the student has an outstanding financial obligation to the College.

Students who withdraw from a course or from the college entirely will receive a grade of "W," "WP," or "WF." Final grades are determined by the date the student withdraws from the course or college as denoted in the college calendar. In order to receive a non-punitive grade of "W," the student must withdraw as follows:

| | |
|---|---|
| Spring or Fall Semesters | By close of 10th week of class |
| Summer Term | By close of 6th week of class |
| Spring or Fall Term I or II | By close of 5th week of class |
| Summer Term I or II | By close of 3rd week of class |

Students who withdraw after the designated dates will receive a grade of "WP" if passing at the time of withdrawal or "WF" if failing at the time of withdrawal. "WF" is calculated the same as an "F" in the grade point average (GPA).

48

CVCC 000051

# SATISFACTORY AND UNSATISFACTORY GRADES

Satisfactory and Unsatisfactory grades are assigned in courses that are designated for institutional credit (IC). These courses will not transfer, and none of the grades carry quality points and will therefore not be calculated in the grade point average.

# AUDITING A COURSE

Students are allowed to audit a course during regular registration and during the enrollment adjustment period. A student auditing a class may not change his/her status to that of a credit student nor may a credit student change his/her status to that of an audit. A student auditing a class is expected to follow the attendance policy.

# INCOMPLETE GRADE

The grade of incomplete (I) may be assigned when a student has been prevented from completing the requirements of a course and is assigned only in exceptional circumstances. The student must request a grade of incomplete from the instructor. The instructor may grant or deny the request. A grade of incomplete (I) must be cleared by the end of the following regular semester or a final grade of "F" will automatically be recorded. This grade will be reported to the student at the end of the semester in which the grade is changed.

A grade of incomplete (I) is not added into the total number of hours attempted until it has been cleared. Students are cautioned that "I" grades may affect their eligibility for financial aid benefits.

# GRADE REPORTS AND GRADE POINT AVERAGES

At the end of each semester, each student will receive final grade reports that will indicate the final grades received by the student for all courses in which he/she was enrolled during that semester. The grade report will show the semester hours attempted, the total quality points and credit hours earned, and a grade point average. Also included on the grade report will be a record of the total number of hours attempted, the total quality points earned, and a cumulative grade point average. Once grades have been recorded, they cannot be expunged from the student's permanent record.

The grade point average is computed by multiplying the quality points earned by the credit value of each course and dividing the total quality points earned by the total credit hours attempted as indicated by the example below:

$$
\begin{array}{rl}
3 \text{ sem hrs of "A" x } 4 = & 12 \text{ quality points} \\
3 \text{ sem hrs of "B" x } 3 = & 9 \text{ quality points} \\
3 \text{ sem hrs of "C" x } 2 = & 6 \text{ quality points} \\
3 \text{ sem hrs of "D" x } 1 = & 3 \text{ quality points} \\
\underline{3 \text{ sem hrs of "F" x } 0 =} & \underline{0 \text{ quality points}} \\
& 30 \text{ total quality points}
\end{array}
$$

30 quality points ÷ 15 hours attempted = 2.0 GPA

AU, I, S, U, and W grades are not included when computing a student's grade point average (GPA), but will be recorded on a student's transcript.

# ACADEMIC HONORS

The College recognizes superior scholastic achievement by publishing in the local newspapers the President's List and the Dean's List at the end of each semester. Students recognized receive congratulatory letters from the College President and/or the deans of the College.

49

CVCC 000052

The President's List recognizes students who were enrolled for a minimum of twelve semester hours (excluding institutional credit hours) during a semester and earned a grade-point-average of 4.00 (A).

The Dean's List recognizes students who were enrolled for a minimum of twelve semester hours (excluding institutional credit hours) during a semester and earned a grade-point-average of 3.50 to 3.99 (B).

Students who consistently maintain high scholastic performance and meet other eligibility requirements may be invited to join the Alpha Theta Rho Chapter of Phi Theta Kappa International Honor Society.

# FINAL EXAMINATIONS

A final examination will be given in each course at the end of each semester during the times specified in the official calendar of the College or as scheduled by the Dean's Office.

# CLASS ATTENDANCE POLICY

Students are expected to be present for all class meetings, and instructors will record attendance at every class meeting. Instructors' expectations are high, and classes are challenging. Therefore, students who are absent may experience difficulty in meeting course objectives and expected outcomes. The instructor will define whether and how makeup work will be administered, and the policy for makeup work shall be defined in the course syllabus.

The instructor will not withdraw a student from the class. Therefore, students who are excessively absent should officially withdraw from the course by the date specified in the college calendar in order to avoid a grade of "F."

# ACADEMIC STANDARDS OF PROGRESS

The following academic standards of progress apply to all students except those enrolled in nursing programs (see information under ADN and LPN programs in the Programs of Study section of this catalog) and students taking institutional credit courses (see Progress Requirements for Students in Institutional Credit Courses following this section).

1. A student must maintain the following cumulative grade point average (GPA) dependent upon the number of hours attempted at the College in order to have clear academic status:

   Hrs. Attempted ..................................................................GPA
   12-21 ............................................................................... 1.50
   22-32 ............................................................................... 1.75
   33 or more ........................................................................2.00

2. When the cumulative GPA of a student is below the GPA required for the number of credit hours attempted at the institution, the student is placed on *academic probation.*

3. When the cumulative GPA of a student who is on academic probation remains below the GPA required for the total number of credit hours attempted at the institution and the semester GPA is below 2.0, the student is suspended for one semester. The transcript will read *Suspended-One Semester.*

4. The student who is suspended for one semester may appeal. If, after appeal, the student is readmitted without serving the one-semester suspension, the transcript will read *Suspended-One Semester/Readmitted Upon Appeal.*

5. A student who is on Academic Probation after being suspended for one semester (whether the student has served the suspension or been readmitted upon appeal) and whose cumulative GPA falls below the level required for the total number of hours attempted at the institution but a semester GPA is 2.0 or above will remain on Academic Probation. If the

50

CVCC 000053

student does not earn the cumulative GPA of 2.0 or above for the required number of hours the student is suspended for *One Academic Year.*

6. A student returning from a one-term or one-year suspension while on academic probation who fails to obtain the required GPA for the number of hours attempted and fails to maintain a term GPA of 2.0, will be suspended for another calendar year.

7. The student must attain *clear* status before beginning the academic standards progress cycle again.

## Process for Appeal for Readmission

If a student does not contest the facts leading to suspension, but simply wishes to request consideration for readmission, the student may submit a request in writing for an "Appeal for Readmission" to the Admissions Committee no later than two working days before the beginning of regular registration. During the meeting of the Admissions Committee, (which shall not be considered a "due process" hearing, but rather a petition for readmission), the student shall be given an opportunity to present a rationale and/or statement of mitigating circumstances in support of immediate readmission. The decision of the Admissions Committee, together with the materials presented by the student, shall be placed in the college's official records. Additionally, a copy of the written decision shall be provided to the student.

## Intervention for Student Success

When a student is placed on academic warning, academic probation, one semester suspension, or one calendar year academic suspension, the student may be required to take study skills courses, to take other specific courses designed to assist him/her in succeeding, to limit the number of hours taken during each semester, and/or to take other steps as designated by the Dean, the student's advisor, or the Admissions Committee.

# ACADEMIC STANDARDS OF PROGRESS FOR TRANSFER STUDENTS

1. A transfer student who is admitted on *clear* academic status is subject to the same standards of academic progress as a "native" student. Grades accrued at other regionally accredited postsecondary institutions are not included in the GPA calculation.

2. A transfer student who is admitted on *academic probation* retains that status until the student has attempted at least twelve semester credit hours at the institution. If, at the conclusion of the semester in which the student has attempted a total of twelve or more semester credit hours at the institution, the cumulative GPA at the institution is below 1.5, the student is suspended for one semester. The transcript will read *Suspended-One Semester.*

3. If, at the conclusion of the semester in which the transfer student admitted on *academic probation* has attempted a total of 12 semester credit hours at the institution, the cumulative GPA at the institution is 1.5 or above, the student's status is *clear.*

# ACADEMIC STANDARDS OF PROGRESS FOR INSTITUTIONAL CREDIT COURSES

1. A student who is enrolled in an institutional credit course and who receives a grade of U for two semesters may not take the course a third semester until he/she receives special academic counseling.

51

CVCC 000054

2. After the third semester in which the student receives a grade of U in the same course, the student must appeal through the institution's appeal process before the student may be allowed to re-enroll in the course.

# ACADEMIC BANKRUPTCY

1. A student may request in writing to the Dean of Student and Administrative Services to declare academic bankruptcy under the following conditions:

   a. If fewer than three (3) calendar years have elapsed since the semester/term for which the student wishes to declared bankruptcy, the student may declare academic bankruptcy on all coursework taken during that one semester/term provided the student has taken a minimum of eighteen semester credit hours of coursework at the institution since the bankruptcy semester/term occurred. All coursework taken, even hours completed satisfactorily during the semester for which academic bankruptcy is declared will be disregarded in the cumulative GPA.

   b. If three (3) or more calendar years have elapsed since the most recent semester/term for which the student wishes to declare bankruptcy, the student may declare academic bankruptcy on all coursework taken during a one to three semester/term provided the student has taken a minimum of eighteen semester hours of coursework at the College since the bankruptcy semester(s) occurred. All coursework taken, even hours completed satisfactorily, during the semester/term which academic bankruptcy is declared will be disregarded in the cumulative GPA.

2. When academic bankruptcy is declared, the transcript will reflect the term Academic Bankruptcy for each semester/term affected. When academic bankruptcy is declared, the transcript will reflect the semester/term of its implementation and the transcript will reflect Academic Bankruptcy Implemented.

3. A student may declare academic bankruptcy only once.

4. Implementation of academic bankruptcy at an institution does not guarantee that other institutions will approve such action. This determination will be made by the respective transfer institution.

# CHANGE OF CURRICULUM OR PROGRAM OF STUDY

Students accepted and enrolled in a particular program of study who seek to pursue another program of study must meet the requirements for admission to the new program. A student should complete the necessary curriculum change form available at the Admissions Office, then see his/her advisor for an updated plan of study. Students who change their program of study will follow the program requirements of the current Catalog at the time of the program of study change.

# COURSE FORGIVENESS

1. If a student repeats a course, the last grade awarded (excluding grades of W) replaces the previous grade in the computation of the cumulative grade point average. The grade point average during the term in which the course was first attempted will not be affected.

2. When a course is repeated more than once, all grades for the course- excluding the first grade- will be employed in computation of the cumulative grade point average. Official records at the institution will list each course in which a student has enrolled.

3. It is the student's responsibility to request of the Dean of Student and Administrative Services that the forgiveness policy be implemented.

4. No course in which the last grade received was a "F" may be counted toward graduation. The student must be aware also that the last recorded grade may be regarded by a senior institution as the grade of record for transfer purposes.

52

CVCC 000055

# INDEPENDENT STUDY

In certain unusual circumstances, the Dean of Instruction, upon recommendation of the Division Chairperson and instructor, may permit a student to take a course by independent study. Permission will be based on such factors as future course availability and the student's academic record. No student whose grade point average is below 2.0 will be permitted to take a course by independent study. Because independent study courses must be completed without the usual assistance from instructors, a student will not be allowed to take more than one independent study course per semester. Exceptions must be approved by the Dean of Instruction.

# COURSE CANCELLATIONS

The College reserves the right to cancel any course listed in the Schedule of Classes. In the event that a student is in his/her last semester before graduation and a course he/she needs is canceled, the student should consult with his/her advisor and/or the Dean of Instruction.

# ASSIGNMENT OF CLASS INSTRUCTOR

Class cancellations, splits, or other conditions may necessitate the reassignment of instructors. Students are cautioned that the listing of an instructor's name to teach a course in the Schedule of Classes is no guarantee that the instructor will teach the course.

# TRANSFER OF CREDITS

Transfer students must furnish an official transcript(s) of all work attempted at all other institutions unless they have completed the baccalaureate degree. Any applicant who has completed the baccalaureate degree is required to submit only the transcript from the institution granting the baccalaureate degree. However, the applicant may submit transcripts from other institutions attended if he/she wishes consideration of those credits for purposes of transferability.

Transferability of credits will be determined in the following manner. If a student has a 2.0 cumulative grade point average in all previous college work attempted, all passing grades will be accepted if they are comparable to CVCC courses. If the student's cumulative grade point average is below 2.0 (C), only those credits will be accepted in which a grade of "C" or better was earned. Of the credits accepted, only those that are applicable to the student's chosen curriculum may be used for purposes of meeting program and graduation requirements. Students who have satisfactorily completed required English and mathematics courses will not be required to take the COMPASS Placement Test at Chattahoochee Valley Community College.

# EVALUATION OF TRANSFER CREDITS

Official transcripts submitted by transfer students who enroll at the College normally will be evaluated by the Office of Admissions no later than two weeks after the receipt of the transcript by the Office of Admissions and in no case later than the end of the first academic semester in which the student is enrolled.

Transfer students will be informed of the amount of credit that will be accepted in three ways: (1) the transferable courses and number of credit hours will be provided to the student's academic advisor who will provide the information to the student, (2) the amount of transfer credit and the transferable courses will be provided in writing to the student after the evaluation, and (3) the courses and number of credits allowed through transfer are recorded on the student's official transcript.

Students who have questions concerning the amount of credit accepted or specific courses accepted may address those questions to the Dean of Student and Administrative Services. In some cases, students may be required to furnish catalogs containing course descriptions in order to determine transferability of certain courses. Students must be currently enrolled at the time transfer credit is awarded.

53

CVCC 000056

# TRANSCRIPTS

A student desiring an official transcript of his/her permanent record must make the request to the Admissions Office in person or in writing. The College reserves the right not to release a transcript if the student has outstanding financial obligations to the College.

# NON-TRADITIONAL CREDIT

Chattahoochee Valley Community College awards limited credit for advanced placement, challenge examination, CLEP and DANTES examinations, armed forces and service schools training, and certain professional certifications. Students may earn credit through non-traditional sources as follows:

|  | Available Credit Hours for Degrees | Available Credit Hours for Certificates |
|---|---|---|
| Advanced Placement | 15 | 9 |
| CLEP and/or DANTES | 15 | 9 |
| Military Training and Education | *20 | 3 |
| Professional Certification | 3-6 |  |
| *Criminal Justice (6) and Fire Science (3) only |  |  |
| Credit by Examination (Challenge) | 15 | 9 |

The maximum credit earned from non-traditional sources that may be applied toward the associate degree is twenty semester hours and twelve semester hours for certificates.

## College Level Examination Program - CLEP

Chattahoochee Valley Community College will award credit through selected CLEP examinations provided the student earns a minimum score as recommended by the American Council on Education (ACE).

## CLEP Subject Matter Examinations

|  | Credit Awarded | CVCC Course Equivalent(s) |
|---|---|---|
| **Business** |  |  |
| Information Systems and Computer Applications | 3 | CIS 146 |
| Introductory Accounting | 6 | BUS 241, 242 |
| Introductory Business Law | 3 | BUS 261 |
| Introduction to Management | 3 | MST 201 |
| Introductory Macroeconomics I | 3 | ECO 231 |
| Introductory Microeconomics II | 3 | ECO 232 |
|  |  |  |
| **Language and Fine Arts** |  |  |
| American Literature w/Essay | 6 | ENG 251, 252 |
| English Literature w/Essay | 6 | ENG 261, 262 |
| Spanish | 3 | SPA 101 |
|  |  |  |
| **Mathematics and Science** |  |  |
| College Algebra | 3 | MTH 112 |
| College Trigonometry | 3 | MTH 113 |
| Calculus w/Elementary Functions | 4 | MTH 125 |

54

CVCC 000057

| | | |
|---|---|---|
| **Social Science & Public Service Technologies** | | |
| Western Civilization I Near East to 1648 | 3 | HIS 121 |
| Western Civilization II 1648 to Present | 3 | HIS 122 |
| American History I Early Colonial to 1877 | 3 | HIS 201 |
| American History I 1865 to Present | 3 | HIS 202 |
| General Psychology | 3 | PSY 200 |
| Introductory Sociology | 3 | SOC 200 |

## DANTES Subject Standardized Tests

Chattahoochee Valley Community College will award credit through selected DANTES examinations provided the student earns a minimum score as recommended by the American Council on Education (ACE).

| | Credit Awarded | CVCC Course Equivalent(s) |
|---|---|---|
| **Business** | | |
| Introduction to Business | 3 | BUS 100 |
| Introduction to Management | 3 | MST 201 |
| Principles of Financial Accounting | 3 | BUS 241 |
| Business Law I | 3 | BUS 261 |
| Basic Marketing | 3 | BUS 285 |
| Principles of Economics II | 3 | ECO 232 |
| **Mathematics and Science** | | |
| College Algebra | 3 | MTH 112 |
| Plane Trigonometry | 3 | MTH 113 |
| Calculus I | 4 | MTH 125 |
| Calculus II | 4 | MTH 126 |
| Linear Algebra | 4 | MTH 237 |
| College Physics II | 4 | PHY 213 |
| College Chemistry | 4 | CHM 111 |
| **Social Sciences and Public Service Technology** | | |
| History of Western Civilization to 1500 | 3 | HIS 121 |
| History of Western Civilization since 1500 | 3 | HIS 122 |
| General Anthropology | 3 | ANT 200 |
| Introduction to Criminology | 3 | CRJ 208 |

Credit for Subject Examinations will be granted provided the student has not previously been enrolled in the course for which credit is to be earned. CLEP/DANTES credit shall not be granted for college level courses previously failed, for courses in which credit for higher-level courses has already been earned, or for both subject examination and its course equivalent.

Credit through CLEP/DANTES examinations will not be recorded on the student's permanent record until the student has earned a minimum of twelve semester hours at Chattahoochee Valley Community College. Notation will be made on the student's permanent record indicating the area where credit was awarded with the statement "Credit by Examination" followed by the number of semester hours granted.

**The policy of granting credit through CLEP/DANTES examinations may differ from policies at other colleges and the student is cautioned to check with other colleges to obtain additional information.**

CVCC 000058

# CREDIT BY EXAMINATION

Credit by Examinations opportunities are available in some subject areas for which CLEP and DANTES examinations are not available or recognized by the College. Students should contact the Dean of Instruction for more information.

Credit by Examination is subject to the following regulations and guidelines.

1.  An admitted student must apply to the Dean of Instruction for requesting a Credit by Examination.

2.  A student may not challenge a specific course more than once.

3.  A maximum of fifteen hours of credit toward the degree or nine toward the certificate may be earned through challenge examinations.

4.  Students must be enrolled in the College and must not have audited or have been previously enrolled in the course for credit at any postsecondary institution. The student must enroll as a regular student in the course to be challenged. This provision includes payment of the respective tuition charges and applicable fees for the course.

5.  The student who passes a challenge examination will receive credit for the course with the notation on the transcript of credit extended and the method by which the credit was earned (credit by examination).

6.  No credit earned through challenge examinations will be extended to any student until the student has completed twelve semester hours of credit at CVCC.

7.  Challenge examinations will not be administered if the student has already received credit for advanced work in the subject area beyond the course for which the examination is being requested.

8.  Credit by Examination procedures may not be utilized to remove or supersede any grade previously earned in a given course or equivalent, including courses which were failed.

9.  A $40 administrative fee will be required for each request to earn Credit by Examination.

# CREDIT THROUGH ADVANCED PLACEMENT

Chattahoochee Valley Community College will grant college credit to students who score 3, 4, or 5 on one or more of the Advanced Placement Program Examinations of the College Entrance Examination Board, not to exceed 15 hours credit. To be eligible, the student must take the examination prior to enrollment in college and must be enrolled at the College when credit is awarded.

# CREDIT FOR MILITARY TRAINING AND EDUCATIONAL EXPERIENCES

Chattahoochee Valley Community College will consider on an individual basis, military experiences as a substitute for approved courses in the student's training and educational curriculum. It will be the responsibility of the student to apply for credits by completing the Request for Military Credit form and providing certified copies of the Military Service form to the Admission Office. Credits extended by the College will be applicable toward the individual's graduation requirements and once the credit is extended the student will be restricted from enrolling in the course for which the substitution was made.

CVCC 000060

Guidelines to be utilized in extending credit are as follows:

1. United States Armed Forces Institute (USAFI) - Credit may be given for study or correspondence study applicable to the student's curriculum which was taken through the United States Armed Forces Institute (USAFI) provided the course is recommended by the American Council on Education. The student must submit official evidence of satisfactory completion of the work to the Office of Admissions.

2. Military Service Schools - Training courses completed in the armed forces that are applicable to the student's curriculum and approved by the American Council on Education may be accepted for credit upon submission of official documentation to the Office of Admissions that such courses were satisfactorily completed.

3. The College will consider credit earned for college-level courses reported through the Defense Activity for Non-Traditional Educational Services Support (DANTES). Credit allowed will be based upon the recommendations of the American Council on Education.

# GRADUATION REQUIREMENTS
## DEGREE REQUIREMENTS

Chattahoochee Valley Community College awards the Associate in Arts degree or the Associate in Science degree to eligible individuals desiring to transfer to senior colleges or universities and the Associate in Applied Science degree to individuals desiring to pursue a specific career program of study.

To become eligible to receive an associate degree from Chattahoochee Valley Community College, the student must fulfill the following requirements:

1. **Associate in Arts or Associate in Science degree** - Completion of a minimum of 60-64 semester hours credit in an approved Associate in Arts or Associate in Science degree program with sixteen semester hours taken at Chattahoochee Valley Community College (the exact number of hours required in each program is specified in the Program of Study section, pages 65-74). Students must complete at least 25% of semester credit hours at CVCC.

   **Associate in Applied Science degree** - Completion of a minimum of 64-70-semester hours credit in an approved Associate in Applied Science degree with 25% of the semester hours taken at Chattahoochee Valley Community College (the exact number of hours required in each program is specified in the Program of Study section, pages 65-74).

2. Meet all requirements for graduation within a calendar year of the last semester/term of attendance.

3. Successfully complete the general education and other required courses as specified in the program of study.

4. Achieve a minimum cumulative grade point average of 2.00.

5. Fulfill all financial obligations to the College.

6. Complete formal application for graduation by the specified deadline date.

7. Complete all incomplete grades.

8. Pay the specified graduation fee.

9. Participate in commencement ceremonies. Students must participate in ceremonies unless prevented from doing so by unusual or extenuating circumstances. Students may be excused from participation in commencement ceremonies ONLY by submitting in writing a formal request to the Director of Admissions and Records stating the nature of the unusual or extenuating circumstances. If the request is granted, the student must contact the Office of Admissions to arrange for receipt of the diploma.

Any exception or waiver of these requirements may be approved at the discretion of the Deans of the College.

CVCC 000061

# CERTIFICATE REQUIREMENTS

To become eligible to receive a Certificate the student must fulfill the following requirements:

1. Meet all admissions requirements.

2. Satisfactorily complete an approved program of study. (See the Programs of Study section for Certificate requirements.)

3. Achieve a minimum cumulative grade point average of 2.0.

4. Complete at least one-half the total semester credit hours required in the program at Chattahoochee Valley Community College.

5. Meet all requirements for graduation within a calendar year of the last semester/term of attendance.

6. Complete a formal application for the certificate by the specified deadline date.

7. Fulfill all financial obligations to the College.

# COMPETENCY REQUIREMENTS FOR GRADUATION

In order to ensure that students have acquired certain competencies before they graduate, Chattahoochee Valley Community College has established the following requirements:

1. In order to develop competency in writing, reading, and computation, students must take the COMPASS Placement Test and must take and satisfactorily complete developmental courses if required by the assessment results. All students must then take at least two written communications skills courses at the college level and reading courses, if required until the exit level is at the twelfth grade or higher. Competencies required for completion of each course are designated on each course syllabus.

2. Competency in the use of computers is required of all students in order to graduate. Every student must take at least one computer course unless he/she can demonstrate computer literacy otherwise. Competencies required for completion of the computer literacy course are designated on the course syllabus.

3. Students must achieve a 2.0 cumulative grade point average in order to graduate. They must satisfy objectives (competencies) included on the syllabus for each course in order to pass the course.

# DUAL DEGREE POLICY

To qualify for a second associate degree, a student must complete an additional 16 semester hours above the degree requirements for the first associate degree, and maintain a grade of "C" or higher.

Students may earn two or more AAS degrees as long as they complete the specified requirements listed in the curriculum for each field of study.

Students seeking to earn an AAS and an AA or AS degree must (1) complete the specified curriculum requirements for the AAS degree, (2) complete the general education requirements for the AA or AS degrees, and (3) complete a sufficient number of elective hours.

CVCC 000062

# APPLICATION FOR GRADUATION

Individuals planning to graduate should make application for graduation to the Office of Admissions by the date specified in the College's academic calendar. Compliance with this deadline will allow the College to evaluate the student's eligibility for graduation and notify the student concerning remaining graduation requirements, if any.

Deadlines will be waived only with approval from the Dean of Student and Administrative Services. Although students may complete requirements for graduation during any semester, degrees will not be officially conferred until commencement ceremonies at the end of Spring Semester. The official date that the student has completed requirements for the degree will be specified on the student's permanent transcript.

## GRADUATION HONORS
### DEGREES

Superior academic achievement by graduating students shall be designated on transcripts by the following:

Summa Cum Laude............................................................................................3.90-4.00 GPA
Magna Cum Laude............................................................................................3.70-3.89 GPA
Cum Laude .........................................................................................................3.50-3.69 GPA

## GRADUATION HONORS
### CERTIFICATES

Superior academic achievement by students earning certificates shall be designated on transcripts as follows:

Graduation with Distinction ..................................................................................3.50-4.0 GPA

Note: Calculation of the GPA for graduation honors shall be identical to the method used to calculate the GPA to fulfill graduation requirements for the degree or certificate to be earned. In addition, to be eligible for a graduation honor, the student must have completed a minimum of thirty-two semester hours at the College. All awards and honors are computed based on the student's standing at the end of the Spring Semester prior to graduation.

## WITHHOLDING OF GRADUATION, DIPLOMA, AND OFFICIAL TRANSCRIPTS

It is the position of the administration of Chattahoochee Valley Community College that in order for a college degree or certificate to have true merit and meaning, it should only be granted upon a student's having demonstrated the level of effort and responsibility indicative of a worthy graduate. Therefore, it is the policy of the College that a student shall earn entitlement to a degree or certificate only by successfully completing a prescribed course of study; paying all tuition, fees, and other appropriate charges; and fully abiding by the College's policies, rules, and regulations. In the event of the failure of a student to meet any of these three basic requirements for graduation, the College shall reserve the right to withhold official graduation and the awarding of a degree or certificate to such student and, until such deficiency is rectified, to include a notation on the student's official transcript that the student is ineligible for graduation.

Furthermore, it is the policy of Chattahoochee Valley Community College that any student who has failed to make timely payment of any tuition, fees, or other appropriate charges shall be ineligible to re-enroll for any subsequent academic semester at the College, except upon special permission from the President, until such time as appropriate payment is made. The College also reserves the right to withhold the issuance of the official transcript of any student who shall have failed to make timely payment of any tuition, fee, or other appropriate charge, until such time as full payment is made.

CVCC 000063

The Admissions Office shall have the authority to impose the withholding of official graduation, certificate, and/or release of official transcripts as long as such authority is exercised in a manner consistent with the intent of this policy.

In the event that the College shall intend to withhold official graduation from a student, withhold the awarding of a degree or certificate to a student, withhold the release of an official transcript, or declare a student ineligible for further enrollment, the Dean of Student and Administrative Services shall provide written notice to the student of such intent. The notice shall be delivered by personal service or mailed to the student's last known home address. The notice shall state the type of action intended to be taken by the College.

A student who receives notice that any of the above-described actions is to be taken shall have the right to meet with the Admissions Officer and request that the action not be taken. If the student substantiates that the basis stated for the action is erroneous, or if the student demonstrates to the satisfaction of the Admissions Officer that the respective problem will be resolved within a time frame acceptable to him/her, or if the Admissions Officer determines for any other appropriate reason that the intended action should be rescinded or modified, he/she shall have the authority to withdraw or modify the action. The Admissions Officer shall provide written notice to the student of any such rescission or modification. The Admissions Officer shall also have the authority to make such rescission or modification conditional upon the student's meeting certain stated requirements, and in such cases, the Admissions Officer shall retain the right to re-impose the action if the stated conditions are not met by the student.

# COOPERATIVE ARRANGEMENTS

Chattahoochee Valley Community College and Troy State University - Phenix City participate in an arrangement that provides for sharing of facilities such as the Learning Resource Center. This arrangement is designed to foster institutional cooperation in meeting the higher education needs of the citizens of the College's service area and to promote the transfer of Chattahoochee Valley Community College students to Troy State University.

# ROTC AT COLUMBUS STATE UNIVERSITY

The Reserve Officers' Training Corps (ROTC) Department at Columbus State University allows CVCC students to take ROTC classes at the Columbus State University Campus. CVCC students must apply as transient students, receive transient student permission, and be full-time students. Courses taken at the Columbus State University ROTC Department are offered at no cost to the first six qualified applicants. Additional students will be considered on a case-by-case basis. Qualified students may compete for ROTC academic scholarships, Association of the United States Army (AUSA) scholarships, The Retired Officers Association (TROA) scholarships, and other civilian awards programs.

Students are considered ineligible if they:

- are not full-time students

- are not U.S. citizens

- are parolees, or have had a criminal conviction involving jail sentences or probation

- are a veteran with more than ten years time in service

- are a veteran ineligible for reentry into military service

- will be older than thirty-three by the time they finish a four-year degree

- are married to another service member and have minor children

CVCC 000064

Upon completing ROTC and a baccalaureate program of their choice, students are commissioned as second lieutenants in the United States Army.

The Military Science Department at Columbus State University is staffed by active duty officers and noncommissioned officers. The military science curriculum, thirty-one credit hours, is divided into the basic course (freshman and sophomore) and the advanced course (junior and senior). The basic course is open to all eligible students. The advanced course is open only to those who complete the basic course or equivalent placement credit. Textbooks and other required course materials are furnished at no cost.

The basic course is the program offered to eligible Chattahoochee Valley Community College students. It requires ten credit hours in leadership and general military subjects which qualify students for transfer to the advanced course at Columbus State University in their junior year.

Required military science courses are ROTC 1215 (Concepts of Leadership), ROTC 1216 (Basic Leadership Skills), ROTC 2225 (Advanced Leadership), ROTC 2226 (Tactics and Officership), and a ROTC elective. While taking these courses, students may be eligible to compete for ROTC academic scholarships. The military cadre will brief students on the scholarships during the course of instruction. Students in this program may participate in leadership labs, M16 rifle marksmanship, field training exercises, rappelling, and other training sponsored by the ROTC program.

# RECIPROCITY AGREEMENTS AFFECTING TUITION

By approval of the Alabama State Board of Education, Georgia residents living in counties contiguous to Lee and Russell Counties in Alabama pay the same tuition and fees assessed Alabama residents. By approval of the Georgia Board of Regents, Alabama residents living in Alabama counties contiguous to Muscogee County, Georgia, pay the same tuition and fees at Columbus State University as those assessed Georgia residents (See Tuition and Fee Schedule, p. 27).

# SERVICEMEMBER'S OPPORTUNITY COLLEGES ASSOCIATE DEGREE (SOCAD)

SOCAD is a system of voluntary off-duty college curricula designed for soldiers and their adult family members. SOCAD-2 is the associate degree program and SOCAD-4 is the bachelor's degree program.

The system was established to improve the quality of college programs offered for soldiers and family members. SOCAD-2 and SOCAD-4 provide military students with the opportunities to complete college programs without the loss of credit because of frequent changes of duty station. Curricula in SOCAD are offered only by regionally accredited colleges on or accessible to most Army installations worldwide.

The system is operated by Servicemembers Opportunity Colleges (SOC) for the Army.

Through prior agreement students in SOCAD Programs:

(1)   are issued a SOCAD Student Agreement upon enrolling.

(2)   have a residency credit limited to one-fourth of total degree requirements taken at any time.

(3)   are awarded credit for non-traditional learning, MOS experience, military training courses, and results of national examinations, based on recommendations of the American Council on Education.

CVCC 000065

(4)   guaranteed transferability of credit among colleges in the SOCAD networks, with no individual prior approval necessary. (This guarantee is available only for students who have been issued SOCAD Student Agreements.)

(5)   guaranteed transfer of a SOCAD-2 to a related SOCAD-4 curriculum to meet at least forty-five percent of the requirements for a bachelor's degree.

(6)   are offered acceptance of family members as SOCAD students.

The degree can be completed after leaving the service. Participation in the SOCAD system begins for the student when a SOCAD Student Agreement is issued by the home college. Official evaluations are completed upon the request of the student after enrollment.

CVCC 000066

# PROGRAMS OF STUDY

CVCC 000067



CVCC 000068

# NURSING (ADN)

## Associate in Applied Science
## Degree Requirements

The Nursing Mobility program enables the Licensed Practical Nurse (LPN) to complete a one-year curriculum leading to an Associate in Applied Science degree. This qualifies the graduate to apply to write the National Council Licensure Examination: NCLEX-RN. The Nursing program is approved by the Alabama Board of Nursing and is accredited by the National League for Nursing. All agencies used as clinical experience for students are approved by their appropriate accrediting organization.

**Alabama Board of Nursing policy requires that students in a mobility program in the State of Alabama who attend clinicals in any Alabama hospital must possess a nursing license in the State of Alabama.**

**It is important for nursing students to note, however, that the review for candidates for eligibility for initial and continuing licensure in Alabama will include questions concerning such matters as whether they have ever been arrested or convicted of a criminal offense and whether they have ever been arrested or convicted for driving under the influence of alcohol. Application to write the examination may be denied on the basis of the review.**

The program requires seventy semester hours for completion including eleven hours awarded for the validation exam. Eleven hours of credit will be awarded for NUR 111, 121, 201, 202, 203, and 241 on admission to the Nursing program and successful completion of clinical skills check-offs.

Admission to the ADN program is competitive, and while the student may be admitted to the College, he/she may not be admitted to the program. Factors influencing admission are listed in the Admission Criteria.

## REQUIRED GENERAL EDUCATION COURSES

| | Prereq | SU | Semesters F | SP |
|---|---|---|---|---|
| **AREA I (6)** | | | | |
| ENG 101  English Composition I (Prerequisite) | 3 | | | |
| ENG 102  English Composition II | | | 3 | |
| **AREA II (3)** | | | | |
| Humanities Elective | | | 3 | |
| **AREA III (19)** | | | | |
| BIO 103  Principles of Biology (Prerequisite) | 4 | | | |
| BIO 201  Human Anatomy and Physiology I | | | 4 | |
| BIO 202  Human Anatomy and Physiology II | | | | 4 |
| BIO 220  General Microbiology | | | 3 | |
| MTH 100  Intermediate College Algebra | | | | |
| **AREA IV (3)** | | | | |
| PSY 200  General Psychology (Prerequisite) | 3 | | | |
| **AREA V** | | | | |
| NUR 131  Health Assessment | | | 1 | |
| NUR 242  Advanced Pharmacology | | | 2 | |

103

CVCC 000107

|  | Prereq | SU* | Semesters F | SP |
|---|---|---|---|---|
| NUR 252 Adult Nursing II .................................................................................. |  |  | 5 |  |
| NUR 271 Maternal Newborn Nursing.................................................................... |  |  | 4 |  |
| NUR 272 Pediatric Nursing ................................................................................. |  |  |  | 2 |
| NUR 279 Concepts of Psychosocial Nursing II.................................................... |  |  |  | 3 |
| NUR 291 Transition into Nursing Practice ........................................................... |  |  |  | 2 |
| NUR 292 Nursing Licensure Examination Review ................................................ | 10 | 12 | 26 | 15 |

**NOTE: CHANGE - A new state-wide standardized curriculum will become effective with the 2006 ADN mobility class. For the 2005 class, admission policies and program requirements will change. For more information, please call 291-4925.**

CVCC 000108

# NURSING CAREER
## MOBILITY PROGRAM (ADN)
### ADMISSIONS CRITERIA

1. Applicants must meet all the admission requirements to be admitted as a regular student to the College.

2. An Application for Admission to the Nursing Mobility Career program must be completed and submitted to the Nursing Office. Applications are available upon request. Testing dates will be announced in a letter to prospective students after the application process is complete.

3. Students must be Licensed Practical Nurses (LPNs) or recent graduates of an LPN program in order to apply for the Nurse Mobility program. Practical nurses must have three months of clinical work experience within the thirty-six-month period prior to beginning the program. Recent graduates of PN programs may apply provided that they commit to document 500 hours of work experience by the June date the program begins. All supporting documents must be in the student's file. All application material except transcripts should be sent to the Nursing Division. Transcripts should be sent by the school attended to the Admissions Office. **It is the student's responsibility to verify that his/her transcript has been received by the Admissions Office.**

4. Applicants who meet the requirements specified in #1 and #2 will be invited to take the admission/validation tests on the dates specified for the tests. Failure to enroll after acceptance constitutes forfeiture of position, and the individual must repeat the entire admission process if he/she seeks admission at a future date.

5. The following factors will be considered in granting provisional admission to the program: scores on the admission/validation examination (50th percentile in Foundations, and a combined average of 40th percentile in Maternal-Child Nursing), employee reference letters, and a GPA of 2.00 on previous college coursework. To gain unconditional admission, students must successfully pass skills check-offs in addition to passing the admission/validation exam. These check-offs will be conducted in the Spring Semester prior to entering the program. Failure will result in forfeiture of position in the program.

6. Students must have completed the following three courses, with a grade of "C" or higher, preferably at the College, prior to beginning study in the nursing program. Individuals may transfer these courses from other accredited colleges.
   BIO 103 Principles of Biology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   ENG 101 English Composition I . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   PSY 200 General Psychology  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   Students must take diagnostic tests in writing, mathematics, and reading at least two semesters prior to beginning prerequisite coursework in order to allow for completion of any required coursework.

7. In the interest of student and patient safety and before consideration for admission, any applicant possessing certain limitations may be required to submit medical examination records and/or statements from physicians indicating that he/she is able to fully participate with reasonable accommodation, if necessary, in the approved program of clinical studies and responsibilities. **Students must be able to perform the essential functions of the program.**

8. Evidence of current CPR certification, health insurance, and malpractice coverage as a nursing student must also be submitted to the Nursing Division. Malpractice insurance application forms are available upon request in the Nursing Division. If the student does not supply these documents to the Nursing Division by the established deadline, admission to the program will be denied.

CVCC 000109

9.   Once a student is admitted to the Nursing Mobility program, he/she will be responsible for accurately following the admissions criteria and the nursing curriculum design. Failure to follow the curriculum design as represented may affect progression in the program.

10.  Once provisionally admitted to the program, the student must complete all coursework at the College unless written approval is obtained from the Division Chairperson and the Dean of Instruction.

11.  Students enrolled in the Nursing Mobility program must earn a "C" or higher in all required courses in the nursing curriculum, in both nursing and non-nursing courses. This includes satisfactory completion of the clinical components of each course. Failure of clinical components results in failure of the course.

12.  Nursing courses 131, 242, and 251 may be taken only once. A student who fails to earn a "C" in any one of these courses must reapply to the nursing program. If a student fails to earn a "C" in two or more of the courses listed above, he/she will be excluded from the program and unable to reapply.

13.  Nursing courses NUR 252, 271, 272, 279, 291, and 292 may be repeated only once and are to be taken the next semester a course is offered provided space is available. If the student does not pass the nursing course on the second attempt, that student shall be excluded from the nursing program, but not the College. Students who repeat 252, 271, 272, 291, and 292 will be encouraged to successfully complete review packets for each course before retaking.

14.  The nursing student must complete the entire nursing program within twenty-four months of the date he/she begin his/her studies in the program or be excluded from the nursing program. If a nursing student fails two different nursing courses within the twenty-four-month period, he/she will be excluded from the program and CANNOT reapply. Exclusion from the nursing program does not constitute exclusion from the College.

15.  Withdrawal from nursing courses will be considered as failure (except in extenuating circumstances as determined by the Division Chairperson). The student must be passing at the time of the withdrawal for the circumstance to be considered.

16.  An Incomplete (I) in nursing courses will be given only in extreme extenuating circumstances (i.e., hospitalization of student, death of a student's immediate family member, or hospitalization of the student related to pregnancy) and is at the discretion of the instructor and Nursing Division Chairperson). Incompletes are not intended for students who are failing nursing courses.

17.  Nursing and non-nursing courses are to be taken in sequence as shown by the nursing curriculum design in this Catalog. When non-nursing courses are failed with a "D" or an "F", the student must repeat the courses the next semester they are offered, provided space is available. The student must be aware that if a grade of "D" or "F" is made in a non-nursing course that is a prerequisite to a nursing course the following semester, he or she may not advance to the next nursing course.

18.  Each student is responsible for mailing his/her own application to the Board of Nursing in the state in which he/she is applying for initial licensure, as well as to NCLEX. Each student is responsible for mailing the application and meeting any deadlines that the Board may announce.

19.  Transfer credit from other nursing programs is occasionally granted, and is done on an individual basis. A student who has been enrolled previously as a nursing student at another institution may be considered for admission after the application filing deadline date if time and space permit, but no guarantee of admission is granted. All applicants must take the entrance/validation examinations and meet all program requirements.

CVCC 000110

20. In addition to the above specification, students in the Nursing Mobility program must fulfill the same requirements and regulations expected of all students who are admitted to the College and outlined in the Nursing Student Handbook.

21. Applicants requiring reasonable accommodations under the Americans with Disabilities Act (ADA) are encouraged to call the ADA Coordinator at 214-4845 (Americans with Disabilities Act Compliance Plan, IV.).

*Special Costs for Nursing Students\**
Liability Insurance (required)
Nursing Pin (optional)
Uniform (required)
Board of Nursing Licensure Fee
NCLEX Fee
NLN Examinations (required per semester and included in Registration Costs)
Nursing Validation Examination and Clinical Testing (required)
Health Insurance (individual rates required)
Physical (required)
Hepatitis B vaccinations (optional but highly encouraged)

\*Costs for these items vary. For specific costs, the student should consult the Division Chairperson of Health Sciences.

107

CVCC 000111

# PRACTICAL NURSING (LPN)

## Certificate

The Practical Nursing (PN) program enables the student to complete a one-year curriculum leading to a certificate in Practical Nursing. This qualifies the graduate to apply to write the National Council Licensure Examination: NCLEX-PN. **It is important for nursing students to note, however, that the review for candidates for eligibility for initial and continuing licensure in Alabama will include questions concerning such things as whether they have ever been arrested or convicted of a criminal offense and whether they have ever been arrested or convicted for driving under the influence of drugs/alcohol.** Application to write the examination may be denied by the State Board on the basis of this review. Therefore, successful completion of the PN Program does not guarantee eligibility to write the NCLEX-PN. Other states have similar stipulations regarding licensure.

When the examination is passed, the student then becomes a Licensed Practical Nurse (LPN). At the time of the printing of this Catalog, the program requires fifty-three hours for completion of the three-semester sequence, including the nine hours of prerequisites required prior to admission.

| | | | Semesters | |
| Course | | F | SP | SU |
|---|---|---|---|---|
| LPN 105A | Fundamentals of Nursing | 6 | | |
| LPN 113 | Body Structure Function/Medical Vocabulary | 4 | | |
| LPN 104A | Pharmacology | 2 | | |
| MTH 186 | Medical Dosage Calculations | 3 | | |
| ENG 101 | English Composition I | 3 | | |
| LPN 152 | Adult Nursing IV | | 8 | |
| LPN 124A | Family Centered Nursing | | 6 | |
| LPN 142 | Adult Nursing III | | | 7 |
| LPN 118 | Mental Health Concepts | | | 2 |
| LPN 145A | Current Issues/Role Transition | | | 2 |
| LPN 140 | NCLEX-PN Examination Review | | | 2 |
| LPN 101 | Emergency First Aid | | | 2 |
| | | 18 | 14 | 15 |

See Appendix--LPN Course Directory

**Note: This curriculum is subject to change. There is a state-wide initiative to implement a standardized curriculum. Change subject to affect the fall 2005 class. For more information, please call 291-4925.**

CVCC 000112

# COURSE DESCRIPTIONS

CVCC 000113



CVCC 000114

**(MUP) INDIVIDUAL PERFORMANCE INSTRUCTION (0-2-1)**
Prerequisite: Permission of the instructor
F, Sp
Individual performance instruction is available in keyboard instruments, voice, strings, wood-winds, brass, percussion, and fretted instruments. Emphasis is placed on developing technique, repertoire and performance skills commensurate with the student's educational goals. Students are required to practice a minimum of five hours per week for each credit hour. Upon completion, students should be able to effectively perform assigned repertoire and technical studies in an appropriate performance evaluation setting. **Code B**

| | |
|---|---|
| MUP 101-02; 201-02 | PRIVATE PIANO I, II, III, IV |
| MUP 103-04; 203-04 | PRIVATE ORGAN I, II, III, IV |
| MUP 105-06; 205-06 | PRIVATE HARPSICHORD I, II, III, IV |
| MUP 111-12; 211-12 | PRIVATE VOICE I, II, III, IV |
| MUP 121-22; 221-22 | PRIVATE VIOLIN I, II, III, IV |
| MUP 123-24; 223-24 | PRIVATE VIOLA I, II, III, IV |
| MUP 125-26; 225-26 | PRIVATE CELLO I, II, III, IV |
| MUP 127-28; 227-28 | PRIVATE DOUBLE BASS I, II, III, IV |
| MUP 131-32; 231-32 | PRIVATE HARP I, II, III, IV |
| MUP 133-34; 233-34 | PRIVATE GUITAR I, II, III, IV |
| MUP 135-36; 235-36 | PRIVATE FRETTED INSTRUMENTS (OTHER THAN GUITAR) |
| MUP 141-42; 241-42 | PRIVATE FLUTE I, II, III, IV |
| MUP 143-44; 243-44 | PRIVATE CLARINET I, II, III, IV |
| MUP 145-46; 245-46 | PRIVATE SAXOPHONE I, II, III, IV |
| MUP 151-52; 251-52 | PRIVATE OBOE I, II, III, IV |
| MUP 153-54; 253-54 | PRIVATE BASSOON I, II, III, IV |
| MUP 161-62; 261-62 | PRIVATE TRUMPET I, II, III, IV |
| MUP 163-64; 263-64 | PRIVATE FRENCH HORN I, II, III, IV |
| MUP 165-66; 265-66 | PRIVATE MELLOPHONE I, II, III, IV |
| MUP 171-72; 271-72 | PRIVATE TROMBONE I, II, III, IV |
| MUP 173-74; 273-74 | PRIVATE EUPHONIUM I, II, III, IV |
| MUP 175-76; 275-76 | PRIVATE TUBA I, II, III, IV |
| MUP 181-82; 281-82 | PRIVATE PERCUSSION I, II, III, IV |

# NURSING (ADN)

See pages 159-160 for ADN prerequisites and corequisites.

### NUR 111. FUNDAMENTALS OF NURSING (4-0-4)
Prerequisite: Permission of the instructor
This course presents concepts and theories related to the art and science of nursing. Emphasis is placed on the application of the nursing process to provide and manage care as a member of the discipline of nursing. Students are introduced to the concepts of needs, growth and development, safety communication, teaching and learning, critical thinking, ethical-legal, nursing history, and the program's philosophy of nursing. Students should be able to demonstrate beginning competence in providing care for individuals with common health alterations. (Clinical required) **CORE Not offered at the College in the Nursing Mobility Program. Credit awarded by validation exam only.**

### NUR 121. CLINICAL NURSING SKILLS (0-6-2)
Prerequisite: Permission of the instructor
This course presents psychomotor nursing skills needed to assist individuals in meeting basic

CVCC 000145

human needs. Skills necessary for maintaining microbial, physical, and psychological safety are introduced along with skills needed in therapeutic interventions. Students will demonstrate beginning level of competency in performing basic nursing skills. (Lab/clinical required) **CORE Not offered at the College in the Nursing Mobility Program. Credit awarded by validation exam only.**

## NUR 131. HEALTH ASSESSMENT (0-3-1)
Prerequisite: Permission of the instructor
Su
This course is designed to provide students the opportunity to learn and practice history-taking and physical examination skills with individuals of all ages. The focus is on symptoms analysis along with physical, psychosocial, and growth and development assessment. Students will be able to utilize critical thinking skills in identifying health alterations, formulating nursing diagnosis and documenting findings appropriate to nursing. (Lab required) **CORE**

## NUR 201. SPECIALIZED AREA OF STUDY (1-0-1)
Prerequisite: Permission of the instructor
This course is directed toward the specialized study of theory and experiences in a selected area as determined by students, employers, and/or the program. Emphasis is placed on the development of knowledge in an area of interest to the student. The student should be able to meet the objectives of the course as approved by the instructor.
Not offered at the College in the Nursing Mobility Program. Credit awarded by validation exam only.

## NUR 202. SPECIALIZED AREA OF STUDY (2-0-2)
Prerequisite: Permission of the instructor
F
This course is directed toward the specialized study of nursing experiences in a selected area as determined by students, employers, and/or the program. Emphasis is placed on the development of knowledge and skills in an area of interest to the student. The student should be able to meet the theoretical and skill objectives of the course as approved by the instructor.

## NUR 203. SPECIALIZED AREA OF STUDY (0-3-1)
Prerequisite: Permission of the instructor
This course is directed toward the application of clinical experiences in a selected area as determined by students, employers, and/or the program. Emphasis is placed on the development of the knowledge and skills in an area of interest to the student. The student should be able to meet the theoretical and skill objectives of the course as approved by the instructor/preceptor. (Clinical required) **Not offered at the College in the Nursing Mobility Program. Credit awarded by validation exam only.**

## NUR 241. BASIC PHARMACOLOGY (0-3-1)
This course introduces the student to basic principles of pharmacology and the skills necessary to safely administer medications. Areas of emphasis include concepts of legal implications, pharmacokinetics, pharmacodynamics, calculation of drug dosages, and medication administration. Students will be able to demonstrate accurate dosage calculations, correct medication administration and knowledge of drug classification. (Lab required) **CORE Not offered at the College in the Nursing Mobility Program. Credit awarded by validation exam only.**

## NUR 242. ADVANCED PHARMACOLOGY (2-0-2)
Prerequisite: Admission to the A.D. N. Program and completion of validation process.
Corequisities: NUR 131, NUR 251, ENG 102 and BIO 201
Su
This course is designed to provide the student comprehensive knowledge of drug classifications and applications of pharmacology. Emphasis is placed on nursing responsibility, accountability, and application of the nursing process regarding drug therapy. The actions, dosages, side effects,

144

CVCC 000146

erse reactions are presented for drug prototypes from each classification of drugs. The stu-
will be able to synthesize knowledge of drug therapy in a variety of settings with individ-
across the life span. **CORE**

**NUR 251. ADULT NURSING I (3-6-5)** (Corequisites: NUR 131, 242, ENG
requisite: Admission to the A.D.N. Program
and BIO 201)
his course provides an opportunity to utilize the provider of care and manager of care roles to
eet nursing needs of adults in a variety of settings. Emphasis is placed on the aging process as
applies to normal developmental changes and alterations in health commonly occurring in the
ult. Students should be able to apply the nursing process in caring for adults in a variety of
settings. (Clinical required) **CORE**

**NUR 252. ADULT NURSING II (3-6-5)**
Prerequisite: NUR 131, 242, 251, and BIO 201 (Corequisite: BIO 202)
This course introduces concepts related to the nursing care of individuals experiencing acute and
chronic alterations in health. Emphasis is placed on utilizing the nursing process as a framework
for providing and managing nursing care to individuals. Student should be able to apply the
nursing process to individuals experiencing acute and chronic health alterations in a variety of
settings. (Clinical required)

**NUR 271. MATERNAL-NEWBORN NURSING (2-6-4)**
Prerequisite: NUR 131, 242, 251, and BIO 201 (Corequisite: BIO 202)
F
This course provides a family centered approach to the nursing care of the childbearing family.
Emphasis is placed on concepts related to the antepartal, intrapartal, post-partal, and neonatal
periods. The student should be able to manage and provide care to the childbearing family in a
variety of health care settings. (Clinical required)

**NUR 272. PEDIATRIC NURSING (2-6-4)**
Prerequisite: NUR 131, 242, 251, and BIO 201, 202 (Corequisite: BIO 220)
Sp
This course provides a family-centered approach to the nursing of children from infancy through
adolescence. Emphasis is placed on concepts, growth and development, health promotion, and
alterations in health. The student should be able to utilize the nursing process in providing and
managing nursing care to the family in a variety of health care setting. (Clinical required)

**NUR 279. CONCEPTS OF PSYCHOSOCIAL NURSING II (1-3-2)**
Prerequisite: NUR 131, 242, 251, and BIO 201, 202 (Corequisite: BIO 220)
Sp
This course provides expanded concepts related to the psychosocial needs of individuals.
Emphasis is on common and acute alteration in mental health and the related intervention
modalities. The student should be able to apply the concepts of individuals experiencing acute
and chronic alterations in mental health in a variety of settings.
(Clinical required)

**NUR 291. TRANSITION INTO NURSING PRACTICE (2-5-3)**
Prerequisite: Permission of the instructor and completing last semester coursework
Sp
This course prepares the student for transition into nursing practice. Emphasis is placed on the
roles of the professional nurse, concepts of leadership and management, and trends and issues
in health care delivery. The student will apply these concepts in the preceptor experience.
(Preceptorship required.)

145

CVCC 000147

**NUR 292. NURSING LICENSURE EXAMINATION REVIEW (2-0-2)**
Prerequisite: Permission of the instructor and completing last semester coursework
Sp
This course is designed to assist the student in preparation for the nursing examination.
Emphasis is placed on test taking skills, computer assisted simulations, and content basic to the
practice of nursing. The student should be able to pass the nursing licensure exam.

# PRACTICAL NURSING

See page 161 for LPN prerequisite and corequisities.

**LPN 101. EMERGENCY/FIRST AID (1-3-2)**
Prerequisite: As required by program
Su
This course will prepare the student to assess and make appropriate decisions to implement first
aid. Content emphasizes common health-related emergencies and preventive measures for
emergency/first aid. Upon completion of this course, the student will demonstrate proficiency
in written, oral, and skill requirements. (OPTIONAL)

**LPN 104A. PHARMACOLOGY (2-0-2)**
Prerequisite: MTH 100 or higher and admission to program (Corequisite: LPN 105A)
F
This course is an introductory course that introduces pharmacological concepts and safety prac-
tices involved in the use of medications as therapeutic agents. Content includes selected phar-
macological interventions and calculation of dosages and solutions. Emphasis is placed on nurs-
ing process. Upon completion, the student should be able to compute dosages and safely pre-
pare and administer medications. **CORE**

**LPN105A. FUNDAMENTAL OF NURSING (3-9-6)**
Corequisite: LPN 104A
F
This course is an introduction to basic nursing concepts and skills. Topics include basic needs,
medical terminology, homeostasis, and the health/wellness continuum. Upon completion of this
course, the student w ill demonstrate competency in providing fundamental care to all patients.

**LPN 113. HUMAN BIOLOGY FOR LPN (4-0-4)**
Prerequisite: Regular admission status
F, Sp, Su
This course introduces the human body with emphasis on structure, function, and pathology. No
laboratory is required.

**LPN 118. MENTAL HEALTH CONCEPTS (2-0-2)**
Prerequisite: LPN 104A, LPN 105A, LPN 152, LPN 124, ENG 101, LPN 113, MTH 186
Su
This course is designed to provide an overview of psychosocial adaptation and coping concepts
used throughout the life span. Topics include therapeutic communication skills, normal and
abnormal behaviors, treatment modalities, and developmental needs. Upon completion of this
course, the student will demonstrate the ability to assist client in maintaining psychosocial
integrity through the use of the nursing process. **CORE**

**LPN 124. FAMILY CENTERED NURSING (4-6-6)**
Prerequisite: LPN 104A, LPN 105A, ENG 101, LPN 113, MTH 186. Co-requisite: LPN 152.
Sp
This course is designed to utilize the nursing process to focus on the childbearing and com-
mensurate stages of the family unit. This introductory course focuses on the role of the Practical
Nurse in meeting the physiological, psychosocial, cultural, and developmental needs of the
family during antepartal, intrapartal, postpartal, newborn, and childhood stages. Course content

146

CVCC 000148

includes aspects of growth and development, health, teaching, health promotion, and prevention. Nutrition and pharmacology are integrated. Upon completion of this course, the student will demonstrate the knowledge necessary to deliver safe and effective nursing care. **CORE**

### LPN 140. NCLEX-PN EXAMINATION REVIEW (2-0-2)
Prerequisite: Last semester of program
Su
This course is designed to assist the student in preparing for the practical nursing licensure examination (NCLEX-PN). Emphasis is placed on test-taking skills, computer-assisted simulations and practice tests, development of a prescriptive plan for remediation, and review content specific to the practice of practical nursing. (OPTIONAL)

### LPN 142. ADULT NURSING III (3-2-7)
Prerequisite: Admission to the program and LPN 105A, LPN 113, LPN 104A, LPN 152, LPN 124. Co-requisite: LPN 118, LPN 101, LPN 140, LPN 145.
Su
This course provides expanded concepts related to nursing care of adults experiencing alterations in health. Content focuses on the nurse's role in meeting needs of clients experiencing disorders/diseases involving the nervous and sensory, reproductive, endocrine, and gastrointestinal systems. Concepts of nutrition, pharmacology and therapeutic communication are integrated. Upon completion, the student should be able to provide comprehensive nursing care in a safe and effective manner. **CORE**

### LPN 145. ROLE TRANSITION (2-0-2)
Prerequisite: Last semester of program
Su
This course is designed to provide the student with the knowledge and skills necessary to make the transition from student to LPN practitioner. Content includes the professional responsibilities of the LPN, leadership skills, quality assurance, fiscal management, professional accountability, resume preparation, job interviewing skills, obtaining/resigning employment, and preparation for the NCLEX-PN. Upon completion of this course, the student will demonstrate knowledge and skills necessary for entry into practical nursing. **CORE**

### LPN 152. ADULT NURSING IV (4-12-8)
Prerequisite: Admission to the program and LPN 105A, LPN 113, LPN 104A. Co-requisite: LPN 124.
Sp
This course is a study in application of the nursing process. It provides the student with the knowledge and skills necessary to meet the needs of individuals experiencing acute and chronic alterations in health throughout the adult life span. Emphasis is placed on utilizing the nursing process as a focus for clients experiencing diseases/disorders involving immune, oncological, musculoskeletal, cardiovascular, respiratory, surgery, integumentary, and genitourinary systems and fluid and electrolyte disturbances. Concepts of nutrition, pharmacology and therapeutic communication are integrated. Upon completion, the student will demonstrate knowledge and skills necessary to provide safe and effective care. **CORE**

## OFFICE ADMINISTRATION

### OAD 100. BASIC KEYBOARDING (1 to 3)
This course is designed to enable the student to develop touch-keyboarding skills for efficient use of the typewriter or microcomputer through classroom instruction and outside lab. Emphasis is on speed and accuracy in keying alphabetic, symbol, and numeric information. Upon completion, the student should be able to demonstrate proper technique while keying on a typewriter or microcomputer keyboard. **Code C**

147

CVCC 000149

# APPENDIX

## NURSING COURSE DIRECTORY
## ADN COURSES

| COURSE TITLE | PREREQUISITES | COREQUISITE |
|---|---|---|
| **NUR 111-** Fundamentals of Nursing | Validation Exam ENG 101, PSY 200, BIO 103 | Validation Exam NUR 121, 241, 201, 202, 203 |
| **NUR 121-** Clinical Nursing Skills | Validation Exam ENG 101, PSY 200, BIO 103 | Validation Exam NUR 111, 241, 201, 202, 203 |
| **NUR 241-** Basic Pharmacology | Validation Exam ENG 101, PSY 200, BIO 103 | Validation Exam NUR 111, 121, 201, 202, 203 |
| **NUR 201-** Specialized Area of Study | ENG 101, PSY 200, BIO 103 | NUR 111, 121, 202, 203, 241 |
| **NUR 202-** Specialized Area of Study | ENG 101, PSY 200, BIO 103 | NUR 111, 121, 241, 201, 203 |
| **NUR 203-** Specialized Area of Study | ENG 101, PSY 200, BIO 103 | NUR 111, 121, 241, 201, 202 |
| **NUR 131-** Health Assessment | ENG 101, PSY 200, BIO 103, NUR 111, 121, 241, 201, 202, 203 | BIO 201, ENG 102, NUR 242, 251 |
| **NUR 242-** Advanced Pharmacology | ENG 101, PSY 200, BIO 103 Validation Courses, NUR 111, 121, 241, 201, 202, 203 | BIO 201, ENG 102, NUR 131, 251 |
| **NUR 251-** Adult Nursing I | ENG 101, PSY 200, BIO 103 Validation Courses, NUR 111, 121, 241, 201, 202, 203 | BIO 201, ENG 102, NUR 131, 242 |
| **NUR 252-** Adult Nursing II | ENG 101, 102, BIO 103, NUR 131, 242, 251, PSY 200 | BIO 201, BIO 202, MTH 100, SPH 107, NUR 271 |

159

CVCC 000161

| | | |
|---|---|---|
| **NUR 271-**<br>Maternal-Newborn Nursing | ENG 101, 102, BIO 103, BIO 201,<br>PSY 200, Validation Courses,<br>NUR 131, 242, 251 | BIO 202, MTH 100,<br>SPH 107, NUR 252 |
| **NUR 272-**<br>Pediatric Nursing | ENG 101, 102, BIO 103, 201, 202,<br>PSY 200, Validation Courses,<br>NUR 131, 242, 251 | BIO 220, NUR 279,<br>291, 292 |
| **NUR 279-**<br>Concepts of<br>Psychosocial Nursing | ENG 101, 102, BIO 103, 201, 202<br>PSY 200, Validation Courses,<br>NUR 131, 242, 251 | BIO 220, NUR 272,<br>291, 292 |
| **NUR 291-**<br>Transition into<br>Nursing Practice | ENG 101, 102, BIO 103, 201, 202<br>PSY 200, Validation Courses,<br>NUR 131, 242, 251 | BIO 220, NUR 272,<br>279, 292 |
| **NUR 292-**<br>Nursing Licensure<br>Examination Review | ENG 101, 102, BIO 103, 201, 202<br>PSY 200, Validation Courses,<br>NUR 131, 242, 251 | BIO 220, NUR 272,<br>279, 291 |

CVCC 000162

# LPN COURSES

| COURSE TITLE | PREREQUISITES | COREQUISITE |
|---|---|---|
| LPN 104A-Pharmacology | None | ENG 101, MTH 186, LPN 113, LPN 105A |
| LPN 105A-Fundamentals | None | ENG 101, MTH 186, LPN 113, LPN 104A |
| LPN 124- Family Centered Nursing | ENG 101, MTH 186, LPN 113, LPN 105, LPN 104 | LPN 152 |
| LPN 152-Adult Nursing IV | ENG 101, MTH 186, LPN 113, LPN 105A, LPN 104A | LPN 124 |
| LPN 101- Emergency First Aid | ENG 101, MTH 186, LPN 113, LPN 105A, LPN 104A, LPN 124, LPN 152 | LPN 118, 140, 142, 145 |
| LPN 118- Mental Health Concepts | ENG 101, MTH 186, LPN 113, LPN 105A, LPN 104A, LPN 124, LPN 152 | LPN 101, 140, 142, 145 |
| LPN 140- NCLEX-PN Examination Review | ENG 101, MTH 186, LPN 113, LPN 105A, LPN 104A, LPN 124, LPN 152 | LPN 101, 118, 142, 145 |
| LPN 142-Adult Nursing II | ENG 101, MTH 186, LPN 113, LPN 105A, LPN 104A, LPN 124, LPN 152 | LPN 101, 118, 140, 145 |
| LPN 145-Current Issues/ Role Transition | ENG 101, MTH 186, LPN 113, LPN 105A, LPN 104A, LPN 124, LPN 152 | LPN 101, 118, 140, 142 |

**\*\*ALL COURSES SUBJECT TO CHANGE FOR FALL, 2005. PLEASE CALL HEALTH SCIENCE FOR MORE SPCEFIC INFORMATION 291-4925.**

CVCC 000163

2. Specifying in the notice of appeal clear and specific objections(s) to the finding(s), conclusion(s), or recommendation(s), affirmed by the President.

If the appeal is not filed with the Chancellor by the close of business on the fifteenth day following the Grievant's receipt of the President's report, the Grievant's opportunity to appeal shall have been waived. If the appeal does not contain clear and specific objections to the President's report, it shall be denied by the Chancellor.

**Review by the Chancellor**

If an appeal is accepted by the Chancellor, the Chancellor shall have thirty (30) calendar days from his/her receipt of the Grievant's notice of appeal to investigate and review the allegations contained in the agreement, to review the report of the President and the Hearing Committee, to hold an appellant hearing (if he/she deems such appropriate), and to issue a report of his/her findings of fact and conclusions of law. The Chancellor shall have the authority to (1) affirm, (2) reverse, or, (3) affirm in part or reverse in part the findings, conclusions, and recommendations of the President and/or Hearing Committee. The report of the Chancellor shall be served to the Grievant and the Respondent(s) by personal service or certified mail, return receipt requested, to the respective home addresses of the parties. The report of the Chancellor shall not be further appealable except as allowed by the policies of the State Board of Education. However, the Grievant shall not be precluded from filing a grievance with an appropriate court or administrative agency.

**General Rule on Filing Deadlines**

If the last date for filing a document under this procedure falls on a Saturday, Sunday, or legal holiday, the date of the first business day following the respective Saturday, Sunday, or legal holiday shall be considered the deadline date.

# GRADE APPEAL PROCEDURE

It is the policy of CVCC that students should have the opportunity to appeal any grade which a student has reason to believe does not accurately and fairly represent the nature of the classwork which the student has performed. Therefore, the College has established a grade appeal procedure to be used if a student has valid reason to believe that a grade which the student received for an examination, a written/oral presentation, a project, or other required classroom activity, is either an inaccurate or unfair grade. A student must make the initial grade inquiry within seven calendar days after the student receives notice of the grade in question except in the case of a punitive grade issued for academic misconduct, which must be appealed by the end of the class day following the date on which the sanction was imposed. Thereafter, each subsequent appeal, if any, must occur within a seven-calendar day increment after the respective decision is received by the student. If a student does not meet the deadline for appealing a grade, the right to appeal will be waived. For grades on final examinations or grades that represent the final grade for the course, the initial seven-day period shall begin to accrue on the first class day of the next academic term. In appealing a grade, the student shall have the opportunity to have his or her concern about the grade reviewed through the following procedures:

The student shall begin by stating either orally or in writing to the instructor that the grade in question is either inaccurate, unfair, or both, and include the justification for appeal. If the student and the instructor cannot successfully resolve the student's concern, the student may then contact the Chairperson of that instructor's division or program. The student shall appeal to the Division Chairperson by submitting the appropriate form stating his/her concern regarding the grade, and describing the prior discussion with the instructor. (If the Instructor issuing the grade is the Chairperson of the respective division or program, the student may appeal directly to the Dean of Instruction.) The Division Chairperson will review the student's grade issue. The Chairperson shall have the authority to call in the Instructor or to ask for the assistance of another CVCC Instructor or seek the opinion of an expert in the subject area under review. If the student's concern about the grade cannot be successfully resolved at this level, the student shall be given the opportunity to take the appeal to the Dean of Instruction. The faculty member shall also have the right to appeal a decision of the Division Chairperson to the Dean. Appeal information must be submitted on the proper form and must contain the following:

CVCC 000203

1. Name and course number of the grade under appeal.

2. Names of the student and the Instructor.

3. The term, day(s) of the week, and time of day that the course was taken.

4. A concise description of the student's complaint and narrative explanation of why it is felt that the grade was unfair, inaccurate, or both.

5. The date that the student first took the appeal to the Instructor.

6. A summary of the result of the student's appeal to the Instructor.

7. The date that the student took the appeal to the Division Chairperson.

8. A summary of the result of the student's appeal to the Division Chairperson.

In addition to the above information, the student and/or instructor should include a photocopy of any and all documents that the student and/or the instructor believes would assist the Dean in reviewing the grade appeal. The Dean shall review the appeal, schedule a meeting with the student and the Instructor and render a written report within fourteen calendar days after the Dean's receipt of all of the appeal information. The Dean shall have the authority to consult with the instructor, the Division Chairperson, or other persons who have expertise in the subject area. Once the Dean has completed the review of the grade appeal, a written report describing her findings and conclusions will be provided to the student, instructor, and Division Chairperson. In the event that the Dean determines that a change in the student's grade is in order, the student's official grade will be changed under the authority of the President of CVCC, which has been delegated to the Dean, to render final rulings on grade appeals. Therefore, the decision of the Dean will be final and not subject to further appeal.

NOTE: The same general process may be used by a student who wishes to express a concern about the fairness and appropriateness of other strictly academic matters. In reviewing appeals regarding matters other than grades, the Dean of Instruction will provide a memorandum of the findings, conclusions, recommendations, and/or directives regarding the matter under appeal, to the student, instructor, and Division Chairperson.

## DRESS AND APPEARANCE

CVCC students are expected to dress appropriately at all times, including complying with attire standards for special functions. CVCC reserves the right to require students to adjust their attire when it is deemed to be disruptive to the learning process or the good order of the College.

## CHILDREN ON CAMPUS

Minor children of students are not permitted in classrooms or laboratories at any time. If children accompany students during registration or other business on campus, the children must be properly supervised at all times. Children below the tenth grade level shall not be allowed in the Learning Resource Center unless accompanied by an adult who is conducting business there. Children in the LRC shall not be allowed to be present in a classroom during a class and must remain with the adult and be properly supervised at all times. All College employees shall be responsible for the enforcement of this policy. Students in violation of this policy will be required to take immediate measure to comply with this policy.

## STUDENT INSURANCE

It is the responsibility of the student to be covered by insurance in case of an injury related to a college-sponsored event. The parent, guardian, or student will be expected to assume all responsibility and shall not hold the College liable for any injury due to an accident related to a college-sponsored event, except for students who participate in intercollegiate athletic events and are covered by college accident insurance.

203

CVCC 000204



Catalog &
Student Handbook

2005-2006

CHATTAHOOCHEE VALLEY COMMUNITY COLLEGE 2005-2006 CATALOG & STUDENT HANDBOOK

# Chattahoochee
Valley Community College

2602 College Drive
Phenix City, AL 36869
www.cv.edu

*One Place – Endless Possibilities*



EXHIBIT

B

CVCC00513

# CATALOG/STUDENT HANDBOOK
# 2005-2006

# CHATTAHOOCHEE VALLEY
# COMMUNITY COLLEGE
## 2602 COLLEGE DRIVE
## PHENIX CITY, ALABAMA 36869
## (334) 291-4900

## ACCREDITATION

Chattahoochee Valley Community College is accredited by the Commission on Colleges of
the Southern Association of Colleges and Schools (1866 Southern Lane, Decatur, Georgia
30033-4097/Telephone number: 770-679-4501 to award the Associate in Arts, Associate in
Science, and Associate in Applied Science degrees.

The Associate Degree Nursing (RN) is accredited by the National League for
Nursing Accrediting Commission, 61 Broadway, New York, NY 10006,
Telephone number 212-363-5555, ext. 153.

The Practical Nursing and Associate Degree Nursing Programs
are approved by the Alabama State Board of Nursing

## MEMBER OF

Alabama College Association
League of Innovation
American Association Community Colleges
National Council for Workforce Education

This *Catalog & Student Handbook*, which becomes effective September 1, 2005, is for infor-
mation only and does not constitute a contract. **The College reserves the right to change, mod-
ify, or alter without notice policies, fees, charges, expenses, and costs of any kind and fur-
ther reserves the right to add or delete without notice any course offerings or information
in this Catalog/Student Handbook.**

**Policy statements and program requirements in this catalog are subject to change.** Except
when students change their programs of study, they may follow requirements of the catalog
under which they enter the College for a period of four years at which time, if they have not
completed their program of study, they must change to the current catalog. Exceptions must be
approved by the Dean of Student and Administrative Services. **When students change their
programs of study, they must change to the catalog that is current at the time of the pro-
gram change.**

1

CVCC00515



# CAMPUS BUILDINGS AND FACILITIES

| A | **WALLACE HALL:** Administrative offices, admissions, business office, management information center, computer laboratories, general classrooms, Student Government Association office, Phi Theta Kappa office, and faculty offices. |
|---|---|
| B | **WILSON HALL:** Information and switchboard, student center, counseling and advising services, financial aid, career resources, job placement, and student activities. |
| C | **BRASSELL HALL:** Science laboratories, general classrooms, and faculty offices. |
| D | **OWEN HALL:** Estelle Bain Owen Learning Resource Center, printed materials, genealogy and local history collection, audio-visual materials and equipment, student learning labs (writing, reading, and mathematics laboratories), computer and testing labs, large and small group study areas, Educational Talent Search office, Community relations and student outreach services, and VCM Faculty Offices. |
| E | **TENNIS COURTS:** Tennis courts and spectator area. |
| F | **BASEBALL FIELD AND SOFTBALL FIELD** |
| G | **FINE ARTS HALL:** Art studio, kiln and galleries, photography dark room, music performance practice room, choral concert and recording studio, general classrooms, and faculty offices. |
| H | **KEY HALL:** Phenix City Room, gymnasium, classrooms, weight room, nursing and EMS classrooms, laboratories, and faculty offices. |
| I | **STUDENT PARKING** |
| J | **RESERVED PARKING:** Reserved for faculty, staff, guests and persons with disabilities. |
| K | **MAINTENANCE BUILDING** |
| M | **SECURITY KIOSK** |
| L | **GREENHOUSE** |

2

CVCC00516

# TABLE OF CONTENTS
# CATALOG

I.    Administration, Faculty, and Staff ..................................................................9

II.   Academic Calendar 2005-2006 ................................................................ 16
III.  The College ...........................................................................................19
        History .......................................................................................20
      Purpose...........................................................................................20
        Institutional Goals .....................................................................20
        Associate Degree Outcomes ........................................................21
      CVCC Foundation .............................................................................21

IV.   Admissions.............................................................................................23
        Admissions Eligibility.................................................................24
        Admissions Procedures................................................................26
        Admissions Status .......................................................................27
        Selection of Programs ..................................................................28
        Student Assessment and Placement...............................................28
        Veterans ......................................................................................30

V.    Financial Information ............................................................................33
        Tuition and Fees .........................................................................34
        Residency ................................................................................... 35
        Financial Aid and Scholarships....................................................40

VI.   Student Services ....................................................................................43
        Records.......................................................................................45
        Counseling...................................................................................46
        Student Activities.........................................................................49
        Student Honors ...........................................................................49
        Learning Resources ......................................................................50
        Services for Persons with Disabilities...........................................51

VII.  Academic Policies..................................................................................53
        Classification of Students.............................................................54
        Course Load ...............................................................................54
        Registration Information ..............................................................54
      Calendar System ...............................................................................54
        Grades and Quality Points............................................................55
        Final Examinations......................................................................57
      Academic Standards of Progress .......................................................57
        Academic Bankruptcy ..................................................................58
        Change of Curriculum ..................................................................59
        Course Forgiveness ......................................................................59
        Independent Study .......................................................................59
      Course Cancellations ........................................................................60
      Class Instructors...............................................................................60
      Transfer Credits................................................................................60
        Transcripts ..................................................................................60
      Non-traditional Credit.......................................................................61

3

CVCC00517

Graduation Requirements .................................................................64
Graduation Honors ..........................................................................66
Cooperative Agreements ..................................................................67

VIII.  Programs of Study..........................................................................69
Program Defined .............................................................................71
Program Requirements.....................................................................72
Degrees Offered...............................................................................73
Certificate Programs ........................................................................80

IX.   Course Descriptions .........................................................................117

X.    Workforce Development and Community Service .............................173

XI.   Advisory Committees .......................................................................177

STUDENT HANDBOOK.....................................................................181

4

CVCC00518



ACADEMIC CALENDAR

CVCC00527

# ACADEMIC CALENDAR
## 2005-2006

### Fall Semester, 2005 (August 15, 2005-December 20, 2005)
### 88 Faculty Duty Days; 79 Instructional Days

August 15, 16............................................................Local Professional Development
August 17-18...............................................................................Regular Registration
August 19 ........................................................................................Faculty Duty Day
August 22.................................................Regular Term and Term I Classes Begin
August 22-24....................................Late Registration/Schedule Adjustment
September 5.................................................................Labor Day (College Closed)
September 23......................Last Day to Withdraw with a Grade of "W" from Term I
October 10 ...................................Last Day to Withdraw: "WP" or "WF" from Term I
October 14 ......................................................................Term I Classes End
October 14.........................................................Graduation Application Deadline
October 17 ........................................................................Term II Classes Begin
October 28.............................Last Day to Withdraw with a Grade of "W" from Regular Term
October 28 ..........................................Admissions Application Deadline for Spring Semester
November 11 ....................................................Veterans Day Holiday (College Closed)
November 7-10 ......................................................Advisement/Advance Registration
November 14-18 ...................................................Advisement/Advance Registration
November 16.....................Last Day to Withdraw with a Grade of "W" from Term II
November 21-22 ....................................State Professional Development (No Classes)
November 23 ...........................................................Faculty Duty Day (No Classes)
November 24-25.........................................Thanksgiving Holidays (College Closed)
November 28...............................................................................Classes Resume
November 28-December 2 ...........................................Advisement/Advance Registration
December 7 .................Last Day to Withdraw: "WP" or "WF" from Term II and Regular Term
December 14 ..............................................................................Last Day of Classes
December 15-16, 19...........................................................................Final Examinations
December 20.........................................Faculty Duty Day (Final Grades due by 2:00 p.m.)
December 21 ..........................................................................................Staff Duty Day
December 22-January 2 ......................................................Christmas Holidays (College Closed)

### Summer Term, 2006 (May 22, 2006-August 7, 2006)
### 54 Duty Days; 50 Instructional Days

January 3 ...........................................................................................College Reopens
January 4 .....................................................................Faculty Duty Day (No Classes)
January 5 ...........................................Local Professional Development (Faculty)
January 6-9 ..........................................................................................Regular Registration
January 10 ............................................................................................Faculty Duty Day
January 11 .................................................Regular Term and Term I Classes Begin
January 11-12, 13 .........................................Late Registration/Schedule Adjustment
January 16 .................................Martin Luther King, Jr., Holiday (College Closed)
February 17 ..........................................Last Day to Withdraw with a Grade of "W" from Term I
March 3.........................................Last Day to Withdraw: "WP" or "WF" Term I
March 10.........................................................................................Term I Classes End
March 13 ........................................................................................Term II Classes Begin
March 20-24 .............................................................................Spring Break (No Classes)
March 22.........................................Local Professional Development - Staff
March 27..........................................................................................Classes Resumes
March 31 .................................Last Day to Withdraw with a Grade of "W" from Regular Term
March 31 ..............................................Admissions Application Deadline for Summer Semester

16

CVCC00528

April 10-13.....................................................................Advisement/Advance Registration
April 13.............................................Last Day to Withdraw with a Grade of "W" from Term II
April 14...................................................................Faculty Duty Day (No Classes)
April 17-21......................................................................Advisement/Advance Registration
April 27........................Last Day to Withdraw: "WP" or "WF" from Term II and Regular Term
May 5 ...............................................................................................Last day of Classes
May 8-10................................................................................Final Examinations
May 11..................................................Faculty Duty Day, (Grades due by 12:00 noon)
May 12...............................................................Graduation (Faculty Duty Day)

### Summer Term, 2006 (May 22, 2006-August 7, 2006)
### 54 Duty Days; 50 Instructional Days

May 22 .....................................................................................Regular Registration
May 23 ...............................................................Faculty Duty Day (No Classes)
May 24 ....................................................Regular Term and Term I Classes Begin
May 24-25............................................................Late Registration/Schedule Adjustment
May 29...................................................................Memorial Day Holiday (College Closed)
June 26...............................................Last Day to Withdraw: "WP" or "WF" from Term I
June 30 ...................................................................................Term I Classes End
June 30 .....................................................Admissions Application Deadline for Fall Semester
July 3 ...................................................................Faculty Duty Day (No Classes)
July 4.......................................................Independence Day Holiday (College Closed)
July 5 ................................................................................Term II Classes Begin
July 8 ..................................................................Faculty Duty Day (No Classes)
July 10-28..................................Advisement/Advance Registration for Fall Semester
July 26 ..........................Last Day to Withdraw: "WP" or "WF" from Term II and Regular Term
August 1 ...............................................................................Last Day of Classes
August 2-4.................................................................................Final Examinations
August 7....................................Faculty Duty Day (Final Grades due by 2:00 p.m.)

17

CVCC00529



THE COLLEGE

CVCC00530

# HISTORY

Chattahoochee Valley Community College was established in 1973 by an Act of the Alabama State Legislature. Located in Phenix City, Alabama, the College was created to serve the citizens of Russell County and parts of Bullock, Lee, Macon, and Barbour counties. It serves as well the citizens of the Phenix City, Alabama, and the Fort Benning-Columbus, Georgia, metropolitan area. Because this service area contains both rural and urban areas, the educational needs of the citizens are varied.

The College opened in temporary quarters in January 1974. In 1976, the College moved to its present permanent location at 2602 College Drive. Each fall the College enrolls approximately 2000 students. The 103-acre site on which the College is located includes nine permanent buildings: an administration/classroom building, one general purpose classroom building, a learning resource center, a fine arts building, a health and physical education building, a student services center, a security kiosk, a maintenance building, and a greenhouse.

# PURPOSE

The purpose of Chattahoochee Valley Community College, a member of the Alabama College System, is to meet the higher education needs of the citizens of the Chattahoochee Valley and others who can benefit from the courses, programs, and services of the College. In order to accomplish its purpose, the College provides:

- General Education and collegiate programs at the freshman and sophomore levels that are designed to prepare individuals for transfer to other colleges and universities.

- Occupational and technological programs and other training that are designed to prepare individuals for immediate employment or job advancement and/or promote local economic development.

- Developmental education that is designed to assist individuals in improving learning skills.

- Life-long learning programs and activities that are designed to provide personal enrichment and improve the quality of life in the community.

- Student services and activities that are designed to assist individuals in formulating and achieving educational goals.

- Administrative and academic support services that facilitate the delivery of educational programs and training.

# INSTITUTIONAL GOALS

To aid in the achievement of its purpose, the College has developed the following goals:

- To offer quality educational programs that provide opportunities for excellence in learning.

- To expand and strengthen program offerings which prepare students for direct entry into jobs at technical, paraprofessional, and entry-level management positions.

- To provide educational and support programs that reduce factors inhibiting student success.

20

CVCC00531



STUDENT SERVICES

CVCC00552

# STUDENT SERVICES

Chattahoochee Valley Community College contributes to the total development of students by assisting them in pursuing both personal and educational goals. A variety of services is available to the student: testing, orientation, counseling and guidance services, academic advisement, student activities and organizations, career development, and job placement assistance.

## RECORDS

The Admissions Office maintains student records and, upon written request from the student, will issue transcripts. The Family Educational Rights and Privacy Act (FERPA) of 1974 defines the rights of the student with regard to records and other information that might be maintained and/or released.

### Release of Student Records

In compliance with and pursuant to the Family Educational Rights and Privacy Act of 1974, known as the Buckley Amendment, student records shall not be released by college personnel except on the written consent of the respective student, a written request in the form of a Court Order, and/or as otherwise expressly provided in the Family Educational Rights and Privacy Act of 1974.

Student records that are held by the College shall be accessible to students when requested. College personnel who are knowledgeable of the individual's record (normally the Dean of Student and Administrative Services) shall be present to explain the contents of the file.

Upon receipt of a written request from a student to review his/her college record, the Dean of Student and Administrative Services shall arrange, as promptly as is reasonably possible, a time when the records may be reviewed in the presence of appropriate college personnel. The student is not permitted to remove the file or remove any of its contents for purposes of reproducing materials within the file unless permission is granted by the Dean of Student and Administrative Services. In order to review a file, the student must present proper identification and complete appropriate form(s) certifying that he/she has requested to review his/her records and that Chattahoochee Valley Community College has complied with the request.

Challenges concerning the contents of student records shall first be made to the Dean of Student and Administrative Services within a minimum of five days from the date of the review of the record. The challenge may be made orally or in writing and shall follow essentially the procedures outlined in the Institutional Policy Manual for resolving grievances, beginning at the Admissions Office as Level One, with the objective of resolving the matter informally at the lowest level position. If as a result of the procedure outlined in Level One the matter is not resolved, then within five (5) working days the procedure outlined in Level Two may be followed, with the challenge being filed in writing specifying the following: (a) the specific records being challenged; (b) results of previous discussions; and (c) dissatisfaction with previous decisions.

### Directory Information

A student has the right to have his/her name and directory information concerning him/her deleted from any directory published and distributed on or off campus. Directory information consists of **name, address, date and place of birth, participation in officially recognized activities and sports, weight and height for athletic team members, telephone number, class standing, curriculum, degrees or certificates, awards received, and dates attended.**

When a student requests that any part of his/her directory information be withheld, all directory information concerning him/her will be deleted from all publications. Students desiring to have any directory information withheld must make such a request each semester by completing the proper form in the Admissions Office.

45

CVCC00553

No information from records, files or data directly related to a student, other than "directory" information, shall be disclosed to individuals or agencies outside the College without the written consent of the student, except pursuant to a lawful subpoena or court order, or in a case where educational or governmental officials have a lawful need for information, or as otherwise specifically authorized by the Buckley Amendment. However, information contained in such records may be disclosed within the College to officials and staff members with a need for that particular information.

Students shall be afforded the opportunity to have access to all such information on themselves, with the exceptions set forth in accordance with procedures outlined within this policy statement.

## COUNSELING AND ADVISING SERVICES

Counseling and advising services are available to all day and evening students. Students can receive assistance with problems concerning choice of curriculum (program), career planning, student orientation, transfer advising, college adjustment or coping with daily demands. Referrals are available for problems of a personal nature. Students are encouraged to visit the Office of Counseling and Advising located in Wilson Hall. Appointments can also be made. Office hours are as follows:

| | |
|---|---|
| Monday - Thursday | 8:00 a.m. - 8:00 p.m. |
| Friday | 8:00 a.m. - 12 noon |

## NEW STUDENT ORIENTATION

New Student Orientation at Chattahoochee Valley Community College is designed to introduce students to college life at CVCC.

In addition to attending the orientation/academic assessment, all new students (except transfer students who have earned twelve or fourteen hours of college credit) will be required to enroll in ORI 101 (Orientation/Study Skills) during their first semester of enrollment unless specifically waived by the College.

## ACADEMIC ADVISEMENT

Upon admission to the College, each student will be assigned an advisor who will assist the student in planning a program of study commensurate with the student's interests and abilities. A student may also consult with an advisor concerning scheduling. It is the student's responsibility to make an appointment and meet with the advisor during the advisor's scheduled office hours to plan his/her total program and courses for each semester. Unclassified students who are interested in exploring the various program options available at the College may also contact the office of Counseling and Advising in Wilson Hall.

### ACADEMIC ADVISING PHILOSOPHY

Chattahoochee Valley Community College recognizes academic advising as an essential part of the educational process. The primary focus of academic advising at CVCC is to facilitate the student's pursuit of realistic academic and career goals by providing them with both accurate information and guidance to support them in the decision-making process. Furthermore, academic advising should assist students in recognizing and accepting responsibility for making choices about their educational program.

To be effective, academic advising must be taken seriously by students, advisors, and the institution with an understanding that academic advising is more than completion of simple clerical functions. Effective academic advising requires an open environment in which the advisor is concerned about the student's welfare in pursuit of academic and career goals. Effective academic advising is concerned with student development and assists students in establishing an educational plan consistent with life goals, as well as assisting students in evaluation and re-evaluation of progress toward established goals.

The institution, advisor, and each student have responsibilities that must be accepted and fulfilled if students are to receive the benefits of an efficient and effective academic advising process.

46

CVCC00554

**RESPONSIBILITIES OF THE INSTITUTION**

1.  Provide advisors with accurate and complete information on institutional policies and procedures, program of study requirements, courses of instruction, graduation requirements, and available institutional resources.

2.  Provide advisors with all student data needed, accurate current student transcripts, and evaluation of transfer credit.

3.  Provide advisors with forms and reference materials needed in the advising process.

4.  Assign advisors and inform students of the identity, office location, and office telephone number of their respective advisors and times advisors may be contacted to make appointments.

5.  Provide new students with academic orientation.

6.  Administer placement tests to new students upon admission, including partial batteries of placement tests to transfer students when needed.

7.  Provide advising services to students with special needs, particularly those students covered by the Americans with Disabilities Act.

8.  Conduct advising orientation for new advisors and workshops for training and updating all advisors periodically.

**RESPONSIBILITIES OF THE ADVISOR**

1.  Be accessible to students.

2.  Maintain accurate records of information relative to each advisee's academic activities and progress.

3.  Be aware of each advisee's educational and career goals, and when needed, assist students in formulation and clarification of these goals.

4.  Guide students in obtaining accurate information about transfer institutions.

5.  Provide students with information about alternatives and limitations of and possible long- and short-range consequences of academic choices.

6.  Refer students to appropriate college services or off-campus agencies.

7.  Assist students in course selection appropriate to their respective educational and career goals and in evaluating progress toward these goals.

8.  Schedule appointments with advisees to ensure adequate time may be given to discussion of each advisee's academic progress.

9.  As much as possible, assist students in making long-range plans concerning courses to be scheduled.

10. Focus on why particular courses should be taken as well as what courses should be taken.

11. Before signing the registration form (student class schedule), verify accuracy of all schedule information (course numbers, section numbers, and class meeting days, times, and locations).

**RESPONSIBILITIES OF THE STUDENT ADVISEE**

1.  When appropriate, be certain that academic records from other educational institutions have been sent to CVCC.

2.  Know his/her advisor's identity, office location, office telephone number, and office hours.

47

CVCC00555

3. Schedule an advising appointment at least once per term with his/her advisor apart from the scheduling and registration process.

4. Promptly keep appointments. If unable to keep appointments, notify the advisor as soon as possible and schedule a new appointment.

5. Discuss educational and career goals with his/her academic advisor and other resource persons.

6. Develop educational and career goals.

7. Be aware of institutional policies and procedures, program of study requirements, and graduation requirements of both CVCC and the institution to which the student may plan to transfer.

8. Be prepared for the advising appointment for the scheduling of classes before meeting with the advisor. Students should study the class schedule, know courses needed, have a list of alternatives, know which courses are offered at times they can attend, and have a list of any questions for the advisor.

9. Accept responsibility for academic choices. The advisor may discuss options with the student, but the student must make the decisions.

10. Maintain personal records of academic activities and progress.

11. Seek help from the advisor when needed. Consult with the advisor whenever the student is not certain of the best academic action to take and before making any changes in the program of study. Academic advising is a continuous process throughout a student's stay at the institution ... not just when selecting courses to take.

12. When completing and before signing the registration form (student class schedule), verify accuracy of all schedule information (course numbers, section numbers, and class meeting days, times, and locations).

## TESTING

A variety of interest, aptitude, and proficiency tests are available to assist students in examining their educational and vocational objectives. Anyone interested in taking advantage of the testing services available should contact the office of Counseling and Advising located in Wilson Hall.

- *GED Test Center.* Chattahoochee Valley Community College has been designated a General Educational Development testing center by the State of Alabama. Information relative to test dates may be obtained by calling 334-291-4921.

- *ACT Test Center.* Chattahoochee Valley Community College has been designated as a test center for the administration of the American College Testing Program. Registration packets may be picked up from the Switchboard or the Counseling & Advising office located in Wilson Hall.

- *DISCOVER.* A career guidance questionnaire that identifies interests, experiences and abilities to help users make important career and educational decisions.

- *COMPASS* - A comprehensive, computer-adaptive assessment that assists in determining a student's placement into appropriate courses to maximize success in college.

48

CVCC00556

## JOB PLACEMENT

Students and alumni seeking job placement assistance are encouraged to visit the office of Counseling and Advising located in Wilson Hall. Listings of part-time and full-time positions are on file.

## STUDENT ACTIVITIES

Student activities are important to the educational experience at Chattahoochee Valley Community College, and a comprehensive program of activities is provided through the campus organizations recognized by the Student Government Association.

Students are provided with opportunities to participate in student government, service organizations, special interest clubs, choir, band, theater, athletics, and other related activities. Students interested in learning more about clubs and organizations on campus should refer to the Student Handbook or contact the Office of Student Activities in Wilson Hall.

- *Athletics.* Chattahoochee Valley Community College is a member of the National Junior College Athletic Association and the Alabama Junior College Athletic Conference. The College participates in varsity competition in men's baseball, women's softball, and men's basketball and women's basketball. The College competes with other members of its conference and junior colleges from other states. Chattahoochee Valley Community College does not discriminate in its athletic programs on the basis of race, color, national origin, or sex.

- *Student Government Association.* All students attending Chattahoochee Valley Community College are afforded the opportunity to participate in the activities of the College through the Student Government Association (SGA). SGA provides students with the opportunity to be involved in leadership and student decision-making by acting as the governing body for student organizations on campus.

## STUDENT HONORS

- *The James B. Allen Award.* This award is presented at commencement annually to a student who is outstanding in community and college activities and in scholarship. Selection of the recipient is made by an appointed college committee.

- *Who's Who Among Students in American Junior Colleges.* The Office of Student Services annually submits names of students who have distinguished themselves in different areas of campus life for inclusion in this publication.

- *President's Award.* This award is given annually to the student who has the highest cumulative grade point average at Chattahoochee Valley Community College and who is completing a two-year degree program with all courses taken at Chattahoochee Valley Community College.

- *Faculty Award of Excellence.* This award is given annually to an outstanding student selected by the faculty. Criteria for selection include a cumulative grade point average of 3.50 or higher, attitude, citizenship and completion of a two-year degree program with at least forty semester hours of credit completed at Chattahoochee Valley Community College.

- *The Outstanding Nursing Student of CVCC Award.* This award is presented annually to the nursing student selected by the nursing class as the individual who most exemplifies its concept of the model nurse.

- *Phi Theta Kappa.* The purpose of this organization is the recognition and encouragement of scholarship among community and junior college students by providing the opportunity for development of leadership, service, and fellowship and for stimulation of interest in continuing academic excellence. Invitations for membership are dependent upon the student's achieving a sufficiently high academic grade point average. An induction ceremony is held each semester.

49

- *Nursing Faculty Award of Excellence.* Presented annually by the nursing faculty to a nursing student for outstanding academic, clinical, and interpersonal performance.

- *President's List.* The President's List recognizes students who were enrolled for a minimum of twelve semester hours (excluding institutional credit hours) during a semester and earned a grade point average of 4.00 (A).

- *Dean's List.* The Dean's List recognizes students who were enrolled for a minimum of twelve semester hours excluding institutional credit hours) and earned a grade-point-average of 3.50 to 3.99.

## ESTELLE BAIN OWEN LEARNING RESOURCES CENTER

The Learning Resource Center (LRC) at Chattahoochee Valley Community College offers students, staff, faculty, and community patrons the facilities, environment, and guidance for pursuing individual interests and educational goals through a variety of services.

The LRC is located in Owen Hall. It houses more than 53,000 physical volumes, subscribes to 220 periodical titles, and provides access to many online databases through the Alabama Virtual Library and Troy State University remote services. The LRC also maintains special collections on genealogy and southern history.

The LRC offers many services to patrons. Some of these services include the online public access catalog (OPAC), circulation, reference, interlibrary loan service, and other customized services to meet the special needs of patrons.

The Learning Resource Center operates with the following objectives:

- Conducting library orientation for students and other members of the community to encourage an understanding and appreciation of a wide range of resource materials and their use.

- Strategically developing, implementing, and managing quantitative and qualitative improvements to the library's resources to support the college's academic, administrative, and community-based programs and initiatives.

- Conducting the systematic assessment of the usability, adequacy, and accessibility of the library's resources to support the College's academic, administrative, and community-based programs and initiatives.

The Learning Resource Center operational hours are:

| | |
|---|---|
| Monday - Thursday | 8:00 a.m. - 9:00 p.m. |
| Friday | 8:00 a.m. - 12:00 noon |
| Saturday | Closed |
| Sunday | 1:00 p.m. - 6:00 p.m. |
| Holidays | Closed |

## LEARNING LABORATORIES

- *The Writing Lab.* Students who need assistance in improving their writing skills will find instructors available to help them in the Writing Lab. A Writing Lab schedule is published and distributed at the beginning of each semester.

- *Mathematics Laboratory.* Students who need assistance in mathematics and/or additional help in mathematics courses may receive that assistance in the Mathematics Laboratory. The lab is staffed by instructors at various times during the week. A schedule is distributed at the beginning of each semester.

50

CVCC00558

- *Computer Laboratory.* Computer resources are provided in open laboratories throughout the Learning Resource Center. Software programs for word processing, spreadsheets, and similar applications are available for student and community use.

## SERVICES FOR STUDENTS WITH DISABILITIES

The College is committed to assisting students with various disabilities in accordance with the guidelines of the Americans with Disabilities Act (A.D.A.). Any student who has a documented disability (physical, emotional, or learning) and who is in need of assistance with admission, registration, orientation, or any other phase of college life should contact the ADA Coordinator at 214-4845.

51

CVCC00559



ACADEMIC POLICIES

CVCC00560

# CALENDAR SYSTEM AND CREDITS

Chattahoochee Valley Community College operates on a semester calendar system consisting of two semesters and a summer term. The semesters ordinarily begin in August and January, and the summer term in May. Credits are earned at the College in terms of semester hours.

# COURSE LOAD

A student enrolled for twelve or more credit hours will be considered a full-time student. A student enrolled for fewer than twelve credit hours will be considered a part-time student.

Most degree programs are designed so that students taking a normal load of 15-18 credit hours per semester may graduate in two academic years. Some students may find it desirable to schedule fewer hours per semester depending upon workload or other personal responsibilities. Students having difficulty determining a proper course load should consult their advisors.

The maximum course load is nineteen hours. Any student wishing to enroll for more than nineteen semester hours must receive approval of the Dean of Instruction. Under no circumstance will a student be allowed to exceed 24 semester hours.

**NOTE: Any student enrolled in two or more college preparatory courses (developmental studies) is prohibited from enrolling for more than twelve total credit hours. Exceptions must be approved by the Dean of Instruction.**

# CLASSIFICATION OF STUDENTS

·  Freshman: A student who has earned fewer than 31 semester hours of credit.
·  Sophomore: A student who has earned 31 or more hours of credit.

# REGISTRATION INFORMATION

A student must be officially registered for every class he/she attends. If the student's name does not appear on the class roll, credit will not be granted.

Details of the dates and times of registration for each semester will be published in the Schedule of Classes. Students may obtain a Schedule of Classes at the Admissions Office, Wilson Hall or Learning Resource Center. In all cases, registration becomes official when students have paid all tuition and fees.

**LATE REGISTRATION**
A late registration period is provided during the first three (3) class days of the semester. Students registering late will be expected to assume responsibility for making up all required course work. Students registering late will be required to pay the Late Registration Fee of $25.00.

**SCHEDULE ADJUSTMENT**
After a student's registration is completed, he/she may, within the first three (3) class days of the semester, change his/her schedule through the process of adding and/or dropping courses. The student will be required to report to the designated office as specified in the Schedule of Classes to complete the necessary forms. A student will not be allowed to add a class after the schedule adjustment period except with the Dean of Instruction's approval.

CVCC00561

# GRADES AND QUALITY POINTS

A letter grade is assigned in each course in which the student is enrolled at the end of the semester. A quality point value per semester hour is assigned to each letter grade.

| Letter Grade | Meaning | Quality Points |
|---|---|---|
| A | Excellent | 4.00 |
| B | Good | 3.00 |
| C | Average | 2.00 |
| D | Poor | 1.00 |
| F | Failing | 0.00 |
| WF | Withdrawal Failing | 0.00 |
| WP | Withdrawal Passing | 0.00 |
| S | Satisfactory completion of Institutional Credit Course | NONE |
| U | Unsatisfactory completion of Institutional Credit Course | NONE |
| W* | Withdrawal | NONE |
| AU | Audit | NONE |
| I | Incomplete | NONE |

*A student may not be assigned a "W" after the deadline published in the official college calendar.

# WITHDRAWAL FROM A COURSE OR FROM THE COLLEGE

After the schedule adjustment (drop/add) period, the following withdrawal policy is in effect.

**FROM A COURSE** - a student must obtain the appropriate form from the Admissions Office, get the instructor's signature, obtain the financial aid officer's signature, and return the form to the Admissions Office for processing. A scholarship student must also secure the signature of the scholarship supervisor. **Withdrawal is not official until all steps are completed.**

**FROM THE COLLEGE** - a student must obtain the appropriate form from the Admissions Office and get signatures from all instructors, financial aid, LRC, and business office. A scholarship student must also secure the signature of the scholarship supervisor. **When the student has all the required signatures, the form must be returned to the Admissions Office for processing. Withdrawal is not official until all steps are completed. Note: Withdrawals will not be processed if the student has an outstanding financial obligation to the College.**

Students who withdraw from a course or from the college entirely will receive a grade of "W," "WP," or "WF." Final grades are determined by the date the student withdraws from the course or college as denoted in the college calendar. In order to receive a non-punitive grade of "W," the student must withdraw as follows:

| | |
|---|---|
| Spring or Fall Semesters | By close of 10th week of class |
| Summer Term | By close of 6th week of class |
| Spring or Fall Term I or II | By close of 5th week of class |
| Summer Term I or II | By close of 3rd week of class |

Students who withdraw after the designated dates will receive a grade of "WP" if passing at the time of withdrawal or "WF" if failing at the time of withdrawal. "WF" is calculated the same as an "F" in the grade point average (GPA).

# SATISFACTORY AND UNSATISFACTORY GRADES

Satisfactory and Unsatisfactory grades are assigned in courses that are designated for institutional credit (IC). These courses will not transfer, and none of the grades carry quality points and will therefore not be calculated in the grade point average.

CVCC00562

# AUDITING A COURSE

Students are allowed to audit a course during regular registration and during the enrollment adjustment period. A student auditing a class may not change his/her status to that of a credit student nor may a credit student change his/her status to that of an audit. A student auditing a class is expected to follow the attendance policy.

# INCOMPLETE GRADE

The grade of incomplete (I) may be assigned when a student has been prevented from completing the requirements of a course and is assigned only in exceptional circumstances. The student must request a grade of incomplete from the instructor. The instructor may grant or deny the request. A grade of incomplete **(I) must be cleared by the end of the following regular semester or a final grade of "F" will automatically be recorded.** This grade will be reported to the student at the end of the semester in which the grade is changed.

A grade of incomplete (I) is not added into the total number of hours attempted until it has been cleared. **Students are cautioned that "I" grades may affect their eligibility for financial aid benefits.**

# GRADE REPORTS AND GRADE POINT AVERAGES

At the end of each semester, each student must go to the website to check the final grades received by the student for all courses in which he/she was enrolled that semester. The grade report will show the semester hours attempted, the total quality points and credit hours earned, and a grade point average. Also included on the grade report will be a record of the total number of hours attempted, the total quality points earned, and a cumulative grade point average. Once grades have been recorded, they cannot be expunged from the student's permanent record.

The grade point average is computed by multiplying the quality points earned by the credit value of each course and dividing the total quality points earned by the total credit hours attempted as indicated by the example below:

|  |  |
|---|---|
| 3 sem hrs of "A" x 4 = | 12 quality points |
| 3 sem hrs of "B" x 3 = | 9 quality points |
| 3 sem hrs of "C" x 2 = | 6 quality points |
| 3 sem hrs of "D" x 1 = | 3 quality points |
| 3 sem hrs of "F" x 0 = | 0 quality points |
|  | 30 total quality points |

30 quality points ÷ 15 hours attempted = 2.0 GPA

AU, I, S, U, and W grades are not included when computing a student's grade point average (GPA), but will be recorded on a student's transcript.

# ACADEMIC HONORS

The College recognizes superior scholastic achievement by publishing in the local newspapers the President's List and the Dean's List at the end of each semester. Students recognized receive congratulatory letters from the College President and the Dean of Instruction.

The President's List recognizes students who were enrolled for a minimum of twelve semester hours (excluding institutional credit hours) during a semester and earned a grade-point-average of 4.00 (A).

The Dean's List recognizes students who were enrolled for a minimum of twelve semester hours (excluding institutional credit hours) during a semester and earned a grade-point-average of 3.50 to 3.99 (B).

CVCC00563

Students who consistently maintain high scholastic performance and meet other eligibility requirements may be invited to join the Alpha Theta Rho Chapter of Phi Theta Kappa International Honor Society.

# FINAL EXAMINATIONS

A final examination will be given in each course at the end of each semester during the times specified in the official calendar of the College or as scheduled by the Dean of Instruction.

# CLASS ATTENDANCE POLICY

Students are expected to be present for all class meetings, and instructors will record attendance at every class meeting. Instructors' expectations are high, and classes are challenging. Therefore, students who are absent may experience difficulty in meeting course objectives and expected outcomes. The instructor will define whether and how makeup work will be administered, and the policy for makeup work shall be defined in the course syllabus.

The instructor will not withdraw a student from the class. Therefore, students who are excessively absent should officially withdraw from the course by the date specified in the college calendar in order to avoid a grade of "F."

# ACADEMIC STANDARDS OF PROGRESS

The following academic standards of progress apply to all students except those enrolled in nursing programs (see information under ADN and LPN programs in the Programs of Study section of this catalog) and students taking institutional credit courses (see Progress Requirements for Students in Institutional Credit Courses following this section).

1.  A student must maintain the following cumulative grade point average (GPA) dependent upon the number of hours attempted at the College in order to have clear academic status:
    **Hrs. Attempted.................................................................... GPA**
    12-21 ...............................................................................1.50
    22-32 ...............................................................................1.75
    33 or more.........................................................................2.00

2.  When the cumulative GPA of a student is below the GPA required for the number of credit hours attempted at the institution, the student is placed on *academic probation.*

3.  When the cumulative GPA of a student who is on academic probation remains below the GPA required for the total number of credit hours attempted at the institution and the semester GPA is below 2.0, the student is suspended for one semester. The transcript will read *Suspended-One Semester.*

4.  The student who is suspended for one semester may appeal. If, after appeal, the student is readmitted without serving the one-semester suspension, the transcript will read *Suspended-One Semester/Readmitted Upon Appeal.*

5.  A student who is on Academic Probation after being suspended for one semester (whether the student has served the suspension or been readmitted upon appeal) and whose cumulative GPA falls below the level required for the total number of hours attempted at the institution but a semester GPA is 2.0 or above will remain on Academic Probation. If the student does not earn the cumulative GPA of 2.0 or above for the required number of hours the student is suspended for *One Academic Year.*

6.  A student returning from a one-term or one-year suspension while on academic probation who fails to obtain the required GPA for the number of hours attempted and fails to maintain a term GPA of 2.0, will be suspended for another calendar year.

57

7.   The student must attain clear status before beginning the academic standards progress cycle again.

**Process for Appeal for Readmission**

If a student does not contest the facts leading to suspension, but simply wishes to request consideration for readmission, the student may submit a request in writing for an "Appeal for Readmission" to the Admissions Committee no later than two working days before the beginning of regular registration. During the meeting of the Admissions Committee, (which shall not be considered a "due process" hearing, but rather a petition for readmission), the student shall be given an opportunity to present a rationale and/or statement of mitigating circumstances in support of immediate readmission. The decision of the Admissions Committee, together with the materials presented by the student, shall be placed in the college's official records. Additionally, a copy of the written decision shall be provided to the student.

**Intervention for Student Success**

When a student is placed on academic warning, academic probation, one semester suspension, or one calendar year academic suspension, the student may be required to take study skills courses, to take other specific courses designed to assist him/her in succeeding, to limit the number of hours taken during each semester, and/or to take other steps as designated by the Dean, the student's advisor, or the Admissions Committee.

# ACADEMIC STANDARDS OF PROGRESS
# FOR TRANSFER STUDENTS

1.   A transfer student who is admitted on *clear* academic status is subject to the same standards of academic progress as a "native" student. Grades accrued at other regionally accredited postsecondary institutions are not included in the GPA calculation.

2.   A transfer student who is admitted on *academic probation* retains that status until the student has attempted at least twelve semester credit hours at the institution. If, at the conclusion of the semester in which the student has attempted a total of twelve or more semester credit hours at the institution, the cumulative GPA at the institution is below 1.5, the student is suspended for one semester. The transcript will read *Suspended-One Semester.*

3.   If, at the conclusion of the semester in which the transfer student admitted on *academic probation* has attempted a total of 12 semester credit hours at the institution, the cumulative GPA at the institution is 1.5 or above, the student's status is *clear.*

# ACADEMIC STANDARDS OF PROGRESS FOR
# INSTITUTIONAL CREDIT COURSES

1.   A student who is enrolled in an institutional credit course and who receives a grade of U for two semesters may not take the course a third semester until he/she receives special academic counseling.

2.   After the third semester in which the student receives a grade of U in the same course, the student must appeal through the institution's appeal process before the student may be allowed to re-enroll in the course.

# ACADEMIC BANKRUPTCY

1    A student may request in writing to the Dean of Student and Administrative Services to declare academic bankruptcy under the following conditions:

58

CVCC00565

a.   If fewer than three (3) calendar years have elapsed since the semester/term for which the student wishes to declared bankruptcy, the student may declare academic bankruptcy on all coursework taken during that one semester/term provided the student has taken a minimum of eighteen semester credit hours of coursework at the institution since the bankruptcy semester/term occurred. All coursework taken, even hours completed satisfactorily during the semester for which academic bankruptcy is declared, will be disregarded in the cumulative GPA.

b.   If three (3) or more calendar years have elapsed since the most recent semester/term for which the student wishes to declare bankruptcy, the student may declare academic bankruptcy on all coursework taken during a one to three semester/term provided the student has taken a minimum of eighteen semester hours of coursework at the College since the bankruptcy semester(s) occurred. All coursework taken, even hours completed satisfactorily, during the semester/term in which academic bankruptcy is declared will be disregarded in the cumulative GPA.

2.   When academic bankruptcy is declared, the transcript will reflect the term *Academic Bankruptcy* for each semester/term affected. When academic bankruptcy is declared, the transcript will reflect the semester/term of its   implementation and the transcript will reflect *Academic Bankruptcy Implemented.*

3.   A student may declare academic bankruptcy only once.

4.   Implementation of academic bankruptcy at an institution does not guarantee that other institutions will approve such action. This determination will be made by the respective transfer institution.

# CHANGE OF CURRICULUM OR PROGRAM OF STUDY

Students accepted and enrolled in a particular program of study who seek to pursue another program of study must meet the requirements for admission to the new program. A student should complete the necessary curriculum change form available at the Admissions Office, then see his/her advisor for an updated plan of study. Students who change their program of study will follow the program requirements of the current Catalog at the time of the program of study change.

# COURSE FORGIVENESS

1.   If a student repeats a course, the last grade awarded (excluding grades of W) replaces the previous grade in the computation of the cumulative grade point average. The grade point average during the term in which the course was first attempted will not be affected.

2.   When a course is repeated more than once, all grades for the course- excluding the first grade-will be employed in computation of the cumulative grade point average. Official records at the institution will list each course in which a student has enrolled.

3.   It is the student's responsibility to request of the Dean of Student and Administrative Services that the forgiveness policy be implemented.

4.   No course in which the last grade received was a "F" may be counted toward graduation. The student must be aware also that the last recorded grade may be regarded by a senior institution as the grade of record for transfer purposes.

# INDEPENDENT STUDY

In certain unusual circumstances, the Dean of Instruction, upon recommendation of the Division Chairperson and instructor, may permit a student to take a course by independent study. Permission will be based on such factors as future course availability and the student's academic record. No student whose grade point average is below 2.0 will be permitted to take a course by independent

CVCC00566

study. Because independent study courses must be completed without the usual assistance from instructors, a student will not be allowed to take more than one independent study course per semester. Exceptions must be approved by the Dean of Instruction.

# COURSE CANCELLATIONS

The College reserves the right to cancel any course listed in the Schedule of Classes. In the event that a student is in his/her last semester before graduation and a course he/she needs is canceled, the student should consult with his/her advisor and/or the Dean of Instruction.

# ASSIGNMENT OF CLASS INSTRUCTOR

Class cancellations, splits, or other conditions may necessitate the reassignment of instructors. Students are cautioned that the listing of an instructor's name to teach a course in the Schedule of Classes is no guarantee that the instructor will teach the course.

# TRANSFER OF CREDITS

Transfer students must furnish an official transcript(s) of all work attempted at all other institutions unless they have completed the baccalaureate degree. Any applicant who has completed the baccalaureate degree is required to submit only the transcript from the institution granting the baccalaureate degree. However, the applicant may submit transcripts from other institutions attended if he/she wishes consideration of those credits for purposes of transferability.

Transferability of credits will be determined in the following manner. If a student has a 2.0 cumulative grade point average in all previous college work attempted, all passing grades will be accepted if they are comparable to CVCC courses. If the student's cumulative grade point average is below 2.0 (C), only those credits will be accepted in which a grade of "C" or better was earned. Of the credits accepted, only those that are applicable to the student's chosen curriculum may be used for purposes of meeting program and graduation requirements. Students who have satisfactorily completed required English and mathematics courses will not be required to take the COMPASS Placement Test at Chattahoochee Valley Community College.

## EVALUATION OF TRANSFER CREDITS

Official transcripts submitted by transfer students who enroll at the College normally will be evaluated by the Office of Admissions no later than two weeks after the receipt of the transcript by the Office of Admissions and in no case later than the end of the first academic semester in which the student is enrolled.

Transfer students will be informed of the amount of credit that will be accepted in three ways: (1) the transferable courses and number of credit hours will be provided to the student's academic advisor who will provide the information to the student, (2) the amount of transfer credit and the transferable courses will be provided in writing to the student after the evaluation, and (3) the courses and number of credits allowed through transfer are recorded on the student's official transcript.

Students who have questions concerning the amount of credit accepted or specific courses accepted may address those questions to the Dean of Student and Administrative Services. In some cases, students may be required to furnish catalogs containing course descriptions in order to determine transferability of certain courses. Students must be currently enrolled at the time transfer credit is awarded.

# TRANSCRIPTS

A student desiring an official transcript of his/her permanent record must make the request to the Admissions Office in person or in writing. The College reserves the right not to release a transcript if the student has outstanding financial obligations to the College.

CVCC00567

# NON-TRADITIONAL CREDIT

Chattahoochee Valley Community College awards limited credit for advanced placement, challenge examination, CLEP and DANTES examinations, armed forces and service schools training, and certain professional certifications. Students may earn credit through non-traditional sources as follows:

|  | Available Credit Hours for Degrees | Available Credit Hours for Certificates |
|---|---|---|
| Advanced Placement | 15 | 9 |
| CLEP and/or DANTES | 15 | 9 |
| Military Training and Education | * 20 | 9 |
| Professional Certification | 3-6 | 3 |
| *Criminal Justice (6) and |  |  |
| Fire Science (3) only |  |  |
| Credit by Examination (Challenge) | 15 | 9 |

The maximum credit earned from non-traditional sources that may be applied toward the associate degree is twenty semester hours and twelve semester hours for certificates.

## College Level Examination Program - CLEP

Chattahoochee Valley Community College will award credit through selected CLEP examinations provided the student earns a minimum score as recommended by the American Council on Education (ACE).

## CLEP Subject Matter Examinations

|  | Credit Awarded | CVCC Course Equivalent(s) |
|---|---|---|
| **Business** |  |  |
| Information Systems and Computer Applications | 3 | CIS 146 |
| Introductory Accounting | 6 | BUS 241, 242 |
| Introductory Business Law | 3 | BUS 261 |
| Introduction to Management | 3 | MST 201 |
| Introductory Macroeconomics I | 3 | ECO 231 |
| Introductory Microeconomics II | 3 | ECO 232 |
| **Language and Fine Arts** |  |  |
| American Literature w/Essay | 6 | ENG 251, 252 |
| English Literature w/Essay | 6 | ENG 261, 262 |
| Spanish | 3 | SPA 101 |
| **Mathematics and Science** |  |  |
| College Algebra | 3 | MTH 112 |
| College Trigonometry | 3 | MTH 113 |
| Calculus w/Elementary Functions | 4 | MTH 125 |
| **Social Science & Public Service Technologies** |  |  |
| Western Civilization I Near East to 1648 | 3 | HIS 121 |
| Western Civilization II 1648 to Present | 3 | HIS 122 |
| American History I Early Colonial to 1877 | 3 | HIS 201 |
| American History II 1865 to Present | 3 | HIS 202 |
| General Psychology | 3 | PSY 200 |
| Introductory Sociology | 3 | SOC 200 |

61

CVCC00568

**DANTES Subject Standardized Tests**

Chattahoochee Valley Community College will award credit through selected DANTES examinations provided the student earns a minimum score as recommended by the American Council on Education (ACE).

|  | Credit Awarded | CVCC Course Equivalent(s) |
|---|---|---|
| **Business** | | |
| Introduction to Business | 3 | BUS 100 |
| Introduction to Management | 3 | MST 201 |
| Principles of Financial Accounting | 3 | BUS 241 |
| Business Law I | 3 | BUS 261 |
| Basic Marketing | 3 | BUS 285 |
| Principles of Economics II | 3 | ECO 232 |
| **Mathematics and Science** | | |
| College Algebra | 3 | MTH 112 |
| Plane Trigonometry | 3 | MTH 113 |
| Calculus I | 4 | MTH 125 |
| Calculus II | 4 | MTH 126 |
| Linear Algebra | 4 | MTH 237 |
| College Physics II | 4 | PHY 213 |
| College Chemistry | 4 | CHM 111 |
| **Social Sciences and Public Service Technology** | | |
| History of Western Civilization to 1500 | 3 | HIS 121 |
| History of Western Civilization since 1500 | 3 | HIS 122 |
| General Anthropology | 3 | ANT 200 |
| Introduction to Criminology | 3 | CRJ 208 |

Credit for Subject Examinations will be granted provided the student has not previously been enrolled in the course for which credit is to be earned. CLEP/DANTES credit shall not be granted for college level courses previously failed, for courses in which credit for higher-level courses has already been earned, or for both subject examination and its course equivalent.

Credit through CLEP/DANTES examinations will not be recorded on the student's permanent record until the student has earned a minimum of twelve semester hours at Chattahoochee Valley Community College. Notation will be made on the student's permanent record indicating the area where credit was awarded with the statement "Credit by Examination" followed by the number of semester hours granted.

**The policy of granting credit through CLEP/DANTES examinations may differ from policies at other colleges and the student is cautioned to check with other colleges to obtain additional information.**

# CREDIT BY EXAMINATION

Credit by Examinations opportunities are available in some subject areas for which CLEP and DANTES examinations are not available or recognized by the College. Students should contact the Dean of Instruction for more information.

Credit by Examination is subject to the following regulations and guidelines.

1.  An admitted student must apply to the Dean of Instruction for requesting a Credit by Examination.

CVCC00569

2. A student may not challenge a specific course more than once.

3. A maximum of fifteen hours of credit toward the degree or nine toward the certificate may be earned through challenge examinations.

4. Students must be enrolled in the College and must not have audited or have been previously enrolled in the course for credit at any postsecondary institution. The student must enroll as a regular student in the course to be challenged. This provision includes payment of the respective tuition charges and applicable fees for the course.

5. The student who passes a challenge examination will receive credit for the course with the notation on the transcript of credit extended and the method by which the credit was earned (credit by examination).

6. No credit earned through challenge examinations will be extended to any student until the student has completed twelve semester hours of credit at CVCC.

7. Challenge examinations will not be administered if the student has already received credit for advanced work in the subject area beyond the course for which the examination is being requested.

8. Credit by Examination procedures may not be utilized to remove or supersede any grade previously earned in a given course or equivalent, including courses which were failed.

9. A $40 administrative fee will be required for each request to earn Credit by Examination.

## CREDIT BY EXAMINATION REFUND POLICY

Student must pay tuition fees in addition to examination fees in order to receive a grade for Credit by Examination. Refunds will only be given in the same semester in which the student has applied. There will be no refunds if the student has not completed the examination in the semester in which he/she has applied.

## CREDIT THROUGH ADVANCED PLACEMENT

Chattahoochee Valley Community College will grant college credit to students who score 3, 4, or 5 on one or more of the Advanced Placement Program Examinations of the College Entrance Examination Board, not to exceed 15 hours credit. To be eligible, the student must take the examination prior to enrollment in college and must be enrolled at the College when credit is awarded.

## CREDIT FOR MILITARY TRAINING
## AND EDUCATIONAL EXPERIENCES

Chattahoochee Valley Community College will consider on an individual basis, military experiences as a substitute for approved courses in the student's training and educational curriculum. It will be the responsibility of the student to apply for credits by completing the Request for Military Credit form and providing certified copies of the Military Service form to the Admission Office. Credits extended by the College will be applicable toward the individual's graduation requirements and once the credit is extended the student will be restricted from enrolling in the course for which the substitution was made.

Guidelines to be utilized in extending credit are as follows:

1. United States Armed Forces Institute (USAFI) - Credit may be given for study or correspondence study applicable to the student's curriculum which was taken through the United States Armed Forces Institute (USAFI) provided the course is recommended by the American Council on Education. The student must submit official evidence of satisfactory completion of the work to the Office of Admissions.

63

CVCC00570

2. Military Service Schools - Training courses completed in the armed forces that are applicable to the student's curriculum and approved by the American Council on Education may be accepted for credit upon submission of official documentation to the Office of Admissions that such courses were satisfactorily completed.

3. The College will consider credit earned for college-level courses reported through the Defense Activity for Non- Traditional Educational Services Support (DANTES). Credit allowed will be based upon the recommendations of the American Council on Education.

# GRADUATION REQUIREMENTS
## DEGREE REQUIREMENTS

Chattahoochee Valley Community College awards the Associate in Arts degree or the Associate in Science degree to eligible individuals desiring to transfer to senior colleges or universities and the Associate in Applied Science degree to individuals desiring to pursue a specific career program of study.

To become eligible to receive an associate degree from Chattahoochee Valley Community College, the student must fulfill the following requirements:

1. **Associate in Arts or Associate in Science degree** - Completion of a minimum of 64 semester hours credit in an approved Associate in Arts or Associate in Science degree program with sixteen semester hours taken at Chattahoochee Valley Community College (the exact number of hours required in each program is specified in the Program of Study section, pages 79-90). Students must complete at least 25% of semester credit hours at CVCC.

   **Associate in Applied Science degree** - Completion of a minimum of 64-70-semester hours credit in an approved Associate in Applied Science degree with 25% of the semester hours taken at Chattahoochee Valley Community College (the exact number of hours required in each program is specified in the Program of Study section, pages 79-90).

2. Meet all requirements for graduation within a calendar year of the last semester/term of attendance.

3. Successfully complete the general education and other required courses as specified in the program of study.

4. Achieve a minimum cumulative grade point average of 2.00.

5. Fulfill all financial obligations to the College.

6. Complete formal application for graduation by the specified deadline date.

7. Complete all incomplete grades.

8. Pay the specified graduation fee.

9. Participate in commencement ceremonies. Students must participate in ceremonies unless prevented from doing so by unusual or extenuating circumstances. Students may be excused from participation in commencement ceremonies ONLY by submitting in writing a formal request to the Dean of Student and Administrative Services stating the nature of the unusual or extenuating circumstances. If the request is granted, the student must contact the Office of Admissions to arrange for receipt of the diploma.

   Any exception or waiver of these requirements may be approved at the discretion of the Deans of Student and Administrative Services.

64

CVCC00571

## CERTIFICATE REQUIREMENTS

To become eligible to receive a Certificate the student must fulfill the following requirements:

1. Meet all admissions requirements.

2. Satisfactorily complete an approved program of study. (See the Programs of Study section for Certificate requirements.)

3. Achieve a minimum cumulative grade point average of 2.0.

4. Complete at least one-half the total semester credit hours required in the program at Chattahoochee Valley Community College.

5. Meet all requirements for graduation within a calendar year of the last semester/term of attendance.

6. Complete a formal application for the certificate by the specified deadline date.

7. Fulfill all financial obligations to the College.

## COMPETENCY REQUIREMENTS FOR GRADUATION

In order to ensure that students have acquired certain competencies before they graduate, Chattahoochee Valley Community College has established the following requirements:

1. In order to develop competency in writing, reading, and computation, students must take the COMPASS Placement Test and must take and satisfactorily complete developmental courses if required by the assessment results. All students must then take at least two written communications skills courses at the college level and reading courses, if required, until the exit level is at the twelfth grade or higher. Competencies required for completion of each course are designated on each course syllabus.

2. Competency in the use of computers is required of all students in order to graduate. Every student must take at least one computer course unless he/she can demonstrate computer literacy otherwise. Competencies required for completion of the computer literacy course are designated on the course syllabus.

3. Students must achieve a 2.0 cumulative grade point average in order to graduate. They must satisfy objectives (competencies) included on the syllabus for each course in order to pass the course.

## DUAL DEGREE POLICY

To qualify for a second associate degree, a student must complete an additional 16 semester hours above the degree requirements for the first associate degree, and maintain a grade of "C" or higher.

Students may earn two or more AAS degrees as long as they complete the specified requirements listed in the curriculum for each field of study.

Students seeking to earn an AAS and an AA or AS degree must (1) complete the specified curriculum requirements for the AAS degree, (2) complete the general education requirements for the AA or AS degrees, and (3) complete a sufficient number of elective hours.

## APPLICATION FOR GRADUATION

Individuals planning to graduate should make application for graduation to the Office of Admissions by the date specified in the College's academic calendar. Compliance with this deadline will allow the College to evaluate the student's eligibility for graduation and notify the student concerning remaining graduation requirements, if any.

CVCC00572

Deadlines will be waived only with approval from the Dean of Student and Administrative Services. Although students may complete requirements for graduation during any semester, degrees will not be officially conferred until commencement ceremonies at the end of Spring Semester. The official date that the student has completed requirements for the degree will be specified on the student's permanent transcript.

# GRADUATION HONORS
## DEGREES

Superior academic achievement by graduating students shall be designated on transcripts by the following:

Summa Cum Laude ....................................................................................................3.90-4.00 GPA
Magna Cum Laude ...................................................................................................3.70-3.89 GPA
Cum Laude ...............................................................................................................3.50-3.69 GPA

# GRADUATION HONORS
## CERTIFICATES

Superior academic achievement by students earning certificates shall be designated on transcripts as follows:

Graduation with Distinction ......................................................................................3.50-4.0 GPA

**Note: Calculation of the GPA for graduation honors shall be identical to the method used to calculate the GPA to fulfill graduation requirements for the degree or certificate to be earned. In addition, to be eligible for a graduation honor, the student must have completed a minimum of thirty-two semester hours at the College. All awards and honors are computed based on the student's standing at the end of the Spring Semester prior to graduation.**

## WITHHOLDING OF GRADUATION, DIPLOMA, AND OFFICIAL TRANSCRIPTS

It is the position of the administration of Chattahoochee Valley Community College that in order for a college degree or certificate to have true merit and meaning, it should only be granted upon a student's having demonstrated the level of effort and responsibility indicative of a worthy graduate. Therefore, it is the policy of the College that a student shall earn entitlement to a degree or certificate only by successfully completing a prescribed course of study; paying all tuition, fees, and other appropriate charges; and fully abiding by the College's policies, rules, and regulations. In the event of the failure of a student to meet any of these three basic requirements for graduation, the College shall reserve the right to withhold official graduation and the awarding of a degree or certificate to such student and, until such deficiency is rectified, to include a notation on the student's official transcript that the student is ineligible for graduation.

Furthermore, it is the policy of Chattahoochee Valley Community College that any student who has failed to make timely payment of any tuition, fees, or other appropriate charges shall be ineligible to re-enroll for any subsequent academic semester at the College, except upon special permission from the President, until such time as appropriate payment is made. The College also reserves the right to withhold the issuance of the official transcript of any student who shall have failed to make timely payment of any tuition, fee, or other appropriate charge, until such time as full payment is made.

The Admissions Office shall have the authority to impose the withholding of official graduation, certificate, and/or release of official transcripts as long as such authority is exercised in a manner consistent with the intent of this policy.

CVCC00573

In the event that the College shall intend to withhold official graduation from a student, withhold the awarding of a degree or certificate to a student, withhold the release of an official transcript, or declare a student ineligible for further enrollment, the Dean of Student and Administrative Services shall provide written notice to the student of such intent. The notice shall be delivered by personal service or mailed to the student's last known home address. The notice shall state the type of action intended to be taken by the College.

A student who receives notice that any of the above-described actions is to be taken shall have the right to meet with the Admissions Officer and request that the action not be taken. If the student substantiates that the basis stated for the action is erroneous, or if the student demonstrates to the satisfaction of the Admissions Officer that the respective problem will be resolved within a time frame acceptable to him/her, or if the Admissions Officer determines for any other appropriate reason that the intended action should be rescinded or modified, he/she shall have the authority to withdraw or modify the action. The Admissions Officer shall provide written notice to the student of any such rescission or modification. The Admissions Officer shall also have the authority to make such rescission or modification conditional upon the student's meeting certain stated requirements, and in such cases, the Admissions Officer shall retain the right to re-impose the action if the stated conditions are not met by the student.

## COOPERATIVE ARRANGEMENTS

Chattahoochee Valley Community College and Troy State University - Phenix City participate in an arrangement that provides for sharing of facilities such as the Learning Resource Center. This arrangement is designed to foster institutional cooperation in meeting the higher education needs of the citizens of the College's service area and to promote the transfer of Chattahoochee Valley Community College students to Troy University.

## ROTC AT COLUMBUS STATE UNIVERSITY

The Reserve Officers' Training Corps (ROTC) Department at Columbus State University allows CVCC students to take ROTC classes at the Columbus State University Campus. CVCC students must apply as transient students, receive transient student permission, and be full-time students. Courses taken at the Columbus State University ROTC Department are offered at no cost to the first six qualified applicants. Additional students will be considered on a case-by-case basis. Qualified students may compete for ROTC academic scholarships, Association of the United States Army (AUSA) scholarships, The Retired Officers Association (TROA) scholarships, and other civilian awards programs.

Students are considered ineligible if they:
- are not full-time students
- are not U.S. citizens
- are parolees, or have had a criminal conviction involving jail sentences or probation
- are a veteran with more than ten years time in service
- are a veteran ineligible for reentry into military service
- will be older than thirty-three by the time they finish a four-year degree
- are married to another service member and have minor children

Upon completing ROTC and a baccalaureate program of their choice, students are commissioned as second lieutenants in the United States Army.

The Military Science Department at Columbus State University is staffed by active duty officers and noncommissioned officers. The military science curriculum, thirty-one credit hours, is divided into the basic course (freshman and sophomore) and the advanced course (junior and senior). The basic course is open to all eligible students. The advanced course is open only to those who complete the basic course or equivalent placement credit. Textbooks and

67

other required course materials are furnished at no cost.

The basic course is the program offered to eligible Chattahoochee Valley Community College students. It requires ten credit hours in leadership and general military subjects which qualify students for transfer to the advanced course at Columbus State University in their junior year.

Required military science courses are ROTC 1215 (Concepts of Leadership), ROTC 1216 (Basic Leadership Skills), ROTC 2225 (Advanced Leadership), ROTC 2226 (Tactics and Officership), and a ROTC elective. While taking these courses, students may be eligible to compete for ROTC academic scholarships. The military cadre will brief students on the scholarships during the course of instruction. Students in this program may participate in leadership labs, M16 rifle marksmanship, field training exercises, rappelling, and other training sponsored by the ROTC program.

## RECIPROCITY AGREEMENTS AFFECTING TUITION

By approval of the Alabama State Board of Education, Georgia residents living in counties contiguous to Lee and Russell Counties in Alabama pay the same tuition and fees assessed Alabama residents. By approval of the Georgia Board of Regents, Alabama residents living in Alabama counties contiguous to Muscogee County, Georgia, pay the same tuition and fees at Columbus State University as those assessed Georgia residents (See Financial Information section, p. 33).

## SERVICEMEMBER'S OPPORTUNITY COLLEGES ASSOCIATE DEGREE (SOCAD)

SOCAD is a system of voluntary off-duty college curricula designed for soldiers and their adult family members. SOCAD-2 is the associate degree program and SOCAD-4 is the bachelor's degree program.

The system was established to improve the quality of college programs offered for soldiers and family members. SOCAD-2 and SOCAD-4 provide military students with the opportunities to complete college programs without the loss of credit because of frequent changes of duty station. Curricula in SOCAD are offered only by regionally accredited colleges on or accessible to most Army installations worldwide.

The system is operated by Servicemembers Opportunity Colleges (SOC) for the Army.

Through prior agreement students in SOCAD Programs:

(1)   are issued a SOCAD Student Agreement upon enrolling.

(2)   have a residency credit limited to one-fourth of total degree requirements taken at any time.

(3    are awarded credit for non-traditional learning, MOS experience, military training courses, and results of national examinations, based on recommendations of the American Council on Education.

(4)   guaranteed transferability of credit among colleges in the SOCAD networks, with no individual prior approval necessary. (This guarantee is available only for students who have been issued SOCAD Student Agreements.)

(5)   guaranteed transfer of a SOCAD-2 to a related SOCAD-4 curriculum to meet at least forty-five percent of the requirements for a bachelor's degree.

(6)   are offered acceptance of family members as SOCAD students.

The degree can be completed after leaving the service. Participation in the SOCAD system begins for the student when a SOCAD Student Agreement is issued by the home college. Official evaluations are completed upon the request of the student after enrollment.

68

CVCC00575



PROGRAMS OF STUDY

CVCC00576

# NURSING (ADN)
## Associate in Applied Science
## Degree Requirements

The Nursing Mobility program enables the Licensed Practical Nurse (LPN) to complete a one-year curriculum leading to an Associate in Applied Science degree. This qualifies the graduate to apply to write the National Council Licensure Examination: NCLEX-RN. The Nursing program is approved by the Alabama Board of Nursing and is accredited by the National League for Nursing. All agencies used as clinical experience for students are approved by their appropriate accrediting organization.

**Alabama Board of Nursing policy requires that students in a mobility program in the State of Alabama who attend clinicals in any Alabama hospital must possess a nursing license in the State of Alabama.**

**It is important for nursing students to note, however, that the review for candidates for eligibility for initial and continuing licensure in Alabama will include questions concerning such matters as whether they have ever been arrested or convicted of a criminal offense and whether they have ever been arrested or convicted for driving under the influence of alcohol. Application to write the examination may be denied on the basis of the review.**

The program requires seventy semester hours for completion including eleven hours awarded for the validation exam. Eleven hours of credit will be awarded for NUR 111, 121, 201, 202, 203, and 241 on admission to the Nursing program and successful completion of clinical skills check-offs.

Admission to the ADN program is competitive, and while the student may be admitted to the College, he/she may not be admitted to the program. Factors influencing admission are listed in the Admission Criteria.

## REQUIRED GENERAL EDUCATION COURSES

|  |  | Prereq | SU | F | SP |
|---|---|---|---|---|---|
| **AREA I (6 Sem. Hrs.)** |  |  |  |  |  |
| ENG 101 | English Composition I (Prerequisite) | 3 |  |  |  |
| ENG 102 | English Composition II |  |  | 3 |  |
| **AREA II (3 Sem. Hrs.)** |  |  |  |  |  |
|  | Humanities Elective |  |  | 3 |  |
| **AREA III (19 Sem. Hrs.)** |  |  |  |  |  |
| BIO 103 | Principles of Biology (Prerequisite) | 4 |  |  |  |
| BIO 201 | Human Anatomy and Physiology I |  | 4 |  |  |
| BIO 202 | Human Anatomy and Physiology II |  |  | 4 |  |
| BIO 220 | General Microbiology |  |  |  | 4 |
| MTH 100 | Intermediate College Algebra |  |  | 3 |  |
| **AREA IV (3 Sem. Hrs.)** |  |  |  |  |  |
| PSY 200 | General Psychology (Prerequisite) | 3 |  |  |  |
| **AREA V** |  |  |  |  |  |
| NUR 131 | Health Assessment |  |  | 1 |  |
| NUR 242 | Advanced Pharmacology |  | 2 |  |  |
| NUR 251 | Adult Nursing I |  | 5 |  |  |
| NUR 252 | Adult Nursing II |  |  | 5 |  |
| NUR 271 | Maternal Newborn Nursing |  |  | 4 |  |
| NUR 272 | Pediatric Nursing |  |  |  | 4 |
| NUR 279 | Concepts of Psychosocial Nursing II |  |  |  | 2 |
| NUR 291 | Transition into Nursing Practice |  |  |  | 3 |
| NUR 292 | Nursing Licensure Examination Review |  |  |  | 2 |
|  |  | 10 | 12 | 26 | 15 |

**\* The current curriculum will be in effect May 2006. With the new class of 2006, the curriculum outline will change and will be available in the nursing department.**

CVCC00615

# NURSING CAREER
# MOBILITY PROGRAM (ADN)
### ADMISSIONS CRITERIA

1.  Applicants must meet all the admission requirements to be admitted as a regular student to the College.

2.  An Application for Admission to the Nursing Mobility Career program must be completed and submitted to the Nursing Office. Applications are available upon request. Testing dates will be announced in a letter to prospective students after the application process is complete.

3.  Students must be Licensed Practical Nurses (LPNs) or recent graduates of an LPN program in order to apply for the Nurse Mobility program. Practical nurses must have three months of clinical work experience within the thirty-six-month period prior to beginning the program. Recent graduates of PN programs may apply provided that they commit to document 500 hours of work experience by the June date the program begins. All supporting documents must be in the student's file. All application material except transcripts should be sent to the Nursing Division. Transcripts should be sent by the school attended to the Admissions Office. **It is the student's responsibility to verify that his/her transcript has been received by the Admissions Office.**

4.  Applicants who meet the requirements specified in #1 and #2 will be invited to take the admission/validation tests on the dates specified for the tests. Failure to enroll after acceptance constitutes forfeiture of position, and the individual must repeat the entire admission process if he/she seeks admission at a future date.

5.  The following factors will be considered in granting provisional admission to the program: scores on the admission/validation examination (50th percentile in Foundations, and a combined average of 40th percentile in Maternal-Child Nursing), employee reference letters, and a GPA of 2.00 on previous college coursework. To gain unconditional admission, students must successfully pass skills check-offs in addition to passing the admission/validation exam. These check-offs will be conducted in the Spring Semester prior to entering the program. Failure will result in forfeiture of position in the program.

6.  Students must have completed the following three courses, with a grade of "C" or higher, preferably at the College, prior to beginning study in the nursing program. Individuals may transfer these courses from other accredited colleges.
    BIO 103 Principles of Biology ........................... 4
    ENG 101 English Composition I........................3
    PSY 200 General Psychology.............................3

    Students must take diagnostic tests in writing, mathematics, and reading at least two semesters prior to beginning prerequisite coursework in order to allow for completion of any required coursework.

7.  In the interest of student and patient safety and before consideration for admission, any applicant possessing certain limitations may be required to submit medical examination records and/or statements from physicians indicating that he/she is able to fully participate with reasonable accommodation, if necessary, in the approved program of clinical studies and responsibilities. **Students must be able to perform the essential functions of the program.**

8.  Evidence of current CPR certification, health insurance, and malpractice coverage as a nursing student must also be submitted to the Nursing Division. Malpractice insurance application forms are available upon request in the Nursing Division. If the student does not supply these documents to the Nursing Division by the established deadline, admission to the program will be denied.

CVCC00616

9. Once a student is admitted to the Nursing Mobility program, he/she will be responsible for accurately following the admissions criteria and the nursing curriculum design. Failure to follow the curriculum design as represented may affect progression in the program.

10. Once provisionally admitted to the program, the student must complete all coursework at the College unless written approval is obtained from the Division Chairperson and the Dean of Instruction.

11. Students enrolled in the Nursing Mobility program must earn a "C" or higher in all required courses in the nursing curriculum, in both nursing and non-nursing courses. This includes satisfactory completion of the clinical components of each course. Failure of clinical components results in failure of the course.

12. Nursing courses 131, 242, and 251 may be taken only once. A student who fails to earn a "C" in any one of these courses must reapply to the nursing program. If a student fails to earn a "C" in two or more of the courses listed above, he/she will be excluded from the program and unable to reapply.

13. Nursing courses NUR 252, 271, 272, 279, 291, and 292 may be repeated only once and are to be taken the next semester a course is offered provided space is available. If the student does not pass the nursing course on the second attempt, that student shall be excluded from the nursing program, but not the College. Students who repeat 252, 271, 272, 291, and 292 will be encouraged to successfully complete review packets for each course before retaking.

14. The nursing student must complete the entire nursing program within twenty-four months of the date he/she begins his/her studies in the program or be excluded from the nursing program. If a nursing student fails two different nursing courses within the twenty-four-month period, he/she will be excluded from the program and CANNOT reapply. Exclusion from the nursing program does not constitute exclusion from the College.

15. Withdrawal from nursing courses will be considered as failure (except in extenuating circumstances as determined by the Division Chairperson). The student must be passing at the time of the withdrawal for the circumstance to be considered.

16. An Incomplete (I) in nursing courses will be given only in extreme extenuating circumstances (i.e., hospitalization of student, death of a student's immediate family member, or hospitalization of the student related to pregnancy) and is at the discretion of the instructor and Nursing Division Chairperson). Incompletes are not intended for students who are failing nursing courses.

17. Nursing and non-nursing courses are to be taken in sequence as shown by the nursing curriculum design in this Catalog. When non-nursing courses are failed with a "D" or an "F", the student must repeat the courses the next semester they are offered, provided space is available. The student must be aware that if a grade of "D" or "F" is made in a non-nursing course that is a prerequisite to a nursing course the following semester, he or she may not advance to the next nursing course.

18. Each student is responsible for mailing his/her own application to the Board of Nursing in the state in which he/she is applying for initial licensure, as well as to NCLEX. Each student is responsible for mailing the application and meeting any deadlines that the Board may announce.

19. Transfer credit from other nursing programs is occasionally granted, and is done on an individual basis. A student who has been enrolled previously as a nursing student at another institution may be considered for admission after the application filing deadline date if time and space permit, but no guarantee of admission is granted. All applicants must take the entrance/validation examinations and meet all program requirements.

111

CVCC00617

20. In addition to the above specification, students in the Nursing Mobility program must fulfill the same requirements and regulations expected of all students who are admitted to the College and outlined in the Nursing Student Handbook.

21. Applicants requiring reasonable accommodations under the Americans with Disabilities Act (ADA) are encouraged to call the ADA Coordinator at 214-4845 (Americans with Disabilities Act Compliance Plan, IV.)

*Special Costs for Nursing Students\**
Liability Insurance (required)
Nursing Pin (optional)
Uniform (required)
Board of Nursing Licensure Fee
NCLEX Fee
NLN Examinations (required per semester and included in Registration Costs)
Nursing Validation Examination and Clinical Testing (required)
Health Insurance (individual rates required)
Physical (required)
Hepatitis B vaccinations (optional but highly encouraged)

*Costs for these items vary. For specific costs, the student should consult the Division Chairperson of Health Sciences.

112

# PRACTICAL NURSING (LPN)

## Certificate

The Practical Nursing (PN) program enables the student to complete a one-year curriculum leading to a certificate in Practical Nursing. This qualifies the graduate to apply to write the National Council Licensure Examination: NCLEX-PN. **It is important for nursing students to note, however, that the review for candidates for eligibility for initial and continuing licensure in Alabama will include questions concerning such things as whether they have ever been arrested or convicted of a criminal offense and whether they have ever been arrested or convicted for driving under the influence of drugs/alcohol.** Application to write the examination may be denied by the State Board on the basis of this review. Therefore, successful completion of the PN Program does not guarantee eligibility to write the NCLEX-PN. Other states have similar stipulations regarding licensure.

When the examination is passed, the student then becomes a Licensed Practical Nurse (LPN). At the time of the printing of this Catalog, the program requires forty-five hours for completion of the three-semester sequence.

**First Term (Fall)** ................................................................................................**Sem. Hrs.**

| | | |
|---|---|---|
| MTH 116 | Mathematical Applications | 3 |
| NUR 101 | Body Structure and Function | 4 |
| Or BIO 201 | (student choice) | |
| NUR 102 | Fundamentals of Nursing | 6 |
| NUR 103 | Health Assessment | 1 |
| NUR 104 | Introduction to Pharmacology | 1 |

**Second Term (Spring)**

| | | |
|---|---|---|
| ENG 101 | English Composition | 3 |
| BIO 202 | Human Anatomy and Physiology II (if elected BIO 201) | 4 |
| NUR 105 | Adult Nursing | 8 |
| NUR 106 | Maternal and Child Nursing | 5 |

**Third Term (Summer)**

| | | |
|---|---|---|
| NUR 107 | Adult/Child Nursing | 8 |
| NUR 108 | Psychosocial Nursing | 3 |
| NUR 109 | Role Transition | 3 |

**Required for Graduation (2 Sem. Hrs.)**

| | | |
|---|---|---|
| WKO101 | Workplace Skill Development | 1IC |
| ORI101 | Orientation | 1 |

**\*NOTE: LPN STUDENTS MUST COMPLETE NUR 101 OR BOTH COURSES ANATOMY AND PHYSIOLOGY (BIO 201 AND BIO 202).**

113

CVCC00619

# THE ALABAMA COLLEGE SYSTEM
# NURSING EDUCATION PROGRAM  PROGRESSION POLICY

In order to continue in the nursing program, the student must:

1. Maintain a grade of C or better in all required general education and nursing courses and maintain a 2.0 cumulative GPA.

2. Unless completed previously, students must complete all required general education courses according to The Alabama College System Nursing Education curriculum. Any exceptions must be approved by the nursing program director.

3. Maintain ability to meet essential functions for nursing with or without reasonable accommodations.

4. Students must successfully complete the program:
   a. Within 48 months from initial semester for ADN students; or
   b. Within 24 months from initial semester for PN and Mobility students.

5. Maintain current CPR at the health care provider level.

6. If a student withdraws or makes a D or an F in a nursing course, the student cannot progress in the nursing course sequence until the course is repeated successfully. Course repetition will be based on instructor availability and program resources.

7. Students whose progression through the nursing program is interrupted and who desire to be reinstated in the program must schedule an appointment with a nursing faculty advisor to discuss reinstatement. In order to be reinstated, a student must:
   a. Apply for readmission to the college if not currently enrolled;
   b. Submit a letter requesting reinstatement to the nursing program Admissions and Progression Committee;
   c. Submit letter of request in a timely manner so that reinstatement would occur within one year from the term of withdrawal or failure;
   d. Demonstrate competency in all previous nursing courses successfully completed;
   e. Adhere to nursing curriculum or program policies and procedures effective at the point of reinstatement.

8. Reinstatement to the nursing program is not guaranteed.

9. Reinstatement may be denied due to, but not limited to, any of the following circumstances:
   a. Space unavailability of a course in which the student wishes to be reinstated. (Students in regular progression have enrollment priorities for clinical sites.)
   b. Grade point average is less than 2.0 from courses completed at current institution.
   c. Refusal by clinical agencies to accept the student for clinical experiences.
   d. Failure to demonstrate competency in all previous nursing courses successfully completed.
   e. Over twelve months have elapsed since the student was enrolled in a nursing course.
   f. Student has been dismissed from the program.

10. A total of two unsuccessful attempts (D, F, or withdrawal) in nursing courses will result in dismissal from the nursing program. Withdrawal and/or a D or F in one or more courses in a term will be considered one attempt.

11. If a student has been dismissed from the associate degree nursing program, the student may apply for admission to the practical nursing program. If a student has been dismissed from the mobility program, the student may apply for admission to the generic program.

114

CVCC00620

12. A student who has been dismissed from a specific program (ADN/PN/Mobility) can apply for admission as a new student to any nursing program within the Alabama College System, provided:
   a. the student meets current entry requirements;
   b. at least two years have elapsed since the student's dismissal from a specific program; and
   c. the student was not dismissed from the previous program for disciplinary reasons or for unsafe/unsatisfactory client care in the clinical area.

13. Students dismissed from the previous program for disciplinary reasons and/or unsafe/unsatisfactory client care in the clinical area will not be allowed reinstatement to the nursing program.

115

CVCC00621



COURSE DESCRIPTIONS

CVCC00622

**MUS 217.  JAZZ IMPROVISATION (3-0-3)**
Prerequisite: Permission of the instructor
On Demand
This course is designed to prepare the student with the theoretical background and improvisa-
tional techniques utilized in jazz performance. Emphasis is placed on the understanding of chord
structures, chord progressions, scale structures and melodic design. Upon completion, students
should be able to perform an improvisational solo with a jazz ensemble. **Code C**

**(MUL) MUSIC ENSEMBLES (0-2-1)**
Prerequisite: Permission of the instructor
F, Sp
This course provides an opportunity for students to participate in a performing ensemble.
Emphasis is placed on rehearsing and performing literature appropriate to the mission and goals
of the group. Upon completion, students should be able to effectively participate in perform-
ances presented by the ensemble. **Code B**

**MUL 170-71; 270-71 MUSIC WORKSHOP I,II,III,IV**
F,SP,F,SP

**MUL 180-81; 280-81 CONCERT CHOIR I, II, III, IV**
F, Sp, F, Sp

**MUL 184-85; 284-85 SHOW CHOIR I, II, III, IV**
F, Sp, F, Sp

**MUL 196-97; 296-97 SHOW BAND I, II, III, IV**
On Demand

**(MUL) CLASS PERFORMANCE INSTRUCTION (0-2-1)**
Prerequisite: None
On Demand
Group instruction is available in voice and piano for students with little or no previous training.
Emphasis is placed on the rudiments of music, basic performance technique and general musi-
cianship skills. Upon completion of one or a sequence of courses, students should be able to
demonstrate a basic proficiency in singing or playing and acknowledgment of music funda-
mentals. **Code C**

**MUL101-02; 201-02        CLASS PIANO I, II, III, IV**

**MUL111-12; 211-12        CLASS VOICE I, II, III, IV**

# NURSING (ADN)

See pages 165-166 for ADN prerequisites and corequisites.

**NUR 111. FUNDAMENTALS OF NURSING (4-0-4)**
Prerequisite: Permission of the instructor
This course presents concepts and theories related to  the art and science of nursing. Emphasis
is  placed on the application of the nursing process to provide and manage care as a member of
the discipline of nursing. Students are introduced to the concepts of needs, growth and devel-
opment, safety communication, teaching and learning, critical thinking, ethical-legal, nursing
history, and the program's philosophy of nursing. Students should be able to demonstrate begin-
ning competence in providing care for individuals with common health alterations. **(Clinical
required) CORE Not offered at the College in the Nursing Mobility Program. Credit
awarded by validation exam only.**

153

CVCC00658

**NUR 121. CLINICAL NURSING SKILLS (0-6-2)**
Prerequisite: Permission of the instructor
This course presents psychomotor nursing skills needed to assist individuals in meeting basic human needs. Skills necessary for maintaining microbial, physical, and psychological safety are introduced along with skills needed in therapeutic interventions. Students will demonstrate beginning level of competency in performing basic nursing skills. **(Lab/clinical required)  CORE Not offered at the College in the Nursing Mobility Program. Credit awarded by validation exam only.**

**NUR 131. HEALTH ASSESSMENT (0-3-1)**
Prerequisite: Permission of the instructor
Su
This course is designed to provide students the opportunity to learn and practice history-taking and physical examination skills with individuals of all ages. The focus is on symptoms analysis along with physical, psychosocial, and growth and development assessment. Students will be able to utilize critical thinking skills in identifying health alterations, formulating nursing diagnosis and documenting findings appropriate to nursing. (Lab required) **CORE**

**NUR 201. SPECIALIZED AREA OF STUDY (1-0-1)**
Prerequisite: Permission of the instructor
This course is directed toward the specialized study of theory and experiences in a selected area as determined by students, employers, and/or the program. Emphasis is placed on the development of knowledge in an area of interest to the student. The student should be able to meet the objectives of the course as approved by the instructor. **Not offered at the College in the Nursing Mobility Program. Credit awarded by validation exam only.**

**NUR 202. SPECIALIZED AREA OF STUDY (2-0-2)**
Prerequisite: Permission of the instructor
F
This course is directed toward the specialized study of nursing experiences in a selected area as determined by students, employers, and/or the program. Emphasis is placed on the development of knowledge and skills in an area of interest to the student. The student should be able to meet the theoretical and skill objectives of the course as approved by the instructor.

**NUR 203. SPECIALIZED AREA OF STUDY (0-3-1)**
Prerequisite: Permission of the instructor
This course is directed toward the application of clinical experiences in a selected area as determined by students, employers, and/or the program. Emphasis is placed on the development of the knowledge and skills in an area of interest to the student. The student should be able to meet the theoretical and skill objectives of the course as approved by the instructor/preceptor. (Clinical required)  Not offered at the College in the Nursing Mobility Program. **Credit awarded by validation exam only.**

**NUR 241. BASIC PHARMACOLOGY (0-3-1)**
This course introduces the student to basic principles of pharmacology and the skills necessary to safely administer medications. Areas of emphasis include concepts of legal implications, pharmacokinetics, pharmacodynamics, calculation of drug dosages, and medication administration. Students will be able to demonstrate accurate dosage calculations, correct medication administration and knowledge of drug classification. (Lab required) **CORE Not offered at the College in the Nursing Mobility Program. Credit awarded by validation exam only.**

154

**NUR 242. ADVANCED PHARMACOLOGY (2-0-2)**
Prerequisite: Admission to the A.D. N. Program and completion of validation process.
Corequisities: NUR 131, NUR 251, ENG 102 and BIO 201
Su
This course is designed to provide the student comprehensive knowledge of drug classifications and applications of pharmacology. Emphasis is placed on nursing responsibility, accountability, and application of the nursing process regarding drug therapy. The actions, dosages, side effects, adverse reactions are presented for drug prototypes from each classification of drugs. The student will be able to synthesize knowledge of drug therapy in a variety of settings with individuals across the life span. **CORE**

**NUR 251. ADULT NURSING I (3-6-5)**
Prerequisite: Admission to the A.D.N. Program (Corequisites: NUR 131, 242, ENG
102 and BIO 201) Su
This course provides an opportunity to utilize the provider of care and manager of care roles to meet nursing needs of adults in a variety of settings. Emphasis is placed on the aging process as it applies to normal developmental changes and alterations in health commonly occurring in the adult. Students should be able to apply the nursing process in caring for adults in a variety of settings. (Clinical required) **CORE**

**NUR 252. ADULT NURSING II (3-6-5)**
Prerequisite: NUR 131, 242, 251, and BIO 201 (Corequisite: BIO 202) F
This course introduces concepts related to the nursing care of individuals experiencing acute and chronic alterations in health. Emphasis is placed on utilizing the nursing process as a framework for providing and managing nursing care to individuals. Student should be able to apply the nursing process to individuals experiencing acute and chronic health alterations in a variety of settings. (Clinical required)

**NUR 271. MATERNAL-NEWBORN NURSING (2-6-4)**
Prerequisite: NUR 131, 242, 251, and BIO 201 (Corequisite: BIO 202) F
This course provides a family centered approach to the nursing care of the childbearing family. Emphasis is placed on concepts related to the antepartal, intrapartal, post-partal, and neonatal periods. The student should be able to manage and provide care to the childbearing family in a variety of health care settings. (Clinical required)

**NUR 272. PEDIATRIC NURSING (2-6-4)**
Prerequisite: NUR 131, 242, 251, and BIO 201, 202 (Corequisite: BIO 220) Sp
This course provides a family-centered approach to the nursing of children from infancy through adolescence. Emphasis is placed on concepts, growth and development, health promotion, and alterations in health. The student should be able to utilize the nursing process in providing and managing nursing care to the family in a variety of health care setting. (Clinical required)

**NUR 279. CONCEPTS OF PSYCHOSOCIAL NURSING II (1-3-2)**
Prerequisite: NUR 131, 242, 251, and BIO 201, 202 (Corequisite: BIO 220) Sp
This course provides expanded concepts related to the psychosocial needs of individuals. Emphasis is on common and acute alteration in mental health and the related intervention modalities. The student should be able to apply the concepts of individuals experiencing acute and chronic alterations in mental health in a variety of settings. (Clinical required)

**NUR 291. TRANSITION INTO NURSING PRACTICE (2-5-3)**
Prerequisite: Permission of the instructor and completing last semester coursework
Sp
This course prepares the student for transition into nursing practice. Emphasis is placed on the roles of the professional nurse, concepts of leadership and management, and trends and issues in health care delivery. The student will apply these concepts in the preceptor experience. (Preceptorship required.)

155

**NUR 292. NURSING LICENSURE EXAMINATION REVIEW (2-0-2)**
Prerequisite: Permission of the instructor and completing last semester coursework Sp
This course is designed to assist the student in preparation for the nursing examination. Emphasis is placed on test taking skills, computer assisted simulations, and content basic to the practice of nursing. The student should be able to pass the nursing licensure exam.

# PRACTICAL NURSING

See page 167 for LPN prerequisite and corequisities.

**NUR 101. BODY STRUCTURE AND FUNCTION (4-0-4)**
F
This course provides students with basic knowledge of the normal structure and function of the human body. Major content focuses on the interrelations among the organ systems and the relationship of each organ system to homeostasis. Medical terminology is integrated throughout course content. Upon completion of this course, students will be able to demonstrate basic knowledge of body systems, their interrelationships and associated medical terminology.

**NUR 102. FUNDAMENTALS OF NURSING (3-3-6)**
F
This course provides opportunities to develop competencies necessary to meet the needs of individuals throughout the lifespan in a safe, legal, and ethical manner using the nursing process. Students learn concepts and theories basic to the art and science of nursing. The role of the nurse as a member of the healthcare team is emphasized. Students are introduced to the concepts of client needs, safety, communication, teaching/learning, critical thinking, ethical-legal, cultural diversity, nursing history, and the program's philosophy of nursing. Additionally, this course introduces psychomotor nursing skills needed to assist individuals in meeting basic human needs. Skills necessary for maintaining microbial, physical, and psychological safety are introduced along with skills needed in therapeutic interventions. At the conclusion of this course students demonstrate competency in performing basic nursing skills for individuals with common health alterations.

**NUR 103. HEALTH ASSESSMENT (0-0-1)**
F
This course is designed to provide students the opportunity to learn and practice history taking and physical examination skills with individuals of all ages, with emphasis on the adult. The focus is on symptom analysis along with physical, psychosocial, and growth and development assessments. Students will be able to utilize critical thinking skills in identifying health alterations, formulating nursing diagnoses and documenting findings appropriate to nursing.

**NUR 104. INTRODUCTION TO PHARMOCOLOGY (0-0-1)**
F
This course provides opportunities to develop competencies necessary to meet the needs of individuals throughout the lifespan in a safe, legal, and ethical manner using the nursing process. This course introduces students to basic principles of pharmacology and the knowledge necessary to safely administer medication. Course content includes legal implications, pharmacokinetics, pharmacodynamics, calculations of drug dosages, medication administration, and an overview of drug classifications. Students will be able to calculate and administer medications.

**NUR 105. ADULT NURSING (5-6-8)**
Prerequisites: NUR 102, NUR 103, NUR 104, BIO 201 or NUR 101, MTH 116
Sp
This course provides opportunities to develop competencies necessary to meet the needs of individuals throughout the lifespan in a safe, legal, and ethical manner using the nursing process. Emphasis is placed on providing care to individuals undergoing surgery, fluid and electrolyte imbalance, and common alterations in respiratory, musculoskeletal, gastro-intestinal, cardiovascular, endocrine, and integumentary systems. Nutrition, pharmacology, communication, cultural, and community concepts are integrated.

156

### NUR 106. MATERNAL AND CHILD NURSING (4-3-5)
Prerequisites: NUR 102, NUR 103, NUR 104, BIO 201 or NUR 101, MTH 116
Sp
This course focuses on the role of the nurse in meeting the physiological, psychosocial, cultural and developmental needs of the maternal and child client. Course content includes antepartal, intrapartal, and postpartal care, complications of pregnancy, newborn care, human growth and development, pediatric care, and selected pediatric alterations. Nutrition, pharmacology, cultural diversity, use of technology, communication, anatomy and physiology review, medical terminology, critical thinking, and application of the nursing process are integrated throughout this course. Upon completion of this course students will be able to provide and manage care for maternal and pediatric clients in a variety of settings.

### NUR 107. ADULT/CHILD NURSING (5-9-8)
Prerequisites: NUR 105, NUR 106, ENG 101, BIO 202
Su
This course provides students with opportunities to develop competencies necessary to meet the needs of individuals throughout the life span in a safe, legal, and ethical manner using the nursing process in a variety of settings. Emphasis is placed on providing care to individuals experiencing complex alterations in: sensory/perceptual reproductive, endocrine, genitourinary, neurological, immune, cardiovascular, and lower gastrointestinal systems. Additional instruction is provided for care for clients experiencing burns, cancer, and emergent conditions. Nutrition, pharmacology, therapeutic communication, community, cultural diversity, health promotion, error prevention, critical thinking, impacts on maternal and child clients are integrated throughout the course.

### NUR 108. PSYCHOSOCIAL NURSING (2-3-3)
Prerequisites: NUR 105, NUR 106, ENG 101, BIO 202
Su
This course is designed to provide an overview of psychosocial adaptation and coping concepts used when caring for clients with acute and chronic alterations in mental health in a variety of settings.  Topics include therapeutic communication skills, normal and abnormal behaviors, treatment modalities, and developmental needs.  Upon completion of this course, students will demonstrate the ability to assist clients in maintaining psychosocial integrity through the use of the nursing process.

### NUR 109. ROLE TRANSITION FOR PRACTICAL NURSING (2-0-3)
Prerequisites: NUR 105, NUR 106, ENG 101, BIO 202
Su
This course provides students with opportunities to gain knowledge and skills necessary to transition from student to practicing nurse. Content includes a discussion of current issues in health care, practical nursing leadership and management, professional practice issues, and transition into the workplace. Emphasis is placed on NCLEX-PN test-taking skills, computer-assisted simulations and practice tests, development of a prescriptive plan for remediation, and review of selective content, specific to the practice of practical nursing.

# BUSINESS AND OFFICE TECHNOLOGY

### OAD 100. INTRODUCTION TO KEYBOARDING AND TECHNOLOGY (2-2-3)
Prerequisites: None
F, Su
This course is designed to enable the student to develop navigating windows and touch keyboarding skills for efficient use of microcomputer through classroom instruction and lab exercises. Upon completion, the student should be able to demonstrate proper keying techniques and basic computer skills. **Code C**

CVCC00662

# APPENDIX

## NURSING COURSE DIRECTORY
## ADN COURSES

| COURSE TITLE | PREREQUISITES | COREQUISITE |
|---|---|---|
| **NUR 111-**<br>Fundamentals of Nursing | Validation Exam<br>ENG 101, PSY 200, BIO 103 | Validation Exam<br>NUR 121, 241, 201,<br>202, 203 |
| **NUR 121-**<br>Clinical Nursing Skills | Validation Exam<br>ENG 101, PSY 200, BIO 103 | Validation Exam<br>NUR 111, 241, 201,<br>202, 203 |
| **NUR 241-**<br>Basic Pharmacology | Validation Exam<br>ENG 101, PSY 200, BIO 103 | Validation Exam<br>NUR 111, 121, 201,<br>202, 203 |
| **NUR 201-**<br>Specialized Area of Study | ENG 101, PSY 200, BIO 103 | NUR 111, 121, 202,<br>203, 241 |
| **NUR 202-**<br>Specialized Area of Study | ENG 101, PSY 200, BIO 103 | NUR 111, 121, 241,<br>201, 203 |
| **NUR 203-**<br>Specialized Area of Study | ENG 101, PSY 200, BIO 103 | NUR 111, 121, 241,<br>201, 202 |
| **NUR 131-**<br>Health Assessment | ENG 101, PSY 200, BIO 103,<br>NUR 111, 121, 241, 201, 202, 203 | BIO 201, ENG 102,<br>NUR 242, 251 |
| **NUR 242-**<br>Advanced Pharmacology | ENG 101, PSY 200, BIO 103<br>Validation Courses, NUR 111,<br>121, 241, 201, 202, 203 | BIO 201, ENG 102,<br>NUR 131, 251 |
| **NUR 251-**<br>Adult Nursing I | ENG 101, PSY 200, BIO 103<br>Validation Courses, NUR 111,<br>121, 241, 201, 202, 203 | BIO 201, ENG 102,<br>NUR 131, 242 |
| **NUR 252-**<br>Adult Nursing II | ENG 101, 102, BIO 103,<br>NUR 131, 242, 251, PSY 200 | BIO 201, BIO 202,<br>MTH 100, SPH 107,<br>NUR 271 |

170

CVCC00675

**NUR 271-**
Maternal-Newborn Nursing

ENG 101, 102, BIO 103, BIO 201,
PSY 200, Validation Courses,
NUR 131, 242, 251

BIO 202, MTH 100,
SPH 107, NUR 252

**NUR 272-**
Pediatric Nursing

ENG 101, 102, BIO 103, 201, 202,
PSY 200, Validation Courses,
NUR 131, 242, 251

BIO 220, NUR 279,
291, 292

**NUR 279-**
Concepts of
Psychosocial Nursing

ENG 101, 102, BIO 103, 201, 202
PSY 200, Validation Courses,
NUR 131, 242, 251

BIO 220, NUR 272,
291, 292

**NUR 291-**
Transition into
Nursing Practice

ENG 101, 102, BIO 103, 201, 202
PSY 200, Validation Courses,
NUR 131, 242, 251

BIO 220, NUR 272,
279, 292

**NUR 292-**
Nursing Licensure
Examination Review

ENG 101, 102, BIO 103, 201, 202
PSY 200, Validation Courses,
NUR 131, 242, 251

BIO 220, NUR 272,
279, 291

CVCC00676

## NURSING COURSE DIRECTORY
## LPN COURSES

| COURSE TITLE | PREREQUISITES | COREQUISITE |
|---|---|---|
| **NUR 101**<br>Body Structure and Function | None | None |
| **NUR 102**<br>Fundamentals of Nursing | None | NUR 103, NUR 104, BIO 201or NUR 101, MTH 116 |
| **NUR 103**<br>Health Assessment | None | NUR 102, NUR 104, BIO 201 or NUR 101, MTH 116 |
| **NUR 104**<br>Introduction to Pharmacology | None | NUR 102, NUR 103, BIO 201 or NUR 101, MTH 116 |
| **NUR 105**<br>Adult Nursing | ENUR 102, NUR 103, NUR 104, BIO 201 or NUR 101, MTH 116 | NUR 106, ENG 101, BIO 202 |
| **NUR 106**<br>Maternal and Child Nursing | NUR 102, NUR 103, NUR 104, BIO 201 or NUR 101, MTH 116 | NUR 105, ENG 101, BIO 202 |
| **NUR 107**<br>Adult/Child Nursing | NUR 105, NUR 106, ENG 101 BIO 202 | NUR 108, NUR 109 |
| **NUR 108**<br>Psychosocial Nursing | NUR 105, NUR 106, ENG 101 BIO 202 | NUR 107, NUR 109 145 |
| **NUR 109**<br>Role Transition for the Practical Nurse | NUR 105, NUR 106, ENG 101 BIO 202 | NUR 107, NUR 108 |

172

CVCC00677

**Review by the Chancellor**

If an appeal is accepted by the Chancellor, the Chancellor shall have thirty (30) calendar days from his/her receipt of the Grievant's notice of appeal to investigate and review the allegations contained in the agreement, to review the report of the President and the Hearing Committee, to hold an appellant hearing (if he/she deems such appropriate), and to issue a report of his/her findings of fact and conclusions of law. The Chancellor shall have the authority to (1) affirm, (2) reverse, or, (3) affirm in part or reverse in part the findings, conclusions, and recommendations of the President and/or Hearing Committee. The report of the Chancellor shall be served to the Grievant and the Respondent(s) by personal service or certified mail, return receipt requested, to the respective home addresses of the parties. The report of the Chancellor shall not be further appealable except as allowed by the policies of the State Board of Education. However, the Grievant shall not be precluded from filing a grievance with an appropriate court or administrative agency.

**General Rule on Filing Deadlines**

If the last date for filing a document under this procedure falls on a Saturday, Sunday, or legal holiday, the date of the first business day following the respective Saturday, Sunday, or legal holiday shall be considered the deadline date.

# GRADE APPEAL PROCEDURE

It is the policy of CVCC that students should have the opportunity to appeal any grade which a student has reason to believe does not accurately and fairly represent the nature of the classwork which the student has performed. Therefore, the College has established a grade appeal procedure to be used if a student has valid reason to believe that a grade which the student received for an examination, a written/oral presentation, a project, or other required classroom activity, is either an inaccurate or unfair grade. A student must make the initial grade inquiry within seven calendar days after the student receives notice of the grade in question except in the case of a punitive grade issued for academic misconduct, which must be appealed by the end of the class day following the date on which the sanction was imposed. Thereafter, each subsequent appeal, if any, must occur within a seven-calendar day increment after the respective decision is received by the student. If a student does not meet the deadline for appealing a grade, the right to appeal will be waived. For grades on final examinations or grades that represent the final grade for the course, the initial seven-day period shall begin to accrue on the first class day of the next academic term. In appealing a grade, the student shall have the opportunity to have his or her concern about the grade reviewed through the following procedures:

The student shall begin by stating either orally or in writing to the instructor that the grade in question is either inaccurate, unfair, or both, and include the justification for appeal. If the student and the instructor cannot successfully resolve the student's concern, the student may then contact the Chairperson of that instructor's division or program. The student shall appeal to the Division Chairperson by submitting the appropriate form stating his/her concern regarding the grade, and describing the prior discussion with the instructor. (If the Instructor issuing the grade is the Chairperson of the respective division or program, the student may appeal directly to the Dean of Instruction.) The Division Chairperson will review the student's grade issue. The Chairperson shall have the authority to call in the Instructor or to ask for the assistance of another CVCC Instructor or seek the opinion of an expert in the subject area under review. If the student's concern about the grade cannot be successfully resolved at this level, the student shall be given the opportunity to take the appeal to the Dean of Instruction. The faculty member shall also have the right to appeal a decision of the Division Chairperson to the Dean. Appeal information must be submitted on the proper form and must contain the following:

1. Name and course number of the grade under appeal.

2. Names of the student and the Instructor.

3. The term, day(s) of the week, and time of day that the course was taken.

CVCC00707

4.  A concise description of the student's complaint and narrative explanation of why it is felt that the grade was unfair, inaccurate, or both.

5.  The date that the student first took the appeal to the Instructor.

6.  A summary of the result of the student's appeal to the Instructor.

7.  The date that the student took the appeal to the Division Chairperson.

8.  A summary of the result of the student's appeal to the Division Chairperson.

In addition to the above information, the student and/or instructor should include a photocopy of any and all documents that the student and/or the instructor believes would assist the Dean in reviewing the grade appeal. The Dean shall review the appeal, schedule a meeting with the student and the Instructor and render a written report within fourteen calendar days after the Dean's receipt of all of the appeal information. The Dean shall have the authority to consult with the instructor, the Division Chairperson, or other persons who have expertise in the subject area. Once the Dean has completed the review of the grade appeal, a written report describing her findings and conclusions will be provided to the student, instructor, and Division Chairperson. In the event that the Dean determines that a change in the student's grade is in order, the student's official grade will be changed under the authority of the President of CVCC, which has been delegated to the Dean, to render final rulings on grade appeals. Therefore, the decision of the Dean will be final and not subject to further appeal.

NOTE: The same general process may be used by a student who wishes to express a concern about the fairness and appropriateness of other strictly academic matters. In reviewing appeals regarding matters other than grades, the Dean of Instruction will provide a memorandum of the findings, conclusions, recommendations, and/or directives regarding the matter under appeal, to the student, instructor, and Division Chairperson.

# DRESS AND APPEARANCE

CVCC students are expected to dress appropriately at all times, including complying with attire standards for special functions. CVCC reserves the right to require students to adjust their attire when it is deemed to be disruptive to the learning process or the good order of the College.

# CHILDREN ON CAMPUS

Minor children of students are not permitted in classrooms or laboratories at any time. If children accompany students during registration or other business on campus, the children must be properly supervised at all times. Children below the tenth grade level shall not be allowed in the Learning Resource Center unless accompanied by an adult who is conducting business there. Children in the LRC shall not be allowed to be present in a classroom during a class and must remain with the adult and be properly supervised at all times. All College employees shall be responsible for the enforcement of this policy. Students in violation of this policy will be required to take immediate measure to comply with this policy.

# STUDENT INSURANCE

It is the responsibility of the student to be covered by insurance in case of an injury related to a college-sponsored event. The parent, guardian, or student will be expected to assume all responsibility and shall not hold the College liable for any injury due to an accident related to a college-sponsored event, except for students who participate in intercollegiate athletic events and are covered by college accident insurance.

206

CVCC00708

# NURSING 252

# ADULT HEALTH NURSING II

# FALL SEMESTER 2005



Revised August 2005

1

EXHIBIT

tabbies

*C*

Wright-00113

## NURSING 252--ADULT NURSING II

| | |
|---|---|
| **I. Instructor: Brenda Bellamy   Office Location:** H-202   **Phone:** 214-4843 | |
| **Office Hours:** TBA         **E-mail:** brenda.bellamy@cv.edu | |

**II.    COURSE DESCRIPTION:** The course introduces concepts related to the nursing care of individuals experiencing acute and chronic alterations in health.  Emphasis is placed on utilizing the nursing process as a framework for providing and managing nursing care to individuals.   Students should be able to apply the nursing process to individuals experiencing acute and chronic health alterations in a variety of settings. (Clinical required).

**Credit Allotment:**        5 semester hours
**Time Allotment:**          3 hours classroom weekly
                             6 hours clinical weekly
                             1-2 hours clinical preparation/assignments weekly

**Placement:**               Fall semester
                             **Pre-requisites:** Nur 131, 242, 251; BIO 201,
                                           Eng 101, 102; Psy200; Mth 100
                             **Co-requisites:** Nur 271, BIO 202

**III.                       REQUIRED TEXTBOOKS:**

(1)    Smeltzer, & Bare (2004).  Brunner & Suddarth's Textbook of Medical-Surgical Nursing, 10th ed. Philadelphia: Lippincott, Williams, & Wilkins.

(2)    Boyer, Mary Jo (2004).  Study Guide to Accompany Brunner & Suddarth's Textbook of Medical-Surgical Nursing. 10th ed. Philadelphia: Lippincott, Williams & Wilkins.(3)    Carpenito.    (1997).  Handbook of Nursing Diagnosis, 8th ed. Philadelphia: Lippincott.

### RECOMMENDED TEXTBOOKS:

(1)    Pagana & Pagana (2001).  Mosby's Diagnostic & Laboratory Test Reference. 5th ed. St. Louis:Mosby

2

    (2)    Perry/Potter (2003). <u>Clinical Nursing Skills and Techniques and Checklist</u>. 6th ed. St. Louis: Mosby.

    (3)    Current 2004 Drug Handbook of Choice

    (4)    Anderson, Kenneth (2002). Mosby's Medical, Nursing & Allied Health Dictionary. 6th ed. St. Louis: Mosby.

    (5)    Barkauskas, Baumann & Darling-Fisher (2002). <u>Health and Physical Assessment</u>. 3rd ed. St. Louis: Mosby

    (6)    Dudek, Susan G. (2006). <u>Nutrition Essentials For Nursing Practice</u>. 5th ed. Philadelphia: Lippincott, Williams & Wilkins.

    (7)    Carpenito (2001). <u>Handbook of Nursing Diagnosis</u>. 9th ed. Philadelphia: Lippincott, Williams & Wilkins

    (8)    MaxiSHARE. Milestones: <u>A Growth & Development Guide</u>. 4th ed. Milwaukee:MaxiSHARE

## IV.    MATERIALS:    notebook, paper, med cards, & other supplemental texts

## V.    PROGRAM ESSENTIAL FUNCTIONS

1.    Must be able to maintain balance from any position.
2.    Must be able to lift unlimited pounds
3.    Must be able to hear high and low frequency sounds produced by the body and the environment. (Example: Heart sounds and telephone).
4.    Must be able to visibly see changes in or around patient. (Example: See skin color changes or heart rhythm changes on monitor.
5.    Must be able to feel body changes or vibrations (Example: Palpate pulse or nodule)
6.    Must be able to smell body and environmental odors. (Example: Electrical equipment burning or infected wounds).
7.    Must be able to coordinate eye and hand movements. (Example: Releasing a blood pressure cuff valve while observing the blood pressure gauge).
8.    Must be able to coordinate fine and gross motor movements with hands. (Example: Able to give injections or start IV's).
9.    Must be able to see different color spectrums. (Example: Bright red drainage as opposed to serous drainage).
10.    Must be able to comprehend readings and write legibly when documenting notes on patients.

3

Wright-00115

11.    Must be able to send familiar message(s) to the receiver and interpret feedback appropriately. (Example: Receiving telephone orders from a physician or obtaining a history from a patient).

12.    Must be able to correctly perform simple mathematical computations for administering drugs.

13.    Must be able to demonstrate a mentally healthy attitude which is age-appropriate and congruent with the local and culture norms.

14.    Must be able to perform cardiopulmonary resuscitation.

15.    Ability to push objects. (Example: pushing a medication cart).

16.    Ability to move quickly through the clinical site.

## VI.    COURSE COMPETENCIES

Upon satisfactory completion of Nursing 252, the student must have, in the instructor's judgement, a reasonable mastery of the following competencies:

1.    Integrate knowledge of holistic principles when dealing with adult and older adult patients.

2.    Apply the nursing process through the individualization of patient/client teaching plans.

3.    Utilize holism throughout the nursing process in preparing the appropriate nursing interventions to assist individuals in the move toward health on the health-illness continuum.

4.    Employ therapeutic communication when dealing with patients family/significant others and fellow health care workers.

5.    Apply the principles of nutrition and pharmacology through restorative and rehabilitative measures for the promotion of health.

6.    Implement the use of universal/standard precautions on all assigned patients.

7.    Compare the care of patients/clients socio-economically, culturally, developmentally in order to promote compatibility with the changing environment.

8.    Incorporate the role and function of selected community resources into the nursing care plan through the identification of personal needs, i.e., cultural, sexual, social, economic.

9.    Apply principles of asepsis by establishing and maintaining a safe environment, and preventing the acquisition of nosocomial infections.

10.    Interpret the ethical and legal ramifications inherent in the care of all patients.

11.    Exercise sound judgment and assume responsibility for one's own actions.

Wright-00116

12. Demonstrate the need for self-development by accepting accountability for one's own nursing actions.

      a. Accept guidance from others in solving problems beyond personal level of knowledge and experience.

      b. Seek independent learning activities.

13. Continue to develop leadership skills necessary for the role of the registered nurse.

14. Demonstrate critical thinking by identifying scientific rationale of nursing actions and the subsequent impact/ramifications of nursing decisions that are made.

## VII.   COURSE REQUIREMENTS

1. Students are expected to attend all classes.
2. Satisfactory completion of a medication dosage calculation exam. (Student will be given up to 3 chances to achieve 100%).
3. Completion of all examinations on the day and time the exam is scheduled. No make-up exams shall be given. **(IF AN EXAM IS MISSED, THESE POINTS WILL BE ADDED TO THE FINAL).**
4. Completion of all required course work.
5. Maintenance of clinical performance checklist that will be turned in at the end of the semester. Failure to do so will result in an "incomplete" for the course.
6. Mandatory clinical attendance and grade of satisfactory in clinical. Failure in the clinical area constitutes failure of the enter course.
7. Students must take the NLN Examination at the end of the semester to receive a grade for the course.
8. Withdrawal from nursing courses are considered as a failure (except in extenuating circumstances as determined by the Nursing Division Chairperson).
9. An incomplete in nursing courses will be given only in illness, death in family, delivery) and is at the discretion of the instructor and Nursing Division Chairperson. Incompletes are not given for students who are failing nursing courses.

## ATTENDANCE POLICY:

The nursing faculty believes that attendance reflects acceptance of professional responsibility, which is one of the essential criteria of the nursing student's performance evaluation. Because nursing education requires a blend of classroom and clinical instruction, separate attendance policies are required and are as follows:

1. **Absence**:

      Class attendance is critical for ensuring academic success; therefore, students are expected to attend all classes for which they are registered. Instructor's expectations are high, and classes are challenging. Therefore, students who are absent may experience difficulty in meeting course objectives and expected outcomes. The instructor will define

Wright-00117

whether and how makeup work will be administered. Absences are counted form the first official day of classes and not from the first day a student attends. Once dropped form the class roll, the student will not be readmitted to the class.

**Clinical**: Students are required to attend a minimum of **85%** of the total clinical hours over the semester. (Example: The number of clinical hours for this semester is 90 hours, therefore, the student must be in attendance for 76.5 hours). Failure to meet this standard will result in failure of essential criteria and, therefore, the course.

2.    **Tardiness:**

a.    **Classroom:** A tardy for class will be defined as five or more minutes past announced starting time of the class. Entrance to the classroom will be at the permission of the instructor. Three tardies equal one class absence.

b.    **Clinical**: Tardies in clinicals in excess of 15 minutes are not acceptable. The student will be sent home and counted as absent. If you believe you will be later than 15 minutes, notify your clinical instructor that you will be absent. The faculty believes the start of the shift is a critical time that determines the quality of the clinical learning experience and is a requirement that is consistent with future employer expectations.

**NOTE: THE STUDENT MUST BE PRESENT AT THE TIME THAT POP-QUIZZES ARE GIVEN AND IN-CLASS ASSIGNMENTS ARE COMPLETED TO BE ELIGIBLE FOR ALLOCATED POINTS.**
**WRITTEN CLASS ASSIGNMENTS WILL BE ACCEPTED AFTER THE DUE DATE WITH THE FOLLOWING SCALE OF POINT DEDUCTIONS:**
**TARDY BUT WITHIN 1 WEEK OF DUE DATE:  - 10% OF POINTS**
**TARDY BUT WITHIN 2 WEEKS OF DUE DATE: -20% OF POINTS**
**WRITTEN ASSIGNMENTS WILL NOT BE ACCEPTED AFTER 3 WEEKS OF THE DUE DATE.**

**Plagiarism**

Plagiarism is taking of someone else's words or ideas and implying or stating that they are one's own. A student is guilty of plagiarism when they copy any type of work of any other person without giving that person credit (for example, a published work, a test answer, an essay, a computer program, or data or a care plan). A student who plagiarizes will receive one of the following penalties as specified by the instructor of the course: an "F" in the course in which the act of plagiarism occurs, a zero on the assignment or test, or a stipulation that an assignment or test must be retaken according to specified conditions. If the student wishes to appeal the charge plagiarism, he/she must do so within 24 hours through the Vice President/Dean of the College's Office.

6

Wright-00118

**Classroom Behavior**

As indicated in the philosophy of Chattahoochee Valley Community College, the student shares responsibility with faculty for open and mature inquiry in the classroom. Students are expected to conduct themselves in the classroom in a manner that facilitates their learning and that of others. The instructor can order the temporary removal or exclusion from class any student who engages in disruptive conduct or conduct in violation of the rules and regulations of the College.

Students are reminded that no food or drink of any kind may be consumed at CVCC. To avoid possible embarrassment, students are urged to respect this regulation at all times. NO GUM CHEWING IS ALLOWED IN THE CLINICAL AREAS. Smoking is allowed in designated areas only on the college campus. Cigarette butts are to be placed in labeled containers only. Any student observed dropping cigarette butts on the ground should face disciplinary action. No smoking is permitted on any hospital property or in your privately owned vehicle parked on hospital property.

Electronic equipment (e.g. beepers, cellular phones) must be turned off during class. Disruption of the class by such devices will result in the student being dismissed for the remainder of the class session.

Students are also reminded that reserved parking spaces are for faculty and staff only. Parking in reserved parking spaces will result in fees for parking violation or towing of the vehicle

## VIII. TEACHING METHODS

1. Lecture-Discussion
2. Audio-Visual Media
3. Handouts-Study Guides
4. Programmed Instruction
5. Simulated laboratory experiences as needed
6. Guided clinical practice
7. Instructor-student conference as needed
8. Pre- and post-clinical conferences
9. Self-directed study

## IX. EVALUATION METHOD

1. Written tests: lecture and skills
2. Class assignments
3. Clinical performance evaluation
4. Clinical nursing care plans
5. Class participation
6. Oral critical thinking exams

7

## X.  CALCULATION OF FINAL GRADE

|  |  |  |
|---|---|---|
| A. | Exams (4 @ 125 points each) | 500 points |
| B. | Comprehensive Final Exam @ 250 points | 250 points |
| C. | Pop Quizzes (5 @ 10 points each) | 50 points |
| D. | Computer Programs (5@ 10 points each) | 50 points |
| E. | Nursing Care Plans (2 @ 25 points each) | 50 points |
| F. | Class Assignments (5 @ 10 points each) | 50 points |
| G. | Critical Thinking Oral Exam @ 50 points | 50 points |
|  | **Total possible for course** | **1000 points** |

Points as applied to derivation of grade

930 - 1000=A       93 - 100%
840 -  929=B       84 - 92%
750 -  839=C       75 - 83%
749.9 or below = D and failure of course

All test reviews will occur at the end of the class following the class during which the exam was administered. Attendance of test reviews is optional, but encouraged.

Students will be expected to assume responsibility in their learning process by preparing for class/clinical by reading and studying objectives. Students should come to class prepared to discuss content with some background knowledge from having read.

ALL OBJECTIVES WILL NOT BE COVERED IN CLASS DUE TO TIME CONSTRAINTS; HOWEVER, THE STUDENT REMAINS RESPONSIBLE FOR THE CONTENT IN THOSE OBJECTIVES NOT COVERED IN CLASS. THE MOST DIFFICULT OBJECTIVES WILL BE COVERED IN CLASS.

IT IS IMPERATIVE THAT THE ASSIGNED NUTRITION, PHYSICAL ASSESSMENT, AND PHARMACOLOGY BOOKS BE UTILIZED IN STUDYING CONTENT. REMEMBER, DRUG AND DIET THERAPIES FOR EACH SYSTEM WILL INCORPORATED INTO THE TESTS.

**Unsatisfactory clinical performance constitutes failure of the entire course. Mid-term and final evaluations will be given. Essential criteria must be met at 100% at the final evaluation. If essential criteria grade is less than 100%, meet with your clinical instructor and develop an understood improvement plan in writing.**

**NOTE:** Mid-term clinical evaluations due October 6 and 7. Final clinical evaluations due December 8 and 9th.
**Care Plan #1 due September 29th and 30th** (week 6).
**Care Plan #2 due November 10th and 11th** (week 12).

Wright-00120

XI.   **DISABILITIES STATEMENT**
      **The College is committed to assisting students with various disabilities in keeping with the guidelines of the American with Disabilities Act (A.D.A.).**  Any student who has a disability (physical, emotional, or learning) and who is in need of assistance with admission, registration, orientation, or any other phase of college life should contact the ADA Coordinator, **CHRIS PATTERSON, 291-4845.**

XII.  **CLINICAL FACILITIES**

      The Medical Center                    St. Francis Hospital


# XIII. STARS

Students who plan to transfer to a senior institution may find information regarding Statewide Transfer and Articulation Reporting System on CVCC's homepage.  This link provides information regarding course and credit transfer within the Alabama College System.  **www.CVCC.edu**

9

Wright-00121

Topic 1:  Respiratory

Subject:  Clients with Respiratory Dysfunction

Respiratory

1.  Identify the anatomical structures of the upper and lower respiratory tracts, as well as the physiology and neural regulation of respiration.  (Ch. 19)

2.  Describe ventilation, diffusion, perfusion, and shunting and the relationship of pulmonary circulation to these processes.  (Ch. 19)

3.  Identify subjective and objective data related to the nursing diagnoses of ineffective airway clearance, ineffective breathing patterns, and impaired gas exchange.  (Chps. 19-22)

4.  Discuss the rationale for the following diagnostic procedures along with nursing care related to each:
    a.    chest x-rays, computed tomography (CT), fluroscopy, angiography
    b.    lung scan
    c.    sputum studies
    d.    arterial blood gases
    e.    pulmonary function studies
    f.    bronchoscopy, thoracoscopy
    g.    laryngoscopy (direct and indirect)
    h.    thoracentesis
    i.    lung biopsy (Ch. 19 and Jaffe)

5.  Compare the upper respiratory tract infections with regard to cause, incidence, clinical manifestations, management.  (Ch. 20)

6.  Utilize the nursing process as a framework for care of patients undergoing laryngectomy.  (Ch. 20)

7.  Describe the nursing management for patients receiving oxygen therapy, IPPB, mini-nebulizer therapy, incentive spirometry, chest physiotherapy and breathing training.  (Ch. 22 Phipps and Chapter 12,13,14 - Perry and Potter)

8.  Differentiate between normal and abnormal breath sounds.  (Ch. 19)

9.  Explain the principles of chest drainage and the nursing responsibilities related to the care of the patient with water-seal drainage.  (Ch. 22 & Ch. 15 Perry/Potter)

10.  Describe the different types of mechanical ventilators along with nursing care of patients receiving mechanical ventilation.  (Ch. 22)

11.  Compare the various pulmonary infections with regard to causes, clinical manifestations, nursing management, complications, and prevention.  (Ch. 21)

12.  Relate pleurisy, pleural effusion, and empyema to pulmonary infection.  (Ch. 21)

11

Wright-00122

13. Describe chronic bronchitis, bronchiectasis, pulmonary emphysema, and asthma as chronic obstructive pulmonary diseases, and describe their relationship to pulmonary heart disease. (Ch. 21)

14. Use the nursing process as a framework for care of the patient with chronic obstructive pulmonary disease (COPD). (Ch. 21)

15. Describe risk factors and measures appropriate for prevention and treatment of pulmonary embolism. (Ch. 21)

16. Specify preventive measures appropriate for controlling and eliminating the problem of occupational lung disease. (Ch. 21)

17. Compare the modes of therapy and related nursing management for patients with lung cancer. (Ch. 21)

18. Describe the complications of chest trauma and its clinical manifestations, along with nursing management. (Ch. 21)

19. Relate the therapeutic management techniques of adult respiratory distress syndrome to the underlying pathophysiology of the syndrome. (Ch. 21)

20. Define and describe the surgical procedures involving the nose, paranasal sinuses, pharynx, trachea, larynx, neck, and lungs. (Ch.20-22)

1) <u>Reading Assignments</u>
   - <u>Brunner</u> - Read chapters 19-22.
   - <u>Lab Book</u> - Read related topics
   - <u>Perry & Potter</u> - Read Chapter 12-15
   - <u>Kuhn</u> - Review related chapters

2) <u>Audiovisual Assignments</u>
   a. Chest Tubes - MO25 - MEDCOM
   b. Normal and Abnormal Breath Sounds - M607 - MEDCOM
   c. Oxygen Administration - MEDCOM - 1081
   d. Acute Respiratory Care: Chest Trauma- MEDCOM - 1094
   e. Winning Against Asthma - MEDCOM - M154


<u>Skills responsible for:</u>

1. Chest tube care (assist with insertion and maintenance).
2. Endotracheal and oral suctioning.
3. Oxygen therapy.
4. Trach care.
5. Ventilator care.

Wright-00123

NUR 252

**Pulmonary System**
**Bibliography**

Blondin, M. (1996). Deep vein thrombosis and pulmonary embolism prevention: What role do nurses play? Medical-Surgical Nursing, 5(3):205-8.

Burchmore, N. (1997). Multiple stab wounds: a short term respiratory case study. Intensive Critical Care Nurse, 13(6):341-50.

Calianno, C., et al. (1995). Oxygen therapy: giving your patient breathing room. Nursing, 25(12):33-8.

Held, J. (1995). Caring for a patient with lung cancer. Nursing, 25(10):34-43.

Lowden, B. (1998). The care and treatment of lung cancer. Nursing Times, 94(9):61-2.

Mackey, L. (1996). Nutritional status and chronic obstructive lung disease. Nursing Standard, 10(39):38-42.

Majoros, K. (1996). Embolism: targeting an elusive enemy. Nursing, 26(4): 26-31.

Molitor, L. (1998). A 55 year-old patient with chronic lung disease and intractable shortness of breath. Journal of Emergency Medicine, 24(2):199-200.

Neiderman, M., et al. (1997). Challenges in pulmonary medicine; beating bronchitis and surviving septic shock. Chest, 112(6):301-44.

Yeaw, E. (1996). The effect of body position upon maximal oxygenation of patients with unilateral lung pathology. Nursing 23(1): 55-61.

13

Topic 2:    <u>Circulation</u>

Subject:    Clients with Cardiovascular, Peripheral Circulatory and Hematologic Dysfunction

Cardiovascular:

1.    Explain cardiac physiology in relation to cardiac anatomy and the normal conduction system of the heart. (Ch. 23, 24)

2.    Differentiate between central and peripheral circulation. (Class & Ch.25, 28)

3.    Determine the following components of an ECG strip: rate, presence or absence of P waves, PR interval, QRS interval, presence or absence of dysrhythmia. (Class & Ch. 24)

4.    Analyze the following electro-physiological alterations in cardiac functioning and subsequent treatment regimens:
    a.    normal EKG pattern
    b.    sinus brady, tachy and sinus arrhythmia
    c.    PAC's
    d.    PVC's
    e.    atrial tachycardia
    f.    atrial fibrillation
    g.    1st degree, 2nd degree, and 3rd degree heart block
    h.    pacemaker spike
    i.    V-tach
    j.    V-fib
    k.    "dying heart"
    l.                    asystole        (Ch. 24 and overheads in class)

5.    Utilize assessment parameters appropriate for determining the status of cardiovascular function. (Ch. 23)

6.    Describe diagnostic test used in assessing cardiovascular dysfunction, and the nursing implications for each test. (Ch. 23 and Lab Book)

7.    Compare central venous pressure monitoring, pulmonary artery and pulmonary artery wedge pressure monitoring, and systemic intra-arterial monitoring with regard to clinical usefulness and significance, nursing responsibilities, and possible complications. (Ch. 23 & 27)

8.    Incorporate assessment of cardiac risk factors into the health history and physical assessment of the cardiac patient. (Ch. 23)

9.    Explain the sequence of events when myocardial tissue is deprived of adequate blood flow. (Ch. 25)

14

Wright-00125

10. Describe the relationship between coronary atherosclerosis, angina pectoris, and myocardial infarction. (Ch. 25)

11. Utilize the nursing process as a framework for care of patients with a myocardial infarction. (Ch. 25)

12. Compare the major complications of cardiovascular disease - (especially an MI) and pulmonary edema, left and right heart failure, left ventricular rupture, emboli, cardiac tamponade. (Ch.25, 26, 27)

13. For the above disorders in objective #12, compare medical and nursing actions directed toward prevention and rehabilitation of the physiological and psychological problems. (Ch. 25, 26, 27)

14. Define Stokes - Adams attacks. (Class)

15. Recognize rehabilitative needs of the cardiac patient and his family. (Ch. 25)

16. Discuss various dietary strategies aimed at preventing and restraining heart disease. (Class & Ch. 25, 27, 28)

17. Compare the infectious diseases of the heart, their causes, pathological changes, clinical manifestations, management and prevention. (Ch. 26)

18. Distinguish between congestive, hypertrophic, and restrictive cardiomyopathies. (Ch. 26)

19. Differentiate between the classifications of hypertension, and be aware of current pharmacologic agents used for this disorder. (Ch. 29)

20. Compare the different types of pacemakers, their uses, nursing implications, and possible complications. (Ch. 24)

21. Describe the major classifications of CV drugs, including emergency drugs. (Clark and all C.V. Ch. 24-29)

22. Identify the nurse's role in a code situation. (Class & Ch. 25)

Cardiovascular Surgery

1. Discuss the indications for surgical treatment of coronary artery disease, valvular heart disease, ventricular aneurysm, cardiomyopathy, thoracic aortic aneurysm, aortic dissection, and cardiac dysrhythmia. (Ch. 24, 25, 26, 27, 28)

2. Identify the nonsurgical technique, client implications and nursing care involved in percutaneous transluminal coronary angioplasty. (Ch. 25)

15

Wright-00126

3.  Specifically describe the surgical procedure CABG (coronary artery bypass grafting) and the major post-op complications that can occur. (Ch. 25)

4.  Anticipate the comprehensive preoperative and postoperative nursing care required of the heart surgery client. (Ch. 25)

5.  Analyze the principles of extracorporeal circulation. (Ch. 26)

6.  Identify the indications of an intra-aortic balloon pump. (Ch. 27)

Peripheral Circulation

1.  Compare and contrast arterial insufficiency and venous insufficiency. (Ch. 28)

2.  Identify diagnostic studies used to assess the peripheral vascular system. (Ch. 28 and Jaffe)

3.  Identify the clinical manifestations and nursing care of clients with Raynaud's disease, Raynaud's phenomenon, and Buerger's disease. (Ch. 28)

4.  Discuss the pathophysiology, clinical manifestations, and nursing care of clients with abdominal, thoracic, and dissecting aortic aneurysms, and peripheral arterial aneurysms. (Ch. 28)

5   Contrast the medical and nursing treatment of a patient/client having an embolectomy. (Ch. 28)

6.  Outline the role diet and pharmacologic agents play in Peripheral Vascular Disease. (Kuhn & Ch. 28)

Hematological Problems

1.  Analyze the blood, bone marrow, and blood volume studies utilized in the diagnosing of circulatory and hematologic problems. (Ch. 29 & Jaffe)

2.  Discuss the drugs that interfere with coagulation and discuss instructions nurses should give clients with hematologic disorders about taking medication. (Kuhn, Ch. 29 Brunner)

3.  Define the following disorders along with treatment regimens: aplastic anemia, pernicious anemia, iron deficiency anemia, DIC, ITP, and granulocytopenia. (Ch. 29)

4.  Differentiate among the types of leukemia and describe therapeutic measures used with them. (Ch. 29)

16

Wright-00127

5.    Discuss the nursing interventions common to the care of clients with neoplastic disorders of the blood and blood-forming organs. (Ch. 29)

6.    Explain the clinical staging method commonly used to classify Hodgkin's disease and non-Hodgkin's lymphoma (NHL) and the application of this method in treatment of these disorders. (Ch. 29)

7.    Describe the role of prevention in nursing interventions, including the use of universal/standard precautions, related to clients with acquired immune deficiency syndrome (AIDS). (Ch. 48)

8.    Describe the nursing care of the bone marrow donor and the bone marrow recipient, including ethical and legal implications . (Ch 29)

1)    <u>Reading Assignments</u>
- <u>Brunner</u> - Read Chapters 23-30, 48
- <u>Jaffe</u>  - Related text.
- <u>Perry/Potter</u>  - Ch. 20.
- <u>Kuhn</u>-Review, related  Chps.

2)    <u>Audiovisual Assignments</u>
    a.    The Heart  - M018  - MEDCOM
    b.    Hemodynamic Monitoring - MEDOCM - 78016
    c.    Understanding Fundamentals of Cardiac Monitoring  - MEDCOM - M109
    d.    Coronary Bypass Surgery  - MEDCOM - M011TP

<u>Skills Responsible For</u>:
1.    Setting up a CVP manometer and calculating a reading.
2.    Describing the components of a crash cart.
3.    Defibrillation/Cardioversion
4.    Defining the components of a Swan-Ganz and being able to calculate wedge pressure.
5.    Central venous catheter care  - Perry and Potter (Ch. 20).

Topic 3:    <u>Endocrine</u>

Subject:    Patients with Endocrine System Dysfunction

1.    Differentiate among the functions of the various endocrine glands and hormones secreted by each. (Ch. 38)

2.    Outline a diagram of the "negative feedback system." (Ch.38)

3.    Describe the various types of diagnostic tests used to determine alterations in function of each of the endocrine glands. (Ch. 38 and Jaffe)

17

Wright-00128

4.  Discuss critically the etiology, signs and symptoms, complications, nursing care, diet and drug therapies for the following disorders:
    a.  Hypo/Hyperthyroidism
    b.  Hypo/Hyperparathyroidism
    c.  Cushing's syndrome
    d.  Addison's disease
    e.  Goiter
    f.  Pheochromocytoma
    g.                              Pituitary dysfunction  (Ch. 38)

5.  Specify the teaching needs of patients requiring corticosteroid therapy. (Kuhn) (Ch 38 Brunner)

6.  Identify the nursing implications including preoperative preparation, postoperative care, and discharge planning for the surgeries:

7.  Differentiate between Type I and Type II diabetes mellitus on the basis of etiology, clinical manifestations, course, and therapy. (Ch. 37)

8.  Identify the role of oral antidiabetic agents in diabetic therapy. (Ch. 37)

9.  Distinguish among the types of insulins by their source, purity, concentration, formulation, and time activity. (Kuhn, Brunner- Ch.37)

10.  Discuss the reasons surrounding special consideration for the diabetic patient undergoing surgery. (Ch. 37)

11.  Compare DKA and hypoglycemia along with therapies and nursing treatment. (Ch. 37)

12.  Describe the long-term complications of diabetes and the relationship between diabetic control and prevention of these complications. (Ch. 37)

13.  Devise a teaching plan, incorporatory therapeutic communication techniques for a patient with diabetes, incorporating community resources. (Ch. 37)

1)  Reading Assignments
    - Brunner - Read chapters 37-38.
    - Jaffe - Read related text.
    - Kuhn - Review related chapters

2)  Audiovisual Assignments
    a.  Insulin: Use and Management  - MEDCOM - M076
    b.  The Insulin Pump: A New Option in Diabetes Management  - 1112 - MEDCOM
    c.  A Close Watch: Intensified Management of Type II Diabetes - MEDCOM-M158

Skill Responsible For:

1.  Accu - check glucose monitoring (Perry & Potter pages 1257-1262)

18

Wright-00129

NUR 252
Endocrine System
Bibliography

Brenner, Z. R. & Cannito, M. (1998). Administering steroids. Nursing, 7(13): 34-39.

Davis, D., et al. (1998). Food obstacles in intensive diabetes therapy. Diabetes Spectrum, 11(1): 37-42, 51-52.

Gallichan, M. (1997). Promoting health in older people with diabetes. Professional Nurse, 13(2): 96,98,100.

Garber, A .J. et al. (1998). Monitoring to prevent diabetes complications. Patient Care, 32(4): 85-6.

Lindsey, R. S. et al. (1997). Hypothyroidism. Lancet, 349(9049): 413-7.

Miller, C. (1998). Keeping up with new drugs for diabetes. Geriatric Nursing: American Journal of Care for the Aging, 19(1): 55-6.

Petrikas, R. et al. (1998). Altered mental status: Hypoglycemia. Journal of the American Academy of Nurse Practitioners, 10(4): 175-83.

Topic 4:       Gastrointestinal (G.I.)

Subject:       The Patient/Client with Gastrointestinal System Dysfunction

1.    Discuss the anatomical and physiological function of the GI system and its components (pancreas, liver, gall bladder). (Ch. 31, 38,36)

2.    Compare the various diagnostic tests related to GI and Hepato-biliary problems. (Ch. 31, 38 ,36  and Jaffe)

3.    Describe the nursing care of patients with NG or gastrostomy tubes, along with the rationale and possible side effects. (Ch. 33)

4.    Compare the following digestive symptoms giving the nursing implications of each:
      a.      anorexia
      b.      constipation
      c.      diarrhea
      d.      indigestion
      e.      vomiting

5.    Specify the nursing management of patients with abnormalities of the lips gums, teeth, mouth, and salivary glands. (Ch. 32)

6.    Compare the various conditions of the esophagus: their clinical manifestations, management, and rehabilitation. (Ch. 32)

7.    Distinguish between acute gastritis and chronic gastritis. (Ch. 34)

19

Wright-00130

8.   Differentiate between gastric and duodenal ulcers and associated therapies. (Ch.34)

9.   Utilize the nursing process as a framework for care of patients with gastric cancer. (Ch. 40)

10.  Compare the primary malabsorption conditions in regard to their pathophysiology, clinical manifestations, and management. (Ch. 35)

11.  Compare the following intestinal disorders including the etiology, pathophysiology, and nursing care (pre and post op if applicable):

     a.   anal abscess, fissure, and fistulas
     b.   appendicitis
     c.   diverticulitis & diverticulosis
     d.   hemorrhoids
     e.   hernias
     f.   peritonitis
     g.   obstruction
     h.   spastic colon   (Ch. 35)

12.  Compare Crohn's disease and ulcerative colitis in regard to their pathophysiology, clinical manifestations, diagnostic evaluation, and medical/surgical nursing management. (Ch. 35)

13.  Specify the indications for a colostomy and/or ileostomy, and contrast the nursing care. (Ch. 35)

14.  Describe the evolvement of a paralytic ileus in a postoperative patient.  (Ch. 35 & Class)

15.  Identify the action, therapeutic use, side effects and nursing measures of anticholinergic drugs. (Kuhn, Brunner- Ch. 34)

16.  Discuss the incidence of colon cancer and proposed risk factors associated with this malignancy. (Ch. 35)

17.  Explain liver function tests and clinical manifestations of liver dysfunction in relation to the pathophysiologic alterations of the liver. (Ch. 36)

18.  Compare the various types of hepatitis and associated nursing care. (Ch. 36)

19.  Critically discuss the pathophysiology of hepatic coma. (Ch.36)

20.  Describe the available shunts used in hepatic disorders. (Ch. 36)

21.  Describe the pathophysiological effect of cholelithiasis and resulting nursing care. (Ch. 36)

22.  Compare acute and chronic pancreatitis. (Ch. 38)

Wright-00131

1)   Reading Assignments
     - Brunner - Read chapters 31-35, 36-38.
     - Jaffe - Read related text.
     - Perry & Potter - Ch. 23, 24 & 27.

2)   Audiovisual Assignments
     a.   Cancer of the Colon and the Rectum - 616.99437
     b.   Management of Colonic Lesions - RC2830-N974
     c.   MEDCOM - 78018 - Lower GI X-Ray
                      78019 - G.I. Tests: U.S. and C.T.
                      M121 - . Ostomy Care
                      MO19 - The Abdomen

Skills Responsible For:

Perry and Potter
1.   Gastric intubation
2.   Ostomy care
3.   G Tube care
4.   Care of Blakemore Tube

**NUR 252**
**Gastrointestinal System**
**Bibliography**

Cerda, J. J. et al. (1997). Diverticulitis: Current management strategies. Patient Care, 31(12):170-2, 175-7, 181-2.

Giacchino, S. et al. (1998). Ruptured varices! Act fast. RN, 61(5):33-6.

Jalan, R. et al. (1997). Hepatic encephalopathy and ascites. Lancet, 350(9087):1309-15.

Kowdly, K. (1996). Update on therapy for hepatobiliary diseases. Nurse Practitioner, 21(7):78-88.

O□Hanton-Nichols, T. (1998). Basic assessment series: Gastrointestinal system. American Journal of Nursing, 98(4):48-53.

Reece-Smith, H. (1997). Pancreatitis. Care of the Critically Ill, 13(4): 135-8.

White, S. et al. (1998). Percutaneous endoscopic gastrostomy. Nursing Standard, 12(28): 41-8.

21

Wright-00132

Topic 5:      <u>Neurological</u>

Subject:      Patients with Sensorineural Dysfunction

1.      Describe the major structural and functional components of the nervous system.  (Ch. 56)

2.      Trace the nerve tracts involved in motor and sensory activities.  (Ch. 56)

3.      Recognize how abnormalities observed during physical assessment are related to CNS dysfunction and formulate related nursing diagnoses common to clients with neurological problems.  (Ch.56)

4.      Specify diagnostic tests used for assessment of neurologic function and the nursing implications.  (Ch. 56 and Jaffe)

5.      Identify the early and late clinical manifestations of increased intracranial pressure, along with the concept of intracranial monitoring.  (Ch. 57)

6.      Describe the multi-system needs of the unconscious patient.  (Ch. 57)

7.      Anticipate the nursing interventions for clients with seizures. (Ch. 59)

8.      Identify the risk factors of stroke (CVA) and (TIA) and related measures for stroke prevention and aphasic clients.  (Ch. 57)

9.      Compare the various types and causes of headache.  (Ch. 59)

10.     Describe brain tumors: their classification, clinical manifestations, diagnosis and management.  (Ch. 59)

11.     Specify the critical nature of intracranial aneurysms and intracranial infection.  (Ch. 59)

12.     Utilize the nursing process as a framework for care of the patient with multiple sclerosis.  (Ch. 59)

13.     Utilize the nursing process as a framework for care of patients with Parkinson's disease.  (Ch.59)

14.     Compare:
            myasthenia gravis
            huntingtons chorea
            amyotrophic lateral sclerosis, and
            muscular dystrophy
            pathophysiology, clinical, manifestations, and nursing and medical
            management   (Ch. 59)

Wright-00133

15. Specify the critical significance of assessment in the management of patients with musculoskeletal injuries. (Ch. 62, 63)

16. Utilize the nursing process as a framework for care of patients with spinal cord injuries. (Ch. 58)

17. Specify the most common disease of the peripheral nervous system, along with the following PNS disorders and related nursing therapies.
    a. polyneuritis
    b. Bell's palsy
    c. pellagra
    d. Guillain-Barre syndrome
    e. peroneal and radial nerve injury      (Class & Ch. 59,63)

18. Describe the functions of the cranial nerves and the conditions that result from damage to them.   (Ch. 56, 59)

**SURGERY**

19. Identify the indications that necessitate cranial and intracranial surgeries such as placement of Burr holes, craniotomy, craniectomy, cranioplasty, and creation of a ventricular shunt. (Ch. 57)

20. Identify the indications that necessitate spinal surgeries such as micro lumbar disectomy, anterior cervical disectomy, and multilevel posterior laminectomy. (Ch. 59)

21. Describe pre and post-op nursing care for the above disorders as well as psychosocial/lifestyle implications. (Ch. 57, 59)

**EYE**

22. Identify the anatomic structures of the eye. (Ch. 54)

23. Analyze the following types of eye problems including etiology, signs and symptoms, surgical care, complications, psychosocial considerations and nursing care:
    a. strabismus
    b. retinal detachment
    c. glaucoma
    d. cataracts
    e. corneal maladaptations
    f. enucleation
    g. senile mascular degeneration            (Ch. 54)

24. Describe the major infectious disorders of the eye. (Ch. 54)

23

Wright-00134

25.   Discuss the nursing care required for the following surgeries:
   a.      vitrectomy
   b.      intraocular lens implantation
   c.      iridectomy
   d.      trabeculectomy        (Ch. 54)

26.   List the categories of ophthalmic medications and their effects, duration, mechanism of action, indications, and contraindications, and side effects.  (\kuhn – related text, Brunner- Ch. 54)

   **EAR**

27.   Analyze the following types of ear problems comparing the medical and nursing interventions as well as surgical interventions, if applicable.
   a.      otosclerosis
   b.      Meniere's syndrome
   c.      internal and external otitis media
   d.      mastoiditis
   e.      cholesteatoma
   f.       acoustic neuroma        (Ch. 55)

28    Identify the common surgical procedures of the auditory system, along with post-op nursing considerations.  (Ch. 55)

1)    Reading Assignments
   - <u>Brunner</u> - Read chapters 54-63.
   - <u>Jaffe</u> - Read page 1392 & related text.
   - <u>Kuhn</u> - Review related chapters.

2)    <u>Audiovisual Assignments</u>
   a.      Actuate Neuro Care: Spinal Cord Injury (MEDCOM-M052)
   b.      The Neurologic System  - MEDCOM-M020
   c.      Eye Trauma
   d.      Nursing Management of Increases Intracranial Pressure-MEDCOM (A2286)
   e.      Stroke:- the Acute Phase (MEDCOM M942)
   f.       How to recognize and classify seizures and epilepsy (MEDCOM 78272)

**Skills Responsible For:**

1.    Neuro checks
2.    Cranial nerve assessment  - Perry & Potter ch 11 p. 407-419

Wright-00135

Topic 6:    Musculoskeletal

Subject:    Patients with Musculoskeletal System Dysfunction

1.    Describe the structure and function of the three major parts of the musculoskeletal system (bones, joints, and muscles), using medical terminology. (Ch. 60)

2.    Describe the clinical manifestations and significance of disorders of connective tissue and muscles, along with the most common drugs used in these disorders. (Ch. 60)

3.    Specify the diagnostic tests used for assessment of musculoskeletal function. (Ch. 60 and Lab Book)

4.    Interpret the pathology and physiology of bone repair, along with changes that can occur in the other body systems as a result of immobility in musculosketetal conditions. (Ch. 61)

5.    Differentiate between contusion, strains, sprains, and dislocations. (Ch. 63)

6.    Specify the clinical manifestations of a fracture and the emergency management of the patient with a fracture. (Ch. 61, 63)

7.    Describe the principles and methods of fracture reduction, fracture immobilization, and management of open fractures. (Ch. 61, 63)

8.    Explain the physical principles of traction and associated nursing responsibilities. (Ch. 61)

9.    Describe the circulatory risks associated with casts. (Ch. 61)

10.    Describe the surgical processes of total hip and total knee replacements. (Ch. 61)

11.    Develop a care plan for a BLK and AK amputee. (Pgs. 770-774)

12.    Discuss the nursing care, to include teaching principles, for the following disorders:
    a.    ankylosing spondylitis
    b.    back pain (acute and chronic)
    c.    degenerative joint disease
    d.    osteomyelitis/osteomalacia
    e.    Paget's disease
    f.    gout   (Ch. 50, 62)

13.    Utilize the nursing process as a framework for care of the patient with a primary malignant bone tumor. (Ch. 62)

Wright-00136

14. Describe surgical procedures for musculoskeletal disorders, along with specific pre and post-operative nursing measures. (Chpts. 61-63)

15. Summarize neurological and physiological principles in order to develop a teaching plan for a patient having undergone back surgery. (Ch. 59)

1) <u>Reading Assignments</u>
   - Brunner - Read chapters 50, 59-63
   - Jaffe - Read pgs. 1394 & 1395.
   - Kuhn - Read related chapter

2) <u>Audiovisual Assignments</u>
   a. Orthopedics: Emergency (Medcom- 974)
   b. The Musculoskeletal System - MEDCOM (M021)
   c. Hip Replacement
   d. Knee Replacement

<u>Skills Responsible For:</u>

1. Crutch walking
2. Basic principles of traction

**NUR 252**
**Neurological/ Musculoskeletal Systems**
**Bibliography**

Barker, E. & Moore, E. (1992). Neurological assessment. <u>RN, 55</u>(4): 28.

Dykes, P. (1993). Minding the five P□s of neurovascular assessment. <u>American Journal of Nursing, 93</u>(6): 38.

Hickey, J. (1991). Myasthenic Crisis: Your assessment counts. <u>RN, 54</u>(5): 54.

Huston, C.J. & Boelman, R. (1995). Autonomic dysreflexia. <u>American Journal of Nursing,95</u>(6): 55.

Kane-Carlsen, P.A. (1992). Managing patients with TIA□s. <u>Nursing, 22</u>(1): 34.

McNew, C.D., Hunt, S. & Warner, L.S. (1997). How to help your patient with epilepsy. <u>Nursing, 27</u>(9): 57.

Moore, K. & Trifiletti, E. (1994). Stroke-The first critical days. <u>RN, 57</u>(2): 22.

Newhourse, J. (1994). Opening your eyes to intraocular drug administration. <u>Nursing, 94</u>(9): 44.

Sandler, R.L. (1995). Clinical Snapshot: Glaucoma. <u>American Journal of Nursing, 95</u>(3): 34.

Specht, D.M. (1995). Cerebral edema: Bringing the brain back down to size. <u>Nursing, 25</u>(1): 34.

Vos, H. (1993). Making headway with intracranial hypertension. <u>American Journal of Nursing, 93</u>(2): 28.

Williams, A. & Coyne, S.M. (1993). Effects of neck position on intracranial pressure. <u>American Journal of Critical Care</u>, 2:68.

Wright-00137

Topic 7:    <u>Renal</u>

Subject:    Patients with Kidney/Urinary Dysfunction

1.    Specify the role of the kidney in regulation of fluid, electrolyte, and acid-base balance. (Ch. 39)

2.    Describe diagnostic tests and assessment parameters for determining the status of renal and urinary function. (Ch. 39 and Lab Book)

3.    Delineate factors contributing to the development of a urinary tract infection. (Ch. 41)

4.    Compare urinary retention and urinary incontinence: their causes, clinical manifestations, complications, and management. (Ch. 40)

5.    Specify the nursing management of patients with neurogenic bladders. (Ch. 40)

6.    Compare hemodialysis and continuous peritoneal dialysis (CAPTD). (Ch. 40)

7.    Compare acute renal failure and chronic renal failure, their causes, pathophysiologic alterations, clinical manifestations, and management. (Ch. 41)

8.    Identify the diet therapies appropriate for managing renal failure. (Class) (Ch. 41)

9.    Specify the possible problems and complications related to renal transplantation. (Ch. 41)

10.    Describe the clinical manifestations and nursing interventions for the following disorders:
    a.    acute and chronic glomerulonephritis
    b.    nephrotic syndrome
    c.    nephrosclerosis
    d.    hydronephrosis        (Ch. 41)

11.    Develop a care plan for a patient with urolithiasis from point of entry into ER through surgery or lithotripsy. (Ch. 41)

12.    Specify urinary diversion procedures used to treat cancer of the bladder. (Ch. 41)

13.    Discuss pre and post-op nursing for the following surgeries:
    a.    nephrectomy
    b.    nephrolithotomy
    c.    cystectomy
    d.    ureteroplasty        (Ch. 41)

14.    Discuss the nursing implications for ureteral stents and nephrotomy tube care. (Ch. 40, 41)

<u>Reading Assignments</u>

Wright-00138

1)      - Brunner - Read chapters 40-41.
        - Jaffe - Read pg. 1394

Skill Responsible For:

1.      Peritoneal vs. Hemodialysis (Perry & Potter pages 762-770)


Topic 8:            Gynecology

Subject:      Patients with Sexual and Reproductive System Dysfunction

1.      Outline the male and female anatomical structures that make up the reproductive systems,
        while explaining paralleling endocrine concepts.  (Chps. 42, 45)

2.      Describe diagnostic exams utilized to determine male and female reproductive system
        dysfunction.  (Chps.  42-45 and Lab Book)

3.      Interpret the physiology of menstruation and its neuro-endocrine connection. (Ch. 42)

4.      Differentiate among the theories that surround Premenstrual Syndrome.  (Ch. 42)

5.      Develop a teaching plan for a woman experiencing menopause.  (Ch. 42).

6.      Identify patient needs associated with the following clinical diagnoses:
        a.      dysfunctional uterine bleeding
        b.      endometriosis
        c.      amenorrhea
        d.      ovarian cysts/tumors
        e.      myomatous tumors                    (Ch. 42-43)

7.      Compare and contrast the following vaginal disorders:
        a.      candidiasis
        b.      gardnerella
        c.      trichomonas vaginalis
        d.      bartholinitis
        e.      HPV
        f.      herpes genitalis                    (Ch. 43)

8.      Compare the various uterine conditions with regard to medical, surgical and nursing
        management. (Ch. 43)

9.      Develop a care plan for a patient undergoing the following surgeries:
        a.      hysterectomy
        b.      oophorectomy
        c.      A & P repair                        (Ch. 43)

10.     Describe the most common malignancies of the female reproductive system.  (Ch. 42, 43,
        44)

28

Wright-00139

11.    Specify the relationship of fibrocystic disease of the breast to carcinoma of the breast. (Ch. 44)

12.    Demonstrate the proper sequence and timing involved in SBE (self breast examination). (Ch. 44)

13.    Compare the modern medical therapeutics available as treatment for breast disorders to include:
    a.    surgery
    b.    radiation
    c.    chemotherapy
    d.    immunotherapy        (Ch. 44)

14.    Describe the medical and nursing management associated with cancer of the male reproductive organs. (Ch. 45)

15.    Compare prostatitis and BPH (benign prostatic hypertrophy). (Ch. 45)

16.    Develop a care plan for a male undergoing a prostatectomy. (Ch. 45)

17.    Describe the various conditions affecting the testes and penis, their pathophysiology, clinical manifestations and management. (Ch. 45)

1)    Reading Assignments
    - Brunner  - Read chapters 42-45
    - Jaffe - Read pg. 1393 & related text.
    - Perry & Potter  - Read ch. 11, p 365-372, p 391-396.
    - Kuhn - Review related chapters

### Renal/Reproductive System
### Bibliography

Connor, P. & Kooker B. (1996). Nurse□s knowledge, attitudes, and practices in managing urinary incontinence in the acute care setting. Medical-Surgical Nursing, 5(2): 87-92.

Gordon, S.I., Brenden, M.A., Wyble, J.S., & Ivey, C.L. (1997). When the Dx is penile cancer. RN, 60(3): 41.

Griefzu, S. & Tiedemann, D. (1995). Prostate cancer: The pros and cons of treatment. RN, 58(6): 22.

King, B. (1997). Preserving renal function. RN, 60(8): 34-39.

Marchiondo, K. (1998). A new look at urinary tract infection. American Journal of Nursing, 98(3): 34.

Price, C. (1992). Issues related to the care of the critically ill patient with end stage renal disease. Critical Care Nurse, 3(3); 585.

Shellenbarger, T. & Krouse, A. (1994). Treating and preventing kidney stones. Medical-Surgical Nursing, 3(5): 389.

Stark, J. (1997). Dialysis choices: Turning the tide in acute renal failure. Nursing, 27(2): 41.

Wright-00140

NUR 252

## Cardiovascular System
### Bibliography

Apple, S. (1996). New trends in thrombolytic therapy. RN, 59(1): 30.

Baas, L.S., Beery, T. A. & Hickey, C. S. (1997). Care and safety of the pacemaker electrodes in intensive care and telemetry nursing units. American Journal of Critical Care, 6(4): 302.

Blondin, M.M., Titler, M.G. (1996). Deep vein thrombosis and pulmonary embolism prevention: What role do nurses play? Medical-Surgical Nursing, 5(3): 205.

Bright, L. D. (1995). Deep vein thrombosis. American Journal of Nursing, 95(6): 48.

Crowe, J. et al. (1996). Anxiety and depression after acute myocardial infarction. Heart and Lung, 25: 98.

Futterman, L.G. & Lemberg, L. (1996). Atrial fibrillation: An increasingly common and provocative arrhythmia. American Journal of Nursing, 97(4): 26.

Haefele, L.& Dumas, M.A. (1996). Controlling hypertension in the elderly. American Journal of Nursing, 96(11): 2.

Hagenhoff, B.D. et. al. (1994). Patient education needs as reported by congestive heart failure patients and their nurses. Journal of Advanced Nurses, 19(4): 685.

Johannsen, J.M. (1993). Update: Guidelines for treating hypertension. American Journal of Nursing, 93(3): 42.

Martensson, J. Karlsson, J.E. & Bengt, F. (1997). Male patients with congestive heart failure and their conception of the life situation. Journal of Advanced Nursing, 25: 579.

Mizell, J., Maglish, B. & Matheny, R. (1997). Minimally invasive direct coronary artery bypass surgery: Introduction for critical care nurses. Critical Care Nurse, 17(3): 46.

Moser, D.K. (197). Correcting misconceptions about woman and heart disease. American Journal of Nursing, 97(4): 26.

Wright-00141

CVCC provides transfer guides and agreements for state colleges and universities through the STARS Program. Please refer to your CVCC Student Handbook for further details.

## CHATTAHOOCHEE VALLEY COMMUNITY COLLEGE
## POLICY ON USE OF COMPUTER RESOURCES

Chattahoochee Valley Community College (CVCC) makes available to its students on-campus computer resources. These computer resources are provided exclusively for educational purposes. In particular, they are made available to provide laboratory experience for approved courses, support for academic programs, and course-related research.

These computers are not provided for non-educational uses such as entertainment, personal correspondence, Internet shopping, or personal financial gain. Therefore, users of CVCC-provided computers are respectfully requested not to abuse the privilege of having these computers available for their academic enrichment.

CVCC reserves the right to monitor the use of each of its on-campus computers and to take appropriate administrative and/or disciplinary action against any student who violates any of the following restrictions:

1. Users must either be currently enrolled in a class requiring the use of a computer or have permission from the appropriate college official.
2. Users shall not engage in the inspection and/or modification of data or programs that were not specifically assigned to, owned by, or created by the user.
3. Users shall not use another's user ID and password.
4. Users shall not interfere, electronically or otherwise, with other users of computers.
5. Users shall not use and college-owned computer or computer resource for personal gain or for any commercial activity.
6. Users shall not use another's program or data.
7. Users shall not receive, print, or send obscene sexually suggestive, vulgar, or offensive material or message on a college-owned computer.
8. Users shall not use and college-owned computer to harass, intimidate, endanger, or unduly embarrass any other person.
9. Users shall not use any college-owned computer to violate any copyright or trademark law or regulation.
10. Users shall not use any college-owned computer to violate the privacy of any other person.
11. Users shall not use any college-owned computer to plagiarize the work of any other person.
12. Users shall not use any college-owned computer for any purpose

violates any law or college policy or regulation.

13. Users shall not waste college-owned computing supplies.
14. Users shall not interfere with or disrupt network services or equipment.
15. Users shall not interfere with or disrupt network services or equipment.

Any violation of these policies shall be reported to the Vice President/Dean of the College for appropriate action.

Wright-00143

# CHATTAHOOCHEE VALLEY
# COMMUNITY COLLEGE

## NURSING 252
## ADULT NURSING II

## CLINICAL SYLLABUS

## FALL SEMESTER 2005



**Revised: August 2005**



EXHIBIT

D

Wright-00106

Chattahoochee Valley Community College
Department of Nursing
Nursing 252

**Clinical Objectives**

I.    On each day of clinical experience, the student will be expected to have prepared a specific amount of material pertaining to the planning of nursing care.  This is designed to meet the overall clinical objectives:

The Student Will:

1.    Perform competent, safe nursing care each clinical day according to the essential criteria stated in the clinical evaluation tool.

2.    Assess patients based on a holistic framework.

3.    Develop a prioritized needs list (comprehensive) after careful assessment of the patient and family based on a holistic framework.

4.    Use critical thinking to plan pertinent nursing care relevant to needs of the patient.

5.    Implement nursing care appropriate to the patient's needs.

6.    Perform medication administration with 100% accuracy.

7.    Interpret the patient's changing needs and the patient's priority of needs each clinical day.

8.    Employ effective communication with patients, family members, and other health care team members.

9.    Provide basic health care information to patients, and families.

10.   Apply principles of nutrition and pharmacology specific to disease pathology when planning and implementing care.

11.   Be currently certified in CPR by the American Red Cross or the American Heart Association.

12.   Practice within the legal and ethical guidelines for Registered Nurses.

13.   Using Erikson's theory of psychosocial development, identify the patient's psychosocial stage of development.

Wright-00107

14.   Recognize own limitations and seek appropriate guidance. Accept responsibility by seeking needed learning activities.

15.   Analyze deviations from normal bodily functions and prioritize patient diagnoses.

16.   Propose appropriate nursing care with measurable goals as related to holistic needs list.

17.   Anticipate and evaluate changing symptoms through a course of illness.

18.   Implement the nursing process in meeting actual or potential patient/client needs and/or problems.

19.   Administer high quality, safe nursing care to each patient/client.

20.   Assist with psychosocial and economic problems through referral to appropriate community agencies.

21.   Differentiate cultural needs among patient/clients.

22.   Critically evaluate nursing care as related to pre-set patient goals.

23.   Communicate therapeutically in assisting the patient/client toward an understanding of his/her illness.

24.   Implement standard precautions on all assigned patients.

25.   Develop a teaching plan for patients being dismissed in order to enhance their rehabilitative efforts.

26.   Demonstrate critical thinking through the analysis of problems, and formulation of solutions with rationales.

II.   Pre- and Post - Conference Objectives
During the pre- and post- conference times, the student will be able to:

1.   Discuss and explain his/her patient's diagnoses, goals, and treatment regimens with the clinical group.

2.   Justify various modes of drug therapy by explaining the rationale for specific drug therapies.

3.   Prioritize a needs list based on a holistic framework and make changes as the patient's condition changes.

4.   Provide rationale for specific nursing care.

Wright-00108

5.    Demonstrate basic patient/family teaching to a certain health care situation.

6.    Present a concise patient/client history to the clinical group.

7.    Analyze patient/client care with emphasis upon the use of the nursing process in meeting prioritized patient/client problems.

8.    Evaluate aspects of nursing care in relation to patient/client goal attainment.

9.    Interpret social, spiritual, and developmental findings which may affect nurse-patient/client relationships.

10.    Relate particular patient/client teachings, as applicable.

11.    Evaluate patient/client emotional responses to hospitalization.

III.    Clinical Math Proficiency Quiz
The student must pass the math computational quiz with 100% accuracy in order to give medications.  If the student does not pass the quiz in three (3) attempts,  subsequent course failure will result.

IV.    Nursing 252 Skills

Chest Tube Care (and assist with insertion and maintenance)
Endotracheal and oral suctioning
Oxygen therapy
Tracheostomy Care
Ventilator Care
Set up a CVP manometer and calculating a reading
Describe the components of a crash cart
Defibrillation/Cardioversion
Define the components of a Swan-Ganz and be able to calculate wedge pressure
Central venous catheter usage and care
Accu-Check Glucose Monitoring
Gastric intubation
Ostomy care
G-tube care
Care of the Blakemore Tube
Neurological checks
Cranial nerve assessment
Crutch walking
Basic principles of traction
Differentiate between Peritoneal & Hemodialysis
I.V. Therapy:  Use the following in the practice setting --
    primary & secondary (piggyback) pump tubing sets

4

Wright-00109

        microdrip sets
        extension tubing
        in-line filters
        I.V. start packs
        fluid containers
        I.V. pumps
        Saline/Heparin locks
        J loops
        armboards
        volume controllers
        Set up an I.V. line
        Regulate a drip rate.
        Change the I.V. fluid and tubing.
        Remove an I.V.

V.    Clinical Orientation Guide

1. Do not call instructor, floor nurses, fellow students, or head nurses by their first names.
2. Follow dress code outlined in ADN Student Handbook.
3. Do not congregate in or at the nurse's station.
4. If personal phone calls must be made, obtain permission from the clinical instructor and make them very brief and outside of the line of traffic.
5. Search for clinical experiences. Once caught up on your patient, ask nurses if you can help.
6. If late or absent, call ahead to instructor and floor.
7. During clinical, you are responsible to that patient and for his/her care.
8. DO NOT under any circumstance perform an invasive procedure (giving medications, inserting catheters, starting IVs, changing dressings, etc.) without the presence of the instructor.
10. After getting report in the morning, immediately check medications against Kardex, and check to see if medications are available. Also, introduce yourself to the patient's primary nurse and explain the interventions you will be doing for your patient.
11. Communicate initial assessment of patient to instructor and/or assigned staff before starting care.
12. Chart at least every 2 hours.
13. Chart according to diagnosis and care plan.
14. Report off before leaving for lunch and post conference.
15. Check patient's chart frequently to update orders to insure proper administration of medications and treatments.
16. Write in black ink, and chart according to military time unless hospital policy is otherwise.

VI.    Uniform Policy
Refer to the ADN Student Handbook.

Wright-00110

VII.  <u>Clinical Rating Scale</u> (Refer to the Clinical Evaluation Tool)
1.  Each instructor will schedule a mid-term and final clinical evaluation with his/her students.
2.  Each student must have a score of one (1) on each Essential Criteria at the final evaluation.
3.  Each student must pass clinically (average of 75% between mid-term and final) in order to pass Nursing 252. Less than 75% is failure of the course.
4.  Students will be graded in each major area on the clinical evaluation tool. Grades will be 0, 0.5, or 1.
5.  The total points (0, 0.5, 1) will be totaled and divided by the number of categories graded.

6

## GRADING SCALE FOR NURSING CARE PLAN

20-25    All existing problems noted, adequate subject and/or objective
Data present, appropriate goals and time frames, nursing
approaches, and scientific principles correct. Shows research
and understanding.

12-19    Lacks complete list of existing and /or potential problems (2+
Missing) or inadequate subjective and/or objective date or
inappropriate goals and/or time frames or lacks complete list of
nursing approaches or lacks scientific principles of incorrect
principles. Prioritization not perfect.

9-11    Lacks 3-4 major existing and /or potential problems, minimal
Subjective and/or objective data or incomplete client goals or
inappropriate time frames or incomplete nursing approaches or
incorrect scientific principles. Prioritization is poor.

0-8    Omitted major nursing problems (more than 4) or lacks sub-
jctive and/or objective data or lacks time frame or lacks criteria
to evaluate goals or incomplete goals or lacks nursing
approaches or lacks scientific principles. Prioritization is poor.

# I. NURSING 272: PEDIATRIC NURSING

| | | |
|---|---|---|
| **II. Instructor: Lynn Harris** | **Office Location:** | **Phone: 291-4919** |
| **Office Hours:** | **Office Hours Will Be Announced** | |

**III.     COURSE DESCRIPTION AND PREREQUISITE:**     This course provides a family-centered approach to the nursing care of children from infancy through adolescence. Emphasis is placed on concepts of growth and development, health promotion and alterations in health. The student should be able to utilize the nursing process in providing and managing nursing care to the family in a variety of health care settings.   (Clinical required.)

Prerequisites:     ENG 101, 102, BIO 103, 201, 202, MTH 100
                           NUR 111, 121, 241, 201, 202, 203, 131, 242, 251, 271, 252
Co-requisites:     BIO 220,  NUR 279, NUR 291, NUR 292

**IV.     TEXTBOOK(S):**     1.     **Wong, D.L. and Huckenberry M. (2003). Nursing Care of Infants and Children St. Louis: Mosby**

**Supplement:**     1.     American Journal of Nursing. www.nursingcenter.com

                           2.     Journal of Professional Nursing. www.wbsaunders.com

                           3.     Journal of Transcultural Nursing. www.tcns.org

                           4.     MCN: The American Journal of Maternal/Child Nursing www.nursingcenter.com

                           **5.**     Nursing 2002-Nursing 2005 www.springnet.com
                           **6.**     Pediatric Nursing www.ajj.com/jpi/journals

**V.     MATERIALS:**          notebook, paper,  handouts, calculator.

**VI.     COURSE ESSENTIAL FUNCTIONS:**
1.     Must be able to maintain balance from any position.
2.     Must be able to assist with lifting unlimited pounds.
3.     Must be able to hear high and low frequency sounds produced by the body and the environment. (Example: Heart sounds and telephone).
4.     Must be able to visibly see changes in or around patient. (Example: See skin color changes or heart rhythm changes on monitor).

**EXHIBIT**

E

Wright-00061

5. Must be able to feel body changes or vibrations. (Example: Palpate pulse or nodule).

6. Must be able to smell body and environmental odors. (Example: Electrical equipment burning or infected wounds).

7. Must be able to coordinate eye and hand movements. (Example: Releasing a blood pressure cuff valve while observing the blood pressure gauge).

8. Must be able to coordinate fine and gross motor movements with hands. (Example: Able to give injections or start IV's).

9. Must be able to see different color spectrums. (Example: Bright red drainage as opposed to serous drainage).

10. Must be able to comprehend readings and write legibly when documenting notes on patients.

11. Must be able to send familiar message(s) to the receiver and interpret feedback appropriately. (Example: Receiving telephone orders from a physician or obtaining a history from a patient).

12. Must be able to correctly perform simple mathematical computations for administering drugs.

13. Must be able to demonstrate a mentally healthy attitude which is age-appropriate and congruent with the local and culture norms.

14. Must be able to perform cardiopulmonary resuscitation.

15. Must be able to push objects. (Example: pushing a medication cart).

16. Must be able to move quickly through the clinical site.


## VII.   COURSE COMPETENCIES

Upon satisfactory completion of Nursing 272, the student must have, in the instructor's judgement, a reasonable mastery of the following competencies:

1. Utilize the nursing process and the theory of holism to assess the needs of the pediatric patient and family.

2. Utilize knowledge of normal growth and development as a basis in planning and implementing care of children and their families.

3. Assess the learning needs and implement appropriate teaching plans for the pediatric patient and family.

4. Use Erikson's theory of psychosocial development to modify behavioral expectations and patient goals according to the developmental level of the child.

5. Implement critical thinking in the nursing care of the pediatric patient and family based on scientific principles from the biological, physical, and social sciences.

6. Evaluate and modify nursing care as appropriate for the pediatric patient and family.

7. Understand the influence that cultural and spiritual beliefs, practices, and customs have on planning and implementing nursing care of the pediatric patient and family.

8. Apply principles of nutrition through restorative and rehabilitative measures for the promotion of health and appropriate growth and development.

9. Utilize principles of adjunctive therapy through the application of pharmacological methods.

2

Wright-00062

10. Establish and maintain a safe environment for the pediatric patient and family by applying the principles of asepsis to prevent the acquisition of nosocomial infections.
11. Illustrate understanding of legal and ethical responsibilities by appropriate personal and professional behavior.
12. Incorporate therapeutic communication skills when interacting with the pediatric patient, family, and other members of the health care team.
13. Assess needs, plan, implement, and evaluate rehabilitative nursing interventions for the pediatric patient and family who experience long-term illness.
14. Assume responsibility for actions as a professional person within the scope of individual nursing practice.
15. Demonstrate appropriate management/supervision in working with other health care workers.
16. Demonstrate self-development by accepting guidance from others, as appropriate, and seeking independent learning activities.
17. Demonstrate principles of universal precautions when caring for the pediatric patient.

## VIII.  COURSE REQUIREMENTS

1. Students are expected to attend all classes.
2. Satisfactory completion of a medication dosage calculation exam.  (Student will be given up to 3 chances to achieve 100%).
3. Completion of all examinations on the day the exam is scheduled.  No make-up exams will be given.
4. Completion of all required course work.
5. Maintenance of clinical performance checklist that will be turned in at the end of the semester (failure to do so will result in an 'incomplete' for the course).
6. Students must take the NLN Examination at the end of the quarter to receive a grade for the course.
7. Withdrawal from nursing courses are considered as a failure (except in extenuating circumstances as determined by the Nursing Department Chairperson).
8. An incomplete in nursing courses will be given only in extreme extenuating circumstances (i.e., extended illness, death in family, delivery) and is at the discretion of the instructor and Nursing Department Chairperson.  Incompletes are not given for students who are failing nursing courses.
9. Mandatory clinical attendance and grade of satisfactory in clinical. Failure in the clinical area constitutes failure of the entire course

**Classroom behavior:**
As indicated in the philosophy of Chattahoochee Valley Community College, the student shares responsibility with faculty for open and mature inquiry in the classroom.  Students are expected to conduct themselves in the classroom in a manner that facilitates their learning and that of others.  The instructor reserves the right to order the temporary removal or exclusion from class any student engaged in disruptive conduct or conduct in violation of the rules and regulations

Wright-00063

of the college.

Nursing students are expected to comply with the information included in the CVCC student Handbook, as well as what is detailed in the AND Student Handbook

**Plagiarism** is the taking of someone else's work or ideas and implying or stating that they are one's own. Student is guilty of plagiarism when he/she copies any type of work of any other person without giving that person credit (for example, a published work, a test paper, an essay, a computer program, or computer data). A student who plagiarizes will receive one of the following penalties as specified by the instructor of the course: an "F" in the course in which the act of plagiarism occurs, a zero on the assignment or test, or a stipulation that an assignment or test must be retaken according to specified conditions. If the student wishes to appeal the charge, he/she must do so within 24 hours through the Dean of Student Services' Office or the Office of the Dean of Instruction

**ATTENDANCE POLICY:**
The nursing faculty believes that attendance reflects acceptance of professional responsibility which is one of the essential criteria of the nursing student's performance evaluation. Because nursing education requires a blend of classroom and clinical instruction, separate attendance policies are required and are as follows:
- A.  Absence:
  1.  Classroom: Students are required to attend a minimum of **80%** of the hours that the class meets over the semester. (Example: NUR 272 meets for 30 hours over the semester; therefore attendance is required for 24 hours.) Failure to meet this standard will result in failure of the course.

  2.  Clinical: Students are required to attend a minimum of **85%** of the total clinical hours over the semester. (Example: The number of clinical hours for the semester is 90 hours, therefore, the student must be in attendance for 76.5 hours.) Failure to meet this standard will result in failure of an essential criteria and, therefore, the course.
- B.  Tardiness:
  1.  Classroom:
      A tardy for class will be defined as five or more minutes past announced starting time of the class. Entrance to the classroom will be at the permission of the instructor.
  2.  Clinical:
      Tardies in clinicals in excess of 15 minutes are not acceptable. The student will be sent home and counted as absent. If you believe you will be later than 15 minutes, notify your clinical instructor that you will be absent. The faculty believes the start of the shift is a critical time that determines the quality of the clinical learning experience and is a requirement that is consistent with future employer expectations.

**NOTE: THE STUDENT MUST BE PRESENT WHEN CLASS ASSIGNMENTS ARE COLLECTED TO BE ELIGIBLE FOR ALLOCATED POINTS. WRITTEN CLASS ASSIGNMENTS WILL NOT BE ACCEPTED AFTER THE**

Wright-00064

**DUE DATE: IF AN ASSIGNMENT IS NOT TURNED IN ON TIME< THE STUDENT WILL RECEIVE A ZERO AS A GRADE FOR THE ASSIGNMENT**

IX.    **Teaching Methods:**
1.    Lecture-Discussion
2.    Audio-visual media
3.    Handouts-study guides
4.    Programmed instruction
5.    Simulated laboratory experience (as needed)
6.    Guided clinical practice
7.    Instructor-student conference (as needed)
8.    Pre- and post- conference
9.    Self-directed study

X.    **Evaluation Method:**

1.    Examinations
2.    Written assignments
3.    Clinical performance evaluation
4.    Clinical nursing care plans
5.    Class participation

Student are expected to assume responsibility in their learning process by preparing for class/clinical by reading and studying the objectives. Students should come to class prepared to discuss content with some background knowledge from having read assigned material. **All objectives may not be covered in class due to time constraints; however, the student remains responsible for the content in those objectives not covered in class.** The most difficult objectives will be covered in class.

It is imperative that the assigned nutrition, pharmacology, and laboratory/diagnostics texts be utilized in studying content. Remember, drug and diet therapy for each system will be incorporated into the tests.

**Computer Programs**
(You must score 85 or higher for credit on programs)

**Clinical Simulations in Pediatric Nursing I**
Unit 2  A Toddler hospitalized following a seizure  ✓
Unit 4  Child with Head Injury ✓
**Clinical Simulations in Pediatric Nursing II**
Unit 1  An infant with Congenital Heart Disease ✓
Unit 2  A toddler with Respiratory Difficulties ✓
Unit 4  A School-age child with Leukemia ✓

**Teaching Assignment:**
A teaching project will be implemented during the 2nd half of the semester in area elementary schools. The topics will be assigned by the school nurse/ teacher and will be provided to the

Wright-00065

nursing students at a later date. Nursing students will be paired and will instruct approximately 3 groups of elementary students. The teaching assignment consists of a written assignment, outlining the content of instruction, with appropriate references, communication strategies, and interactive activities that are age-appropriate, as well as, a performance evaluation. The teacher of each class will evaluate the nursing student's performance on a satisfactory/unsatisfactory basis. The written assignment will be due approximately 2 weeks prior to the assigned teaching date. The post teaching documentation will be due at the first class session following the teaching project. See attached guidelines.

**Written Assignments:**

Written assignments ( pediatric assignments, ,care plans, computer programs ) will be given throughout the course. (Please be neat). Due dates for written assignments will be provided.

**XI.    CALCULATION OF FINAL GRADE**

| | | |
|---|---|---|
| 1. | Examinations (4 exams at 150 points each) | 600 points |
| 2. | Comprehensive final | 250 points |
| 3. | Computer programs | |
| | (5 programs @ 10 points each) | 50 points |
| 4. | Teaching Assignment | 50 points |
| 5. | Pediatric assessment & Care plans (2@ 25 points each) | 50points |
| | | 1000 points |

Satisfactory clinical performance - unsatisfactory clinical performance constitutes failure of the entire course

Points
930 - 1000 = A
840 - 929  = B
750 - 839  = C
749.9 or below = D and failure of course

**XII.    DISABILITIES STATEMENT**
**The College is committed to assisting students with various disabilities in keeping with the guidelines of the Americans With  Disabilities Act (A.D.A.).** Any student who has a disability (physical, emotional, or learning) and who is in need of assistance with admission, registration, orientation, or any other phase of college life should contact the ADA Coordinator at 291-4991.

Wright-00066

## XIII. CLINICAL FACILITIES:

The Medical Center
Columbus, Georgia

Columbus Department of Public Health
Columbus, Georgia

Phenix City Public Schools
Phenix City, Alabama

Wright-00067

**Nursing 272 Pediatric Nursing**
**Spring, 2006**

| Date | Subject | Assignment |
|------|---------|------------|
| 1/18 | Introduction to course, Math | |
| 1/25 | Unit I Assessment of the Child<br>Pediatric Nursing Interventions<br>Math Test I | Chps. 1-7 |
| | Unit II Infants, toddlers ,Preschooler,<br>Schoolage, adolescent | Chps. 12-15 |
| 2/1 | Unit III Special needs /hospitalization<br>Math TEST II , Math Test III TBA | Chps. 17-21 |
| 2/8 | ***Exam I*** ( Unit I,II, III )<br>Unit IV GU | Chps  30 |
| 2/15 | Unit V GI, Integument<br>Test review Exam I post class | Chps 33 |
| 2/22 | ***Exam II*** ( Unit IV, V )<br>Unit VI Endocrine | Chps. 38 |
| 3/1 | Unit VIII Cardiac,<br>Test  review Exam II post class | Chps 34<br>Computer Program: Congenital heart<br>disease Due |
| 3/8 | Unit IX  Hematologic | Chps. 35,36 |
| 3/15 | ***Exam   III*** (Unit VI,VIII, IX) | Computer program Leukemia due |
| 3/22 | NO CLASS; INSTITUTIONAL<br>PROFESSIONAL DEVELOPMENT | |
| 3/29 | Unit VII Respiratory<br>Test Review Exam III post class<br>problems | Chp 31,32<br>Computer Program: Respiratory |
| 4/5 | Unit VII Respiratory | Chp 31,32<br>Computer Program: Respiratory<br>problems Due |
| 4/12 | Unit X Cerebral, Cognitive/Sensory | Chp 22, 24,37, 40<br>Computer Program Head injury due |
| 4/19 | Unit X  | Chp 22, 24,37, 40 |
| 4/26 | Unit XI Neuromuscular | Chp 39<br>Computer program Seizures Due |

8

Wright-00068

| 5/3 | *Exam IV* (Unit VII, X, XI) Test review exam IV |
| | NLN Exam |
| 5/10 0900 | Comprehensive Final Exam |

## CLASS OBJECTIVES

### Unit I: Pediatric Nursing of the Child & Family/ Assessment of the Child & Family

1. Compare and contrast communication strategies for parents and children.
2. Illustrate four (4) communication techniques for use with children.
3. Discuss structural and functional assessments of the family.
4. Demonstrate understanding of health history and nutritional assessments of the child.
5. Demonstrate a physical examination of a pediatric client.
6. Perform a development assessment of a pediatric client using a standard screening test.
7. Identify the stresses of illness and hospitalization for children and family during each development stage.
8. Illustrate nursing interventions that prevent or minimize the effects of the stresses identified above.
9. Describe methods of assessing and managing pain in the pediatric patient.
10. Discuss preparation of the pediatric patient for procedures.
11. Demonstrate hygiene and safety measures for the pediatric patient.
12. Illustrate proper technique for the administration of medication to the pediatric patient.
13. Demonstrate appropriate nutrition and elimination procedures for the pediatric patient.
14. Explain the procedures for the collection of specimen from children.
15. Discuss procedures for maintaining respiratory function of children.
16. Identify the major reactions of and effects on the family with a child with special needs.
17. Outline nursing interventions that promote the family's optimum adjustment to a child's chronic disorder.
18. Formulate nursing interventions that support the family at the time of death.
19. Identify major causes of death in infancy, childhood, and adolescence.
20. Discuss the evolution of child health care in the U.S.
21. Critically discuss the philosophy of family-centered care.
22. Describe the various roles of the pediatric nurse.
23. Describe subcultural influences on child development, and child health care.
24. Identify four common diseases or disorders that affect certain ethnic or cultural groups.
25. Discuss the development of the family unit.
26. Utilize the qualities of strong families to assess a family unit.
27. Discuss the effects of parenting behaviors, such as style, disciplinary patterns, and communication skills on the family system.
28. Describe the impact of an illness or disability on the growth and development of the child.
29. Describe the physical changes that occur during a child's growth and development.
30. Discuss the relationships of personality, cognitive, language, moral, spiritual, and self-concept development.
31. Explain the role of play in the child's developmental process.
32. Discuss hereditary and environmental factors in the development of the child.

**Reading Assignment: Wong & Hockenberry, Chapters 1-7**

| **Audiovisual:** | RJ505.G62 | Techniques of Play Therap |
| | RJ 50: P44 Part I Assessment skills and preparation |
| | | Medcom 78517 Medicating Children |
| | | Medcom 78518 Physical Assessment of a Child |
| | | Medcom M130 Acute Pain Management in Children |
| | | RJ 245.P44 The Dying Child |

9

Wright-00069

Wright-00070

## Unit II: Infants, Toddlers, Pre-Schoolers, School-age, & Adolescent

1. Describe biological, psychosocial, cognitive and social development of the infant ,toddler, pre-schooler, school-age, and adolescent.
2. Provide anticipatory guidance to parents regarding nutrition, sleep, and activities of the infant.
3. Explain immunization requirements for the pediatric patient.
4. Describe injury prevention for the pediatric client.
5. Discuss nutritional disturbances in the infant.
6. Demonstrate nursing interventions for the infant with feeding difficulties.
7. Compare and contrast Sudden Infant Death Syndrome (SIDS) and Apnea of Infancy (AOI).
8. Describe the biologic, psychosocial, cognitive, social, and spiritual development of the toddler.
9. Provide anticipatory guidance to parents regarding toilet training, temper tantrums, and nutrition, sleep and activity for the toddler.
10. Demonstrate dental hygiene methods for the toddler.
11. Describe accident prevention for the toddler.
12. Discuss the various childhood emergencies and treatment regimens

**Reading Assignment:**      **Wong & Hockenberry Chapters 12- 15**

**Audiovisual:** RJ 245.P44 Part 1 Psychosocial Care of Infants and Toddlers

## Unit III: Special Needs, Illness & Hospitalization

1. Describe the biologic, psychosocial, cognitive, social, and spiritual development of the pre-schooler.
2. Provide anticipatory guidance to parents regarding nutrition, sleep, and activity of the pre-schooler.
3. Discuss universal precautions, communicable diseases and their prevention in toddlers and pre-school children.
4. Describe three forms of maltreatment of the child.
5. Identify three factors predisposing to child abuse.
5. Demonstrate nursing intervention related to the abused child, and discuss the legal and ethical implications of nursing interventions.
7. Describe the biologic, psychosocial, cognitive, moral, spiritual, and social development of the school age child.
8. Provide anticipatory guidance to parents regarding nutrition, sleep and activity of the school age child.
9. Discuss behavioral disorders of the school-age child.
10. Describe the biologic, psychosocial, cognitive, moral, spiritual, and social development of the adolescent.
11. Discuss changes that occur at puberty and their effect on the adolescent's self-concept and body image.
12. Provide anticipatory guidance to parents regarding sexuality education.
13. Demonstrate an understanding of health problems related to the adolescent.
14. Distinguish eating patterns, etiology, and management of three eating disorders.
15. Describe three behavioral disorders of the adolescent.

**Reading Assignment: Wong & Hockenberry Chapters 17-21**

**Audiovisuals:**      HV6626. N974 Child Abuse. Prevention, Detection and Management
RJ245.P44 Part 2 Preschool and School-Age Children
RJ245.P44 Part 3 Adolescents

11

Wright-00071

## Unit IV: Genitourinary Dysfunction

1.    Compare factors related to urinary tract infections in the pediatric client.
2.    Outline care guidelines for a child who has a structural defect in the genitourinary tract.
3.    Compare and contrast nephrotic syndrome and acute glomerulonephritis in terms of clinical manifestations and nursing interventions.
4.    Compare and contrast the pathophysiology and management of actue renal failure and chronic renal failure.
5.    Discuss the etiology and nursing management of hemolytic - uremic syndrome and Wilms tumor.
6.    Compare those differences in body fluid and electrolyte composition, and regulation between infants/chilildren and adults that make infants/children more vulnerable to imbalances
7,    Describe nursing interventions to prevent fluid and electrolyte imbalances

**Reading Assignment: Wong & Hockenberry, chapter 30**

## Unit V: Gastrointestinal and Integumentary Dysfunction

1.    Discuss nutritional and hydration disturbances in the pediatric patient
2.    Describe disorders of gastric motility in the pediatric patient.
3.    Distinguish between the intestinal parasitic diseases.
4.    Discuss the inflammatory disorders of the gastrointestinal tract.
5.    Describe hepatic disorders of the pediatric patient.
6.    Discuss the nursing management of children with structural defects of the GI system.
7.    Distinguish between obstructive disorders of the gastrointestinal system in the pediatric patient.
8.    Discuss poisoning in children.
9.    Describe the distributions and configuration of the various skin lesions.
10.    Differentiate the manifestions, medical treatment, and nursing interventions of bacterial, viral and fungal infections of the skin.
11.    Discuss nursing intervention for the pediatric patient with severe burns.

**Reading Assignment: Wong & Hockenberry Chapters 33**

**Audiovisuals:** RJ 50.P 44 Part 4 Chest and Abdomen

## Unit VI: Endocrine dysfunction

.    Compare the disorders caused by hypopituitary and hyperpituitary dysfunctions.
.    Compare disorders caused by thyroid hypofunction and hyperfunction and the management of children with these disorders.
.    Differentiate between the disorders caused by adrenal hypofunction and hyperfunction.
.    Differentiate pathology, symptomology, and nursing interventions for the various types of diabetes.
.    Design a teaching plan for the parents of and a child with diabetes mellitus.

**Reading assignment: Wong & Hockenberry Chapter 38**

Wright-00072

## Unit VII :Respiratory Dysfunction

1.  Describe the signs and symptoms of respiratory infections in children.
2.  Distinguish between infections of the upper and lower respiratory tracts.
3.  Distinguish the etiology, pathology, symptomology, and nursing interventions of asthma and cystic fibrosis.
4.  Outline a plan of care for the child with cystic fibrosis.
5.  Describe the nursing care for a child with asthma.
6.  Critically analyze the signs of respiratory distress in infants and children and the therapeutic measures used to relieve symptoms.

**Reading assignment: Wong & Hockenberry Chapter 31,32**

**Audiovisual:** RJ 50. P 44 Part 4 Chest and Abdomen, Heart and lungs
RT 436.A8 Managing Childhood Asthma

## Unit VIII: Cardiovascular Dysfunction

1.  Describe assessment of cardiac functioning.
2.  Demonstrate an understanding of the hemodynamics, distinctive manifestations, therapeutic management, and nursing interventions of congenital heart disease.
3.  Discuss nursing interventions for the pediatric patient with congestive heart failure and hypoxia.
4.  Differentiate between the acquired cardiovascular disorders.
5.  Describe the dysfunctions of the vascular system.
6.  Discuss the unique presentation behaviors of infants and children with a congenital heart defect
7.  Describe nursing care for the child with rheumatic
8.  Discuss the impact of warfan Syndrome on the cardiovascular system
9.  Identify priority interventions when caring for a child with Kawasaki disease

**Reading assignment: Wong & Hockenberry Chapter 34**

**Audiovisual:** RJ 50.P44 Part 4 Chest and Abdomen, Heart and lungs

## Unit IX: Hemological Dysfunction

-  Differentiate between the etiology and nursing management of the various anemias.
-  Compare and contrast defects of hemostasis.
-  Provide anticipatory guidance for the parents of a child with hemophilia.
-  Distinguish the pathology, symptomatology, and nursing interventions for neoplastic hematologic disorders.
-  Develop a nursing care plan for a child with HIV infection.

**Reading assignment: Wong & Hockenberry Chapter 35,36**

**Audiovisuals:**

Wright-00073

## Unit X: Cerebral Dysfunction/ Neuromuscular or Muscular Dysfunction/ Cognitive & Sensory Impairment

1.  Demonstrate assessment of cerebral function in the pediatric patient.
2.  Discuss nursing interventions in caring for an unconscious child.
3.  Utilize the nursing process in caring for children with head trauma.
4.  Differentiate between the various types of cerebral tumors.
5.  Discuss therapeutic interventions of the various intracranial infections.
6.  Differentiate between the various types of seizure disorders.
7.  Discuss the nursing interventions of pediatric patients with cerebral malformations.
8.  Differentiate etiology, pathology, symptomalogy, and nursing interventions of Down syndrome and Fragile X syndrome.
9.  Demonstrate assessment and nursing interventions for the pediatric patient with sensory impairment.
10. Identify common characteristics of anxiety and depression
11. Develop a care plan for a child at risk for suicide or for support of the family of a child who has committed suicide
12. Identify the primary symptoms and manifestations of Attention-Deficit Hyperactivity Disorder (ADHD)
13. Identify symptoms of various types of substance abuse
14. Identify potential growth and development interruptions that may occur with problems affecting the sensory organs
15. Discuss the etiology, symptomology, and nursing intervention of the child with cerebral palsy
16. Utilize the nursing process to provide care to the child with spina bifida
17. Differentiate between the various progressive neurological degenerative disorders
18. List measures used to prevent or treat cerebral edema
19. Develop a plan of care for the child ( and familt) with hydrocephalus
20. Discuss the various childhood neurological conditions that require critical care.

Reading assignment:  Wong & Hockenberry Chapters 22, 24,37, 40,

Audiovisuals:        Part 3 Eyes, Ears, Nose and Throat

## Unit XI:  Musculoskeletal or articular Dysfunction

Discuss physiologic and psychologic effects of immobilization of the pediatric patient.
Differentiate types of fractures and,immobilization devices, traction and their respective nursing interventions.
Describe the various congenital defects of the musculoskeletal system.
Describe the therapeutic management and nursing care of the child with scoliosis.
5.  Discuss etiology, pathology, symptomalogy, and nursing interventions of juvenile rheumatoid arthritis (JRA) and systemic lupus erythematosus (SLE).
6.  Identify characteristic behaviors that indicate altyerations in musculoskeletal functioning
7.  Differentiate between the various progressive muscular degenerative disorders

Reading assignment: Wong & Hockenberry Chapter 39

Audiovisual: RJ 50. P 44 Part 5 Genitalia and Spine, Extremities and Muscles

Wright-00074

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **LINDY G. WRIGHT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3:06-cv-1087-WKW** |
| **v.** | ) | |
| | ) | |
| **CHATTAHOOCHEE VALLEY** | ) | |
| **COMMUNITY COLLEGE (CVCC),** | ) | |
| ***et al.,*** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AFFIDAVIT OF BRADLEY R. BYRNE, CHANCELLOR
## ALABAMA DEPARTMENT OF POSTSECONDARY EDUCATION

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| COUNTY OF MONTGOMERY | ) |

Before me, the undersigned notary public, personally appeared Bradley R. Byrne, Chancellor of the Alabama Department of PostSecondary Education, who after having been identified to me and after having been sworn, deposed and testified as follows:

"My name is Bradley R. Byrne and I am Chancellor of the Alabama Department of Post-Secondary Education. Chattahoochee Valley Community College operates under my supervision as Chancellor. Chattahoochee Valley Community College is a State Junior College. §16-60-110 through §16-60-114 entitled, "Management and Control of Trade Schools and Junior Colleges," sets forth certain provisions of State Law relative to the management and control of Chattahoochee Valley Community College and other such colleges.

Attached to this Affidavit are portions of Act No. 384, (Regular Session, Alabama

1



EXHIBIT
F

Legislature, 1973) and Act No. 1277, (Regular Session, Alabama Legislature, 1973) which set forth certain funding allowances for certain educational facilities and institutions, including Chattahoochee Valley Community College. (See Byrne Attachment 1.) Further, attached to this Affidavit are two pages from the Minutes of Meetings of the Alabama State Board of Education, which relate to Chattahoochee Valley Community College. The Minutes dated September 26, 1973 confirm the hiring of Dr. Ralph M. Savage as the first president of this college, which at that time had not been named. The Minutes dated October 18, 1973 establish the name of this college as Chattahoochee Valley State Junior College. (See Byrne Attachment 2.) Additionally, attached to this Affidavit is a copy of correspondence from Fred Gainous, a former Chancellor of the Alabama Department of PostSecondary Education, dated October 25, 1996 to Dr. Richard J. Federinko, a past president of this college, which grants Dr. Federinko's request to change the name of the college to Chattahoochee Valley Community College. That is the current name of the college in question. (See Byrne Attachment 3.) I have also attached the *Code* provisions previously referenced which are §s 16-60-110, *Code of Alabama* through §16-60-114, *Code of Alabama*. (See Byrne Attachment 4.)

I make this Affidavit based upon personal knowledge and in my role as Chancellor of the Alabama Department of Post-Secondary Education.

FURTHER, AFFIANT SAYETH NOT."

Bradley R. Byrne

2

STATE OF ALABAMA   )
          )
COUNTY OF MONTGOMERY )

   I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that Bradley R. Byrne, whose name is signed to the foregoing, and who is known to me, acknowledged before me, on this day, that being informed of the contents of said document, he executed the same voluntarily on the day the same bears date.

   Given under my hand and seal this _15th_ day of _October 2007_ , 2007.

   [SEAL]

           _Gloria W Whiting_
           NOTARY PUBLIC
           My Commission Expires: _3/2/08_

3

Each Probate Judge, Sheriff, and the Clerk and Register of
the Circuit Court is required by law to preserve this slip or
pamphlet in a book kept in his office until the Act is published
in permanent form.

# ALABAMA LAW

### (Regular Session, 1973)

Act No. 384    H. 822—Mathews, Lyons, McCorquodale, Drake,
Turner, Williams, Pruitt, Bank

## AN ACT

To make annual appropriations for the support, maintenance, and
development of public education in Alabama for each of the fiscal years
ending September 30, 1974, and September 30, 1975.

*Be It Enacted by the Legislature of Alabama:*

Section 1. That for the purpose of this Act, the following
classifications, definitions and restrictions shall be applicable:
(a) "salary" and "other salaries", wherever appearing herein,
shall mean the wages or other compensation for skill, work or
employment for anyone performing services for the State of
Alabama as an employee, officer or official, and shall be expended
only for such purposes; (b) "other expenses" shall mean the
operating costs of agencies, departments, boards, bureaus and
institutions of the State, other than salaries and equipment
purchases and shall be expended only for operating costs incident
to the normal operations of such agencies, departments, boards,
bureaus and institutions, including supplies and materials, post-
age, telephone, telegraph, express, travel expense, motor vehicle
operations, lights, water, power, insurance and bonding, printing
and binding, repairs, rental and items of general expense not
defined as "equipment purchases", and the money appropriated
therefor shall be expended only for such purposes; (c) "equip-
ment purchases" shall mean those items of office equipment,
motor vehicle equipment and other equipment which have an
appreciable and calcuable period of usefulness in excess of one
year; (d) "automotive equipment purchases" shall mean those
items of motor vehicle equipment only and the money appropri-
ated therefor shall be expended only for such purposes. The
amounts herein appropriated for "equipment purchases" and
"automotive equipment purchases" shall be decreased by the
amount of the sale, trade-in or exchange of the items of equip-
ment purchases and automotive equipment purchases as des-
cribed in Section 1 (c) and (d) hereof. Provided, however, that
if at the end of any fiscal year, a pay period which has been or
may be established by the Legislature providing for the payment

25 22

Byrne
Attachment 1

7    *Act No. 384*

| | | |
|---|---|---|
| For Operation of Course Study Commission | 5,000.00 | |
| **Total** | | 4,854,000.00 |
| For the fiscal year ending September 30, 1975: | | |
| For salaries | 52,800.00 | |
| For other expenses | 37,775.00 | |
| For disbursements to Local Boards | 60,637.00 | |
| For equipment purchases | 1,000.00 | |
| For the repair of used and the purchase of new text- books | 4,842,788.00 | |
| For Operation of Course Study Commission | 5,000.00 | |
| **Total** | | 5,000,000.00 |

I. Alabama High School of Fine Arts:
For operation and mainte-
tenance:

| | |
|---|---|
| For the fiscal year ending September 30, 1974 | 120,000.00 |
| For the fiscal year ending September 30, 1975 | 126,000.00 |

The above appropriation is to carry out the provisions of HJR 145 of the 1971 Regular Session.

J.(a) Junior College Equalization Account:
For operation and mainte-
nance of the Junior Colleges listed below, to be distrib-
uted on a formula adopted by the State Board of Edu-
cation:

| | |
|---|---|
| For the fiscal year ending September 30, 1974 | 16,852,581.00 |
| For the fiscal year ending September 30, 1975 | 18,969,252.00 |

(The above appropriation is to be distributed to the fol-
lowing Junior Colleges: (1)

*Act No. 384*
*(Regular Session 1973)*

8

Alexander City; (2) Albert
P. Brewer; (3) John C.
Calhoun; (4) Enterprise
State; (5) James H. Faulk-
ner; (6) Gadsden (7) Jef-
ferson Davis; (8) Jefferson
State; (9) Theodore Alfred
Lawson; (10) Mobile State;
(11) Northeast; (12) North-
west; (13) Patrick Henry;
(14) Snead State; (15)
S o u t h e r n Union; (16)
George C. Wallace (Napier
Field); (17) George C. Wal-
lace (Selma); (18) Lurleen
B. Wallace State.)

Of the above appropriations contained herein in Section 4.
paragraph J not more than the sum of $150,000.00 for the fiscal
year ending September 30, 1974, and not more than the sum of
$175,000.00 for the fiscal year ending September 30, 1975. may
be used by the State Board of Education for administration of
the state junior college program.

| | |
|---|---:|
| (b) For a junior college at Phenix City | 250,000.00 |
| K. J.F. Ingram Vocational Technical School: For the operation and maintenance of a Vocational Technical School | 200,000.00 |
| L. State Mental Health Department: For salaries, other expenses and equipment purchases necessary to operate schools at Alabama State Hospitals: For the fiscal year ending September 30, 1974 | 40,125.00 |
| For the fiscal year ending September 30, 1975 | 50,125.00 |
| M. State Mental Health Department: For salaries, other expenses and equipment purchases necessary to operate a | |

23 24

2181

upon its passage and approval by the Governor, or upon its otherwise becoming a law.

Approved September 19, 1973.

Time: 1:45 P.M.

Act No. 1276                                              S. 145—Weaver

## AN ACT

To amend Title 52, Section 351, Code of Alabama, 1940, as amended, to provide that certificated employees of the Alabama Institute for Deaf and Blind, Alabama Industrial School for Boys, Alabama Industrial School for Girls, and Alabama Industrial School at Mt. Meigs shall be defined as teachers and shall be covered under the Alabama Teacher Tenure Law.

*Be It Enacted by the Legislature of Alabama:*

Section 1.   Amend Section 351, Title 52, Code of Alabama, 1940, as amended, to read as follows:

"Section 351.   Teacher defined.—The term teacher as employed in this chapter is deemed to mean and include all persons regularly certified by the teacher certificating authority of the State of Alabama who may be employed as instructors, principals or supervisors in the public elementary and high schools of the State of Alabama and persons employed as instructors, principals or supervisors in the Alabama Institute for Deaf and Blind, Alabama Industrial School for Boys, Alabama Industrial School for Girls, and Alabama Industrial School at Mt. Meigs."

Section 2.   This act shall become effective upon its passage and approval by the Governor or upon its otherwise becoming law.

Approved September 19, 1973.

Time: 5:05 P.M.

Act No. 1277              H. 1345—Fite, Hill, Drake, McCluskey,
                          Smith (P), Robertson,
                          Naramore, Carnes, Snell,
                          Wynot, Coshatt, Grey (D),
                          Goodwin, Casey, Williams,
                          Headley, Bank, Falkenburg,
                          Callahan, Cottingham,
                          O'Daniel, Mims, Agee, Kinsey,
                          Benton, May, Hardin, Collins,
                          Barron, Barkett, McBride,
                          McDonald, Merrill, Burgess

80. 25

2188

**Section 8. Use of Bond Proceeds.** The proceeds derived from each sale of the bonds shall be deposited in the State Treasury and shall be carried in a separate fund therein for the account of the Authority, which shall pay therefrom the expenses of issuance thereof. The proceeds from the sale of the bonds remaining after payment of the expenses of issuance thereof shall be retained in said fund and paid out from time to time on orders or warrants issued by or on the direction of the Authority for any one or more of the purposes specified in Section 2 of this Act as may be deemed by the Authority to be most advantageous to the State, and such proceeds shall be used solely for such purposes and shall be allocated and expended by the Authority in the amount out as follows:

a. fifty two million four hundred fifty six thousand dollars ($52,456,000) to colleges and universities to be distributed as follows:

(1) $7,500,000.00 of such proceeds shall be distributed to the Board of Trustees of the University of Alabama to be used at its Tuscaloosa campus;

(2) $7,500,000.00 of such proceeds shall be distributed to the Board of Trustees of the University of Alabama to be used at its Birmingham campus;

(3) $3,333,000.00 of such proceeds shall be distributed to the Board of Trustees of the University of Alabama to be used at its Huntsville campus;

(4) $7,500,000.00 of such proceeds shall be distributed to Auburn University;

(5) $2,500,000.00 of such proceeds shall be distributed to Auburn University at Montgomery;

(6) $3,667,000.00 of such proceeds shall be distributed to the University of South Alabama;

(7) $2,790,000.00 of such proceeds shall be distributed to the University of Montevallo;

(8) $3,333,000.00 of such proceeds shall be distributed to Florence State University;

(9) $3,333,000.00 of such proceeds shall be distributed to Jacksonville State University;

(10) $2,333,000.00 of such proceeds shall be distributed to Livingston State University;

(11) $3,333,000.00 of such proceeds shall be distributed to Troy State University;

28 2⸺

2189 *Act No. 1277*
*(Regular Session 1973)*

(12) $2,667,000.00 of such proceeds shall be distributed to Alabama Agricultural and Mechanical University;

(13) $2,667,000.00 of such proceeds shall be distributed to Alabama State University.

b. twenty-two million five hundred thousand dollars ($22,500,000) to Junior Colleges and Vocational-Technical Institutes to be distributed as follows:

| | | |
|---|---|---|
| 1. | Alexander City State Junior College | $ 557,872 |
| 2. | S. D. Bishop State Junior College | 550,619 |
| 3. | Brewer State Junior College | 310,833 |
| 4. | John C. Calhoun State Tech. Jr. Col. | 1,000,000 |
| 5. | Jefferson Davis State Jr. Col. | 310,833 |
| 6. | Enterprise State Junior Col. | 588,206 |
| 7. | Faulkner State Jr. Col. | 615,805 |
| 8. | Gadsden State Jr. Col. | 1,070,531 |
| 9. | Patrick Henry State Jr. Col. | 310,833 |
| 10. | Jefferson State Jr. Col. | 2,500,000 |
| 11. | T. A. Lawson State Jr. Col. | 865,823 |
| 12. | Northeast Alabama State Jr. Col. | 331,690 |
| 13. | Northwest Alabama State Jr. Col. | 450,000 |
| 14. | Snead State Junior College | 554,575 |
| 15. | Southern Union State Jr. Col. | 530,176 |
| 16. | George C. Wallace State Tech. Jr. Col., Dothan | 673,271 |
| 17. | George C. Wallace State Jr. Col., Selma | 424,599 |
| 18. | Lurleen B. Wallace State Jr. Col. | 475,000 |
| 19. | Phenix City State Junior College | 900,000 |
| 20. | Alabama Institute of Aviation Tech. | 258,196 |
| 21. | Alabama Technical College — Gadsden | 403,232 |
| 22. | Ayers State Technical College | 298,594 |
| 23. | Bessemer State Technical College | 432,348 |
| 24. | Calhoun State Tech. Trade School | 360,755 |
| 25. | Carver State Tech. Trade School | 174,272 |
| 26. | Drake State Technical Col. | 191,885 |
| 27. | Gadsden State Technical Inst. | 207,425 |
| 28. | Hobson State Technical Inst. | 259,226 |
| 29. | MacArthur State Tech. Col. | 422,398 |
| 30. | Muscle Shoals Tech. Inst. | 345,733 |
| 31. | Northwest Alabama State Technical Col. | 317,761 |
| 32. | Nunnelley State Tech. Inst. | 317,761 |
| 33. | Opelika State Technical Col. | 404,786 |
| 34. | Patterson State Tech. Col. | 345,215 |
| 35. | Reid State Technical Col. | 344,697 |
| 36. | Shelton State Technical Col. | 299,112 |
| 37. | Sparks State Technical Inst. | 107,115 |
| 38. | Southwest State Tech. Col. | 392,873 |
| 39. | Trenholm State Trade School | 297,559 |
| 40. | Tuscaloosa State Trade School | 135,423 |

2190

| 41. | Walker County State Trade School | 441,048 |
| 42. | Wallace State Technical Trade School, Dothan | 563,935 |
| 43. | Wallace State Technical Institute, Cullman | 615,616 |
| 44. | Wallace State Technical Institute, Selma | 239,542 |
| 45. | Wenonah State Technical School | 201,210 |
| 46. | Atmore Trades School | 216.232 |
| 47. | J. F. Ingram State Trade School | 211,052 |
| 48. | Regional Technical Institute | 257,672 |

*Talladega Voc. School for Deaf ............ 416,667

*Not a portion of the Junior College and Trade School funds.

c.) one hundred million dollars ($100,000,000) for elementary-secondary systems to be distributed as follows:

(1) One hundred thousand dollars ($100,000) shall be paid to each city and county board of education and to the Alabama Institute for Deaf and Blind at Talladega, Girls Industrial School at Chalkville, Boys Industrial School at Birmingham, and the Industrial School at Mt. Meigs.

(2) The residue from the one hundred million dollars ($100,000,00) after providing for costs involved in issuing said bonds and (1) above shall be allocated and distributed to city and county boards of education, pro rata, on the basis of teacher units as determined in accordance with the minimum school program for the school year 1973-74 to be used for the construction of school building facilities, including buildings and equipment, for reconstruction, alteration, equipment and improvement of existing school buildings in school building centers approved by the State Department of Education as permanent school centers.

(3) Of the amount allocated in sub section (1) and (2) above to Covington County, one hundred thousand dollars ($100,000) shall be expended for Straughn School and the remainder for the Red Level schools.

Of the amount allocated in sub section (1) and (2) above to Mobile County, one million dollars ($1,000,000) shall be expended for a school at Theodore, Alabama and the remainder shall be allocated to the Board of Education of Mobile County.

Of the amount allocated in sub section (1) and (2) above to Franklin County, two hundred and fifty thousand dollars ($250,000) shall be expended for a gymnasium at Red Bay High School, Red Bay, Alabama and the remainder shall be allocated to the Board of Education of Franklin County.

Of the amount allocated in sub section (1) and (2) above to Jefferson County, one million dollars ($1,000,000) shall be expended for McAdory High School, McCalla, Alabama and

## NAMED PRESIDENT OF JUNIOR COLLEGE AT PHENIX CITY, ALABAMA

State Superintendent LeRoy Brown presented the following resolution and recommended its approval:

WHEREAS, the Alabama Legislature has authorized and funded a junior college to be established at Phenix City, Alabama; and

WHEREAS, the president of the institution needs to assume responsibilities connected with planning, hiring and development at an early date so that classes may officially open in the fall quarter, 1974; and

WHEREAS, Dr. Ralph M. Savage has been recommended by Mr. T. L. Faulkner, Director, Division of Vocational-Technical and Higher Education, and Dr. LeRoy Brown, State Superintendent of Education; and

WHEREAS, Dr. Savage has shown administrative competency as Dean of Instruction and Business Manager in Alabama junior colleges, and currently as Director, Higher Education Branch, Division of Vocational-Technical and Higher Education, State Department of Education, and is otherwise qualified by education and experience:

NOW, THEREFORE, BE IT RESOLVED That Dr. Ralph M. Savage be appointed President of the junior college to be established in Phenix City, Alabama, and assume full-time duties of that position on January 1, 1974, and that he be empowered to act in that capacity on any matters which might pertain to the establishment of said college prior to January 1, 1974.

Mrs. Cherry moved the adoption of the above resolution; motion seconded by Dr. Martin and motion carried by all members voting aye.

## BOARD REQUESTS TO BE CONSULTED ON NAMING OF NEW BRANCH DIRECTOR
## FOR JUNIOR COLLEGE BRANCH, DIVISION OF VOCATIONAL-TECHNICAL AND HIGHER EDUCATION

Byrne
Attachment 2

## REPORT ON EARLY CHILDHOOD EDUCATION PROGRAM

Dr. Berryman gave the following progress report on the Early Childhood Education Program. He said after the legislation was passed all school systems were invited to submit a program and the State Department of Education has now received 34 applications representing one or more from each State Board District. He said the law states one program is to be located in each State Board District. Dr. Berryman said about two years ago Dr. Brown appointed an Early Childhood Advisory Committee and this committee is now in the process of reviewing the applications and making on-sight visits and will soon make its recommendations to Dr. Brown for his submission to the State Board.

## SALE OF $1,500,000 STATE BOARD OF EDUCATION ALABAMA AGRICULTURAL AND MECHANICAL UNIVERSITY HEALTH AND PHYSICAL EDUCATION BUILDING BONDS OF 1973 AUTHORIZED

Dr. Martin introduced the following resolution in writing and moved its adoption, which motion was seconded by Mr. Roberts:

(Copy of resolution given to each member at the meeting and same will be recorded in full in the Minute Book.)

The chairman then called for a vote on said resolution, whereupon the following vote was recorded: yeas: Dr. James D. Nettles, Mrs. Isabelle B. Thomasson, Mrs. S. A. Cherry, Mrs. Bettye Frink, Mr. Victor P. Poole, Dr. Harold C. Martin, Mr. Roscoe Roberts, Jr.; nays: none; absent: Governor George C. Wallace and Mr. H. Ray Cox.

The chairman thereupon declared the aforesaid resolution adopted.

## NEW PHENIX CITY JUNIOR COLLEGE NAMED CHATTAHOOCHEE VALLEY STATE JUNIOR COLLEGE

Mrs. Cherry moved that the new junior college to be located in Phenix City be named the Chattahoochee Valley State Junior College; motion seconded by Mrs. Thomasson and unanimously adopted.

## DISCUSSION OF ACT TO PROVIDE AN EXPENSE ALLOWANCE FOR MEMBERS OF STATE BOARD

Dr. Kimbrough reported to the Board that the legislature passed an act which states, "Each member of the State Board of Education shall be entitled to an expense allowance of one hundred dollars ($100) per month which shall be in addition to the per diem compensation and actual traveling and other necessary expenses incurred in attending meetings and transacting the business of the board, as provided in Code of Alabama 1940, Title 52, Section 13."

CC: Files & Deans
Received
11/4/96
Sent 11-5-96



# ALABAMA
# DEPARTMENT OF
# POSTSECONDARY EDUCATION

## *Representing Alabama's Public Two-Year College System*

STATE BOARD OF EDUCATION    Governor Fob James, Jr. President    Bradley Byrne District 1    G. J. Higginbotham District 2    Stephanie Bell District 3    Ethel Hall Vice President District 4    Willie J. Paul District 5    David F. Byers, Jr. District 6    Sandra Ray District 7    Mary Jane Caylor District 8

October 25, 1996

Dr. Richard J. Federinko, President
Chattahoochee Valley State Community College
2602 College Drive
Phenix City, Alabama 36869

Dear President Federinko:

We have reviewed your recent request to change the official college name to Chattahoochee Valley Community College. At its meeting yesterday, October 24, 1996, the State Board of Education adopted Policy Number 102.06 - Chancellor: Official College Names, which allows the Chancellor to change a college name by removing "State" from the official name upon request and adequate justification by the president.

The information you have provided in conjunction with your request supports such a name change. You are hereby authorized to remove "State" from the official college name. We will change our records accordingly, and notify the members of the State Board of Education of this change.

If we may be of further assistance, please let me know.

Sincerely,

Fred Gainous

Fred Gainous
Chancellor

RC:vs

Byrne
Attachment 3

.ds, issued by the
 shall be deposited
sury in a special or
·awn upon by the
ich the bonds were

**— Sinking fund.**

·rity to pay at their
 bonds issued by it
 the objects of its
 irpose and hereby
 ·r said purpose out
 x levied by Section
 ·eipts the amounts
 mounts specified in
 ;-181, said residue
 iat is now required
 l Trust Fund. The
 a sinking fund for
 n the bonds of the

'his law is referred to in:

16-60-94, the State
ipal of and interest
s of this article, as
he State Treasurer
ippropriate records

ding, the authority
:e of an application
e members of the
authorized to take
ion for dissolution,
hall file and record
·ecord in his office,
e, a certificate that
·ith the application

for dissolution. Title to all property held in the name of the authority shall be vested in the state upon dissolution of the authority.

**Cross references.** — This law is referred to in: §§ 16-60-38, 16-60-39, 16-60-40, 16-60-112, 16-60-114, 16-60-130, 16-60-132, 16-60-150.

ARTICLE 5

MANAGEMENT AND CONTROL OF TRADE SCHOOLS AND JUNIOR COLLEGES

## § 16-60-110. Definitions.

For purposes of this article, the following words and phrases shall have the respective meaning ascribed to them by this section:

(1) BOARD. The State Board of Education.

(2) JUNIOR COLLEGE. An educational institution offering instruction in the arts and sciences on the level of difficulty of the first two years above high school level.

(3) STATE. The State of Alabama.

(4) TRADE SCHOOL. An educational institution offering instruction primarily in useful trades, occupations or vocational skills.

(5) ATHENS STATE COLLEGE. An educational institution offering instruction on the level of difficulty of the third and fourth years above the high school level. Wherever used herein, the phrase "junior colleges and trade schools" shall be understood to include Athens State College.

(6) POSTSECONDARY EDUCATION DEPARTMENT. A parallel organization to the State Department of Education directly responsible to the State Board of Education for the direction and supervision of junior colleges and trade schools and community colleges with a chief executive officer entitled chancellor.

**History.** Acts 1982, No. 82-486.
**Related statutes.** Acts 1982, No. 82-486, § 13: "Any other law to the contrary notwithstanding, the authority, powers and duties prescribed in §§ 16-60-80 through 16-60-96, Code of Alabama 1975, relating to the Alabama Trade School and Junior College Authority Act, are hereby transferred to the chancellor and expressly removed from the state superintendent of education; provided further, any other law to the contrary notwithstanding, this act shall be construed to require that all actions of the state board of education concerning the junior colleges and trade schools which previously have required the recommendation of the state superintendent of education shall not require only the recommendation of the chancellor; provided, however, that this act shall not be construed as removing the state superintendent of education from membership on any

board, commission, authority or other agency on which the state superintendent of education now serves except as otherwise provided herein."

Acts 1994, No. 94-62: "[T]he Legislature expressly declares that it is the intent of the Legislature that any appropriation to any two-year postsecondary institution based on a formula for credit hours taught is earned when the credit hours are taught and, in the event the program is later discontinued, any appropriation allocation based on credit hours already taught may be redistributed by the institution to any other program or activity at the institution at the discretion of the institution."
**Cross references.** — This law is referred to in: §§ 16-60-38, 16-60-39, 16-60-40, 16-60-112.

Alabama trade school and junior college authority act, § 16-60-80 et seq.

Byrne
Attachment 4

§ 16-60-111    EDUCATION    § 16-60-111.3

CASE NOTES

Cited in Klein v. State Bd. of Educ., 547 So. 2d 549 (Ala. Civ. App. 1988); Ex parte Boyette, 728 So. 2d 644 (Ala. 1998); Young v. McLeod, — So. 2d —, 2001 Ala. Civ. App. LEXIS 1 (Ala. Civ. App. Jan. 5, 2001); Morris v. Wallace Community College-Selma, 125 F. Supp. 2d 1315 (S.D. Ala. 2001).

§ 16-60-111. Repealed: Acts 1982, No. 82-486.

§ 16-60-111.1. Chancellor; generally.

For the sole purpose of assisting the board in carrying out its authority and responsibility for each of the junior colleges and trade schools, the board shall have the authority to appoint a chancellor who will also be chief executive officer of the Postsecondary Education Department. The chancellor shall serve at the pleasure of the board and perform such duties as assigned by the board; provided, however, that the board may enter into a contract with the chancellor for his services for a period not to exceed four years. The chancellor shall be a person of good moral character with academic and professional education equivalent to graduation from a recognized university or college, who is knowledgeable in postsecondary institution administration and has training and experience sufficient to qualify him to perform the duties of his office.

History. Acts 1982, No. 82-486.

CASE NOTES

Cited in Klein v. State Bd. of Educ., 547 So. 2d 549 (Ala. Civ. App. 1988); DeWitt v. Gainous, 601 So. 2d 103 (Ala. Civ. App. 1992).

§ 16-60-111.2. Chancellor; operation and management of schools.

The authority and responsibility for the operation, management, control, supervision, maintenance, regulation, improvement, and enlargement of each of the junior colleges and trade schools shall be vested in the chancellor, subject to the approval of the board.

History. Acts 1982, No. 82-486.

§ 16-60-111.3. Salaries of state superintendent and chancellor.

Notwithstanding any provision of law to the contrary, the board shall have the authority to establish the salary of the State Superintendent of Education and the chancellor. The board may also provide for expense allowances to be paid to the State Superintendent of Education and the chancellor in whatever amounts and for whatever purposes deemed necessary and appropriate by the board. Such salary and expense allowances shall be paid in installments from the annual appropriation made to the board or the State Department of Education as appropriate.

§ 16-60-111.4    TRADE SCHOOLS AND JUNIOR COLLEGES    § 16-60-111.4

**History.** Acts 1982, No. 82-486.

### § 16-60-111.4. State board; powers.

The State Board of Education, upon recommendation of the chancellor, shall be authorized to:

(1) Make rules and regulations for the government of each junior college and trade school.

(2) Prescribe for the junior colleges and trade schools the courses of study to be offered and the conditions for granting certificates, diplomas and/or degrees.

(3) Appoint the president of each junior college and trade school, each president to serve at the pleasure of the board.

(4) Direct and supervise the expenditure of legislative appropriations of each junior college and trade school.

(5) Prescribe qualifications for faculty and establish a salary schedule and tenure requirements for faculty at each junior college and trade school.

(6) Accept gifts, donations, and devises and bequests of money and real and personal property for the benefit of junior colleges and trade schools or any one of them.

(7) Disseminate information concerning and promote interest in junior colleges and trade schools among the citizens of Alabama.

**History.** Acts 1982, No. 82-486.
**Cross references.** — This law is referred to in:
§ 16-60-111.7.

### CASE NOTES

Construction with other law.
Faculty.
Junior colleges.
Mandamus.
Subsection (3).
When applicable.
Cited.

**Construction with other law.**

The establishment of tenure by the State Board of Education in its regulations, pursuant to subsection (5), renders full-time, post-secondary teachers to be covered by a state statute. One who is otherwise covered by another state statute is, therefore, expressly excluded from the act. Williams v. Ward, 667 So. 2d 1375 (Ala. Civ. App. 1994).

**Faculty.**

The circuit court erred in determining that the plaintiff-junior college instructor "was employed for sufficient time to obtain tenure" where the instructor worked full time 6 quarters and taught 15 credit hours per quarter for another 9 quarters but under a contract which designated him as "part-time." Young v.

McLeod, — So. 2d —, 2001 Ala. Civ. App. LEXIS 1 (Ala. Civ. App. Jan. 5, 2001).

**Junior colleges.**

This section makes it clear that the presidents of Alabama's junior colleges are at-will employees of the Board of Education and serve at the pleasure of the Board. DeWitt v. Gainous, 628 So. 2d 418 (Ala. 1993).

**Mandamus.**

If a teacher is in fact tenured under statute, then mandamus will lie to enforce the rights of the tenured teacher. Owen v. Rutledge, 475 So. 2d 826 (Ala. 1985).

Mandamus is an appropriate remedy for exploring the rights of junior college teachers under teacher tenure laws. Klein v. State Bd. of Educ., 547 So. 2d 549 (Ala. Civ. App. 1988).

**Subsection (3).**

Junior college president, as an at-will employee, may resign from his job at any time or may tender a prospective resignation; however, a prospective resignation may not be withdrawn after it has been unconditionally ac-

cepted. DeWitt v. Gainous, 601 So. 2d 103 (Ala. Civ. App. 1992).

**When applicable.**
Instructional personnel at the state's junior colleges and trade schools are covered by the ATSJCAA. Young v. McLeod, — So. 2d —, 2001

Ala. Civ. App. LEXIS 1 (Ala. Civ. App. Jan. 5, 2001).

**Cited in** Morris v. Wallace Community College-Selma, 125 F. Supp. 2d 1315 (S.D. Ala. 2001).

## § 16-60-111.5. Chancellor; duties.

The chancellor shall act as chief executive officer of the Postsecondary Education Department of the State Board of Education and will direct all matters involving the junior colleges and trade schools within the policies of the State Board of Education. The chancellor shall:

(1) Execute and enforce the rules and regulations of the State Board of Education governing the junior colleges and trade schools.

(2) Interpret the rules and regulations of the board concerning the junior colleges and trade schools.

(3) Administer the office of the chancellor and appoint to positions of employment such professional, clerical, and other assistants, including specialists and consultants, on a full- or part-time basis as may be needed to assist the chancellor in performing the duties of the office of the chancellor. The number of employees, their compensation and all other expenditures of the office of the chancellor shall be within the limits of a budget for the office of the chancellor which shall be approved by the board. The chancellor and all employees of the office of the chancellor shall not be subject to or governed by the provisions of the State Merit System law but shall be entitled to all benefits accruing to merit system employees including the right to accumulate leave and participate in the Teachers' Retirement System under the same terms and conditions as employees of the State Department of Education.

(4) Have the authority to take any and all actions necessary and proper to administer policies, rules and regulations of the board in carrying out its responsibility for the management and operation of the junior colleges and trade schools.

(5) Prepare, or cause to be prepared, an annual report of the State Board of Education on the activities of the postsecondary education department and shall submit on the first day of December, or as early thereafter as practicable, the same to the board for its approval and adoption. He shall also prepare, or cause to be prepared, all other reports which are or may be required of the board.

(6) Prepare, or cause to be prepared, and submit for approval by the State Board of Education such budget for each quadrennium, or for such other period as may be fixed by the Department of Finance or other duly authorized body.

(7) Prepare, or cause to be prepared, and submit for approval and adoption by the State Board of Education such legislative measures as are in his opinion needed for the further development and improvement of the junior colleges and trade schools.

§ 16-60-111.6    TRADE SCHOOLS AND JUNIOR COLLEGES    § 16-60-111.7

**History.** Acts 1982, No. 82-486.

### CASE NOTES

Tenure decisions.
Tenure requirements.
Cited.

**Tenure decisions.**

This section did not require junior college instructors to seek administrative review of their denial of tenure claim; although this section may authorize the college chancellor to conduct a review of tenure decisions it does not require an instructor to seek such a review before resorting to other remedies, and the circuit court is the proper forum to litigate this issue. McLeod v. Beaty, 718 So. 2d 673 (Ala. Civ. App. 1996).

**Tenure requirements.**

The interpretation of tenure requirements by the chancellor of postsecondary education was entitled to great weight, where nontenured junior college instructors contended that the junior college had not recognized their right to tenure, because the chancellor was the official charged by the legislature with establishing tenure requirements and with interpreting rules and regulations concerning junior colleges. McLeod v. Beaty, 718 So. 2d 673 (Ala. Civ. App. 1996).

**Cited in** Young v. McLeod, — So. 2d —, 2001 Ala. Civ. App. LEXIS 1 (Ala. Civ. App. Jan. 5, 2001).

### § 16-60-111.6. Delegation of authority to chancellor by state board.

Except where otherwise clearly indicated herein the board will delegate to the chancellor, authority for the chancellor to act and make decisions concerning the management and operation of the junior colleges and trade schools. The president of each junior college and trade school shall be responsible to the chancellor for the day-to-day operation of each school.

**History.** Acts 1982, No. 82-486.

### CASE NOTES

**Cited in** Klein v. State Bd. of Educ., 547 So. 2d 549 (Ala. Civ. App. 1988); DeWitt v. Gainous, 601 So. 2d 103 (Ala. Civ. App. 1992); Ward v. Wortham, 706 So. 2d 1238 (Ala. Civ. App. 1997).

### § 16-60-111.7. Faculty and staff; appointment.

The president of each junior college and trade school shall appoint the faculty and staff of each junior college and trade school according to qualifications prescribed by the board and such other regulations which may be adopted by the board in accordance with Section 16-60-111.4.

**History.** Acts 1982, No. 82-486.

### CASE NOTES

When applicable.
Cited.

**When applicable.**

Instructional personnel at the state's junior colleges and trade schools are covered by the ATSJCAA. Young v. McLeod, — So. 2d —, 2001 Ala. Civ. App. LEXIS 1 (Ala. Civ. App. Jan. 5, 2001).

**Cited in** Ward v. Wortham, 706 So. 2d 1238 (Ala. Civ. App. 1997); Morris v. Wallace Community College-Selma, 125 F. Supp. 2d 1315 (S.D. Ala. 2001).

## § 16-60-111.8. Implementation of chapter.

Upon this section becoming law, the board and the State Superintendent of Education shall be authorized to take all administrative action, including transfer of funds appropriated to the State Board of Education for administration of the junior college and trade school program, necessary to carry out the intent and purpose of this article.

History. Acts 1982, No. 82-486.

## § 16-60-112. Construction of article.

Nothing contained in Section 16-60-110 or any provision of this article shall be construed as repealing any provision of the Alabama Trade School and Junior College Authority Act, Sections 16-60-80 through 16-60-96, or the provisions of Sections 16-5-1 through 16-5-14 relating to the Alabama Commission on Higher Education.

History. Acts 1982, No. 82-486.
Cross references. — This law is referred to in:
§§ 16-60-38, 16-60-39, 16-60-40.

## § 16-60-113. Loans.

Any junior college or trade school shall have authority during any fiscal year upon the approval of the chancellor to borrow money in anticipation of the current revenues for that fiscal year and to pledge the current revenues for said fiscal year for payment of such loan or loans if funds on hand are not sufficient to pay the salaries of teachers for any given month; provided, that any amount borrowed shall not exceed one month's allotment and shall not exceed the amount of the state appropriation minus the amount disbursed from said school's annual allotment.

History. Acts 1982, No. 82-486; Acts 1983, 2nd
Ex. Sess., No. 83-131.

## § 16-60-114. Transfer of authority to chancellor from state superintendent.

Any other law to the contrary notwithstanding, the authority, powers and duties prescribed in Sections 16-60-80 through 16-60-96, relating to the Alabama Trade School and Junior College Authority Act, are hereby transferred to the chancellor and expressly removed from the State Superintendent of Education; provided further, any other law to the contrary notwithstanding, this article shall be construed to require that all actions of the State Board of Education concerning the junior colleges and trade schools which previously have required the recommendation of the State Superintendent of Education shall now require only the recommendation of the chancellor; provided, however, that this article shall not be construed as removing the State Superintendent of Education from membership on any board, commission,

authority or other agency on which the State Superintendent of Education now serves except as otherwise provided herein.

**History.** Acts 1982, No. 82-486; Acts 1983, 2nd Ex. Sess., No. 83-131.

## CASE NOTES

**Tenure requirements.**

The interpretation of tenure requirements by the chancellor of postsecondary education was entitled to great weight, because the chancellor was the official charged by the legislature with establishing tenure requirements and with interpreting rules and regulations concerning junior colleges. McLeod v. Beaty, 718 So. 2d 673 (Ala. Civ. App. 1996).

## ARTICLE 6

## SOUTHERN UNION COLLEGE

### § 16-60-130. Generally.

Upon receipt of a proper deed or such other conveyances as may be appropriate for the purpose, as determined by the Governor, he may accept on behalf of the state the property, buildings, facilities and effects appertaining to Southern Union College, Wadley, in Randolph County; and by executive order he may provide for the operation and maintenance of the college as a state educational institution of the same kind as the institutions provided for in Sections 16-60-80 through 16-60-96.

**Cross references.** — This law is referred to in: § 16-60-131.

### § 16-60-131. Operation and management.

Upon the acceptance of Southern Union College as a state educational institution, as provided in Section 16-60-130, the college shall be operated, managed, controlled, maintained and regulated thereafter as other like institutions.

### § 16-60-132. Advisory board.

There shall be established a Southern Union College Advisory Board, to consist of not more than nine citizens who are members of the college community, appointed by the State Superintendent of Education, upon nomination and recommendation of the president of the college. The advisory board shall promote and serve the best interests of the institution in every way not inconsistent with the Alabama Trade School and Junior College Authority Act, Sections 16-60-80 through 16-60-96.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

LINDY G. WRIGHT,                          )
                                          )
    Plaintiff,                        )
                                          )   Civil Action No. 3:06-cv-1087-WKW
v.                                        )
                                          )
CHATTAHOOCHEE VALLEY                       )
COMMUNITY COLLEGE (CVCC),                  )
et al.,                                   )
                                          )
    Defendants.                       )

### AFFIDAVIT OF DIXIE PETERSON

STATE OF ALABAMA          )
                          )
COUNTY OF RUSSELL         )

Before me, the undersigned notary public, personally appeared Dixie Peterson, who after having been identified to me and after having been sworn, deposed and testified as follows:

"My name is Dixie Peterson and I was the Division Chairperson and a member of the faculty in the Chattahoochee Valley Community College Nursing Program while Lindy Wright was a student in the Program. With respect to all decisions made by me and in my interaction with Ms. Wright, I exercised my professional judgment to the best of my ability. At all times, I worked within the line and scope of my authority as Division Chairperson and a member of nursing faculty at CVCC.

This Affidavit is given upon personal knowledge.

1

**EXHIBIT**

G

FURTHER, AFFIANT SAYETH NOT."

_Dixie Peterson_ (signature)

Dixie Peterson

STATE OF ALABAMA            )
                            )
COUNTY OF Russell           )

    I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that Dixie Peterson, whose name is signed to the foregoing, and who is known to me, acknowledged before me, on this day, that being informed of the contents of said document, she executed the same voluntarily on the day the same bears date.

    Given under my hand and seal this 15 day of October ,
2007.

[SEAL]                        _Christine E. Hill_ (signature)
                              NOTARY PUBLIC
                              My Commission Expires: 6/28/11

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: June 28, 2011
BONDED THRU NOTARY PUBLIC UNDERWRITERS

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

LINDY G. WRIGHT,                          )
                                          )
        Plaintiff,                        )
                                          )     Civil Action No. 3:06-cv-1087-WKW
v.                                        )
                                          )
CHATTAHOOCHEE VALLEY                      )
COMMUNITY COLLEGE (CVCC),                 )
et al.,                                   )
                                          )
        Defendants.                       )

## AFFIDAVIT OF DAVID N. HODGE

STATE OF ALABAMA          )
                          )
COUNTY OF RUSSELL         )

Before me, the undersigned notary public, personally appeared Dr. David N. Hodge,

who after having been identified to me and after having been sworn, deposed and testified

as follows:

"My name is David N. Hodge. I am the Dean of Student and Administrative Services

at Chattahoochee Valley Community College (hereinafter "CVCC"), a college in the

Alabama Department of Post-Secondary Education College system. I hold a Doctorate in

Education which I received from Auburn University in 2004. I started as Dean of Student

and Administrative Services at CVCC in March 2004. One of my responsibilities as Dean

is overseeing the Admissions Department. In that role, I oversee the processes of

application and admission, the maintenance of documentation concerning student

academic performance and the process of graduation, including student application for

1



graduation, school evaluation of student transcripts for completion of courses necessary for graduation and school notification to students concerning their graduation status. Also, as Dean of Student and Administrative Services, I administer certain CVCC policies such as the CVCC "Course Forgiveness" policy and others.

According to our catalog, a student must address a request for course forgiveness to the Dean of Students and Administrative Services. In this capacity, I reviewed a letter dated May 19, 2006 with Ms. Lindy Wright. I recall meeting and speaking with Lindy Wright on that one occasion. Attached to this Affidavit as Attachment "1" is a copy of the May 19, 2006 letter addressed and delivered to me by hand on that date by Ms. Wright. At the time Ms. Wright met with me, I was not personally familiar with her records or her progression in school.

On May 19, 2006, at 4:05 p.m., when Ms. Wright handed Attachment "1" to me, she and I discussed her request for "Course Forgiveness" regarding NUR 252. My handwriting appears in the bottom righthand corner of Attachment "1". This writing states, "Received, Friday, May 19, 4:05 p.m."

This meeting was held in my office at CVCC. I explained to Ms. Wright that I was not familiar with her specific situation. I discussed the general subject of "Course Forgiveness" with her as it is described in the Catalog and Student Handbook and as it is applied by CVCC. Attachment "2" to this Affidavit is a copy of page 52 of the 2004/2005 Catalog and Student Handbook and Attachment "3" is a copy of page 59 of the 2005/2006 Catalog and Student Handbook. The language on these two pages related to "Course Forgiveness" is identical. This is the language that defines "Course Forgiveness" for all purposes at CVCC. The 2004/2005 Catalog was applicable to Ms.

2

Wright because she entered the Nursing Program seeking an Associate Degree in Nursing in May 2005 which is the summer semester and the last semester of the 2004/2005 academic year.

The Catalog states, and I pointed out to Ms. Wright, that "Course Forgiveness" allows for the improvement of the cumulative grade point average by replacing a prior grade in a course with a subsequent grade in the same course awarded to a student upon retaking that course, but that the cumulative grade point average is the stated subject of the policy. I explained that "Course Forgiveness" does not take away a failing grade. It merely allows for the inclusion of a better grade in the same course, whether the prior grade was a failing grade or not for the purpose of calculating the student's cumulative grade point average. In Ms. Wright's May 19, 2006 letter, she makes the following statement,

> "The student handbook states, 'if [sic] a student repeats the [sic] course, the
>
> last grade awarded [sic] replaces the previous grade earned [sic]' (page 59)."

Ms. Wright quotes from the 2005/2006 Catalog. There are mistakes in her quotation. For example, the word "earned" is not found anywhere in the quoted sentence as the sentence appears in the Catalog. Ms. Wright stops her quotation at a crucial place in the Catalog's explanation of "Course Forgiveness". The sentence as quoted by Ms. Wright stops at and fails to include the following words at the end of the quoted sentence and her quote does not include the next sentence which is important to the meaning of "Course Forgiveness". The complete and accurate quotation from the Catalog regarding "Course Forgiveness" which begins with the sentence fragment quoted by Ms. Wright is as follows:

3

"If a student repeats a course, the last grade awarded (excluding grades of

W) replaces the previous grade in the computation of the cumulative grade

point average. The grade point average during the term in which the course

was first attempted will not be affected."

I explained to Ms. Wright that her failing grade in NUR 252 does not come off of her record,

even if one assumed "Course Forgiveness" was applicable.

The definition that Ms. Wright seeks to use for "Course Forgiveness" is not the

definition stated in the Catalog. Further, the Catalog, irrespective of whether one looks at

the 2004/2005 edition or the 2005/2006 edition states on page 56 (of the 2005/2006 edition

of the Catalog) (also found on a different page in the 2004/2005 edition of the Catalog)

under the heading "Grade Reports and Grade Point Averages," the following policy:

"Once grades have been recorded, they cannot be expunged from the

student's permanent record."

I also discussed with Ms. Wright the fact that "Course Forgiveness" may only be

used where the course numbers are identical. I explained to her that our computer does

not allow for the substitution of a course with a different number from a previously taken

course. However, since meeting with Ms. Wright, I have examined her record and I have

reviewed an email from Dixie Peterson, a copy of which is attached to this Affidavit as

Attachment __"4"__. In this email, Ms. Peterson, on January 17, 2006, stated the course

substitution procedure to be used regarding NUR 252 and NUR 200 for Ms. Wright and the

rationale for its use. The Admissions Department did not address the "substitution" of NUR

200 for NUR 252 pursuant to Ms. Peterson's January 17, 2006 email because Ms. Wright

4

did not proceed through the graduation process, but instead, was excluded from the Nursing Program because she failed two required courses - NUR 252 and NUR 272. Exclusion from the Nursing Program upon being awarded a failing grade in two nursing courses is a policy of the Nursing Program. If Ms. Wright had not been awarded the failing grade of "D" in two nursing courses and had otherwise satisfied all graduation requirements, pursuant to ADN policy, based upon these hypothetical assumptions, then NUR 200 would have been substituted for NUR 252 by way of a manual adjustment in Ms. Wright's record and if Ms. Wright had applied for "Course Forgiveness" in veiw of the above hypothetical assumptions, she would have been allowed "Course Forgiveness" as described previously in this Affidavit and in the Catalog. In other words, her grade in NUR 200 would have been used to calculate her cumulative GPA. However, under no circumstances would her failure in NUR 252 have been removed from her transcript or from consideration when applying various other CVCC and Nursing Program policies.

Course substitution was necessary because NUR 252, a required Nursing Program course, would not be offered again and because Ms. Wright was required to retake the NUR 252 course and make a passing grade. The purpose of this is to allow for the student to develop mastery of the course content. Course substitution allowed NUR 200 to be taken instead of NUR 252 and still satisfy Nursing Program policy regarding the retaking of a failed course. Course substitution does not erase a prior failing grade. NUR 252 remained on Ms. Wright's record. Further, Attachment 5 is a copy of the Authorization for Course Substitution signed by both Ms. Peterson and Dean Lowe. The fact that Ms. Wright was excluded from the Nursing Program in May 2006 upon failing the second

course caused the Admissions Department to stop all graduation processing activities regarding Ms. Wright to the extent that any had begun and, therefore, the issue related to NUR 200 was not pursued to a conclusion by the Admissions Department.

Ms. Wright was enrolled in a Professional Nursing curriculum which is officially titled Associate Degree in Nursing. This program is also called the Nursing Mobility Program. If Ms. Wright had graduated from CVCC, her degree would have been Associate of Applied Sciences, Associate Degree of Nursing. Ms. Wright did not qualify for graduation, however, because she was awarded a "D," which is a failing grade in the Nursing Program, in two different Nursing Program courses; NUR 252, "Adult Nursing II," and NUR 272, "Pediatric Nursing". Attachment __6__ to this Affidavit is a copy of the ADN Mobility Program Admissions Criteria and Requirements from the 2004/2005 Catalog. These criteria are identical in the 2005/2006 Catalog. The Nursing Program has policies and rules that other programs do not have. One of those rules is set forth in Item No. 14 of Attachment __6__ as follows:

> "The nursing student must complete the entire nursing program within twenty-four months of the date he/she began his /her studies in the program or be excluded from the nursing program. If a nursing student fails two different nursing courses within the twenty-four month period, he/she will be excluded from the program and CANNOT reapply. Exclusion from the nursing program does not constitute exclusion from the College."

This is the ADN policy in effect at the time with regard to Ms. Wright that precluded her from graduation in that program and that excluded her from further participation in the program. The current policy related to students who wish to attend a Nursing Program at CVCC after "two unsuccessful attempts" in the ADN or Mobility Program is attached hereto as Attachment __7__. This policy, entitled "The Alabama College System Nursing

6

Education Program Progression Policy" (specifically, item No. 12 on page 59), now governs Ms. Wright's eligibility to make application for admission to the Nursing Program at CVCC.

Attached to this Affidavit as Attachment ___8___ is a certified copy of Ms. Wright's official transcript at CVCC.

All decisions and actions made and taken by me regarding Ms. Wright in my role as Dean of Student and Administrative Services and in my role overseeing the Admissions Department were made in good faith and in the exercise of my professional judgment and within the line and scope of my authority as an employee in the above-described position at CVCC.

This affidavit is given upon personal knowledge.

FURTHER, AFFIANT SAYETH NOT."

_____
David N. Hodge

STATE OF ALABAMA          )
                          )
COUNTY OF Russell         )

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that David N. Hodge, whose name is signed to the foregoing, and who is known to me, acknowledged before me, on this day, that being informed of the contents of said document, he executed the same voluntarily on the day the same bears date.

Given under my hand and seal this 15 day of October _____,
2007.

[SEAL]                    _____
                          NOTARY PUBLIC
                          My Commission Expires: 6/28/11

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: June 28, 2011
BONDED THRU NOTARY PUBLIC UNDERWRITERS

May 19, 2006

Chattahoochee Valley Community College
Attn: Dean of Students
2602 College Drive
Phenix City, AL 36869

Dean Hodge,

    I would like to take this opportunity to ask for course forgiveness for Nursing 252. After researching the student handbook, I found that it is a student's responsibility to ask for course forgiveness. The student handbook states "if a student repeats a course, the last grade awarded replaces the previous grade earned" (Page 59). I was given the opportunity to take Nursing 200 this past semester to replace Nursing 252 due to the fact this class would not be offered again. Mrs. Dixie Peterson offered this class to me, along with another student, and stated that the grade earned in Nursing 252 would not be held against me. In turn, I have earned an A in Nursing 200. This allowed me to get the credit needed to graduate.

    I have since finished the last semester of the Associate Degree of Nursing program. Unfortunately, I earned a D in Pediatric Nursing. I am asking for course forgiveness so that I can participate in a summer class to earn the credit to finish this program.

Sincerely,

*Lindy Wright*

Lindy Wright

*6/29/06 – Course forgiveness not granted. There is no repeat of Nur 252, the exact same course.*

*Received Friday May 19, 4:05 pm*

ADMISSIONS
Received
MAY 2 2 2006
SCA

EXHIBIT
H
Att. 1

CVCC 000508

2.  After the third semester in which the student receives a grade of U in the same course, the student must appeal through the institution's appeal process before the student may be allowed to re-enroll in the course.

# ACADEMIC BANKRUPTCY

1.  A student may request in writing to the Dean of Student and Administrative Services to declare academic bankruptcy under the following conditions:

    a.  If fewer than three (3) calendar years have elapsed since the semester/term for which the student wishes to declared bankruptcy, the student may declare academic bankruptcy on all coursework taken during that one semester/term provided the student has taken a minimum of eighteen semester credit hours of coursework at the institution since the bankruptcy semester/term occurred. All coursework taken, even hours completed satisfactorily during the semester for which academic bankruptcy is declared will be disregarded in the cumulative GPA.

    b.  If three (3) or more calendar years have elapsed since the most recent semester/term for which the student wishes to declare bankruptcy, the student may declare academic bankruptcy on all coursework taken during a one to three semester/term provided the student has taken a minimum of eighteen semester hours of coursework at the College since the bankruptcy semester(s) occurred. All coursework taken, even hours completed satisfactorily, during the semester/term which academic bankruptcy is declared will be disregarded in the cumulative GPA.

2.  When academic bankruptcy is declared, the transcript will reflect the term Academic Bankruptcy for each semester/term affected. When academic bankruptcy is declared, the transcript will reflect the semester/term of its implementation and the transcript will reflect Academic Bankruptcy Implemented.

3.  A student may declare academic bankruptcy only once.

4.  Implementation of academic bankruptcy at an institution does not guarantee that other institutions will approve such action. This determination will be made by the respective transfer institution.

# CHANGE OF CURRICULUM OR PROGRAM OF STUDY

Students accepted and enrolled in a particular program of study who seek to pursue another program of study must meet the requirements for admission to the new program. A student should complete the necessary curriculum change form available at the Admissions Office, then see his/her advisor for an updated plan of study. Students who change their program of study will follow the program requirements of the current Catalog at the time of the program of study change.

# COURSE FORGIVENESS

1.  If a student repeats a course, the last grade awarded (excluding grades of W) replaces the previous grade in the computation of the cumulative grade point average. The grade point average during the term in which the course was first attempted will not be affected.

2.  When a course is repeated more than once, all grades for the course- excluding the first grade- will be employed in computation of the cumulative grade point average. Official records at the institution will list each course in which a student has enrolled.

3.  It is the student's responsibility to request of the Dean of Student and Administrative Services that the forgiveness policy be implemented.

4.  No course in which the last grade received was a "F" may be counted toward graduation. The student must be aware also that the last recorded grade may be regarded by a senior institution as the grade of record for transfer purposes.

EXHIBIT
H
Att. 2

'tables'

CVCC 000055

a.    If fewer than three (3) calendar years have elapsed since the semester/term for which the student wishes to declared bankruptcy, the student may declare academic bankruptcy on all coursework taken during that one semester/term provided the student has taken a minimum of eighteen semester credit hours of coursework at the institution since the bankruptcy semester/term occurred. All coursework taken, even hours completed satisfactorily during the semester for which academic bankruptcy is declared, will be disregarded in the cumulative GPA.

b.    If three (3) or more calendar years have elapsed since the most recent semester/term for which the student wishes to declare bankruptcy, the student may declare academic bankruptcy on all coursework taken during a one to three semester/term provided the student has taken a minimum of eighteen semester hours of coursework at the College since the bankruptcy semester(s) occurred. All coursework taken, even hours completed satisfactorily, during the semester/term in which academic bankruptcy is declared will be disregarded in the cumulative GPA.

2.    When academic bankruptcy is declared, the transcript will reflect the term *Academic Bankruptcy* for each semester/term affected. When academic bankruptcy is declared, the transcript will reflect the semester/term of its   implementation and the transcript will reflect *Academic Bankruptcy Implemented.*

3.    A student may declare academic bankruptcy only once.

4.    Implementation of academic bankruptcy at an institution does not guarantee that other institutions will approve such action. This determination will be made by the respective transfer institution.

# CHANGE OF CURRICULUM OR PROGRAM OF STUDY

Students accepted and enrolled in a particular program of study who seek to pursue another program of study must meet the requirements for admission to the new program. A student should complete the necessary curriculum change form available at the Admissions Office, then see his/her advisor for an updated plan of study. Students who change their program of study will follow the program requirements of the current Catalog at the time of the program of study change.

# COURSE FORGIVENESS

1.    If a student repeats a course, the last grade awarded (excluding grades of W) replaces the previous grade in the computation of the cumulative grade point average. The grade point average during the term in which the course was first attempted will not be affected.

2.    When a course is repeated more than once, all grades for the course- excluding the first grade- will be employed in computation of the cumulative grade point average. Official records at the institution will list each course in which a student has enrolled.

3.    It is the student's responsibility to request of the Dean of Student and Administrative Services that the forgiveness policy be implemented.

4.    No course in which the last grade received was a "F" may be counted toward graduation. The student must be aware also that the last recorded grade may be regarded by a senior institution as the grade of record for transfer purposes.

# INDEPENDENT STUDY

In certain unusual circumstances, the Dean of Instruction, upon recommendation of the Division Chairperson and instructor, may permit a student to take a course by independent study. Permission will be based on such factors as future course availability and the student's academic record. No student whose grade point average is below 2.0 will be permitted to take a course by independent

59



EXHIBIT
H
Att. 3

CVCC00566

## Heather Chalkley

**From:** Dixie Peterson
**Sent:** Tuesday, January 17, 2006 6:31 PM
**To:** Heather Chalkley
**Cc:** Saundra L. Noles; James Lowe; Sanquita Alexander
**Subject:** Lindy Wright

Heather,

I spoke with Lindy Wright today, and she is eligible after Dean Lowe's ruling, to return to the program. She will need to register for :Nursing 272, Nursing 279, Nursing 291, Nursing 292 and Nursing 200. I think she also has a non-nursing course to take to complete degree requirements by May. The Nursing 200 is a new course, and is being offered for the first time this semester. It is a course reserved for those new ADN students who will be admitted to our May, 2006 program. Since Ms. Wright's failure of Nursing 252 stands, it will be necessary for her to repeat that course to reach a grade of "C" or better. Since the new standardized curriculum will be implemented with the new RN class that enters in May, 2006, Nursing 252 will not exist in the new curriculum. Therefore, in order for Lindy to repeat the course in the most closely resembling manner to Nursing 252, I will allow her to register for Nursing 200 which we will substitute (by authorization of the Dean) for Nursing 252. This means that if Lindy passes everything for which she is registered in the spring of 2006, she could still possibly graduate in May, 2006.

Sanquita, I will be requesting of Dean Lowe to sign a substitution form for Nursing 200 to be accepted for Nursing 252, so Lindy will be registering for Nursing 200 to fulfill the 252 requirement. Has she filled out all graduation application forms?

Thanks,

Dixie

EXHIBIT
H
Att. 4

CVCC 000249

1/25/2006

# AUTHORIZATION FOR COURSE SUBSTITUTION

_Spring_____ Semester, 1~~99~~ 2006

STUDENT NAME _Lindy Wright_____

SOCIAL SECURITY NUMBER _254 / 49 / 7629_

MAJOR _ADN_____   DEGREE PROGRAM_____

COLLEGE CATALOG YEAR _FA 04_____

RATIONALE: _sfc per Ms Peterson_

Student failed Nur 252 in Fall 05. The new state wide curriculum takes effect in May 06. Nur 252 will not exist and the course content will actually be divided between numerous courses. NSG 200 is a combination of this course.

| COURSE(S) SUBSTITUTED | REPLACED COURSE(S) |
|---|---|
| _Nur 252_ _sfc per Ms Peterson_ | ~~New~~ _NSG 200_ |
| | |
| | |
| | |

STUDENT _____                DATE _____

ACKNOWLEDGED:

_signature_
FACULTY ADVISOR                DATE _1-24-06_

APPROVED:

_signature_
DEAN OF THE COLLEGE            DATE _1/26/06_

EXHIBIT
H
Att. 5

CVCC 000248

Semesters
F   SP
..........5
..........4
..........................4
..........................2
..........................3
..........................2
26      15

m will become
ass, admission
e information,

# NURSING CAREER
# MOBILITY PROGRAM (ADN)
## ADMISSIONS CRITERIA

1. Applicants must meet all the admission requirements to be admitted as a regular student to the College.

2. An Application for Admission to the Nursing Mobility Career program must be completed and submitted to the Nursing Office. Applications are available upon request. Testing dates will be announced in a letter to prospective students after the application process is complete.

3. Students must be Licensed Practical Nurses (LPNs) or recent graduates of an LPN program in order to apply for the Nurse Mobility program. Practical nurses must have three months of clinical work experience within the thirty-six-month period prior to beginning the program. Recent graduates of PN programs may apply provided that they commit to document 500 hours of work experience by the June date the program begins. All supporting documents must be in the student's file. All application material except transcripts should be sent to the Admissions Office. Nursing Division. Transcripts should be sent by the school attended to the Admissions Office. **It is the student's responsibility to verify that his/her transcript has been received by the Admissions Office.**

4. Applicants who meet the requirements specified in #1 and #2 will be invited to take the admission/validation tests on the dates specified for the tests. Failure to enroll after acceptance constitutes forfeiture of position, and the individual must repeat the entire admission process if he/she seeks admission at a future date.

5. The following factors will be considered in granting provisional admission to the program: scores on the admission/validation examination (50th percentile in Foundations, and a combined average of 40th percentile in Maternal-Child Nursing), employee reference letters, and a GPA of 2.00 on previous college coursework. To gain unconditional admission, students must successfully pass skills check-offs in addition to passing the admission/validation exam. These check-offs will be conducted in the Spring Semester prior to entering the program. Failure will result in forfeiture of position in the program.

6. Students must have completed the following three courses, with a grade of "C" or higher, preferably at the College, prior to beginning study in the nursing program. Individuals may transfer these courses from other accredited colleges.
   BIO 103 Principles of Biology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   ENG 101 English Composition I . . . . . . . . . . . . . . . . . . . . . . . 3
   PSY 200 General Psychology . . . . . . . . . . . . . . . . . . . . . . . . . 3
   Students must take diagnostic tests in writing, mathematics, and reading at least two semesters prior to beginning prerequisite coursework in order to allow for completion of any required coursework.

7. In the interest of student and patient safety and before consideration for admission, any applicant possessing certain limitations may be required to submit medical examination records and/or statements from physicians indicating that he/she is able to fully participate with reasonable accommodation, if necessary, in the approved program of clinical studies and responsibilities. **Students must be able to perform the essential functions of the program.**

8. Evidence of current CPR certification, health insurance, and malpractice coverage as a nursing student must also be submitted to the Nursing Division. Malpractice insurance application forms are available upon request in the Nursing Division. If the student does not supply these documents to the Nursing Division by the established deadline, admission to the program will be denied.

105

**EXHIBIT**
**H**
Att. 6

tabbies

CVCC 000267

9. Once a student is admitted to the Nursing Mobility program, he/she will be responsible for accurately following the admissions criteria and the nursing curriculum design. Failure to follow the curriculum design as represented may affect progression in the program.

10. Once provisionally admitted to the program, the student must complete all coursework at the College unless written approval is obtained from the Division Chairperson and the Dean of Instruction.

11. Students enrolled in the Nursing Mobility program must earn a "C" or higher in all required courses in the nursing curriculum, in both nursing and non-nursing courses. This includes satisfactory completion of the clinical components of each course. Failure of clinical components results in failure of the course.

12. Nursing courses 131, 242, and 251 may be taken only once. A student who fails to earn a "C" in any one of these courses must reapply to the nursing program. If a student fails to earn a "C" in two or more of the courses listed above, he/she will be excluded from the program and unable to reapply.

13. Nursing courses NUR 252, 271, 272, 279, 291, and 292 may be repeated only once and are to be taken the next semester a course is offered provided space is available. If the student does not pass the nursing course on the second attempt, that student shall be excluded from the nursing program, but not the College. Students who repeat 252, 271, 272, 291, and 292 will be encouraged to successfully complete review packets for each course before retaking.

14. The nursing student must complete the entire nursing program within twenty-four months of the date he/she begin his/her studies in the program or be excluded from the nursing program. If a nursing student fails two different nursing courses within the twenty-four-month period, he/she will be excluded from the program and CANNOT reapply. Exclusion from the nursing program does not constitute exclusion from the College.

15. Withdrawal from nursing courses will be considered as failure (except in extenuating circumstances as determined by the Division Chairperson). The student must be passing at the time of the withdrawal for the circumstance to be considered.

16. An Incomplete (I) in nursing courses will be given only in extreme extenuating circumstances (i.e., hospitalization of student, death of a student's immediate family member, or hospitalization of the student related to pregnancy) and is at the discretion of the instructor and Nursing Division Chairperson). Incompletes are not intended for students who are failing nursing courses.

17. Nursing and non-nursing courses are to be taken in sequence as shown by the nursing curriculum design in this Catalog. When non-nursing courses are failed with a "D" or an "F", the student must repeat the courses the next semester they are offered, provided space is available. The student must be aware that if a grade of "D" or "F" is made in a non-nursing course that is a prerequisite to a nursing course the following semester, he or she may not advance to the next nursing course.

18. Each student is responsible for mailing his/her own application to the Board of Nursing in the state in which he/she is applying for initial licensure, as well as to NCLEX. Each student is responsible for mailing the application and meeting any deadlines that the Board may announce.

19. Transfer credit from other nursing programs is occasionally granted, and is done on an individual basis. A student who has been enrolled previously as a nursing student at another institution may be considered for admission after the application filing deadline date if time and space permit, but no guarantee of admission is granted. All applicants must take the entrance/validation examinations and meet all program requirements.

106

CVCC 000268

20. In addition to the above specification, students in the Nursing Mobility program must fulfill the same requirements and regulations expected of all students who are admitted to the College and outlined in the Nursing Student Handbook.

21. Applicants requiring reasonable accommodations under the Americans with Disabilities Act (ADA) are encouraged to call the ADA Coordinator at 214-4845 (Americans with Disabilities Act Compliance Plan, IV.)

*Special Costs for Nursing Students**

Liability Insurance (required)
Nursing Pin (optional)
Uniform (required)
Board of Nursing Licensure Fee
NCLEX Fee
NLN Examinations (required per semester and included in Registration Costs)
Nursing Validation Examination and Clinical Testing (required)
Health Insurance (individual rates required)
Physical (required)
Hepatitis B vaccinations (optional but highly encouraged)

*Costs for these items vary. For specific costs, the student should consult the Division Chairperson of Health Sciences.

107

CVCC 000269

# Catalog and Student Handbook
# 2007-2008
# Chattahoochee Valley Community College

**2602 College Drive • Phenix City, Alabama 36869 • 334-291-4900**

## Accreditation

Chattahoochee Valley Community College is accredited by the Commission on Colleges of the Southern Association of Colleges and Schools (1866 Southern Lane, Decatur, Georgia 30033-4097/Telephone: 770-679-4501) to award the Associate in Arts, Associate in Science, and Associate in Applied Science degrees.

The Associate Degree Nursing (RN) is accredited by the National League for Nursing Accrediting Commission, 61 Broadway, New York, NY 10006, Telephone number 212-363-5555, ext. 153.

The Practical Nursing and Associate Degree Nursing Programs are approved by the Alabama State Board of Nursing

## Member of

Alabama College Association
League of Innovation
American Association of Community Colleges
National Council for Workforce Education

This *Catalog and Student Handbook*, effective September 1, 2007, is for information only and does not constitute a contract. The College reserves the right to change, without notice, policies, fees, charges, expenses, and costs of any kind, and further reserves the right to add or delete any course offerings or information in this *Catalog and Student Handbook*.

Policy statements and program requirements in this catalog are subject to change. Except when changing their programs of study, students may follow requirements of the Catalog under which they enter the College for a period of four years. If they have not completed their programs of study, they must change to the current catalog. Exceptions must be approved by the Dean of Student and Administrative Services. When students change their programs of study, they must change to the Catalog that is current at the time of the program changes.



EXHIBIT
H
Att. 7

## Academic standards of progress for Nursing students

### The Alabama College System Nursing Education Program Progression Policy

Please note that these policies are subject to revision by the Alabama College System.

In order to continue in the nursing program, the student must:

1. Maintain a grade of C or better in all required general education and nursing courses and maintain a 2.0 cumulative GPA.

2. Unless previously completed, students must complete all required general education courses according to The Alabama College System Nursing Education curriculum. Exceptions must be approved by the nursing program director.

3. Be acceptable by clinical agencies for clinical experiences.

4. Maintain ability to meet essential functions for nursing with or without reasonable accommodations.

5. Students must successfully complete the nursing education program:
   a. Within 48 months from initial enrollment in courses with an NUR prefix for ADN students; or
   b. Within 24 months from initial enrollmentin courses with an NUR prefix for PN students.
   c. Within 24 months from initial enrollment in NUR201 for Mobility students.

6. Maintain current CPR at the health care provider level.

7. A student that has an unsuccessful attempt in a nursing course (W,D, or F) cannot progress until the course is completed successfully. Course repetition will be based on instructor availability and program resources.

8. Students whose progression through the nursing program is interrupted and who desire to be reinstated in the program must schedule an appointment with a nursing faculty advisor to discuss reinstatement. In order to be eligible for reinstatement, the following criteria must be met:
   a. Students must apply for the nursing program and readmission to the college if not currently enrolled;
   b. Requests must be received by published deadline;
   c. Students must request reinstatement within one year from the term of withdrawal or failure;
   d. Students must adhere to nursing curriculum and/or program policies and procedures effective at the point of reinstatement.

9. Withdrawal and/or a D or F in one or more nursing courses in a term is considered one unsuccessful attempt.

10. A total of two unsuccessful attempts (D, F, or withdrawal) in the nursing program will result in dismissal.

11. If a student has been unsuccessful in the associate degree nursing program, the student may apply for admission to the practical nursing program. If a student has been unsuccessful in the mobility program, the student may apply for admission to the generic program.

---

CVCC00894

12. Students who have two unsuccessful attempts in a specific program (ADN/PN/Mobility) may apply for admission as a new student to any nursing program within the Alabama College system, provided:
   a. the student meets current entry requirements;
   b. at least two years have elapsed since the student's dismissal from a specific program, and
   c. the student was not dismissed from the previous program for disciplinary reasons or for unsafe/unsatisfactory client care in the clinical area.

### Reinstatement policy

1. Students whose progression through the nursing program is interrupted and who desire reinstatement in the program must schedule an appointment with a nursing faculty advisor to discuss reinstatement. Students must meet the following criteria :
   a. Students must apply for the nursing program and readmission to the college if not currently enrolled;
   b. Requests must be received by published deadline;
   c. Students must request reinstatement within one year from the term of withdrawal or failure;
   d. Students must adhere to nursing curriculum and/or program policies and procedures effective at the point of reinstatement.
2. Reinstatement to the nursing program is not guaranteed. Selection for reinstatement is based on GPA at the current institution and space availability. Reinstatement will be denied due to, but not limited to, any of the following circumstances:
   a. Grade point average is less than 2.0 from courses completed at the current institution;
   b. Refusal by clinical agencies to accept the student for clinical experiences;
   c. Twelve months have elapsed since the student was enrolled in a nursing course;
   d. Student has been dismissed from the program.
3. Students dismissed from the previous program for disciplinary reasons and/or unsafe/unsatisfactory client care in the clinical area will not be allowed reinstatement to the nursing program.

### Transfer policy

**Please note that these policies are subject to revision by the Alabama College System.**

The transfer policy applies only to students desiring to transfer between Alabama College System institutions. It does not apply to students wishing to transfer from other institutions.

Must meet minimum admission standards for the nursing program.

1. Must possess a grade of C or better in all general education taken at another institution and possess a minimum of a 2.5 cumulative GPA at time of transfer.
2. Students must successfully complete the program:
   a. Within 48 months from initial semester for ADN students or;
   b. Within 24 months from initial semester for PN and Mobility students.
3. Must be a student in good standing and eligible to return to the previous nursing program.
4. Provide a letter of recommendation from the Dean/Director of the previous program.

CVCC00895

5. Complete at least 25 percent of the total program at the accepting institution.

6. Acceptance of transfer students into nursing programs is limited by the number of faculty and clinical facilities available. Meeting minimal standards does not guarantee acceptance.

## Academic standards of progress for veterans

CVCC will certify only veterans who are making "satisfactory progress" toward the completion of the selected program of study, according to the standards of satisfactory academic progress that apply to all students.

Students are making satisfactory progress in a course when they are attending classes regularly and attempting to complete the course requirements, as stipulated by the instructor. Class attendance alone is not sufficient for satisfactory progress in a course.

## Veterans' class attendance

Students are expected to attend and be on time for all classes for which they are registered. Instructors are required to maintain accurate attendance records. Instructors must explain their absence and makeup policies to students and provide written guidelines; however, the student is responsible for knowing specific attendance requirements and for satisfactory makeup requirements as prescribed by the written guidelines. The individual course syllabus should state if, and under what conditions, missed classes, laboratories, or clinicals can be made up.

## Withdrawal from class for veterans

A veteran student who withdraws from a class or classes after the official drop/add period may be required to reimburse the College for tuition and fees charged since the first day of classes. This determination is made by the Veterans Administration.

## Transfer of credits

Transfer students must furnish the official transcript(s) of all work attempted at all other institutions unless they have completed the baccalaureate degree. An applicant who has completed the baccalaureate degree is required to submit only the transcript from the institution granting the baccalaureate degree. However, the applicant may submit transcripts from other institutions attended if he/she wishes consideration of those credits for purposes of transferability.

Transferability of credits will be determined in the following manner:

1. If a student has a 2.0 cumulative grade point average in all previous college work attempted, all passing grades will be accepted if they are comparable to CVCC courses.

2. If the student's cumulative grade point average is below 2.0 (C), only credits in which a grade of "C" or better was earned will be accepted.

3. Of the credits accepted, only those that are applicable to the student's chosen curriculum may be used for purposes of meeting program and graduation requirements.

4. Students who have satisfactorily completed required English and mathematics courses will not be required to take the COMPASS Placement Test at CVCC.

CVCC00896

A BLACK & WHITE DOCUMENT IS NOT OFFICIAL

CHATTAHOOCHEE VALLEY COMMUNITY COLLEGE

2602 COLLEGE DRIVE
PHENIX CITY, ALABAMA 36869

(334) 291-4900    FAX (334) 291-4994
FICE CODE: 012182

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                                                    10/15/2007
SSN/ID: _____    DATE OF BIRTH: 01/28/1971                  PAGE : 1

| COURSE NO | COURSE NAME | GRADE | CR HRS | QPTS |
|---|---|---|---|---|
| | **PRIOR COLLEGE** | | | |
| 2005-2006 CVCC | | | | |
| | TRANSFER AND OTHER CREDIT | | | |
| | ACCEPTED | | | |
| FROM: CVCC | | | | |
| NUR111 2 | FUNDAMENTALS OF NURS | A | 4.000 | SemHr |
| NUR121 | CLINICAL NURSING SKI | A | 2.000 | SemHr |
| NUR201 2 | SPECIALIZED AREA OF | A | 1.000 | SemHr |
| NUR203 | SPECIALIZED AREA OF | A | 2.000 | SemHr |
| NUR204 4 | SPECIALIZED AREA OF | A | 1.000 | SemHr |
| NUR241 | BASIC PHARMACOLOGY | A | 1.000 | SemHr |
| | ─── 1998-1999 SUMMER ─── | PRO/DPT: LIB AA | | |
| CIS146 | MICROCOMPUTER APPLICATIONS | B | 3.000 | 9.000 |
| | AHRS | DHRS | EHRS | QPTS GPA |
| CUR | 3.000 | 3.000 | 9.000 3.000 |
| CUM | 3.000 | 3.000 | 9.000 3.000 |
| | ─── 1999-2000 FALL ─── | PRO/DPT: LIB AA | | |
| ENG093 | BASIC ENGLISH II | S | 3.000 | |
| MTH090 | BASIC MATHEMATICS | S | 3.000 | |
| | AHRS | DHRS | EHRS | QPTS GPA |
| CUR | 6.000 | | | |
| CUM | 6.000 | 3.000 | 3.000 9.000 3.000 |
| | ─── 1999-2000 SPRING ─── | PRO/DPT: LIB AA | | |
| ENG101 | ENGLISH COMPOSITION SKILLS I | A | 3.000 | 12.000 |
| ENG102 | ENGLISH COMPOSITION II | B | 3.000 | 9.000 |
| | ELEMENTARY ALGEBRA | S | 3.000 | |
| PSY100 | ORIENTATION | B | 1.000 | 3.000 |
| | AHRS | DHRS | EHRS | QPTS GPA |
| CUR | 3.000 | 7.000 | 7.000 24.000 3.429 |
| CUM | 9.000 | 10.000 | 10.000 33.000 3.300 |
| **\*\*\* NO FURTHER ENTRIES THIS COLUMN \*\*\*** | | | | |

| COURSE NO | COURSE NAME | GRADE | CR HRS | QPTS |
|---|---|---|---|---|
| | ─── 1999-2000 SPRING ─── (CONTINUED) | | | |
| | ─── 2000-2001 FALL ─── | PRO/DPT: LIB AA | | |
| BIO103 | PRINCIPLES OF BIOLOGY I | C | 4.000 | 8.000 |
| PSY200 | GENERAL PSYCHOLOGY | B | 3.000 | 9.000 |
| | AHRS | DHRS | EHRS | QPTS GPA |
| CUR | 7.000 | 7.000 | 17.000 2.429 |
| CUM | 9.000 | 17.000 | 17.000 50.000 2.941 |
| | ─── 2000-2001 SUMMER ─── | PRO/DPT: LIB AA | | |
| LPN113 | BODY STRUCTURE FUNC/MED VOCABU | B | 4.000 | 12.000 |
| | AHRS | DHRS | EHRS | QPTS GPA |
| CUR | 4.000 | 4.000 | 12.000 3.000 |
| CUM | 9.000 | 21.000 | 21.000 62.000 2.952 |
| | ─── 2001-2002 FALL ─── | PRO/DPT: LPN CER | | |
| LPN104A | PHARMACOLOGY | B | 2.000 | 6.000 |
| LPN105A | FUNDAMENTALS OF NURSING | B | 6.000 | 18.000 |
| | AHRS | DHRS | EHRS | QPTS GPA |
| CUR | 8.000 | 8.000 | 24.000 3.000 |
| CUM | 9.000 | 29.000 | 29.000 86.000 2.966 |
| | ─── 2001-2002 SPRING ─── | PRO/DPT: LPN CER | | |
| LPN124A | FAMILY CENTERED NURSING | C | 6.000 | 12.000 |
| LPN152 | ADULT NURSING IV | C | 8.000 | 16.000 |
| | AHRS | DHRS | EHRS | QPTS GPA |
| CUR | 14.000 | 14.000 | 28.000 2.000 |
| CUM | 9.000 | 43.000 | 43.000 114.000 2.651 |
| | ─── 2001-2002 SUMMER ─── | PRO/DPT: LPN CER | | |
| LPN101 | EMERGENCY FIRST AID | B | 2.000 | 6.000 |
| LPN118 | MENTAL HEALTH CONCEPTS | C | 2.000 | 4.000 |
| LPN140 | NCLEX PN EXAM REVIEW | A | 2.000 | 8.000 |
| LPN142 | ADULT NURSING III | C | 7.000 | 14.000 |
| LPN145A | CURRENT ISSUES/ROLE TRANSITION | C | 2.000 | 4.000 |
| **\*\*\* TRANSCRIPT CONTINUED NEXT PAGE \*\*\*** | | | | |

EXHIBIT
H
Att. 8

David N. Hodge, Ed.D.
Dean of Student & Admin

THE NAME OF THE COLLEGE APPEARS IN BLUE ACROSS THE FACE OF THIS 8½ x 11 DOCUMENT

A BLACK & WHITE DOCUMENT IS NOT OFFICIAL

CHATTAHOOCHEE VALLEY COMMUNITY COLLEGE

2602 COLLEGE DRIVE
PHENIX CITY, ALABAMA 36869

(334) 291-4900   FAX (334) 291-4994
FICE CODE: 012182

LINDY G WRIGHT                         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                        10/15/2007
STUID: 2453843                    DATE OF BIRTH: 01/28/1971                PAGE : 2

| COURSE NO | COURSE NAME | GRADE | CR HRS | QPTS |
|---|---|---|---|---|

--- 2001-2002 SUMMER -- (CONTINUED)                    --- 2005-2006 FALL --- (CONTINUED)
                                                        NUR PROG EXCLUSION

|  | AHRS | DHRS | EHRS | QHRS | QPTS | GPA |
|---|---|---|---|---|---|---|

CUR        15.000  15.000          36.000 2.400
CUM    9.000 50.000  50.000        150.000 2.586

--- 2003-2004 SUMMER ---    PRG/OPT: LIR AA
ART100  ART APPRECIATION           W   3.000
BIO201  HUMAN ANATOMY & PHYSIOLOGY I  W  4.000
MTH100  INTERMEDIATE COLLEGE ALGEBRA  W  3.000
WITHDRAWN

CUR
CUM    9.000 50.000  50.000        150.000 2.586

--- 2004-2005 SPRING ---    PRG/OPT: LIR AA
BIO201  HUMAN ANATOMY & PHYSIOLOGY I   C  4.000   8.000
BIO202  HUMAN ANATOMY & PHYSIOLOGY II  B  4.000  12.000

CUR        8.000   8.000          20.000 2.500
CUM    9.000 66.000  66.000        170.000 2.576

--- 2004-2005 SUMMER ---    PRG/OPT: ADN AAS
MTH100  INTERMEDIATE COLLEGE ALGEBRA  C  3.000   6.000
NUR131  HEALTH ASSESSMENT            B  1.000   3.000
NUR242  ADVANCED PHARMACOLOGY        C  2.000   4.000
NUR251  ADULT NURSING I              C  5.000  10.000

CUR        11.000  11.000         23.000 2.091
CUM    9.000 77.000  77.000       193.000 2.506

--- 2005-2006 FALL ---    PRG/OPT: ADN AAS
BIO220  GENERAL MICROBIOLOGY         A  4.000  12.000
NUR252  ADULT NURSING II             D  5.000   5.000
NUR271  MATERNAL-NEWBORN NURSING     C  4.000   6.000

*** NO FURTHER ENTRIES THIS COLUMN ***

CUR        13.000  13.000         25.000 1.923
CUM    9.000 90.000  90.000       218.000 2.422

--- 2005-2006 SPRING ---    PRG/OPT: ADN AAS
ART100  ART APPRECIATION             A  3.000  12.000
NUR200  NURSING CAREER MOBILITY ASSESS  A  6.000  24.000
NUR272  PEDIATRIC NURSING            D  4.000   4.000
NUR279  CONCEPTS OF PSYCHOLOGICAL NURS  B  2.000   6.000
NUR291  TRANSITION/NURSING PRACTICE   A  3.000  12.000
NUR292  NURSING LICENSURE EXAM REVIEW  B  2.000   6.000
WKO101  WORKPLACE SKILL DEVELOPMENT   S  1.000
NUR PROG EXCLUSION

CUR        1.000  20.000  20.000   64.000 3.200
CUM    10.000 110.000 110.000     282.000 2.564

--- DEGREES EARNED ---
PRACTICAL NURSING
CERTIFICATE
CERTIFICATE
  Grad Date: 08/09/2002   Grad Term: SU2002
  Req Met Date: 08/09/2002 Term Req Met: SU2002

*****   END OF ACADEMIC RECORD   *****

David N. Hodge, Ed.D.
Dean of Student & Admin

THE NAME OF THE COLLEGE APPEARS IN BLUE ACROSS THE FACE OF THIS 8½ x 11 DOCUMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

LINDY G. WRIGHT,            )
                                 )
      Plaintiff,          )
                                 )
v.                       )    Civil Action No. 3:06-cv-1087-WKW
                               )
CHATTAHOOCHEE VALLEY   )
COMMUNITY COLLEGE (CVCC), )
et al.,                   )
                               )
      Defendants.      )

## AFFIDAVIT OF LAUREL BLACKWELL

STATE OF ALABAMA      )
                             )
COUNTY OF RUSSELL      )

Before me, the undersigned notary public, personally appeared Dr. Laurel Blackwell, who after having been identified to me and after having been sworn, deposed and testified as follows:

"My name is Laurel Blackwell and I am the President of Chattahoochee Valley Community College. I hold a EdD in Administration of Higher Education. I do not usually get involved in student problems or complaints. However, I met with Lindy Wright one time. I do not remember when or what was said, but she came to my office without an appointment and waited until I could see her. That is the only thing I had to do with Lindy Wright's complaint until her attorney wrote to me sometime in the summer of 2006. I did gather information from various individuals to make a response to the attorney.

Attached to this Affidavit is a copy of the *Curriculum Vitae* of Tawyna Cash. Ms.

1



Cash was hired as an adjunct instructor on a part-time basis. She was employed as a full-time nursing instructor at Southern Union State Community College at that time. We had two sudden resignations of nursing instructors after classes started August 2005. It was difficult to find qualified instructors for the two courses being taught by these faculty members who resigned, but we were able to find highly-qualified instructors, including Tawyna Cash and, of course, Lynn Harris.

Of the very small amount of activity by me in this matter, most of which related to the response to an attorney's letter, I exercised my judgment as an administrative professional, and at all times, worked within the line and scope of my authority as President of Chattahoochee Valley Community College.

This affidavit is given upon personal knowledge.

FURTHER, AFFIANT SAYETH NOT."

_Laurel M Blackwell_
Laurel Blackwell

STATE OF ALABAMA          )
                          )
COUNTY OF Russell         )

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that Laurel Blackwell, whose name is signed to the foregoing, and who is known to me, acknowledged before me, on this day, that being informed of the contents of said document, she executed the same voluntarily on the day the same bears date.

Given under my hand and seal this _15th_ day of _October_ , 2007.

[SEAL]                         _Deborah Lynn Boone_
                               NOTARY PUBLIC
                               My Commission Expires: _6/13/11_

2

# CURRICULUM VITA

| | |
|---|---|
| **Name:** | Tawyna Rene Cosper Cash |
| **Current Address:** | 2500 County Road 222<br>Lanett, Alabama 36863 |
| **Telephone Number:** | (334) 499-2411<br>(334) 745-6437 ext 5539 |
| **E-Mail:** | tcash@suscc.cc.us<br>tcash@hotmail.com |
| **Licensure:** | Alabama Board of Nursing – RN<br>Georgia Board of Nursing  -- RN |
| **Certification:** | BCLS Instructor<br>NRP Instructor<br>PALS Provider<br>Certified Childbirth Educator- CCE<br>International Board Certified Lactation Consultant- IBCLC |

| **Professional Education :** | 2002 | Troy State University | MSN |
|---|---|---|---|
| | 1983 | UAB – SON | BSN |

| **Professional Experience:** | 2000- Present | Southern Union State Community College | Nursing Faculty |
|---|---|---|---|
| | 1996- 2000 | Randolph County Hospital | Patient/Staff-Educator<br>OB Nurse Mgr.<br>Employee Health |
| | 1989- 1996 | Hospice | Staff Nurse/ Educator |
| | 1988- 1989 | Central Alabama Home Health | Staff RN |
| | 1986- 1988 | Lanier Health Services | OB Staff Nurse |
| | 1983- 1986 | West Georgia Medical  Center | OB Staff/Charge |

| | |
|---|---|
| **Professional Organizations:** | National League for Nursing<br>Sigma Theta Tau  (upon graduation from BSN program) |
| **Honors/Awards:** | Graduated from BSN program with Sigma Theta Tau honors. |
| **Research/Publications/ Grants:** | |
| **Continuing Education:** | Continuing Education (10/1999 – 9/2002): |

Continuing Education (10/1999 – 9/2002):

3/19/2002 -  Enhancing Interpersonal Relationships Seminar – Southern Union State Community College – Opelika, Alabama.

2/21/2002 -  Progress in OB/GYN – Birmingham, Alabama.

9/29/2001-  LaLeche League International Lactation Specialist  Workshop- Nutrition & Distressed Infant Behaviors. LLI - Atlanta, Georgia.

8/01/2001    Making A Difference: Alabama Organ Center Lanier Health Services – Valley, Alabama.

6/21/2001    Insulin Resistance: Cardiovascular Risks & Therapeutic Interventions. Tele-conference- Lanier Health Services – Valley, Alabama.

3/2001       BCLS Instructor Update- East Alabama Medical Center – Opelika, Alabama.

3/21/2001    Vascular Access Devices- Lanier Health Services- Valley, Alabama.

8/04/2000    Breastfeeding Conference- Teaming Up For Success –Columbus Regional Medical Center Columbus, Georgia.

2/29/2000    Pain Assessment & Analgesics- East Alabama Medical Center- Opelika, Alabama.

2/24/2000    Basic Spanish Survival Skills for Health Care – Randolph County Hospital – Roanoke, Alabama.

11/05/1999  12 Lead EKG Class – Randolph County Hospital- Roanoke, Alabama.

| | |
|---|---|
| | 11/02/1999  Perinatal Care: The New Frontier – Columbus Regional Medical Center- Columbus, Georgia.<br><br>10/12/1999  Natural Rubber Latex Allergy – Randolph County Hospital – Roanoke, Alabama. |
| **Community Activities:** | Instructor for CPR<br>Community Childbirth Education<br>Community resource person for lactation concerns.<br>Assist with health fairs and career days.<br>Advocate of health promotion and health screening in church and community. |

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | |
|---|---|
| **LINDY G. WRIGHT,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No. 3:06-cv-1087-WKW** |
| **v.** ) | |
| ) | |
| **CHATTAHOOCHEE VALLEY** ) | |
| **COMMUNITY COLLEGE (CVCC),** ) | |
| ***et al.,*** ) | |
| ) | |
| **Defendants.** ) | |

<u>**AFFIDAVIT OF LYNN HARRIS**</u>

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| COUNTY OF RUSSELL | ) |

Before me, the undersigned notary public, personally appeared Lynn Harris, who after having been identified to me and after having been sworn, deposed and testified as follows:

"My name is Lynn Harris. I am currently the Nursing Department Chairperson at Chattahoochee Valley Community College (hereinafter "CVCC"), a State college under the supervision of the Alabama Department of Post-Secondary Education.

"I attended LaGrange College in LaGrange, Georgia where I received my Associate Degree in Nursing in 1980. In 1983, I received a Bachelor of Arts in Psychology at LaGrange College. In 1984, I received my Bachelor of Science in Nursing from the Medical College of Georgia in Augusta, Georgia. In 1985, I completed my Master of Science in Nursing at the Medical College of Georgia. In 1999, I received my Post Master Nurse Practitioner at the Medical College of Georgia.



"From 1987 until 1992, I taught at Southern Union State Community College in Valley, Alabama, as an instructor in their Nursing Program. As part of my duties during my four years at Southern Union, I designed the nursing curriculum; assisted with the redesign of course content, syllabi, tests, and clinical evaluation tools for this newly acquired practical nursing program; and developed course syllabi, class objectives, goals and lectures for the classroom.

"From 1993 until 1995, I worked at LaGrange College as the Student Health Nurse and as an instructor in the Nursing Program. My duties included performing student assessments and making appropriate referrals of students to community medical services, designing education programs to meet student health needs, and providing lectures and clinical supervision for nursing students.

"In 1995, I took a job with West Georgia Health Systems as manager of both inpatient and outpatient psychiatric programs for adolescents, adults and geriatric patients. My duties included developing budgets for the programs at this facility; assisting with making presentations; developing educational programs for families, clients, staff and the community; designing quality improvement programs for services provided to clients; designing an after-school drug and alcohol treatment program for adolescent clients; acting as liaison for community service and support groups; and evaluating staff on-the-job performance and competency.

"From 1998 until 1999, I worked as a Staff Nurse in the Emergency Department of the West Georgia Health Systems while working on my Post Master Degree. In 1999, I returned to Southern Union Community College as the Chair of the Nursing Department and as an Instructor in the Nursing Department. As Chair of this Department, I assisted with the PN and ADN curriculum design; participated in NLNAC accreditation site visits;

Page 2 of 19

assisted instructors with the development of course content lists, creation of syllabi, and clinical evaluation tools; developed class schedules for nursing courses; interviewed and hired clinical adjunct faculty to do clinical rotations; negotiated with medical facilities to schedule student clinical experiences; prepared annual nursing reports for accrediting agencies; and provided lectures and clinical supervision to students as well as evaluations of students' performance academically and clinically to ensure that they met nursing education and safety standards.

"I left Southern Union at the end of 2004, and took a job as a clinical educator at West Georgia Health Systems and worked at this job until December of 2005. While at West Georgia, I was asked to come and teach as an instructor in the CVCC Nursing Program. Before beginning at CVCC, I had acquired twelve years of teaching experience in Nursing Programs and as indicated, had been Chair of a Department of Nursing for five years.

"I first started working at CVCC as an instructor in the Fall of 2005 teaching NUR 252, Adult Nursing II. I was hired to replace Ms. Brenda Bellamy who had been a full-time nursing faculty member at CVCC. It is my understanding that Ms. Bellamy resigned after classes began meeting in the Fall 2005 semester.

"During the Fall 2005 Semester, students in NUR 252 met for classroom instruction under my direction every Wednesday. I have attached a copy of the academic calendar for the Fall 2005 semester as Harris Attachment "1", Bates I.D. # CVCC00527-529. According to this calendar, classes started on August 22, 2005. The first classroom meeting of NUR 252 would have occurred on Wednesday, August 24, 2005 under the instruction of Brenda Bellamy. I started teaching the class on Wednesday, September 14, 2005.

Page 3 of  19

"It was during my instruction of NUR 252 that I first met Lindy Wright. At that time, Ms. Wright was one of the students in NUR 252.

"Because the students in NUR 252 had already started the course under the syllabus provided by Ms. Bellamy, I determined that I would use that same syllabus for this course. The NUR 252 Classroom Syllabus is Exhibit "C" in the Book of Exhibits. The Clinical Syllabus for NUR 252 is Exhibit "D" in the Book of Exhibits. As I will later explain, I did modify some of the types of graded assignments listed on the Classroom Syllabus.

"NUR 252 was comprised of classroom instruction each Wednesday and a clinical component in which students received hands-on instruction at a medical facility. In order to make a passing grade in this course, each student in NUR 252 was required to meet or exceed the minimum requirements of both the classroom portion of the course and the clinical portion of the course. A failure to meet or exceed the minimum requirements resulted in a failure in the course.

"As part of the Clinical component of the class, the students were required to create and turn in Nursing Care Plans. The grading scale for the Nursing Care Plans is attached to the NUR 252 Clinical Syllabus. (See Exhibit "D", Book of Exhibits, Bates I.D. #Wright00112.)

"The NUR 252 Classroom Syllabus, Exhibit "C", Book of Exhibits, clearly described the course and required the students to obtain two textbooks. In addition to the required textbooks, the students were also given a list of recommended textbooks for further study and reference. One of the essential course functions stated on pages 3 and 4 of the NUR 252 Classroom Syllabus, is the following: "must be able to correctly perform simple mathematical computations for administering drugs." Section VI of the Syllabus, pp. 4-5,

clearly states that for satisfactory completion of NUR 252 the student must, in the professional judgment of the instructor, have a reasonable mastery of fourteen specifically described competencies. Section VII (p. 5) of the Syllabus lists nine course requirements for NUR 252 and indicate, among other requirements, that a student must satisfactorily complete the medication dosage calculation exam and take an NLN Examination at the end of the semester.  The sentence at the top of page 7 of the Syllabus states the following:

> As indicated in the philosophy of Chattahoochee Valley Community College, the student shares responsibility with faculty for open and mature inquiry in the classroom.  Students are expected to conduct themselves in the classroom in a manner that facilitates their learning and that of others.  The instructor can order the temporary removal or exclusion from class any student who engages in disruptive conduct or conduct in violation of the rules and regulations of the College.

(See Exhibit "C", Book of Exhibits, Bates I.D. #Wright00119.)

The teaching methods are defined on this page of the Syllabus as are the evaluation methods.  The term "self-directed study" is a fancy phrase for what most people call homework or personal time spent as individually necessary to learn and become proficient in the necessary course competencies, course requirements, test materials, and clinical work. Section IX on the syllabus states that students are evaluated through written tests, class assignments, clinical performance evaluations, clinical nursing care plans, class participation, and oral critical thinking exams.

"During the NUR 252 semester meetings and work, I provided students with their test grades once each test was graded.  I also conducted at least two optional review courses of material for the students prior to the final exam and I was available the entire semester for any student to schedule an appointment with me to discuss any questions

Page 5 of 19

he/she had or to receive help in course assignments and material. Ms. Wright never made any appointment with me during the semester.

"Finally, the Classroom Syllabus for this course states,

Students will be expected to assume responsibility in their learning process by preparing for class/clinical by reading and studying objectives. Students should come to class prepared to discuss content with some background knowledge from having read.

ALL OBJECTIVES WILL NOT BE COVERED IN CLASS DUE TO TIME CONSTRAINTS; HOWEVER, THE STUDENT REMAINS RESPONSIBLE FOR THE CONTENT IN THOSE OBJECTIVES NOT COVERED IN CLASS. THE MOST DIFFICULT OBJECTIVES WILL BE COVERED IN CLASS.

(See Exhibit "D", Book of Exhibits, Bates I.D. # Wright00120.)

"Every student's final grade was calculated by me on a point scale of 1000 total points. These points are allocated as shown on page 8, Section X of the Classroom Syllabus for NUR 252. (Exhibit "D", Book of Exhibits, Bates I.D. # Wright-00120.)

X.    Calculation of Final Grade

| | | |
|---|---|---|
| A. | Exams (4 @ 125 points each) | 500 points |
| B. | Comprehensive Final Exam @ 250 points | 250 points |
| C. | Pop quizzes (5 @ 10 points each) | 50 points |
| D. | Computer Programs (5 @ 10 points each) | 50 points |
| E. | Nursing Care Plans (2 @ 25 points each) | 50 points |
| F. | Class Assignments (5 @ 10 points each) | 50 points |
| G. | Critical Thinking Oral Exam @ 50 points | 50 points |
| | **Total Possible for Course** | **1000 points** |

I did modify this somewhat in that my students were not given pop quizzes and class assignments. Instead, I gave my students five take home quizzes worth 20 points each or a total of 100 points. I also allowed my students to do a case study worth 50 points instead of the oral examination.

"The grade point scale was as follows:

| Points | Grade |
|--------|-------|
| 930 - 1000 | A |
| 840 - 929 | B |
| 750 to 839 | C |
| 749.9 or less | D (and failure of the course) |

(See Exhibit "D", Book of Exhibits, Bates I.D. # Wright-00120)

"All tests/exams that I gave in NUR 252 were multiple choice. The students recorded their answers on a Scantron sheet that I later graded with a Scantron Machine.

"I have attached Ms. Wright's grade sheet for NUR 252 as Harris Attachment "2", Bates I.D. # CVCC000891. As an explanation of the Nursing Program's grading system for tests/exams, I would assign a grade based on the generally used academic 100 point scale; however, I would then convert those grades to determine the number of points a student received on the Nursing Program's point system (e.g., if a student received a grade of 90 on a test/exam that would be the equivalent of 112.5 points out of the possible 125 points for the test/exam). On her first exam, Ms. Wright received a grade of 61.3 which was worth 76.6 points. She received a grade of 62.22 worth 77.77 points on her second test/exam, a grade of 60 worth 75 points on her third test/exam, and a grade of 66 worth 82.5 points on her fourth test/exam. Ms. Wright's total points for the four test/exams in NUR 252 was 311.57 out of the possible 500 points available. Ms. Wright received a 69.4 on her final exam which was equivalent to 173.52 points. 250 points were available on the final exam. She did receive 50 points for her computer programs and also received 100 points for her home quizzes. On her first Care Plan of the semester, she received 23 points out of the possible 25 points available. On her second Care Plan, she received 23

points out of the possible 25 points available. She also received 50 points on her Case Study. Ms. Wright, therefore, received a total of 741.4 points for the entire semester. As previously stated, this is a failing grade. (See Harris Attachment "2", Bates I.D. # CVCC000891.)

"Ms. Wright received her test/exam grades after each test was graded. I gave my students their grades the first class meeting after the class in which the text/exam had been given. I also provided my students copies of printed sheets with a list of the grades they had received in the course after each test/exam. I did not review the test/exams in class because, in my judgment, it was more important and beneficial to the class to begin my lectures on necessary course concepts. I did, however, make announcements after I passed out test/exam grades that students should make an appointment if they had questions or concerns about their individual grades. On December 13, 2005, I conducted two separate sessions to review for the final exam. Each session covered half of the course material upon which the final exam was based. Ms. Wright attended only a portion of one of these final exam review sessions. Ms. Wright did not request any assistance from me throughout the entire semester. The final examination was given on December 14, 2005, which was the last day of classes.

"Once the final exam grades were completed, I briefly met with each student to inform them of their final grade. Ms. Wright was one of two students who failed NUR 252. After all the students had received notification regarding grades, Ms. Wright came back while I was in a teacher's meeting highly upset and highly irrate regarding her grade. At that specific moment, I was unable to meet with her because I was in a teacher's meeting.

"I did subsequently schedule several appointments with Ms. Wright at her request.

She and I met several times and reviewed the test/exams given throughout the semester and the final exam. After these sessions with Ms. Wright, it was my professional judgment that no additional points could or should be awarded to Ms. Wright and that her grade of "D" should stand. In my judgment, at that time and now, as an instructor and a professional, Ms. Wright did not have a strong grasp of the course material required to pass NUR 252 evidenced by her grades on the unit exams and the final exam.

"Ms. Wright was still persistent that she should be given a passing grade for NUR 252. I informed her that we could not reach an agreement and that, in my judgment, her grade should not be changed. I suggested that if she wished to discuss this matter further, she appeal the issue to Dixie Peterson, Chairman of the Nursing Department at that time.

"Ms. Wright filed a formal grade appeal regarding NUR 252 on December 20, 2005. I have attached her grade appeal to my affidavit as Harris Attachment "3". The college was closed from December 22, 2005 through January 2, 2006 for Christmas holidays.

"Because the academic term was over and the holiday season was beginning, I responded to Ms. Wright's formal appeal promptly at the outset of the Spring 2006 academic term. The college reopened on January 3, 2006, and January 4, 2006, was a faculty day. I provided Ms. Peterson a copy of a letter I wrote, attached to my affidavit as Harris Attachment "3", Bates I.D. # CVCC00370, which summarizes Ms. Wright's performance in the classroom and points out that Ms. Wright only earned 741.4 points when 750 points were needed to pass the course. It was my understanding that Ms. Wright complained that she was uninformed that certain information would be tested. I believe she complained that questions relating to drug calculations were included on tests.

"As I indicated in my letter addressing her appeal, it is clear throughout the syllabus that drug calculations are a part of the competencies a student must have to successfully pass the course. This is because drug calculations are a part of hospital employment competency requirements and because correct drug calculations are required for safe administration for medications. Students learn drug calculations at the Practical Nurse (PN) level due to the safety goals of the nursing program. As Ms. Wright was a Licensed Practical Nurse (LPN), drug calculations should not have been an issue. Nevertheless, as I stated before, Ms. Wright never requested assistance on any concept taught in the course prior to learning her grade on the final exam.

"After I provided my response to Ms. Wright's formal appeal to Ms. Peterson, Ms. Peterson indicated that she agreed with my professional judgment that the grade of "D" should stand. Ms. Peterson provided her assessment to Dean Lowe.

"After receiving Ms. Wright's appeal form and attached materials, my response and Ms. Peterson's assessment, it is my understanding that Dean Lowe did consult with outside experts as well to review the course syllabi, unit exams, final exam, and texts before he made his determination regarding Ms. Wright's appeal. It is my understanding that based on all the information before him, Dean Lowe determined that Ms. Wright's grade of "D" would stand and that her appeal would be denied.

"Nursing Program requirements dictated that Ms. Wright had to demonstrate an understanding of the course material of NUR 252 by repeating and passing this course. (See Exhibit "A", Book of Exhibits, Bates I.D. # CVCC000110, ¶ 13.) When a student failed a course, the student had to repeat the course in order to demonstrate an understanding of the required material and make a passing grade. Generally, the student would repeat

the course the next time it was offered. NUR 252 was generally offered in the Fall semester of each Nursing Program academic year. However, the school, under state wide directive, was instituting a new Nursing Curriculum beginning in the Fall of 2006 when NUR 252 would normally have been offered and available to Ms. Wright. Due to the change in curriculum, NUR 252 would no longer be offered at CVCC.

"In order to assist Ms. Wright and the other student who failed NUR 252, Elise Sizemore, in satisfying Nursing Program requirements regarding their successful completion of the NUR 252 course material, Dixie Peterson asked that I use the NUR 200 course platform and structure the content taught to more nearly comport with the content of NUR 252. Dean Lowe approved a course substitution which allowed NUR 200 to substitute for NUR 252. I taught, supervised, and graded Ms Wright's and Ms. Sizemore's work in NUR 200. This took place during the Spring 2006 semester.

"As long as Ms. Wright successfully completed NUR 200 and successfully passed all the other Nursing courses she was enrolled in for the Spring 2006 semester, her failing grade of "D" in NUR 252 would not prevent her from graduating.

"Not only did Ms. Wright take NUR 200 with me as the instructor in the Spring 2006 semester, but she also took NUR 272 in the Spring 2006 semester. I was the instructor for NUR 272. Ms. Wright's Spring 2006 semester began on January 11, 2006.

"NUR 272 was the course on Pediatric Nursing. The focus of NUR 272 is to provide students with a family-centered approach to the nursing care of children from infancy through adolescence. (See NUR 272 Syllabus, Exhibit "E", Book of Exhibits.) The Syllabus which I prepared established seventeen course competencies which in my professional judgment were necessary for students to master to a reasonable degree. (Exhibit "E", Book

of Exhibits, Bates I.D. # Wright00062.) I, of course, explained in the Syllabus that teaching methods for this class would include discussion, chapter readings, PowerPoint presentations, computerized testing, guided clinical practice, and self-directed study. (Exhibit "E", Book of Exhibits, Bates I.D. # Wright00065.) The Syllabus set forth evaluation methods which included written examinations, clinical performance evaluations, written assignments, clinical nursing care plans, and class participation. (Exhibit "E", Book of Exhibits, Bates I.D. # Wright00065.) There were a possible 1000 points available in this course. The students were given 5 computer programs worth 10 points each or a total of 50 points, two Care Plans worth 25 points each or 50 total points, a teaching project worth a total of 50 points, 4 exams each worth 150 points or a total of 600 points and a final examination worth 250 points. (Exhibit "E", Book of Exhibits, Bates I.D. # Wright00066.) Any student receiving 749.9 points or less received a grade of "D" which constituted a failing grade. (Exhibit "E", Book of Exhibits, Bates I.D. # Wright00066.)

"I have attached Ms. Wright's grading sheet for NUR 272 to my affidavit as Harris Attachment "4". Ms. Wright received the following points and grades on her tests/exams:

|          | Grade | Points |
|----------|-------|--------|
| Test I   | 64.58 | 96.87  |
| Test II  | 80.43 | 120.65 |
| Test III | 69.86 | 104.79 |
| Test IV  | 68.75 | 103.12 |

Ms. Wright failed three of the four tests/exams and received a total of 425.13 points. (See Harris Attachment "4".) The tests/exams were multiple choice and students recorded their answers on Scantron sheets. The Scantron sheets were then graded by a Scantron machine.

"Ms. Wright did successfully complete her computer programs and received a total of 50 points. She also received the full 50 points on her teaching project. Finally, she received a total of 40.1 points on her Care Plans. (See Harris Attachment "4".)

"Ms. Wright took her final examination on May 10, 2006. The final examination consisted of two parts, Part A and Part B. The final was multiple choice and the students recorded their answers to the questions on the final exam on a Scantron Sheet. The scantron sheet was then graded that same day with the Scantron machine.

"Throughout the semester and prior to the exam, I had provided Ms. Wright and the other students in NUR 272 with the grades they received throughout the course. Ms. Wright had accumulated a total of 565.53 points prior to the final; as stated before, a student had to have 750 points to pass the course. Ms. Wright needed to earn at least 184.47 points on her final to pass the course.

"As I stated previously, the final examination in NUR 272 was split into two parts, Part A worth a total of 150 points and Part B worth a total of 100 points. Ms. Wright received a grade of 78.48 on part A, which was the equivalent of 117.72 points, and she received a grade of 64 on part B, which was the equivalent of 64 points. (See Harris Attachment "4".) She needed a total number of 184.47 points to pass the course; however, she only received a total of 181.72 points on her final exam.

"As previously stated, Care Plans were required. Care Plans are assessments of patient condition and needs both short term and long term. Students typically prepare these for patients actually seen by them in the clinical setting. After assessing the patient, the student determines the patient's problem areas and establishes goals for patient care.

The student also determines specific interventions for the patient toward meeting the established patient goals.

"I did not teach Lindy or any other student in their clinicals for NUR 272. We hire clinical instructors to teach the students in the clinical setting. Part of the clinical instructors' duties are to supervise the students in the clinical setting, and to monitor the students as they provide patient care. The clinical instructors grade the Care Plans developed by the students based on the clinical instructors' professional evaluation of the Care Plans in conjunction with their assessment of the patients.

"During NUR 272, the students developed two Care Plans and were later given an opportunity to "redo" both of these Care Plans. If a student chose to "redo" any one or both of their Care Plans, the student had to do so before the final examination. Ms. Wright's Care Plans for NUR 272 are attached as Harris Attachments "5" and "6". Ms. Wright received 7 points on her first Care Plan (Harris Attachment "5") and 20.1 points on her second Care Plan (Harris Attachment "6"). According to my grade sheet for NUR 272 (Harris Attachment "4"), and a handwritten note on one of Ms. Wright's Care Plans (Harris Attachment "5"), Ms. Wright chose to "redo" her first Care Plan. After she redid this Care Plan, it was the clinical instructor's professional judgment that Ms. Wright be awarded 20 points for the Care Plan instead of the original score of 7. Ms. Wright chose not to "redo" her second Care Plan.

"Ms. Wright received a total of 747.25 points for the semester which was a failing grade of "D". In my professional judgment, this score was appropriate and commensurate with Ms. Wright's understanding and grasp of the course materials and their application which was evidenced by her failure of unit tests and the final exam. A failing grade of "D"

in my professional opinion is an accurate measurement of Ms. Wright's lack of conformance with and failure to meet NUR 272 course requirements.    Ms. Wright successfully completed NUR 200.

"According to the Nursing Program Admissions Criteria, a nursing student was excluded from the nursing program if the student failed two nursing courses. (See Exhibit "A", Book of Exhibits, Bates I.D. # CVCC000110, ¶ 14.)  Ms. Wright failed NUR 252. Although she successfully demonstrated knowledge of the course material through her grade in NUR 200[1], which is required in this program for the development of nursing professionals, the failing grade in NUR 252 remains on her transcript and counts as the failure of one nursing course. Ms. Wright also failed NUR 272. This constituted her second failed course which excluded her from continuing in the nursing program.

"On May 28, 2006, I received a letter from Ms. Wright asking me to re-grade her Care Plans.  I have attached Ms. Wright's letter as Harris Attachment "7".

"After considering this request and the other previously stated factors relative to these Care Plans, along with Ms. Wright's poor understanding and grasp of the subject matter of the course, it was my opinion that the scores on these two care plans should remain as they were and that the failing grade in NUR 272 should not be changed. Moreover, Ms. Wright had already been given the opportunity, as had all the other students in the class, to "redo" her Care Plans during the semester if she had been dissatisfied with her performance on these Care Plans.  Ms. Wright was allowed to, and did, "redo" one

---

[1] Ms. Sizemore successfully passed NUR 200 and also passed all of her other courses for the Spring of 2006.  As a result, Ms. Sizemore had only one failing grade for NUR 252 and was eligible for graduation.

Care Plan bringing that score up to 20 points for that plan instead of the very poor 7 original points. She chose not to "redo" the other Care Plan. Ms. Wright received a total of 40.1 points of the possible 50 points available for Care Plans.

"After receiving Ms. Wright's letter, I do remember speaking with Dean Lowe and Dixie Peterson regarding this decision. It was my professional judgment that Ms. Wright's grade should stand and that the Care Plans should not be re-graded. It was my understanding the Ms. Peterson and Dr. Lowe agreed with the decision not to re-grade the Care Plans as well.

"After my determination that her grade should stand, Ms. Wright did not file a formal grade appeal regarding her grade in NUR 272.[2]

"I do not specifically remember talking to Ms. Wright regarding her grade in NUR 252 or NUR 272 prior to the final exams given in both of these courses. It is common prior to a final examination to have a number of students ask me the number of points they need on the final to pass the course. In the past, I have given the students a ballpark figure of what they need to pass the course and also told them that they can calculate the number of points they need based on the previous grades and points they've received thus far in the class.

---

[2] One other student failed NUR 272. Because that student had not failed any other courses and NUR 272 was her first failed course, she was allowed to repeat NUR 272. As with Ms. Wright, we created an independent study covering the course material for NUR 272 because it would no longer be offered under the new curriculum. That student successfully completed the independent study repeating the materials for NUR 272. Because she had only one failure, NUR 272, on her transcript she was eligible for graduation.

"During Ms. Wright's enrollment in the Nursing Program at CVCC, Dixie Peterson was the Department Chair. I did inform Ms. Peterson that Ms. Wright was performing poorly in her classes as I did with all students who were struggling in my classes. My judgment that Ms. Wright was performing poorly was based on Ms. Wright's continued failure of examinations and inability to meet course requirements along with her general demonstration of a failure to accept responsibility for and the consequences of her own actions or inactions. Ms. Peterson and I worked together to find a solution to help Ms. Wright repeat NUR 252 after she failed this course, because it would no longer be offered. We did discuss Ms. Wright's performance, but never at any time did Ms. Peterson express or imply that I should fail Ms. Wright or make classes more difficult for her. Ms. Wright was given the same consideration and received the same fair academic and participatory evaluations, grading, and scoring by me in the courses for which I was the instructor as all other students in those courses.

"Because of Ms. Wright's difficulties with meeting the requirements of her courses, the Nursing Program faculty, including Ms. Peterson and the Dean of Instruction attempted to assist Ms. Wright in progressing to graduation in the ADN Program. However, Ms. Wright could not pass the required courses.

"Although, Ms. Wright was excluded from the CVCC Nursing Program in May 2006 based on her academic performance and resulting failure of two courses, she is or will be eligible to apply for admission to any nursing program within the Alabama College System. The 2007-2008 Academic Standards of Progress for Nursing Students located in paragraph 12, page 58-59 of the Chattahoochee Valley Community College Catalog and Handbook state:

12.    Students who have two unsuccessful attempts in a specific program (ADN/PN/Mobility) may apply for admission as a new student to any nursing program within the Alabama College system provided:

    a.  the student meets current entry requirements;
    b.  at least two years have elapsed since the student's dismissal from a specific program; and
    c.  the student was not dismissed from the previous program for disciplinary reasons or for unsafe/unsatisfactory client care in the clinical area.

The above is attached to my affidavit as Harris Attachment "8", Bates I.D. # CVCC00895.

"Ms. Wright was excluded from the CVCC Nursing Mobility Program in the Spring 2006 semester. She will be eligible to apply to CVCC as a new nursing student for entry into the 2008 - 2009 program since two academic years will have elapsed by the time classes for the 2008 - 2009 Nursing Program begin. If Ms. Wright chooses to apply as a new student in the program, she will be subject to meeting the admission criteria and requirements for the Nursing Program and to compete for a position as an admittee into the subject Nursing Program with other students also applying."

"In all respects regarding my activities with and decisions regarding Lindy Wright and her grades and academic performance at CVCC, I exercised my professional judgment and worked within the line and scope of my authority as a faculty member in the CVCC Nursing Program."

"FURTHER, THE AFFIANT SAITH NOT."

LYNN HARRIS

STATE OF ALABAMA        )

COUNTY OF RUSSELL )
)

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that Lynn Harris, whose name is signed to the foregoing, and who is known to me, acknowledged before me, on this day, that being informed of the contents of said document, she executed the same voluntarily on the day the same bears date.

Given under my hand and seal this _15th_ day of ___October___, 2007.

[SEAL]

_Deborah Lynn Boone_
NOTARY PUBLIC
My Commission Expires:

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: June 13, 2011
BONDED THRU NOTARY PUBLIC UNDERWRITERS



ACADEMIC CALENDAR



EXHIBIT.
HARRIS
#1

## ACADEMIC CALENDAR
### 2005-2006

**Fall Semester, 2005 (August 15, 2005-December 20, 2005)**
**88 Faculty Duty Days; 79 Instructional Days**

August 15, 16.................................................................Local Professional Development
August 17-18...............................................................................Regular Registration
August 19....................................................................................Faculty Duty Day
August 22...........................................................Regular Term and Term I Classes Begin
August 22-24.........................................................Late Registration/Schedule Adjustment
September 5...............................................................................Labor Day (College Closed)
September 23.....................................Last Day to Withdraw with a Grade of "W" from Term I
October 10.......................................Last Day to Withdraw: "WP" or "WF" from Term I
October 14 ...................................................................................Term I Classes End
October 14...........................................................................Graduation Application Deadline
October 17..................................................................................Term II Classes Begin
October 28...............................Last Day to Withdraw with a Grade of "W" from Regular Term
October 28 ..............................................Admissions Application Deadline for Spring Semester
November 11 ......................................................................Veterans Day Holiday (College Closed)
November 7-10 ...................................................................Advisement/Advance Registration
November 14-18 .................................................................Advisement/Advance Registration
November 16...............................Last Day to Withdraw with a Grade of "W" from Term II
November 21-22 ...........................................State Professional Development (No Classes)
November 23 ....................................................................Faculty Duty Day (No Classes)
November 24-25..............................................Thanksgiving Holidays (College Closed)
November 28 ...........................................................................................Classes Resume
November 28-December 2...................................................Advisement/Advance Registration
December 7 .................Last Day to Withdraw: "WP" or "WF" from Term II and Regular Term
December 14 ...............................................................................Last Day of Classes
December 15-16, 19................................................................Final Examinations
December 20.................................................Faculty Duty Day (Final Grades due by 2:00 p.m.)
December 21...............................................................................Staff Duty Day
December 22-January 2 ...................................................Christmas Holidays (College Closed)

**Summer Term, 2006 (May 22, 2006-August 7, 2006)**
**54 Duty Days; 50 Instructional Days**

January 3 ........................................................................................College Reopens
January 4........................................................................Faculty Duty Day (No Classes)
January 5.................................................................Local Professional Development (Faculty)
January 6-9..................................................................................Regular Registration
January 10 ....................................................................................Faculty Duty Day
January 11 .......................................................Regular Term and Term I Classes Begin
January 11-12, 13 .........................................................Late Registration/Schedule Adjustment
January 16 .....................................................Martin Luther King, Jr., Holiday (College Closed)
February 17 ........................................Last Day to Withdraw with a Grade of "W" from Term I
March 3...........................................................Last Day to Withdraw: "WP" or "WF" Term I
March 10 ...................................................................................Term I Classes End
March 13 ..................................................................................Term II Classes Begin
March 20-24 ....................................................................Spring Break (No Classes)
March 22............................................................Local Professional Development - Staff
March 27...................................................................................Classes Resumes
March 31 ...................................Last Day to Withdraw with a Grade of "W" from Regular Term
March 31 ..............................................Admissions Application Deadline for Summer Semester

16

April 10-13 ..................................................................................Advisement/Advance Registration
April 13 ......................................................Last Day to Withdraw with a Grade of "W" from Term II
April 14 ..........................................................................................Faculty Duty Day (No Classes)
April 17-21 ...................................................................................Advisement/Advance Registration
April 27 ........................Last Day to Withdraw: "WP" or "WF" from Term II and Regular Term
May 5 .........................................................................................................Last day of Classes
May 8-10 ...................................................................................................Final Examinations
May 11 ........................................................................Faculty Duty Day, (Grades due by 12:00 noon)
May 12 ...........................................................................................Graduation (Faculty Duty Day)

### Summer Term, 2006 (May 22, 2006-August 7, 2006)
### 54 Duty Days; 50 Instructional Days

May 22 ...........................................................................................................Regular Registration
May 23 ..........................................................................................Faculty Duty Day (No Classes)
May 24 ....................................................................Regular Term and Term I Classes Begin
May 24-25 ..............................................................Late Registration/Schedule Adjustment
May 29 .........................................................................Memorial Day Holiday (College Closed)
June 26 .....................................................Last Day to Withdraw: "WP" or "WF" from Term I
June 30 ........................................................................................................Term I Classes End
June 30 ......................................................Admissions Application Deadline for Fall Semester
July 3 ...............................................................................................Faculty Duty Day (No Classes)
July 4 ....................................................................Independence Day Holiday (College Closed)
July 5 ...............................................................................................Term II Classes Begin
July 8 ...............................................................................................Faculty Duty Day (No Classes)
July 10-28 .................................................Advisement/Advance Registration for Fall Semester
July 26 .........................Last Day to Withdraw: "WP" or "WF" from Term II and Regular Term
August 1 ...........................................................................................................Last Day of Classes
August 2-4 ...................................................................................................Final Examinations
August 7 ......................................................Faculty Duty Day (Final Grades due by 2:00 p.m.)

17

CVCC00529

COPY

NUR 252 Grade Sheet
Fall 2005
Lindy Wright

| Examination | Grade | Points |
|---|---|---|
| Unit Test I | 61.3 | 76.6 |
| Unit Test II | 62.22 | 77.77 |
| Unit Test III | 60 | 75 |
| Unit Test IV | 66 | 82.5 |
| | | |
| Total Points from unit tests | | 311.87 |
| | | |
| Final Exam (250) | 69.4 | 173.52 |
| | | |
| Computer program 1 | | 10 |
| Computer program 2 | | 10 |
| Computer program 3 | | 10 |
| Computer program 4 | | 10 |
| Computer program 5 | | 10 |
| | | |
| Home Quiz 1 | | 20 |
| Home quiz 2 | | 20 |
| Home quiz 3 | | 20 |
| Home quiz 4 | | 20 |
| Home quiz 5 | | 20 |
| | | |
| Careplan 1 | | 23 |
| Careplan 2 | | 23 |
| | | |
| Case study | | 50 |
| | | |
| Total points | | 741.4 |



EXHIBIT
Harris
#2

CVCC00891

# GRADE APPEAL FORM

Name of Student **Lindy Wright**          (Signature) *Lindy Wright*

Social Security Number **254 497 629**

Submitted to (Division Chairperson) **Dixie Peterson**

Date **12 - 20 - 05**

## Section A: (To be completed by the student)

I.  Course information:
    a.  Name of course **Adult Nursing II**
    b.  Course number **NUR252**
    c.  Course section number _____
    d.  Semester course was taken **Fall 05**
    e.  Days of week course met **Wednesday**
    f.  Time of day course met **12 - 3 pm**

II.  Name of Instructor **Lynn Harris RN, MSN**

III.  Date on which the specific item in question was received by the student **12 - 20 - 05**

IV.  Date on which the student presented his/her appeal to the instructor for the respective course **12 - 20 - 05**

V.  Concise, clear description of the specific nature of the complaint with particular regard to a description of how the grade at issue was either unfair, inaccurate, or both:

   *please see attached*

VI.  Description of the results of the student's discussion with his/her instructor.

   *please see attached*

VII.  Date on which the results of student/instructor discussion were finalized *please see attached*

VIII.  Attachments (from the student)

**(Section A must be presented to the appropriate Division Chairperson for appeal)**



EXHIBIT
HARRIS
# 3

CVCC 000367

V. Concise, clear description of the specific nature of the complaint with regard to how the grade at issue was either unfair, inaccurate, or both.

Test Grades:  I have been told by Ms. Harris that I have earned at least 745 points out of the available 1,000 points for a letter grade of "D". I have several concerns regarding how the points were allocated, how exams were given, how information not covered during lecture was tested on exams, and how grades and points were communicated with students.

Some of the specific complaints regarding my grade are as follows:

Instructor was unavailable to discuss concerns at time of individual exams. Instructor did not formally review any exams until December 13th. Upon review and research of multiple exam questions, objective documentation was found in nursing textbooks to support the answers I chose and to refute the answers listed on the answer key. When questioned, the instructor refused to provide the rationale for answers indicated on the key. The instructor has been provided with this documentation.

The instructor did not post nor make available exam grades in a timely manner. Due to lack of communication by instructor, I was unaware that I was in jeopardy of failing this class until one to two week before the final exam. When questioned, the instructor stated "All you have to make is another 180 points" & you will pass. No tutoring or remediation was offered at that point.

Clinical Instructors did not "show up" for two (2) clinicals, negatively impacting my ability to synthesize and practice the knowledge given in lecture or to receive instructor feedback on my knowledge.

Instructor was not assigned until week 5 of the semester. A guest speaker (ADN prepared & no teaching experience) was utilized until that time. "Guest Speaker" on Respiratory System specifically instructed the class that compensatory mechanisms of ABG's would NOT be included on the exam. Two questions directly related to compensation were on the exam. Other exams were not given on the dates scheduled and for which students prepared.

Nursing Care Plans were "unavailable" and arbitrary grades (23 of 25 points) were assigned. If these grades were arbitrary, then I am requesting the full 25 points.

There were approximately 10 drug and solution calculation questions included on the four exams during the semester. No where in the syllabus or objectives was it indicated that drug dosage and calculation knowledge would be tested on the unit exams. No review of drug calculations were given in class prior to the exams.

VI. Description of the results of the student's discussion with his/her instructor.

Ms. Harris refused to discuss my grade or the documentation addressed in Section V. with me. However, I was advised to continue with the appeal process (CVCC Policy 6.7.2) and therefore, am doing so.

VII. Date on which the results of the student/instructor discussion were finalized.
I am unsure whether the discussions are finalized or not. Ms. Harris has refused to allow me to review any more of my test papers and has refused to discuss the six (6) questions for which objective documentation was provided and are in dispute at this time. Each question was valued at at least 2.5 points.

VIII. Attachments

I am hereby requesting that until the results of the appeal process, grievance process, and any litigation resulting from this matter be resolved and finalized, that I be allowed to continue participating in all aspects of the nursing program to include, but not be limited to: attending of classes and clinicals, timely assignment of preceptor, and participation in any NCLEX reviews or classes.

Respectfully submitted,

*Lindy Wright*

Lindy Wright

January 4, 2006
Grade Appeal Response 
Lynn D Harris RN, MSN

Submitted to (Division Chairperson) Mrs. Dixie Peterson

Test Grades:
Mrs. Wright's final points for the semester were 741 out of a total of 1000. This resulted
in a letter grade of D in the following nursing course, NUR 252: Adult Nursing II.

Instruction and remediation was offered during the semester upon student request. This
student did not request or make an appointment to discuss any concerns prior to the close
of the semester. Two study sessions with review were offered. This student did not attend
either session. All of the Unit exams were reviewed with **rationales given and open
discussion** on December 13, two sessions were offered, and this student attended only
**part of one**. The student did not request any assistance. The Scan Trons were reviewed
with the student and checked for any incorrect answers The student spent time reviewing
each test. Any questions asked would have been answered.
I have reviewed the questions; documentation is supportive of current answers. This
student did not successfully pass any of the four unit tests nor did she successfully pass
the final exam. Her test average for the four unit tests was 64.38 (321.93 points divided
by possible 500 points). The final exam grade was 69.40 (173.52 points divided by
possible 250 points) the total average for these tests was 66 (495 points divided by
possible 750 points. The other points that could have been achieved were from 5
computer programs (50 points), a case study (50 points), 5 take home quizzes (100
points) and 2 care plans (50 points). This would be a total of 250 achievable points. The
student achieved 246 points for these items. The total points achieved for the semester
was 246 for outside work and 495 for exams. This total is 741 which is a D.
Test scores were given to the students after each test. A written copy that delineated the
status of each student's tests and course work was given to each student during class. An
announcement was made to the class; if the students had questions about their individual
grades please see this instructor. Some students did make an appointment, however this
student did not.
There was one exam date in Adult Nursing 252 that was altered. The students had a unit
exam in Maternal-child and a unit exam in adult nursing 252 on the same day. Thinking it
would help the students do well on both tests; this instructor delayed the adult nursing
exam one week. The students knew of this change well in advance as it was discussed in
class prior to both tests original due date.
Part of the national patient safety goals is accurate medication administration. The
students are required to successfully complete a calculation test. As part of hospital
employment competencies math calculations are required for safe administration of
medications. As a licensed Practical Nurse, I would hope medication calculations are not
an issue. Nonetheless, the student should have requested assistance with medication
administration calculations prior to the close of the semester, she did not.
There are barriers to communication. Threats concerning grievances do not create an
environment of open communication.

Name of Student   Lindy Wright        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

## Section C: (To be completed by the Dean of the College)

I.      Date on which the appeal was filed with the Dean of the College   January 9, 2006

II.     Actions/findings of the Dean of the College

        **The findings were the same as recommended by the instructor Ms. Harris.  I concur with this recommendation.**

III.    Attachments (from the instructor and/or Dean of the College)

        - o  **Recommendations of Ms. Short and Ms. Williams**
        - o  **NUR 252 Fall Semester 2005 Syllabus**
        - o  **Student Exams**

IV.     Decision of the Dean of the College

        **After reviewing the information regarding Ms. Wright's appeal, I found no evidence that she received an inappropriate grade.  I agree with the grade of D that she received from Ms. Harris.**

V.      Date of decision and notification (copies of Section A, B, and C) given to the student, instructor, and Division Chairperson

        **January 17, 2006**

Signature

Name of Student _Lindy Wright_ 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

Section B: (To be completed by the Division Chairperson)

I.    Date on which the appeal was filed with the Division Chairperson __1-4-06__

II.   Actions/findings of the Division Chairperson

The review of the appeal supports the grade given by Ms. Harris - the classroom instructor. Based upon failure of every test and no evidence of erroneous grading or discrimination, the grade should stand.

III.  Attachments (from the instructor and/or Division Chairperson)

IV.   Decision of the Division Chairperson

\# The grade of D should stand
\# The student did not pass any tests

V.    Date of decision and notification (copies of Section A and B) given to the student and instructor _Notified by phone on 1-10-06. Copies available in office._

(Signature) _Lupe Peterson_
1-10-06

(Section A and B must be presented to the Dean of the College for appeal along with a **Notice of Appeal**)

CVCC 000372

NUR 272 Pediatric Grade sheet
Spring 2006

Student Name Lindy Wright

| COURSE WORK | Grade | TOTAL POINTS |
|---|---|---|
| | | Points |
| 4 tests @150 points (total possible points 600) | | 96.87 |
| Test I | 64.58 | 120.65 |
| Test II | 80.43 | 104.79 |
| Test III | 69.86 | 103.12 |
| Test IV | 68.75 | |
| | | |
| Final Part A @ 150 points | 78.48 | 117.72 |
| Final Part B @ 100 points | 64 | 64 |
| | | |
| | | |
| Computer Programs 5 @ 10 points( total of 50 points) | | |
| Program 1 | 10 | |
| Program 2 | 10 | |
| Program 3 | 10 | |
| Program 4 | 10 | |
| Program 5 | 10 | |
| Total | | 50 |
| | | |
| Teaching project total of 50 points | | 50 |
| | | |
| Careplan 2 @ 25 points ( Total of 50 points) | (Careplans could be redone to achieve higher points) | |
| Careplan 1 | | First grade 7/25 redo 20/25 |
| Careplan2 | | Student chose not to redo 20.1/25 |
| | | |
| | | |
| TOTAL | D | 747.25 |
| CLINICAL GRADE | 100/satisfactory | 600/600 |

Student signature _____   Date_____

Faculty Signature_____   Date_____



EXHIBIT
HARRIS
#4
tabbies®

CVCC 000228

NUR 272 Pediatric Nursing Assessment/ Care Plan/ Case Study/ Teaching Plan
*Grading Criteria (Care Plan #1 & 2)

Student's Name _Lindy Whyut_     Date _2-10-06_

Pediatric Assessment Tool (5 Points Total)

|  | Possible Points | Earned Points |
|---|---|---|
| Identifying Data | 0.5 | 0.5 |
| Chief Complaint | 0.5 | 0.5 |
| Present Illness | 0.5 | 0.75 |
| Birth History | 0.5 | 0.5 |
| Previous History | 0.5 | 0.5 |
| Immunizations | 0.5 | 0.5 |
| Growth and Development | 0.5 | 0.5 |
| Assessment | 0.5 | 0.5 |
| Personal/ Social | 0.5 | 0.5 |
| Medication List | 0.5 | 0.25 |
| Narrative Head-to-Toe Assessment Note | 1.0 | 0.75 |

Pathophysiology (10 points total)

| | | |
|---|---|---|
| Disease process/condition statement | 2 | 2 |
| Sequelae of disease process/ condition statement | 2 | |
| Treatment and medication regimens | 2 | 1—only listed medicine regimen |
| Abnormal lab values & their meanings | 2 | |
| Abnormal diagnostic test results & their meaning | 2 | 1.5 |
| Prioritized Patient Problem List (at least three) | 1 | 1 |

The Care Plan (Nursing Diagnoses- at least three with four nursing interventions each) (5.5 point total)

| | | |
|---|---|---|
| Subjective Data | 0.5 | 0.5 |
| Objective | 0.5 | 0.4 |
| Nursing Diagnoses (RT, AEB) | 0.5 | 0.5 |
| Patient Goals (include time frames) | 0.5 | 0.5 |
| Nursing Interventions (frequency, specifics) | 1.0 | |
| Rationales | 1.0 | 0.4 |
| Implementations | 0.5 | 0.4 |
| Evaluation | 0.5 | 0.5 |
| References Cited | 0.5 | 0.5 |
| The Teaching Plan (two topic areas, get specific) | 2.5 | 1.75 |

Total Points Possible     25

Total Points Earned _20.1_

Student Signature _____     Date _____

Instructor's Signature _Harmon, RN_     Date _3-10-06_

*This form must be stapled to the front of the entire assignment.


EXHIBIT
HARRIS
#5

CVCC 000394

NUR 272  Maternal – Newborn Nursing
Nursing Care Plan #1

Student: Lindy Wright _____

Instructor: Harmon, Shirley    Date: 1-27-06

| Evaluation Criteria | Possible #Pts | Earned Pts | Comments | |
|---|---|---|---|---|
| A. Assessment Packet | 5 | 3 | Left Thing out | Never NA or No abd seen |
| B. Nursing Diagnoses | | | | |
|   1. Appropriate | 4 | 1/4 | | |
|   2. Prioritized | 3 | 0/3 | | |
| C. Subjective | 2 | 0/2 | | |
| D. Patient Goals | | | Goals Not Approp | for |
|   1. Appropriate | 4 | 0x/4 | This Patient | |
|   2. AEB | 3 | 0/3 | | |
| E. Nursing Interventions | | | | |
|   1. Appropriate | 4 | 2/3 | Did Not Match | |
|   2. Prioritized | 3 | 0/2 | Nursing Diagnosis | |
| F. Scientific Rationale with References | 4 | | Where did you get This Info | |
| G. Evaluation of Patient Goals | 3 | 1/3 | | |
| | | | | |
| TOTAL | 35 25 pts | /21 | | |

Grade (7)



EXHIBIT
HARRIS
#6

CVCC 000403



May 28, 2006

Reference: Lindy Wright's Care Plans

Ms. Harris,

I'm enclosing this letter to get you up to date regarding the request made by the Nursing office to get the Care Plans to the school for review.

I was left a voice mail on Friday May 26, 2006 of which I received at 6:00 PM regarding my Care Plans. The message was from Saundra (Nursing Secretary) stating Ms. Peterson wanted me to come to the school with my Care Plans to be reviewed by you and Ms. Peterson. Once I reviewed the message I called the school and did not receive an answer. I also called Ms. Peterson on her cell phone and did not get an answer.

On Sunday May 28, 2006 a conversation was held with Ms. Peterson. Ms. Peterson stated she did not want to be responsible for them and that they would need to go to Ms. Harris because she would be the one that needed to review them.

I attempted to call you on your cell phone at 706-402-2727 Sunday afternoon of which I received a message stating the call could not be completed as dialed, please check the number.

Enclosed you will find a copy of the Care Plans the Nursing office requested. Once you have reviewed the Care Plan, please get with Dean Lowe regarding your findings and have him contact my attorney Connie Cooper @ 334-297-9442, since I'm working through her to get this resolved.

You time is greatly appreciated in helping get this matter to a resolution that will be satisfactory and fair to all parties involved.

Sincerely,
Lindy Wright

*Lindy Wright*

cc: Connie Cooper

EXHIBIT
HARRIS
# 7

CVCC 000393



# Chattahoochee
## Valley Community College

### 2007-2008

Catalog and Student Handbook

EXHIBIT
HARRIS
#8

# Catalog and Student Handbook

## 2007-2008

# Chattahoochee Valley Community College

**2602 College Drive • Phenix City, Alabama 36869 • 334-291-4900**

## Accreditation

Chattahoochee Valley Community College is accredited by the Commission on Colleges of the Southern Association of Colleges and Schools (1866 Southern Lane, Decatur, Georgia 30033-4097/Telephone: 770-679-4501) to award the Associate in Arts, Associate in Science, and Associate in Applied Science degrees.

The Associate Degree Nursing (RN) is accredited by the National League for Nursing Accrediting Commission, 61 Broadway, New York, NY 10006, Telephone number 212-363-5555, ext. 153.

The Practical Nursing and Associate Degree Nursing Programs are approved by the Alabama State Board of Nursing

## Member of

Alabama College Association
League of Innovation
American Association of Community Colleges
National Council for Workforce Education

This *Catalog and Student Handbook*, effective September 1, 2007, is for information only and does not constitute a contract. The College reserves the right to change, without notice, policies, fees, charges, expenses, and costs of any kind, and further reserves the right to add or delete any course offerings or information in this *Catalog and Student Handbook*.

Policy statements and program requirements in this catalog are subject to change. Except when changing their programs of study, students may follow requirements of the Catalog under which they enter the College for a period of four years. If they have not completed their programs of study, they must change to the current catalog. Exceptions must be approved by the Dean of Student and Administrative Services. When students change their programs of study, they must change to the Catalog that is current at the time of the program changes.

CVCC00893

## Academic standards of progress for Nursing students

### The Alabama College System Nursing Education Program Progression Policy

Please note that these policies are subject to revision by the Alabama College System.

In order to continue in the nursing program, the student must:

1. Maintain a grade of C or better in all required general education and nursing courses and maintain a 2.0 cumulative GPA.

2. Unless previously completed, students must complete all required general education courses according to The Alabama College System Nursing Education curriculum. Exceptions must be approved by the nursing program director.

3. Be acceptable by clinical agencies for clinical experiences.

4. Maintain ability to meet essential functions for nursing with or without reasonable accommodations.

5. Students must successfully complete the nursing education program:
   a. Within 48 months from initial enrollment in courses with an NUR prefix for ADN students; or
   b. Within 24 months from initial enrollment in courses with an NUR prefix for PN students.
   c. Within 24 months from initial enrollment in NUR201 for Mobility students.

6. Maintain current CPR at the health care provider level.

7. A student that has an unsuccessful attempt in a nursing course (W,D, or F) cannot progress until the course is completed successfully. Course repetition will be based on instructor availability and program resources.

8. Students whose progression through the nursing program is interrupted and who desire to be reinstated in the program must schedule an appointment with a nursing faculty advisor to discuss reinstatement. In order to be eligible for reinstatement, the following criteria must be met:
   a. Students must apply for the nursing program and readmission to the college if not currently enrolled;
   b. Requests must be received by published deadline;
   c. Students must request reinstatement within one year from the term of withdrawal or failure;
   d. Students must adhere to nursing curriculum and/or program policies and procedures effective at the point of reinstatement.

9. Withdrawal and/or a D or F in one or more nursing courses in a term is considered one unsuccessful attempt.

10. A total of two unsuccessful attempts (D, F, or withdrawal) in the nursing program will result in dismissal.

11. If a student has been unsuccessful in the associate degree nursing program, the student may apply for admission to the practical nursing program. If a student has been unsuccessful in the mobility program, the student may apply for admission to the generic program.

CVCC00894

12. Students who have two unsuccessful attempts in a specific program (ADN/PN/Mobility) may apply for admission as a new student to any nursing program within the Alabama College system, provided:
   a. the student meets current entry requirements;
   b. at least two years have elapsed since the student's dismissal from a specific program, and
   c. the student was not dismissed from the previous program for disciplinary reasons or for unsafe/unsatisfactory client care in the clinical area.

### Reinstatement policy

1. Students whose progression through the nursing program is interrupted and who desire reinstatement in the program must schedule an appointment with a nursing faculty advisor to discuss reinstatement. Students must meet the following criteria :
   a. Students must apply for the nursing program and readmission to the college if not currently enrolled;
   b. Requests must be received by published deadline;
   c. Students must request reinstatement within one year from the term of withdrawal or failure;
   d. Students must adhere to nursing curriculum and/or program policies and procedures effective at the point of reinstatement.

2. Reinstatement to the nursing program is not guaranteed. Selection for reinstatement is based on GPA at the current institution and space availability. Reinstatement will be denied due to, but not limited to, any of the following circumstances:
   a. Grade point average is less than 2.0 from courses completed at the current institution;
   b. Refusal by clinical agencies to accept the student for clinical experiences;
   c. Twelve months have elapsed since the student was enrolled in a nursing course;
   d. Student has been dismissed from the program.

3. Students dismissed from the previous program for disciplinary reasons and/or unsafe/unsatisfactory client care in the clinical area will not be allowed reinstatement to the nursing program.

### Transfer policy

**Please note that these policies are subject to revision by the Alabama College System.**

The transfer policy applies only to students desiring to transfer between Alabama College System institutions. It does not apply to students wishing to transfer from other institutions.

Must meet minimum admission standards for the nursing program.

1. Must possess a grade of C or better in all general education taken at another institution and possess a minimum of a 2.5 cumulative GPA at time of transfer.

2. Students must successfully complete the program:
   a. Within 48 months from initial semester for ADN students or;
   b. Within 24 months from initial semester for PN and Mobility students.

3. Must be a student in good standing and eligible to return to the previous nursing program.

4. Provide a letter of recommendation from the Dean/Director of the previous program.

CVCC00895

5. Complete at least 25 percent of the total program at the accepting institution.
6. Acceptance of transfer students into nursing programs is limited by the number of faculty and clinical facilities available. Meeting minimal standards does not guarantee acceptance.

## Academic standards of progress for veterans

CVCC will certify only veterans who are making "satisfactory progress" toward the completion of the selected program of study, according to the standards of satisfactory academic progress that apply to all students.

Students are making satisfactory progress in a course when they are attending classes regularly and attempting to complete the course requirements, as stipulated by the instructor. Class attendance alone is not sufficient for satisfactory progress in a course.

## Veterans' class attendance

Students are expected to attend and be on time for all classes for which they are registered. Instructors are required to maintain accurate attendance records. Instructors must explain their absence and makeup policies to students and provide written guidelines; however, the student is responsible for knowing specific attendance requirements and for satisfactory makeup requirements as prescribed by the written guidelines. The individual course syllabus should state if, and under what conditions, missed classes, laboratories, or clinicals can be made up.

## Withdrawal from class for veterans

A veteran student who withdraws from a class or classes after the official drop/add period may be required to reimburse the College for tuition and fees charged since the first day of classes. This determination is made by the Veterans Administration.

## Transfer of credits

Transfer students must furnish the official transcript(s) of all work attempted at all other institutions unless they have completed the baccalaureate degree. An applicant who has completed the baccalaureate degree is required to submit only the transcript from the institution granting the baccalaureate degree. However, the applicant may submit transcripts from other institutions attended if he/she wishes consideration of those credits for purposes of transferability.

Transferability of credits will be determined in the following manner:

1. If a student has a 2.0 cumulative grade point average in all previous college work attempted, all passing grades will be accepted if they are comparable to CVCC courses.
2. If the student's cumulative grade point average is below 2.0 (C), only credits in which a grade of "C" or better was earned will be accepted.
3. Of the credits accepted, only those that are applicable to the student's chosen curriculum may be used for purposes of meeting program and graduation requirements.
4. Students who have satisfactorily completed required English and mathematics courses will not be required to take the COMPASS Placement Test at CVCC.

CVCC00896

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

LINDY G. WRIGHT,                         )
                                         )
    Plaintiff,                       )
                                         )     Civil Action No. 3:06-cv-1087-WKW
v.                                       )
                                         )
CHATTAHOOCHEE VALLEY                      )
COMMUNITY COLLEGE (CVCC),                )
et al.,                                  )
                                         )
    Defendants.                      )

## AFFIDAVIT OF DR. JAMES LOWE

STATE OF ALABAMA          )
                          )
COUNTY OF RUSSELL         )

    Before me, the undersigned notary public, personally appeared Dr. James Lowe, who after having been identified to me and after having been sworn, deposed and testified as follows:

    "My name is James Lowe and I currently serve as Interim President of Bishop State Community College in Mobile, Alabama. I formerly served as Dean of Instruction at Chattahoochee Valley Community College ("CVCC") in Phenix City, Alabama from January of 2004 until July 2, 2007. Prior to my time at CVCC, I served as Interim President as Northwest-Shoals Community College in Muscle Shoals, Alabama.

    "I attended Bethune-Cookman College in Daytona Beach, Florida where I received a Bachelor of Science in Physical Education with a Minor in Biology. I received my Master of Science in Physical Education and Administration from American University in

1



Washington, D.C. I received my post-graduate Education Specialist (Ed.S) certification in Educational Administration from Troy State University in Phenix City, Alabama. In 2003 I received my Ph.D. in Education Administration from San Francisco Technical University in San Francisco, California.

"CVCC is a State College under the supervision of the Alabama Department of Post-Secondary Education. I was Acting Dean of Instruction during the Summer and Fall 2005 semesters, and the Spring 2006 semester when Lindy Wright was enrolled in CVCC's ADN Program. As Dean of Instruction, I was responsible for certain processes related to the instructional units of CVCC, including career/technical, occupational, and academic. I also performed various functions related to the Learning Resource Center (Library). Additionally, I was responsible for overseeing certain instructional support services, and implementing the College's instructional plan. I was responsible with others at CVCC for maintaining CVCC's academic integrity and programmatic viability. Consequently, my responsibilities at CVCC included considering and making rulings on student grade appeals.

"On August 31, 2005, Sandy Gunnells, Nursing Instructor for Nursing 252, Adult Nursing II, and Brenda Bellamy, Nursing Instructor for Nursing 271, Pediatrics, resigned after classes had already started meeting during the Fall 2005 semester. Students in Nursing 252 and 271 met in classrooms for instruction with these two instructors once a week. Both Ms. Gunnells and Ms. Bellamy resigned on the day that the second class meeting with their students should have taken place. As a result of their resignations, we had two classroom instructor positions that needed to be filled immediately.

"Until qualified full-time classroom instructors were found to fill these vacancies, Dixie Peterson, Chairperson of the Nursing Department at that time, arranged for qualified guest speakers to teach the class on the concepts that were directly related to each of these courses. I reviewed the qualifications of these guest speakers to ensure that they were qualified to teach the concepts in these two nursing programs. The guest speakers were qualified in my opinion.

"Within a short period of time, we filled the two vacancies with individuals who, in my professional judgment, were highly qualified instructors in the two subjects constituting NUR 252 and NUR 271. The Nursing 252 vacancy was filled by Lynn Harris, and the Nursing 271 vacancy was filled by Tawyna Cash. Both Ms. Cash and Ms. Harris had been instructors in nursing programs before. In fact, both of them had taught the same or similar content to the courses that they were taking over at CVCC.

"At the end of the Fall 2005 semester, I received notification that Ms. Lindy Wright had failed two nursing courses in the ADN Program. I learned of this when Ms. Wright began the appeal process for the two failed grades she had received in Nursing 252 and Nursing 271. Prior to this time, I had never met or dealt with Ms. Lindy Wright.

"The ADN Admissions Criteria contained in the CVCC Student Catalog and Handbook states:

11.    Students enrolled in the Nursing Mobility program must earn a "C" or higher in all required courses in the nursing curriculum, in both nursing and non-nursing courses. This includes satisfactory completion of the clinical components of each course. Failure of clinical components results in failure of the course.

(See Lowe Attachment "1", Bates I.D. #s CVCC000109, 110, and 111.)

3

"Additionally, these criteria state,

13.    Nursing courses NUR 252, 271, 272, 279, 291, and 292 may be repeated only once and are to be taken the next semester a course is offered provided space is available. If the student does not pass the nursing course on the second attempt, that student shall be excluded from the nursing program, but not the College.

(See Admissions Criteria, Lowe Attachment "1", Bates I.D. # CVCC000110.)

"The catalog also explicitly states:

14.    The nursing student must complete the entire nursing program within twenty-four months of the date he/she begin *(sic)* his/her studies in the program or be excluded from the nursing program. If a nursing student fails two different nursing courses within the twenty-four month period, he/she will be excluded from the program and CANNOT reapply.

(See Admissions Criteria, Lowe Attachment "1", Bates I.D. # CVCC000110.)

"Based on the policies and procedures in effect at that time, because Ms. Wright had received two failing grades during the Fall 2005 semester in two separate nursing courses, NUR 252 and NUR 271, she was excluded from the Nursing Program. (See Lowe Attachment "2", Letter of December 20, 2005, from Dixie Peterson to Lindy Wright; Bates I.D. # CVCC000381).

"CVCC has an established Grade Appeal Procedure set forth in the catalog. (See Lowe Attachment "3", "Grade Appeal Procedure"; Bates I.D. # CVCC000203-204) It is the policy of CVCC that students should have the opportunity to appeal any grade which the student has reason to believe does not accurately and fairly represent the nature of the class work which the student has performed. According to the Grade Appeal Procedure, a student must make an initial grade inquiry with the course instructor within seven calendar days after the student receives notice of the grade or grades in question. The

4

student must state orally or in writing that the grade is either inaccurate, unfair or both, and must include the justification for the appeal. In this instance, Ms. Wright's instructor for NUR 252 was Lynn Harris. Her instructor for NUR 271 was Tawyna Cash. If the student and the instructor cannot successfully resolve the student's concern regarding the grade, the student may then contact the chairperson of that instructor's division or program. As previously stated, Ms. Dixie Peterson was Chairperson of the Nursing Department at that time. If the student's appeal cannot be handled or settled at the Chairperson level, then the student may appeal to the Dean of Instruction. According to the Grade Appeal Procedure, any student's initial inquiry must be made within the above stated seven day time frame. Any appeal by a student from (1) the instructor's decision and (2) the Chairperson's decision (the first two appeal procedure stages) must be made by the student within seven days of the student's receipt of the result or decision.

"On January 9, 2006, as Dean of Instruction, I received notice that Ms. Wright had filed a grade appeal for Nursing 271 to the Department Chair, Dixie Peterson, because Ms. Wright believed she could not successfully resolve the issue with the nursing instructor, Tawyna Cash. I reviewed the information provided to me by Ms. Peterson regarding Ms. Wright's appeal of her grade in NUR271. There was no paperwork from the instructor, Tawyna Cash, submitted to me for review. Because I did not have any submission from Ms. Cash that was responsive to Ms. Wright's grade appeal, I approved a grade change in my discretion as Dean of Instruction and as recommended by Ms. Peterson. Ms. Wright's failing grade of "D" in NUR 271 was changed to a passing grade of "C". (See Lowe Attachment "4", Grade Change Form; Bates I.D. # CVCC000503. See also, Lowe Attachment "5"; my January 23, 2006, letter to Lindy Wright; Bates I.D. # CVCC000359.)

5

"Lindy Wright filed a grade appeal form on December 20, 2005 regarding, NUR 252, Adult Nursing II, taught by Lynn Harris. (See Lowe Attachment "6", Ms. Wright's Grade Appeal Form for NUR 252; Bates I.D. # CVCC 000351, 352, and 353.)

"Ms. Harris, the instructor for Nursing 252, responded to Ms. Wright's Grade Appeal Form on January 4, 2006. (See Low Attachment "7", Ms. Harris' response, Bates I.D. # 000355.) Ms. Harris' response was timely (actually there are no written time requirement for instructor responses) because Ms. Wright's appeal overlapped with the end of the Fall 2005 academic term and the beginning of the Spring 2006 academic term. Although I do not remember the specific date, I also learned in this time frame that Ms. Wright hired attorney Connie Cooper to represent her. I had a conversation with Ms. Cooper regarding the CVCC Grade Appeal Process. I received a follow-up letter from Ms. Cooper on January 10, 2006. (See Lowe Attachment "11", Bates I.D. # CVCC00234.)

"On January 10, 2006, Dixie Peterson issued her findings regarding Ms. Wright's grade appeal in NUR 252 and stated "the review of the appeal supports the grade given by Ms. Harris, the classroom instructor. Based upon [Ms. Wright's] failure of every test and no evidence of erroneous grading or discrimination the grade should stand." (See Lowe Attachment "8", Ms. Peterson's findings; Bates I.D. # CVCC00354.) As noted, Ms. Wright was notified about Dixie Peterson's decision by telephone on January 10, 2006. Ms. Wright then forwarded her grade appeal to me.

"After receiving Ms. Wright's formal grade appeal, under the discretion granted to me as Dean of Instruction, I determined that it was necessary to have experts from outside the college review the syllabus, classroom material, and exams taken by Ms. Wright in NUR 252 to obtain additional opinions for consideration by me in making a determination

6

regarding Ms. Wright's appeal of NUR 252. I requested that two nursing instructors, teaching the same course content as NUR 252, from Wallace Community College in Dothan, Alabama, travel to CVCC to review the NUR 252 material including syllabi, textbooks, exams, etc., and provide an evaluation and opinion regarding whether the grade of "D" received by Ms. Wright should stand.

"Ms. Carol Williams and Ms. Candice Short, from Wallace Community College, in Dothan, Alabama, traveled to CVCC on January 13, 2006 to review the materials. Their determination is attached to this affidavit. (See Lowe Attachment "9", the handwritten findings of Ms. Williams and Ms. Short, Bates I.D. # CVCC000357.) Their determination states, "Upon review of documents presented regarding the grade appeal for Nursing 252, it is the opinion of us that the grade of "D" stands."

"It was specifically pointed out by these two independent experts that the grading criteria and calculations were clearly stated in the course syllabus. The final calculation of grades was well defined in that section of the syllabus. It was also noted that Ms. Wright could calculate her grade throughout the entire semester and that Ms. Harris had well-documented the fact that test scores were given to students after each test. In response to Ms. Wright's allegations that "nowhere in the syllabus or objectives was it indicated that drug dosage or calculation knowledge would be tested on unit exams," the outside instructors found that the course syllabus stated in Section 5, no. 12, that "the student must be able to correctly perform simple mathematical computations for administering drugs." It was the opinion of these two outside instructors, that the final grade of "D" should not be changed and that it should remain.

7

"After thoroughly reviewing all the materials provided to me by Ms. Wright, the response to Ms. Wright's appeal by Ms. Harris, the recommendation of Ms. Peterson, and the report provided by Carol Williams and Candice Short from Wallace Community College, and in the exercise of my professional judgment, I denied Ms. Wright's grade appeal relative to NUR 252. On January 17, 2006, I wrote to Ms. Wright and advised her of my decision. (See Lowe Attachment "10", January 17, 2006, letter to Ms. Wright, Bates I.D. # CVCC000304).

"Ms. Wright would have been excluded from the Nursing Mobility ADN Program and unable to reapply to the program at that time based on her receiving the grade of "D" in both NUR 252 and NUR 271 pursuant to paragraphs 11 and 14 of the Nursing Mobility Program Academic Criteria. (See Lowe Attachment ""1", Bates I.D. # CVCC000110.) However, after the appeal process, because the failing grade of "D" she received in NUR 271 was administratively changed to a passing grade of "C", Ms. Wright's transcript reflected that she had only failed one nursing course. Ms. Wright, therefore, remained in the Nursing Mobility ADN program and moved forward with her class to the Spring 2006 semester.

"Nevertheless, because Ms. Wright had failed to satisfactorily complete the course work in NUR 252 and, in that she lost her grade appeal in that course, she was required by policy to successfully complete NUR 252 before she could graduate. The substance of this course had to be learned by Ms. Wright. NUR 252 was a course that was typically offered in the Fall semester of each year. However, due to a statewide curriculum change for all Nursing Programs in Alabama, NUR 252 would no longer be offered as a course at CVCC.

"Because Ms. Wright had to successfully complete the substance of the course requirements of NUR 252, I, at the recommendation of the Nursing Department Chairperson, Dixie Peterson, allowed Ms. Wright to take NUR 200 as a substitute for NUR 252. NUR 200 was a course number in the new curriculum. Ms. Harris, Ms. Wright's instructor in NUR 252, crafted the course material in NUR 200 to cover the required information Ms. Wright needed to study and learn in order to complete the requirements of NUR 252. We allowed Ms. Wright to take this course, NUR 200, in the Spring 2006 semester so she could still potentially graduate with her class.

"This specially developed and approved course substitution allowed Ms. Wright an opportunity to cover and complete the required course material of NUR 252 and progress in the program into the Spring 2006 semester. Ms. Wright and one other student who had failed NUR 252 took NUR 200 under Ms. Harris. It is my understanding that both students received a passing grade in NUR 200 in Spring 2006.

"Ms. Wright's successful completion of NUR 200 as substituted for NUR 252 did not "erase" her previous failure of NUR 252. That forever remains on her transcript. The failed grade in NUR 252 was, pursuant to Nursing Program Policy, considered one failure of a course for purposes of determining Ms. Wright's compliance or non-compliance with CVCC's ADN graduation requirements.

"Despite Ms. Wright's successful completion of NUR 200, she received a final grade of "D" in NUR 272 in the Spring 2006 semester. Because Ms. Wright had been awarded a "C" administratively in NUR 271, based upon the circumstances described previously herein, she was considered by CVCC and the Nursing Program to have failed one course

9

instead of two as she began the Spring 2006 Semester. However, her failure of NUR 272 in the Spring 2006 Semester caused her to be excluded from the program.

"It is my understanding that Ms. Wright says that Ms. Peterson and I told her that her grade in NUR 252 would not be "held against her" if she passed NUR 200. I do not recall whether I made this statement to her, although the statement is correct. There is a procedure whereby the grade in a course taken the second time is used for the calculation of the GPA instead of the first grade and, if Ms. Wright had not failed NUR 272 in the Spring 2006 semester causing her immediate exclusion from the program, then this could have been accomplished.

Nevertheless, regardless of my inability to recall whether Ms. Wright and I discussed the potential effect of her grade in NUR 200, I hereby unequivocally state that I have never told Ms. Wright that her failing grade in NUR 252 would be "erased" or expunged or taken off her transcript and I have never told Ms. Wright that the fact of her failure of NUR 252 would not be used in any way in the normal course of her education as a professional nurse. Ms. Wright received a catalog upon admission. (See Lowe Attachment "12", Bates I.D. # CVCC00864.) In my experience, the Nursing students at CVCC knew the Admission Criteria and the Nursing Program policies. My communications with Ms. Wright on these and other topics have either been consistent with or not inconsistent with the language of provisions in the Catalog and Handbook. Further, the Catalog and Handbook states that the student has the responsibility of learning or knowing the CVCC policies contained therein and those policies, including the policies discussed in this affidavit are clearly set forth in the Catalog and Handbook.

10

"It is my understanding that Ms. Wright filed a request for "course forgiveness" regarding NUR 252 with Dean Hodge that was denied. However, according to the CVCC handbook, even if her request for course forgiveness had been granted, it would have only affected the calculation of Ms. Wright's cumulative grade point average and it would not have "erased" the NUR 252 failure.

"Ms. Wright did not file a grade appeal in NUR 272 and, because Ms. Wright had two failed courses, CVCC policy required that she be excluded from the nursing program. Accordingly, Ms. Wright was, therefore, excluded from the ADN program. All review, consideration, decisions, and action made or taken by me relative to the matters set forth in this affidavit were done in the line and scope of my employment with CVCC and to the best of my ability and judgment as Dean of Instruction.

"FURTHER, THE AFFIANT SAITH NOT."

_____
James Lowe

STATE OF ALABAMA          )
                          )
COUNTY OF MOBILE          )

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that James Lowe, whose name is signed to the foregoing, and who is known to me, acknowledged before me, on this day, that being informed of the contents of said document, he executed the same voluntarily on the day the same bears date.

Given under my hand and seal this 15th day of _October_, 2007.

_____
NOTARY PUBLIC

My Commission Expires: NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Oct 29, 2007
BONDED THRU NOTARY PUBLIC UNDERWRITERS

[SEAL]

11

2005
2004

One Place – Endless Possibilities

Chattahoochee
Valley Community College

ORIGINAL

Catalog &
Student Handbook

Lowe Attachment "1"

CVCC 000001

# NURSING CAREER
# MOBILITY PROGRAM (ADN)
## ADMISSIONS CRITERIA

1. Applicants must meet all the admission requirements to be admitted as a regular student to the College.

2. An Application for Admission to the Nursing Mobility Career program must be completed and submitted to the Nursing Office. Applications are available upon request. Testing dates will be announced in a letter to prospective students after the application process is complete.

3. Students must be Licensed Practical Nurses (LPNs) or recent graduates of an LPN program in order to apply for the Nurse Mobility program. Practical nurses must have three months of clinical work experience within the thirty-six-month period prior to beginning the program. Recent graduates of PN programs may apply provided that they commit to document 500 hours of work experience by the June date the program begins. All supporting documents must be in the student's file. All application material except transcripts should be sent to the Nursing Division. Transcripts should be sent by the school attended to the Admissions Office. **It is the student's responsibility to verify that his/her transcript has been received by the Admissions Office.**

4. Applicants who meet the requirements specified in #1 and #2 will be invited to take the admission/validation tests on the dates specified for the tests. Failure to enroll after acceptance constitutes forfeiture of position, and the individual must repeat the entire admission process if he/she seeks admission at a future date.

5. The following factors will be considered in granting provisional admission to the program: scores on the admission/validation examination (50th percentile in Foundations, and a combined average of 40th percentile in Maternal-Child Nursing), employee reference letters, and a GPA of 2.00 on previous college coursework. To gain unconditional admission, students must successfully pass skills check-offs in addition to passing the admission/validation exam. These check-offs will be conducted in the Spring Semester prior to entering the program. Failure will result in forfeiture of position in the program.

6. Students must have completed the following three courses, with a grade of "C" or higher, preferably at the College, prior to beginning study in the nursing program. Individuals may transfer these courses from other accredited colleges.

   BIO 103 Principles of Biology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   ENG 101 English Composition I . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   PSY 200 General Psychology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   Students must take diagnostic tests in writing, mathematics, and reading at least two semesters prior to beginning prerequisite coursework in order to allow for completion of any required coursework.

7. In the interest of student and patient safety and before consideration for admission, any applicant possessing certain limitations may be required to submit medical examination records and/or statements from physicians indicating that he/she is able to fully participate with reasonable accommodation, if necessary, in the approved program of clinical studies and responsibilities. **Students must be able to perform the essential functions of the program.**

8. Evidence of current CPR certification, health insurance, and malpractice coverage as a nursing student must also be submitted to the Nursing Division. Malpractice insurance application forms are available upon request in the Nursing Division. If the student does not supply these documents to the Nursing Division by the established deadline, admission to the program will be denied.

CVCC 000109

9. Once a student is admitted to the Nursing Mobility program, he/she will be responsible for accurately following the admissions criteria and the nursing curriculum design. Failure to follow the curriculum design as represented may affect progression in the program.

10. Once provisionally admitted to the program, the student must complete all coursework at the College unless written approval is obtained from the Division Chairperson and the Dean of Instruction.

11. Students enrolled in the Nursing Mobility program must earn a "C" or higher in all required courses in the nursing curriculum, in both nursing and non-nursing courses. This includes satisfactory completion of the clinical components of each course. Failure of clinical components results in failure of the course.

12. Nursing courses 131, 242, and 251 may be taken only once. A student who fails to earn a "C" in any one of these courses must reapply to the nursing program. If a student fails to earn a "C" in two or more of the courses listed above, he/she will be excluded from the program and unable to reapply.

13. Nursing courses NUR 252, 271, 272, 279, 291, and 292 may be repeated only once and are to be taken the next semester a course is offered provided space is available. If the student does not pass the nursing course on the second attempt, that student shall be excluded from the nursing program, but not the College. Students who repeat 252, 271, 272, 291, and 292 will be encouraged to successfully complete review packets for each course before retaking.

14. The nursing student must complete the entire nursing program within twenty-four months of the date he/she begin his/her studies in the program or be excluded from the nursing program. If a nursing student fails two different nursing courses within the twenty-four-month period, he/she will be excluded from the program and CANNOT reapply. Exclusion from the nursing program does not constitute exclusion from the College.

15. Withdrawal from nursing courses will be considered as failure (except in extenuating circumstances as determined by the Division Chairperson). The student must be passing at the time of the withdrawal for the circumstance to be considered.

16. An Incomplete (I) in nursing courses will be given only in extreme extenuating circumstances (i.e., hospitalization of student, death of a student's immediate family member, or hospitalization of the student related to pregnancy) and is at the discretion of the instructor and Nursing Division Chairperson). Incompletes are not intended for students who are failing nursing courses.

17. Nursing and non-nursing courses are to be taken in sequence as shown by the nursing curriculum design in this Catalog. When non-nursing courses are failed with a "D" or an "F", the student must repeat the courses the next semester they are offered, provided space is available. The student must be aware that if a grade of "D" or "F" is made in a non-nursing course that is a prerequisite to a nursing course the following semester, he or she may not advance to the next nursing course.

18. Each student is responsible for mailing his/her own application to the Board of Nursing in the state in which he/she is applying for initial licensure, as well as to NCLEX. Each student is responsible for mailing the application and meeting any deadlines that the Board may announce.

19. Transfer credit from other nursing programs is occasionally granted, and is done on an individual basis. A student who has been enrolled previously as a nursing student at another institution may be considered for admission after the application filing deadline date if time and space permit, but no guarantee of admission is granted. All applicants must take the entrance/validation examinations and meet all program requirements.

CVCC 000110

20. In addition to the above specification, students in the Nursing Mobility program must fulfill the same requirements and regulations expected of all students who are admitted to the College and outlined in the Nursing Student Handbook.

21. Applicants requiring reasonable accommodations under the Americans with Disabilities Act (ADA) are encouraged to call the ADA Coordinator at 214-4845 (Americans with Disabilities Act Compliance Plan, IV.).

*Special Costs for Nursing Students**
Liability Insurance (required)
Nursing Pin (optional)
Uniform (required)
Board of Nursing Licensure Fee
NCLEX Fee
NLN Examinations (required per semester and included in Registration Costs)
Nursing Validation Examination and Clinical Testing (required)
Health Insurance (individual rates required)
Physical (required)
Hepatitis B vaccinations (optional but highly encouraged)

*Costs for these items vary. For specific costs, the student should consult the Division Chairperson of Health Sciences.

107

CVCC 000111



# Chattahoochee
## Valley Community College
### CLOSE TO YOU. CLOSE TO PERFECT.

*1.334.291.4900*

P.O. Box 1000
2602 College Drive
Phenix City, Alabama 36868-1000

# STATUS LETTER REGARDING PROGRESSION
# IN THE <u>ADN</u> PROGRAM

Date: December 20, 2005

Student's Name: Lindy Wright

Social Security Number: 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

The purpose of this notice is to inform you of your status in the LPN program.

**① <u>FAILURE/WITHDRAWAL</u>**

**SEMESTER FAILED**

**NUR 252** — **Fall 2005**

**NUR 271** — **Fall 2005**

Policy states that a student is allowed a maximum of two failures in the L.P.N. or A.D.N. program before he/she is dismissed from the program, and withdrawals from nursing courses are counted as failures except in the extenuating circumstances as determined by the Division Chairperson. A student cannot progress in the program until the course failed has been successfully repeated. Students dismissed from the program may apply for admission as a new student after two years has elapsed (CV 2005-2006 Catalog pg. 111, #12 ADN Admissions Criteria).

**② <u>ELIGIBILITY</u>**

    a. May Re-enter     _____

    b. May <u>NOT</u> Re-enter   X

*please file in Lindy wrights folder*

**③ <u>SEMESTER TO RETURN</u>**

N/A

**NOTE:** All students must complete the program within twenty-four months of date he/she began (Alabama Department of Postsecondary Program Progression).

Sincerely,

Dixie Peterson
Division Chair/Health Sciences

*Lowe Attachment "2"*

CVCC 000381

2.  Specifying in the notice of appeal clear and specific objections(s) to the finding(s), conclu-
sion(s), or recommendation(s), affirmed by the President.

If the appeal is not filed with the Chancellor by the close of business on the fifteenth day following
the Grievant's receipt of the President's report, the Grievant's opportunity to appeal shall have been
waived. If the appeal does not contain clear and specific objections to the President's report, it shall be
denied by the Chancellor.

**Review by the Chancellor**
If an appeal is accepted by the Chancellor, the Chancellor shall have thirty (30) calendar days from
his/her receipt of the Grievant's notice of appeal to investigate and review the allegations contained in
the agreement, to review the report of the President and the Hearing Committee, to hold an appellant
hearing (if he/she deems such appropriate), and to issue a report of his/her findings of fact and con-
clusions of law. The Chancellor shall have the authority to (1) affirm, (2) reverse, or, (3) affirm in part
or reverse in part the findings, conclusions, and recommendations of the President and/or Hearing
Committee. The report of the Chancellor shall be served to the Grievant and the Respondent(s) by per-
sonal service or certified mail, return receipt requested, to the respective home addresses of the par-
ties. The report of the Chancellor shall not be further appealable except as allowed by the policies of
the State Board of Education. However, the Grievant shall not be precluded from filing a grievance
with an appropriate court or administrative agency.

**General Rule on Filing Deadlines**
If the last date for filing a document under this procedure falls on a Saturday, Sunday, or legal holiday,
the date of the first business day following the respective Saturday, Sunday, or legal holiday shall be
considered the deadline date.

# GRADE APPEAL PROCEDURE

It is the policy of CVCC that students should have the opportunity to appeal any grade which a stu-
dent has reason to believe does not accurately and fairly represent the nature of the classwork which
the student has performed. Therefore, the College has established a grade appeal procedure to be used
if a student has valid reason to believe that a grade which the student received for an examination, a
written/oral presentation, a project, or other required classroom activity, is either an inaccurate or
unfair grade. A student must make the initial grade inquiry within seven calendar days after the stu-
dent receives notice of the grade in question except in the case of a punitive grade issued for academ-
ic misconduct, which must be appealed by the end of the class day following the date on which the
sanction was imposed. Thereafter, each subsequent appeal, if any, must occur within a seven-calendar
day increment after the respective decision is received by the student. If a student does not meet the
deadline for appealing a grade, the right to appeal will be waived. For grades on final examinations or
grades that represent the final grade for the course, the initial seven-day period shall begin to accrue
on the first class day of the next academic term. In appealing a grade, the student shall have the oppor-
tunity to have his or her concern about the grade reviewed through the following procedures:

The student shall begin by stating either orally or in writing to the instructor that the grade in question
is either inaccurate, unfair, or both, and include the justification for appeal. If the student and the
instructor cannot successfully resolve the student's concern, the student may then contact the Division
Chairperson of that instructor's division or program. The student shall appeal to the Division
Chairperson by submitting the appropriate form stating his/her concern regarding the grade, and
describing the prior discussion with the instructor. (If the Instructor issuing the grade is the Chairperson
of the respective division or program, the student may appeal directly to the Dean of Instruction.) The
Division Chairperson will review the student's grade issue. The Chairperson shall have the authority
to call in the Instructor or to ask for the assistance of another CVCC Instructor or seek the opinion of
an expert in the subject area under review. If the student's concern about the grade cannot be success-
fully resolved at this level, the student shall be given the opportunity to take the appeal to the Dean of
Instruction. The faculty member shall also have the right to appeal a decision of the Division
Chairperson to the Dean. Appeal information must be submitted on the proper form and must contain
the following:

Lowe Attachment "3"

CVCC 000203

1. Name and course number of the grade under appeal.
2. Names of the student and the Instructor.
3. The term, day(s) of the week, and time of day that the course was taken.
4. A concise description of the student's complaint and narrative explanation of why it is felt that the grade was unfair, inaccurate, or both.
5. The date that the student first took the appeal to the Instructor.
6. A summary of the result of the student's appeal to the Instructor.
7. The date that the student took the appeal to the Division Chairperson.
8. A summary of the result of the student's appeal to the Division Chairperson.

In addition to the above information, the student and/or instructor should include a photocopy of any and all documents that the student and/or the instructor believes would assist the Dean in reviewing the grade appeal. The Dean shall review the appeal, schedule a meeting with the student and the Instructor and render a written report within fourteen calendar days after the Dean's receipt of all of the appeal information. The Dean shall have the authority to consult with the instructor, the Division Chairperson, or other persons who have expertise in the subject area. Once the Dean has completed the review of the grade appeal, a written report describing her findings and conclusions will be provided to the student, instructor, and Division Chairperson. In the event that the Dean determines that a change in the student's grade is in order, the student's official grade will be changed under the authority of the President of CVCC, which has been delegated to the Dean, to render final rulings on grade appeals. Therefore, the decision of the Dean will be final and not subject to further appeal.

NOTE: The same general process may be used by a student who wishes to express a concern about the fairness and appropriateness of other strictly academic matters. In reviewing appeals regarding matters other than grades, the Dean of Instruction will provide a memorandum of the findings, conclusions, recommendations, and/or directives regarding the matter under appeal, to the student, instructor, and Division Chairperson.

# DRESS AND APPEARANCE

CVCC students are expected to dress appropriately at all times, including complying with attire standards for special functions. CVCC reserves the right to require students to adjust their attire when it is deemed to be disruptive to the learning process or the good order of the College.

# CHILDREN ON CAMPUS

Minor children of students are not permitted in classrooms or laboratories at any time. If children accompany students during registration or other business on campus, the children must be properly supervised at all times. Children below the tenth grade level shall not be allowed in the Learning Resource Center unless accompanied by an adult who is conducting business there. Children in the LRC shall not be allowed to be present in a classroom during a class and must remain with the adult and be properly supervised at all times. All College employees shall be responsible for the enforcement of this policy. Students in violation of this policy will be required to take immediate measure to comply with this policy.

# STUDENT INSURANCE

It is the responsibility of the student to be covered by insurance in case of an injury related to a college-sponsored event. The parent, guardian, or student will be expected to assume all responsibility and shall not hold the College liable for any injury due to an accident related to a college-sponsored event, except for students who participate in intercollegiate athletic events and are covered by college accident insurance.

CVCC 000204

# Chattahoochee
## Valley Community College
### CLOSE TO YOU. CLOSE TO PERFECT.

## GRADE CHANGE FORM

| NAME OF STUDENT | SOCIAL SECURITY NO. | DATE |
|---|---|---|
| Lindy Wright | 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 | 1/18/2006 |
| COURSE NAME AND NUMBER Maternal | SECTION NUMBER | SEMESTER |
| NUR 271 Newborn | 1 | Fall 2005 |

To change a grade erroneously reported and to clear an "I", simply fill in the information below.

**GRADE CHANGE FROM** D **TO** C

**REASON:** Student submitted a grade appeal request. Since the procedures for the grade appeal were not completed in the time allotted, the grade needs to be changed from a D to a C.

**NOTES: **INCOMPLETE:** A Grade of "I" (Incomplete) **must be cleared by the end of the following regular semester or a final grade of "F" will automatically be recorded.** This grade will be reported to the student at the end of the semester in which the grade is changed.

_James Lowe_                              1/19/06
Signature of Instructor                   Date

APPROVED BY

_Mike Peterson_
Signature of Department Chairperson       1-19-06
                                          Date
APPROVED BY

ADMISSIONS Received JAN 20 2006 DRF

ADMISSIONS OFFICE                         Date

Lowe Attachment "14"

CVCC 000503

# Chattahoochee
## Valley Community College
### CLOSE TO YOU. CLOSE TO PERFECT.

1.334.291.4900
1.334.291.4994 (fax)

2602 College Drive
Phenix City, Alabama 36869

January 23, 2006

Ms. Lindy Wright
7716 Boulder Drive
Columbus, GA  31909

Dear Ms. Wright:

I have reviewed your Grade Appeal for the grade you received in NUR 271 – Maternal Newborn Nursing during the Fall 2005 Semester. Upon this review, it has been decided to change your grade from a "D" to a "C." The proper paperwork has been filed and will be submitted to the appropriate offices to reflect this change. You have been reinstated into the program due to the fact that the proper procedures on the grade appeal were not followed in a timely manner as required by Grade Appeal policy as stated in the Student Handbook.

Sincerely,

James Lowe
Academic Dean

cc:     Dixie Peterson
        Sanquita Alexander

Lowe Attachment "5"

CVCC 000359

# GRADE APPEAL FORM

Name of Student _Lindy Wright_          (Signature) _Lindy Wright_

Social Security Number _254 497629_

Submitted to (Division Chairperson) _Dixie Peterson_

Date _12 - 20 - 05_

## Section A: (To be completed by the student)

I.  Course information:
    a.  Name of course _Adult Nursing II_
    b.  Course number _NUR252_
    c.  Course section number _____
    d.  Semester course was taken _Fall 05_
    e.  Days of week course met _Wednesday_
    f.  Time of day course met _12 - 3pm_

II.  Name of Instructor _Lynn Harris RN, MSN_

III.  Date on which the specific item in question was received by the student _12-20-05_

IV.  Date on which the student presented his/her appeal to the instructor for the respective course _12 - 20 - 05_

V.  Concise, clear description of the specific nature of the complaint with particular regard to a description of how the grade at issue was either unfair, inaccurate, or both:

please see attached

VI.  Description of the results of the student's discussion with his/her instructor.

please see attached

VII.  Date on which the results of student/instructor discussion were finalized _please see attached_

VIII.  Attachments (from the student)

**(Section A must be presented to the appropriate Division Chairperson for appeal)**

Lowe Attachment "6"

CVCC 000351

V. Concise, clear description of the specific nature of the complaint with particular regard to a description of how the grade at issue was either unfair, inaccurate, or both.

Test Grades:  I have been told by Ms. Harris that I have earned at least 745 points out of the available 1,000 points for a letter grade of "D". I have several concerns regarding how the points were allocated, how exams were given, how information not covered during lecture was tested on exams, and how grades and points were communicated with students.

Some of the specific complaints regarding my grade are as follows:

Instructor was unavailable to discuss concerns at time of individual exams. Instructor did not formally review any exams until December 13th. Upon review and research of multiple exam questions, objective documentation was found in nursing textbooks to support the answers I chose and to refute the answers listed on the answer key. When questioned, the instructor refused to provide the rationale for answers indicated on the key. The instructor has been provided with this documentation.

The instructor did not post nor make available exam grades in a timely manner. Due to lack of communication by instructor, I was unaware that I was in jeopardy of failing this class until one to two week before the final exam. When questioned, the instructor stated "All you have to make is another 180 points" & you will pass. No tutoring or remediation was offered at that point.

Clinical Instructors did not "show up" for two (2) clinicals, negatively impacting my ability to synthesize and practice the knowledge given in lecture or to receive instructor feedback on my knowledge.

Instructor was not assigned until week 5 of the semester. A guest speaker (ADN prepared & no teaching experience) was utilized until that time. "Guest Speaker" on Respiratory System specifically instructed the class that compensatory mechanisms of ABG's would NOT be included on the exam. Two questions directly related to compensation were on the exam. Other exams were not given on the dates scheduled and for which students prepared.

Nursing Care Plans were "unavailable" and arbitrary grades (23 of 25 points) were assigned. If these grades were arbitrary, then I am requesting the full 25 points.

There were approximately 10 drug and solution calculation questions included on the four exams during the semester. No where in the syllabus or objectives was it indicated that drug dosage and calculation knowledge would be tested on the unit exams. No review of drug calculations were given in class prior to the exams.

VI. Description of the results of the student's discussion with his/her instructor.

Ms. Harris refused to discuss my grade or the documentation addressed in Section V. with me. However, I was advised to continue with the appeal process (CVCC Policy 6.7.2) and therefore, am doing so.

VII. Date on which the results of the student/instructor discussion were finalized.
I am unsure whether the discussions are finalized or not. Ms. Harris has refused to allow me to review any more of my test papers and has refused to discuss the six (6) questions for which objective documentation was provided and are in dispute at this time. Each question was valued at at least 2.5 points.

CVCC 000352

VIII. Attachments

I am hereby requesting that until the results of the appeal process, grievance process, and any litigation resulting from this matter be resolved and finalized, that I be allowed to continue participating in all aspects of the nursing program to include, but not be limited to: attending of classes and clinicals, timely assignment of preceptor, and participation in any NCLEX reviews or classes.

Respectfully submitted,

*Lindy Wright*

Lindy Wright

January 4, 2006
Grade Appeal Response
Lynn D Harris RN, MSN

Submitted to (Division Chairperson) Mrs. Dixie Peterson

Test Grades:
Mrs. Wright's final points for the semester were 741 out of a total of 1000. This resulted in a letter grade of D in the following nursing course, NUR 252: Adult Nursing II.

Instruction and remediation was offered during the semester upon student request. This student did not request or make an appointment to discuss any concerns prior to the close of the semester. Two study sessions with review were offered. This student did not attend either session. All of the Unit exams were reviewed with **rationales given and open discussion** on December 13, two sessions were offered, and this student attended only part of one. The student did not request any assistance. The Scan Trons were reviewed with the student and checked for any incorrect answers The student spent time reviewing each test. Any questions asked would have been answered.
I have reviewed the questions; documentation is supportive of current answers. This student did not successfully pass any of the four unit tests nor did she successfully pass the final exam. Her test average for the four unit tests was 64.38 (321.93 points divided by possible 500 points). The final exam grade was 69.40 (173.52 points divided by possible 250 points) the total average for these tests was 66 (495 points divided by possible 750 points. The other points that could have been achieved were from 5 computer programs (50 points), a case study (50 points), 5 take home quizzes (100 points) and 2 care plans (50 points). This would be a total of 250 achievable points. The student achieved 246 points for these items. The total points achieved for the semester was 246 for outside work and 495 for exams. This total is 741 which is a D.
Test scores were given to the students after each test. A written copy that delineated the status of each student's tests and course work was given to each student during class. An announcement was made to the class; if the students had questions about their individual grades please see this instructor. Some students did make an appointment, however this student did not.
There was one exam date in Adult Nursing 252 that was altered. The students had a unit exam in Maternal-child and a unit exam in adult nursing 252 on the same day. Thinking it would help the students do well on both tests; this instructor delayed the adult nursing exam one week. The students knew of this change well in advance as it was discussed in class prior to both tests original due date.
Part of the national patient safety goals is accurate medication administration. The students are required to successfully complete a calculation test. As part of hospital employment competencies math calculations are required for safe administration of medications. As a licensed Practical Nurse, I would hope medication calculations are not an issue. Nonetheless, the student should have requested assistance with medication administration calculations prior to the close of the semester, she did not.
There are barriers to communication. Threats concerning grievances do not create an environment of open communication.

*Lowe Attachment "7"*

CVCC 000355

Name of Student _Lindy Wright_ 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

Section B:  (To be completed by the Division Chairperson)

I.    Date on which the appeal was filed with the Division Chairperson _1-4-06_

II.   Actions/findings of the Division Chairperson

*The review of the appeal supports the grade given by Ms. Harris – the classroom instructor. Based upon failure of event test and no-evidence of erroneous grading or discrimination the grade should stand.*

III.  Attachments (from the instructor and/or Division Chairperson)

IV.   Decision of the Division Chairperson

*# The grade of D should stand*
*# The student did not pass any tests*

V.    Date of decision and notification (copies of Section A and B) given to the student and instructor _Notified by phone on 1-10-06. Copies available in office._

(Signature) _Dixie Peterson_ _1-10-06_

**(Section A and B must be presented to the Dean of the College for appeal along with a Notice of Appeal)**

*Lowe Attachment #8*

CVCC 000354

1-13-06

Upon review of documents presented regarding the Grade Appeal for NUR 252, it is the opinion of us that the grade of "D" stands.

Grading criteria and calculations are clearly stated in the course syllabus. Initial Calculation of grade well defined in section X.

Student implies that delay in posting grades contributed to the fact that she was unaware that she was "in jeopardy of failing this class until one to two weeks before the final exam." Using section X, the student could calculate grade standing at any point in the semester. Mrs. Harris documented that "test scores were given to the students after each test."

In response to students allegation of unfairness related to the drug computation questions stating, "No where in the syllabus or objectives was it indicated that drug dosage and calculation knowledge would be tested on the unit exams." The course syllabus states in section V, number 12: the student "must be able to correctly perform simple mathematical computations for administering drugs."

Again, after careful review of the course syllabus, student exams, and documentation from Mrs. Harris and the student, we recommend the final grade of "D" remain.

Carol Williams          Candace Shon

Lowe Attachment "9"

CVCC 000357

# Chattahoochee
## Valley Community College
CLOSE TO YOU.  CLOSE TO PERFECT.

1.334.291.4900

P.O. Box 1000
2602 College Drive
Phenix City, Alabama 36868-1000

January 17, 2006

Ms. Lindy Wright
7716 Boulder Drive
Columbus, GA  31909

Dear Ms. Wright:

I have reviewed your Grade Appeal for the grade you received in NUR 252 Adult Nursing II during the Fall 2005 Semester.  I can find no evidence that you received an inappropriate grade. Therefore, your grade appeal is hereby denied.  Please contact me if you have any questions.

Sincerely,

James Lowe
Academic Dean

cc:    Dixie Peterson
       Lynn Harris

Lowe Attachment "6"

CVCC 000304




### CONNIE COOPER
*Attorney at Law*
*P.O. Box 3110*
*Phenix City, AL 36868*
*(334) 297-9442*
*Fax: (334) 297-6008*

January 10, 2006

Dean James Lowe
Chattahoochee Valley Community College
2602 College Drive
Phenix City, AL 36869

RE: My client, Lindy Gale Wright

Dear Dean Lowe,

I am writing to follow-up on our telephone conversation today. I have been retained to assist Ms. Wright in pursuit of her due process rights regarding her grade appeal of two college courses.

It is my understanding that you will inform Ms. Wright or myself either today or tomorrow as to whether she will be allowed to continue classes until a ruling on her appeal is rendered. In the event she is not allowed to continue classes, I understand that concessions will be made later, in the event the ruling of her appeal is successful. We are aware of other students who have been allowed to continue class pending their appeal.

Additionally, it is my understanding that this entire process will be completed within 10-15 days after receipt of the information from Ms. Peterson and a decision is rendered. My client is aware of the due process procedure and will strictly adhere to the school policy in this regard.

Thank you for your time and attention.

Sincerely,

Connie Cooper

Connie Cooper

Lowe Attachment #11

CVCC 000234

NAME: _Lindy Wright_          DATE: _4-7-05_

## INDIVIDUAL CHECK OFF SHEET

(YES)   NO        HAVE I OBTAINED A CATALOG IF NEEDED?

(YES)   NO        HAVE I SUBMITTED ANY FILE ITEM INFORMATION?

(YES)   NO        DO I UNDERSTAND I MUST HAVE AN ALABAMA LICENSE AND THAT I
                  MUST BEGIN APPLICATION PROCESS TO OBTAIN MY LICENSE IF I
                  HAVE NOT YET DONE SO?

(YES)   NO        DO I KNOW WHERE I STAND WITH MY PREREQUISITES?

(YES)   NO        HAVE I MADE AN APPOINTMENT FOR MY SKILLS CHECKOFFS?

(YES)   NO        HAVE I MADE AN APPOINTMENT FOR ADVANCED REGISTRATION?

(YES)   NO        HAVE I MET WITH UNIFORM REPRESENTATIVE?

(YES)   NO        DO I UNDERSTAND THAT SCHEDULES CHANGE FROM SEMSTER TO
                  SEMESTER, AND THAT I WILL HAVE TO DO A PRECEPTOR OF
                  APPROXIMATLEY 70 HOURS IN MY LAST SEMESTER?

SIGNATURE: _Lindy Wright_          DATE: _4.7-05_

## OFFICE COPY

Lowe Attachment 12

# DEPOSITION OF LINDY WRIGHT

## July 13, 2007

## Pages 1 through 328

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

EXHIBIT

L

# DEPOSITION OF LINDY WRIGHT

## July 13, 2007

## Pages 1 through 328

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION


LINDY G. WRIGHT,

     Plaintiff,

Vs.                            CIVIL ACTION NO.
                                    3:06-CV-1087-WKW

CHATTAHOOCHEE VALLEY
COMMUNITY COLLEGE (CVCC),
et al.,

     Defendants.



* * * * * * * * * * * *



DEPOSITION OF LINDY WRIGHT, taken pursuant

to stipulation and agreement before Lisa J. Nix,

Registered Professional Reporter and Commissioner

for the State of Alabama at Large, in the Law

Offices of Parker & Cooley, 1507 Broad Street,

Phenix City, Alabama on Friday, July 13, 2007,

commencing at approximately 9:40 a.m. EDT.



* * * * * * * * * * * *

## Page 2

APPEARANCES

FOR THE PLAINTIFF:
Ms. Jennifer B. Cooley
PARKER & COOLEY
Attorneys at Law
1507 Broad Street
Phenix City, AL  36867
Mr. Peter A. Dumbuya
Attorney at Law
Post Office Box 3302
Phenix City, AL  36868

FOR THE DEFENDANT:
Mr. H. E. Nix, Jr.
Ms. Brandy F. Price
NIX, HOLTSFORD, GILLILAND,
   HIGGINS & HITSON
Attorneys at Law
Suite 300
4001 Carmichael Road
Montgomery, AL  36106

ALSO PRESENT:
Dr. Laurel Blackwell
Ms. Dixie Peterson

* * * * * * * * * * * *
EXAMINATION INDEX

LINDY WRIGHT
   BY MR. NIX  . . . . . . . . . .  6

## Page 3

EXHIBIT INDEX
MAR
DEFENDANT'S EXHIBIT
1  Notice of Second Amended Deposition       31
   Duces Tecum

2  Defendants' First Amended Set of         136
   Requests for Production of Documents
3  6/30/05 letter to Lindy Wright from      169
   David Hodge

4  Nursing 252 Adult Nursing II Clinical    201
   Syllabus - Fall Semester 2005
5  Nursing 252 Adult Health Nursing II -    201
   Fall Semester 2005 course outline

6  NUR271 - Maternal - Newborn Nursing      232
   course outline
7  Nursing 272 - Pediatric Nursing course   233
   outline

8  NUR 200 Nursing Career Mobility          233
   Assessment course outline
9  Printout of electronic document sent to  236
   Lindy Wright from instructor at CVCC

10  Documents produced by Lindy Wright      238

11  4/29/05 letter to Linday Wright from     277
    Katie Lackey
12  Income tax returns                       279

## Page 4

INDEX OF EXHIBITS (Continued)
13  Names and addresses of witnesses with    281
    attachments

14  Envelope addressed to Lindy Wright from  289
    CVCC postmarked 5/16/06
15  1/10/06 letter to Dean James Lowe from   290
    Connie Cooper

16  5/19/06 letter to Dean of Students from  291
    Lindy Wright
17  6/7/06 letter to Dr. Laurel Blackwell    293
    from Connie Cooper

18  NLN Diagnostic Readiness Test            304
    Performance Profile
19  6/13/06 letter to Connie Cooper from     306
    Laurel Blackwell, Ed.D. with attachment

20  7/28/06 letter to Dr. Laurel Blackwell   311
    from Jennifer Cooley with attachments
21  10/10/06 letter to Jennifer Cooley from  317
    Tracy Miller

22  Composite exhibit consisting of          318
    documents relating to authorization to
    release information

23  10/25/06 letter to Jennifer Cooley from  319
    Tracy Miller

## Page 5

STIPULATION

It is hereby stipulated and agreed by and
between counsel representing the parties that the
deposition of LINDY WRIGHT is taken pursuant to the
Federal Rules of Civil Procedure and that said
deposition may be taken before Lisa J. Nix,
Registered Professional Reporter and Commissioner
for the State of Alabama at Large, without the
formality of a commission, that objections to
questions other than objections as to the form of
the question need not be made at this time but may
be reserved for a ruling at such time as the said
deposition may be offered in evidence or used for
any other purpose by either party provided for by
the Statute.

It is further stipulated and agreed by and
between counsel representing the parties in this
case that the filing of said deposition is hereby
waived and may be introduced at the trial of this
case or used in any other manner by either party
hereto provided for by the Statute regardless of
the waiving of the filing of the same.

It is further stipulated and agreed by and

Page 6

1  between the parties hereto and the witness that the
2  signature of the witness to this deposition is
3  hereby waived.
4
5              * * * * * * * * * * * * *
6
7              LINDY WRIGHT
8      The witness, after having first been duly
9  sworn to speak the truth, the whole truth and
10 nothing but the truth testified as follows:
11             EXAMINATION
12 BY MR. NIX:
13 Q.  Would you state your name, please.
14 A.  Lindy L. Wright.
15 Q.  Where do you live, Ms. Wright?
16 A.  7716 Bolder Drive, Columbus, Georgia.
17 Q.  I have seen your name stated as Lindy
18     Warren.
19 A.  Correct.
20 Q.  Is that your maiden name?
21 A.  No, that was a previous marriage.
22 Q.  Previous marriage.  So who were you married
23     to?

Page 7

1  A.  Jason Michael Warren.
2  Q.  Did you get divorced?
3  A.  Uh-huh.  (Positive response.)
4  Q.  When you answer --
5  A.  Yes.
6  Q.  -- if you could, thank you, say yes or no.
7  A.  Okay.
8  Q.  Have you ever given a deposition before?
9  A.  Yes, sir.
10 Q.  When was that?
11 A.  I don't know the precise year.  It's many
12     years ago.  Probably in '93, '94 maybe,
13     '93.
14 Q.  What was it about?
15 A.  Job-related.
16 Q.  All right.  Were you a party in the case?
17 A.  Yes, sir.
18 Q.  What was the case?
19 A.  Termination of a position.
20 Q.  And you filed a lawsuit against your
21     employer?
22 A.  Yes.
23 Q.  Who was your employer?

Page 8

1  A.  Total Systems.
2  Q.  Total?
3  A.  Systems.
4  Q.  Where were they located?
5  A.  In Columbus.
6  Q.  Are they still there?
7  A.  They are.
8  Q.  Was the suit filed in Georgia?
9  A.  I think -- yes, sir.
10 Q.  Who was your lawyer in that?
11 A.  It was the State.
12 Q.  The State?
13 A.  Equal Employment Opportunity Commission.
14     It was an attorney from them.
15 Q.  It was the federal government, EEOC?
16 A.  Yes.
17 Q.  You filed a -- what kind of suit was it?
18     You were terminated.  I hear you saying
19     that, but do you know what type of suit it
20     was?
21 A.  No, I don't.
22 Q.  Do you remember how the suit was instituted
23     or started?

Page 9

1  A.  No.
2  Q.  Do you remember filing a charge with the
3     Equal Employment Opportunity Commission?
4  A.  What do you mean?
5  Q.  Typically, those -- if you file anything
6     with the EEOC, you typically file a
7     charge.  It's what they call a charge.
8     It's a form that you fill out and you make
9     a complaint.  It has some blocks that you
10    fill in and then a little narrative section
11    that you tell what happened.
12 A.  Yes.
13 Q.  Did you do that?
14 A.  Yes.
15 Q.  And then a lawsuit was instituted against
16    Total Systems?
17 A.  Yes.
18 Q.  And you're saying that you did not have a
19    private lawyer?  The EEOC itself --
20 A.  Yes.
21 Q.  -- filed the suit?
22 A.  Yes.
23 Q.  Was it a class action?

Page 10

1  A.  I don't know.
2  Q.  Where was the office of the EEOC?
3  A.  In Atlanta.
4  Q.  What was the outcome of the case?
5  A.  It never went to court.
6  Q.  Why not?
7  A.  They said they didn't have enough
8      evidence.  That's what the attorney told
9      me.
10  Q.  Who said that?  What attorney?
11  A.  I don't know his name.
12  Q.  Was it the attorney representing you?
13  A.  Correct.
14  Q.  The attorney from the EEOC?
15  A.  Correct.
16  Q.  Who at Total Systems did you work for?
17  A.  Eric Seldon.
18  Q.  Can you spell his last name?
19  A.  S-E-L-D-O-N.
20  Q.  Is he still at Total Systems?
21  A.  I have no idea.
22  Q.  Is Total Systems still operating?
23  A.  It is.

Page 11

1  Q.  What kind of business is it?
2  A.  Credit card processing company.
3  Q.  And they're in Columbus you say?
4  A.  Uh-huh.  (Positive response.)
5  Q.  Yes?
6  A.  Yes.
7  Q.  Do you know anybody that still works at
8      Total Systems?
9  A.  Yes.
10  Q.  Who?
11  A.  Jason Pettis, Holley Pettis.
12  Q.  Can you spell Pettis for me?
13  A.  P-E-T-T-I-S.
14  Q.  Holley Pettis?
15  A.  Uh-huh.  (Positive response.)
16  Q.  Who else?  Do you know anybody in
17      management?
18  A.  Joan McCraine.
19  Q.  John McCraine?
20  A.  Joan McCraine.
21  Q.  Aren't you related to Joan McCraine?
22  A.  I am.
23  Q.  How are you related to her?

Page 12

1  A.  She's my mother-in-law.
2  Q.  And she's in management?
3  A.  She is.
4  Q.  What's her position at Total Systems?
5  A.  She's a manager over her department.  I
6      don't know what her -- I don't know
7      anything else other than that.
8  Q.  Do you know what her department is?
9  A.  No.
10  Q.  Did she have anything to do with the
11      lawsuit --
12  A.  No.
13  Q.  -- that you filed against Total Systems?
14  A.  No.
15  Q.  Was it a discrimination lawsuit,
16      Ms. Wright?
17  A.  No.
18  Q.  It was not a discrimination lawsuit?
19  A.  Not towards me.
20  Q.  What did you file it over, then?
21  A.  For being fired.
22  Q.  And why did you say they fired you?
23  A.  Because I felt like that I was fired

Page 13

1      unjustly.
2  Q.  For what unjust reason?
3  A.  For what unjust reason?
4  Q.  Yes.
5  A.  Because they took two other people's word
6      over mine and terminated me and also
7      terminated a supervisor that --
8  Q.  I'm sorry.  Go ahead.
9  A.  -- that originally was told -- told by
10      those employees that he committed sexual
11      harassment towards them.
12  Q.  So you filed -- inside the company, you
13      filed a sexual harassment complaint?
14  A.  I did not file a sexual harassment
15      complaint.
16  Q.  Did you contend that you had been sexually
17      harassed?
18  A.  Did I contend?
19  Q.  Yes.
20  A.  No, that I -- no, that I was not sexually
21      harassed, no.
22  Q.  Did you contend that you were discriminated
23      against because of your sex?

Page 14

```
 1   A.  No.
 2   Q.  Are you sure you were a plaintiff in this
 3       EEOC thing against Total Systems?  Are you
 4       sure that you were a party, that you were a
 5       plaintiff?
 6   A.  Yes.
 7   Q.  All right.  You say you were not
 8       discriminated against or that no sexual
 9       harassment occurred with you.  Who did it
10       occur with?
11   A.  The sexual harassment?
12   Q.  Yes.
13   A.  The two girls that turned this man in for
14       sexual harassment.
15   Q.  Who was the man?  What was his name?
16   A.  Arthur Wimberly.
17   Q.  Who were the two girls?
18   A.  You'll have to give me a minute so I can
19       remember because it's been a long time.
20   Q.  That's all right.
21   A.  I think one of them's name was Susan
22       Marshall.
23   Q.  Okay.
```

Page 15

```
 1   A.  And I cannot remember the other girl's
 2       name.
 3   Q.  All right.  Did Arthur Wimberly remain
 4       employed with Total Systems?
 5   A.  No.
 6   Q.  So he was fired as a result of that?
 7   A.  He was fired.
 8   Q.  And were the two girls also fired?
 9   A.  I don't think at that time, but I think
10       that one has been fired since then.
11   Q.  Do you remember the name of the lawyer that
12       represented Total Systems?
13   A.  I don't.
14   Q.  Have you ever given any other depositions
15       besides that one?
16   A.  No.
17   Q.  Did you say Jason was the name of your
18       former husband?
19   A.  Yes.
20   Q.  Jason Warren?
21   A.  Jason Warren.
22   Q.  When were you married to him?
23   A.  Let me think of the year.  I think I was
```

Page 16

```
 1       23.  From 23 to -- we were married nine
 2       years, whatever those --
 3   Q.  23 to 32 be about right?  Nine years.  Do
 4       you remember what year you were married,
 5       the year in which you were married?
 6   A.  No.  Sorry.
 7   Q.  Do you remember the year in which you were
 8       divorced?
 9   A.  It was the year I graduated LPN school, so
10       that was 2001, 2002.
11   Q.  All right.  Now, where was the divorce
12       action filed?  Was it filed in Georgia
13       or --
14   A.  In Georgia.
15   Q.  Over in Columbus?
16   A.  Yes.
17   Q.  Now, your husband -- former husband, Jason
18       Warren, does he live in the Columbus area?
19   A.  He lives in Phenix City.
20   Q.  In Phenix City.  Where does he work?
21   A.  He works for Coca-Cola.
22   Q.  What does he do there?
23   A.  I have no idea.
```

Page 17

```
 1   Q.  Okay.  Now, have you ever been married
 2       other than to Jason Warren?
 3   A.  Yes.
 4   Q.  Tell me about that husband.
 5   A.  We're currently married.
 6   Q.  Currently married.  His name is Wright?
 7   A.  No, his name is Douglas Scott McCraine.
 8   Q.  Oh, that's right.  Do you go by the name
 9       McCraine?
10   A.  No, I don't.
11   Q.  Why not?
12   A.  Because I've not changed my name.  We're
13       separated.
14   Q.  You're separated?
15   A.  Yes.
16   Q.  When were you married to Douglas Scott
17       McCraine?
18   A.  December 31st of 2004.
19   Q.  When did y'all become separated?
20   A.  It was two years ago the end of March, the
21       beginning of April.
22   Q.  That would be 2005?
23   A.  Yes, sir.
```

Page 18

1   Q.  Was that a formal separation?
2   A.  As far as?
3   Q.  A lot of times people will actually enter
4       into a written agreement --
5   A.  No, sir.
6   Q.  -- in a separation.
7   A.  No.
8   Q.  Y'all just agreed to part ways, and you're
9       living in separate places now?
10  A.  Yes.
11  Q.  Is that the way it worked?  Is that right?
12  A.  Yes.
13  Q.  And where does he live?
14  A.  He lives in Smiths Station.
15  Q.  Where does he work?
16  A.  He works for Alabama Power.
17  Q.  What does he do for Alabama Power?
18  A.  He is an apprentice lineman.
19  Q.  Have you talked with him about getting back
20      together?
21  A.  Oh, yes, sir.
22  Q.  Have you talked with him about consummating
23      a divorce?

Page 19

1   A.  Yes, we've talked about that also.
2   Q.  So it's kind of up in the air right now?
3   A.  Well, you could say that.
4           (Brief interruption.)
5   Q.  Have you ever had any other husbands?
6   A.  No.
7   Q.  Do you have any children?
8   A.  Yes.  I have two small children.
9   Q.  What are their names?
10  A.  Brandon McCraine and Mason McCraine.
11  Q.  Spell McCraine for me.
12  A.  M-C-C-R-A-I-N-E.
13  Q.  Brandon McCraine and who?
14  A.  Mason, M-A-S-O-N.
15  Q.  Mason McCraine.
16          (Brief interruption.)
17  Q.  What is Brandon's birthday?
18  A.  6-16-05.
19  Q.  6-16-05.
20      What is Mason's birthday?
21  A.  7-7-06.
22  Q.  7-7-06.
23          (Brief interruption.)

Page 20

1   Q.  And you were separated in March 2005 you
2       think?
3   A.  (Witness nods head up and down.)
4   Q.  March, April.
5   A.  I think that's right.
6   Q.  Do you have any children by Jason Warren?
7   A.  No.
8   Q.  You told me, didn't you, that you live in
9       Georgia?
10  A.  Correct.
11  Q.  I have that address I'm pretty sure.
12      Do you live with anyone other than
13      Brandon and Mason?
14  A.  My mother.
15  Q.  What's your mother's name?
16  A.  Lois Anita Wright.
17  Q.  L-O-I-S?
18  A.  Uh-huh.  (Positive response.)
19  Q.  Lois Anita?
20  A.  A-N-I-T-A.
21  Q.  Is your father living?
22  A.  No, he's not.
23  Q.  Does your mother work?

Page 21

1   A.  No, she doesn't.
2   Q.  Do you live in your mother's house?
3   A.  Yes.
4   Q.  Do you know where Sandy Gunnels lives?
5   A.  She lives in Georgia.
6   Q.  Have you ever been to her house in Georgia?
7   A.  No.
8   Q.  Didn't you stay with her some while you
9       were attending CVCC?
10  A.  With who?
11  Q.  With Sandy Gunnels.
12  A.  No.
13  Q.  Never did stay with her?
14  A.  Never.
15  Q.  Would you tell me, Ms. Wright, who your
16      other relatives are that live in Alabama in
17      this general region, let's say the
18      southeastern part of Alabama.
19  A.  Gladys Crews.
20  Q.  Can you spell Crews for me?
21  A.  C-R-E-W-S.
22  Q.  All right.
23  A.  Karl Crews.

Page 22

1   Q.  With a K or a C?
2   A.  K.
3   Q.  Okay.
4   A.  Katrina Crews.
5   Q.  Okay.
6   A.  Ray Crews.
7   Q.  That's quite a crew.
8   A.  Julie Crews.
9   Q.  All right.
10  A.  Do you want their children's name, also?
11  Q.  No.  Any other relatives other than Crews?
12  A.  Harlan.
13  Q.  H-A-R-L-A-N?
14  A.  Uh-huh.  (Positive response.)
15  Q.  Give me their names.
16  A.  Crews.
17  Q.  Oh, Harlan Crews?
18  A.  Uh-huh.  (Positive response.)
19  Q.  Oh, I thought you meant the last name was
20      Harlan.
21  A.  No, that's the first name.  Sorry.
22  Q.  Do you have any other relatives in
23      southeastern Alabama with a last name other

Page 23

1       than Crews?
2   A.  McCraine.
3   Q.  Anybody else?
4   A.  Websters.
5   Q.  Give me --
6   A.  That's married, is that what you want?
7       Married family?
8   Q.  Sure.
9   A.  Okay.  Websters.  Mary Webster.
10  Q.  Mary?
11  A.  Uh-huh.  (Positive response.)
12  Q.  Okay.
13  A.  Mark and Robin Webster.
14  Q.  All right.
15  A.  Mary Ellen and Robert Brooks.
16  Q.  That's E-L-L-E-N?
17  A.  Uh-huh.  (Positive response.)
18  Q.  And Robert.
19  A.  Allen and Vickie Webster.
20  Q.  Okay.
21  A.  You just want in the local area or --
22  Q.  You know what I really want?  Well, the
23      Eastern District of Alabama is comprised of

Page 24

1       counties like Russell County, Lee County,
2       Macon County, counties in that general
3       region and around.  Chambers.  Do you have
4       any other relatives in those counties?
5   A.  No, sir.
6   Q.  You were telling me about the McCraines.
7       What McCraines live in this part of
8       Alabama?
9   A.  I think there's a lot of them, but I don't
10      know them all.
11  Q.  Just give me the adults, the ones that,
12      let's say, are over 19 years of age that
13      you can remember right now.
14  A.  Joan and Merlin McCraine.
15  Q.  Okay.
16  A.  Scott McCraine.
17  Q.  Is that your husband?
18  A.  It is.
19  Q.  Okay.
20  A.  Ronny McCraine.
21  Q.  His husband?
22  A.  That's his father's brother.  That's his
23      uncle.

Page 25

1       Tiffany McCraine.  Drew McCraine.
2   Q.  Okay.
3   A.  Christy McCraine.
4   Q.  All right.  Any other last names you can
5       give me, relatives by blood or marriage?
6   A.  No, sir.  I think that pretty much covers
7       them.
8   Q.  Does Jason Warren have relatives in this
9       general area?
10  A.  He does.
11  Q.  Who are his parents?
12  A.  Jeannie Warren.  I think it's Welch now.
13  Q.  Where does she live?
14  A.  Buena Vista, Georgia.
15  Q.  Who do you know that lives in Alabama
16      that's related to Jason Warren?
17  A.  John and Christy Warren.
18  Q.  Any others that are close, let's say, to
19      him?
20  A.  Michael Warren.  That's his son.
21  Q.  How old is Michael?
22  A.  He's probably 16, 17 years old now.  I'm
23      not sure.

Page 26

1   Q.  Just give me the ones over 19.
2   A.  Okay.  That's it.
3   Q.  Where does Jeannie Warren Welch work?
4   A.  Skyline Electric.
5   Q.  How about John and/or Christy Warren?
6       Where do they work?
7   A.  I don't know where Christy works.  I think
8       John works for Tallapoosa Power.
9   Q.  Does your mother work?
10  A.  No, she does not.
11  Q.  Gladys Crews.  Does Gladys Crews work?
12  A.  She does.
13  Q.  Where does she work?
14  A.  Alabama CCH.
15  Q.  What is that?
16  A.  It's a tax business.
17  Q.  Karl Crews, does he work?
18  A.  You could say he does.  They have a store
19      on 165 in Alabama.
20  Q.  Is that close to a town?
21  A.  It's Bluff Creek.  They call it Bluff
22      Creek.
23  Q.  Okay.  How about Katrina?  Are Katrina, Ray

Page 27

1       and Julie, are they all over 19 years of
2       age?
3   A.  Yes.
4   Q.  Does Katrina work to your knowledge?
5   A.  No.
6   Q.  Does Ray?
7   A.  Yes.
8   Q.  Where does he work?
9   A.  At their store.
10  Q.  All right.  How about Julie?
11  A.  At their store.
12  Q.  Is it like a little general store?
13  A.  Yes, sir, and a restaurant.
14  Q.  What's the name of the restaurant?
15  A.  Country Kitchen.
16  Q.  How about Joan and Merlin McCraine?  I know
17      where Joan works.  How about Merlin?
18  A.  I'm not --
19  Q.  I guess Joan is still at Total Systems.
20  A.  Total Systems.
21      I'm not sure of the name that Merlin
22      works at.  It's kind of like Airgas, but
23      it's a different company.

Page 28

1   Q.  It's not Airgas?
2   A.  No.
3   Q.  But it's a company like Airgas?
4   A.  Right.
5   Q.  How about Ronny?  Where does he work?
6   A.  I don't know.
7   Q.  Tiffany, do you know where Tiffany or Drew
8       work?
9   A.  AFLAC.  I think they both work at AFLAC if
10      I'm not mistaken.
11  Q.  In Columbus?
12  A.  Yes.
13  Q.  And Christy?
14  A.  McCraine?
15  Q.  Yes.
16  A.  She works at a day care, Central -- Kids
17      Central.
18  Q.  Where is that?
19  A.  It's on Summerville Road.
20  Q.  In what town?
21  A.  Alabama.  Phenix City.
22  Q.  Let's go to the Websters.  Mary Webster.
23  A.  She doesn't work.

Page 29

1   Q.  How about Mark and/or Robin?
2   A.  Mark owns a business, Webster Electric.
3   Q.  Where is that?  What town?
4   A.  It's in Phenix City.
5   Q.  Does Robin work?
6   A.  Total Systems.
7   Q.  Mary Ellen Brooks?
8   A.  She doesn't work.
9   Q.  Robert Brooks?
10  A.  He does, but I'm not sure where.
11  Q.  I saw you kind of smile when you said their
12      names.  Any significance to that?
13  A.  No.
14  Q.  I thought you smiled and looked over across
15      the table, but there's no significance to
16      that?
17  A.  No.
18  Q.  It's just me.  Don't worry about it.  I'm a
19      little crazy.
20          Allen and Vickie Webster?
21  A.  Allen works for a -- I think it's kind of
22      like a temporary agency.  He fills --
23      through his agency fills positions for

Page 30

1    companies.
2  Q.  What's the name of the agency?
3  A.  I'm not real sure.
4  Q.  Where is it?
5  A.  I think it's in Columbus.
6  Q.  All right.  This deposition, Ms. Wright, is
7    being taken pursuant to the Federal Rules
8    of Civil Procedure.  And under those rules,
9    you have the right to get a copy of this
10    deposition when Ms. Nix completes it and
11    read it and -- for any typographical errors
12    or anything like that or whatever and sign
13    it, approving it, or you may waive that
14    right and trust that the court reporter,
15    Ms. Nix, gets everything down right.
16      Which would you prefer to do?  Do you
17    want to read and sign your deposition or do
18    you want to waive reading and signing?
19  A.  Waive it.  That's fine, unless my
20    attorneys ...
21      MR. NIX:  Is that all right?
22      MS. COOLEY:  (Nods head up and
23      down.)

Page 31

1  Q.  Now, I know that you have provided a number
2    of documents to me yesterday, which I
3    appreciate it.  And you did that pursuant
4    to a deposition notice which has changed a
5    few times.
6      (Defendant's Exhibit 1 was marked
7      for identification.)
8  Q.  I want to show you a copy of your
9    deposition notice.  And I'm marking it as
10    Defendant's Exhibit Number 1 to your
11    deposition.  It's entitled Notice of Second
12    Amended Deposition Duces Tecum.
13      Would you take a look at that and tell
14    me if you have ever seen that before.
15      MR. NIX:  Jennifer, while she's
16      reading that, it occurred to
17      me last night that we'd need
18      to get a written response to
19      the request for production
20      from you --
21    MS. COOLEY:  Okay.
22    MR. NIX:  -- if that's all right.
23      Just the regular response.

Page 32

1      Typically -- and I think
2    this is what the rules
3    require.  What we try to do is
4    number our documents when we
5    produce them and then refer to
6    that number when we respond to
7    a specific request.
8      I don't know if that's
9    required or not to be honest
10    with you, but it makes it
11    easier for me, anyway.  But, I
12    mean, that's not something you
13    have to do.  I'm just telling
14    you that's what I --
15      But what I do want to
16    know when you go through the
17    request -- when you do the
18    written response, if you don't
19    mind, is when you produce all
20    of the documents that relate
21    to it, you know, that type
22    thing -- there may be some
23    additional or whatever, if

Page 33

1    that's all right with you.
2    MS. COOLEY:  Okay.
3  Q.  Have you seen that deposition notice
4    before, Ms. Wright?
5  A.  It looks like the same thing I've seen.
6  Q.  Okay.
7  A.  But it looks like there's added -- I don't
8    remember it being so long.
9  Q.  Okay.  There is a request for production of
10    documents that's being copied right now
11    that is a different document, but it is
12    shorter because it doesn't have this
13    preface right here.  It's not much shorter,
14    but it's a little shorter.  This is thick
15    paper, but -- as soon as that comes in,
16    I'll show that to you.
17      But what I would like to do, and your
18    lawyers may be able to help me with this,
19    I'd like to establish either by just your
20    looking at the two, the duces tecum and the
21    notice and the request for production, that
22    they are the same or that they request the
23    same documents item for item.

Page 34

1      MR. NIX:  Can y'all stipulate that
2         they are the same, the request
3         for production of documents
4         and the duces tecum and the
5         notice of the deposition are
6         the same item for item?  Can
7         y'all --
8      MS. COOLEY:  (Nods head up and
9         down.)
10     MR. DUMBUYA:  We will stipulate to
11        it.
12     MR. NIX:  Thank you.  That helps a
13        lot.
14  Q.  Let me give you that back and let's take a
15     look at it.  This is my goal, Ms. Wright.
16     I want to go through these real quickly if
17     we can and just talk about them briefly.
18     The main thing I really want to know is,
19     have you provided all of the documents that
20     are requested.  Okay?
21        And your lawyers, of course, have also
22     provided some documents, and they -- I
23     don't know.  It's possible, I guess, that

Page 35

1      they may have some additional documents or
2      whatever, but let's look at number one.
3         It asks for all documents, including
4      doctor's notes, reports, statements,
5      invoices, bills, insurance claims and
6      records for medical payment for any claim
7      you make for emotional distress or damages
8      of any kind in this case.
9         Are you claiming emotional distress as
10     an element of damages in this case?
11  A.  Yes, sir.
12  Q.  Have you been to a doctor or a hospital or
13     any other -- a counselor, psychologist,
14     psychiatrist for emotional distress as a
15     result of the things that you say happened
16     in this case?
17  A.  No, sir.
18  Q.  So would it be correct to say that you do
19     not have and documents do not exist that
20     meet these specifications, like doctor's
21     notes or statements or bills or insurance
22     claims or records related to any treatment
23     or diagnosis for emotional distress?  They

Page 36

1      do not exist, correct?
2   A.  Correct.
3   Q.  Because you have not had any treatment,
4      correct?
5   A.  No treatment.
6   Q.  And then what other damages are you
7      claiming in this case?
8   A.  Lost wages, humiliation.
9   Q.  All right.  Lost wages, humiliation.
10  A.  I mean, that was my livelihood.  I didn't
11     get to sit for my boards.  Therefore,
12     there's been lost wages, there's been
13     humiliation, positions that I could not
14     apply for because I'm an LPN, not an RN.
15  Q.  What else?  Any other damages that you
16     claim in the case or anything for which you
17     claim damages?
18  A.  Would that be like attorneys' fees that I'm
19     having to --
20  Q.  If that's part of your damage claim.  I
21     can't tell you what you're claiming, but if
22     that's a part of your damage claim, that's
23     the type thing I want to know.

Page 37

1   A.  Attorneys' fees, because, I mean, that's
2      damage to me.
3   Q.  And I assume expenses as well?
4   A.  Yes.
5   Q.  Is that right?
6   A.  Expenses.
7   Q.  Expenses of the lawsuit.  Anything else?
8   A.  Not that I can think of at this moment.
9   Q.  As we go through this deposition, would
10     you -- if you remember anything else, would
11     you stop and tell me about it?
12  A.  Yes, sir.
13  Q.  And then there's another place in the
14     deposition where I'll ask you some more
15     questions, give you another opportunity to
16     talk about them.  Okay?
17  A.  Okay.
18  Q.  Now, you say that you've lost wages.  Have
19     you been working as an LPN?
20  A.  I have.
21  Q.  Were you working as an LPN while you were
22     in school at Chattahoochee Valley Community
23     College in their nursing program, their

1    Nursing Mobility Program to receive an RN?
2    A.   Yes, sir.
3    Q.   Where were you working as an LPN?
4    A.   Doctors Hospital p.r.n.  That's on an
5       as-needed basis, when I had time to go in
6       and work.
7    Q.   Doctors Hospital?
8    A.   Uh-huh.  (Positive response.)
9    Q.   Is that in Columbus?
10   A.   It is.
11   Q.   When did you first start school at CVCC in
12      their Nursing Mobility Program?
13   A.   RN and LP -- RN?
14   Q.   RN.
15   A.   I think I started in 2005.  Was it 2005?
16   Q.   Do you remember the month?
17   A.   It was May.  May of 2005.
18   Q.   Do you have any documents that would
19      refresh your recollection as to when you
20      started?
21   A.   No, I don't, except I looked back at my
22      transcript to see the dates.  I think it
23      was May of 2005.

1    Q.   So in May of 2005, were you working as an
2       RN?
3    A.   No.
4    Q.   I'm sorry.  As an LPN.
5    A.   LPN.
6    Q.   And you were working at Doctors Hospital?
7    A.   Yes.
8    Q.   Were you working on an as-needed basis at
9       that time?
10   A.   Yes.
11   Q.   Have you always worked on an as-needed
12      basis as an LPN?
13   A.   No.
14   Q.   Have you worked full-time as an LPN?
15   A.   Yes.
16   Q.   When was that?
17   A.   2002 I think.
18   Q.   Right after you graduated?
19   A.   (Witness nods head up and down.)
20   Q.   Yes?
21   A.   Yes.
22   Q.   With respect to being an LPN, do you have
23      to sit for boards --

1    A.   Yes.
2    Q.   -- to receive a license to be an LPN?
3    A.   Yes.
4    Q.   And those are given by the Alabama Board of
5       Nursing; is that right?
6    A.   Yes, sir.
7    Q.   Can you work in a Georgia hospital with an
8       Alabama license?
9    A.   No.
10   Q.   So you had to sit for the Georgia board as
11      well?
12   A.   No, sir.  It was -- I took my boards and
13      then I applied for my Georgia license, kind
14      of like grandfathered in.
15   Q.   Reciprocal agreement?
16   A.   Yes.
17   Q.   When you first started working at Doctors
18      Hospital --
19         That is where you first started, right?
20   A.   Right.
21   Q.   Is that the only place you've worked as an
22      LPN?
23   A.   No.

1    Q.   Who at Doctors Hospital did you work for
2       when you first started to work there?
3    A.   Gertrude.  I don't know what her last name
4       is.
5    Q.   What was her job?
6    A.   She was the manager over med-surge.
7    Q.   And this would have been in -- after you
8       got your license in 2002; is that correct?
9    A.   Correct.
10   Q.   And was this the first job you had after
11      you got your license as an LPN?
12   A.   Yes.  I worked as a tech on the floor once
13      I graduated.
14   Q.   Until you got your license?
15   A.   Right.
16   Q.   What was your job at Doctors Hospital in
17      the med-surge --
18   A.   As a nurse?
19   Q.   -- in the -- well, yes, as a nurse, as an
20      LPN?
21   A.   As an LPN, floor nurse.
22   Q.   You were a floor nurse on a floor of the
23      hospital?  You were not in the medical --

1  you were not actually, for example,
2  assigned to a surgical team or a surgical
3  suite or the surgical part of the hospital
4  where they perform surgery?
5  A.  No.
6  Q.  You were on a floor?
7  A.  On a floor.
8  Q.  And that was under Gertrude?
9  A.  Correct.
10 Q.  Have you ever worked at any other jobs at
11     Doctors Hospital other than being on the
12     floor as an LPN?
13 A.  No.
14 Q.  Now, when you were a tech, how long were
15     you a tech?
16 A.  About a year.
17 Q.  What did you do as a tech?
18 A.  Patient care, bathing, basically running
19     errands for the patient, communicating with
20     the nurses.
21 Q.  You would do more menial chores?  Would
22     that be a good way to describe what you did
23     as a tech?

1  A.  Vital signs, bathing, providing linens,
2      ice, whatever the patient needed.
3  Q.  Now, you said you have worked somewhere
4      else as an LPN --
5  A.  Correct.
6  Q.  -- other than Doctors Hospital.  Where is
7      that?
8  A.  St. Francis.
9  Q.  And St. Francis is in Columbus, too?
10 A.  Columbus.
11 Q.  Do you still work at St. Francis?
12 A.  No, sir.
13 Q.  When did you work at St. Francis?
14 A.  I think it was November of 2000 ... I
15     worked there for about six months.  It was
16     '03 or '04 -- I think it was '04 until
17     April or -- March or April of '05.  I think
18     it was April of '05.
19 Q.  Why did you leave St. Francis?
20 A.  Because I was pregnant and starting the RN
21     Mobility Program at CVCC.
22 Q.  When did you have the child that you were
23     pregnant with in April of 2005?

1  A.  I had him in June of '05.
2  Q.  Was your pregnancy normal?
3  A.  Yes.
4  Q.  Who is your OB-GYN doctor?
5  A.  It was Melissa Flynn.
6  Q.  Where is Melissa Flynn?
7  A.  She's in Columbus, Georgia.
8  Q.  F-L-Y?
9  A.  Uh-huh.  (Positive response.)  N-N.
10 Q.  Do you have a general doctor anywhere?
11 A.  Miranda Edwards.
12 Q.  Where is Miranda Edwards?
13 A.  Columbus, Georgia.
14 Q.  What kind of doc is she?
15 A.  Family practice.
16 Q.  Do you have any other doctors?
17 A.  No, sir -- yes, I do.  Steven Leichter.
18     He's an endocrinologist.
19 Q.  Spell his name if you would.  Is it P-H on
20     Steven or V?
21 A.  V.  I think it's L-I-E-T-C-H-N-E-R.  I
22     think that's it.
23 Q.  And he's an endocrinologist?

1  A.  He is.
2  Q.  What do you see him for?
3  A.  Thyroid.
4  Q.  I saw a reference to Synthroid in some of
5      the documents.  Do you take Synthroid?
6  A.  I do.
7  Q.  How long have you been taking Synthroid?
8  A.  Ten -- between ten and 12 years.
9  Q.  And you said Steven Leichter is in
10     Columbus, also?
11 A.  Correct.
12 Q.  Any other doctors that you have?
13 A.  No, sir.
14 Q.  All right.  Now, you did what job at
15     St. Francis?
16 A.  Med nurse.
17 Q.  What is a med nurse?
18 A.  Give the patients their medications when
19     it's time.
20 Q.  Is that all you did?
21 A.  No.  I helped the other floor nurses with
22     patient care.
23 Q.  Tell me what's involved in being a med

Page 46

```
 1        nurse and giving patients their medication.
 2    A.  Educating them on the medications they're
 3        getting, hanging IV fluids, antibiotics
 4        through a --
 5             (Brief interruption.)
 6    Q.  Go ahead.
 7    A.  Hanging IV fluids, antibiotics, anything
 8        that was prescribed by the doctor to give
 9        the patient and educate them on the
10        medications if they didn't understand.
11    Q.  Did you as a med nurse have to make
12        calculations about the medications --
13    A.  Sometimes.
14    Q.  Sometimes?
15    A.  Yes, sir.
16    Q.  Can you explain to me what that means?
17        I've seen a reference to that, but I really
18        don't know what is involved in it.
19    A.  In med calculations?
20    Q.  Right.
21    A.  Well, there's -- in school, they teach you
22        formulas, but it's not that difficult.  If
23        the doctor orders 500 milligrams of Vicodin
```

Page 47

```
 1        and they only get a half a tab, then pretty
 2        much you figure out that that's 250
 3        milligrams and you'd break the tablet in
 4        half.  But that's not a medication that we
 5        would normally do that with.  That's just
 6        an example.
 7    Q.  How about on IVs?
 8    A.  That pretty much came up from the pharmacy,
 9        but if there was a discrepancy in the order
10        from the doctor and the pharmacy, then you
11        would call the pharmacy and question them.
12    Q.  Is that a matter of doing a calculation?
13    A.  No.  Basically when you're out on the
14        floor, it's given.  The doctor gives the
15        order, and that's pretty much what it is so
16        you really don't have to calculate when
17        you're on the floor.
18    Q.  The pharmacy does whatever calculation is
19        necessary for the IV bag or whatever?
20    A.  Right.
21    Q.  What other types of calculation figuring
22        does a med nurse have to do on medications?
23    A.  That's pretty much it.  You just have to
```

Page 48

```
 1        know what you're giving to the patient so
 2        you can explain to them what they're
 3        getting if they have questions, and there
 4        was always reference books if you
 5        didn't ...
 6    Q.  Well, you mentioned that in school, they
 7        teach you formulas.  What do you mean by
 8        that?
 9    A.  Formulas?  How to calculate the amount of
10        drug needed to be given was the question
11        that they gave in school.  I mean, they
12        would give you a question and it would
13        say -- an example would be, I guess, if you
14        had somebody with Tylenol, give them 1,000
15        milligrams of Tylenol and the order calls
16        for 500, how many tablets would you give?
17    Q.  That's it?  It's just that simple; is that
18        right?
19    A.  Some of them are.  The IV were different.
20        IV calculations were a little different.
21        There's different formulas.  I don't know
22        them right off the top of my head.
23    Q.  But you studied those is what you're
```

Page 49

```
 1        telling me in school, right?
 2    A.  We did.
 3    Q.  And as a med nurse at a hospital, I assume
 4        you're expected to know those formulas, are
 5        you not?
 6    A.  Yes.
 7    Q.  And that would be true for St. Francis
 8        Hospital when you were a med nurse at
 9        St. Francis, correct?
10    A.  Correct.
11    Q.  And therefore, of course, you knew those
12        formulas at that time, correct, when you
13        were at St. Francis?
14    A.  Correct.
15    Q.  So the formulas taught in school are no
16        different really than the formulas that
17        you're required to know as a med nurse --
18        or were required to know as a med nurse in
19        November of 2004 when you were a med nurse
20        at St. Francis, right?
21    A.  Right.
22    Q.  Who was your supervisor at St. Francis?
23    A.  Shirley Stanford.
```

Page 50

```
1   Q.  Is she still there?
2   A.  She is.
3   Q.  What was her title?
4   A.  She was the manager over 3 South and 3
5       North.
6   Q.  She was the nursing manager --
7   A.  Uh-huh.  (Positive response.)
8   Q.  -- or the med nurse manager?
9   A.  She was the nursing manager.
10  Q.  Okay.  How were you hired at St. Francis?
11      What process did you go through?
12  A.  Through human resources and filling out an
13      application and taking a test.  I think
14      it's kind of like a personality test.
15  Q.  Okay.
16  A.  Interview process and hired.
17  Q.  And how were you hired at Doctors
18      Hospital?  The same type process?
19  A.  Yes, sir.
20  Q.  Let's see.  You worked at Doctors Hospital
21      in 2002 as an LPN after you got your
22      license; is that right?
23  A.  After I got my license.
```

Page 51

```
1   Q.  You got your license, didn't you, in 2002,
2       your LPN license?
3   A.  I think it might have been 2003.  I'm not
4       real sure of the date because I waited
5       about a year.  I waited a year, I
6       think.
7   Q.  You're saying that after you graduated from
8       CVCC as an LPN candidate for the boards,
9       you waited a year before you took the
10      boards?
11  A.  No.  I took the boards a few months
12      after -- I think maybe in December I took
13      the boards.
14  Q.  When would you have graduated?
15  A.  August.  The LPN program was August.
16  Q.  That would be the graduation time?
17  A.  Uh-huh.  (Positive response.)
18  Q.  Okay.
19  A.  I think 2002.
20  Q.  And you took the licensing test or the
21      boards in December of '02?
22  A.  Yeah, December of '02.
23  Q.  December 2002.  Do you have to go to
```

Page 52

```
1       Montgomery to do that?
2   A.  Yes.
3   Q.  You do?
4   A.  Uh-huh.  (Positive response.)
5   Q.  And you go to the Board of Nursing to do
6       that?
7   A.  No, it was a testing site.
8   Q.  Was December 2002 the first opportunity you
9       had to take the licensing exam after you
10      graduated as an LPN in August?
11  A.  No, I'm sure it wasn't the first
12      opportunity, but it was the first date that
13      I scheduled.
14  Q.  Why did you wait?
15  A.  No reason.
16  Q.  And were you working at that time as a
17      tech?
18  A.  I was.
19  Q.  Do you remember when you first started
20      working as a tech at Doctors Hospital?
21  A.  I think maybe in November of that same
22      year, 2002.  I didn't work right away.
23  Q.  You worked as a tech in November of '02 for
```

Page 53

```
1       the first time you think --
2   A.  I think so.
3   Q.  -- at Doctors Hospital?
4       I don't know why, but I thought you
5       said you worked for about a year as a tech.
6   A.  Correct.
7   Q.  So even though you took the boards in
8       December '02, you continued to work on as a
9       tech for a year after November '02 when you
10      first started, right?
11  A.  Correct.
12  Q.  Did you pass the LPN licensing test on the
13      first try?
14  A.  No.
15  Q.  How do they grade that or how do they
16      determine whether you pass?
17  A.  I think that it's on maybe a cumulative,
18      how many questions you get right.  I'm not
19      real sure.
20  Q.  Do you remember what your score was?
21  A.  No, they don't give a score.  It's
22      pass/fail.
23  Q.  They just told you you failed, right?
```

1   A.   Yes.
2   Q.   So after you took it in December 2002, when
3        did you take it again?
4   A.   Close to that year mark between tech and
5        LPN.  I'm not sure the exact date.
6   Q.   So if you became a tech in November 2002 at
7        Doctors Hospital, sometime around November
8        2003 is when you took the LPN licensing
9        exam for the second time?
10  A.   Somewhere around there I think.  I'm not
11       real sure.  I'm not sure of the date.
12  Q.   Did you pass it the second time?
13  A.   Yes, I did.
14  Q.   So after you passed the LPN exam, were you
15       automatically moved up in your job at
16       Doctors Hospital to work as an LPN?
17  A.   Yes.  You had to precept with somebody for
18       about six to eight weeks.
19  Q.   What is precept?
20  A.   Work alongside of a seasoned nurse.
21  Q.   Did you say precept?
22  A.   Yeah, it's like precepting with --
23  Q.   P-R-E-C-E-P-T?

1   A.   Uh-huh.  (Positive response.)
2   Q.   What is --
3   A.   A mentor.
4   Q.   All right.  So you had to work with a
5        mentor --
6   A.   Correct.
7   Q.   -- for about six weeks you said?
8   A.   Somewhere between six to eight weeks.
9   Q.   Who was your mentor?
10  A.   Jan Lackey.
11  Q.   What job did you do with your mentor?
12  A.   Nursing.
13  Q.   Floor nurse?
14  A.   Floor nurse.
15  Q.   The same job that you eventually did as an
16       LPN; is that right?
17  A.   Right.
18  Q.   So sometime around November 2003, you
19       started as an LPN at Doctors Hospital, and
20       then about a year later, you began working
21       at St. Francis; am I right?
22  A.   Correct.
23  Q.   Am I right?

1   A.   Correct.
2   Q.   Now, at Doctors Hospital, let's say, in
3        November 2003 when you began working as an
4        LPN, did you work on an as-needed basis?
5   A.   At Doctors Hospital still or -- can you
6        repeat that question, please.
7   Q.   In November 2003, maybe October, but
8        sometime in that time frame, you began
9        working as an LPN at Doctors Hospital,
10       correct?
11  A.   Correct.
12  Q.   When you began working as an LPN at Doctors
13       Hospital, did you work on an as-needed
14       basis?
15  A.   No.
16  Q.   So you would call that a full-time basis?
17  A.   Yes, sir.
18  Q.   How many hours a week did you work?
19  A.   Anywhere from 36 to 40 plus hours.
20  Q.   How much did you make?  Were you paid on an
21       hourly basis?
22  A.   Hourly basis.
23  Q.   How much did you make?

1   A.   I think it was 11, $11 and some change.
2        I'm not real sure the exact amount.
3   Q.   And that's an hour; is that right?
4   A.   Yes, sir.
5   Q.   And did you get benefits of any kind?
6   A.   Yes.
7   Q.   What were they?
8   A.   Medical, dental.
9   Q.   Any other benefits?
10  A.   No, sir.  Vacation, time off, sick time.
11  Q.   Did the hospital pay 100 percent of the
12       premium for the medical and dental
13       coverage?
14  A.   No.
15  Q.   How did that work?
16  A.   You have to pay a portion.
17  Q.   Do you remember the portion you had to pay?
18  A.   No.
19  Q.   Do you remember about how much money it was
20       a month?
21  A.   No, I don't.  I mean, I don't remember.
22  Q.   Now, did you work at Doctors Hospital on a
23       full-time basis from about November 2003 as

Page 58

1    an LPN all the way up to the time that you
2    took the job at St. Francis as a med nurse?
3    A.  No, I worked p.r.n. some at the very end.
4    Q.  Okay.  So at the beginning of your LPN work
5    at Doctors, you worked full-time, but then
6    at some point in time later, they switched
7    you to as-needed?
8    A.  That was my choice.
9    Q.  Do you recall about when you switched?
10   A.  Maybe October of 2003 or four.  I'm not
11   real sure of the exact date.
12   Q.  It would have to be four because you
13   started working as an LPN at Doctors
14   Hospital around November 2003.  Am I right
15   about that?
16   A.  Yes.
17   Q.  And so that if you worked for some period
18   of time at Doctors Hospital on a full-time
19   basis and you chose to switch to an
20   as-needed basis later and it was in the
21   November time frame, October, November time
22   frame, it would have been 2004, right?
23   A.  I think so.

Page 59

1    Q.  Do you think that's correct, that you chose
2    to go on an as-needed basis in 2004 in
3    October, November sometime?
4    A.  I think it was October 2004.
5    Q.  Why did you choose to go on an as-needed
6    basis?
7    A.  I took another position with some doctors
8    that used to come into the hospital for
9    about three months, and then I went to
10   St. Francis.
11   Q.  Explain that to me.  Okay?
12   A.  I started working with gastroenterologists.
13   Q.  Did you do that work with the
14   gastroenterologists at the hospital or --
15   A.  No, sir, it was in their office.
16   Q.  Who were these doctors?
17   A.  A. D. and P. H. Patel.
18   Q.  A. D. and P. H. Patel.  Were they in
19   Columbus?
20   A.  Yes, sir.
21   Q.  Are they still practicing in Columbus?
22   A.  Yes, sir.
23   Q.  Were you still making about $11 and change

Page 60

1    per hour at Doctors Hospital when you went
2    to work for the Patels?
3    A.  No, I think it was $15.  I think it was $15
4    an hour.
5    Q.  And how much did you make with the Patels?
6    A.  I think maybe $12.
7    Q.  Twelve?
8    A.  I think so.
9    Q.  Well, I must have misunderstood you.  Did
10   you tell me that you went on an as-needed
11   basis with Doctors Hospital because you
12   started working with the Patels?
13   A.  Yeah, that's why.  Yes, sir.
14   Q.  So I guess I don't understand why you would
15   go from a $15 an hour full-time job to a
16   $15 an hour part-time job on an as-needed
17   basis to a $12 an hour part-time job.
18   A.  No.  The doctors' office was full-time.  The
19   hospital was as-needed.
20   Q.  Why did you do that?
21   A.  A change, to come out of the hospital and
22   get experience in an office.
23   Q.  That's the only reason?

Page 61

1    A.  The only reason.
2    Q.  The hospital did not ask you to move on?
3    A.  No.
4    Q.  Were you having any kind of problems at the
5    hospital -- at Doctors Hospital at the time
6    you took the job with the Patels?
7    A.  No.
8    Q.  What did you do for the Patels?
9    A.  Assisted with procedures in their -- they
10   had a procedure room in the back of their
11   office.  I assisted the doctors with that
12   and helped with the patients that came in
13   and out to get them ready for the
14   procedures and after the procedures.
15   Q.  Tell me what you did to assist.
16   A.  Started IVs.
17   Q.  Started IVs?
18   A.  Started IVs in the beginning.  When the
19   patient first came in, I started IVs and
20   would hang fluids and then just wait for
21   the doctor to --
22       There were different people in that
23   procedure room that would help, and you

Page 62

```
 1      didn't do the same procedure every time.
 2      Sometimes you would help get the patient
 3      ready.  Sometimes you would go in with the
 4      doctor to do the procedure.  Sometimes you
 5      would be on the back end and sit with the
 6      patient, take their vital signs after they
 7      came out of the procedure because an RN was
 8      in the procedure room giving medications to
 9      sedate.
10  Q.  Did you ever work with the Patels in the
11      procedure room?
12  A.  Yes, sir.
13  Q.  What did you do while you were in the
14      procedure room working for them?
15  A.  Assist the doctor with the scopes.
16  Q.  Did you administer any medication in the
17      procedure room?
18  A.  No.
19  Q.  Did not?
20  A.  No, sir.
21  Q.  Now, you indicated before that when people
22      would come in, you would start IVs.
23  A.  Correct.
```

Page 63

```
 1  Q.  Is that right?
 2          I'm sorry.  Were you through?
 3  A.  Uh-huh.  (Positive response.)
 4  Q.  Did you do anything else other than that
 5      when you worked in that part of the
 6      operation?  The front end is what I guess
 7      you would say.
 8  A.  Take vital signs.
 9  Q.  When you started IVs, what were they?
10  A.  What do you mean?
11  Q.  What was in them?
12  A.  Normal saline.
13  Q.  Just establishing an open line?
14  A.  Yes, sir.
15  Q.  No meds in those?
16  A.  No, sir.
17  Q.  And you took vitals and, I guess, recorded
18      all of that --
19  A.  Yes, sir.
20  Q.  -- in the record; is that right?
21  A.  Yes, sir.
22  Q.  All right.  Was there any way you knew from
23      day to day whether you would be working on
```

Page 64

```
 1      the front end or in the procedure room or
 2      the back end at the Patels'?
 3  A.  No, sir.
 4  Q.  They would just tell you when you went in
 5      that day; is that right?
 6  A.  Yes, sir.
 7  Q.  Was there, like, a person there who
 8      determined where everybody would be for the
 9      day?
10  A.  Yes, sir.
11  Q.  Who was that?
12  A.  Jean Patterson.
13  Q.  With a J?
14  A.  I think so.
15  Q.  J-E-A-N?
16  A.  Yes.
17  Q.  Jean Patterson.  What qualifications did
18      she have?
19  A.  She was an RN.
20  Q.  Do you know if she still works there?
21  A.  I do not know.
22  Q.  Do you know where she lives?
23  A.  No, sir.
```

Page 65

```
 1  Q.  Does she live in Columbus?  Does she live
 2      in --
 3  A.  I think she lives in Columbus.
 4  Q.  How many nurses worked at the Patels' when
 5      you worked there?
 6  A.  Three.
 7  Q.  Jean Patterson was one of them?
 8  A.  Correct.
 9  Q.  You were one of them?
10  A.  Correct.
11  Q.  Who was the third?
12  A.  Her first name is Mandy.  I'm not real sure
13      what the last name is.  I can't remember
14      right now.
15  Q.  Was she an LPN?
16  A.  No, sir.  She was an RN.
17  Q.  You were the only LPN?
18  A.  Correct.
19  Q.  Now, when you went into the procedure room,
20      all you did was help with the scopes?
21      That's the only job you did?
22  A.  Correct.
23  Q.  And what did you do or what would you do to
```

17 (Pages 62 to 65)

Page 66

1      help with the scopes?
2  A.  Just hold the scope for the doctor. And
3      there's a guidewire that they insert into
4      those scopes sometimes, and you help with
5      that.
6  Q.  Then you worked also on the back end of
7      that operation?
8  A.  Yes, sir.
9  Q.  What did you do on the back end?
10 A.  I'd receive the patients out of the
11     procedure room and take their vital signs,
12     make sure that they were coming out of
13     their sedation correctly. If there was
14     nausea and vomiting, you would get the
15     nurse to give them medication.
16 Q.  Okay. How long did you monitor those
17     patients before they could leave?
18 A.  I think it was usually 30 minutes to an
19     hour, depending on how well they did.
20 Q.  Would it be correct to say that you were
21     the only monitoring nurse in the recovery
22     room when you worked in the recovery room?
23 A.  No.

Page 67

1  Q.  Who else would have --
2  A.  They had techs.
3  Q.  Okay. How many techs worked there?
4  A.  Two possibly. I think two maybe, two other
5      people.
6  Q.  Why did you leave the Patels?
7  A.  The office was a little slow compared to
8      where I came, so that's why I went back to
9      the hospital work.
10 Q.  When you say the office was a little slow,
11     what do you mean?
12 A.  Slow-paced. Hospital work is a little
13     faster pace.
14 Q.  So when was it that you left the Patels,
15     Ms. Wright?
16 A.  I worked there for about three months,
17     so ...
18 Q.  Did you ever get a raise there?
19 A.  No, sir.
20 Q.  Did you get benefits there at the Patels'?
21 A.  No, I wasn't there long enough.
22 Q.  So you did not have medical or dental,
23     right?

Page 68

1  A.  No, sir.
2  Q.  I'm trying to figure out when this -- how
3      this lines up with your marriage to Scott
4      McCraine.
5  A.  We were not married at that time.
6  Q.  And you had no children?
7  A.  No, sir.
8  Q.  Where were you living in that time frame?
9  A.  With my mom.
10 Q.  All right. So you say that the Patels'
11     office was a little slow, so you wanted to
12     get back into something a little bit more
13     fast-paced; is that right?
14 A.  Right.
15 Q.  Did you apply back at Doctors Hospital?
16 A.  I was still there p.r.n.
17 Q.  Did you go back full-time at Doctors
18     Hospital?
19 A.  No.
20 Q.  Did you stay on at Doctors Hospital as
21     needed?
22 A.  As needed.
23 Q.  So where all did you apply?

Page 69

1  A.  St. Francis.
2  Q.  That's the only place?
3  A.  Yes, sir.
4  Q.  And we've already talked about what you did
5      there, I believe.
6          How much did they pay you at
7      St. Francis?
8  A.  I think $12.50 maybe.
9  Q.  And how long? You said six months, you
10     think, at St. Francis?
11 A.  I think it was about six months.
12 Q.  Were you still working at Doctors Hospital
13     on an as-needed basis during the time that
14     you worked at St. Francis?
15 A.  Yes, sir.
16 Q.  How much were you making on an as-needed
17     basis?
18 A.  At Doctors Hospital?
19 Q.  Yes. I'm sorry. Yes.
20 A.  I think about $15 an hour.
21 Q.  So the same rate of pay that you made while
22     you were full-time?
23 A.  No. When I was full-time at Doctors?

Page 70

1  Q.  Right.
2  A.  I didn't make $15 an hour.
3  Q.  Oh, I thought you said you had gotten a
4     raise from your original pay of, like, 11
5     and change to 15 bucks at Doctors.
6  A.  Full-time pay is not the same as p.r.n.
7     pay.  The rates are different.
8  Q.  All right.  So you did not get a raise at
9     Doctors Hospital?
10 A.  When I went p.r.n., they paid more.
11 Q.  So p.r.n. or an as-needed nurse gets a
12    higher rate of pay; is that right?
13 A.  Correct.
14 Q.  How many hours a week on an average week
15    would you work at Doctors Hospital when you
16    were there on an as-needed basis?
17 A.  Maybe 24.
18 Q.  How many hours a week did you work at the
19    Patels' office while you were working
20    there?  And that was a full-time job,
21    wasn't it?
22 A.  That was 40 hours a week.
23 Q.  And so you were working about 40 hours a

Page 71

1     week with the Patels, and 24 hours a week
2     at the hospital, Doctors Hospital?
3  A.  Not all the time.
4  Q.  Can you explain that to me or describe it?
5  A.  I only went to Doctors Hospital when they
6     called and asked, said we need some help,
7     can you come over and help us out a few
8     hours.  Maximum, maybe 24 hours.
9  Q.  That's max, is 24?
10 A.  Max, maybe.
11 Q.  Well, what I had asked you is how many
12    hours per week on an average would you work
13    at Doctors Hospital when you worked there
14    on an as-needed basis.
15 A.  Anywhere between eight and 24 hours.
16 Q.  When you worked at St. Francis, how many
17    hours on an average did you work Doctors
18    on an as-needed basis?
19 A.  Four to 12, and that's not weekly.  I mean,
20    that was just -- it wasn't a weekly deal.
21    I didn't go to Doctors Hospital every week,
22    only when they called and needed somebody.
23 Q.  Well, what does four to 12 mean?  I'm not

Page 72

1     sure I understand.
2  A.  In a week that they called, they could have
3     called twice.  They could have needed me
4     for a four-hour shift.  They could have
5     needed me for an eight-hour shift.
6  Q.  It was random?
7  A.  It was random.
8  Q.  It was just random?
9  A.  Random.
10 Q.  There was no way to predict what it would
11    be?
12 A.  No.
13 Q.  Now, you indicated, I think, to me that you
14    left St. Francis around early April '05 or
15    maybe late March '05 because you were
16    pregnant and you started in the RN program;
17    am I --
18 A.  Correct.
19 Q.  -- right about that?
20       And you told me, I think, that you had
21    that baby in June of '05.
22 A.  Correct.
23 Q.  After you had the baby, did you go back to

Page 73

1     St. Francis?
2  A.  No.
3  Q.  No, you did not?
4  A.  No.
5  Q.  Were you working anywhere after you left
6     St. Francis around late March, early April
7     2005?
8  A.  Doctors Hospital.
9  Q.  And was that on this as-needed basis?
10 A.  Yes.
11 Q.  And that was random?  You had no way to
12    predict how many hours that would be?
13 A.  Yes.
14 Q.  When they called you, were there times
15    after your baby was born that you could not
16    go, could not work?
17 A.  When I was in school.
18 Q.  Okay.
19 A.  Because I had him while I was in the RN
20    program.
21 Q.  Right.  You're right.  And that's what I'm
22    really asking, is after you had your baby
23    in June 2005 -- and, of course, at that

Page 74

1    time, you were in the RN program -- there
2    were times when you could not accommodate
3    Doctors Hospital when they called you to
4    come and work on an as-needed basis; is
5    that right?
6    A.  Correct.
7    Q.  How long did you stay in this particular
8    situation after June of 2005 where you had
9    a new baby -- or you had a baby and you
10   were working on an as-needed basis at
11   Doctors Hospital?  How long did that job
12   situation last?
13   A.  I think I quit working for them sometime --
14   sometime in 2005, I stopped working for
15   them.
16   Q.  Why did you stop?
17   A.  School.
18   Q.  So at that point, you had no job
19   whatsoever, right?
20   A.  Right.
21   Q.  You have no idea about what month it was
22   that you stopped?
23   A.  It was sometime I think during that second

Page 75

1    semester of RN school.
2    Q.  Can you give me a judgment as to what month
3    in 2005 that would be?
4    A.  I don't know the month.
5    Q.  Can you give me any landmark or time mark,
6    an occurrence or something, an event that
7    happened or that you can attach your
8    quitting the as-needed work to?
9    A.  Maybe September, October.  I'm not real
10   sure what month it was.
11   Q.  And you can't think of any event or
12   occurrence or any particular thing that
13   happened or -- that just happened to occur
14   about the same time you quit at Doctors?
15   A.  No, sir.
16   Q.  How did you quit at Doctors?
17   A.  It was a p.r.n. basis.  So that was my
18   decision to go in or not.  If they would
19   call and say can you come in, I could tell
20   them no, and that's fine.  And then --
21   Q.  Go ahead.
22   A.  I mean, I'm sure I eventually told them
23   that I was not going to be able to work

Page 76

1    while in school.
2    Q.  And you think -- for some reason, you think
3    it was August, September, in that time
4    frame of 2005?
5    A.  Maybe so.  I'm not real sure of the date.
6    Q.  At that time, who was your supervisor at
7    Doctors Hospital?
8    A.  Marie Redden.
9    Q.  Do you know if she's still at the hospital?
10   A.  She is.
11   Q.  What department does she work in?
12   A.  She works med-surge, 4th floor.
13   Q.  Where does she live?
14   A.  I think she lives in Harris County, which
15   is in Columbus.
16   Q.  All right.  Did you work at all after you
17   decided not to go in anymore at Doctors
18   Hospital and up until the point you stopped
19   going to school at CVCC?
20   A.  I think I might have worked one or two days
21   when I was pregnant with my second child.
22   Q.  So, basically, no is the answer, correct?
23   A.  (Witness nods head up and down.)

Page 77

1    Q.  Is that right?  Basically, you did not work
2    the whole rest of the time you were in
3    school at CVCC; is that right?
4    A.  One or two days.
5    Q.  Where did you work in those one or two
6    days?
7    A.  Doctors Hospital.
8    Q.  This was your first child in June of '05?
9    A.  Yes, sir.
10   Q.  And so you had another child -- when was
11   that child born?  Let's see.  You tell me.
12   A.  July 7th of '06.
13   Q.  Of '06.  Were you still in school at that
14   time?
15   A.  Yes, sir.
16   Q.  You were?
17   A.  When he was born --
18   Q.  Right.
19   A.  -- or when I got pregnant?
20   Q.  When he was born.
21   A.  No.
22   Q.  You said July?
23   A.  July.

Page 78

1   Q.  Of '06?
2   A.  Uh-huh.  (Positive response.)
3   Q.  Yes?
4   A.  Yes.
5   Q.  2006, born.  When did you last attend
6       school at CVCC?
7   A.  May of '06.
8   Q.  Can you tell me how that occurred that you
9       stopped going to school at CVCC?
10  A.  That was the end of the nursing program.
11  Q.  Okay.  Had you taken any courses in the
12      spring semester of 2006 --
13  A.  In the spring --
14  Q.  -- at CVCC in the nursing program?
15  A.  I can't remember how it falls.  I think May
16      is in summer, so I think -- if I'm thinking
17      correctly, then, yes, I did, because that
18      would be before summer.
19  Q.  Right.  It would be.
20          Did you take a full load of classes in
21      that spring semester of 2006?
22  A.  If ...
23  Q.  I call that starting sometime in January

Page 79

1       and going to May.
2   A.  Yes.
3   Q.  Took a full load; is that right?
4   A.  I mean, I don't know if it was a full load
5       or not.  It was the nursing courses that
6       were required to be taken.
7   Q.  And you made a D in how many of the courses
8       you were taking in that semester?
9   A.  In?
10  Q.  In the spring semester of 2006.
11  A.  Would that be the last semester or --
12  Q.  Yes.
13  A.  The last semester?
14  Q.  Yes.
15  A.  I made a D in one course.
16  Q.  What course?
17  A.  Pediatrics.
18  Q.  Do you know the number of it?
19  A.  I think it was 272.
20  Q.  272?
21  A.  I think so.
22  Q.  All right.  And who taught it?
23  A.  Lynn Harris.

Page 80

1   Q.  And you did not make a D initially in any
2       other course in the spring semester?
3   A.  I'm trying to think how these semesters
4       fall and get my dates --
5   Q.  January to May is what I believe is the
6       spring semester, so January to May of '06.
7           MR. NIX:  Am I right?
8           DR. BLACKWELL:  (Nods head up and
9       down.)
10  Q.  So January to May of '06 is the spring
11      semester.  That would be your last semester
12      at CVCC.
13  A.  Right.
14  Q.  Didn't make a D in any other courses?
15  A.  No.
16  Q.  Didn't have a grade changed from a D to a C
17      in that semester, correct?
18  A.  No, not in that semester.
19  Q.  In the semester before that, you did?
20  A.  Correct.
21  Q.  And that would be the fall semester of
22      2005.
23  A.  Correct.

Page 81

1   Q.  Which begins sometime in August if I'm not
2       mistaken; am I right about that?  Do you
3       remember that?
4   A.  Yes.
5   Q.  So August -- let's just say August to mid
6       December of 2005, you made how many D's in
7       that semester?
8   A.  They told me that I made two D's.
9   Q.  When you say they, who are you talking
10      about?
11  A.  Lynn Harris and Tawyna Cash.
12  Q.  Now, Lynn Harris was an instructor in the
13      fall semester.  You made a D in her class,
14      correct?
15  A.  Correct.
16  Q.  What class was that?
17  A.  That was adult nursing.
18  Q.  Do you remember the number of that?
19  A.  I think that was 252.
20  Q.  252.  And then Tawyna Cash, what did she
21      teach?
22  A.  OB.
23  Q.  And you made a D in that one?

## Page 82

1  A.  Correct.
2  Q.  Do you know the number of that?
3  A.  I think it was 271.
4  Q.  All right.  Did the D that you made in
5      Tawyna Cash's class, OB, which was NUR 271,
6      did that D stay a D on your record?
7  A.  No, sir.
8  Q.  It did not?
9  A.  No, sir.
10 Q.  Why not?
11 A.  They changed it to a C.
12 Q.  Who's they?
13 A.  Dixie Peterson and Dean Lowe.
14 Q.  Why did they do that?
15 A.  We went through the grade appeal process,
16     and I was told by Dixie that Tawyna Cash
17     did not turn in paperwork that she was
18     supposed to turn in at the end of that
19     grade appeal process, so it was under her
20     discretion to change that D to a C.
21 Q.  So Dixie Peterson and Dean Lowe changed the
22     D to a C in NUR 271, correct?
23 A.  Correct.

## Page 83

1  Q.  Tell me the significance of making a D in a
2      course there at CVCC in their nursing
3      program, their RN program.
4  A.  That's a failure.
5  Q.  In most schools, an F is a failure.  Why is
6      it that a D is a failure in that program at
7      CVCC?
8  A.  That's their qualifications.
9  Q.  That's just what they set; is that what
10     you're saying?
11 A.  I think so.
12 Q.  You knew that, correct?
13 A.  Correct.
14 Q.  You knew that from the very beginning of
15     your RN work there?
16 A.  Correct.
17 Q.  Now, with regard to NUR 271, which was
18     obstetrics --
19 A.  Yes, sir.
20 Q.  -- Tawyna Cash taught that.  You say you
21     appealed that D; is that right?
22 A.  Correct.
23 Q.  What was the basis of that appeal?

## Page 84

1  A.  The basis of that appeal was there was no
2      instructor the first five weeks of class.
3      When reviewing test questions and thinking
4      about -- when talking with other classmates
5      and talking about the tests that she had
6      given, it was obvious that some of the
7      questions were not -- the answers that she
8      chose were -- I'm not saying that they were
9      wrong, but the answers I chose were not
10     wrong either.
11        So there was a lot of communication
12     going on in the class about her test
13     questions and how the tests were given, so
14     I asked to review all my grades, all my
15     tests.
16 Q.  That's an interesting situation.  You're
17     saying that on this test -- or on the
18     tests, plural, that Tawyna Cash gave, you
19     determined or learned somehow or whatever
20     that the answers --
21        Did she have what's called an answer
22     key?
23 A.  I'm sure she did.

## Page 85

1  Q.  Was it a multiple choice type of test?
2  A.  It's a Scantron, yes.
3  Q.  What's a Scantron?  I'm not sure I know
4      what that is.
5  A.  It's a thin sheet with A, B, C, D, E, F.
6      And it was multiple choice questions, and
7      you read the question and pick the correct
8      answer.
9  Q.  And then you darken --
10 A.  Darken it.
11 Q.  With a pencil?
12 A.  Yes, sir.
13 Q.  So it's a multiple choice?
14 A.  Correct.
15 Q.  Now, and what you're saying is that Tawyna
16     Cash developed the test and determined the
17     correct answers to the questions or the
18     multiple choice questions?
19 A.  As far as I know.
20 Q.  And that while you made -- you might have
21     made a failing grade in that test or those
22     tests, you determined that the answer that
23     you gave was correct even though the answer

22  (Pages 82 to 85)

Page 86

1    that Tawyna Cash gave was also correct. Am
2    I hearing you right?
3  A.  Well, I never told her that her answers
4    were incorrect. I told her that my answer
5    is not incorrect because I had nursing
6    books that had my answer as well as hers,
7    so ...
8  Q.  You never told Tawyna Cash that her answers
9    were incorrect, the answers that she used
10   as the correct answers, right? You never
11   told her they were not right?
12 A.  Right.
13 Q.  But what I want to know is, are you saying
14   that they were not right, that Tawyna
15   Cash's answers to those multiple choice
16   questions were not right?
17 A.  Some of those were not right.
18 Q.  Okay. How many out of how many tests?
19 A.  We only went over my final -- well, I think
20   we did go over all of them, but my final
21   was the one that was in question at the
22   very end, and we only went over one test
23   question and she refused to go over any

Page 87

1    more.
2        She asked me after that one question
3    that she changed from wrong to right, are
4    we going to do this -- are we going to keep
5    on doing this? I said, yes, ma'am, we are
6    because these are my grades.
7  Q.  You were going over the final with Tawyna
8    Cash, correct?
9  A.  Correct.
10 Q.  Was this in December of 2005?
11 A.  Yes, sir, I think so.
12 Q.  Was it at the school?
13 A.  Yes, sir.
14 Q.  Where did y'all meet?
15 A.  In the nursing office, in her office.
16 Q.  Did you have a copy of your final exam?
17 A.  No, sir. She provided those.
18 Q.  She provided what, now?
19 A.  She brought the tests to the school.
20       She -- I had to contact her at home, and
21   she brought the tests and things to the
22   school.
23 Q.  Tests and things, what do you mean tests

Page 88

1    and things?
2  A.  Any kind of papers that were graded. We
3    didn't get to keep our tests or our graded
4    papers. They took them back up and kept
5    them.
6  Q.  She brought the test -- only the final,
7    right, because that's all you went over?
8  A.  I think, if I remember correctly, we may
9    have gone over some of the tests or gone
10   through the Scantron, but that final was
11   the one that we concentrated on. And we
12   only got to one question, and she wouldn't
13   go over any more questions because -- I
14   don't know why. She just wouldn't.
15 Q.  When you say you may have gone through the
16   other tests --
17 A.  Uh-huh. (Positive response.)
18 Q.  Yes?
19 A.  Yes.
20 Q.  That was in that same meeting --
21 A.  Yes, sir.
22 Q.  -- in that one meeting?
23       Did she bring all of the tests with her

Page 89

1    when she came to meet with you in December?
2  A.  I don't know if she did or not. I just
3    know she brought a box in with some of my
4    work.
5  Q.  But you think you went over some of the
6    earlier tests before the final that were
7    given during the semester; is that right?
8  A.  Right.
9  Q.  So those tests would have had a question
10   and then it would have had your Scantron
11   document, correct?
12 A.  Correct.
13 Q.  How did y'all go over those? Did you
14   look -- both of you have a copy of the
15   question -- multiple choice question and
16   the Scantron?
17 A.  I think that we were using one and she
18   was -- I mean, we were sitting at arm's
19   length at a desk.
20 Q.  So y'all were looking on together?
21 A.  Yes, sir.
22 Q.  And y'all would go through each question --
23 A.  Yes.

Page 90

1   Q.  -- or just the wrong questions?
2   A.  Just the wrong questions.
3   Q.  So y'all would -- you would select the
4       answers that you wrote down wrong according
5       to her grading, correct?
6   A.  Uh-huh.  (Positive response.)
7   Q.  And you would talk about those, right?
8   A.  Yes.
9   Q.  All right.  You had someone with you,
10      didn't you?
11  A.  Someone with me?
12  Q.  Yes.
13  A.  With Tawyna Cash?
14  Q.  Yes.
15  A.  No.
16  Q.  So it was just you and Tawyna Cash?
17  A.  Yes.
18  Q.  So you and Tawyna Cash at this meeting in
19      December of 2005 were sitting down close to
20      one another, looking at the multiple choice
21      questions and your Scantron paper, right?
22  A.  Right.
23  Q.  Talking about the semester test and the

Page 91

1       answers you chose that were marked
2       incorrect, right?
3   A.  Right.
4   Q.  Now, how many of those, Ms. Wright, did you
5       contest; in other words, how many of those
6       did you say to Tawyna Cash about your
7       answer is wrong or my answer is right?
8   A.  Well, we only got to one because she
9       refused to go over any more.
10  Q.  But I'm talking about the semester tests,
11      the tests that were given during the
12      semester as opposed to the final exam.
13  A.  We went over the final first.
14  Q.  In other words, are you saying now that you
15      did not go over any of the tests that were
16      given during the semester?
17  A.  As far as going over the tests, going over
18      the Scantron saying this is the answer I
19      chose and just going down the Scantron
20      saying A, D, B, B, D, A, or whatever.
21  Q.  I'm not sure I understand what you meant
22      then.
23  A.  Not reading the question and saying, okay,

Page 92

1       this is the answer I chose, this is the
2       rationale.  That was never done.
3   Q.  You're talking about on the --
4   A.  Just to make sure that the Scantron
5       didn't -- when they run it through the
6       machine did not mess up.
7   Q.  I've got you.  So what you did with the
8       semester tests was you compared the answers
9       that she had marked incorrect that you had
10      made to her key?
11  A.  Correct.
12  Q.  And just to make sure that however it was
13      graded was done accurately; is that right?
14  A.  Correct.
15  Q.  And so there was no discussion about those
16      questions?
17  A.  No.
18  Q.  No discussion about her key?
19  A.  No.
20  Q.  No discussion about whether your answer on
21      those tests was right and her answer was
22      wrong?
23  A.  No.

Page 93

1   Q.  Were there answers that were on her key for
2       any of those tests, were there any of those
3       answers that she had determined that were
4       correct, were any of those wrong or did you
5       contest her answer to any of those
6       semester --
7   A.  On the final.
8   Q.  But not on the tests given during the
9       semester?  You didn't contest any of those?
10  A.  In the classroom?
11  Q.  Did you contest in the classroom?  I'm
12      talking about --
13  A.  Yes, sir.
14  Q.  -- at any time.
15  A.  Yes, sir.
16  Q.  Did Tawyna Cash give out her semester --
17      how should we say it?  What do you call
18      those exams, the ones given during the
19      semester?  Just an exam?
20  A.  An exam.
21  Q.  We'll call those exams, and we'll call the
22      final the final.  Okay?
23      So during the exams, did Tawyna Cash go

Page 94

1    over the exams in class?
2    A.  No.
3    Q.  How did you begin talking to her or anyone
4        about the fact that she had the wrong
5        answer on the key or that her answer was
6        right, but so was yours?
7    A.  Because people in the classroom would
8        question her as well as myself, and she
9        refused to go over anything with us in the
10       classroom because it was always an argument
11       with someone in the classroom.  There was
12       always something going on.
13   Q.  Okay.
14   A.  She refused to go over the tests in class.
15   Q.  When you got a grade on an exam in Tawyna
16       Cash's class, 271, NUR 271 --
17   A.  Yes, sir.
18   Q.  -- when you took a test and you got your
19       grade, would she hand out the papers or did
20       she just give you the grade?
21   A.  She would give us the grade.  If my memory
22       is correct, she would have us come up and
23       let us look and see what our grade was in

Page 95

1    her grade book.
2    Q.  So that's all anybody got to see was just
3        the grade, correct?
4    A.  Yes, sir.
5    Q.  When an exam was given by Tawyna Cash
6        during the semester, would everyone have a
7        copy of the multiple choice questions to
8        take the exam with?
9    A.  Yes, sir.
10   Q.  And then everyone would have a Scantron in
11       order to mark the answers, correct?
12   A.  Correct.
13   Q.  And at the end of that process, would the
14       actual test with the multiple choice
15       questions be handed back in by the
16       students?
17   A.  Yes, sir.
18   Q.  And so would the Scantron cards, correct?
19   A.  Correct.
20   Q.  On the test, when you received a test with
21       the multiple choice questions on it in
22       Tawyna Cash's class, did you put your name
23       or your ID number or any identifying mark

Page 96

1    on that test?
2    A.  I'm not sure if we did in her class or
3        not.  I'm really not sure.  I don't
4        remember.
5    Q.  That's a practice, though, isn't it, that
6        schools use, is for a student to -- if they
7        get a test that's going to be taken back
8        up, they'll make some identifying mark on
9        it in accordance with what the teacher
10       tells them to do or the professor tells
11       them to do if the teacher tells them to do
12       so?  You're familiar with that practice,
13       aren't you?
14   A.  Yes, sir.
15   Q.  So everybody turned their test back in at
16       the conclusion of it?
17   A.  Yes, sir.
18   Q.  Along with the Scantron?
19   A.  Yes, sir.
20   Q.  So I guess I'm at a loss to understand how
21       students could contest her answers if they
22       didn't have the test subsequent to turning
23       it in, didn't have the Scantron and didn't

Page 97

1    have her key.  How would they do that?
2    A.  Talk amongst each other because they
3        remembered the test questions.  As soon as
4        the test was over, people would start
5        talking about, what did you get for this
6        question?  Do you remember that question?
7            They would say, well, I don't think
8        that's right.  And then people would open
9        their books and look through their books to
10       see if they could find a specific answer
11       for any test question that they could
12       remember.
13   Q.  Did you do that?  Did you participate in
14       those discussions?
15   A.  Yes, sir.
16   Q.  I still don't know, though.  I mean, how
17       did the class know what her key was?
18   A.  They didn't -- what do you mean know what
19       her key was?
20   Q.  Well, she had to have taken that test
21       herself or when she created the test, the
22       multiple choice test, she had to have
23       selected the correct answer to give that

Page 98

1    answer on the test to whoever was going to
2    grade the Scantron, however that's done,
3    whether by computer or by a person; isn't
4    that right?
5    A.  Correct.
6    Q.  Well, how did y'all know her answers?  How
7       did you know Tawyna Cash's answers on those
8       exams?
9    A.  Nobody knew those answers.
10   Q.  So there's no way anyone could have made a
11      contest of the type you're describing, is
12      there?
13   A.  Yeah, you can raise a question in the
14      classroom and say, Ms. Cash, we -- you had
15      a question on there about mother/baby,
16      and -- do you breast feed, does that bring
17      the baby closer to the mother or whatever
18      that question may be.  You can ask those
19      questions to her and say, well, I think
20      this answer that you -- you know, this
21      answer is correct that's in the book, but
22      you said this answer was correct.
23          I'm not going over anything was her

Page 99

1    response.  I'm not doing that, because it
2    was always an argument.  People would start
3    fussing in the classroom.  And that would
4    be the end of that.  You can schedule time
5    with me, and we can go over test questions.
6    Q.  How did the person who disagreed with
7       Tawyna Cash know what Tawyna Cash
8       determined to be the right answer on a
9       particular question?
10   A.  I don't know.  I don't know.
11   Q.  I mean, did Tawyna Cash after an exam tell
12      everybody what all the right answers were?
13   A.  I don't remember her doing that.
14   Q.  Did Tawyna Cash after she gave an exam
15      during the semester go over the exam
16      afterwards and say here is the right answer
17      on that, here is the right answer on that
18      and go down it and tell everybody what the
19      right answers were?
20   A.  I think she might have once or twice going
21      through, but not reading the question and
22      just calling out the A, B, C, or D for
23      whatever question.

Page 100

1    Q.  Tell me how she would do that.  How would
2       she do that?
3    A.  I'm not sure.  If I remember correctly,
4       there might have been once or twice that
5       she did give a test back and read the
6       answer -- I mean the A, B, C or D, not read
7       the -- A is whatever she had written behind
8       A, read off the letters on the Scantron.
9    Q.  If I remember correctly, she might have one
10      or two times.  That was your answer.
11   A.  Right.
12   Q.  So, I mean, Ms. Wright, are you sure she
13      did that?
14   A.  I'm trying to remember.  I mean, it's been
15      a long time.
16   Q.  Well, this is your lawsuit.
17   A.  I know it is.
18   Q.  And you filed it, right?
19   A.  Right.
20   Q.  I need to know what happened in the class.
21      Did Tawyna Cash get the test and go over it
22      and tell everybody what the right answers
23      were during the semester?

Page 101

1    A.  I think, yes, she did.  I think she did.
2    Q.  For every test?
3    A.  I'm not sure if it was every test.
4    Q.  Can you tell me how many tests she did that
5       for?
6    A.  Maybe two, three.  I'm not real sure.  I'm
7       not even sure how many tests we had
8       anymore.
9    Q.  Are you saying that you're sure she did
10      that, but -- because you still say I think
11      instead of -- you don't -- you're not
12      saying I know she did that, right?
13   A.  Can I have a minute and let me try and
14      think?
15   Q.  Absolutely.  Yes, ma'am.
16   A.  Because, I mean, it's been over two years.
17      I think she did.
18   Q.  You think she did?
19   A.  I'll say she did.
20   Q.  How many tests did she go over in the
21      class?
22   A.  Two to three.
23   Q.  When she did this, Ms. Wright, did she go

Page 102

1  down and do every question on the test?
2  A.  As far as reading the question and
3  saying --
4  Q.  And the right answer.
5  A.  No, she would not.  She would say, number
6  one, A; number two, B; number three, C.
7  Would not read the question, tell you the
8  answer and give a rationale behind that.
9  Q.  She would not read the question.  She would
10  not go through the possible choices and
11  tell you why --
12  A.  This was wrong and why this was right, no.
13  Q.  She would just go number one is A, number
14  two is C and that type thing?
15  A.  Correct.
16  Q.  Talk to me about the final exam.  All
17  right?
18  A.  Okay.
19  Q.  The final exam was a multiple choice exam,
20  correct?
21  A.  Yes, sir.
22  Q.  And it had a Scantron as well, correct?
23  A.  Correct.

Page 103

1  Q.  How did you find out what your grade was on
2  the final in Ms. Cash's class?
3  A.  I think I called her or she -- I'm not
4  sure.  She was not a full-time employee
5  there, and she wasn't available all the
6  time.  And I can't recall if she came in
7  and gave us those grades or if she called
8  us.
9  Q.  Okay.
10  A.  But one way or the other, she told me what
11  my grade was.
12  Q.  She didn't post it on a board by social
13  security number or anything?  She would
14  actually tell you, hey, Lindy, you made
15  whatever on --
16  A.  Right.
17  Q.  Now, when you went in to talk to her about
18  the final exam, tell me exactly what you
19  said to the best of your knowledge and
20  recollection.
21  A.  When I did the grade appeal?  Because she
22  wasn't available to talk to until the grade
23  appeal.

Page 104

1  Q.  So you could not talk to Ms. Cash, and
2  therefore you filed a grade appeal?
3  A.  Correct.
4  Q.  Then after you filed the grade appeal, you
5  and Ms. Cash sat down in her office and
6  met, correct?
7  A.  Correct.
8  Q.  And she brought with her the test and the
9  Scantron, right?
10  A.  Correct.
11  Q.  And y'all were sitting close together?
12  A.  Uh-huh.  (Positive response.)
13  Q.  Going over the questions?
14  A.  Correct.
15  Q.  And just tell me what happened.
16  A.  We got to the first question, and I pointed
17  out in a book the answer that I chose was
18  right there in black and white.  And she
19  agreed and she said, okay, I'll change that
20  one.
21  We flipped to the next one, and I said,
22  and this one right here -- she said, are we
23  going to do this with all of them?  I said,

Page 105

1  yes, ma'am, we are, because these are my
2  grades.
3  Q.  On number one, question number one --
4  A.  I don't know if it was question number one
5  or what question it was.  I know it was the
6  first question that we came to on the test
7  that was wrong, that she had marked wrong.
8  Q.  All you did was go over the ones that she
9  had marked wrong?
10  A.  Wrong.
11  Q.  I've got you.  So whichever number that
12  was -- you don't remember what number that
13  was?
14  A.  No, I don't.
15  Q.  So you got to the first one on the test
16  that she had marked wrong?
17  A.  Uh-huh.  (Positive response.)
18  Q.  And you said to her, my answer was right?
19  Is that what you said?
20  A.  And this is what page it's in in this book.
21  Q.  Huh?
22  A.  I said, this is what page it's in in this
23  book.

Page 106

1  Q.  What book are you talking about?
2  A.  It was the OB book that we were using. I
3     don't know the name of it -- now I don't.
4  Q.  Did you look up the answer on any other
5     questions on the final exam in a different
6     book?
7  A.  Yes, sir.
8  Q.  Can you tell me which books, the name of
9     all the books?
10 A.  I don't know the name of -- I don't know
11    the name and author of the books, no.
12 Q.  How did you do that? How did you find the
13    books and look for the right answers to the
14    questions -- the multiple choice questions
15    that Ms. Cash put on the final exam?
16 A.  It wasn't the exact question that she put
17    on the final exam. It was what I could
18    remember from taking that test --
19 Q.  Okay.
20 A.  -- in general.
21 Q.  All right. So you pulled other sources,
22    other books on obstetrics; is that right?
23 A.  Uh-huh. (Positive response.)

Page 107

1  Q.  Yes?
2  A.  I think there was two books.
3  Q.  You pulled other books on obstetrics,
4     right?
5  A.  Right.
6  Q.  And you used your own memory with regard to
7     what had been asked on the test, right?
8  A.  Not just mine. I mean, there was other
9     students that -- when we were trying to
10    recall the test questions.
11 Q.  When was this, now?
12 A.  Before I had to go in to talk with her
13    about the grade appeal and review the
14    test.
15 Q.  Why did y'all do that? I mean, why did
16    y'all get together and try to recall the
17    test questions after the final?
18 A.  Because those were my grades, and they were
19    saying that I made a D. I wasn't satisfied
20    with a D because I knew that some of the
21    questions that we had -- that I had
22    answered I had seen in the books, and the
23    answer that I chose was some of the answers

Page 108

1  in the book or ... some of the things that
2  I read in nursing books.
3  Q.  Was this an actual sit-down type of thing
4     where you got with other students and tried
5     to remember questions on the final?
6  A.  No.
7  Q.  How did that work?
8  A.  Just talking.
9  Q.  In person?
10 A.  Uh-huh. (Positive response.)
11 Q.  Yes?
12 A.  Yes.
13 Q.  Didn't talk to anybody on the phone?
14 A.  Sometimes.
15 Q.  Who did you speak with about that?
16 A.  Any test questions?
17 Q.  On that final that Tawyna Cash gave.
18 A.  Crystal Love.
19 Q.  Okay.
20 A.  April Gunnels.
21 Q.  Okay.
22 A.  Kim Smith.
23 Q.  Okay.

Page 109

1  A.  Corolla Rambo.
2  Q.  Is that a K?
3  A.  It's a C.
4  Q.  Okay.
5  A.  Sandy Gunnels.
6  Q.  Okay. Who else?
7  A.  And there may -- I don't know the lady's
8     name. She's an instructor at Columbus
9     Tech.
10 Q.  Isn't that where Sandy Gunnels is now,
11    Columbus Tech?
12 A.  She is.
13 Q.  So there was another instructor from
14    Columbus Tech?
15 A.  Yes.
16 Q.  And you can't remember her name?
17 A.  I don't. I don't remember her name.
18 Q.  Had she previously worked at Chattahoochee
19    Valley Community College?
20 A.  No.
21 Q.  Did you sit down with -- actually meet with
22    this person, this other professor at
23    Columbus Tech?

Page 110

1    A.  Yes.
2    Q.  And was Sandy Gunnels there at that
3        meeting?
4    A.  She was.
5    Q.  Was there more than one meeting?
6    A.  Yes, sir.
7    Q.  After you took the final in NUR 271,
8        obstetrics, the course taught by Tawyna
9        Cash, how long was it before you had your
10       first meeting about the final with Sandy
11       Gunnels and/or this other instructor whose
12       name you cannot remember?
13   A.  When she told me what my final grade was.
14   Q.  Well, do you remember the date of the final
15       exam?
16   A.  I don't.
17   Q.  I mean, it was in December of 2005, right?
18   A.  Correct.
19   Q.  Was it the first of December?  Middle of
20       December?
21   A.  Probably, say, the first half of December,
22       maybe the first week or so.  I'm not real
23       sure the exact date.

Page 111

1    Q.  So how long was it after you took Tawyna
2        Cash's final that she told you what you had
3        made?
4    A.  Within the next week of class, within the
5        next -- within the next week.
6    Q.  So within a week of your taking the final,
7        correct?
8    A.  Correct.
9    Q.  Now, I didn't understand what you meant.
10       You said within the next week of class or
11       in the next week of class.  The semester
12       was not over?
13   A.  It was over.  When she told me my grade, it
14       was over.  I'm trying to remember how long
15       it took me to sit down with her for the
16       grade appeal.  That's what I was trying to
17       remember.
18   Q.  Right now, we're talking about, though,
19       when Tawyna Cash told you what you made on
20       your final in obstetrics, and that was
21       within a week of your taking the final,
22       correct?
23   A.  Correct.

Page 112

1    Q.  And was it over the phone?
2    A.  I don't remember.
3    Q.  But she told you?
4    A.  She told me.
5    Q.  It was a D, right?
6    A.  Correct.
7    Q.  When she told you that, did y'all have any
8        kind of discussion at all?
9    A.  Not that I can recall at the time.
10   Q.  You just said thank you, and y'all hung up?
11   A.  Yes.
12   Q.  Did you have any kind of concern, a
13       premonition that you might not have made a
14       passing grade on that final?
15   A.  No.
16   Q.  So how long was it after you talked to
17       Tawyna Cash and she gave you your grade in
18       obstetrics, how long was it before you
19       spoke with Sandy Gunnels?
20   A.  Within the next day or so.
21   Q.  Do you think it could have been more than
22       two days?
23   A.  No, sir.

Page 113

1    Q.  Would it have been the same day?
2    A.  It could have been.
3    Q.  Either the same day or the very next day?
4    A.  Could have been.
5    Q.  One of those two days, the same day you
6        learned of the grade or the next day after
7        you learned; is that right?
8    A.  Right.
9    Q.  How did you reach Ms. Gunnels?
10   A.  By phone.
11   Q.  Where did you call her?  Where was she?
12   A.  At work.
13   Q.  At?
14   A.  Columbus Tech.
15   Q.  Columbus Tech.  Tell me what y'all said to
16       each other.
17   A.  I don't recall the whole conversation, but
18       in that conversation, I told her what I was
19       told that my grade was.  And I was advised
20       to do a grade appeal by her, and that's
21       what I did.
22   Q.  How long was this conversation that you had
23       with Ms. Gunnels on the telephone?

29  (Pages 110 to 113)

Page 114

1  A.  Probably 30 minutes.
2  Q.  So can you tell me what all was said?
3      That's a pretty good while.
4  A.  How to go about doing the grade appeal,
5      that I needed to go talk to Dixie Peterson,
6      Dean Lowe, who to communicate things with
7      and go through the chain of command and get
8      a copy of the grade appeal process.
9          She told me that there was a sheet --
10     or it was in the -- could be in the catalog
11     or they had it up in the dean's office how
12     to fill out a grade appeal, so that's what
13     I did.
14 Q.  So how long was it after you spoke with
15     Sandy Gunnels that you filled out the grade
16     appeal?
17 A.  It was immediately.  I had -- I think I
18     might have had it back to them within the
19     next day or two.
20 Q.  Now, that same semester, you also made a D
21     in another class, correct?
22 A.  Correct.
23 Q.  And that was the class taught by Lynn

Page 115

1      Harris, correct?
2  A.  Correct.
3  Q.  That was NUR 252?
4  A.  Correct.
5  Q.  What is the name of that course?
6  A.  I think that was Adult -- I think it was
7      Adult Nursing II.
8  Q.  How did you find out about the D you made
9      in Lynn Harris's class?
10 A.  She told me that I didn't make -- she told
11     me my points, what my points were and what
12     she had calculated without -- and I think I
13     gave that sheet and -- a copy of that
14     sheet.  And she said without the -- even
15     without the care plan, you didn't make
16     enough points to pass.
17 Q.  Let's talk about when and how you first
18     learned of your D in NUR 252.  Did you say
19     that's called Adult Nursing II?
20 A.  Adult Nursing II.
21 Q.  How did you first find out about it?
22 A.  I found out about that from Lynn Harris.
23 Q.  How long after the test?  How long after

Page 116

1      the final exam?
2  A.  Maybe the next day.
3  Q.  Where were you?
4  A.  At the school in her office.
5  Q.  Okay.
6  A.  In her office.
7  Q.  You were at the school, and so was she?
8  A.  Uh-huh.  (Positive response.)
9  Q.  Yes?
10 A.  Yes.
11 Q.  Was anyone else there?
12 A.  We were in a line to go in and see what our
13     grades were, and she went -- she had a
14     sheet that she wrote out our points.
15 Q.  Did everybody go in alone with her?
16 A.  Yes.
17 Q.  And the door was closed?
18 A.  Right.
19 Q.  So you could talk privately?
20 A.  Right.
21 Q.  Okay.
22 A.  I'm sorry.  I'm trying to remember and I'm
23     trying to put things together.  Can we go

Page 117

1      back?
2  Q.  Yes, ma'am.
3  A.  If I remember correctly, when I got that
4      grade from Tawyna Cash, if I -- there was
5      some point in time when I spoke to Dixie
6      Peterson and she told me that I did not
7      have enough points for that, that I made a
8      D in that OB class.  I'm trying to remember
9      everything.
10 Q.  But, now, was that before you learned from
11     Tawyna Cash of your grade in obstetrics?
12 A.  I'm trying to remember, because I found out
13     about that one after -- yes, it was.  I'm
14     sorry.  Yes, it was.  I think Dixie
15     Peterson is the one that told me that I
16     made a D in that one also, because Ms. Cash
17     was not coming back to the school and would
18     not be available.  I'm sorry.
19 Q.  That's all right.  Don't apologize.
20 A.  I'm trying to remember everything, and it's
21     just --
22 Q.  I want you to remember, and I want to give
23     you a chance to.  So don't apologize.  It's

Page 118

1    fine.
2    A.  Well, then, I'm not sorry.  I hate that
3        it's taking me, you know, a longer period
4        of time and me -- you know, I may have said
5        this.  I'm thinking about both classes at
6        the same time because there was so much
7        going on, so it's just hard to get it all
8        together.
9    Q.  Now, let's talk about Dixie Peterson.
10       Okay?  Are you saying that Dixie Peterson
11       told you about your grade in NUR 252 Adult
12       Nursing II?
13   A.  No, Lynn Harris told me about that grade.
14   Q.  Did Lynn Harris tell you about that grade
15       before or after Dixie Peterson told you
16       about your grade in obstetrics?
17   A.  Before.
18   Q.  Lynn told you before.
19   A.  Lynn told me before I knew what my grade
20       was in the OB class, the 271.
21   Q.  All right.  So after you learned from Lynn
22       Harris what your grade was in the OB
23       class --

Page 119

1    A.  In the adult --
2    Q.  -- I'm sorry, in the adult nursing class,
3        how long was it before Dixie told you what
4        your grade was in the OB class?
5    A.  It could have been -- I think it was a
6        couple of days because she said that
7        Ms. Cash had not turned in her grades yet.
8        I'm sorry.  That is the way I found out my
9        grade was, through her.
10   Q.  Through?
11   A.  Dixie Peterson, that I made a D in this
12       class, also.  So I didn't pass that second
13       semester.
14   Q.  Did you contact Tawyna Cash after you spoke
15       with Dixie and she told you that you'd made
16       a D in obstetrics?
17   A.  Yes, sir, I did.  I called her at home.
18   Q.  That same day?
19   A.  I tried.  I don't remember exactly what day
20       it was, but I had to track down this lady's
21       telephone number because nobody would give
22       it to me from the school and I didn't have
23       any sheets with her number on it.  I knew

Page 120

1    she lived in Lanett, Valley, somewhere, so
2    I looked her up in the phone book and
3    called her.
4    Q.  So that was very shortly after Dixie told
5        you what you had made in obstetrics?
6    A.  Correct.
7    Q.  The day of?  Did you call Tawyna Cash --
8    A.  I'm not sure if it was the day of because I
9        had a hard time getting her telephone
10       number.
11   Q.  Was it the next day, the day after Dixie
12       told you what your grade was in obstetrics?
13   A.  It could have been.
14   Q.  It was just as soon as possible after she
15       told you -- after Dixie told you what the
16       grade was, correct?
17   A.  Correct.
18   Q.  And then you went through the process of
19       meeting with her that you've already
20       described, correct?
21   A.  Yes, sir.
22   Q.  Is everything else the same with respect to
23       your grade in OB and your discussions with

Page 121

1    Tawyna Cash other than the fact that you
2    initially learned from Dixie?
3    A.  Yes, sir.
4    Q.  So everything is correct that you've
5        testified to before with that exception?
6    A.  Yes, sir.
7    Q.  Let's go back to Lynn Harris.  Okay?  You
8        went into the office with Lynn Harris and
9        closed the door.  There was no one else
10       there with the two of you, correct?
11   A.  I don't think the door was closed because
12       all the students were in a line.
13   Q.  And Lynn Harris, did she show you what you
14       made on the final in addition to all of the
15       points for the semester?
16   A.  If my memory serves me right, yes, sir, she
17       did.  She showed me a Scantron that had red
18       writing all over it, and that was my --
19       supposed to be my final.  There was red
20       marks all in my final.
21   Q.  Your Scantron?
22   A.  Yes, sir, and all over it.
23   Q.  Do you know what your number of correct

Page 122

1   answers were out of whatever number that
2   was there?
3   A.  (Shakes head from side to side.)
4   Q.  You don't know?
5   A.  (Shakes head from side to side.)
6   Q.  Nevertheless, you did not pass that final,
7   correct?
8   A.  Correct.
9   Q.  When Lynn Harris totaled up your total
10   points for all of the other work that you
11   would have been doing, she said that --
12   what?
13   A.  You don't have enough points.
14   Q.  Don't have enough points?
15   A.  You get a D.
16   Q.  Did she tell you of any way that you could
17   bring -- or any way that that grade could
18   get better if you --
19       I guess what I'm asking, there were
20   several components to your grade, correct?
21   A.  Correct.
22   Q.  What?  There was at least one paper, wasn't
23   there?  There was clinical.

Page 123

1   A.  Yeah, there was clinical.  That was in the
2   hospital.  If you did not pass clinical,
3   you didn't pass the course.  There were
4   care plans that had to be done.
5   Q.  Right.
6   A.  There were tests.  There were computer
7   assignments.  And I'm not sure if there was
8   a paper that we had to do.  I don't
9   remember.
10   Q.  Nevertheless, whatever the components would
11   have been to that grade, did Lynn Harris
12   have all of those numbers in when you met
13   with her?
14   A.  No, sir.
15   Q.  She did not?
16   A.  No, sir.
17   Q.  What did she lack?
18   A.  There was care plans that I was told that
19   were lost, and they were giving me -- they
20   said that they would allot 23 points out of
21   25.
22   Q.  Okay.  How many care plans?
23   A.  We had to do two.

Page 124

1   Q.  So that would have been a total of 50
2   points?
3   A.  Yes, sir.
4   Q.  And because they were lost, you got 46 out
5   of 50?
6   A.  Yes, sir, I guess so.
7   Q.  Is that a good grade on those care plans?
8   A.  Pretty much.
9   Q.  Pretty much?
10   A.  Yeah.  I mean, that's a good grade.  I
11   think that's a B maybe.  I'm not real
12   sure.  Have to calculate it.
13   Q.  Who told you they were lost?
14   A.  Lynn Harris did.
15   Q.  Did she tell you how they got lost?
16   A.  No, she didn't give an explanation.  She
17   said that she was told that they were
18   lost.  And the instructor that did my
19   clinicals, her name was Deborah Gruber.
20   And that's the lady that we turned those
21   care plans in to in the hospital.  We
22   turned those care plans in to her.
23       And she -- there was a phone

Page 125

1   conversation between her and Sandy
2   Gunnels.  I was listening.  She said she
3   turned those care plans in to Dixie.
4   Q.  Deborah Gruber?
5   A.  Uh-huh.  (Positive response.)
6   Q.  Told Sandy Gunnels that she turned your
7   care plans in to Dixie?
8   A.  Yes.
9   Q.  For NUR 252, Adult Nursing II, right?
10   A.  Yes, sir.
11   Q.  Was that the only component to the total
12   number of points that Lynn Harris did not
13   have the actual number for?
14   A.  I think so.
15   Q.  And Lynn Harris knew, however, that you
16   would be getting this 23 out of 25 on those
17   two care plans, correct?
18   A.  That's what she told me that they were
19   going to allot for the lost care plan.
20   Q.  Did anybody else have a lost care plan?
21   A.  My whole group did.  Just my group, my
22   clinical group.
23   Q.  How many were in your clinical group?

Page 126

1   A.  I think six.
2   Q.  Who were they?
3   A.  That particular time, I know Crystal Love
4       was in there, April Gunnels, Corolla
5       Rambo.  I'm trying to think who else was in
6       that group.
7   Q.  Where did you do your clinicals?
8   A.  The Medical Center.  6 East.
9   Q.  The Medical Center?
10  A.  It's in Columbus, Georgia.  It's --
11  Q.  It's a hospital?
12  A.  Yeah.
13  Q.  Is it Columbus Medical Center or --
14  A.  Columbus Regional Medical Center.  The
15      Medical Center.
16  Q.  That was on 6 East?
17  A.  Yes, sir.
18  Q.  Who was the -- Deborah Gruber.  You've
19      already told me.  Columbus Regional.  All
20      right.
21          Now, did you have a discussion with
22      Lynn Harris about your grade when she told
23      you what it was?

Page 127

1   A.  Oh, yes, sir.
2   Q.  Tell me about that, exactly what was said.
3   A.  I wanted to go over everything that she had
4       for me and review all the tests and look
5       for my points.
6   Q.  When did you want to do that?
7   A.  As soon as possible.
8   Q.  All right.  You say look for the points.
9       There weren't any other lost papers or
10      anything like that, were there, other than
11      those care plans?
12  A.  Correct.
13  Q.  What do you mean look for the points?
14  A.  Look for the points.  To go through all my
15      test grades and make sure that the
16      Scantrons were not messed up.
17          And they gave me the opportunity to
18      look at those tests, and she let me write
19      down -- not word for word, but she let me
20      write down some of the test questions and
21      review and try and find -- try and, I
22      guess, go to her and say, this is my
23      answer; this is correct; will you accept

Page 128

1       this or what.
2   Q.  So when you told Lynn Harris that you'd
3       like to sit down with her and go over
4       everything, what did Lynn Harris say?
5   A.  It was not very nice at that time.  I mean,
6       she was not being very nice to me which,
7       you know, that -- that really is
8       irrelevant, but it was not a nice
9       situation.  It was very ugly and nasty.
10  Q.  Well, I'm not --
11  A.  She was very defensive.  She didn't want
12      you to question her or her answers.  And
13      when I did so, it was not nice.
14  Q.  How about in that first meeting in her
15      office where there was a line behind you
16      and she gave you the total number of points
17      and you knew it was a D and you said, I'd
18      like to meet with you and go through all of
19      this?
20  A.  Don't have time right now.
21  Q.  Did she set up a time for you to meet with
22      her?
23  A.  I had to go to Dixie.

Page 129

1   Q.  Now, was Lynn Harris real defensive when
2       she told you what your grade was and you
3       said I want to meet?
4   A.  No.  When she told me what my grade was,
5       no.  I said, well, I want to review
6       everything, I want to see everything,
7       that's when --
8   Q.  She was defensive then?
9   A.  (Witness nods head up and down.)
10  Q.  Yes?
11  A.  I took it as an offense -- just her
12      demeanor, the way she was acting.
13  Q.  In that very first meeting when you said I
14      want to go over everything with you, right,
15      is that --
16  A.  I want to see all my test grades.  I want
17      to see all my papers.  I want to see
18      everything.
19  Q.  Did you take that as -- that she was
20      behaving offensively at that time?
21  A.  Yes, sir.
22  Q.  So tell me exactly how that manifested.
23  A.  I don't know.  I don't know.

1  Q.  What did she do that was nasty, cruel, mean
2      or whatever you said?
3  A.  Raised her voice. I mean, her face would
4      turn red and she would just get excited.
5  Q.  What else?
6  A.  That's it.
7  Q.  Did you -- you say that you were able to
8      look at your tests in 252, that course?
9  A.  Yes, sir.
10  Q.  Adult nursing?
11      Yes?
12  A.  Yes, sir.
13  Q.  So when did you look at your tests?
14  A.  After I had filled out the papers for the
15      grade appeal, then we set a date for me to
16      come in and look at the tests and go over
17      it with her.
18  Q.  When you called Sandy Gunnels on the phone
19      about your grade in obstetrics, you knew
20      about your grade in Adult Nursing II also,
21      didn't you?
22  A.  I knew about that grade first, and I called
23      her about that one.

1  Q.  First?
2  A.  First.
3  Q.  Adult Nursing II?
4  A.  Yes, sir.
5  Q.  And then you called her about obstetrics --
6  A.  When I learned that grade.
7  Q.  -- when Dixie Peterson told you about that
8      one?
9  A.  Yes, sir.
10  Q.  Now, when you talked to Sandy Gunnels about
11      Adult Nursing II, tell me about that
12      conversation.
13  A.  I told her that -- I told her about not
14      having enough points, saying they lost the
15      care plans and things like that, and she
16      told me to go through the grade appeal
17      process, just as in the OB class. She told
18      me to do that one first because that's the
19      one I knew about first. Then she said if
20      you're going to do that, you need to go and
21      do the OB, just do it, also. Review
22      everything.
23  Q.  Did you tell Sandy Gunnels that you were

1      receiving 23 out of 25 total points on each
2      of those care plans that were lost?
3  A.  It was only one care plan that was lost.
4      Yes, I did.
5  Q.  So you got your actual grade on one care
6      plan, correct?
7  A.  Correct.
8  Q.  And then they gave you a 23 out of 25 on
9      the other care plan that was lost, correct?
10  A.  Correct.
11  Q.  Did they do that for all six of the people
12      in your group?
13  A.  I'm not real sure. As far as I know, they
14      did.
15  Q.  But did you tell Sandy Gunnels when you
16      talked to her the first time about the fact
17      that you were getting 23 out of 25 on that
18      lost care plan?
19  A.  Yes, sir.
20  Q.  So tell me everything you told Sandy
21      Gunnels about your Adult Nursing II grade
22      and any problems or whatever you talked to
23      her about before she said file a grade

1      appeal.
2  A.  As far as the whole semester? I mean --
3  Q.  Were you talking to her the whole semester?
4  A.  Oh, yes, sir.
5  Q.  Tell me about your relationship with Sandy
6      Gunnels then during that time.
7  A.  She's a colleague, so, I mean, I kept in
8      touch with her after the LPN program as
9      well as some other instructors.
10  Q.  Let's do this. You called Sandy Gunnels
11      right after you learned about your Adult
12      Nursing II grade, right?
13  A.  Right.
14  Q.  Before you had any kind of -- before you
15      ever talked with Lynn Harris again after
16      that first time when she told you about the
17      grade?
18  A.  Yes, sir, and that's when I filed my grade
19      appeal.
20  Q.  All right.
21  A.  She was talking me through where to go and
22      what papers to get to do it because no one
23      else would help me.

Page 134

1  Q. So you had talked to Lynn Harris once about
2     your grade, correct?
3  A. Correct.
4  Q. And then you called Sandy Gunnels, right?
5  A. Correct.
6  Q. And she told you to file a grade appeal,
7     right?
8  A. Correct.
9  Q. Then did you call Lynn Harris back after
10    you filed the grade appeal?
11 A. Did I call her back? I'm sure I did.
12 Q. Or did you go through --
13 A. I went through the process --
14 Q. -- the administration at that point in
15    time? Is that the way you do that?
16 A. I went through everybody. I went through
17    Dixie, Dean Lowe, the grade appeal process
18    until we -- they gave me a date to come in
19    and sit down with her to go through my
20    papers.
21 Q. After Dixie told you your grade in
22    obstetrics, it was very -- like that day or
23    the next day that you called Sandy Gunnels

Page 135

1     about obstetrics, correct?
2  A. Correct.
3  Q. And you had not spoken at that time with
4     Tawyna Cash, correct?
5  A. Correct.
6  Q. You had not spoken subsequent to speaking
7     with Dixie when she told you what your
8     grade was to anyone else at the school
9     about your obstetrics grade, correct?
10 A. As far as instructors?
11 Q. Before you called Sandy Gunnels -- yes, as
12    far as instructors, as far as officials or
13    instructors or employees at the school.
14 A. I mean, I just talked to Dixie and -- no,
15    sir, I didn't. I didn't talk to anybody
16    else.
17 Q. You had one conversation with Dixie. She
18    told you what your grade was. You called
19    Sandy Gunnels, and she said file a grade
20    appeal?
21 A. Right.
22 Q. And that was in obstetrics?
23 A. Right.

Page 136

1     MR. NIX: Let's take a break.
2     (Lunch recess was taken.)
3     (Defendant's Exhibit 2 was marked
4     for identification.)
5  Q. Ms. Wright, I've marked as Defendant's
6     Exhibit Number 2 the Defendants' First
7     Amended Set of Request for Production of
8     Documents which was submitted to you and
9     your attorneys and that you responded to
10    yesterday by giving me some documents and
11    that your lawyer is going to give me a
12    written response to today.
13        MR. NIX: I just wanted to
14        establish for the Record that
15        Defendant's Exhibit 1 and
16        Defendant's Exhibit 2 ask for
17        the same documents. There are
18        44 items in the request for
19        production, and there are 44
20        items in the notice of
21        deposition duces tecum.
22        There's a stipulation that
23        these are the same.

Page 137

1  Q. So with that done, let me go back and ask
2     you a few more questions about what we were
3     talking about before I move on.
4        We were talking about damages, and you
5     had told me that you had humiliation. That
6     was another thing that you mentioned, and
7     then we've been talking about your pay as
8     an LPN. One of the things your complaint
9     says -- or that maybe you said in the
10    deposition is that you've had to -- or that
11    there have been RN jobs that you could have
12    applied for if you had your RN license.
13       What I would ask you to do for me is to
14    tell me about some of those jobs, what they
15    are and how much they pay.
16 A. Well, I was approached by a friend that
17    works at St. Francis, and she was telling
18    me that -- she's currently working there as
19    an RN, and they're paying $35 an hour for
20    p.r.n.
21       And the employer that I was currently
22    working for, there was positions open that
23    required RN, and they were salaried

Page 138

1    positions, and they were between 20 and $25
2    an hour.
3  Q. You say the employer that you were working
4    for. Do you mean Doctors Hospital?
5  A. No.
6  Q. Or do you mean St. Francis?
7  A. No, sir.
8  Q. Patel?
9  A. No. The last was Wiregrass Hospice.
10 Q. Oh, okay. I didn't know about that place.
11   Now, when did you start working for
12   Wiregrass Hospice?
13 A. August 21st, 2006.
14 Q. How long did you work for them, or are you
15   still?
16 A. No, I'm not working there as of June of
17   this year.
18 Q. All right. June '07. Now, were you
19   working at Wiregrass Hospice on an
20   as-needed basis or were you working there
21   full-time?
22 A. Full-time.
23 Q. And how were you paid?

Page 139

1  A. I was hourly in the beginning and then went
2    to a salaried position.
3  Q. How much was the hourly rate?
4  A. $15 an hour.
5  Q. How long were you there before you went to
6    a salaried position?
7  A. I think I was put on that payroll for the
8    salaried position in December of --
9  Q. '06?
10 A. Yes, sir.
11 Q. What was the salary?
12 A. 45,000 plus incentives.
13 Q. What incentives do you mean?
14 A. It was based on referrals, the referrals
15   that I had come into the office.
16 Q. How did you get these referrals?
17 A. By going out and talking to families and
18   doctors, hospitals, educating them on
19   hospice benefits.
20 Q. And what was the incentive pay?
21 A. It was anywhere from -- it started at five
22   referrals, anywhere from 25 to -- and it
23   always started back at one. $25 per

Page 140

1    referral up to whatever. I mean, it could
2    have been $2,000, up to $2,000 extra a
3    month.
4  Q. I'm not sure I understand. $25 per
5    referral?
6  A. Uh-huh. (Positive response.)
7  Q. Did it ever go higher than $25 per
8    referral?
9  A. It could, if you brought in more than -- if
10   you had from -- one through five I think
11   was $25. If you got up to ten, it always
12   went back to one. It was paid from one
13   to -- started at one, and it was $25 per
14   referral, but it went up, kind of like it
15   doubled.
16 Q. Then there was a cap on it at $2,000?
17 A. No.
18 Q. There's no cap?
19 A. Huh-uh. (Negative response.)
20 Q. What was the highest amount of money you
21   made on referrals, incentive pay?
22 A. I think 125, 225. I'm not real sure.
23 Q. Where is Wiregrass Hospice?

Page 141

1  A. It's in Phenix City.
2  Q. Now, what was the name of that salaried
3    position?
4  A. It was account executive.
5  Q. So you were not actually practicing as an
6    LPN after you got the salaried position; is
7    that right?
8  A. No.
9  Q. Were you practicing as an LPN at Wiregrass
10   Hospice when you were there at $15 an hour?
11 A. Yes, sir.
12 Q. Why did you leave Wiregrass Hospice in
13   June?
14 A. Because they eliminated the marketing
15   position.
16 Q. Do you have a job now?
17 A. Not right this minute.
18 Q. Are you looking?
19 A. Yes, sir.
20 Q. How does an LPN look for a job?
21 A. Go out and apply, I mean, just like anybody
22   else would, fill out applications and --
23 Q. I didn't know whether there was a referral

1    place for nurses or what.
2  A.  No. I've placed my resume on
3    careerbuilder.com, so I've pretty much
4    gotten phone calls and people that I've met
5    in that time frame ...
6  Q.  You mentioned this one position at
7    St. Francis, an RN position, $35
8    as-needed. Was that a position that was
9    open at some point in time?
10  A.  It's been open.
11  Q.  You've never applied for it, obviously,
12    because you don't have the RN license, but
13    was there a full-time position for an RN at
14    St. Francis?
15  A.  I'm sure there is. There's full-time
16    positions for RNs everywhere.
17  Q.  But you don't know what a full-time
18    position would pay; is that right?
19  A.  No.
20  Q.  When you said that you -- there were jobs
21    you could have applied for if you had your
22    RN license, are you thinking of any other
23    specific jobs other than this as-needed job

1    at St. Francis?
2  A.  Well, there was one at Wiregrass that I
3    could have applied for.
4  Q.  And that was an RN position?
5  A.  Yes, sir.
6  Q.  How much would it have paid?
7  A.  I'm not real sure. Probably somewhere in
8    the same range as what I was making as a
9    marketer.
10  Q.  Are you thinking -- Are there any other
11    places that you can specifically tell me
12    about where an RN position may have been
13    open that you would have applied for if you
14    had had your RN license?
15  A.  Doctors Hospital. I mean, there's --
16  Q.  Everywhere?
17  A.  Everywhere.
18  Q.  Now, let me ask you this. You said
19    humiliation was one of your damages. Tell
20    me about that.
21  A.  The humiliation of the class, having to
22    explain -- I mean, because you can't --
23    people say, are you going to go back to RN

1    school? Well, what do you tell them? You
2    have to tell them. I don't go into detail,
3    but I tell them briefly.
4  Q.  What do you tell them?
5  A.  I have been and I'm still working on it.
6  Q.  I'm sorry. Is that what you tell them?
7  A.  Uh-huh. (Positive response.) Trying to
8    get things resolved.
9  Q.  Okay. So in other words, what you tell
10    them is, I'm working on it?
11  A.  Working on it and trying to get things
12    resolved with what I've already been
13    through as far as --
14  Q.  In terms of this lawsuit is what you're
15    saying?
16  A.  As far as classes and the class that I need
17    to take if granted.
18  Q.  So what you're saying is -- tell me what
19    you would have to do if you could get back
20    into the RN program at CVCC. What would
21    you have to do to graduate?
22  A.  If I were granted course forgiveness like I
23    was under the impression that would be able

1    to take place, then I would only have to
2    take that pediatric class and be done.
3  Q.  Which number was that?
4  A.  That was the 272, the last class.
5  Q.  So you'd have to take that. Now, are you
6    saying that that's what you want to do?
7  A.  That's the only thing I wanted to do.
8  Q.  Okay. You're saying that your goal in this
9    lawsuit is to be able to get back to CVCC,
10    get your RN certificate or your diploma
11    from there, take the State exam and become
12    an RN; is that correct?
13  A.  Pretty much.
14  Q.  Do you understand what happened or what the
15    rules are regarding course forgiveness?
16  A.  Yes, sir, I had to research that myself in
17    the course catalog.
18  Q.  Okay. Tell me exactly what you did
19    researching that.
20  A.  From the beginning of that?
21  Q.  Sure. Might as well start at the
22    beginning.
23  A.  Okay. Well, when everything occurred as

1  far as the grade appeals, I went to Dixie
2  and she made an appointment with Dean Lowe
3  for her and him to be in her office.
4     And we were discussing the things that
5  had happened. She said, Lindy, it's not
6  like you've got course forgiveness. And I
7  was thinking, okay, well, nobody said
8  anything -- I didn't say anything. I said,
9  well, nobody said anything to me about
10  course forgiveness. What is this?
11     So I took it upon myself to get the
12  course catalog and research. And it said
13  that it's the student's responsibility to
14  ask for course forgiveness.
15     Well, they offered me Nursing 200 in
16  place of 252. They told me that they would
17  change the -- they had to change the course
18  number due to the fact that the course
19  curriculum -- that the course was changing
20  the following year, that 252 would not be
21  offered the following year, so they would
22  change it to 200. I said, okay.
23     I talked to an attorney about it, and

1  she had contacted Dean Lowe. And we
2  thought we had come to an agreement, so I
3  said, fine, because I didn't want to
4  argue. Fine.
5 Q. You're talking about come to an agreement
6  with regard to what?
7 A. The 252.
8 Q. What agreement did you think you had come
9  to with Dean Lowe?
10 A. He told me -- his words were, the D will
11  not come off of your transcript, but it
12  will not be held against you. So we're
13  going to offer you Nursing 200 in place of
14  252 because the course curriculum is
15  changing. And that also came from Dixie
16  Peterson.
17 Q. All right. Tell me again what they said.
18  The D will not come off?
19 A. The D will not come off of your transcript,
20  but it will not be held against you.
21 Q. Okay. What else?
22 A. And we're offering 200 in place of 252.
23 Q. All right.

1 A. At that point, I knew nothing about course
2  forgiveness, so Dixie had made that
3  comment. So I went and researched in the
4  course catalog, and it stated the procedure
5  for course forgiveness. You ask the dean
6  of students, write a letter.
7     I took a letter to Dean Hodge,
8  presented it to him and then waited for a
9  response. Nowhere in the course catalog
10  did it say that the nursing program was
11  exempt from that.
12 Q. It does say in the nursing portion of the
13  catalog that two failures or two courses
14  with a D disqualifies you, though, doesn't
15  it?
16 A. Correct, it does. But at that point, I did
17  not have two D's. That semester, there was
18  no -- there was only one.
19 Q. I'm not sure I understand what you're
20  saying. You're saying -- you're talking, I
21  guess --
22 A. Talking about the second semester, 252 and
23  271.

1 Q. Right.
2 A. The OB and the med-surge --
3 Q. 271 got changed to a C?
4 A. Correct.
5 Q. That was in the fall of 2005, fall
6  semester.
7 A. Correct.
8 Q. It was. And then in January of 2006, you
9  entered into the spring term for 2006?
10 A. (Witness nods head up and down.)
11 Q. And so I guess what I'm confused about is,
12  you said at that time, I did not have two
13  D's.
14 A. No. I had the D in 252 that I was told
15  would not be held against me. In return, I
16  made an A in Nursing 200, which the 200
17  replaced that 252 that I would have had to
18  take the following year.
19 Q. When you said at that time I did not have
20  two D's, what is that time?
21 A. That time was that second semester when I
22  took Nursing 252 and 271. There were not
23  two D's. That D in OB was changed to a C.

Page 150

1  Q. Right.
2  A. Correct.
3  Q. Okay. At that time, you did not
4     have ... All right. Are you saying that
5     you had a D in 252 and that you met with
6     Dixie and Dean Lowe?
7  A. Uh-huh. (Positive response.)
8  Q. And --
9  A. In the process of the grade appeal.
10 Q. And when was this?
11 A. That was before that second semester -- I
12    mean that last semester had started, right
13    before -- it might have been when I got
14    confirmation that I could come back to
15    school. It was maybe a day or two into
16    class time.
17 Q. So late December, early January -- late
18    December '05, early January '06?
19 A. Early January.
20 Q. You're saying you met with Dixie Peterson
21    and Dean Lowe?
22 A. Uh-huh. (Positive response.)
23 Q. And they talked to you about taking 200

Page 151

1     instead of 252 because 252 would not be
2     offered again?
3  A. Correct.
4  Q. And you're saying that is the time at which
5     you did not have two D's, right?
6  A. Yes, sir. They had told me that the C --
7     Dixie told me that it was at her discretion
8     that that C would be changed to a D because
9     Tawyna Cash did not follow up with the
10    grade appeal process. She didn't turn in
11    some kind of paperwork that she was
12    supposed to have finished.
13 Q. So that the D that you made in 271 was
14    changed by the school to a C?
15 A. Uh-huh. (Positive response.)
16 Q. You moved into the spring semester of 2006
17    with one D in 252. In the spring term, you
18    made a D in 272, right?
19 A. Correct.
20 Q. Which gives you two D's or two courses that
21    were failed; isn't that right?
22 A. At that time, yes. But when I asked -- I
23    called Ms. Alexander and asked her about

Page 152

1     the course forgiveness, and she told me I
2     couldn't get course forgiveness until that
3     class had been completed. So I
4     completed --
5  Q. Who's Ms. Alexander? I'm sorry.
6  A. She is the lady in -- I don't know. She
7     works up in the business office,
8     admissions, somewhere up there. And she
9     handles --
10 Q. In nursing?
11 A. No, for the school, for the college.
12 Q. Ms. Alexander works in the main college
13    office, admissions office?
14 A. As far as I know, yes. I don't know
15    exactly where her office is.
16 Q. All right. Tell me when you called
17    Ms. Alexander.
18 A. When I was told that I could not take a
19    class that would be offered the summer
20    semester for students that had been told
21    they failed that peds class, also, which
22    would have been 272.
23 Q. Who told you that?

Page 153

1  A. Lynn Harris.
2  Q. Okay.
3  A. No. I'm sorry. She didn't tell me that.
4     The secretary told me that over the
5     telephone when I called to ask when this
6     class was going to be started. The
7     secretary told me -- of the nursing
8     program. I guess it was the secretary. It
9     was some lady answering the phones down
10    there. I don't know.
11 Q. I want to get the timing right. You're
12    talking about calling the secretary in the
13    nursing program and talking to her about a
14    course being offered in the summer of 2006?
15 A. Correct.
16 Q. And that course would have in your mind
17    replaced 272; is that correct?
18 A. Correct.
19 Q. And 272 is what again?
20 A. The pediatric.
21 Q. Okay. I'm catching on.
22 A. Okay.
23 Q. 272 is pediatrics. All right.

Page 154

1    So you did a grade appeal on 272,
2    didn't you?
3  A.  Yes, sir.
4  Q.  And you met with Lynn Harris on 272 -- on
5    that course, correct?
6  A.  Correct.
7  Q.  And you met with her at the end of the
8    spring semester of 2006 and -- when she
9    told you about the grade you had made in
10   272; is that right?
11 A.  Uh-huh.  (Positive response.)
12 Q.  Is that right?
13 A.  Yes, sir.  Sorry.
14 Q.  That's all right.  So had you met with Lynn
15   Harris about your status in that course,
16   pediatrics, NUR 272, prior to the time that
17   she told you about your grade, your final
18   grade?
19 A.  For that last semester for the pediatric
20   class?
21 Q.  The spring of 2006.
22 A.  It was one to two weeks before.  And she
23   said that all you need is -- I think she

Page 155

1    said all you need is 180 points on your
2    final.
3  Q.  One or two weeks before the final exam in
4    NUR 272, you met with Lynn Harris; is that
5    right?
6  A.  Correct.
7  Q.  And she said all you need is 180 points?
8  A.  Uh-huh.  (Positive response.)
9  Q.  Is that right?
10 A.  Yes.
11 Q.  You need to say yes.
12 A.  I'm sorry.  Yes, sir.
13 Q.  That's all right.
14   Was it possible at that time to get 180
15   points?
16 A.  Oh, sure it was.
17 Q.  And how would you have done that?
18 A.  If she would have been available to go over
19   tests, go over any kind of remediation for
20   any student, not just myself, anybody.
21 Q.  How does that get you points?
22 A.  That refreshes -- refreshes for tests.
23   That just prepares you even more.

Page 156

1  Q.  What about Lindy Wright --
2  A.  I mean, if you have any questions --
3  Q.  -- preparing?  What about Lindy Wright
4    preparing for tests?
5  A.  She did.
6  Q.  I mean, isn't it the student's
7    responsibility, Ms. Wright, to study and
8    prepare for tests?
9  A.  Yes.
10 Q.  It's not the professor's responsibility to
11   study for you, is it?
12 A.  No, sir.
13 Q.  The professor outlined that course 272,
14   pediatrics; isn't that right?
15 A.  She did.
16 Q.  And there was a book?  You had a book in
17   that course?
18 A.  Yes, sir.
19 Q.  What other materials did you have to study
20   for pediatrics, NUR 272?
21 A.  Just her PowerPoints and the book.
22 Q.  Did you study those things?
23 A.  Yes, sir.

Page 157

1  Q.  Did you have the same opportunity to study
2    those things as any other student in the
3    class?
4  A.  Yes.
5  Q.  And you did not make an adequate number of
6    points on your final exam to make above a D
7    in NUR 272, did you?
8  A.  That was because there were care plans that
9    were regraded that semester just in my
10   clinical group --
11 Q.  First answer my question.
12 A.  Okay.  Go ahead.
13 Q.  You did not make enough points in NUR 272,
14   pediatrics, to make above a D?
15 A.  That's what Lynn Harris told me.
16 Q.  She told you that when?
17 A.  She told me that the day that she went
18   over -- well, she didn't go over any test,
19   the day that she said we could come in and
20   see what our grades were.
21 Q.  Okay.  What day was that?
22 A.  That, I think, might have been the day of
23   the finals, that afternoon.

Page 158

1   Q.  After the final was over?
2   A.  Yes, sir.
3   Q.  Are those Scantrons graded by computer?
4   A.  As far as I know, they are.
5   Q.  So it's real quick to get the grade, I
6       guess?
7   A.  Yes.
8   Q.  And so did you go in the afternoon that you
9       took the final in pediatrics and see Lynn
10      Harris?
11  A.  Yes.
12  Q.  Tell me about that meeting.  Where were you
13      and who was present?
14  A.  Just her in her office.
15  Q.  Was there a line again?
16  A.  Yes.
17  Q.  And tell me what was said.
18  A.  That I didn't have enough points on my
19      final to pass.  And she told me not to
20      worry about it, that she was going to offer
21      a class in the summer just like she did the
22      Nursing 200 and I would be able to take
23      that class and everything would be fine.

Page 159

1   Q.  She said don't worry about it; a course
2       will be given in the summer that you can
3       take, and everything will be cool?
4   A.  Right.
5   Q.  Did she tell you what course that was?
6   A.  No.  I mean, apparently, it would be a
7       pediatric course because that was the
8       course that I apparently didn't have enough
9       points.
10  Q.  So after you spoke with Lynn Harris the
11      afternoon of the final and knew that you
12      were not making a passing grade in
13      Pediatrics 272, what did you do?
14  A.  I went home.
15  Q.  What did you do next in terms of school?
16  A.  Waited on graduation to be over with and
17      then them to come back.  And I started
18      calling the school to find out when this
19      course was going to start and what I needed
20      to do, and that's when I got the secretary
21      finally because nobody else would take my
22      calls.
23  Q.  What do you mean no one else would take

Page 160

1   your calls?
2   A.  I would ask for Dixie, Lynn Harris.  They
3       were never available.
4   Q.  Who would you ask?
5   A.  The secretary.
6   Q.  So you're saying that you called the school
7       a number of times --
8   A.  Yes, sir.
9   Q.  -- in that time frame immediately after the
10      final exam was given in 272, NUR 272?
11  A.  Yes.
12  Q.  Where did you call from?
13  A.  Home and cell phone I'm sure.
14  Q.  What's your cell number?
15  A.  706-566-4148.  That's a new cell phone
16      number.  Do you want the old one?
17  Q.  Yes.
18  A.  706-442-0128.
19  Q.  What service provider was that one with?
20  A.  T-Mobile.
21  Q.  T-Mobile.  How about this new one?
22  A.  That's Verizon.
23  Q.  What is your home phone number?

Page 161

1   A.  706-596-0365.
2   Q.  That's the one in Georgia where -- were you
3       living there at the time that you made
4       these phone calls from home?  If you called
5       the school --
6   A.  Yes.
7   Q.  -- about the grade in NUR 272, that's where
8       you would have been living?
9   A.  Yes.
10  Q.  And who is the service provider for that
11      hard line?
12  A.  I guess it's BellSouth.
13  Q.  So how many times -- about how many times
14      did you call?
15  A.  At least five times.
16  Q.  What would you say?
17  A.  I need to speak to Dixie Peterson or Lynn
18      Harris.  And I think it was the last time I
19      called, she asked me could she help me.
20      And I said, I need to know when this class
21      is going to start for this pediatric class
22      that Ms. Harris told me about.  She said,
23      well, you're not going to be able to take

Page 162

1  it because you didn't pass. You had two
2  D's. So I said, what two D's did I have?
3  Q. So the secretary said you can't take this
4     course in the summer of 2006 because you
5     were disqualified, basically; is that
6     right?
7  A. Right.
8  Q. By virtue of the fact that you had two D's,
9     right?
10 A. Right.
11 Q. When she told you that, what did you say to
12    her?
13 A. I went to the school.
14 Q. That very day?
15 A. I think I did.
16 Q. What part of the school? Did you go to the
17    nursing offices or --
18 A. The nursing offices.
19 Q. Did you see anyone?
20 A. If I'm not mistaken, I think that's when
21    I -- I think that's when I talked to
22    Dixie. And then that's when a meeting was
23    set up with Dean Lowe, I think. You'll

Page 163

1  have to give me just a minute and let me
2  try and remember.
3     I think that's right, because I know
4  that my course forgiveness was -- that I
5  asked for, I think that was dated May 19th,
6  2006. So that's when she made the comment
7  about it's not like you've got course
8  forgiveness.
9  Q. And that was in a meeting between you and
10    Dixie and Dean Lowe?
11 A. And Dean Lowe in his office.
12 Q. Okay.
13 A. And she also told me in his office that she
14    would help me any way she could, to go ask
15    Ms. Harris if she would look over the care
17    them.
18    I did so, and Ms. Harris told me that
19    she had already spoken with Ms. Peterson
20    about doing that for any student and that
21    they had discussed it, and that she
22    knew that they had discussed no, that that
23    would not be done.

Page 164

1  Q. So after the meeting with Dixie and Dean
2     Lowe, you talked to Lynn Harris about
3     regrading your care plans?
4  A. Uh-huh. (Positive response.) Went back
5     down to the nursing office.
6  Q. Yes?
7  A. Yes. Went back down to the nursing office
8     and asked her about care plans. I told her
9     what Dixie had said. And she said, I don't
10    know why she told you that because we had
11    already discussed it and it was no for any
12    student.
13 Q. To regrade, okay, care plans, can't do it.
14    Cannot do it.
15    All right. Tell me. When you met with
16    Dixie and Dean Lowe -- you said that you
17    filed your course forgiveness around May
18    19, 2006, right --
19 A. Correct.
20 Q. -- that request? That was a letter, and
21    we'll look at that in just a minute.
22    So if that letter was May 19, 2006,
23    when did you meet with Dixie and Dean Lowe?

Page 165

1  A. It was possibly the day before or two days
2     prior to. I'm not sure if there was a
3     weekend time in there or not, but I know
4     all faculty -- I was -- I called up there
5     to see if the dean was there so I could
6     bring my letter, and I was told that the
7     faculty wasn't in. I happened to catch him
8     coming down the stairs as I was going up.
9  Q. Which dean are you talking about?
10 A. Dean Hodge.
11 Q. Shortly before May 19, a day or two or if
12    there was a weekend, you met with Dixie,
13    and Dixie said something like, it's not
14    like you have course forgiveness?
15 A. It's not like you have course forgiveness,
16    Lindy.
17 Q. You're very emphatic about that. It sounds
18    like those were her exact words.
19 A. Those were her exact words.
20 Q. What did you say in response, if anything?
21 A. I just looked at her, and I was thinking to
22    myself, what's course forgiveness? I
23    didn't know anything about it. And that's

Page 166

1    when I went and researched my course
2    catalog.
3  Q.  But you didn't say anything and y'all
4    didn't discuss it in that meeting?
5  A.  No.
6  Q.  And Dean Lowe didn't discuss it in that
7    meeting with you?
8  A.  No.
9  Q.  So that's all that was said, was just that
10    comment --
11  A.  Correct.
12  Q.  -- about course forgiveness?
13    What else was said in that meeting?
14  A.  I don't remember everything that was said,
15    but it was basically about they would help
16    me any way they could and apologetic, sorry
17    this has happened to you, and that was
18    pretty much the basis of it.
19  Q.  And then you went to see Lynn Harris. Lynn
20    Harris said I can't regrade the care plans?
21  A.  Correct. There was some point in time, and
22    I don't remember exactly when, that Dixie
23    told me to go talk to whoever. And so I

Page 167

1    went and talked to Laurel Blackwell and
2    Dean Hodge. He came in --
3  Q.  Okay.
4  A.  -- to her office.
5  Q.  This was after your meeting with Dixie and
6    Dean Lowe?
7  A.  I think it was.
8  Q.  Was it after you filed the course for --
9    wrote the letter about course forgiveness?
10  A.  If I'm not mistaken, it was -- it was -- it
11    may have been, because I was waiting on a
12    decision from the dean about the course
13    forgiveness.
14  Q.  Dean Hodge?
15  A.  Yes.
16  Q.  So you're saying Dixie said, why don't you
17    go see who?
18  A.  She told me she didn't care who I went and
19    talked to.
20  Q.  Dixie --
21  A.  Yes.
22  Q.  -- said that? So what did you do?
23  A.  I went and talked to Laurel Blackwell, and

Page 168

1    Dean Hodge was in on that meeting. And it
2    was not a scheduled meeting. I went up and
3    sat in the office and waited on her.
4  Q.  Would this have also been in May?
5  A.  Yes, sir.
6  Q.  So what was said in that meeting?
7  A.  She basically told me that she had nothing
8    do with the academics, that it was their
9    decision, and that was the extent of that.
10  Q.  Did Dean Hodge say anything?
11  A.  I don't recall him saying anything. I
12    think he was just sitting in.
13  Q.  Okay.
14  A.  I may have asked him at that point about
15    the course forgiveness.
16  Q.  Tell me what you recall. Don't guess,
17    speculate or --
18  A.  I know there was at some point in time that
19    I did contact him by phone and ask him
20    about the course forgiveness, and he told
21    me that it had to go through some sort of
22    process -- I don't know what -- but he
23    didn't have an answer for me yet. And then

Page 169

1    I received a letter in the mail saying that
2    academic bankruptcy was not granted due to
3    the fact that the course numbers didn't
4    match.
5  Q.  Do you have that letter?
6  A.  Uh-huh. (Positive response.) And I think
7    there was a copy -- I'm sorry. Yes.
8  Q.  Was this a letter from Dean Hodge?
9  A.  Yes, sir, I believe so.
10        (Brief interruption.)
11        (Defendant's Exhibit 3 was marked
12        for identification.)
13  Q.  Ms. Wright, what is your understanding of
14    course forgiveness, what it is?
15  A.  Course forgiveness, it's -- my
16    understanding is if you fail a class, you
17    repeat that class. And your GPA does not
18    change, but that letter grade gets dropped
19    in place of whatever you've made on the
20    second course if you've passed it
21    successfully.
22  Q.  So your understanding is that if you take a
23    course and you fail it and then you take it

Page 170

1    over again and you pass it, that the grade
2    taken -- that you got the second time
3    replaces the failure and you move forward?
4  A.  Correct.
5  Q.  And the failure is forgiven?  Is that what
6    you're saying occurs?
7  A.  Correct.  And I also asked Ms. Alexander
8    about that, to clarify so I knew what was
9    going on and so my understanding would be
10   correct, if that was -- if that was
11   correct.
12 Q.  So Ms. Alexander explained to you what
13   course forgiveness is?
14 A.  Yes, sir.
15 Q.  Is that correct?
16 A.  Yes.
17 Q.  Now, you say that she's in the main office,
18   correct?
19 A.  Correct.
20 Q.  In admissions; is that right?
21 A.  I'm not sure where she's at, but Dean Hodge
22   is the one that told me that she handles
23   course forgiveness.  I don't know what her

Page 171

1    duties are, but he did tell me that she
2    handles course forgiveness.
3  Q.  Now, let me ask you this.  I take it that
4    the idea of course forgiveness came to you
5    when Dixie Peterson commented it's not like
6    you have course forgiveness, Lindy,
7    correct?
8  A.  Correct.
9  Q.  But, now, she did not tell you to apply for
10   course forgiveness, did she?
11 A.  No.
12 Q.  And she did not tell you that course
13   forgiveness was available, did she?
14 A.  No.
15 Q.  And neither did Dean Lowe, did he?
16 A.  No.
17 Q.  And isn't it correct that you researched
18   the handbook or the listings of the various
19   people at the school and determined that
20   Dean Hodge was the one you needed to talk
21   to?
22 A.  Correct.
23 Q.  And you saw in reading the handbook or the

Page 172

1    catalog that it was up to a student to
2    request course forgiveness, correct?
3  A.  Correct.
4  Q.  And therefore, you wrote the letter of May
5    19, 2006, to Dean Hodge and requested
6    course forgiveness, right?
7  A.  Right.
8  Q.  And all of that was based on your own
9    research, correct?
10 A.  Correct.
11 Q.  And it was not based on anything that
12   anybody within the nursing department told
13   you, correct?
14 A.  Correct.
15 Q.  And you understand, don't you, Ms. Wright,
16   that course forgiveness is not available
17   for the nursing program?
18 A.  No.  There's nowhere in the catalog that it
19   states course forgiveness -- the nursing
20   program classes are exempt from course
21   forgiveness.
22 Q.  Has anyone told you that course forgiveness
23   is not available in the nursing program?

Page 173

1  A.  No.
2  Q.  Is my question today the first thing you've
3    heard -- ever heard about the possibility
4    that course forgiveness is not available in
5    the nursing program?
6  A.  Can I ask you what you mean?  Do I know of
7    anybody else that has received course
8    forgiveness for a nursing class?
9  Q.  No.
10 A.  Okay.  Because I'm going to --
11 Q.  My question is this.  Is my question today
12   as we sit here right now about the fact
13   that course forgiveness does not apply to
14   the nursing program the first time you've
15   ever heard that?
16 A.  With this letter that I received?  No --
17   Yeah, it is.  That's the first time I've
18   ever heard that, because I researched in
19   the catalog and it's not there.
20 Q.  Do you know anyone in the nursing program
21   that's ever received course forgiveness?
22 A.  Yes, I do.
23 Q.  Who?

44 (Pages 170 to 173)

Page 174

1  A.  Corolla Rambo.
2  Q.  Okay.  How do you know about her receiving
3      it?
4  A.  Because she was one of the students that
5      was said to have failed Nursing 272, which
6      was the last class offered that year, the
7      pediatric class.
8  Q.  Corolla Rambo was a contemporary of yours
9      in school, right?
10 A.  Right.
11 Q.  I mean, she was in the same progression?
12     Started the same time, was going to
13     graduate at the same time, correct?
14 A.  Right.
15 Q.  And you're saying y'all were in the same
16     272 class --
17 A.  Correct.
18 Q.  -- together?
19 A.  Yes.
20 Q.  With Lynn Harris, correct?
21 A.  Yes.
22 Q.  And that both of you made a D --
23 A.  Yes.

Page 175

1  Q.  -- in Nursing 272?
2  A.  Yes.
3  Q.  Did Corolla Rambo graduate from the RN
4      program?
5  A.  Yes, she did.
6  Q.  What makes you think that she received
7      course forgiveness for NUR 272?
8  A.  She told me.
9  Q.  In pediatrics?
10 A.  She told me she did.
11 Q.  When did she tell you this?
12 A.  After she applied and received course
13     forgiveness.  I don't know the exact times
14     and dates.
15 Q.  Had she flunked another course besides 272?
16 A.  Not that I'm aware of as far as a nursing
17     class.
18 Q.  That's what I'm asking about.
19 A.  No.
20 Q.  A class that was required within the
21     nursing program that you were involved in.
22 A.  Not that I'm aware of.
23 Q.  Has Ms. Rambo ever shown you any letter or

Page 176

1      any document that verifies what she's
2      saying about having received course
3      forgiveness?
4  A.  No, sir.  I've not asked to see anything.
5  Q.  Do you know where Ms. Rambo is now?
6  A.  Yes, I do.
7  Q.  Where?
8  A.  She lives in Columbus and she works in
9      Phenix City.
10 Q.  Where does she work?
11 A.  She works at Canterbury Nursing Home.
12 Q.  Do you know if she's married?
13 A.  I think she is.
14 Q.  Do you know what her husband's name is?
15 A.  I don't.
16 Q.  But she does live in Columbus?
17 A.  Yes, sir.
18 Q.  Do you know of anyone else that you believe
19     has received course forgiveness that's in
20     the nursing program?
21 A.  No, sir, not course forgiveness.
22 Q.  Okay.  She's the only one you're aware of?
23 A.  That has received course forgiveness.

Page 177

1  Q.  That you believe has received course
2      forgiveness?
3  A.  Correct.
4  Q.  Whatever.  All right.  Rambo.
5      All right.  Now, you said not course
6      forgiveness, and you distinguished course
7      forgiveness from something else.  What did
8      you mean to distinguish course forgiveness
9      from?
10 A.  That has received special treatment.
11 Q.  Okay.  Special treatment.  What do you mean
12     by special treatment?
13 A.  Has been able to come back to the program
14     after two failures or has been able to
15     rectify their wrong instead of having to
16     come back the following year or pay for
17     classes or take -- repeat the class.
18 Q.  Let's take one classification of special
19     treatment at a time.  Okay?
20 A.  Okay.
21 Q.  What is your understanding of anyone in the
22     nursing program that has received what you
23     call special treatment?

Page 178

1   A.  There was a student the first half of the
2       second semester that came into one of our
3       clinical labs that was held at the school,
4       and she had not been in any of our classes
5       and --
6   Q.  You said the first half of what semester?
7   A.  The second semester.
8   Q.  Okay. I'm sorry. Go ahead.
9   A.  And not just myself, but everyone was
10      asking who the girl was.
11  Q.  Who was she?
12  A.  Her name was Arit Dan Umoh. And she was a
13      student from the previous year that was
14      taking, I guess, a pediatric course is what
15      I was told before it was offered. And she
16      was there that day performing clinical
17      check-offs with the rest of us in my class.
18  Q.  Was Arit Dan -- how do you say it?
19  A.  Umoh. I think that's how you say it.
20  Q.  Was she enrolled in your clinical class?
21  A.  No, sir, she was not enrolled in my
22      clinical class.
23  Q.  But she came to that class is what you

Page 179

1       you're saying?
2   A.  She came to that clinical check-off.
3   Q.  Which clinical was that?
4   A.  It was just a check-off that we had to do.
5   Q.  But, I mean, what course did the clinical
6       go with? Don't you have a lecture and a
7       clinical?
8   A.  It was the second -- it was the beginning
9       of the second semester, so it had to be the
10      OB and the adult nursing because I think
11      that's when we started doing our clinicals
12      in the hospital.
13  Q.  Okay.
14  A.  Before we did -- Before we started doing
15      the clinicals in the hospital, we had to do
16      a check-off, and she was there that day.
17  Q.  What did you say? OB and what?
18  A.  The OB and the adult nursing.
19  Q.  Adult nursing.
20  A.  Yes, sir.
21  Q.  What is a check-off?
22  A.  How to start IVs, to make sure that you're
23      competent enough to start IVs. We had to

Page 180

1       do a check-off with Foley catheters.
2       That's all I can recall from that day.
3   Q.  And a check-off, if I hear you correctly --
4       and tell me if I'm wrong. A check-off is
5       where you perform a task, and if you
6       perform it adequately, that task is checked
7       off of the list of things you need to be
8       able to do before you become an RN; is that
9       right?
10  A.  Before you're able to go into the clinical
11      setting.
12  Q.  The actual hospital setting?
13  A.  Uh-huh. (Positive response.) Correct.
14      But not for you to be able to sit for your
15      boards or become an RN --
16  Q.  Ultimately, though --
17  A.  Correct.
18  Q.  Ultimately, you've got to be able to do a
19      Foley catheter in order to go to the
20      hospital for your clinical and thereby get
21      to the point where you can take the license
22      exam, right?
23  A.  Correct.

Page 181

1   Q.  Do you know what Ms. Umoh was doing in
2       terms of her check-off? Was it the same
3       things y'all were doing?
4   A.  As far as the check-offs, yes, starting IVs
5       and sterile technique and putting in a
6       Foley.
7   Q.  Did you say she came into this clinical
8       class in the middle of the year?
9   A.  No, it was the beginning of that second
10      semester.
11  Q.  And you're saying she did not stay there,
12      correct?
13  A.  Not -- She was not in any of my clinical
14      groups or in my classroom group. I was
15      told that she had, I guess, like a -- an
16      independent study.
17  Q.  Who told you she had an independent study?
18  A.  Sandy Gunnels, Wendy Wall and Lynn Harris
19      had made a comment about her -- well, not
20      about her -- didn't call her name
21      specifically, but said she had a student.
22      And that was the only student that was not
23      with everyone else that I knew about.

46 (Pages 178 to 181)

Page 182

1  Q.  Lynn Harris?
2  A.  Yes, sir.
3  Q.  Lynn Harris said I have a student that
4     what?
5  A.  That she had to do independent study with.
6  Q.  Did she say why she had to do an
7     independent study with her?
8  A.  No.
9  Q.  Do you know why she had to do an
10    independent study with her?
11 A.  Because she didn't pass from the previous
12    year.
13 Q.  Didn't pass what from the previous year?
14 A.  Didn't pass the nursing courses from the
15    previous year.
16 Q.  So you're saying that someone okayed her
17    taking this independent study or doing this
18    independent study to complete her
19    requirements for the nursing program?
20 A.  Correct.
21 Q.  Do you know who approved that?
22 A.  No, I don't know who approved it.
23 Q.  Do you know why it was approved?

Page 183

1  A.  No, I don't.
2  Q.  Has anyone told you who approved it?
3  A.  Yes.
4  Q.  Who told you?
5  A.  Sandy Gunnels and Wendy Wall had made a
6     comment that the dean and Dixie approved
7     her to come back.
8  Q.  Wall, W-A-L-L?
9  A.  Uh-huh.  (Positive response.)
10 Q.  Wendy Wall.  Where does Wendy Wall work?
11 A.  If I'm not mistaken, I think she's working
12    for Columbus Tech.
13 Q.  Was she working for Columbus Tech when you
14    spoke to them and they told you this?
15 A.  No, sir.  They were working for CVCC.
16 Q.  When did Sandy Gunnels leave CVCC?
17 A.  That second semester.
18 Q.  The spring of '06?
19 A.  Yes, sir.  That was the OB and the peds --
20    if that's spring.  Is that spring?
21 Q.  Tell me what month and year that Sandy
22    Gunnels left CVCC.
23 A.  Okay.  We started in May, and that went

Page 184

1     through August; is that correct?
2  Q.  I'm asking you.
3  A.  I think that's right.  I think that's
4     right.  It stopped in August.  The first
5     semester stopped in August and then picked
6     back up -- I don't know exactly the date
7     that they picked back up, but it was the
8     first week of the second semester --
9  Q.  Okay.
10 A.  -- that we did the clinical check-off.
11 Q.  Who did Sandy Gunnels say had approved the
12    independent study?
13 A.  Dixie Peterson and Dean Lowe.
14 Q.  What reason did she give for them approving
15    it?
16 A.  That she came back -- well, she came up to
17    the school with her attorney at her side
18    and they let her come back.
19 Q.  Do you know how Sandy Gunnels supposedly
20    knew this?
21 A.  The only thing I know is that she was an
22    instructor there, and she was that girl's
23    instructor.

Page 185

1  Q.  Was Wendy Wall an instructor there at the
2     time?
3  A.  She was a clinical instructor.
4  Q.  Clinical.  Do you know a person named
5     Brenda Bellamy?
6  A.  Yes.
7  Q.  How do you know Brenda Bellamy?
8  A.  She was my instructor in the RN program at
9     CVCC the first semester starting in May.
10 Q.  Of the --
11 A.  RN program.
12 Q.  What course in the RN program?
13 A.  I'm not sure what the first courses we
14    took.  I don't know the names of them right
15    off the top of my head.
16 Q.  What you're saying is, Brenda Bellamy was a
17    professor of yours?
18 A.  Yes, sir.
19 Q.  Beginning in June 2005, the summer
20    semester?
21 A.  May 2005.
22 Q.  May 2005.  Have you spoken with Brenda
23    Bellamy since you finished her course?

1   A.  Yes, sir.
2   Q.  Did you have Brenda Bellamy for any course
3       other than the one you took in the summer
4       semester of 2005?
5   A.  For the first -- maybe the first couple of
6       days of the second semester, and that was
7       it --
8   Q.  What course?
9   A.  -- from the first semester to the second
10      semester.
11          She would have been the teacher for, I
12      guess, the Adult Nursing II.  I think the
13      course syllabus has her name on it.
14  Q.  Who took over that course?
15  A.  Lynn Harris.
16  Q.  That would have been NUR 272; is that
17      right?
18  A.  No, that was -- yeah -- well, no, that was
19      the 252.
20  Q.  Okay.
21  A.  Brenda Bellamy was the instructor for 252,
22      and then Lynn Harris took over.
23  Q.  So when did you talk to Brenda Bellamy

1       last?
2   A.  Probably about three weeks ago, two or
3       three weeks ago.
4   Q.  Can you tell me about that?
5   A.  I called her because Ms. Cooley told me
6       that she would be subpoenaed to -- I guess
7       today or needed to come in today for a
8       deposition.  So I called her to let her
9       know that the attorney would be contacting
10      her, and that was the extent of that
11      conversation.
12  Q.  Before that, when was the last time you
13      talked to her?
14  A.  While we were in nursing school, we ran
15      into her.  Myself and some of the students
16      went to eat at TGI Friday's over in
17      Columbus, and we ran into her in the
18      restaurant.
19  Q.  Did you have any lengthy conversation with
20      her?
21  A.  Yeah, I sat down at the table with her and
22      her husband.
23  Q.  Tell me about that.

1   A.  Just asking how she was doing, what was
2       going on.  Told her that I'd had some
3       problems in the second semester after she
4       left, and that was the extent of that.  She
5       said that she wouldn't work for CVCC again
6       and she was glad to be gone.
7   Q.  Did you say why?
8   A.  Lots of problems.  We didn't go into
9       detail.
10  Q.  Do you know her husband's name?
11  A.  I do not.
12  Q.  Do you know whether Brenda Bellamy and
13      Sandy Gunnels are friends?
14  A.  I don't know that.
15  Q.  Do you know where Brenda Bellamy works now?
16  A.  Yes, I do.
17  Q.  Where?
18  A.  Doctors Hospital.
19  Q.  Do you know what she's doing?
20  A.  I think she works down in triage.
21  Q.  Has Brenda Bellamy ever helped you with any
22      course while you were at CVCC, your RN
23      courses?

1   A.  Helped me or taught me?
2   Q.  Well, not taught you, but helped you on an
3       outside basis or an extracurricular basis.
4   A.  No.
5   Q.  Does Brenda Bellamy know anything about the
6       courses that you failed and about the
7       lawsuit that you filed?
8   A.  Yes.
9   Q.  How does she know that?
10  A.  Because in crossing at the hospital, she
11      asked me how I did and I told her that I
12      didn't pass and that I was seeking legal
13      advice.
14  Q.  Tell me when that occurred.
15  A.  Probably a year ago.
16  Q.  What did she say?
17  A.  She was sorry.
18  Q.  You were telling me about special
19      treatment, and you've told me about
20      Ms. Umoh -- or at least what you were --
21      basically what you've been told about
22      Ms. Umoh, correct?
23  A.  Correct.

Page 190

1  Q. You don't have any personal knowledge of
2     these things; isn't that correct?
3  A. Correct.
4  Q. Is there anything else about Ms. Umoh that
5     you haven't told me in terms of special
6     treatment?
7  A. Things that I've been told?
8  Q. Yes.
9  A. I was told that she failed in clinical and
10    in the classroom, that peds class.
11 Q. What class?
12 A. The pediatric class, the 272.
13 Q. When did she do that?
14 A. I was told that she did that the year
15    before -- the year that she was in the
16    nursing program, and I was also told that
17    she didn't pass with Ms. Harris in the
18    classroom setting. That's what somebody
19    had heard, that she did not pass in the
20    classroom setting and --
21 Q. That was back in the 272 course that she
22    had taken previously, the one she failed?
23 A. No, that was the year that I was there. I

Page 191

1     was told that she failed the year that she
2     was there. Then I was told that she failed
3     again when she came back.
4         And I was told that -- I think Sylvia
5     Shirley or -- I don't know the lady's
6     first -- last name. I don't know which
7     order it goes. But I was told that they
8     had her check her off in the clinical
9     setting so they could pass her and move her
10    on through.
11 Q. Who is Sylvia Shirley?
12 A. She was one of the clinical instructors
13    that I had for pediatrics.
14 Q. Was she there at the school or was she in
15    the hospital?
16 A. I saw her in the hospital.
17 Q. Which hospital does she work in?
18 A. If she's still there, she works at the
19    Medical Center on the pediatric floor.
20 Q. Now, let me go back. I want to make sure I
21    understand this about Ms. Umoh. Ms. Umoh
22    the year before you took 272, NUR 272, took
23    that course and did not pass it; is that

Page 192

1     right?
2  A. That's what I was told.
3  Q. And then in the fall semester 2005,
4     Ms. Umoh was back; is that right?
5  A. Correct.
6  Q. And that's when she took the independent
7     study?
8  A. Correct.
9  Q. With Lynn Harris?
10 A. Correct.
11 Q. Did the independent study involve going to
12    class?
13 A. She didn't come to any of our classes. She
14    just came to the clinical check-off.
15 Q. When was it that she flunked the class
16    portion of Ms. Harris's course?
17 A. I don't know.
18 Q. Somebody told you that, though, right?
19 A. Correct.
20 Q. They told you that -- someone told you that
21    she flunked the class part and the clinical
22    part, right?
23 A. Correct.

Page 193

1  Q. And that was the same year -- that was fall
2     of '05, right?
3  A. Correct.
4  Q. And who told you that?
5  A. Sandy Gunnels said that somebody had told
6     her that. I'm not for sure who that
7     someone was, but I think she said that
8     Wendy Wall told her that.
9  Q. Okay. So, again, Ms. Umoh did not graduate
10    is what we're saying, right?
11 A. Yeah, she graduated.
12 Q. She graduated when?
13 A. I'm not real sure. I assume that it was
14    2006, because I know she has her license
15    now.
16 Q. I thought you said that someone told you
17    that she failed again after --
18 A. She did. That's what I was told.
19 Q. By Sandy Gunnels?
20 A. Correct.
21 Q. That Ms. Umoh failed again in 2006 or 2005?
22 A. The class was given -- that particular
23    class for her was given in 2005.

Page 194

1   Q.  Right, the independent study?
2   A.  Correct.
3   Q.  And Sandy Gunnels told you Ms. Umoh failed
4       the independent study; is that right?
5   A.  Sandy told me that's what she had heard.
6   Q.  So when did Ms. Umoh graduate?  Did Sandy
7       Gunnels tell you that?
8   A.  No, she didn't.  I have no idea.
9   Q.  Did Sandy Gunnels tell you anything else
10      about Ms. Umoh?
11  A.  No.
12  Q.  Now, that's Ms. Umoh.  Let's go to another
13      situation on special treatment.
14      Apparently, there were others that you were
15      going to tell me about, right?
16  A.  Yes, sir.
17  Q.  Okay.  Let's go.
18  A.  Elise Sizemore, we were given drug
19      calculation tests and we were supposed to
20      have those tests three times.  If we didn't
21      pass by the third time, then we were out of
22      the program.
23          She took drug calculation tests

Page 195

1       throughout the second semester with Lynn
2       Harris.  The day of finals, I was talking
3       to Ms. Harris and she said that she didn't
4       have time because she had a student that
5       had to take a drug calculation test over,
6       and it was Elise Sizemore.
7   Q.  Elise Sizemore was a contemporary of yours
8       in school, correct?
9   A.  Correct.
10  Q.  Y'all were in the same class together which
11      involved drug calculation tests, correct?
12  A.  Correct.
13  Q.  Elise Sizemore failed the drug calculation
14      part, right?
15  A.  Correct.
16  Q.  You're saying that Elise Sizemore was
17      allowed to take the drug calculation --
18  A.  Calculation up until the day of the final,
19      and she passed the day of the final.
20  Q.  Okay.
21  A.  And you were supposed to have passed those
22      tests before you gave medication in the
23      clinical setting at the hospitals.

Page 196

1   Q.  Are you aware of her giving medication in
2       the hospitals in the clinical setting
3       before she passed those tests?
4   A.  I'm not, but she told me that she did.
5   Q.  Who let her do that?
6   A.  I can't remember the -- I didn't have that
7       lady for clinicals.  I can't remember her
8       name.  If you'll give me just a minute, I
9       might be able to recall.
10  Q.  What hospital was it?
11  A.  It was the Medical Center.
12  Q.  What floor?
13  A.  I'm not sure what floor.
14  Q.  Where is Elise Sizemore now?
15  A.  She works for St. Francis.
16  Q.  Where?  What floor?
17  A.  She works, I think, two.  2 north.
18  Q.  What course number would that have been?
19      252?
20  A.  252.
21  Q.  Is it correct or incorrect that the drug
22      calculation part was a portion of a test,
23      not a complete or a whole test?

Page 197

1   A.  No.  The drug calculation that we took was
2       a test on its own to make sure that we knew
3       how to calculate the medications before we
4       went into the clinical setting.
5   Q.  When did y'all first take a drug
6       calculation test in NUR 252?
7   A.  We didn't have instruction for the first
8       five weeks of class, so it had to be when
9       Ms. Harris came on board.
10  Q.  Had to be after that for sure?
11  A.  A week or two after.
12  Q.  If you didn't have instruction --
13  A.  It was probably the second week that she
14      was there.
15  Q.  Did you pass your drug calculation test?
16  A.  Yes, sir.
17  Q.  Did you pass on the first time?
18  A.  I'm not sure if I passed that one the first
19      time or the second time.
20  Q.  But what you're saying is, that is a
21      separate and distinct test apart from any
22      other test; is that correct?
23  A.  Correct.

Page 198

1  Q.  Is there more than one of those?
2  A.  Yes, I think so.  I think they give -- if
3      I'm not mistaken -- I'm trying to decipher
4      between LPN and RN.  I think they give one
5      for the pediatric, also, or it may be just
6      one with -- I think it's just one with a
7      mixture of -- I think it was one with a
8      mixture of pediatric calculations as well
9      as adult.  I think it's one.
10 Q.  So you don't recall whether you passed it
11     the first time or the second time?
12 A.  I think I passed the second time because it
13     was -- it was something -- I can't remember
14     exactly what it was, but it was nothing
15     major.  I think I missed one question.
16 Q.  Do you have to get them all right?
17 A.  Correct, but I passed the second time.
18 Q.  Why were you allowed to take it again?
19 A.  Because you have three chances to pass.
20 Q.  So you could --
21 A.  If you didn't pass the first time, you got
22     a second chance.  If you didn't pass the
23     second time, you got a third chance.  If

Page 199

1      you didn't pass the third time --
2  Q.  You're out?
3  A.  Right.
4  Q.  You're out of the program?
5  A.  That's the way it reads.  You're out of
6      that specific class until the next class is
7      offered.  I don't think you're out of the
8      program, but you're out of --
9  Q.  You fail that course; is that right?
10 A.  Correct, because that's part of the
11     clinical portion.
12 Q.  And when you say that's the way it reads,
13     what are you referring?
14 A.  I think it's in the syllabus.
15 Q.  I'm going to show you Defendant's Exhibit
16     3, which is a June 30, 2006, letter from
17     David N. Hodge to you.  I'll ask you
18     whether that is the letter you received
19     from Dr. Hodge relative to your course
20     forgiveness request.
21 A.  Yes.
22 Q.  With regard to the course forgiveness, the
23     rule relative to whether a nursing student

Page 200

1      can obtain course forgiveness for any
2      nursing course is either a nursing student
3      can get course forgiveness for a nursing
4      course or a nursing student in the RN
5      program cannot get course forgiveness for a
6      nursing course, right?  It has to be one or
7      the other; isn't that right?
8  A.  Correct.
9  Q.  If it's correct that the course forgiveness
10     rule with regard to the nursing students is
11     that they cannot get course forgiveness,
12     then irrespective of what anybody said --
13     Dr. Hodge or Ms. Alexander or anybody
14     else -- that's the rule, right?
15 A.  Right.
16 Q.  Let's look at these real quick.
17         MR. NIX:  I don't know what's
18             what, but I'm going to mark
19             Nursing 252, the Adult Nursing
20             II Clinical Syllabus, as
21             Defendant's Exhibit 4.
22 A.  Do you want me to tell you what page it's
23     on?

Page 201

1  Q.  Wait a minute and let me mark this.
2         MR. NIX:  I'm going to mark
3             Nursing 252, Adult Health
4             Nursing II, as Defendant's
5             Exhibit 5.
6         (Defendant's Exhibits 4 and 5 were
7             marked for identification.)
8  Q.  I'll show you both of them.  Tell me which
9      book it's in.
10        MR. DUMBUYA:  Excuse me.  Which
11             one is number four?
12        MR. NIX:  Four is the clinical
13             syllabus, and five does not
14             say clinical on it.  It just
15             says Fall Semester, Adult
16             Health Nursing II.
17 Q.  I assume that's the -- What would you say
18     that is?  If it's not clinical, it's what?
19 A.  This is the classroom portion.
20        MS. COOLEY:  Is that 252?
21        MR. NIX:  Yes.  Exhibit 5 is the
22             classroom portion.
23 Q.  Did you say that you could show me where

1    this is?
2  A.  Yes, sir.  It's on page five of the
3      classroom portion of Nursing 252, Adult
4      Health Nursing.  And it's also --
5  Q.  Where is it on page five?
6  A.  It's number two under course requirements.
7  Q.  Course requirements.  Students are expected
8      to attend all classes.  Number two,
9      satisfactory completion of a medication
10     dosage calculation exam.  Student will be
11     given up to three chances to achieve 100
12     percent.  Is that what you're referring to?
13 A.  Yes, sir.
14 Q.  And you're saying that it's against the
15     rules for anyone to have more than three
16     chances; is that right?
17 A.  That's what we've always been told.
18 Q.  Well, I mean, you're referring to the
19     syllabus, right?
20 A.  Correct.
21 Q.  Who's told you that?
22 A.  All of the instructors that I've had in LPN
23     school and RN school.

1  Q.  So the only person that you're aware of
2      that ever got to take this calculation --
3      medication dosage calculation exam more
4      than three times is Elise Sizemore,
5      correct?
6  A.  Correct.
7  Q.  You know of no other person that's ever
8      been allowed to do that there, correct?
9  A.  No, sir.
10 Q.  You were allowed to take it two times,
11     right?
12 A.  Correct.
13 Q.  And you're saying that's within the
14     guideline, but Elise Sizemore was given
15     special treatment because she got to take
16     it more than three times?
17 A.  Correct.
18 Q.  How does that affect you?
19 A.  Well, or she took it three times up until
20     the day of finals, and she was allowed to
21     go into the clinical setting and give
22     medication.
23     And it says in the clinical syllabus,

1      also, on page four --
2  Q.  Defendant's Exhibit 4 is the clinical
3      syllabus.  On page four.  Okay.  Where on
4      page four?
5  A.  Under Roman numeral three, clinical math
6      proficiency quiz.
7  Q.  The student must pass the math
8      computational quiz with 100 percent
9      accuracy in order to give medications.  If
10     the student does not pass the quiz in three
11     attempts, subsequent course failure will
12     result.
13         Now, you just said in the alternative.
14     Okay?  Either she was allowed to take it
15     three times up to the final or she was
16     allowed to take it more than three times or
17     she was allowed -- she took it three times
18     and never passed it and was allowed to give
19     medication in a clinical setting, right?
20 A.  Correct.
21 Q.  Do you know which --
22 A.  No, sir.
23 Q.  -- is correct?  You do not know?

1  A.  No, I don't know if she was allowed to take
2      it more than three times or three times up
3      until, but we were always told that we were
4      taking these calculation tests before we
5      set foot into the clinical setting to make
6      sure that we were competent enough to do
7      the drug calculations that may be requested
8      of us by our instructors.  And those were
9      to be passed before we set foot into the
10     hospital to give medications.
11 Q.  What I want to make sure I understand is
12     this.  You do not know whether Ms. Sizemore
13     was allowed to take the exam more than
14     three times before the final exam.  Isn't
15     that correct?
16 A.  Correct.
17 Q.  And you do not know on the other hand
18     whether she was allowed to take it three
19     times up to the final, didn't pass it in
20     the third try, yet was allowed to give
21     medication in the clinical setting, right?
22 A.  Correct.
23 Q.  But you're saying one of those is true; is

Page 206

1   that what you're saying?
2   A.  Correct.
3   Q.  And that that therefore violates the rule
4       of the school in that regard?
5   A.  Correct.
6   Q.  My question to you is, how does that affect
7       you?  How does that hurt you?
8   A.  You asked me who has received special
9       treatment.
10  Q.  Right.  But I'm asking you -- Okay.  You've
11      given me this example.  How does that
12      affect you?
13  A.  Well, it affects me because if somebody
14      else can receive special treatment and the
15      rules are broken for someone else and the
16      rules are changed and it's up to their
17      discretion to make those rules, then why am
18      I in the position that I'm in because
19      somebody wouldn't change those rules for me
20      or give me special treatment as though
21      they've given someone else?
22  Q.  Give me another example of someone that got
23      special treatment.

Page 207

1   A.  Shannah Lowe.
2   Q.  Tell me about that.
3   A.  We were in pediatrics.  She was not in my
4       clinical group, but one of her friends was
5       in my clinical group.
6   Q.  This would have been the spring of '06,
7       right?
8   A.  Correct.
9   Q.  Go ahead.
10  A.  And the lady --
11  Q.  Clinical, again?
12  A.  It was the clinical, in the hospital.
13  Q.  Okay.
14  A.  The lady that spoke up and said she was
15      having problems -- her name is Jill
16      Boyette.  She was in my clinical group, and
17      she spoke up and said that Shannah Lowe did
18      not pass her clinical portion because she
19      refused to start an IV on a child.  And
20      Artemisa Harmon was that clinical
21      instructor and told her that she would not
22      be passing.  And she stated that Shannah
23      called Dixie Peterson and Dean Lowe.

Page 208

1   Q.  Let's go back.  Okay?  We're in the
2       clinical setting.  We're in pediatrics.
3       This is the spring of 2006.  Ms. Lowe --
4       Shannah Lowe is not in your clinical group,
5       correct?
6   A.  Correct.
7   Q.  But she is in Jill Boyette's clinical
8       group?
9   A.  No, sir.  That's Jill Boyette's friend.
10  Q.  And Jill Boyette is a nurse?
11  A.  She is.
12  Q.  Jill Boyette was not in class at CVCC?  She
13      was, instead, a nurse employed at, what?
14      The Medical Center, Regional Medical
15      Center?
16  A.  No, she was a student and she was in my
17      clinical group.
18  Q.  You lost me, okay, on what happened here.
19      You're saying that Shannah Lowe was in a
20      clinical setting, that she would not give a
21      child an IV?
22  A.  I was told that by Jill Boyette, that she
23      refused to -- it wasn't just me that she

Page 209

1   was telling.  She was telling our whole
2   clinical group that she refused to start an
3   IV on a child.
4   Q.  All right.
5   A.  And Artemisa Harmon told her that she would
6       not be passing the clinical portion.  And
7       she was -- Jill Boyette said that she
8       called Dixie Peterson and Dean Lowe at that
9       time.
10      Do you want me to keep going?
11  Q.  Yeah.
12  A.  And in the process of me taking Nursing
13      200, she was seen at the school with
14      Bridgett Jackson going to the lab.  And we
15      were told that Bridgett Jackson was giving
16      her time in the lab to rectify her --
17      whatever she did in that clinical class
18      with Artemisa Harmon.
19  Q.  200 -- when did you take 200?
20  A.  In the summer.
21  Q.  Of?
22  A.  Yeah.
23  Q.  And who told you this?

Page 210

1  A.  About Shannah Lowe? Jill Boyette.
2  Q.  Who told you that Ms. Jackson and Shannah
3     Lowe were going to the clinic at the
4     school?
5  A.  Jill Boyette and other students were
6     talking about it, and Kim Smith, also.
7  Q.  Is she a student as well?
8  A.  She was.
9  Q.  Kim Smith, Jill Boyette.  Who else?
10  A.  I think Cindy Richards told Kim Smith is
11     what Kim told me, and Cindy Richards was in
12     Shannah Lowe's clinical class.
13  Q.  Who else?
14  A.  That's all that I recall.
15  Q.  Based on what you've been told, Shannah
16     Lowe was allowed to go back and start an IV
17     on a child so that she could pass the
18     clinical portion of NUR 272; is that right?
19  A.  I was told that she was allowed to go to
20     the lab with Bridgett Jackson, not in the
21     clinical setting.
22  Q.  All right.  You were told that Shannah Lowe
23     was allowed to go to the lab with Bridgett

Page 211

1     Jackson and start an IV on a child --
2  A.  Correct.
3  Q.  -- in order to pass the clinical portion of
4     272?
5  A.  I think it was 272.
6  Q.  And that is the only thing that you know of
7     that Shannah Lowe was allowed to do that
8     you think is different from what other
9     people were allowed to do; is that right?
10  A.  Correct.
11  Q.  Do you know why she would not start an IV
12     on a child?
13  A.  I have no idea.
14  Q.  Do you know where Shannah Lowe is now?
15  A.  I do not.
16  Q.  How well do you know Shannah Lowe?
17  A.  Not well at all.
18  Q.  Do you know any reason why she would be
19     allowed to go to the lab in the summer of
20     2006 and start an IV on a child in order to
21     pass the clinical portion of 272?
22  A.  I don't know any reason, but I do know that
23     Dean Lowe is her uncle, I believe.

Page 212

1  Q.  Well, do you know of any -- do you know
2     whether or not someone contends that Dean
3     Lowe is the one that allowed her to do this
4     as a favor because she was related to him?
5     Do you know of anyone that's said that?
6  A.  No, I don't.
7  Q.  Not even Sandy Gunnels?
8  A.  Not even Sandy Gunnels.
9  Q.  Give me another example of special
10     treatment.
11  A.  I can't think of any right now.
12  Q.  That's all you can think of?
13  A.  Right now.
14  Q.  If you think of anything else as we go
15     through, would you please tell me --
16  A.  Yes.
17  Q.  -- about special treatment?  Okay?
18  A.  Yes, sir.
19  Q.  Defendant's Exhibits 4 and 5 are documents
20     that you brought with you and produced;
21     isn't that right?
22  A.  Yes, sir.
23  Q.  And how about Defendant's Exhibit 3, the

Page 213

1     letter from Dean Hodge?  Is that something
2     that you brought with you and produced?
3  A.  Yes, sir.
4  Q.  Are there any other damages that you have
5     sustained other than emotional distress,
6     embarrassment -- humiliation, and lost
7     opportunity to make the pay of an RN?
8  A.  No, sir.
9  Q.  Have you ever filed a lawsuit before this
10     one?
11  A.  Yes.
12  Q.  What lawsuit?
13  A.  The lawsuit against Total Systems.
14  Q.  Is that the only one you've ever filed
15     besides this one?
16  A.  Yes, sir.
17  Q.  Have any of your husbands ever filed a
18     lawsuit?
19  A.  No, sir, that I'm aware of.
20  Q.  Have you ever been involved in any other
21     court proceedings other than this court
22     proceeding and the one having to do with
23     Total Systems?

54 (Pages 210 to 213)

Page 214

```
 1   A.  No, sir.
 2   Q.  Have you ever filed bankruptcy?
 3   A.  Yes, sir.
 4   Q.  When?
 5   A.  In '94, 1994, I think.
 6   Q.  Were you single at that time or married?
 7   A.  Married.
 8   Q.  Was the bankruptcy filed jointly with you
 9       and your husband?
10   A.  No.
11   Q.  It was just filed by you individually?
12   A.  Well, he filed his bankruptcy because he
13       was married previously, and that affected
14       my credit, so I ended up filing bankruptcy.
15   Q.  So he filed bankruptcy because he had been
16       married before?
17   A.  And had some stuff going on with his
18       previous marriage, and that affected my
19       credit after we got married.
20   Q.  So then you filed your own separate
21       bankruptcy, right?
22   A.  Correct.
23   Q.  And that was in Alabama?
```

Page 215

```
 1   A.  No, I think that was in Georgia.
 2   Q.  Okay.
 3   A.  It may have been in Alabama.  I'm not real
 4       sure.  I think it was filed in Alabama.
 5   Q.  Do you?
 6   A.  Yes.  That's been a long time ago.
 7   Q.  That was '94.  Was that a Title 7 or was it
 8       reorganization?
 9   A.  It was a Title 7.
10   Q.  So it was a straight bankruptcy?
11   A.  Uh-huh.  (Positive response.)
12   Q.  Is that right?
13   A.  Yeah.
14   Q.  What kind of job did you have at that time?
15   A.  I think I was working at Blue Cross-Blue
16       Shield.
17   Q.  Okay.
18   A.  If I'm not mistaken, I think I was.
19   Q.  Have you ever had any other court
20       proceedings other than the bankruptcy, the
21       Total Systems and this case we're here
22       about today?
23   A.  No.
```

Page 216

```
 1   Q.  Have you ever been arrested?
 2   A.  Yes.
 3   Q.  Tell me about that.
 4   A.  When I was 21, I got a DUI.
 5   Q.  Where was that?
 6   A.  That was in Columbus.
 7   Q.  Did you go to jail?
 8   A.  I went to jail.
 9   Q.  And so what happened with that DWI, DUI?
10   A.  I had to pay a fine and go to a class to
11       get my license back.
12   Q.  All right.  Have you ever been arrested any
13       other time?
14   A.  No, sir.
15   Q.  You have said that in the fall or August --
16       well, the fall of 2005 that your class 252
17       and I guess -- would it be 271 did not have
18       instructors for the first five weeks?
19   A.  Yes, sir.
20   Q.  Explain that to me.
21   A.  Well, Sandy Gunnels and Brenda Bellamy were
22       there for, I'd say, the first week -- or
23       the first couple of days of class, which
```

Page 217

```
 1       was basically the first week, and they --
 2       we were told by Dean Lowe -- he came down
 3       to the class and said that our instructors
 4       were sick, they wouldn't be in.
 5           They had quit, and we didn't have
 6       instructors and we had guest speakers come
 7       in.
 8   Q.  They were there the first couple of days of
 9       class?  Is that what you're saying?
10       Ms. Bellamy and Ms. Gunnels both were
11       present the first couple of days of class?
12   A.  Yes, sir.
13   Q.  And that would be the classroom portion,
14       correct?  They didn't do clinical, did
15       they?
16   A.  I know they were there for that clinical
17       check-off.  And I don't know if they -- if
18       we had even had a chance to do any
19       classroom.
20   Q.  So they wouldn't have been there at all?
21       They never came that semester?
22   A.  Yeah, they did.  They were there for the
23       clinical check-off, and that was the first
```

Page 218

```
 1    portion of that semester.  We had a
 2    clinical check-off the first week.
 3  Q.  But you're saying that you did not have any
 4    class; is that right?
 5  A.  No, we had class, but we had guest
 6    speakers, so it wasn't a formal class.
 7  Q.  I'm sorry.  I meant you did not have any
 8    class where Gunnels and Bellamy taught the
 9    class; is that --
10  A.  No, sir.
11  Q.  And you're saying that Dean Lowe came to
12    your classes and said, I'm sorry, your
13    instructors are sick, they'll be back --
14    what did he say?
15  A.  He said they're sick and they're not coming
16    in today, and that was the extent of that.
17  Q.  How many times did he do that?
18  A.  He did that for sure that day.  There was
19    always chaos in that class.  There was
20    always something going on, somebody
21    fussing.
22  Q.  Which class?
23  A.  My nursing class.
```

Page 219

```
 1  Q.  That would be 252?
 2  A.  That was the --
 3  Q.  The whole class?
 4  A.  I'm talking about the whole year and the
 5    whole class.
 6  Q.  The whole year.  And when you say the whole
 7    class, you're talking about the people in
 8    the class?
 9  A.  I'm talking about the people.  There was
10    always something going on.
11  Q.  I hear you.  I've got you.  What do you
12    attribute that to?
13  A.  No instructors.  Well, actually, I can't
14    say that was the whole year.  The first
15    semester, we didn't have so much ruckus
16    going on.
17        When the instructors left and we didn't
18    have instruction for the first five
19    weeks -- the majority of my class was from
20    Atlanta, and they were very vocal and
21    wanted to know what was going on, where the
22    instructors were, what are you going to do
23    to replace them; I want to see my test; I
```

Page 220

```
 1    want to --
 2        I mean, there was something constantly
 3    going on.  They were very vocal.
 4  Q.  And they were just that way the whole time?
 5  A.  Except for the first -- the first semester,
 6    it wasn't like that.
 7  Q.  Okay.
 8  A.  Just when nobody knew what was going on --
 9    it was very unorganized after those
10    instructors left.
11  Q.  Well, why did they leave?  Why did Gunnels
12    leave?
13  A.  I have no idea.
14  Q.  She's never told you about that?
15  A.  I've never really asked her why she left.
16  Q.  And you're saying that at no time did
17    Ms. Gunnels or Ms. Bellamy meet a class
18    during the fall semester of 2005, correct?
19  A.  No.
20  Q.  They did not?
21  A.  Just that clinical.
22  Q.  Just that one clinical?
23  A.  Lab clinical check-off.
```

Page 221

```
 1  Q.  Where was the clinical check-off?
 2  A.  It was in the classroom -- I think it was
 3    in the classroom that we normally met in.
 4    I'm trying to figure out which side of the
 5    building we were on because there's two
 6    sides to that building -- there was.
 7  Q.  Do you know?
 8  A.  What?
 9  Q.  Where was the clinical check-off?
10  A.  It wasn't down in the normal lab.  If I'm
11    not mistaken, it was -- it may have been
12    across the hall or upstairs in the
13    classroom on the same side of the
14    building.  It was either the upstairs
15    classroom or the downstairs classroom, that
16    clinical check-off was.
17  Q.  Were both Bellamy and Gunnels there for
18    that?
19  A.  I remember Wendy Wall and Sandy Gunnels
20    being in there.
21  Q.  Did Ms. Gunnels stay for that entire
22    clinical check-off?
23  A.  She did.
```

56 (Pages 218 to 221)

Page 222

```
1    Q.  Are you saying that was the very first
2        meeting of that particular class, was to
3        have that clinical check-off?
4    A.  Yeah, I think so.  I think that's what it
5        was.
6    Q.  And so she -- Ms. Gunnels met that clinical
7        check-off class and then never returned; is
8        that correct?
9    A.  That's correct.
10   Q.  Did you miss class very much in the fall of
11       2005?
12   A.  Miss class?
13   Q.  Yes.
14   A.  No, sir.
15   Q.  Did you miss class any in the fall of 2005?
16   A.  I had a baby in June, so that summer.  Fall
17       was August to whatever.  I think I may have
18       missed one class period.
19   Q.  Okay.  In the fall of 2005?
20   A.  No, that was the last semester that I -- I
21       know I missed one class period the last
22       semester.
23   Q.  All right.  Why did Gunnels leave?
```

Page 223

```
1    A.  I'm sorry.  I forgot.  There was talk
2        about -- and myself was not the only one
3        that knew.  There was talk about some kind
4        of contract between her and Ms. Bellamy and
5        the school, their contracts.  I don't
6        know -- I don't know anything other than
7        that.  It was something to do with their
8        contracts is what I heard.
9    Q.  Who told you that?
10   A.  April Gunnels, which is Sandy's
11       daughter-in-law, and then other -- I mean,
12       just students talking to other students.  I
13       don't know.  I can't recall exactly which
14       one, pinpoint it.  But, I mean, it was
15       rumor all over.  Everybody -- I say
16       everybody knew.
17   Q.  Do you know what was -- what the deal was
18       about the contract?
19   A.  No, sir.
20   Q.  And Gunnels has never told you that; is
21       that right?
22   A.  I never asked her specifics.
23   Q.  Do you remember being in a class when
```

Page 224

```
1        Gunnels and Bellamy were at the school and
2        they packed up their things and left on
3        that day?
4    A.  That was the day that Dean Lowe came in and
5        said our instructors were sick.  One of the
6        students came down and said that they were
7        up there packing their things.  I was told
8        that they were told not to talk to any of
9        the students.  Sandy did say she was told
10       not to talk to any of the students.  Her
11       and Brenda Bellamy said that.
12   Q.  When did they tell you that?
13   A.  In passing in the parking lot.  Because if
14       I'm not mistaken, I think the security guy
15       was out there.  I don't know his name.
16   Q.  How did you get out to the parking lot?
17       Weren't you supposed to be in class?
18   A.  If I'm not mistaken -- I don't remember.  I
19       don't remember if we were having class or
20       what was going on at that time.
21   Q.  Do you remember anybody writing something
22       on the board, the chalkboard that day?
23   A.  As far as who?
```

Page 225

```
1    Q.  Do you remember Sandy Gunnels writing
2        something on the chalkboard in the
3        classroom that day?
4    A.  Sandy Gunnels?  No.
5    Q.  Do you remember anybody writing something
6        on the chalkboard that day?
7    A.  I remember April Gunnels writing somebody's
8        number on the chalkboard.  I don't remember
9        the lady's name, but it was somebody to do
10       with the school, the school board,
11       somebody -- I think.  I'm not real sure.
12   Q.  All right.  Did April Gunnels tell the
13       class what she was doing and why?
14   A.  Yeah, she got up and said she was writing
15       the lady's name on the board and if they
16       wanted to complain about anything, to call
17       whoever that was.
18   Q.  Do you remember anything else that happened
19       that day?
20   A.  Huh-uh.  (Negative response.)  It was just
21       chaos.
22   Q.  Because the students were --
23   A.  Upset.
```

57 (Pages 222 to 225)

Page 226

1   Q. -- from Atlanta, they were very vocal, a
2       very aggressive type of person; is that
3       right?
4   A. Correct.
5   Q. Let me ask you this. When did Sandy
6       Gunnels first begin helping you outside of
7       her job at CVCC, helping you with nursing
8       school?
9   A. Outside of CVCC?
10   Q. Right.
11   A. In the nursing -- the RN program, outside
12      of, that's when she was at Columbus Tech.
13      She offered me tutorial help as well as
14      everybody else. She voiced that. She said
15      if anybody needs any kind of help, you can
16      call me. Here is my number, whatever.
17   Q. Let's see. If they left in August of 2005,
18      would it be correct to say that Ms. Gunnels
19      offered that help sometime shortly after
20      August 2005?
21   A. Yes. She always made herself available if
22      you had any kind of questions about any of
23      the courses that you were having.

Page 227

1   Q. You're talking about like in the summer,
2      for example?
3   A. Yes, sir.
4   Q. Was Ms. Bellamy that way, too?
5   A. And, in fact -- yes, she was. And, in
6      fact, in the -- I think it was the summer
7      that myself and one of the other students
8      went to Ms. Gunnels' office in the nursing
9      department, and she tutored us on some
10     pharmacology.
11   Q. That was the summer of 2005?
12   A. Uh-huh. (Positive response.)
13   Q. Yes?
14   A. Yes.
15   Q. All right. Now, how did Ms. Gunnels offer
16     to help people at CVCC if they wanted
17     help? How did she make that known?
18   A. She voiced it in the classroom. If you
19     don't understand, ask me. I'll help you.
20     Come to my office. These are my office
21     hours.
22   Q. What I was talking about, though,
23     Ms. Wright, is Ms. Gunnels helped you after

Page 228

1     she left the employ of CVCC, correct?
2   A. Correct.
3   Q. I thought you had said that she made it
4     known that she would be glad to help
5     anybody who was having a problem with their
6     studies at CVCC even after she had left.
7     Am I wrong about that?
8   A. Her daughter-in-law came in and voiced that
9     she was available.
10   Q. April did?
11   A. Uh-huh. (Positive response.)
12   Q. Yes?
13   A. Yes.
14   Q. Where is April now?
15   A. She works for the Medical Center in
16     Columbus.
17   Q. When was this that April came in and said
18     my --
19        Is it her aunt -- her mother-in-law,
20     isn't it?
21   A. Her mother-in-law.
22   Q. -- my mother-in-law, Sandy Gunnels, said
23     she'd help anybody that needed help over

Page 229

1     here?
2   A. After she left.
3   Q. How long after she'd left?
4   A. Probably the middle of that second
5     semester. I'm not real sure the exact
6     date.
7   Q. So when did you first take advantage of
8     that offer?
9   A. Let me think. When I started having
10     problems with -- basically with the grade
11     appeal and things like that. And she gave
12     me -- it was mainly when I started with the
13     grade appeal.
14       And if I had any questions about
15     anything that Ms. Harris was teaching in
16     the class that I didn't understand, I would
17     call Sandy and ask her. And I went over
18     there several times with her and -- Venus
19     is the lady's name at Columbus Tech. Her
20     name is Venus. I don't know what her last
21     name is.
22   Q. Venus is her first name?
23   A. Venus. I think that's what it is. It's

Page 230

1     something odd.
2  Q.  Columbus Tech?
3  A.  Uh-huh. (Positive response.)
4  Q.  She would also help?
5  A.  Correct.
6  Q.  She's a professor at Columbus Tech, Venus
7     is?
8  A.  Uh-huh. (Positive response.)
9  Q.  You would go over to Columbus Tech. Where
10     would you meet with Sandy Gunnels?
11  A.  In their office, either-or.
12  Q.  Both Sandy Gunnels' and Venus'?
13  A.  Either hers or -- yeah.
14  Q.  And what would you do when you went there?
15  A.  Tell her what -- this is what we're
16     studying. What do you know about it? Do
17     you have any notes? What kind of notes do
18     you have? Do you have anything that will
19     help me?
20  Q.  In 252 --
21  A.  That was the adult nursing.
22  Q.  Right. 252 ... Was there an Adult Nursing
23     I and Adult Nursing II?

Page 231

1  A.  I think so. I think the Adult Nursing I
2     was that first semester. I know we had --
3     I think we had assessment, pharmacology,
4     and the Adult I. And the Adult I was
5     taught by, I think, Brenda Bellamy. If I'm
6     not mistaken, I think that's correct. We
7     don't have the syllabus for that.
8  Q.  What was 252?
9  A.  Adult Nursing II.
10  Q.  So that was in the fall of '05. Okay. And
11     then wasn't 271 in the fall of '05?
12  A.  Correct.
13  Q.  And that would be maternal --
14  A.  Uh-huh. (Positive response.)
15  Q.  -- newborn, and would that be the class
16     that Tawyna Cash taught?
17  A.  Correct.
18  Q.  Did you talk with or meet with Sandy
19     Gunnels about 271?
20  A.  Yeah, I talked with her about it, but I
21     don't think I met with her until the end of
22     that semester.
23  Q.  But you met with Sandy Gunnels before the

Page 232

1     end of the fall semester about 252; is that
2     right?
3  A.  Huh-uh. (Negative response.) It was --
4  Q.  The first time you met with her was when
5     you were doing the grade appeal?
6  A.  Correct.
7  Q.  Okay.
8  A.  And then we went into the pediatric class,
9     and that's when she helped me with that,
10     also, with some study questions and things
11     like that. I've got it, what she gave me
12     in here somewhere.
13  Q.  You do?
14  A.  Yeah, it's in there.
15         (Defendant's Exhibit 6 was marked
16         for identification.)
17  Q.  Defendant's Exhibit 6 is the syllabus for
18     Nursing 271, Maternal and Newborn Nursing;
19     is that right?
20  A.  Yes, sir.
21  Q.  And that's the class that Tawyna Cash
22     taught?
23  A.  Yes.

Page 233

1         (Defendant's Exhibit 7 was marked
2         for identification.)
3  Q.  Defendant's Exhibit 7 is the nursing
4     syllabus for 272, pediatric nursing, right,
5     and that was taught in the spring of '06 by
6     Lynn Harris, correct?
7  A.  Correct.
8         (Defendant's Exhibit 8 was marked
9         for identification.)
10  Q.  Defendant's 8 is the syllabus for Nursing
11     200 which you took in the summer of 2006,
12     correct?
13  A.  Correct.
14  Q.  All of those syllabi are syllabi that you
15     had in your files; isn't that right? They
16     were your documents that you produced?
17  A.  I didn't produce them. The instructors
18     gave these to me and I've held on to them.
19  Q.  Well, what I mean is --
20  A.  Produced for today.
21  Q.  Correct. You produced those documents in
22     this lawsuit because you had them?
23  A.  Correct. The 272 and the Nursing 200, I

Page 234

1    took those classes together.
2  Q.  Oh, you did?  You took 200 and 272 in the
3     spring of 2006?
4  A.  Correct.  I didn't take anything in the
5     summer because they told me that --
6  Q.  You were out.
7  A.  -- I could not.
8  Q.  Let's go back to the deposition notice.
9     Okay?
10  A.  Okay.
11  Q.  We're on number two.  We've talked about
12     all your damages, I take it, right?
13  A.  Correct.
14  Q.  Number two is all documents regarding your
15     grade appeals and request for grade and/or
16     course forgiveness.
17        This particular item also asked for
18     audio recordings, e-mails, notes or letters
19     of any kind.  Have you had any telephone
20     conversations with anyone about any part of
21     this case that you've recorded?
22  A.  About the case?
23  Q.  Well, about the underlying facts in the

Page 235

1     case.
2  A.  No.
3  Q.  Have you had a telephone conversation with
4     anyone that you've recorded, either about
5     the case or about what happened with
6     respect to the events at CVCC?
7  A.  No.
8  Q.  Have you taken any -- you hesitated
9     earlier.  It sounded like you had done a
10     tape recording of some telephone
11     conversation.
12  A.  I was trying to understand what you were
13     asking.
14  Q.  Okay.  Do you know whether your lawyers
15     have taken any telephone tape recordings of
16     conversations?
17  A.  No.
18        MR. NIX:  I assume y'all would
19        have produced those if you had
20        those, correct?
21        MS. COOLEY:  (Nods head up and
22        down.)
23        MR. NIX:  You haven't.

Page 236

1  Q.  Have you produced all of the documents that
2     have any relationship to your grade
3     and/or -- grade appeals and your request
4     for course forgiveness?  Have you brought
5     those?
6  A.  I'm sorry.  Repeat that, please.
7  Q.  Have you produced or provided to me
8     pursuant to this request for production of
9     documents number two all of the documents
10     that you have that relate to your grade
11     appeals?
12  A.  Yes, sir.
13  Q.  Have you produced all of the documents that
14     relate to your course forgiveness?
15  A.  Yes, sir.
16  Q.  Now, let's do this real quickly.
17        MR. NIX:  Do y'all want to take a
18        quick break?
19        MS. COOLEY:  Yes.
20        (Brief recess was taken.)
21  Q.  Ms. Wright, let me do something real quick
22     if I can.
23        (Defendant's Exhibit 9 was marked

Page 237

1     for identification.)
2  Q.  Let me show you what I've marked as
3     Defendant's Exhibit Number 9, and let me
4     try to describe it and you tell me how I'm
5     wrong.  I'm sure I will be for the most
6     part, but ...
7        These are printouts of electronic
8     documents sent to you by one of your
9     instructors from CVCC; is that right?
10  A.  That's correct.
11  Q.  Who sent these to you?
12  A.  Lynn Harris.
13  Q.  Are they related to any one particular
14     course?
15  A.  Pediatrics, which is the 272.
16  Q.  272.  Did Lynn Harris send any electronic
17     documents of this type like Defendant's
18     Exhibit 9 for 252?
19  A.  I don't recall any for 252.
20  Q.  My understanding is you still have these
21     documents on a hard drive or your computer
22     that you can reproduce.
23  A.  (Witness nods head up and down.)

Page 238

1    MR. NIX: I'll put these into the
2        record just so that we'll know
3        you produced these to us.
4    MS. COOLEY: Would you mind saying
5        what class that was again. I
6        know it came from Lynn Harris.
7    MR. NIX: 272 is the one that
8        these documents relate to,
9        Defendant's 9.
10        Kind of chopped up your
11        production a little bit. Put
12        all of these together.
13        I'm going to mark this
14        stack of documents as
15        Defendant's Exhibit 10.
16        (Defendant's Exhibit 10 was marked
17        for identification.)
18 Q. These documents are also documents that you
19    have produced pursuant to our request for
20    production of documents.
21        Would you take a quick look at these,
22    Ms. Wright, and just confirm that those are
23    additional documents that you produced.

Page 239

1    They're not all the rest of them that
2    you've produced because I've got some
3    others here.
4        Are they?
5 A. Yes, sir.
6 Q. I'm marking these as Defendant's Exhibit
7    10. The first page here is a lot of
8    scribbling. Can you tell me what that
9    relates to?
10 A. That relates to Ms. Harris at the end of
11    the second semester letting me write
12    down -- not word for word -- some of the
13    test questions of some of the tests -- I'm
14    not sure which test questions or what test
15    numbers those come from. It was all of
16    them to review --
17 Q. Okay.
18 A. -- and to challenge.
19    MR. DUMBUYA: What is the caption
20        on Exhibit Number 10?
21    MR. NIX: There's really not a
22        caption. Defendant's 10 is a
23        group of documents produced by

Page 240

1        Ms. Wright pursuant to our
2        request for production. It
3        just so happens that the first
4        page are some notes that she
5        took.
6 Q. What? In May or June of 2006?
7 A. No. That was the end of the second
8    semester, the 252.
9 Q. Okay. December of 2005, early January
10    2006?
11 A. Correct.
12 Q. So the first page -- and then I'm just
13    going to flip through these. Are all of
14    these pages that have this handwritten
15    information on them -- I think there are
16    five pages -- four pages, are these four
17    pages all related to the course 252?
18 A. Yes.
19 Q. And Lynn Harris allowed you to look at the
20    exams that she had put together and write
21    down notes about the questions on them; is
22    that right?
23 A. Right.

Page 241

1 Q. Were you able to see the Scantron, your
2    Scantron showing the answers and the ones
3    she had marked wrong?
4 A. Correct.
5 Q. And she did this for what purpose? Lynn
6    Harris did this for what purpose?
7 A. To challenge those questions.
8 Q. To allow you to know what was on the test
9    so that you could go back and look them
10    up? Is that --
11 A. Correct.
12 Q. -- basically correct?
13 A. Correct.
14 Q. Look them up and determine whether you
15    could make some contention that your answer
16    was the right answer instead of the answer
17    that she had determined was correct?
18 A. Correct.
19 Q. After you -- and I'm going to put on
20    Defendant's Exhibit 10 in the bottom
21    right-hand corner on each of these four
22    pages A for the top page with a circle
23    around it, B for the second page with a

1    circle around it, C for the third page with
2    a circle around it, and D for the fourth
3    page with a circle around it.
4        Those four pages are the pages that
5    we're talking about that relate to course
6    252?
7  A.  That's some of the questions.
8  Q.  Are these four pages, Exhibit 10-A, B, C,
9    and D, all of your notes, though?
10  A.  Those are the only notes that I was allowed
11    to write down.
12  Q.  I'm not sure I understand how you're
13    limiting the response.  Are you saying that
14    Ms. Harris would not allow you to write
15    some things down?
16  A.  Correct.
17  Q.  Like what?
18  A.  Any more test questions.  When she allowed
19    me to do that, I was communicating with
20    Sandy Gunnels and the other instructor at
21    Columbus Tech, and they were helping me
22    research through nursing books.
23        And when she realized -- She asked me,

1    are you letting other instructors look at
2    this?  I said, yes, ma'am.  She said, no
3    more, we're not going through this
4    anymore.  That's it.  And that was it.  And
5    then --
6  Q.  What did she think you were writing them
7    down for?
8  A.  She knew what I was writing them down for,
9    was to challenge those answers and look
10    them up in nursing books because Dixie
11    Peterson told me to do that.
12  Q.  When did Dixie Peterson tell you to do
13    that?
14  A.  Within a day or so of setting the
15    appointment with Ms. Harris to come and
16    review the grades.
17  Q.  Was that at a special meeting of some type
18    that you had with Dixie Peterson?
19  A.  No.  That was at the time of reviewing my
20    test.  It was not a special meeting.  There
21    were no other students on campus.
22  Q.  Was it after you filed your grade appeal?
23  A.  Yes, sir, I think it was.

1  Q.  I'll get to that in a minute.  We'll get to
2    the grade appeal in a minute.
3        There are four pages of notes.  About
4    how far did you get in writing down your
5    notes on exams that you were looking at?
6    How far into the exams with the incorrect
7    answers did you get?
8  A.  I don't know how far I got.  I didn't -- I
9    know I didn't get to review every test and
10    every question because she would not
11    allow ...
12  Q.  Did you take these to Sandy Gunnels --
13  A.  Yes.
14  Q.  -- these notes?
15  A.  Yes.
16  Q.  And you talked over your notes with her,
17    correct?
18  A.  Correct.
19  Q.  Why don't you do this.  Take this top
20    page -- don't take it out of the clip or
21    anything, but just take the top page and
22    tell me which question that was on which
23    exam and what the precise question was that

1    you wrote down there.
2  A.  What question it was on which exam?  I'm
3    sorry.  I don't understand your question.
4  Q.  Well, I mean, apparently, it was -- the top
5    of that page has notes on it, correct?
6  A.  Correct.
7  Q.  Do those notes relate to a question that
8    Lynn Harris marked your answer for as an
9    incorrect answer?
10  A.  Correct.
11  Q.  So tell me what the question was from those
12    notes.
13  A.  It looks like -- I can't read the top of
14    that one.  It looks like it was cut off in
15    copying.
16        The second one, it says:  Nurses
17    providing irrigation for nasogastric tube.
18    Patient's potassium level is four -- it
19    looks like four something and sodium is --
20    four milliequivalents maybe and sodium is
21    130.  What would the nurse irrigate with?
22  Q.  So that was a question on --
23  A.  It's not a complete question.  It's not

1    word for word.

2  Q.  But it was marked wrong on the test,

3    correct, on your Scantron?

4  A.  Correct.

5  Q.  Did Sandy Gunnels say that your answer was

6    correct?

7  A.  It says right here, could use either. And

8    this is not precise, just Sandy Gunnels --

9    one of the other instructors was looking at

10    this also at Columbus Tech. And it says,

11    could use either, does not have to be

12    sterile. It's got C and D marked with the

13    little quotation I guess or whatever. And

14    that says, no, normal saline is isotonic

15    and will not impact the sodium level.

16  Q.  Did you talk to Lynn Harris about the fact

17    that Sandy Gunnels and this other

18    instructor said it could have been either?

19  A.  When I tried to do that, that's when she

20    refused to talk to me about any of these

21    questions or allow me to look at anything

22    else.

23  Q.  Let me ask you something. Who was your

1    instructor for 252?

2  A.  Lynn Harris.

3  Q.  Which one of these ladies -- Ms. Bellamy or

4    Ms. Gunnels -- was supposed to have taught

5    that course?

6  A.  Brenda Bellamy.

7  Q.  Was supposed to have taught 252?

8  A.  Correct.

9  Q.  Which course was Sandy Gunnels going to

10    teach in the fall of 2005?

11  A.  271.

12  Q.  You're talking to a nurse who was a

13    professor at this school who taught various

14    courses at this school but who was not the

15    professor for your course 252, weren't you?

16  A.  Correct.

17  Q.  And you were getting their impression about

18    an answer to a question that Ms. Harris had

19    marked incorrect on your test, right?

20  A.  Correct.

21  Q.  And what you're saying is that they're

22    saying Ms. Harris wasn't really wrong, but

23    neither were you, and so she shouldn't have

1    marked that off. Isn't that what you're

2    saying?

3  A.  Is that what I'm saying?

4  Q.  Well, I'm just asking you if that's your

5    contention in this case. Are you saying

6    that Ms. Harris, her answer was right, but

7    so was yours because Sandy Gunnels said so

8    was yours?

9  A.  Yes.

10  Q.  And you're saying that you should have been

11    given credit for that correct answer. Is

12    that what your contention is?

13  A.  But I'm not saying it's just because Sandy

14    Gunnels said so. It was in nursing books.

15  Q.  You've written down a paraphrase of a

16    question. But irrespective of that,

17    Ms. Harris was the instructor, wasn't she?

18  A.  Yes.

19  Q.  Reasonable and good professionals can

20    disagree on various things, can they not?

21  A.  Yes.

22  Q.  The professional teaching this course,

23    Ms. Harris, said the right answer for you

1    on this test because I'm your teacher is

2    the one that I had in my key, not the one

3    you chose; isn't that right?

4  A.  No.

5  Q.  What? Tell me --

6  A.  She never discussed any of these questions

7    with me. She never gave me any rationale.

8    She never said this is the answer I chose,

9    it's right, you're wrong. She never --

10  Q.  That's really not what I'm asking you.

11    You're saying she should have spent all

12    kinds of time with you doing this, even

13    though she had 30 students or however many

14    she had. But what I'm saying is, she was

15    the teacher, not you, right?

16  A.  Right.

17  Q.  She was the teacher, not Sandy Gunnels,

18    right?

19  A.  Right.

20  Q.  She was the teacher, not this lady, Ventura

21    or whatever her name is, right?

22  A.  Right.

23  Q.  She had a key. She put an answer down that

Page 250

```
 1    was the right answer in her view as the
 2    instructor for the course.  And you're
 3    complaining because she didn't mark your
 4    answer right because some other person
 5    says, well, your answer is -- it could be
 6    right and so is hers, right?  Isn't that
 7    what you're doing?
 8  A.  No.
 9  Q.  Yes, it is.  Tell me what you're doing.
10  A.  I'm complaining because she didn't give me
11    the opportunity to go over these test
12    questions and give me rationale for the
13    answers that I chose.  As any of the tests
14    that she gave, she never went over anything
15    except for that last semester the day
16    before finals.  At the end of the day at
17    certain times, you could either be there or
18    not.  No, she did not go over any of this
19    stuff with me.
20  Q.  So you're not complaining, then -- I've got
21    it all wrong.  You're not complaining about
22    the fact that the test was graded the way
23    it was.  You agree with the way the way the
```

Page 251

```
 1    test was graded.  It's just that she didn't
 2    sit down with you and explain all of this
 3    stuff, right?
 4  A.  Wrong.  No, I do not --
 5  Q.  How is that wrong?
 6  A.  I do not agree with the way the tests were
 7    graded.  From my understanding and what she
 8    did was she threw out questions on some
 9    people's tests and some people's she
10    didn't.  I feel like I was not graded
11    equally.
12  Q.  You filed a lawsuit, Ms. Wright, in this
13    case, and you're telling me from what I
14    understand, she threw out questions for
15    other people but not me.  You're telling me
16    that?
17  A.  That was for everybody.  There were test
18    questions that she threw out on other
19    people's tests and she didn't throw out
20    on -- she didn't do it -- overall, she
21    didn't do it for everybody.
22  Q.  And you don't know that.  It's just
23    something that you think, right?
```

Page 252

```
 1  A.  From what -- that last semester --
 2  Q.  How about 252?
 3  A.  From 252?
 4  Q.  Yeah.
 5  A.  She told me.  Ms. Harris told me this.
 6  Q.  Told you what?
 7  A.  That she omitted -- if you'll look on the
 8    back of one of these -- those are the
 9    originals, and I think I made a copy of
10    that back part.  She told me she omitted
11    two of eight questions -- it's on the back
12    of one of these.
13  Q.  You're referring to Defendant's Exhibit 9?
14  A.  Uh-huh.  (Positive response.)
15  Q.  What did she tell you?
16  A.  She told me she omitted two out of eight on
17    my test and graded from that, gave me a
18    grade off of that.
19  Q.  She omitted two of your wrong answers?
20  A.  Two out of eight that she threw out.
21  Q.  Two of your wrong answers?
22  A.  She threw out questions and then she
23    omitted some questions.
```

Page 253

```
 1  Q.  So she gave you a break.  She gave you a
 2    break, right?  She threw out two wrong
 3    answers, right?
 4  A.  Right.
 5  Q.  And she omitted some others that were
 6    wrong, right?
 7  A.  Right.
 8  Q.  She gave you a break, and you're suing?
 9  A.  But she didn't give me credit the way she
10    should have.
11  Q.  Oh, okay.
12  A.  According to what she was saying when
13    she -- what she told me, the calculation --
14    it didn't calculate.
15  Q.  Did Sandy Gunnels do your calculation for
16    you on that, too?
17  A.  No, she didn't.
18  Q.  Did you do that calculation?
19  A.  Can we look at that?
20  Q.  I don't have time to be honest with you.  I
21    mean, this -- what are you saying?  Just
22    tell me what you're saying.
23          MR. DUMBUYA:  Let me step in at
```

1    this time. You've introduced
2    Exhibit Number 9, so I think
3    you have a responsibility to
4    go over that exhibit from the
5    perspective of the witness.
6    Exhibit Number 9 has already
7    been introduced.
8        MR. NIX: I know, but I don't have
9    an obligation to do anything
10    other than discover, and
11    that's what I'm doing.
12 Q. So tell me --
13        MR. DUMBUYA: If the witness is
14    insisting that information is
15    on Exhibit Number 9, I think
16    you have the responsibility
17    to --
18        MR. NIX: She's told me what's on
19    it. You can question her at
20    trial or here when I get
21    finished, whatever you want to
22    do.
23        MR. DUMBUYA: I just want to make

1    sure we're on the same plane
2    here.
3        MR. NIX: I understand what you're
4    saying. I think I understand
5    what she's saying as well, and
6    I don't think there's any need
7    to go to it. I understand it.
8 Q. Go to 272. What did Lynn Harris do wrong
9    on that course?
10 A. Lynn Harris didn't teach 272 -- yes, she
11    did. She taught 272. I thought you were
12    meaning 271.
13 Q. What did Lynn Harris do wrong on 272?
14 A. What did she do wrong on 272?
15 Q. Right, to you.
16 A. To me?
17 Q. Yeah.
18 A. Well, she said that she was going to go
19    over test questions and give rationale for
20    every test, and she did not do that. She
21    never went over any test except for the day
22    before finals.
23        And she told us weeks in advance she

1    was going to give us a study guide for the
2    final. She never did that. She did it a
3    day before the final. That was not
4    adequate time to study for a final.
5 Q. What did she do wrong, though -- okay.
6    You're saying that's all she did wrong.
7    Okay? Is that right?
8 A. She told me that -- there were times in the
9    clinical -- there was a clinical that we
10    had to turn in care plans, and she
11    addressed the class and said that we're not
12    discussing any of the care plans. Whoever
13    got -- well, the care plans that were
14    regraded can be redone. You can redo your
15    care plans, and that was it.
16        And that deducted points from me, so
17    that was wrong, from my original grade that
18    I received from care plans.
19 Q. It deducted points from you?
20 A. Yes, sir, it did.
21 Q. I thought she allowed you to redo a care
22    plan and you doubled your score on it.
23 A. No, sir.

1 Q. Did you redo a care plan and it reduced
2    your score?
3 A. Yes, sir.
4 Q. What course was that in?
5 A. That was in 272.
6 Q. And which care plan was that?
7 A. I think that was -- may have been the first
8    care plan that we did. I'm not real sure
9    exactly which one it was.
10 Q. Are you talking about the care plan that
11    was said to have been lost? Is that the
12    one you're talking about?
13 A. No.
14 Q. Talking about the other one?
15 A. Uh-huh. (Positive response.)
16 Q. Yes?
17 A. In 272.
18 Q. Yes? You're talking about another one?
19 A. Yes.
20 Q. And she said you could redo -- y'all can
21    redo your care plans if you'd like?
22 A. She addressed the class.
23 Q. She told the whole class that?

Page 258

1    A.  Yes.
2    Q.  So some people -- you had an option to redo
3        the care plan, correct?
4    A.  Correct.
5    Q.  And you chose to redo the care plan,
6        correct?
7    A.  Correct.
8    Q.  And you made a worse score on the care
9        plan?
10   A.  No, I made a higher score than what they
11       originally -- the second time they graded.
12       I made a higher score than that.
13   Q.  I don't understand.  I'm sorry.  You made a
14       higher score which time?
15   A.  There was a care plan that third
16       semester -- there was two care plans the
17       third semester.  Artemisa Harmon in our
18       clinical group gave back my original care
19       plan with my original sheet on it that
20       said -- I think it was 22 out of 25
21       points.  And we had to hand those back in,
22       so I handed it back in to her.
23            Well, the next clinical session was

Page 259

1        Shirley Harmon, and she gave -- no, the
2        next session, I had Artemisa again, I
3        think.  But when they handed out care plans
4        again, my original sheet was torn off and
5        there was red writing, and it was a grade
6        of a seven.  And it was that same care
7        plan.  They took those back up.
8            And that's when Lynn Harris said -- she
9        addressed the class and said she didn't
10       want to hear any fussing about the care
11       plans, to redo them if you wanted to redo
12       them.
13   Q.  In other words, she redid the grading on
14       them, Lynn Harris did?
15   A.  She said she did not.
16   Q.  Lynn Harris said she did not redo the
17       grading?
18   A.  Correct.
19   Q.  Someone else redid the grading?
20   A.  Correct.
21   Q.  And gave you a lower score?
22   A.  Correct.
23   Q.  And then you redid the care plan?

Page 260

1    A.  Correct.
2    Q.  And did you make higher than a seven?
3    A.  Correct.
4    Q.  What was that?
5    A.  I think it was a 19.
6    Q.  Right.  So Lynn Harris gave you a break.
7        She allowed you to redo the care plan that
8        someone else had regraded to your disliking
9        down from a 22 to a seven.  Isn't that
10       right?
11   A.  Lynn Harris didn't grade our care plans.
12       Our clinical instructors graded our care
13       plans and gave us those grades.
14   Q.  So did Artemisa regrade it, is that what
15       you're saying, from a 22 to a seven?
16   A.  Artemisa told me that Shirley -- Sylvia
17       Shirley or --
18   Q.  Whatever her name is.
19   A.  Whatever her name is.
20   Q.  She regraded it?
21   A.  Is the one that regraded it.
22   Q.  And she was a clinical instructor?
23   A.  Correct.

Page 261

1    Q.  Was she the clinical instructor for that
2        particular part of your clinical --
3        whatever, the one that was supposed to have
4        graded it to start with?
5    A.  It was between her and Artemisa.
6    Q.  So whatever happened, Lynn Harris said redo
7        them if you want to; if you don't, that's
8        fine.  You chose to redo it.  You made
9        higher than a seven, right?
10   A.  Correct.
11   Q.  All right.  What else did Lynn Harris do to
12       you that was different from anybody else?
13       How did she discriminate against you in a
14       negative way in such a way that it hurt
15       you?  How did she treat you differently?
16   A.  In what course?
17   Q.  272.
18   A.  In 272?  I didn't really have too much of a
19       problem with Lynn Harris in 272.
20   Q.  All right.  You agreed with the grades in
21       272?
22   A.  No.
23   Q.  Nevertheless, the grades are the grades

Page 262

1    that Lynn Harris gave you. Do you agree
2    with that?
3    A.  Do I agree that those are the grades that
4    she gave?
5    Q.  Yes.
6    A.  Yes.
7    Q.  Now, do you say, Ms. Wright, that for some
8    reason, either Lynn Harris or some other
9    person at the school was out to get you?
10   A.  Do I believe that?
11   Q.  Are you contending that in this case?
12   A.  Yes.
13   Q.  Explain that to me.
14   A.  From what I have been told by -- do you
15   want names? Do you want me just to explain
16   from start --
17   Q.  I want the whole deal. Yes, ma'am.
18   A.  Start to finish?
19   Q.  You just let it rip. Okay? You know how
20   I'm doing. I want as much knowledge as I
21   can get. I really want to understand your
22   case. Okay?
23   A.  Okay.

Page 263

1    Q.  Tell me as much as you can.
2    A.  When the ordeal happened with the second
3    semester, having the D in 252 --
4    Q.  What are you calling the ordeal?
5    A.  What am I calling an ordeal?
6    Q.  The ordeal.
7    A.  The ordeal?
8    Q.  Yes.
9    A.  When I received my grade and went through
10   the process of the grade appeal, I was
11   treated -- I feel like I was treated
12   unfairly because I didn't get the
13   opportunity to go through all of the test
14   questions, any kind of rationale or any
15   kind of questions that I would have had
16   about any of the tests that were given to
17   me, and was stopped in the process when
18   other instructors were helping me with
19   trying to -- what is it, argue my side per
20   se.
21   Q.  I'm trying to -- trying to tell the teacher
22   she's wrong?
23   A.  If that's what you want to call it.

Page 264

1    Q.  Well, that's what it is, isn't it? I mean,
2    you -- let me ask you this.
3    Did Lynn Harris meet with every single
4    one of her students and elaborately go over
5    these tests the way you wanted to go over
6    them?
7    A.  No, she never made herself available for
8    us.
9    Q.  Okay. Fine. Keep going. Okay? You were
10   telling me how somebody is out to get you.
11   A.  When I filed for grade appeal, I was told
12   that Dixie Peterson had told two
13   instructors to -- well, I was told that she
14   asked about everybody the first semester,
15   how everybody did, what their grades were,
16   and that I was specifically picked out and
17   said that I was a weak student, that I
18   didn't pass my LPN boards the first time,
19   that I did not need to pass the second
20   semester.
21   Q.  Okay. And that was Sandy Gunnels that told
22   you that, right?
23   A.  Correct.

Page 265

1    Q.  Did anyone else tell you that?
2    A.  No.
3    Q.  Do you know of anyone else that supposedly
4    heard Dixie Peterson say that you should --
5    What did she say again?
6    A.  Lindy doesn't need to pass next semester.
7    She's weak. She didn't pass her LPN boards
8    the first time, so she won't pass her RN
9    boards.
10   Q.  And when did this occur?
11   A.  The end of the first semester.
12   Q.  That would be, what? August sometime,
13   2005; is that right?
14   A.  Yes.
15   Q.  Are you saying that Sandy Gunnels told you
16   that Dixie Peterson said that to Sandy
17   Gunnels?
18   A.  And Brenda Bellamy. She said that she said
19   it to her and Brenda Bellamy.
20   Q.  You've spoken with Brenda Bellamy since all
21   of this, correct?
22   A.  Correct.
23   Q.  Does Brenda Bellamy confirm what Sandy

Page 266

1     Gunnels said about what Dixie said?
2  A.  She doesn't recall, and we didn't go
3     in-depth.
4  Q.  So you asked Brenda Bellamy about it?
5  A.  Has Dixie Peterson ever said anything about
6     me to you.  Not that I recall was her
7     answer.
8  Q.  And was this at the restaurant that night?
9  A.  No.
10 Q.  Where was it?
11 A.  This was in passing at Doctors Hospital.
12 Q.  So Sandy Gunnels, though, nevertheless says
13    that that occurred, correct?
14 A.  Correct.
15 Q.  If I hear you correctly, Sandy Gunnels
16    didn't say Dixie Peterson ordered me to
17    fail Lindy Wright this next semester,
18    right?  What I think I heard you say -- I'm
19    asking you to tell me if I'm hearing you
20    correctly.
21        What I think I heard you say that Sandy
22    Gunnels told you was that Dixie Peterson
23    said Lindy Wright is a weak student.  She

Page 267

1     did not pass her LPN licensing test -- or
2     boards the first time, and she really does
3     not need to go forward in the program or
4     does not need to pass or whatever.
5  A.  Correct.
6  Q.  Is that correct?
7  A.  Correct.
8  Q.  But she did not say to Sandy Gunnels, I
9     want you to fail her in this course, right?
10 A.  I don't know exactly what she said to Sandy
11    Gunnels because I was not in the room, but
12    that's what Sandy relayed to me.
13 Q.  Sandy Gunnels has never said to you that
14    Dixie Peterson said to her, I want you to
15    fail Lindy Wright in those words, has she?
16 A.  No, she never said that.
17 Q.  All she said was that Dixie Peterson
18    commented about you, that you were a weak
19    student and that you really did not need to
20    go forward as an RN; isn't that right?
21    Basically that.  Not in those exact words,
22    but basically that, right?
23 A.  Right.

Page 268

1  Q.  Tell me everything else you can tell me
2     about somebody being out to get you.
3  A.  And then the courses offered for the
4     Nursing 200 in place of the 252, and I feel
5     like that had been discussed between Dixie,
6     Dean Lowe and whomever has the authority to
7     do that to keep me from getting course
8     forgiveness.
9  Q.  Let me make sure I understand this.  Okay?
10    You're saying that when you were told that
11    you could not retake 252 because it would
12    not be offered again in view of the new
13    curriculum or the new program and that you
14    should nevertheless take 200 instead, then
15    the people who told you that -- Dixie and
16    Dean Lowe --
17 A.  Um-huh.  (Positive response.)
18 Q.  -- had discussed the fact that you could
19    not get course forgiveness?
20 A.  I feel like they did.  I don't know that
21    for a fact.
22 Q.  And you feel like they talked about the
23    fact that you couldn't get course

Page 269

1     forgiveness because the 252 course was not
2     the same number as the 200 course?
3  A.  Correct.
4  Q.  Tell me everything you can tell me that's
5     factual that you base that belief on.
6  A.  Because of her comments saying it's not
7     like you've got course forgiveness.  Then I
8     went to Dean Hodge and asked for course
9     forgiveness, and they're telling me that
10    the course numbers don't match up.  I
11    didn't choose the course number.  They
12    chose the course number.  They said they
13    had to change it because of the course
14    curriculum.
15        And then the student in the -- the last
16    semester that had taken the 272, they
17    didn't change her course number because she
18    would have actually had to come back the
19    following year and take whatever course it
20    is for the pediatrics.  They gave her 272
21    at the time that she came back during the
22    summer to take it.
23 Q.  Who is that?

Page 270

1   A.  Corolla Rambo.
2   Q.  Okay.  What else?  Keep going.
3   A.  Laurel Blackwell when I had the meeting in
4       her office, she tells me that she didn't
5       have anything to do with the academics.  I
6       mean, I wouldn't -- I don't understand
7       that, because she's the president of the
8       college.  So, I mean, she oversees
9       everything I would expect.
10  Q.  So you disagree with Laurel Blackwell, too,
11      about her job, right?
12  A.  Not about her job.  About the way I was
13      treated there.
14  Q.  Well, what you said was that she told you
15      that she had nothing to do with academics,
16      and you disagree with that?
17  A.  Correct.
18  Q.  And you disagree with that because she's
19      the president of the school, right?
20  A.  Correct.
21  Q.  And you think that the president of the
22      school is like the 500-pound parakeet?
23      They can do whatever they want to do,

Page 271

1       regardless?
2               MS. COOLEY:  I'm going to object
3           to the form of that question.
4   Q.  Is that what you think?  The president of a
5       school can just do willy-nilly whatever
6       they want to do, whether it's in the
7       administrative part, the operations part,
8       the academic part?
9   A.  From the past and the things that I've seen
10      done with other students, yes.
11  Q.  So tell me everything that Dr. Blackwell
12      has done with other students that you've
13      seen in the past that leads you to believe
14      this.
15  A.  Well, I've discussed three other students,
16      and I'm sure that she knew what was going
17      on with the other students because they all
18      have to communicate what's going on with
19      somebody and their livelihood as far as
20      degree and --
21  Q.  So you're speculating, basically, right?
22      You're speculating that Dr. Blackwell had
23      something to do with Sizemore, with Rambo,

Page 272

1       and with Umoh, right?
2   A.  Am I speculating that?
3   Q.  Right.
4   A.  Yes.
5   Q.  Is there anything else you can tell me that
6       leads you to believe -- factual, anything
7       factual you can tell me that leads you to
8       believe that Dr. Blackwell had anything to
9       do or knew anything about the academic
10      aspects of those three people that you've
11      told me about that you say were treated --
12      that got special treatment?
13  A.  No.
14  Q.  Now, you were telling me about this
15      conspiracy to get you.  Is there anything
16      else that relates to it that you have not
17      already told me?
18  A.  Not that I can think of at this moment.
19  Q.  And tell me again who is involved in the
20      conspiracy, the people that are involved in
21      the conspiracy to get you.
22  A.  Dixie Peterson.
23  Q.  All right.

Page 273

1   A.  Dean Lowe.
2   Q.  All right.
3   A.  Dean Hodge.
4   Q.  All right.
5   A.  Laurel Blackwell was involved.
6   Q.  All right.
7   A.  Lynn Harris was involved.
8   Q.  You're saying all these people were
9       involved in a conspiracy together to get
10      you; is that right?
11  A.  Right.
12  Q.  Anybody else?
13  A.  No.
14  Q.  I've already asked you about
15      Dr. Blackwell.  And with regard to the
16      conspiracy, I guess I have not really said
17      tell me what Dixie Peterson did in the
18      course of this conspiracy to get you, but
19      tell me that.
20  A.  She offered me Nursing 200 in place of 252,
21      and I was told that she told other
22      instructors I did not need to pass because
23      I was weak, insinuating to fail me.

Page 274

1  Q.  Sandy Gunnels told you that?
2  A.  Uh-huh. (Positive response.)
3  Q.  What else?
4  A.  When I was with Ms. Harris in her office
5      the day that I was down there trying to
6      review these tests, they were having their
7      Christmas luncheon, I think. When I was
8      trying to do this, she came over and got
9      Ms. Harris and told me that I would have to
10     come back, that they had things they had to
11     do, they had a meeting, and it was to
12     progress with their luncheon and that she
13     didn't care if I dropped a bomb. She
14     didn't care what I did.
15 Q.  Didn't care if you dropped a bomb?
16 A.  Correct. Those were her words. I don't
17     care if you drop a bomb.
18 Q.  Talking about what Dixie Peterson said?
19 A.  Correct.
20 Q.  What else?
21 A.  She told me to go ask Ms. Harris to let me
22     redo care plans that last semester when, in
23     fact, her and Ms. Harris had already

Page 275

1      discussed that and she knew beforehand that
2      there was no need for me to do that because
3      they had already discussed that nobody was
4      to redo care plans --
5  Q.  All right.
6  A.  -- per Ms. Harris's comment.
7  Q.  What else?
8  A.  That's all I can think of right now.
9  Q.  How about Dean Lowe? What has he done in
10     the course of this conspiracy to get you?
11 A.  Offer the Nursing 200 as well as Dixie
12     Peterson and then told me that the D would
13     not be held against me when, in fact,
14     they're holding the D against me and not
15     letting me proceed with my career path.
16 Q.  All right. Is that it?
17 A.  Uh-huh. (Positive response.) That's all I
18     can think of right now.
19 Q.  How about Dean Hodge? What has Dean Hodge
20     done in the course of this conspiracy to
21     get you?
22 A.  When I explained to him about the Nursing
23     200 class and the 252, he just told me to

Page 276

1      turn in my grade forgiveness appeal paper,
2      and I turned that in and didn't --
3  Q.  Talking about the course forgiveness?
4  A.  Yeah, the course forgiveness. And I didn't
5      receive a response, and then I receive a
6      letter stating that the course numbers
7      didn't match, so I didn't get course
8      forgiveness because the course number that
9      they changed didn't match.
10 Q.  Anything else?
11 A.  Not right now.
12 Q.  And you've already told me everything about
13     Dr. Blackwell, correct?
14 A.  Correct.
15 Q.  What has Lynn Harris done in the course of
16     this conspiracy to get you?
17 A.  In the 252 class?
18 Q.  I don't know. I mean, it's your
19     conspiracy.
20 A.  Well, she did not let me review. She did
21     not give any rationale. She was not
22     available for me. She wasn't available.
23 Q.  Anything else?

Page 277

1  A.  That's all I can think of right now.
2          (Defendant's Exhibit 11 was marked
3          for identification.)
4  Q.  Let me show you what I've marked as
5      Defendant's Exhibit 11. It's a letter from
6      Katie Lackey to you dated April 29, 2005.
7      It says: Congratulations on your
8      acceptance into the ADN program. It
9      mentions an orientation meeting Thursday,
10     May 5 at 2:00 p.m. I'm sure that would be
11     2005. I don't know if you remember getting
12     that or not, but ...
13         That appears to be a letter to you,
14     correct?
15 A.  Correct.
16 Q.  Do you recall receiving it?
17 A.  No.
18 Q.  Any reason to think you did not receive it?
19 A.  No.
20 Q.  Is it to the correct address? 97 Green
21     Dudley Road.
22 A.  No, it should have been 7716.
23 Q.  7716 Green Dudley Road?

1    A.  Boulder Drive, Columbus, Georgia.
2    Q.  What is 97 Green Dudley Road?
3    A.  That's where Scott McCraine lived.
4    Q.  Before y'all got married?
5    A.  Correct.
6    Q.  And then y'all moved to Columbus?
7    A.  No.  That's where he lived.
8    Q.  That's where he lived after you separated?
9    A.  No.  That was before we got married.
10   Q.  Before you got married?
11   A.  Correct.
12   Q.  So where did you live after you got
13       married?
14   A.  7716 Boulder Drive.
15   Q.  In Columbus?
16   A.  Yes.  I have always --
17   Q.  You've always lived there?
18   A.  Correct.
19   Q.  Did Scott live there with you after you got
20       married?
21   A.  Where?
22   Q.  On that Boulder place.
23   A.  No.

1    Q.  He never did?
2    A.  No.
3    Q.  Did y'all ever live together?
4    A.  Yes.
5    Q.  Where?
6    A.  At 1563 Lee Road 239.  That's where he
7        lives now.
8    Q.  Where is that?
9    A.  Smiths Station.
10   Q.  Smiths Station.  Is Salem close to Smiths
11       Station?
12   A.  It's probably about 15 minutes.
13   Q.  All right.  When you filed your
14       application, you must have used that
15       address is the only thing I can think of.
16       Do you know whether you did?
17   A.  I don't remember.
18   Q.  Did you go to an orientation session on May
19       5 at the school?
20   A.  I'm sure I'd remember if I did.  I don't
21       recall.
22           (Defendant's Exhibit 12 was marked
23           for identification.)

1    Q.  Let me show you what I'm marking as
2        Defendant's Exhibit 12, Ms. Wright, to your
3        deposition.  Would you look at them and
4        tell me what they are.
5    A.  Tax returns.
6    Q.  What year or years are they?
7    A.  2004, 2002, 2003, 2005 and 2006.
8    Q.  Are those your tax returns?
9    A.  Yes, sir.
10   Q.  Do they have anyone else's income on them
11       other than your income?
12   A.  Yes.
13   Q.  Which one does?  2006 doesn't.  Five
14       doesn't.  Four, Scott McCraine --
15   A.  Yes.
16   Q.  -- and Lindy Wright, 97 Green Dudley Road,
17       Salem, Alabama.
18           Is 2003 in here?
19   A.  I think so.
20   Q.  You think so?
21   A.  I think so.  Is it back there?
22   Q.  2004 in the very back, which is out of
23       place.  2002 is here.  That is Jason Warren

1        and Lindy Warren.  Were you divorced in
2        2002 from Jason Warren?
3    A.  Correct.  I think it was 2002.
4    Q.  That lists 7716 Boulder Drive, Columbus.
5    A.  Correct.
6    Q.  Did you say that's your mother's house?
7    A.  Uh-huh.  (Positive response.)
8    Q.  Yes?
9    A.  Yes.
10   Q.  And did you and Jason Warren live there --
11   A.  Yes.
12   Q.  -- together?
13           There's 2003, Lindy Warren, 7716
14       Boulder Drive.  Okay.  You produced these
15       pursuant to our request for production,
16       correct?
17   A.  Correct.
18   Q.  I'll give you a packet of material that you
19       produced to us today.
20           (Defendant's Exhibit 13 was marked
21           for identification.)
22   Q.  If we could, let's go through these names,
23       please.

Page 282

1    Jill Boyette, I think you've told me
2  who she is. She was a member of your
3  clinical group?
4  A.  Correct.
5  Q.  What is she on this witness list for?
6  A.  She is the one that brought the attention
7     to our clinical group about Shannah Lowe
8     receiving special treatment.
9  Q.  Okay. Is that the only reason she's on it?
10 A.  Correct.
11 Q.  Is this her current residence?
12 A.  As far as I know.
13 Q.  Why is Brenda Bellamy on the list?
14 A.  She was supposed to be one of the
15    instructors that Dixie communicated that I
16    was weak to and that I did not need to pass
17    the next semester.
18 Q.  Is that the only reason?
19 A.  Yes.
20 Q.  Why is Wendy Wall on here?
21 A.  Because she knows information about Arit
22    Dan Umoh.
23 Q.  Did you say she was an instructor?

Page 283

1  A.  Clinical instructor.
2  Q.  Is that the only reason she's --
3  A.  Correct.
4  Q.  Why is Artemisa Harmon on it?
5  A.  She's the clinical instructor that
6     supposedly failed Shannah Lowe in the
7     clinical setting and gave me back the
8     regraded care plan.
9  Q.  Any other reason for her being on it?
10 A.  No.
11 Q.  Sylvia Shirley, why is she on it?
12 A.  She is one of the clinical instructors that
13    I was told that regraded that care plan.
14 Q.  Is that the only reason she's on it?
15 A.  Yes.
16 Q.  Bridgett Jackson.
17 A.  Because she was one of our -- she was our
18    lead clinical instructor, and she was the
19    one that I was told that let -- well, took
20    Shannah Lowe down into the lab to rectify
21    her wrong in the clinical setting.
22 Q.  Is that the only reason she's on it?
23 A.  Yes.

Page 284

1  Q.  Sandy Gunnels and records. What does that
2     mean, Sandy Gunnels and records?
3  A.  She came in and gave a deposition and said
4     she had several records pertaining to the
5     school and the faculty and Arit.
6  Q.  And what?
7  A.  Arit Umoh.
8  Q.  Records concerning the faculty, the school,
9     and Ms. Umoh?
10 A.  Correct.
11 Q.  And you don't have a copy of those?
12 A.  No, I don't.
13 Q.  Your lawyers don't have a copy of those?
14 A.  I don't know.
15     MS. COOLEY:  (Shakes head from
16        side to side.)
17 Q.  Okay. Arit Umoh. The reason she's on
18    there, I guess, is because of the -- what
19    you've already told me, correct?
20 A.  Correct.
21 Q.  Sherika Derico?
22 A.  Derico.
23 Q.  Why is she on your list?

Page 285

1  A.  She was the clinical instructor that I had
2     for the Nursing 200.
3  Q.  So what can she add to this?
4  A.  When I -- when myself and Elise Sizemore
5     were in that clinical group, she was asking
6     us why were we there, why did we have to
7     redo clinicals, and we had no explanation.
8     All we know was that we were told to do it.
9  Q.  When was this, now?
10 A.  The Nursing 200.
11 Q.  Is that all for her?
12 A.  Yes.
13 Q.  Shannah Lowe, you've already talked to us
14    about her doing the child's IV.
15 A.  Yes.
16 Q.  Is that all for her?
17 A.  Uh-huh. (Positive response.)
18 Q.  Yes?
19 A.  Yes.
20 Q.  Lynn Harris, I think we know about her.
21    Kim Smith gave a statement that you've
22    produced. Have you read her statement?
23 A.  No.

Page 286

1 Q. Go to the next thing. It's Elise Sizemore
2 giving you permission to use records, my
3 transcripts and letter for evidence, and
4 then her letter is here. Have you read her
5 letter to Dean Hodge?
6 A. No.
7 Q. Do you know what the letter is about?
8 A. No.
9 Q. Do you have the attachments to the letter?
10 A. Do I have attachments --
11 Q. On page three, it lists what appear to be
12 some attachments, I think, anyway.
13 MR. NIX: Are those attachments?
14 Do y'all know?
15 A. These look like the syllabus. You have
16 copies of those -- or something out of the
17 syllabus. I have no idea.
18 Q. I see. She's listing all the names of the
19 people in the clinical group in number
20 three, but --
21 Then the very last thing is an e-mail
22 from Dixie Peterson to Dale Sizemore. Who
23 is Dale Sizemore?

Page 287

1 A. I don't know unless that's Elise's
2 husband. I don't know.
3 Q. Do you know what this e-mail is about?
4 A. No.
5 Q. It's a read receipt, apparently, dated
6 1-31-06, indicating that -- I believe it
7 indicates that Dixie Peterson received and
8 opened an e-mail from Dale Sizemore. Do
9 you know what that's about?
10 A. No.
11 Q. It may be this letter here.
12 MR. DUMBUYA: What is Exhibit
13 Number 13?
14 MR. NIX: It's this packet of
15 documents that y'all produced
16 today.
17 MR. DUMBUYA: Is that a list of
18 witnesses?
19 MR. NIX: It's several things
20 actually, Peter. It's a list
21 of witnesses --
22 MS. COOLEY: We've got it.
23 MR. DUMBUYA: I'm just trying to

Page 288

1 find out how you entitled it.
2 MR. NIX: I don't know that I did
3 really.
4 Q. Did you receive a copy of the catalog and
5 handbook at some point in time before you
6 started school at CVCC in the RN program?
7 A. I picked one up.
8 Q. Before you started school?
9 A. I'm sure I did.
10 Q. Do you know what a Comprehensive Predictor
11 Exam is?
12 A. I received it in the mail.
13 Q. Huh?
14 A. I received one in the mail. I think it's
15 the same thing.
16 Q. Oh, really? Do I have that?
17 A. I think that's what it is. I don't know.
18 MR. NIX: Did y'all produce that?
19 MS. COOLEY: I don't have that.
20 THE WITNESS: This was -- I don't
21 think that was asked for in
22 there, but I brought it
23 anyway.

Page 289

1 MR. NIX: I'll tell you what. If
2 we didn't ask for it -- we
3 asked for everything -- I
4 mean, really, it's so broad.
5 MS. COOLEY: We'll go ahead and
6 get --
7 MR. NIX: Thank you.
8 Q. Where did that come from?
9 A. (Indicates.)
10 Q. It's a manila envelope with your name and
11 address and a CVCC return address. It
12 didn't come with a cover letter or note or
13 anything?
14 A. I don't recall.
15 Q. The postage mark says May 16, 2006. I'll
16 tell you what.
17 (Defendant's Exhibit 14 was marked
18 for identification.)
19 Q. I'm going to mark the front of this
20 envelope that Predictor exam came in
21 14. Defendant's 14 is the envelope, the
22 brown or the manila envelope that you
23 received that Predictor exam in, correct?

Page 290

1  A.  Yes.
2  Q.  You don't know the name of the individual
3      or the person who sent it to you --
4  A.  No.
5  Q.  -- from CVCC?
6      I want to ask you about some
7      correspondence.
8          (Defendant's Exhibit 15 was marked
9          for identification.)
10 Q.  Defendant's Exhibit 15 is a letter from a
11     person named Connie Cooper.  Who is Connie
12     Cooper?
13 A.  She's an attorney in Phenix City.
14 Q.  Has she ever represented you?
15 A.  She has.
16 Q.  Does she represent you now?
17 A.  No.
18 Q.  This letter is dated January 10, 2006, from
19     Connie Cooper, Defendant's Exhibit 15, to
20     Dean James Lowe.  Apparently, Connie Cooper
21     spoke with him.  She writes following up on
22     a conversation.  Said that she had been
23     retained to assist you in the pursuit of

Page 291

1      your due process rights regarding a grade
2      appeal of two college courses.  Is that why
3      you hired Ms. Cooper?
4  A.  Yes.
5  Q.  It was to assist you in that regard?
6  A.  Yes.
7          (Defendant's Exhibit 16 was marked
8          for identification.)
9  Q.  Defendant's Exhibit 16 is a copy of your
10     letter to Dean Hodge, is that right --
11 A.  Correct.
12 Q.  -- dated May 19, 2006.  And you say:  Dean
13     Hodge, I would like to take this
14     opportunity to ask for course forgiveness
15     for Nursing 252.  After researching the
16     student handbook, I found that it is the
17     student's responsibility to ask for course
18     forgiveness.  And you cite some pages, it
19     appears, and some course numbers here.
20         Have we already talked about all of the
21     discussions you had with Dean Hodge about
22     this request for course forgiveness?
23 A.  Yes, sir, I think so.

Page 292

1  Q.  So the last paragraph of this letter,
2      Ms. Wright, says -- to Dean Hodge:  I have
3      since finished the last semester of the
4      associate degree of nursing program.
5      Unfortunately, I earned a D in Pediatric
6      Nursing.  I am asking for course
7      forgiveness so that I can participate in a
8      summer class to earn the credit to finish
9      this program, correct?
10 A.  Correct.
11 Q.  So that at the time you were rendered
12     disqualified from the program for failing
13     two different nursing courses, your
14     intention was to continue on in school and
15     take this course, Pediatric Nursing; is
16     that right?
17 A.  Correct.
18 Q.  And it would have taken you through an
19     additional semester; is that right?
20 A.  Correct.
21 Q.  But you did not engage in that course in
22     that semester, correct --
23 A.  Correct.

Page 293

1  Q.  -- because you were rendered unqualified by
2      the school?
3  A.  Correct.
4          (Defendant's Exhibit 17 was marked
5          for identification.)
6  Q.  Number 17 is another letter from Connie
7      Cooper.  It's dated June 7, 2006.  Is that
8      what that is?
9  A.  I think so.  Two pages, and then a
10     signature on the back page?
11 Q.  That's correct.  It's to Dr. Blackwell from
12     Connie Cooper.
13         Have you read this letter?
14 A.  Yes, sir.
15 Q.  Did you ask Connie Cooper to write the
16     letter?
17 A.  Yes.
18 Q.  Do you agree with the contents of the
19     letter?
20 A.  I haven't read it recently.  But if I asked
21     her to do it, I'm sure I agree.
22 Q.  This letter from Connie Cooper to
23     Dr. Blackwell dated June 7, 2006, which is

Page 294

1    Defendant's Exhibit 17, says in part -- I'm
2    going to start reading from the very bottom
3    right here where it says she, bottom of
4    page one.
5        She has attempted to contact Dean Lowe,
6    Ms. Dixie Peterson, and Sanquita
7    Alexander -- is that the way you say it --
8    Sanquita Alexander in order to be allowed
9    to be placed in Nursing 272.
10        That would have been for the summer
11    semester of 2006?
12   A.  Right.
13   Q.  She has had no response from this request.
14    She has been informed by both Dean Lowe and
15    Dixie Peterson that due to the fact that
16    she failed Nursing 252, she now has two
17    failures and cannot continue in the
18    program.
19        Do you see that?
20   A.  Uh-huh.  (Positive response.)
21   Q.  Yes?
22   A.  Yes.
23   Q.  Do you agree that you were told that by

Page 295

1    Dean Lowe and Dixie Peterson?
2    A.  Correct.
3    Q.  When were you first told that by them?
4    A.  That second semester before the grade
5      appeal and that process took place.
6    Q.  I'm sorry.  The second semester, which
7      would have been fall 2005?
8    A.  Right.
9    Q.  During the grade appeals of 271 and 252,
10     those courses, right?
11   A.  Right.
12   Q.  Well, the letter is referring to 272 and
13     252.  Further, on page one, it says:  That
14     aside, my client was willing to take --
15     retake Nursing 272 which is being offered
16     this summer in order to graduate.  She also
17     turned in a request for course
18     forgiveness.
19         She has attempted to contact Dean Lowe
20     and Dixie Peterson and Sanquita Alexander
21     in order to be allowed to be placed in
22     Nursing 272.  She has had no response from
23     this request.  She has been informed by

Page 296

1    both Dean Lowe and Dixie Peterson that due
2    to the fact that she failed Nursing 252,
3    she now has two failures and cannot
4    continue the program.
5        Is that correct?
6    A.  Correct.
7    Q.  So apparently, Dean Lowe and Dixie Peterson
8      told you -- they may have told you in the
9      fall, also, but they told you sometime in
10     the spring of 2006 that a failure in 272
11     and 252 disqualified you in the program.
12   A.  In the -- when was that again?  When did
13     you say?
14   Q.  Sometime in the spring of 2006.  This
15     letter is dated June 7, 2006.
16   A.  This letter was after graduation.
17     Graduation was in May.  I went to her after
18     that to try and get something resolved
19     and --
20   Q.  When you say her, you mean Connie Cooper?
21   A.  Connie Cooper.
22   Q.  Okay.
23   A.  -- to get something resolved.  And you're

Page 297

1    asking me --
2    Q.  All I'm saying -- I had asked you when Dean
3      Lowe and Dixie Peterson told you that two
4      failures would make you ineligible to
5      complete the program, and you said in the
6      fall of 2005.
7         What I'm asking you and what I'm saying
8      is, this letter indicates that Dixie
9      Peterson and Dean Lowe told you that in
10     relation to your failure of Nursing 272 and
11     252 --
12         And the failure of 272 did not occur
13     until the end of the spring semester of
14     2006, correct?
15   A.  Correct.  Also, when 271 was involved
16     before that grade was changed, they were
17     telling me that I had two failures and
18     could not return.  The grade appeal took
19     place.  The 271 was changed to a C, so
20     therefore I was able to move on.
21   Q.  Right.
22   A.  And they offered me Nursing 200 in place of
23     252.

Page 298

1    Well, we move on to the next semester,
2  and they said I don't have enough points in
3  272, but have finished and made an A in
4  200, which if the course number had not
5  been changed, then I should have had no
6  problem with the course forgiveness.
7    Therefore, that would have erased that
8  D from my transcript, replaced it with an
9  A. My GPA would have stayed the same. I
10  would have had one D and that summer been
11  able to take whatever course number they
12  wanted to create for me to take and I would
13  have been able to graduate.
14  Q.  But you failed 272 --
15  A.  Correct.
16  Q.  -- which is something that I assume you had
17  not anticipated.
18  A.  No.
19  Q.  And thereafter, apparently, Dean Lowe and
20  Dixie Peterson told you that you had failed
21  two courses, 272 and 252, and were
22  therefore no longer eligible to be in the
23  program.

Page 299

1  A.  Correct.
2  Q.  This letter also says on page two -- and
3  I'm referring now to Defendant's Exhibit
4  17, the June 7, 2006, letter of Connie
5  Cooper. It says: My client has personal
6  knowledge of another student who had two
7  failures in the nursing program and was
8  allowed to graduate. Who is that?
9  A.  That would have been Arit Umoh.
10  Q.  And she was -- correct me if I'm wrong,
11  now. She was not in any of your classes,
12  correct?
13  A.  She was in that clinical.
14  Q.  Check-off?
15  A.  Check-off.
16  Q.  But that's just like a one-day thing,
17  right?
18  A.  Correct.
19  Q.  It's like -- You've already said, I think,
20  she was not in that clinical group,
21  correct?
22  A.  She was not in any of my clinical groups.
23  She was in that clinical check-off.

Page 300

1  Q.  That one day.
2  A.  Correct.
3  Q.  And she was not in any class that you took.
4  A.  Correct.
5  Q.  I assume therefore that any knowledge you
6  have about Ms. Umoh and the allegation of
7  two failures in the nursing program came
8  from someone else other than yourself. You
9  do not know that based upon looking at
10  documents or records at the school, right?
11  A.  Correct.
12  Q.  So who did you hear that from?
13  A.  Sandy Gunnels and Wendy Wall.
14  Q.  This letter also says, Ms. Wright, this
15  Defendant's Exhibit 17, the June 7, 2006,
16  letter of Connie Cooper -- let me read it.
17  It says: Most importantly, my client was
18  accused of cheating, and this information
19  was relayed to other students in the
20  program. It appears there was constant
21  turmoil in the program.
22    When were you accused of cheating?
23  A.  I think that was the last semester.

Page 301

1  Q.  The spring of 2006?
2  A.  Yes. Pediatrics.
3  Q.  Who made the accusation?
4  A.  Lynn Harris, Dixie Peterson, and Dean Lowe.
5  Q.  In what part of the year, what part of the
6  semester did they say that you'd cheated?
7  A.  I don't know what part of the semester. It
8  wasn't the beginning of the semester. It
9  wasn't the end. Maybe middle, middle of
10  the semester. I don't know what the exact
11  date was.
12  Q.  How did they say you had cheated?
13  A.  They said that it was brought to their
14  attention that myself and another student
15  had documentation that other students were
16  not privy to.
17  Q.  What documentation was that?
18  A.  They didn't say what documentation.
19  Q.  Do you know what documentation?
20  A.  No.
21  Q.  Who was the other student?
22  A.  April Gunnels.
23  Q.  Whatever became of the cheating accusation

Page 302

1    allegation?
2  A.  Lynn Harris made the whole class take a
3    test over.
4  Q.  Do you know what test that was?
5  A.  If I'm not mistaken, it had something to do
6    with the pediatric GI, gastrointestinal
7    tract.
8  Q.  This would have been in the spring -- we've
9    already talked about that.
10  A.  (Witness nods head up and down.)
11  Q.  And you don't know what material they said
12    you had, you and April Gunnels had the
13    other students did not have?
14  A.  They said documentation.  They didn't
15    specify.
16  Q.  Documentation related to a test?
17  A.  They didn't say related to a test.  They
18    just said documentation.
19  Q.  All right.  You say Lynn Harris gave the
20    whole class the test over?
21  A.  Correct.
22  Q.  Did you ever hear anything further about
23    that allegation of cheating after Dean Lowe

Page 303

1    and Dixie Peterson --
2        And who else did you say?
3  A.  Lynn Harris.
4  Q.  -- confronted you about it?
5  A.  Correct.
6  Q.  I mean, did you ever hear any more after
7    the first time they confronted you about
8    it?
9  A.  No, not specifically.  But when I was in
10    the meeting with Dixie Peterson and Dean
11    Lowe in his office talking about not being
12    able to go on the summer semester and
13    failing the pediatrics or -- I think that's
14    what it was, she -- I said, and then you've
15    accused me of cheating.  And I said, you
16    know, I don't do that.
17        And she said, your grade did not
18    reflect cheating, did it?  I said, no, it
19    did not.  I made probably a C on that test,
20    I think.  And then when she retested, I may
21    have gotten a point higher than what I
22    originally made.
23  Q.  Okay.

Page 304

1        (Defendant's Exhibit 18 was marked
2        for identification.)
3  Q.  Let me mark this real quick and show you
4    this.  Defendant's Exhibit 18, what is
5    that, please, ma'am?
6  A.  It says NLN Diagnostic Readiness Test
7    Performance Profile.
8  Q.  When was that taken?  Do you know?
9  A.  The last semester.
10  Q.  April '06 -- I'm sorry.  What am I saying?
11    Spring '06?
12  A.  Yes, sir.
13  Q.  You apparently received it not too long
14    after it was taken because the postmark is
15    May 16, 2006.  Would that be correct?
16  A.  Correct.
17  Q.  Did you read it?
18  A.  I looked over it.  I didn't flip through
19    it.
20  Q.  It says probability of success on NCLEX.
21    Your performance on this test was close to
22    the minimum needed to pass NCLEX.  What's
23    NCLEX?

Page 305

1  A.  That's the test you take for your boards.
2  Q.  Without serious preparation, the
3    probability that you will pass NCLEX is
4    marginal.  Use this individualized report
5    to target your specific needs.  Your score
6    was higher than 26 percent of all examinees
7    in the norming sample when they took NCLEX.
8    Your score was higher than 22 percent of
9    the examinees in the norming sample who
10    passed NCLEX.
11        What does that mean to you?  You've got
12    it there.
13  A.  What does it mean to me?  It means that I
14    would probably need to prepare before I sat
15    down and took my boards a little bit more.
16  Q.  What does marginal mean?
17  A.  Possibility that I would not pass.
18  Q.  Okay.  Is this something that's done by the
19    school for every class that is close to
20    graduating, taking their boards?
21  A.  I'm not sure if it's every class.  I know
22    it was for mine.
23  Q.  Everybody in the class took this, correct?

Page 306

1    A.  Correct.
2           (Defendant's Exhibit 19 was marked
3           for identification.)
4    Q.  Let me show you Defendant's 19.  It's the
5         June 13, 2006, letter from Dr. Blackwell to
6         Connie Cooper in response to Connie
7         Cooper's June 7 letter.  Do you have that?
8    A.  Yes, sir.  I have a copy.
9    Q.  You have it in your materials, don't you,
10        that you brought?
11   A.  Uh-huh.  (Positive response.)
12   Q.  I assume that when Ms. Cooper received
13        this, she gave you a copy of this letter,
14        correct?
15   A.  Correct.
16   Q.  Did you take issue with any part of this
17        letter?
18   A.  That's when I contacted Jennifer Cooley.  I
19        was referred to her by Ms. Cooper and
20        another attorney.  I can't remember his
21        name.  Ms. Cooper had him look over some
22        things.
23   Q.  The following -- this is part of the letter

Page 307

1         from Dr. Blackwell.  It says that policy
2         number 11, students enrolled in the Nursing
3         Mobility Program must earn a C or higher in
4         all required courses in the nursing
5         curriculum in both nursing and non-nursing
6         courses.  This includes satisfactory
7         completion of the clinical components of
8         each course.  Failure of clinical
9         components results in failure of the
10        course.
11          Do you agree that that's accurately
12        stated as the policy of the school?
13   A.  Correct.
14   Q.  And that you failed NUR 252 in the fall of
15        2005, correct?
16   A.  Correct.
17   Q.  And you failed NUR 272 in the spring 2006,
18        correct?
19   A.  Correct.
20   Q.  Then Dr. Blackwell quotes policy number
21        13.  Nursing courses NUR 252, 271, 272, it
22        goes on with other numbers, may be repeated
23        only once and are to be taken the next

Page 308

1         semester a course is offered provided space
2         is available.  If the student does not pass
3         the nursing course on the second attempt,
4         that student shall be excluded from the
5         nursing program, but not the college.
6         Students who repeat those courses will be
7         encouraged to successfully complete review
8         packets for each course before retaking.
9           Do you agree that that's the policy?
10   A.  Correct.
11   Q.  And then she says:  NUR 252 would not be
12        offered again because of the implementation
13        of the standardized statewide curriculum,
14        so a substitute had to be offered in order
15        for Ms. Wright to be able to repeat the
16        course.  As a result, NUR 200 was
17        substituted for the course NUR 252 which
18        would no longer be offered, correct?
19   A.  Correct.
20   Q.  However, NUR 200 did not take away the
21        failing grade of NUR 252.  It merely
22        allowed an opportunity for Ms. Wright to
23        repeat a failed course, right?

Page 309

1    A.  Correct.
2    Q.  Isn't that what you understood to be the
3         case the whole time, is that when you're
4         given an opportunity to repeat a failed
5         course, if they had had 252, you could have
6         taken that, but the opportunity to take 200
7         is like the repeating of a failed course,
8         but it does not take away the failing grade
9         that you made initially?
10   A.  Because the course numbers don't match --
11        no, I didn't understand it that way.
12   Q.  Even if the course numbers had matched,
13        isn't it correct that the policy would not
14        allow for the failing grade in the original
15        taking of NUR 252 to be taken away?
16   A.  No, not according to course forgiveness.
17   Q.  Okay.
18   A.  It states that that letter grade would be
19        taken away, replaced by the new letter
20        grade, but your GPA would stay the same.
21   Q.  Policy 14:  The nursing student must
22        complete the entire nursing program within
23        24 months of the date he or she begins his

1   or her studies in the program or be
2   excluded from the nursing program. If a
3   nursing student fails two different nursing
4   courses within the 24-month period, he or
5   she will be excluded from the program and,
6   all caps, cannot reapply.
7       Do you agree that that's the policy?
8   A.  Yes.
9   Q.  You failed three courses actually, but you
10      were given a break on 271 because of a
11      problem with Tawyna Cash's not responding
12      to your grade appeal. But the failing of
13      272 and 252 fit within that policy number
14      14, don't they, to make you non-eligible
15      for attendance in the nursing program?
16  A.  Are you asking me for yes or no?
17  Q.  Yes.
18  A.  Yes.
19  Q.  Look at the attachments to -- do you have
20      those?
21  A.  I think that's it, but I'm not sure.
22  Q.  It looks like that right there. It says
23      Mobility Program (ADN) Admissions Criteria.

1   A.  I don't have it.
2   Q.  Page 105, 106, and 107. That's not
3       attached to your copy of it, I assume.
4           (Defendant's Exhibit 20 was marked
5           for identification.)
6   Q.  20 is Jennifer's letter dated July 28,
7       2006, to Dr. Blackwell. Have you seen this
8       letter?
9   A.  Yes.
10  Q.  And this letter included attachments, all
11      of which are here. One of the attachments
12      is the grade appeal for 252. Tell me if
13      that's right or wrong.
14  A.  Yes.
15  Q.  Do you have that there?
16  A.  No, I don't have that with me.
17  Q.  Let me ask you this. It looks to me like
18      this is a misprint or a misfiled --
19      mis-Xerox of what's on the next page, this.
20  A.  That is a copy of --
21  Q.  Two pages?
22  A.  I've got that.
23  Q.  Would you take a look at this. That's one

1   of the documents behind the July 28 letter
2   of Jennifer Cooley. It's attached to the
3   grade appeal, 252.
4   A.  Yes, sir.
5   Q.  Is that a document that you prepared?
6   A.  Yes.
7   Q.  Is that sort of like your version of the
8       events of what occurred with regard to that
9       course?
10  A.  Yes.
11  Q.  Let's do this. This is going to be 20.
12      I'm going to do the same thing I did on the
13      other one. 20-A page one, B page two, C is
14      page three.
15          That's the grade appeal form that you
16      completed. You did complete that form, did
17      you not, 20-C?
18  A.  Yes.
19  Q.  20-D is what appears to me to be that kind
20      of messed up copy, and then 20-E is page
21      one of your version of the events relative
22      to 252, correct?
23  A.  Correct.

1   Q.  20-F is the second page of it where you
2       signed; is that right?
3   A.  Right.
4   Q.  You quote a section -- or you refer to CVCC
5       Policy 6.7.2. What were you referring to?
6   A.  That had to be something out of the course
7       catalog. I don't have the course catalog
8       in hand, so I'd have to ...
9   Q.  It says that I was advised to continue with
10      the appeal process. That's Sandy Gunnels
11      advising you, right?
12  A.  Correct.
13  Q.  Page 20-E says that an instructor was not
14      assigned until week five of the semester.
15  A.  Of that second -- yes, that semester,
16      correct.
17  Q.  Did you know that Sandy Gunnels just walked
18      out, just left without a word or without
19      any prior warning?
20  A.  No.
21  Q.  It's reasonable, isn't it, that it takes
22      some time to fill a spot like that, for a
23      school to fill a space like that for a

Page 314

1    professor?
2    A.  Are you asking --
3    Q.  Yeah.  Sure.  I mean, it's reasonable,
4        isn't it, that it takes some time to get a
5        professor of worth to fill a spot like the
6        teaching of a nursing course, a
7        professional course?
8    A.  I don't know how long it would take them
9        to --
10   Q.  You know it has to take some time, right?
11   A.  I guess.  I mean, I don't know.
12   Q.  But they did -- it says here that a guest
13       speaker was utilized until that time.
14       Guest speaker on respiratory system
15       specifically instructed the class that
16       compensatory mechanisms on ABG's would not
17       be included on the exam.  Then it says:
18       Two questions directly related to
19       compensation were on the exam.  Other exams
20       were not given on the dates scheduled and
21       for which students prepared.  Right?
22   A.  Right.
23   Q.  Every student in the class had to deal with

Page 315

1        this if it's correct; isn't that true?
2    A.  Correct.
3    Q.  Every student in the class had to deal with
4        the same situation about when the grades
5        were posted by Ms. Harris on course number
6        252, correct?
7    A.  Correct.
8    Q.  The next attachment -- let's see.  G is the
9        January 10, 2006, letter of Connie Cooper
10       that we've talked about.
11           And then H is the first page of an
12       unofficial transcript, and I is the second
13       page of an unofficial transcript.  Do you
14       know how this was obtained, 20-H and I?
15   A.  This was from me -- off of my computer,
16       going to their Web site and printing it
17       off.
18   Q.  This is your entire transcript, isn't it,
19       from your whole attendance at all
20       Chattahoochee Valley Community College
21       courses, correct?
22   A.  Correct.
23   Q.  This shows your Nursing 252 grade on 20-I.

Page 316

1        Page 20-I is a D; isn't that right?
2    A.  Yes.
3    Q.  And it shows your 271 grade which Tawyna
4        Cash taught is a C, correct?
5    A.  Correct.
6    Q.  That C was put there because Ms. Cash was
7        really an employee at another school where
8        she taught nursing and did not respond to
9        your grade appeal, correct?
10   A.  That's what I was told.
11   Q.  J is the Hodge letter that you wrote to
12       Dr. Hodge.  K is the June 7 Connie Cooper
13       letter.  L is the June 13, 2006, letter
14       from Dr. Blackwell that we've discussed.  M
15       is the June 13 letter from Dr. Blackwell we
16       discussed, and that is where I think that
17       packet ends.
18           Of course, the letter from Jennifer is
19       on top of June 28.  Now, was there a
20       response to this letter of June 28 -- of
21       July 28, 2006, Exhibit 20?
22   A.  I don't know.
23           MS. COOLEY:  I don't either.  We

Page 317

1        don't know if there was a
2        response.  We think there
3        was.  We're going to look for
4        it.
5        MR. NIX:  All right.
6        MS. COOLEY:  You can read that.
7        Ms. Miller I believe is her
8        name.
9        MR. NIX:  Tracy Miller?
10       MS. COOLEY:  Uh-huh.  (Positive
11       response.)  Then it becomes
12       y'all.
13           For some reason, I
14       thought there was a response
15       from Dr. Blackwell.
16       MR. NIX:  Let me mark that.
17       MS. COOLEY:  You can have it
18       because I don't believe that
19       attorney is involved in this
20       anymore.
21       (Defendant's Exhibit 21 was marked
22       for identification.)
23   Q.  Defendant's Exhibit 21 is a letter from

Page 318

1  Tracy Miller at Maynard Cooper to Jennifer
2  that Jennifer just gave me. It just says
3  we've been employed to investigate your
4  complaint.
5      MR. NIX: I don't know what that
6          is.
7      MS. COOLEY: That goes with that.
8          That's the fax and fax
9          confirmation where she signed
10         a release for records.
11     (Defendant's Exhibit 22 was marked
12         for identification.)
13     MS. COOLEY: Chip, for the sake of
14         time, I'm assuming we're going
15         to get copies of these. That
16         way we don't have to continue
17         to make copies of little
18         things.
19     MR. NIX: That's a good idea.
20 Q. Defendant's Exhibit 22 is a fax cover sheet
21     from Chattahoochee Valley Community College
22     to Jennifer Cooley. It says: Ms. Wright
23     has verbally consented for the release of

Page 319

1  her information; however, we will need the
2  following form completed to be placed in
3  her file. Attached is an authorization
4  that you appear to have signed, correct?
5  A. Correct.
6      MR. NIX: Take a look at that,
7          Jennifer.
8      MS. COOLEY: (Nods head up and
9          down.)
10     MR. NIX: It looks familiar?
11     MS. COOLEY: Yes.
12     MR. NIX: I'm glad somebody else
13         has things in other parts of
14         their file besides me.
15     MS. COOLEY: Yes.
16     MR. NIX: I was going to show it
17         to her real quick.
18     MS. COOLEY: That's from
19         Ms. Miller.
20     MR. NIX: That will be Defendant's
21         23.
22     (Defendant's Exhibit 23 was marked
23         for identification.)

Page 320

1  Q. Have you seen that correspondence?
2  A. No.
3  Q. Who is it signed by? The signature blank
4     states the name of the person who wrote it.
5  A. Tracy Miller.
6  Q. What is the date on the letter?
7  A. January 11, 2007.
8  Q. Have you seen the substance of this letter,
9     whether it was in a form sent by
10    Dr. Blackwell or in a form sent by Tracy
11    Miller?
12 A. No, I don't recall.
13     MR. NIX: But you did get this,
14         Jennifer; isn't that right?
15     MS. COOLEY: It looks very
16         familiar and I do remember
17         having a discussion with Tracy
18         Miller about mediation, and I
19         believe that Peter was there.
20         But it was very brief and
21         we had a difficult time
22         getting in touch with
23         Ms. Miller. I do remember

Page 321

1          that, but she was, I believe,
2          on the case a very short time.
3      MR. NIX: Okay. I'm going to mark
4          it then as Defendant's Exhibit
5          23 as the substance of the
6          correspondence sent out.
7  Q. Ms. Wright, with regard to the
8     correspondence that I've shown you that is
9     marked beginning with Defendant's Exhibit
10    15, it's correct, isn't it, that you have
11    seen, read, and you even wrote some of this
12    correspondence; isn't that right? Do you
13    want to take a look at all of it?
14 A. That's correct.
15 Q. It's fair to say, isn't it, that
16    Chattahoochee Valley Community College has
17    been responsive to the correspondence, the
18    requests that have been made regarding this
19    complaint by you?
20 A. Repeat that.
21 Q. Isn't it fair to say that Chattahoochee
22    Valley Community College has been
23    responsive to these requests that you've

Page 322

```
 1      made and complaints that you've made prior
 2      to the filing of this lawsuit?
 3   A.  That they did?
 4   Q.  Yeah, that they have been responsive.
 5   A.  Oh, yes.
 6   Q.  Okay.  I want to go back to Ms. Gunnels.
 7      Okay?  The books that you had that showed
 8      answers to some of these questions that
 9      Lynn Harris posed on exams and maybe the
10      final exam, isn't it correct that
11      Ms. Gunnels helped you find those books?
12   A.  The books that had what, now?
13   Q.  What you claim are the correct answers to
14      the tests that Lynn Harris gave you.
15   A.  It's nursing books that we used in class
16      and that her institution has for those
17      students.
18   Q.  When you say her institution ...
19   A.  Sandy Gunnels.
20   Q.  So when you spoke with Sandy Gunnels about
21      the various problems you were having, like
22      the failure of these two courses in the
23      fall of 2005 and the failure of the course
```

Page 323

```
 1      272 in the spring of 2006, she helped you
 2      by advising you right away to file an
 3      appeal, correct?
 4   A.  Correct.
 5   Q.  And she helped you by pulling nursing
 6      treatises and pointing out various
 7      arguments you could make with regard to why
 8      your answers were right or could be
 9      interpreted as being correct, correct?
10   A.  Correct.
11   Q.  She helped you by calling -- I'm trying to
12      remember the name of the person -- I think
13      it was Debbie Gruber and talking to
14      Ms. Gruber about an aspect of the clinical
15      program.  I'm trying to remember exactly
16      what that was.  Do you recall?
17   A.  It was the care plans that --
18   Q.  Right, that were lost.
19   A.  That were lost.
20   Q.  That's right.  So that Sandy Gunnels
21      actually called -- got in touch with
22      Ms. Gruber to talk with her about that,
23      correct?
```

Page 324

```
 1   A.  Correct.
 2   Q.  So what else did Ms. Gunnels do for you?
 3      What other steps did she take?
 4   A.  That's all.
 5   Q.  That's it?
 6   A.  That's all.  I mean, she advised me on how
 7      to do the grade appeal.  She tutored me
 8      when I asked her for help.  That's it.
 9   Q.  Are you related to Sandy Gunnels?
10   A.  No.
11   Q.  Are any of your relatives good friends with
12      her?
13   A.  No.
14   Q.  Did you first meet her around May or June
15      of 2005 when you started the nursing
16      program at CVCC?
17   A.  No.  I first met her in LPN school at CVCC.
18   Q.  Was she an instructor at that time in the
19      LPN school?
20   A.  Yes.
21   Q.  So how long had you known her when you
22      started the RN program at CVCC?
23   A.  Since the start date of the LPN program at
```

Page 325

```
 1      CVCC.  I think that was in 2001 maybe.
 2   Q.  And had you been as good friends with her
 3      since that time as you were in the fall of
 4      2005, apparently, and 2006 -- spring of
 5      2006?
 6   A.  Was I as good friends with her in LPN
 7      school?
 8   Q.  Right.
 9   A.  Is that what you're asking?
10   Q.  From 2001 on.
11   A.  No.  Our relationship has grown over the
12      years.
13   Q.  When did your relationship begin to
14      blossom, get better, get stronger, become
15      closer?
16   A.  I don't know any specific dates.
17   Q.  Did it get better after Ms. Gunnels left
18      the school?
19   A.  No.
20   Q.  So it was real good, apparently, before she
21      left the school.
22   A.  It's been good throughout.
23   Q.  Isn't it correct that Sandy Gunnels left
```

Page 326

1  Q.  CVCC of her own accord?
2  A.  I don't know.
3  Q.  She's never told you that she was fired,
4      has she?
5  A.  No.
6      MR. NIX:  Can we take a quick
7          break and discuss what's
8          cooking real quick?  I'm
9          getting close to being
10         finished.
11      (Brief recess was taken.)
12  Q.  What's your mother's maiden name?
13  A.  Walker.
14  Q.  Walker?
15  A.  Uh-huh.  (Positive response.)
16  Q.  Is one of your grandmothers a Webster?
17  A.  That's my husband's grandmother.
18  Q.  Okay.  Mary Webster?
19  A.  Mary Webster.
20      MR. NIX:  That's all I've got.
21         Thank you.
22      I offer those exhibits.
23      (The Deposition of Lindy Wright was

Page 327

1      concluded at 5:40 p.m. EDT.)
2
3      * * * * * * * * * * * * *
4      FURTHER DEPONENT SAITH NOT
5      * * * * * * * * * * * * *
6
7      REPORTER'S CERTIFICATE
8  STATE OF ALABAMA:
9  MONTGOMERY COUNTY:
10     I, Lisa J. Nix, Registered Professional
11 Reporter and Commissioner for the State of Alabama
12 at Large, do hereby certify that I reported the
13 deposition of:
14     LINDY WRIGHT
15 who was first duly sworn by me to speak the truth,
16 the whole truth and nothing but the truth, in the
17 matter of:
18     LINDY G. WRIGHT,
19     Plaintiff,
20     Vs.
21 CHATTAHOOCHEE VALLEY COMMUNITY
22 COLLEGE (CVCC),
23     Et al.,

Page 328

1  Defendants.
2      In The U.S. District Court
3      For the Middle District of Alabama
4      Eastern Division
5      Case Number 3:06-CV-1087-WKW
6  on Friday, July 13, 2007.
7      The foregoing 327 computer printed pages
8  contain a true and correct transcript of the
9  examination of said witness by counsel for the
10 parties set out herein.  The reading and signing of
11 same is hereby waived.
12     I further certify that I am neither of kin
13 nor of counsel to the parties to said cause nor in
14 any manner interested in the results thereof.
15     This 22nd day of July 2007.
16
17
18
   _____
19     Lisa J. Nix, Registered
       Professional Reporter and
       Commissioner for the State
20     of Alabama at Large
21
22
23

# DEPOSITION OF DIXIE PETERSON

## August 16, 2007

## Pages 1 through 153

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
566 South Perry Street
Post Office Box 62
Montgomery, AL 36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net

EXHIBIT

tabbies®

M

August 16, 2007

Deposition of Dixie Peterson

---

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3                EASTERN DIVISION
4
5    LINDY G. WRIGHT,
6         Plaintiff,
7    Vs.                      CIVIL ACTION NO.
                              3:06-CV-1087-WKW
8    CHATTAHOOCHEE VALLEY
     COMMUNITY COLLEGE (CVCC),
9    et al.,
10        Defendants.
11
12         * * * * * * * * * * * * *
13
14
15      DEPOSITION OF DIXIE PETERSON, taken
16   pursuant to stipulation and agreement before Lisa
17   J. Green, Registered Professional Reporter and
18   Commissioner for the State of Alabama at Large, in
19   the Law Offices of Smith & Smith, P.C., 1503 Broad
20   Street, Phenix City, Alabama on Thursday, August
21   16, 2007, commencing at approximately 9:25 a.m.
22
23         * * * * * * * * * * * * *

---

Page 2

1              APPEARANCES
2
3    FOR THE PLAINTIFF:
4    Ms. Jennifer B. Cooley
     PARKER & COOLEY
5    Attorneys at Law
     1507 Broad Street
6    Phenix City, AL 36867
7
8    FOR THE DEFENDANT:
9    Mr. H. E. Nix, Jr.
     Ms. Brandy F. Price
10   NIX, HOLTSFORD, GILLILAND,
        HIGGINS & HITSON
11   Attorneys at Law
     Suite 300
12   4001 Carmichael Road
     Montgomery, AL 36106
13
14   ALSO PRESENT:
15   Dr. Laurel Blackwell
16
17
18
19
20
21
22
23

---

Page 3

1              EXAMINATION INDEX
2
3    DIXIE PETERSON
       BY MS. COOLEY . . . . . . . . . . 5
4      BY MR. NIX  . . . . . . . . . . 131
5
6
7
8
9              EXHIBIT INDEX
10                          MAR
11   DEFENDANT'S EXHIBIT
       44  12/20/05 Status Letter Regarding      131
12        Progression in the ADN Program
13     45  Section C of Grade Appeal for NUR 252  131
14     46  Section C of the Grade Appeal for NUR  131
          271
15
       47  1/17/06 e-mail to Heather Chalkley from  131
16        Dixie Peterson re: Lindy Wright
17     48  1/18/06 Grade Change Form             131
18     49  Authorization for Course Substitution  131
19
20
21
22
23

---

Page 4

1              STIPULATION
2      It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of DIXIE PETERSON is taken pursuant to
5    the Federal Rules of Civil Procedure and that said
6    deposition may be taken before Lisa J. Green,
7    Registered Professional Reporter and Commissioner
8    for the State of Alabama at Large, without the
9    formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16     It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23     It is further stipulated and agreed by and

August 16, 2007

Deposition of Dixie Peterson

Page 9

1  additional duties because nursing has
2  external controls, specifically the Alabama
3  Board of Nursing and the National League
4  for Nursing. So while the math and science
5  department may not have -- well, they
6  don't. They don't have an accrediting body
7  that oversees their program.
8       So while there are common duties for
9  all chairpersons, there are some additional
10  ones for the person serving as nursing
11  chair.
12  Q. One of them you mentioned -- I want to make
13  sure I have a clear understanding. That
14  would be some type of either a liaison
15  status or communication status with the
16  Alabama Board of Nursing for accreditation
17  purposes; is that correct?
18  A. No, that's not correct. The Alabama Board
19  of Nursing is the immediate control of our
20  program. They oversee our progress.
21       And the National League for Nursing
22  Accrediting Commission is the accrediting
23  body that puts an extra stamp of approval

Page 10

1  on the program.
2  Q. So in the capacity when you were the
3  division chair, did you interact on a
4  regular basis with the Alabama Board of
5  Nursing?
6  A. Absolutely.
7  Q. And did you do so for things such as --
8       I'm just making some assumptions here.
9  A. Okay.
10  Q. -- for things such as board pass rates for
11  the students?
12  A. It's not necessarily a personal interaction
13  with them unless they need to come and see
14  your program.
15  Q. Okay.
16  A. But, yes, I did have a very good working
17  relationship with them, but it was not like
18  we called each other every week.
19       But, yes, they would be the body or the
20  entity that would come if there was a
21  problem.
22  Q. Did they, in fact, ever come to visit CVCC
23  during the time that you were in the

Page 11

1  position as the division chair?
2  A. Only on an informal basis once.
3       They have a series of actions that they
4  take, and those are published on the
5  Alabama Board of Nursing Web site based
6  upon if your program has had any difficulty
7  and the length of time and how your program
8  has responded.
9       So there's not an automatic anything --
10  disciplinary action I suppose is what I'm
11  trying to allude to that occurs because you
12  didn't do well one time. So, no, there's
13  not ever been a formal visit.
14  Q. But you do recall them coming? You said
15  one time there was a visit?
16  A. There was a person that I invited to come
17  and speak with us.
18  Q. So that was at your invitation?
19  A. It was at my invitation. Her name was
20  Barbara Johns. She was education
21  consultant for the Board of Nursing.
22  Q. Did Ms. Johns come and speak to the
23  students or to the faculty?

Page 12

1  A. She came to speak to me, and I believe
2  Dr. Blackwell and Dean Lowe came in. We
3  were in one of the faculty offices.
4  Q. Do you recall -- and if you don't recall
5  the exact date, that's fine. Do you recall
6  about the time that that interaction
7  occurred between Dr. Blackwell, Dean Lowe,
8  yourself and Barbara Johns?
9  A. I do not.
10  Q. Do you recall about the year that that
11  would have occurred?
12  A. It would probably be in the fall of 2005
13  when we had faculty members resign, but I
14  cannot state for sure. Of course, I
15  notified her as a courtesy and then, of
16  course, enlisted her assistance.
17  Q. And she came at your invitation; is that
18  correct?
19  A. She did.
20  Q. Was there ever a time aside from that that
21  you're aware that the Alabama Board of
22  Nursing came to visit the campus or to
23  speak with any of the individuals that you

August 16, 2007

Deposition of Dixie Peterson

Page 17

1    For the first three years, I did clinicals
2    and the classroom, yes.
3  Q.  You stated previously that some of the
4    duties that you had when you were division
5    chair was to assist in the hiring process;
6    is that correct?
7  A.  Yes.
8  Q.  When you say assist in the hiring process,
9    can you elaborate a little more as far as
10    hiring the potential nursing faculty
11    members?
12  A.  Sure.  It's fairly complex to explain, but
13    the Alabama College System used to have --
14    and we pretty much still follow it at the
15    college -- certain hiring procedures where
16    jobs have to be posted for a certain length
17    of time.  They have to be advertised in
18    certain places, and then there are closing
19    dates, those kinds of things, that
20    certainly are not handled at the faculty
21    level.
22    But in my position as chair, what I did
23    was potentially find people who were

Page 18

1    interested, people that I knew or people
2    who knew people who would be interested and
3    encourage them to apply for a job and hope
4    that they would follow through with the
5    process in order to get to the point of an
6    interview.
7    I did not have or do not have the power
8    to hire except for clinical faculty because
9    those are on a semester-by-semester basis.
10  Q.  When you would seek out these qualified and
11    possibly interested individuals to apply
12    for jobs, would you also be a part of the
13    interviewing process for those individuals?
14  A.  On some occasions I was, and some occasions
15    I was not.
16  Q.  Would it be safe to say that during the
17    course of you having been a division chair
18    at CVCC, that you would more likely than
19    not be familiar with all the instructors
20    who would have been under, I guess, your
21    supervision or control?
22  A.  Yes.  That would be true.
23  Q.  However, you may or may not have

Page 19

1    interviewed each and every one of them?
2  A.  Correct.
3  Q.  And if you don't know the answer to this,
4    that's fine.  You can just say.  Do you by
5    any chance know what the retention rate for
6    the nursing instructors is within the
7    nursing program at CVCC?
8  A.  At CVCC?
9  Q.  Yes, ma'am.
10  A.  I do not know a number.  No, I'm sorry.
11  Q.  Would it be safe to say that all of the
12    nursing instructors in the CVCC program
13    would report directly to you even if you
14    had not been the individual who had hired
15    them?
16  A.  Yes.  That is correct.
17  Q.  Would you do some form of an evaluation on
18    them periodically to determine if they were
19    up to par in your standards?
20  A.  Yes.
21  Q.  And how often or how frequently would you
22    conduct those evaluations of those
23    employees?

Page 20

1  A.  It would depend on how long they stayed.
2    Obviously, if -- it's very realistic to
3    have a clinical instructor who would only
4    be there one semester, depending on the
5    content that was being taught.  If it's a
6    full-time faculty member, then they should
7    be evaluated every year, once annually.
8  Q.  Let's say hypothetically that someone did
9    not evaluate well at the end of that year
10    process or that year-long evaluation.  What
11    would be the typical or, I guess,
12    traditional way that you would deal with
13    that?
14  A.  What would happen would be that I would
15    have been communicating with my supervisor,
16    who would be the dean of instruction, and
17    potentially the president, but absolutely
18    the dean of instruction.  And if I was
19    inclined to recommend that that person not
20    be renewed, then it would simply be that.
21    It would be a recommendation.  But that
22    doesn't mean that it would be seconded and
23    carried out ultimately by the president.

August 16, 2007

Deposition of Dixie Peterson

Page 25

1    A.    Each -- We don't have a set number of
2          students that we admitted to each class.
3          When the standardized curriculum began, the
4          admissions process also changed.  So prior
5          to the standardized curriculum, students
6          were admitted based on a test.  They had to
7          take an entrance test, and now they do not
8          have to take an entrance test.
9    Q.    Can I stop you right there and you tell me
10         about that admissions test?
11   A.    Sure.
12   Q.    You stated that prior to.  Prior to when
13         that they took an admissions test?
14   A.    Prior to the class that was admitted in
15         fall of '06 -- summer of '06.
16   Q.    So any student in the CVCC nursing program
17         prior to being admitted into the program
18         prior to 2006, there was some type of a
19         mandatory admissions test; is that correct?
20   A.    That is correct.
21   Q.    And was that a lengthy admissions test?
22   A.    It was an admissions test and a validation
23         test.  It was a standardized exam from the

Page 26

1          National League for Nursing.  It was called
2          the Nurse Mobility Profile Exam.
3    Q.    What would be the, I guess, qualifications
4          for someone to sit for that?
5    A.    They had to be a licensed practical nurse
6          because it was a test of nursing
7          knowledge.  So a student who had not -- did
8          not have a credential could not take the
9          test.  They would not have any knowledge.
10   Q.    So one must have already obtained the
11         degree of LPN in order to sit for the
12         Nursing Mobility entrance exam --
13   A.    Yes.
14   Q.    -- prior to 2006?
15   A.    Yes.
16   Q.    How was that test scored?
17   A.    That test was scored in New York.  And
18         then, of course, it was sent to us.  Copies
19         of the scores were sent to us, and then we
20         sent them to students.
21               And it was reported in three areas:
22         There was a foundation score, which is like
23         fundamentals of nursing; and there was a

Page 27

1          maternal score, which is like obstetrics;
2          and then there was a pediatrics or nursing
3          of children score.  So there were three
4          areas.
5    Q.    And then from all three of these scores, is
6          that how the faculty or whomever made the
7          decision whether or not to admit a
8          particular student?
9    A.    Yes, the student -- we had criteria.  Those
10         criteria were set by a committee of nursing
11         and non-nursing faculty on campus.
12               MR. NIX:  I'm sorry.  Are you
13               still talking about before
14               2006?
15               MS. COOLEY:  Yes.
16               MR. NIX:  I'm sorry.
17   Q.    The test isn't administered now, so that's
18         not --
19   A.    Correct.
20   Q.    Okay.  Okay.
21   A.    The scores were tabulated.  When I say
22         tabulated, that's probably not a good
23         word.  They were ranked, because they were

Page 28

1          already scored when they came to us.  They
2          were ranked on a spreadsheet by a nursing
3          secretary, and then a committee of -- a
4          nursing admissions committee that was
5          comprised of faculty from nursing and
6          outside of nursing would meet and review
7          those scores, and then students would be
8          selected.
9    Q.    Was it strictly on the basis of the score
10         and how they ranked was how they were
11         admitted into the program?
12   A.    Yes, it was strictly on score.
13   Q.    Was foundations, maternal and pediatrics,
14         were they equally weighted or --
15   A.    They were not.  Foundations was weighted
16         more because a student -- a nurse has to
17         know more of that knowledge than they do
18         the specialized knowledge.
19   Q.    And then as far as the other two, maternal
20         and pediatrics, were those two equally
21         weighted?
22   A.    Yes.
23   Q.    If, in fact, some -- would there be a

August 16, 2007

Deposition of Dixie Peterson

Page 33

1   A.  It never was.
2   Q.  Okay.  Is 272 as of today's date still a
3        valid course at CVCC?
4   A.  It is not.
5   Q.  Has it been replaced with a different
6        course?
7   A.  Not exactly, because in the old curriculum,
8        courses were categorized according to
9        content:  Adult health, obstetrics,
10       pediatrics.  And now the courses are
11       integrated, so they're not separate courses
12       for each area.
13  Q.  And did that begin in fall of 2006?
14  A.  Yes.  Actually, I guess it was summer
15       2006.  I'm sorry.
16  Q.  Were you a part of the decision-making
17       process to hire Lynn Harris at CVCC?
18  A.  I'm the one who asked her to consider
19       coming there because I heard that she was
20       not teaching anywhere.
21  Q.  So you asked her to interview; is that
22       correct?
23  A.  Yes, and I -- I'm sorry, Ms. Cooley.  I

Page 34

1        asked Dean Lowe to call her, too, and I
2        believe he made a phone call to ask her if
3        she was interested.
4   Q.  Were you a part of her interview process at
5        CVCC or was that someone else?
6   A.  She didn't really have an interview process
7        because when she first started, she was
8        part-time.  She was adjunct.  She became
9        full-time -- I believe it was maybe
10       December '05.  For the first part of the
11       semester, she was there part-time while she
12       transitioned from her other job.
13  Q.  So if someone is hired in the nursing
14       program part-time, they don't go through an
15       interview process; is that correct?
16  A.  That is correct.
17  Q.  And if they progressed from part-time to
18       full-time, no interview process there
19       either?
20  A.  I don't speak for Dr. Blackwell, but she
21       has the power to hire people on a temporary
22       basis without going through the
23       full-fledged interview process for them.

Page 35

1        And after they remain a certain period of
2        time, then they are required to go through
3        an interview process.
4   Q.  To your knowledge, was Lynn Harris, did she
5        ever go through an interview process?
6   A.  She did.
7   Q.  Were you a part of that interview process
8        when she did go through it?
9   A.  I was.
10  Q.  Do you know when that interview actually
11       took place for Lynn Harris?
12  A.  I do not remember.  I remember sitting in
13       the room and watching her teaching
14       demonstration, but I don't remember exactly
15       when it was.
16  Q.  You may not know exactly when it was, but
17       do you know if it was in the year 2007?
18  A.  No, I believe it was in 2006.
19  Q.  Are you familiar with an individual named
20       Sandra Gunnels?
21  A.  I am.
22  Q.  And how are you familiar with Ms. Gunnels?
23  A.  Ms. Gunnels worked with me for a number of

Page 36

1        years as an adjunct instructor in the
2        program and then for a semester as a
3        full-time instructor.
4   Q.  Ms. Gunnels is not currently at CVCC; is
5        that correct?
6   A.  That is correct.
7   Q.  Do you know what classes Ms. Gunnels taught
8        while she was at CVCC?
9   A.  I can't name them semester by semester, but
10       she was -- she taught obstetrics and she
11       taught pediatrics because her experience
12       and her master's degree are in those
13       areas.  She also taught some pharmacology
14       to students.  That was an area that she was
15       very interested in and liked.  Most of the
16       time it was obstetrics or pediatrics
17       because those were her areas.
18  Q.  When you say those were her areas, does
19       that mean that was an area that she seemed
20       to excel in as a nurse or as a teacher?
21  A.  She had a master's degree specifically in
22       those areas, in maternal-infant nursing or
23       maternal-child nursing.

Deposition of Dixie Peterson

Page 41

1  fall semester of '05, but since she
2  resigned August 31st, it -- she would not
3  have had opportunity to teach very much.
4  Q.  Are you familiar with an individual named
5  Tawyna Cash?
6  A.  I know Tawyna, yes.  I met her when she
7  came to assist us in the fall of 2005.  I
8  did not know her prior to that.
9  Q.  When you say she came to assist us in the
10  fall of 2005, can you elaborate on what you
11  mean by that?
12  A.  Sure.  When Ms. Gunnels and Ms. Bellamy
13  resigned on August 31st, of course, that
14  left us two vacancies, one for adult health
15  and then one for the obstetrical course,
16  and so we were -- began to work immediately
17  to try to find replacements.
18     And Barbara Johns, the person to whom I
19  alluded earlier, called her.  And Dr. Laura
20  Steadman in Montgomery, who was over all
21  the health programs at that time, assisted
22  us.  And then, of course, we had local
23  contacts.

Page 42

1     And Dr. Steadman is the person who
2  found Ms. Cash at Southern Union.  She was
3  a full-time instructor at Southern Union
4  Community College in Opelika.
5  Q.  Was Ms. Cash employed on a temporary basis
6  at CVCC then; is that correct?
7  A.  Yes, temporary or part-time.  I'm not sure
8  how her contract reads.
9  Q.  Was she there to replace a full-time
10  instructor, Ms. Gunnels, or --
11  A.  Yes.
12  Q.  Was she hired temporary part-time or
13  temporary full-time?  Ms. Cash.
14  A.  I believe it was temporary part-time, but I
15  do not know.  I've not seen Ms. Cash's
16  contract.  I know that she maintained some
17  of her duties at Southern Union.  How many
18  of those, I don't know.  And then she was
19  contracted to come over and assist us as
20  well, so she did not leave her duties at
21  Southern Union.
22  Q.  So Ms. Gunnels had been full-time and left
23  in August of 2005.  Had Ms. Bellamy been

Page 43

1  full-time and left in August of 2005 as
2  well?
3  A.  Yes.  They both resigned on the same day.
4  Q.  So that was two full-time instructor
5  positions that were left vacant; is that
6  correct?
7  A.  That's correct.
8  Q.  So Ms. Tawyna Cash filled in at least
9  part-time.  Were there any other
10  individuals who were hired or who assisted
11  in that role, the roles of the two vacant
12  instructor positions?
13  A.  Well, yes.  They were part-time, but they
14  taught all of the class.  The class only
15  met once a week, so Ms. Cash taught all of
16  the class.
17     The students didn't have anyone to
18  teach except her once she came, and the
19  same for Ms. Harris.  Ms. Cash -- I can't
20  remember if she did any clinicals as well
21  as class, and I can't remember if
22  Ms. Harris did.  But they -- They both were
23  there every week for the class once they

Page 44

1  started.
2  Q.  So Ms. Cash and Ms. Harris were the two
3  individuals who basically came in to try to
4  fill the void, is that correct, for
5  Ms. Gunnels and Ms. Bellamy when they left
6  in August of 2005?
7  A.  That is correct.
8  Q.  Was there any type of a time delay from the
9  time that Ms. Gunnels and Ms. Bellamy
10  entered their resignations and the time
11  Ms. Cash and Ms. Harris began working for
12  CVCC?
13  A.  Yes, there was a brief delay.  I believe
14  classes -- the first class for the RN
15  students met on August 24th.  And I do not
16  know how many times Ms. Bellamy or
17  Ms. Gunnels may have talked to them about
18  clinically-related things, but the official
19  first day of class for fall semester was
20  August 22nd, '05.
21     Our classes for RNs have typically
22  always been on Wednesday, so the first
23  class would have been August 24th.  And

August 16, 2007

Deposition of Dixie Peterson

Page 49

1    do those respiratory concepts for the
2    students.
3    Q.  Did Mr. Christopher -- let me backtrack.
4        To your knowledge, does Mr. Christopher
5    have a master's degree in nursing?
6    A.  I do not know what he holds now, but we
7    don't have certain qualifications for guest
8    speakers.
9    Q.  Do guest speakers create exams or tests for
10   the students in the program typically?
11   A.  In his instance he did, because we had him
12   contracted to do adjunct work and clinical
13   work as well.
14   Q.  Your adjunct professors, is that also one
15   of your requirements, that they have
16   master's degrees in the nursing program?
17   A.  If they were there for a significant length
18   of time.  We would not allow a person
19   without a master's degree to teach a
20   course, an entire course.  We couldn't
21   because that is required by the Board of
22   Nursing.
23   Q.  To your knowledge, did Mr. Christopher just

Page 50

1    create one exam; is that correct?
2    A.  That is correct.
3    Q.  To your knowledge, is that a typical
4    procedure, that guest speakers create exams
5    for nursing students?
6    A.  Well, he was really more than a guest
7    speaker.  He was an adjunct, and he shared
8    those concepts with me.  So I knew the
9    kinds of concepts that he was testing, and
10   they were -- they were appropriate.
11   Q.  Did you review the exam that John
12   Christopher --
13   A.  Not question by question, but we talked
14   about the content on the exam.
15   Q.  Since that time, have you seen the exam
16   that he administered to the students?
17   A.  I've not looked at it.  I've seen it in
18   some of the materials.
19   Q.  To your knowledge, did Pat Fuggatt
20   administer any type of exam to the students
21   when she spoke to them or taught them?
22   A.  Not to my knowledge.
23   Q.  As far as the distance learning, whatever

Page 51

1    it was that the students learned through
2    distance learning, was there any type of
3    follow-up exam or quiz or questionnaire
4    that was administered to the students?
5    A.  I don't know.
6    Q.  Nursing 271, what actually used to be the
7    name of that course?  You had said before
8    it was categorized by subject matter; is
9    that correct?
10   A.  Right.  Maternal-infant nursing or either
11   maternal-child, one or the other.  It was
12   mother-baby or mother-child.  Mother-baby,
13   maternal-infant, because we had a separate
14   pediatrics course.
15   Q.  What is the name that I should refer to it
16   in this deposition?  Mother-baby or
17   maternal-infant nursing?
18   A.  Maternal-infant.  I'm sorry.
19   Q.  Is that subject matter content, the
20   maternal-baby, is that still a part of the
21   curriculum today at CVCC Nursing Mobility
22   Program?
23   A.  Yes, it's integrated into one of the

Page 52

1    courses.
2    Q.  So it's called something different;
3    however, it has the same basic subject
4    material.  Is that correct?
5    A.  In different amounts.  Obviously, when we
6    had a course completely devoted to maternal
7    nursing, then the student took that the
8    entire semester.  Now since it's
9    integrated, the State has it based on
10   modules.  So there may be a module within a
11   course that's devoted to that content.
12   Q.  But it is safe to say that the CVCC Nursing
13   Mobility students are at least being
14   exposed to maternal-infant nursing type
15   curriculum or subject matter material
16   during the course of their instruction?
17   A.  Yes, that's a required content component by
18   the board of nursing.
19   Q.  Do you recall any type of conversation or
20   meeting that you would have had on August
21   the 26th, 2005, with Dr. Blackwell, Dean
22   Lowe, an individual named Mrs. Gruber,
23   Mrs. Gunnels and yourself to discuss the

13 (Pages 49 to 52)

August 16, 2007

Deposition of Dixie Peterson

Page 57

1    places would be.  And that also as a part
2    of your job duties and responsibilities
3    when you were the division chair that you
4    would also seek out qualified and
5    interested individuals to at least apply
6    for those positions, not necessarily be
7    hired for them; is that correct?
8  A.  That's correct.
9  Q.  And that you may or may not be involved in
10    the interview process for those individuals
11    and that -- but you would be involved in
12    the evaluation process for individuals once
13    they were hired.
14  A.  On most occasions, I'd be involved in the
15    interview process.
16  Q.  Okay.  So you have been involved in most of
17    the interview process then?
18  A.  Yes.
19  Q.  So more often than not, you have been
20    involved in the interviewing of new
21    potential hires for the nursing program at
22    CVCC?
23  A.  Yes.

Page 58

1  Q.  In your new position, will you be involved
2    in the potential hiring of individuals for
3    the nursing program?
4  A.  I do not think so.
5  Q.  Okay.
6  A.  The position is evolving, as we spoke, and
7    so Dr. Blackwell has asked me to -- she's
8    told me some of the things that she wants
9    and has asked me to work on a job
10    description basically.  We know some of the
11    things that have to be done, and so I do
12    not think I will be involved.
13        I will be associated with health
14    science because I'll be developing programs
15    that are of health science nature, but that
16    would be the role now of the current
17    division chair.
18  Q.  Okay.  Has that individual already
19    transitioned into that position, then, the
20    individual who's taken over that position?
21  A.  Yes.
22  Q.  Would you mind telling me who that person
23    is again?  I'm sorry.

Page 59

1  A.  That's Lynn Harris.
2  Q.  And if you don't know this, you can say
3    that you don't know.  Back on August 31st
4    of 2005, were you aware of Ms. Sandra
5    Gunnels apparently being prevented or
6    stopped from going into the classroom to
7    teach at CVCC?
8  A.  I heard after that occurred that that was
9    her perception, that she was being stopped.
10  Q.  But you were not present during any type of
11    an interaction between her and Dean Lowe;
12    is that correct?
13  A.  That's correct.
14  Q.  Did you provide a copy of the vote of no
15    confidence for Dr. Blackwell to
16    Mrs. Gunnels?
17  A.  I don't know what you mean by a vote of no
18    confidence, a copy of it.  I never had a
19    copy of a vote.
20  Q.  Okay.  Did you provide any documentation to
21    Ms. Gunnels referencing the vote of no
22    confidence that Dr. Blackwell had received?
23  A.  I don't remember anything being on paper

Page 60

1    other than survey responses, but it's my
2    understanding that all faculty had those or
3    most had access.  So I don't -- I don't
4    remember anything that would be called a
5    vote.
6  Q.  But there's not anything as far as any
7    documentation, whether it was a newspaper
8    article or any type of summarization of
9    senate notes?  You would not have provided
10    anything like that to Ms. Gunnels; is that
11    correct?
12  A.  No, I didn't do -- Senate minutes were kept
13    by the senate secretary, and I did not
14    serve as the senate secretary.
15  Q.  Were you a member at all of that faculty
16    senate?
17  A.  I was.
18  Q.  Were you a part of that voting process?
19  A.  I was.
20  Q.  The voting process, was that tallied by an
21    individual or was that something that was
22    done -- how was that done?
23  A.  It's been a while.  To the best of my

15 (Pages 57 to 60)

August 16, 2007

Deposition of Dixie Peterson

Page 65

1   Q.   Was your vote published at the end?  Was
2        there not something put in the Ledger
3        Inquirer whether or not the vote was to
4        vote yes or no regarding -- I mean the vote
5        of confidence, no confidence regarding
6        Dr. Blackwell?
7   A.   I don't remember anything being in the
8        Ledger Inquirer.
9   Q.   Was there anything to your knowledge in any
10       type of local paper within Phenix City as
11       far as whether or not there was a vote of
12       confidence or no confidence regarding
13       Dr. Blackwell?
14  A.   It seems to me there was something in some
15       newspaper, but I do not remember which
16       newspaper.
17  Q.   Does CVCC have any type of internal student
18       newsletter or some type of a memo that they
19       send out to the students and faculty
20       members?
21  A.   There is no student internal memo.  There's
22       a student government association, but what
23       they do, I do not know.

Page 66

1   Q.   So in your role as a faculty member, there
2        is no interaction between a faculty
3        member -- a faculty member not receiving
4        printouts or anything of that nature from
5        the student government association,
6        newsletter, memo, anything of that nature;
7        is that correct?
8   A.   I don't recall ever getting anything from
9        student government.  We get announcements
10       about what they do through Monday Morning
11       Message which is the campus-wide
12       mechanism.  It's campus-wide that comes
13       from the president's office.
14  Q.   Was there anything on a Monday Morning
15       Message to your knowledge that ever
16       referred to Dr. Blackwell receiving a vote
17       of no confidence?
18  A.   I do not recall that.
19  Q.   Do you recall in the summer of 2005 having
20       a conversation with Ms. Brenda Bellamy,
21       Ms. Sandra Gunnels regarding my client,
22       Ms. Lindy Wright, as far as her ability as
23       a nursing student?

Page 67

1   A.   I don't recall a conversation.  I've heard
2        that --
3            MR. NIX:  You don't need to say
4              anything other than what you
5              do recall about that
6              question.  Just answer the
7              question.
8   A.   I don't recall the specifics of any
9        conversations.
10  Q.   Do you recall ever referring to Ms. Lindy
11       Wright as a weak nursing student at any
12       point?
13  A.   I remember being told by Ms. Gruber who was
14       substituting for Ms. Bellamy for the first
15       few weeks of the semester that there were
16       some students who were borderline, that it
17       looked as though unless they really did
18       well throughout the rest of the semester
19       they would not pass.  I remember, as I
20       always do, asking Ms. Bellamy and
21       Ms. Gunnels did it look like anybody was
22       going to fail.  Beyond that, I do not
23       remember anything specifically.

Page 68

1   Q.   So are you saying that you recall asking
2        Ms. Gruber or Ms. Bellamy --
3   A.   I'm saying Ms. Gruber informed me after her
4        interactions with the class in
5        Ms. Bellamy's absence that Lindy and a
6        couple of others were borderline at that
7        point, which is --
8            MR. NIX:  That's all you need to
9              say.  I mean, just answer her
10             question.
11  Q.   Would you describe borderline.
12  A.   I'm not sure I can quantify it exactly.
13       Not doing well, performing -- performing
14       less than satisfactory on assignments.  I
15       can't give you a number.
16  Q.   When you say not performing well on
17       assignments, would that include any type of
18       tests or exams in addition to clinicals?
19  A.   It would include tests and exams and/or
20       clinicals.  Some people do very well in
21       class and may not perform well in
22       clinicals, and vice versa.  It just
23       depends.

August 16, 2007

Deposition of Dixie Peterson

Page 73

1  Q.  For, give or take, three weeks?
2  A.  Two or three.  It would have been two or
3     three classes.  I can't remember exactly.
4        MR. NIX:  Can we take a break?  Do
5        you mind?
6        MS. COOLEY:  Of course.  No
7        problem.
8        (Lunch recess was taken.)
9  Q.  Just to remind you that you're still under
10    oath from the previous --
11 A.  Right.
12       (Brief interruption.)
13 Q.  I want to verify, too, that I'm saying this
14    individual's name right.  Is it Grubear or
15    Gruber?
16 A.  Gruber.
17 Q.  Like the fish almost except make it a B
18    instead of a P, Gruber?
19 A.  Exactly.
20 Q.  Going back to Ms. Gruber.  She was a
21    full-time instructor for approximately
22    three years at CVCC; is that correct?
23 A.  About that amount of time, yes.

Page 74

1  Q.  You did not hire her.  She was hired
2     elsewhere; is that correct?
3  A.  No, I believe that -- when you say
4     elsewhere, do you mean somewhere other than
5     Chattahoochee Valley?
6  Q.  No.  I apologize for that.  By someone else
7     other than you.
8  A.  I believe she came temporary at first,
9     which is very common.  The reason that
10    people can be hired temporary is because of
11    an immediate need.  But then after they
12    stay for a while, then there has to be a
13    search.  I believe that's how she was
14    hired.  I'm not sure.
15 Q.  Did you also state that you believe that
16    she had been employed at CVCC for
17    approximately three years?
18 A.  Thereabout.  Two, three, something like
19    that.  I don't remember the exact number of
20    years.
21 Q.  During the time that she was employed at
22    CVCC, did she report to you?
23 A.  Yes.

Page 75

1  Q.  Was she the individual who did not have a
2     master's degree --
3  A.  Yes.
4  Q.  -- who was told to get a master's degree to
5     comply with the new regulations?
6  A.  Yes.  I believe Dr. Blackwell put that
7     language in her contract.
8  Q.  When did Ms. Gruber leave?  Do you know
9     when she actually left CVCC?
10 A.  It was towards the end of fall semester
11    2005.
12 Q.  Do you know why she left?
13 A.  She resigned.  That's ...
14 Q.  Do you know why Mrs. Gruber resigned?
15 A.  I do not.  I believe that it was because
16    she had not completed her master's degree
17    requirement within the time frame set forth
18    in the language, but I don't know how
19    that -- again, I believe the language was
20    in the contract --
21       MR. NIX:  Don't guess.  If you
22       don't know --
23       THE WITNESS:  Okay.

Page 76

1  Q.  But you do believe that she resigned and
2     not that she was terminated?
3  A.  She resigned.
4  Q.  She resigned.  So it was a voluntary
5     resignation to your knowledge?
6  A.  To my knowledge, all I know is that she
7     resigned.
8  Q.  What classes was Mrs. Gruber teaching at
9     the time that she left around fall of 2005?
10 A.  LPN classes, but I don't know if she
11    taught -- I can't remember what was being
12    taught that semester.  I believe it was
13    fundamentals.  The students would have been
14    new because the LPN students are admitted
15    in the fall semester.  LPN students enter
16    in the fall semester.
17 Q.  Did Mrs. Gruber ever -- was she ever
18    involved with or created anything called a
19    care plan, C-A-R-E?
20 A.  Every clinical instructor typically is
21    involved with care plans unless they have a
22    similar assignment like a health assessment
23    packet or --

August 16, 2007

Deposition of Dixie Peterson

Page 81

1  Q.  During the time that Ms. Gruber was
2     employed at CVCC -- I want to make sure
3     we're setting up the right time frame.
4         During the time that she was employed
5     at CVCC, did either Ms. Gruber come to you
6     or a student come to you or another faculty
7     member come to you and say, Mrs. Gruber
8     somehow lost the care plans for these
9     students?
10 A.  I'm pretty sure the first time I heard
11     about it is when Lindy mentioned something
12     to me.
13 Q.  Was that after the case was filed, after
14     the lawsuit was filed?
15 A.  No, I believe it was during an appeal, but
16     I can't remember -- a grade appeal.  I
17     can't remember exactly.
18 Q.  An internal grade appeal within CVCC?
19 A.  Yes.
20 Q.  So would that be during the time frame that
21     Lindy would have still been a student at
22     CVCC?
23 A.  Yes.

Page 82

1  Q.  You said that you believed that Lindy told
2     you about that.  Do you recall any
3     conversation that you and Lindy may have
4     had --
5  A.  I can't say that she specifically told me.
6     I think she did or I heard that she said
7     some care plans were lost.  I can't
8     remember which one it was.
9  Q.  But to your knowledge, the only person that
10     even mentioned that to you at that point in
11     time would have been Lindy and not anyone
12     else; is that correct?
13 A.  That is correct.
14 Q.  Did you follow up on or do any research to
15     determine whether or not that was a rumor
16     or a fact?
17 A.  I did.
18 Q.  And what was your finding?
19 A.  I talked to Ms. Harris at length, and she
20     assured me that no care plans were lost.
21     She assured me that she had given grades
22     for -- or recorded grades for care plans
23     that instructors had given her and that she

Page 83

1     believed that the only thing that
2     potentially was lost was an assignment that
3     students had been given in the summer by
4     Mrs. Gunnels.  What that assignment was I
5     do not know.
6  Q.  And what I'm trying to figure out is, why
7     would Ms. Harris have been recording
8     Mrs. Gruber's grades?
9  A.  Because the lead instructor always does
10     that.
11 Q.  Okay.
12 A.  And he or she is in charge of the course.
13 Q.  So Ms. Harris was in charge of the course.
14     Ms. Gruber reported to Ms. Harris then?
15 A.  Or would have submitted them some way to
16     Ms. Harris, yes.
17 Q.  So Ms. Harris would have been the lead
18     instructor for that particular -- that
19     clinical course; is that correct?
20 A.  The lead instructor is in charge of the
21     class in clinicals because grades are not
22     given separately.  One grade is given for
23     the course.  And in some courses, care

Page 84

1     plans were part of grades and other courses
2     they were not.
3         So clinical instructors do not give
4     grades in a course.  They just record
5     grades for assignments in their clinical
6     areas.
7  Q.  Do they also give some type of evaluation
8     or recommendation on that student's ability
9     to perform in the clinical setting to the
10     head instructor or lead instructor on a
11     course?
12 A.  Yes.  They submit those clinical evaluation
13     plans to the lead instructor.
14 Q.  So to your knowledge, the only care plans
15     that would have potentially been lost, that
16     was only brought to your attention through
17     Lindy Wright.  And then you followed up on
18     that with Ms. Harris, and Ms. Harris
19     assured you that care plans were not lost;
20     in fact, grades had been recorded.  That if
21     anything was missing, it was an assignment
22     that had occurred that summer with the
23     students.  Is that correct?

21 (Pages 81 to 84)

Deposition of Dixie Peterson

Page 89

1    were admitted to that program did not take
2    an entrance exam.  The new admission
3    criteria would have been implemented.
4  Q.  Are you saying sic as in S-I-C codes?
5  A.  C-I-P, CIP.
6  Q.  CIP.  As far as the CIP codes, was there
7    some person or entity that did data entry
8    to make the comparison between the old
9    classes and the new classes?
10  A.  I would assume so, but I don't know who
11    exactly that would be.  I assume that it
12    would be someone in the computer department
13    or the dean of instruction's office or
14    both.
15  Q.  Was that something that was done on a
16    statewide level and then fed to y'all in
17    some type of a data map or was that --
18  A.  Yes, it was done at the statewide level,
19    exactly.  And then each school -- I'm not
20    sure how the information got onto a system,
21    but ...
22    And then at the department of
23    postsecondary, these courses were added to

Page 90

1    what's called the Statewide Common Course
2    Directory.
3  Q.  Going back to the 252 and 200 that we
4    referenced previously, you were going to
5    tell us about your understanding of what
6    occurred with Lindy with the Adult Nursing
7    252 in the fall of 2005 and then Adult
8    Nursing 200 in the spring of 2006.
9  A.  Okay.  I suppose I'll start with 252.  What
10    exactly do you want me to tell you?
11  Q.  Anything that's your understanding and your
12    involvement of what occurred only with
13    Lindy Wright during that time frame with
14    those particular grades.
15  A.  Okay.  What I understand is that Lindy at
16    the end of the semester was told that she
17    had to make a certain grade on the final,
18    which is a typical thing for instructors to
19    tell students because students want to know
20    what number of points that they need.
21    And it is my understanding -- I did not
22    witness -- that when grades were being
23    given out that Lindy, as did her fellow

Page 91

1    students, go to find out what their final
2    grades were.  And she was told what she
3    made on the final and that her points did
4    not add up to 750.
5    From that point, my understanding is
6    that she wanted to see her test grades --
7    her tests, excuse me, not her test
8    grades -- or both and that she wanted to
9    review them.
10  Q.  Okay.  Are you aware of her being allowed
11    to take Nursing 200 in the spring of 2006?
12  A.  Yes.
13  Q.  And at that time, it was referred to as
14    Adult Nursing; is that correct?
15  A.  Nursing 200 was not Adult Nursing, no.
16  Q.  What was that?  What was the name of that
17    class?
18  A.  I'm not sure exactly what the title, but
19    the course is intended -- it's a transition
20    course for students who are coming into the
21    mobility program, so it's not an adult
22    health course.
23    It's a course whereby students are

Page 92

1    assessed immediately preceding the program
2    in order to determine if they can progress
3    into the program.  It is intended at all
4    schools and is implemented in all schools
5    to be a transition course.
6    It's a melting pot course where
7    students -- where faculty review all
8    concepts that a student should have learned
9    in an LPN program and to ensure that they
10    are ready to move on, so it takes the place
11    of an entrance test mechanism.
12  Q.  In the spring of 2006, was Nursing 200 a
13    mandatory course?
14  A.  Yes, for students who had not gone through
15    a statewide standardized LPN curriculum.
16    It was for new students coming into our RN
17    program who had not graduated from a
18    statewide standardized LPN program.
19  Q.  To your knowledge, had Lindy graduated from
20    a statewide recognized LPN program?
21  A.  No, she had not graduated from a
22    standardized curriculum.
23  Q.  Okay.

August 16, 2007

Deposition of Dixie Peterson

Page 97

1  referring to as the spring 2006, the Adult
2  Nursing 200 that y'all basically
3  custom-tailored for Lindy; is that correct?
4  A.  Yes, I'm aware she made an A.
5  Q.  Nursing 272 in the spring of 2006, did that
6  consist of pediatrics?
7  A.  Yes, it did.
8  Q.  Was that the proper name for it?
9  A.  Yes.
10  Q.  Pediatrics?
11  A.  Uh-huh.  (Positive response.)
12  Q.  In the pediatrics course, are you aware of
13  how Lindy faired in that class in 272 in
14  the spring of 2006?
15  A.  Pretty much based on Lindy's description
16  and coming to talk to me, yes.  I think
17  that she was very close.  I don't remember
18  the number of points exactly, but a student
19  has to have 750.  I don't remember the
20  number of points.
21  Q.  Is that 750 points per class that a student
22  takes in order to progress to the next
23  level?

Page 98

1  A.  Yes.  It's 750 points, which is synonymous,
2  as you can see, with 75 percent.
3  Q.  What is your understanding of what Lindy
4  did in Nursing 272 in the spring of 2006?
5  A.  What she did in regards to --
6  Q.  Grade-wise, yes, ma'am, in the pediatrics
7  course.
8  A.  I don't know what her test grades were.  I
9  don't think they were very good, but I
10  don't -- I don't remember exactly what they
11  were.  I know what Lindy told me, and then
12  I know that there is a grade sheet, you
13  know, where students get their grade sheets
14  and the points are outlined.
15  Q.  What is your understanding of what Lindy
16  told you how she faired in 272 in the
17  spring of 2006?
18  A.  That she was close.  And, again, I don't
19  remember what she told me as far as number
20  of points, but that she was close.  And she
21  asked me about care plans.  We talked a
22  little bit about care plans and the grades
23  that she had made on some care plans.

Page 99

1  We talked in the dean's office during
2  the time that she was in appeal.  She asked
3  me to help her.  I told her I wanted to
4  help her, I said, but I'm not the
5  instructor and, you know, that's not
6  anything that I can rule on.  The only
7  thing I can tell you to do is to go back to
8  your instructor and check your points and
9  you can ask her if you -- if you can do
10  your -- redo your care plans, but I can't
11  answer for her.
12  Q.  Do you remember who she told you her
13  instructor was for 272?
14  A.  Yes.  It was Ms. Harris.
15  Q.  Ms. Harris?
16  A.  Uh-huh.  (Positive response.)
17  Q.  You said that y'all had a meeting -- or you
18  believe that y'all had a meeting in the
19  dean's office?
20  A.  Well, Lindy came by, yes, and we were in
21  the dean's office.  Yes.
22  Q.  Which dean?
23  A.  Lowe.  Lowe.

Page 100

1  She was in the midst of trying to go
2  around, looking for her things and make
3  appointments, yes.
4  Q.  Was that during the grade appeal process?
5  A.  I believe it was.
6  Q.  Do you recall the conversation that would
7  have occurred between Dean Lowe, Lindy and
8  yourself?
9  A.  Pretty much.  Lindy, again, was trying to
10  gather her information or I believe make
11  appointments with Ms. Harris and find out
12  the process again.  Again, she asked me to
13  help her, and I referred her back to the
14  instructor.
15  Q.  So you do recall Lindy requesting help from
16  you, and you referred her back to the
17  instructor, Ms. Harris?
18  A.  She said, will you help me?  And I said,
19  Lindy, I want to help you.  And we talked
20  about care plans, and I told her that I
21  could not authorize that.  I was not the
22  instructor of record.  But, I said, you can
23  go back and see, because I didn't know

Page 105

1   A.  Yes.
2   Q.  Is that something that you've been involved
3       with with your students previously?
4   A.  Yes.
5   Q.  Is that something that you've been involved
6       with on a frequent or infrequent basis with
7       your students?
8   A.  I would say infrequent.  In fact, we had to
9       report that at our recent accreditation.
10  Q.  When you say report, what does that mean?
11  A.  Actually submit the number and types of
12      grade appeals.
13  Q.  So basically it's almost like an accounting
14      type process of how many folks have
15      appealed, and you report that to -- is that
16      what you're saying?
17  A.  No, it's not an accounting process.  It was
18      part of the accreditation process when they
19      came.
20  Q.  And they being the Board of Nursing?
21  A.  The National League for Nursing Accrediting
22      Commission, yes.
23  Q.  When was that that they came recently?

Page 106

1   A.  November '06.
2   Q.  Are you familiar with a student named Arit
3       Umoh?
4   A.  Yes.
5   Q.  Was she one of the students enrolled at
6       CVCC?
7   A.  Yes.
8   Q.  To your knowledge, was she allowed course
9       forgiveness within CVCC's nursing program?
10  A.  No, not to my knowledge.
11  Q.  Are you familiar with a student Shannah
12      Lowe?
13  A.  Yes.
14  Q.  Was she a student at the CVCC nursing
15      program?
16  A.  Yes.
17  Q.  Do you know?  Was she -- or are you aware
18      that she was allowed to take a makeup lab
19      for Pediatrics 272?
20  A.  Yes, I'm aware of that.
21  Q.  Do you know Elise Sizemore?
22  A.  Yes.
23  Q.  Was she a student at CVCC's nursing

Page 107

1       program?
2   A.  Yes.
3   Q.  To your knowledge, was she allowed to
4       administer medication without having
5       completed the medication calculation test
6       successfully to your knowledge?
7   A.  My understanding is -- I don't know for
8       sure.
9   Q.  But you are aware that she was a student at
10      CVCC?
11  A.  Yes.
12  Q.  Do you know an individual named Carola
13      Rambo?
14  A.  Yes.
15  Q.  Was Ms. Rambo a student at CVCC?
16  A.  Yes.
17  Q.  To your knowledge, was she allowed course
18      forgiveness for 272?
19  A.  No.
20  Q.  Do you know an individual named Courtney
21      Kelly?
22  A.  Yes.
23  Q.  Was she a student at CVCC?

Page 108

1   A.  Yes, and she is a student now at CVCC.
2   Q.  To your knowledge, when she was a previous
3       student at CVCC, did she, in fact, fail two
4       classes at CVCC within the nursing program?
5   A.  She failed --
6           MR. NIX:  If you know.
7   A.  She failed three.
8   Q.  In the nursing program?
9   A.  Simultaneously, not three separate
10      occasions, because of not coming to class.
11      It was a failure for lack of attendance.
12  Q.  Okay.
13  A.  Failures for lack of attendance.  She did
14      not show up for class.  And because she did
15      not come and drop the classes, the
16      instructors were forced by policy to give
17      her F's.
18  Q.  And that was within the nursing program; is
19      that correct?
20  A.  Yes.
21  Q.  And she's a current student today; is that
22      correct?
23  A.  Yes, under new guidelines.  When she --

August 16, 2007

Deposition of Dixie Peterson

Page 113

1  Q.  Was that just one time to your knowledge
2      that she substituted?
3  A.  It might have been two classes, maybe a
4      total of five or six hours.
5  Q.  Do you know what class that would have been
6      that she would have substituted for
7      Ms. Harris?
8  A.  It was in spring '07.  It would have been
9      Nursing 203, I believe.
10 Q.  And you're saying that's spring of 2007?
11 A.  Yes, when she substituted --
12 Q.  So that would have been the spring that
13     just occurred, then?
14 A.  Yes.
15 Q.  During the time that Ms. Lifsey -- in
16     November and December of 2005, you said
17     that she was with you.  Did that mean she
18     was your assistant, or what did she do?
19 A.  She just followed me.  She did not have a
20     teaching assignment because she came
21     obviously in the middle of the semester.
22 Q.  Did Ms. Lifsey have a master's in nursing?
23 A.  Yes.

Page 114

1  Q.  Do you know what that master's was in?
2  A.  Nursing education.
3  Q.  Do you recall ever instructing Ms. Lifsey
4      to oversee a grade review between
5      Ms. Harris and Lindy Wright?
6  A.  I don't recall instructing, no.  It seems
7      like I remember Lynn asking her to witness
8      something, but I can't remember for sure.
9  Q.  And when you say Lynn, are you referring to
10     Instructor Harris?
11 A.  Yes.  I'm sorry.
12 Q.  She would have asked Ms. Lifsey to --
13 A.  Witness a review or something of that
14     nature is my understanding.
15 Q.  And that would have been a grade review
16     between Instructor Harris and Ms. Wright;
17     is that correct?
18 A.  I'm not sure if it was a grade review.  I
19     assume that's what it was, Lindy asking
20     questions to see her materials I suppose.
21 Q.  Okay.  But you did not instruct Ms. Lifsey
22     to be a part of that?
23 A.  Not to my recollection.

Page 115

1  Q.  Going back to Lindy's grade appeal for
2      Nursing 252, do you recall telling Lindy
3      that instructors from Wallace would be
4      involved in that grade appeal process as
5      far as their opinions and thoughts?
6  A.  I don't remember if I told Lindy that or
7      not.
8  Q.  Is it normal or is it ordinary in the
9      course of a grade appeal process for
10     Wallace instructors to be involved in that?
11 A.  I wouldn't say that it is commonplace, but
12     it is certainly within the guidelines of
13     the policy to seek outside help.
14 Q.  Are there particular individuals within
15     Wallace who specialize in grade appeals?
16 A.  No.  I believe what happened was -- and I
17     can't answer for Dean Lowe, that he
18     asked --
19        MR. NIX:  If you don't know, don't
20          speculate.
21 A.  I don't know.  I don't know.
22 Q.  So you don't know if there are individuals
23     at Wallace who have expertise in the grade

Page 116

1      appeal process; is that correct?
2  A.  I do not know.
3  Q.  And you also stated that it is not uncommon
4      to seek outside assistance in the grade
5      appeal process.
6  A.  Correct.
7  Q.  Had Wallace instructors previously been
8      sought in a grade appeal process for
9      nursing --
10 A.  From that particular college, no.
11 Q.  When you say that particular college, do
12     you mean the nursing college or Wallace,
13     the college itself?
14 A.  Both.
15 Q.  Is Wallace also the same --
16        MR. NIX:  Excuse me.  Let me go
17          back.  I think you misquoted
18          her.  I think you said -- you
19          quoted her as saying not
20          uncommon to have outside
21          people in the grade review
22          process but within the
23          guidelines.

29 (Pages 113 to 116)

August 16, 2007

Deposition of Dixie Peterson

Page 121

1    provided the distance learning for the
2    nursing program would not be the same
3    Wallace Community College who may or may
4    not have participated in the grade appeal
5    process?
6  A.  Correct.
7  Q.  To your knowledge, did, in fact, Wallace
8    Community College become involved in
9    Lindy's grade appeal process?
10 A.  Yes.
11 Q.  Was that the Wallace Community College that
12    was based in Dothan, Alabama?
13 A.  Yes.
14 Q.  Do you know how many individuals from
15    Wallace Community College were involved in
16    that process?
17 A.  Yes.  There were two.
18 Q.  Are those individuals, individuals who are
19    nursing faculty members?
20 A.  Yes.
21 Q.  Both of those individuals?
22 A.  Yes.
23 Q.  At the conclusion of the grade appeal

Page 122

1    process -- scratch that.
2      Who else was involved in reviewing
3    Lindy's grade appeal form?
4  A.  Well, the procedure is that the student
5    first speaks with the instructor, and the
6    instructor then provides a written response
7    to the student.
8      And then the next step is the student
9    if they disagree with the response that
10    they receive from the instructor submits it
11    to the division chair.
12      Then if the student disagrees with the
13    response from the division chair, then it
14    goes to the dean of instruction.
15 Q.  At what point did Wallace Community College
16    become involved in the grade appeal process
17    for Lindy?
18 A.  I'm not sure.  I believe it was at the
19    dean's level.
20 Q.  When you say dean, that's the dean of
21    instruction, and at that point in time that
22    would have been Dean Lowe?
23 A.  Correct.

Page 123

1  Q.  Are there any other individuals to your
2    knowledge besides Dean Lowe, the original
3    instructor and the two individuals from
4    Wallace who would have been involved in the
5    grade appeal process for Lindy for Course
6    252?
7  A.  Well, myself.  You didn't mention me, but
8    none other than those.
9  Q.  And so the team -- would that be like a
10    grade appeal team for her at that point?
11 A.  I don't think it would be called a grade
12    appeal team.  I just think it would be
13    considered -- according to policy, I think
14    the policy calls it outside experts.
15 Q.  Okay.  So would the two outside experts,
16    yourself, Dean Lowe, and the instructor who
17    would have been Ms. Harris --
18      Is that correct?
19 A.  Correct.
20 Q.  -- did you-all meet together to try to come
21    up with a plan or was it --
22 A.  No.
23 Q.  How was that done?

Page 124

1  A.  I believe Lindy followed the policy and saw
2    Ms. Harris first.  Ms. Harris gave me a
3    written summary of Lindy's grades and the
4    care plan grades, test grades, those kinds
5    of things.  I believe she gave me a written
6    summary.
7      And then I ruled in Ms. Harris's favor
8    based upon the information that I had, and
9    then it went to the dean.  And I don't
10    remember at what level the Wallace
11    Community College people were involved.
12 Q.  To your knowledge, did Ms. Harris provide a
13    written response back to Lindy Wright?
14 A.  I don't know.
15 Q.  Based on the outline that you provided to
16    me, I want to verify the grade appeal
17    process.  The first step is for the student
18    to go to the instructor, and then the
19    instructor provides a written response back
20    to the student; is that correct?
21 A.  I'm not sure if the policy says written
22    response, but the instructor has to respond
23    to the student in some fashion.  Lindy had

31 (Pages 121 to 124)

August 16, 2007

Deposition of Dixie Peterson

Page 129

1  secretaries in the office repeatedly tried
2  to contact her because it was reported to
3  us that she was not showing up. And they
4  were trying to reach her in order to get
5  her to drop the classes.
6  Q. But a WF is still seen as a failure; is
7  that correct?
8  A. If a student withdraws from the program or
9  withdraws -- according to the policy at
10  that time, withdrawals are failures.
11  Q. And that was under the same curriculum that
12  Ms. Wright had when she was attending; is
13  that correct?
14  A. I assume so. I don't remember exactly the
15  year that Courtney was there. But, yes, it
16  should have been exactly -- it should have
17  been -- withdrawals are failures, yes.
18  Q. So if, in fact, Ms. Wright wanted to begin
19  the application process as a fresh student
20  at CVCC, would she be allowed to do that?
21  A. Absolutely. If the time span -- the State
22  has a time span. I believe it's two years.
23  Q. Two years, what? From the time that

Page 130

1  someone -- how does that work?
2  A. I've never had to look at it. I believe
3  that it is two years from the time that
4  they left the program. I don't have the
5  policy --
6  Q. Two years from the time that they left the
7  program, but they would still be considered
8  a -- if they were even accepted, it would
9  still be a new admission; is that correct?
10  A. Yes.
11  Q. Competing with all the same brand new
12  nursing students and basically taking
13  classes over from scratch; is that correct?
14  A. Well, they wouldn't be taking classes over
15  because now it's a totally -- the classes
16  are new and there are not as many as there
17  were before. There are only four classes
18  in the mobility program now. There's one
19  each semester except for the last
20  semester. There's a total of four.
21  Q. So those classes must be incredibly
22  concentrated then, aren't they?
23  A. They're very integrated, yes.

Page 131

1  MS. COOLEY: I have nothing
2  further. Thank you.
3  MR. NIX: We need a minute. I'm
4  going to ask some questions,
5  if you'll excuse us.
6  (Brief recess was taken.)
7  (Defendant's Exhibits 44 through 49
8  were marked for identification.)
9  MR. NIX: We have not been -- I
10  don't think we've been
11  offering our exhibits, any of
12  us have been really in the
13  depositions. Can we just
14  agree that anything offered
15  is -- at least the predicate
16  is --
17  MS. COOLEY: Sure.
18  EXAMINATION
19  BY MR. NIX:
20  Q. Ms. Peterson, earlier in this deposition,
21  Ms. Cooley asked you whether you recalled
22  certain things. She asked you whether you
23  recalled saying to Ms. Gunnels and/or

Page 132

1  Ms. Bellamy or both Ms. Gunnels and
2  Ms. Bellamy together that Lindy Wright
3  needed to fail or needed to be failed,
4  and your answer to that was emphatic,
5  although I'm not sure the record really
6  reflects the meaning of it. You said I do
7  not remember that at all.
8  So I would ask you this simply, very
9  simply. Have you ever said to any
10  instructor in the nursing program that any
11  particular or specific student needed to
12  fail?
13  A. Are you finished with the question?
14  Q. Yes.
15  A. No.
16  Q. Have you ever said to any instructor or
17  anyone in the nursing program that any
18  particular or specific student needed to be
19  failed by an instructor?
20  A. Absolutely not.
21  Q. Okay. You described at about that same
22  time in the deposition what your general
23  inquiry is with respect to students and how

August 16, 2007

Deposition of Dixie Peterson

Page 137

1    grade appeal that was processed by
2    Ms. Wright; is that correct?
3    A.  Yes.
4    Q.  She actually made two grade appeals in the
5        fall -- or December of 2005, and that was a
6        grade appeal for number 251 or NUR 251 and
7        a grade appeal for NUR 271; is that
8        correct?
9    A.  No, it's for 252.
10   Q.  I'm sorry.  I said 251, didn't I?  She did
11       a grade appeal for NUR 252 and then one for
12       271, right?
13   A.  Yes.
14   Q.  Do you know the outcome of those two grade
15       appeals?
16   A.  Yes, I do.
17   Q.  Can you tell us what that was?
18   A.  The grade appeal for 252 was ruled in the
19       instructor's favor, and the grade appeal
20       for 271 was ruled in Lindy's favor.
21   Q.  So if a grade appeal is ruled in
22       Ms. Wright's favor or Lindy's favor, what
23       does that mean?

Page 138

1    A.  That means that that course did not count
2        as a failure and she should not receive a
3        failing grade for the course.
4    Q.  Do you know the reason that NUR 271, that
5        the grade appeal on NUR 271 was ruled in
6        favor of Lindy Wright?
7    A.  Yes.
8    Q.  What was that reason?
9    A.  Because I asked Dean Lowe to rule in her
10       favor because the instructor of record
11       during that time did not respond to her in
12       a timely manner.
13   Q.  And that instructor was Ms. Cash; is that
14       correct?
15   A.  That is correct.
16   Q.  Is it correct to say that the reason that
17       grade appeal was ruled in favor of Lindy
18       Wright was that there was an administrative
19       failure on the part of the teacher to
20       respond timely to the request made by
21       Ms. Wright that the grade be reconsidered?
22   A.  Yes.
23   Q.  Is it correct, Ms. Peterson, to say that

Page 139

1    the merits of that grade or the merits of
2    what Lindy Wright earned as a grade in NUR
3    271 were never considered, the merits of
4    her performance in NUR 271?
5    A.  Ask me that again.
6    Q.  I'm sorry.  Is it correct to say that
7        the -- Ms. Wright got a D in 271; is that
8        right?
9    A.  (Witness nods head up and down.)
10   Q.  And that's a failing grade, correct?
11   A.  Yes.
12   Q.  Is it correct to say that on the grade
13       appeal that Lindy Wright won that the
14       merits of her obtaining that grade were
15       never considered?
16   A.  That's correct.
17   Q.  It was an administrative situation, wasn't
18       it?
19   A.  Yes.
20   Q.  So that Ms. Wright could well have -- if
21       the merits had been considered could well
22       have failed out of school in December 2005;
23       is that right?

Page 140

1    A.  That is correct.
2    Q.  And then on 252, the merits were
3        considered, and the process of the grade
4        appeal was ruled against Ms. Wright; is
5        that right?
6    A.  Correct.
7    Q.  And therefore, that failing grade and that
8        course stood; is that right?
9    A.  Correct.
10   Q.  Now, let me show you what I've marked as
11       Defendant's Exhibit 45.  Can you just tell
12       us what that is, please.
13   A.  This is Section C of the grade appeal that
14       is completed by the dean of instruction.
15   Q.  All right.  And who is that?
16   A.  James Lowe.
17   Q.  All right.  What course was that for?
18   A.  Nursing 252.
19   Q.  And what was the ruling on Nursing 252 as
20       reflected in Defendant's Exhibit 45?
21   A.  Dean Lowe documented after reviewing the
22       information regarding Ms. Wright's appeal,
23       "I found no evidence that she received an

August 16, 2007

Deposition of Dixie Peterson

Page 145

1  and you worked out a mechanism whereby she
2  could take 200 in the spring and graduate
3  with her class in May?
4  A.  Yes.
5  Q.  If you had not done that, what would she
6  have done about retaking the substance of
7  252?
8  A.  Well, we would have had to have offered her
9  another course in the new curriculum to try
10  to mold it together.
11  Q.  Why is it that a nursing student that fails
12  a particular course must take it over
13  again?  Why is that?
14  A.  Why does a student have to take a course
15  over that he or she has failed?
16  Q.  Correct.
17  A.  Because the policy states they have to make
18  a C or better.
19  Q.  Okay.  Now, let me show you -- and let me
20  ask you a question, Ms. Peterson.  Does
21  Exhibit 47 explain to Heather Chalkley what
22  happened with respect to Ms. Wright in her
23  grade appeal with regard to 252?

Page 146

1  A.  Yes.  I went into great detail.
2  Q.  All right.
3      MR. NIX:  I offer Exhibit 47.
4  Q.  And what is Exhibit 48?
5      MS. COOLEY:  Do you have Exhibit
6      46?
7      MR. NIX:  If I didn't offer 46, I
8      offer it now.
9  A.  Exhibit 48 is a grade change form.
10  Q.  All right.  What is a grade change form?
11  A.  A grade change form is changing one grade
12  to another grade.  And so because the
13  appeal was ruled in Lindy's favor, then the
14  grade needed to be changed to reflect such.
15  Q.  All right.  If a grade change had not been
16  made from a D to a C in 271, what would
17  have happened to Ms. Wright's eligibility
18  to continue in school?
19  A.  She would have been excluded after fall
20  semester '05.
21      MR. NIX:  I offer Exhibit 48.
22  Q.  Now I'll show you Exhibit 49, if you'll
23  tell me what that is, please.

Page 147

1  A.  This is an authorization for course
2  substitution in spring '06 because I had to
3  get it approved by the dean of instruction.
4  Q.  All right.  And did the dean of instruction
5  sign that document?
6  A.  He did.
7  Q.  And does that document describe the fact
8  that Ms. Wright is taking 200 in the place
9  of 252 so that she can learn the content of
10  that course and get a C in it or better?
11  A.  Well, it actually states that 252 would
12  substitute for -- excuse me, 200 would
13  substitute for 252, and it makes reference
14  to the statewide curriculum and that if she
15  were not offered this, then she would have
16  to take possibly more than one course
17  because the content was divided.  It was
18  not ... the content was integrated is a
19  better word, is what I meant to say.
20  Q.  Is it correct to say that you and Dean Lowe
21  and others were trying to assist Ms. Wright
22  by offering her 200 so that she could
23  graduate in May of 2006?

Page 148

1  A.  Absolutely.
2  Q.  And would Ms. Wright have graduated in May
3  2006 if she had passed all of her courses
4  in the spring of 2006?
5  A.  Yes, I believe she had already been sent a
6  letter by the admissions office about
7  graduation, but, yes.  The answer is yes.
8  Q.  And what happened to cause Ms. Wright not
9  to graduate in May 2006?
10  A.  The failure of Nursing 272.
11  Q.  Now, when a person fails a course,
12  Ms. Peterson, in the nursing program there
13  at Chattahoochee Valley Community College
14  and substitutes or takes another course or
15  takes the same course over again and passes
16  it, does the taking of that course over
17  again or the taking of a substitution
18  course and the passing of the course the
19  second time or the passing of the
20  substitution course cause the failure of
21  the course initially to go off of that
22  person's record?
23  A.  No.

August 16, 2007

Deposition of Dixie Peterson

Page 153

```
1
2
3         I, Dixie Peterson, hereby certify that
4    I have read the foregoing transcript of my
5    deposition given on Thursday, August 16, 2007, and
6    it is a true and correct transcript of the
7    testimony given by me at the time and place stated
8    with the corrections, if any, and the reasons
9    therefor noted on a separate sheet of paper and
10   attached hereto.
11
12
13         _____
             Dixie Peterson
14
15
16
17         SWORN TO AND SUBSCRIBED before me this
18   _____ day of _____, 20___.
19
20
21         _____
             NOTARY PUBLIC
22
23
```

Deposition of Dixie Peterson

## A

**ability** 66:22 84:8
**about** 12:6,10 21:3,11
25:10 27:13 31:11
37:20 44:17 50:14
54:20 55:8 56:12
66:10 67:5 69:21
70:6,9,17,20,22
71:18 73:23 78:9
79:18 80:11 81:11
82:2 85:2,3,14 87:14
88:2 90:5 93:5 95:19
98:21,22 100:20
101:1,5 103:9 104:16
104:18,22 125:21
132:21 133:6 136:23
145:6 148:6
**absence** 68:5
**absences** 109:1 128:11
128:19,20
**absent** 128:21
**absolutely** 10:6 20:17
79:13 80:23 93:18
102:2 103:9 104:5
109:10,10 110:17
129:21 132:20 148:1
150:2
**academic** 8:15 88:15
**acceptance** 29:6
**accepted** 31:17 130:8
**access** 60:3
**according** 33:8 123:13
129:9 141:22 142:1,3
**accounting** 105:13,17
**accreditation** 9:16
105:9,18
**accrediting** 9:6,22,22
105:21
**achieving** 55:13,13
**acronym** 77:7,9
**action** 1:7 11:10
**actions** 11:3
**actual** 80:2
**actually** 7:21 8:12 14:8
29:10 33:14 35:10
47:22 51:6 54:23
75:9 86:15 88:6
96:18 105:11 120:18
125:18 134:7,10
137:4 147:11
**add** 54:17 55:9 91:4
**added** 89:23
**addition** 68:18
**additional** 9:1,9 15:10
15:18 54:17
**address** 5:19,20,21,23
6:1,7 54:2 134:18
**addressed** 134:16,19

**addressing** 63:15,20
142:16
**adjunct** 34:8 36:1 38:3
48:21 49:12,14 50:7
**administer** 50:20 107:4
50:16 51:4
**administered** 27:17
**administrative** 138:18
139:17 142:11
**admission** 29:17 30:15
87:13,15 89:2 109:6
130:9
**admissions** 25:4,10,13
25:19,21,22 28:4
29:12 148:6
**admit** 27:7
**admitted** 24:14,15 25:2
25:6,14,17 28:11
29:2 30:23 76:14
87:6 89:1 95:10
109:5
**ADN** 3:12 135:15
**adult** 33:9 40:9 41:14
45:10 48:17 72:21
85:21 86:1,5,10 90:6
90:7 91:14,15,21
95:6,16,20 96:4,6
97:1
**advertised** 17:17 56:21
**advice** 62:18
**after** 5:8 29:7 35:1 59:8
61:18 68:3 74:11
79:9 81:13,13 126:14
140:21 146:19
149:22
**again** 53:6 55:6 58:23
75:19 98:18 100:9,12
100:12 101:12
126:19 128:16 133:2
135:9 139:5 144:3,13
144:20 145:13
148:15,17
**against** 125:9 140:4
**ago** 13:3,12,12 39:5
**agree** 131:14 141:1
**agreed** 4:2,16,23
**agreement** 1:16
**ahead** 79:21
**al** 1:9 2:6,12 151:17
**Alabama** 1:2,18,20 4:8
5:22 9:2,16,18 10:4
11:5 12:21 15:4
17:13 23:2 120:14
121:12 151:2,5,20
152:14
**Alexander** 142:14
**allow** 49:18 102:15,17
**allowed** 86:5,9 91:10
93:12 102:9 106:8,18

107:3,17 128:7
129:20 135:14
**allude** 11:11
**alluded** 41:19
**almost** 16:11 73:17
94:23 103:9 105:13
**along** 8:21
**already** 23:4 24:13
26:10 28:1 29:13
30:12 58:18 95:10,11
104:10 136:23 148:5
**although** 132:5
**always** 14:19 44:22
56:1 67:20 72:2 83:9
**amount** 73:23
**amounts** 52:5
**Andalusia** 120:22
**and/or** 56:4 68:19 69:2
69:9 70:10,18 131:23
**announcements** 66:9
**annually** 20:7
**another** 22:15 81:6
93:6 94:12 103:22
104:3 112:14 119:22
119:23 144:1 145:9
146:12 148:14
**answer** 19:3 55:22
62:12,19 67:6 68:9
70:21 99:11 115:17
117:11,19,21 118:2,9
132:4 148:7
**anybody** 67:21 85:2
120:9
**anymore** 13:13
**anyone** 39:18 43:17
82:11 109:20 132:17
**anything** 11:9 21:8,11
30:21 55:6 59:23
60:4,6,10 62:2 65:7,9
66:4,6,8,14 67:4,23
70:5 76:18 84:21
90:11 99:6 101:1
112:2,6 131:14
**anywhere** 33:20
**apologize** 24:3 74:6
**apparently** 59:5
**appeal** 3:13,14 81:15
81:16,18 94:4,5 99:2
100:4 104:22 115:1,4
115:9 116:1,5,8
117:8 118:7,13
119:16,18,22 121:4,9
121:23 122:3,16
123:5,10,12 124:16
136:18 137:1,6,7,11
137:18,19,21 138:5
138:17 139:13 140:4
140:13,22 141:8,10
145:23 146:13

**appealed** 105:15
**appeals** 105:12 115:15
117:18 119:19 137:4
137:15
**appear** 133:8
**APPEARANCES** 2:1
129:19
**application** 128:17
129:19
**applied** 31:15,23 109:3
**apply** 18:3,11 39:13
57:5
**appointed** 62:16
**appointment** 56:10
**appointments** 100:3,11
**approached** 93:5
**appropriate** 21:6 50:10
54:14 55:7 93:3,10
**appropriately** 55:22
**approval** 9:23
**approved** 147:3
**approximately** 1:21
14:3 32:12 46:10
47:7 53:2,17 54:9
72:7 73:21 74:17
**area** 33:12 36:14,19
**areas** 26:21 27:4 36:13
36:17,18,22 84:6
**Arit** 106:2
**around** 76:9 100:2
**arranged** 45:19
**arrangements** 126:6
**arrived** 47:20 48:9
**article** 60:8
**aside** 12:20
**asked** 30:9,10 33:18,21
34:1 39:11,13 48:22
58:7,9 70:20 77:1
80:3,4 85:6,9 96:20
98:21 99:2 100:12
101:20 114:12
115:18 117:22 119:1
127:22 131:21,22
138:9
**asking** 31:11 46:15,23
55:2 62:19 67:20
68:1 85:3 114:7,19
127:20 143:2
**assessed** 92:1
**assessment** 76:22
**assigned** 7:12 14:4
78:15
**assignment** 7:1,5,6,13
7:16,19,20 8:1,3,4,7
8:10 14:5 76:22 83:2
83:4 84:21 85:5,11
85:15,17 113:20
**assignments** 68:14,17
84:5 94:21 127:23
128:1

**assist** 8:16,17 17:5,8
22:9,18 41:7,9 42:19
95:15 147:21
**assistance** 12:16 116:4
118:12 119:18 126:3
126:15
**assistant** 113:18 142:12
**assisted** 41:21 43:10
**associate** 24:14
**associated** 58:13
**association** 65:22 66:5
**assume** 89:10,11
114:19 129:14
**assumption** 93:20
**assumptions** 10:8
**assured** 82:20,21 84:19
**attached** 63:18 153:10
**attempt** 93:3
**attempting** 144:7
**attendance** 108:11,13
109:8
**attending** 129:12
**attention** 84:16
**Attorneys** 2:5,11
**August** 1:20 7:21,22
40:20 41:2,13 42:23
43:1 44:6,15,20,23
45:6 46:19 47:13
52:20 54:1,19,23
59:3 151:23 153:5
**authority** 8:19
**authorization** 3:18
147:1
**authorize** 100:21
**authorized** 102:15
**automatic** 11:9 13:16
**autonomy** 23:10,15
**aware** 12:21 24:18,20
59:4 91:10 96:22
97:4,12 106:17,20
107:9
**away** 56:8
**a.m** 1:21

## B

**B** 2:4 73:17
**baccalaureate** 16:14
**back** 14:12 39:11 59:3
61:20 73:20 78:21
90:3 93:8 99:7
100:13,16,23 101:21
102:3 115:1 116:17
117:3 124:13,19
**backtrack** 37:1 49:3
**Barbara** 11:20 12:8
41:18
**base** 22:9
**based** 11:5 25:6 52:9
77:12 97:15 121:12

**Community** 1:8 32:7
42:4 45:19 111:5
120:4,5,10,13,16,20
120:21,23 121:3,8,11
121:15 122:15
124:11 126:4,8,16
148:13 151:15
**comparison** 89:8
**compete** 128:12,18
**Competing** 130:11
**complaint** 80:3 103:12
103:13,14
**complete** 71:13
**completed** 71:17 75:16
107:5 140:14
**completely** 52:6 64:9
**completing** 61:18
**completion** 71:19
**complex** 17:12
**comply** 75:5
**component** 52:17
**comprised** 28:5
**computer** 88:17 89:12
152:1
**concentrated** 130:22
**concepts** 45:14 49:1
50:8,9 92:8 95:7 96:6
**concerned** 70:9 125:21
**concluded** 150:4
**conclusion** 121:23
**conditional** 29:2,5
**conduct** 19:22
**conferred** 29:14
**confidence** 59:15,18,22
61:22,23 65:5,5,12
65:12 66:17
**confidential** 62:7 63:22
64:2,5
**confidentiality** 64:16
**consider** 33:18 56:9
125:22
**considered** 123:13
128:14 130:7 139:3
139:15,21 140:3
**consist** 97:6
**consistent** 13:5 55:14
55:17 102:11
**consistently** 55:8,18
**constraints** 77:13
**consultant** 11:21
**consulted** 126:14
**contact** 5:20 6:4 14:21
104:2 129:2
**contacted** 102:5 126:22
127:3
**contacts** 41:23
**contain** 143:9 152:2
**contained** 135:11
**content** 20:5 23:12

33:9 45:21 50:14
51:19 52:11,17 94:21
143:9 144:1,2,12,13
144:19,22 147:9,17
147:18
**continue** 136:10 146:18
**continued** 61:16
**contract** 42:8,16 61:19
75:7,20
**contracted** 42:19 48:21
49:12
**control** 9:19 18:21
**controls** 9:2
**conversation** 21:14
52:19 53:19 54:12
66:20 67:1 69:23
82:3 100:6 101:6
**conversations** 67:9
**Cooley** 2:4,4 3:3 5:12
27:15 33:23 37:17
46:17 47:1 53:7
54:22 73:6 78:10
80:10,20,23 85:16
104:12 110:4,18,21
111:10 117:1 118:22
119:5,10 131:1,17,21
146:5
**coordinate** 8:21
**coordinator** 6:22 96:19
**copied** 142:13
**Copies** 26:18
**copy** 59:14,18,19 127:2
**core** 127:17
**correct** 7:14,15 9:17,18
12:18 16:19 17:6
19:2,16 25:19,20
27:19 30:19 33:22
34:15,16 36:5,6 37:9
38:18,19 42:6 43:6,7
44:4,7 46:11 48:2,19
50:1,2 51:9 52:4
53:13 56:18,22 57:7
57:8 59:12,13 60:11
61:11 62:23 66:7
72:18 73:22 74:2
78:7 82:12,13 83:19
84:23 91:14 93:17
95:17 96:17,18 97:3
102:13 103:1 104:19
108:19,22 114:17
116:1,6 118:8 121:6
122:23 123:18,19
124:20 126:10,18
127:8 129:7,13 130:9
130:13 136:2 137:2,8
138:14,15,16,23
139:6,10,12,16 140:1
140:6,9 141:11,12
143:11 144:15,17,20

144:21 145:16
147:20 149:10,16
152:2 153:6
**correction** 78:17
**corrections** 153:8
**correctly** 30:13
**correspondence** 136:1
**counsel** 4:3,17 62:19
119:17 152:3,7
**count** 138:1 149:5
**counted** 135:18
**COUNTY** 151:3
**couple** 68:6
**course** 3:18 6:2,8 7:21
8:18 12:14,16 14:13
14:16 15:13 18:17
22:21 23:7 26:18
32:10 33:3,6 37:21
41:13,15,22 45:3,10
45:11 49:20,20 51:7
51:14 52:6,11,16
63:8 73:6 83:12,13
83:19,23 84:4,11
85:20,23 88:8,8,23
90:1 91:19,20,22,23
92:5,6,13 93:2,9
94:12 95:5,13,15
96:11,13,21,23,23
97:12 98:7 103:8,10
104:3,7,18 106:8
107:17 110:14 112:8
112:11 115:9 117:7
123:5 133:13 135:17
135:22 138:1,3 140:8
140:17 142:22,23
143:20,20,22,23
144:1,2,4,10,11,14
144:19 145:9,12,14
147:1,10,16 148:11
148:14,15,16,18,18
148:20,21 149:19
**courses** 8:22 32:15
33:8,10,11 52:1
83:23 84:1 88:16,17
89:23 109:2,11,12
112:3 128:23 133:14
135:18 136:9 142:19
148:3 149:7,10
**Court** 1:1 151:19
**courtesy** 12:15
**Courtney** 107:20
109:19 128:6,11
129:15
**CPR** 30:9
**create** 49:9 50:1,4
64:12 77:3,4
**created** 76:18 77:2
**credential** 26:8
**credentials** 22:8

**credit** 29:14,19,21
93:22
**criteria** 27:9,10 89:3
**critical** 48:22
**current** 6:12 58:16
108:21 136:14
**currently** 6:17,19 32:6
36:4 53:15
**curriculum** 22:21 23:4
24:5,12 25:3,5 33:7
51:21 52:15 86:16,19
86:20 87:1,8,9,12,23
88:7,13 92:15,22
94:9 109:3 112:9
128:10 129:11 145:9
147:14
**curriculums** 24:16
**custom** 95:19
**customize** 95:4
**customized** 94:23 95:3
**custom-tailored** 96:5
97:3
**CV** 88:10,11
**CVCC** 1:8 6:12,14
10:22 16:10,11 18:18
19:7,8,12 23:20 24:6
25:16 31:18 32:9,13
33:3,17 34:5 36:4,8
37:14 39:23 42:6
44:12 45:9 51:21
52:12 55:20 57:22
59:7 61:17 65:17
70:23 71:6 72:6,11
73:22 74:16,22 75:9
77:21 78:10 79:17
80:14 81:2,5,18,22
103:8 104:8,19,23
106:6,14 107:10,15
107:23 108:1,3,4
109:20 110:6,11
111:7,15,18,22
112:12 119:17 120:6
129:20 151:16
**CVCC's** 106:9,23
**C-A-R-E** 76:19
**C-I-P** 89:5

**D**

**D** 139:7 141:2 146:16
**daily** 21:15
**data** 31:3 89:7,17
**date** 12:5 23:19 33:2
54:11 86:13 134:13
**dated** 134:15
**dates** 17:19 87:15
**day** 14:7 38:11 43:3
44:19 46:2 48:1,10
48:12 152:9 153:18
**days** 46:22

**deadline** 24:10
**deal** 20:12 103:21
**dealt** 103:10,17,20
**dean** 12:2,7 13:1 20:16
20:18 21:8,22 34:1
39:21 52:21 53:9
54:13 56:4 59:11
89:13 99:22 100:7
115:17 117:21
122:14,20,20,22
123:2,16 124:9
125:11,16,18,19
126:2,14 138:9
140:14,21 141:16
142:12 147:3,4,20
**deans** 88:6
**dean's** 88:15 99:1,19
99:21 122:19
**Deborah** 70:12
**December** 34:10 112:4
113:16 134:15,21
136:14 137:5 139:22
**decided** 96:10
**decision** 27:7 30:22
125:7,7 126:17
**decision-making** 33:16
**DEFENDANT** 2:8
**Defendants** 1:10
151:18
**Defendant's** 3:11 131:7
133:20 136:21
140:11,20 141:5,6
142:9
**defined** 104:18
**definitely** 38:6
**degree** 15:1,5,8,16
24:14 26:11 36:12,21
37:3,5 40:6 49:5,19
71:11,13,16 75:2,4
75:16
**degrees** 15:11 49:16
**delay** 44:8,13
**deliver** 45:20
**demonstrate** 30:3
**demonstration** 30:4
35:14
**demonstrations** 29:11
**department** 9:5 14:18
89:12,22
**departments** 8:15
**depend** 20:1
**depending** 14:17 20:4
**depends** 68:23
**DEPONENT** 150:16
**deposition** 1:15 4:4,6
4:13,18 5:2 51:16
131:20 132:22 150:4
151:7 153:5
**depositions** 131:13

Deposition of Dixie Peterson

110:23 111:3
**Family** 37:7
**far** 17:9 22:20 23:16,23
  24:4 28:19 48:17
  50:23 60:6 65:11
  66:22 70:22 80:13
  86:9 87:22 89:6
  98:19 101:23 115:5
**fashion** 21:13 79:5
  124:23
**faster** 79:3
**favor** 94:5 124:7 125:8
  137:19,20,22,22
  138:6,10,17 141:11
  146:13
**fed** 89:16
**Federal** 4:5
**fellow** 90:23 127:11
**felt** 85:1
**few** 40:18 67:15
**figure** 83:6
**filed** 81:13,14
**filing** 4:18,22
**fill** 44:4 72:21
**filled** 43:8 63:9 72:20
  96:19
**filling** 72:22
**final** 90:17 91:1,3
  126:17 128:19 133:5
**find** 17:23 41:17 91:1
  93:9 100:11
**finding** 82:18
**findings** 125:15 127:1
  127:5
**fine** 12:5 19:4 31:21
  101:19
**finished** 132:13
**fire** 8:20
**firing** 21:5
**first** 5:8 14:14 16:5,23
  17:1 34:7,10 40:1,13
  40:18 44:14,19,22
  45:4 67:14 74:8
  81:10 112:1 122:5
  124:2,17 133:11
  151:9
**fish** 73:17
**fits** 64:15
**five** 13:5,19 37:20,21
  113:4
**focus** 95:5
**folks** 105:14
**follow** 17:14 18:4 22:18
  82:14 102:3
**followed** 84:17 113:19
  124:1
**following** 24:5 93:9
  117:5
**follows** 5:10

**follow-up** 51:3
**forced** 108:16
**foregoing** 152:1 153:4
**forgiveness** 103:8,10
  104:4,7,18 106:9
  107:18 143:20
**form** 3:17 4:10 19:17
  30:6,7 54:5 96:21
  103:3 104:9 122:3
  141:13 146:9,10,11
**formal** 11:13 54:16
**formality** 4:9
**formalized** 55:12
**former** 95:8
**forms** 63:8
**forth** 14:13 15:3 75:17
**forwarded** 125:17
**found** 42:2 140:23
**foundation** 26:22
**foundations** 28:13,15
**four** 13:4,19 16:2 46:10
  47:8 130:17,20
**fourth** 61:19
**frame** 75:17 81:3,20
  90:13 111:17 126:1
**frequent** 105:6
**frequently** 19:21 69:13
**fresh** 129:19
**friend** 32:9
**from** 3:15 7:6 12:20
  14:13 15:8 22:6
  23:15 24:21 25:23
  27:5 28:5 34:12,17
  44:8 45:6 46:5,13
  59:6 64:9 66:4,8,13
  70:19 73:10 80:1
  85:4 88:10,18 91:5
  92:17,19,21 100:15
  109:6,16 115:3
  116:10 121:14
  122:10,13 123:3
  125:6,23 126:1,4
  129:8,23 130:3,6,13
  135:16,17,17 141:2
  141:20 146:16
**Fuggatt** 46:5,6 47:21
  47:22 48:1,4 50:19
**full** 5:15
**full-fledged** 34:23
**full-time** 14:12,13
  16:12 20:6 34:9,18
  36:3 37:16,23 39:4
  42:3,9,13,22 43:1,4
  71:3 72:6 73:21
**fundamentals** 26:23
  76:13
**funding** 8:5
**further** 4:16,23 131:2
  150:16 152:6

**future** 55:3,5
**FYI** 21:15
**F's** 108:17

---
**G**
---
**G** 1:5 151:12
**gain** 61:17
**gather** 100:10
**gave** 29:19 71:12 124:2
  124:5 127:4
**general** 55:3 69:15,21
  132:22
**getting** 66:8
**GILLILAND** 2:10
**give** 29:23 68:15 72:2
  73:1 84:3,7 108:16
  144:7,11
**given** 45:8 71:8 78:16
  79:2 82:21,23 83:3
  83:22,22 85:5 90:23
  93:22 109:14 127:2
  128:2 153:5,7
**glad** 53:7
**go** 23:14 34:14 35:2,5,8
  38:14 53:4 79:21
  91:1 99:7 100:1,23
  116:16 124:18
  128:15 148:21
**goes** 122:14
**going** 14:18 34:22 59:6
  61:20 67:22 73:20
  90:3,4 96:16 109:15
  115:1 128:1 131:4
  133:14 143:3
**gone** 40:20 62:9,10
  92:14
**good** 10:16 27:22 95:2
  98:9 120:6,7
**government** 65:22 66:5
  66:9
**grade** 3:13,14,17 77:4
  81:16,18 83:22 90:17
  98:12,13 100:4
  104:22 105:12 114:4
  114:15,18 115:1,4,9
  115:15,23 116:4,8,21
  117:8,18 118:7,13
  119:16,18,19,22
  121:4,9,23 122:3,16
  123:5,10,11 124:16
  128:1 136:18 137:1,4
  137:6,7,11,14,18,19
  137:21 138:3,5,17,21
  139:1,2,10,12,14
  140:3,7,13 141:1,2,8
  141:10,19,20,21
  144:17,23 145:23
  146:9,10,11,11,12,14
  146:15

**grades** 78:22 82:21,22
  83:8,21 84:1,4,5,20
  90:14,22 91:2,6,8
  98:8,22 101:2,10,12
  101:18 124:3,4,7
  125:6 133:7
**grade-wise** 94:4 98:6
**graduate** 15:14 93:4,8
  93:13,17,19 94:18
  143:17 144:8 145:2
  147:23 148:9 149:17
**graduated** 92:17,19,21
  148:2
**graduation** 148:7
**grant** 8:5
**great** 146:1
**Green** 1:17 4:6 151:4
  152:12
**group** 61:5,7,10 62:14
  62:15 64:7 127:12,16
  127:17
**grow** 55:10
**Grubear** 73:14
**Gruber** 52:22 53:11,14
  67:13 68:2,3 70:12
  70:12,20 71:2,3,5
  72:5,14 73:15,16,18
  73:20 75:8,14 76:8
  76:17 77:19,22 79:15
  79:18 80:5,13 81:1,5
  81:7 83:14 127:21,22
  127:23
**Gruber's** 83:8
**guess** 18:20 20:11 26:3
  31:19 33:14 61:21
  75:21 78:6 87:23
**guest** 46:4 48:23 49:7,9
  50:4,6
**guidelines** 108:23
  109:4 115:12 116:23
  117:14 118:19
**Gunnels** 35:20,22,23
  36:4,7 37:8,13 38:14
  41:12 42:10,22 44:5
  44:9,17 45:4 46:3
  47:9,10 48:2 52:23
  53:14 59:5,16,21
  60:10 66:21 67:21
  69:2,9 70:2 83:4 85:5
  128:2,4 131:23 132:1

---
**H**
---
**H** 2:9
**half** 14:14 40:2 45:16
  111:16
**Hanceville** 45:20
  120:14,21
**handbook** 135:4,5,11
  136:8

**handed** 142:8
**handled** 17:20
**hands-on** 16:16 29:10
**handwriting** 96:20
**happen** 20:14 94:2,10
**happened** 115:16
  117:20 119:20
  145:22 146:17 148:8
**hard** 79:6
**Harris** 32:3,5,15 33:17
  35:4,11 37:2 43:19
  43:22 44:2,11 45:1
  59:1 70:2 80:4 82:19
  83:7,13,14,16,17
  84:18,18 93:4,14
  94:20,22 96:7 99:14
  99:15 100:11,17
  101:22 102:3,12
  112:23 113:7 114:5
  114:10,16 123:17
  124:2,2,12 125:8
  141:3 143:9,12 144:9
**Harris's** 124:7
**having** 5:8 18:17 23:15
  31:9 66:19 69:22
  107:4
**head** 84:10 139:9
**health** 8:5 33:9 40:9
  41:14,21 45:10 46:7
  48:17 58:13,15 61:14
  72:21 76:22 91:22
  96:6,18
**heard** 33:19 59:8 67:1
  79:19 81:10 82:6
  85:4
**Heather** 3:15 142:10
  142:17 145:21
**help** 93:3 94:17 99:3,4
  100:13,15,18,19
  101:21 115:13
  117:15
**her** 11:19 12:15,16
  22:23 23:10 32:7,8,9
  32:10,11 33:18,21
  34:1,2,4,12 35:13
  36:11,12,17,18 37:5
  37:18 38:3,12 39:12
  39:14 41:6,8,19 42:8
  42:17,20 43:18 59:9
  59:11 66:22 68:3,9
  69:4,5,5 70:10,22
  71:5,9,12,18,19
  72:17 74:1 75:7,16
  80:6,16 82:23 85:3,7
  86:9 90:23 91:3,6,7,7
  91:10 93:4,5,10 94:4
  94:5,5,14,15,17,19
  94:23 95:16 96:8,21
  98:8 99:3,3,4,9,11,12

135:1,4,8 136:13
148:6
letters 29:4
letting 142:17 143:2,16
Let's 20:8 142:8 143:1
level 8:19 17:21 30:12
89:16,18 97:23
122:19 124:10
125:10 126:21
liaison 9:14
licensed 26:5 72:15
Lifsey 111:1,2,3,6,15
111:18,21 112:20
113:15,22 114:3,12
114:21
like 8:16 10:17 21:7
23:16 26:22 27:1
60:10 62:12 64:21
67:21 73:17 74:18
76:22 94:13,23
105:13 114:7 123:9
liked 36:15
likely 18:18
Lindy 1:5 3:16 66:22
67:10 68:5 70:6
81:11,21 82:1,3,11
84:17 86:4 90:6,13
90:15,23 92:19 93:1
93:15,16 95:9,21
96:5,22 97:3,13 98:3
98:11,15 99:20 100:7
100:9,15,19 101:3,9
102:4,18 103:5,14
114:5,19 115:2,6
122:17 123:5 124:1
124:13,23 125:9,12
125:16,20 127:6
132:2 134:17,23
138:6,17 139:2,13
142:17 143:3 151:12
Lindy's 97:15 115:1
121:9 122:3 124:3
137:20,22 146:13
Lisa 1:16 4:6 151:4
152:12
list 8:13
listen 62:18
little 17:9 79:3 98:22
101:5
live 77:15 78:6,23
lived 39:7
local 41:22 65:10
long 6:14 7:16 14:8
20:1 32:12 37:13,22
70:15 111:15 126:3
longer 88:3 96:14,16
136:10
look 67:21 125:23
130:2 133:21 141:6

looked 50:17 67:17
looking 100:2
lose 133:15
lost 79:15 80:17 81:8
82:7,20 83:2 84:15
84:19 85:8,11,19
93:23 127:8,18
lot 63:17,17
Lowe 12:2,7 13:1 22:1
34:1 39:21 52:22
53:10 59:11 99:23,23
100:7 106:12 115:17
117:21 122:22 123:2
123:16 125:11,16,18
125:19 126:2,14
138:9 140:16,21
141:16 142:13
147:20
LPN 26:11 30:12 72:18
76:10,14,15 92:9,15
92:18,20 95:12 112:3
112:9,18 135:15
Lunch 73:8
Lynn 32:3 33:17 35:4
35:11 59:1 114:7,9
L-I-F-S-E-Y 111:12,14

### M

made 4:11 27:6 34:2
48:15 69:15 91:3
96:22 97:4 98:23
101:10 125:7 126:17
126:21 137:4 138:20
146:16
mailed 125:19
mailing 5:23 6:1
maintain 55:18
maintained 42:16
make 9:12 14:21 16:15
30:21 56:14 73:17
81:2 89:8 90:17
95:20 100:2,10 126:5
145:17
makes 147:13
makeup 106:18
making 10:8 56:9 69:1
69:8
mandate 71:10 102:17
mandatory 23:18
25:19 86:17,23 87:12
92:13
mannequin 30:6,8
manner 4:20 138:12
152:8
many 13:11 15:14
31:14,15,16 37:11
42:17 44:16 45:22
47:1 64:21 105:14
119:19 121:14

130:16 133:12,13
map 89:17
MAR 3:10
Margaret 109:22 110:1
110:5
marked 131:8 133:20
140:10
mastered 30:12
mastery 69:17
master's 15:1,5,16
36:12,21 37:2,5 40:5
49:5,16,19 71:11,13
71:16 75:2,4,16
113:22 114:1
material 52:4,15 94:16
materials 50:18 114:20
maternal 27:1 28:13,19
52:6
maternal-baby 51:20
maternal-child 36:23
37:10,12 51:11
maternal-infant 36:22
37:10,12 51:10,13,17
51:18 52:14
math 9:4
mathematical 102:22
103:1,6
matter 51:8,19 52:15
151:11
maximum 135:14
may 4:6,11,13,19 9:5
18:23,23 23:11 35:16
40:23 44:17 52:10
53:11 57:9,9 61:3
62:9,9 68:21 82:3
86:21 87:18,21 94:18
101:9 110:18 112:14
119:20 121:3,3 127:2
136:19 143:17 144:8
145:3 147:23 148:2,9
149:17
maybe 14:11,14,15,16
34:9 38:1 40:2 71:7
111:16 113:3
ma'am 5:17 19:9 55:4
98:6 110:17
mean 20:22 21:19
36:19 41:11 59:17
65:4 68:9 74:4 80:8
80:19 93:20 102:16
105:10 113:17
116:12 137:23
142:23
meaning 132:6
means 138:1
meant 94:6 147:19
mechanism 45:17
66:12 92:11 144:9
145:1

Medical 46:5
medical-surgical 16:7
medication 107:4,5
meet 23:20 24:2,10
28:6 61:6 123:20
meeting 24:1 52:20
53:22 54:21 62:11
64:14,21 99:17,18
meetings 64:22
melting 92:6 95:5
member 7:9 14:6 20:6
21:3 39:5 60:15 61:3
66:1,3,3 77:11 81:7
members 12:13 13:8
17:11 22:3 56:13
61:8,9 65:20 121:19
memo 21:13 65:18,21
66:6
Memorial 16:6
memos 21:18
mention 85:10 123:7
127:7
mentioned 9:12 13:1
70:1 81:11 82:10
85:17 101:8 127:9,12
127:17
merits 139:1,1,3,14,21
140:2
Message 66:11,15
met 38:12 41:6 43:15
44:15
method 55:12
middle 1:2 5:16 24:12
113:21 151:20
midst 100:1
might 30:5,7,8,9 85:11
113:3 133:12,13
mind 58:22 73:5 117:3
mine 32:9
minute 131:3
minutes 60:12
misquoted 116:17
missing 84:21
misstated 86:21
mobility 26:2,12 30:16
30:23 31:17 45:8
51:21 52:13 91:21
109:17 110:13
112:21 130:18
modified 143:8,12
module 52:10
modules 52:10
mold 144:11 145:10
molded 94:22
molding 94:20
Monday 66:10,14
Montgomery 2:12
41:20 88:6 151:3
more 8:13 15:14 17:9

18:18 23:16 28:16,17
50:6 55:13,17 57:19
101:5 143:9 147:16
Morning 66:10,14
most 36:15 38:2 47:19
57:14,16 60:3 72:17
93:3,10
Mostly 95:8
mother-baby 51:12,12
51:16
mother-child 51:12
move 39:6 92:10
much 8:16 14:10,20
17:14 23:16 41:3
56:1 97:15 100:9
must 26:10 130:21
145:12
myself 123:7

### N

name 5:13,14,15 11:19
36:9 45:13 46:4 51:7
51:15 73:14 91:16
97:8 134:19
named 32:2 35:19
38:20 41:4 52:22
106:2 107:12,20
109:22 110:5,23
names 53:5 126:11
National 9:3,21 26:1
105:21
nature 8:11 58:15
64:20 66:4,6 114:14
necessarily 10:12 57:6
need 4:11 10:13 56:7
67:3 68:8 74:11
90:20 131:3
needed 69:10 93:23
95:9 96:10 132:3,3
132:11,18 142:18,21
144:12 146:14
neither 152:6
never 33:1 38:12,14
59:18 102:20 103:10
104:1 130:2 139:3,15
new 7:20 8:1,3,4,5
26:17 56:13 57:20
58:1 71:14,21,22
72:1 75:5 76:14
86:23 87:9 89:2,9
92:16 94:9 108:23
109:4 112:8 128:14
128:17 130:9,11,16
145:9
newsletter 65:18 66:6
newspaper 60:7 65:15
65:16
next 47:14 97:22 122:8
Nix 2:9,10 3:4 27:12,16

Deposition of Dixie Peterson

34:2
physical 5:21 134:18
picked 112:8
place 35:11 56:11
    88:22 92:10 147:8
    153:7
places 17:18 56:21 57:1
Plaintiff 1:6 2:3 151:13
plan 76:19 77:2,6,9,11
    78:3 79:1 123:21
    124:4 125:6
planning 55:5
plans 76:21 77:19 78:2
    78:11,16,21 79:7,16
    80:17 81:8 82:7,20
    82:22 84:1,13,14,19
    85:8 98:21,22,23
    99:10 100:20 101:4,8
    101:11 102:1,6,18
    103:2 127:8,18
please 5:13,17 101:16
    110:19 133:22
    140:12 141:6 146:23
pneumonia 40:19
    70:19
point 13:21 14:20 18:5
    30:14 54:1 61:17
    67:12 68:7 82:10
    87:10 91:5 96:12
    122:15,21 123:10
    125:5,10 127:10
    128:21
points 90:20 91:3 93:23
    97:18,20,21 98:1,14
    98:20 99:8
policy 104:20 108:16
    115:13 117:14
    123:13,14 124:1,21
    129:9 130:5 135:13
    145:17 149:6 150:1
posed 62:13
position 7:5,12 11:1
    17:22 56:20 58:1,6
    58:19,20
positions 43:5,12 56:16
    57:6 64:6
Positive 97:11 99:16
possibilities 71:19
possible 31:8 94:15
possibly 18:11 147:16
posted 17:16 56:16
postgraduate 15:13,18
postsecondary 88:19
    89:23
pot 92:6 95:5
potential 17:10 31:6
    57:21 58:2 85:11,19
potentially 17:23 20:17
    83:2 84:15

power 18:7 34:21
    102:16,19
practical 26:5 72:16
practices 55:14
preceding 92:1
predicate 131:15
prediction 69:4
predominantly 72:15
preparation 22:20 80:7
    88:3,4
prepare 13:7
preparing 78:14
present 2:14 59:10
    125:15
presentation 62:1
president 8:20 20:17
    20:23 21:10 54:14
    56:5,9 61:1
president's 66:13
pretty 8:11,16 14:10,20
    17:14 56:1 81:10
    97:15 100:9 102:7
prevented 59:5
previous 15:23 73:10
    108:2 109:6
previously 7:12 13:16
    17:3 22:7 48:14
    56:12,15 70:21 90:4
    105:3 116:7 127:6
    143:7
pre-created 24:5
Price 2:9
primarily 15:2
primary 112:11,13,15
    112:17
principles 48:20
printed 152:1
printouts 66:4
prior 16:9 23:23 24:9
    25:4,12,12,14,17,18
    26:14 30:14 41:8
    125:3
privileged 62:8 63:12
    64:18,19,23
probably 6:5 7:22
    12:12 27:22 63:18
    87:17 88:2
problem 10:21 13:23
    73:7
problems 13:15
procedure 4:5 50:4
    122:4 128:17
procedures 17:15
proceed 143:14
proceeding 63:5
process 17:5,8 18:5,13
    20:10 21:5 25:4
    29:12 33:17 34:4,6
    34:15,18,23 35:3,5,7

38:15 39:15,19 56:1
    57:10,12,15,17 60:18
    60:20 64:12 87:22
    88:12 100:4,12
    104:22,23 105:14,17
    105:18 115:4,9 116:1
    116:5,8,22 117:8
    118:7,13 119:16,18
    121:5,9,16 122:1,16
    123:5 124:17 129:19
    140:3
processed 137:1
processes 56:13 88:21
Professional 1:17 4:7
    151:4 152:13
professors 49:14
Profile 26:2
program 3:12 9:7,20
    10:1,14 11:6,7 13:2,6
    16:14 19:7,12 22:3
    24:13 25:16,17 28:11
    29:2 30:16 31:1,7,17
    31:23 34:14 36:2
    37:14,23 49:10,16
    51:22 53:2 54:4,18
    55:15,19 57:21 58:3
    72:16 87:13 89:1
    91:21 92:1,3,9,17,18
    92:20 95:11 106:9,15
    107:1 108:4,8,18
    109:6,9,16,17 110:13
    112:4 121:2 128:7,15
    129:8 130:4,7,18
    132:10,17 134:1,12
    135:15,16,21 136:9
    136:11 143:15
    148:12
programs 8:6 13:4,6,10
    13:14 41:21 55:10
    58:14
progress 9:20 92:2
    97:22 134:9,10
    135:21
progressed 34:17
progression 3:12 134:1
    134:11
pronouncing 53:12
proper 97:8
proposed 126:2
proprietary 62:7 64:17
provide 59:14,20
    124:12
provided 4:14,21 60:9
    121:1 124:15
provides 122:6 124:19
PUBLIC 153:21
published 11:4 65:1
purpose 4:14 95:14
    135:1

purposes 9:17
pursuant 1:16 4:4
put 64:10 65:2 75:6
    88:16 94:14
puts 9:23
P.C 1:19
p.m 150:4
P.O 6:1

_____
Q
qualifications 26:3
    49:7
qualified 18:10 57:4
qualify 14:22 15:20
quantify 68:12
quarter 14:15,15 77:20
question 4:11 50:13,13
    62:5,20 67:6,7 68:10
    117:6,16 118:4,10,14
    132:13 145:20
questionnaire 51:3
questions 4:10 62:13
    70:21 114:20 131:4
quick 37:2 110:18
quickly 78:18,19
quiz 51:3
quote 135:4,7,12 136:7
quoted 116:19

_____
R
Rambo 107:13,15
ranked 27:23 28:2,10
rate 19:5 24:19,20
rates 10:10
rather 93:8
ratio 24:21
re 3:16
reach 129:4
read 104:20 117:3,5
    126:12 135:7,10
    143:1 153:4
reading 80:1 152:4
reads 42:8 135:13
ready 85:7 92:10
real 37:1 79:5
realistic 20:2
really 34:6 50:6 55:21
    67:17 131:12 132:5
reapply 128:12
reason 29:6 74:9 93:1
    138:4,8,16
reasons 153:8
recall 11:14 12:4,4,5,10
    13:11 21:18 31:14
    52:19 53:19,22 54:16
    55:6 66:8,18,19 67:1
    67:5,8,10 68:1 69:1,8
    69:20,22 70:7 82:2
    100:6,15 101:9 102:1

102:8 111:21 114:3,6
    115:2 126:5 127:14
    127:19 128:21
recalled 131:21,23
receive 122:10 138:2
received 29:20 59:22
    125:5 140:23 141:2
receiving 66:3,16
recent 105:9
recently 105:23
recess 73:8 110:20
    131:6
recognized 92:20 104:7
recollection 61:1
    114:23
recommend 20:19 21:9
recommendation 20:21
    84:8 126:22
recommended 56:3
reconsidered 138:21
record 84:4 96:9
    100:22 132:5 133:22
    138:10 148:22 149:5
recorded 82:22 84:20
recording 83:7
recuperating 70:19
redo 99:10
refer 51:15
reference 101:4 147:13
referenced 90:4
referencing 59:21
referred 38:3 66:16
    71:21 86:1 91:13
    100:13,16 101:21
referring 61:4 67:10
    96:2 97:1 103:13
    114:9 133:3
reflect 146:14
reflected 140:20
reflects 13:2
regard 145:23
regarding 3:11 13:2
    65:4,5,12 66:21
    69:23 101:7 104:3
    125:16 133:23
    140:22
regardless 4:21
regards 98:5
register 142:18
Registered 1:17 4:7
    151:4 152:12
regular 10:4 13:17
regulated 23:16
regulations 75:5
related 15:11 80:2
    109:20
relationship 10:17
    120:6,7,8
remain 35:1 63:22 64:2

August 16, 2007

Deposition of Dixie Peterson

Page 11

span 129:21,22
speak 5:9 11:17,22
  12:1,23 34:20 46:21
  96:8 151:9
speaker 46:4 48:23
  50:7
speakers 49:8,9 50:4
speaks 122:5
specialize 115:15
  117:18
specialized 28:18
specific 53:19 54:11,12
  55:6 70:5 101:7
  132:11,18
specifically 9:2 36:21
  67:23 69:20,22 70:8
  80:4 82:5
specifics 67:8
specify 56:19
speculate 101:14
  115:20 118:1
spell 111:9,11
spoke 50:21 58:6
spoken 80:5
spreadsheet 28:2
spring 32:18 40:14
  86:1,6 90:8 91:11
  92:12 93:14,21 96:2
  97:1,5,14 98:4,17
  112:7 113:8,10,12
  142:18 144:4 145:2
  147:2 148:4 149:3,13
St 16:4
staff 16:1
staffing 54:13
stamp 9:23
stamped 29:21
stand 77:7
standardized 23:3
  24:12 25:3,5,23
  86:16,20 88:7 92:15
  92:18,22
standards 19:19
start 24:11 71:22 86:19
  87:9 90:9
started 14:7 16:23 34:7
  40:23 44:1
starts 87:20
state 1:18 4:8 5:13
  12:14 23:2,6 52:9
  74:15 129:21 151:2,5
  152:13
stated 17:3 24:18 25:12
  48:18 72:5 101:6
  116:3 118:10 127:6
  153:7
statements 69:15
states 1:1 135:13 136:8
  145:17 147:11

statewide 88:3,4,10
  89:16,18 90:1 92:15
  92:18,20 147:14
status 3:11 7:2,7 9:15
  9:15 61:16 110:16
  133:23 134:2,4,11,13
  135:2 136:14,17
Statute 4:15,21
stay 74:12 149:5
stayed 20:1
Steadman 41:20 42:1
  45:18
step 21:6 122:8 124:17
  125:2
sterile 30:5,7
still 17:14 27:13 33:2
  51:20 62:12 73:9
  81:21 94:7 109:8
  129:6 130:7,9
stipulated 4:2,16,23
stipulation 1:16 4:1
stood 140:8
stop 25:9 79:22
stopped 13:21 59:6,9
straight 22:5
strategies 54:2
strategy 54:17 55:4
streamlining 87:23
  88:12
Street 1:20 2:5
strictly 28:9,12
student 25:16 26:7
  27:8,9 28:16 29:15
  30:22 52:7 65:17,21
  65:22 66:5,9,23
  67:11 77:10 78:4
  79:8,15 81:6,21 92:8
  93:6 97:18,21 104:3
  106:2,11,14,23 107:9
  107:15,23 108:1,3,21
  110:6,11 122:4,7,8
  122:12 124:17,20,23
  127:17,20 129:8,19
  132:11,18 135:5,13
  145:11,14 149:7
students 10:11 11:23
  14:21 16:17 22:11
  24:13,15,20 25:2,5
  26:20 28:7 29:7,20
  30:2 31:9 36:14
  43:17 44:15 45:9,21
  49:2,10 50:5,16,20
  51:1,4 52:13 53:3,18
  54:10 65:19 67:16
  69:16,21 76:13,14,15
  78:11,20 80:16 81:9
  83:3 84:23 85:4,6
  86:19 87:6 88:23
  90:19,19 91:1,20,23

92:7,14,16 98:13
  102:10 103:21 105:3
  105:7 106:5 110:9
  112:21 127:11,15
  128:13 130:12
  132:23 133:6,8,12,13
  133:15,16 134:8
  135:20
student's 84:8 110:15
  125:12
stuff 63:2
subject 51:8,19 52:3,15
submit 84:12 105:11
submits 122:10
submitted 83:15 127:1
SUBSCRIBED 153:17
subsequent 55:2
substance 145:6
substitute 96:13,16
  147:12,13
substituted 70:13,15
  112:22 113:2,6,11
  143:13,13 149:2
substitutes 148:14
substituting 67:14
substitution 3:18 96:21
  143:20,22,23 147:2
  148:17,20
successfully 107:6
  135:22
suggestion 125:19
Suite 2:11
summarization 60:8
  125:5
summarized 56:14
summary 124:3,6
summer 25:15 30:14
  32:20 33:14 40:15
  66:19 69:3,10 83:3
  84:22 85:6,14,16
  86:16,20 87:5,6,10
  87:15,20 88:11
  109:12 112:15 128:3
supervision 18:21
supervisor 20:15 21:4
  32:10
supervisory 102:16
support 22:8
suppose 11:10 90:9
  114:20
sure 8:12 9:13 12:14
  16:15 17:12 25:11
  41:12 42:7 46:1,1
  53:7,22 55:21 56:14
  68:12 74:14 80:10
  81:2,10 86:11 89:20
  91:18 102:7 107:8
  114:8,18 122:18
  124:21 131:17 132:5

survey 60:1
sworn 5:9 151:9 153:17
syllabi 23:4
syllabus 22:20 23:1,8
  23:13,17 24:4
synonymous 98:1
system 17:13 23:3
  88:17,20 89:20 120:1
system-wide 88:16
S-I-C 89:4

_____

T

T 111:13
tabulated 27:21,22
tailored 95:19
take 11:4 21:6 25:7,8
  26:8 56:11 73:1,4
  86:5,9 89:1 91:11
  93:7,16 94:20 106:18
  110:18 143:3 144:4
  144:13 145:2,12,14
  147:16
taken 1:15 4:4,6 58:20
  73:8 88:22 110:20
  131:6
takes 92:10 97:22
  148:14,15
taking 29:15,19 130:12
  130:14 144:20 147:8
  148:16,17
talk 80:11 97:16
talked 44:17 50:13
  55:8 56:12 71:18
  82:19 93:5 98:21
  99:1 100:19 136:23
talking 27:13 54:20
  69:21 78:9 85:2,3,14
tallied 60:20 61:3
taught 16:11 20:5 22:7
  23:7 32:16,17,19,20
  36:7,10,11,13 38:5
  40:11,12,15 43:14,15
  45:14 46:6 48:18,20
  50:21 72:14 76:11,12
  77:21 111:22 112:11
  144:10
Tawyna 41:5,6 43:8
teach 15:4 22:11 40:21
  41:3 43:18 49:19
  59:7 112:2,6,21
teacher 16:21 36:20
  128:22 138:19
teaching 8:22 14:7 16:9
  22:16 33:20 35:13
  48:10 72:17 76:8
  79:17 112:3 113:20
team 123:9,10,12
technique 30:5
tell 25:9 77:6 86:12

90:5,10,19 99:7
  101:17 128:6 133:1,9
  136:2 137:17 140:11
  141:7 144:3 146:23
  149:16
telling 58:22 101:12
  115:2
tells 136:13
temporary 34:21 42:5
  42:7,12,13,14 56:9
  74:8,10
tenure 61:16,17
term 54:6 55:17
terminated 76:2
terms 62:8 63:22 64:2
  64:5
test 25:6,7,8,10,13,19
  25:21,22,23 26:6,9
  26:16,17 27:17 29:14
  29:15,16,20 30:1,15
  30:16,18 91:6,7
  92:11 98:8 107:5
  124:4 125:21
testified 5:10
testimony 153:7
testing 50:9
tests 69:4 98:18,19 91:7
  textbooks 8:21 23:11
  23:11
Thank 37:8 110:21
  131:2 150:3
their 9:7 29:18,21
  44:10 52:16 78:21
  84:5 91:1 98:13
  115:5 126:11 127:1,4
  127:18,23 128:1
  134:9,10,11
Thereabout 74:18
therefor 153:9
thereof 134:9 152:8
thing 13:5,16 21:16
  54:15 83:1 85:1
  90:18 99:7
things 8:16 10:7,10
  17:19 22:19 44:18
  58:8,11 63:23 64:3
  71:20 88:14,22 100:2
  124:5 131:22
think 31:12 48:14 58:4
  58:12 63:8,11 64:15
  64:18,19 82:6 97:16
  98:9 102:19 110:14
  111:19 116:17,18
  118:14 123:11,12,13
  131:10
though 46:22 48:1
  67:17 77:1 96:1
  149:2
thought 93:15 127:7

Deposition of Dixie Peterson

132:2 134:17,22,23
135:8 136:2 137:2
138:6,18,21 139:2,7
139:13,20 140:4
141:11 143:14 144:3
145:22 147:8,21
148:2,8 149:3,11,17
151:12
**Wright's** 103:14
137:22 140:22
141:19 146:17
**written** 63:7 122:6
124:3,5,13,19,21
**wrong** 86:13 136:3
**wrote** 142:10

_____
**Y**
**Yeah** 54:22 119:2
**year** 12:10 16:12 20:7
20:9 35:17 39:6 40:2
40:4 72:9 87:21 93:9
111:16 129:15
**years** 6:16 7:18 13:3,5
13:12,12,19 14:3,3,5
14:14 16:2 17:1 36:1
37:20,21 39:5,9
61:18 71:8 72:7,8
73:22 74:17,20 88:2
88:4 102:20 103:17
129:22,23 130:3,6
**year-long** 20:10
**yesterday** 80:9
**York** 26:17
**you-all** 87:10 123:20
**y'all** 89:16 97:2 99:17
99:18

_____
**Z**
**Zip** 6:3

_____
**0**
**05** 24:17 34:10 40:15
40:15 41:1 44:20
111:19,20 146:20
**06** 23:19 24:15 25:15
25:15 86:23 87:12,16
88:12 94:19 106:1
112:16 147:2
**07** 94:18 113:8

_____
**1**
**1st** 111:20
**1/17/06** 3:15
**1/18/06** 3:17
**100** 53:3,17 54:10
**105** 112:10
**107** 112:16
**12/20/05** 3:11
**131** 3:4,11,13,14,15,17

**3:18**
**14th** 45:1,7
**1503** 1:19
**1507** 2:5
**151** 152:1
**16** 1:21 151:23 153:5
**1984** 6:20 7:11 15:23
**1986** 15:7

_____
**2**
**20** 7:18 14:3 134:21
136:14 153:18
**20th** 134:15
**200** 32:19 86:1,5,10
90:3,8 91:11,15
92:12 93:1,7,12,13
93:21 94:20 96:1,3
97:2 143:4,8,12
144:4,4 145:2 147:8
147:12,22 149:2
**2005** 12:12 31:14 32:14
32:17 41:7,10 42:23
43:1 44:6 45:6 46:19
48:15 52:21 54:1,19
54:19 55:1 59:4
66:19 69:3,10 72:12
75:11 76:9 85:21
90:7 113:16 134:15
134:21 136:4,15
137:5 139:22 149:2
149:13
**2005-2006** 21:21 24:21
**2006** 23:21,23 24:7,9
25:18 26:14 27:14
30:14,15 32:18,20
33:13,15 35:18 86:1
86:6,17,18 90:8
91:11 92:12 93:14,21
96:3 97:1,5,14 98:4
98:17 143:17 144:5
147:23 148:3,4,9
149:3,14,17
**2007** 1:21 7:21,23
35:17 113:10 151:23
152:9 153:5
**201** 32:22,23
**203** 113:9
**21st** 45:3 46:9,20 48:9
**22nd** 44:20
**23** 6:16 14:3 103:17
**24th** 44:15,23 47:13
**25** 14:16
**251** 40:16 137:6,6,10
**252** 3:13 32:18 40:22
85:20 90:3,7,9 94:1,4
94:7,9,13,21 96:13
96:16 115:2 123:6
135:3 136:3 137:9,11
137:18 140:2,18,19

**143**:4,10,14 144:16
144:23,23 145:7,23
147:9,11,13 149:1,4
149:12
**26th** 52:21
**2602** 6:8
**271** 3:14 51:6 94:4,6
135:3 136:4 137:7,12
137:20 138:4,5 139:3
139:4,7 141:9,20
144:16,18,20 146:16
149:23
**272** 32:19,20,23 33:2
97:5,13 98:4,16
99:13 106:19 107:18
148:10 149:13,18,22

_____
**3**
**3** 8:4
**3rd** 7:21
**3:06-CV-1087-WKW**
1:7 151:22
**30th** 45:6 46:19
**300** 2:11
**31st** 40:20 41:2,13 45:6
59:3
**3247** 6:1
**334-214-4817** 6:11
**36106** 2:12
**36867** 2:6
**36868** 6:3
**36869** 6:9

_____
**4**
**4th** 152:9
**4001** 2:12
**44** 3:11 131:7 133:20
134:14 135:12
136:22
**45** 3:13 140:11,20
141:5,14
**46** 3:14 141:7 142:3,6
146:6,7
**47** 3:15 142:9 145:21
146:3
**48** 3:17 146:4,9,21
**49** 3:18 131:7 146:22

_____
**5**
**5** 3:3
**5:30** 150:4
**581** 5:21

_____
**6**
**6th** 7:22,22

_____
**7**
**706-577-0003** 6:6
**75** 98:2

**750** 91:4 93:22 97:19
97:21 98:1

_____
**8**
**88** 5:21

_____
**9**
**9:25** 1:21
**90** 53:2,17 54:10

# Chattahoochee
## Valley Community College
### CLOSE TO YOU.  CLOSE TO PERFECT.

*1.334.291.4900*

P.O. Box 1000
2602 College Drive
Phenix City, Alabama 36868-1000

## STATUS LETTER REGARDING PROGRESSION
## IN THE ADN PROGRAM

Date: __December 20, 2005__          Social Security Number: __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__

Student's Name: __Lindy Wright__

The purpose of this notice is to inform you of your status in the LPN program.

|  | **SEMESTER FAILED** |
|--|--|
| ① **FAILURE/WITHDRAWAL** |  |
| **NUR 252** | __Fall 2005__ |
| **NUR 271** | __Fall 2005__ |

Policy states that a student is allowed a maximum of two failures in the L.P.N. or A.D.N. program before he/she is dismissed from the program, and withdrawals from nursing courses are counted as failures except in the extenuating circumstances as determined by the Division Chairperson.  A student cannot progress in the program until the course failed has been successfully repeated.  Students dismissed from the program may apply for admission as a new student after two years has elapsed (CV 2005-2006 Catalog pg. 111, #12 ADN Admissions Criteria).

② **ELIGIBILITY**

    a.   May Re-enter   _____

    b.   May **NOT** Re-enter   __X__

*please file in Lindy Wright's folder*

③ **SEMESTER TO RETURN**

    __N/A__

NOTE: All students must complete the program within twenty-four months of date he/she began (Alabama Department of Postsecondary Program Progression).

Sincerely,

Dixie Peterson
Division Chair/Health Sciences



CVCC 000381

4

Name of Student  Lindy Wright        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

## Section C: (To be completed by the Dean of the College)

I.    Date on which the appeal was filed with the Dean of the College  January 9, 2006

II.   Actions/findings of the Dean of the College

The findings were the same as recommended by the instructor Ms. Harris. I concur with this recommendation.

III.  Attachments (from the instructor and/or Dean of the College)

o  Recommendations of Ms. Short and Ms. Williams
o  NUR 252 Fall Semester 2005 Syllabus
o  Student Exams

IV.   Decision of the Dean of the College

After reviewing the information regarding Ms. Wright's appeal, I found no evidence that she received an inappropriate grade.  I agree with the grade of D that she received from Ms. Harris.

V.    Date of decision and notification (copies of Section A, B, and C) given to the student, instructor, and Division Chairperson

January 17, 2006

DEFENDANT'S
EXHIBIT
45

Signature _____

**4**



Name of Student __Lindy Wright__     __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__

## Section C: (To be completed by the Dean of the College)

I.      Date on which the appeal was filed with the Dean of the College  __January 9, 2006__

II.     Actions/findings of the Dean of the College

        The instructor did not submit Section A of the appeal process in the time stated by policy.

III.    Attachments (from the instructor and/or Dean of the College)

        **No attachments**

IV.     Decision of the Dean of the College

        **I have reviewed the information regarding Ms. Wright's appeal. The proper paperwork from the instructor was not submitted on time as prescribed by policy; therefore, I made a grade change from a "D" to "C" in NUR271 with the approval of the Division Chair.**

V.      Date of decision and notification (copies of Section A, B, and C) given to the student, instructor, and Division Chairperson

        **January 19, 2006**

Signature _____
        Dr. James Lowe, Dean of Instruction

DEFENDANT'S
EXHIBIT
46

Heather Chalkley

**From:** Dixie Peterson
**Sent:** Tuesday, January 17, 2006 6:31 PM
**To:** Heather Chalkley
**Cc:** Saundra L. Noles; James Lowe; Sanquita Alexander
**Subject:** Lindy Wright

Heather,

I spoke with Lindy Wright today, and she is eligible after Dean Lowe's ruling, to return to the program. She will need to register for :Nursing 272, Nursing 279, Nursing 291, Nursing 292 and Nursing 200. I think she also has a non-nursing course to take to complete degree requirements by May. The Nursing 200 is a new course, and is being offered for the first time this semester. It is a course reserved for those new ADN students who will be admitted to our May, 2006 program. Since Ms. Wright's failure of Nursing 252 stands, it will be necessary for her to repeat that course to reach a grade of "C" or better. Since the new standardized curriculum will be implemented with the new RN class that enters in May, 2006, Nursing 252 will not exist in the new curriculum. Therefore, in order for Lindy to repeat the course in the most closely resembling manner to Nursing 252, I will allow her to register for Nursing 200 which we will substitute (by authorization of the Dean) for Nursing 252. This means that if Lindy passes everything for which she is registered in the spring of 2006, she could still possibly graduate in May, 2006.

Sanquita, I will be requesting of Dean Lowe to sign a substitution form for Nursing 200 to be accepted for Nursing 252, so Lindy will be registering for Nursing 200 to fulfill the 252 requirement. Has she filled out all graduation application forms?

Thanks,

Dixie


DEFENDANT'S
EXHIBIT
47

CVCC 000249

1/25/2006

# Chattahoochee
## Valley Community College
*CLOSE TO YOU. CLOSE TO PERFECT.*

## GRADE CHANGE FORM

| NAME OF STUDENT | SOCIAL SECURITY NO. | DATE |
|---|---|---|
| Lindy Wright | 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 | 1/18/2006 |
| COURSE NAME AND NUMBER | SECTION NUMBER | SEMESTER |
| NUR 271 Maternal Newborn | 1 | Fall 2005 |

To change a grade erroneously reported and to clear an "I", simply fill in the information below.

**GRADE CHANGE FROM** _____D_____ **TO** _C_____

**REASON:** Student submitted a grade appeal request. Since the procedures for the grade appeal were not completed in the time allotted, the grade needs to be changed from a D to a C.

**NOTES: \*\*INCOMPLETE:** A Grade of "I" (Incomplete) **must be cleared by the end of the following regular semester or a final grade of "F" will automatically be recorded.** This grade will be reported to the student at the end of the semester in which the grade is changed.

_____        1/19/06
Signature of Instructor                          Date

APPROVED BY

_____        1-19-06
Signature of Department Chairperson          Date

ADMISSIONS
Received
JAN 20 2006
DRF

APPROVED BY

ADMISSIONS OFFICE                          _____
                                                         Date

CVCC 000503

DEFENDANT'S
EXHIBIT

# AUTHORIZATION FOR COURSE SUBSTITUTION

_Spring_ Semester, 199 _2006_

**STUDENT NAME** _Lindy Wright_

**SOCIAL SECURITY NUMBER** _254_ / _49_ / _7629_

**MAJOR** _ADN_          **DEGREE PROGRAM**

**COLLEGE CATALOG YEAR** _FA 04_

**RATIONALE:** _SC per Ms Peterson_

_Student failed Nur 252 in Fall 05. The new state wide Curriculum takes effect in May 06. Nur 252 will not exist and the Course content will actually be divided between numerous Courses. NSG 200 is a combination of this Course._

**COURSE(S) SUBSTITUTED**                    **REPLACED COURSE(S)**

_Nur 252 - SC per Ms Peterson_                _Nur NSG 200_

_____                    _____

_____                    _____

_____                    _____

**STUDENT**                                  **DATE**

**ACKNOWLEDGED:**

_[signature]_                                _1-24-06_

**FACULTY ADVISOR**                          **DATE**

**APPROVED:**

_[signature]_                                _1/26/06_

**DEAN OF THE COLLEGE**                       **DATE**

DEFENDANT'S EXHIBIT
47

CVCC 000248

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION


LINDY G. WRIGHT,

     Plaintiff,

  vs.                  CIVIL ACTION NO.
                           3:06-CV-1087-WKW

CHATTAHOOCHEE VALLEY
COMMUNITY COLLEGE (CVCC),
et al.,

     Defendants.


\* \* \* \* \* \* \* \* \* \* \* \* \*


DEPOSITION OF LAUREL BLACKWELL, Ed.D.,
taken pursuant to stipulation and agreement before
Lyn Daugherty, Certified Shorthand Reporter and
Commissioner for the State of Alabama at Large, in
the Law Offices of Parker & Cooley, 1507 Broad
Street, Phenix City, Alabama, on Tuesday, July
17th, 2007, commencing at approximately 10:15 a.m.,
E.D.T.


\* \* \* \* \* \* \* \* \* \* \* \* \*

EXHIBIT

tabbies®

N

Page 2

1       APPEARANCES
2   FOR THE PLAINTIFF:
3   Ms. Jennifer B. Cooley
    PARKER & COOLEY
4   Attorneys at Law
    1507 Broad Street
5   Phenix City, Alabama 36867
6   Mr. Peter A. Dumbuya
    Attorney at Law
7   P.O. Box 3302
    Phenix City, Alabama 36868
8
9   FOR THE DEFENDANT:
10  Mr. H.E. Nix, Jr.
    Ms. Brandy F. Price
11  NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
    Attorneys at Law
12  4001 Carmichael Road, Suite 300
    Montgomery, Alabama 36106
13
14  ALSO PRESENT: Ms. Lindy Wright
15
        * * * * * * * * * * * *
16
17
        EXAMINATION INDEX
18
19  LAUREL BLACKWELL, Ed.D.
20    BY MR. DUMBUYA . . . . . . . . . .  6
21    BY MS. COOLEY  . . . . . . . . .  60
22
        (Index continued on next page)
23

Page 3

1       EXHIBIT INDEX
2               MAR
    Plaintiff
3
    1   Letter dated June 7, 2006 to Dr. Laurel     60
4       M. Blackwell from Connie Cooper
5   2   Letter dated June 13, 2006 to Ms. Connie    61
        Cooper from Laurel M. Blackwell, Ed.D.
6
    3   Letter dated July 28, 2006 to Dr. Laurel    64
7       Blackwell from Jennifer Cooley
8
9
10
11
12
        * * * * * * * * * * * * *
13
14
15
16
17
18
19
20
21
22
23

Page 4

1               STIPULATIONS
2       It is hereby stipulated and agreed by and
3   between counsel representing the parties that the
4   deposition of LAUREL BLACKWELL, Ed.D. is taken
5   pursuant to the Federal Rules of Civil Procedure
6   and that said deposition may be taken before Lyn
7   Daugherty, Certified Shorthand Reporter, and
8   Commissioner for the State of Alabama at Large,
9   without the formality of a commission, that
10  objections to questions other than objections as to
11  the form of the question need not be made at this
12  time but may be reserved for a ruling at such time
13  as the said deposition may be offered in evidence
14  or used for any other purpose by either party
15  provided for by the Statute.
16      It is further stipulated and agreed by and
17  between counsel representing the parties in this
18  case that the filing of said deposition is hereby
19  waived and may be introduced at the trial of this
20  case or used in any other manner by either party
21  hereto provided for by the Statute regardless of
22  the waiving of the filing of the same.
23      It is further stipulated and agreed by and

Page 5

1   between the parties hereto and the witness that the
2   signature of the witness to this deposition is
3   hereby waived.
4       * * * * * * * * * * * *
5           LAUREL BLACKWELL, Ed.D.
6       The witness, after having first been duly sworn
7   to speak the truth, the whole truth and nothing but
8   the truth testified as follows:
9           MR. NIX:  Peter, let me -- I
10          apologize to you first for
11          interrupting you.  I know you
12          need to start.  But last
13          Friday I mentioned to you the
14          fact that your wife had worked
15          at Chattahoochee Valley
16          Community College.  And I just
17          wanted to make sure that, you
18          know, there's not a conflict
19          or anything like that.  And so
20          I mention it again to you and
21          just say that if you -- if you
22          do feel there's a conflict or
23          if you've discussed the case

Page 6

1  with her to the extent that
2  she's given you any policies
3  or other things that might not
4  be policy but that might be
5  proprietary to the college
6  that I'd appreciate your just
7  letting me know if she has at
8  some point in time.
9  MR. DUMBUYA: No. She has no such
10  information. As a matter of
11  fact, I did speak with her.
12  She was out of there before
13  she was enrolled in the
14  program. I think she was only
15  there for one or two
16  semesters, but she was gone
17  before Ms. Wright was enrolled
18  in the program. She only met
19  the plaintiff at the
20  St. Francis Hospital. Is that
21  correct? That's where you met
22  her?
23  MS. WRIGHT: Yes.

Page 7

1  MR. DUMBUYA: But you never knew
2  her when she was at CVCC?
3  MS. WRIGHT: No.
4  MR. DUMBUYA: I spoke to her and
5  she said she never --
6  MR. NIX: Okay. Thank you very
7  much.
8  EXAMINATION
9  BY MR. DUMBUYA:
10  Q. If you would, could you state your name and
11  address, please.
12  A. My name is Laurel Blackwell. I live at 167
13  Glenwood Way. And the mailing address is
14  Smiths Station, Alabama.
15  Q. And how long have you lived at this
16  address, Dr. Blackwell?
17  A. I moved there in May two years ago.
18  Q. And before you moved to this address two
19  years ago, what was your previous address?
20  A. I lived in Auburn. Auburn, Alabama. And
21  my address was 1257 Ingleside -- that's
22  I-N-G-L-E -- Ingleside Drive.
23  Q. And for how long were you at the address in

Page 8

1  Auburn?
2  A. From 1998 to when we moved here in '05.
3  Q. 2005?
4  A. Uh-huh (positive response).
5  Q. Now, at your current address in Smiths
6  Station, who lives with you at that
7  address?
8  A. Just my husband.
9  Q. Your husband?
10  A. Uh-huh (positive response).
11  Q. And your husband has been at this
12  address -- the current address with you
13  since 2005; is that correct?
14  A. Correct.
15  Q. Do you have any children living with you at
16  this address?
17  A. No. Our children are grown.
18  Q. Do any of your children live in Alabama?
19  A. I have two children -- no, three children.
20  One just moved back. I have three children
21  in Alabama. One in Dothan and two in the
22  Huntsville area.
23  Q. You said one of them just moved?

Page 9

1  A. Just moved to the Huntsville area from
2  Miami, Florida.
3  Q. Oh, okay. I thought that he moved in with
4  you.
5  A. No. They just moved back to Alabama from
6  Florida.
7  Q. Dr. Blackwell, how long have you been
8  married to your husband?
9  A. Since 1994.
10  Q. And what is your husband's name?
11  A. Fred A. Blackwell, Jr.
12  Q. Is Mr. Blackwell employed at this time?
13  A. Yes.
14  Q. Who is employing him?
15  A. He works for Michelin.
16  Q. And where is he employed at this time?
17  A. In Opelika.
18  Q. Do you know his responsibilities at
19  Michelin in Opelika?
20  A. He's human resources. He oversees human
21  resources for the facility and governmental
22  affairs.
23  Q. For how long has he been in that position?

Page 10

```
 1   A.  He went to that position in 1997.
 2   Q.  As someone in charge of the human
 3       resources, what exactly does he do in that
 4       position?
 5   A.  He oversees a variety of things from -- he
 6       oversees the hiring.  He oversees labor
 7       negotiation.  He oversees safety.  He
 8       oversees security, the EMTs.  I don't know
 9       if I can tell you -- He's the interface
10       with the corporate office for human
11       resources.
12   Q.  Has he ever been employed by CVCC, your
13       husband?
14   A.  No.
15   Q.  Have any of your children ever been
16       employed by CVCC?
17   A.  No.
18   Q.  Do you currently have any relatives who are
19       employed by CVCC?
20   A.  No.
21   Q.  Dr. Blackwell, you are currently employed;
22       is that correct?
23   A.  That's correct.
```

Page 11

```
 1   Q.  Who is your employer?
 2   A.  I'm employed as the president of
 3       Chattahoochee Valley Community College.  My
 4       contract, though, is through -- from the
 5       chancellor's office, so my supervisor is
 6       the chancellor of the system.
 7   Q.  This would be the chancellor of the
 8       two-year --
 9   A.  Alabama College System.
10   Q.  Of the Alabama College Systems?
11   A.  (Witness nods head).
12   Q.  Would this be the two-year colleges or the
13       four-year colleges?
14   A.  Two-year.  Public two-year colleges.
15   Q.  Who is the current chancellor of the
16       two-year --
17   A.  Bradley Byrne.
18   Q.  And where is the chancellor based?
19   A.  In Montgomery.
20   Q.  When did you become president of CVCC?
21   A.  I was appointed July 1st, 2002 as the
22       acting president.  In the summer of 2003 I
23       went through a national search and I was
```

Page 12

```
 1       selected as the permanent president and
 2       placed in that position in August of '03.
 3   Q.  Now, who conducted the national search for
 4       the president?
 5   A.  The chancellor's office.
 6   Q.  What is your term of employment?  Is it
 7       five years, 10 years or --
 8   A.  It's no end date in our employment.  I'm
 9       not under contract.  I serve at the
10       pleasure of the chancellor and the State
11       Board of Education.
12   Q.  As president of CVCC, what are your
13       responsibilities?
14   A.  My primary responsibility is to provide
15       direction to the institution and to ensure
16       that policy and procedure established by
17       the State Board of Education and the
18       chancellor are implemented at our local
19       institution.
20   Q.  In the last five years -- You've been in
21       this position now since August of 2003; is
22       that correct?
23   A.  Permanently, yes.
```

Page 13

```
 1   Q.  And you were in the position in July 2002
 2       in an acting position; is that correct?
 3   A.  Correct.
 4   Q.  Before you became acting president of CVCC,
 5       what other positions did you hold at CVCC?
 6   A.  I worked for two other colleges.  I worked
 7       at Southern Union State Community College
 8       in Opelika going there in 1998 when I moved
 9       to that area, to Auburn.  And prior to that
10       I was at Wallace Community College in
11       Dothan.  I went there in 1985.
12   Q.  You went to Southern Union in '98.  When
13       did you leave?
14   A.  When I came to CVCC in '02.
15   Q.  2003 -- 2002?
16   A.  '02.
17   Q.  Which positions did you hold at Southern
18       Union?
19   A.  I was in charge of work force development
20       at Southern Union.
21   Q.  What does that mean, work force
22       development?
23   A.  Preparing the work force.  It was a very
```

Page 14

1    external role working with business and
2    industry, ensuring that our programs
3    aligned with the needs of the region.
4    Q.  Did you have any teaching positions at
5        Southern Union?
6    A.  I didn't teach at Southern Union, no.
7    Q.  You said before that you were employed by
8        Wallace Community College?
9    A.  Uh-huh (positive response).
10   Q.  Where is Wallace based?
11   A.  In Dothan. Dothan, Alabama.
12   Q.  And Southern Union is in Opelika; is that
13       correct?
14   A.  That's correct.
15   Q.  And what was your position at Wallace?
16   A.  I had a number of positions over the years
17       I was there. But I went there in 1985, so
18       over those years I did grant writing, grant
19       implementation, advising, recruiting, some
20       teaching. As many years as I was there my
21       responsibilities and roles grew and were
22       diversified while I was there.
23   Q.  You said you did some teaching?

Page 15

1    A.  I did some teaching.
2    Q.  Which courses did you teach?
3    A.  I did -- I taught a communications class.
4        I taught some orientation classes, I
5        believe some job search courses.
6    Q.  And when did you leave Wallace Community
7        College?
8    A.  That's not an easy answer because I worked
9        simultaneously for Wallace College and
10       Southern Union. I had an overlapping time
11       period. So I'll have to think if I can
12       come up with that date. Probably --
13       Probably February of 2000, although I'm not
14       absolutely certain of that. I believe it
15       was February of 2000. I believe I had
16       about 18 months of overlapping where I
17       worked for both institutions, for both
18       Wallace and Southern Union.
19   Q.  Were you employed full-time at Southern as
20       well as at Wallace at the same time?
21   A.  I was employed -- During that overlapping
22       time I was employed by Wallace College and
23       subcontracted by Southern Union. So I was

Page 16

1    working half time at Wallace and half time
2    at Southern Union.
3    Q.  And why did you leave Wallace Community
4        College?
5    A.  Because my husband was transferred to
6        Opelika.
7    Q.  And why did you leave Southern Union?
8    A.  For a promotion to presidency.
9    Q.  And this would be the presidency at CVCC;
10       correct?
11   A.  That's right.
12   Q.  Before your promotion to the presidency at
13       CVCC, had you held any administrative
14       positions?
15   A.  I had been in administrative roles ever
16       since I went into the college system in
17       1985. All my jobs were primarily
18       administrative. When I taught, I taught
19       part-time, Mr. Dumbuya. Most of my roles
20       have always been administrative.
21   Q.  Had you been head of department at Southern
22       Union or Wallace?
23   A.  Yes.

Page 17

1    Q.  Had you been dean?
2    A.  No, I had not.
3    Q.  Now, Dr. Blackwell, what is your level of
4        education? I'm just going to limit you to
5        the college university level. What is your
6        highest degree that you have earned?
7    A.  My highest degree, I have an Ed.D. from the
8        University of Alabama. It's in
9        administration of higher education.
10   Q.  And when did you earn your Ed.D.?
11   A.  1994.
12   Q.  Did you specialize or did you take any
13       particular courses for you to earn the
14       Ed.D.?
15   A.  Well, the degree was administration of
16       higher education, so all of my course work
17       was -- all my course work was regarding
18       college administration.
19   Q.  Is there any particular specialty within
20       the administration courses?
21   A.  No.
22   Q.  It's just general administration?
23   A.  College administration, yes.

Page 26

| | |
|---|---|
| 1 | we'll make a request |
| 2 | accordingly. |
| 3 | Q. Who makes up the faculty senate at CVCC? |
| 4 | A. It is faculty members that they select. |
| 5 | It's a self-selecting body. It's not an |
| 6 | official part of the college, so I don't |
| 7 | provide any oversight to that. It's a |
| 8 | self-selecting process. |
| 9 | Q. Dr. Blackwell, as part of your |
| 10 | responsibilities as president, do you often |
| 11 | meet with students who have a problem at |
| 12 | CVCC? |
| 13 | A. No, I do not. That would not be something |
| 14 | that I would normally do. |
| 15 | Q. But have you met with any students in the |
| 16 | past, you know, since you've become |
| 17 | president? |
| 18 | A. Upon occasion. |
| 19 | Q. On those occasions in which students came |
| 20 | to you, what was the nature of the |
| 21 | discussions? |
| 22 | MR. NIX: You mean every one? |
| 23 | Q. Any example would suffice of students |

Page 27

| | |
|---|---|
| 1 | coming to your office to talk to you. |
| 2 | MR. NIX: An example? Is that |
| 3 | what you want? |
| 4 | MR. DUMBUYA: Yeah. |
| 5 | A. Well, a student might come to see me from a |
| 6 | range of reasons from they want a letter of |
| 7 | reference to they're unhappy with a faculty |
| 8 | member. But those visits with me from a |
| 9 | student are rare. |
| 10 | Q. Have you ever met with the plaintiff in |
| 11 | this case, Ms. Wright? |
| 12 | A. Yes. Ms. Wright came to see me. |
| 13 | Q. How many times did she come to see you? |
| 14 | A. Only once. |
| 15 | Q. Do you remember when that was? |
| 16 | A. No. Huh-uh (negative response). |
| 17 | Q. Do you remember why she came to see you? |
| 18 | A. Ms. Wright was coming because she was |
| 19 | dissatisfied with a decision that had been |
| 20 | made regarding her attendance at the |
| 21 | college, in the nursing program |
| 22 | specifically. |
| 23 | Q. You say you don't recall when she came to |

Page 28

| | |
|---|---|
| 1 | see you? |
| 2 | A. No. I don't remember which semester it |
| 3 | was, if it was -- if it was at the first |
| 4 | semester where she failed courses or if it |
| 5 | was the second semester when she failed the |
| 6 | courses. |
| 7 | Q. Do you remember any particular course that |
| 8 | she came to talk to you about? |
| 9 | A. No. I don't remember the specifics of our |
| 10 | conversation. |
| 11 | Q. You don't have any recollections of that? |
| 12 | A. No. I do not remember specifics of our |
| 13 | conversation. |
| 14 | Q. Do you have a present recollection of how |
| 15 | that particular issue was resolved when she |
| 16 | came to see you? |
| 17 | MR. NIX: I'm sorry? |
| 18 | Q. What was resolved when Ms. Wright came to |
| 19 | see you? |
| 20 | MR. NIX: If anything. |
| 21 | Q. If anything. |
| 22 | A. Nothing was resolved when Ms. Wright came |
| 23 | to see me. |

Page 29

| | |
|---|---|
| 1 | Q. Dr. Blackwell, do heads of departments |
| 2 | report to your office? |
| 3 | A. No. |
| 4 | Q. Do deans report to your office? |
| 5 | A. Deans report to my office. |
| 6 | Q. And would those reports include any reports |
| 7 | from heads of departments? |
| 8 | A. Let me back up and talk about the |
| 9 | organizational chart, because there are |
| 10 | some exceptions to what I just said. An |
| 11 | organizational chart would look like this; |
| 12 | the State Board of Education, the |
| 13 | chancellor and then me and then my direct |
| 14 | reports that include two deans, and then |
| 15 | the instructional part of the college |
| 16 | reports to the dean of instruction. The |
| 17 | dean of student and administrative services |
| 18 | has another tier of people that report to |
| 19 | him. I have a few reports that are |
| 20 | directors, but -- would you like me to show |
| 21 | you? |
| 22 | Q. Well, all of those reports having to do |
| 23 | with anything -- |

Page 30

1  A. To do with instruction?
2  Q. -- to do with the instruction of the
3     nursing program regarding this particular
4     plaintiff?
5         MR. NIX: Regarding -- I'm sorry.
6             You're asking her to describe
7             for you reports that she would
8             obtain or that she did obtain
9             regarding Ms. Wright?
10        MR. DUMBUYA: No. Generally
11            whether she did receive
12            reports from the deans of the
13            various colleges.
14        MR. NIX: So this is not
15            specifically related to --
16        MR. DUMBUYA: No, not yet. I'm
17            working my way through.
18 A. Two deans report to my office, the dean of
19    instruction and the dean of student and
20    administrative services. Two deans.
21 Q. Are those the only two deans you have at
22    CVCC?
23 A. The only two deans we have at the college,

Page 31

1     yes.
2  Q. So they report to you?
3  A. Yes.
4  Q. Would the deans' report include reports
5     from the heads of their departments?
6  A. The heads of the departments report to
7     those deans, yes. Department chairs report
8     to the dean, instructional department
9     chairs, if that's what you're asking.
10 Q. And then the deans report to you; is that
11    correct?
12 A. Yes. Uh-huh (positive response).
13 Q. Now, in any of those reports since you've
14    been president, have those reports included
15    any information about the plaintiff in this
16    case, Ms. Wright?
17        MR. NIX: You mean a written
18            report from a dean?
19 A. Are you talking about a written report?
20 Q. Any written reports.
21 A. No. Not that I -- Not that I have any
22    recollection of a written report.
23 Q. But has any of the deans or the heads of

Page 32

1     programs or departments ever come to your
2     office to discuss the plaintiff in this
3     case?
4  A. Yes. At the end of fall 2004 --
5         MR. NIX: We're talking deans now?
6  Q. Deans or heads of departments or programs.
7  A. Dean Lowe discussed with me at the end of
8     fall 2004 that there was a nursing student
9     that had two failures. That was just by
10    matter of -- by manner of letting me know
11    that there was a problem. I don't think I
12    knew the student's name at that time.
13 Q. Did Dean Lowe mention the two failures in
14    terms of course numbers?
15 A. I doubt it.
16 Q. So Dean Lowe never mentioned the student's
17    name; is that correct?
18        MR. NIX: She did not say that. I
19            object to the form of the
20            question in that you seem to
21            be quoting something that --
22        MR. DUMBUYA: (Shakes head).
23        MR. NIX: You're not. Okay.

Page 33

1         MR. DUMBUYA: She mentioned that
2             there was no name given. I'm
3             just trying to make sure that
4             I heard what she said. She
5             mentioned that she didn't
6             think Dean Lowe mentioned a
7             name.
8  Q. Is that correct?
9  A. I really don't recall something that was in
10    2004 that at that time didn't have any
11    particular significance. It was just a
12    passing notification to me that we had a
13    nursing student that had failed two
14    courses.
15 Q. But the dean never mentioned which two
16    courses?
17 A. I wouldn't remember that.
18 Q. Did any of the heads of departments -- I'm
19    calling them heads of departments. Is that
20    how you call them at CVCC?
21 A. They're department chairs if they're a
22    faculty member. If it's instruction,
23    they're a faculty chair.

1     the 7th for the one teacher that resigned,
2     and we had a substitute there on the 7th
3     and the 14th for the other teacher that
4     resigned.
5  Q.  Were these substitutes also known as guest
6     speakers?
7  A.  Yes. I believe that's what Ms. Peterson
8     arranged, yes, guest speakers.
9  Q.  And these are people trained in the nursing
10    program?
11  A.  I know that they were trained in the area
12    that Mrs. Peterson wanted lectures given
13    on, what she determined was appropriate
14    instruction, and so she arranged those
15    guests to come and provide instruction.
16  Q.  Do you have any present recollection of the
17    credentials of these substitutes that were
18    hired?
19  A.  No. Because providing substitute teachers
20    would not be something that I would
21    normally be involved in.
22  Q.  Do you know for how long Ms. Gunnels was
23    employed at CVCC?

1  A.  She was a part-time employee prior to my
2    arrival for a period of time. And she was
3    a part-time employee some after I arrived
4    and then she was a full-time employee for
5    maybe just one semester. Summer, summer
6    '05.
7  Q.  I'm sorry?
8  A.  Summer '05.
9  Q.  Do you know why Ms. Gunnels left CVCC?
10  A.  I do not.
11  Q.  Had you ever met with Ms. Gunnels herself?
12  A.  The day she was packing her office I went
13    to see her.
14  Q.  And was that the very first time you met
15    with her?
16  A.  No. I've met with Ms. Gunnels as I offered
17    her employment. Is that what you mean?
18    Yes. Met with Ms. Gunnels well before I
19    offered her employment. In 2002 I met her
20    first when I first was at the college and I
21    interviewed her and met her then. And then
22    I saw Ms. Gunnels off and on during her
23    employment at the college.

1  Q.  You also mentioned that Ms. Brenda Bellamy
2    also resigned?
3  A.  Yes.
4  Q.  Do you know why she resigned?
5  A.  No, I do not.
6  Q.  During any of the courses --
7  A.  Let me state I could go back to the
8    personnel file and see if there is a reason
9    in the letters of resignation, but I don't
10    recall that there is anything in the letter
11    of resignation. Excuse me.
12  Q.  I was going to ask you about Ms. Bellamy.
13    Do you know for how long she was employed
14    at CVCC? Brenda Bellamy?
15  A.  Ms. Bellamy had been employed at the
16    college prior to my arrival and then she
17    and her husband moved to another part of
18    the country. She returned and we rehired
19    her full-time in January of '05. I believe
20    she worked part-time some for the college
21    also.
22  Q.  Do you know any of the courses Ms. Gunnels
23    was teaching?

1  A.  No. I really don't assign instruction
2    within the department. That's really what
3    the chair does. So probably I don't know
4    what courses she taught, Mr. Dumbuya.
5  Q.  And would the same apply to Ms. Bellamy?
6  A.  Uh-huh (positive response).
7  Q.  Do you know -- You were here the last time
8    for the deposition of Ms. Wright. There
9    was mention of a Tawanna Cash as an
10    instructor. Do you know who this
11    individual is?
12  A.  I do.
13  Q.  Was she employed in the nursing program?
14  A.  She was.
15  Q.  Did you employ her? Was she there before
16    you arrived?
17  A.  Ms. Cash was an employee at Southern Union
18    and she served as an interim -- an interim
19    contract with us after the resignations of
20    Mrs. Gunnels and Mrs. Bellamy.
21  Q.  Did you know which course she was
22    teaching? Ms. Cash?
23  A.  I think she taught 271, but I'm not

Page 42

1  Q.  What was the reason for you to visit that
2      particular class?
3  A.  I went to that class with Dean Lowe because
4      we had -- we had some problems in the
5      department that day and Mrs. Peterson was
6      off campus.  We could not reach her.
7      Normally it would be something
8      Mrs. Peterson as department chair would
9      have managed, but she was not available
10     that day.
11 Q.  What type of problem was it?
12 A.  It was my understanding that the faculty
13     members were resigning that day.  They were
14     leaving their positions that they were
15     contracted for and the students were
16     upset.  So I went down with Dean Lowe in
17     the absence of Mrs. Peterson to ascertain
18     what was happening and to talk with the
19     students and to see the faculty.
20 Q.  Who are the faculty members who were
21     resigning on this occasion?
22 A.  Sandy Gunnels and Brenda Bellamy.
23 Q.  Approximately how long after the beginning

Page 43

1      of the semester in 2005 -- the fall
2      semester in 2005 did these two faculty
3      members resign?
4  A.  I'm sorry.  Ask that question again.
5  Q.  How soon after the fall semester began did
6      Ms. Gunnels and Ms. Bellamy resign?
7  A.  I don't remember what the date was, the
8      first date on their contract.  The first
9      date of classes was August 21st.  Normally
10     the faculty's contract starts the week
11     before that, so I would -- I'm sure a week
12     prior to August 21st they went under
13     contract with the college for that year,
14     for that nine-month period, and they left
15     their positions on August 31st.
16 Q.  Was there any particular reason or reasons
17     given for them leaving that you're aware of?
18 A.  I was notified that they had -- one or both
19     had turned in a letter of resignation to HR
20     that day.  And that was the first notice I
21     had that they were leaving and breaking
22     their contract.
23 Q.  Were there any replacements for these two

Page 44

1      faculty members, Ms. Gunnels and
2      Ms. Bellamy?
3  A.  We immediately began working on that.  We
4      contacted the chancellor's office.  This
5      was an anomaly to have faculty leave in the
6      midst of a contract.  So we contacted the
7      chancellor's office because there is a
8      director of health programs, for the lack
9      of a better word -- I'm not sure that's
10     exact title -- but to seek his guidance and
11     hers because she oversees the health
12     programs throughout the state and the
13     system and began working on a resolution.
14     She came over immediately to begin helping
15     us work toward filling those positions,
16     and, in fact, the chancellor told her that
17     if she had to teach those classes herself
18     that that was to be the resolution.  So we
19     began immediately to fill those slots.
20 Q.  How soon were you able to fill those two
21     positions?
22 A.  One of them was filled by September 14th
23     and the other was filled September 21st.

Page 45

1  Q.  In the meantime between the resignations
2      and the replacements, did you have anyone
3      teaching those courses for which these two
4      former faculty members were responsible?
5  A.  Well, one of those classes met one time
6      between the time there was a resignation,
7      and that would have been the 7th, because
8      they only met once a week.  And the other
9      class met twice, the 7th and the 14th,
10     before there was a replacement.  In each
11     case we had a substitute teacher there, as
12     we would always aspire to do when you have
13     a vacancy -- when you have a teacher's
14     absence.  Oftentimes classes are canceled
15     when a faculty member is sick or can't be
16     there.  In that case we arrange substitutes
17     instead of canceling the class.
18 Q.  And did these substitutes attend those
19     classes regularly as scheduled?
20 A.  Yes.
21 Q.  Whether it's once a week or twice a week --
22 A.  Only once a week.  Those classes met on
23     Wednesday.  So we had a substitute there on





PLAINTIFF'S
EXHIBIT
1

*CONNIE COOPER*
*Attorney at Law*
*P.O. Box 3110*
*Phenix City, AL 36868*
*(334) 297-9442*
*Fax: (334) 297-6008*
June 7, 2006

Dr. Laurel M. Blackwell
Chattahoochee Valley Community College
2602 College Drive
Phenix City, AL 36869

RE: My client, Lindy Gale Wright

Dear Dr. Blackwell,

I represent Ms. Lindy Gale Wright. I have previously had contact with Dean
Lowe regarding problems my client has encountered as a nursing student at
the school.

Ms. Wright finished the Associate Degree program this semester. In order to
fully inform you of the problems, I will outline what has taken place.

Ms. Wright currently has a GPA of 3.2. She was informed she had failed
Nursing 252, medical surgical nursing. Ms. Lynn Harris, instructor, informed
Ms. Wright that Nursing 200 would be substituted for the Nursing 252 due to
course curriculum changes in the program. Ms. Wright successfully
completed this course, obtaining an A grade. Her final semester, summer
2006, she was informed she had failed Pediatric Nursing 272. Ms. Wright
obtained copies of her care plans (which comprise a portion of the course
grade) from Bridgette Jackson, clinical instructor. I have those care plans
which appear to indicate that my client's grades were changed on three
occasions. That aside, my client was willing to take re-take Nursing 272
which is being offered this summer in order to graduate. She also turned in a
request for course forgiveness. She has attempted to contact Dean Lowe,
Ms. Dixie Peterson and Sanquita Alexander in order to be allowed to be
placed in Nursing 272. She has had no response from this request. She has
been informed by both Dean Lowe and Dixie Peterson that due to the fact

that she failed Nursing 252, she now has two failures and cannot continue in the program. I personally assisted Ms. Wright with what we believed was a successful resolution of the Nursing 252 issue in that the Nursing 200 course would substitute for Nursing 252, as long as Ms. Wright successfully passed Nursing 200. It appears Dean Lowe is now denying that this was the resolution reached by all involved. There would have been no reason for my client to take Nursing 200 unless this would have assisted her to graduate.

My client has personal knowledge that there is a student currently enrolled in Nursing 272, Pediatric Nursing, who previously failed this course and is being allowed to take 272 this summer. My client should be allowed to retake Nursing 272 this summer in order to graduate.

My client has personal knowledge of another student who had two failures in the nursing program and was allowed to graduate.

Additionally, my client has informed me that there were numerous problems within the program which included that the students had no instructor for the first 5 weeks of the second semester, no instructor for clinical on two occasions, instructors were late for class, teachers were unprepared for class, instructors not following their course syllabus and most importantly my client was accused of cheating and this information was relayed to other students in the program. It appears there was constant turmoil in this program.

The only goal my client has is to graduate, sit for the nursing boards and start her career as a nurse. She contracted with your school, paid her tuition and we believed successfully completed the requirements of the nursing program. (She is willing to take Nursing 272 this summer).

This has been extremely stressful to Ms. Wright who is now in her 8th month of pregnancy. We know of no resolution if the school is unwilling to follow procedure outlined in the student handbook and the agreement reached with Dean Lowe. The only alternative is to file a lawsuit for breach of contract.

We would like to resolve this without litigation but feel that unless a resolution can be had within 7 days, we will be unable to resolve the matter.

Please contact me within 7 days if you feel there is a resolution to this matter.

Thank you for your prompt attention.

Sincerely,

Connie Cooper

cc:  James Lowe
     Dixie Peterson

## Chattahoochee
### Valley Community College



PLAINTIFF'S
EXHIBIT

2

*Laurel M. Blackwell, Ed.D.*
*President*

*2602 College Drive*
*Phenix City, Alabama 36869*
*1.334.291.4981*
*1.334.291.4981 (fax)*

June 13, 2006

Ms. Connie Cooper, Esq.
Attorney at Law
P.O. Box 3110
Phenix City, AL  36868

Dear Ms. Cooper:

This letter is in reference to the letter received by Chattahoochee Valley Community College on June 9, 2006 regarding Ms. Lindy Gale Wright.

Ms. Wright was admitted under the Nursing Career Mobility Admission Criteria as listed in the 2004-2005 Chattahoochee Valley Community College Catalog and Student Handbook.

The following responses are based on our established institutional nursing policies published on Page 106 of the 2004-2005 Chattahoochee Valley Community College Catalog and Student Handbook:

**Policy # 11**
Students enrolled in the Nursing Mobility program must earn a "C" or higher in all required courses in the nursing curriculum, in both nursing and non-nursing courses. This includes satisfactory completion of the clinical components of each course. Failure of clinical components results in failure of the course.

- Ms. Wright failed NUR252 in Fall 2005 with an earned grade of "D".
- In Spring 2006, Ms. Wright failed NUR272 with an earned grade of "D".

**Policy # 13**
Nursing courses NUR 252, 271, 272, 279, 291, and 292 may be repeated only once and are to be taken the next semester a course is offered provided space is available. If the student does not pass the nursing course on the second attempt, that student shall be excluded from the nursing program, but not the College. Students who repeat 252, 271, 272, 291, and 292 will be encouraged to successfully complete review packets for each course before retaking.

- NUR252 would not be offered again because of the implementation of the standardized statewide curriculum, so a substitute had to be offered in order for Ms. Wright to be able to repeat the course.  As a result, NUR200 was substituted for the course, NUR252, which will no longer be offered.

- However, NUR200 did not take away the failing grade of NUR252; it merely allowed an opportunity for Ms. Wright to repeat a failed course.

**Policy # 14**
The nursing student must complete the entire nursing program within twenty-four months of the date he/she begins his/her studies in the program or be excluded from the nursing program. If a nursing student fails two different nursing courses within the twenty-four-month period, he/she will be excluded from the program and CANNOT reapply. Exclusion from the nursing program does not constitute exclusion from the College.

- Ms. Wright failed NUR252 in Fall 2005 with an earned grade of "D".
- In Spring 2006, Ms. Wright failed NUR272 with an earned grade of "D".
- Ms. Wright failed two different nursing courses within a twenty-four month period, which results in her exclusion from the program. According to our policy, she will not be allowed to take any further nursing courses at Chattahoochee Valley Community College.

Attached are copies of the policies from the Nursing Career Mobility Criteria Program as listed in the 2004-2005 Catalog. These long-standing policies have guided all the actions taken in regards to Ms. Wright's enrollment at Chattahoochee Valley Community College.

Sincerely,

*Laurel M. Blackwell*

Laurel M. Blackwell, Ed.D.
President

LB/LH/hc

cc:    Dr. James Lowe
       Dixie Peterson

07-28-06   13:05            ☎ 334 297 6008         C. NIE COOPER ATTY.        ☐ 003

Seme:.
F

..........5
.........4

...................
..................
..................
26

will beco:
s, admissi
Informatio..

# NURSING CAREER
## MOBILITY PROGRAM (ADN)
### ADMISSIONS CRITERIA

1. Applicants must meet all the admission requirements to be admitted as a regular student to the College.

   An Application for Admission to the Nursing Mobility Career program must be completed and submitted to the Nursing Office. Applications are available upon request. Testing dates will be announced in a letter to prospective students after the application process is complete.

   Students must be Licensed Practical Nurses (LPNs) or recent graduates of an LPN program in order to apply for the Nurse Mobility program. Practical nurses must have three months of clinical work experience within the thirty-six-month period prior to beginning the program. Recent graduates of PN programs may apply provided that they commit to document 500 hours of work experience by the June date the program begins. All supporting documents must be in the student's file. All application material except transcripts should be sent to the Nursing Division. Transcripts should be sent by the school attended to the Admissions Office. **It is the student's responsibility to verify that his/her transcript has been received by the Admissions Office.**

   Applicants who meet the requirements specified in #1 and #2 will be invited to take the admission/validation tests on the dates specified for the tests. Failure to enroll after acceptance constitutes forfeiture of position, and the individual must repeat the entire admission process if he/she seeks admission at a future date.

   The following factors will be considered in granting provisional admission to the program: scores on the admission/validation examination (50th percentile in Foundations, and a combined average of 40th percentile in Maternal-Child Nursing), employee reference letters, and a GPA of 2.00 on previous college coursework. To gain unconditional admission, students must successfully pass skills check-offs in addition to passing the admission/validation exam. These check-offs will be conducted in the Spring Semester prior to entering the program. Failure will result in forfeiture of position in the program.

   Students must have completed the following three courses, with a grade of "C" or higher, preferably at the College, prior to beginning study in the nursing program. Individuals may transfer these courses from other accredited colleges.
   BIO 103 Principles of Biology . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   ENG 101 English Composition I . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   PSY 200 General Psychology . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   Students must take diagnostic tests in writing, mathematics, and reading at least two semesters prior to beginning prerequisite coursework in order to allow for completion of any required coursework.

   In the interest of student and patient safety and before consideration for admission, any applicant possessing certain limitations may be required to submit medical examination records and/or statements from physicians indicating that he/she is able to fully participate with reasonable accommodation, if necessary, in the approved program of clinical studies and responsibilities. **Students must be able to perform the essential functions of the program.**

   Evidence of current CPR certification, health insurance, and malpractice coverage as a nursing student must also be submitted to the Nursing Division. Malpractice insurance application forms are available upon request in the Nursing Division. If the student does not supply these documents to the Nursing Division by the established deadline, admission to the program will be denied.

105

9. Once a student is admitted to the Nursing Mobility program, he/she will be responsible for accurately following the admissions criteria and the nursing curriculum design. Failure to follow the curriculum design as represented may affect progression in the program.

10. Once provisionally admitted to the program, the student must complete all coursework at the College unless written approval is obtained from the Division Chairperson and the Dean of Instruction.

11. Students enrolled in the Nursing Mobility program must earn a "C" or higher in all required courses in the nursing curriculum, in both nursing and non-nursing courses. This includes satisfactory completion of the clinical components of each course. Failure of clinical components results in failure of the course.

12. Nursing courses 141, 242, and 251 may be taken only once. A student who fails to earn a "C" in any one of these courses must reapply to the nursing program. If a student fails to earn a "C" in two or more of the courses listed above, he/she will be excluded from the program and unable to reapply.

13. Nursing courses NUR 252, 271, 272, 279, 291, and 292 may be repeated only once and are to be taken the next semester a course is offered provided space is available. If the student does not pass the nursing course on the second attempt, that student shall be excluded from the nursing program, but not the College. Students who repeat 252, 271, 272, 291, and 292 will be encouraged to successfully complete review packets for each course before retaking.

14. The nursing student must complete the entire nursing program within twenty-four months of the date he/she began his/her studies in the program. If a nursing student fails two different nursing courses within the twenty-four month period, he/she will be excluded from the program and CANNOT reapply. Exclusion from the nursing program does not constitute exclusion from the College.

15. Withdrawal from nursing courses will be considered as failure (except in extenuating circumstances as determined by the Division Chairperson). The student must be passing at the time of the withdrawal for the circumstance to be considered.

16. An Incomplete (I) in nursing courses will be given only in extreme extenuating circumstances (i.e., hospitalization of student, death of a student's immediate family member, or hospitalization of the student related to pregnancy) and is at the discretion of the instructor and Nursing Division Chairperson). Incompletes are not intended for students who are failing nursing courses.

17. Nursing and non-nursing courses are to be taken in sequence as shown by the nursing curriculum design in this Catalog. When non-nursing courses are failed with a "D" or an "F", the student must repeat the courses the next semester they are offered, provided space is available. The student must be aware that if a grade of "D" or "F" is made in a non-nursing course that is a prerequisite to a nursing course the following semester, he or she may not advance to the next nursing course.

18. Each student is responsible for mailing his/her own application to the Board of Nursing in the state in which he/she is applying for initial licensure, as well as to NCLEX. Each student is responsible for mailing the application and meeting any deadlines that the Board may announce.

19. Transfer credit from other nursing programs is occasionally granted, and is done on an individual basis. A student who has been enrolled previously as a nursing student at another institution may be considered for admission after the application filing deadline date if time and space permit, but no guarantee of admission is granted. All applicants must take the entrance/validation examinations and meet all program requirements.

20. In addit...
fill the s...
College...

21. Applican...
Act (AI...
Disabili...

*Special Costs,*
Liability Insur...
Nursing Pin (...
Uniform (requ...
Board of Nurs...
NCLEX Fee...
NLN Examina...
Nursing Valid...
Health Insuran...
Physical (requ...
Hepatitis B va...

*Costs for th...
Chairperson o...

07-28-06    13:07    ☎ 334 297 6008    C[ ]IE COOPER ATTY.    ⊡ 005



20. In addition to the above specification, students in the Nursing Mobility program must fulfill the same requirements and regulations expected of all students who are admitted to the College and outlined in the Nursing Student Handbook.

21. Applicants requiring reasonable accommodations under the Americans with Disabilities Act (ADA) are encouraged to call the ADA Coordinator at 214-4845 (Americans with Disabilities Act Compliance Plan, IV.)

*Special Costs for Nursing Students* *

Liability Insurance (required)
Nursing Pin (optional)
Uniform (required)
Board of Nursing Licensure Fee
NCLEX Fee
NLN Examinations (required per semester and included in Registration Costs)
Nursing Validation Examination and Clinical Testing (required)
Health Insurance (individual rates required)
Physical (required)
Hepatitis B vaccinations (optional but highly encouraged)

*Costs for these items vary. For specific costs, the student should consult the Division Chairperson of Health Sciences.

a. If fewer than three (3) calendar years have elapsed since the semester/term for which the student wishes to declared bankruptcy, the student may declare academic bankruptcy on all coursework taken during that one semester/term provided the student has taken a minimum of eighteen semester credit hours of coursework at the institution since the bankruptcy semester/term occurred. All coursework taken, even hours completed satisfactorily during the semester for which academic bankruptcy is declared, will be disregarded in the cumulative GPA.

b. If three (3) or more calendar years have elapsed since the most recent semester/term for which the student wishes to declare bankruptcy, the student may declare academic bankruptcy on all coursework taken during a one to three semester/term provided the student has taken a minimum of eighteen semester hours of coursework at the College since the bankruptcy semester(s) occurred. All coursework taken, even hours completed satisfactorily, during the semester/term in which academic bankruptcy is declared will be disregarded in the cumulative GPA.

2. When academic bankruptcy is declared, the transcript will reflect the term *Academic Bankruptcy* for each semester/term affected. When academic bankruptcy is declared, the transcript will reflect the semester/term of its   implementation and the transcript will reflect *Academic Bankruptcy Implemented.*

3. A student may declare academic bankruptcy only once.

4. Implementation of academic bankruptcy at an institution does not guarantee that other institutions will approve such action. This determination will be made by the respective transfer institution.

# CHANGE OF CURRICULUM OR PROGRAM OF STUDY

Students accepted and enrolled in a particular program of study who seek to pursue another program of study must meet the requirements for admission to the new program. A student should complete the necessary curriculum change form available at the Admissions Office, then see his/her advisor for an updated plan of study. Students who change their program of study will follow the program requirements of the current Catalog at the time of the program of study change.

## COURSE FORGIVENESS

1. If a student repeats a course, the last grade awarded (excluding grades of W) replaces the previous grade in the computation of the cumulative grade point average. The grade point average during the term in which the course was first attempted will not be affected.

2. When a course is repeated more than once, all grades for the course- excluding the first grade- will be employed in computation of the cumulative grade point average. Official records at the institution will list each course in which a student has enrolled.

3. It is the student's responsibility to request of the Dean of Student and Administrative Services that the forgiveness policy be implemented.

4. No course in which the last grade received was a "F" may be counted toward graduation. The student must be aware also that the last recorded grade may be regarded by a senior institution as the grade of record for transfer purposes.

## INDEPENDENT STUDY

In certain unusual circumstances, the Dean of Instruction, upon recommendation of the Division Chairperson and instructor, may permit a student to take a course by independent study. Permission will be based on such factors as future course availability and the student's academic record. No student whose grade point average is below 2.0 will be permitted to take a course by independent

59

9. Once a student is admitted to the Nursing Mobility program, he/she will be responsible for accurately meeting the admissions criteria and the nursing curriculum design. Failure to follow the curriculum design as represented may affect progression in the program.

10. Once provisionally admitted to the program, the student must complete all coursework at the College unless written approval is obtained from the Division Chairperson and the Dean of Instruction.

11. Students enrolled in the Nursing Mobility program must earn a "C" or higher in all required courses in the nursing curriculum, in both nursing and non-nursing courses. This includes satisfactory completion of the clinical components of each course. Failure of clinical components results in failure of the course.

12. Nursing courses 131, 242, and 251 may be taken only once. A student who fails to earn a "C" in any one of these courses must reapply to the nursing program. If a student fails to earn a "C" in two or more of the courses listed above, he/she will be excluded from the program and unable to reapply.

13. Nursing courses NUR 252, 271, 272, 279, 291, and 292 may be repeated only once and are to be taken the next semester a course is offered provided space is available. If the student does not pass the nursing course on the second attempt, that student shall be excluded from the nursing program, but not the College. Students who repeat 252, 271, 272, 291, and 292 will be encouraged to successfully complete review packets for each course before retaking.

14. The nursing student must complete the entire nursing program within twenty-four months of the date he/she begins his/her studies in the program or be excluded from the nursing program. If a nursing student fails two different nursing courses within the twenty-four-month period, he/she will be excluded from the program and CANNOT reapply. Exclusion from the nursing program does not constitute exclusion from the College.

15. Withdrawal from nursing courses will be considered as failure (except in extenuating circumstances as determined by the Division Chairperson). The student must be passing at the time of the withdrawal for the circumstance to be considered.

16. An Incomplete (I) in nursing courses will be given only in extreme extenuating circumstances (i.e., hospitalization of student, death of a student's immediate family member, or hospitalization of the student related to pregnancy) and is at the discretion of the instructor and Nursing Division Chairperson). Incompletes are not intended for students who are failing nursing courses.

17. Nursing and non-nursing courses are to be taken in sequence as shown by the nursing curriculum design in this Catalog. When non-nursing courses are failed with a "D" or an "F", the student must repeat the courses the next semester they are offered, provided space is available. The student must be aware that if a grade of "D" or "F" is made in a non-nursing course that is a prerequisite to a nursing course the following semester, he or she may not advance to the next nursing course.

18. Each student is responsible for mailing his/her own application to the Board of Nursing in the state in which he/she is applying for initial licensure, as well as to NCLEX. Each student is responsible for mailing the application and meeting any deadlines that the Board may announce.

19. Transfer credit from other nursing programs is occasionally granted, and is done on an individual basis. A student who has been enrolled previously as a nursing student at another institution may be considered for admission after the application filing deadline date if time and space permit, but no guarantee of admission is granted. All applicants must take the entrance/validation examinations and meet all program requirements.

111

the purpose or effect of unreasonably interfering with a person's work or academic performance or creating an intimidating, hostile, or offensive work, academic, or living environment, or (4) such conduct denies, limits, provides different, or conditions the provision of, aid, compensation benefits or services provided to students or employees by CVCC."

**Reporting Harassment**

Any person who is the victim of, or who is aware of, any harassment prohibited by this policy should report such harassment to the College Grievance Officer. Reports of a sensitive nature will be investigated and resolved in such a manner as to best protect the privacy of all victims and witnesses to the fullest extent possible under the circumstances.

# COMPLAINT AND GRIEVANCE PROCEDURES

CVCC promotes the open exchange of ideas among all members of the CVCC community, including students, faculty, staff, and administration. An environment conducive to the open exchange of ideas is essential to intellectual growth and positive change. However, CVCC recognizes that, at times, people may have differences which they are unable or unwilling to resolve themselves. The procedures described below shall be available to a CVCC student only after the student has made every reasonable attempt to resolve his/her problem with the appropriate College official or representative. In the case of a student who has made a good faith effort to resolve a problem and who has been unable to resolve the matter informally, CVCC offers the following grievance procedure as the appropriate course of action for settling disputes and resolving problems. The name and institutional address and phone number of any College officials referred to herein may be obtained from the Office of Student Services.

This grievance procedure is not intended to be used by a student with a complaint about a strictly academic matter such as grades, work assignments, quality of instruction, fairness of examinations, etc. Any student of CVCC who wishes to make a complaint about a strictly academic matter shall do so by virtue of the CVCC grade appeal procedure. A complaint by a student relating to a disability shall be reported to the College ADA Coordinator. Other types of complaints shall be reported to the Dean of Student and Administrative Services. If the complaint is about a specific occurrence, the complaint must be made within ten business days after the occurrence or after the student becomes aware of the occurrence.

A student with a complaint shall begin his/her attempt to resolve the situation by bringing it to the attention of the appropriate College official or representative as stated above. If, after a discussion between the student and the respective College official or representative, it is determined that the complaint is valid and can be resolved immediately, the College official or representative will take appropriate action to resolve the complaint. If the matter at issue involves an allegation of physical abuse or racial, sexual, or other discrimination or harassment, or if the complaint relates to a disability, or if the complaint relates to a matter involving theft or any other act of dishonesty, the respective College official shall submit a written report within ten working days of the filing of the complaint to the College Grievance Officer describing both the complaint and how it was resolved, or how it will be resolved through a "plan of resolution."

**Grievance Process**

If a student's complaint cannot be resolved in the manner described above, such an unresolved complaint shall be termed a "grievance." A student who submits a complaint to the appropriate college official or representative in the manner described above and who is not informed of a satisfactory resolution or plan of resolution of the complaint within ten business days after complaint's submission shall have the right to file, within the following ten business days, with the College Grievance Officer a written statement detailing the grievance. The written grievance statement shall be filed using Grievance Form A, which will be provided by the Grievance Officer and shall include the following information:

1. Date the original complaint was reported;

2. Name of person to whom the original complaint was reported;

201

3.    Facts of the complaint; and,

4.    Action taken, if any, by the receiving official to resolve the complaint.

The grievance statement shall also contain any other information relevant to the grievance that the Grievant wants to be considered by the Grievance Officer. If the grievance involves a claim of discrimination based on sex, race, national origin, religion, age, handicap, or disability, the complaining party should state with particularity the nature of the discrimination and reference any statute, regulation, or policy that the Grievant believes to have been violated. The Grievant shall file any grievance involving alleged discrimination within forty-five calendar days of the occurrence of the alleged discriminatory act or the date on which the Grievant became aware that the alleged discriminatory act took place. This deadline shall be in addition to all other applicable reporting deadlines.

The College shall have thirty (30) calendar days from the date of receipt by the College Grievance Officer of the grievance to conduct an investigation of the allegation(s), hold a hearing (if requested) on the grievance, and submit a written report to the Grievant of the findings arising from the hearing. Grievance Form A shall be used to report both the grievance and the hearing findings.

## Investigation Procedure

The Grievance Officer, either personally or with the assistance of such other person(s) as the President may designate, shall conduct a factual investigation of the grievance allegations and shall research each applicable statute, regulation, and/or policy, if any. The College Grievance Officer shall determine, after completion of the investigation, whether or not there is substantial evidence to support the grievance. The factual findings in the investigation and the conclusion of the grievance officer shall be stated in the written report which shall be submitted to the Grievant and to the party or parties against whom the complaint was made (the "Respondent or Respondents") and shall be made a part of the hearing record, if a hearing is requested by the Grievant. Each of the parties shall have the opportunity to file written objections to any of the factual findings, and, if there is a hearing, to make their objections part of the hearing records. Publications or verified photocopies containing relevant statutes, regulations, and policies shall also be prepared by the Grievance Officer for the grievance record. If the Grievance Officer finds the grievance is supported by substantial evidence, he or she shall make a recommendation in the report as to how the grievance should be resolved. Upon the receipt by the Grievant of the Grievance Officer's report, the Grievant and Respondent(s) shall have three business days to notify the Grievance Officer whether or not the Grievant or Respondent(s) demand(s) a hearing on the grievance. The failure by the Grievant or Respondent(s), respectively, to request a hearing by the end of the third business day shall constitute a waiver of the opportunity for a hearing. However, the College Grievance Officer may, nevertheless, at his or her discretion, schedule a hearing on the grievance if to so do would appear to be in the best interest of the College. In the event that no hearing is to be conducted, the Grievance Officer's report shall be filed with the President, with a copy to be provided to the Grievant and each Respondent.

## Hearing Procedure

In the event that the College Grievance Officer schedules a hearing, the President shall designate a qualified, three- person committee to conduct the grievance hearing. The hearing committee members will generally be employees of CVCC. However, the President shall have the discretion to select persons other than CVCC employees to serve as committee members. The committee shall notify the Grievant and each Respondent of the time, place, and subject matter of the hearing at least seventy-two hours prior to the scheduled beginning of the hearing. The hearing shall be conducted in a fair and impartial manner and shall not be open to the public unless both parties agree in writing for the hearing to be public.

202

t the hearing, the Grievant and the Respondent(s) shall be read the grievance statement. After the
ievance is read into the record, the Grievant shall have the opportunity to present such
al testimony and offer such other supporting evidence as he/she shall deem appropriate to
s/her claim. Each Respondent shall then be given the opportunity to present such oral testimo-
y and offer such other evidence as he/she deems appropriate to the Respondent's defense against
e charges. In the event that the College, or the administration of the College at large, is the party
gainst whom the grievance is filed, the President shall designate a representative to appear at the
earing on behalf of the College.

ny party to a grievance hearing shall have the right to retain, at the respective party's own cost,
e assistance of legal counsel or other personal representative. However, the respective attorney
r personal representative, if any, shall act in an advisory role only, and shall not be allowed to
ddress the hearing body or question any witness. In the event that the College or its administra-
on at large is the Respondent, the College representative shall not be an attorney or use an attor-
ey unless the Grievant is also assisted by an attorney or other personal representative.

he hearing shall be recorded by either a court reporter or on audio or videotape or by other elec-
onic recording medium. In addition, all items offered into evidence by the parties, whether admit-
ed into evidence or not, shall be marked and preserved as part of the hearing record.

**Rules of Evidence**

he hearing committee shall make the participants aware that the rules relating to the admissibil-
ty of evidence for the hearing will be similar to, but less stringent than, those which apply to civil
ials in the courts of Alabama.

enerally speaking, irrelevant or immaterial evidence and privileged information (such as
ersonal medical information or attorney-client communications) shall be excluded. However,
earsay evidence and unauthenticated documentary evidence may be admitted if the hearing chair-
erson determines that the evidence offered is of the type and nature commonly relied upon or
aken into consideration by a responsible prudent person in conducting his/her affairs.

n the event of an objection by any party to any testimony or other evidence offered at the hear-
ng, the hearing committee chairperson shall have the authority to rule on the admissibility of the
evidence, and this ruling shall be final and binding on the parties.

**Report of Findings and Conclusions**

Within five working days following the hearing, there shall be a written report given to the
College Grievance Officer (with a copy to the President, the Grievant, and each Respondent) of
the findings of the Chairperson of the Hearing Committee, and the report shall contain at least the
following:

1.  Date and place of the hearing;
2.  The name of each member of the Hearing Committee;
3.  A list of all witnesses for all parties to the grievance;
4.  Findings of facts relevant to the grievance;
5.  Conclusions of law, regulations, or policy relevant to the grievance; and
6.  Recommendation(s) arising from the grievance and the hearing thereon.

**Resolution of Grievance**

In the event of a finding by the hearing officer/committee that the grievance was unfounded or was
not supported by the evidence presented, the College Grievance Officer shall notify the Grievant
of any appeal that may be available to the Grievant. In the event of a finding that the grievance
was supported, in whole or in part, by the evidence presented, the College Grievance Officer shall
meet with the Grievant, the Respondent(s), and the appropriate College representative(s) and

attempt to bring about a reasonable agreed-upon resolution of the grievance. If there is not a mutu-
al resolution within a reasonable amount of time, the President shall impose a resolution of th[e]
grievance which shall be final and binding, except where the decision may be subject to an appe[al]
to the Chancellor as discussed below.

**Available Appeal**

If the grievance does not involve a claim of illegal discrimination or a claim relating to a dis[-]
ability, the findings of the Hearing Committee shall be final and shall be non-appealable. If th[e]
grievance involves a claim of illegal discrimination or a claim relating to a disability, th[e]
Grievant and each Respondent shall have the right to appeal the decision of the Hearin[g]
Committee to the President of CVCC, provided that:

1. A notice of appeal is filed, using Grievance Form B, with the College Grievance Office[r]
   and the President within fifteen calendar days following the party's receipt of the hearin[g]
   report; and

2. The notice of appeal contains clear and specific objection(s) to the find[-]
   ing(s), conclusion(s), or recommendation(s), of the hearing committee.

If the appeal is not filed by the close of business on the fifteenth day following the party's receip[t]
of the report, the party's opportunity to appeal shall have been waived. If the appeal does not
contain clear and specific objections to the hearing report, it shall be denied by the President.

**President's Review**

If an appeal is accepted by the President, the President shall have thirty calendar days from his
receipt of the notice of appeal to review and investigate the allegations contained in the griev-
ance, review the hearing record, to hold an appellant hearing (if deemed appropriate by the
President), and to produce a report of the President's findings of fact and conclusions of law. The
President shall have the authority to (1) affirm, (2) reverse, or (3) affirm in part or reverse in part
the findings, conclusions, and recommendations of the Hearing Committee. The President's
report shall be served to the Hearing Committee members, Grievant, and the Respondent(s) by
personal service or by certified mail, return receipt requested, at their respective home address-
es.

**Appeal to the Chancellor**

Except in cases involving a claim alleging a violation of Title IX of the Civil Rights Act of 1964,
as amended, the President's findings and conclusions will not be appealable. However, pursuant
to applicable State Board of Education policy, a Grievant who is alleging a claim of illegal dis-
crimination based on a violation of Title IX may file an appeal to the Chancellor of the Alabama
Department of Postsecondary Education for a review of the President's decision and the find-
ings arising from the College grievance hearing. A Grievant who has grounds for appealing the
findings of the President by the Chancellor may do so by:

1. Filing a notice of appeal, using Grievance Form C, to the Chancellor and the President of
   CVCC, within fifteen calendar days following the Grievant's receipt of the report of the
   President's findings; and

2. Specifying in the notice of appeal clear and specific objections(s) to the finding(s),
   conclusion(s), or recommendation(s), affirmed by the President.

If the appeal is not filed with the Chancellor by the close of business on the fifteenth day fol-
lowing the Grievant's receipt of the President's report, the Grievant's opportunity to appeal shall
have been waived. If the appeal does not contain clear and specific objections to the President's
report, it shall be denied by the Chancellor.

204

| Left column (partial, cut off) |
|---|

If there is not a mut...
...e a resolution of t...
...subject to an appe...

...im relating to a dis...
...on-appealable. If th...
...to a disability, th...
...ion of the Hearin...

...Grievance Office...
...ceipt of the hearing...

(s)  to  the  find...
...tee.

...g the party's receip...
...he appeal does no...
by the President."

...ndar days from his...
...ained in the griev...
...appropriate by the...
...usions of law. The...
...t or reverse in part...
...e. The President's...
...Respondent(s) by...
...ive home address-

...ights Act of 1964,...
...lowever, pursuant...
...aim of illegal dis-...
...or of the Alabama...
...ion and the find-...
...for appealing the...

...l the President of...
...the report of the...

...) the finding(s),...

...ifteenth day fol-...
...y to appeal shall...
...o the President's

---

**eview by the Chancellor**

...an appeal is accepted by the Chancellor, the Chancellor shall have thirty (30) calendar days ...om his/her receipt of the Grievant's notice of appeal to investigate and review the allegations ...ontained in the agreement, to review the report of the President and the Hearing Committee, to ...old an appellant hearing (if he/she deems such appropriate), and to issue a report of his/her ...ndings of fact and conclusions of law. The Chancellor shall have the authority to (1) affirm, ...) reverse or, (3) affirm in part or reverse in part the findings, conclusions, and recommenda-...ons of the President and/or Hearing Committee. The report of the Chancellor shall be ...erved to the Grievant and the Respondent(s) by personal service or certified mail, return ...eceipt requested, to the respective home addresses of the parties. The report of the Chancellor ...hall not be further appealable except as allowed by the policies of the State Board of Education. ...lowever, the Grievant shall not be precluded from filing a grievance with an appropriate court ...r administrative agency.

**General Rule on Filing Deadlines**

...f the last date for filing a document under this procedure falls on a Saturday, Sunday, or legal ...oliday, the date of the first business day following the respective Saturday, Sunday, or legal ...oliday shall be considered the deadline date.

## GRADE APPEAL PROCEDURE

...t is the policy of CVCC that students should have the opportunity to appeal any grade which a ...tudent has reason to believe does not accurately and fairly represent the nature of the classwork ...which the student has performed. Therefore, the College has established a grade appeal proce-...lure to be used if a student has valid reason to believe that a grade which the student received ...or an examination, a written/oral presentation, a project, or other required classroom activity, ...s either an inaccurate or unfair grade. A student must make the initial grade inquiry within seven ...calendar days after the student receives notice of the grade in question except in the case of a ...punitive grade issued for academic misconduct, which must be appealed by the end of the class ...day following the date on which the sanction was imposed. Thereafter, each subsequent appeal, ...f any, must occur within a seven-calendar day increment after the respective decision is ...eceived by the student. If a student does not meet the deadline for appealing a grade, the right ...o appeal will be waived. For grades on final examinations or grades that represent the final ...grade for the course, the initial seven-day period shall begin to accrue on the first class day of ...the next academic term. In appealing a grade, the student shall have the opportunity to have his ...or her concern about the grade reviewed through the following procedures:

...The student shall begin by stating either orally or in writing to the instructor that the grade in ...question is either inaccurate, unfair, or both, and include the justification for appeal. If the stu-...dent and the instructor cannot successfully resolve the student's concern, the student may then ...contact the Chairperson of that instructor's division or program. The student shall appeal to the ...Division Chairperson by submitting the appropriate form stating his/her concern regarding the ...grade, and describing the prior discussion with the instructor. (If the Instructor issuing the grade ...is the Chairperson of the respective division or program, the student may appeal directly to the ...Dean of Instruction.) The Division Chairperson will review the student's grade issue. The ...Chairperson shall have the authority to call in the Instructor or to ask for the assistance of anoth-...er CVCC Instructor or seek the opinion of an expert in the subject area under review. If the stu-...dent's concern about the grade cannot be successfully resolved at this level, the student shall be ...given the opportunity to take the appeal to the Dean of Instruction. The faculty member shall ...also have the right to appeal a decision of the Division Chairperson to the Dean. Appeal infor-...mation must be submitted on the proper form and must contain the following:

1. Name and course number of the grade under appeal.

2. Names of the student and the Instructor.

3. The term, day(s) of the week, and time of day that the course was taken.

4. A concise description of the student's complaint and narrative explanation of why it is f[elt] that the grade was unfair, inaccurate, or both.

5. The date that the student first took the appeal to the Instructor.

6. A summary of the result of the student's appeal to the Instructor.

7. The date that the student took the appeal to the Division Chairperson.

8. A summary of the result of the student's appeal to the Division Chairperson.

In addition to the above information, the student and/or instructor should include a photocop[y] of any and all documents that the student and/or the instructor believes would assist the Dean i[n] reviewing the grade appeal. The Dean shall review the appeal, schedule a meeting with the stu[-]dent and the Instructor and render a written report within fourteen calendar days after the Dean[']s receipt of all of the appeal information. The Dean shall have the authority to consult with th[e] instructor, the Division Chairperson, or other persons who have expertise in the subject area. findings and conclusions will be provided to the student, instructor, and Division Chairperson. In the event that the Dean determines that a change in the student's grade is in order, the stu[-]dent's official grade will be changed under the authority of the President of CVCC, which has been delegated to the Dean, to render final rulings on grade appeals. Therefore, the decision o[f] the Dean will be final and not subject to further appeal.

NOTE: The same general process may be used by a student who wishes to express a concern about the fairness and appropriateness of other strictly academic matters. In reviewing appeals regarding matters other than grades, the Dean of Instruction will provide a memorandum of the findings, conclusions, recommendations, and/or directives regarding the matter under appeal, to the student, instructor, and Division Chairperson.

## DRESS AND APPEARANCE

CVCC students are expected to dress appropriately at all times, including complying with attire standards for special functions. CVCC reserves the right to require students to adjust their attire when it is deemed to be disruptive to the learning process or the good order of the College.

## CHILDREN ON CAMPUS

Minor children of students are not permitted in classrooms or laboratories at any time. If chil-dren accompany students during registration or other business on campus, the children must be properly supervised at all times. Children below the tenth grade level shall not be allowed in the Learning Resource Center unless accompanied by an adult who is conducting business there. Children in the LRC shall not be allowed to be present in a classroom during a class and must remain with the adult and be properly supervised at all times. All College employees shall be responsible for the enforcement of this policy. Students in violation of this policy will be required to take immediate measure to comply with this policy.

## STUDENT INSURANCE

It is the responsibility of the student to be covered by insurance in case of an injury related to a college-sponsored event. The parent, guardian, or student will be expected to assume all respon-sibility and shall not hold the College liable for any injury due to an accident related to a col-lege-sponsored event, except for students who participate in intercollegiate athletic events and are covered by college accident insurance.

206

---

[s]tudents are permitted
[...]ay telephones are conv[...]
[a]ccept messages for, or [...]
[il]lness in the student's fa[...]

## STUDENT [...]

[C]VCC does not general[...]
[fi]eld trips, or course- rel[...]
[p]olicy, CVCC shall not [...]
[d]amage to, personal pr[...]
[p]articipating in, the res[...]

[...]

[C]VCC shall not be resp[...]
[a]lways keep purses, bo[...]
[p]lace. CVCC recomme[...]
[...], and found items sh[...]

**Fire**
[I]n the event of a fire, th[...]
[a] continuous horn bla[...]
[i]mmediately notify the [...]
[o]r, during evening hou[...]
[p]recautions in the use [...]

[I]n the event of a fire i[...]
[va]te the building and r[...]
[a]s the fire department [...]
[d]ing evacuation. Instru[...]
[c]lasses and to provid[...]
[i]nstructor shall make [...]
[t]he fire department if [...]

[T]he Phenix City Fire [...]
[o]r suspicious smoke [...]
[o]fficials will be respo[...]
[c]les.

[A]ll College employee[...]
[fi]re. Among the steps [...]
[fr]om heat, reporting [...]
[l]earning the location [...]

**Bomb Threat**
[A] bomb threat may b[...]
[t]he event of a bom[...]
[S]witchboard Operato[...]
[w]ill call the Phenix C[...]
[(]298-6535).



THE LAW OFFICES OF



# PARKER
# *&*
# COOLEY
## LLC

Jo Anna Chancellor Parker
Jennifer Batson Cooley

<div align="right">
1507 Broad Street<br>
Phenix City, Alabama 36867<br>
Telephone (334) 298-7062<br>
Facsimile (334) 298-7158
</div>

July 28, 2006

Dr. Laurel Blackwell, President
Chattahoochee Valley Community College (C.V.C.C.)
2602 College Drive
Phenix City, Alabama 36869

RE: Ms. Lindy G. Wright

Dr. Blackwell:

Ms. Lindy Wright has retained me in order to pursue legal action against Chattahoochee Valley Community College regarding her due process rights as a nursing student at your institution from 2005-2006.

Please see a timeline of events listed below:

**December 20, 2005:** Ms. Wright completed and filed a GRADE APPEAL FORM. (Exhibit A)

**January 10, 2006:** Ms. Wright's legal counsel, Connie Cooper, contacted Dean James Lowe via telephone to discuss Ms. Wright's ability to remain in classes at C.V.C.C. pending the appeal process. A copy of a subsequent letter is attached. (Exhibit B)

**Spring 2006:** Ms. Lynn Harris, nursing instructor, informed Ms. Wright that she would be able to substitute another class, Nursing 200, for the course she previously failed, Nursing 252. As a result of Ms. Harris' directive, Ms. Wright enrolled in Nursing 200 and earned an A in the course. A copy of her unofficial transcript is attached. (Exhibit C)

**May 19, 2006:** Ms. Wright submitted a letter to Dean Hodge, requesting Course Forgiveness. (Exhibit D) This request was later denied.

**June 7, 2006:** Ms. Cooper sent a letter to your attention outlining the actions of C.V.C.C. and requested a response from your office. (Exhibit E)

**June 13, 2006**: You responded to Ms. Cooper (Exhibit F); however, you merely indicated that Ms. Wright had an opportunity to repeat a failed course but did not address the other concerns as mentioned by Ms. Cooper in her correspondence to you:

1. Inadequate staffing of the course (no instructor for the first five weeks of semester, no instructor for two clinical sessions, ill-prepared instructors);

2. The conversation between Dean Lowe and Ms. Connie Cooper, in which Dean Lowe apparently stated to her that Nursing 200 would be an adequate substitute for Nursing 252 (provided she passed the class, which she did);

3. The fact that Ms. Wright's nursing group had CARE plans which were arbitrarily re-graded (2nd semester CARE plans were lost and Ms. Wright received a grade of 23/25 with no explanation, 3rd semester CARE plans were re-graded three different times with no explanation 22/25, 7/25, and 19/25); and

4. Another student with two failures who was allowed to graduate with her fellow nursing students.

Moreover, new concerns have been brought to my attention. Specifically, one of your faculty members, Dixie Peterson, stated to a third party that it was **pre-determined** that Ms. Wright would fail the specific class in question, even before the class was actually tested. How is a student re-determined to pass or fail a class prior to the administering of an exam?

As a result, Ms. Wright was not allowed to graduate with her fellow nursing students nor is she allowed to re-enroll at your institution to complete her nursing degree.

If we are not able to reach a resolution, please respond with the name of your legal counsel with whom to address future communication.

Sincerely,

Jennifer Cooley

CC: Ms. Connie Cooper

# DEPOSITION OF SANDRA GUNNELS

## July 24, 2007

## Pages 1 through 241

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

EXHIBIT

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  EASTERN DIVISION
4
5  LINDY G. WRIGHT,
6     Plaintiff,
7  Vs.                    CIVIL ACTION NO.
                          3:06-CV-1087-WKW
8  CHATTAHOOCHEE VALLEY
   COMMUNITY COLLEGE (CVCC),
9  et al.,
10    Defendants.
11
12        * * * * * * * * * * * * *
13
14     DEPOSITION OF SANDRA GUNNELS, taken
15  pursuant to stipulation and agreement before Lisa
16  J. Nix, Registered Professional Reporter and
17  Commissioner for the State of Alabama at Large, in
18  the Conference Room, Ramada Inn, Limited, 3560
19  Highway 431 North, Phenix City, Alabama on Tuesday,
20  July 24, 2007, commencing at approximately
21  9:40 a.m. EDT.
22
23        * * * * * * * * * * * * *

**Page 2**

1
2        APPEARANCES,
3  FOR THE PLAINTIFF:
4  Mr. Peter A. Dumbuya
   Attorney at Law
5  Post Office Box 3302
   Phenix City, AL  36868
6
7  FOR THE DEFENDANT:
8  Mr. H. E. Nix, Jr.
   Ms. Brandy F. Price
9  NIX, HOLTSFORD, GILLILAND,
      HIGGINS & HITSON
10  Attorneys at Law
   Suite 300
11  4001 Carmichael Road
   Montgomery, AL 36106
12
13  ALSO PRESENT:
14  Dr. Laurel Blackwell
   Ms. Dixie Peterson
15
16        * * * * * * * * * * * * *
17
18
19     EXAMINATION INDEX
20  SANDRA GUNNELS
      BY MR. NIX  . . . . . . . . . .  5
21
22
23

**Page 3**

1        EXHIBIT INDEX
2                              MAR
3  DEFENDANT'S EXHIBIT
4  24  Calendar for year 2005            143
5  25  Handwritten test questions and answers  153
      prepared by Lindy Wright (previously
6      marked DX-10A, B, C, D)
7  26  Sandra Gunnels' pediatric notes (G-1 -  153
      G-22)
8
   27  Documentation regarding vote of no      209
9      confidence for Dr. Blackwell
10  28  Documents regarding hiring of nursing  167
      instructor for CVCC
11
   29  Write-up documentation - Arit D. Umoh   213
12
   29-B Write-up documentation - Arit D. Umoh  215
13
   30  Composite exhibit comprised of academic  218
14     transcript for Sandra Gunnels from
      Florida State University, course
15     outlines, syllabi, student handouts
      etc.
16
   31  Copy of license for Sandra Gunnels     220
17
   32  Contact list for ADN class            221
18
   33  7/1/05 letter to Ms. Gunnels from Dr.  221
19     Blackwell
20  34  Subpoena to Sandra Gunnels            222
21  35  List prepared by Sandra Gunnels re:   223
      deposition documents
22
   36  Transcript of oral deposition of Sandra  232
23     Gunnels

**Page 4**

1        STIPULATION
2     It is hereby stipulated and agreed by and
3  between counsel representing the parties that the
4  deposition of SANDRA GUNNELS is taken pursuant to
5  the Federal Rules of Civil Procedure and that said
6  deposition may be taken before Lisa J. Nix,
7  Registered Professional Reporter and Commissioner
8  for the State of Alabama at Large, without the
9  formality of a commission, that objections to
10  questions other than objections as to the form of
11  the question need not be made at this time but may
12  be reserved for a ruling at such time as the said
13  deposition may be offered in evidence or used for
14  any other purpose by either party provided for by
15  the Statute.
16     It is further stipulated and agreed by and
17  between counsel representing the parties in this
18  case that the filing of said deposition is hereby
19  waived and may be introduced at the trial of this
20  case or used in any other manner by either party
21  hereto provided for by the Statute regardless of
22  the waiving of the filing of the same.
23     It is further stipulated and agreed by and

Deposition of Sandra Gunnels

---

Page 5

1  between the parties hereto and the witness that the
2  signature of the witness to this deposition is
3  hereby not waived.
4
5  * * * * * * * * * * * * *
6
7          SANDRA GUNNELS
8      The witness, after having first been duly
9  sworn to speak the truth, the whole truth and
10 nothing but the truth testified as follows:
11          EXAMINATION
12 BY MR. NIX:
13 Q.  Would you state your name, please.
14 A.  Sandra Jean Wright Gunnels.
15 Q.  What is your address, Ms. Gunnels?
16 A.  11107 Rambling Trail, Midland, Georgia
17     31820.
18 Q.  And what is your telephone number there, if
19     you don't mind?
20 A.  706-565-8185.
21 Q.  Did you have a work address?
22 A.  Yes, I do.
23 Q.  What is that address?

---

Page 6

1  A.  I think it's 918 Manchester Expressway,
2     Columbus, Georgia 31904.
3  Q.  What's the employer?
4  A.  Columbus Technical College is my full-time
5     employment.
6  Q.  And if something is sent there, should it
7     go, like, to the nursing department or --
8  A.  Associate degree nursing.
9  Q.  Okay. And what is -- Do you have a phone
10    number there?
11 A.  706-649-1167.
12 Q.  Ms. Gunnels, we talked about this before we
13    got on the record, but this deposition is
14    being taken pursuant to the Federal Rules
15    of Civil Procedure, and under those rules
16    when this deposition is completed,
17    Ms. Green can either send that deposition
18    to you, allow you to read over it and make
19    whatever corrections that she will indicate
20    to you that you can make and she'll have an
21    errata sheet with it, or if you want to,
22    you can waive the right to read and sign.
23 A.  I would prefer to read and sign simply for

---

Page 7

1  the reasons I said, because of the medical
2  terminology that might be utilized.
3  Q.  That's fine. And I think the only
4     requirement is that you get it back within
5     30 days after you receive it.
6  A.  All right.
7  Q.  Ms. Gunnels, we're here today on a lawsuit
8     filed by Lindy Wright. Do you know
9     Ms. Wright?
10 A.  Yes, sir, I do.
11 Q.  And she has sued Chattahoochee Valley
12    Community College, Dr. Laurel Blackwell,
13    Ms. Dixie Peterson, and Dean James Lowe.
14       Do you know the three individuals who I
15    have -- the names whom I stated?
16 A.  Yes, sir.
17 Q.  And are you familiar with Chattahoochee
18    Valley Community College?
19 A.  Yes, sir.
20 Q.  You worked there, right?
21 A.  Yes, sir.
22 Q.  And I know that you've given a statement in
23    this case; isn't that correct?

---

Page 8

1  A.  Yes, sir.
2  Q.  And you gave that statement to Ms. Cooley
3     and Mr. Dumbuya in -- I think it was
4     November 1, 2006.
5  A.  November 2006. 1st day of November, yes,
6     sir.
7  Q.  And that is a statement that was taken
8     where? What physical location?
9  A.  Ms. Cooley's law office, I believe, was
10    where we were.
11 Q.  Where is that?
12 A.  Broad Street, Phenix City, Alabama.
13 Q.  Were you sworn in at that deposition?
14 A.  Yes, sir.
15 Q.  Who was present at that deposition -- or at
16    that sworn statement?
17 A.  Would be the court reporter, Courtney
18    Tillman Peters as I'm looking at her name,
19    Mr. Dumbuya, Ms. Cooley, Ms. Wright. I
20    believe that was all that were there.
21 Q.  There was a break taken during the course
22    of this statement.
23 A.  Yes, sir.

---

Page 9

1  Q. And someone else I think, if I'm
2     interpreting it correctly, gave a
3     statement. Do you know who that was?
4  A. It was a past student, and her name is
5     Carola, but --
6  Q. Ms. Rambo?
7  A. Rambo. That was it, yes, sir.
8  Q. Was she present while you were giving your
9     statement?
10  A. No, sir.
11  Q. Were you present while she was giving her
12     statement?
13  A. No, sir.
14  Q. Now, a minute ago, you indicated that there
15     were some errors in the statement. Tell me
16     what you meant by that.
17  A. For example, spelling errors, nothing of
18     substance. But I noticed where med-surg,
19     which is a short term we use for
20     medical-surgical nursing, was spelled
21     S-U-R-G-E instead of S-U-R-G. One of the
22     instructor's names was spelled Grouper,
23     like the fish, and her name is Gruber,

Page 10

1     G-R-U-B-E-R. So those types of -- just
2     spelling errors.
3  Q. How many times have you met with either
4     Mr. Dumbuya or Ms. Cooley or both of them
5     about this case?
6  A. I've only met with either one of them once
7     about this case or any other time.
8  Q. And was that at the time you gave this
9     statement?
10  A. Yes, sir.
11  Q. Have you spoken with either of them on the
12     telephone about the case?
13  A. No, sir.
14  Q. How did you know to come to give this
15     statement?
16  A. A federal marshal, I think it was, came to
17     my office and --
18     This one -- (indicating) -- or yours?
19     I'm sorry
20  Q. No, the one you gave in November of '06.
21  A. Their office called and asked me would I
22     come or did they need to subpoena me. I
23     really don't remember. I know they called

Page 11

1     me and asked me would I come.
2  Q. You don't know who you spoke with?
3  A. No, sir.
4  Q. Did you know what it was about, what the
5     case was about when they called you?
6  A. Yes, sir.
7  Q. Now, you had spoken with Lindy Wright about
8     the case; isn't that right?
9  A. Yes, sir.
10  Q. Now, Ms. Gunnels, this is what I'd like for
11     you to do if you don't mind. I've just got
12     some general questions for you.
13  A. Okay.
14  Q. Tell me your understanding of what this
15     case is about.
16  A. I only know what Lindy has told me. I
17     don't understand all of it I'm sure.
18     What I understand is she received a
19     failing grade in NUR -- I believe it was
20     272, was offered course forgiveness. That
21     was, apparently, rescinded or whatever, and
22     then that there was another course -- I'm
23     sorry. 271, then 272, that she received

Page 12

1     not passing grades in both of those.
2  Q. When you mixed those two numbers or changed
3     them, 271 and 272, I got confused.
4  A. 271 at that point in time -- and I know
5     they've changed since then, and I don't
6     know what the new numbers are. But 271 was
7     obstetrical nursing, 272 was pediatric
8     nursing.
9  Q. What is your understanding about Lindy
10     Wright's performance in either of those two
11     courses?
12  A. Towards the end of the quarter --
13     semester --
14     I'm sorry. I'm on quarter system now,
15     so ...
16  Q. Okay.
17  A. Substitute semester when I say quarter.
18     -- of obstetrical nursing, I know that
19     she was issued --
20  Q. Which one is that? That's 271?
21  A. 271 would be the obstetrical nursing course
22     that would have been due to end sometime in
23     December of -- '04 we're talking about or

Page 13

1    '05?
2        That she was issued on at least one
3    test, if not another, a failing grade.  She
4    had questions about some of the test
5    questions and the answers as to how they
6    were counted.  She was allowed to look over
7    her test paper and copy down questions and
8    choices and --
9  Q.  You're talking about 271?
10 A.  Yes, sir.
11 Q.  Okay.  And this is -- it was, by the way,
12     just so that we're correct on this, that
13     course ended in '05, December '05.
14 A.  Yes, sir.
15 Q.  All right.  And she had questions about --
16 A.  Some of her test questions.
17 Q.  Okay.
18 A.  And she brought them to me and, actually,
19     another obstetrical instructor that I work
20     with and --
21 Q.  Who was that?
22 A.  Her name is Venius, V-E-N-I-U-S, Turner,
23     who is an obstetrical nursing instructor at

Page 14

1    CTC.
2        We went over some of the test
3    questions, found in the book where the
4    answer that was graded correct was not,
5    indeed, the correct answer and sent her
6    back to discuss that with her instructor.
7  Q.  The answer that was graded correct was not
8      the correct answer?
9  A.  Yes, sir.  Would you like me to elaborate?
10 Q.  She got credit for something that she got
11     wrong?
12 A.  No.  She didn't get credit for something
13     that she answered correctly according to
14     the references we had.
15 Q.  Let me ask you this.  When you went over
16     the questions on the test relative to NUR
17     271, what were you looking at?
18 A.  As I remember -- and I'd like to say that
19     if I'd known all of this was going to be so
20     important, I would have written down dates
21     and times and that type of thing, but this
22     is going back as I remember.
23         She was allowed to copy down the

Page 15

1    questions in her handwriting on a piece of
2    paper with the four potential answers and
3    indicated what had been counted as correct
4    by the instructor and what she had answered
5    and what she had -- you know, the questions
6    that she disagreed with the answer that the
7    instructor accepted, if that makes more
8    sense.
9  Q.  Now, when you looked at the copy that she
10     had copied down --
11 A.  Yes, sir.
12 Q.  -- was it in handwriting?
13 A.  Yes, sir.
14 Q.  Okay.  Do you recall how many pieces of
15     paper there were?
16 A.  No, sir.
17 Q.  Do you recall how many questions there
18     were?
19 A.  There were what I consider quite a few, and
20     this is a guess.  Ten.
21 Q.  Let me make sure I understand what you did.
22 Q.  You and Ms. Turner -- both of you together;

Page 16

1    is that right?
2  A.  She was in there for part of the time.  I
3      can't remember if she was there for the
4      entire time.
5  Q.  You, what?  Looked at the piece of paper
6      that Ms. Wright had --
7  A.  Yes, sir.
8  Q.  -- or pieces of paper that had these
9      questions?
10 A.  Yes, sir.
11 Q.  From what test?  Do you know?  Was it more
12     than one test or was it --
13 A.  I only remember doing that twice with
14     Lindy, one for obstetrics and one for
15     pediatrics.  I can't say that it wasn't
16     more than once for obstetrics, but I don't
17     believe so.
18 Q.  So you remember doing it once for
19     obstetrics?
20 A.  Yes, ma'am -- Yes, sir.
21 Q.  And once for pediatrics?
22 A.  Yes, sir.
23 Q.  When was pediatrics?

Deposition of Sandra Gunnels

June 24, 2007

Page 17

1   A.   That would be the NUR 272. That was the
2        next semester.
3   Q.   That would have been --
4   A.   It would run from January to May.
5   Q.   Spring '06?
6   A.   '06.
7   Q.   So you remember doing this once for each of
8        these courses, obstetrics and pediatrics,
9        correct?
10  A.   Yes, sir, at least once. I can't ...
11  Q.   At least once. I guess, still, if you can
12       tell me, do you know which test or tests --
13  A.   I honestly do not.
14  Q.   -- she had made notes about?
15  A.   I honestly do not. I know it was in
16       conjunction with the instructor that she
17       was allowed to do this.
18  Q.   In other words, the instructor allowed her
19       to do that, correct?
20  A.   That is what Lindy told me, yes.
21  Q.   Do you know who the instructor was?
22  A.   Ms. Harris, I believe.
23  Q.   Now, was Ms. Harris the instructor for both

Page 18

1        of these courses?
2   A.   I believe so, but I believe that
3        Ms. Peterson can answer that question
4        better. I would go by her information.
5   Q.   Do you know Ms. Harris?
6   A.   No, I do not. I've met her once.
7   Q.   Okay. Do you know her to be a qualified
8        instructor?
9   A.   No, I do not.
10  Q.   You just don't know one way or the other?
11  A.   I have heard that she was not qualified for
12       some of the subjects that she was
13       teaching. Now, this was in other
14       instructors' and students' opinions, but I
15       have no personal knowledge of her that
16       would make me say one way or the other,
17       just things I've heard.
18  Q.   So you don't know or you don't have any
19       personal knowledge --
20  A.   No, sir.
21  Q.   -- of her qualifications or anything like
22       that, correct?
23  A.   No, sir.

Page 19

1   Q.   So who have you heard from that says that
2        she was not qualified to teach some of the
3        courses she was teaching?
4   A.   Several students from the class of
5        2005-2006, if my years are right, who would
6        have graduated in 2006.
7   Q.   You're talking about Lindy's class, then?
8   A.   Lindy's class.
9   Q.   I think that's right. That class was
10       subject to the '04-05 catalog and manual,
11       and I believe that class started -- June of
12       '05 was their first semester.
13  A.   May of '05, yes, sir.
14  Q.   Or May of '05. May or June of '05; is that
15       right?
16  A.   Yes, sir.
17  Q.   Tell me who these students were.
18  A.   Let's see. Crystal Love, April Gunnels,
19       Lindy Wright, Ereka Hicks.
20  Q.   Spell that. Ereka?
21  A.   E-R-E-E-K-A, I believe, Hicks.
22  Q.   H-I-C-K-S?
23  A.   Yes, sir. And there were several others,

Page 20

1        but I cannot remember who exactly.
2            And then I do not remember who told me,
3        but that Ms. Harris did not have a -- just
4        excellent reputation in the community.
5        That's just things I heard from
6        different -- that there had been issues
7        with her instructing. And even I had heard
8        at one point in time she had been asked to
9        leave Southern Union, but that, like I
10       said, I'm presenting as gossip. That is
11       just I-heard-on-the-street type thing, so I
12       cannot vouch for that.
13  Q.   Now, did you hear from any other persons
14       that -- let's go back to not qualified to
15       teach some of the courses she was teaching
16       at CVCC. Did you hear that from any other
17       person other than the people you've already
18       told me about: Crystal Love, April
19       Gunnels, Ereka Hicks, Lindy Wright?
20  A.   There were others, but I cannot remember
21       which students.
22  Q.   Were they all students?
23  A.   Yes, sir, in that class.

Page 21

1  Q.  Did you hear that from any instructors or
2      nursing professionals?
3  A.  The only two instructors at that point in
4      time were Ms. Harris and Ms. Gruber, I
5      believe.  And, no, I wasn't in
6      communication with either one of those.
7  Q.  So when did you hear this?
8  A.  During both of those quarters.  I had
9      several students call me and ask me for
10     clarification of information that they had
11     received that contradicted either what
12     their book said, or some of them I had had
13     as students in the LPN program, that they
14     were trying to get some correct
15     information, some about pediatric math
16     dosages and dosage and solutions.
17  Q.  Let me ask you this.
18  A.  Yes, sir.
19  Q.  You say during both of the -- you said
20      quarters again, but we know --
21  A.  I'm talking about semesters.
22  Q.  -- you're talking about semesters.  That's
23      fine.

Page 22

1  A.  Yes, sir.
2  Q.  So we're talking about the fall semester of
3      '05 and the spring semester of '06?
4  A.  Yes, sir.
5  Q.  Okay.  So who were those students that
6      called you?
7  A.  It was among those names that I've given
8      you, and then other instructors -- I mean
9      other students.
10  Q.  Okay.
11  A.  Like I said, if I had known that I was
12      going to be asked this, I would have
13      written down and kept names and times, but
14      I didn't realize --
15  Q.  I'm just asking for your recollection.
16  A.  To my recollection, I can't tell you
17      exactly who.
18  Q.  So they called you and they were doing
19      what, now?  They were asking you questions
20      about what?
21  A.  One incident that comes to mind is during
22      pediatric dosage and solution -- that would
23      have been NUR 272 -- that some of the

Page 23

1      things that Ms. Harris was instructing them
2      in they stated contradicted what I had
3      taught them in pediatrics, what their books
4      had said, and then those who had me in
5      pediatrics for LPN, how I had taught them
6      to do it earlier.  So they were asking
7      which methodology was correct.
8          There were some other instances, and I
9      can't remember exactly.  The pediatric math
10     one stands out.
11  Q.  So you're saying that they were studying
12      the very same thing in NUR 272 that you
13      taught them in LPN school?
14  A.  And also in pharmacology, certain things.
15      I taught -- This group, I taught their
16      pharmacology class and so had taught them
17      to do math problems in a specific manner,
18      and this contradicted what I had taught
19      them earlier.
20  Q.  Now, Lindy Wright was one of your students,
21      correct?
22  A.  Yes, sir.
23  Q.  You taught her in LPN school?

Page 24

1  A.  Yes, sir.
2  Q.  You taught her in the summer of 2005,
3      correct?
4  A.  Not the -- Yes, summer of 2005.
5  Q.  Did she know how to do computations and
6      calculations relative to dosages of
7      medication?
8  A.  Yes, sir.
9  Q.  When you taught her, did she know that?
10  A.  Yes, sir.
11  Q.  So you would talk to these students and
12      give them answers?
13  A.  Primarily, for example, with the
14      computation, I remember telling them that
15      even though that contradicted how I had
16      taught them and -- what I knew was that
17      Ms. Harris was teaching the class and that
18      they needed to, obviously, do it the way
19      she had taught them if they wanted to be
20      successful in the class.
21  Q.  Apparently, they told you then how she was
22      teaching them to make these calculations.
23  A.  Yes, sir.

Deposition of Sandra Gunnels

June 24, 2007

Page 25

```
1    Q.  Is that right?
2    A.  Yes, sir.
3    Q.  And so do you recall the way -- Do you
4        recall whether the way she was teaching it
5        would allow the students to arrive at a
6        correct result?
7    A.  Based on what they told me -- and they
8        called me with several math problems and
9        asked me how I would figure them out.  What
10       they reported to me that Ms. Harris was
11       telling them, you know, would kind of go
12       off there -- was incorrect, and it had to
13       do with how you rounded in pediatric
14       dosages.
15   Q.  Now, would you agree with me that
16       instructors and professors are present in
17       the class to teach and instruct because
18       they have qualifications to do that and
19       that students are there to learn and obtain
20       information so that they can take their
21       tests and otherwise learn the various
22       courses they have to --
23   A.  As a general statement, yes, I would agree
```

Page 26

```
1        with that.
2    Q.  And isn't it correct -- You've been an
3        instructor; isn't that right?
4    A.  Yes, sir.
5    Q.  You're an instructor now at Columbus Tech,
6        correct?
7    A.  Yes, sir.
8    Q.  Do you ever have students that get
9        confused?
10   A.  Oh, yes, sir.
11   Q.  Do you ever have students that hear you
12       incorrectly?
13   A.  Occasionally, yes.
14   Q.  I mean, isn't it correct that students do
15       that?  I mean, sometimes they hear the
16       instructor incorrectly or they even read
17       the book incorrectly in terms of what's
18       actually present in the book in terms of
19       the course?
20   A.  As a general rule, just a general
21       statement, yes --
22   Q.  Right.
23   A.  -- that can happen.
```

Page 27

```
1    Q.  Sure.  And when you talked to these
2        students, you told them, do what Ms. Harris
3        says do because she's the instructor,
4        right?
5    A.  Yes, sir.
6    Q.  Now, let's go back to -- let me pursue one
7        other thing.  You said something about her
8        reputation.
9    A.  Uh-huh.  (Positive response.)
10   Q.  What were you talking about there?
11   A.  Just in general, because Columbus is a
12       small -- Columbus, Phenix City, Opelika is
13       a small-knit nursing community, I had heard
14       that she had gone over there.  And I had
15       just been told there had -- she had had
16       issues before in some of her teachings, and
17       it was just general ...
18   Q.  She had had issues -- when you say she'd
19       gone over there, do you mean --
20   A.  To CVCC from Southern Union.
21   Q.  And you heard from somebody that she had
22       had issues --
23   A.  Yes, sir.
```

Page 28

```
1    Q.  -- in her instruction --
2    A.  Yes, sir.
3    Q.  -- at Southern Union?
4    A.  Yes, sir.
5    Q.  Who told you that?
6    A.  I cannot remember, but more than one.  I
7        honestly cannot remember.
8    Q.  Student?
9    A.  Oh, no, sir.
10   Q.  It was an adult who was a professor or a
11       nurse?  What type of person --
12   A.  I know one was up at The Medical Center on
13       pediatrics.  It was a general remark, and I
14       cannot remember who made it or who was
15       present.
16   Q.  When you say The Medical Center, what are
17       you talking about?
18   A.  The Medical Center hospital.
19   Q.  Is that -- Okay.  A facility in Columbus?
20   A.  In Columbus, yes, sir.
21   Q.  All right.
22   A.  And some other instructor had told me that,
23       and I honestly do not remember who.
```

7 (Pages 25 to 28)

Page 29

1  Q.  What you're really doing is responding by
2      giving me rumor?
3  A.  Yes, sir, and I presented it as rumor,
4      gossip.
5  Q.  Right.  You did.  I know you did.
6      And the first question that I really
7      asked you when we started this was, can you
8      state whether or not Lynn Harris is a
9      qualified and good instructor or something
10     to that effect, and your answer was, no, I
11     can't, right?
12 A.  Right.
13 Q.  And therefore, the reason you can't is the
14     things that you've told me?
15 A.  Well, and, also, I've never seen her
16     resume.  I've never been present in her
17     classroom.
18 Q.  And what I want to make sure I understand,
19     Ms. Gunnels, is that you're not saying
20     she's unqualified.  You're just saying you
21     don't know?
22 A.  I'm saying I'm not in a position to judge.
23 Q.  Very good.  Now --

Page 30

1  A.  What I have presented to you is what I have
2      been told, what I have heard.  I've not
3      experienced any of that firsthand except
4      for the questions that Lindy brought me
5      that were obviously incorrect and the
6      students who called me with math problems
7      that were incorrect.
8  Q.  If they were correct.
9  A.  If they were correct.
10 Q.  And the paperwork that Lindy brought you
11     are the questions that she copied down, and
12     you say she also copied down the answers?
13 A.  Choices of answers, yes, sir.
14 Q.  And she copied down what her answer was
15     that had been marked incorrect?
16 A.  Correct.
17 Q.  And these were all questions that had been
18     marked incorrect on a test?
19 A.  Yes, sir.  I mean, that's how it was
20     presented to me, yes, sir.
21 Q.  Was this in December of 2005?  Was it in
22     May 2006?
23 A.  I cannot tell you the months  I know once

Page 31

1      during 271 and once during 272.
2  Q.  Did you keep a copy of those papers --
3  A.  No, sir.
4  Q.  -- the things that she had copied down?
5  A.  No, sir.
6  Q.  Did you know she's produced those papers?
7  A.  No, sir.  I haven't asked her.
8  Q.  Now, when you met with her -- I assume you
9      met with her and she let you see the paper,
10     or did she tell you what the questions
11     were?
12 A.  Do you mean when I met with her in my
13     office when she -- she brought paper with
14     her and said this was one of the
15     questions.  This is what I thought was the
16     answer, you know, from here in my book.
17     This is what was counted as the correct
18     answer, and my answer was counted
19     incorrectly.
20     We went through some of the references
21     that I had and found where in most cases --
22     not all of them -- Lindy's answer was what
23     the references -- the books I had said were

Page 32

1      correct.
2  Q.  But in terms -- Let's talk about 271.
3  A.  Okay.
4  Q.  That course was offered in the fall of
5      2005.
6  A.  Yes, sir.
7  Q.  Did she come to you at the end of that
8      course or in the middle of that course?  Do
9      you know when that was in the fall?
10 A.  I honestly do not remember.
11 Q.  Do you know whether she had been allowed to
12     look at the final exam in that course?
13 A.  Do you mean before the fact or --
14 Q.  No.
15 A.  -- after the fact?
16 Q.  I mean after the fact, do you know whether
17     or not these questions she copied down were
18     from her final exam or were they from
19     another test?
20 A.  I cannot remember.
21 Q.  Now, when y'all met and talked, did she
22     tell you what the question was and here is
23     what I answered and it was marked wrong, or

Page 33

1 did you actually take the piece of paper,
2 read the question and the options, see what
3 she had marked down and then respond to
4 whether or not it was right or wrong?
5 A. I looked at the question, the responses she
6 had written down as possible responses, and
7 what she had answered and had been counted
8 incorrectly.
9 Q. Now, I maybe wrong about this, but my
10 recollection when I talked to her in her
11 deposition -- when I asked her about these
12 questions, she said that she had been told
13 by you and Ms. Turner that her answer was
14 as correct as the answer that the teacher
15 or the instructor had selected as the
16 correct answer instead of your answer is
17 right and the answer the teacher selected
18 is wrong
19 A. And that was true of some of the questions,
20 but some of them, as I remember, it was an
21 incorrect answer that the instructor of
22 that course was counting correct. I'd say
23 there was a mixture of them. And if I'm

Page 34

1 not mistaken, there were one or two that I
2 said, you know, I can see why she chose
3 this one, you know, as being the more
4 correct, but --
5 Q. Now, you say there were about 10.
6 A. As I remember.
7 Q. Is that 10 per course, 271 and 272, or 10
8 total for both courses?
9 A. I do not remember. If you have copies of
10 them, you know, I could look at it and
11 refresh my memory.
12 Q. I'll let you see it in a minute.
13 A. I remember it happening twice.
14 Q. I want to see what your memory is first.
15 Do you know whether if on these few
16 questions -- how many do you think -- let's
17 say there were 10. How many out of 10 do
18 you think she got right that were marked
19 wrong?
20 A. Not knowing how many questions for sure, I
21 would say 70 to 80 percent of those she
22 showed me in my opinion and the references
23 I had, she had a correct answer and credit

Page 35

1 had not been given for it.
2 Q. And when you say 70 to 80 percent, do you
3 mean 70 to 80 percent she had answered
4 correctly and there was no other correct
5 answer, or the instructor had chosen as the
6 correct answer for that question an
7 incorrect answer?
8 Does that make sense? Because we
9 talked about --
10 A. Could you repeat that?
11 Q. Yeah. We talked about a situation where
12 her answer -- she told me her answer was as
13 good as the instructor's answer.
14 A. It was as good as or more correct.
15 Q. All right. In 70 to 80 percent of the
16 situations?
17 A. Of the questions that she showed me.
18 Q. As opposed to her answer was definitely
19 correct and the instructor's answer was
20 definitely wrong?
21 A. As I remember, there were some where the
22 instructor's answer in my opinion was
23 definitely wrong, and that was one of the

Page 36

1 reasons why I had called Ms. Turner in to
2 look at it and to see if she concurred with
3 me. And we got books out at least on one
4 occasion and marked where it contradicted
5 what Ms. Harris had said was the correct
6 answer and supported what Lindy said was
7 the correct answer.
8 Q. On one occasion or one question?
9 A. On one occasion.
10 Q. Let's talk about the 10 -- let's assume 10
11 or -- do your percentage if you want to.
12 That's fine.
13 Give me the percentage that you recall
14 were right as answered by Lindy and wrong
15 as answered by the instructor or as --
16 wrong as selected, the answer selected by
17 the instructor.
18 A. And, again, going on memory, if I'm forced
19 to pick a percentage which I'm
20 uncomfortable with doing --
21 Q. I want you to give a judgment if you can.
22 If you cannot give a judgment, that's
23 fine. If you --

Page 37

1    A.  I would prefer making a judgment after I
2        saw the questions I was asked to look at.
3    Q.  You cannot give a judgment at this time?
4    A.  I can give you a guess.
5    Q.  Well, is the 70 to 80 percent a guess when
6        you gave me that?
7    A.  I'd say an educated guess, but a guess
8        without looking at the questions and going
9        through them.
10   Q.  Okay.
11   A.  Once I go through them, I could give you a
12       definite number.
13   Q.  Okay.
14   A.  And, again, I had reference books at my
15       disposal at that time, too, when I was
16       looking at those questions and going
17       through.
18   Q.  I'm going to show you Exhibit 10 to
19       Ms. Wright's deposition. And I will tell
20       you that the pages -- I think I can show
21       you the pages that relate to what she wrote
22       down.
23   A.  Okay.

Page 38

1    Q.  I mean, this is a group of documents that
2        she produced pursuant to a subpoena, very
3        much like the one you got. Okay?
4    A.  Okay.
5    Q.  But I did specifically ask her about them.
6        I'm going to put it like this. Okay? I'm
7        pretty sure that's all of them.
8        What is that? That's not a test, is
9        it?
10   A.  I would say not, but I've never seen that
11       before, so ...
12   Q.  That wasn't one of the things she showed
13       you?
14   A.  No.
15   Q.  I've put these crossways as the ones that
16       she identified for me were her notes.
17       Let's see. It is -- and I marked them on
18       the bottom right-hand corner as Defendant's
19       10-A, B, C, and D.
20   A.  Those were the test questions that she
21       brought?
22   Q.  Yeah. But I'll give you that whole packet
23       just in case and tell me if that's what you

Page 39

1        looked at, at 10-A, B, C, and D.
2    A.  Well, my handwriting is on here, so ...
3        Actually, these are ones I didn't
4        remember looking at because these are not
5        obstetrical or pediatric questions. These
6        appear to be med-surg.
7    Q.  Med-surg questions?
8    A.  Uh-huh. (Positive response.)
9    Q.  What course would that have belonged to?
10   A.  You would have to ask Ms. Peterson or
11       Dr. Blackwell as far as what the course
12       number was, but when I --
13   Q.  But your writing is on there?
14   A.  Yes, sir.
15   Q.  Would you do this. Would you take this
16       highlighter, and everywhere you see your
17       writing highlight it.
18   A.  Okay. Apparently, I also showed it to my
19       med-surg instructor peers also.
20       (Brief interruption.)
21   A.  I also showed these to three of my med-surg
22       instructor peers also.
23       What if I think that could be my

Page 40

1        writing but I'm not positive because it's
2        written sideways?
3    Q.  I don't know. I mean, if you know it's
4        your writing, mark it.
5    A.  Okay. The ones that I'm positive are my
6        handwriting I have indicated in yellow, and
7        I believe I counted a total of 16
8        questions.
9    Q.  And are all of those med-surg questions?
10   A.  There's one that -- I was trying to look at
11       some of them. One looks like a pediatric
12       question but could have been utilized as a
13       med-surg question. Some of them could go
14       either way, so I cannot -- but a lot of
15       them are definitely not basic pediatric
16       questions and are not --
17       (Brief interruption.)
18   Q.  You've marked in yellow --
19   A.  Those things that I can positively identify
20       as my handwriting.
21       MR. NIX: Lisa, you can color copy
22       these, can't you?
23       COURT REPORTER: Yes.

Page 41

1 Q. Do you know Lindy's handwriting?
2 A. Oh, I'm sorry.
3 Q. Do you want to look through those and see
4     if there's any other stuff that she may
5     have copied?
6 A. Do you mean questions that she would have
7     copied or something from me or --
8 Q. Anything that you went over with her, any
9     questions from tests --
10 A. Just questions?
11 Q. Questions from tests or whatever, questions
12     from tests and answers where you were
13     trying to determine for her whether she got
14     it right or wrong.
15 A. No, sir, none of those others are test
16     questions.
17 Q. Do you see any other paperwork in there
18     that you recognize?
19 A. Yes, sir. That's why I had to ask that.
20 Q. Show me that.
21 A. I gave her some of my old notes and
22     handouts. Not that, but ...
23 Q. These are yours?

Page 42

1 A. No, those are yours. I'm putting clips on
2     mine.
3 Q. This is not something you gave her or --
4 A. No, sir.
5 Q. You didn't talk to her about it?
6 A. Not to my ...
7 Q. And you're putting clips on the ones that
8     you --
9 A. The ones that came from me, yes, sir.
10 Q. All right.
11 A. I see forms that were mine that, obviously,
12     the college continued utilizing for
13     courses, but I didn't have anything to do
14     with filling them out or anything.
15         (Brief interruption.)
16 A. That was also yours. It was in this
17     group. And then the two sets of papers
18     with the clips on them are pediatric notes
19     that I'm assuming Lindy got from me. I
20     know I gave her some, but I don't know that
21     someone at the college didn't utilize my
22     notes and pass them out, too. But I do
23     know I gave Lindy some pediatric notes.

Page 43

1 Q. And the notes that you clipped are your
2     notes?
3 A. Yes, sir, my lecture notes. I recognize
4     them partially because of the little
5     pictures, but then also -- as what I had
6     used in the past.
7 Q. Two groups?
8 A. Yes, sir, that was it. They just had
9     something sticking in between the two
10     groups.
11 Q. Do these notes, these two groups of notes
12     go together?
13 A. I am assuming they do, but I didn't check
14     for that. I just recognized --
15 Q. Can you put them together if they do go
16     together?
17 A. I will try, because this is several
18     chapters of ... these actually go right in
19     here.
20 Q. Put them where they belong.
21 A. Okay.
22 Q. Now, I'm holding in my hand the rest of
23     Exhibit 10. I've held out 10-A, B, C, and

Page 44

1     D, and then you're giving me your pediatric
2     notes that you gave Lindy?
3 A. Yes, sir. I'm assuming these are the ones
4     that I gave her.
5 Q. Okay.
6 A. I don't know that someone didn't utilize my
7     notes and pass them out, but these are my
8     notes.
9 Q. All right. And the other part that I have
10     in my hand here -- the rest of Exhibit 10
11     other than 10-A, B, C, and D and your
12     pediatric notes, have you ever seen any of
13     these documents that I have in my hand here
14     that Lindy produced?
15 A. I'll look back through those. It's a lot
16     when you're going through them the first
17     time.
18         Now, I have seen blanks of this. I've
19     not seen this filled out, grade appeal
20     form.
21 Q. You've never seen the filled-out one that's
22     in Exhibit 10?
23 A. Not to my knowledge, no, sir.

Deposition of Sandra Gunnels

---

Page 45

1    I did see one nursing care plan grading
2    form, but I cannot attest to it was this
3    one. I just know that I did see one that
4    was filled out, but I don't know if it was
5    that one or not.
6 Q. If you can identify one, please do. And if
7    you cannot, just don't say anything about
8    it.
9 A. Yes, sir.
10    To my knowledge, I've never seen any of
11    these other forms. I'm sorry. That goes
12    in there.
13 Q. It does?
14 A. Yes, sir.
15 Q. Where?
16 A. Just at the back. It was just a list of
17    commonly-used abbreviations.
18 Q. I'm going to give you back these pediatric
19    notes that you gave me because I have
20    hopefully put numbers -- the letter G and
21    then a number on each page consecutively,
22    G-1 through G-22. I would just like for
23    you to verify for me that I have done

---

Page 46

1    that --
2 A. Okay.
3 Q. -- and that I've gotten all the pages, and
4    that all of the pages I've put a G-1, G-2,
5    G-3 all the way through G-22 are all your
6    notes and that I've marked them all
7    correctly with a G and a number.
8 A. Those are mine, and they're numbered G-1
9    through G-22.
10 Q. These are pediatric notes from your
11    lectures on pediatrics which would have
12    been --
13    Did you teach pediatrics at --
14 A. No, sir. Let me let you finish the
15    question. I'm sorry.
16 Q. Did you teach pediatrics at CVCC?
17 A. Yes, sir.
18 Q. You did?
19 A. Yes, sir.
20 Q. Do you recall the number of pediatrics --
21    the course number?
22 A. NUR 272 for the ADN students, and then I
23    also taught the LPN students MCN 124, I

---

Page 47

1    believe, LPN ..
2 Q. Now, which course was this from, these
3    notes, G-1 through G-22?
4 A. Those would have been notes that I utilized
5    in NUR 272 the year before when I had
6    taught that to the RN students.
7    MR. DUMBUYA: If I understand it
8    correctly, you taught the same
9    course with different numbers?
10    THE WITNESS: No. NUR 272 I
11    taught for I want to say two
12    years, but I'm not positive,
13    for CVCC, but then the LPN's
14    also had pediatrics.
15    MR. NIX: Just for order, if you
16    don't mind, Peter, could you
17    wait until the end and then
18    you can ask her whatever you
19    need to ask her.
20    MR. DUMBUYA: You were
21    interrupting and said
22    something.
23    MR. NIX: I'm sorry?

---

Page 48

1    MR. DUMBUYA: You were
2    interrupting and said
3    something when we took the
4    deposition of Dr. Blackwell.
5    MR. NIX: I interrupted and
6    objected --
7    MR. DUMBUYA: No, you interrupted
8    and said something, asking for
9    clarification.
10    MR. NIX: I asked you for
11    clarification. I asked
12    Jennifer for clarification,
13    depending on who was asking
14    the questions. But I didn't
15    address the witness and ask
16    questions of the witness which
17    is what I'm referring to.
18    If you don't mind, I
19    would appreciate your not
20    asking questions of the
21    witness until I'm concluded or
22    finished. Okay?
23    MR. DUMBUYA: Okay.

---

Page 49

1    MR. NIX: Thank you.
2    MR. DUMBUYA: I hope you don't do
3        the same thing next time.
4    MR. NIX: Well, I've got to ask
5        clarification of you if you're
6        asking a question that needs
7        to be clarified or of Jennifer
8        if she's asking one that needs
9        to be clarified.
10           But I will not address
11       the witness until it's my turn
12       to ask questions, and that's
13       what I would hope you would do
14       and Jennifer would do as well.
15   Q. Ms. Gunnels, you indicated initially or
16       when you looked at Exhibit 10-A, B, C, and
17       D that you did not remember looking at
18       those; is that correct?
19   A. Not these specific questions. As I said, I
20       knew Lindy had come by a couple of times
21       with questions. I remember them being OB
22       and pediatric questions; obviously, at
23       least once there were medical-surgical type

Page 50

1        questions. So that's what I was saying.
2           You know, as I told you, I remembered
3        her coming by. I remembered pieces of
4        paper, going through reference books,
5        finding answers, that type of thing.
6    Q. And you're certain that those other
7        documents you looked at with Lindy were
8        test questions --
9    A. Right.
10   Q. -- and answers that had been given and
11       other choices for answers that were
12       possible?
13   A. As I said, I remembered looking at
14       questions. I remembered them being
15       pediatric and obstetrical questions.
16   Q. Okay.
17   A. I cannot -- I know she came back -- by
18       twice with questions, and both times it was
19       with the instructor's permission that she
20       had copied down questions and answers and
21       was asking for clarification.
22   Q. From tests?
23   A. Uh-huh. (Positive response.)

Page 51

1    Q. Is that yes?
2    A. Yes, sir.
3    Q. Therefore, those courses would have been
4        27 -- NUR 271, which is obstetrics,
5        correct?
6    A. Uh-huh. (Positive response.)
7    Q. Yes?
8    A. Yes, sir.
9    Q. And NUR 272, which is pediatrics, correct?
10   A. As I said, I remembered questions from both
11       of those courses, but it might have been
12       med-surg once --
13   Q. I'm sorry?
14   A. It may have been merely med-surg, one of
15       those.
16   Q. Well, I guess what I'm trying to
17       distinguish is whether you simply discussed
18       with her those courses and questions that
19       she had about them -- and I'm talking about
20       NUR 271 obstetrics, and NUR 272
21       pediatrics -- or whether she actually
22       copied down questions from tests that she
23       had taken and gotten wrong and went over

Page 52

1        them with you as opposed to going over with
2        you Exhibit 10-A, B, C, and D, which appear
3        to be questions from another course other
4        than 271 and 272.
5    A. Could you repeat that so I make sure I
6        understand? I want to answer correctly.
7    Q. I'll be glad to. Sure.
8           How many times do you think you met
9        with Lindy over the course of her tenure at
10       CVCC in the RN program or the ADN
11       program --
12          Is that what it is? ADN?
13   A. ADN, yes, sir.
14   Q. Between the time you left CVCC, which I
15       believe was on or around August 31, 2005,
16       and the time she finished her last course
17       at CVCC, which was in May 2006, how many
18       times do you think you met with her about
19       nursing school?
20   A. Two or three times. That's as close as I
21       can get.
22   Q. In that period of time --
23   A. Yes, sir.

13 (Pages 49 to 52)

Deposition of Sandra Gunnels

June 24, 2007

Page 53

1  Q.  -- that I just stated to you?
2  A.  Uh-huh.  (Positive response.)
3  Q.  Yes?
4  A.  Yes, sir.
5  Q.  Now, was each of those times, times when
6     you went over with Lindy certain questions,
7     issues, points or subject matter of the
8     courses that she was taking at CVCC in the
9     ADN program?
10 A.  At least once, if not twice, was going over
11    questions.  Once, for example, when I gave
12    her some notes from when I had taught
13    pediatrics was that -- she was looking for
14    study aids to help her with her pediatrics
15    or in addition to what she had received
16    during the class in pediatrics.
17 Q.  All right.  I apologize to you.  That got
18    through my head without sticking.
19 A.  Okay.
20 Q.  Once or twice --
21 A.  At least once or twice with questions,
22    going over test questions.
23 Q.  Okay.  And then another time --

Page 54

1  A.  At least one other time.
2  Q.  -- where she was looking for study aids?
3  A.  Right.  Yes, sir.
4  Q.  And that's when you gave her the pediatric
5     notes, correct?
6  A.  Yes, sir.
7  Q.  All right.  This is the question I have.
8  A.  Okay.
9  Q.  Well, you said at least one or two times
10    going over test questions.
11 A.  Yes, sir.
12 Q.  Is it possible that these are the only test
13    questions you went over with her, the 10-A,
14    B, C, and D and that the other times you
15    talked to her, you were talking to her
16    about questions she had about the subject?
17 A.  It is possible.
18 Q.  It's been a good while, hasn't it?
19 A.  Well, from -- this would have been November
20    of 2005 to April or May of 2006.
21 Q.  Now, if Lindy testified that those are the
22    only documents that reflect questions she
23    copied from tests that she'd gotten wrong,

Page 55

1     would you have any reason to disagree with
2     her about that?
3  A.  No, sir.  I would defer to her.  I do know
4     we discussed OB and peds questions, but I
5     don't -- I cannot swear she brought me
6     written OB and peds questions.  I
7     remembered written questions, but ...
8  Q.  Now, this is another question I'd like to
9     ask.  With respect to any test questions
10    that she may have in your opinion gotten
11    right or that she may have -- let's do
12    this.  Let's do it this way.  Let me break
13    it down if you don't mind.
14 A.  Okay.
15 Q.  With respect to any test questions that you
16    went over with her that in your opinion she
17    was right on but was marked wrong on and
18    the instructor's answer was clearly wrong
19    as opposed to being equally as good as
20    Lindy's, okay --
21 A.  Okay.
22 Q.  -- answer, on those questions, if you take
23    just those, can you tell me whether or not

Page 56

1     if she had been given credit for those
2     questions it would have changed her grade
3     in the course that those questions related
4     to?
5  A.  No, sir, I could not say that without
6     having the test in front of me and all of
7     her possible points for that course.
8  Q.  And then the other question is, if you take
9     just the questions that you went over with
10    her where she had given an answer that in
11    your opinion was just as good as the answer
12    chosen by the instructor as the correct
13    answer but it was marked wrong on her
14    paper, first of all, as an instructor,
15    would you give a student credit for that
16    answer if it was not the answer taught in
17    the course?
18 A.  Yes, sir.
19 Q.  Why would you do that?
20 A.  I can explain to you how we do it at CTC.
21 Q.  Let me ask you this first.
22 A.  Okay.
23 Q.  Is that a discretionary call typically by

14 (Pages 53 to 56)

Page 57

1   the instructor as to whether an instructor
2   is willing to give a student credit for an
3   answer that could be correct but is not the
4   answer chosen by the instructor? Is that a
5   matter of discretion on the instructor's
6   part?
7   A. No, that's not a good test question. If
8      you have two equally correct answers, then
9      you would give credit for both equally
10     correct answers.
11  Q. Well, if you have -- isn't it correct,
12     Ms. Gunnels, that in this field, in the RN
13     field, that there are issues that remain
14     controversial and where two or more
15     reasonable and conscientious professionals
16     could have a difference of opinion as to
17     the correct answer?
18  A. In a general sense, I'm sure as with any
19     profession, yes.
20  Q. But it's certainly true, isn't it, of the
21     nursing profession and the subjects taught
22     relative to a registered nursing course?
23  A. I can't say that's any more true than any

Page 58

1      other professional field.
2   Q. Well, it's true, then, is what you're
3      saying, but it's not more true than for
4      doctors or more true --
5   A. True.
6   Q. Is that what you're saying?
7   A. As you're stating it, true.
8   Q. And so my question is, if an instructor
9      taught a particular answer to a question
10     and the student gave another answer that in
11     your opinion could have been the right
12     answer but was not taught in the course,
13     wouldn't that be discretionary as to
14     whether the instructor gave credit for that
15     answer?
16  A. To be able to say that, I would have to see
17     the syllabus. I would have to see the
18     handouts that were given out.
19  Q. Well, I'm asking you to assume a
20     hypothetical. Okay? I'm not asking you to
21     agree that that was the case. Okay? I'm
22     asking you to assume a hypothetical.
23        And I'm asking you to assume that an

Page 59

1   instructor asked a test question that the
2   instructor had taught a specific answer to
3   that question or had taught a specific
4   thing relative to that issue and the
5   student gave an answer that in your opinion
6   could be as correct as the instructor's
7   answer. I'm asking you to assume that.
8   A. Uh-huh. (Positive response.)
9   Q. Wouldn't it be discretionary with the
10     instructor as to whether to give the
11     student a correct answer or to not mark it
12     wrong if the student gave an answer that
13     was not taught in the class by the
14     instructor?
15  A. If I followed you all the way through
16     correctly --
17  Q. Yes, it was long.
18  A. -- I would answer no.
19  Q. Why not?
20  A. If the student could produce evidence in
21     textbook, notes, et cetera that the
22     instructor had provided that said this was
23     an equally correct answer, then my practice

Page 60

1   has been and what I'm accustomed to in
2   academia is that credit is given for both.
3   Q. That's your practice.
4   A. Yes, sir.
5   Q. But that is not everybody's practice, is
6      it?
7   A. As I had begun to say, for example, at
8      Columbus Technical College, we run our
9      Scantrons -- we have a little more
10     sophisticated system than they had at CVCC
11     when I was there. And it tells us what
12     percentage of questions were answered
13     correctly, incorrectly.
14        And any question that there's not a
15     majority that have, you know, answered it
16     correctly, a panel of two or three
17     instructors go over the test, we go through
18     notes, we go through the books and make a
19     decision as to whether we will accept
20     another answer. And frequently -- I won't
21     say frequently, but often it is determined
22     that two answers are equally correct and
23     appropriate.

Deposition of Sandra Gunnels                                    June 24, 2007

---

Page 61

1   Q.  Would you impose the Columbus Tech
2       procedure on CVCC?
3   A.  Well, I had the same procedure myself when
4       I was at CV in that I would go through my
5       tests, and if the majority missed it or if
6       someone -- I gave them an opportunity.  We
7       went over tests.  If someone challenged it
8       and could give me rationale and data as to
9       why that question should be counted
10      correctly, I considered it and most often
11      gave credit if they could prove and provide
12      me with rationale.
13  Q.  I'm not asking you what you do.
14  A.  That's the only way I can answer because
15      that would be based on my --
16  Q.  Would you impose Columbus Tech's policies
17      and procedures on CVCC?
18  A.  In that general question --
19  Q.  Would you impose and require them?
20  A.  -- in solitary questioning that, no.
21  Q.  You don't put yourself above, do you, the
22      Alabama Board of Education, the State Board
23      of Education?

---

Page 62

1           MR. DUMBUYA:  I would object to
2       the form of that question.
3   Q.  I'm just asking you.  Do you consider
4       yourself a higher authority than the State
5       Board of Education in Alabama in terms of a
6       nursing program and how it should be run?
7           MR. DUMBUYA:  Again, you know, I
8       would object to the form of
9       the question.
10  A.  And I would have to ask that as it depends
11      or what point we were speaking of, because
12      I frequently disagree with boards of
13      authority on certain points.
14  Q.  And do you consider yourself a higher
15      authority with regard to how a nursing
16      program should be run and operated than
17      Dixie Peterson, who is the chair of the
18      nursing program at CVCC?
19  A.  I've never been a chair, so I cannot say
20      that I do, no.
21  Q.  Now, in terms --
22  A.  I don't want to be one.
23  Q.  In terms of the notes that are taken there,

---

Page 63

1       10-A, B, C, and D, I know that you've
2       looked at them.  Do you know whether or not
3       Ms. Wright accurately and correctly copied
4       the actual questions and answers that were
5       set forth on the tests that she was copying
6       from?
7   A.  I was not privy to the original test, no.
8   Q.  So you do not know whether she copied them
9       accurately; would that be true?
10  A.  Yes, sir.
11  Q.  Now, you threw in a minute ago the fact
12      that you asked several of your med-surg
13      colleagues to look at this particular
14      exhibit, 10-A, B, C, and D; is that right?
15  A.  Portions of it, yes.
16  Q.  In view of the fact that you didn't even
17      remember that document, how do you know you
18      did that?
19  A.  Because I wrote down three med-surg
20      instructors picked A as an answer.
21  Q.  What are their names?
22  A.  Would have been Lisa O'Steen, Yolanda
23      Williams, and I'm making the assumption

---

Page 64

1       Bobbie Hunter, because those were the three
2       med-surg instructors that were employed at
3       Columbus Technical College at that time.
4   Q.  Why are you making that assumption?
5   A.  Because it says three med-surg instructors,
6       and I remember discussing it with
7       Ms. Turner and Ms. O'Steen.  And if I put
8       med-surg instructors, my assumption is
9       since neither Ms. Turner nor I, although we
10      are med-surg instructors, aren't med-surg
11      specialists --
12  Q.  Okay.
13  A.  -- that those are the two I consulted or I
14      would not have written it in that way.
15  Q.  Who's the chair of the nursing program
16      there at Columbus Tech?
17  A.  It's not set up quite that way.  My
18      immediate boss is Ken Gordon, who is
19      program director.
20  Q.  Ken Gordon?
21  A.  Yes, sir.
22  Q.  Is he a registered nurse?
23  A.  RN, MSN, yes, sir.

---

Page 65

1  Q.  Now, in looking at Exhibit 10-A, B, C, and
2      D, can you tell me whether or not you wrote
3      anything on those questions or on those
4      answers that would identify now which ones
5      in your opinion should have been counted
6      correctly --
7  A.  On some of them, yes, sir.
8  Q.  -- or counted correct?  I'm sorry.
9  A.  Yes, sir, on some of them, because I wrote
10     down references and where the correct
11     answer was found.
12 Q.  Tell me.  How can we identify those?  Can
13     you identify them for me?
14 A.  Where it had page numbers, 9th edition,
15     Bruner, page 1827, those types of things
16     were the references where we found them for
17     her to take back.
18 Q.  Let me ..
19         THE WITNESS:  While you're doing
20         that, could I take a little
21         break?
22         MR. NIX:  Absolutely.
23         (Brief interruption.)

Page 66

1          (Brief recess was taken.)
2  Q.  I was just looking to see.  The yellow
3      appears to have actually marked some of the
4      resources?
5  A.  Uh-huh.  (Positive response.)  Because it
6      was in my handwriting.  You told me to mark
7      everything that was in my handwriting.
8  Q.  Okay.  I'm going to give you back 10-A, B,
9      C, and D.  Let me see if I can figure out
10     something here.
11         Would you please take that pink marker
12     and highlight the resources or the -- you
13     say you put the -- someone put the
14     resources on there that constituted the
15     correct answer; is that right?
16 A.  Yes, sir, on some of them.
17 Q.  So you're putting pink highlight on those
18     places; is that right?
19 A.  Yes, sir.
20 Q.  Are you marking over some of the yellow?
21 A.  (Witness nods head up and down.)  But you
22     can tell it's yellow.
23 Q.  Okay.

Page 67

1  A.  I did it very gently.
2  Q.  Let me ask you this, Ms. Gunnels.  Do these
3      pink marks constitute questions -- let me
4      rephrase that.
5          Do these pink marks go along with all
6      of the questions that you or some other
7      person from Columbus Tech believed Lindy
8      got right?
9  A.  Ask that question again.
10 Q.  Do the pink marks, those are the
11     authorities, correct --
12 A.  Yes, sir.
13 Q.  -- for the answers that you and your
14     colleagues, I guess, believed --
15 A.  Correct.
16 Q.  -- were correct in terms of Lindy's
17     answer?
18         And I guess my question is, do those
19     marks, are they beside every one of the
20     questions and answers that you believe
21     Lindy got correct that were marked wrong?
22         Let me go about it this way.  I know
23     you're looking.

Page 68

1  A.  Yeah.
2  Q.  Isn't it correct that the reason you were
3      looking at Exhibit 10-A, B, C, and D was to
4      advise Lindy as to whether you believed she
5      got some questions right that were marked
6      wrong and then to give her some resources
7      to use in making her arguments for a change
8      in the grading of those particular
9      questions?
10 A.  That's partially correct, yes, sir.
11 Q.  What's the rest of the answer, then?
12 A.  Well, also, it was a learning experience,
13     because there were some of these that I
14     agreed that the instructor was correct and
15     spent time with Lindy explaining why her
16     answers were not correct, so ...
17 Q.  Did you or did someone mark or put on that
18     Exhibit 10-A, B, C, and D the resource
19     citation or whatever y'all call it in
20     nursing for the questions that y'all
21     believed she got right that were marked
22     wrong?
23 A.  Yes, sir.

Deposition of Sandra Gunnels                                      June 24, 2007

Page 69

1  Q.  Did you put a resource by each one of the
2      ones that y'all believed she got right that
3      were marked wrong?
4  A.  I cannot say for sure.
5  Q.  Can you tell me out of the questions that
6      you see on those four pieces of paper,
7      10-A, B, C, and D, how many of them you
8      opine Lindy got correct where the teacher
9      was clearly wrong in marking it wrong,
10     marking Lindy's answer wrong?
11 A.  Some of them I'm having to read, so ...
12 Q.  I understand.
13 A.  From looking at this, five.
14 Q.  Looking at what?  Oh, I'm sorry.  You gave
15     me the number five.
16 A.  Yes, sir, five or six.
17 Q.  Well, is it five or six?
18 A.  Well, partially -- the copies aren't
19     excellent.  Some of the questions are cut
20     off, so I can't tell if that was a correct
21     answer or not because the question is not
22     supplied.  And there is a notation by
23     there, but I don't know what the question

Page 70

1      is, so I can't judge at this point exactly
2      what it means.  But one, two, three --
3  Q.  That's the way I got the documents, you
4      know.
5  A.  Five definite and potential six is what --
6      from this piece of paper.
7  Q.  Because of the cutoff?
8  A.  Uh-huh.  (Positive response.)
9  Q.  Yes?
10 A.  Yes, sir.
11 Q.  Didn't you say there were 16 total?
12 A.  16 or 15.  I can't remember at this point.
13 Q.  Now, are those five or six where you think
14     Lindy got it clearly right where the
15     teacher was clearly wrong?
16 A.  Apparently, these were the ones that I felt
17     were clearcut.
18 Q.  They are the ones you --
19 A.  Yes, sir.  I said there were five of them
20     that --
21 Q.  What I want you to do is read the question,
22     read Lindy's answer and read the teacher's
23     answer.

Page 71

1  A.  Okay.  If I can make it all out from
2      this -- the writing-over.  The one I cannot
3      read the question, so I cannot say for
4      sure.
5          The second one --
6  Q.  I'm talking about just the five or six
7      you --
8  A.  Okay.  The nurse is providing irrigation
9      for NG tube.  Patient's potassium level --
10         (Brief interruption.)
11 Q.  You have to go slow.
12 A.  I'm sorry.
13 Q.  Is that on 10-A?
14 A.  Yes, sir, second question.
15 Q.  The second question on 10-A, read the
16     question, please, slowly.
17 A.  The nurse is providing irrigation for
18     nasogastric tube.  The patient's potassium
19     level is four milliequivalents per liter --
20         THE WITNESS:  Is that the right
21     speed?
22         COURT REPORTER:  Thank you.
23         THE WITNESS:  I just didn't know

Page 72

1      how slow or how fast.
2  A.  -- and sodium is 130 per liter.  The nurse
3      would irrigate with, and from looking at
4      this Lindy picked A, which is tap water.
5          Do you want all three other options
6      or --
7  Q.  Well, Lindy picked tap water which you
8      believe is clearly correct?
9  A.  Yes, sir.
10 Q.  Is that right?
11 A.  Yes, sir.
12 Q.  Are the three other options clearly wrong,
13     or can you tell which option the teacher or
14     the instructor concluded was the correct
15     answer?
16 A.  From this piece of paper, because I don't
17     independently recollect, D is marked in red
18     on the Scantron, which is 0.9 percent
19     normal saline.
20 Q.  Is that written on that paper right there?
21 A.  Yes, sir.
22 Q.  That's what you're reading?
23 A.  Yes, sir.

18 (Pages 69 to 72)

Page 73

```
1    Q.  All right.
2    A.  And my handwriting says normal saline is
3         isotonic and would not impact the sodium
4         level. And if I remember correctly, Lindy
5         said they had discussed this one with
6         Ms. Harris in court and she said you would
7         use normal saline because of the sodium
8         level.
9    Q.  They had discussed this with who?
10   A.  Ms. Harris.
11   Q.  In court?
12   A.  No, in class.
13   Q.  I thought you said court.
14   A.  If I said court, no.
15   Q.  I think you did say court, but anyway ...
16        So is D the answer, then, that you're
17        saying Ms. Harris --
18   A.  Chose.
19   Q.  -- chose? Okay. All right.
20        And then read the next one, the next
21        question that you believe is clearcut.
22   A.  Interventions, priority in the plan of care
23        for a patient with multiple myeloma. She
```

Page 74

```
1         has that she chose B, and I'll say what
2         that is in a second. She says Ms. Harris
3         chose A, which A was to increase the
4         fluids. My agreement was with B, monitor
5         the red blood cells, and I have marked here
6         that that's on page 1827, 9th edition of
7         Bruner.
8    Q.  I'm sorry?
9    A.  The 9th edition of Bruner. It's a med-surg
10        textbook.
11   Q.  Now, I didn't hear you read the whole
12        question. Did you read the whole question?
13   A.  I read what is on here: Intervention,
14        priority in the plan of care for the
15        patient with multiple myeloma.
16   Q.  Lindy picked B which you thought was
17        clearly correct, and Ms. Harris was A which
18        you thought was clearly wrong; is that
19        right?
20   A.  Yes, sir, with the information given in the
21        question.
22   Q.  Now, that's on 10-A?
23   A.  That's the first page, is A, yes, sir.
```

Page 75

```
1    Q.  Go to the next one.
2    A.  Patient with cancer developed complications
3         of thrombocytopenia. Which hygiene is
4         contraindicated? And I can't see where
5         Lindy marked what had been chosen by
6         Ms. Harris. The question -- The answer
7         that I felt was correct or -- was correct
8         was A, brushing teeth and dental flossing
9         due to the bleeding, Chapter 303, 9th
10        edition, again, of Bruner and page 770 of
11        some other textbook.
12   Q.  Is that also on 10-A?
13   A.  Yes, sir.
14   Q.  Go to the next one.
15   A.  Okay. Assessment of a 34 year-old patient,
16        post liver biopsy. They have an IV of 0.9
17        percent KVO, respiration of 24, blood
18        pressure is 80 over 40, pulse 130,
19        temperature 97. Skin is cool. Capillary
20        refill is greater than five. What would
21        your first action be?
22        And I have to say this is one where I
23        disagreed. I don't know that you would --
```

Page 76

```
1         actually, I wrote on here it's a bad
2         question, because A was elevate the head of
3         the bed. Lindy said call the physician. C
4         is check the incision. D was increase
5         fluids to 100 ml per hour.
6         And I disagreed with D because I felt
7         like that that wasn't even maintenance for
8         a patient of this age. And if you went
9         through the two books that are marked
10        here ...
11   Q.  You say Lindy chose B?
12   A.  Uh-huh. (Positive response.)
13   Q.  Yes?
14   A.  Yes, sir. So this was one where I didn't
15        agree with Lindy, but I also didn't agree
16        with Ms. Harris.
17   Q.  So both of them got it wrong?
18   A.  In my humble opinion.
19   Q.  Okay. We might disagree about humility,
20        but -- go to the next one.
21        That was 10-B, correct?
22   A.  That was 10-B, correct.
23   Q.  All right.
```

Page 77

1   A. This one I'm having trouble reading, so I
2       can't say what the agreement or
3       disagreement was.
4   Q. Well, you picked out five or six. I just
5       want you to tell me which ones of those --
6   A. Yes, sir, and I'm trying to go through and
7       do that, so ...
8           (Brief interruption.)
9   A. If I had longer to look at these, I
10      could ...
11         Some of these I would have to defer to
12      Lindy as to what some of these notes mean
13      because they're not in my hand. She was
14      writing what I said.
15  Q. Writing what you said?
16  A. Uh-huh. (Positive response.)
17  Q. Yes?
18  A. On one of these, I thought all of the
19      answers would be choices.
20  Q. Correct choices?
21  A. Would be correct. And we do have questions
22      where it's pick all that are correct and
23      there's more than one answer. So that one

Page 78

1        I would have to defer to Lindy as to
2        exactly what because she wrote that.
3   Q. But I still want you just to give -- you
4       told me five or six a minute ago.
5   A. Well, I said five because the sixth one I
6       can't read the front, so I don't know.
7       And, actually, in looking at the fifth one,
8       I believe I told her she was wrong, so --
9       because it says picked D.
10  Q. Which one was that?
11  A. On C.
12  Q. 10-C?
13  A. The third one down says: Caring for
14      patient hospitalized with acute
15      exacerbation of COPD. Which of the
16      following would the nurse expect to
17      evaluate on this client? Lindy picked an
18      incorrect answer, and I gave her the
19      correct answer and what page it was on.
20  Q. So you miscounted is what you're telling
21      me.
22  A. Yes, sir, in that quick brief going through
23      with not having the fifth one -- and one of

Page 79

1        them I said I thought she was correct, but
2        in looking at it I told her she was wrong.
3   Q. Now, the one you say is cut off is on what
4       page?
5   A. It's the very top of 10-A.
6   Q. Now, let me tell you what I've got. I've
7       got the second question on 10-A.
8   A. Right.
9   Q. I've got the one about the --
10  A. That would be the third question on 10-A
11      with the multiple myeloma.
12  Q. Is that the tap water answer?
13  A. No. I'm sorry. No. I thought you were
14      going down to that one. I apologize.
15  Q. I'm just trying to recount to you.
16  A. Right.
17  Q. There were three on page 10-A.
18  A. Okay.
19  Q. Isn't that right?
20  A. Yes, sir.
21  Q. And then there was one on 10-B where you
22      said both the teacher and Lindy were wrong,
23      right?

Page 80

1   A. That I disagreed with their answer, yes,
2       sir.
3   Q. And then there was one on 10-C that you had
4       counted as clearly -- that Lindy got it
5       clearly correct and the teacher got it
6       clearly wrong. Now that you've looked back
7       over it, you've realized --
8   A. It was the other way around.
9   Q. -- that it was the other way around?
10  A. Yes, sir.
11  Q. Any others that you see on there?
12  A. Not in looking through this selection, no,
13      sir. I mean, if I had more time to look at
14      it and read everything, I might come up
15      with a different answer. But in looking at
16      it in this time period ...
17  Q. Well, I want you to take as much time as
18      you need.
19  A. You may not want me to.
20  Q. You've been a professor or an instructor in
21      nursing how long?
22  A. I have taught for -- off and on for 30
23      years, so ...

Page 81

1  Q.  I mean, if you need more time, I want you
2      to take it.
3  A.  Okay.
4         Again, I don't want to answer on the
5      others because I would need Lindy here to
6      explain what some of this writing means.
7      Those four I can say with assurance.  The
8      others without further consultation I could
9      not say.
10 Q.  What you're saying is, you're having a hard
11     time reading the writing on some of them?
12 A.  Some of them, yes, sir.
13 Q.  Would it be correct to say that some of
14     them where you can read the writing,
15     there's just not enough information for you
16     to tell what it means?
17 A.  Do you mean as she copied down the question
18     or as --
19 Q.  As she copied down the question and the
20     answer, right.
21 A.  Not so much as copying down the question,
22     but what is written in the margins as to
23     what we said about the question.

Page 82

1  Q.  Where she actually did the writing?
2  A.  Yes, sir.
3  Q.  Can you tell on this 10-A, B, C, and D
4      where she did the writing?
5  A.  I don't know what Lindy's handwriting looks
6      like.  I'm assuming if it's not mine it was
7      hers, but that's an assumption, and that
8      the questions are written in her
9      handwriting.  I just know it's not my
10     handwriting.
11 Q.  What advice did you give Lindy upon going
12     over this group of papers with her, 10-A,
13     B, C, and D?
14 A.  I referred her back to Ms. Harris.
15 Q.  To do what?
16 A.  To go back over and see if -- with the
17     references that Lindy had and the things
18     that she had, were those, indeed, questions
19     that would stand or potentially would be
20     counted correct or incorrect.
21 Q.  I guess we've determined that the questions
22     reflected on 10-A, B, C, and D do not
23     relate to NUR 271 obstetrics, or NUR 272

Page 83

1      pediatrics, correct?
2  A.  Correct.
3  Q.  And I think we've also established that
4      you're not positive that you actually went
5      over test questions on those two.  You know
6      you discussed them with her at least,
7      correct?
8  A.  Correct.
9  Q.  Did you ever give Lindy any other advice
10     other than go back and talk to your
11     instructor?
12 A.  I told her -- I referred her to
13     Ms. Peterson, also.
14 Q.  For what purpose?
15 A.  On several issues, and not just Lindy.  But
16     that, for example, the quarter of 271
17     started out in August with me at least for
18     the first 15 minutes of class being the
19     instructor of record, and it was my
20     syllabi, et cetera.
21         I had given them an assignment to do
22     over the break that they were to turn in,
23     which they had done, that was to be graded

Page 84

1      to use as part of the grade points in 271.
2      I left those papers when I resigned and
3      left CVCC, and the students were told that
4      those were not available.  And I told them
5      where they were and advised them to go to
6      Ms. Peterson if they were not found.
7  Q.  What were those?
8  A.  It was an assignment that was given to them
9      prior to the start of the semester for them
10     to have worked over --
11 Q.  Fall semester?
12 A.  -- over the break and to have been turned
13     in.  And in the syllabus, it was part of
14     the points that they were to earn for the
15     syllabus and they were to have received
16     those points.  And I left those in my
17     office when I left CVCC.
18 Q.  The papers that they turned in?
19 A.  Yes, sir.
20 Q.  And so the reason you told Lindy to go see
21     Ms. Peterson was because you wanted her to
22     retrieve those?
23 A.  Well, if they were saying that those

Page 85

1    couldn't be found and the points could not
2    be given to them, I referred her to
3    Ms. Peterson.
4    Q.  Were they saying that those could not be
5        found and points could not be given for
6        them?
7    A.  The students were told that those
8        assignments they had completed could not be
9        found in my office.
10   Q.  Do you know what Ms. Peterson said?
11       Actually, do you know whether Lindy
12       talked to Ms. Peterson about those papers?
13   A.  I do not know what the outcome of that was.
14   Q.  You don't know what Ms. Peterson said?
15   A.  No, sir.
16   Q.  You don't know whether Lindy talked to
17       Ms. Peterson, correct?
18   A.  I cannot remember.
19   Q.  Okay.
20   A.  And it would have been Lindy reported to me
21       whether or not she spoke with Ms. Peterson,
22       and I can't remember.
23   Q.  Did you give her any other advice, give

Page 86

1        Lindy any other advice?
2    A.  I advised her on -- that she needed to file
3        a grade appeal if she felt that she had a
4        case.  I advised her that the syllabus was
5        a legal and binding contract, and if that
6        wasn't being followed that she needed to
7        address that.  And I may have advised her
8        to contact a lawyer.
9    Q.  Did you give her the name of a lawyer?
10   A.  No, sir.  I don't know many lawyers of this
11       type.
12   Q.  Did you tell her anything about whether
13       other people had obtained a lawyer with
14       regard to a problem with CVCC?
15   A.  I honestly don't remember.  I don't know.
16       I don't think so, but I cannot recall.
17   Q.  Do you know of any other person that
18       obtained a lawyer and went to CVCC with a
19       lawyer about a nursing problem?
20   A.  Yes, sir.
21   Q.  Who?
22   A.  Arit Umoh.
23   Q.  What was that about?

Page 87

1    A.  She was a student in the class before
2        Lindy, so she would have graduated in May
3        of 2005 if my dates are correct.
4    Q.  You're right.  I think that's right.
5    A.  Okay.
6        (Brief interruption.)
7    A.  But that she was issued a failing grade in
8        clinicals in NUR 272, which was pediatric
9        nursing, and she was appealing that grade.
10   Q.  NUR 272?
11   A.  Pediatrics, yes, sir.
12   Q.  You were her clinical instructor?
13   A.  I was her didactic classroom instructor and
14       had been present in clinicals with
15       Ms. Umoh.
16   Q.  When you say didactic classroom instructor,
17       is that a different type of instructor from
18       the NUR 272 lecture instructor?
19   A.  No, that's the lecture instructor.  The
20       didactic is the classroom portion.
21   Q.  And we're talking about what semester would
22       that have been?
23   A.  That would have been spring of 2005 unless

Page 88

1        I'm incorrect.
2    Q.  Now, were you a full-time employee for the
3        spring semester of 2005?
4    A.  No, sir.  I believe I was employed -- I was
5        either temporary full-time or I had been
6        hired specifically for NUR 272 lecture and
7        clinical and MCN 124, which was the
8        pediatric LPN --
9    Q.  That would have been an LPN course?
10   A.  That would have been an LPN course.
11       (Brief interruption.)
12   A.  I don't remember what my status was.  I was
13       either temporary full-time or I had been
14       hired specifically for teaching NUR 272,
15       both lecture and clinical, and another LPN
16       course.
17   Q.  Did Ms. Umoh have a clinical instructor
18       other than you?
19   A.  Yes, sir.
20   Q.  Who?
21   A.  I believe she was officially in Ms. Wendy
22       Wall's group, but she also -- she was
23       either in Arit -- sorry, Arte Harmon,

Page 89

1    A-R-T-E, Harmon or Wendy Wall's group, not
2    officially in my group.
3    Q. She was giving -- given a failing grade in
4       the clinical, correct?
5    A. Yes, sir.
6    Q. But not in the didactic part?
7    A. Yes, sir.
8    Q. She made a passing grade in the didactic
9       part?
10   A. Yes, sir.
11   Q. And you taught that, correct?
12   A. Yes, sir.
13   Q. So tell me about her getting a lawyer. I
14      don't understand what you're talking about.
15   A. She had a lawyer present the campus with
16      his card and said he was acting on her
17      behalf and that she was appealing or
18      protesting her grade.
19   Q. Do you know who this lawyer was?
20   A. No, sir.
21   Q. Do you know who the lawyer spoke with?
22   A. I did not speak with him, so I do not know
23      who he spoke with.

Page 90

1    Q. Did you meet the lawyer?
2    A. Not to my knowledge or remembrance.
3    Q. Did you speak with the lawyer?
4    A. No, sir.
5    Q. How did you know that she got a lawyer?
6    A. I was told by Ms. Peterson I think
7       initially, and then Dr. Lowe.
8    Q. So you weren't in any meetings where the
9       lawyer was present, correct?
10   A. I don't believe so. I don't remember
11      anything where I was present at the same
12      time he was.
13   Q. One of the things you told Lindy in meeting
14      with her -- let me ask you this. Do you
15      recall whether that meeting would have been
16      related to Exhibit 10-A, B, C, and D, these
17      questions that you and I have been
18      discussing?
19   A. I'm sorry. You'll have to specify which
20      meeting.
21   Q. Was the meeting where you told her to do a
22      grade -- to meet with Ms. Harris, do a
23      grade appeal, get a lawyer, was that the

Page 91

1    meeting where you discussed the questions
2    on this Exhibit 10-A, B, C, and D?
3    A. I don't recall.
4    Q. Did you ever advise her to do anything
5       other than a grade appeal?
6    A. As I said, I may have, going through the
7       steps and -- probably did; said, and then
8       if not, then you can seek legal means.
9    Q. So grade appeal and legal recourse of some
10      type, correct?
11   A. Uh-huh. (Positive response.)
12   Q. Yes? You're going to have to say yes.
13   A. I'm sorry. Yes, I could have and probably
14      did. I can't say for certain I said
15      dah-dah-dah and get a lawyer, but I said
16      these are the steps.
17   Q. Do you know if she did get a lawyer?
18   A. Well, since I'm being deposed, yes, I'm
19      assuming she did get one.
20   Q. Do you know who the lawyer was?
21   A. I'm trying to recall, because in looking
22      through those papers, I saw Connie Cooper's
23      name on them and know that's a law firm

Page 92

1    that Lindy -- I honestly do not know if I
2    knew that was who her attorney was or
3    whatever. The first contact I had with an
4    attorney was with Ms. Cooley and
5    Mr. Dumbuya.
6    Q. How do you know Connie Cooper?
7    A. I saw her name on your papers you --
8    Q. You don't know her?
9    A. Oh, no, sir. No.
10   Q. And Ms. Cooper did not speak with you?
11   A. Not to my remembrance no, I don't believe
12      so.
13   Q. Before Ms. Cooley wrote the letter that she
14      wrote to Dr. Blackwell, Ms. Cooley did not
15      speak with you?
16   A. No, sir. I mean, I'd have to know the date
17      of the letter.
18   Q. July 28 or 23, somewhere in that time
19      frame, of 2006, I believe.
20   A. To my knowledge, I can just state that I
21      never spoke with Ms. Cooley or met her
22      until I went to her office for deposition
23      or whatever you call --

23 (Pages 89 to 92)

Deposition of Sandra Gunnels

Page 93

1   Q.  July 28, 2006, was Ms. Cooley's letter,
2        Exhibit 20.
3   A.  I do not remember speaking or meeting with
4        Ms. Cooper [sic] until I met her and talked
5        with her at the deposition.
6   Q.  Okay.  Did you give Lindy Wright advice on
7        more than one occasion relative to her
8        problems passing courses at CVCC?
9   A.  Yes, I'm sure I did.
10  Q.  Can you go through each one?
11  A.  I know I spoke with her on several
12       occasions over that eight-month time
13       period, approximately -- well, I wouldn't
14       say eight months, five-month time period,
15       approximately.
16       And, you know, basically listened to
17       her concerns and addressed as best I could
18       advice, which ultimately led to the grade
19       appeal -- meeting with the instructor,
20       grade appeal, meeting with Ms. Peterson,
21       and going through the proper channels.
22  Q.  What I want you to do is start with the
23       first meeting you had with her about a

Page 94

1        grade problem or a course failure and tell
2        me about each meeting you had with her.
3   A.  I could not do that because I don't recall
4        dates or times or specific, you know,
5        meetings or conversations.  I can give you
6        general conversations we had and she came
7        by my office a couple of times, those types
8        of things.
9   Q.  I don't care about precise dates.  I don't
10       care about precision in exactly what each
11       of you said.  Okay?
12  A.  Okay.
13  Q.  I just want to know approximately when you
14       met with her.  I know you met with her one
15       time, and it appears to have been in
16       December of 2005 --
17  A.  Okay.
18  Q.  -- relative to 10-A, B, C, and D.  Okay?
19  A.  (Witness nods head up and down.)
20  Q.  Now, did you meet with her before this to
21       your knowledge about a problem with grades
22       at CVCC?
23  A.  I do not recall.

Page 95

1   Q.  All right.  Did you meet with her after you
2        met with her in December 2005?
3   A.  I know I did because that is when I gave
4        her the pediatric notes to help her with
5        her studying.  I'm trying to think if she
6        came to the office another time.  And then
7        I spoke to her on the phone a couple of
8        times.
9   Q.  In December 2005, you met with her and
10       talked to her about 10 -- this Exhibit
11       10 --
12  A.  You're telling me I did.  I know I met with
13       her at some point --
14  Q.  No, I'm representing to you that Ms. Wright
15       testified that she met with you in December
16       2005 and talked about her grades.
17  A.  Then I would defer to Ms. Wright's memory
18       of when it was.  I do know that I met with
19       her and we went over those.
20  Q.  I'm asking you to assume your first -- not
21       your first meeting, but at least you had a
22       meeting with her --
23  A.  Yes.

Page 96

1   Q.  -- in December 2005 about failing grades.
2        Okay?
3   A.  Yes, sir.
4   Q.  And I'm asking you -- Now, was that the
5        time when you gave her the information on
6        pediatrics, your --
7   A.  No, sir.  There was another meeting.
8   Q.  All right.  Do you know when that meeting
9        was?
10  A.  About -- I would have to look at the 272
11       syllabus, but they were studying GI and, I
12       think, urinary.  They were studying those
13       subjects.
14  Q.  And was anything else discussed other than
15       pediatrics at that meeting?
16  A.  Not that I recall.
17  Q.  Did you give her anything other than these
18       course notes that we've marked as 10 -- G-1
19       through G-22?
20  A.  I believe I also gave her some old NCLEX
21       questions, type style questions.
22  Q.  Some what?
23  A.  Old NCLEX style questions.  There are Web

Page 97

1   sites and there are books you can get NCLEX
2   questions out of. I had collected some
3   from various Web sites that are study
4   guides for the NCLEX board and where a lot
5   of instructors --
6   Q.  Get their tests?
7   A.  Not get their tests, but use those as
8       guidance for what types of test questions
9       you're going to ask.
10  Q.  Let me show you Exhibit 9 to Ms. Wright's
11      deposition. Does that look like the NCLEX
12      material?
13  A.  No, sir, those are my slides. Those are my
14      notes.
15      Except for some personal notes that are
16      in the middle of this from Lindy, which are
17      other copies of grade appeals, et cetera,
18      these are notes I provided to her on
19      pediatrics, but there are no NCLEX style
20      questions here. And I may have just given
21      her a Web site.
22  Q.  Okay. So Defendant's Exhibit 9 are notes
23      and materials that you gave Lindy, except

Page 98

1       that there are some materials in here that
2       relate to --
3   A.  Her grade appeal.
4   Q.  -- her grade appeal?
5   A.  Yeah.
6   Q.  So anything related to grade appeal is
7       something that she developed or is hers?
8   A.  Yes, sir.
9   Q.  The rest of it is stuff that you gave her,
10      right?
11  A.  Yes, sir.
12  Q.  Do you know when you would have given her
13      that?
14      Is that pediatric material?
15  A.  That's pediatrics, yes, sir.
16  Q.  Every bit of it is?
17  A.  Let me double check and make sure, but it
18      all looked like --
19      Now, some of these may have been slides
20      that Ms. Harris gave her. Some of them do
21      not look familiar, but a lot of them are my
22      slides and notes. So I can't say -- some
23      of them -- some of them are mine, and some

Page 99

1       of them I can't say that I gave them to
2       her.
3       But a large number of them are slides I
4       gave her and, also, some of them I went
5       over with her.
6   Q.  When was that?
7   A.  It would have been before they had a test
8       on -- I believe it was GI and urinary was
9       what I remember studying with Lindy.
10  Q.  And that would be pediatrics?
11  A.  Pediatrics, yes, sir.
12  Q.  Let me ask you this. I want to kind of go
13      back and pick a couple of things up.
14      Give me your understanding of why Lindy
15      is no longer in the ADN program at CVCC?
16  A.  My understanding is, is that she did not
17      receive a passing grade -- I thought it was
18      in 271. It could have been med-surg. I
19      honestly don't remember.
20      That she appealed, met with, was
21      offered some type of course forgiveness and
22      then was issued a non-passing grade in
23      pediatrics.

Page 100

1   Q.  When you say she was offered some kind of
2       course forgiveness, what do you mean?
3   A.  She took another course, and as reported --
4       per discussion with her was if this -- she
5       passed this course successfully, then that
6       would take the place of the failing grade
7       she had received in the course for fall of
8       2005.
9   Q.  And so that's what she told you?
10  A.  I believe so, yes, sir, to the best of my
11      memory.
12  Q.  Are you familiar with the policies and
13      procedures of CVCC relative to nursing
14      students?
15  A.  To a degree. It would depend on which
16      particular -- seeing that I primarily
17      worked as adjunct, I did not get involved a
18      lot in those types of situations.
19  Q.  So to a degree, you have knowledge of the
20      CVCC policies and procedures for nursing
21      students, but not to a great degree? Would
22      that be correct?
23  A.  Generally, yes.

Page 101

1  Q.  And I guess I'm still wondering what you
2      mean when you discuss what you have
3      discussed with me, and that is that she
4      failed a course, that she was told that she
5      could take another course and receive some
6      kind of course forgiveness, as you put it,
7      and then she failed another course, I
8      guess --
9          Did you say Pediatrics 272?
10 A.  I believe that's what it was.
11 Q.  All right.  So why would -- why would what
12     you have told me disqualify her from
13     continuing in school at CVCC?  Do you
14     understand that?
15 A.  I think I do.  Let me answer it if I've not
16     answered the question.
17 Q.  Okay.
18 A.  My understanding of the policy is a failing
19     grade in two nursing courses precludes you
20     from -- or did preclude you from
21     entering -- re-entering the nursing
22     program.
23         From what Lindy had reported to me,

Page 102

1      because there was some controversy over the
2      semester and how grades had been given,
3      that type of thing, that she was offered
4      the opportunity of taking a course, and
5      course numbers had changed, that the grade
6      that she made in that course would offset a
7      failing grade that was issued in the
8      earlier course if that makes sense.
9  Q.  So are you saying that she was disqualified
10     from attending CVCC, the nurse ADN program,
11     as you understand it, because she failed
12     two courses, or are you not saying that?
13 A.  I'm saying that it was my understanding
14     that if two courses were failed -- and
15     that's just my understanding of the nursing
16     program, but Lindy --
17         (Brief interruption.)
18         (Brief recess was taken.)
19 Q.  Ms. Gunnels, you were telling me your
20     understanding of the nursing program, is
21     that if you fail two courses, that you're
22     no longer eligible to participate, correct?
23 A.  That that was the ruling, yes.

Page 103

1  Q.  That was the policy, right?
2  A.  Right.
3  Q.  Are you saying that it's your understanding
4      that Lindy is no longer qualified to be in
5      the nursing program at CVCC because she
6      failed two nursing courses?
7  A.  No.  I am saying that Lindy presented to me
8      she was told that if she completed the
9      course and received a passing grade on it
10     that it would -- that she would at this
11     point not be considered as having failed
12     two nursing courses because she repeated
13     one and received a passing grade in it and
14     that that was -- I guess the term would be
15     forgiven.
16 Q.  Do you know how course forgiveness works at
17     CVCC?
18 A.  No, sir.
19 Q.  Do you know what it's for, the purpose of
20     it?
21 A.  I can't say that I do, no, sir.
22 Q.  Do you know what course substitution is at
23     CVCC?

Page 104

1          (Brief interruption.)
2  Q.  Ms. Gunnels, do you know what course
3      substitution is at CVCC?
4  A.  I don't know the parameters of it or the
5      definition, no, sir.
6  Q.  And you do not know its purpose?
7  A.  My -- and it's an assumption, would be if
8      you --
9  Q.  Tell me what you know.  Don't give me an
10     assumption.
11 A.  Then I know nothing.
12 Q.  And you don't know how it works, obviously,
13     at CVCC, correct?
14 A.  No.
15 Q.  Do you know what academic bankruptcy is at
16     CVCC?
17 A.  No, sir.
18 Q.  If I hear you correctly, your time at CVCC,
19     you dealt with instructing.
20 A.  Yes.
21 Q.  And that's all you got involved with was
22     instructing, correct?
23 A.  Yes, sir.  I mean, that's what my job was.

Page 105

1  Q. Dixie Peterson was the chair of the
2     nursing -- that nursing program or the
3     health sciences part or portion of CVCC's
4     curriculum; isn't that correct?
5  A. Yes, sir.
6  Q. And she was over nursing, correct?
7  A. Yes, sir.
8  Q. Do you know how many courses Lindy actually
9     failed while she was at CVCC in that ADN
10    program, let's say, between August 2005 and
11    May 2006?
12 A. Independently, no, sir.
13 Q. Does that matter?
14 A. To me?
15 Q. Yes.
16 A. No, sir. I mean, I'd need to know what you
17    mean by does it matter.
18 Q. Would it matter to you if a student in your
19    nursing program failed courses in terms of
20    that person's qualifications and ability to
21    become a nurse who was not dangerous and
22    who proficiently performed the job of a
23    registered nurse?

Page 106

1  A. It would depend on which courses they
2     failed, how frequently, what were the
3     circumstances, was it because they were not
4     a good test taker versus were they not
5     competent. There's a lot of factors that
6     go into that.
7        But I have had students who have failed
8     courses before and repeated them and did
9     exceptionally well and were outstanding
10    nurses.
11 Q. Does Columbus Tech have a policy of any
12    kind that relates to the number of courses
13    an RN student can fail and still graduate?
14 A. Yes, sir.
15 Q. What is that policy?
16 A. Policy is that absolute failure of two
17    nursing courses, you're not eligible for
18    re-admission into Columbus Technical.
19    There are cases of exceptional
20    circumstances where a grade other than F
21    will be issued so that the student is
22    eligible to come back.
23 Q. You just said that upon failure of two

Page 107

1     courses, you're not eligible for admission.
2  A. Re-entry into.
3  Q. Okay. In other words, if a nursing student
4     fails two courses at Columbus Tech, they
5     are out of the nursing program; is that
6     correct?
7  A. The ADN program, yes, sir.
8  Q. The ADN, the same program we're talking
9     about here at CVCC, correct?
10 A. It's a little bit different at CTC. That's
11    why I said ADN.
12 Q. I've got you. But that's the policy at
13    Columbus Tech, correct?
14 A. Uh-huh. (Positive response.) If they
15    receive two F's in a nursing class.
16 Q. There is a little difference, because a D
17    is an F basically at CVCC, correct?
18 A. Well, and the same -- a failing grade I
19    should have said instead of an F. A
20    failing grade.
21 Q. Because the scale is pretty much the same
22    at Columbus Tech as it is at CVCC? A D --
23 A. It's a little different, but D is a

Page 108

1     failure.
2  Q. Does Columbus Tech have anything that you
3     call course forgiveness?
4  A. I do not know.
5  Q. Does Columbus Tech have anything that you
6     call course substitution?
7  A. Yes.
8  Q. All right. What is it?
9  A. Well, as I was going to say earlier, at
10    CTC, it is only in non-nursing courses. In
11    that we require Algebra 191, whatever the
12    first college algebra is, if someone has
13    calculus because they tested out of
14    algebra, you can substitute your calculus
15    course for your algebra course.
16 Q. Okay.
17 A. So that type of course substitution.
18 Q. But you can't substitute another nursing
19    course for one you failed?
20 A. No, sir.
21 Q. Why is that?
22 A. If you have not successfully completed a --
23    if you've not successfully mastered a

Page 109

1　course, then there's an opportunity those
2　concepts would not be taught in another
3　course.
4　Q.　There's an opportunity for them to do what,
5　now?
6　A.　There's an opportunity that -- I really
7　need more information. But, for example,
8　if it was a med-surg course, different
9　concepts would be covered than in a
10　pharmacology course.
11　Q.　Isn't it correct that an ADN program which
12　will allow for a person to become a
13　registered nurse if they pass the boards is
14　a program that requires high standards
15　because of the nature of the work of a
16　registered nurse?
17　A.　Generally, yes.
18　Q.　A registered nurse is a professional; isn't
19　that correct?
20　A.　By most definitions.
21　Q.　A registered nurse deals with sick people,
22　correct?
23　A.　Correct.

Page 110

1　Q.　A registered nurse deals with situations
2　where if they take the wrong step or
3　measure, they could seriously harm a
4　patient; isn't that correct?
5　A.　Correct.
6　Q.　For that reason, taking classes to get an
7　ADN degree and then take the State board to
8　become a licensed registered nurse is a
9　little bit different from taking, let's
10　say, business administration, wouldn't you
11　agree, in the sense that the profession of
12　nursing will allow for the possibility of a
13　patient actually either dying or
14　becoming -- or being seriously harmed by
15　the professional taking care of that
16　person, the registered nurse taking care of
17　that patient?
18　A.　I think I agree with that --
19　Q.　Okay.
20　A.　-- question. It was kind of long.
21　Q.　It's important, isn't it, for a registered
22　nurse to know what they're doing?
23　A.　Yes, sir.

Page 111

1　Q.　And the reason that most nursing schools do
2　not allow students to continue in a program
3　like an ADN program after two nursing
4　course failures is because it is a
5　profession that does have potential for
6　danger, and it is a profession that
7　requires a high degree of knowledge and
8　skill?
9　A.　Was there -- I'm sorry. Was there a
10　question in there?
11　Q.　That was my question. Am I correct when I
12　say that?
13　A.　Would you repeat that?
14　Q.　Yes.
15　A.　I'm sorry.
16　Q.　Isn't it correct that most nursing schools
17　in an ADN program of the type we've been
18　discussing do not allow a student to
19　continue in the program if they fail two
20　substantive nursing courses because nursing
21　is a profession where patients can be
22　endangered by a nurse; isn't that true?
23　A.　Well, there's two parts of that question.

Page 112

1　Yes, nursing is a profession where patients
2　can be harmed. I think the idea -- and
3　this is my opinion -- of saying someone
4　can't come back into a nursing program
5　because of -- it's a little bit of a
6　fallacy because a student could fail out of
7　CTC and go over to CVCC and be entered or
8　go to Columbus State and be entered and
9　successfully complete their course.
10　　　So it doesn't necessarily -- the whole
11　purpose there is not to stop an incompetent
12　practitioner from reaching ...
13　Q.　Are you telling me that a student could
14　flunk -- in an ADN program at Columbus Tech
15　could flunk two substantive nursing
16　courses, be out of the ADN program at
17　Columbus Tech and go across the state line
18　to CVCC and register in that ADN program
19　and be admitted and go through and finish
20　up and take the board right away?
21　A.　Theoretically, yes. And in practice, I
22　have taught four or five students who have
23　failed out of the CSU nursing program, then

Deposition of Sandra Gunnels

Page 113

1   came to the CTC program and were
2   successful.
3       So there is a difference with schools
4   and -- you know, I can't say what all the
5   factors were that made students successful
6   at CTC when they were not successful at
7   other nursing schools.
8   Q.  So you're saying that Columbus Tech allows
9       a nursing student into the ADN program
10      after that student has flunked two
11      substantive nursing courses at another
12      institution in the same curriculum without
13      a passage of time or anything else?
14  A.  If they meet all other qualifications to be
15      entered into and selected into the ADN
16      program, yes, sir.
17  Q.  And a nursing school has no responsibility,
18      then, for the safety of a nurse that it
19      graduates or the competency of a nurse that
20      it graduates?  Would that be true?
21  A.  No, sir, that is --
22          MR. DUMBUYA:  Object to the form
23          of that question.

Page 114

1   Q.  Would that be true?
2   A.  No, and that's not at all what I said.
3   Q.  Well, isn't it correct that if a candidate
4       or a student flunks two substantive nursing
5       courses in an ADN program, that the reason
6       they're no longer allowed to continue in
7       that program is because they are not good
8       nursing candidates and that -- they are not
9       good nursing candidates?
10  A.  I would disagree with that.  No, sir.
11  Q.  Tell me how.
12  A.  Well, because of differences in
13      curriculums, differences in teacher
14      personality, any number of things.
15          But as I said, I've personally taught
16      students who were not successful at CSU.  I
17      don't know if there were any from CVCC, but
18      I know of three definites from CSU who did
19      not pass nursing at CSU, came to CTC, were
20      admitted, were successful, did pass boards
21      and are excellent nurses at this point.
22  Q.  Let me ask you this.  I know you've never
23      been in administration in a nursing school,

Page 115

1   correct?
2   A.  Yes, sir.
3   Q.  What you're giving me is your personal
4       opinion as an instructor from a nursing
5       school?
6   A.  My personal opinion and my experience.
7   Q.  But what is your opinion as to the reason
8       for the rule that nursing schools use, that
9       if you flunk two substantive nursing
10      courses in a program like an ADN course,
11      you can't continue until a certain period
12      of time after which you can apply for
13      re-entry, let's say?
14  A.  Since I did not write that rule, you would
15      have to ask them the reason for that.
16  Q.  Okay.  You don't know then?
17  A.  I would not want to -- you said in facts,
18      not assumptions.
19  Q.  Okay.  Very good.
20          (Brief interruption.)
21          THE WITNESS:  I said he told me he
22          wished me to deal in facts,
23          not assumptions.

Page 116

1   A.  I've never been privy or present when that
2       was --
3   Q.  Yeah, I don't want you to speculate.
4   A.  Right.
5   Q.  And that would be speculation for you,
6       wouldn't it?
7   A.  Right.
8   Q.  Do you know the result of any grade appeals
9       that Lindy filed at CVCC?
10  A.  My understanding was -- from Lindy was that
11      the appeal of whichever course she failed
12      in winter was answered through taking
13      another course and that her appeal for
14      spring was non-successful, and obviously so
15      since we're here, so ...
16  Q.  Did you know she failed two courses in the
17      fall of 2005?
18  A.  I don't know if I knew that or not to be
19      honest.
20  Q.  As we sit here today, you do not know that;
21      is that correct?
22  A.  My memory or my remembrance was that she
23      did not pass one, but I don't know or I

29 (Pages 113 to 116)

Page 117

1     just don't remember that she did not pass
2     two.
3    Q. Did you know she had two grade appeals in
4     December 2005?
5    A. I don't know. I mean, we spoke about grade
6     appeals in general and you, know, where to
7     find it on the Web site and the catalog and
8     those kinds of things, but not
9     specifically.
10   Q. Did you know Ms. Dumbuya when you were at
11     CVCC?
12   A. I did somewhat. I don't know that I ran
13     into her as an instructor, but I also
14     worked at St. Francis Hospital at the same
15     time she did.
16   Q. How long have you known Ms. Dumbuya?
17   A. I cannot say when I first met Ms. Dumbuya.
18     I honestly don't know. I would say five to
19     seven years, but that's a guess just based
20     on where I've worked.
21   Q. I apologize to you, but I did not catch
22     whether you did or did not know Ms. Dumbuya
23     from CVCC.

Page 118

1    A. I knew her from St. Francis Hospital. I
2     know she worked at CVCC. I do not know if
3     we worked there at the same time or not.
4    Q. Have you ever spoken with her about Lindy
5     Wright?
6    A. I don't remember.
7    Q. When did you first know that Ms. Dumbuya's
8     husband is a lawyer?
9    A. I'm trying to remember if I knew before I
10     got the -- went to the office. I think I
11     knew that just from some type of general
12     information. Until I went to be deposed, I
13     had never met him or spoken to him or
14     really knew who he was.
15   Q. Are you related to Lindy Wright?
16   A. No, sir.
17   Q. Do you know any of her relatives?
18   A. I met her mother once, and I've met her two
19     sons, but that's it -- in the course of
20     working at St. Francis or that type of
21     thing.
22   Q. Do you know where Lindy Wright works now?
23   A. I know she just changed jobs, and I think

Page 119

1     it's at one of the nursing homes, but I
2     don't know which one.
3    Q. How do you know she just changed jobs?
4    A. Because where she was working before, I had
5     a friend who was an executive. And I know
6     they had a shake-up, and my friend lost her
7     job. And I spoke with Lindy, and she
8     resigned and -- because of finances, that
9     kind of thing. She resigned and told me
10     she was going to work at one of the nursing
11     homes.
12   Q. So when did you find that out?
13   A. Two weeks ago?
14   Q. Did you talk to Lindy about the fact that
15     she was changing jobs?
16   A. In a conversation with her, it came up,
17     yes, sir.
18   Q. Was that about two weeks ago?
19   A. I think it was about two weeks ago. Ten
20     days ago, two weeks ago.
21   Q. What else did you talk about with her at
22     that time?
23   A. This deposition, that I had been deposed.

Page 120

1    Q. You say you talked to her about this
2     deposition --
3    A. This deposition.
4    Q. -- that was coming up?
5    A. Right, that I had received the
6     deposition -- the subpoena.
7    Q. All right.
8    A. She had changed her job. The person we
9     knew in common, what -- that person was
10     employed now and where, just general ...
11   Q. Was this a conversation you had with her in
12     person?
13   A. I saw her probably about a week ago in
14     person and then talked to her on the phone
15     about 10 days ago.
16   Q. So the conversation you had with her about
17     being subpoenaed for this deposition today
18     was on the telephone, correct?
19   A. Yes, sir. I called her and told her I had
20     received a subpoena.
21   Q. And you talked about the other things that
22     you've already told me about, correct?
23   A. Uh-huh. (Positive response.)

Page 121

1  Q.  Yes?
2  A.  Yes, sir.  I'm sorry.
3  Q.  You were real good about this at the very
4     beginning of the deposition.
5  A.  I know.  I'm, like, thinking, so I
6     apologize.
7  Q.  That's all right.
8        Now, a week ago, where did you see her?
9  A.  I saw her in Ms. Cooley's parking lot.
10  Q.  All right.
11  A.  She was leaving, and I was coming in, in
12     the law office.
13  Q.  What was the day of the week?  Was it a
14     Tuesday?  This is Tuesday, the 24th.
15  A.  It was either Monday or Tuesday.  I don't
16     remember which day exactly.
17  Q.  Okay.
18  A.  I know it was not Wednesday, Thursday or
19     Friday.
20  Q.  What was your purpose for going into
21     Ms. Cooley's office that day?
22  A.  I was taking them some copies of documents
23     that y'all had requested.  I called and

Page 122

1     asked did I need to bring them the same
2     documents and was told yes.  So I made
3     copies of the ones that I had found up to
4     that point and took it to their office and
5     left them with the secretary.
6  Q.  Have you met with either Mr. Dumbuya or
7     Ms. Cooley in preparation for this
8     deposition?
9  A.  No, sir.
10  Q.  Have you met with Ms. Cooley or Mr. Dumbuya
11     recently?
12  A.  No, sir.  The only time I've ever met with
13     Ms. Cooley or Mr. Dumbuya is November 1st,
14     2006, for my deposition in their office --
15     her office.
16  Q.  Now, when Lindy Wright came to you about
17     her grades in December 2005 -- she talked
18     to you about her grades, right?
19  A.  Yes, sir.
20  Q.  Now, did you do anything other than speak
21     with Lindy Wright to assist her?
22  A.  When you go to -- that's called Exhibit 10
23     I think is the number.

Page 123

1  Q.  Yes.
2  A.  If that was the time I talked with her
3     about her grades, I talked with my peers at
4     CTC, but ...
5  Q.  Okay.  So you talked with your peers at
6     Columbus Tech --
7  A.  Uh-huh.  (Positive response.)  About those
8     questions, that type of thing.
9  Q.  Did you do anything else to help her in
10     December 2005 when you met with her about
11     Exhibit 10-A, B, C, and D?
12  A.  Not that I recall.  I mean, we went through
13     the appeal process, those types of things
14     where it was -- and I can't remember now if
15     it was online or getting a catalog, that
16     she needed to do that, those types ...
17  Q.  All right.  Was there ever a time when you
18     discussed with Lindy a question about
19     clinical care plans or care plans?
20  A.  She brought a care plan by --
21        And I can't say if it was that time or
22     if it was before, exactly what it was.
23        -- that she was preparing and asked me

Page 124

1     to look over it and see if I had any
2     suggestions for how she could improve it.
3  Q.  Do you recall what course it was in?
4  A.  No, sir.
5  Q.  I apologize for standing up.  Got a bad
6     back.
7        Do you recall about when that was?
8  A.  No, sir, I honestly don't.
9  Q.  Did you give her suggestions about how to
10     improve it?
11  A.  Yes, sir.
12  Q.  Did you ever talk to her at any other time
13     about a care plan or care plans?
14  A.  Yes, sir.  I had forgotten until ...
15        There was an occasion she told me
16     about -- and I can't remember when she told
17     me or what course it was in -- where a care
18     plan was graded.  She received a grade on
19     that care plan.
20        And then my understanding was it was
21     regraded to a -- and she received another
22     grade, and then they regraded again and she
23     then received yet a third grade, if I'm

Deposition of Sandra Gunnels

June 24, 2007

---

Page 125

1    remembering correctly.
2    Q. Do you recall when you spoke with her about
3       this?
4    A. No, sir.
5    Q. Do you recall whether you spoke with her in
6       person about it or on the telephone?
7    A. No, sir.
8    Q. Do you recall why she raised that with you?
9    A. It would be an assumption, but that I'm an
10      instructor and knowledgeable about grading
11      care plans.
12   Q. But, now, that's an assumption, right?
13   A. That's an assumption. You'd have to ask
14      her why she called me.
15   Q. Have you ever talked to her about any other
16      clinical program or any aspect of any
17      clinical part of a course that she was
18      taking?
19   A. Not that I recall. I mean, I would need
20      more information than that.
21   Q. Have you ever -- Has she ever told you
22      anything about any care plans or any other
23      documents related to any part of her

---

Page 126

1    clinical work that was lost or misplaced
2    or ...
3    A. I remember her commenting on -- that there
4       was -- besides the paperwork that I had
5       left in my office when I left CVCC, but
6       that one of the instructors had lost some
7       care plans. But I don't remember any
8       particulars, just the general --
9    Q. Just a comment by her?
10   A. Uh-huh. (Positive response.)
11   Q. Yes?
12   A. Yes, sir.
13   Q. Did you take any action on her behalf
14      relative to the loss-- the alleged loss of
15      the care plan?
16   A. I'm not sure what you're referring to when
17      you say action.
18   Q. Action means doing something. Did you do
19      anything on her behalf or for her relative
20      to anything she told you about a care plan
21      or care plans being lost?
22   A. Not that I remember.
23   Q. I mean, is there any reason why you would

---

Page 127

1    do anything?
2    A. Not in those circumstances, no, sir.
3    Q. Do you consider yourself her advisor in
4       terms of getting through nursing school?
5    A. I considered myself her instructor.
6    Q. But I mean now --
7    A. And I think she still saw me in that role.
8    Q. December of 2005, did you consider yourself
9       her advisor in assisting her through
10      nursing school?
11   A. Not her advisor, no, but as --
12   Q. What?
13   A. She was an old student.
14   Q. Okay.
15   A. And I still have relations with old
16      students and receive phone calls
17      periodically or visits or whatever.
18   Q. Have you ever talked to Lindy Wright about
19      entering Columbus Tech's ADN program?
20   A. I advised her if she wasn't successful in
21      her grade appeals at CVCC that she then
22      should consider applying to another
23      program, yes, sir.

---

Page 128

1    Q. Do you know whether Lindy Wright has
2       applied to another program?
3    A. To my knowledge, no, but ... no, not that
4       I'm aware of.
5    Q. She has not applied to Columbus Tech?
6    A. Not to my knowledge, no, sir.
7    Q. Do you know whether she would be accepted
8       if she did apply to Columbus Tech's ADN
9       program?
10   A. I do not know because of what the
11      qualifications are, and I don't know what
12      Lindy's -- you know, she would take a
13      different test for Columbus Tech, COMPASS
14      scores, et cetera, and get the
15      determination. What the criteria for
16      Columbus Tech is, is very different than
17      what it is for CVCC.
18   Q. Have you ever made a telephone call on
19      Lindy Wright's behalf?
20   A. As far as her grades are concerned or --
21   Q. As far as any aspect of her schooling,
22      studies or work at CVCC.
23   A. To my recollection, no.

---

Page 129

1    Q. Have you ever called an instructor of hers
2        for any reason -- an instructor from CVCC?
3    A. Not that I recall.
4    Q. Have you ever called a clinical instructor
5        as opposed to a classroom lecturer from
6        CVCC on behalf of Lindy Wright?
7    A. Not that I recall, no, sir.
8    Q. Is there any reason you can think of why
9        you would do that?
10   A. If I had been on friendly terms with or
11       whatever to discuss, but that would be the
12       only -- and as far as I know, I didn't
13       really know any of her clinical
14       instructors. I don't know who she had.
15   Q. Do you blame anyone other than Lindy,
16       Ms. Gunnels, for her failing out of the ADN
17       program at CVCC?
18   A. Could you restate that?
19   Q. Do you blame anyone other than Lindy for
20       Lindy failing out of the ADN program at
21       CVCC?
22   A. That implies that I do blame Lindy, which I
23       would say I don't blame Lindy or anyone. I

Page 130

1        don't think that the way the fall
2        quarter -- fall semester 2005 began was
3        particularly a good situation for
4        students. And I think that was kind of a
5        not-positive-environment semester for any
6        of the students at that point just from
7        what I know of it, but I don't blame
8        anyone.
9    Q. Do you believe that anyone is responsible
10       other than Lindy Wright for her failing out
11       of the ADN program at CVCC?
12   A. From what I know of the situation, I don't
13       blame --
14   Q. I said responsible.
15   A. Don't hold anyone responsible for.
16   Q. For her failing out of the ADN program,
17       correct?
18   A. Correct.
19   Q. Does that include Lindy? I mean, you don't
20       hold Lindy responsible for her failing out
21       of the ADN program there at CVCC?
22   A. I would have to say with the situation as I
23       know it, I think it was a combination of

Page 131

1        issues.
2    Q. Would you please tell me what that
3        combination of issues is comprised of.
4    A. Well, I know that Ms. Bellamy and I
5        resigned and left CTC [sic] August 31st,
6        2005, which if I'm not mistaken was the
7        RNs' first class day, and that there was
8        some time period where there was not
9        stability in some of the instruction. And
10       then also, I know there was a lot of unrest
11       on campus and within the nursing students
12       and nursing division.
13   Q. Now, when you say that you and Ms. Bellamy
14       resigned August 31, 2005, how did that
15       affect Lindy Wright's grade?
16   A. Well, I think the turmoil and upheaval and
17       not having the instructor that wrote the
18       syllabus being the instructor that
19       completed the semester -- I know they had
20       some guest lecturers, some lecture by
21       long-distance, those types of things. And
22       the campus was in somewhat of an upheaval,
23       also, at that point.

Page 132

1    Q. Do you know how long it was before you and
2        Ms. Bellamy were replaced with other
3        permanent instructors?
4    A. I could not tell you exactly, no, sir.
5    Q. Full-time instructors, maybe that's a
6        better term.
7    A. No, sir.
8    Q. You do not know?
9    A. I don't know a time frame, no, sir.
10   Q. What day did you leave CVCC?
11   A. August 31, 2005.
12   Q. The same day you turned in your
13       resignation, correct?
14   A. Yes, sir.
15   Q. And there was no advance notice given by
16       you, was there, that you were going to
17       resign?
18   A. In the circumstances, A, I had not signed a
19       contract and informed them that I was not
20       going to sign a contract if it did not have
21       certain parameters in it, and that I was
22       asked not to go to my classroom on that day
23       of class.

**Page 133**

1     I had initially written a resignation
2 with a date two weeks to one month after
3 that date, but after my interaction with
4 some of the administrative staff at CVCC, I
5 felt that it was wise to leave on that day.
6 Q. Why had you not signed a contract?
7 A. The primary reason was that the years of
8    experience that I had, had not been
9    addressed in the contract would be the
10    primary reason that I did not sign a
11    contract.
12 Q. Would you explain that to me.
13 A. I graduated from nursing school in June of
14    1972, and I had at that point in time 33 or
15    34 years of nursing experience, and the
16    fact that I was only being given credit one
17    semester, I think it was, 13 years and the
18    second semester it had gone down to six
19    years of credit for that nursing experience
20    as far as salaries went -- or what contract
21    I was offered.
22 Q. When you say in the first semester you were
23    given credit for 13 years, that would have

**Page 134**

1    been the spring semester of 2005, right?
2 A. I believe that would have been the summer
3    of 2005. It was fall 2005 that was the six
4    years.
5 Q. Got you. So was the summer of 2005 your
6    first full-time work as a professor there,
7    instructor at CVCC?
8 A. I was a full-time temporary instructor,
9    yes, sir.
10 Q. In the summer of 2005, right?
11 A. Yes, sir.
12 Q. And that was your first full-time
13    employment at CVCC, correct?
14 A. Yes, sir.
15 Q. For that summer of 2005, you were given 13
16    years credit; is that right?
17 A. Yes, sir.
18 Q. Do you know how that was figured?
19 A. Yes, sir.
20 Q. How?
21 A. There was -- and you've got copies of it.
22    In June of 2005, I was instructed to get
23    written proof of my past work experience.

**Page 135**

1    First off, I've never had a company or an
2    organization who hired me ask me to prove
3    my own work experience. I expressed that
4    and was told that, you know, just to get
5    it.
6      So Katie Lackey, who was our
7    administrative assistant at that point,
8    designed a form that we faxed off. I
9    needed to prove 25 years experience. And
10    some of those were returned, some were
11    not.
12      At some point in time, I was told that
13    that was not the correct format, that they
14    wanted it on organization letterhead. It
15    couldn't be on the form we had sent out and
16    asked organizations to fill out, and that I
17    needed to redo the validation of my
18    employment.
19 Q. What kind of employment were you seeking to
20    get verification of?
21 A. All full-time nursing employment up to a
22    total of 25 years I believe it was, was the
23    maximum.

**Page 136**

1 Q. And when you say all full-time nursing
2    employment, you're not including teaching,
3    are you?
4 A. I had never taught anywhere full-time I
5    don't believe up to that point. It was
6    full-time nursing experience.
7 Q. Do you know why this was necessary for you
8    to get this verification?
9 A. Oh, I understand why it was necessary. The
10    salary scale was that -- based on years
11    experience, and I'm quite accustomed to
12    having my employment verified. I've just
13    never been asked to personally approach
14    organizations and request verification of
15    my employment.
16 Q. Really? You've never had any organization
17    you've worked for write and seek
18    verification --
19 A. Oh, yes.
20 Q. -- of prior employment?
21 A. I've had them do that. I've never had them
22    to ask me to contact and ask them to send
23    employment -- I'm very accustomed and

Page 137

1    expect for my work experience to be
2    validated, but typically that's an HR
3    function.
4        And I expressed during a meeting -- at
5    least once -- that I saw that being fraught
6    with problems, that you would have someone
7    verify their own employment and provide
8    that verification to you.
9  Q. Did you resign because you were required to
10   send off a form or to seek a written
11   verification of your prior employment?
12 A. No, sir.
13 Q. Tell me why you left on August 31, 2005,
14   without any kind of prior notice.
15 A. Well, there had been some prior notice, but
16   nothing in writing. August --
17 Q. Stop there and tell me what prior notice.
18 A. We need to back up further to -- if you
19   want to do that to March of 2005. I had
20   sought full-time employment at CVCC once
21   and had been offered a position. At that
22   point in time -- and that was back in
23   2004. That would have been such a drastic

Page 138

1    paycut that I could not accept it.
2        I spent that time doing some things
3    financially to put myself in a position
4    where I could teach full-time and take that
5    salary cut and for a time period had been
6    attempting to gain full-time employment at
7    CVCC since that's where I had taught and
8    had experience teaching at that
9    organization the students.
10       Since that was not successful, I
11   applied at Columbus Technical College in
12   February or March of 2005 and was offered
13   full-time employment there which I
14   accepted. I informed Ms. Peterson that I
15   was accepting full-time employment at
16   Columbus Technical College and due to their
17   non-compete clause, I would no longer be
18   available after the end of spring
19   quarter -- spring semester to -- spring
20   semester to teach classes for CVCC. She
21   informed Dr. Blackwell and Dean Lowe at the
22   end of March of that.
23       Subsequent to that, I had several

Page 139

1    meetings with Dean Lowe, potentially with
2    Dr. Blackwell -- I can't remember exactly,
3    but I know with Dean Lowe and with
4    Ms. Peterson. Was asked to come temporary
5    full-time to CVCC because otherwise, there
6    really wasn't an instructor to take on my
7    teaching load.
8        I approached the administration of CTC
9    and got from them -- received from them a
10   one-year grace period to teach for CVCC and
11   that I would have a position when I came
12   back to CTC in May, June of 2006, that I
13   would teach this one ADN class.
14 Q. So you're saying that you had intended to
15   go back to Columbus Tech the whole time?
16 A. Well, I was told I would not be offered a
17   full-time contract at CVCC. And I may be a
18   little slow, but it only takes two years of
19   denying me full-time employment for me to
20   figure out that I'm not going to get
21   full-time employment.
22 Q. I thought you had full-time employment.
23 A. Full-time temporary. There's a

Page 140

1    difference. And I really -- based on my
2    prior relationship with Ms. Peterson and
3    with knowing what a large number of
4    students that were going to be in that ADN
5    class, wanted them to have a successful
6    year and did not want to leave the college
7    shorthanded, so I --
8  Q. Had you already accepted at Columbus
9    Tech --
10 A. Yes, sir.
11 Q. -- full-time employment?
12 A. I had an office.
13 Q. What was the salary there?
14 A. It was less than CVCC. I think I started
15   at -- I either started at fifty or 55,000
16   at CTC. I can't remember.
17 Q. What did you start at full-time at CVCC?
18 A. Well, I never received the appropriate
19   salary, so I don't really remember. It's
20   in the contract what I was paid for the one
21   semester that I did sign a temporary
22   contract for the summer and provided that
23   I -- that I was signing this contract

Page 141

1    knowing my hours were not correct and that
2    my expectation would be once, you know,
3    that was -- validation of employment was
4    provided, that the contract would be
5    adjusted appropriately, provided what when
6    reading the letter from Ms. Boone I had
7    thought was appropriate validation of my
8    employment.
9        But then met with Dr. Blackwell, Dean
10   Lowe, I believe Ms. Peterson was present,
11   Ms. Bellamy, Ms. Gruber on the Friday
12   before August the 31st, announced my
13   intention that I would not be signing a
14   contract if I was not offered the
15   correct -- you know, if the contract did
16   not represent my professional experience.
17       And it was more a point of honor and
18   professionalism than it was dollars, as
19   obviously I took a position making less
20   than what I was entitled to at CVCC. That
21   was on a Friday. I announced, you know --
22   I mean, I said I would not sign an
23   incorrect contract.

Page 142

1        I was ill on Monday and Tuesday of that
2    week and had called and spoke to the
3    administrative assistant. Came to class on
4    Wednesday, August the 31st, assuming that I
5    would be teaching that day. Met with a
6    couple of the students before I went down
7    to class.
8        As I was walking to class, I met
9    Dr. Lowe in the hall who basically stated I
10   was not allowed to enter my classroom and
11   that a substitute teacher had been -- was
12   there and was going to teach. I gave him
13   the syllabus, the handouts, et cetera, and
14   he told me he would be back up to speak
15   with me.
16       At that point in time, based on the
17   tone of our conversation, et cetera, I went
18   back to my office, found a contract with
19   Dr. Blackwell's signature on it and a
20   note -- I believe it was from Dr. Lowe --
21   stating that this is the contract that I
22   was going to be offered. And at that point
23   in time, I sat down and wrote out a

Page 143

1    resignation and I think I gave two weeks'
2    notice. It might have been a month.
3        Had a further interaction with Dean
4    Lowe, and based on not being allowed to
5    enter my classroom and the conversation
6    that I had with Dean Lowe changed the date
7    to that current date and delivered it to
8    Ms. Peterson who was absent from campus
9    that day and to Dr. Blackwell and Dean
10   Lowe.
11           (Defendant's Exhibit 24 was marked
12           for identification.)
13   Q.  Ms. Gunnels, let me show you what I have --
14       I just got it off the computer last night.
15       I assume it's correct. It purports to be a
16       2005 calendar. If I hear you correctly --
17       Okay. Look at that and tell me if that
18       looks right to you. Look at August. I
19       mean --
20   A.  That's what I'm trying to get down to.
21   Q.  That's the operative month.
22   A.  Yes, sir.
23   Q.  Now, if I understand you correctly, you

Page 144

1    were in a meeting the Friday before August
2    31.
3    A.  Yes, sir.
4    Q.  And that would be August 26?
5    A.  Yes, sir.
6    Q.  And who was in that meeting?
7    A.  Dr. Blackwell, Dean Lowe, I believe
8        Ms. Peterson was there, Ms. Gruber -- and
9        that's G-R-U-B-E-R -- and Ms. Bellamy.
10   Q.  All right. What did y'all talk about?
11   A.  Talked about the difficulties in the
12       nursing division in recruiting staff,
13       talked some about Ms. Gruber had a
14       particular situation. We discussed the
15       verification of employment. And I know
16       they have minutes, so I think they can
17       answer that a lot better than I could, but
18       those are the things that stand out and I
19       remember.
20   Q.  What makes you think they have minutes?
21   A.  If I'm -- I know other people took notes,
22       and typically they take minutes during
23       these or, you know, have notes. I didn't

Page 145

1    keep any notes or anything of that nature.
2    Q.  Was it a meeting that was held every Friday
3        or periodically?
4    A.  No.  This was a special meeting.
5    Q.  I mean, are you saying that someone was
6        appointed to be secretary?
7    A.  No, sir.  I was just saying I did not take
8        minutes, did not keep minutes.  Remember
9        some of the conversations.  Can't remember
10       if there was a computer -- a computer, a
11       recorder present in the room, which on
12       occasion there were.  I don't know.
13   Q.  So you don't know if anyone really kept
14       minutes?
15   A.  Oh, no, sir.  That was not what I was -- I
16       should have said notes.
17   Q.  You didn't keep any?
18   A.  (Witness shakes head from side to side.)
19       If I did, I did not keep those notes.
20   Q.  Do you know anybody specifically who did
21       keep notes?
22   A.  I know that people wrote on tablets.  What
23       they were writing, what they have, I don't

Page 146

1    know.
2    Q.  You don't remember who, right, who was
3        writing?
4    A.  No, sir.
5    Q.  What was said about the difficulties in the
6        nursing division?
7    A.  The nursing division -- There's a nursing
8        shortage, and there's even a greater
9        shortage of master's-prepared nurses which
10       are required by the State Board of Nursing
11       to -- and the NLN to teach nursing.
12           There were, in essence, three
13       instructors for -- I don't remember how
14       many freshmen were coming in then, but
15       somewhere close to -- a guesstimate is a
16       hundred students, 90 to a hundred students
17       total.  It could have been a little bit
18       more, a little bit less.
19           And I was temporary part-time.
20       Ms. Gruber was not allowed to teach in the
21       classroom because she didn't have a
22       master's, and I know those types of issues
23       were discussed.

Page 147

1    Q.  Any solution to them or any plan about what
2        to do about it?
3    A.  Not that I remember.
4    Q.  Did you know the status of that same
5        situation at other schools, nursing
6        schools?
7    A.  Not to that degree, but it was that common
8        that -- it was hard to acquire master's-
9        prepared instructors, that was a known
10       fact, yes, sir.
11   Q.  Now, what was said about recruiting staff
12       or recruiting, if anything?
13   A.  I just know we talked about the difficulty.
14   Q.  And then what was said about verification
15       of employment?
16   A.  And, again, I wish I had known people were
17       going to ask me questions about this
18       because I would have kept notes.
19           I believe that that came up as an
20       issue.  We were discussing that.
21           Ms. Debbie Boone came in, if I'm not
22       mistaken, or some information was provided
23       that were worksheets that she had done and

Page 148

1    that she was now saying that the form that
2    we had designed would not meet the needs
3    and that we needed to --
4        And I think Ms. Bellamy was in -- well,
5    I don't think.  I know some of her work,
6    according to her -- she was having some of
7    the issues, also.
8        And let me just -- that I personally
9    would need to go back and re-verify the
10   majority of my employment.  And I expressed
11   that if I was going to be teaching a number
12   of classes and hours and the students I was
13   going to be teaching, I was not going to
14   have time to do that and did not really
15   feel it was appropriate for me to be doing
16   that.
17   Q.  Why were you going to have to verify the
18       years of employment?
19   A.  Because it was not on the hospital or
20       organization's letterhead.  It was on
21       CVCC's letterhead where we had designed the
22       form.  So people had said worked here
23       from -- and you've got copies.

Page 149

1  Q. So you're saying that you had all of the
2     verification, it just wasn't on the right
3     form?
4  A. The majority of it, yes, much more than six
5     years.
6  Q. Are you familiar with the requirements in
7     terms of getting that kind of information?
8  A. You would have to elaborate.
9  Q. The requirements of the school needing that
10    information before it can --
11 A. I know what was sent to me in a letter and
12    then told to me in one meeting.
13 Q. Were you told that you would receive some
14    type of credit for your nursing experience?
15 A. Yes, sir.
16 Q. Explain what you were told.
17 A. I was told that I would receive one year
18    teaching experience for each year of
19    nursing experience. And at that point, I
20    had over 30 years of nursing experience.
21 Q. You understood that it had to be a whole
22    year of nursing experience, correct --
23 A. (Witness nods head up and down.)

Page 150

1  Q. -- for you to get a year credit of teaching
2     experience, correct?
3  A. Yes, sir.
4  Q. If you got a year as credit of teaching
5     experience from having worked a year as a
6     nurse, then that put you in a different pay
7     category --
8  A. Yes, sir.
9  Q. -- or if you got enough of those years
10    credit; would that be correct?
11 A. Yes. There's a copy of the pay scale.
12    From this amount to this amount, you're on
13    this grade or scale; from this amount to
14    this amount, you receive -- so based on
15    your years experience, your salary did
16    change.
17       MR. NIX: Can we take a real quick
18       break?
19 Q. And one thing I'd like to do, I would like
20    to kind of compare what you brought to what
21    I'm looking at over here because I think
22    I've got it all messed up and confused.
23    That's one thing right there. I've got

Page 151

1     that.
2  A. And that's what I'm referring to at this
3     point.
4  Q. Do you mind comparing them and see and
5     getting everything right, and then I've got
6     some other stuff over here that I don't
7     know if that's -- I know that's yours right
8     there.
9  A. Yes, that's what I just gave you this
10    morning, yes, sir, and answered the items
11    on the subpoena.
12 Q. And I know that over here, this is stuff --
13    I think I have this. I don't know. Do you
14    want to look at it real quick?
15 A. I mean, I can look at it -- if you want to
16    just fan through it, I'll tell you if it's
17    anything I brought you.
18 Q. I don't remember seeing some of that.
19 A. The front looks familiar, but that's not
20    necessarily my subpoena. It's somebody's
21    subpoena.
22 Q. Yeah, that's your subpoena. Look at it
23    real quickly and tell me if you brought

Page 152

1     that with you today.
2  A. You asked for my education. You asked for
3     my resume.
4  Q. Right.
5  A. You asked for what I had passed out in
6     271. You asked for any other course I
7     started teaching that year. You asked for,
8     I think in particular, NUR 272 from when I
9     had taught it before.
10 Q. All right.
11 A. My license.
12 Q. All right.
13 A. Anything I had that had anything to do with
14    the class that Lindy Wright was in. That's
15    just a contact list.
16 Q. Okay.
17 A. And I gave you two copies of my transcript
18    because I was really proud of it.
19 Q. All right. Is there anything else then
20    that you've brought other than this
21    packet over here that --
22 A. You have copies of everything else, so
23    those were the only things that ...

Deposition of Sandra Gunnels

Page 153

1   Q.  This one packet that Brandy is doing.
2   A.  Uh-huh.  (Positive response.)
3       (Brief recess was taken.)
4       (Defendant's Exhibits 25 and 26
5       were marked for identification.
6       MR. NIX:  I have re-marked a
7           couple of things just for
8           identification purposes so
9           it's more clear.
10          I have re-marked what
11      we've been referring to as
12      Exhibit 10-A through D as
13      Defendant's Exhibit 25 -- 10-A
14      through D.
15          And then I've marked as
16      Defendant's Exhibit 26 what
17      we've been referring to as
18      your pediatric notes, G-1
19      through G-22.  That's 26.
20      (Brief interruption.)
21  Q.  Exhibit 24 is this calendar for the year
22      2005.
23  A.  Yes, sir.

Page 154

1   Q.  August 26th is the Friday that you were
2       involved in the meeting where you were
3       discussing various things that were going
4       on.  I'm just going to circle that August
5       26th day because it's easier to spot when
6       you do that.
7           You said you were out sick August 29th
8       and 30th; is that correct?
9   A.  Yes, sir.
10  Q.  And that August 31 was the day you
11      resigned; is that right?
12  A.  Yes, sir.
13  Q.  And you said that Dean Lowe told you not to
14      go to your class; is that right?
15  A.  Yes, sir.
16  Q.  That was on August 31?
17  A.  Yes, sir.
18  Q.  And do you know why he told you that?
19  A.  He either explained to me at that point or
20      told me in a subsequent meeting that
21      because of the meeting on Friday and that I
22      had not come to work on Monday and Tuesday
23      that they were unsure or had assumed that I

Page 155

1       would not be at work on the 31st, and there
2       was a guest lecturer.
3           I told him that was okay.  I knew the
4       guest lecturer and would go down there and
5       listen with the students and, you know,
6       pass out my syllabi, et cetera, et cetera.
7       He said, no, I'm asking you not to go to
8       your class or words to that effect.
9   Q.  Do you recall what the first day of the
10      fall semester was?
11  A.  It would have been that Monday, the 20 ...
12  Q.  Third?
13  A.  The 29th, I believe.
14  Q.  Oh, really?
15  A.  The 31st was the first time I would have
16      met with the ADN students.
17  Q.  All right.  So your recollection is that
18      the first day of class that semester would
19      be August 29?
20  A.  That would have been the first time I would
21      have been scheduled to meet with the ADN
22      students, I believe, in the classroom.
23      That's when I had the syllabi, et cetera,

Page 156

1       so --
2   Q.  Would there have been other meetings that
3       were supposed to have been held prior to
4       August 29, 2005, for that particular class,
5       whether in the classroom or not?
6   A.  I cannot answer that.  I don't recall.  I
7       just know that was when I was meeting them
8       in the classroom with the syllabi.
9   Q.  I mean, would there have been a clinical or
10      anything like that?
11  A.  There could have been.  There could have
12      been.  I don't remember.
13  Q.  But what you're saying is that the 31st was
14      the first day of class for the purpose of
15      regular class and lecture?
16  A.  Of lecturing as I recall, yes, sir.
17  Q.  It would be incorrect to say that the first
18      day of class was August 17?
19  A.  I could not say that was incorrect or
20      correct.  As I said, what I remember is
21      August 31st going down to my classroom and
22      being stopped.
23  Q.  Okay.  You see that August 17 is two

**Page 157**

1    Wednesdays before August 31. Do you see
2    that?
3    A.  Yes, sir.
4    Q.  Isn't it correct that August 17 was the
5    first day of class?
6    A.  I don't recall. I don't remember what was
7    occurring the two weeks before the 31st.
8        (Inaudible discussion.)
9        COURT REPORTER: I didn't hear any
10       of that.
11   A.  So, obviously, we would have had an
12   opportunity to meet the 24th. I don't
13   recall meeting with the students or not
14   meeting with them or whatever. But the
15   31st was when I went down to lecture with
16   the syllabi and handouts when I was stopped
17   by Dean Lowe.
18   Q.  Our whispers have determined that it was
19   August what?
20   A.  I believe the 23rd was what I heard.
21       MS. PRICE: It was the 21st --
22   A.  The 21st was a Sunday, and I don't think
23   we --

**Page 158**

1    Q.  I thought it was the 17th.
2    A.  We didn't usually have classes on Sunday,
3    so I'm assuming --
4    Q.  All right. Well, we don't know really I
5    guess is what we're saying.
6    A.  I don't know when the semester started.
7    Q.  Let me ask you this.
8    A.  I know August 31st I was going down to meet
9    with my class.
10   Q.  Had you been out sick any other days in
11   that fall semester of 2005 before August
12   29?
13   A.  I do not believe so, no, sir.
14   Q.  Had you been out any other days during the
15   term of the -- during the fall term prior
16   to August 29, out for any reason?
17   A.  You're saying the 29th would be --
18   Q.  You had said the 29th and 30th you were out
19   sick.
20   A.  That's what I remember.
21   Q.  And the 31st, you met class -- or you were
22   going to meet class and they had a guest
23   lecturer because Dean Lowe had been told

**Page 159**

1    you were not going to be there because you
2    were sick. Am I right about that?
3    A.  That's not what I said.
4    Q.  I'm wrong about that.
5    A.  Yes, sir.
6    Q.  Tell me what you said again. I apologize.
7    A.  Okay. That I had called out on the 29th
8    and spoke with Katie Lackey and told her I
9    probably would also be sick on the 30th,
10   but I would be there on the 31st.
11       I called on the 30th and left a message
12   that I was still ill. What I did not know
13   was Katie Lackey obviously was not there on
14   that day also. And that Dean Lowe stopped
15   me on the 31st and stated we weren't sure
16   if you were going to come to class,
17   dah-dah-dah, dah-dah --
18       THE WITNESS: I don't know. Can
19       you do dah-dah-dah, dah-dah?
20   A.  -- and asked me not to go to my classroom.
21   Q.  Because there was a guest lecturer there,
22   correct?
23   A.  (Witness nods head up and down.) And that

**Page 160**

1    he had determined, assumed, whatever, that
2    I wasn't going to be here. And I said, I
3    am. He said, I don't want you to go down
4    there, you know, please wait.
5    Q.  Was it your understanding that he wanted
6    the guest lecturer to proceed and did not
7    want an interruption in that class?
8    A.  No, sir. Class hadn't started at that
9    point.
10   Q.  Well, he wanted the guest lecturer because
11   he had already -- or someone had already
12   lined up the guest lecturer, they wanted to
13   allow the guest lecturer to lecture the
14   class?
15   A.  You'd have to ask him.
16   Q.  Did he not say that to you?
17   A.  He said, we have a guest lecturer, words to
18   the effect, you don't need to go down
19   there. I said, well, that's okay. I know
20   the guest lecturer and I have these
21   things. He said, I don't want you to go
22   down there. I will take those down for
23   you.

Page 161

1  Q.  Who was the guest lecturer?
2  A.  Pat Fuggatt.
3  Q.  Is that a male or a female?
4  A.  That would be a female.
5  Q.  Spell Fuggatt.
6  A.  F-U-G-G-A-T-T.  I'm not positive about the
7      T's.
8  Q.  Is Pat Fuggatt qualified to be a guest
9      lecturer in that course?
10 A.  I would probably say Pat Fuggatt was
11     qualified -- or I would say she was
12     qualified to be a guest lecturer.  What she
13     was asked to speak on was not appropriate
14     at that point in time, and I remember now I
15     expressed that to Dean Lowe.
16         But at that point in time, she was the
17     assistant nurse manager or clinical
18     coordinator of labor and delivery at The
19     Medical Center.
20 Q.  So Pat Fuggatt was qualified.  It was just
21     that on August 31, the subject matter she
22     was discussing was not appropriate for the
23     time frame in that semester; is that right?

Page 162

1  A.  Yes, sir.
2  Q.  Did Dean Lowe, was he pleasant, polite when
3      he said you don't need to go to class?
4  A.  He was polite.  I would not say pleasant.
5  Q.  Now, you say you had already drafted a
6      letter of resignation at that time?
7  A.  No, sir.  I went down -- I went over to my
8      office after speaking with him and drafted
9      a letter of resignation.
10 Q.  On August 31?
11 A.  Yes, sir.
12 Q.  That letter of resignation was turned in
13     when?
14 A.  Well, the original letter was never turned
15     in.
16 Q.  All right.  Tell me about that.
17 A.  I drafted a letter which basically says the
18     same things as the letter you have in your
19     possession now says.  Based on
20     interactions -- but the date was either two
21     or four weeks from August 31st.  After
22     further interaction, I changed that date.
23 Q.  What further interaction are you talking

Page 163

1      about?
2  A.  Dean Lowe came back to my office -- can I
3      back up for one second?
4  Q.  Yeah.
5  A.  When I went back to my office -- I cannot
6      remember.  I don't think I had opened the
7      envelope with the current contract offering
8      in it before I saw him or after the first
9      time, but did see it before I saw him the
10     second time, which based on interacting
11     with him and seeing the contract that was
12     offered to me was what prompted me to write
13     the resignation and then to change the
14     date.
15         He came back, and we had some other
16     conversation.  And I think that is when he
17     told me that Katie had been out, so nobody
18     knew I had called in and confirmed on that
19     Tuesday that I was, indeed, still ill, but
20     that I would be in class on Wednesday.
21         I believe I verbalized to him at that
22     point I would not sign the contract and
23     that I would be resigning at that point.

Page 164

1  Q.  Tell me again why you would not sign the
2      contract.
3  A.  It was incorrect as far as my years of
4      experience.  And then also -- But the
5      reason I resigned was not so much because
6      of the incorrect contract, because I just
7      would have refused to keep signing it and
8      would have negotiated more and they would
9      have either fired me or, you know,
10     whatever, but it was more based on the
11     interactions that I had with him.
12 Q.  After that?
13 A.  (Witness nods head up and down.)
14 Q.  After the --
15 A.  When he stopped me from going to my
16     classroom and when I had a conversation
17     with him after that.
18 Q.  Tell me about that conversation.
19 A.  I cannot remember the particulars, but it
20     basically was the culmination of the
21     meeting on Friday and having stated that I
22     wouldn't sign the contract, that being
23     prohibited in my opinion from going to my

Deposition of Sandra Gunnels

June 24, 2007

Page 165

1     class -- those issues, and just the general
2     atmosphere on campus and lack of support.
3  Q.  That's all stuff you said to him, right?
4  A.  Yes, sir. You asked me why did I resign.
5  Q.  Right. I thought you said you resigned
6     because of interaction you had with him
7     after he told you not to go to your class
8     and after you went to your office and after
9     you had written the resignation that gave
10    two weeks' notice.
11  A.  Uh-huh. (Positive response.)
12  Q.  Am I right about that?
13  A.  I think you're correct.
14  Q.  And then after that, you had some more
15    interaction with Dean Lowe, correct?
16  A.  Correct.
17  Q.  And you were saying that's why you
18    resigned?
19  A.  That's why I changed the date.
20  Q.  To an immediate resignation?
21  A.  Right.
22  Q.  So what you just told me was a bunch of
23    stuff that you said to him; is that right?

Page 166

1  A.  I told you some things he said also.
2  Q.  Tell me, then, what he said, because I
3    didn't hear it.
4  A.  Primarily what he said, again, was that --
5    you know, when he initially stopped me from
6    going into my classroom, came back and
7    confirmed he did not want me entering my
8    classroom teaching or interacting with
9    students on that morning that --
10  Q.  Now, this is in the second conversation
11    with him?
12  A.  Yes, sir, when he came back upstairs, I
13    believe.
14  Q.  He told you that the first time.
15  A.  The first time he stopped me from entering
16    my classroom or going to my classroom,
17    asked me to go back to my office and he
18    would come back and talk with me after he
19    had taken --
20  Q.  So he didn't tell you don't go to your
21    class the first time?
22  A.  Yes, sir.
23  Q.  He did tell you --

Page 167

1  A.  Yes, sir, those were primarily the first
2    words out of his mouth when --
3  Q.  And then he came up and y'all talked a
4    second time?
5  A.  Some more.
6  Q.  Tell me what was said.
7  A.  Basically, the same information. We
8    discussed the contract. We discussed his
9    stopping me from going to my classroom.
10    That is when he told me that -- I believe
11    that's when he told me Katie was absent and
12    so he had not known or they had not known
13    that I was going to be there on Wednesday
14    and had gotten the guest lecturer. And I
15    can't remember any other particulars
16    besides that.
17  Q.  Let me show you what I'm going to mark as
18    Defendant's Exhibit 28.
19        (Defendant's Exhibit 28 was marked
20        for identification.)
21  Q.  It's a group of documents you brought with
22    you today. I would ask you to take a look
23    at it if you would. I want you to go

Page 168

1    through it and tell me what each one of
2    those things are. Look at this. Was that
3    in there?
4  A.  That was in this, yes, sir.
5  Q.  Is it in there now? Is this an extra copy
6    that we have of it?
7  A.  It would go right here, I believe. I don't
8    believe there's a copy in here.
9  Q.  There was also the letter from
10    Dr. Blackwell, too?
11  A.  Yes.
12  Q.  This was also in that package?
13  A.  That was just single -- That was basically
14    a letter that was sent out to all faculty
15    members. When I was looking through my
16    things, I found it.
17  Q.  If you would, go through and tell me what
18    each of these things are.
19  A.  The first document is an intent to employ
20    that was posted at CVCC, posted April 11th,
21    2004, looking for a nursing instructor.
22  Q.  We're talking Defendant's Exhibit 28 now,
23    correct?

Deposition of Sandra Gunnels

June 24, 2007

---

Page 169

1   A.  Pardon?
2   Q.  Defendant's Exhibit 28, correct?
3   A.  Correct.
4   Q.  The first one is intent to employ.  Second
5       page?
6   A.  The second page is a letter from Debbie
7       Boone telling me that in order to satisfy
8       legal requirements imposed, the nursing
9       instructor search was being re-advertised
10      in an effort to augment the current
11      applicant pool and that I did not need to
12      reapply.
13  Q.  Was that letter correct?  Anything wrong
14      with that letter or anything that occurred
15      after that letter that relates to it?
16  A.  That letter?  As far as I know, not, sir.
17  Q.  Go to the next thing.
18  A.  The next one is an e-mail from myself to
19      Debbie Boone that says --
20  Q.  What's the date on it, please?
21  A.  September the 9th.
22  Q.  Of what year?
23  A.  2004.  I'm sorry.

---

Page 170

1   Q.  The prior letter from Debbie Boone was July
2       26, 2004, correct?
3   A.  Right.
4   Q.  And now we're looking at an e-mail from you
5       to Debbie Boone dated September 9, 2004,
6       right?
7   A.  That references her letter of July saying
8       the search had been extended.  Could you
9       please inform me of the status of my
10      request.
11  Q.  Go to the next document.
12  A.  This document is from Debbie Boone again,
13      dated September 4th --
14          But I obviously know that I did not
15      receive it before September 9th or I would
16      not have sent the e-mail.
17          -- stating that they were closing the
18      nursing instructor search and would
19      re-advertise at a later date.
20  Q.  So this was September 4, 2004, from Debbie
21      Boone to you, informing you that they're
22      closing the nursing instructor search?
23  A.  Right.

---

Page 171

1   Q.  Did you have a problem with that letter at
2       all?
3   A.  I didn't quite understand why based on the
4       information I had been given and
5       considering from everything that I had been
6       told that I was a qualified candidate and
7       had been offered employment earlier, why
8       there was the need to close that and
9       re-advertise.  But as far as the letter
10      itself, no, sir.
11  Q.  Had you been offered full-time employment
12      prior to September 4, 2004?
13  A.  Yes, sir.
14  Q.  Tell me again what month and year that was.
15  A.  I honestly don't remember.  I want to say
16      it was November 2003, but it might have
17      been at some other time.
18  Q.  But that would have required too much of a
19      paycut?
20  A.  Yes, sir.
21  Q.  And so you could not take it at that time;
22      is that correct?
23  A.  I regretfully declined at that point.

---

Page 172

1   Q.  And you were working at St. Francis
2       Hospital at that time; is that correct?
3   A.  Yes, sir.
4   Q.  Is that right?
5   A.  Yes, sir.
6   Q.  Did you continue to work at St. Francis
7       Hospital at that time?
8   A.  Yes, sir.
9   Q.  Was that a full-time job?
10  A.  Yes, sir.
11  Q.  Go to the next document.
12  A.  Tuesday Times dated September 14th where
13      the search was closed for nursing
14      instructor, to be re-advertised at a later
15      date.
16  Q.  That is also a 2004 document, correct?
17  A.  September 14th, 2004.
18  Q.  Why did you put that in here?
19  A.  I just was keeping with when the search
20      opened and closed.  These were things I had
21      in my file when you asked for these things
22      I went through.
23  Q.  All right.

---

Deposition of Sandra Gunnels

Page 173

1  A.  September 30th is a letter I wrote to Roy
2     Johnson, who was the chancellor, explaining
3     that -- I questioned why I had not been
4     re-offered a position or rehired as a
5     nursing instructor --
6        (Brief interruption.)
7  A.  Met requirements, and that other
8     instructors who had not followed the
9     requirements were being interviewed and
10    offered positions.
11 Q.  So your complaint to Dr. Johnson on
12    September 30, 2004, was that you had gone
13    through the process and had not been
14    offered a job?
15 A.  No, sir.  I had gone through the process,
16    been offered a position, and now that there
17    was another one open, kept being told that
18    I was a candidate, did not need to
19    re-interview with Dr. Blackwell, merely to
20    meet with the search committee, and that
21    the requirements and the search kept
22    changing.
23 Q.  That's what you said in your letter?

Page 174

1  A.  Yes, sir.
2  Q.  Now, you mention the names of some people
3     in this letter, and one of them is Melliny
4     Macklin and another is Paige Harford,
5     H-A-R-F-O-R-D.
6        You say in this letter in paragraph
7     three, the September 30, 2004, letter that
8     Dr. Blackwell's office contacted Melliny
9     Macklin and Paige Harford and scheduled
10    each an appointment to meet with
11    Dr. Blackwell.  How did you know that?
12 A.  Melliny Macklin informed me of that, and in
13    the other case I was told by someone else.
14 Q.  Who else?
15 A.  Do I have to --
16 Q.  Yeah.
17 A.  -- give that source at this point?
18 Q.  Sure.
19 A.  Would be Dixie Peterson.
20 Q.  Give me the circumstances under which
21    Melliny Macklin told you about this -- the
22    fact that she had been contacted by
23    Dr. Blackwell's office.

Page 175

1  A.  We ran into each other and were talking,
2     and she told me that she had received a
3     call and confirmed that she had been
4     requested to put in an application or
5     offered employment to work full-time for
6     CVCC.
7  Q.  Had she gone through the application
8     process?
9  A.  No, sir, not for these --
10 Q.  How do you know that?
11 A.  -- positions.
12 Q.  Huh?
13 A.  She told me she had not.
14 Q.  Where is Melliny Macklin now?
15 A.  The last I talked with Ms. Macklin, she was
16    working at the Opelika Mental Health
17    Center.
18 Q.  How long ago was that?
19 A.  Approximately two years ago, year and a
20    half ago.
21 Q.  Where is Paige Harford?
22 A.  She works at The Medical Center.
23 Q.  Where were you when Dixie said something to

Page 176

1     you about Paige Harford having received a
2     call?
3  A.  I believe in her office.
4  Q.  Mimi Merriman?
5  A.  Yes, sir.
6  Q.  How do you know that Dr. Blackwell
7     contacted Mimi Merriman?
8  A.  Again, it came up in conversation with
9     Ms. Peterson.
10 Q.  At the same time --
11 A.  Yes, sir.
12 Q.  -- as the Paige Harford?
13 A.  Yes, sir, I believe so.
14 Q.  And then there was another name, Marla
15    Kundee.  How did you know that Marla Kundee
16    had been --
17 A.  In the same conversation.
18 Q.  Do you know where Mimi Merriman is?
19 A.  The last I saw her picture was as a new
20    employee at St. Francis, but I can't say
21    she's still employed there.
22 Q.  And then how about Marla Kundee?
23 A.  I have no idea.

44 (Pages 173 to 176)

Page 177

1  Q.  The last paragraph on the first page says
2      this: Columbus-Phenix City is a close-knit
3      nursing community and it is abuzz with the
4      manner in which instructors have been hired
5      by the college. Tell me about that.
6  A.  Well, just that it was discussed -- for
7      example, Gwen Pugh, I heard nurses
8      discussing it in the ICU at St. Francis
9      where she worked part-time, and I believe
10     she confirmed that she had been offered a
11     position there.
12 Q.  Where? At CVCC?
13 A.  Yes, sir.
14 Q.  Where is Gwen Pugh now?
15 A.  I think she works part-time at Columbus
16     State and, I believe, still at St. Francis.
17 Q.  And you're saying that Ms. Pugh did not
18     comply with the requirements?
19 A.  Before she was offered a position, that is
20     what I believe she told me.
21 Q.  And then you say something about a $75,000
22     salary. How did you get that information?
23 A.  That is what either she or the ICU nurses

Page 178

1      told me.
2  Q.  ICU nurses at St. Francis?
3  A.  Yes, sir.
4  Q.  Who had heard her say that she was making
5      $75,000?
6  A.  Yes, sir, that's what she'd be making.
7  Q.  As an instructor at CVCC in the nursing
8      program?
9  A.  Yes, sir.
10 Q.  What is the Ameris subsidy?
11 A.  Ameris is, I believe, the company that owns
12     Summit Hospital. And they gave money to
13     CVCC to subsidize nursing instructor
14     salaries in order to help them acquire
15     nursing instructors because the payout for
16     teaching is so much less than working at
17     the hospital.
18 Q.  At this time, were you aware of any other
19     subsidy or any other extra money for hiring
20     nursing instructors?
21 A.  No, sir. I was aware of that money, but --
22 Q.  The Ameris money?
23 A.  Yes, sir. That was in the newspaper, so --

Page 179

1  Q.  Were you aware of any other money available
2      for the hiring of nursing instructors?
3  A.  No, sir.
4  Q.  Go to the first paragraph on page two.
5      Explain that paragraph to me if you would,
6      what it means.
7  A.  I met with Ms. Peterson, asking her if she
8      knew if any of these had actually been
9      hired or not in the spring 2005. And I
10     also discussed it with Ms. Gruber, and
11     Ms. Gruber told me that Dr. Blackwell had
12     told her they had found some nursing
13     instructors. I know one was hired, and I
14     don't remember when, who worked a total of
15     eight hours. And I can't remember if that
16     was for that semester coming up or at
17     another time.
18 Q.  You say in that second paragraph on page
19     two: I should have been considered a
20     viable, qualified candidate. Is that
21     right?
22 A.  Yes.
23 Q.  And what is that based upon?

Page 180

1  A.  That I had been offered a position before
2      and nothing had changed and that I had
3      passed the search committee, passed -- my
4      chairperson wanted or expressed the desire
5      to hire me, and there really was no legal
6      reason I should not be and, yet, I could
7      not find out a reason I was not being
8      employed full-time.
9  Q.  And then the fourth paragraph on that page,
10     page two, apparently, you're giving
11     Dr. Johnson some reasons why you should be
12     hired by CVCC. Would that be correct?
13 A.  No, sir.
14 Q.  Tell me what that one, two, and three are
15     for in that paragraph.
16 A.  That was to -- I had been involved with
17     CVCC for a longtime. I could have walked
18     to CTC or CSU or Southern Union or
19     potentially any other nursing program and
20     have been offered a job, you know,
21     immediately.
22         I felt a responsibility to
23     Ms. Peterson, to the nursing program, to my

Page 181

1  longevity there that that was -- my child
2  went to college there, that that wasa
3  place where I felt a loyalty and had been
4  supportive of CVCC.
5  Q.  All right.
6  A.  That was to show my support of CVCC.
7  Q.  You say:  Furthermore, I am now concerned
8  regarding the quality of the nursing
9  education that will be provided by the
10  program as neither of the newly-employed
11  instructors are maternal-child/pediatric
12  nurses.
13  A.  Correct.  If any of those who had been
14  offered positions had, indeed, come to
15  work --
16  (Brief interruption.)
17  A.  None of the ones that were listed except
18  for Ms. Macklin -- and she had declined.  I
19  knew that.  If any of those others had
20  maternal-child/pediatric experiences --
21  primarily, they were medical-surgical
22  instructors.
23  Q.  And then what's the next thing in that

Page 182

1  exhibit, Exhibit 28?
2  A.  This?
3  Q.  Isn't it 28?
4  A.  Yes, sir.
5  Q.  What's the next document?
6  A.  You don't have a copy of this, and that's
7  just where I mailed it.
8  That was just the form letter back from
9  Roy Johnson.
10  Q.  And he referred you back to Dr. Blackwell;
11  isn't that correct?
12  A.  Right.  Well, he said he forwarded a copy
13  of my correspondence to Dr. Blackwell.
14  Q.  I had that page that you -- I don't have
15  it.  Go back to the page that's your
16  mailing page and tell me.  That's just the
17  page where you mailed that -- -
18  A.  Yeah, certified.  You said everything that
19  had any names on it, so --
20  Q.  That's the certified thing to Johnson,
21  right?
22  A.  Uh-huh.  (Positive response.)
23  Q.  All right.  Go ahead.

Page 183

1  A.  I did not receive a reply the first time I
2  mailed it, so I sent it a second time
3  certified.
4  Q.  And that's the certified slip for the
5  second time?
6  A.  Yes, sir.
7  Q.  Which was the first time you sent it?  Was
8  it September 30, '04?
9  A.  Yes, sir.  I sent the exact same letter
10  twice.
11  Q.  That was the first time?
12  A.  Right.
13  Q.  Do you know the date of the second time?
14  A.  October the 19th.
15  Q.  And then Dr. Johnson's response to you is
16  October 28, 2004?
17  A.  Correct.
18  Q.  What's next?
19  A.  Part-time faculty employment contract,
20  spring semester 2005.
21  Q.  Executed by you and Dr. Blackwell, correct?
22  A.  Correct.
23  Q.  And so in the spring term of '05, you were

Page 184

1  a part-time faculty employee, correct?
2  A.  Correct.  I had -- and I just didn't have
3  copies of the other contracts.  I had from
4  August of 2001 worked every semester for
5  CVCC in some type of capacity.
6  Q.  Go to the next thing in there.  What is
7  that?
8  A.  That is where I had discussed it with
9  Ms. Peterson, but wrote her that I would be
10  unavailable to teach classes for CVCC after
11  May 13th due to Columbus Tech's no compete.
12  Q.  Was this before you were offered a job
13  full-time by CVCC?
14  A.  This was after.  I've only been offered one
15  full-time job by CVCC, and that was in 2003
16  or 2004.  I'm not sure when.  I had been
17  trying to become employed by CVCC during
18  this time period.  Was unsuccessful.
19  Q.  We're on March 29, 2005, correct?
20  A.  Yes, sir.
21  Q.  You were offered a full-time, but you say
22  temporary full-time job; isn't that right?
23  A.  Right.

Deposition of Sandra Gunnels

June 24, 2007

**Page 185**

1  Q.  But it was a full-time job as opposed to a
2      part-time faculty member; isn't that right?
3  A.  I was not offered a temporary full-time
4      position until I sent Ms. Peterson this
5      e-mail, and meetings subsequently started
6      occurring based on the fact that at that
7      point in time, there really was no one to
8      take my place.
9  Q.  After March 29, 2005 -- let's see.  You
10     actually sent your e-mail to Dixie March
11     18, 2005, and then Dixie forwarded a copy
12     of that to Dr. Blackwell and Dean Lowe.
13     And then what's the next thing in there?
14 A.  The next thing in there is dated June the
15     15th from Debbie Boone -- of 2005 -- where
16     she states that she had put an offer of
17     temporary employment in my mailbox and
18     called my home and on June 1st, sent an
19     e-mail.  And to my knowledge, I got none of
20     those.
21        That I found this when I came in to
22     work or Ms. Peterson gave it to me because
23     it had not reached me in another way,

**Page 186**

1      offering me temporary employment for summer
2      semester 2005.
3  Q.  Did you accept that job?
4  A.  Yes, I did.
5        The next is a contract from May 23rd,
6      2005, till August the 8th, 2005.
7  Q.  All right.  And that is executed by both
8      you and Dr. Blackwell, correct?
9  A.  Right.
10 Q.  And that is -- Do you have the terms and
11     conditions that are printed on the back
12     side of this contract?
13 A.  No, sir.  I just had a copy of it.
14 Q.  Okay.  This was for a full-time temporary
15     position; am I correct about that?
16 A.  Right, from May 23rd to August the 8th.
17 Q.  Do you know why it was for that period of
18     time?
19 A.  That would be the summer semester.
20 Q.  Did they have different or separate
21     contracts for the summer semester as
22     opposed to the fall and spring semesters?
23 A.  Yes, sir.

**Page 187**

1  Q.  What's the next document?
2  A.  The next item is where I will be placed on
3      Step 13, which is the 13 years of
4      experience.
5  Q.  Let me ask you this.  Were you satisfied
6      with that?
7  A.  If you'll turn the page, the next is a memo
8      to Debbie Boone from me saying I'm signing
9      this contract pending my submission of
10     documentation which should put me on a
11     different pay step and that I expected the
12     amount to be amended.
13 Q.  That's a June 17, 2005, memo from you to
14     Debbie Boone?
15 A.  Yes, sir.
16 Q.  And the signing of the contract, you say,
17     is pending submission of documentation
18     which should put you on a different pay
19     step, and that documentation would have
20     been verification of your full-time work as
21     a nurse, correct?
22 A.  Correct.
23 Q.  What's next?

**Page 188**

1  A.  The next couple of pages are the form where
2      Katie e-mailed my past 25 years of
3      employers -- I'm sorry, faxing them and
4      asking them to fill out the form they had
5      designed -- or she had designed.  Some
6      people did write on letterhead and fax it
7      back.
8  Q.  Tell me what the form is that you designed.
9  A.  If you'll look at that one, like two or
10     three back, that is what Katie typed up and
11     I faxed out to however many employers it
12     took to make 28 years -- 25 years.
13 Q.  And the particular document we're looking
14     at this point is on Chattahoochee Valley
15     Community College stationery.  It says
16     employment verification at the top.  It has
17     your name, social security number, position
18     held, the dates of your work, and please
19     sign and stamp below to verify employment.
20        And that particular one was returned,
21     apparently, by Lynnette O' --
22 A.  Something.
23 Q.  -- O'Baugh, East Jefferson General

Deposition of Sandra Gunnels

June 24, 2007

Page 189

1   Hospital, correct?
2   A.  Yes, sir.
3   Q.  That document is not on the letterhead of
4       the entity that this lady works for, right?
5   A.  Correct.
6   Q.  And that was not an appropriate or an
7       acceptable form for the employment
8       verification to be in, correct?
9   A.  That was not communicated the first time I
10      was asked to do this.  It was merely --
11  Q.  What I asked you was, that was not an
12      appropriate form for the employment
13      verification, correct?
14  A.  As of the date it was sent, yes, it was.
15  Q.  It was not accepted, was it, Ms. Gunnels?
16  A.  I was not told it was not accepted until
17      two months later.
18  Q.  It was not accepted; is that right?
19  A.  As of August the whatever, yes, sir.
20  Q.  That's right?
21  A.  Yes, sir.
22  Q.  Did you send other forms out after you
23      learned that it was not accepted?

Page 190

1   A.  No, sir, because I did not find out until
2       August it was not accepted.
3   Q.  Tell me when in August you learned it was
4       not accepted.
5   A.  I don't remember exactly, but it was close
6       to or on August the 29th.  That's when it
7       was discussed.
8   Q.  How do you remember that date?
9   A.  Because that's the date we had the meeting
10      about all the issues, including contracts
11      and salaries.
12  Q.  That's the Friday?
13  A.  Yes, sir.
14  Q.  So August 26 was that date?
15  A.  Oh, I'm sorry.  August 26.
16  Q.  Now, there was one that was sent back on
17      letterhead, Slidell Memorial Hospital.
18  A.  Two, actually.
19  Q.  There were two?
20  A.  Yes, sir.
21  Q.  What was the other one?
22  A.  St. Francis Hospital.
23  Q.  Did you ever check the status of these

Page 191

1   forms coming back from your employers
2   between the time this went out and the time
3   you got it back?
4   A.  These actually came back to the nursing
5       office and then were submitted to Debbie
6       Boone.  And I never heard back since I
7       submitted them in person.  My assumption
8       was that they were adequate.
9   Q.  Did the forms come back to you then and you
10      submitted them to Ms. Boone?
11  A.  Yes, sir -- or to the nursing office, yes,
12      sir.
13  Q.  What is this right here, this verification
14      of work experience?
15  A.  That was given to me by Debbie Boone in the
16      August 26th meeting.  It's actually a
17      two-sided document, but that was the side
18      that was given to me.  And your copy has
19      both sides.
20      When I first applied for the full-time
21      position on November the 14th, '02, I had
22      to have verification of work experience and
23      Millie Paradiso's signature from

Page 192

1   St. Francis verifying that St. Francis had
2   verified that employment for those years,
3   and that was what was required at that
4   point in time.  So this was in along with
5   the two spreadsheets that were given back
6   to me.
7   Q.  Did that mean they were accepting this 2002
8       document as verification?
9   A.  That was my assumption.  And that you would
10      have to ask them, but this was in my file
11      on what they were -- they had accepted it
12      in 2002.
13  Q.  What's the next thing in your file?
14  A.  The next is a memo from -- to myself from
15      Laurel Blackwell -- copying Laurel
16      Blackwell, Dixie Peterson, and Debbie Boone
17      from James Lowe saying here is a copy of
18      your 2005-2006 academic year contract.  As
19      we discussed in our meeting Friday, we've
20      only received verification of six years of
21      full-time.  He's recommending that I be
22      placed on Step 6 on the salary schedule.
23  Q.  Did you ever sign that contract?

Deposition of Sandra Gunnels

Page 193

1   A.  No, sir.
2   Q.  Why not?
3   A.  Because it was not what we had discussed
4       and what I had agreed upon.
5   Q.  What had you discussed and agreed upon?
6   A.  I had been fairly verbal in the meeting
7       that I did not have time to and did not
8       feel it was appropriate for me to be
9       re-verifying -- especially re-verifying my
10      own employment when I was not given
11      adequate instructions the first time as to
12      how they were wanted and that I really
13      didn't have time to do it.
14  Q.  Did anybody at that meeting on the 26th of
15      August say that they would make
16      accommodation for that, that they would
17      send out a verification form on your
18      behalf?
19  A.  No, sir.  I was told Ms. Boone was too busy
20      to do that.  Unless we could find someone
21      else, that -- I guess we were at a
22      stalemate.
23  Q.  Who told you that?

Page 194

1   A.  It was in the meeting with Ms. Boone -- I'm
2       assuming she was there at that point --
3       Dean Lowe and Dr. Blackwell, my chair
4       and --
5   Q.  Who told you that, though?  Who told you
6       that Ms. Boone was too busy?
7   A.  Dr. Blackwell supported Ms. Boone when she
8       said that she just didn't have time to do
9       that.
10  Q.  Ms. Boone said it is what you're saying?
11  A.  And I believe that -- and I know on
12      Wednesday, the 30th, Dr. Blackwell asked me
13      had I ever gotten in touch with
14      Ms. Peterson and asked her to do it, and I
15      said I don't -- I'm quite she didn't have
16      time nor was it an appropriate role for her
17      either.
18  Q.  Who did you say came up with the form that
19      was considered to be inadequate?
20  A.  Katie Lackey, the administrative assistant
21      in nursing -- health sciences in trying to
22      help me.
23  Q.  Katie Lackey --

Page 195

1   A.  Yes, sir.
2   Q.  -- came up with it is what you're saying?
3   A.  Yes, sir.
4   Q.  And did Katie Lackey send it out?
5   A.  Yes, sir.
6   Q.  You did not send it out?
7   A.  I would say it was a joint effort because
8       we were looking up addresses and fax
9       numbers and faxing them out.
10  Q.  What's the next document there?
11  A.  Would be the copy of the contract I did not
12      sign for August 15th, 2005, ending May 12,
13      2006.
14          An e-mail that I sent to -- I'm sorry.
15      I was moving on.
16  Q.  Go ahead.  You're doing good.
17  A.  An e-mail I sent to Rhonda Davis, telling
18      her I was leaving CVCC and there had been
19      some conflicts in the CVCC/Southern Union
20      and -- OB days.
21  Q.  Who is Rhonda Davis?
22  A.  She is, I believe, the chair of the nursing
23      program at Southern Union.  I know she's in

Page 196

1       some managerial capacity.
2   Q.  R. Davis.  What is S-U-S ...
3   A.  Southern Union State Community College.
4   Q.  Is that where she works?
5   A.  Southern Union, yes, sir.
6   Q.  Hi, Rhonda.  This is March 22, 2005, from
7       you --
8   A.  Yes, sir.
9   Q.  -- to Rhonda Davis at Southern Union.  Hi,
10      Rhonda.  If you are still in need of
11      clinical instructor for --
12          Peds?
13  A.  Peds.  Pediatrics.
14  Q.  Oh, pediatrics?
15  A.  Yes, sir.
16  Q.  I highly recommend Arte Harmon.  She's RNC,
17      BSN, and works at TMC.  What's the U-S-S --
18  A.  Usually in the PICU, which is pediatric
19      intensive care unit.
20  Q.  I know she has some available time this
21      summer.  She's awesome.  I don't have her
22      phone number here with me at work but can
23      get it for you.  Her e-mail address is, and

Page 197

1   it gives that. You can also reach her
2   through ...
3       Do you do OB in the summer? I have a
4   recommendation for one there also if you're
5   looking as well as med-surg if it's here in
6   Columbus.
7       And then you say: I will be leaving
8   CVCC on May 13. If you want to get
9   together prior to that and nail something
10  down about the conflicts in CVCC/SU --
11  A.  Southern Union.
12  Q.  -- OB days --
13      OB days?
14  A.  Obstetrical clinical days.
15  Q.  -- just let me know.
16  A.  Yes, sir.
17  Q.  "About the conflicts," what is that?
18  A.  In the arrangement of clinical space for
19      students to be in the different hospitals,
20      TUMC -- not TUMC, that's Tulane, TMC, The
21      Medical Center, has a meeting once a year
22      and everybody puts in when they'd like to
23      be up there.

Page 198

1       In the last meeting that I attended,
2   there were some conflicts between Southern
3   Union and CVCC. Rather than to hold up the
4   entire meeting trying to work it out,
5   Rhonda and I had said in the meeting that
6   we would get together and figure out how we
7   could both get what we needed, which we had
8   done in the past.
9       And since I was going to be leaving at
10  that point in time, I didn't want to leave
11  anything untaken care of or hanging out
12  there, so I had written her about deciding
13  who was coming at what time where on OB so
14  that there wouldn't be two groups of
15  students on one floor when there shouldn't
16  be from two different colleges.
17  Q.  All right. Now, I've actually gotten to
18      your resignation letter, August 31, 2005.
19  A.  Yes, sir.
20  Q.  Now, you refer to the August 26, 2005,
21      meeting the previous Friday in this letter,
22      correct?
23  A.  Yes, sir.

Page 199

1   Q.  And then you say -- you say: Please
2       consider this as a follow-up to our meeting
3       on Friday, August 26, 2005.
4       So it's correct, isn't it, that you had
5       decided to resign before August 31?
6   A.  No, sir, that's not true.
7   Q.  Isn't it correct that your husband and
8       Ms. Bellamy's husband were there to help
9       you get all your stuff out of the building
10      that day, August 31?
11  A.  No, sir. My husband was nowhere around.
12      He was at work.
13      I did call Ms. Bellamy -- she was not
14      at work yet -- and told her about my
15      interaction with Dean Lowe and that I had
16      received my contract and that my
17      expectation was I would be resigning as
18      soon as I had my next interaction with Dean
19      Lowe.
20      And she said, do I have a contract?
21      And I said, I don't know. She asked me to
22      go in her office, open it. We had further
23      discussion, and she and her husband came up

Page 200

1   there. She had her husband come with her
2   in his truck.
3   Q.  The first paragraph starts: Please
4       consider this as follow-up to our meeting
5       on Friday, August 26, 2005. And the second
6       paragraph begins with based on our
7       interaction this morning, August 31, 2005,
8       will be my last day.
9   A.  Yes, sir.
10  Q.  And you're saying you did not make the
11      decision to resign before August 31? Is
12      that what you're saying?
13  A.  I had been considering it, especially after
14      the meeting of August the 26th. My
15      assumption was that I would resign from
16      CVCC, but my assumption also was that I
17      would be allowed to and would work out some
18      period of notice. My intent was not on the
19      morning of August 31st to resign on August
20      the 31st at the beginning of the morning.
21  Q.  After you left CVCC on August 31, when did
22      you start back work?
23  A.  The next day.

Page 201

1  Q.  Where was that?
2  A.  At Columbus Technical College.
3  Q.  When did you first alert Columbus Technical
4      College that you would be starting back
5      there on September 1?
6  A.  Let me rephrase that. I'm not positive it
7      was September 1, but there was
8      communication during that week. I think I
9      took the rest of that week off. But I was
10     also already working at St. Francis during
11     that time period, and I think I worked for
12     them some that week.
13 Q.  You're saying that your first answer was
14     incorrect? You did not start at Columbus
15     Tech the very next day?
16 A.  I would say that was an error. I do not
17     know the exact day I started.
18 Q.  So could it have been September 1?
19 A.  I don't believe so. I believe it was that
20     next week, but I did have communication
21     with Linn Storey September 1 that I was,
22     indeed, leaving or had left CVCC and did
23     she have a job for me to come back to at

Page 202

1      that point.
2  Q.  You had not spoken to her or anyone else at
3      Columbus Tech before August 31, 2006, about
4      coming back -- 2005 about coming back?
5  A.  Not to my knowledge, no, sir.
6  Q.  April Gunnels is related to you, correct?
7  A.  She was.
8  Q.  She was?
9  A.  She was related to me. She's my
10     ex-daughter-in-law at this point. She was
11     my daughter-in-law.
12 Q.  Oh, really? She was married to your son?
13 A.  Yes, sir.
14 Q.  And she and Lindy Wright were friends,
15     weren't they?
16 A.  Yes, sir.
17 Q.  They were in the same clinical group,
18     right?
19 A.  I don't know that for sure.
20 Q.  Where is April now?
21 A.  She works at the recovery room at The
22     Medical Center.
23 Q.  Is she an RN?

Page 203

1  A.  Yes, sir.
2  Q.  Is she still Gunnels?
3  A.  No. She is now April Dunn, D-U-N-N.
4  Q.  Are you on good terms with her?
5  A.  We're on speaking terms, yes, sir.
6  Q.  Now, when you left that day, August 31, did
7      you go by the class?
8  A.  No, sir.
9  Q.  Did you see the class at all that morning?
10 A.  I did -- Well, are you talking prior to my
11     resignation or after my resignation?
12 Q.  Either one.
13 A.  Prior to my resignation, I saw several of
14     the class members as I was coming in.
15     Exchanged pleasantries. April came to my
16     office and, in fact, she was walking to
17     class with me when Dean Lowe stopped me.
18         There was another student who had come
19     by my office. I think it was Crystal
20     Love. I cannot be absolutely positive,
21     but -- was walking a little ahead of us as
22     we were going to class.
23 Q.  So April before class. Crystal Love?

Page 204

1  A.  Crystal Love, I believe.
2  Q.  Anybody else?
3  A.  I don't remember. When I came through,
4      people were sitting out, talking. We
5      waved. We talked. We spoke.
6  Q.  So April Gunnels was with you when Dean
7      Lowe said you don't need to go to your
8      class?
9  A.  Yes, sir.
10 Q.  Was anyone else with you?
11 A.  No, sir. They had walked ahead.
12 Q.  Then after that, did you see the class?
13 A.  As I was loading things into my car, yes,
14     sir.
15 Q.  What were they doing?
16 A.  Several of them came up and spoke to me.
17     Some of them were just sitting out during a
18     break, that type of thing.
19 Q.  Did you instruct or tell anybody to put any
20     writing on the board?
21 A.  I did provide a phone number, yes.
22 Q.  Tell me about that.
23 A.  Someone contacted me, and I think it was by

Page 205

1 cell phone, which all the students had my
2 cell phone number, and said -- you know, I
3 believe it was after I left, but I can't
4 swear. Wanted to know who they could
5 contact if they were unhappy about this,
6 and I told them three organizations that --
7 or one individual and two organizations
8 that if they felt their learning needs
9 weren't being met that they could contact.
10 Q. Who did you tell them?
11 A. Betty Peters, who was the Alabama State
12 Board representative, I guess, over CVCC,
13 the State Board of Nursing and the National
14 League of Nursing.
15 Q. Did you give them phone numbers for all of
16 these?
17 A. No, sir.
18 Q. Did you give them phone numbers for any of
19 these?
20 A. Yes.
21 Q. Which ones?
22 A. I gave them Betty Peters' phone number.
23 Q. Do you know who wrote that on the board?

Page 206

1 A. No, sir, I don't. I wasn't present.
2 Q. Pardon?
3 A. I wasn't present, so no, sir, I don't.
4 Q. But you knew it was written up there on the
5 board, didn't you?
6 A. I don't know that I knew that or not, but I
7 know I was called and asked for.
8 Q. Do you know what happened after you left in
9 that class?
10 A. No, sir.
11 Q. Nobody ever told you?
12 A. I don't know if you mean after that actual
13 class on August the 31st or you mean the
14 class, ADN class.
15 Q. I mean that August 31 class, that roomful
16 of people.
17 A. I was told that Dean --
18 (Brief interruption.)
19 THE WITNESS: We're going to have
20 to break in a few minutes.
21 MR. NIX: Okay.
22 THE WITNESS: I've got to go to
23 work and I've got to get

Page 207

1 something to eat. I'm fixing
2 to pass out cold on this table
3 here.
4 MR. NIX: We won't be much longer.
5 We're about done.
6 (Brief interruption.)
7 A. August 31st.
8 Q. Yeah.
9 A. That class.
10 Q. That roomful of people.
11 A. Right. One of the reasons I didn't go down
12 was security watched me pack my office and
13 said they were to escort me out to my car
14 so I would not be interacting with
15 students.
16 Q. What did you do about --
17 A. It was a new experience.
18 Q. -- that roomful of people?
19 If you would answer my questions, we'd
20 be through.
21 A. All right.
22 Q. You've been editorializing a lot, so if
23 you'll answer my questions, we'll get

Page 208

1 through.
2 A. All right. That I was told that Dean Lowe
3 and Dr. Blackwell and potentially -- I
4 can't remember -- Dean Hodge had come down
5 and addressed the class. At one point in
6 time -- and I don't know if it was the
7 first meeting or second meeting -- Dean
8 Blackwell [sic] indicated I was still ill.
9 But I do not know what was exactly said
10 in the class. You would have to ask
11 someone who was present or who was there
12 speaking.
13 Q. One meeting -- the first meeting or the
14 second meeting --
15 A. Dean Blackwell -- Dean Lowe presented to
16 the class twice is my understanding.
17 Q. And one time he said you were still ill?
18 A. One time with -- right, and with
19 Dr. Blackwell on the second occasion,
20 potentially Dean Hodge, and I don't know
21 who else the second time.
22 Q. Well, they knew you weren't ill, didn't
23 they?

Page 209

1  A.  Yes, sir.
2  Q.  How did you find out that Dean Lowe said
3     you were still ill?
4  A.  Because several of the students told me
5     that he said I was still ill.  They said,
6     we saw her.
7  Q.  Let me show you what I've marked as
8     Defendant's 27.  You've got it.  Why don't
9     you pull your copy out.
10          (Defendant's Exhibit 27 was marked
11          for identification.)
12  Q.  What is that?
13  A.  That is documentation regarding the vote of
14     no confidence for Dr. Blackwell.
15  Q.  How did you obtain this?
16  A.  It was provided to me by Ms. Peterson.
17  Q.  When?
18  A.  I don't remember the exact date, but after
19     the vote took place.
20  Q.  Sometime after the vote?
21  A.  Yes, sir.
22  Q.  And the vote -- do you know when the vote
23     did take place?

Page 210

1  A.  I believe it was June 17th is what the
2     newspaper says when it took place.
3  Q.  Now, that's something else I didn't get is
4     that -- I don't think.  No, I know I
5     didn't -- no, I did.  Hold on.  I'm sorry.
6     I did, too.  This must be the one you gave
7     me today.  No, I had seen this.  I had.
8     Never mind.  Sorry.
9          So there was also a form -- there's a
10     memorandum here from Anne Messner who was
11     president of the faculty senate, right?
12  A.  Yes, sir.
13  Q.  Then it's got a feedback form, correct?
14  A.  Yes, sir.
15  Q.  And then it's got the responses on the
16     feedback -- or to the --
17  A.  Some responses.  I don't know that that's
18     all, but some responses.
19  Q.  Did you make a response?
20  A.  Yes, sir, I did.
21  Q.  Which one is yours?
22  A.  I don't think -- well, I know mine is not
23     in here.

Page 211

1  Q.  Where is it?
2  A.  And I don't have a copy of mine.
3  Q.  You don't have --
4  A.  I honestly do not.  My computer blew up,
5     and I lost everything on my hard drive
6     approximately a year and a half ago.
7     That's where I had a copy of mine.
8  Q.  But you turned it in, right?
9  A.  Yes, sir.
10  Q.  Who did you turn it in to?
11  A.  Turned it in to Ann Messner.
12  Q.  So would Anne Messner have it?
13  A.  She should, yes.  I mean, I'd have to look
14     at it and pick out which one was mine.
15  Q.  Did you sign it?
16  A.  I don't know.
17  Q.  None of these are signed.
18  A.  No, sir.
19  Q.  Is this the way you received them?
20  A.  Yes, sir.
21  Q.  Do you know why you received this?
22  A.  Ms. Peterson and I were discussing this
23     issue.

Page 212

1  Q.  What issue?
2  A.  The no confidence vote for Dr. Blackwell.
3  Q.  Have you read all of these?
4  A.  I did at one point in time.  I haven't read
5     all of them recently.
6  Q.  Does it appear to you that they all pretty
7     much say the same thing?
8  A.  There's a theme there, yes, sir.
9  Q.  It's more than a theme to me.  It's almost
10     like a script.  Wouldn't you say that
11     that's about the way it looks to you?
12  A.  I wouldn't call it a script.  I'd say if
13     you have a lot of people participating and
14     experiencing the same situation, you're
15     going to get a lot of the same answers or
16     similar answers.
17  Q.  All right.  Now, this was provided by you,
18     Ms. Gunnels, Exhibit 27 was.  Was it
19     provided pursuant to the subpoena that I
20     issued?
21  A.  Beg your pardon?
22  Q.  Was this provided pursuant to the subpoena
23     I issued?

Page 213

1   A.   Yes, sir.
2   Q.   Exhibit 27.
3   A.   Uh-huh. (Positive response.) I didn't
4        even realize that I still had it until I
5        started going through a box of stuff.
6   Q.   I've got something else here. I don't know
7        if you brought this with you here today or
8        not. It's notes on Ms. Umoh.
9   A.   Uh-huh. (Positive response.) Mine just
10       looks differently. It's the same pieces of
11       paper.
12            (Defendant's Exhibit 29 was marked
13            for identification.)
14  Q.   Defendant's Exhibit 29 are those documents
15       that you've provided pursuant to the
16       subpoena. What are these?
17  A.   These are copies of write-ups on the
18       student that I discussed earlier who was
19       issued a failing grade in her pediatric
20       clinicals and appealed that grade.
21  Q.   Why did you keep this?
22  A.   Again, I didn't realize I had it until I
23       went through a box of things. When I

Page 214

1        packed on August the 31st, this was in a
2        folder marked something else. And I took
3        it with me – or a copy of it, not the
4        original, but a copy of it.
5   Q.   So it was a mistake?
6   A.   I did not mean to take it. But at one
7        point in time, I had thought about – I
8        wouldn't say taking it, because at the time
9        this was going on, I was not thinking about
10       resigning. But I did not intentionally
11       plan on taking this with me if that's what
12       you're asking. It was in some files.
13  Q.   Why did you write this up?
14  A.   The original – we're not on the same –
15       these were done in real time as was the
16       other handwritten documents, documentation
17       of Miss Arit's performance. I was asked to
18       type up the written –
19  Q.   I don't have one of those documents.
20  A.   You should have.
21  Q.   See the one on the top, your top one?
22  A.   You don't have that one? I gave you that
23       today.

Page 215

1            MS. PRICE: That's what we got
2            from the plaintiff's counsel's
3            office --
4   A.   Okay. I probably found this one after ...
5        I started going through stuff and spent
6        this weekend going through more stuff.
7        There you go. I think that one matches the
8        one that I've got a copy of for myself.
9            MR. NIX: I'm going to re-mark it,
10           then.
11  Q.   Looking at Exhibit 29 again, the first
12       document, the top document is what?
13  A.   That would be a copy of her clinical
14       evaluation for NUR 272, spring of '05.
15  Q.   Who filled out that evaluation?
16  A.   Mid term, Ms. Harmon and Ms. Wall. At the
17       end, because I was the lead instructor in
18       that course or the lecturer for that
19       course, I also sat in on her evaluation.
20           (Defendant's Exhibit 29-B was
21           marked for identification.)
22  Q.   Do you know why -- let me show you 29-B.
23       Look at 29-B. That is a document that

Page 216

1        Jennifer Cooley gave us, I assume, the day
2        you brought this material by her office.
3   A.   Yes. You've got --
4   Q.   I've got Exhibit 29. Okay?
5   A.   If you continue to look, I believe
6        that's --
7   Q.   Correct. But 29-B does not contain the top
8        document -- 29-B, that exhibit, that total
9        exhibit omits this top document which says
10       up here criteria in the left column, and
11       it's got some blocks drawn off. It's got
12       essential criteria on the front, assessment
13       criteria, diagnosis criteria, outcome
14       identification criteria. All of those
15       topics are addressed. On the second page,
16       implementation criteria, evaluation
17       criteria, and the date of the mid term
18       evaluation is February 11, 2004, correct?
19  A.   Yes, sir.
20  Q.   And the date of the intern evaluation is
21       March 11, 2004 [sic], correct?
22  A.   Yes, sir.
23  Q.   Who refused to sign this document?

Page 217

1    A.  Arit Umoh, the student.
2    Q.  Why?
3    A.  Because she did not agree with the failing
4        grade in clinical she was being issued.
5        She said she was not going to sign it.
6    Q.  And you're saying you didn't find the
7        evaluation form that I just spoke about
8        until recently?
9    A.  Yes, sir.
10   Q.  Were any of these documents created for the
11       purpose of addressing -- I don't know
12       whether it was a grade appeal or what.  Did
13       she file a grade appeal?
14   A.  I don't know exactly what all she did, but
15       there were multiple meetings about this
16       grade that was issued.
17   Q.  Was the April 13, 2005, memo, let's call
18       it, signed by you created for the purpose
19       of addressing Ms. Umoh's grade appeal or
20       concerns or whatever?
21   A.  Yes, sir.
22   Q.  Is there any other document among
23       Exhibits -- Exhibit 29 that was created

Page 218

1        purely for the purpose of addressing
2        Ms. Umoh's grade appeal?
3    A.  There was a typing of written notes.
4    Q.  I've got you.  Okay?
5    A.  Because these are the handwritten notes,
6        and I typed them for --
7    Q.  Okay.
8    A.  -- one of the meetings.
9    Q.  So the typed notes we have here are taken
10       from handwritten notes, and the typed notes
11       taken from the handwritten notes have dates
12       by each paragraph, correct?
13   A.  Correct.
14   Q.  This is another group of documents that you
15       brought today.
16           (Brief interruption.)
17   Q.  Let me show you these documents.  I'm
18       clipping them together and marking them as
19       Defendant's Exhibit 30.
20           (Defendant's Exhibit 30 was marked
21            for identification.)
22   Q.  Just ask you to tell me what they are.
23   A.  The first would be my unofficial academic

Page 219

1        transcript from Florida State University
2        where I received my master's degree in
3        nursing in 1989.  Do you want me just to go
4        through them?
5    Q.  No.  Just tell me, what are they
6        generally?  Well, you've got one
7        transcript.  Do you have another transcript
8        in there?
9    A.  I've got several transcripts in here.
10   Q.  All right.  And then you've got some course
11       outlines and syllabi?
12   A.  I've got course outlines, syllabi.  I have
13       my CV.
14   Q.  All right.
15   A.  The course outline for NUR 271, which is
16       the course I began teaching in August of
17       2005 for fall quarter 2005.
18           MR. DUMBUYA:  Did you say 271?
19           THE WITNESS:  271.  Yes, sir.
20   A.  Notes that I gave to -- or handouts I gave
21       to Dr. Lowe to give to the students for the
22       first lectures of NUR 271.
23           The NUR 271 worksheet study guide that

Page 220

1        the students filled out over their May
2        to -- well, no, would have been from August
3        8th to August 31st, thereabout, break that
4        they were to turn in for points.
5            A maternal-child nursing skills
6        checklist that would have been utilized
7        during that quarter of NUR 271 had I
8        continued to teach.  I don't know if they
9        used it.
10           Then there is a -- I also was scheduled
11       to teach NUR 104 to the current new LPN
12       students in August, and that would have
13       been a pharmacology course.
14           Also, I included my pediatric nursing
15       syllabus.  And when I pulled it off of my
16       disc -- obviously, I was thinking ahead
17       because I was already adjusting it for
18       spring 2005 or January.  So when you see
19       that, that would be -- and that would be
20       the last document in there.
21           (Defendant's Exhibit 31 was marked
22            for identification.)
23   Q.  Exhibit 31 is something you brought today.

Page 221

1    That's your license?
2    A.   My nursing license.
3         (Defendant's Exhibit 32 was marked
4         for identification.)
5    Q.   Exhibit 32 is something you brought today.
6    What is that?
7    A.   You asked for anything that had to do with
8    that class.  I found my old contact list
9    for the ADN class and members therein.
10   Q.   ADN class for --
11   A.   Started May 2005.
12   Q.   Right.
13        (Defendant's Exhibit 33 was marked
14        for identification.)
15   Q.   Exhibit 33 is a letter dated July 1, 2005,
16   from Dr. Blackwell that's addressed to
17   you.  Would you look at that.  You had
18   previously said that was sent to all of the
19   school faculty.
20   A.   That's my understanding.
21   Q.   And that was sent to the school faculty
22   because of the vote of no confidence?
23   A.   Yes, sir.  In reading the letter, that

Page 222

1    would be my understanding.
2    Q.   And that letter was addressed to you, but
3    also addressed to all other faculty members
4    individually, correct?
5    A.   That is my understanding.
6    Q.   And therefore, that letter does not really
7    relate to or apply to any specific
8    criticism you made of Dr. Blackwell or to
9    her; wouldn't that be correct?
10   A.   That's what I would perceive it as.  I
11   brought it because you asked for all
12   CVCC --
13   Q.   Pardon me?
14   A.   I said you asked me to bring any piece of
15   paper I had --
16   Q.   Yes, ma'am.  I appreciate it.
17   A.   -- about CVCC, so I brought it.
18        (Defendant's Exhibit 34 was marked
19        for identification.)
20   Q.   All right.  34 is -- have you ever seen
21   that?
22   A.   That would be my subpoena here.
23   Q.   Did you come?

Page 223

1    A.   Yes, sir, I think so.  I feel like I've
2    been here a while.
3    Q.   And did you look for all of the documents
4    that are on that subpoena?  There's a list
5    of those documents; isn't that right?
6    A.   I believe 24 different paragraphs, yes,
7    sir.
8    Q.   And Exhibit 35 is what?
9         (Defendant's Exhibit 35 was marked
10        for identification.)
11   A.   That was a document I created for my own
12   use so that I made sure that I cut through
13   the legalese and brought in what I did have
14   and could find during the time period from
15   when I received the subpoena till now.
16   Q.   And that list corresponds to the numbers on
17   the document request; is that right?
18   A.   Yes, sir.
19   Q.   And that list tells me whether you had
20   documents that I had requested or whether
21   you did not have documents that I had
22   requested; is that correct?
23   A.   It more breaks down to -- you asked me for

Page 224

1    anything from any student.  I had assumed
2    we'd go through -- I have, like, letters of
3    thanks and plaques and that kind of thing I
4    did not bring and I assumed you did not
5    want.
6         But anything that I did have in these
7    categories I brought.  And if it was
8    something that would have been warehoused
9    and -- at CVCC, I marked that it should be
10   at CVCC.
11   Q.   But you made a diligent search for all the
12   documents described in there; is that
13   right?
14   A.   I have made -- yes, sir, for the time
15   period that I've had.
16   Q.   Well, do you think you may have additional
17   documents that are responsive?
18   A.   I don't think so, but I don't know.  I have
19   boxes and drawers and file folders of
20   teaching things and whatever that I have
21   gone through and cleared out some things,
22   but I don't know that there's not a box
23   somewhere that I haven't found or gotten to

June 24, 2007

Deposition of Sandra Gunnels

Page 225

1  yet.
2  Q.  Well, if you find any other documents, as
3      soon as you do, would you mind giving me a
4      call?
5  A.  Yes, sir.
6  Q.  You have my number, I believe, don't you?
7  A.  Yes, sir, I do.
8  Q.  I would appreciate that.
9      Now, let me make sure I understand one
10      thing. It's your position that you did not
11      know until August 29 that the form that
12      we've previously discussed that is included
13      in Exhibit ...
14  A.  And if I can correct -- I believe I said --
15      August 26th or sometime right before that.
16  Q.  I'm sorry. Yeah, you did. You said the
17      29th. It was really August 26th that --
18  A.  Or sometime before that.
19  Q.  So it's your position that you did not
20      know --
21  A.  That I remember, yes, sir.
22  Q.  -- that that form that we've discussed
23      which is in Exhibit 28, the form that you

Page 226

1      say Katie Lackey faxed for you to all of
2      the folks for employment verification, you
3      didn't know that form was inadequate --
4  A.  That I recall -- no, sir, I was not told
5      that.
6  Q.  -- until the 26th of August?
7  A.  I said some point in time close to the
8      26th.
9  Q.  I thought you said you found out in the
10      meeting on the 26th.
11  A.  I said just a little bit before that, a
12      couple of days before that, I believe.
13  Q.  If you found out a couple of days before,
14      who told you?
15  A.  I don't recall. I'm just saying I don't
16      remember exactly when I found out, but I
17      believe it was sometime that week up and to
18      the day of that meeting.
19  Q.  But you really don't know?
20  A.  No.
21  Q.  Did you bring your transcript today? Yeah,
22      you did. You went to your truck -- your
23      car --

Page 227

1  A.  Do you mean my --
2  Q.  That's it.
3  A.  I'm thinking college transcripts.
4  Q.  I'm sorry. This is a sworn statement that
5      you gave; is that correct?
6  A.  Yes, sir.
7  Q.  Now, this document says -- how about that.
8      It says -- it has a style on it: In the
9      United States District Court for the Middle
10      District of Alabama, Opelika Division,
11      Lindy Wright versus Chattahoochee Valley
12      Community College, right?
13  A.  Yes, sir.
14  Q.  Did you understand a lawsuit had been filed
15      when you gave this?
16  A.  Yes, sir.
17  Q.  There were two lawyers present --
18  A.  If I can go back.
19  Q.  Yes, ma'am.
20  A.  I understood -- I don't know if I knew one
21      had been filed or if it was in the process
22      of being filed, but I knew that lawyers
23      going back and forth, talking to each other

Page 228

1      was going on.
2  Q.  All right. There were two lawyers present
3      at your giving of this sworn statement,
4      correct?
5  A.  Yes, sir, that I remember.
6  Q.  One of them was Jennifer Cooley. Did you
7      know who she represents -- or who she
8      represented?
9  A.  Lindy Wright was my assumption. I don't
10      know that --
11  Q.  She never said?
12  A.  I just assumed, and I guess I was told she
13      was Lindy's lawyer.
14  Q.  Who did Peter Dumbuya represent, then?
15  A.  My assumption was Lindy Wright.
16  Q.  Your assumption was that both of them
17      represented Lindy Wright?
18  A.  Yes, sir.
19  Q.  The court reporter was from a firm called
20      Courtney Tillman Peters; is that right?
21  A.  Looking at this, I would assume her name
22      was Courtney Tillman Peters.
23  Q.  You're right.

Deposition of Sandra Gunnels                                                    June 24, 2007

Page 229

1   A.  And the firm was Causey & Peterson.
2   Q.  And they're from where?
3   A.  According to this, Columbus, Georgia.
4   Q.  Were you sworn in in this deposition?
5   A.  Yes, sir.
6   Q.  Look at the --
7   A.  I'm assuming I was.
8   Q.  It says you were.
9   A.  Okay.  Then I was.
10  Q.  It says -- look on page four.  Whereupon,
11      the deposition --
12  A.  Oh, yes.  Okay.
13  Q.  Having been first duly sworn, testified as
14      follows.  Okay?
15  A.  Yes, sir.
16  Q.  But do you remember being sworn in?  Do you
17      remember --
18  A.  Yes, sir.  I mean, I'm just --
19  Q.  -- raising your hand and saying I will or I
20      do, I swear I will or whatever --
21  A.  Promise to tell the truth, the whole truth
22      and nothing but the truth, so help me God.
23  Q.  All right.  Look at page 34.

Page 230

1   A.  Little page?  I've got little pages.
2   Q.  I'm sorry.  It's still page 34, but it's --
3   A.  Okay.
4   Q.  It says State of Georgia, County of
5       Muscogee.  The foregoing transcript of the
6       proceedings was taken before me as a
7       certified court reporter in and for the
8       State of Georgia and reduced to this
9       transcript under my direction and
10      supervision, and I certify that it is a
11      true and correct and complete transcript to
12      the best of my ability of the proceedings.
13          Now, you gave this in the state of
14      Alabama, didn't you?
15  A.  Yes, sir.
16  Q.  And this court reporter was a Georgia court
17      reporter; isn't that right?
18  A.  She did not tell me she was from Georgia.
19      I did not ask.  I saw this like a week ago,
20      so ...
21  Q.  I know you did not get the court reporter.
22      I know you did not.
23  A.  I have no reason to doubt that she's from

Page 231

1   Georgia since it says she's from Georgia.
2   Q.  Do you know whether she is authorized to
3       administer oaths in the state of Alabama?
4   A.  No, sir, but I don't know that she is
5       either.  (Indicating.)
6   Q.  She is.  I promise you.  All right.  Now,
7       let's go to a page --
8          (Brief interruption.)
9   Q.  Now, on page 10, would you look at page
10      10.
11  A.  Yes, sir.  Yes, sir.
12  Q.  Wait a minute.  I'm sorry.  Page 10, line
13      five, the question from Ms. Cooley:  Was
14      there ever a time that you can recall --
15          THE WITNESS:  I'm sorry.  Can I
16          stop this for one second.  I
17          apologize, but I'm fixing to
18          be ill.
19          (Brief recess was taken.)
20  Q.  Page 10, I was reading the question that
21      Ms. Cooley asked you:  Was there ever a
22      time you can recall where you had a
23      conversation with Ms. Peterson specifically

Page 232

1   regarding Ms. Wright -- Lindy Wright?  You
2   said, yes.  And she said, do you recall
3   that conversation?  You said, yes, I do.
4          MR. NIX:  Brandy, do we have a
5          clean copy of this?
6              I'm going to mark this
7          statement as Exhibit 36.  When
8          I refer to it, it will be
9          Exhibit 36.
10         (Defendant's Exhibit 36 was marked
11         for identification.)
12  Q.  That's what I'm reading from now.  I was
13      reading from page 10 of that.  Your
14      response, if you'll read along with me --
15      and I don't think we need to read every
16      word, but you say, yes, this -- it's hard
17      to say verbatim with it having been a
18      period of time, but the gist of the
19      conversation was Ms. Peterson came into the
20      faculty offices.  And as I recall, Brenda
21      Bellamy was present and potentially Deborah
22      Gruber.  Grouper here, G-R-O-U-P-E-R.
23          And then you talk about the offices and

Page 233

1  about the fact that she asked if anyone was
2  going to fail. And then there was -- I
3  think Ms. Bellamy said something about
4  Lindy Wright was close, but that she'd made
5  a C.
6      And this would have been, I guess,
7  Ms. Gunnels, for the summer of 2005; would
8  that be right?
9  A.  Yes, sir.
10 Q.  The last sentence in your answer is this:
11     And Ms. Peterson made a statement to the
12     effect of y'all need to flunk her, she does
13     not need to pass, she is weak, she's not
14     going to pass boards, y'all need to flunk
15     her.
16         Then the statement continues to go on,
17     and you say on page 11, it was end of
18     summer -- line three, summer semester
19     because we were averaging grades.
20         And then the question on paragraph --
21     line five, page 11: Is it a regular
22     course, I guess, of conversation for
23     Ms. Peterson, the director of the program,

Page 234

1   to come and ask all the instructors is
2   anyone going to fail?
3       Answer: That's very normal and that's
4   her responsibility. She needs to know
5   because in nursing, if they flunk a course,
6   you know, they have an opportunity to come
7   back. When -- how I was taught and how I
8   handle my classes was the fact that -- and
9   Ms. Bellamy did the same thing, was that if
10  we thought someone was not going to pass or
11  there was -- there were -- they were close
12  or, in fact, did not pass, then went we
13  back over every test, every piece of paper,
14  met with Ms. Peterson, told her who was not
15  going to pass. So then you talk about
16  the -- that answer.
17      See what the question says. Let's go
18  to page 12, Ms. Gunnels. Page 14, line
19  seven, was there a specific course that
20  Ms. Peterson said that Lindy needed to be
21  failed in is the question. And your answer
22  is: No, it was a general statement, and I
23  perceived it not as -- and I know she would

Page 235

1   not have done, asking us to go back and
2   change grades that Lindy had made. But the
3   assumption at that point in time was
4   Ms. Bellamy and I would be returning for
5   the fall semester and we would both have
6   Lindy again as a student -- myself in
7   obstetrics, Ms. Bellamy in her advanced
8   medical-surgical course work -- and it
9   was -- or I perceived it as a in-the-
10  future-this-needs-to-occur, that she
11  verbalized that she did not feel that Lindy
12  would pass the boards and would be a
13  liability and did not need to pass.
14      And then the question is: But you do
15  not -- you did not interpret that to mean
16  that you needed to go back and regrade her
17  to fail her that particular semester?
18  Answer: No, but Ms. Peterson would not
19  have asked of me I know. Then you go
20  on to testify about that.
21      Tell me why you say Ms. Peterson would
22  not have asked you to do that.
23 A.  In general, I would not expect Ms. Peterson

Page 236

1   to do that and she would not ask that of
2   me. I did not perceive it as a you-need-
3   to-go-back-and-, as I said, -regrade or
4   arrange things so that she received a
5   failing grade. She is moral enough to know
6   that I would not do that and I would not
7   expect that of her.
8  Q.  Well, sure. And Ms. Peterson would not ask
9   that of you. She's not that kind of
10  person; am I right?
11 A.  From my interactions with her, no.
12 Q.  From your interactions with her, would you
13  say she's an honest, good chairperson of
14  that department who works in that
15  department with integrity?
16 A.  That was my interaction with her.
17      THE WITNESS: I'm sorry. I'm not
18      going to be able to finish.
19 Q.  Let me ask you one other question.
20 A.  Yes, sir.
21 Q.  Would it be correct to say that
22  Ms. Peterson was not asking you to
23  intentionally flunk Lindy Wright on any

Page 237

1  occasion, she was just commenting on the
2  fact that she was a weak student; would
3  that be true?
4  A.  I'm sorry.  Could you repeat that?
5  Q.  Ms. Peterson was commenting on the fact
6  that Lindy Wright was a weak student, but
7  she was not asking you to in the future
8  flunk her in a course intentionally?
9  A.  My perception was she was expressing her
10  appraisal of Ms. Wright's ability, and she
11  was not instructing me to flunk her in any
12  course.
13  Q.  There was a question that Mr. Dumbuya asked
14  you that misstated your statement in that
15  regard.  I don't know if I'm going to be
16  able to find it in time to ... I'm probably
17  not.
18     Here we go, page 18.  Mr. Dumbuya is
19  asking this question, and this is what he
20  asked:  Now, to the best of your
21  knowledge --
22     Are you there?
23  A.  Yes, sir.

Page 238

1  Q.  Line five.  Now, to the best of your
2  knowledge, had Ms. Peterson made that
3  statement before concerning another
4  student, that you have to make sure that
5  she flunks?
6     That's not what you said at all
7  previously, was it?
8  A.  No, sir.
9  Q.  So he misinterpreted what you said, isn't
10  that right, or he either misinterpreted it
11  or he misstated it in some way, correct?
12  She never said you have to flunk her, you
13  must do it intentionally no matter what?
14  A.  The question is had she ever made a
15  statement like that to me before was how I
16  perceived it, and I had never heard her say
17  that before.
18  Q.  Right.  And she didn't say you have to make
19  sure she flunks with respect to Lindy
20  Wright either?
21  A.  No, sir.
22     MR. NIX:  That's all I have.
23     Peter, do you have any

Page 239

1  questions?
2     MR. DUMBUYA:  No.
3     MR. NIX:  Thank you.
4     (The deposition was concluded at
5  2:40 p.m. EDT.)
6
7  * * * * * * * * * * * * *
8  FURTHER DEPONENT SAITH NOT
9  * * * * * * * * * * * * *
10
11  REPORTER'S CERTIFICATE
12  STATE OF ALABAMA:
13  MONTGOMERY COUNTY:
14     I, Lisa J. Nix, Registered Professional
15  Reporter and Commissioner for the State of Alabama
16  at Large, do hereby certify that I reported the
17  deposition of:
18     SANDRA GUNNELS
19  who was first duly sworn by me to speak the truth,
20  the whole truth and nothing but the truth, in the
21  matter of:
22     LINDY G. WRIGHT,
23     Plaintiff,

Page 240

1  Vs.
2  CHATTAHOOCHEE VALLEY COMMUNITY
3  COLLEGE (CVCC),
4  Et al.,
5  Defendants.
6  In The U.S. District Court
7  For the Middle District of Alabama
8  Eastern Division
9  Case Number 3:06-CV-1087-WKW
10  on Tuesday, July 24, 2007.
11     The foregoing 239 computer printed pages
12  contain a true and correct transcript of the
13  examination of said witness by counsel for the
14  parties set out herein.  The reading and signing of
15  same is hereby not waived.
16     I further certify that I am neither of kin
17  nor of counsel to the parties to said cause nor in
18  any manner interested in the results thereof.
19     This 30th day of July 2007.
20
21     _____
     Lisa J. Nix, Registered
22     Professional Reporter and
     Commissioner for the State
23     of Alabama at Large

Deposition of Sandra Gunnels                                    June 24, 2007

Page 241

```
 1
 2
 3
 4        I, Sandra Gunnels, hereby certify that
 5   I have read the foregoing transcript of my
 6   deposition given on Tuesday, July 24, 2007, and it
 7   is a true and correct transcript of the testimony
 8   given by me at the time and place stated with the
 9   corrections, if any, and the reasons therefor noted
10   on a separate sheet of paper and attached hereto.
11
12
13
14        _____
                Sandra Gunnels
15
16
17
18        SWORN TO AND SUBSCRIBED before me this
19   _____ day of _____, 20__.
20
21
22        _____
                NOTARY PUBLIC
23
```

# DEPOSITION OF BRENDA BELLAMY

## July 24, 2007

## Pages 1 through 94

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
566 South Perry Street
Post Office Box 62
Montgomery, AL  36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net

EXHIBIT

ρ



**Page 1**

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3            EASTERN DIVISION
4
5   LINDY G. WRIGHT,
6        Plaintiff,
7   Vs.                    CIVIL ACTION NO.
                    3:06-CV-1087-WKW
8   CHATTAHOOCHEE VALLEY
    COMMUNITY COLLEGE (CVCC),
9   et al.,
10       Defendants.
11
12       * * * * * * * * * * * * *
13
14       DEPOSITION OF BRENDA BELLAMY, taken
15   pursuant to stipulation and agreement before Lisa
16   J. Nix, Registered Professional Reporter and
17   Commissioner for the State of Alabama at Large, in
18   the Conference Room, Ramada Inn, Limited, 3560
19   Highway 431 North, Phenix City, Alabama on Tuesday,
20   July 24, 2007, commencing at approximately
21   3:10 p.m. EDT.
22
23       * * * * * * * * * * * * *

**Page 2**

1            APPEARANCES,
2
3   FOR THE PLAINTIFF:
4   Mr. Peter A. Dumbuya
    Attorney at Law
5   Post Office Box 3302
    Phenix City, AL 36868
6
7   FOR THE DEFENDANT:
8   Ms. Brandy F. Price
    NIX, HOLTSFORD, GILLILAND,
9     HIGGINS & HITSON
    Attorneys at Law
10  Suite 300
    4001 Carmichael Road
11  Montgomery, AL 36106
12
    ALSO PRESENT:
13
    Dr. Laurel Blackwell
14  Ms. Dixie Peterson
15
16       * * * * * * * * * * * * *
17
18       EXAMINATION INDEX
19
    BRENDA BELLAMY
20    BY MS. PRICE . . . . . . . . . . . 5
21
22
23

**Page 3**

1
2            EXHIBIT INDEX
3                  MAR
4   DEFENDANT'S EXHIBIT
5   38  Resume of Brenda Bellamy          30
6   39  8/31/05 letter to Dr. James Lowe from   36
        Brenda Bellamy; 8/31/05 letter to Brenda
7       Bellamy from Laurel Blackwell
8   40  8/23/05 e-mail to James Lowe and Laurel  42
        Blackwell from Brenda Bellamy
9
10
11  41  Employment Experience Verification Form  42
12
13  42  Composite exhibit - documents produced   61
        by Brenda Bellamy consisting of
        certification cards, Master of Science
        in Nursing certification, copy of
        nursing license
14
15  43  Composite exhibit consisting of          81
        application documents for Brenda Bellamy
16
17
18
19
20
21
22
23

**Page 4**

1            STIPULATION
2       It is hereby stipulated and agreed by and
3   between counsel representing the parties that the
4   deposition of BRENDA BELLAMY is taken pursuant to
5   the Federal Rules of Civil Procedure and that said
6   deposition may be taken before Lisa J. Nix,
7   Registered Professional Reporter and Commissioner
8   for the State of Alabama at Large, without the
9   formality of a commission, that objections to
10  questions other than objections as to the form of
11  the question need not be made at this time but may
12  be reserved for a ruling at such time as the said
13  deposition may be offered in evidence or used for
14  any other purpose by either party provided for by
15  the Statute.
16      It is further stipulated and agreed by and
17  between counsel representing the parties in this
18  case that the filing of said deposition is hereby
19  waived and may be introduced at the trial of this
20  case or used in any other manner by either party
21  hereto provided for by the Statute regardless of
22  the waiving of the filing of the same.
23      It is further stipulated and agreed by and

June 24, 2007

Deposition of Brenda Bellamy

Page 5

1  between the parties hereto and the witness that the
2  signature of the witness to this deposition is
3  hereby not waived.
4
5        * * * * * * * * * * * * *
6
7            BRENDA BELLAMY
8      The witness, after having first been duly
9  sworn to speak the truth, the whole truth and
10 nothing but the truth testified as follows:
11           EXAMINATION
12 BY MS. PRICE:
13 Q.  Ms. Bellamy, my name is Brandy Price.
14     We've met off the record informally.  Could
15     you state your full name for the record.
16 A.  Brenda Louise Bellamy.
17 Q.  And I know we've talked about some of the
18     protocol for the deposition.  As I
19     explained before, the court reporter is
20     going to be taking down everything we say.
21     All I would ask, if you don't understand
22     one of my questions, please let me know.
23     Okay?

Page 6

1  A.  (Witness nods head up and down.)
2  Q.  Is that a yes?
3  A.  Yes.
4  Q.  And that was one thing we talked about.
5      You're nodding your head, and she can't
6      take nods of the head down, so please make
7      sure you give me a verbal answer.
8          Additionally, I'm going to assume if
9      you answer my question that you understood
10     my question.  Is that all right?
11 A.  Yes.
12 Q.  Just to start off with, to go ahead and get
13     it out of the way, I'm going to show you --
14         Is this the subpoena that you received
15     to appear at the deposition today?
16 A.  Yes.
17 Q.  And the documents that you gave me in this
18     folder that are labeled case, those are the
19     documents that you brought with you
20     pursuant to that subpoena, correct?
21 A.  Yes, that's correct.
22 Q.  And we'll go through those in the
23     deposition and label those as exhibits.

Page 7

1        Just in general, you know we're here
2      for a lawsuit filed by Ms. Wright; is that
3      correct?
4  A.  Yes, according to the ...
5  Q.  Do you understand why you're here today?
6  A.  No.
7  Q.  Do you understand anything about the
8      lawsuit that Ms. Wright has filed?
9  A.  No.
10 Q.  Did you know that Ms. Wright had filed a
11     lawsuit against Chattahoochee Valley
12     Community College?
13 A.  Yes, when I received the deposition.
14 Q.  When you received the subpoena; is that
15     correct?
16 A.  I mean the subpoena, yes.
17 Q.  Is that the first time you knew that
18     Ms. Wright had filed a lawsuit?
19 A.  Yes.  I'm trying to think.
20 Q.  Let me go ahead and tell you.  Ms. Wright
21     has filed a lawsuit against Chattahoochee
22     Valley Community College, Dixie Peterson,
23     Dr. Laurel Blackwell and Dr. James Lowe.

Page 8

1        Did you know that she has filed the
2      lawsuit against Dr. Blackwell, Dr. Lowe,
3      and Ms. Peterson as well?
4  A.  No.
5  Q.  And you have no understanding at all as to
6      why Ms. Wright would list you as a witness
7      in this matter?
8  A.  No.
9  Q.  Prior to today, have you ever been
10     contacted by Ms. Wright's counsel or an
11     attorney for Ms. Wright about giving a
12     statement of any kind?
13 A.  No.
14 Q.  Have you been contacted by any attorney on
15     behalf of Ms. Wright?
16 A.  No.
17 Q.  Have you been contacted by Ms. Wright prior
18     to today?
19 A.  No.
20 Q.  Did Ms. Wright call you or try to call you
21     to tell you that you might be subpoenaed in
22     this case?
23 A.  Yes.

June 24, 2007

Deposition of Brenda Bellamy

Page 9

1   Q. Do you remember when that was?
2   A. No, I don't.
3   Q. Has it been in the last month?
4   A. I can't remember when it was.
5   Q. Do you remember any event around that time
6      that may help you narrow down the time
7      period that she may have called you?
8   A. I was at work. I think I was at work, and
9      she called and said something about I might
10     be contacted, but no details of what --
11     what's going on.
12  Q. Was that sometime this summer?
13  A. Yes. Yes, definitely summer.
14  Q. Was that all you talked about, just the
15     fact that you might be contacted --
16  A. Yes.
17  Q. -- for this case?
18  A. No details.
19  Q. Was that the first time you knew that there
20     was something going on as far as litigation
21     or legal action?
22  A. Yes.
23  Q. Has anyone else other than Ms. Wright

Page 10

1     mentioned this lawsuit to you?
2   A. No.
3   Q. Have you talked to anyone today about
4     giving -- about giving deposition
5     testimony?
6   A. Yes.
7   Q. Who?
8   A. My husband. I told him I had to come, and
9     he brought me.
10  Q. Have you talked to anyone else?
11  A. No.
12  Q. I assume you told your employers that you
13     had to come here.
14  A. Yes.
15  Q. Other than your employer and your husband,
16     there hasn't been anyone else?
17  A. No.
18  Q. Did Ms. Wright call you and let you know
19     that she was going to list you as a witness
20     at any point prior to this -- prior to the
21     call you received about the deposition
22     today?
23  A. I'm not sure what you mean by witness. Do

Page 11

1     you mean if the case goes to court?
2   Q. Yes, ma'am. And let me -- she has listed a
3     number of people, including you, as
4     possible witnesses in this case.
5       At any point previous to the scheduling
6     of your deposition and her contacting you
7     to tell you that you were going to have a
8     deposition soon, did she tell you or anyone
9     tell you that you were being listed as a
10     witness in this case?
11  A. No, that's not what I was told.
12  Q. When was the first time that you knew you
13     were listed as a witness in this matter?
14  A. Now, when you say witness, are you meaning
15     if the case goes to court?
16  Q. No, ma'am. Right now, you're considered a
17     witness right now because you're sitting
18     here giving testimony.
19  A. Okay.
20  Q. When was the first time you knew you were
21     going to be a witness and possibly have to
22     give testimony in this case?
23  A. The only thing I knew about this case was

Page 12

1     when I got that call at home -- I mean at
2     work. I'm sorry.
3   Q. From Ms. Wright?
4   A. Yes. That was the only time.
5   Q. And since you left CVCC, I believe the date
6     was August 31st, 2005, have you spoken to
7     Ms. Wright up until the point where she
8     called you the other day?
9   A. No. I left in 2005. Not that I can
10     remember.
11  Q. So that phone call that you got at work is
12     the only time you remember hearing from
13     Ms. Wright since you left CVCC?
14  A. Yes, that's the only time I can remember.
15  Q. And I know the nursing community here is
16     small. Have you run into her at work or at
17     any -- any nursing function or work that
18     you may have attended?
19  A. Since I left the school, I did see her once
20     at work. She used to work there. But it
21     had nothing to do with this case, just a
22     hi, hi. I don't even think this case was
23     in effect then.

June 24, 2007

Deposition of Brenda Bellamy

**Page 13**

1  Q. Did she mention anything about her
2      situation at CVCC or the fact that she was
3      no longer attending CVCC?
4  A. Yes.
5  Q. Did she elaborate on that any at all?
6  A. No.
7  Q. Did she give any details about why she was
8      no longer attending CVCC?
9  A. No. I have no idea.
10  Q. Do you have any idea how long as far as
11      length of time your conversation was with
12      her on that occasion?
13  A. No, but it was real short.
14  Q. Was it brief, just passing at work?
15  A. Are you referring to when I ran into her up
16      on the floor or --
17  Q. Yes, ma'am.
18  A. Oh, gosh. That was quick. That was very
19      brief, just basically passing.
20  Q. And did she mention -- is that the time
21      that she mentioned that she was no longer
22      attending CVCC to you?
23  A. Yes.

**Page 14**

1  Q. Was that the first time you had ever heard
2      that she was no longer attending CVCC?
3  A. Yes.
4  Q. Have you ever spoken with a Ms. Jennifer
5      Cooley?
6  A. Jennifer Cooley?
7  Q. Cooley.
8  A. I don't know who that is.
9  Q. And the gentleman sitting to your right is
10      Mr. Peter Dumbuya. Have you ever met him
11      before or spoken with him before?
12  A. I don't think so. I don't know who he is.
13  Q. Have you ever spoken with a lady named
14      Connie Cooper?
15  A. No.
16  Q. Other than Lindy Wright, have you spoken to
17      anyone else regarding Ms. Wright's lawsuit?
18  A. No.
19  Q. And I know Ms. Gunnels just left the room.
20      Did you speak to her about her deposition
21      after she left?
22  A. No.
23  Q. Have you talked to her prior to today about

**Page 15**

1      the depositions that were scheduled today?
2  A. Can you repeat that?
3  Q. I sure can. Prior to arriving today at the
4      deposition, have you at any time spoken to
5      Ms. Gunnels about being deposed?
6  A. Oh, still talking about her? No. No.
7  Q. Now, are you and Ms. Gunnels friends?
8  A. Yes.
9  Q. How long have you known Ms. Gunnels?
10  A. I honestly can't remember exactly how
11      long. I knew her before CVCC, so I don't
12      know.
13  Q. It's been a number of years?
14  A. Yes, it has.
15  Q. And how do y'all know each other?
16  A. Well, we both used to work at St. Francis.
17  Q. And when was the last time you spoke to
18      Ms. Gunnels prior to today?
19  A. It's been a long time.
20  Q. Have you spoken to her any at all this
21      summer?
22  A. No.
23  Q. Have you spoken to her at all this year?

**Page 16**

1  A. I don't think so.
2  Q. Let me ask you this. Would you consider
3      Ms. Gunnels a close friend or more of an
4      acquaintance through work?
5  A. Acquaintance through work.
6  Q. As far as any preparation that you did for
7      the deposition today, did you do any kind
8      of preparation for the deposition?
9  A. No. Does that include Xeroxing those
10      things?
11  Q. Other than preparing the documents we asked
12      for.
13  A. No.
14  Q. By that I mean, did you go through any
15      materials that you had or nursing books or
16      anything like that and look at any
17      materials in preparation for today?
18  A. No.
19  Q. And you didn't have any other files or
20      documents other than these that you thought
21      were relevant and you thought that we'd
22      requested?
23  A. No.

June 24, 2007

Deposition of Brenda Bellamy

Page 17

1  Q.  That was not a very good question, but ...
2      Do you have any knowledge at all as to
3      why you were listed as a witness in this
4      case?
5  A.  No.
6  Q.  Do you have any inkling of an idea why you
7      would have been listed as a witness in this
8      case?
9  A.  What do you mean by inkling of an idea?
10 Q.  Just any small thought that you had of why
11     you would have been listed as a witness.
12 A.  Yes, I have a small thought.
13 Q.  What is that?
14 A.  I used to be one of her instructors.
15 Q.  Tell me what courses you taught that
16     Ms. Wright was a student in.
17 A.  I think it was 251, Nursing 251 and Nursing
18     252. It's been a while. I'm just trying
19     to -- I want to say 271, but I can't
20     remember.
21 Q.  251 and 252 would have been in the ADN --
22 A.  I think it was med-surg.
23 Q.  Did you teach Ms. Wright at all when she

Page 18

1      was receiving her LPN degree at CVCC?
2  A.  No.
3  Q.  So you didn't have her as a student until
4      she started in the ADN program?
5  A.  Yes.
6  Q.  And Nursing 251, what type of course was
7      that?
8  A.  Med-surg.
9  Q.  And that was -- that would have been in the
10     summer of '05?
11 A.  I honestly don't remember when it was.
12 Q.  Was 251 the first class that you had her as
13     a student?
14 A.  Yes, I believe so. I think so.
15 Q.  Is that the first time you had ever met
16     Ms. Wright was in that class?
17 A.  I can't remember the dates. I'm not sure
18     if I knew her before, if she worked at
19     Doctors before or after. No, I think I
20     knew her before she started class.
21 Q.  From work at Doctors?
22 A.  No, I think she used to work at
23     St. Francis, I think.

Page 19

1  Q.  And then you would have had her for Nursing
2      252 as well; is that correct?
3  A.  Yes, that's correct.
4  Q.  Now, that was -- that would have been the
5      semester that you resigned. It's my
6      understanding that she took that
7      semester -- that she took that class in the
8      fall semester of 2005, and that was the
9      semester that you resigned, I believe
10     August 31st, 2005; is that correct?
11 A.  My memory ...
12 Q.  Take your time. If you need to think about
13     it, that's fine. I know it's been a
14     long ...
15 A.  Oh, gosh. Can I ask you a question? Am I
16     allowed to ask anybody?
17 Q.  Do you mean ask me a question to clarify
18     or --
19 A.  Can I speak to anybody else at the table or
20     just you?
21 Q.  No, ma'am, just me for now.
22     And let me tell you this. It is
23     perfectly all right if you don't know, it

Page 20

1      is perfectly okay to say that, and we can
2      rely on something else to kind of plug that
3      in for us if we need to.
4      Let me ask you this. Are you having a
5      hard time remembering what course --
6  A.  Yes.
7  Q.  -- you were teaching --
8  A.  Yes.
9  Q.  -- when you left CVCC?
10 A.  Yes. And I'm having a hard time
11     remembering what semester everything was
12     in.
13 Q.  From the records, I believe you left on
14     August 31st, 2005, and that would have been
15     the fall 2005 semester.
16 A.  Okay. Time flies. It don't even seem like
17     I've been gone that long.
18 Q.  But, I mean, assuming we have documents to
19     support that, will you agree that your date
20     of resignation was August 31st, 2005?
21 A.  Yes.
22 Q.  As far as Nursing 251, which I understand
23     was med-surg, can you tell me or describe

June 24, 2007

Deposition of Brenda Bellamy

Page 21

1    to me how Lindy was as far as a student.
2    For example, how was her performance in the
3    class?
4    A. Can you specify performance, exactly what
5    you want?
6    Q. I understand, and I want to make sure this
7    is correct. That class was two
8    components. There was a clinical component
9    and an academic component.
10   A. That's correct.
11   Q. On the academic component, how did she
12   perform in the classroom setting
13   academically on the tests that were given,
14   quizzes that you may have given, things
15   like that?
16   A. She passed the course.
17   Q. Do you remember what her grade was in that
18   course?
19   A. No.
20   Q. Do you remember whether or not she received
21   a C in that course?
22   A. I honestly don't remember.
23   Q. Do you have any -- if you had to describe

Page 22

1    her as far as a student, would you describe
2    her as a weak student or was she strong
3    academically?
4    A. Academically, that's a difficult question
5    because I don't remember what grade she
6    received.
7    Q. A student who receives a C in a course,
8    would you describe that student as weak or
9    strong academically, just in general?
10   A. In general?
11   Q. Yes. If I was a student --
12   A. Average.
13   Q. If I was a student in one of your courses
14   and I received a low to mid C, would you
15   consider me a weak student or an average
16   student?
17   A. If you're referring to the A, B, C scale,
18   that would be considered weak.
19   Q. Do you remember or have any recollection as
20   to how Ms. Wright performed in the clinical
21   setting in your class?
22   A. Yes. I had her in clinical group.
23   Q. How did she perform clinically?

Page 23

1    A. She did very well in clinicals from what I
2    can remember.
3    Q. Did you have her in clinicals for med-surg
4    or was that a different clinical group or
5    different class that you had her in for
6    clinicals?
7    A. No, I think she was in my med-surg
8    clinicals at St. Francis.
9    Q. Do you have any recollection of ever
10   discussing Ms. Wright's performance with
11   Ms. Gunnels and Ms. Peterson?
12   A. Are you referring to her performance in
13   class or performance in clinicals?
14   Q. Her overall performance in your med-surg
15   class or any other class.
16   A. It would be a lot easier to answer it if I
17   had her grades in front of me.
18   Q. I understand. Just based on your best
19   recollection, do you have any recollection
20   of discussing her performance with
21   Ms. Peterson and Ms. Gunnels -- or
22   Ms. Gunnels?
23   A. The only thing I can actually remember is

Page 24

1    we actually discuss -- if we have students
2    that are, you know, borderline, meaning
3    barely passing or whatever, we sit down and
4    discuss ways that we can perhaps, you know,
5    assist these students, you know, like extra
6    credit -- not credit, but extra -- what
7    word am I looking for? We have a separate
8    class where we give them extra instruction,
9    make sure they understand.
10   Q. Like extra --
11   A. I can't think of the word now.
12   Q. Almost like a tutoring session?
13   A. There you go. That's the word I'm looking
14   for, tutoring.
15   Q. Did you ever have any tutoring sessions
16   with Ms. Wright?
17   A. I had study group once a week, and I was
18   trying to think if she attended it. I
19   think she did. I want to say she did, but
20   I'm not sure.
21   Q. Do you remember any of the other students
22   who may have attended that study group?
23   A. Oh, gosh. No.

6 (Pages 21 to 24)

Deposition of Brenda Bellamy

Page 25

1  Q.  Would that have been a study group for the
2      med-surg class, 251?
3  A.  I think so.
4  Q.  And is that something you did for all
5      students or you made available for all
6      students?
7  A.  Yes, it was available to everyone.
8  Q.  Now, you mentioned earlier that you would
9      try to help those students that wanted help
10     through the study groups.  If you had a
11     weak student in a class, did you ever
12     inform Ms. Peterson about those weak
13     students who were kind of borderline?  I
14     believe you said those borderline students
15     earlier.
16         Is that something you would do just out
17     of the regular course as a teacher?  If
18     there was a borderline or weak student,
19     would you let Ms. Peterson know about that
20     student?
21  A.  I'm required to turn in mid semester
22     grades.  At that point, any student that
23     was barely passing or not passing would be

Page 26

1      identified.  But that's part of the
2      protocol.
3  Q.  Ms. Gunnels has previously given a
4      statement in this case, and it is listed as
5      Exhibit 36, and in that, she mentioned a
6      conversation where she, you, and
7      Ms. Peterson have a conversation, and I
8      believe Ms. Gruber was there also.
9         She said:  Ms. Peterson had come and
10     asked if anyone was going to fail, and we
11     said no.  And I believe it was Ms. Bellamy
12     that said Lindy had been close in her
13     course, but that she had -- her grades had
14     come up at the end and she had made a C.
15         Do you remember having any conversation
16     where that was discussed?
17  A.  I don't remember that conversation, but ...
18  Q.  And that would have been in the summer of
19     2005 regarding that course.
20  A.  I don't remember.  I don't actually
21     remember -- honestly remember the
22     conversation.
23         MS. PRICE:  For the record, I was

Page 27

1      reading off page 10 of Exhibit
2      36.
3  Q.  Was that common practice for Ms. Peterson
4      to inquire about students who may not pass
5      or who were close to not passing courses?
6  A.  Well, we had to notify her of anyone --
7      yes, she was always concerned about the
8      students.
9         MR. DUMBUYA:  Brandy, if you may,
10        would it be proper for you to
11        read what Ms. Gunnels said on
12        page number 10?  Maybe that
13        will refresh her memory and
14        maybe she can recognize --
15        MS. PRICE:  I did read part of
16        page 10.  I'm going to ask all
17        the questions I'm going to ask
18        in the deposition.  If there's
19        anything you want to go back
20        and ask ...
21  Q.  Did Ms. Peterson ever tell you to fail a
22      student?
23  A.  No.

Page 28

1  Q.  Do you remember overhearing Ms. Peterson
2      ever tell any instructor to fail a student?
3  A.  No.
4  Q.  Is that something that you would believe
5      Ms. Peterson would say?
6  A.  No.
7  Q.  How long have you known Ms. Peterson?
8  A.  Well, I've known her since I first started
9      teaching there before I moved out of town.
10  Q.  When did you first start teaching at CVCC?
11  A.  It was either '98 or '99, I think, because
12     I moved out of town in 2000.  I moved to
13     Philadelphia.
14  Q.  But then you moved back?
15  A.  Yes.
16  Q.  When did you move back?
17  A.  It will be three years in November -- or
18     four years in November?  Three or four
19     years this November.
20  Q.  When you came back, did you start teaching
21     at CVCC?
22  A.  Yes.
23  Q.  Had you taught at CVCC prior to moving to

Deposition of Brenda Bellamy

Page 29

1       Philadelphia?
2   A.  Yes.
3   Q.  How many years --
4   A.  I'm trying to think if I actually taught
5       classes --
6   Q.  Or was it clinicals?
7   A.  -- or if I was just clinicals prior to or
8       both.
9           I don't even remember if it was -- I
10      know it was at least clinicals I know for
11      sure. I can't remember if it was class
12      also because I started off part-time, and I
13      just -- I don't remember what year I went
14      full-time.
15  Q.  You provided a copy of your -- it looks
16      like your resume or your CV. I assume that
17      all this information details where you were
18      when and when you were at CVCC.
19          According to it, it's got that you
20      were -- it has you there from August 2000
21      to December of 2001 as a classroom and
22      clinical instructor and then later
23      returning to CVCC in January 2005 to August

Page 30

1       2005.
2   A.  That sounds right.
3   Q.  Do you want to look at that and just make
4       sure that you agree with that.
5   A.  I'm terrible on dates. This should be
6       accurate.
7   Q.  Okay.
8           MS. PRICE: Let's mark that
9           Exhibit 38 just for the
10          record, her resume.
11  A.  Okay. Yes, so it was both classroom and
12      clinicals before. That's why I keep that
13      updated.
14          (Defendant's Exhibit 38 was marked
15          for identification.)
16  Q.  Do you know why y'all reported the grades
17      to Ms. Peterson mid semester and at the end
18      of the semester?
19  A.  She's the -- our boss. She's the
20      department head.
21  Q.  Do you know why that information would be
22      important to her as far as students'
23      performance in classes?

Page 31

1   A.  Well, we have to keep her abreast of what's
2       going on in the program.
3   Q.  And that's important to determine how well
4       the students are doing in the courses?
5   A.  Repeat that.
6   Q.  It's important to know how well the
7       students are doing in the courses?
8   A.  Yes, I guess so.
9   Q.  And I would assume as well, it's also
10      important to know in the nursing profession
11      that you're producing competent nurses.
12  A.  That's true.
13  Q.  Would you agree with that?
14  A.  Yes, I would.
15  Q.  I mean, if a student is not performing well
16      clinically or academically, do you believe
17      that would be an indication of how they
18      would perform in the professional
19      atmosphere as a nurse?
20  A.  You're asking my personal opinion?
21  Q.  Yes, ma'am.
22  A.  Not necessarily so.
23  Q.  Please explain what you mean by that.

Page 32

1   A.  If I'm hearing you, what you're asking me
2       is if a student does poorly in school, is
3       that an indication they'll be a poor nurse;
4       is that what you're asking? If they do
5       well in school, does that make them a great
6       nurse; is that what you're asking?
7   Q.  Do you think the performance of a student
8       in school has an effect on how they're
9       going to perform on the boards?
10  A.  On how they're going to perform on the
11      boards?
12  Q.  Yes, ma'am.
13  A.  Well, the boards are an indication of how
14      well you learn the material that you're
15      taught in school.
16  Q.  And additionally, a grading system is there
17      so that you can judge or assess how a
18      student is going to do in their profession
19      ultimately before you send them out into
20      the world to be nurses and take care of
21      people; would you agree with that?
22  A.  Say that again.
23  Q.  Do you agree in the nursing program, you

8 (Pages 29 to 32)

Deposition of Brenda Bellamy

Page 33

1    have grades and you determine a student's
2    performance in the classroom and clinically
3    so that you can determine whether or not
4    they're well-suited to be a nurse
5    professionally; would you agree with that?
6   A.   Yes.
7   Q.   I understand when you left on 8-31 --
8    August 31st, 2005, that the semester had
9    just started. Do you remember that as
10    being correct?
11   A.   That's correct.
12   Q.   And it's my understanding that classes
13    started on August 22nd, 2005.
14   A.   I don't remember the exact date.
15   Q.   The day you left, it's my understanding
16    that classes had been going on for about a
17    week, week and a half. Do you remember
18    that?
19   A.   I'm not sure the exact dates, but that
20    sounds close. Classes hadn't been going on
21    that long.
22   Q.   Had your class met at any point prior to
23    your leaving on August 31st, 2005?

Page 34

1   A.   If classes started on the 22nd and I left
2    on the 31st --
3    Is that what you have recorded?
4   Q.   Yes, ma'am.
5   A.   -- I would have to have had at least one
6    class I would think.
7   Q.   Let me show you Exhibit 24. It's a
8    calendar that we've already marked. It may
9    help with some reference on dates and
10    stuff.
11   A.   Okay.
12   Q.   It's not a school calendar. It's just a
13    general year calendar, but --
14   A.   Okay.
15   Q.   The 31st was on a Wednesday. Classes would
16    have started on Monday, August 22nd.
17   A.   Okay.
18   Q.   So how many times would you have met with
19    your class before you left on the 31st?
20   A.   Classes are generally just -- no, it
21    depends on if it's -- gosh, is it once a
22    week or twice a week.
23   Q.   Do you remember how often your class met?

Page 35

1    I believe that was Nursing 252.
2   A.   I think it was just once. Well, I can say
3    we had to have at least met once, at least.
4   Q.   Do you specifically remember meeting with
5    your class that one time --
6   A.   No.
7   Q.   -- prior to leaving on August 31st?
8   A.   No.
9   Q.   Did you meet with your class on August
10    31st, the day that you resigned?
11   A.   Oh, gosh. No, I don't think I did. I
12    don't think I met with my class on that
13    day.
14   Q.   It's my understanding that you turned in
15    your resignation on August 31st, 2005.
16   A.   Now, that I don't remember the exact date.
17   Q.   Do you remember leaving the school?
18   A.   Yes.
19   Q.   Do you remember if you turned in your
20    resignation on the same day that you left?
21   A.   I don't remember. I would honestly have to
22    look at my resignation letter. I would
23    have to find it and look at it.

Page 36

1   Q.   I have a copy of that, so maybe this will
2    refresh your memory, so ...
3   A.   Thank goodness.
4   Q.   What I'm handing you is a letter. It's
5    from you and it's signed to Dean Lowe dated
6    August 31st, and also a letter from
7    Dr. Blackwell to you dated August 31st.
8    Can you look at those and ...
9   A.   Okay.
10   Q.   Do you remember those?
11   A.   Yes.
12   Q.   Is that the letter that you turned in
13    informing the Chattahoochee Valley
14    Community College that you were resigning?
15   A.   Yes, it is.
16   Q.   And the second document, is that the letter
17    that -- the letter that you received from
18    Dr. Blackwell regarding your resignation?
19   A.   Yes.
20      MS. PRICE: Let's mark those as
21      Exhibit 39.
22      (Defendant's Exhibit 39 was marked
23      for identification.)

Page 37

1    (Brief interruption.)
2  Q.  Just to read a portion of your letter, it
3      says, Dear Dr. Lowe:  I am submitting this
4      letter of resignation to terminate my
5      position as nursing instructor effective
6      immediately.  Some of the reasons, as
7      previously discussed in numerous meetings,
8      are cited as, and then you've got a list.
9          I'd like to ask you first, why did you
10     resign immediately and not give any notice?
11 A.  Could you repeat the question?  I need a
12     minute.
13 Q.  Your letter says that you were turning in
14     your resignation to terminate your position
15     effective immediately.  Why did you turn in
16     your resignation effective immediately
17     without any notice?
18 A.  Well, I stated the reasons in the letter.
19 Q.  I'll go through those.  It says:  Some of
20     the reasons, as previously discussed in
21     numerous meetings, are cited as contract
22     negotiations, salary disputes, and broken
23     verbal promises.

Page 38

1          Tell me what you mean by contract
2      negotiations.
3  A.  I didn't know I was going to be on trial.
4      MS. PRICE:  Let's go off the
5      record for just a second.
6      (Off-the-record discussion.)
7      (The following was read:
8      Question:  I'll go through those.
9          It says:  Some of the reasons,
10         as previously discussed in
11         numerous meetings, are cited
12         as contract negotiations,
13         salary disputes, and broken
14         verbal promises.
15             Tell me what you mean by
16         contract negotiations.)
17 A.  They -- There were just things that were
18     promised that did not surface.  That's the
19     only thing I can remember.
20 Q.  Do you remember any specific promises or
21     any specific thing, things that were
22     promised?
23 A.  I don't actually have a list, but the thing

Page 39

1      that sticks out the most in our mind was
2      bonuses.
3  Q.  What were you promised or -- as far as
4      bonuses were concerned?
5  A.  We were supposed to be getting a $10,000
6      bonus I think it was.
7  Q.  And who had told you that you were going to
8      be getting the $10,000 bonus?
9  A.  Well, I had heard it from several sources:
10     Dr. Lowe, Dr. Blackwell.  Several sources.
11 Q.  Do you remember anyone else that you
12     remember regarding that specific bonus?
13 A.  The only thing I remember is we were
14     promised it.  Several things we were
15     promised never surfaced.
16 Q.  Do you remember any other thing other than
17     bonuses that you feel like you were
18     promised that you didn't get?
19 A.  Oh, gosh.  To be honest, that part I just
20     kind of had tucked that whole part away.
21 Q.  What specifically do you -- do you remember
22     anything specifically about salary
23     disputes?

Page 40

1  A.  No, I just can't off the top of my head.
2  Q.  Does that have something to do with that
3      bonus as well?
4  A.  Does what?
5  Q.  The salary dispute, does part of that
6      encompass the bonus issue?
7  A.  Yes.
8  Q.  Do you remember anything else that would
9      have fallen into the salary dispute
10     category that you were mentioning?
11 A.  I would like to say raises, but I honestly
12     don't remember all the specifics.
13 Q.  I've got another e-mail from you to
14     Dr. Blackwell and Dr. Lowe.  It says
15     Ms. Peterson just gave me the information
16     regarding my verification of employment is
17     the first sentence.
18         Can you look at that and see if that
19     helps you recollect anything about what was
20     going on at the time maybe and what you
21     mean by contract negotiations, salary
22     disputes or the broken verbal promises in
23     your letter.

Deposition of Brenda Bellamy

Page 41

1 A. I remember this letter. This is one of the
2 reasons -- another reason why I resigned.
3 Q. When you say it's one of the reasons, can
4 you tell me what that reason is as is
5 outlined in that letter?
6 A. I was asked to -- this is after I had been
7 working there. I was asked to verify my
8 own employment, and I just felt like it was
9 something I shouldn't handle.
10 Q. Can you explain to me what you mean by
11 verify your employment?
12 A. I was asked to call -- we were all asked to
13 call all of our past employers and get them
14 to write us a letter saying how long we'd
15 worked there as a nurse, whatever, and mail
16 it to us or fax it to us or whatever and
17 then we'd turn it in to Ms. Boone. I just
18 felt like that that wasn't the instructor's
19 function. That wasn't our function.
20 Q. I just want to make sure that I understand
21 this correctly. It's my understanding that
22 that information was necessary so they
23 could determine what pay scale you were on

Page 42

1 because you were paid accordingly to --
2 your year as a nurse would translate over
3 to a year of teaching. Is that your
4 understanding, or do I have that wrong? Is
5 that correct?
6 A. That is correct, but all this transpired --
7 that letter -- after I had been hired on at
8 a certain level.
9 Q. What level had you been hired on as?
10 A. It's in my folder. I can't remember. The
11 items I turned in to you, that letter is in
12 there.
13 Q. Okay. This one, the Employment Experience
14 Verification Form?
15 A. Yes.
16 MS. PRICE: The e-mail from
17 Ms. Bellamy to Dr. Lowe and
18 Dr. Blackwell as Exhibit 40,
19 and we'll attach her
20 employment experience
21 verification form as 41.
22 (Defendant's Exhibits 40 and 41
23 were marked for identification.)

Page 43

1 Q. It says here you were given appropriate
2 number of years of credit for relevant work
3 experience is 18 years.
4 A. Yes.
5 Q. And you were on a salary schedule of D-1;
6 is that right?
7 A. Yes, that's what the letter stated.
8 Yes. Effective January 2005.
9 Q. What about that particular day, August
10 31st, 2005, made you decide to resign? Did
11 anything happen or had you been planning on
12 resigning?
13 A. Yes, I had planned on resigning after -- as
14 the letter stated, after several attempts
15 to resolve some of those issues.
16 Q. When did you decide you were going to
17 resign? How long before you wrote that
18 letter?
19 A. It wasn't very long before I wrote it.
20 Q. And why did you decide? Was there anything
21 that prompted you to turn in your
22 resignation effective immediately that
23 particular day on August 31st, 2005?

Page 44

1 A. I don't remember exactly what, but
2 something happened.
3 Q. You're aware that Ms. Gunnels resigned that
4 same day?
5 A. Yes, I am.
6 Q. In Ms. Gunnels' deposition previously, she
7 mentioned that she was at the school and
8 she had given you a phone call. Do you
9 remember receiving a phone call from her
10 that day?
11 A. Yes, I do.
12 Q. So you weren't at the school when
13 Ms. Gunnels -- Ms. Gunnels called you from
14 the school?
15 A. Yes, but I was en route.
16 Q. And then you came to the school that day?
17 A. Yes.
18 Q. Did something happen once you arrived to
19 make you decide that you were going to turn
20 in your resignation that day, or had you
21 already made up your mind that you were
22 going to resign that day on your way to
23 work or before you got in to work that day?

11 (Pages 41 to 44)

June 24, 2007

Deposition of Brenda Bellamy

Page 45

1  A.  I'm sorry.  I'm a little slow.  I just ...
2  Q.  It's okay.
3  A.  I tried to put all of this behind me.
4  Q.  We'll try to get through it as quick as we
5     can.
6  A.  I loved teaching there.  I miss it.
7        THE WITNESS:  Can I just have a
8        minute?
9        MS. PRICE:  Yeah.  Do you want to
10        take a break for a second?
11        THE WITNESS:  (Nods head up and
12        down.)
13        MS. PRICE:  Why don't we take a
14        little break.  Do you want
15        something to drink?
16        THE WITNESS:  I'm fine.  I just
17        need to step out.
18        (Brief recess was taken.)
19        MS. PRICE:  Let's go back on the
20        record.
21  Q.  Before we took a break, we were talking
22     about your resignation.  Like I said, we'll
23     get through this as quick as we can.  Okay?

Page 46

1  A.  Okay.
2  Q.  The question that we were talking about
3     before you left is, was there something
4     that happened that day, August 31st, 2005,
5     the day that you turned in your resignation
6     that made you decide to resign effective
7     immediately without giving notice?
8  A.  There was something that happened, but I'm
9     just trying to think of what it was.
10     That's the part that ...
11  Q.  Let's go through that day.  You said you
12     were on your way in to work and that you
13     received a call from Ms. Gunnels.
14  A.  (Witness nods head up and down.)
15  Q.  Is that correct?  That's a yes?
16  A.  That's correct.  Yes.
17  Q.  What did you and Ms. Gunnels talk about in
18     that telephone conversation?
19  A.  I can't remember.  Something had just
20     happened at the school.  I'm trying to
21     think of what it was specifically had
22     happened.
23  Q.  Do you remember her mentioning anything

Page 47

1     about a guest speaker or speaking with Dean
2     Lowe in that conversation?
3  A.  I remember our classes that day, there was
4     a guest speaker there.  So it was -- I
5     guess it was expected we weren't going to
6     teach.  I do remember that.
7  Q.  Do you know why there was a guest speaker
8     in your class that day?
9  A.  You know what?  Okay.  I don't remember why
10     there was a guest speaker, but I -- now I
11     remember why Ms. Gunnels called me.
12  Q.  Okay.
13  A.  Because she said she was banned from her
14     class that day, that she was told that she
15     was not allowed in her own classroom.
16  Q.  Okay.
17  A.  I do remember that now.
18  Q.  Is that all she --
19  A.  And that somebody else -- they had someone
20     else taking over her class.
21  Q.  What time was your class that day?  Was it
22     in the afternoon?
23  A.  I'm trying to think.  I don't remember what

Page 48

1     day of the week it was.
2  Q.  That was on -- that's on a Wednesday.
3  A.  Yes, I think mine -- hers was in the
4     morning and mine was in the afternoon, I
5     think.
6  Q.  And it was my understanding from her
7     deposition earlier that she had called in
8     sick for the -- prior to, like prior -- the
9     class periods that she had scheduled
10     earlier in the -- earlier at the beginning
11     of that semester.  Do you remember that,
12     her being sick or calling in sick for any
13     classes?
14  A.  I do remember her calling, yeah, one day.
15     I can remember one day.  I don't remember
16     what day it was.
17  Q.  And she had mentioned something in her
18     deposition that because she had called in
19     sick, a guest speaker had been scheduled
20     for her class, but then she came in.  Do
21     you remember her saying anything about
22     that?
23  A.  The only thing I remember her saying is

12 (Pages 45 to 48)

June 24, 2007

Deposition of Brenda Bellamy

Page 49

1  that she had called in -- I want to say she
2  called in sick one day before that, but the
3  students -- she said the students had told
4  her that they were told that we were both
5  sick, and we weren't. And they were
6  surprised when we showed up at the school.
7  Q.  Had you called in sick anytime before that
8  day during that semester?  And by that,
9  August 31st.
10  A.  No, I don't think so.
11  Q.  You don't have any recollection of you
12  calling in sick?
13  A.  No.  I have perfect attendance in that
14  regard.
15  Q.  When you said Ms. Gunnels called you and
16  told you that she had been banned from her
17  classroom, did she elaborate on this any?
18  A.  No, she just said that she was stopped, I
19  think she said, by Dean Lowe and was told
20  that she was not allowed to enter her
21  classroom.
22  Q.  Do you specifically remember her using the
23  word banned or is that just a word that

Page 50

1  you're using and you're associating with
2  that day?
3  A.  I don't remember honestly if she said
4  banned or not allowed.  I'm not sure which
5  one.
6  Q.  Did she mention anything else regarding any
7  other conversation with Dean Lowe when you
8  talked to her on the telephone?
9  A.  In reference to this?
10  Q.  Yes, ma'am.
11  A.  Nothing that I can remember.
12  Q.  Do you remember if she said anything about
13  her contract in that telephone
14  conversation?
15  A.  I do remember something in regards to her
16  contract, but I can't remember what.  I'm
17  not sure if it wasn't renewed or wasn't
18  something, it wasn't offered.  Something.
19  I can't remember what, the specifics.
20  Q.  You don't remember the specifics?
21  A.  I don't remember specifics.
22  Q.  So you remember her contract being
23  mentioned, but you don't remember

Page 51

1  specifically why it was mentioned; is that
2  correct?
3  A.  Right.
4  Q.  Did she mention anything to you about your
5  contract during that telephone
6  conversation?
7  A.  I don't remember, but I know neither one of
8  us had signed a contract for that semester
9  yet.
10  Q.  You, specifically, why had you not signed a
11  contract yet that semester?
12  A.  Well, a lot of times we start the semester
13  off teaching, and the contracts for
14  whatever reason aren't ready at the
15  beginning sometimes like they should.  So
16  we might be a couple of weeks into the
17  semester and then once they get ready, then
18  we sign it afterwards.
19  Q.  Had you received your contract at that
20  point?
21  A.  You wouldn't by chance have a copy, would
22  you?
23  Q.  That's what I was looking for.  Do you

Page 52

1  remember having received your contract at
2  that point?
3  A.  I don't remember, but I -- I know in the
4  contract -- I think this is the one our
5  bonus was supposed to be included.
6  Q.  And by that bonus, you mean that $10,000?
7  A.  $10,000, and it wasn't.  I remember that.
8  I don't remember if we actually had it
9  without looking at the date.
10  Q.  Now, I know Ms. Gunnels said that she went
11  to her office that day and her contract was
12  in her office.  Do you remember whether or
13  not there was a contract for you when you
14  arrived that day?
15  A.  Her contract was in her office?
16  Q.  That's what she testified earlier.  I was
17  just curious.  Do you remember whether or
18  not your contract was there as well?
19  A.  I don't remember, but when we got -- one --
20  we all got contracts at the same time.
21  Q.  Let me ask you this.  You mentioned that
22  you were contemplating resigning prior to
23  turning in your resignation.  That's

13 (Pages 49 to 52)

June 24, 2007

Deposition of Brenda Bellamy

Page 53

1    correct?
2    A.  That's correct.
3    Q.  Had you spoken to anyone other than your
4        husband, I assume, regarding this
5        contemplation to turn in your resignation
6        prior to doing so?
7    A.  Yes.
8    Q.  Who had you spoken to?
9    A.  Dean Lowe.
10   Q.  Do you remember when you spoke to him?
11   A.  No, I don't remember when.
12   Q.  Was it before that semester started, that
13       fall semester of 2005?
14   A.  Yes.
15   Q.  Let's see.  In your letter to Dr. Lowe, you
16       mentioned -- in your letter of resignation
17       to Dr. Lowe, you mentioned that your
18       decision was made after numerous attempts
19       to resolve these issues and others with
20       administration, but to no avail.
21           Had you actually had opportunities to
22       meet with Dr. Lowe --
23   A.  Yes.

Page 54

1    Q.  -- about anything?
2    A.  Yes.
3    Q.  On how many occasions?
4    A.  I don't remember the exact number, but I
5        know as a minimum I met in his office once,
6        and I know he's been down to the nursing
7        office.  We asked him to come down and met
8        with him at least once.
9    Q.  Ms. Gunnels mentioned a meeting that took
10       place, I believe, on August 26th, 2005,
11       with you, herself, Dr. Blackwell, Dixie,
12       and Dean Lowe where y'all discussed some
13       different issues in the nursing
14       department.  Do you remember that meeting?
15       That would have been right after the
16       beginning of that fall semester.
17   A.  If I'm remembering correctly, it was a
18       meeting we had -- I think it was up on the
19       hill.
20   Q.  Up on the hill, what do you mean?
21   A.  I'm sorry.  In the conference room up on
22       the hill.
23   Q.  You mean in the administration --

Page 55

1    A.  In the administration office.  I'm sorry.
2    Q.  Do you remember what y'all talked about in
3        that meeting?
4    A.  The same issues:  Bonuses ...
5    Q.  The verification of --
6    A.  The verification of employment, I think
7        working hours.  There were other things,
8        too.  I just can't remember everything that
9        was -- that was said, but I know ... I know
10       that the -- it wasn't a successful
11       meeting.  I know that much.
12   Q.  And when you say it wasn't successful, you
13       didn't feel like it was a successful
14       meeting?
15   A.  I don't feel like anything got solved, no.
16   Q.  Now, I know the day that you resigned,
17       Ms. Gunnels had mentioned that your husband
18       came up to the school with you.
19   A.  Yes, that's correct.
20   Q.  Was he there to drop you off or did you ask
21       him to come up with you that day?
22   A.  No, I asked him to come up there to carry
23       my box to be honest.  I think that's why I

Page 56

1    asked him.
2    Q.  So you had decided to resign before you got
3        to the school that day?
4    A.  Yes.
5    Q.  And who did you turn your resignation
6        letter in to?  Do you remember which
7        individual you gave it to or whether or not
8        you put it in someone's mailbox?
9    A.  No, I don't.  I remember taking it to the
10       administration building, but I don't
11       remember who I gave it to.
12   Q.  Do you remember if you gave it to Dr. Lowe
13       or Dr. Blackwell?
14   A.  I'm trying to think if Dr. Blackwell was
15       there that day, but I don't remember giving
16       it to her.
17   Q.  Do you remember seeing Dr. -- I'm sorry.
18       Go ahead.
19   A.  I'm sorry.  I don't think -- I'm trying to
20       think if Dr. Lowe was physically in his
21       office or if his secretary -- if I gave it
22       to him or her to give to him when he
23       returned.  I don't remember which one I

14 (Pages 53 to 56)

June 24, 2007

Deposition of Brenda Bellamy

Page 57

1    gave it to. It was either him or his -- I
2    think -- well, I want to say it was him,
3    but ...
4    Q. But you don't specifically remember?
5    A. No, but my husband was with me.
6    Q. Look, if you remember throughout the course
7       of the deposition at some point, you just
8       let me know. Okay?
9    A. Okay.
10   Q. Do you remember seeing Dr. Lowe down at the
11      nursing department at the time that you
12      came to pick up your stuff and turn in your
13      resignation?
14   A. I think -- yes, I think so. Let me see.
15      When I arrived, the students were
16      outside -- or they came outside. Oh,
17      gosh. Was he standing there? I'm not
18      sure.
19   Q. When you said the students were outside,
20      what do you mean by that?
21   A. I think they had been given a break or
22      something.
23   Q. By outside, you mean they weren't in the

Page 58

1    classroom?
2    A. Right. They were outside the building,
3       because they came rushing over to me.
4    Q. Did you speak to any of them at that time?
5    A. Oh, yes.
6    Q. Did you tell them you were about to resign
7       or --
8    A. Yes.
9    Q. Do you remember? Did you tell any of them
10      about why you were about to resign?
11   A. I don't think I did.
12   Q. Do you remember seeing Dr. Blackwell down
13      at the nursing department that day?
14   A. No, I don't remember seeing her.
15   Q. Earlier I had asked you if you had spoken
16      with anyone regarding your resignation or
17      the contemplation of resignation before you
18      resigned on August 31st, 2005. You said
19      Dean Lowe. Were there any other
20      individuals that you had spoken to
21      regarding your resignation?
22   A. Does my husband count as a person?
23   Q. Other than your husband.

Page 59

1    A. Okay. Okay.
2    Q. Let me ask you this. Did you talk to
3       Ms. Gunnels about --
4    A. That's what I'm trying to think, because we
5       were a close-knit group in the nursing
6       building, all of us. And I'm trying to
7       think if I had actually -- I might have
8       told her, you know. I want to say yes,
9       that I may have told her and Ms. Gruber as
10      well.
11   Q. Other than Gunnels and Gruber, were there
12      any other individuals that you think you
13      might have mentioned this to?
14   A. I'm not sure if I told Ms. Peterson or
15      not. I honestly don't know.
16   Q. Now, Ms. Gunnels resigned that same day.
17   A. (Witness nods head up and down.)
18   Q. That's a yes?
19   A. Yes.
20   Q. Did Ms. Gunnels talk to you prior to that
21      day about her consideration to resign?
22   A. Yes.
23   Q. Do you remember when she first mentioned to

Page 60

1    you that she was contemplating resigning?
2    A. No, I don't remember exactly when.
3    Q. I don't want you to guess, but can you
4       estimate how long before that day she had
5       mentioned that she may be resigning?
6    A. No. To be honest, I don't want to guess
7       and I don't remember, but there were
8       contract issues and all kinds of things,
9       you know, going ...
10   Q. Do you know why Ms. Gunnels was
11      contemplating resigning or why she
12      resigned?
13   A. Basically some of the same issues, the
14      reason I resigned.
15   Q. And by that, the contract negotiations, the
16      bonus issue?
17   A. (Witness nods head up and down.)
18   Q. Is that a yes?
19   A. Yes. I'm sorry. Yes.
20   Q. Some salary issues?
21   A. Yes, the employment verification.
22   Q. Ms. Gunnels, I want to go ahead just so
23      they're part of the record --

15 (Pages 57 to 60)

June 24, 2007

Deposition of Brenda Bellamy

Page 61

1    DR. BLACKWELL: You said Gunnels
2  Q.  I'm sorry, Ms. Bellamy.  I'm so sorry.
3      It's been a long day.
4      I'm going to go ahead and attach the
5    rest of these documents that you gave us
6    today to the deposition so that the
7    plaintiffs have them as well.  And I
8    understand that these are just -- it looks
9    like these are all your different
10   certifications.
11  A.  Certifications.
12  Q.  And your Master of Science in Nursing and
13      your Board of Nursing cards.
14      MS. PRICE:  And I think we are at
15        Exhibit 42, so I'm just going
16        to collectively go ahead and
17        put these in as Exhibit 42.
18        (Defendant's Exhibit 42 was marked
19        for identification.)
20  Q.  Do you remember a student named Arit Umoh?
21  A.  I remember the name, but I never taught
22      her.
23  Q.  I understand from conversations in other

Page 62

1      depositions that she was from Nigeria.  I
2      don't know if that would help your
3      recollection of whether or not you actually
4      met her or taught her.
5  A.  No, I never taught her.  That was while I
6      was gone, meaning when I was living up
7      North.
8  Q.  Do you have any knowledge about her
9      performance as a student?
10  A.  No.
11  Q.  Do you have any knowledge or has anyone
12      told you or mentioned to you that Ms. Umoh
13      failed any courses while attending CVCC?
14  A.  I remember the name, but that was -- I
15      wasn't even teaching there at the time, but
16      that name just rings a bell.
17  Q.  But you couldn't tell me anything
18      specifically about her as a student, could
19      you?
20  A.  No.
21  Q.  And you couldn't tell me anything about her
22      performance, whether or not she failed or
23      passed all her classes, could you?

Page 63

1  A.  No.
2  Q.  And you couldn't tell me anything about any
3      grade appeal process that she may or may
4      not have gone through, could you?
5  A.  I don't know what's going on with her --
6      what went on with her.
7  Q.  So you couldn't tell me anything about her,
8      whether or not she even ever filed a grade
9      appeal or had failed a course; is that
10     correct?
11  A.  Why that name rings a bell?  I don't
12      remember if she filed an appeal, because
13      for some reason that name sticks in my
14      mind.
15  Q.  Do you know for a fact whether or not she
16      filed an appeal?
17  A.  I don't know for a fact, but -- I don't
18      know.  I've just heard her name somewhere.
19  Q.  Even if she had filed an appeal, you
20      couldn't tell us anything about that or
21      about her as a student?
22  A.  No.
23  Q.  Has anyone ever told you that Ms. Wright

Page 64

1      failed two courses and was not allowed to
2      continue in the program at CVCC -- in the
3      ADN program?
4  A.  Failed two courses?
5  Q.  Yes, ma'am.  Were you aware that Ms. Wright
6      had failed two courses in the ADN program?
7  A.  No.  She progressed from my -- the last
8      semester I taught from what I can remember.
9  Q.  But after you left CVCC, do you have any
10     knowledge of how Lindy continued to
11     perform --
12  A.  No.
13  Q.  -- during the rest of her career as a
14     student in the nursing program at CVCC?
15  A.  No.
16  Q.  So you weren't aware that she failed
17     Nursing 252 after you left?
18  A.  No.
19  Q.  And you weren't aware that she failed
20     Nursing 272 after you left?
21  A.  No.
22  Q.  Now, I understand -- did Ms. Wright -- I
23     just want to ask because we've kind of

16 (Pages 61 to 64)

Deposition of Brenda Bellamy

Page 65

1 already talked about this. Ms. Wright
2 never contacted you after you left for any
3 help or any suggestions in any class, did
4 she?
5 A. No. You said help or suggestions in any
6 class?
7 Q. Yeah. Any advice or help as a former
8 faculty member, she never called you for
9 any outside tutorial help or anything like
10 that, did she?
11 A. No.
12 Q. Do you have any understanding of the
13 repercussions or the effect of a student in
14 the nursing program -- the ADN program at
15 CVCC failing two courses?
16 A. Yes.
17 Q. And what is your understanding of that?
18 A. If they fail two courses, it's my
19 understanding they're out of the program.
20 Q. Do you have an understanding of what course
21 forgiveness is?
22 A. No.
23 Q. And by that, you couldn't explain what

Page 66

1 course forgiveness is as applied to CVCC or
2 at CVCC, could you?
3 A. No. Could I ask you what that is?
4 Q. Not right --
5 A. I'm sorry. I'm sorry.
6 Q. It's okay.
7 A. I was just curious.
8 Q. I'm trying to find out what you know and
9 what you can testify to.
10 A. Okay.
11 Q. That's what we're going through right now.
12 A. Okay.
13 Q. Have you ever had to participate in any
14 type of grade appeal while you were
15 teaching at CVCC?
16 A. No.
17 Q. Do you have any knowledge about the grade
18 appeal policy at CVCC?
19 A. The only thing I do know is -- are you
20 referring to if a student fails a class,
21 what happens?
22 Q. Yes, ma'am. If a student fails a class and
23 that student then decides to appeal that

Page 67

1 grade in that class, do you have any
2 knowledge of that policy and procedure at
3 CVCC for that student to appeal a failed
4 course?
5 A. I'm not sure.
6 Q. What do you mean by you're not sure? Is it
7 that you don't understand my question or --
8 A. No. I understand your question, but I
9 think they have to do something in
10 writing. I think they have to put it in
11 writing if I'm not mistaken and it gets
12 turned in to -- I think to Ms. Peterson if
13 I'm not mistaken.
14 Q. Do you know what would happen to that
15 appeal after it was turned in to
16 Ms. Peterson?
17 A. (Shakes head from side to side.)
18 Q. That's a no?
19 A. I don't know who all -- I don't know who
20 all looks at it or what process -- I've
21 never had to participate in that, so I
22 don't know.
23 Q. So you never had a student appeal a failed

Page 68

1 grade in any of your courses at CVCC?
2 A. Not that I know of, no.
3 Q. Do you know any of Ms. Wright's relatives
4 or family members?
5 A. No.
6 Q. Are you familiar with where she's working
7 right now?
8 A. I know where she used to work, but I don't
9 think she works there anymore.
10 Q. Where is the last place that you knew that
11 she worked?
12 A. Doctors Hospital.
13 Q. I've got one more question or a couple more
14 questions about that day that you
15 resigned.
16 After you resigned, did you resign
17 before your class met that day, before you
18 were supposed to go meet your class that
19 day?
20 A. Yes, because I resigned in the morning. I
21 mean, I came in, packed my stuff that
22 morning.
23 Q. Do you know if there was a guest lecturer,

17 (Pages 65 to 68)

June 24, 2007

Deposition of Brenda Bellamy

Page 69

1  someone to fill in for you after you
2  resigned? Do you have any knowledge about
3  that?
4  A. No, I don't.
5  Q. What did you do as far as work or what were
6  your plans to do for work after you
7  resigned?
8  A. Let me think. I was working part-time at
9  Doctors Hospital. I went full-time there
10  in the emergency room which is where I work
11  now.
12  Q. Now, I understand today is your last day of
13  work; is that correct?
14  A. (Shakes head from side to side.)
15  Q. Today is not your last day of work? Did I
16  misunderstand that?
17  A. It's my last day of this session. I work
18  seven on, seven off. This is day seven of
19  12-hour shifts in a row of seven.
20  Q. Okay. So you'll be off for seven days.
21  A. Yes. That's correct.
22  Q. I understand. I thought it was odd. I
23  thought that today was your last day of

Page 70

1  work, so ...
2  A. Oh, no. I love the emergency room.
3  Q. And that's where you work, is in the
4  emergency room?
5  A. Yes.
6  Q. Prior to Ms. Gunnels' resignation, had she
7  mentioned anything to you about accepting
8  or taking a job at Columbus Tech?
9  A. Yes. She was already working there.
10  Q. So she was working at Columbus Tech prior
11  to her resignation at CVCC?
12  A. Yes, part-time.
13  Q. Do you know what she was doing at Columbus
14  Tech prior to her resignation as far as
15  what classes she was teaching or in what
16  capacity she was teaching at Columbus Tech?
17  A. Yes, I believe she was teaching OB and --
18  peds.
19  Q. Do you know when she started teaching at
20  Columbus Tech?
21  A. I don't remember exactly. I know she was
22  there part-time.
23  Q. It was your understanding that she was

Page 71

1  teaching at Columbus Tech and at CVCC at
2  the same time?
3  A. Yes.
4  Q. Do you have any knowledge as far as what
5  the class or the students were told about
6  your resignation the day you resigned, or
7  Ms. Gunnels' resignation for that fact?
8  A. About what they were told as far as us
9  resigning?
10  Q. Yes, ma'am.
11  A. No, I don't know what they were told.
12  Q. After you left that day, did you receive
13  any phone calls from any of the students
14  about your resignation?
15  A. Yes.
16  Q. Do you remember? Did Ms. Wright contact
17  you after your resignation that day?
18  A. I'm not sure if she was one of the students
19  that called me, but I received -- I know
20  several students called me, e-mailed me,
21  asked me to come back.
22  Q. But you don't specifically remember hearing
23  from Ms. Wright?

Page 72

1  A. I don't remember, no. She may have been
2  one of the students, but I just don't
3  remember because there was several of them.
4  Q. Do you know a student named April Gunnels
5  or did you know a student named April
6  Gunnels?
7  A. Yes.
8  Q. And was she one of your students?
9  A. Yes.
10  Q. It's my understanding that she was
11  Ms. Gunnels' daughter-in-law. Did you know
12  that?
13  A. Yes, I did.
14  MS. PRICE: Why don't we take a
15  quick break. Do you mind?
16  THE WITNESS: Okay.
17  (Brief recess was taken.)
18  Q. Let's go back on the record. Do you
19  remember a student named Kim Smith at CVCC?
20  A. Kim Smith?
21  Q. Yes, ma'am.
22  A. The name doesn't ring a bell.
23  Q. It does not ring a bell?

Deposition of Brenda Bellamy

Page 73

1  A. It doesn't. Kim Smith. It doesn't stick
   out in my mind.
2  Q. Okay. Do you remember a student named
3     Elise Sizemore?
4
5  A. Yes, I remember her name.
6  Q. And after you left CVCC on August 31st,
7     2005, do you have any knowledge about
8     Ms. Sizemore's continued performance or --
9  A. No.
10  Q. -- during the nursing program?
11  A. No.
12  Q. So you couldn't tell us anything about any
13    classes she took or any -- any part of her
14    academic or clinical performance at CVCC
15    after you left; is that correct?
16  A. That's correct.
17  Q. Do you remember a student named Shannah
18    Lowe?
19  A. Yes.
20  Q. Can you tell me anything about Shannah
21    Lowe's performance as a student or any of
22    her clinical or academic work after you
23    left CVCC on August 31st, 2005?

Page 74

1  A. No.
2  Q. Ms. Bellamy, I promise. I'm going to try
3     to get through this as quick as I can and
4     cover everything I think we need to cover.
5        Do you remember in the summer of 2005 a
6     faculty senate meeting where there was a
7     survey done regarding various issues at the
8     school?
9  A. Yes.
10  Q. It's my understanding and we've been
11    provided with some documents that there was
12    a number of comments turned in to the
13    faculty senate, and ultimately there was a
14    vote of no confidence issued. Do you
15    remember all that?
16  A. Yes.
17  Q. Did you attend any of those senate meetings
18    about that?
19  A. Yes.
20  Q. Can you tell me what you remember about
21    that in particular, just about the senate
22    meeting and kind of what progressed as far
23    as how that occurred and how that came

Page 75

1     about?
2  A. About the meeting itself?
3  Q. Yes, ma'am.
4  A. Basically, the faculty -- we all met and
5     discussed issues that different departments
6     were having and -- with administration. At
7     the end, it came to a vote. Basically to
8     sum it up, it just came to a vote.
9  Q. And you were a member of the faculty. Were
10    you a member of the faculty senate at that
11    time?
12  A. No, not of the senate itself, no.
13  Q. I'm going to give you what's been
14    previously marked as Defendant's Exhibit
15    27. In here is the senate survey and then
16    there are some responses that we have been
17    provided.
18       Can you look through these and see if
19    you believe that any of these would be the
20    response, if you gave a response, to the
21    senate survey, if any of these are the
22    response that you gave?
23  A. I could tell you which ones are mine?

Page 76

1  Q. Flipping through that, if you can tell. If
2     you can't tell, that's all right. I'm just
3     curious if any of those responses to the
4     senate survey were yours. I think there
5     are four or five in there total, so ...
6  A. I can't remember which of these comments
7     are mine, if any.
8  Q. Okay.
9  A. Honestly, I just -- gosh, I remember
10    reading them all, though. I just don't
11    remember which ones are mine.
12  Q. You said you remember reading them all.
13    When did you see those before, or did you
14    see anyone else's comments?
15  A. Some of them -- we got -- well, they
16    posted, seems like, a summary. Maybe this
17    was it. There was a summary.
18  Q. I don't want you to guess if one of those
19    are yours. I just wanted to know if you
20    knew definitely if one of those was yours
21    or not.
22  A. Honestly, I don't know.
23  Q. Now, let me ask you this. You mentioned

June 24, 2007

Deposition of Brenda Bellamy

Page 77

1     that there was a summary posted. Who
2     posted the summary?
3   A.  I don't know. There was something posted.
4     I think it was just to let us know what the
5     final -- what the ultimate decision was
6     from the vote, but I don't see it here.
7   Q.  And when you mentioned -- when you said
8     they posted, do you mean the faculty senate
9     posted the summary?
10   A.  I think that's who sent it out, if I'm not
11     mistaken, because it was just -- it was a
12     summary of what the -- you know, what the
13     faculty decision -- what the decision was.
14   Q.  Okay.
15   A.  I think it was just to let everyone know
16     how the vote went.
17   Q.  Okay. Well, thank you.
18     I know earlier we were talking about
19     Dixie Peterson and any comments that she
20     had made about a student. Have you ever
21     heard her say anything negative regarding
22     Lindy Wright?
23   A.  No.

Page 78

1   Q.  Do you remember ever hearing her say
2     anything negative or detrimental to any
3     nursing student at CVCC?
4   A.  No.
5   Q.  I'm going to show you what we've previously
6     marked as Exhibit 37.
7     (Brief interruption.)
8   Q.  I just want to go through all these
9     documents and make sure that we've gotten
10     everything that you may or may not have.
11     Okay?
12   A.  Okay.
13   Q.  We asked that you bring any and all e-mail,
14     correspondence, any notes or memos that you
15     had to or from anybody that worked at
16     CVCC. Did you have any of that at home?
17   A.  No.
18   Q.  That would include -- Did you have any
19     notes or anything about anyone at CVCC,
20     even if it was not directed to them or if
21     it did not come from them?
22   A.  No.
23   Q.  Do you know who Lynn Harris is?

Page 79

1   A.  No.
2   Q.  Do you know who Tawyna Cash is?
3   A.  No.
4   Q.  Have you ever heard those names before?
5   A.  The Tawyna name is an odd name. Seems like
6     I've heard it somewhere, but I don't
7     remember in what capacity.
8   Q.  You don't know why that name is familiar to
9     you?
10   A.  No.
11   Q.  Did you know that Lynn Harris taught at
12     CVCC and still teaches at CVCC?
13   A.  Okay.
14   Q.  Did you know that?
15   A.  I don't know all of the faculty.
16   Q.  And you've brought all the information that
17     you would have regarding your employment at
18     CVCC; is that correct?
19   A.  Yes, because -- what other information did
20     you need?
21   Q.  Like copies of any application materials or
22     any letters that you have to CVCC about
23     your employment there, about any salary

Page 80

1     issues, anything like that, any
2     correspondence regarding your employment at
3     CVCC or anything that related to your
4     employment at CVCC.
5   A.  Even the application itself? Is that what
6     you're asking?
7   Q.  Yes, ma'am.
8   A.  I might have a copy of the application.
9   Q.  All right.
10   A.  I can go home and look.
11   Q.  Let me ask you this. I might have a copy
12     of that. Let me see.
13     Let's go through this. I've got some
14     of your application materials. Let me hand
15     you this stuff. It looks like a lot of
16     this is repeated. Look through that. That
17     looks like it was application materials
18     from both stints that you had at CVCC.
19   A.  Okay.
20   Q.  If you'll just look through that and
21     confirm it.
22   A.  This is definitely my writing. Yeah, these
23     are all in my handwriting.

Deposition of Brenda Bellamy

**Page 81**

1 Q. Okay. And the rest of these documents are
2 just documents about your employment there
3 as far as contracts and verification of
4 employment. If you'll flip through that
5 and just make sure all that -- just look at
6 those very quickly as well.
7 A. Okay.
8 Q. Let's put all our application materials in
9 as our next exhibit, which is 43.
10 (Defendant's Exhibit 43 was marked
11 for identification.)
12 Q. I'm going back through the document request
13 that we sent you. Do you have any copies
14 of any course or clinical work or anything
15 that Lindy Wright did as part of any of
16 your classes while you were teaching her at
17 CVCC?
18 A. No. All of that is school property.
19 Q. Okay. And you haven't received any
20 correspondence -- we talked about this
21 earlier. You haven't communicated or
22 received any correspondence from any
23 attorney or anyone in any capacity

**Page 82**

1 representing Ms. Wright; is that correct?
2 A. That's correct.
3 Q. Request number 13 was asking for any
4 documents, memos, recording or anything
5 that might relate to any student at CVCC
6 receiving special consideration or
7 treatment while they were a student at
8 CVCC. Do you have any documents that would
9 reflect that?
10 A. No.
11 Q. Do you have any knowledge of any student
12 ever receiving special treatment while at
13 CVCC?
14 A. No.
15 Q. The request for number 14 was any documents
16 that contain or have information in them
17 regarding any nursing student's grade or
18 grades being changed when they complained
19 about their grades at CVCC. Do you have
20 any documents that would reflect anything
21 like that?
22 A. No.
23 Q. Do you know of that ever happening?

**Page 83**

1 A. No.
2 Q. Do you have any correspondence to or from
3 anyone at the Alabama Department of
4 Postsecondary Education regarding your
5 employment at CVCC or while -- that was
6 written to you or that you wrote to the
7 Alabama Department of Postsecondary
8 Education while you were employed at CVCC?
9 A. I don't have it, but I saw a letter in that
10 packet.
11 Q. In what you just reviewed?
12 A. Yes.
13 Q. Regarding your employment as far as salary
14 and being hired at CVCC?
15 A. I don't have a copy, but I saw one in
16 there.
17 Q. Okay. Do you have any correspondence from
18 you or to you -- from you or to you
19 regarding the National League for Nursing
20 Accreditation, the NLNAC, regarding any
21 faculty member at CVCC, any policies at
22 CVCC?
23 A. No.

**Page 84**

1 Q. Do you have any documents regarding any
2 course or clinical work of Ms. Wright for
3 Nursing 252, 271, 272 or Nursing 200?
4 A. No.
5 Q. And you've never reviewed any materials
6 like that for Ms. Wright; is that correct?
7 A. What do you mean by reviewed?
8 Q. You've never -- Ms. Wright has never given
9 you any materials from any of her courses
10 to review; is that correct?
11 A. Correct.
12 Q. In Ms. Gurnels' deposition, she mentioned
13 visiting the chancellor, Mr. Johnson.
14 A. Yes.
15 Q. Did you attend that meeting with her?
16 A. Yes.
17 Q. What was the purpose of that meeting?
18 A. Some of the -- in the previous letter, some
19 of the unresolved issues in my letter of
20 resignation, we decided -- Ms. Gunnels and
21 I decided to go up there and see
22 Mr. Johnson about that.
23 Q. Who had the idea initially to go see

June 24, 2007

Deposition of Brenda Bellamy

Page 85

1    Mr. Johnson? Was that you or Ms. Gunnels?
2    A. I don't remember which one of us did.
3    Q. Did you actually get to see Mr. Johnson?
4    A. Yes.
5    Q. You got to discuss your concerns with him?
6    A. Yes. It was Ms. Gunnels, myself, and my
7       husband went as an uninterested party and
8       the driver.
9    Q. Did he sit in the meeting with y'all?
10   A. Yes, he did.
11   Q. Was there any resolution at that meeting?
12   A. No.
13   Q. Did you ever hear back from the chancellor
14      regarding that meeting or regarding your
15      concerns?
16   A. We didn't hear back from him directly. We
17      heard through the faculty counsel, who also
18      I believe made a visit up there, that
19      nothing was going to be resolved.
20   Q. Did you mention to anyone -- Strike that.
21      Other than Ms. Gunnels and your
22      husband, did anyone else know that you were
23      taking that trip to see Mr. Johnson?

Page 86

1    A. Yes.
2    Q. Who was that?
3    A. I think Ms. Gruber knew.
4    Q. Do you remember anyone else?
5    A. But she was -- I think she was sick or
6       something and couldn't go. Something
7       personal and she couldn't go.
8    Q. Do you believe she had contemplated going
9       with y'all up there?
10   A. Yes.
11   Q. Had she expressed interest in wanting to go
12      with y'all up there?
13   A. Yes, I think -- yes.
14   Q. Did you ever receive any correspondence
15      personally from the chancellor regarding
16      any of the issues that were expressed in
17      your resignation letter or through the
18      faculty senate?
19   A. No.
20   Q. Just for the record, I wanted to get a
21      little bit of brief background information
22      from you, just for our benefit and
23      information.

Page 87

1    Can you state your current address
2    right now.
3    A. 2700 Double Churches Road, Apartment 338.
4    Q. In what city is that?
5    A. Columbus, Georgia 31909.
6    Q. And what's your phone number there?
7    A. 706-317-2391.
8    Q. Just to be clear on the record, where are
9       you currently employed?
10   A. Doctors Hospital, emergency room.
11   Q. It's my understanding you work seven on,
12      seven off.
13   A. Yes, basically, it's ...
14   Q. And you're in the emergency room?
15   A. Yes.
16   Q. Your husband's name, what is that?
17   A. David. His whole name?
18   Q. David Bellamy?
19   A. His middle name, too?
20   Q. Yes, ma'am.
21   A. David Douglas Bellamy, Jr.
22   Q. Are you from this area?
23   A. No.

Page 88

1    Q. Where did you grow up?
2    A. I actually grew up in St. Louis mostly, but
3       I'm from Indianapolis, Indiana.
4    Q. When did you first move to this area? By
5       this, I mean the Phenix City, Columbus,
6       Georgia area.
7    A. I came to Fort Benning in September 1990.
8    Q. Were you in the military?
9    A. Yes, I was.
10   Q. How long were you in the military?
11   A. A total of 11 and a half years.
12   Q. So you've been in this area for quite some
13      time?
14   A. Yes.
15   Q. Do you have any relatives in this area?
16   A. Yes.
17   Q. Who are your relatives in this area?
18   A. My daughters. They came here with me.
19      They were young then, younger.
20   Q. Are any of them married?
21   A. Yes.
22   Q. Can you give me your daughters' names?
23   A. The whole name or just the first and last?

22 (Pages 85 to 88)

Page 89

1 Q. Let me ask you this. Do your daughters
2    live in Alabama or Georgia?
3 A. Georgia.
4 Q. None of them live in Alabama?
5 A. No.
6 Q. Do you have any relatives that live in
7    Alabama?
8 A. No.
9 Q. Does your husband have any relatives that
10    live in Alabama?
11 A. That's a difficult question.
12 Q. Is it difficult because there are a lot of
13    relatives that he has that live here or --
14 A. No, it's difficult because he knows that he
15    does, but he doesn't know who they are on
16    his dad's side of the family.
17 Q. So he would have some relatives with the
18    last name Bellamy in Alabama; is that
19    correct?
20 A. Yes, but he doesn't know who they are.
21 Q. Do you know as far as last names of any
22    other relatives that he -- any relatives at
23    all that he might have that live in

Page 90

1    Alabama?
2 A. No.
3 Q. Other than Bellamy, that's it?
4 A. Yes.
5 Q. There was one other student I wanted to
6    mention and ask you. Do you have any
7    knowledge of a student named Corolla Rambo?
8 A. Yes.
9 Q. Would you be able to tell me anything or
10    tell anyone anything about her performance
11    or her class work as a student after you
12    left CVCC on August 31st, 2005?
13 A. No.
14 Q. Ms. Bellamy, I think right now I don't have
15    any more questions. I don't know if
16    Mr. Dumbuya does, but I'll reserve to ask
17    additional questions if necessary after he
18    asks questions if he's planning on it.
19    MR. DUMBUYA: I don't have any
20    questions. I think she's
21    already answered them.
22 Q. Because this is in federal court and you've
23    given a deposition, there is an opportunity

Page 91

1    once Ms. Nix gets the deposition printed up
2    for you to read over the deposition and
3    sign off that you've read the deposition
4    and that nothing has been misstated or
5    spelled incorrectly, you know.
6    Would you like the opportunity to do
7    that or would you want to waive that
8    opportunity? And you'll have 30 days to do
9    it if you want to.
10 A. I'd rather have that opportunity to go over
11    it.

      (Deposition concluded at 5:40 p.m.
      EDT.)

      * * * * * * * * * * * *
      FURTHER DEPONENT SAITH NOT
      * * * * * * * * * * * *

Page 92

1    REPORTER'S CERTIFICATE
2 STATE OF ALABAMA:
3 MONTGOMERY COUNTY:
4    I, Lisa J. Nix, Registered Professional
5 Reporter and Commissioner for the State of Alabama
6 at Large, do hereby certify that I reported the
7 deposition of:
8    BRENDA BELLAMY
9 who was first duly sworn by me to speak the truth,
10 the whole truth and nothing but the truth, in the
11 matter of:
12    LINDY G. WRIGHT,
13    Plaintiff,
14    Vs.
15 CHATTAHOOCHEE VALLEY COMMUNITY
16    COLLEGE (CVCC),
17    Et al.,
18    Defendants.
19    In The U.S. District Court
20    For the Middle District of Alabama
21    Eastern Division
22    Case Number 3:06-CV-1087-WKW
23 on Tuesday, July 24, 2007.

June 24, 2007

Deposition of Brenda Bellamy

Page 93

1    The foregoing 92 computer printed pages
2  contain a true and correct transcript of the
3  examination of said witness by counsel for the
4  parties set out herein.  The reading and signing of
5  same is hereby not waived.
6    I further certify that I am neither of kin
7  nor of counsel to the parties to said cause nor in
8  any manner interested in the results thereof.
9    This 30th day of July 2007.
10
11    _____
12    Lisa J. Nix, Registered
      Professional Reporter and
      Commissioner for the State
13    of Alabama at Large
14
15
16
17
18
19
20
21
22
23

Page 94

1
2
3    I, Brenda Bellamy, hereby certify that
4  I have read the foregoing transcript of my
5  deposition given on Tuesday, July 24, 2007, and it
6  is a true and correct transcript of the testimony
7  given by me at the time and place stated with the
8  corrections, if any, and the reasons therefor noted
9  on a separate sheet of paper and attached hereto.
10
11
12
13    _____
      Brenda Bellamy
14
15
16
17    SWORN TO AND SUBSCRIBED before me this
18  _____ day of _____, 20__.
19
20
21    _____
      NOTARY PUBLIC
22
23

24 (Pages 93 to 94)

June 24, 2007

Deposition of Brenda Bellamy

Page 1

---
**A**

**able** 90:9
**about** 5:17 6:4 7:7 8:11
  9:9,14 10:3,4,21
  11:23 13:1,7 14:20
  14:23 15:5,6 19:12
  25:12,19 27:4,7
  33:16 39:22 40:19
  43:9 45:22 46:2,17
  47:1 48:21 50:12
  51:4 54:1 55:2 58:6
  58:10,10 59:3,21
  62:8,18,21 63:2,7,20
  63:21 65:1 66:17
  68:14 69:2 70:7 71:5
  71:8,14 73:7,12,20
  74:18,20,21 75:1,2
  77:18,20 78:19 79:22
  79:23 81:2,20 82:19
  84:22 90:10
**abreast** 31:1
**academic** 21:9,11
  73:14,22
**academically** 21:13
  22:3,4,9 31:16
**accepting** 70:7
**according** 7:4 29:19
**accordingly** 42:1
**Accreditation** 83:20
**accurate** 30:6
**acquaintance** 16:4,5
**action** 1:7 9:21
**actually** 23:23 24:1
  26:20 29:4 38:23
  52:8 53:21 59:7 62:3
  85:3 88:2
**additional** 90:17
**additionally** 6:8 32:16
**address** 87:1
**administration** 53:20
  54:23 55:1 56:10
  75:6
**ADN** 17:21 18:4 64:3,6
  65:14
**advice** 65:7
**after** 5:8 14:21 18:19
  41:6 42:7 43:13,14
  53:18 54:15 64:9,17
  64:20 65:2 67:15
  68:16 69:1,6 71:12
  71:17 73:6,15,22
  90:11,17
**afternoon** 47:22 48:4
**afterwards** 51:18
**again** 32:22
**against** 7:11,21 8:2
**agree** 20:19 30:4 31:13
  32:21,23 33:5
**agreed** 4:2,16,23
**agreement** 1:15

**ahead** 6:12 7:20 56:18
  60:22 61:4,16
**al** 1:9 2:5,11 92:17
**Alabama** 1:2,17,19 4:8
  83:3,7 89:2,4,7,10,18
  90:1 92:2,5,20 93:13
**allowed** 19:16 47:15
  49:20 50:4 64:1
**Almost** 24:12
**already** 34:8 44:21
  65:1 70:9 90:21
**always** 27:7
**another** 40:13 41:2
**answer** 6:7,9 23:16
**answered** 90:21
**anybody** 19:16,19
  78:15
**anymore** 68:9
**anyone** 9:23 10:3,10,16
  11:8 14:17 26:10
  27:6 39:11 53:3
  58:16 62:11 63:23
  76:14 78:19 81:23
  83:3 85:20,22 86:4
  90:10
**anything** 7:7 13:1
  16:16 27:19 39:22
  40:8,19 43:11,20
  46:23 48:21 50:6,12
  51:4 54:1 55:15
  62:17,21 63:2,7,20
  65:9 70:7 73:12,20
  77:21 78:2,19 80:1,3
  81:14 82:4,20 90:9
  90:10
**anytime** 49:7
**Apartment** 87:3
**appeal** 63:3,9,12,16,19
  66:14,18,23 67:3,15
  67:23
**appear** 6:15
**APPEARANCES** 2:1
**application** 3:14 79:21
  80:5,8,14,17 81:8
**applied** 66:1
**appropriate** 43:1
**approximately** 1:20
**April** 72:4,5
**area** 87:22 88:4,6,12,15
  88:17
**Arit** 61:20
**around** 9:5
**arrived** 44:18 52:14
  57:15
**arriving** 15:3
**asked** 16:11 26:10 41:6
  41:7,12,12 54:7
  55:22 56:1 58:15
  71:21 78:13
**asking** 31:20 32:1,4,6

**80:6** 82:3
**asks** 90:18
**assess** 32:17
**assist** 24:5
**associating** 50:1
**assume** 6:8 10:12 29:16
  31:9 53:4
**assuming** 20:18
**atmosphere** 31:19
**attach** 42:19 61:4
**attached** 94:9
**attempts** 43:14 53:18
**attend** 74:17 84:15
**attendance** 49:13
**attended** 12:18 24:18
  24:22
**attending** 13:3,8,22
  14:2 62:13
**attorney** 2:4 8:11,14
  81:23
**Attorneys** 2:9
**August** 12:6 19:10
  20:14,20 29:20,23
  33:8,13,23 34:16
  35:7,9,15 36:6,7 43:9
  43:23 46:4 49:9
  54:10 58:18 73:6,23
  90:12
**avail** 53:20
**available** 25:5,7
**average** 22:12,15
**aware** 44:3 64:5,16,19
**away** 39:20

---
**B**

**B** 22:17
**back** 27:19 28:14,16,20
  45:19 71:21 72:18
  81:12 85:13,16
**background** 86:21
**banned** 47:13 49:16,23
  50:4
**barely** 24:3 25:23
**based** 23:18
**basically** 13:19 60:13
  75:4,7 87:13
**before** 1:15 4:6 5:19
  14:11,11 15:11 18:18
  18:19,20 28:9 30:12
  32:19 34:19 43:17,19
  44:23 45:21 46:3
  49:2,7 53:12 56:2
  58:17 60:4 68:17,17
  76:13 79:4 94:17
**beginning** 48:10 51:15
  54:16
**behalf** 8:15
**behind** 45:3
**being** 11:9 15:5 33:10
  48:12 50:22 82:18

**83:14**
**believe** 12:5 18:14 19:9
  20:13 25:14 26:8,11
  28:4 31:16 35:1
  54:10 70:17 75:19
  85:18 86:8
**bell** 62:16 63:11 72:22
  72:23
**Bellamy** 1:14 2:19 3:5
  3:6,7,8,11,14 4:4 5:7
  5:13,16 26:11 42:17
  61:2 74:2 87:18,21
  89:18 90:3,14 92:8
  94:3,13
**benefit** 86:22
**Benning** 88:7
**best** 23:18
**between** 4:3,17 5:1
**bit** 86:21
**Blackwell** 2:13 3:7,8
  7:23 8:2 36:7,18
  39:10 40:14 42:18
  54:11 56:13,14 58:12
  61:1
**Board** 61:13
**boards** 32:9,11,13
**bonus** 39:6,8,12 40:3,6
  52:5,6 60:16
**bonuses** 39:2,4,17 55:4
**books** 16:15
**Boone** 41:17
**borderline** 24:2 25:13
  25:14,18
**boss** 30:19
**both** 15:16 29:8 30:11
  49:4 80:18
**box** 2:5 55:23
**Brandy** 2:8 5:13 27:9
**break** 45:10,14,21
  57:21 72:15
**Brenda** 1:14 2:19 3:5,6
  3:6,8,11,14 4:4 5:7
  5:16 92:8 94:3,13
**brief** 13:14,19 37:1
  45:18 72:17 78:7
  86:21
**bring** 78:13
**broken** 37:22 38:13
  40:22
**brought** 6:19 10:9
  79:16
**building** 56:10 58:2
  59:6

---
**C**

**C** 21:21 22:7,14,17
  26:14
**calendar** 34:8,12,13
**call** 8:20,20 10:18,21
  12:1,11 41:12,13

**44:8,9** 46:13
**called** 9:7,9 12:8 44:13
  47:11 48:7,18 49:1,2
  49:7,15 65:8 71:19
  71:20
**calling** 48:12,14 49:12
**calls** 71:13
**came** 28:20 44:16
  48:20 55:18 57:12,16
  58:3 68:21 74:23
  75:7,8 88:7,18
**capacity** 70:16 79:7
  81:23
**cards** 3:11 61:13
**care** 32:20
**career** 64:13
**Carmichael** 2:10
**carry** 55:22
**case** 4:18,20 6:18 8:22
  9:17 11:1,4,10,15,22
  11:23 12:21,22 17:4
  17:8 26:4 92:22
**Cash** 79:2
**category** 40:10
**cause** 93:7
**certain** 42:8
**CERTIFICATE** 92:1
**certification** 3:11,12
**certifications** 61:10,11
**certify** 92:6 93:6 94:3
**chance** 51:21
**chancellor** 84:13 85:13
  86:15
**changed** 82:18
**Chattahoochee** 1:8
  7:11,21 36:13 92:15
**Churches** 87:3
**cited** 37:8,21 38:11
**city** 1:19 2:5 87:4 88:5
**Civil** 1:7 4:5
**clarify** 19:17
**class** 18:12,16,20 19:7
  21:3,7 22:21 23:5,13
  23:15,15 24:8 25:2
  25:11 29:11 33:22
  34:6,19,23 35:5,9,12
  47:8,14,20,21 48:9
  48:20 65:3,6 66:20
  66:22 67:1 68:17,18
  71:5 90:11
**classes** 29:5 30:23
  33:12,16,20 34:1,15
  34:20 47:3 48:13
  62:23 70:15 73:13
  81:16
**classroom** 21:12 29:21
  30:11 33:2 47:15
  49:17,21 58:1
**clear** 87:8
**clinical** 21:8 22:20,22

23:4 29:22 73:14,22
81:14 84:2
**clinically** 22:23 31:16
33:2
**clinicals** 23:1,3,6,8,13
29:6,7,10 30:12
**close** 16:3 26:12 27:5
33:20
**close-knit** 59:5
**collectively** 61:16
**College** 1:8 7:12,22
36:14 92:16
**Columbus** 70:8,10,13
70:16,20 71:1 87:5
88:5
**come** 10:8,13 26:9,14
54:7 55:21,22 71:21
78:21
**commencing** 1:20
**comments** 74:2 76:6
76:14 77:19
**commission** 4:9
**Commissioner** 1:17 4:7
92:5 93:12
**common** 27:3
**communicated** 81:21
**community** 1:8 7:12,22
12:15 36:14 92:15
**competent** 31:11
**complained** 82:18
**component** 21:8,9,11
**components** 21:8
**Composite** 3:10,13
**computer** 93:1
**concerned** 27:7 39:4
**concerns** 85:5,15
**concluded** 91:12
**conference** 1:18 54:21
**confidence** 74:14
**confirm** 80:21
**Connie** 14:14
**consider** 16:2 22:15
**consideration** 59:21
82:6
**considered** 11:16 22:18
**consisting** 3:11,13
**contact** 71:16
**contacted** 8:10,14,17
9:10,15 65:2
**contacting** 11:6
**contain** 82:16 93:2
**contemplated** 86:8
**contemplating** 52:22
60:1,11
**contemplation** 53:5
58:17
**continue** 64:2
**continued** 64:10 73:8
**contract** 37:21 38:1,12
38:16 40:21 50:13,16

50:22 51:5,8,11,19
52:1,4,11,13,15,18
60:8,15
**contracts** 51:13 52:20
81:3
**conversation** 13:11
26:6,7,15,17,22
46:18 47:2 50:7,14
51:6
**conversations** 61:23
**Cooley** 14:5,6,7
**Cooper** 14:14
**copies** 79:21 81:13
**copy** 3:12 29:15 36:1
51:21 80:8,11 83:15
**Corolla** 90:7
**correct** 6:20,21 7:3,15
19:2,3,10 21:7,10
33:10,11 42:5,6
46:15,16 51:2 53:1,2
55:19 63:10 69:13,21
73:15,16 79:18 82:1
82:2 84:6,10,11
89:19 93:2 94:6
**corrections** 94:8
**correctly** 41:21 54:17
**correspondence** 78:14
80:2 81:20,22 83:2
83:17 86:14
**counsel** 4:3,17 8:10
85:17 93:3,7
**count** 58:22
**COUNTY** 92:3
**couple** 51:16 68:13
**course** 18:6 20:5 21:16
21:18,21 22:7 25:17
26:13,19 57:6 63:9
65:20 66:1 67:4
81:14 84:2
**courses** 17:15 22:13
27:5 31:4,7 62:13
64:1,4,6 65:15,18
68:1 84:9
**court** 1:1 5:19 11:1,15
90:22 92:19
**cover** 74:4,4
**credit** 24:6,6 43:2
**curious** 52:17 66:7
76:3
**current** 87:1
**currently** 87:9
**CV** 29:16
**CVCC** 1:8 12:5,13 13:2
13:3,8,22 14:2 15:11
18:1 20:9 28:10,21
28:23 29:18,23 62:13
64:2,9,14 65:15 66:1
66:2,15,18 67:3 68:1
70:11 71:1 72:19
73:6,14,23 78:3,16

78:19 79:12,12,18,22
80:3,4,18 81:17 82:5
82:8,13,19 83:5,8,14
83:21,22 90:12 92:16

---

**D**

**dad's** 89:16
**date** 12:5 20:19 33:14
35:16 52:9
**dated** 36:5,7
**dates** 18:17 30:5 33:19
34:9
**daughters** 88:18,21
89:1
**daughter-in-law** 72:11
**David** 87:17,18,21
**day** 12:8 33:15 35:10
35:13,20 43:9,23
44:4,10,16,20,22,23
46:4,5,11 47:3,8,14
47:21 48:1,14,15,16
49:2,8 50:2 52:11,14
55:16,21 56:3,15
58:13 59:16,21 60:4
61:3 68:14,17,19
69:12,15,17,18,23
71:6,12,17 93:9
94:18
**days** 69:20 91:8
**Dean** 36:5 47:1 49:19
50:7 53:9 54:12
58:19
**Dear** 37:3
**December** 29:21
**decide** 43:10,16,20
44:19 46:6
**decided** 56:2 84:20,21
**decides** 66:23
**decision** 53:18 77:5,13
77:13
**DEFENDANT** 2:7
**Defendants** 1:10 92:18
**Defendant's** 3:4 30:14
36:22 42:22 61:18
75:14 81:10
**definitely** 9:13 76:20
80:22
**degree** 18:1
**department** 30:20
54:14 57:11 58:13
83:3,7
**departments** 75:5
**depends** 34:21
**DEPONENT** 91:20
**deposed** 15:5
**deposition** 1:14 4:4,6
4:13,18 5:2,18 6:15
6:23 7:13 10:4,21
11:6,8 14:20 15:4
16:7,8 27:18 44:6

48:7,18 57:7 61:6
84:12 90:23 91:1,2,3
91:12 92:7 94:5
**depositions** 15:1 62:1
**describe** 20:23 21:23
22:1,8
**details** 9:10,18 13:7
29:17
**determine** 31:3 33:1,3
41:23
**detrimental** 78:2
**different** 23:4,5 54:13
61:9 75:5
**difficult** 22:4 89:11,12
89:14
**directed** 78:20
**directly** 85:16
**discuss** 24:1,4 85:5
**discussed** 26:16 37:7
37:20 38:10 54:12
75:5
**discussing** 23:10,20
**discussion** 38:6
**dispute** 40:5,9
**disputes** 37:22 38:13
39:23 40:22
**District** 1:1,2 92:19,20
**Division** 1:3 92:21
**Dixie** 2:14 7:22 54:11
77:19
**Doctors** 18:19,21 68:12
69:9 87:10
**document** 36:16 81:12
**documents** 3:10,14
6:17,19 16:11,20
20:18 61:5 74:11
78:9 81:1,2 82:4,8,15
82:20 84:1
**doing** 31:4,7 53:6 70:13
**done** 74:7
**Double** 87:3
**Douglas** 87:21
**down** 5:20 6:1,6 9:6
24:3 45:12 46:14
54:6,7 57:10 58:12
59:17 60:17
**Dr** 2:13 3:6 7:23,23 8:2
8:2 36:7,18 37:3
39:10,10 40:14,14
42:17,18 53:15,17,22
54:11 56:12,13,14,17
56:20 57:10 58:12
61:1
**drink** 45:15
**driver** 85:8
**drop** 55:20
**duly** 5:8 92:9
**Dumbuya** 2:4 14:10
27:9 90:16,19
**during** 49:8 51:5 64:13

48:7,18 57:7 61:6
*(see above)*
**depositions** 15:1 62:1

73:10
**D-1** 43:5

---

**E**

**each** 15:15
**earlier** 25:8,15 48:7,10
48:10 52:16 58:15
77:18 81:21
**easier** 23:16
**Eastern** 1:3 92:21
**EDT** 1:21 91:13
**Education** 83:4,8
**effect** 12:23 32:8 65:13
**effective** 37:5,15,16
43:8,22 46:6
**either** 4:14,20 28:11
57:1
**elaborate** 13:5 49:17
**Elise** 73:4
**else's** 76:14
**emergency** 69:10 70:2
70:4 87:10,14
**employed** 83:8 87:9
**employer** 10:15
**employers** 10:12 41:13
**employment** 3:9 40:16
41:8,11 42:13,20
55:6 60:21 79:17,23
80:2,4 81:2,4 83:5,13
**en** 44:15
**encompass** 40:6
**end** 26:14 30:17 75:7
**enter** 49:20
**estimate** 60:4
**et** 1:9 92:17
**even** 12:22 20:16 29:9
62:15 63:8,19 78:20
80:5
**event** 9:5
**ever** 8:9 14:1,4,10,13
18:15 23:9 24:15
25:11 27:21 28:2
63:8,23 66:13 77:20
78:1 79:4 82:12,23
85:13 86:14
**everyone** 25:7 77:15
**everything** 5:20 20:11
55:8 74:4 78:10
**evidence** 4:13
**exact** 33:14,19 35:16
54:4
**exactly** 15:10 21:4 44:1
60:2 70:21
**examination** 2:18 5:11
93:3
**example** 21:2
**exhibit** 3:2,4,10,13
26:5 27:1 30:9,14
34:7 36:21,22 42:18
61:15,17,18 75:14

78:6 81:9,10
exhibits 6:23 42:22
expected 47:5
experience 3:9 42:13
   42:20 43:3
explain 31:23 41:10
   65:23
explained 5:19
expressed 86:11,16
extra 24:5,6,8,10
e-mail 3:8 40:13 42:16
   78:13
e-mailed 71:20

**F**

F 2:8
fact 9:15 13:2 63:15,17
   71:7
faculty 65:8 74:6,13
   75:4,9,10 77:8,13
   79:15 83:21 85:17
   86:18
fail 26:10 27:21 28:2
   65:18
failed 62:13,22 63:9
   64:1,4,6,16,19 67:3
   67:23
failing 65:15
fails 66:20,22
fall 19:8 20:15 53:13
   54:16
fallen 40:9
familiar 68:6 79:8
family 68:4 89:16
far 9:20 13:10 16:6
   20:22 21:1 22:1
   30:22 39:3 69:5
   70:14 71:4,8 74:22
   81:3 83:13 89:21
fax 41:16
federal 4:5 90:22
feel 39:17 55:13,15
felt 41:8,18
filed 7:2,8,10,18,21 8:1
   63:8,12,16,19
files 16:19
filing 4:18,22
fill 69:1
final 77:5
find 35:23 66:8
fine 19:13 45:16
first 5:8 7:17 9:19
   11:12,20 14:1 18:12
   18:15 28:8,10 37:9
   40:17 59:23 88:4,23
   92:9
five 76:5
flies 20:16
flip 81:4
Flipping 76:1

floor 13:16
folder 6:18 42:10
following 38:7
follows 5:10
foregoing 93:1 94:4
forgiveness 65:21 66:1
form 3:9 4:10 42:14,21
formality 4:9
former 65:7
Fort 88:7
four 28:18,18 76:5
Francis 15:16 18:23
   23:8
friend 16:3
friends 15:7
from 3:6,7,8 12:3,12
   18:21 20:13 23:1
   29:20 36:5,6,17 39:9
   40:13 42:16 44:9,13
   46:13 47:13 48:6
   49:16 61:23 62:1
   64:7,8 67:17 69:14
   71:13,23 77:6 78:15
   78:21 80:18 81:22
   83:2,17,18 84:9
   85:13,16 86:15,22
   87:22 88:3
front 23:17
full 5:15
full-time 29:14 69:9
function 12:17 41:19
   41:19
further 4:16,23 91:20
   93:6

**G**

G 1:5 92:12
gave 6:17 40:15 56:7
   56:11,12,21 57:1
   61:5 75:20,22
general 7:1 22:9,10
   34:13
generally 34:20
gentleman 14:9
Georgia 87:5 88:6 89:2
   89:3
gets 67:11 91:1
getting 39:5,8
GILLILAND 2:8
give 6:7 11:22 13:7
   24:8 37:10 56:22
   75:13 88:22
given 21:13,14 26:3
   43:1 44:8 57:21 84:8
   90:23 94:5,7
giving 8:11 10:4,4
   11:18 46:7 56:15
go 6:12,22 7:20 16:14
   24:13 27:19 37:19
   38:4,8 45:19 46:11

56:18 60:22 61:4,16
68:18 72:18 78:8
80:10,13 84:21,23
86:6,7,11 91:10
goes 11:1,15
going 5:20 6:8,13 9:11
   9:20 10:19 11:7,21
   26:10 27:16,17 31:2
   32:9,10,18 33:16,20
   38:3 39:7 40:20
   43:16 44:19,22 47:5
   60:9 61:4,15 63:5
   66:11 74:2 75:13
   78:5 81:12 85:19
   86:8
gone 20:17 62:6 63:4
good 17:1
goodness 36:3
gosh 13:18 19:15 24:23
   34:21 35:11 39:19
   57:17 76:9
gotten 78:9
grade 21:17 22:5 63:3
   63:8 66:14,17 67:1
   68:1 82:17
grades 23:17 25:22
   26:13 30:16 33:1
   82:18,19
grading 32:16
great 32:5
grew 88:2
group 22:22 23:4 24:17
   24:22 25:1 59:5
groups 25:10
grow 88:1
Gruber 26:8 59:9,11
   86:3
guess 31:8 47:5 60:3,6
   76:18
guest 47:1,4,7,10 48:19
   68:23
Gunnels 14:19 15:5,7,9
   15:18 16:3 23:11,21
   23:22 26:3 27:11
   44:3,6,13,13 46:13
   46:17 47:11 49:15
   52:10 54:9 55:17
   59:3,11,16,20 60:10
   60:22 61:1 70:6 71:7
   72:4,6,11 84:12,20
   85:1,6,21

**H**

half 33:17 88:11
hand 80:14
handing 36:4
handle 41:9
handwriting 80:23
happen 43:11 44:18
   67:14

happened 44:2 46:4,8
   46:20,22
happening 82:23
happens 66:21
hard 20:5,10
Harris 78:23 79:11
having 5:8 20:4,10
   26:15 52:1 75:6
head 6:1,5,6 30:20 40:1
   45:11 46:14 59:17
   60:17 67:17 69:14
hear 85:13,16
heard 14:1 39:9 63:18
   77:21 79:4,6 85:17
hearing 12:12 32:1
   71:22 78:1
help 9:6 25:9,9 34:9
   62:2 65:3,5,7,9
helps 40:19
her 11:6 12:16,19 13:1
   13:12,15 14:20,20,23
   15:6,11,20,23 17:14
   18:1,3,12,18,20 19:1
   21:2,17 22:1,2,22
   23:3,5,12,14,17,20
   26:12,13 27:6,13
   28:8 30:10,22 31:1
   42:19 44:9 46:23
   47:13,15,20 48:6,12
   48:14,17,20,21,23
   49:4,16,20,22 50:8
   50:13,15,22 52:11,11
   52:12,15,15 56:16,22
   58:14 59:8,9,21
   61:22 62:4,4,5,8,18
   62:21,23 63:5,6,7,18
   63:21 64:13 70:11,14
   73:5,13,22 77:21
   78:1 81:16 84:9,15
   90:10,11
hereto 4:21 5:1 94:9
herself 54:11
hi 12:22,22
HIGGINS 2:9
Highway 1:19
hill 54:19,20,22
him 10:8 14:10,11
   53:10 54:7,8 55:21
   55:22 56:1,22,22
   57:1,2 85:5,16
hired 42:7,9 83:14
HITSON 2:9
HOLTSFORD 2:8
home 12:17 78:16 80:10
honest 39:19 55:23
   60:6
honestly 15:10 18:11
   21:22 26:21 35:21
   40:11 50:3 59:15
   76:9,22

Hospital 68:12 69:9
   87:10
hours 55:7
husband 10:8,15 53:4
   55:17 57:5 58:22,23
   85:7,22 89:9
husband's 87:16

**I**

idea 13:9,10 17:6,9
   84:23
identification 30:15
   36:23 42:23 61:19
   81:11
identified 26:1
immediately 37:6,10
   37:15,16 43:22 46:7
important 30:22 31:3,6
   31:10
include 16:9 78:18
included 52:5
including 11:3
incorrectly 91:5
INDEX 2:18 3:2
Indiana 88:3
Indianapolis 88:3
indication 31:17 32:3
   32:13
individual 56:7
individuals 58:20
   59:12
inform 25:12
informally 5:14
information 29:17
   30:21 40:15 41:22
   79:16,19 82:16 86:21
   86:23
informing 36:13
initially 84:23
inkling 17:6,9
Inn 1:18
inquire 27:4
instruction 24:8
instructor 28:2 29:22
   37:5
instructors 17:14
instructor's 41:18
interest 86:11
interested 93:8
interruption 37:1 78:7
introduced 4:19
issue 40:6 60:16
issued 74:14
issues 43:15 53:19
   54:13 55:4 60:8,13
   60:20 74:7 75:5 80:1
   84:19 86:16
items 42:11

**J**

June 24, 2007

Deposition of Brenda Bellamy

Page 4

**J** 1:16 4:6 92:4 93:11
**James** 3:6,8 7:23
**January** 29:23 43:8
**Jennifer** 14:4,6
**job** 70:8
**Johnson** 84:13,22 85:1
85:3,23
**Jr** 87:21
**judge** 32:17
**July** 1:20 92:23 93:9
94:5
**just** 6:12 7:1 9:14 12:21
13:14,19 14:19 17:10
17:18 19:20,21 22:9
23:18 25:16 29:7,13
30:3,9 33:9 34:12,20
35:2 37:2 38:5,17
39:19 40:1,15 41:8
41:17,20 45:1,7,16
46:9,19 49:18,23
52:17 55:8 57:7
60:22 61:8,15 62:16
63:18 64:23 66:7
72:2 74:21 75:8 76:2
76:9,10,19 77:4,11
77:15 78:8 80:20
81:2,5,5 83:11 86:20
86:22 87:8 88:23

**K**
**keep** 30:12 31:1
**Kim** 72:19,20 73:1
**kin** 93:6
**kind** 8:12 16:7 20:2
25:13 39:20 64:23
74:22
**kinds** 60:8
**knew** 7:17 9:19 11:12
11:20,23 15:11 18:18
18:20 68:10 76:20
86:3
**know** 5:17,22 7:1,10
8:1 10:18 12:15 14:8
14:12,19 15:12,15
19:13,23 24:2,4,5
25:19 29:10,10 30:16
30:21 31:6,10 38:3
47:7,9 51:7 52:3,10
54:5,6 55:9,9,11,16
57:8 59:8,15 60:9,10
62:2 63:5,15,17,18
66:8,19 67:14,19,19
67:22 68:2,3,8,23
70:13,19,21 71:11,19
72:4,5,11 76:19,22
77:3,4,12,15,18
78:23 79:2,8,11,14
79:15 82:23 85:22
89:15,20,21 90:15
91:5

**knowledge** 17:2 62:8
62:11 64:10 66:17
67:2 69:2 71:4 73:7
82:11 90:7
**known** 15:9 28:7,8
**knows** 89:14

**L**
**label** 6:23
**labeled** 6:18
**lady** 14:13
**Large** 1:17 4:8 92:6
93:13
**last** 9:3 15:17 64:7
68:10 69:12,15,17,23
88:23 89:18,21
**later** 29:22
**Laurel** 2:13 3:7,8 7:23
**Law** 2:4,9
**lawsuit** 7:2,8,11,18,21
8:2 10:1 14:17
**League** 83:19
**learn** 32:14
**least** 29:10 34:5 35:3,3
54:8
**leaving** 33:23 35:7,17
**lecturer** 68:23
**left** 12:5,9,13,19 14:19
14:21 20:9,13 33:7
33:15 34:1,19 35:20
46:3 64:9,17,20 65:2
71:12 73:6,15,23
90:12
**legal** 9:21
**length** 13:11
**let** 5:22 7:20 10:18 11:2
16:2 19:22 20:4
25:19 34:7 52:21
57:8,14 59:2 69:8
76:23 77:4,15 80:11
80:12,14 89:1
**letter** 3:6,6 35:22 36:4
36:6,12,16,17 37:2,4
37:13,18 40:23 41:1
41:5,14 42:7,11 43:7
43:14,18 53:15,16
56:6 83:9 84:18,19
86:17
**letters** 79:22
**Let's** 30:8 36:20 38:4
45:19 46:11 53:15
72:18 80:13 81:8
**level** 42:8,9
**license** 3:12
**like** 16:16 20:16 21:15
24:5,10,12 29:16
37:9 39:17 40:11
41:8,18 45:22 48:8
51:15 55:13,15 61:9
65:9 76:16 79:5,21

80:1,15,17 82:21
84:6 91:6
**Limited** 1:18
**Lindy** 1:5 14:16 21:1
26:12 64:10 77:22
81:15 92:12
**Lisa** 1:15 4:6 92:4
93:11
**list** 8:6 10:19 37:8
38:23
**listed** 11:2,9,13 17:3,7
17:11 26:4
**litigation** 9:20
**little** 45:1,14 86:21
**live** 89:2,4,6,10,13,23
**living** 62:6
**long** 13:10 15:9,11,19
19:14 20:17 28:7
33:21 41:14 43:17,19
60:4 61:3 88:10
**longer** 13:3,8,21 14:2
**look** 16:16 30:3 35:22
35:23 36:8 40:18
57:6 75:18 80:10,16
80:20 81:5
**looking** 24:7,13 51:23
52:9
**looks** 29:15 61:8 67:20
80:15,17
**lot** 23:16 51:12 80:15
89:12
**Louis** 88:2
**Louise** 5:16
**love** 70:2
**loved** 45:6
**low** 22:14
**Lowe** 3:6,8 7:23 8:2
36:5 37:3 39:10
40:14 42:17 47:2
49:19 50:7 53:9,15
53:17,22 54:12 56:12
56:20 57:10 58:19
73:18
**Lowe's** 73:21
**LPN** 18:1
**Lynn** 78:23 79:11

**M**
**made** 4:11 25:5 26:14
43:10 44:21 46:6
53:18 77:20 85:18
**mail** 41:15
**mailbox** 56:8
**make** 6:6 21:6 24:9
30:3 32:5 41:20
44:19 78:9 81:5
**manner** 4:20 93:8
**many** 29:3 34:18 54:3
**MAR** 3:3
**mark** 30:8 36:20

**marked** 30:14 34:8
36:22 42:23 61:18
75:14 78:6 81:10
**married** 88:20
**Master** 3:11 61:12
**material** 32:11
**materials** 16:15,17
79:21 80:14,17 81:8
84:5,9
**matter** 8:7 11:13 92:11
**may** 4:6,11,13,19 9:6,7
12:18 21:14 24:22
27:4,9 34:8 59:9 60:5
63:3,7 72:1 78:10,10
**maybe** 27:12,14 36:1
40:20 76:16
**ma'am** 11:2,16 13:17
19:21 31:21 32:12
34:4 50:10 64:5
66:22 71:10 72:21
75:3 80:7 87:20
**mean** 7:16 10:23 11:1
12:1 16:14 17:9
19:17 20:18 31:15,23
38:1,15 40:21 41:10
52:6 54:20,23 57:20
57:23 67:6 68:21
77:8 84:7 88:5
**meaning** 11:14 24:2
62:6
**med-surg** 17:22 18:8
20:23 23:3,7,14 25:2
**meet** 35:9 53:22 68:18
**meeting** 35:4 54:9,14
54:18 55:3,11,14
74:6,22 75:2 84:15
84:17 85:9,11,14
**meetings** 37:7,21 38:11
74:17
**member** 65:8 75:9,10
83:21
**members** 68:4
**memory** 19:11 27:13
36:2
**memos** 78:14 82:4
**mention** 13:1,20 50:6
51:4 85:20 90:6
**mentioned** 10:1 13:21
25:8 26:5 44:7 48:17
50:23 51:1 52:21
53:16,17 54:9 55:17
59:13,23 60:5 62:12
70:7 76:23 77:7
84:12
**mentioning** 40:10
46:23
**met** 5:14 14:10 18:15
33:22 34:18,23 35:3
35:12 54:5,7 62:4
68:17 75:4

**mid** 22:14 25:21 30:17
**middle** 1:2 87:19 92:20
**might** 8:21 9:9,15
51:16 59:7,13 80:8
80:11 82:5 89:23
**military** 88:8,10
**mind** 39:1 44:21 63:14
72:15 73:2
**mine** 48:3,4 75:23 76:7
76:11
**minimum** 54:5
**minute** 37:12 45:8
**miss** 45:6
**misstated** 91:4
**mistaken** 67:11,13
77:11
**misunderstand** 69:16
**Monday** 34:16
**Montgomery** 2:11 92:3
**month** 9:3
**more** 16:3 68:13,13
90:15
**morning** 48:4 68:20,22
**most** 39:1
**mostly** 88:2
**move** 28:16 88:4
**moved** 28:9,12,12,14
**moving** 28:23
**much** 55:11
**myself** 85:6

**N**
**name** 5:13,15 61:21
62:14,16 63:11,13,18
72:22 73:5 79:5,5,8
87:16,17,19 88:23
89:18
**named** 14:13 61:20
72:4,5,19 73:3,17
90:7
**names** 79:4 88:22
89:21
**narrow** 9:6
**National** 83:19
**necessarily** 31:22
**necessary** 41:22 90:17
**need** 4:11 19:12 20:3
37:11 45:17 74:4
79:20
**negative** 77:21 78:2
**negotiations** 37:22 38:2
38:12,16 40:21 60:15
**neither** 51:7 93:6
**never** 39:15 61:21 62:5
65:2,8 67:21,23 84:5
84:8,8
**next** 81:9
**Nigeria** 62:1
**Nix** 1:16 2:8 4:6 91:1
92:4 93:11

NLNAC 83:20
nodding 6:5
nods 6:1,6 45:11 46:14
   59:17 60:17
None 89:4
North 1:19 62:7
NOTARY 94:21
noted 94:8
notes 78:14,19
nothing 5:10 12:21
   50:11 85:19 91:4
   92:10
notice 37:10,17 46:7
notify 27:6
November 28:17,18,19
number 11:3 15:13
   27:12 43:2 54:4
   74:12 82:3,15 87:6
   92:22
numerous 37:7,21
   38:11 53:18
nurse 31:19 32:3,6 33:4
   41:15 42:2
nurses 31:11 32:20
nursing 3:12,12 12:15
   12:17 16:15 17:17,17
   18:6 19:1 20:22
   31:10 32:23 35:1
   37:5 54:6,13 57:11
   58:13 59:5 61:12,13
   64:14,17,20 65:14
   73:10 78:3 82:17
   83:19 84:3,3

O

OB 70:17
objections 4:9,10
occasion 13:12
occasions 54:3
occurred 74:23
odd 69:22 79:5
off 5:14 6:12 27:1
   29:12 38:4 40:1
   51:13 55:20 69:18,20
   87:12 91:3
offered 4:13 50:18
office 2:5 52:11,12,15
   54:5,7 55:1 56:21
Off-the-record 38:6
often 34:23
Oh 13:18 15:6 19:15
   24:23 35:11 39:19
   57:16 58:5 70:2
okay 5:23 11:19 20:1
   20:16 30:7,11 34:11
   34:14,17 36:9 42:13
   45:2,23 46:1 47:9,12
   47:16 57:8,9 59:1,1
   66:6,10,12 69:20
   72:16 73:3 76:8

77:14,17 78:11,12
   79:13 80:19 81:1,7
   81:19 83:17
once 12:19 24:17 34:21
   35:2,3 44:18 51:17
   54:5,8 91:1
one 5:22 6:4 17:14
   22:13 34:5 35:5 41:1
   41:3 42:13 48:14,15
   49:2 50:5 51:7 52:4
   52:19 56:23 68:13
   71:18 72:2,8 76:18
   76:20 83:15 85:2
   90:5
ones 75:23 76:11
only 11:23 12:4,12,14
   23:23 38:19 39:13
   48:23 66:19
opinion 31:20
opportunities 53:21
opportunity 90:23 91:6
   91:8,10
other 4:10,14,20 9:23
   10:15 12:8 14:16
   15:15 16:11,19,20
   23:15 24:21 39:16,16
   50:7 53:3 55:7 58:19
   58:23 59:11,12 61:23
   79:19 85:21 89:22
   90:3,5
others 53:19
out 6:13 25:16 28:9,12
   32:19 39:1 45:17
   65:19 66:8 73:2
   77:10 93:4
outlined 41:5
outside 57:16,16,19,23
   58:2 65:9
over 42:2 47:20 58:3
   91:2,10
overall 23:14
overhearing 28:1
own 41:8 47:15

P

packed 68:21
packet 83:10
page 27:1,12,16
pages 93:1
paid 42:1
paper 94:9
part 26:1 27:15 39:19
   39:20 40:5 46:10
   60:23 73:13 81:15
participate 66:13 67:21
particular 43:9,23
   74:21
parties 4:3,17 5:1 93:4
   93:7
party 4:14,20 85:7

part-time 29:12 69:8
   70:12,22
pass 27:4
passed 21:16 62:23
passing 13:14,19 24:3
   25:23,23 27:5
past 41:13
pay 41:23
peds 70:18
people 11:3 32:21
perfect 49:13
perfectly 19:23 20:1
perform 21:12 22:23
   31:18 32:9,10 64:11
performance 21:2,4
   23:10,12,13,14,20
   30:23 32:7 33:2 62:9
   62:22 73:8,14,21
   90:10
performed 22:20
performing 31:15
perhaps 24:4
period 9:7
periods 48:9
person 58:22
personal 31:20 86:7
personally 86:15
Peter 2:4 14:10
Peterson 2:14 7:22 8:3
   23:11,21 25:12,19
   26:7,9 27:3,21 28:1,5
   28:7 30:17 40:15
   59:14 67:12,16 77:19
Phenix 1:19 2:5 88:5
Philadelphia 28:13
   29:1
phone 12:11 44:8,9
   71:13 87:6
physically 56:20
pick 57:12
place 54:10 68:10 94:7
Plaintiff 1:6 2:3 92:13
plaintiffs 61:7
planned 43:13
planning 43:11 90:18
plans 69:6
please 5:22 6:6 31:23
plug 20:2
point 10:20 11:5 12:7
   25:22 33:22 51:20
   52:2 57:7
policies 83:21
policy 66:18 67:2
poor 32:3
poorly 32:2
portion 37:2
position 37:5,14
possible 11:4
possibly 11:21
Post 2:5

posted 76:16 77:1,2,3,8
   77:9
Postsecondary 83:4,7
practice 27:3
preparation 16:6,8,17
preparing 16:11
PRESENT 2:12
previous 11:5 84:18
previously 26:3 37:7
   37:20 38:10 44:6
   75:14 78:5
Price 2:8,20 5:12,13
   26:23 27:15 30:8
   36:20 38:4 42:16
   45:9,13,19 61:14
   72:14
printed 91:1 93:1
prior 8:9,17 10:20,20
   14:23 15:3,18 28:23
   29:7 33:22 35:7 48:8
   48:8 52:22 53:6
   59:20 70:6,10,14
procedure 4:5 67:2
process 63:3 67:20
produced 3:10
producing 31:11
profession 31:10 32:18
professional 1:16 4:7
   31:18 92:4 93:12
professionally 33:5
program 18:4 31:2
   32:23 64:2,3,6,14
   65:14,14,19 73:10
progressed 64:7 74:22
promise 74:2
promised 38:18,22
   39:3,14,15,18
promises 37:23 38:14
   38:20 40:22
prompted 43:21
proper 27:10
property 81:18
protocol 5:18 26:2
provided 4:14,21 29:15
   74:11 75:17
PUBLIC 94:21
purpose 4:14 84:17
pursuant 1:15 4:4 6:20
put 45:3 56:8 61:17
   67:10 81:8
p.m 1:21 91:12

Q

question 4:11 6:9,10
   17:1 19:15,17 22:4
   37:11 38:8 46:2 67:7
   67:8 68:13 89:11
questions 4:10 5:22
   27:17 68:14 90:15,17
   90:18,20

quick 13:18 45:4,23
   72:15 74:3
quickly 81:6
quite 88:12
quizzes 21:14

R

raises 40:11
Ramada 1:18
Rambo 90:7
ran 13:15
rather 91:10
read 27:11,15 37:2
   38:7 91:2,3 94:4
reading 27:1 76:10,12
   93:4
ready 51:14,17
real 13:13
reason 41:2,4 51:14
   60:14 63:13
reasons 37:6,18,20
   38:9 41:2,3 94:8
receive 71:12 86:14
received 6:14 7:13,14
   10:21 21:20 22:6,14
   36:17 46:13 51:19
   52:1 71:19 81:19,22
receives 22:7
receiving 18:1 44:9
   82:6,12
recess 45:18 72:17
recognize 27:14
recollect 40:19
recollection 22:19 23:9
   23:19,19 49:11 62:3
record 5:14,15 26:23
   30:10 38:5 45:20
   60:23 72:18 86:20
   87:8
recorded 34:3
recording 82:4
records 20:13
reference 34:9 50:9
referring 13:15 22:17
   23:12 66:20
reflect 82:9,20
refresh 27:13 36:2
regard 49:14
regarding 14:17 26:19
   36:18 39:12 40:16
   50:6 53:4 58:16,21
   74:7 77:21 79:17
   80:2 82:17 83:4,13
   83:19,20 84:1 85:14
   85:14 86:15
regardless 4:21
regards 50:15
Registered 1:16 4:7
   92:4 93:11
regular 25:17

Deposition of Brenda Bellamy

June 24, 2007

Page 6

relate 82:5
related 80:3
relatives 68:3 88:15,17
  89:6,9,13,17,22,22
relevant 16:21 43:2
rely 20:2
remember 9:1,4,5
  12:10,12,14 15:10
  17:20 18:11,17 21:17
  21:20,22 22:5,19
  23:2,23 24:21 26:15
  26:17,20,21,21 28:1
  29:9,11,13 33:9,14
  33:17 34:23 35:4,16
  35:17,19,21 36:10
  38:19,20 39:11,12,13
  39:16,21 40:8,12
  41:1 42:10 44:1,9
  46:19,23 47:3,6,9,11
  47:17,23 48:11,14,15
  48:15,21,23 49:22
  50:3,11,12,15,16,19
  50:20,21,22,23 51:7
  52:1,3,7,8,12,17,19
  53:10,11 54:4,14
  55:2,8 56:6,9,11,12
  56:15,17,23 57:4,6
  57:10 58:9,12,14
  59:23 60:2,7 61:20
  61:21 62:14 63:12
  64:8 70:21 71:16,22
  72:1,3,19 73:3,5,17
  74:5,15,20 76:6,9,11
  76:12 78:1 79:7 85:2
  86:4
remembering 20:5,11
  54:17
renewed 50:17
repeat 15:2 31:5 37:11
repeated 80:16
repercussions 65:13
reported 30:16 92:6
reporter 1:16 4:7 5:19
  92:5 93:12
REPORTER'S 92:1
representing 4:3,17
  82:1
request 81:12 82:3,15
requested 16:22
required 25:21
reserve 90:16
reserved 4:12
resign 37:10 43:10,17
  44:22 46:6 56:2 58:6
  58:10 59:21 68:16
resignation 20:20
  35:15,20,22 36:18
  37:4,14,16 43:22
  44:20 45:22 46:5
  52:23 53:5,16 56:5

57:13 58:16,17,21
  70:6,11,14 71:6,7,14
  71:17 84:20 86:17
resigned 19:5,9 35:10
  41:2 44:3 55:16
  58:18 59:16 60:12,14
  68:15,16,20 69:2,7
  71:6
resigning 36:14 43:12
  43:13 52:22 60:1,5
  60:11 71:9
resolution 85:11
resolve 43:15 53:19
resolved 85:19
response 75:20,20,22
responses 75:16 76:3
rest 61:5 64:13 81:1
results 93:8
resume 3:5 29:16 30:10
returned 56:23
returning 29:23
review 84:10
reviewed 83:11 84:5,7
right 6:10 11:16,17
  14:9 19:23 30:2 43:6
  51:3 54:15 58:2 66:4
  66:11 68:7 76:2 80:9
  87:2 90:14
ring 72:22,23
rings 62:16 63:11
Road 2:10 87:3
room 1:18 14:19 54:21
  69:10 70:2,4 87:10
  87:14
route 44:15
row 69:19
Rules 4:5
ruling 4:12
run 12:16
rushing 58:3

                S
SAITH 91:20
salary 37:22 38:13
  39:22 40:5,9,21 43:5
  60:20 79:23 83:13
same 4:22 35:20 44:4
  52:20 55:4 59:16
  60:13 71:2 93:5
saw 83:9,15
saying 41:14 48:21,23
says 37:3,13,19 38:9
  40:14 43:1
scale 22:17 41:23
schedule 43:5
scheduled 15:1 48:9,19
scheduling 11:5
school 12:19 32:2,5,8
  32:15 34:12 35:17
  44:7,12,14,16 46:20

49:6 55:18 56:3 74:8
  81:18
Science 3:11 61:12
second 36:16 38:5
  45:10
secretary 56:21
see 12:19 40:18 53:15
  57:14 75:18 76:13,14
  77:6 80:12 84:21,23
  85:3,23
seeing 56:17 57:10
  58:12,14
seem 20:16
seems 76:16 79:5
semester 19:5,7,8,9
  20:11,15 25:21 30:17
  30:18 33:8 48:11
  49:8 51:8,11,12,17
  53:12,13 54:16 64:8
senate 74:6,13,17,21
  75:10,12,15,21 76:4
  77:8 86:18
send 32:19
sent 77:10 81:13
sentence 40:17
separate 24:7 94:9
September 88:7
session 24:12 69:17
sessions 24:15
set 93:4
setting 21:12 22:21
seven 69:18,18,18,19
  69:20 87:11,12
several 39:9,10,14
  43:14 71:20 72:3
Shakes 67:17 69:14
Shannah 73:17,20
sheet 94:9
shifts 69:19
short 13:13
show 6:13 34:7 78:5
showed 49:6
sick 48:8,12,12,19 49:2
  49:5,7,12 86:5
side 67:17,17 69:14,14
  89:16
sign 51:18 91:3
signature 5:2
signed 36:5 51:8,10
signing 93:4
since 12:5,13,19 28:8
sit 24:3 85:9
sitting 11:17 14:9
situation 13:2
Sizemore 73:4
Sizemore's 73:8
slow 45:1
small 12:16 17:10,12
Smith 72:19,20 73:1
solved 55:15

some 5:17 34:9 37:6,19
  38:9 43:15 54:12
  57:7 60:13,20 63:13
  74:11 75:16 76:15
  80:13 84:18,18 88:12
  89:17
somebody 47:19
someone 47:19 69:1
someone's 56:8
something 9:9,20 20:2
  25:4,16 28:4 40:2
  41:9 44:2,18 45:15
  46:3,8,19 48:17
  50:15,18,18 57:22
  67:9 77:3 86:6,6
sometime 9:12
sometimes 51:15
somewhere 63:18 79:6
soon 11:8
sorry 12:2 45:1 54:21
  55:1 56:17,19 60:19
  61:2,2 66:5,5
sounds 30:2 33:20
sources 39:9,10
speak 5:9 14:20 19:19
  58:4 92:9
speaker 47:1,4,7,10
  48:19
speaking 47:1
special 82:6,12
specific 38:20,21 39:12
specifically 35:4 39:21
  39:22 46:21 49:22
  51:1,10 57:4 62:18
  71:22
specifics 40:12 50:19
  50:20,21
specify 21:4
spelled 91:5
spoke 15:17 53:10
spoken 12:6 14:4,11,13
  14:16 15:4,20,23
  53:3,8 58:15,20
St 15:16 18:23 23:8
  88:2
standing 57:17
start 6:12 28:10,20
  51:12
started 18:4,20 28:8
  29:12 33:9,13 34:1
  34:16 53:12 70:19
state 1:17 4:8 5:15 87:1
  92:2,5 93:12
stated 37:18 43:7,14
  94:7
statement 8:12 26:4
STATES 1:1
Statute 4:15,21
step 45:17
stick 73:1

sticks 39:1 63:13
still 15:6 79:12
stints 80:18
stipulated 4:2,16,23
stipulation 1:15 4:1
stopped 49:18
Strike 85:20
strong 22:2,9
student 17:16 18:3,13
  21:1 22:1,2,7,8,11,13
  22:15,16 25:11,18,20
  25:22 27:22 28:2
  31:15 32:2,7,18
  61:20 62:9,18 63:21
  64:14 65:13 66:20,22
  66:23 67:3,23 72:4,5
  72:19 73:3,17,21
  77:20 78:3 82:5,7,11
  90:5,7,11
students 24:1,5,21 25:5
  25:6,9,13,14 27:4,8
  30:22 31:4,7 49:3,3
  57:15,19 71:5,13,18
  71:20 72:2,8
student's 33:1 82:17
study 24:17,22 25:1,10
stuff 34:10 57:12 68:21
  80:15
submitting 37:3
subpoena 6:14,20 7:14
  7:16
subpoenaed 8:21
SUBSCRIBED 94:17
successful 55:10,12,13
suggestions 65:3,5
Suite 2:10
sum 75:8
summary 76:16,17
  77:1,2,9,12
summer 9:12,13 15:21
  18:10 26:18 74:5
support 20:19
supposed 39:5 52:5
  68:18
sure 6:7 10:23 15:3
  18:17 21:6 24:9,20
  29:11 30:4 33:19
  41:20 50:4,17 57:18
  59:14 67:5,6 71:18
  78:9 81:5
surface 38:18
surfaced 39:15
surprised 49:6
survey 74:7 75:15,21
  76:4
sworn 5:9 92:9 94:17
system 32:16

                T
table 19:19

Deposition of Brenda Bellamy

take 6:6 19:12 32:20 45:10,13 72:14
taken 1:14 4:4,6 45:18 72:17
taking 5:20 47:20 56:9 70:8 85:23
talk 46:17 59:2,20
talked 5:17 6:4 9:14 10:3,10 14:23 50:8 55:2 65:1 81:20
talking 15:6 45:21 46:2 77:18
taught 17:15 28:23 29:4 32:15 61:21 62:4,5 64:8 79:11
Tawyna 79:2,5
teach 17:23 47:6
teacher 25:17
teaches 79:12
teaching 20:7 28:9,10 28:20 42:3 45:6 51:13 62:15 66:15 70:15,16,17,19 71:1 81:16
Tech 70:8,10,14,16,20 71:1
telephone 46:18 50:8 50:13 51:5
tell 7:20 8:21 11:7,8,9 17:15 19:22 20:21 27:21 28:2 38:1,15 41:4 58:6,9 62:17,21 63:2,7,20 73:12,20 74:20 75:23 76:1,2 90:9,10
terminate 37:4,14
terrible 30:5
testified 5:10 52:16
testify 66:9
testimony 10:5 11:18 11:22 94:6
tests 21:13
thank 36:3 77:17
their 32:18 82:19
therefor 94:8
thereof 93:8
thing 6:4 11:23 23:23 38:19,21,23 39:13,16 48:23 66:19
things 16:10 21:14 38:17,21 39:14 55:7 60:8
think 7:19 9:8 12:22 14:12 16:1 17:17,22 18:14,19,22,23 19:12 23:7 24:11,18,19 25:3 28:11 29:4 32:7 34:6 35:2,11,12 39:6 46:9,21 47:23 48:3,5 49:10,19 52:4 54:18

55:6,23 56:14,19,20 57:2,14,14,21 58:11 59:4,7,12 61:14 67:9 67:10,12 68:9 69:8 74:4 76:4 77:4,10,15 86:3,5,13 90:14,20
though 76:10
thought 16:20,21 17:10 17:12 69:22,23
three 28:17,18
through 6:22 16:4,5,14 25:10 37:19 38:8 45:4,23 46:11 63:4 66:11 74:3 75:18 76:1 78:8 80:13,16 80:20 81:4,12 85:17 86:17
throughout 57:6
time 4:11,12 7:17 9:5,6 9:19 11:12,20 12:4 12:12,14 13:11,20 14:1 15:4,17,19 18:15 19:12 20:5,10 20:16 35:5 40:20 47:21 52:20 57:11 58:4 62:15 71:2 75:11 88:13 94:7
times 34:18 51:12
today 6:15 7:5 8:9,18 10:3,22 14:23 15:1,3 15:18 16:7,17 61:6 69:12,15,23
told 10:8,12 11:11 39:7 47:14 49:3,4,16,19 59:8,9,14 62:12 63:23 71:5,8,11
top 40:1
total 76:5 88:11
town 28:9,12
transcript 93:2 94:4,6
translate 42:2
transpired 42:6
treatment 82:7,12
trial 4:19 38:3
tried 45:3
trip 85:23
true 31:12 93:2 94:6
truth 5:9,9,10 92:9,10 92:10
try 8:20 25:9 45:4 74:2
trying 7:19 17:18 24:18 29:4 46:9,20 47:23 56:14,19 59:4,6 66:8
tucked 39:20
Tuesday 1:19 92:23 94:5
turn 25:21 37:15 41:17 43:21 44:19 53:5 56:5 57:12
turned 35:14,19 36:12

42:11 46:5 67:12,15 74:12
turning 37:13 52:23
tutorial 65:9
tutoring 24:12,14,15
twice 34:22
two 21:7 64:1,4,6 65:15 65:18
type 18:6 66:14

_____ U _____
ultimate 77:5
ultimately 32:19 74:13
Umoh 61:20 62:12
understand 5:21 7:5,7 20:22 21:6 23:18 24:9 33:7 41:20 61:8 61:23 64:22 67:7,8 69:12,22
understanding 8:5 19:6 33:12,15 35:14 41:21 42:4 48:6 65:12,17,19,20 70:23 72:10 74:10 87:11
understood 6:9
uninterested 85:7
UNITED 1:1
unresolved 84:19
until 12:7 18:3
updated 30:13
used 4:13,20 12:20 15:16 17:14 18:22 68:8
using 49:22 50:1
U.S 92:19

_____ V _____
Valley 1:8 7:11,22 36:13 92:15
various 74:7
verbal 6:7 37:23 38:14 40:22
verification 3:9 40:16 42:14,21 55:5,6 60:21 81:3
verify 41:7,11
very 13:18 17:1 23:1 43:19 81:6
visit 85:18
visiting 84:13
vote 74:14 75:7,8 77:6 77:16
Vs 1:7 92:14

_____ W _____
waive 91:7
waived 4:19 5:3 93:5
waiving 4:22
want 17:19 21:5,6 24:19 27:19 30:3

41:20 45:9,14 49:1 57:2 59:8 60:3,6,22 64:23 76:18 78:8 91:7,9
wanted 25:9 76:19 86:20 90:5
wanting 86:11
wasn't 41:18,19 43:19 50:17,17,18 52:7 55:10,12 62:15
way 6:13 44:22 46:12
ways 24:4
weak 22:2,8,15,18 25:11,12,18
Wednesday 34:15 48:2
week 24:17 33:17,17 34:22,22 48:1
weeks 51:16
well 8:3 15:16 19:2 23:1 27:6 28:8 31:1,3 31:6,9,15 32:5,13,14 35:2 37:18 39:9 40:3 51:12 52:18 57:2 59:10 61:7 76:15 77:17 81:6
well-suited 33:4
went 29:13 52:10 63:6 69:9 77:16 85:7
were 11:7,9,13,20 15:1 16:21 17:3 20:7 21:13 25:13 27:5 29:17,18,20 36:14 37:13 38:17,17,21 39:3,4,5,7,13,14,17 40:10 41:12,23 42:1 42:23 43:1,5,16 44:19,21 45:21 46:2 46:12 49:4,4,5 52:22 55:7 57:15,19 58:2,6 58:10,19 59:5,11 60:7 64:5 66:14 68:18 69:5 71:5,8,11 75:6,9,9 76:4 77:18 81:16 82:7 83:8 85:22 86:16 88:8,10 88:19
weren't 44:12 47:5 49:5 57:23 64:16,19
we'll 6:22 42:19 45:4 45:22
we're 7:1 66:11
we've 5:14,17 34:8 64:23 74:10 78:5,9
while 17:18 62:5,13 66:14 81:16 82:7,12 83:5,8
whole 5:9 39:20 87:17 88:23 92:10
witness 5:1,2,8 6:1 8:6 10:19,23 11:10,13,14

11:17,21 17:3,7,11 45:7,11,16 46:14 59:17 60:17 72:16 93:3
witnesses 11:4
word 24:7,11,13 49:23 49:23
work 9:8,8 12:2,11,16 12:17,20,20 13:14 15:16 16:4,5 18:21 18:22 43:2 44:23,23 46:12 68:8 69:5,6,10 69:13,15,17 70:1,3 73:22 81:14 84:2 87:11 90:11
worked 18:18 41:15 68:11 78:15
working 41:7 55:7 68:6 69:8 70:9,10
works 68:9
world 32:20
wouldn't 51:21
Wright 1:5 7:2,8,10,18 7:20 8:6,11,15,17,20 9:23 10:18 12:3,7,13 14:16 17:16,23 18:16 22:20 24:16 53:23 64:5,22 65:1 71:16 71:23 77:22 81:15 82:1 84:2,6,8 92:12
Wright's 8:10 14:17 23:10 68:3
write 41:14
writing 67:10,11 80:22
written 83:6
wrong 42:4
wrote 43:17,19 83:6

_____ X _____
Xeroxing 16:9

_____ Y _____
yeah 45:9 48:14 65:7 80:22
year 15:23 29:13 34:13 42:2,3
years 15:13 28:17,18 28:19 29:3 43:2,3 88:11
young 88:19
younger 88:19
y'all 15:15 30:16 54:12 55:2 85:9 86:9,12

_____ $ _____
$10,000 39:5,8 52:6,7

_____ 0 _____
05 18:10

Deposition of Brenda Bellamy                                                                                      June 24, 2007

Page 8

**1**
**10** 27:1,12,16
**11** 88:11
**12-hour** 69:19
**13** 82:3
**14** 82:15
**18** 43:3
**1990** 88:7

**2**
**20** 94:18
**200** 84:3
**2000** 28:12 29:20
**2001** 29:21
**2005** 12:6,9 19:8,10
  20:14,15,20 26:19
  29:23 30:1 33:8,13
  33:23 35:15 43:8,10
  43:23 46:4 53:13
  54:10 58:18 73:7,23
  74:5 90:12
**2007** 1:20 92:23 93:9
  94:5
**22nd** 33:13 34:1,16
**24** 1:20 34:7 92:23 94:5
**251** 17:17,17,21 18:6
  18:12 20:22 25:2
**252** 17:18,21 19:2 35:1
  64:17 84:3
**26th** 54:10
**27** 75:15
**2700** 87:3
**271** 17:19 84:3
**272** 64:20 84:3

**3**
**3:06-CV-1087-WKW**
  1:7 92:22
**3:10** 1:21
**30** 3:5 91:8
**30th** 93:9
**300** 2:10
**31st** 12:6 19:10 20:14
  20:20 33:8,23 34:2
  34:15,19 35:7,10,15
  36:6,7 43:10,23 46:4
  49:9 58:18 73:6,23
  90:12
**31909** 87:5
**3302** 2:5
**338** 87:3
**3560** 1:18
**36** 3:6 26:5 27:2
**36106** 2:11
**36868** 2:5
**37** 78:6
**38** 3:5 30:9,14
**39** 3:6 36:21,22

**4**

**40** 3:8 42:18,22
**4001** 2:10
**41** 3:9 42:21,22
**42** 3:8,9,10 61:15,17,18
**43** 3:13 81:9,10
**431** 1:19

**5**
**5** 2:20
**5:40** 91:12

**6**
**61** 3:10

**7**
**706-317-2391** 87:7

**8**
**8-31** 33:7
**8/23/05** 3:8
**8/31/05** 3:6,6
**81** 3:13

**9**
**92** 93:1
**98** 28:11
**99** 28:11

Dixie Peterson
P.O. Box 3247
Phenix City, Al. 36868

<u>Education:</u>

**University of Alabama,** (Doctoral student)     Tuscaloosa, AL.     Current
Degree seeking: PhD – Higher Educational Administration

**Troy State University,** (part-time)     Phenix City, Al.     1989-1996
Degree: Post graduate coursework in Nursing and Educational Administration

**Troy State University,**     Montgomery, Al.     1986-1988
Degree: Master of Science in Nursing with concentration in Cardiovascular Nursing

**Samford University,**     Birmingham, Al.     1978-1981
Degree: Bachelor of Science- **Cum Laude Graduate**
Major: Nursing
Minor: Biology

**Chattahoochee Valley State Community College,** Phenix City, Al     1976-1978
Degree: Associate of Science in General Education – **President's Award Recipient**

<u>Employment
History:</u>

**Chattahoochee Valley Community College,**     Phenix City, Al.     1984 to Present
**Division Chairperson of Health Sciences/Public Service Technologies**
Responsibilities/Accomplishments:
Management/Administration of Associate Degree and Licensed Practical Nursing
Programs, Emergency Medical, Fire Science, Physical Education, Child Care, and
Criminal Justice
Programs to include:
- Teaching
- Hiring, orienting and supervising approximately 20 full and part-time faculty
- Scheduling classes and off-campus clinicals
- Budget development and management
- Accreditation preparation
- Curriculum development and revision
- Planning/Research

**The Medical Center**     Columbus Ga.     2002-present
**Recovery Room Nurse**
- Responsible for care of stable and critically ill post operative patients assisting
them to a stable physiological post-anethesia state.

**EXHIBIT**
tabbies
CVCC00897

**Chattahoochee Valley Community College,**     Phenix City AL.     2002-2003
  **Chair – Workforce Development**
- Development of short-term non-credit courses and programs.
- Development of proposal for creation of a school security academy.
- Development of courses for short-term training for business/industry.

**Chattahoochee Valley Community College,**     Phenix City, AL.     1998-2000
  **Senior Division Chair**
- Assisting the Vice President of the college in daily administrative functions.

**Phenix Regional Hospital**     Phenix City, Al.     1984 to 2002
  **Relief Supervisor**
Responsible for supervision of nursing and all ancillary services on the 3-11 shift and for representing the administrative staff to the public.

**Critical Care Nurse**
Responsible for care of critically ill patients to include monitoring, assisting with pacer insertions, hemodynamic monitoring and assessing surgically compromised patients. Also, responsible for teaching EKG and cardiac pharmacotherapeutic classes to hospital nursing and cardiopulmonary staff.

**Phenix Regional Hospital**     Phenix City, Al.     1981-1984
  **Unit Coordinator-Cardiac Services**
Responsibilities/Accomplishments:
24 Hour responsibility for unit management to include:
- Supervision of Nursing Care/Cardiac Management
- Policy Manual development
- Budgeting
- Hiring and Orientation of new employees
- Developed comprehensive teaching plan for cardiac patients

<u>**Overall Professional Accomplishments:**</u>
- Developed workforce development component to college by preparing and proposing short-term courses programs for business industry.
- Increased enrollment in the health science areas by 60-70%
- Maintained high pass rate on State Board exams
- Developed a comprehensive record-keeping and tracking system for 400+ students
- Prepared self-study manual for the Nursing Programs and successfully achieved continuing Accreditation for those programs
- Developed policies for state-wide implementation (Alabama College system)
- Developed evaluation tool for college employees
- Constructed policies for new cardiac unit

<u>**Business Skills:**</u>
- Organization/Planning
- Communication – Written/Verbal
- Finance/Budgeting
- Scheduling


CVCC00898

- Seminar/Lecture Leadership
- Development of teaching materials, operational policies
- Curriculum Development
- Planning and development of systematic evaluation plans

## Honors/Awards:

- 2001 Chancellor's Award for Most Outstanding Technical College Faculty
- Gamma Beta Phi Social Science Honorary
- Presidents Award (Given to graduate with highest point average-GPA of 4.0) Chattahoochee Valley State Community College
- Distinguished Alumnus Award Alabama College System
- George C. Wallace Leadership Scholarship
- National Student Nurses Association Scholarship
- Pi Gamma Mu Social Science Honorary
- America's Outstanding Names and Faces
- Sigma Theta Tau National Honor Society of Nursing
- Who's Who in American Nursing
- Distinguished Alumnus Award Chattahoochee Valley State Community College

## Nursing Certificates and Memberships:

- American Association of Critical Care Nurses
- Basic Cardiac Life Support
- Advanced Cardiac Life Support
- EKG Certification
- Alabama State Nurses Association
- Sigma Theta Tau National Honor Society of America
- National League for Nursing
- Alabama League for Nursing

## Continuing Education:

### Seminars

- Nurse Educator- Summer Institute 2004
- Sexual Harassment Seminar - Chattahoochee Valley Community College Spring 2004
- FERPA Seminar - Chattahoochee Valley Community College Fall 2003
- Emergency Management Decontamination – Feb, 2003
- Cardovascular Nursing: Excellence Across the Continuum – University of Alabama – Sept, 2002.
- Carl L. Patrick Cardiovscular Symposium – St. Francis Hospital in Columbus Ga. – 2001
- "Critical Thinking in Critical Care" – Alabama Board of Nursing - 2001
- Cardiovascular Nursing Triangle of Excellence – UAB – Oct., 2001
- Mississippi Gulf Coast Community College- June, 2001
- Cardiovascular Nursing Triangle of Excellence – UAB – Sept, 2000
- CV Nursing- Moving into the 21st Century Conference – UAB – October, 1999
- AACN – "Saving Hearts and Minds"-1999
- "Advanced Cardiac Life Support"-1999
- Principles of Communication"-1997
- "Medical-Surgical Symposium"-1997
- Med Ed's "Medical – Surgical" Seminar-1996

CVCC00899



- AACN–"Challenges in the Diagnosis and Management of Acute Myocardial Infarctioqn"-1994
- Princeton Heart Institute's "Nurse/Technologist Cardiovascular Conference"-1994
- "Health Care Reform in Alabama" sponsored by TSU/Montgomery-1994
- NCSBN Workshop on Computer Adaptive Testing-1994
- Alabama Board of Nursing "A Nursing Need: Understanding the Nurse Practice act"-1992
- Princeton Heart Institute's "Nurse Technologist Cardiovascular Conference"-1992
- "For the Record-Legal Issue's Seminar for Nurses"-1991
- "Cardiovascular Nursing Update"-1991
- "Evaluating Clinical Performances" sponsored by the Medical College of Georgia-1991

## College Activities:

- College Planning Board
- Senior Division Chair – Academic Division
- College Self-Study Steering Committee
- Member of Technology Task Force
- Member of Administrative Council
- Nursing Admission Committee
- College Policy Committee
- Member of Faculty Senate
- Past President-A.D.N. Deans/Chairpersons of Professional Schools of Nursing in Alabama

## Community Activities:

- Phenix City Rotary Club
- Network for Business/Professional Women
- Local Chapter of American Heart Association
- Central Baptist Church-Personnel Committee
- Little League Board of Directors
- Russell County Red Cross Board of Directors

## References:

Dr. Jo Marshall
President
Somerset Community College
Somerset, Kentucky

Dr. Vicki Hawsey
President
Wallace Community College
Hanceville

Dr. Richard Federinko
President
Middle Georgia College

Ann Chard
Vice President
Southern Association of Colleges/Schools
Atlanta, Ga.
(404) 679-4500

Taffy Hall
Administrative Assistance to Associate Director - SACS
Southern Association of Colleges/Schools
Atlanta, Georgia 6869
(404) 679-4500

Dr. Howard Weldon, MD FACS
Surgeon
700 Center Street
Columbus Ga. 31901
(706) 494-8375

Paige Harford, RN, MSN
Director of Clinical Education
The Medical Center

CVCC00901



## Chattahoochee
### Valley Community College
*CLOSE TO YOU. CLOSE TO PERFECT.*

1.334.291.4900

*P.O. Box 1000*
*2602 College Drive*
*Phenix City, Alabama 36868-1000*

April 29, 2005

Linday Wright
97 Green Dudley Road
Salem, AL 36874

Dear Linday,

Congratulations on your acceptance into the 2005 – 2006 ADN program. There are still a few items that need to be taken care of. Make sure you have registered for all of your nursing classes which are: NUR 131, NUR 242 and NUR 251.

During the first week of class you will have your regular classes as schedule on Wednesday, May 25. FOR THE FIRST WEEK ONLY, you will need to be on campus for Thursday AND Friday. You will need to be available from 8:00 a.m. until 4:00 p.m. You will be meeting regarding hospital orientation and other important information. If you have non-nursing classes that interfere with this, please contact the office and we will handle it on an individual basis.

Beginning in May, our clinical facilities will be requiring a criminal background check on each student. These background checks will be performed by a clinical facility and the approximate cost will be $50.00.

Also, if you do not have all of your file items turned in to the office you will need to get those in IMMEDIATELY. On Thursday, May 5 at 2:00 p.m. we will be holding a nursing orientation in Key Hall. If you missed the first orientation or if you still have questions you are encouraged to come to this meeting.

Thank you,

Katie Lackey
Health Sciences Coordinator/Administrative Assistant

**EXHIBIT**

R

CVCC00856



**Chattahoochee**
Valley Community **College**
*CLOSE TO YOU.  CLOSE TO PERFECT.*

P.O. Box 1000
2602 College Drive
Phenix City, Alabama  36868-1000

1.334.291.4900

March 18, 2004

Lindy Wright
7716 Boulder Drive
Columbus, GA 31909

Dear Ms. Wright,

We have received your re-application for Summer Semester 2004, and we are delighted to welcome you back to Chattahoochee Valley Community College.

### ADVANCED REGISTRATION FOR SUMMER SEMESTER 2004
### April 12 – 15 and 19 - 22 (Monday-Thursday) from 9:00 a.m.-6:00 p.m.
### April 16 & 23  (Friday) from 9:00 a.m. – 1:00 p.m.
**You must call your advisor, Ms. Dixie Peterson, at (334) 291-4925 to schedule an appointment for advanced registration.**

### REGULAR REGISTRATION WILL BE HELD
### MAY 24, 204 FROM 9:00 A.M. – 3:00 P.M. AND 5:00 P.M. – 7:00 P.M.

### CLASSES BEGIN ON May 26, 2004

*Remember that it is your responsibility to request an official copy of your high school, GED or college transcript(s) be sent immediately to the Office of Admissions.*

In keeping with the Americans With Disabilities Act, should you need special accommodations, please call Ms. Jacquie Thacker at (334) 291-4992.

# WELCOME TO CVCC!

Sincerely,

*Rita M. Cherry*

Rita M. Cherry
Admissions Clerk

EXHIBIT
S
tabbies'

CVCC00799

## Chattahoochee
### Valley Community College
*CLOSE TO YOU. CLOSE TO PERFECT.*

*1.334.291.4900*

P.O. Box 1000
2602 College Drive
Phenix City, Alabama 36868-1000

# STATUS LETTER REGARDING PROGRESSION
# IN THE <u>ADN</u> PROGRAM

Date: _December 20, 2005_

Student's Name: _Lindy Wright_     Social Security Number: _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_

The purpose of this notice is to inform you of your status in the LPN program.

① <u>FAILURE/WITHDRAWAL</u>                    <u>SEMESTER FAILED</u>

__NUR 252__                                __Fall 2005__

__NUR 271__                                __Fall 2005__

Policy states that a student is allowed a maximum of two failures in the L.P.N. or A.D.N. program before he/she is dismissed from the program, and withdrawals from nursing courses are counted as failures except in the extenuating circumstances as determined by the Division Chairperson. A student cannot progress in the program until the course failed has been successfully repeated. Students dismissed from the program may apply for admission as a new student after two years has elapsed (CV 2005-2006 Catalog pg. 111, #12 ADN Admissions Criteria).

② <u>ELIGIBILITY</u>

    a.    May Re-enter  _____

    b.    May **NOT** Re-enter  __X__

③ <u>SEMESTER TO RETURN</u>

    _N/A_

*please file in Lindy Wright's folder*

**NOTE: All students must complete the program within twenty-four months of the date he/she began (Alabama Department of Postsecondary Program Progression).**

Sincerely,

Dixie Peterson
Division Chair/Health Sciences



EXHIBIT
1

CVCC 000381




*CONNIE COOPER*
*Attorney at Law*
*P.O. Box 3110*
*Phenix City, AL 36868*
*(334) 297-9442*
*Fax: (334) 297-6008*

June 7, 2006

Dr. Laurel M. Blackwell
Chattahoochee Valley Community College
2602 College Drive
Phenix City, AL 36869

RE: My client, Lindy Gale Wright

Dear Dr. Blackwell,

I represent Ms. Lindy Gale Wright. I have previously had contact with Dean Lowe regarding problems my client has encountered as a nursing student at the school.

Ms. Wright finished the Associate Degree program this semester. In order to fully inform you of the problems, I will outline what has taken place.

Ms. Wright currently has a GPA of 3.2. She was informed she had failed Nursing 252, medical surgical nursing. Ms. Lynn Harris, instructor, informed Ms. Wright that Nursing 200 would be substituted for the Nursing 252 due to course curriculum changes in the program. Ms. Wright successfully completed this course, obtaining an A grade. Her final semester, summer 2006, she was informed she had failed Pediatric Nursing 272. Ms. Wright obtained copies of her care plans (which comprise a portion of the course grade) from Bridgette Jackson, clinical instructor. I have those care plans which appear to indicate that my client's grades were changed on three occasions. That aside, my client was willing to take re-take Nursing 272 which is being offered this summer in order to graduate. She also turned in a request for course forgiveness. She has attempted to contact Dean Lowe, Ms. Dixie Peterson and Sanquita Alexander in order to be allowed to be placed in Nursing 272. She has had no response from this request. She has been informed by both Dean Lowe and Dixie Peterson that due to the fact

EXHIBIT

U

CVCC 000388

that she failed Nursing 252, she now has two failures and cannot continue in the program. I personally assisted Ms. Wright with what we believed was a successful resolution of the Nursing 252 issue in that the Nursing 200 course would substitute for Nursing 252, as long as Ms. Wright successfully passed Nursing 200. It appears Dean Lowe is now denying that this was the resolution reached by all involved. There would have been no reason for my client to take Nursing 200 unless this would have assisted her to graduate.

My client has personal knowledge that there is a student currently enrolled in Nursing 272, Pediatric Nursing, who previously failed this course and is being allowed to take 272 this summer. My client should be allowed to retake Nursing 272 this summer in order to graduate.

My client has personal knowledge of another student who had two failures in the nursing program and was allowed to graduate.

Additionally, my client has informed me that there were numerous problems within the program which included that the students had no instructor for the first 5 weeks of the second semester, no instructor for clinical on two occasions, instructors were late for class, teachers were unprepared for class, instructors not following their course syllabus and most importantly my client was accused of cheating and this information was relayed to other students in the program. It appears there was constant turmoil in this program.

The only goal my client has is to graduate, sit for the nursing boards and start her career as a nurse. She contracted with your school, paid her tuition and we believed successfully completed the requirements of the nursing program. (She is willing to take Nursing 272 this summer).

This has been extremely stressful to Ms. Wright who is now in her 8th month of pregnancy. We know of no resolution if the school is unwilling to follow procedure outlined in the student handbook and the agreement reached with Dean Lowe. The only alternative is to file a lawsuit for breach of contract.

We would like to resolve this without litigation but feel that unless a resolution can be had within 7 days, we will be unable to resolve the matter.

Please contact me within 7 days if you feel there is a resolution to this matter.

Thank you for your prompt attention.

Sincerely,

Connie Cooper

cc: James Lowe
    Dixie Peterson

# Chattahoochee
### Valley Community College



2602 College Drive
Phenix City, Alabama 36869
1.334.291.4981
1.334.291.4944(fax)

*Laurel M. Blackwell, Ed.D.*
*President*

June 13, 2006

Ms. Connie Cooper, Esq.
Attorney at Law
P.O. Box 3110
Phenix City, AL 36868

Dear Ms. Cooper:

This letter is in reference to the letter received by Chattahoochee Valley Community College on June 9, 2006 regarding Ms. Lindy Gale Wright.

Ms. Wright was admitted under the Nursing Career Mobility Admission Criteria as listed in the 2004-2005 Chattahoochee Valley Community College Catalog and Student Handbook.

The following responses are based on our established institutional nursing policies published on Page 106 of the 2004-2005 Chattahoochee Valley Community College Catalog and Student Handbook:

**Policy # 11**
Students enrolled in the Nursing Mobility program must earn a "C" or higher in all required courses in the nursing curriculum, in both nursing and non-nursing courses. This includes satisfactory completion of the clinical components of each course. Failure of clinical components results in failure of the course.

- Ms. Wright failed NUR252 in Fall 2005 with an earned grade of "D".
- In Spring 2006, Ms. Wright failed NUR272 with an earned grade of "D".

**Policy # 13**
Nursing courses NUR 252, 271, 272, 279, 291, and 292 may be repeated only once and are to be taken the next semester a course is offered provided space is available. If the student does not pass the nursing course on the second attempt, that student shall be excluded from the nursing program, but not the College. Students who repeat 252, 271, 272, 291, and 292 will be encouraged to successfully complete review packets for each course before retaking.

- NUR252 would not be offered again because of the implementation of the standardized statewide curriculum, so a substitute had to be offered in order for Ms. Wright to be able to repeat the course. As a result, NUR200 was substituted for the course, NUR252, which will no longer be offered.

**EXHIBIT**

_____ V

CVCC 000420

- However, NUR200 did not take away the failing grade of NUR252; it merely allowed an opportunity for Ms. Wright to repeat a failed course.

**Policy # 14**
The nursing student must complete the entire nursing program within twenty-four months of the date he/she begins his/her studies in the program or be excluded from the nursing program. If a nursing student fails two different nursing courses within the twenty-four-month period, he/she will be excluded from the program and CANNOT reapply. Exclusion from the nursing program does not constitute exclusion from the College.

- Ms. Wright failed NUR252 in Fall 2005 with an earned grade of "D".
- In Spring 2006, Ms. Wright failed NUR272 with an earned grade of "D".
- Ms. Wright failed two different nursing courses within a twenty-four month period, which results in her exclusion from the program. According to our policy, she will not be allowed to take any further nursing courses at Chattahoochee Valley Community College.

Attached are copies of the policies from the Nursing Career Mobility Criteria Program as listed in the 2004-2005 Catalog. These long-standing policies have guided all the actions taken in regards to Ms. Wright's enrollment at Chattahoochee Valley Community College.

Sincerely,

*Laurel M Blackwell*

Laurel M. Blackwell, Ed.D.
President

LB/LH/hc

cc:   Dr. James Lowe
       Dixie Peterson

Semesters
F    SP

..........5
..........4
.........................4
.......................2
.......................3
.......................2
26    15

m will become
ass, admission
e information,

# NURSING CAREER
# MOBILITY PROGRAM (ADN)
## ADMISSIONS CRITERIA

1. Applicants must meet all the admission requirements to be admitted as a regular student to the College.

2. An Application for Admission to the Nursing Mobility Career program must be completed and submitted to the Nursing Office. Applications are available upon request. Testing dates will be announced in a letter to prospective students after the application process is complete.

3. Students must be Licensed Practical Nurses (LPNs) or recent graduates of an LPN program in order to apply for the Nurse Mobility program. Practical nurses must have three months of clinical work experience within the thirty-six-month period prior to beginning the program. Recent graduates of PN programs may apply provided that they commit to document 500 hours of work experience by the June date the program begins. All supporting documents must be in the student's file. All application material except transcripts should be sent to the Nursing Division. Transcripts should be sent by the school attended to the Admissions Office. **It is the student's responsibility to verify that his/her transcript has been received by the Admissions Office.**

4. Applicants who meet the requirements specified in #1 and #2 will be invited to take the admission/validation tests on the dates specified for the tests. Failure to enroll after acceptance constitutes forfeiture of position, and the individual must repeat the entire admission process if he/she seeks admission at a future date.

5. The following factors will be considered in granting provisional admission to the program: scores on the admission/validation examination (50th percentile in Foundations, and a combined average of 40th percentile in Maternal-Child Nursing), employee reference letters, and a GPA of 2.00 on previous college coursework. To gain unconditional admission, students must successfully pass skills check-offs in addition to passing the admission/validation exam. These check-offs will be conducted in the Spring Semester prior to entering the program. Failure will result in forfeiture of position in the program.

6. Students must have completed the following three courses, with a grade of "C" or higher, preferably at the College, prior to beginning study in the nursing program. Individuals may transfer these courses from other accredited colleges.
   BIO 103 Principles of Biology .................................... 4
   ENG 101 English Composition I ................................... 3
   PSY 200 General Psychology ..................................... 3

   Students must take diagnostic tests in writing, mathematics, and reading at least two semesters prior to beginning prerequisite coursework in order to allow for completion of any required coursework.

7. In the interest of student and patient safety and before consideration for admission, any applicant possessing certain limitations may be required to submit medical examination records and/or statements from physicians indicating that he/she is able to fully participate with reasonable accommodation, if necessary, in the approved program of clinical studies and responsibilities. **Students must be able to perform the essential functions of the program.**

8. Evidence of current CPR certification, health insurance, and malpractice coverage as a nursing student must also be submitted to the Nursing Division. Malpractice insurance application forms are available upon request in the Nursing Division. If the student does not supply these documents to the Nursing Division by the established deadline, admission to the program will be denied.

105

CVCC 000422

9. Once a student is admitted to the Nursing Mobility program, he/she will be responsible for accurately following the admissions criteria and the nursing curriculum design. Failure to follow the curriculum design as represented may affect progression in the program.

10. Once provisionally admitted to the program, the student must complete all coursework at the College unless written approval is obtained from the Division Chairperson and the Dean of Instruction.

11. Students enrolled in the Nursing Mobility program must earn a "C" or higher in all required courses in the nursing curriculum, in both nursing and non-nursing courses. This includes satisfactory completion of the clinical components of each course. Failure of clinical components results in failure of the course.

12. Nursing courses 131, 242, and 251 may be taken only once. A student who fails to earn a "C" in any one of these courses must reapply to the nursing program. If a student fails to earn a "C" in two or more of the courses listed above, he/she will be excluded from the program and unable to reapply.

13. Nursing courses NUR 252, 271, 272, 279, 291, and 292 may be repeated only once and are to be taken the next semester a course is offered provided space is available. If the student does not pass the nursing course on the second attempt, that student shall be excluded from the nursing program, but not the College. Students who repeat 252, 271, 272, 291, and 292 will be encouraged to successfully complete review packets for each course before retaking.

14. The nursing student must complete the entire nursing program within twenty-four months of the date he/she begin his/her studies in the program or be excluded from the nursing program. If a nursing student fails two different nursing courses within the twenty-four-month period, he/she will be excluded from the program and CANNOT reapply. Exclusion from the nursing program does not constitute exclusion from the College.

15. Withdrawal from nursing courses will be considered as failure (except in extenuating circumstances as determined by the Division Chairperson). The student must be passing at the time of the withdrawal for the circumstance to be considered.

16. An Incomplete (I) in nursing courses will be given only in extreme extenuating circumstances (i.e., hospitalization of student, death of a student's immediate family member, or hospitalization of the student related to pregnancy) and is at the discretion of the instructor and Nursing Division Chairperson). Incompletes are not intended for students who are failing nursing courses.

17. Nursing and non-nursing courses are to be taken in sequence as shown by the nursing curriculum design in this Catalog. When non-nursing courses are failed with a "D" or an "F", the student must repeat the courses the next semester they are offered, provided space is available. The student must be aware that if a grade of "D" or "F" is made in a non-nursing course that is a prerequisite to a nursing course the following semester, he or she may not advance to the next nursing course.

18. Each student is responsible for mailing his/her own application to the Board of Nursing in the state in which he/she is applying for initial licensure, as well as to NCLEX. Each student is responsible for mailing the application and meeting any deadlines that the Board may announce.

19. Transfer credit from other nursing programs is occasionally granted, and is done on an individual basis. A student who has been enrolled previously as a nursing student at another institution may be considered for admission after the application filing deadline date if time and space permit, but no guarantee of admission is granted. All applicants must take the entrance/validation examinations and meet all program requirements.

106

CVCC 000423



20.  In addition to the above specification, students in the Nursing Mobility program must fulfill the same requirements and regulations expected of all students who are admitted to the College and outlined in the Nursing Student Handbook.

21.  Applicants requiring reasonable accommodations under the Americans with Disabilities Act (ADA) are encouraged to call the ADA Coordinator at 214-4845 (Americans with Disabilities Act Compliance Plan, IV.)

*Special Costs for Nursing Students\**
Liability Insurance (required)
Nursing Pin (optional)
Uniform (required)
Board of Nursing Licensure Fee
NCLEX Fee
NLN Examinations (required per semester and included in Registration Costs)
Nursing Validation Examination and Clinical Testing (required)
Health Insurance (individual rates required)
Physical (required)
Hepatitis B vaccinations (optional but highly encouraged)

*Costs for these items vary. For specific costs, the student should consult the Division Chairperson of Health Sciences.

107

CVCC 000424



Tuesday, October 9, 2007

▸CONTACT US    ▸DOWNLOADS    ▸HOME

Home

Advanced Practice

Alternative Program

Applications

Board Information

Center for Nursing

Complaint Forms

Contact Us

Continuing Ed

Disciplinary

Employer Info

Fee Schedule

Forms & Other Information

Frequently Asked Questions

License Lookup

News & Updates

Nurse Practice Act and Administrative Code

Nursing Programs

Online Services

Renewal Status

Privacy / Security Statement

Español

Translation Disclaimer

# Alabama Board of Nursing
# Nurse Practice Act

Code Commissioner's note. - Acts 1993, No. 93-183, § 2, provides: "The existence and functioning of the Alabama Board of Nursing, created and functioning pursuant to Sections 34-21-1 to 34-21-63, inclusive, is continued, and those code sections are expressly preserved."

## Table Of Contents

**Article 1. - General Provisions.**

**Article 2. - Licenses.**

**Article 3. - Continuing Education.**

**Article 4. - Post-Baccalaureate Scholarships.**

**Article 5. - Advanced Practice Nursing.**

EXHIBIT

tabbies®    W

▲TOP

1-800-656-5318  |  Alabama Board of Nursing P.O. Box 303900 Montgomery, AL 36130-3900



Tuesday, October 9, 2007

▶CONTACT US   ▶DOWNLOADS   ▶HOME

**Home**

**Advanced Practice**

**Alternative Program**

**Applications**

**Board Information**

**Center for Nursing**

**Complaint Forms**

**Contact Us**

**Continuing Ed**

**Disciplinary**

**Employer Info**

**Fee Schedule**

**Forms & Other Information**

**Frequently Asked Questions**

**License Lookup**

**News & Updates**

**Nurse Practice Act and Administrative Code**

**Nursing Programs**

**Online Services**

**Renewal Status**

**Privacy / Security Statement**

**Español**

**Translation Disclaimer**

# Alabama Board of Nursing
# Nurse Practice Act

<u>Download this Article (MS Word)</u>     <u>Download this Article (PDF)</u>

## Article 1. - General Provisions.

| 34-21-1. | Definitions. |
|---|---|
| 34-21-2. | Board of nursing generally. |
| 34-21-3. | Advisory councils. |
| 34-21-4. | Funds of board; transfer of duties, powers, etc., of board of nurses' examiners and registration to board of nursing. |
| 34-21-5. | Nursing educational programs. |
| 34-21-6. | Exemptions. |
| 34-21-7. | Violations and penalties. |

Back to Table of Contents

▲TOP

1-800-656-5318 | Alabama Board of Nursing P.O. Box 303900 Montgomery, AL 36130-3900

ARTICLE 1.

GENERAL PROVISIONS.

§ 34-21-1.  Definitions.

For purposes of this chapter, the following terms shall have the respective meanings ascribed by this section:

(1)  BOARD.  The board of nursing created hereunder.

(2)  ADVISORY COUNCILS.  Advisory councils provided for under the terms of this chapter.

(3)  PRACTICE OF PROFESSIONAL AND PRACTICAL NURSING.  Nursing is a profession the practice of which is defined as:

a.  PRACTICE OF PROFESSIONAL NURSING.  The performance, for compensation, of any act in the care and counseling of persons or in the promotion and maintenance of health and prevention of illness and injury based upon the nursing process which includes systematic data gathering, assessment, appropriate nursing judgment and evaluation of human responses to actual or potential health problems through such services as case finding, health teaching, health counseling; provision of care supportive to or restorative of life and well-being; and executing medical regimens including administering medications and treatments prescribed by a licensed or otherwise legally authorized physician or dentist.  A nursing regimen shall be consistent with and shall not vary any existing medical regimen.  Additional acts requiring appropriate education and training designed to maintain access to a level of health care for the consumer may be performed under emergency or other conditions which are recognized by the nursing and medical professions as proper to be performed by a registered nurse.

b.  PRACTICE OF PRACTICAL NURSING.  The performance, for compensation, of acts designed to promote and maintain health, prevent illness and injury and provide care utilizing standardized procedures and the nursing process, including administering medications and treatments, under the direction of a licensed professional nurse or a licensed or otherwise legally authorized physician or dentist.  Such practice requires basic knowledge of the biological, physical and behavioral sciences and of nursing skills but does not require the substantial specialized skill, independent judgment and knowledge required in the practice of professional nursing.  Additional acts requiring appropriate education and training may be performed under emergency or other conditions which are recognized by the nursing and medical professions as proper to be performed by a licensed practical nurse.

(4)  LICENSED PROFESSIONAL NURSE.  A person who is currently licensed to practice professional nursing.

(5)  LICENSED PRACTICAL NURSE.  A person who is currently licensed to practice practical nursing.  (Acts 1965, No. 867, p. 1615, § 2; Acts 1975, No. 427, p. 1024, § 1; Acts 1983, No. 83-642, p. 989, § 1.)

§ 34-21-2.  Board of nursing generally.

(a)  There is hereby created the board of nursing, which shall be composed of 13

members to be appointed as hereinafter provided for, which shall have the duties and powers hereinafter enumerated. In order to insure continuity of administration, the nine board members provided for by section 3 of Act No. 427, regular session 1975, shall continue to serve to the completion of the term for which they are serving. The governor shall within 60 days of January 1, 1984, appoint a tenth member who shall be a licensed practical nurse for a term of four years from a list of nominees furnished him by the Alabama Federation of Licensed Practical Nurses, Incorporated as hereinafter provided. As the terms of all board members expire, their successors shall be appointed for terms of four years each. Vacancies in unexpired terms shall be filled in the same manner as original appointments are made. No member shall be appointed to more than two consecutive terms of four years each. Eight members of the board shall be licensed professional nurses, and four members of the board shall be licensed practical nurses. The governor shall appoint the members of the board who are licensed professional nurses from a list of nominees who are selected by the Board of Nursing Nomination Committee and furnished to the governor by the Alabama State Nurses' Association, and such list, when furnished, shall contain at least twice the number of nominees as there are appointments to be made or vacancies to be filled. The Alabama State Nurses' Association shall or before December 1 of each year, or at such other times as necessary, furnish the governor with a list of licensed professional nurses qualified for appointment to the board. In the nominating and appointing process, due care will be taken to ensure the maintenance of qualified representation from the fields of nursing education, nursing administration, clinical nursing, and advanced practice nursing. The governor shall appoint two of the members of the board who are to be licensed practical nurses from a list of nominees furnished him by the board of directors of the Licensed Practical Nurses Association of Alabama, and such list, when furnished, shall contain at least twice the number of nominees for the vacancies to be filled. The board of directors of the Licensed Practical Nurses Association of Alabama, shall on or before December 1 of each year in which the term of office of a board member or a nominee of said board of directors shall expire or at such other time as necessary, furnish the governor with such list of licensed practical nurses qualified for appointment to the board. The governor shall appoint two members on the board who are to be licensed practical nurses from a list of nominees furnished him by the board of directors of the Alabama Federation of Licensed Practical Nurses, Incorporated, and such list, when furnished, shall contain at least twice the number of nominees for the vacancies to be filled. The board of directors of the Alabama Federation of Licensed Practical Nurses, Incorporated, shall on or before December 1 of each year in which the term of office of the board member filled by the nominee of such board of directors shall expire, or at such other times as necessary, furnish the governor with a list of licensed practical nurses qualified for appointment to the board. The governor may remove any member from the board for neglect of duty of the board, incompetency or unprofessional or dishonorable conduct. Each person appointed to the board as a licensed professional nurse shall be a citizen of the United States and a resident of the state of Alabama and shall have these additional qualifications: be a graduate of a state-approved educational program for the preparation of practitioners of professional nursing; be a currently licensed professional nurse in Alabama; have a minimum of five years' successful nursing experience in an administrative, teaching, clinical capacity, or advanced practice and be actively engaged in professional nursing in

this state immediately preceding and during appointment. Each person appointed to the board as a licensed practical nurse shall be a citizen of the United States and a resident of the state of Alabama and shall have these additional qualifications: hold a diploma from an accredited high school or its equivalent; be a graduate of a state-approved vocational educational program for the preparation of practitioners of licensed practical nursing; be a currently licensed practical nurse in Alabama; have a minimum of five years' successful nursing experience and be actively engaged in licensed practical nursing in this state immediately preceding and during appointment. There shall be one member of the board who is a consumer and who is not a member of any of the health care professions. The consumer member shall be appointed by the Governor effective January 1, 1998, and shall serve for a term of four years. His or her successor shall be appointed in a like manner at the expiration of each term or upon a vacancy for the remainder of an unexpired term of office. The consumer member of the board shall have, presently or formerly, no direct financial interest in any health care facility, profession, agency, or insurer, or be or have been a health care worker. There shall be two advanced practice nurse positions to be filled effective January 1, 1998, in the same manner as all other professional nurse positions. One advanced practice nurse position shall be served for an initial five-year term and successors shall serve four-year terms. The remaining member appointed to an advance practice nurse position shall serve an initial four-year term and successors shall serve four-year terms.

(b)    All members of the board shall enjoy immunity from individual civil liability while acting within the scope of their duties as board members.

(c)    The board shall have the following powers and perform the following duties: It shall meet at least once a year and shall, at its organization meeting and at its annual meetings thereafter, elect from its members a president, a vice-president and a secretary. It may hold such other and additional meetings during any year as it deems necessary for the transaction of business. A majority of the board, including one officer, shall constitute a quorum at any meeting.

The board is authorized to:

(1)    Adopt and, from time to time, revise such rules and regulations, not inconsistent with law, as may be necessary to carry out the provisions of this chapter.

Nothing in this chapter shall be construed as limiting the rights of affected parties to appeal decisions of the board with regard to rules and regulations promulgated hereunder;

(2)    Prescribe standards and approve curricula for nursing educational programs preparing persons for licensure under this chapter;

(3)    Provide for surveys and evaluations of such programs at such times as it may deem necessary;

(4)    Approve such nursing educational programs as meet the requirements of this chapter and the board. Nothing in this chapter shall be construed to diminish the power of the state board of education or other constitutionally or legislatively established state agencies to govern the schools under their respective jurisdictions;

(5)    Deny or withdraw approval from educational programs for failure to meet prescribed standards provided, that withdrawal of approval shall be effected only after a hearing in accordance with board rules and regulations;

(6)    Examine, license and renew the licenses of duly qualified applicants and require employers to submit listings of personnel covered by this chapter to the board upon

request;

(7)  Conduct investigations, hearings and proceedings concerning alleged violations of this section or of the rules and regulations of the board;

(8)  Have the power to issue subpoenas, compel the attendance of witnesses and administer oaths to persons giving testimony at hearings;

(9)  Cause the prosecution of all persons violating the provisions of this chapter and incur such necessary expenses therefor;

(10)  Keep a public record of all of its proceedings;

(11)  Keep a register of all licensees;

(12)  Make an annual report to the governor;

(13)  Appoint and employ a qualified person, not subject to the state merit system, who shall not be a member of the board, to serve as executive officer;

(14)  Define the duties and fix the compensation for the executive officer;

(15)  Employ such other persons as may be necessary to carry on the work of the board and provide for appropriate bonding of employees; regular employees of the board shall be employed subject to the state merit system in effect on January 1, 1966, or at the time of employment;

(16)  Employ consultants, specialists, counsel or other specially qualified persons under contract or on a part-time basis to assist it in administering this chapter and without regard to the state merit system in effect on or after January 1, 1966, and to pay for the services of such persons;

(17)  Accept gifts and grants upon terms and conditions imposed by it through official resolutions;

(18)  Perform such other duties, not inconsistent with law, as required by this chapter to foster and improve nursing and the regulation thereof and the public health of this state;

(19)  Expend funds of the board in exercising its powers and duties and in administering this chapter;

(20)  Determine and collect reasonable fees;

(21)  Adopt standards for registered and practical nursing practice and for continued competency of licensees; and

(22)  Join organizations that develop and regulate the national nursing licensure examinations and promote the improvement of the legal standards of the practice of nursing for the protection of the public health, safety and welfare.

(d)  The executive officer, employed by the board as provided for herein, shall be a citizen of the United States and a person of the highest integrity and shall possess these additional qualifications: be a licensed professional nurse in Alabama or eligible for licensure, be a graduate of a professional nursing program approved by the state in which the program was completed, hold a master's degree, and have had a varied experience in nursing, including at least five years' experience in an administrative or teaching capacity. The executive officer shall be bonded for the faithful performance of the duties of the office in the sum of not less than $5,000.00, and the premium of the bond shall be paid out of the funds of the board.

(e)  Each member of the board shall receive the same per diem and travel allowance as is paid by law to state employees for each day's attendance at the board meetings incurred in the discharge of his or her duties as a board member in addition to any daily compensation or allowance, if any, as may be provided by the board, in such amount as

may be determined by the board. Also, any member of the board engaged in duties under the direction of the board shall receive the said per diem and travel expenses and daily compensation or allowance authorized by the board. (Acts 1965, No. 867, p. 1615, § 3; Acts 1975, No. 427, p. 1024, § 1; Acts 1983, No. 83-642, p. 989, § 2; Acts 1989, No. 89-243, p. 349, § 3.)

Cited in Stevens v. Blake, 456 So. 2d 795 (Ala. Civ. App. 1984).

§ 34-21-3. Advisory councils.

The board shall appoint advisory councils as the board shall, from time to time, deem advisable to represent health disciplines and consumers. Each member of such advisory council appointed by the board shall receive $30.00 per day for attendance at meetings of such advisory council or for attendance at the board meetings or otherwise engaged under the direction of the board, together with necessary travel and other expenses incurred in the discharge of such duties. (Acts 1965, No. 867, p. 1615, § 4; Acts 1975, No. 427, p. 1024, § 1.)

§ 34-21-4. Funds of board; transfer of duties, powers, etc., of board of nurses' examiners and registration to board of nursing.

All funds and revenues of whatever kind authorized or collected under the provisions of this chapter or the regulations of the board shall be collected by the board and shall be handled in accordance with existing regulations and accounting procedures of state departments and deposited in the board's trust fund in the state treasury. Disbursements and withdrawals of such funds by the board shall be made in accordance with existing regulations and accounting procedures of state departments. The board shall pay all of its expenses from its own funds, and no expenses shall be borne by the state of Alabama from general funds of the state. All the rights, duties, powers and authority now or hereafter vested by law in the board of nurses' examiners and registration are hereby transferred to and vested in the board of nursing, and all rights, powers, duties and authorities, whether clerical, executive, administrative, judicial or quasijudicial, now vested by law in the board of nurses' examiners and registration, shall be vested in the board of nursing hereby created and shall be exercised by it, together with any additional rights, powers and authorities herein given or created by this chapter. The jurisdiction, functions, funds, effects and personnel of the board of nurses' examiners and registration are hereby transferred to the board of nursing and covered with their current status. No unexpended funds of the board of nurses' examiners and registration or the board of nursing shall ever revert to the state of Alabama but shall remain the property of the board of nursing. (Acts 1965, No. 867, p. 1615, § 9.)

§ 34-21-5. Nursing educational programs.

An institution desiring to conduct a nursing educational program to prepare professional or practical nurses shall apply to the board and submit evidence that: It is prepared to

carry out the prescribed minimum standards to educate students in professional nursing or in practical nursing and that it is prepared to meet such other standards as shall be established by this chapter or by the board.

The board shall cause a survey to be made of the institution and its proposed educational program. If the survey reveals and the board is of the opinion that all requirements for an approved nursing educational program are met, it shall approve the institution.

The board, as often as deemed necessary, shall survey all nursing educational programs in the state. Should such survey reveal that the institution conducting such nursing educational program is not maintaining the standards required by the board, notice shall be given to the institution in writing, specifying deficiencies. Should an institution fail to correct the deficiencies to the satisfaction of the board within a reasonable length of time, the board shall disapprove the nursing educational program of such institution; provided, the institution may again qualify for approval if all requirements and standards are met. (Acts 1965, No. 867, p. 1615, § 10.)

§ 34-21-6. Exemptions.

This chapter does not prohibit: the furnishing of nursing assistance in an emergency; the practice of any legally qualified nurse of another state, who is employed by the United States government or any bureau, division or agency thereof, while in the discharge of his or her official duties; the practice of nursing by students enrolled in approved schools of nursing, as may be incidental to their course of study, nor shall it prohibit such students working as nursing aides; the practice of any currently licensed registered nurse or licensed practical nurse of another state whose employment responsibilities include transporting patients into, out of, or through this state or who is presenting educational programs or consultative services within this state not to exceed 30 days; persons, including nursing aides, orderlies and attendants, carrying out duties necessary for the support of nursing services, including those duties which involve supportive nursing services performed in hospitals and elsewhere under the direction of licensed physicians or dentists, or under the supervision of professional nurses licensed hereunder, nor gratuitous nursing of the sick by friends or members of the family, nor the care of the sick when done in accordance with the practice of religious principles or tenets of any well recognized church or denomination which relies upon prayer or spiritual means alone for healing. (Acts 1965, No. 867, p. 1615, § 12; Acts 1983, No. 83-642, p. 989, § 3.)

34-21-7. Violations and penalties.

Any person or persons, firm, partnership, association or corporation, who shall sell or fraudulently obtain or furnish any nursing diploma, license or license renewal or aid or abet therein; or practices nursing as defined in this chapter under cover of any diploma, license or renewal license fraudulently obtained or issued under fraudulent misrepresentation or, after January 1, 1968, practices professional nursing as defined in this chapter or, after January 1, 1971, practices practical nursing as defined in this chapter, unless duly licensed to do so under the provisions hereof; or uses in connection with his or her name any designation implying or tending to imply that he or she is a licensed professional nurse and licensed to practice as a registered nurse, or a practical

nurse licensed to practice practical nursing as a licensed practical nurse, unless duly licensed to practice under the provisions of this chapter; or after January 1, 1968, practices professional nursing or, after January 1, 1971, practices practical nursing during the time his or her license issued under the provisions of this chapter shall be suspended, revoked or has expired; or conducts a nursing education program for the preparation of professional or practical nurses, purporting eligibility of its graduates for license hereunder, unless the program has been approved by the board; or knowingly conceals information relating to violations of this chapter; or otherwise violates any of the provisions of this chapter, shall be guilty of a Class A misdemeanor and upon conviction, shall be punished in accordance with the laws of the state of Alabama. (Acts 1965, No. 867, p. 1615, § 13; Acts 1983, No. 83-642, p. 989, § 4.)

# ALABAMA BOARD OF NURSING

## CHAPTER 610-X-3

### NURSING EDUCATION PROGRAMS

### TABLE OF CONTENTS

**610-X-3-.01  Definitions**
**610-X-3-.02  Standards for Approval**
**610-X-3-.03  Distance Education**
**610-X-3-.04  Outcome Standards**
**610-X-3-.05  Deficiencies**
**610-X-3-.06  Establishing a New Program**
**610-X-3-.07  Closing a Program**
**610-X-3-.08  Nursing Education Program Hearing**

### 610-X-3-.01  Definitions

(1)    Approved Program:  A nursing education program that meets all of the standards as specified in these rules or those of a regulatory authority in another jurisdiction.

(2)    Articulation:  A planned process between two or more educational programs or systems to assist students to make a smooth transition from one program to another without duplication in learning or coursework.

(3)    Clinical and theoretical competence:  The possession of knowledge, attitudes and skills, and the ability to apply these attributes to meet current standards of nursing practice and education as specified in Chapter 610-X-6, Standards of Nursing Practice,  Chapter 610-X-3, Nursing Education Programs, and Chapter 610-X-4, Licensure.

(4)    Clinical Learning Experiences:  Organized plan of learning experiences that provides nursing students an opportunity to develop competencies in the assessment, planning, implementation and evaluation of nursing care appropriate to the scope of practice for the level and type of program.  Programs that offer only simulations or clinical testing do not meet the requirements for providing clinical learning experiences for nursing students.

(5)    Clinical Supervisor:  A licensed registered nurse, acting in a supervisory capacity of clinical learning experiences, who is accessible to assign or prescribe a course of action, give procedural guidance, direction and evaluation for a nursing student(s).

(6)    Curriculum:  An organized plan of study in nursing that includes both theoretical and clinical learning experiences essential for preparing students to be eligible upon graduation to apply for licensure as a registered nurse or licensed practical nurse.



EXHIBIT

(7)    Curriculum Outcomes:  A common set of competencies expected of a program's graduates upon completion of an organized plan of study.  Outcomes are clear, measurable demonstrations of student learning that occurs at or after the end of a comprehensive set of learning experiences.

(8)    Deficiency(ies):  Failure of a nursing education program to meet one or more of the standards as stated in the Standards for Approval of a Nursing Education Program.

(9)    Distance Education:  A formal educational process in which the majority of the instruction in a course/program occurs when instructors and students are not physically in the same location.  The educational process may use various methodologies for communication, instruction, and evaluation.

(10)    Licensed Hospital:  A facility described in Code of Alabama, 1975, Section 22-21-20(1), other than a health maintenance organization, which has an organized medical staff or which employs the services of a medical director who is a physician licensed to practice medicine in Alabama.  The term hospital shall not include the private offices of physicians or dentists, whether in individual, group, professional corporation or professional association practice.

(11)    Provisional Approval:  The initial status granted to a new nursing education program that evidences the potential to meet the Standards for Approval of a Nursing Education Program.

(12)    Survey:  A comprehensive Board authorized on-site evaluation or review of a written report for a proposed or existing program that serves as verification of the program's compliance with the Board's educational standards.

(13)    Systematic Plan of Evaluation:  A comprehensive written document that reflects ongoing evaluation of all program components that includes, but is not limited to, collection of objective data, evaluation of outcomes, and results in improvements based on evaluative data.

**Author:** Alabama Board of Nursing
**Statutory Authority:  Code of Ala. 1975**, §34-21-2(2)
**History:**  September 27, 1982.  Amended May 6, 1985.  Amended May 23, 1997. **Repealed and Replaced:**  Filed July 22, 2002.  Effective August 26, 2002.  Amended effective November 1, 2004. **Amended**:  Filed September 25, 2006.  Effective October 31, 2006.

## 610-X-3-.02 Standards for Approval

(1)    The governing institution, nursing program administrator, and nursing faculty are accountable for the standards, processes, and outcomes of the nursing education program.

(2)    The governing institution offering the nursing program shall be:
(a)    A postsecondary educational institution that is authorized to offer nursing education and is accredited by the Southern Association of Colleges and Schools (SACS) or a comparable regional accrediting body.

(b)    Approved by the appropriate State of Alabama educational agency(ies) if applicable.

(3)    The governing institution shall provide financial support and resources sufficient to meet the outcomes of the nursing education program.  Resources include, but are not limited to:

(a)    Financial.

(b)    Educational facilities.

(c)    Equipment.

(d)    Learning aids.

(e)    Technology.

(f)    Administrative, instructional and support personnel.

(4)    The governing institution or program administrator shall notify the Board, in writing, of any changes in the following:

(a)    Nursing program administrator.

(b)    Governing institution administrator.

(c)    Governance structure of the institution.

(d)    Regional accreditation status.

(5)    A nursing education program shall be administered by a qualified program administrator who is accountable for the planning, implementation, and evaluation of the program.  Minimum qualifications of a nursing program administrator shall include:

(a)    An unencumbered Alabama registered nurse license.

(b)    An earned graduate degree in nursing.

(c)    Nursing leadership and management experience.

(d)    Evidence of knowledge and skills related to current teaching methodologies, curriculum development, and program evaluation.

(6)    The governing institution and nursing program administrator shall provide sufficient numbers of qualified faculty to assure that curriculum implementation and expected program outcomes are achieved.  Minimum qualifications of nurse faculty shall include:

(a)    An unencumbered Alabama registered nurse license.

(b)    Evidence of current nursing knowledge, clinical practice skills and current teaching methodologies.

(c)    An earned graduate degree in nursing or a related health field.

(7)    Institutional and program policies and procedures shall:

(a)    Be written, published, and publicly available.

(b)    Address students' ability to assume clinical assignments including, but not limited to, educational preparedness and physical, mental, and emotional behaviors.

(c)    Provide opportunities for students to regularly participate in the development and evaluation of the program.

(8)    Faculty are accountable for curriculum development, implementation, and evaluation.

(9)    The curriculum of a nursing education program shall:

(a)    Enable the student to develop the nursing knowledge, skills and abilities required for entry level practice, consistent with the scope and standards of nursing practice.
(b)    Comply with the standards set forth in this chapter.
(c)    Be evidence-based, and outcome-focused.
(d)    Provide theoretical and clinical experiences specific to the expected scope of practice of graduates from each type of entry level nursing education program and shall include:
(i)    Content for students to attain knowledge and competence in providing a safe and effective care environment.
(ii)    Prevention of illness.
(iii)    Maintenance, promotion, and restoration of health.
(iv)    Psychological integrity of individuals across the life span.
(v)    Critical thinking and problem solving skills to assist in recognizing, analyzing, and applying relevant knowledge and skills to nursing care.
(vi)    Clinical learning experiences to provide opportunities for students to develop cognitive, psychomotor, and affective skills in the provision of nursing care.
(e) The curriculum content of a nursing education program shall include:
(i)    Liberal arts and sciences supportive of the nursing program.
(ii)    On or before August 1, 2008, all nursing programs shall offer science courses, including a corresponding lab, in anatomy and physiology.
(iii)    Nursing foundations, pharmacology, nutrition, and community-based nursing.
(iv)    History and trends of nursing, cultural diversity, legal and ethical responsibilities, and nursing practice responsibilities including leadership, management, delegation, and health care delivery systems.
(v)    Theory and clinical learning experiences in the areas of adult, maternal, child, and psychiatric/mental health nursing.
(10) The governing institution, nursing program administrator, and nursing faculty are accountable for selecting and evaluating the teaching methods, delivery modalities, and processes used to achieve expected program outcomes.

(11)  Clinical supervision of students shall comply with the standards set forth in this Chapter.

(a)     Clinical activities shall be supervised by a registered nurse who is knowledgeable of educational strategies and subject matter, and is experienced in the clinical technologies essential to the safe practice of nursing.

(b)    The registered nurse shall hold an unencumbered license to practice professional nursing in Alabama.

(c)    The clinical supervisor shall be readily accessible to assign or prescribe a course of action, give procedural guidance, direction and evaluation for students engaged in the clinical learning experience.

(d)    The faculty-student ratio in clinical practice shall be collaboratively determined by the professional nursing faculty, the School of Nursing administration and the professional nurse administrator, or designee, in the clinical agency.  In licensed hospitals that provide inpatient acute care, the faculty to student ratio shall not exceed 1:8 during clinical learning experiences.  The faculty-student ratio shall be determined according to the:

(i)       Complexity of the educational experience.
(ii)      Acuity of the patient(s).
(iii)     Physical layout of the clinical setting.
(iv)     Student's level of knowledge and skills to provide safe patient care.

(e)    The nursing education program shall work with clinical agencies for the planning, implementation, and evaluation of clinical experiences.

(f)     Clinical learning experiences shall include the development of skills in clinical judgments, management of care for groups of patients, delegation to, and supervision of other health care personnel.

(g)    Nursing faculty shall maintain responsibility and accountability for planning, implementation, and evaluation of all student clinical learning experiences.

**Author:** Alabama Board of Nursing
**Statutory Authority: Code of Ala. 1975**, §34-21-2(2)
**History:**  September 27, 1982.  Amended May 6, 1985.  Amended May 23, 1997. **Repealed and Replaced:** Filed July 22, 2002.  Effective August 26, 2002.  Amended effective November 1, 2004. **Amended**:  Filed September 25, 2006.  Effective October 31, 2006. **Amended:** Filed March 12, 2007.  Effective April 16, 2007.


### 610-X-3-.03 Distance Education

(1)    Delivery of instruction by distance education methods shall enable students to meet the goals, competencies, and objectives of the educational program and the standards of the Board, including supervised clinical learning experiences.

(2)   A distance learning program shall establish a means for assessing individual student and program outcomes.

(3)  A nursing education program based outside the state of Alabama who provides students with clincal learning experiences in Alabama shall:

(a)  Notify the Alabama Board of Nursing, in writing, thirty (30) days in advance of the clinical learning experience:

(i)  Name of student, including license number if the student is licensed in Alabama.

(ii)  Name and license number of the clinical supervisor.

(iii)  Name and location of the clinical facility.

(iv)  Learning outcomes expected of the student.

(v)  Name and license number of the nursing faculty responsible for the evaluation and oversight of the student's clinical learning experience.

(4)  Have regional accreditation comparable to the Southern Association of Colleges and Schools (SACS).

(5)  Comply with all standards of this Chapter, including those related to clinical supervision of student learning experiences. The Board may request periodic reports for the purpose of data collection or to determine compliance with the provisions of this chapter.

**Author:** Alabama Board of Nursing
**Statutory Authority:  Code of Ala. 1975, §34-21-5**
**History:** Filed September 25, 2006.  Effective October 31, 2006.

### 610-X-3-.04  Outcome Standards

(1)   Graduates shall demonstrate theoretical and clinical competence for entry into practice.

(2)   Graduates, as a composite of first time writers, shall achieve no less than an eighty percent (80%) pass rate on a board selected national licensure exam.  The Board shall establish the reporting time period.

(3)   There shall be a written plan for the systematic evaluation of the total program that is comprehensive, demonstrates ongoing evaluation, is based on program outcomes and incorporates continuous improvement.  The systematic evaluation plan shall include:

(a)   Collection, aggregation, analysis and trending of data.

(b)   Programmatic outcomes, levels of achievement, evaluative criteria, assignment of responsibility, frequency of assessment, methods of achievement, actions taken and quantitative data collected.

(c)   Ongoing evaluation and revisions based on the evaluation.

(4)   Each program shall submit written evaluation reports to the Board as determined by the Board.

**Author:**  Alabama Board of Nursing
**Statutory Authority:  Code of Ala. 1975, §34-21-5**

**History:** September 27, 1982. Amended May 6, 1985. Amended May 23, 1997.
**Repealed and Replaced:** Filed July 22, 2002. Effective August 26, 2002.
**Amended**: Filed September 25, 2006. Effective October 31, 2006.

### 610-X-3-.05 Deficiencies

(1)    The Board shall conduct surveys and evaluations as often as necessary to determine compliance with all standards set forth in Chapter 610-X-3.

(2)    The Board shall, upon determining that a program is not in compliance with 610-X-3-.01 through 610-X-3-.03, provide to the governing institution and nursing program administrator a written notice of deficiencies that establishes a reasonable time, based upon the number and severity of deficiencies, to correct deficiencies.

(3)    A nursing education program that receives a Notice of Deficiency from the Board shall establish a written plan within the specified time and provide reports to the Board as requested to document progress in removing deficiency(ies).

(4)    The Board shall conduct a hearing for any program that fails to correct identified deficiencies within the time specified by the Board.  The Board may:
    (a)    Withdraw approval from the nursing education program resulting in graduates being ineligible to take the licensing examination.
    (b)    Continue approval of the nursing education program for a specified time period.
    (c)    Direct the nursing program administrator to notify students in writing.

**Author:** Alabama Board of Nursing
**Statutory Authority: Code of Ala. 1975**, §34-21-5
**History:** September 27, 1982. Amended May 6, 1985. Amended May 23, 1997.
**Repealed and Replaced:** Filed July 22, 2002. Effective August 26, 2002.
**Amended**: Filed September 25, 2006. Effective October 31, 2006.

### 610-X-3-.06 Establishing a New Program

(1) A governing institution that plans to establish a new nursing education program shall submit to the Board a minimum of six (6) months in advance of the expected opening date:

(a) A letter of intent identifying the governing institution, the type of nursing education program, and the status of approval from accrediting bodies and state agencies.
    (b) A feasibility study that includes:

(i)  Purpose of establishing the new nursing education program.

(ii) Availability of health care agencies with sufficient practice experiences to support the program.    Letters of commitment and contract proposals are accepted documents for inclusion to demonstrate meeting the standard.

(iii) Enrollment projections and identification of potential students.

(iv) Availability of adequate educational facilities and practice sites for clinical learning experiences throughout the life span.

(v)  Assurance of adequate financial resources to support the initial and continuing program including submission of the proposed initial budget and continuing budget.

(vi) Availability of qualified faculty for theoretical and clinical instruction.

(vii) Timeline for planning and implementation of the proposed program.

(viii) Determination of demand for graduates of specific proposed program in geographical area.

(ix)  Impact on existing nursing programs within a fifty (50) mile radius of the proposed program.

(x)  Organizational structure of the governing institution and placement of proposed nursing education program within the overall organization.

(2)  The governing institution shall submit an application for approval to establish a new program at least three (3) months prior to expected review by the Board.

(3)  The application for Establishing a New Program shall include:

(a)  Demonstration of the potential to meet all standards identified in this Chapter.

(b)  Verification that a nursing program administrator or nursing faculty member is employed to develop the nursing program.

(c)  Verification of availability of qualified nursing faculty to support the proposed numbers of student admissions to the new nursing education program.

(d) Curriculum plan that complies with the standards identified in this Chapter.

(4) A survey may be conducted to amplify, clarify, and verify information in the application.

(5)  If all standards for approval are met, the program shall receive provisional approval.

(6)  Following receipt of the first fiscal year report of performance of graduates on the national licensure examination, the Board shall conduct a survey to determine if all standards for approval of a nursing education program have been met.  The Board may:

(a) Grant full approval if standards of a nursing education program are met.

(b) Continue provisional approval and provide to the governing institution and nursing program administrator a written notice of deficiencies that establishes a reasonable time, based upon the number and severity of deficiencies, to correct deficiencies.

**Author:** Alabama Board of Nursing
**Statutory Authority: Code of Ala. 1975**, §34-21-5
**History:** September 27, 1982. Amended May 6, 1985. Amended May 23, 1997.
**Repealed and Replaced:** Filed July 22, 2002. Effective August 26, 2002.
**Amended**: Filed September 25, 2006. Effective October 31, 2006.

### 610-X-3-.07 Closing a Program

(1) A governing institution seeking to close a nursing education program shall submit written notification to the Board at least six months prior to the planned closing date.

(2) The governing institution shall ensure that all standards for nursing education programs are maintained and all necessary courses are taught until the last student is transferred or graduated.

(3) The governing institution shall secure and provide for the permanent custody and storage of records of students and graduates. The Board shall be notified of the location and method of retrieving information from these records.

**Author:** Alabama Board of Nursing
**Statutory Authority: Code of Ala. 1975**, §34-21-2(1)
**History:** September 27, 1982. Amended May 6, 1985. Amended May 23, 1997.
**Repealed and Replaced:** Filed July 22, 2002. Effective August 26, 2002.
**Amended**: Filed September 25, 2006. Effective October 31, 2006.

### 610-X-3-.08 Nursing Education Program Hearing

(1) A governing institution may request a hearing before the Board regarding the Board's decisions about the nursing education program.

(2) The Board shall conduct a hearing prior to withdrawing approval or denying approval of a nursing education program.

(3) The institution may present any written or oral evidence for the Board's consideration at any Board hearing.

**Author:** Alabama Board of Nursing
**Statutory Authority: Code of Ala. 1975**, §34-21-2(1)
**History:** September 27, 1982. Amended May 6, 1985. Amended May 23, 1997.
**Repealed and Replaced:** Filed July 22, 2002. Effective August 26, 2002.
**Amended**: Filed September 25, 2006. Effective October 31, 2006.

# Chattahoochee
## Valley Community College
*CLOSE TO YOU. CLOSE TO PERFECT.*

*1.334.291.4900*

*P.O. Box 1000*
*2602 College Drive*
*Phenix City, Alabama 36868-1000*

## STATUS LETTER REGARDING PROGRESSION
## IN THE ADN PROGRAM

Date: December 20, 2005

Student's Name: Lindy Wright        Social Security Number: 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

The purpose of this notice is to inform you of your status in the LPN program.

① **FAILURE/WITHDRAWAL**                    **SEMESTER FAILED**

**NUR 252**                                 **Fall 2005**

**NUR 271**                                 **Fall 2005**

Policy states that a student is allowed a maximum of two failures in the L.P.N. or A.D.N. program before he/she is dismissed from the program, and withdrawals from nursing courses are counted as failures except in the extenuating circumstances as determined by the Division Chairperson. A student cannot progress in the program until the course failed has been successfully repeated. Students dismissed from the program may apply for admission as a new student after two years has elapsed (CV 2005-2006 Catalog pg. 111, #12 ADN Admissions Criteria).

② **ELIGIBILITY**

   a.   May Re-enter  _____

   b.   May **NOT** Re-enter  _____X_____

*please file in Lindy Wright folder*

③ **SEMESTER TO RETURN**

   N/A

**NOTE: All students must complete the program within twenty-four months o.... date he/she began (Alabama Department of Postsecondary Program Progression).**

Sincerely,

*Dixie Peterson*

Dixie Peterson
Division Chair/Health Sciences

**EXHIBIT**
tabbies
Y

CVCC 000381