**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| LINDY G. WRIGHT, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:06-cv-1087-WKW |
| | ) | |
| CHATTAHOOCHEE VALLEY | ) | |
| COMMUNITY COLLEGE (CVCC), et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

PLAINTIFF, Lindy G. Wright ("plaintiff" or "Wright"), by and through the undersigned counsel of record, files her opposition to defendants' motion for summary judgment, and would show unto the Court the following:  In their motion for summary judgment, defendants asserted that (1) there are no genuine issues of material fact upon which relief can be granted; (2) that defendants are entitled to absolute or sovereign immunity from suit; (3) that plaintiff's rights were not violated under 42 U.S.C. § 1983; (4); that defendants did not conspire to violate plaintiff's rights under 42 U.S.C. §1981; and (5) that plaintiff did not state a cause of action for which relief can be granted for the tort of outrage.  ("Defs. Mot." p. 1; Defs. Brief, pp. 26, 28, 33, 35, 43, 46).  For the reasons and authorities set forth below, defendants' motion for summary judgment is due to be denied.

**STANDARD OF REVIEW FOR SUMMARY JUDGMENT**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"), a court can dismiss a complaint for failure to state a claim under which relief can be granted.  The factual allegations in a complaint must be taken as true and viewed in the light most favorable to plaintiff.  *Thomas v. Hill*,

963 F.Supp. 753 (N.D. Ind. 1997), citing *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), and *Roots Partnership v. Lands' End, Inc*., 965 F.2d 1411 (7th Cir. 1992). Even though the court does not have to accept any legal conclusions alleged in the complaint, dismissal is appropriate only if it appears beyond doubt that plaintiff can prove no set of facts in support of her claim that would entitle her to relief. *Hishon v. King Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

Furthermore, in reviewing a motion for summary judgment pursuant to Rule 56(c) of the FRCP, the trial court must determine that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment bears the initial burden of proof that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *McGrady v. Nissan Motor Acceptance Corp*., 40 F.Supp.2d 1323 (M.D. Ala. 1998), *Costa & Head Dev. Co., v. Mayer Elec. Supply Co*., 562 So.2d 1323 (Ala. Civ. App. 1989). Conversely, summary judgment must be denied if there is a genuine issue of any material fact, and the moving party is not entitled to a judgment as a matter of law. *Worthey v. Worthey*, 491 So.2d 953 (Ala. Civ. App. 1986).

In addition, Rule 56(c) mandates a trial court to render summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file point to the absence of a genuine issue as to any material fact. *Alabama Farm Bureau Mutual Casualty Co. Inc. v. American Fidelity Life Insurance Co.*, 606 F.2d 602, 609 (5th Cir. 1979). Before a trial court can grant a motion for summary judgment, it must view all of the evidence and all factual inferences from the evidence in the light most favorable to the nonmoving party, and to resolve all doubts against the

moving party. *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345 (5th Cir. 1989). In addition, when "reasonable minds might differ on the inferences arising from undisputed facts," summary judgment must be denied. *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982).

In this case plaintiff has proffered sufficient evidence that would allow a reasonable jury to infer that defendants probably committed the acts alleged in the complaint. *Hynson v. City of Chester Legal Dept.*, 864 F.2d 1026 (3rd Cir. 1988), *Watson v. City of Kansas City, Kan.*, 857 F.2d 690 (10th Cir. 1988). Contrary to defendants' assertions, plaintiff has presented factual questions that cannot be resolved on a motion for summary judgment. It is also conceivable under the facts alleged in the complaint that plaintiff could prove a set of facts in support of her claims against defendants for violation of her rights under federal and state laws. In situations when "reasonable minds could *differ* as to whether a preponderance of the evidence establishes the facts of a prima facie case, then a question of fact *does* remain, which the trier of fact will be called upon to answer." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Based on the facts and authorities cited herein, the Court should properly deny defendants' motion for summary judgment.

## STATEMENT OF FACTS

Viewed in the light most favorable to the non-moving party, the following facts are established. In August 2002 plaintiff Wright graduated from CVCC with a certificate in Practical Nursing ("PN") (Wright Depo. p. 16:9-10, p. 51, Exhibit 1). Upon graduation as a PN, and as a Licensed Practical Nurse ("LPN") after passing the National Council Licensure Examination ("NCLEX-PN") in November 2003, Wright worked at Doctors' Hospital (2003-2004), St. Francis Hospital (for six months in 2004), and for gastroenterologists Dr. A.D. Patel and Dr. P.H. Patel in

Columbus, Georgia (Wright Depo. pp. 38-43, 54-55, 59, 69, Exhibit 1). In April 2005 CVCC admitted Wright into the Nursing Career Mobility Program ("ADN"), a twenty-four month nursing program that would have led to the award of the Registered Nurse ("RN") degree (Wright Depo. pp. 37-38, Exhibit 1). At the time of her admission to the ADN program at CVCC in the spring semester of 2005, Wright was pregnant (Wright Depo. p. 43, Exhibit 1).

Fall semester started on August 22, 2005, and RN classes met once a week on Wednesdays, with the first class scheduled to meet on August 24 (Peterson Depo. p. 44:8-23, p. 43:14-16, p. 47: 4-6, Exhibit 2). On August 31, 2005, nursing instructors Sandra Gunnels ("Gunnels"), who taught a course in Maternal-Newborn Nursing (NUR271), and Brenda Bellamy ("Bellamy"), the instructor for the Adult Health Nursing II course (NUR252), abruptly resigned from CVCC (Peterson Depo. pp. 35-43, Exhibit 2). In her deposition, Gunnels testified that she resigned because she "never received the appropriate salary" for her thirty-year experience as a nursing (Gunnels Depo. p. 140:18-19, p. 149:19-20, Exhibit 3). In a letter dated August 31, 2005, and addressed to Dr. James Lowe ("Lowe"), Dean of Instruction, Bellamy cited as reasons for her resignation "contract negotiations, salary disputes, and broken verbal promises" (Letter from Bellamy to Lowe, Exhibit 4).

In her deposition, Wright testified that Lowe "came down to the class and said that our instructors were sick, they wouldn't be in. They quit, and we didn't have instructors and we had guest speakers come in" (Wright Depo. p. 217:2-7, p. 218, Exhibit 1). Bellamy denied that she had called in sick on the day she resigned (Bellamy Depo. p. 49, Exhibit 5). During her deposition, Wright testified: "There was always chaos in that class. There was always something going on, somebody fussing" (Wright Depo. p. 218:18-21, Exhibit 1). She also testified that "When the instructors left and we didn't have instruction for the first five weeks -- the majority of my class was

from Atlanta, and they were very vocal and wanted to know what was going on, where the instructors were, what are you going to do to replace them; I want to see my test" (Wright Depo. p. 219:17-23, Exhibit 1). The students in her nursing class, according to Wright, were upset, and that "It was just chaos" (Wright Depo. p. 225:20-23, Exhibit 1).

The day Gunnels and Bellamy resigned, CVCC allowed Pat Fuggatt from the Columbus Medical Center hospital to serve as "a guest speaker" in Gunnels' Maternal-Newborn Nursing class (NUR271), while on one occasion (one class) Wallace Community College in Hanceville, Alabama, "deliver[ed] obstetrical content to the students" through what is known as distance learning (Peterson Depo. p. 45:22-23, p. 46:1-8, Exhibit 2).

To fill the two vacancies created by the resignations of Gunnels and Bellamy, CVCC assigned John Christopher, a critical care nurse and an adjunct instructor who taught respiratory principles, to teach Bellamy's course (NUR252) for "a class and a half;" Christopher also served as a guest speaker in respiratory concepts (Peterson Depo. p. 45:10-16, p. 48:17-22, pp. 48-49, Exhibit 2). On September 14, 2005, CVCC hired Lynn Harris ("Harris") to teach Bellamy's NUR252 course (Peterson Depo. pp. 32:15-18, p. 45:1, Exhibit 2). On September 21, 2005, CVCC hired Tawyna Cash ("Cash"), a nursing instructor from Southern Union College in Opelika, Alabama, as a part-time nursing instructor to teach Gunnels' NUR271 course (Peterson Depo. pp. 41-45, Exhibit 2).

At the end of the fall semester 2005, Harris and Cash, instructors for NUR252 and NUR271 respectively, told Wright she had made a grade of "D" in each course (Wright Depo. pp. 81-82, Exhibit 1). Wright filed a grade appeal for both courses in December 2005. Specifically, in her grade appeal for NUR252, Wright complained that the:

Instructor was unavailable to discuss concerns at time of individual exams. Instructor

did not formally review any exams until December 13th. Upon review and research of multiple exam questions, objective documentation was found in nursing textbooks to support the answers I chose and to refute the answers listed on the answer key. When questioned, the instructor refused to provide the rationale for answers indicated on the key. The instructor has been provided with this documentation.

The instructor did not post nor make available exam grades in a timely manner. Due to lack of communication by instructor, I was unaware that I was in jeopardy of failing this class until one to two week before the final exam. When questioned, the instructor stated "All you have to make is another 180 points" & you will pass. No tutoring or remediation was offered at that point.

Clinical Instructors did not "show up" for two (2) clinicals, negatively impacting my ability to synthesize and practice the knowledge given in lecture or to receive instructor feedback on my knowledge.

Instructor was not assigned until week 5 of the semester. A guest speaker (ADN prepared & no teaching experience) was utilized until that time. "Guest Speaker" on Respiratory System specifically instructed the class that compensatory mechanisms of ABG's would NOT be included on the exam. Two questions directly related to compensation were on the exam. Other exams were not given on the dates scheduled and for which students prepared.

Nursing Care Plans were "unavailable" and arbitrary grades (23 of 25 points) were assigned. If these grades were arbitrary, then I am requesting the full 25 points.

There were approximately 10 drug and solution calculation questions included on the four exams during the semester. Nowhere in the syllabus or objectives was it indicated that drug dosage and calculation knowledge would be tested on the unit exams. No review of drug calculations were given in class prior to the exams (Grade Appeal Form for NUR 252, Exhibit 6).

Wright also complained about two NUR252 care plans, including those of her entire clinical group at the Columbus Medical Center hospital, the clinical instructor, Deborah Gruber, had lost and for which Harris summarily awarded her 46 out of a total of 50 points (Wright Depo. pp. 123-126, Exhibit 1). In addition, Wright testified during her deposition that when she asked to meet with Harris to discuss her grade, Harris was "very ugly and nasty," and "very defensive" (Wright Depo. p.

-6-

128:5-13, Exhibit 1).[1]  Before Wright could meet with Harris in her office, Wright had to go through

Dixie Peterson ("Peterson"), chairperson of the Division of Health Sciences and Public Technologies

at CVCC, and when the meeting finally took place on December 13, 2005, Harris "Raised her voice.

I mean, her face would turn red and she would just get excited" (Wright Depo. p. 128:20-23, p.

130:3-4).  In the end CVCC denied Wright's grade appeal for NUR252.

      With regard to NUR271, the course taught by Cash, Wright complained that the:

> Instructor was unavailable to discuss concerns at time of individual exams.  Instructor did not formally review any exams.  Whereas I have not at this time been allowed to review my scantrons and exams, I have found objective documentation in nursing textbooks to support the answers I chose and to refute the answers stated by the instructor to multiple exam questions,

> The instructor did not post nor make available exam grades in a timely manner.  Due to lack of communication by the instructor, I was unaware that I was in jeopardy of failing this class.  No tutoring was offered.  The instructor was consistently late to the 9 am Wednesday class and had to leave immediately after most class sessions.

> Instructor was not assigned until week 5 of the semester.  A guest speaker (ADN prepared & no teaching experience) was utilized for one class period.  Another guest speaker from Doctors Hospital provided blatantly incorrect information about Obstetrical patient care that differed from our textbook.  On the 4th week, no lecture was provided due to a televised communication system being set up with Wallace and no make-up lecture time was provided.

> There were approximately 740 drug and solution calculation questions included on the four exams during the semester.  Nowhere in the class course syllabus or objectives was it indicated that drug dosage and calculation knowledge would be tested on the unit exams.  No review of drug calculations was given in class prior to the exams.  Ms. Cash was asked to instruct the class on how to perform a drug dosage and calculation from one of the exams given and she said she could not perform the problem herself (Grade Appeal Form for NUR271, Exhibit 8).

---

[1] Wright was not the only student who met with Harris to discuss her performance in NUR 252.  Elise Sizemore met with Harris to review math calculations on the second math test in which she failed to achieve 100 percent.  Also, Sizemore complained of tests being given with little or no notice and preparation, given that fact that CVCC did not assign a permanent instructor for the class for two weeks, but instead assigned "guest speakers" like John Christopher to teach the course.  Sizemore's letter to David N. Hodge, Dean of Student and Administrative Services is attached herein as Exhibit No. 7.

In her deposition, Peterson testified that Wright had one failing grade ("D") in the fall semester of 2005, namely in Harris' NUR252, and ruled in Wright's favor in Cash's NUR271, with the grade of "D" being changed to a grade of "C" for NUR271 (Peterson Depo. p. 94:2-7, p. 137:18-20, Exhibit 2; Grade Change Form for NUR 271, Exhibit 9). According to Peterson, Cash's NUR271 "did not count as a failure and she should not receive a failing grade for the course" (Peterson Depo. p. 138:1-3, Exhibit 2). Wright's Unofficial Transcript showed a grade of "C" for NUR271 (Wright's Unofficial Transcript, Exhibit 10). During the deposition, Hon. Chip Nix, attorney for defendants, asked Peterson to explain why the grade appeal in NUR271 was ruled in Wright's favor:

> Q. Do you know the reason that NUR271, that the grade appeals on NUR271 was ruled in favor of Lindy Wright?
> A. Yes.
> Q. What was that reason?
> A. Because I asked Dean Lowe to rule in her favor because the instructor of record during that time did not respond to her in a timely manner.
> Q. And that instructor was Ms. Cash; is that correct?
> A. That is correct.
> Q. Is it correct to say that the reason that grade appeal was ruled in favor of Lindy Wright was that there was an administrative failure on the part of the teacher to respond timely to the request made by Ms. Wright that the grade be reconsidered?
> A. Yes.
> (Peterson Depo. p. 138:4-22, Exhibit 2).

According to Peterson, "I asked Dean Lowe to rule in her favor because the instructor did not respond to her in a timely manner" (Peterson Depo. p. 138:9-12, Exhibit 2). The Dean of Instruction James Lowe concurred, writing: "You have been reinstated into the program due to the fact that the proper procedures on the grade appeal were not followed in a timely manner as required by Grade Appeal policy as stated in the Student Handbook" (Letter from Lowe to Wright, Exhibit 11).

In early January 2006, before the commencement of spring semester, Wright met with Peterson and Dean Lowe.  According to Wright, Peterson and Lowe authorized her to enroll in NUR200 in place of NUR252 that will no longer be offered because of a change in the nursing curriculum to a standardized curriculum that would go into effect in the summer semester 2006 and become mandatory in the fall semester 2006 (Wright Depo. pp. 146-147, Exhibit 1; Peterson Depo. p. 86, Exhibit 2).  During her deposition and in her affidavit (Exhibit 12), Wright averred that she had an agreement with Peterson and Lowe for her to take NUR200 in place of NUR252, and that they assured her that "the D [in NUR252] will not come off of your transcript, but it will not be held against you" (Wright Depo. p. 147:5-23, Exhibit 1).  According to Peterson, NUR200 was modeled upon NUR252, and asked the Health Science coordinator to fill out the course substitution form for Wright (Peterson Depo. p. 96, Exhibit 2).

On January 10, 2006, Hon. Connie Cooper ("Cooper") followed this up with a letter to Dean Lowe seeking assurances that Wright "will be allowed to continue classes until a ruling on her appeal is rendered.  In the event she is not allowed to continue classes, I understand that concessions will be made later, in the event the ruling of her appeal is successful.  We are aware of other students who have been allowed to continue class pending their appeal" (Letter from Cooper to Lowe, Exhibit 13). One of those students was Elise Sizemore who registered for NUR272 even though CVCC had informed her on December 20, 2005, that she had failed NUR252, a requirement for NUR272.  She went on to say that "Mrs. Peterson instructed me to go ahead and attend the classes that I had registered for even though a requirement for NUR272 is the completion of NUR252 per the Spring 2006 syllabus" (Letter from Sizemore to Hodge, Exhibit 7).

In a January 17, 2006, e-mail sent by Peterson to Heather Chalkley and copied to Dean Lowe,

among others, Peterson wrote that NUR200 was a substitute for NUR252. Specifically to Sanquita Alexander, Peterson wrote: "Sanquita, I will be requesting of Dean Lowe to sign a substitution form for Nursing 200 to be accepted for Nursing 252, so Lindy will be registering for Nursing 200 to fulfill the 252 requirement" (E-mail from Peterson to Heather Chalkley, Exhibit 14; Authorization for Course Substitution, Exhibit 15). Wright earned an "A" grade in NUR200.

Also in the spring semester 2006, Wright enrolled in NUR272, Pediatric Nursing, taught by Harris. Wright testified during her deposition that a week before the final exam, she met with Harris who told her she needed 180 points to pass the course (Wright Depo. pp. 154-155, Exhibit 1). Wright got a "D" grade in NUR272. Wright avers that she would have earned the necessary 180 points if Harris had "been available to go over tests, go over any kind of remediation for any student, not just myself, anybody" and that such remediation would have prepared her to pass the course (Wright Depo. p. 155:18-23, Exhibit 1). When Wright met Harris in her office after the final exam, Wright stated that Harris told her she did not have enough points to pass the course, but told her not to worry about it because the course would be offered in the summer semester, and that everything would be fine (Wright Depo. p. 157-159, Exhibit 1).

Wright blamed her failure in NUR272 mainly on the fact that two of her clinical instructors, Artemisa Harmon and a Shirley (or Sylvia or Sherry Lifsey?), regarded her care plans three times resulting in three different grades: 22/25, 7/25/ 19/25  (Wright Depo. pp. 207, 256-261, Exhibit 1; NUR272 Care Plans, Exhibit 16). On May 19, 2006, Wright filed a grade appeal with Dean Hodge, Dean of Students, arguing that the grade of "A" earned in NUR200 would have allowed her to graduate earn enough credits in the summer semester 2006 to graduate with an associate degree of nursing (Letter from Wright to Hodge, May 19, 2006, Exhibit 17).

According to Wright, when she met with Peterson on May 19, 2006, after filing her application for course forgiveness, Peterson, who had promised to help Wright, "told me in his [Dean Lowe's] office that she would help me any way she could, to go ask Ms. Harris if she would look over the care plans and regrade those or let me redo them" (Wright Depo. p. 163:13-17, Exhibit 1; Peterson Depo. pp. 98-101, Exhibit 2).  Harris refused to regrade the care plans, saying she had already discussed the issue with Peterson (Wright Depo. p. 164:7-12, Exhibit 1).

On June 7, 2006, Cooper wrote a letter to Dr. Laurel M. Blackwell ("Blackwell"), president of CVCC, in an attempt to resolve the issue as to whether Wright had two failures (NUR252 and NUR272) by the end of the spring semester 2006.  Cooper wrote, "I personally assisted Ms. Wright with what we believed was a successful resolution of the Nursing 252 issue in that the Nursing 200 course would substitute for Nursing 252, as long as Ms. Wright successfully passed Nursing 200.  It appears Dean Lowe is now denying that this was the resolution reached by all involved.  There would have been no reason for my client to take Nursing 200 unless this would have assisted her to graduate" (Letter from Cooper to Blackwell, Exhibit 18).  In her response, dated June 13, 2006, Blackwell asserted that "NUR200 did not take away the failing grade of NUR252; it merely allowed an opportunity for Ms. Wright to repeat a failed course" (Letter from Blackwell to Cooper, Exhibit 19).  On June 30, 2006, Dean Hodge wrote Wright to say, "We regret to inform you that your Request for Academic Bankruptcy was not approved for the following reason:

> You've requested course forgiveness for NUR252.  Course forgiveness can only be implemented when the same course and course number has been repeated.  After researching your records, we found no repeat of NUR252" (Letter from Hodge to Wright, Exhibit 20).

## ARGUMENT
### I.  CLAIMS OF ABSOLUTE OR SOVEREIGN IMMUNITY FOR CVCC AND ITS OFFICIALS

In the motion for summary judgment, defendants have argued that they are entitled to absolute or sovereign immunity from suit under Alabama law, citing in particular Article 1, Section 14 of the Alabama Constitution of 1901 (Defs. Mot. pp. 26, 28-29, 32). These claims are unpersuasive in light of the United States Supreme Court's holding in *Harlow v. Fitzgerald*, 457 U.S. 800, 73 L.Ed.2d 396, 102 S.Ct. 2727 (1982), and *Estelle v. Gamble*, 429 U.S. 97, 50 L.Ed.2d 251, 97 S.Ct. 285 (1976), citing *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The Eleventh Amendment to the Constitution of the United States shields CVCC and its officials from damage suits in their official capacities, but these officials are individually subject to liability under 42 U.S.C. § 1983 for violations of the United States Constitution and federal law. *Newsome v. Lee County, Alabama, et al.*, 431 F. Supp. 2d 1189 (M.D. Ala. 2006), citing *Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 87 L. Ed. 2d 114 (1985).

In *Harlow*, the Court recognized the defense of absolute immunity only for officials such as legislators, judges, prosecutors, and the President of the United States, whose special functions or constitutional status demands complete protection from suit. See also *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 95 S. Ct. 1813, 44 L.Ed.2d 324 (1975), *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). Other government officials, including governors, members of the President's Cabinet, and other executive officials, are entitled to qualified or good faith immunity. Therefore, the bases of immunity set forth in the motion for summary judgment are either inapplicable to these defendants under the particular circumstances of this case.

In *Newsome*, supra, citing *Crosby v. Monroe* County, 394 F. 3d 1328 (11th Cir. 2004, the

Court held that government officials sued in their individual capacities under § 1983 may assert qualified immunity as an affirmative defense if they were performing discretionary functions. The Court noted, quoting *Crosby* at 1332, "Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity." In other words, defendants are entitled to judgment as a matter of law only when plaintiff fails to furnish sufficient factual allegations at the summary judgment stage. The United States Supreme Court, in *Saucier v. Katz*, 533 U.S. 194, 121 S.CT. 2151, 150 L. Ed. 2d 272 (2001), set forth two steps for determining whether an official is eligible for qualified immunity. The first step focuses on whether plaintiff's allegations, if considered true, show that the official violated a constitutional right. In the second step, the Court has to find that an official acted in an unconstitutional manner to trigger an analysis as to whether the right in question was clearly established such that the official had fair warning that his or her conduct was constitutionally prohibited. The *Newsome* Court, citing *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed. 2d 523 (1987), noted, "This standard does not require a prior court decision to have declared the precise set of facts presently alleged unlawful," only that in light of pre-existing law the unlawfulness must be apparent.

Additionally, in *Vinyard v.* Wilson, 311 F. 3d 1340, 1350-51 (11th Cir. 2002), the Eleventh Circuit of Appeals held that a law is clearly established by (1) the clarity of the pertinent federal law or constitutional provision; (2) a judicial determination that certain conduct has been determined to be unlawful with regard to particular facts; and (3) holdings in specific cases are tied to certain facts. Thus, in the performance of discretionary functions, CVCC officials are entitled only to qualified or good faith immunity. However, qualified immunity can be defeated if an official knew or reasonably

should have known that the action she/he took within her/his sphere of official responsibility would violate Wright's constitutional rights or if they took the action with the malicious intention to cause a deprivation of constitutional rights or other injury. *Harlow*, 457 U.S. at 815. In *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Court established a similar causation test with respect to a municipality's liability pursuant to 42 U.S.C § 1983. See also *Mandel v. Doe*, 888 F.2d 783 (11th Cir. 1989).

In *Cranman v.* Maxwell, 792 So.2d 392 (Ala. 2000), the Alabama Supreme Court held that defendant University of Alabama physicians were entitled to discretionary function immunity in a medical malpractice action brought against them by the executor of the estate of Matthew Cranman. The Court held that a state agent shall not be immune from civil liability in his or her personal capacity

> (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
>
> (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

See also *DeStafney v. University of Alabama*, 413 So.2d 391 (Ala. 1981), interpreting immunity from tort liability for peace officers in Ala. Code § 6-5-338 (1975) as inapplicable to conduct that is willful or malicious; *Williams v. City of Montgomery*, 21 F.Supp.2d 1360 (M. D. Ala. 1998), and *Restatement (Second) of Torts, § 895D (1979)*.

Similarly, the United States Supreme Court has held that "Even a suit for money damages may be prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so long as the relief is sought not from the state

treasury but from the officer personally." *Alden v. Maine*, 119 S.Ct. 2240 (1999), *Ford Motor Co. v. Department of Treasury of Ind.,* 323 U.S. 459 (1945).

### Dr. Laurel Blackwell

It is undisputed that since August 2005, Blackwell has been the president of CVCC (Blackwell Depo. p. 12). In the management and administration of CVCC, Deans Lowe and Hodge, and Peterson, Division Chairperson of Health Sciences and Public Service Technologies, assist Blackwell (Defs. Mot. pp. 4-6, Blackwell Depo. pp. 29-31, Exhibit 21). As president Blackwell provides direction to CVCC, implements its policies and procedures, and offers and signs faculty employment contracts (Defs. Mot. p. 28; Blackwell Depo. p. 12, 37-38, Exhibit 21). Furthermore, "The information provided in Dr. Blackwell's response was obtained from staff and faculty members" (Defs. Mot. pp. 28-29). The information that faculty and staff members provided and upon which Blackwell acted shows that on August 31, 2005, Gunnels and Bellamy abruptly resigned their positions as nursing instructors at CVCC. They were replaced on September 14 (the hiring of Harris to teach NUR252) and 21 (the hiring of Cash to teach NUR271) respectively.

In the meantime, John Christopher and Pat Fuggatt served as "guest speakers" in the class, with the former teaching for a class and a half. Wright described a class that was characterized by chaos and fussing, with a vocal group of students from Atlanta demanding to know where the nursing instructors were. In her letter to Hodge on January 29, 2006, Sizemore described situations where exams were given in NUR 252 with little or no notice or preparation. The lack of nursing instructors for a period of five weeks and the uncertainty it created had a disparate impact upon some of the students including Wright and Sizemore, both of whom had problems passing NUR252.

The information that faculty and staff members provided to Blackwell and upon which she

acted and thus ratified also tends to show that in the spring semester 2006, Lowe ruled on the eligibility of Wright to take NUR200 in place of NUR252. The rationale was that "Since the new standardized curriculum will be implemented with the new RN class that enters in May, 2006, Nursing 252 will not exist in the new curriculum" (E-mail from Peterson to Chalkley, Exhibit 14). In her letter to Cooper on June 13, 2006, Blackwell seemed to have ratified the actions of Lowe and Peterson in substituting NUR200 for NUR252 (Blackwell Depo. p. 98:7-21, Exhibit 21). In May 2006, after "Dixie told me to go talk to whoever," Wright had an unscheduled meeting with Blackwell to discuss her application for grade forgiveness (Wright Depo. p. 166:22-23, Exhibit 1). According to Wright, Blackwell "basically told me that she had nothing [to] do with the academics, that it was their decision, and that was the extent of that" (Wright Depo. p. 168:7-9, p. 270, Exhibit 1; Blackwell Depo. p. 27-28, Exhibit 21).

Contrary to assurances Lowe and Peterson had given to Wright and Cooper that the failing grade in NUR252 would not be held against her, Blackwell wrote to say that "However, NUR200 did not take away the failing grade of NUR252; it merely allowed an opportunity for Ms. Wright to repeat a failed course"(Letter from Blackwell to Cooper, Exhibit 19). Even though NUR252 was no longer going to be part of the new standardized curriculum, Dean Hodge wrote Wright to say that course forgiveness can only be given when a student repeats the same course and course number.

Thus, assuming the facts to be as plaintiff alleges them, a jury could determine that Blackwell violated Wright's rights under § 1983 on the theory of governmental or supervisory liability. *Monell*, supra, *Rizzo v. Goode*, 423 U.S. 362 (1976). Under § 1983, supervisory liability may be shown by either the supervisor's personal participation in the acts that comprise the constitutional violation or the existence of a causal connection linking the supervisor's actions with the violation. *Lewis v.*

*Smith*, 855 F. 2d 736, 738 (11th Cir. 1988).

As president of CVCC, Blackwell had a duty to provide direction to CVCC and to implement its policies and procedures fairly and without violating plaintiff's federal rights, and she had knowledge, through her correspondence with Cooper and receipt of information from staff and faculty members, of the disruptions caused by the abrupt resignations of Gunnels and Bellamy on August 31, 2005. During her deposition, Blackwell testified that she, along with Lowe, visited Wright's classroom and saw that the students were upset (Blackwell Depo. pp. 41-42, Exhibit 21). Blackwell also knew that Dean Lowe had approved NUR200 for Wright to take in the spring semester 2006, and knew that she had failed the course (Blackwell Depo. p. 53, Exhibit 21). It is clear from the foregoing discussion and authorities that Blackwell violated clearly established law. *Howell v. Evans*, 922 F.2d 712. (11th Cir. 1991), *Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), *GJR Investments, Inc. v. County of Escambia, FLA*, 132 F.3d 1359 (11th Cir. 1998).

## Dr. James Lowe

As Dean of Instruction, Lowe was one of two deans that reported directly to president Blackwell. Peterson, as division chairperson for the Health Sciences, reported to Lowe (Peterson Depo. p. 21-22, Exhibit 2). There were allegations that CVCC had three instructors for upwards of 90-100 nursing students, and that meetings were held with Lowe and Blackwell, some attended by Peterson, to "add nursing faculty in order to grow the programs" (Peterson Depo. pp. 52-54, p. 55:6-10, Exhibit 2).

On August 31, 2005, Lowe told nursing students, including Wright, that Gunnels and Bellamy had called in sick when he knew that Bellamy was not sick. Bellamy testified during her

deposition that she did not call in sick and that she had had a perfect attendance at CVCC (Bellamy Depo. p. 49:7-14, Exhibit 5). Gunnels testified, "As I was walking to class, I met Dr. Lowe in the hall who basically stated I was not allowed to enter my classroom and that a substitute teacher had been -- was there and was going to teach" (Gunnels Depo. p. 142:8-12, Exhibit 3). Furthermore, Gunnels stated that after her resignation and that of Bellamy, "there was some time period where there was not stability in some of the instruction. And also, I know there was a lot of unrest on campus and within the nursing students and nursing division" (Gunnels Depo. p. 131:7-12, Exhibit 3). The "turmoil and upheaval" in the nursing program led students, including Wright, to call Gunnels for assistance with their course work and test questions (Gunnels Depo. pp. 13-14, 16, 19, 21-24, 131:16-23, Exhibit 3).

In January 2006, Lowe authorized Wright to take NUR200 as a substitute for NUR252 on the understanding that NUR252 would no longer be offered in the standardized curriculum in the fall semester 2006. Lowe signed the course substitution form for NUR200. As Cooper wrote in her letter to Blackwell on June 7, 2006, "I personally assisted M. Wright with what we believed was a successful resolution of the Nursing 252 issue in that the Nursing 200 course would substitute for Nursing 252, as long as Ms. Wright successfully passed Nursing 200. It appears Dean Lowe is now denying that this was the resolution reached by all involved. There would have been no reason for my client to take Nursing 200 unless this would have assisted her to graduate" (Letter from Cooper to Blackwell, Exhibit 18). Dean Hodge's letter to Wright on June 30, 2006, completely contradicted the assurances Lowe had given to Wright in January 2006. These facts and the authorities cited above are sufficient to sustain a claim against defendants' motion for summary judgment.

## Dixie Peterson

-18-

Until August 6, 2007, when Lynn Harris filled the position, Dixie Peterson was, for over twenty years, Chairperson of the Division of Health Sciences at CVCC (Peterson Depo. pp. 6-7, 58, Exhibit 2). As chairperson, Peterson scheduled classes, assisted in hiring nursing faculty members, coordinated the purchase of textbooks for adoption by nursing instructors, and reported directly to Dean Lowe (Peterson Depo. pp. 8, 21-22, Exhibit 2).

In her deposition, Wright averred that when she filed the grade appeal in NUR252, she also learned from Gunnels and Bellamy that Peterson had told them during the first semester (summer 2005) that "she [Peterson] asked everybody the first semester, how everybody did, what their grades were, and that I was specifically picked out and said that I was a weak student, that I didn't pass my LPN boards the first time, that I did not need to pass the second semester" (Wright Depo. p. 264:11-20, p. 265, Exhibit 1). In an oral deposition obtained by Wright, Gunnels, in one instance, described Wright as "book-wise, an average student; clinical hands on, an above average student," and another as "above average, very proficient" (Gunnels Oral Deposition, p. 8:18-19, Exhibit 22). Gunnels went on to relate an instance in which Peterson suggested that Wright was a weak student and that she needed to be flunked. Gunnels testified that

> "Ms. Peterson came into the faculty offices and as I recall Ms. Brenda Bellamy was present and potentially Debra Grouper. We had offices and Ms. Peterson was kind of going back and forth and in between. And she had come by and asked was anyone going to fail. And we said, no. And I believe it was Ms. Bellamy said that Lindy had been close in her course but that she had – her grades had come up at the end and she had made a C. And Ms. Peterson made a statement to the effect of y'all need to flunk her, she does not need to pass, she is weak, she's not going to pass boards, y'all need to flunk her" (Gunnels Oral Depo. p. 10:15-25, Exhibit 22).

Gunnels elaborated further by saying that

> "It was a general statement, and I perceived it not as -- and I know she would not have done, asking us to go back and change grades that Lindy had made but the assumption at that point

in time was Ms. Bellamy and I would be returning for the fall semester and we would both have Lindy again as a student, myself in obstetrics, Ms. Bellamy in her advance medical surgical coursework. And it was -- or I perceived it as a, in the future this needs to occur, that she verbalized that she did not feel that Lindy would pass boards and would be a liability and did not need to pass" (Gunnels Oral Deposition, p. 14:10-20, Exhibit 22). Gunnels acknowledged these statements during her deposition (Gunnels Depo. pp. 232-238, Exhibit 22).

In her deposition, Peterson had this to say: "I remember, as I always do, asking Ms. Bellamy and Ms. Gunnels did it look like anybody was going to fail. Beyond that, I do not remember anything specifically" (Peterson Depo. p. 67:19-23, Exhibit 2). In another instance, Peterson said: "I frequently ask instructors who is borderline, who is not passing. And I have made statements in the past in general that students should not pass if they do not have mastery of the information" (Peterson Depo. p. 69:12-17, Exhibit 2). Statements Peterson made to nursing instructors about Wright being a weak student during the summer semester of 2005 prejudiced Wright's property interest in an education, especially when she appealed her final grade in NUR252 and asked for course forgiveness at the end of the spring semester 2006. As Wright testified during her deposition, she did not know anything about course forgiveness until Peterson mentioned it to her in a meeting in Dean Lowe's office on May 19, 2006 (Wright Depo. pp. 146-148, Exhibit 1). Peterson denied any knowledge of course forgiveness until Wright filed her complaint (Peterson Depo. pp. 103-104, Exhibit 2).

Peterson prejudged Wright's ability to complete the ADN program successfully. In her concern to maintain an 80 percent, as opposed to a 75 percent, pass rate on the nursing board certification exams for CVCC graduates (Blackwell Depo. p. 39, Exhibit 21), Peterson sought to weed out supposedly "weak" students from the ADN program. At the end of the fall semester 2005, when Wright was trying to review her tests with Harris, Peterson came and got Harris for a

Christmas luncheon and told Wright she did not care whether Wright "dropped a bomb," and that she did not care what Wright did (Wright Depo. p. 271:7-14, Exhibit 1).

As Gunnels and Bellamy noted, Wright struggled sometimes but came through with passing grades in their respective courses. It was not unusual for nursing instructors to offer additional help to students who were struggling with the course material. Students contacted Gunnels when they needed additional assistance (Gunnels Depo. p. 21-23, Exhibit 3). Additionally, Gunnels was the one who reviewed Wright's NUR252 final exam and concluded that there were at least sixteen (16) "clear cut" instances in which Harris marked wrong answers Wright got right (Gunnels Depo. 70:12-17, Exhibit 3; Exhibit 23). Bellamy testified that she discussed ways of assisting borderline students by offering tutorials and creating a study group that met once a week (Bellamy Depo. p. 24, Exhibit 5).

## VIOLATION OF PLAINTIFF'S DUE PROCESS RIGHTS

Defendants further argue that they did not violate Wright's due process, and that Wright received adequate procedural rights with respect to her grades and academic performance. The record shows that defendants CVCC, nursing Harris, Peterson, and Dean Lowe violated Wright's due process rights guaranteed to her under the Fourteenth Amendment to the Constitution of the United States by handling her very differently from similarly situated students. Specifically, in her grade appeal for NUR252, Wright complained that the:

> Instructor was unavailable to discuss concerns at time of individual exams. Instructor did not formally review any exams until December 13th. Upon review and research of multiple exam questions, objective documentation was found in nursing textbooks to support the answers I chose and to refute the answers listed on the answer key. When questioned, the instructor refused to provide the rationale for answers indicated on the key. The instructor has been provided with this documentation. …

Instructor was not assigned until week 5 of the semester. A guest speaker (ADN prepared & no teaching experience) was utilized until that time. "Guest Speaker" on Respiratory System specifically instructed the class that compensatory mechanisms of ABG's would NOT be included on the exam. Two questions directly related to compensation were on the exam. Other exams were not given on the dates scheduled and for which students prepared.

Nursing Care Plans were "unavailable" and arbitrary grades (23 of 25 points) were assigned. If these grades were arbitrary, then I am requesting the full 25 points. … (Grade Appeal Form for NUR252, Exhibit 6).

Furthermore, Wright testified that during her meeting with Harris to discuss her grade, Harris was "very ugly and nasty," and "very defensive" (Wright Depo. p. 128: 5-13). Before Wright could meet with Harris in her office, she had to go through Peterson, and when the meeting finally took place on December 13, 2005, Harris "Raised her voice. I mean, her face would turn red and she would just get excited" (Wright Depo. p. 128: 20-23, p. 130: 3-4, Exhibit 1). In the end CVCC denied Wright's grade appeal for NUR252.

In January 2006, before the commencement of spring semester, Wright met with Peterson and Lowe. Peterson and Lowe authorized Wright to enrolling in NUR200 in place of NUR252 that will no longer be offered because of the change to a standardized curriculum. Wright testified during her deposition that she had an agreement with Peterson and Lowe for her to take NUR200 in place of NUR252, and that they assured her that "the D [in NUR 252] will not come off of your transcript, but it will not be held against you" (Wright Depo. p. 147:5-23, Exhibit 1). According to Peterson, NUR200 was modeled upon NUR252.

In a January 17, 2006, e-mail sent by Peterson to Heather Chalkley and copied to Lowe, among others, Peterson wrote that NUR200 was a substitute for NUR252. Specifically to Sanquita Alexander, Peterson wrote: "Sanquita, I will be requesting of Dean Lowe to sign a substitution form for Nursing 200 to be accepted for Nursing 252, so Lindy will be registering for Nursing 200 to

fulfill the 252 requirement" (E-mail from Peterson to Heather Chalkley, Exhibit 14; Authorization

for Course Substitution, Exhibit 15).  After it became clear that Wright was not going to graduate as

planned, Cooper wrote a letter to Blackwell, informing her that "I personally assisted Ms. Wright

with what we believed was a successful resolution of the Nursing 252 issue in that the Nursing 200

course would substitute for Nursing 252, as long as Ms. Wright successfully passed Nursing 200.  It

appears Dean Lowe is now denying that this was the resolution reached by all involved.  There

would have been no reason for my client to take Nursing 200 unless this would have assisted her to

graduate" (Letter from Cooper to Blackwell, Exhibit No. 18).  In her response, Blackwell asserted

that "NUR 200 did not take away the failing grade of NUR 252; it merely allowed an opportunity for

Ms. Wright to repeat a failed course" (Letter from Blackwell to Cooper, Exhibit No. 19).

As Cooper's letter made clear, Lowe and Peterson reneged on their assurances to Wright that

NUR252 would not be held against her if she took NUR200.  The following similarly situated

students were given course forgiveness or allowed to retake previously failed courses:

**Carolla Rambo**, one of Wright's classmates, failed NUR272 in the spring semester, but was allowed

to retake it in the summer of 2006 (Rambo's Oral Depo. pp. 5-7, Exhibit 24).

**Arit D. Umoh** would have graduated in May 2005 had she not failed the clinical portion of NUR272

taught by Gunnels (Exhibit 24).  According to what Dean Lowe and Peterson told Gunnels, Umoh

showed up at CVCC with a lawyer to appeal or protest her grade, and was allowed to retake NUR272

as an independent study course (Gunnels Depo. pp. 86-90, Exhibit 3).  CVCC allowed Umoh to

retake NUR272 even though it scheduled the course to be offered in the 2006/07 academic year.

Umoh again failed NUR272 in the fall semester 2005, making it two failures in the same course.

Umoh graduated in 2006 (Wright Depo. pp 178, 190-193, Exhibit 1).  During her deposition,

Peterson denied knowledge of course forgiveness for Umoh (Peterson Dep. p. 106, Exhibit 2.

**Shannah Lowe**, according to Jill Boyette (in Wright's spring 2006 NUR272 clinical group), failed the clinical portion of the course taught by Artemisa Harmon. But after calling Dean Lowe, whom Wright believed was her uncle, and Peterson, another clinical instructor, Bridgett Jackson, took Lowe to the lab to redo her clinicals (Wright Depo. pp. 207-211, Exhibit 1). During her deposition, Peterson did not dispute the fact that Lowe was allowed to take a makeup lab for NUR272 (Peterson Depo. p. 106, Exhibit 2).

Wright believes that her dismissal from the nursing program at CVCC was motivated by arbitrariness, capriciousness, and bad faith. Defendants' decision to dismiss her from the program was not deliberate and careful. As her interactions with Harris demonstrate, Wright was not given an opportunity to examine the work she did in NUR252 and NUR272. Defendants, therefore, denied Wright's procedural due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution. Wright was also denied her rights as guaranteed by 42 U.S.C §1981 in that her ability to make and enforce contracts at CVCC was impaired under color of state law. The Equal Protection Clause of the Fourteenth Amendment requires that all similarly situated persons should be treated alike. *Newsome*, supra, citing *City of Cleburne Living Ctr.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed 313 (1985).

## CIVIL CONSPIRACY AND VIOLATION OF 42 U.S.C. §1981

Defendants argued in the motion for summary judgment that 42 U.S.C § 1981 is not applicable to civil conspiracies because it deals with suits arising from racial discrimination. Wright averred in the complaint that Blackwell, Lowe, and Peterson, all of them acting within the line and scope of their employment, authorized Wright to enroll in NUR200 under the mistaken belief that

NUR252 would not be held against her if she passed NUR200. Prior to that, in the summer of 2005, Peterson had sought to weed out so-called "weak" students, including Wright, on the assumption that they would not pass the nursing certification exam.

A prima facie case of conspiracy under §§ 1981, 1983, and 1985 requires a violation of plaintiff's federal rights and an agreement among defendants to violate those rights. *Bendiburg v. Dempsey*, 909 F.2d 463 (11th Cir. 1990). A "smoking gun" is not needed to prove the existence of an agreement on the part of defendants. What is needed is an understanding and willful participation to show the kind of joint action that will subject the parties to § 1981 liability. Furthermore, it is not necessary that all members of the conspiracy be governmental officials, and there is no requirement that all parties to the conspiracy be brought before the court. *Ng Pui Yu. v. United States*, 352 F. 2d 626 (9th Cir. 1965). Defendants denied Wright the right to make and enforce contracts as a full-time student at CVCC pursuant to §1981. Wright has alleged sufficient facts to overcome defendants' assertion of absolute or sovereign immunity.

## THE TORT OF OUTRAGE

Defendants have argued that there is no cognizable cause of action for the tort of outrage in cases in which a student has been dismissed college. Defendants have also argued that they are entitled to judgment as a matter of law on the plaintiff's claim of intentional infliction of emotional distress. This claim lacks merit. In *McGrady v. Nissan Motor Acceptance Corp.*, 40 F.Supp.2d 1323 (M.D. Ala. 1998), the Court held that Alabama law permits unlimited recovery for mental anguish damages in claims brought for intentional infliction of emotional distress. Alabama courts have also upheld the award of punitive damages for emotional distress and mental anguish. *Prudential Ballard Realty Company, Inc. v. Weatherly*, supra, *Tuscaloosa County v. Henderson*, 699 So.2d 1274 (Ala.

Civ. App. 1997).

In her deposition, Wright testified that she felt the "humiliation of the class," and that "people say, are you going to go back to RN school?  Well, what do you tell them?  You have to tell them.  I don't go into detail, but I tell them briefly" Wright Depo. p. 143:21-23, p. 144:1-3, Exhibit 1). Wright has missed out on job opportunities such as the one at St. Francis Hospital in Columbus, Georgia, which paid $35.00 an hour for registered nurses.  There were job opportunities at Wiregrass Hospice where the pay was between $20-25 an hour for registered nurses, compared to $15 an hour Wright was making at Wiregrass.

## CONCLUSION

For the foregoing reasons and authorities, defendants' motion for summary judgment is due to be denied.

Respectfully submitted on this the 6th day of November 2007.


/s/ Peter A. Dumbuya                          /s/ Jennifer B. Cooley.
Peter A. Dumbuya (DUM006)          Jennifer B. Cooley (COO083)
Attorney for Plaintiff                          Attorney for Plaintiff
P.O. Box 3302                                     1507 Broad Street
Phenix City, AL 36868                       Phenix City, AL 36867
(706) 289-5082                                   (334) 298-7062

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 6, 2007, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to the following:


Hon. H.E. Nix, Jr.
Hon. Brandy F. Price
Nix, Holstford, Gilliland, Higgins & Hitson, P.C.
P.O. Box 4128
Montgomery, AL 36103

Hon. Joan Davis
Department of Post Secondary Education
401 Adams Street, Suite 280
Montgomery, AL 36130


<u>/s/ Peter A. Dumbuya</u>