IN THE DISTRICT COURT OF THE UNITED STATES
MIDDLE  DISTRICT OF ALABAMA
EASTERN DIVISION

RECEIVED

2007 NOV -7  A 9: 45

DEBRA P. HACKETT, CL
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| LINDY G. WRIGHT, | ) |
| | ) |
| Plaintiff | ) |
| v. | ) |
| | ) |
| CHATTAHOOCHEE VALLEY | ) |
| COMMUNITY COLLEGE, et al., | ) |
| | ) |
| Defendants | ) |

Case No.: 3:06-CV-1087-WKW

## PLAINTIFF'S EXHIBITS

## CERTIFICATE OF SERVICE

I hereby certify that Plaintiff's Exhibits have been duly served upon the following on

this the 6th day of November, 2007:

Hon. H.E. Nix, Jr.
Hon. Brandy F. Price
Nix Holtsford Gilliland Higgins & Hitson, P.C.
P.O. Box 4128
Montgomery, AL 36103

Hon. Joan Y. Davis
Department of Secondary Education
401 Adams Avenue, Suite 280
Montgomery, AL 36130

Peter A. Dumbuya



# DEPOSITION OF LINDY WRIGHT

## July 13, 2007

## Pages 1 through 328

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

July 13, 2007



Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3              EASTERN DIVISION
4
5  LINDY G. WRIGHT,
6       Plaintiff,
7  Vs.              CIVIL ACTION NO.
                    3:06-CV-1087-WKW
8  CHATTAHOOCHEE VALLEY
   COMMUNITY COLLEGE (CVCC),
9  et al.,
10      Defendants.
11
12
              * * * * * * * * * * * * *
13
14
15        DEPOSITION OF LINDY WRIGHT, taken pursuant
16  to stipulation and agreement before Lisa J. Nix,
17  Registered Professional Reporter and Commissioner
18  for the State of Alabama at Large, in the Law
19  Offices of Parker & Cooley, 1507 Broad Street,
20  Phenix City, Alabama on Friday, July 13, 2007,
21  commencing at approximately 9:40 a.m. EDT.
22
23        * * * * * * * * * * * * *

Page 2

1
2              APPEARANCES
3
   FOR THE PLAINTIFF:
4  Ms. Jennifer B. Cooley
   PARKER & COOLEY
5  Attorneys at Law
   1507 Broad Street
6  Phenix City, AL  36867
7  Mr. Peter A. Dumbuya
   Attorney at Law
8  Post Office Box 3302
   Phenix City, AL  36868
9
10 FOR THE DEFENDANT:
11 Mr. H. E. Nix, Jr.
   Ms. Brandy F. Price
12 NIX, HOLTSFORD, GILLILAND,
      HIGGINS & HITSON
13 Attorneys at Law
   Suite 300
14 4001 Carmichael Road
   Montgomery, AL 36106
15
16 ALSO PRESENT:
17 Dr. Laurel Blackwell
   Ms. Dixie Peterson
18
19        * * * * * * * * * * * * *
20      EXAMINATION INDEX
21
   LINDY WRIGHT
22   BY MR. NIX . . . . . . . . . .  6
23

Page 3

1
2              EXHIBIT INDEX
3                          MAR
4  DEFENDANT'S EXHIBIT
5    1  Notice of Second Amended Deposition      31
        Duces Tecum
6
     2  Defendants' First Amended Set of        136
7       Requests for Production of Documents
8    3  6/30/05 letter to Lindy Wright from      169
        David Hodge
9
10   4  Nursing 252 Adult Nursing II Clinical    201
        Syllabus - Fall Semester 2005
11   5  Nursing 252 Adult Health Nursing II -    201
        Fall Semester 2005 course outline
12
13   6  NUR271 - Maternal - Newborn Nursing      232
        course outline
14   7  Nursing 272 - Pediatric Nursing course   233
        outline
15
16   8  NUR 200 Nursing Career Mobility          233
        Assessment course outline
17   9  Printout of electronic document sent to  236
        Lindy Wright from instructor at CVCC
18
19   10  Documents produced by Lindy Wright      238
20   11  4/29/05 letter to Linday Wright from     277
         Katie Lackey
21
22   12  Income tax returns           279
23

Page 4

1
2          INDEX OF EXHIBITS (Continued)
3   13  Names and addresses of witnesses with    281
        attachments
4
5   14  Envelope addressed to Lindy Wright from  289
        CVCC postmarked 5/16/06
6   15  1/10/06 letter to Dean James Lowe from   290
        Connie Cooper
7
8   16  5/19/06 letter to Dean of Students from  291
        Lindy Wright
9   17  6/7/06 letter to Dr. Laurel Blackwell    293
        from Connie Cooper
10
11  18  NLN Diagnostic Readiness Test            304
        Performance Profile
12  19  6/13/06 letter to Connie Cooper from     306
        Laurel Blackwell, Ed.D. with attachment
13
14  20  7/28/06 letter to Dr. Laurel Blackwell   311
        from Jennifer Cooley with attachments
15  21  10/10/06 letter to Jennifer Cooley from  317
        Tracy Miller
16
17  22  Composite exhibit consisting of         318
        documents relating to authorization to
18      release information
19  23  10/25/06 letter to Jennifer Cooley from  319
        Tracy Miller
20
21
22
23

Deposition of Lindy Wright

Page 5

1          STIPULATION
2          It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of LINDY WRIGHT is taken pursuant to the
5    Federal Rules of Civil Procedure and that said
6    deposition may be taken before Lisa J. Nix,
7    Registered Professional Reporter and Commissioner
8    for the State of Alabama at Large, without the
9    formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16         It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23         It is further stipulated and agreed by and

Page 6

1    between the parties hereto and the witness that the
2    signature of the witness to this deposition is
3    hereby waived.
4
5          * * * * * * * * * * * * *
6
7          LINDY WRIGHT
8          The witness, after having first been duly
9    sworn to speak the truth, the whole truth and
10   nothing but the truth testified as follows:
11         EXAMINATION
12   BY MR. NIX:
13   Q.   Would you state your name, please.
14   A.   Lindy L. Wright.
15   Q.   Where do you live, Ms. Wright?
16   A.   7716 Bolder Drive, Columbus, Georgia.
17   Q.   I have seen your name stated as Lindy
18        Warren.
19   A.   Correct.
20   Q.   Is that your maiden name?
21   A.   No, that was a previous marriage.
22   Q.   Previous marriage.  So who were you married
23        to?

Page 7

1    A.   Jason Michael Warren.
2    Q.   Did you get divorced?
3    A.   Uh-huh.  (Positive response.)
4    Q.   When you answer --
5    A.   Yes.
6    Q.   -- if you could, thank you, say yes or no.
7    A.   Okay.
8    Q.   Have you ever given a deposition before?
9    A.   Yes, sir.
10   Q.   When was that?
11   A.   I don't know the precise year.  It's many
12        years ago.  Probably in '93, '94 maybe,
13        '93.
14   Q.   What was it about?
15   A.   Job-related.
16   Q.   All right.  Were you a party in the case?
17   A.   Yes, sir.
18   Q.   What was the case?
19   A.   Termination of a position.
20   Q.   And you filed a lawsuit against your
21        employer?
22   A.   Yes.
23   Q.   Who was your employer?

Page 8

1    A.   Total Systems.
2    Q.   Total?
3    A.   Systems.
4    Q.   Where were they located?
5    A.   In Columbus.
6    Q.   Are they still there?
7    A.   They are.
8    Q.   Was the suit filed in Georgia?
9    A.   I think -- yes, sir.
10   Q.   Who was your lawyer in that?
11   A.   It was the State.
12   Q.   The State?
13   A.   Equal Employment Opportunity Commission.
14        It was an attorney from them.
15   Q.   It was the federal government, EEOC?
16   A.   Yes.
17   Q.   You filed a -- what kind of suit was it?
18        You were terminated.  I hear you saying
19        that, but do you know what type of suit it
20        was?
21   A.   No, I don't.
22   Q.   Do you remember how the suit was instituted
23        or started?

2 (Pages 5 to 8)

Page 9

1   A.  No.
2   Q.  Do you remember filing a charge with the
3       Equal Employment Opportunity Commission?
4   A.  What do you mean?
5   Q.  Typically, those -- if you file anything
6       with the EEOC, you typically file a
7       charge. It's what they call a charge.
8       It's a form that you fill out and you make
9       a complaint. It has some blocks that you
10      fill in and then a little narrative section
11      that you tell what happened.
12   A.  Yes.
13   Q.  Did you do that?
14   A.  Yes.
15   Q.  And then a lawsuit was instituted against
16      Total Systems?
17   A.  Yes.
18   Q.  And you're saying that you did not have a
19      private lawyer? The EEOC itself --
20   A.  Yes.
21   Q.  -- filed the suit?
22   A.  Yes.
23   Q.  Was it a class action?

Page 10

1   A.  I don't know.
2   Q.  Where was the office of the EEOC?
3   A.  In Atlanta.
4   Q.  What was the outcome of the case?
5   A.  It never went to court.
6   Q.  Why not?
7   A.  They said they didn't have enough
8      evidence. That's what the attorney told
9      me.
10   Q.  Who said that? What attorney?
11   A.  I don't know his name.
12   Q.  Was it the attorney representing you?
13   A.  Correct.
14   Q.  The attorney from the EEOC?
15   A.  Correct.
16   Q.  Who at Total Systems did you work for?
17   A.  Eric Seldon.
18   Q.  Can you spell his last name?
19   A.  S-E-L-D-O-N.
20   Q.  Is he still at Total Systems?
21   A.  I have no idea.
22   Q.  Is Total Systems still operating?
23   A.  It is.

Page 11

1   Q.  What kind of business is it?
2   A.  Credit card processing company.
3   Q.  And they're in Columbus you say?
4   A.  Uh-huh. (Positive response.)
5   Q.  Yes?
6   A.  Yes.
7   Q.  Do you know anybody that still works at
8      Total Systems?
9   A.  Yes.
10   Q.  Who?
11   A.  Jason Pettis, Holley Pettis.
12   Q.  Can you spell Pettis for me?
13   A.  P-E-T-T-I-S.
14   Q.  Holley Pettis?
15   A.  Uh-huh. (Positive response.)
16   Q.  Who else? Do you know anybody in
17      management?
18   A.  Joan McCraine.
19   Q.  John McCraine?
20   A.  Joan McCraine.
21   Q.  Aren't you related to Joan McCraine?
22   A.  I am.
23   Q.  How are you related to her?

Page 12

1   A.  She's my mother-in-law.
2   Q.  And she's in management?
3   A.  She is.
4   Q.  What's her position at Total Systems?
5   A.  She's a manager over her department. I
6      don't know what her -- I don't know
7      anything else other than that.
8   Q.  Do you know what her department is?
9   A.  No.
10   Q.  Did she have anything to do with the
11      lawsuit --
12   A.  No.
13   Q.  -- that you filed against Total Systems?
14   A.  No.
15   Q.  Was it a discrimination lawsuit,
16      Ms. Wright?
17   A.  No.
18   Q.  It was not a discrimination lawsuit?
19   A.  Not towards me.
20   Q.  What did you file it over, then?
21   A.  For being fired.
22   Q.  And why did you say they fired you?
23   A.  Because I felt like that I was fired

Deposition of Lindy Wright                                                                July 13, 2007

Page 13

1    unjustly.
2    Q.   For what unjust reason?
3    A.   For what unjust reason?
4    Q.   Yes.
5    A.   Because they took two other people's word
6         over mine and terminated me and also
7         terminated a supervisor that --
8    Q.   I'm sorry.  Go ahead.
9    A.   -- that originally was told -- told by
10        those employees that he committed sexual
11        harassment towards them.
12   Q.   So you filed -- inside the company, you
13        filed a sexual harassment complaint?
14   A.   I did not file a sexual harassment
15        complaint.
16   Q.   Did you contend that you had been sexually
17        harassed?
18   A.   Did I contend?
19   Q.   Yes.
20   A.   No, that I -- no, that I was not sexually
21        harassed, no.
22   Q.   Did you contend that you were discriminated
23        against because of your sex?

Page 14

1    A.   No.
2    Q.   Are you sure you were a plaintiff in this
3         EEOC thing against Total Systems?  Are you
4         sure that you were a party, that you were a
5         plaintiff?
6    A.   Yes.
7    Q.   All right.  You say you were not
8         discriminated against or that no sexual
9         harassment occurred with you.  Who did it
10        occur with?
11   A.   The sexual harassment?
12   Q.   Yes.
13   A.   The two girls that turned this man in for
14        sexual harassment.
15   Q.   Who was the man?  What was his name?
16   A.   Arthur Wimberly.
17   Q.   Who were the two girls?
18   A.   You'll have to give me a minute so I can
19        remember because it's been a long time.
20   Q.   That's all right.
21   A.   I think one of them's name was Susan
22        Marshall.
23   Q.   Okay.

Page 15

1    A.   And I cannot remember the other girl's
2         name.
3    Q.   All right.  Did Arthur Wimberly remain
4         employed with Total Systems?
5    A.   No.
6    Q.   So he was fired as a result of that?
7    A.   He was fired.
8    Q.   And were the two girls also fired?
9    A.   I don't think at that time, but I think
10        that one has been fired since then.
11   Q.   Do you remember the name of the lawyer that
12        represented Total Systems?
13   A.   I don't.
14   Q.   Have you ever given any other depositions
15        besides that one?
16   A.   No.
17   Q.   Did you say Jason was the name of your
18        former husband?
19   A.   Yes.
20   Q.   Jason Warren?
21   A.   Jason Warren.
22   Q.   When were you married to him?
23   A.   Let me think of the year.  I think I was

Page 16

1         23.  From 23 to -- we were married nine
2         years, whatever those --
3    Q.   23 to 32 be about right?  Nine years.  Do
4         you remember what year you were married,
5         the year in which you were married?
6    A.   No.  Sorry.
7    Q.   Do you remember the year in which you were
8         divorced?
9    A.   It was the year I graduated LPN school, so
10        that was 2001, 2002.
11   Q.   All right.  Now, where was the divorce
12        action filed?  Was it filed in Georgia
13        or --
14   A.   In Georgia.
15   Q.   Over in Columbus?
16   A.   Yes.
17   Q.   Now, your husband -- former husband, Jason
18        Warren, does he live in the Columbus area?
19   A.   He lives in Phenix City.
20   Q.   In Phenix City.  Where does he work?
21   A.   He works for Coca-Cola.
22   Q.   What does he do there?
23   A.   I have no idea.

Deposition of Lindy Wright                                                    July 13, 2007

Page 17

1    Q.  Okay.  Now, have you ever been married
2         other than to Jason Warren?
3    A.  Yes.
4    Q.  Tell me about that husband.
5    A.  We're currently married.
6    Q.  Currently married.  His name is Wright?
7    A.  No, his name is Douglas Scott McCraine.
8    Q.  Oh, that's right.  Do you go by the name
9         McCraine?
10   A.  No, I don't.
11   Q.  Why not?
12   A.  Because I've not changed my name.  We're
13        separated.
14   Q.  You're separated?
15   A.  Yes.
16   Q.  When were you married to Douglas Scott
17        McCraine?
18   A.  December 31st of 2004.
19   Q.  When did y'all become separated?
20   A.  It was two years ago the end of March, the
21        beginning of April.
22   Q.  That would be 2005?
23   A.  Yes, sir.

Page 18

1    Q.  Was that a formal separation?
2    A.  As far as?
3    Q.  A lot of times people will actually enter
4         into a written agreement --
5    A.  No, sir.
6    Q.  -- in a separation.
7    A.  No.
8    Q.  Y'all just agreed to part ways, and you're
9         living in separate places now?
10   A.  Yes.
11   Q.  Is that the way it worked?  Is that right?
12   A.  Yes.
13   Q.  And where does he live?
14   A.  He lives in Smiths Station.
15   Q.  Where does he work?
16   A.  He works for Alabama Power.
17   Q.  What does he do for Alabama Power?
18   A.  He is an apprentice lineman.
19   Q.  Have you talked with him about getting back
20        together?
21   A.  Oh, yes, sir.
22   Q.  Have you talked with him about consummating
23        a divorce?

Page 19

1    A.  Yes, we've talked about that also.
2    Q.  So it's kind of up in the air right now?
3    A.  Well, you could say that.
4         (Brief interruption.)
5    Q.  Have you ever had any other husbands?
6    A.  No.
7    Q.  Do you have any children?
8    A.  Yes.  I have two small children.
9    Q.  What are their names?
10   A.  Brandon McCraine and Mason McCraine.
11   Q.  Spell McCraine for me.
12   A.  M-C-C-R-A-I-N-E.
13   Q.  Brandon McCraine and who?
14   A.  Mason, M-A-S-O-N.
15   Q.  Mason McCraine.
16        (Brief interruption.)
17   Q.  What is Brandon's birthday?
18   A.  6-16-05.
19   Q.  6-16-05.
20        What is Mason's birthday?
21   A.  7-7-06.
22   Q.  7-7-06.
23        (Brief interruption.)

Page 20

1    Q.  And you were separated in March 2005 you
2         think?
3    A.  (Witness nods head up and down.)
4    Q.  March, April.
5    A.  I think that's right.
6    Q.  Do you have any children by Jason Warren?
7    A.  No.
8    Q.  You told me, didn't you, that you live in
9         Georgia?
10   A.  Correct.
11   Q.  I have that address I'm pretty sure.
12        Do you live with anyone other than
13        Brandon and Mason?
14   A.  My mother.
15   Q.  What's your mother's name?
16   A.  Lois Anita Wright.
17   Q.  L-O-I-S?
18   A.  Uh-huh.  (Positive response.)
19   Q.  Lois Anita?
20   A.  A-N-I-T-A.
21   Q.  Is your father living?
22   A.  No, he's not.
23   Q.  Does your mother work?

Deposition of Lindy Wright

Page 21

1  A.  No, she doesn't.
2  Q.  Do you live in your mother's house?
3  A.  Yes.
4  Q.  Do you know where Sandy Gunnels lives?
5  A.  She lives in Georgia.
6  Q.  Have you ever been to her house in Georgia?
7  A.  No.
8  Q.  Didn't you stay with her some while you
9      were attending CVCC?
10  A.  With who?
11  Q.  With Sandy Gunnels.
12  A.  No.
13  Q.  Never did stay with her?
14  A.  Never.
15  Q.  Would you tell me, Ms. Wright, who your
16      other relatives are that live in Alabama in
17      this general region, let's say the
18      southeastern part of Alabama.
19  A.  Gladys Crews.
20  Q.  Can you spell Crews for me?
21  A.  C-R-E-W-S.
22  Q.  All right.
23  A.  Karl Crews.

Page 22

1  Q.  With a K or a C?
2  A.  K.
3  Q.  Okay.
4  A.  Katrina Crews.
5  Q.  Okay.
6  A.  Ray Crews.
7  Q.  That's quite a crew.
8  A.  Julie Crews.
9  Q.  All right.
10  A.  Do you want their children's name, also?
11  Q.  No. Any other relatives other than Crews?
12  A.  Harlan.
13  Q.  H-A-R-L-A-N?
14  A.  Uh-huh. (Positive response.)
15  Q.  Give me their names.
16  A.  Crews.
17  Q.  Oh, Harlan Crews?
18  A.  Uh-huh. (Positive response.)
19  Q.  Oh, I thought you meant the last name was
20      Harlan.
21  A.  No, that's the first name. Sorry.
22  Q.  Do you have any other relatives in
23      southeastern Alabama with a last name other

Page 23

1      than Crews?
2  A.  McCraine.
3  Q.  Anybody else?
4  A.  Websters.
5  Q.  Give me --
6  A.  That's married, is that what you want?
7      Married family?
8  Q.  Sure.
9  A.  Okay. Websters. Mary Webster.
10  Q.  Mary?
11  A.  Uh-huh. (Positive response.)
12  Q.  Okay.
13  A.  Mark and Robin Webster.
14  Q.  All right.
15  A.  Mary Ellen and Robert Brooks.
16  Q.  That's E-L-L-E-N?
17  A.  Uh-huh. (Positive response.)
18  Q.  And Robert.
19  A.  Allen and Vickie Webster.
20  Q.  Okay.
21  A.  You just want in the local area or --
22  Q.  You know what I really want? Well, the
23      Eastern District of Alabama is comprised of

Page 24

1      counties like Russell County, Lee County,
2      Macon County, counties in that general
3      region and around. Chambers. Do you have
4      any other relatives in those counties?
5  A.  No, sir.
6  Q.  You were telling me about the McCraines
7      What McCraines live in this part of
8      Alabama?
9  A.  I think there's a lot of them, but I don't
10      know them all.
11  Q.  Just give me the adults, the ones that,
12      let's say, are over 19 years of age that
13      you can remember right now.
14  A.  Joan and Merlin McCraine.
15  Q.  Okay.
16  A.  Scott McCraine.
17  Q.  Is that your husband?
18  A.  It is.
19  Q.  Okay.
20  A.  Romy McCraine.
21  Q.  His husband?
22  A.  That's his father's brother. That's his
23      uncle.

Page 25

1    Tiffany McCraine. Drew McCraine.
2  Q.  Okay.
3  A.  Christy McCraine.
4  Q.  All right. Any other last names you can
5     give me, relatives by blood or marriage?
6  A.  No, sir. I think that pretty much covers
7     them.
8  Q.  Does Jason Warren have relatives in this
9     general area?
10 A.  He does.
11 Q.  Who are his parents?
12 A.  Jeannie Warren. I think it's Welch now.
13 Q.  Where does she live?
14 A.  Buena Vista, Georgia.
15 Q.  Who do you know that lives in Alabama
16    that's related to Jason Warren?
17 A.  John and Christy Warren.
18 Q.  Any others that are close, let's say, to
19    him?
20 A.  Michael Warren. That's his son.
21 Q.  How old is Michael?
22 A.  He's probably 16, 17 years old now. I'm
23    not sure.

Page 26

1  Q.  Just give me the ones over 19.
2  A.  Okay. That's it.
3  Q.  Where does Jeannie Warren Welch work?
4  A.  Skyline Electric.
5  Q.  How about John and/or Christy Warren?
6     Where do they work?
7  A.  I don't know where Christy works. I think
8     John works for Tallapoosa Power.
9  Q.  Does your mother work?
10 A.  No, she does not.
11 Q.  Gladys Crews. Does Gladys Crews work?
12 A.  She does.
13 Q.  Where does she work?
14 A.  Alabama CCH.
15 Q.  What is that?
16 A.  It's a tax business.
17 Q.  Karl Crews, does he work?
18 A.  You could say he does. They have a store
19    on 165 in Alabama.
20 Q.  Is that close to a town?
21 A.  It's Bluff Creek. They call it Bluff
22    Creek.
23 Q.  Okay. How about Katrina? Are Katrina, Ray

Page 27

1     and Julie, are they all over 19 years of
2     age?
3  A.  Yes.
4  Q.  Does Katrina work to your knowledge?
5  A.  No.
6  Q.  Does Ray?
7  A.  Yes.
8  Q.  Where does he work?
9  A.  At their store.
10 Q.  All right. How about Julie?
11 A.  At their store.
12 Q.  Is it like a little general store?
13 A.  Yes, sir, and a restaurant.
14 Q.  What's the name of the restaurant?
15 A.  Country Kitchen.
16 Q.  How about Joan and Merlin McCraine? I know
17    where Joan works. How about Merlin?
18 A.  I'm not --
19 Q.  I guess Joan is still at Total Systems.
20 A.  Total Systems.
21    I'm not sure of the name that Merlin
22    works at. It's kind of like Airgas, but
23    it's a different company.

Page 28

1  Q.  It's not Airgas?
2  A.  No.
3  Q.  But it's a company like Airgas?
4  A.  Right.
5  Q.  How about Ronny? Where does he work?
6  A.  I don't know.
7  Q.  Tiffany, do you know where Tiffany or Drew
8     work?
9  A.  AFLAC. I think they both work at AFLAC if
10    I'm not mistaken.
11 Q.  In Columbus?
12 A.  Yes.
13 Q.  And Christy?
14 A.  McCraine?
15 Q.  Yes.
16 A.  She works at a day care, Central -- Kids
17    Central.
18 Q.  Where is that?
19 A.  It's on Summerville Road.
20 Q.  In what town?
21 A.  Alabama. Phenix City.
22 Q.  Let's go to the Websters. Mary Webster.
23 A.  She doesn't work.

Page 29

1　Q.　How about Mark and/or Robin?
2　A.　Mark owns a business, Webster Electric.
3　Q.　Where is that?  What town?
4　A.　It's in Phenix City.
5　Q.　Does Robin work?
6　A.　Total Systems.
7　Q.　Mary Ellen Brooks?
8　A.　She doesn't work.
9　Q.　Robert Brooks?
10　A.　He does, but I'm not sure where.
11　Q.　I saw you kind of smile when you said their
12　　　names.  Any significance to that?
13　A.　No.
14　Q.　I thought you smiled and looked over across
15　　　the table, but there's no significance to
16　　　that?
17　A.　No.
18　Q.　It's just me.  Don't worry about it.  I'm a
19　　　little crazy.
20　　　　Allen and Vickie Webster?
21　A.　Allen works for a -- I think it's kind of
22　　　like a temporary agency.  He fills --
23　　　through his agency fills positions for

Page 30

1　　　companies.
2　Q.　What's the name of the agency?
3　A.　I'm not real sure.
4　Q.　Where is it?
5　A.　I think it's in Columbus.
6　Q.　All right.  This deposition, Ms. Wright, is
7　　　being taken pursuant to the Federal Rules
8　　　of Civil Procedure.  And under those rules,
9　　　you have the right to get a copy of this
10　　　deposition when Ms. Nix completes it and
11　　　read it and -- for any typographical errors
12　　　or anything like that or whatever and sign
13　　　it, approving it, or you may waive that
14　　　right and trust that the court reporter,
15　　　Ms. Nix, gets everything down right.
16　　　　Which would you prefer to do?  Do you
17　　　want to read and sign your deposition or do
18　　　you want to waive reading and signing?
19　A.　Waive it.  That's fine, unless my
20　　　attorneys ...
21　　　　MR. NIX:  Is that all right?
22　　　　MS. COOLEY:  (Nods head up and
23　　　　down.)

Page 31

1　Q.　Now, I know that you have provided a number
2　　　of documents to me yesterday, which I
3　　　appreciate it.  And you did that pursuant
4　　　to a deposition notice which has changed a
5　　　few times.
6　　　　(Defendant's Exhibit 1 was marked
7　　　　for identification.)
8　Q.　I want to show you a copy of your
9　　　deposition notice.  And I'm marking it as
10　　　Defendant's Exhibit Number 1 to your
11　　　deposition.  It's entitled Notice of Second
12　　　Amended Deposition Duces Tecum.
13　　　　Would you take a look at that and tell
14　　　me if you have ever seen that before.
15　　　　MR. NIX:  Jennifer, while she's
16　　　　reading that, it occurred to
17　　　　me last night that we'd need
18　　　　to get a written response to
19　　　　the request for production
20　　　　from you --
21　　　　MS. COOLEY:  Okay.
22　　　　MR. NIX:  -- if that's all right.
23　　　　Just the regular response.

Page 32

1　　　　Typically -- and I think
2　　　this is what the rules
3　　　require.  What we try to do is
4　　　number our documents when we
5　　　produce them and then refer to
6　　　that number when we respond to
7　　　a specific request.
8　　　　I don't know if that's
9　　　required or not to be honest
10　　　with you, but it makes it
11　　　easier for me, anyway.  But, I
12　　　mean, that's not something you
13　　　have to do.  I'm just telling
14　　　you that's what I --
15　　　　But what I do want to
16　　　know when you go through the
17　　　request -- when you do the
18　　　written response, if you don't
19　　　mind, is when you produce all
20　　　of the documents that relate
21　　　to it, you know, that type
22　　　thing -- there may be some
23　　　additional or whatever, if

Page 33

1    that's all right with you.
2        MS. COOLEY: Okay.
3    Q. Have you seen that deposition notice
4        before, Ms. Wright?
5    A. It looks like the same thing I've seen.
6    Q. Okay.
7    A. But it looks like there's added -- I don't
8        remember it being so long.
9    Q. Okay. There is a request for production of
10       documents that's being copied right now
11       that is a different document, but it is
12       shorter because it doesn't have this
13       preface right here. It's not much shorter,
14       but it's a little shorter. This is thick
15       paper, but -- as soon as that comes in,
16       I'll show that to you.
17       But what I would like to do, and your
18       lawyers may be able to help me with this,
19       I'd like to establish either by just your
20       looking at the two, the duces tecum and the
21       notice and the request for production, that
22       they are the same or that they request the
23       same documents item for item.

Page 34

1        MR. NIX: Can y'all stipulate that
2        they are the same, the request
3        for production of documents
4        and the duces tecum and the
5        notice of the deposition are
6        the same item for item? Can
7        y'all --
8        MS. COOLEY: (Nods head up and
9        down.)
10       MR. DUMBUYA: We will stipulate to
11       it.
12       MR. NIX: Thank you. That helps a
13       lot.
14   Q. Let me give you that back and let's take a
15       look at it. This is my goal, Ms. Wright.
16       I want to go through these real quickly if
17       we can and just talk about them briefly.
18       The main thing I really want to know is,
19       have you provided all of the documents that
20       are requested. Okay?
21       And your lawyers, of course, have also
22       provided some documents, and they -- I
23       don't know. It's possible, I guess, that

Page 35

1    they may have some additional documents or
2    whatever, but let's look at number one.
3        It asks for all documents, including
4    doctor's notes, reports, statements,
5    invoices, bills, insurance claims and
6    records for medical payment for any claim
7    you make for emotional distress or damages
8    of any kind in this case.
9        Are you claiming emotional distress as
10   an element of damages in this case?
11   A. Yes, sir.
12   Q. Have you been to a doctor or a hospital or
13       any other -- a counselor, psychologist,
14       psychiatrist for emotional distress as a
15       result of the things that you say happened
16       in this case?
17   A. No, sir.
18   Q. So would it be correct to say that you do
19       not have and documents do not exist that
20       meet these specifications, like doctor's
21       notes or statements or bills or insurance
22       claims or records related to any treatment
23       or diagnosis for emotional distress? They

Page 36

1    do not exist, correct?
2    A. Correct.
3    Q. Because you have not had any treatment,
4        correct?
5    A. No treatment.
6    Q. And then what other damages are you
7        claiming in this case?
8    A. Lost wages, humiliation.
9    Q. All right. Lost wages, humiliation.
10   A. I mean, that was my livelihood. I didn't
11       get to sit for my boards. Therefore,
12       there's been lost wages, there's been
13       humiliation, positions that I could not
14       apply for because I'm an LPN, not an RN.
15   Q. What else? Any other damages that you
16       claim in the case or anything for which you
17       claim damages?
18   A. Would that be like attorneys' fees that I'm
19       having to --
20   Q. If that's part of your damage claim. I
21       can't tell you what you're claiming, but if
22       that's a part of your damage claim, that's
23       the type thing I want to know.

July 13, 2007

Deposition of Lindy Wright

Page 37

1   A.  Attorneys' fees, because, I mean, that's
2       damage to me.
3   Q.  And I assume expenses as well?
4   A.  Yes.
5   Q.  Is that right?
6   A.  Expenses.
7   Q.  Expenses of the lawsuit.  Anything else?
8   A.  Not that I can think of at this moment.
9   Q.  As we go through this deposition, would
10      you -- if you remember anything else, would
11      you stop and tell me about it?
12  A.  Yes, sir.
13  Q.  And then there's another place in the
14      deposition where I'll ask you some more
15      questions, give you another opportunity to
16      talk about them.  Okay?
17  A.  Okay.
18  Q.  Now, you say that you've lost wages.  Have
19      you been working as an LPN?
20  A.  I have.
21  Q.  Were you working as an LPN while you were
22      in school at Chattahoochee Valley Community
23      College in their nursing program, their

Page 38

1       Nursing Mobility Program to receive an RN?
2   A.  Yes, sir.
3   Q.  Where were you working as an LPN?
4   A.  Doctors Hospital p.r.n.  That's on an
5       as-needed basis, when I had time to go in
6       and work.
7   Q.  Doctors Hospital?
8   A.  Uh-huh.  (Positive response.)
9   Q.  Is that in Columbus?
10  A.  It is.
11  Q.  When did you first start school at CVCC in
12      their Nursing Mobility Program?
13  A.  RN or LP --RN?
14  Q.  RN.
15  A.  I think I started in 2005.  Was it 2005?
16  Q.  Do you remember the month?
17  A.  It was May.  May of 2005.
18  Q.  Do you have any documents that would
19      refresh your recollection as to when you
20      started?
21  A.  No, I don't, except I looked back at my
22      transcript to see the dates.  I think it
23      was May of 2005.

Page 39

1   Q.  So in May of 2005, were you working as an
2       RN?
3   A.  No.
4   Q.  I'm sorry.  As an LPN.
5   A.  LPN.
6   Q.  And you were working at Doctors Hospital?
7   A.  Yes.
8   Q.  Were you working on an as-needed basis at
9       that time?
10  A.  Yes.
11  Q.  Have you always worked on an as-needed
12      basis as an LPN?
13  A.  No.
14  Q.  Have you worked full-time as an LPN?
15  A.  Yes.
16  Q.  When was that?
17  A.  2002 I think.
18  Q.  Right after you graduated?
19  A.  (Witness nods head up and down.)
20  Q.  Yes?
21  A.  Yes.
22  Q.  With respect to being an LPN, do you have
23      to sit for boards --

Page 40

1   A.  Yes.
2   Q.  -- to receive a license to be an LPN?
3   A.  Yes.
4   Q.  And those are given by the Alabama Board of
5       Nursing; is that right?
6   A.  Yes, sir.
7   Q.  Can you work in a Georgia hospital with an
8       Alabama license?
9   A.  No.
10  Q.  So you had to sit for the Georgia board as
11      well?
12  A.  No, sir.  It was -- I took my boards and
13      then I applied for my Georgia license, kind
14      of like grandfathered in.
15  Q.  Reciprocal agreement?
16  A.  Yes.
17  Q.  When you first started working at Doctors
18      Hospital --
19      That is where you first started, right?
20  A.  Right.
21  Q.  Is that the only place you've worked as an
22      LPN?
23  A.  No.

10 (Pages 37 to 40)

Page 41

1  Q.  Who at Doctors Hospital did you work for
2      when you first started to work there?
3  A.  Gertrude.  I don't know what her last name
4      is.
5  Q.  What was her job?
6  A.  She was the manager over med-surge.
7  Q.  And this would have been in -- after you
8      got your license in 2002; is that correct?
9  A.  Correct.
10 Q.  And was this the first job you had after
11     you got your license as an LPN?
12 A.  Yes.  I worked as a tech on the floor once
13     I graduated.
14 Q.  Until you got your license?
15 A.  Right.
16 Q.  What was your job at Doctors Hospital in
17     the med-surge --
18 A.  As a nurse?
19 Q.  -- in the -- well, yes, as a nurse, as an
20     LPN?
21 A.  As an LPN, floor nurse.
22 Q.  You were a floor nurse on a floor of the
23     hospital?  You were not in the medical --

Page 42

1      you were not actually, for example,
2      assigned to a surgical team or a surgical
3      suite or the surgical part of the hospital
4      where they perform surgery?
5  A.  No.
6  Q.  You were on a floor?
7  A.  On a floor.
8  Q.  And that was under Gertrude?
9  A.  Correct.
10 Q.  Have you ever worked at any other jobs at
11     Doctors Hospital other than being on the
12     floor as an LPN?
13 A.  No.
14 Q.  Now, when you were a tech, how long were
15     you a tech?
16 A.  About a year.
17 Q.  What did you do as a tech?
18 A.  Patient care, bathing, basically running
19     errands for the patient, communicating with
20     the nurses.
21 Q.  You would do more menial chores?  Would
22     that be a good way to describe what you did
23     as a tech?

Page 43

1  A.  Vital signs, bathing, providing linens,
2      ice, whatever the patient needed.
3  Q.  Now, you said you have worked somewhere
4      else as an LPN --
5  A.  Correct.
6  Q.  -- other than Doctors Hospital.  Where is
7      that?
8  A.  St. Francis.
9  Q.  And St. Francis is in Columbus, too?
10 A.  Columbus.
11 Q.  Do you still work at St. Francis?
12 A.  No, sir.
13 Q.  When did you work at St. Francis?
14 A.  I think it was November of 2000 ... I
15     worked there for about six months.  It was
16     '03 or '04 -- I think it was '04 until
17     April or -- March or April of '05.  I think
18     it was April of '05.
19 Q.  Why did you leave St. Francis?
20 A.  Because I was pregnant and starting the RN
21     Mobility Program at CVCC.
22 Q.  When did you have the child that you were
23     pregnant with in April of 2005?

Page 44

1  A.  I had him in June of '05.
2  Q.  Was your pregnancy normal?
3  A.  Yes.
4  Q.  Who is your OB-GYN doctor?
5  A.  It was Melissa Flynn.
6  Q.  Where is Melissa Flynn?
7  A.  She's in Columbus, Georgia.
8  Q.  F-L-Y?
9  A.  Uh-huh.  (Positive response.)  N-N.
10 Q.  Do you have a general doctor anywhere?
11 A.  Miranda Edwards.
12 Q.  Where is Miranda Edwards?
13 A.  Columbus, Georgia.
14 Q.  What kind of doc is she?
15 A.  Family practice.
16 Q.  Do you have any other doctors?
17 A.  No, sir -- yes, I do.  Steven Leichter.
18     He's an endocrinologist.
19 Q.  Spell his name if you would.  Is it P-H on
20     Steven or V?
21 A.  V.  I think it's L-I-E-T-C-H-N-E-R.  I
22     think that's it.
23 Q.  And he's an endocrinologist?

Deposition of Lindy Wright

**Page 45**

1   A.  He is.
2   Q.  What do you see him for?
3   A.  Thyroid.
4   Q.  I saw a reference to Synthroid in some of
5       the documents.  Do you take Synthroid?
6   A.  I do.
7   Q.  How long have you been taking Synthroid?
8   A.  Ten -- between ten and 12 years.
9   Q.  And you said Steven Leichter is in
10      Columbus, also?
11  A.  Correct.
12  Q.  Any other doctors that you have?
13  A.  No, sir.
14  Q.  All right.  Now, you did what job at
15      St. Francis?
16  A.  Med nurse.
17  Q.  What is a med nurse?
18  A.  Give the patients their medications when
19      it's time.
20  Q.  Is that all you did?
21  A.  No.  I helped the other floor nurses with
22      patient care.
23  Q.  Tell me what's involved in being a med

**Page 46**

1       nurse and giving patients their medication.
2   A.  Educating them on the medications they're
3       getting, hanging IV fluids, antibiotics
4       through a --
5           (Brief interruption.)
6   Q.  Go ahead.
7   A.  Hanging IV fluids, antibiotics, anything
8       that was prescribed by the doctor to give
9       the patient and educate them on the
10      medications if they didn't understand.
11  Q.  Did you as a med nurse have to make
12      calculations about the medications --
13  A.  Sometimes.
14  Q.  Sometimes?
15  A.  Yes, sir.
16  Q.  Can you explain to me what that means?
17      I've seen a reference to that, but I really
18      don't know what is involved in it.
19  A.  In med calculations?
20  Q.  Right.
21  A.  Well, there's -- in school, they teach you
22      formulas, but it's not that difficult.  If
23      the doctor orders 500 milligrams of Vicodin

**Page 47**

1       and they only get a half a tab, then pretty
2       much you figure out that that's 250
3       milligrams and you'd break the tablet in
4       half.  But that's not a medication that we
5       would normally do that with.  That's just
6       an example.
7   Q.  How about on IVs?
8   A.  That pretty much came up from the pharmacy,
9       but if there was a discrepancy in the order
10      from the doctor and the pharmacy, then you
11      would call the pharmacy and question them.
12  Q.  Is that a matter of doing a calculation?
13  A.  No.  Basically when you're out on the
14      floor, it's given.  The doctor gives the
15      order, and that's pretty much what it is so
16      you really don't have to calculate when
17      you're on the floor.
18  Q.  The pharmacy does whatever calculation is
19      necessary for the IV bag or whatever?
20  A.  Right.
21  Q.  What other types of calculation figuring
22      does a med nurse have to do on medications?
23  A.  That's pretty much it.  You just have to

**Page 48**

1       know what you're giving to the patient so
2       you can explain to them what they're
3       getting if they have questions, and there
4       was always reference books if you
5       didn't ...
6   Q.  Well, you mentioned that in school, they
7       teach you formulas.  What do you mean by
8       that?
9   A.  Formulas?  How to calculate the amount of
10      drug needed to be given was the question
11      that they gave in school.  I mean, they
12      would give you a question and it would
13      say -- an example would be, I guess, if you
14      had somebody with Tylenol, give them 1,000
15      milligrams of Tylenol and the order calls
16      for 500, how many tablets would you give?
17  Q.  That's it?  It's just that simple; is that
18      right?
19  A.  Some of them are.  The IV were different.
20      IV calculations were a little different.
21      There's different formulas.  I don't know
22      them right off the top of my head.
23  Q.  But you studied those is what you're

Deposition of Lindy Wright

Page 49

1    telling me in school, right?
2  A.  We did.
3  Q.  And as a med nurse at a hospital, I assume
4    you're expected to know those formulas, are
5    you not?
6  A.  Yes.
7  Q.  And that would be true for St. Francis
8    Hospital when you were a med nurse at
9    St. Francis, correct?
10  A.  Correct.
11  Q.  And therefore, of course, you knew those
12    formulas at that time, correct, when you
13    were at St. Francis?
14  A.  Correct.
15  Q.  So the formulas taught in school are no
16    different really than the formulas that
17    you're required to know as a med nurse --
18    or were required to know as a med nurse in
19    November of 2004 when you were a med nurse
20    at St. Francis, right?
21  A.  Right.
22  Q.  Who was your supervisor at St. Francis?
23  A.  Shirley Stanford.

Page 50

1  Q.  Is she still there?
2  A.  She is.
3  Q.  What was her title?
4  A.  She was the manager over 3 South and 3
5    North.
6  Q.  She was the nursing manager --
7  A.  Uh-huh.  (Positive response.)
8  Q.  -- or the med nurse manager?
9  A.  She was the nursing manager.
10  Q.  Okay.  How were you hired at St. Francis?
11    What process did you go through?
12  A.  Through human resources and filling out an
13    application and taking a test.  I think
14    it's kind of like a personality test.
15  Q.  Okay.
16  A.  Interview process and hired.
17  Q.  And how were you hired at Doctors
18    Hospital?  The same type process?
19  A.  Yes, sir.
20  Q.  Let's see.  You worked at Doctors Hospital
21    in 2002 as an LPN after you got your
22    license; is that right?
23  A.  After I got my license.

Page 51

1  Q.  You got your license, didn't you, in 2002,
2    your LPN license?
3  A.  I think it might have been 2003.  I'm not
4    real sure of the date because I waited
5    about a year.  I waited about a year, I
6    think.
7  Q.  You're saying that after you graduated from
8    CVCC as an LPN candidate for the boards,
9    you waited a year before you took the
10    boards?
11  A.  No.  I took the boards a few months
12    after -- I think maybe in December I took
13    the boards.
14  Q.  When would you have graduated?
15  A.  August.  The LPN program was August.
16  Q.  That would be the graduation time?
17  A.  Uh-huh.  (Positive response.)
18  Q.  Okay.
19  A.  I think 2002.
20  Q.  And you took the licensing test or the
21    boards in December of '02?
22  A.  Yeah, December of '02.
23  Q.  December 2002.  Do you have to go to

Page 52

1    Montgomery to do that?
2  A.  Yes.
3  Q.  You do?
4  A.  Uh-huh.  (Positive response.)
5  Q.  And you go to the Board of Nursing to do
6    that?
7  A.  No, it was a testing site.
8  Q.  Was December 2002 the first opportunity you
9    had to take the licensing exam after you
10    graduated as an LPN in August?
11  A.  No, I'm sure it wasn't the first
12    opportunity, but it was the first date that
13    I scheduled.
14  Q.  Why did you wait?
15  A.  No reason.
16  Q.  And were you working at that time as a
17    tech?
18  A.  I was.
19  Q.  Do you remember when you first started
20    working as a tech at Doctors Hospital?
21  A.  I think maybe in November of that same
22    year, 2002.  I didn't work right away.
23  Q.  You worked as a tech in November of '02 for

Deposition of Lindy Wright

July 13, 2007

Page 53

1    the first time you think –
2  A.  I think so.
3  Q.  -- at Doctors Hospital?
4       I don't know why, but I thought you
5    said you worked for about a year as a tech.
6  A.  Correct.
7  Q.  So even though you took the boards in
8    December '02, you continued to work on as a
9    tech for a year after November '02 when you
10   first started, right?
11 A.  Correct.
12 Q.  Did you pass the LPN licensing test on the
13   first try?
14 A.  No.
15 Q.  How do they grade that or how do they
16   determine whether you pass?
17 A.  I think that's on maybe a cumulative,
18   how many questions you get right.  I'm not
19   real sure.
20 Q.  Do you remember what your score was?
21 A.  No, they don't give a score.  It's
22   pass/fail.
23 Q.  They just told you you failed, right?

Page 54

1  A.  Yes.
2  Q.  So after you took it in December 2002, when
3    did you take it again?
4  A.  Close to that year mark between tech and
5    LPN.  I'm not sure the exact date.
6  Q.  So if you became a tech in November 2002 at
7    Doctors Hospital, sometime around November
8    2003 is when you took the LPN licensing
9    exam for the second time?
10 A.  Somewhere around there I think.  I'm not
11   real sure.  I'm not sure of the date.
12 Q.  Did you pass it the second time?
13 A.  Yes, I did.
14 Q.  So after you passed the LPN exam, were you
15   automatically moved up in your job at
16   Doctors Hospital to work as an LPN?
17 A.  Yes.  You had to precept with somebody for
18   about six to eight weeks.
19 Q.  What is precept?
20 A.  Work alongside of a seasoned nurse.
21 Q.  Did you say precept?
22 A.  Yeah, it's like precepting with --
23 Q.  P-R-E-C-E-P-T?

Page 55

1  A.  Uh-huh.  (Positive response.)
2  Q.  What is --
3  A.  A mentor.
4  Q.  All right.  So you had to work with a
5    mentor --
6  A.  Correct.
7  Q.  -- for about six weeks you said?
8  A.  Somewhere between six to eight weeks.
9  Q.  Who was your mentor?
10 A.  Jan Lackey.
11 Q.  What job did you do with your mentor?
12 A.  Nursing.
13 Q.  Floor nurse?
14 A.  Floor nurse.
15 Q.  The same job that you eventually did as an
16   LPN; is that right?
17 A.  Right.
18 Q.  So sometime around November 2003, you
19   started as an LPN at Doctors Hospital, and
20   then about a year later, you began working
21   at St. Francis; am I right?
22 A.  Correct.
23 Q.  Am I right?

Page 56

1  A.  Correct.
2  Q.  Now, at Doctors Hospital, let's say, in
3    November 2003 when you began working as an
4    LPN, did you work on an as-needed basis?
5  A.  At Doctors Hospital still or -- can you
6    repeat that question, please.
7  Q.  In November 2003, maybe October, but
8    sometime in that time frame, you began
9    working as an LPN at Doctors Hospital,
10   correct?
11 A.  Correct.
12 Q.  When you began working as an LPN at Doctors
13   Hospital, did you work on an as-needed
14   basis?
15 A.  No.
16 Q.  So you would call that a full-time basis?
17 A.  Yes, sir.
18 Q.  How many hours a week did you work?
19 A.  Anywhere from 36 to 40 plus hours.
20 Q.  How much did you make?  Were you paid on an
21   hourly basis?
22 A.  Hourly basis.
23 Q.  How much did you make?

Deposition of Lindy Wright

Page 57

1    A.  I think it was 11, $11 and some change.
2        I'm not real sure the exact amount.
3    Q.  And that's an hour; is that right?
4    A.  Yes, sir.
5    Q.  And did you get benefits of any kind?
6    A.  Yes.
7    Q.  What were they?
8    A.  Medical, dental.
9    Q.  Any other benefits?
10   A.  No, sir.  Vacation, time off, sick time.
11   Q.  Did the hospital pay 100 percent of the
12       premium for the medical and dental
13       coverage?
14   A.  No.
15   Q.  How did that work?
16   A.  You have to pay a portion.
17   Q.  Do you remember the portion you had to pay?
18   A.  No.
19   Q.  Do you remember about how much money it was
20       a month?
21   A.  No, I don't.  I mean, I don't remember.
22   Q.  Now, did you work at Doctors Hospital on a
23       full-time basis from about November 2003 as

Page 58

1        an LPN all the way up to the time that you
2        took the job at St. Francis as a med nurse?
3    A.  No, I worked p.r.n. some at the very end.
4    Q.  Okay.  So at the beginning of your LPN work
5        at Doctors, you worked full-time, but then
6        at some point in time later, they switched
7        you to as-needed?
8    A.  That was my choice.
9    Q.  Do you recall about when you switched?
10   A.  Maybe October of 2003 or four.  I'm not
11       real sure of the exact date.
12   Q.  It would have to be four because you
13       started working as an LPN at Doctors
14       Hospital around November 2003.  Am I right
15       about that?
16   A.  Yes.
17   Q.  And so that if you worked for some period
18       of time at Doctors Hospital on a full-time
19       basis and you chose to switch to an
20       as-needed basis later and it was in the
21       November time frame, October, November time
22       frame, it would have been 2004, right?
23   A.  I think so.

Page 59

1    Q.  Do you think that's correct, that you chose
2        to go on an as-needed basis in 2004 in
3        October, November sometime?
4    A.  I think it was October 2004.
5    Q.  Why did you choose to go on an as-needed
6        basis?
7    A.  I took another position with some doctors
8        that used to come into the hospital for
9        about three months, and then I went to
10       St. Francis.
11   Q.  Explain that to me.  Okay?
12   A.  I started working with gastroenterologists.
13   Q.  Did you do that work with the
14       gastroenterologists at the hospital or --
15   A.  No, sir, it was in their office.
16   Q.  Who were these doctors?
17   A.  A. D. and P. H. Patel.
18   Q.  A. D. and P. H. Patel.  Were they in
19       Columbus?
20   A.  Yes, sir.
21   Q.  Are they still practicing in Columbus?
22   A.  Yes, sir.
23   Q.  Were you still making about $11 and change

Page 60

1        per hour at Doctors Hospital when you went
2        to work for the Patels?
3    A.  No, I think it was $15.  I think it was $15
4        an hour.
5    Q.  And how much did you make with the Patels?
6    A.  I think maybe $12.
7    Q.  Twelve?
8    A.  I think so.
9    Q.  Well, I must have misunderstood you.  Did
10       you tell me that you went on an as-needed
11       basis with Doctors Hospital because you
12       started working with the Patels?
13   A.  Yeah, that's why.  Yes, sir.
14   Q.  So I guess I don't understand why you would
15       go from a $15 an hour full-time job to a
16       $15 an hour part-time job on an as-needed
17       basis to a $12 an hour part-time job.
18   A.  No.  The doctors' office was full-time.  The
19       hospital was as-needed.
20   Q.  Why did you do that?
21   A.  A change, to come out of the hospital and
22       get experience in an office.
23   Q.  That's the only reason?

Deposition of Lindy Wright

Page 61

1    A.  The only reason.
2    Q.  The hospital did not ask you to move on?
3    A.  No.
4    Q.  Were you having any kind of problems at the
5        hospital -- at Doctors Hospital at the time
6        you took the job with the Patels?
7    A.  No.
8    Q.  What did you do for the Patels?
9    A.  Assisted with procedures in their -- they
10       had a procedure room in the back of their
11       office.  I assisted the doctors with that
12       and helped with the patients that came in
13       and out to get them ready for the
14       procedures and after the procedures.
15   Q.  Tell me what you did to assist.
16   A.  Started IVs.
17   Q.  Started IVs?
18   A.  Started IVs in the beginning.  When the
19       patient first came in, I started IVs and
20       would hang fluids and then just wait for
21       the doctor to --
22           There were different people in that
23       procedure room that would help, and you

Page 62

1        didn't do the same procedure every time.
2        Sometimes you would help get the patient
3        ready.  Sometimes you would go in with the
4        doctor to do the procedure.  Sometimes you
5        would be on the back end and sit with the
6        patient, take their vital signs after they
7        came out of the procedure because an RN was
8        in the procedure room giving medications to
9        sedate.
10   Q.  Did you ever work with the Patels in the
11       procedure room?
12   A.  Yes, sir.
13   Q.  What did you do while you were in the
14       procedure room working for them?
15   A.  Assist the doctor with the scopes.
16   Q.  Did you administer any medication in the
17       procedure room?
18   A.  No.
19   Q.  Did not?
20   A.  No, sir.
21   Q.  Now, you indicated before that when people
22       would come in, you would start IVs.
23   A.  Correct.

Page 63

1    Q.  Is that right?
2            I'm sorry.  Were you through?
3    A.  Uh-huh.  (Positive response.)
4    Q.  Did you do anything else other than that
5        when you worked in that part of the
6        operation?  The front end is what I guess
7        you would say.
8    A.  Take vital signs.
9    Q.  When you started IVs, what were they?
10   A.  What do you mean?
11   Q.  What was in them?
12   A.  Normal saline.
13   Q.  Just establishing an open line?
14   A.  Yes, sir.
15   Q.  No meds in those?
16   A.  No, sir.
17   Q.  And you took vitals and, I guess, recorded
18       all of that --
19   A.  Yes, sir.
20   Q.  -- in the record; is that right?
21   A.  Yes, sir.
22   Q.  All right.  Was there any way you knew from
23       day to day whether you would be working on

Page 64

1        the front end or in the procedure room or
2        the back end at the Patels'?
3    A.  No, sir.
4    Q.  They would just tell you when you went in
5        that day; is that right?
6    A.  Yes, sir.
7    Q.  Was there, like, a person there who
8        determined where everybody would be for the
9        day?
10   A.  Yes, sir.
11   Q.  Who was that?
12   A.  Jean Patterson.
13   Q.  With a J?
14   A.  I think so.
15   Q.  J-E-A-N?
16   A.  Yes.
17   Q.  Jean Patterson.  What qualifications did
18       she have?
19   A.  She was an RN.
20   Q.  Do you know if she still works there?
21   A.  I do not know.
22   Q.  Do you know where she lives?
23   A.  No, sir.

16 (Pages 61 to 64)

Page 65

1  Q. Does she live in Columbus? Does she live
2     in --
3  A. I think she lives in Columbus.
4  Q. How many nurses worked at the Patels' when
5     you worked there?
6  A. Three.
7  Q. Jean Patterson was one of them?
8  A. Correct.
9  Q. You were one of them?
10 A. Correct.
11 Q. Who was the third?
12 A. Her first name is Mandy. I'm not real sure
13    what the last name is. I can't remember
14    right now.
15 Q. Was she an LPN?
16 A. No, sir. She was an RN.
17 Q. You were the only LPN?
18 A. Correct.
19 Q. Now, when you went into the procedure room,
20    all you did was help with the scopes?
21    That's the only job you did?
22 A. Correct.
23 Q. And what did you do or what would you do to

Page 66

1     help with the scopes?
2  A. Just hold the scope for the doctor. And
3     there's a guidewire that they insert into
4     those scopes sometimes, and you help with
5     that.
6  Q. Then you worked also on the back end of
7     that operation?
8  A. Yes, sir.
9  Q. What did you do on the back end?
10 A. I'd receive the patients out of the
11    procedure room and take their vital signs,
12    make sure that they were coming out of
13    their sedation correctly. If there was
14    nausea and vomiting, you would get the
15    nurse to give them medication.
16 Q. Okay. How long did you monitor those
17    patients before they could leave?
18 A. I think it was usually 30 minutes to an
19    hour, depending on how well they did.
20 Q. Would it be correct to say that you were
21    the only monitoring nurse in the recovery
22    room when you worked in the recovery room?
23 A. No.

Page 67

1  Q. Who else would have --
2  A. They had techs.
3  Q. Okay. How many techs worked there?
4  A. Two possibly. I think two maybe, two other
5     people.
6  Q. Why did you leave the Patels?
7  A. The office was a little slow compared to
8     where I came, so that's why I went back to
9     the hospital work.
10 Q. When you say the office was a little slow,
11    what do you mean?
12 A. Slow-paced. Hospital work is a little
13    faster pace.
14 Q. So when was it that you left the Patels,
15    Ms. Wright?
16 A. I worked there for about three months,
17    so ...
18 Q. Did you ever get a raise there?
19 A. No, sir.
20 Q. Did you get benefits there at the Patels'?
21 A. No, I wasn't there long enough.
22 Q. So you did not have medical or dental,
23    right?

Page 68

1  A. No, sir.
2  Q. I'm trying to figure out when this -- how
3     this lines up with your marriage to Scott
4     McCraine.
5  A. We were not married at that time.
6  Q. And you had no children?
7  A. No, sir.
8  Q. Where were you living in that time frame?
9  A. With my mom.
10 Q. All right. So you say that the Patels'
11    office was a little slow, so you wanted to
12    get back into something a little bit more
13    fast-paced; is that right?
14 A. Right.
15 Q. Did you apply back at Doctors Hospital?
16 A. I was still there p.r.n.
17 Q. Did you go back full-time at Doctors
18    Hospital?
19 A. No.
20 Q. Did you stay on at Doctors Hospital as
21    needed?
22 A. As needed.
23 Q. So where all did you apply?

Page 69

1  A.  St. Francis.
2  Q.  That's the only place?
3  A.  Yes, sir.
4  Q.  And we've already talked about what you did
5      there, I believe.
6          How much did they pay you at
7      St. Francis?
8  A.  I think $12.50 maybe.
9  Q.  And how long?  You said six months, you
10     think, at St. Francis?
11 A.  I think it was about six months.
12 Q.  Were you still working at Doctors Hospital
13     on an as-needed basis during the time that
14     you worked at St. Francis?
15 A.  Yes, sir.
16 Q.  How much were you making on an as-needed
17     basis?
18 A.  At Doctors Hospital?
19 Q.  Yes.  I'm sorry.  Yes.
20 A.  I think about $15 an hour.
21 Q.  So the same rate of pay that you made while
22     you were full-time?
23 A.  No.  When I was full-time at Doctors?

Page 70

1  Q.  Right.
2  A.  I didn't make $15 an hour.
3  Q.  Oh, I thought you said you had gotten a
4      raise from your original pay of, like, 11
5      and change to 15 bucks at Doctors.
6  A.  Full-time pay is not the same as p.r.n.
7      pay.  The rates are different.
8  Q.  All right.  So you did not get a raise at
9      Doctors Hospital?
10 A.  When I went p.r.n., they paid more.
11 Q.  So p.r.n. or an as-needed nurse gets a
12     higher rate of pay; is that right?
13 A.  Correct.
14 Q.  How many hours a week on an average week
15     would you work at Doctors Hospital when you
16     were there on an as-needed basis?
17 A.  Maybe 24.
18 Q.  How many hours a week did you work at the
19     Patels' office while you were working
20     there?  And that was a full-time job,
21     wasn't it?
22 A.  That was 40 hours a week.
23 Q.  And so you were working about 40 hours a

Page 71

1      week with the Patels, and 24 hours a week
2      at the hospital, Doctors Hospital?
3  A.  Not all the time.
4  Q.  Can you explain that to me or describe it?
5  A.  I only went to Doctors Hospital when they
6      called and asked, said we need some help,
7      can you come over and help us out a few
8      hours.  Maximum, maybe 24 hours.
9  Q.  That's max, is 24?
10 A.  Max, maybe.
11 Q.  Well, what I had asked you is how many
12     hours per week on an average would you work
13     at Doctors Hospital when you worked there
14     on an as-needed basis.
15 A.  Anywhere between eight and 24 hours.
16 Q.  When you worked at St. Francis, how many
17     hours on an average did you work at Doctors
18     on an as-needed basis?
19 A.  Four to 12, and that's not weekly.  I mean,
20     that was just -- it wasn't a weekly deal.
21     I didn't go to Doctors Hospital every week,
22     only when they called and needed somebody.
23 Q.  Well, what does four to 12 mean?  I'm not

Page 72

1      sure I understand.
2  A.  In a week that they called, they could have
3      called twice.  They could have needed me
4      for a four-hour shift.  They could have
5      needed me for an eight-hour shift.
6  Q.  It was random?
7  A.  It was random.
8  Q.  It was just random?
9  A.  Random.
10 Q.  There was no way to predict what it would
11     be?
12 A.  No.
13 Q.  Now, you indicated, I think, to me that you
14     left St. Francis around early April '05 or
15     maybe late March '05 because you were
16     pregnant and you started in the RN program;
17     am I --
18 A.  Correct.
19 Q.  -- right about that?
20         And you told me, I think, that you had
21     that baby in June of '05.
22 A.  Correct.
23 Q.  After you had the baby, did you go back to

Page 73

```
1       St. Francis?
2    A.  No.
3    Q.  No, you did not?
4    A.  No.
5    Q.  Were you working anywhere after you left
6        St. Francis around late March, early April
7        2005?
8    A.  Doctors Hospital.
9    Q.  And was that on this as-needed basis?
10   A.  Yes.
11   Q.  And that was random?  You had no way to
12       predict how many hours that would be?
13   A.  Yes.
14   Q.  When they called you, were there times
15       after your baby was born that you could not
16       go, could not work?
17   A.  When I was in school.
18   Q.  Okay.
19   A.  Because I had him while I was in the RN
20       program.
21   Q.  Right.  You're right.  And that's what I'm
22       really asking, is after you had your baby
23       in June 2005 -- and, of course, at that
```

Page 74

```
1        time, you were in the RN program -- there
2        were times when you could not accommodate
3        Doctors Hospital when they called you to
4        come and work on an as-needed basis; is
5        that right?
6    A.  Correct.
7    Q.  How long did you stay in this particular
8        situation after June of 2005 where you had
9        a new baby -- or you had a baby and you
10       were working on an as-needed basis at
11       Doctors Hospital?  How long did that job
12       situation last?
13   A.  I think I quit working for them sometime --
14       sometime in 2005, I stopped working for
15       them.
16   Q.  Why did you stop?
17   A.  School.
18   Q.  So at that point, you had no job
19       whatsoever, right?
20   A.  Right.
21   Q.  You have no idea about what month it was
22       that you stopped?
23   A.  It was sometime I think during that second
```

Page 75

```
1        semester of RN school.
2    Q.  Can you give me a judgment as to what month
3        in 2005 that would be?
4    A.  I don't know the month.
5    Q.  Can you give me any landmark or time mark,
6        an occurrence or something, an event that
7        happened or that you can attach your
8        quitting the as-needed work to?
9    A.  Maybe September, October.  I'm not real
10       sure what month it was.
11   Q.  And you can't think of any event or
12       occurrence or any particular thing that
13       happened or -- that just happened to occur
14       about the same time you quit at Doctors?
15   A.  No, sir.
16   Q.  How did you quit at Doctors?
17   A.  It was a p.r.n. basis.  So that was my
18       decision to go in or not.  If they would
19       call and say can you come in, I could tell
20       them no, and that's fine.  And then --
21   Q.  Go ahead.
22   A.  I mean, I'm sure I eventually told them
23       that I was not going to be able to work
```

Page 76

```
1        while in school.
2    Q.  And you think -- for some reason, you think
3        it was August, September, in that time
4        frame of 2005?
5    A.  Maybe so.  I'm not real sure of the date.
6    Q.  At that time, who was your supervisor at
7        Doctors Hospital?
8    A.  Marie Redden.
9    Q.  Do you know if she's still at the hospital?
10   A.  She is.
11   Q.  What department does she work in?
12   A.  She works med-surge, 4th floor.
13   Q.  Where does she live?
14   A.  I think she lives in Harris County, which
15       is in Columbus.
16   Q.  All right.  Did you work at all after you
17       decided not to go in anymore at Doctors
18       Hospital and up until the point you stopped
19       going to school at CVCC?
20   A.  I think I might have worked one or two days
21       when I was pregnant with my second child.
22   Q.  So, basically, no is the answer, correct?
23   A.  (Witness nods head up and down.)
```

Page 77

1    Q.  Is that right? Basically, you did not work
2         the whole rest of the time you were in
3         school at CVCC; is that right?
4    A.  One or two days.
5    Q.  Where did you work in those one or two
6         days?
7    A.  Doctors Hospital.
8    Q.  This was your first child in June of '05?
9    A.  Yes, sir.
10   Q.  And so you had another child -- when was
11        that child born? Let's see. You tell me.
12   A.  July 7th of '06.
13   Q.  Of '06. Were you still in school at that
14        time?
15   A.  Yes, sir.
16   Q.  You were?
17   A.  When he was born --
18   Q.  Right.
19   A.  -- or when I got pregnant?
20   Q.  When he was born.
21   A.  No.
22   Q.  You said July?
23   A.  July.

Page 78

1    Q.  Of '06?
2    A.  Uh-huh. (Positive response.)
3    Q.  Yes?
4    A.  Yes.
5    Q.  2006, born. When did you last attend
6         school at CVCC?
7    A.  May of '06.
8    Q.  Can you tell me how that occurred that you
9         stopped going to school at CVCC?
10   A.  That was the end of the nursing program.
11   Q.  Okay. Had you taken any courses in the
12        spring semester of 2006 --
13   A.  In the spring --
14   Q.  -- at CVCC in the nursing program?
15   A.  I can't remember how it falls. I think May
16        is in summer, so I think -- if I'm thinking
17        correctly, then, yes, I did, because that
18        would be before summer.
19   Q.  Right. It would be.
20        Did you take a full load of classes in
21        that spring semester of 2006?
22   A.  If ...
23   Q.  I call that starting sometime in January

Page 79

1    and going to May.
2    A.  Yes.
3    Q.  Took a full load; is that right?
4    A.  I mean, I don't know if it was a full load
5         or not. It was the nursing courses that
6         were required to be taken.
7    Q.  And you made a D in how many of the courses
8         you were taking in that semester?
9    A.  In?
10   Q.  In the spring semester of 2006.
11   A.  Would that be the last semester or --
12   Q.  Yes.
13   A.  The last semester?
14   Q.  Yes.
15   A.  I made a D in one course.
16   Q.  What course?
17   A.  Pediatrics.
18   Q.  Do you know the number of it?
19   A.  I think it was 272.
20   Q.  272?
21   A.  I think so.
22   Q.  All right. And who taught it?
23   A.  Lynn Harris.

Page 80

1    Q.  And you did not make a D initially in any
2         other course in the spring semester?
3    A.  I'm trying to think how these semesters
4         fall and get my dates --
5    Q.  January to May is what I believe is the
6         spring semester, so January to May of '06.
7             MR. NIX:  Am I right?
8             DR. BLACKWELL:  (Nods head up and
9         down.)
10   Q.  So January to May of '06 is the spring
11        semester. That would be your last semester
12        at CVCC.
13   A.  Right.
14   Q.  Didn't make a D in any other courses?
15   A.  No.
16   Q.  Didn't have a grade changed from a D to a C
17        in that semester, correct?
18   A.  No, not in that semester.
19   Q.  In the semester before that, you did?
20   A.  Correct.
21   Q.  And that would be the fall semester of
22        2005.
23   A.  Correct.

Page 81

1　Q.　Which begins sometime in August if I'm not
2　　　mistaken; am I right about that?  Do you
3　　　remember that?
4　A.　Yes.
5　Q.　So August -- let's just say August to mid
6　　　December of 2005, you made how many D's in
7　　　that semester?
8　A.　They told me that I made two D's.
9　Q.　When you say they, who are you talking
10　　　about?
11　A.　Lynn Harris and Tawyna Cash.
12　Q.　Now, Lynn Harris was an instructor in the
13　　　fall semester.  You made a D in her class,
14　　　correct?
15　A.　Correct.
16　Q.　What class was that?
17　A.　That was adult nursing.
18　Q.　Do you remember the number of that?
19　A.　I think that was 252.
20　Q.　252.  And then Tawyna Cash, what did she
21　　　teach?
22　A.　OB.
23　Q.　And you made a D in that one?

Page 82

1　A.　Correct.
2　Q.　Do you know the number of that?
3　A.　I think it was 271.
4　Q.　All right.  Did the D that you made in
5　　　Tawyna Cash's class, OB, which was NUR 271,
6　　　did that D stay a D on your record?
7　A.　No, sir.
8　Q.　It did not?
9　A.　No, sir.
10　Q.　Why not?
11　A.　They changed it to a C.
12　Q.　Who's they?
13　A.　Dixie Peterson and Dean Lowe.
14　Q.　Why did they do that?
15　A.　We went through the grade appeal process,
16　　　and I was told by Dixie that Tawyna Cash
17　　　did not turn in paperwork that she was
18　　　supposed to turn in at the end of that
19　　　grade appeal process, so it was under her
20　　　discretion to change that D to a C.
21　Q.　So Dixie Peterson and Dean Lowe changed the
22　　　D to a C in NUR 271, correct?
23　A.　Correct.

Page 83

1　Q.　Tell me the significance of making a D in a
2　　　course there at CVCC in their nursing
3　　　program, their RN program.
4　A.　That's a failure.
5　Q.　In most schools, an F is a failure.  Why is
6　　　it that a D is a failure in that program at
7　　　CVCC?
8　A.　That's their qualifications.
9　Q.　That's just what they set; is that what
10　　　you're saying?
11　A.　I think so.
12　Q.　You knew that, correct?
13　A.　Correct.
14　Q.　You knew that from the very beginning of
15　　　your RN work there?
16　A.　Correct.
17　Q.　Now, with regard to NUR 271, which was
18　　　obstetrics --
19　A.　Yes, sir.
20　Q.　-- Tawyna Cash taught that.  You say you
21　　　appealed that D; is that right?
22　A.　Correct.
23　Q.　What was the basis of that appeal?

Page 84

1　A.　The basis of that appeal was there was no
2　　　instructor the first five weeks of class.
3　　　When reviewing test questions and thinking
4　　　about -- when talking with other classmates
5　　　and talking about the tests that she had
6　　　given, it was obvious that some of the
7　　　questions were not -- the answers that she
8　　　chose were -- I'm not saying that they were
9　　　wrong, but the answers I chose were not
10　　　wrong either.
11　　　　So there was a lot of communication
12　　　going on in the class about her test
13　　　questions and how the tests were given, so
14　　　I asked to review all my grades, all my
15　　　tests.
16　Q.　That's an interesting situation.  You're
17　　　saying that on this test -- or on the
18　　　tests, plural, that Tawyna Cash gave, you
19　　　determined and learned somehow or whatever
20　　　that the answers --
21　　　　Did she have what's called an answer
22　　　key?
23　A.　I'm sure she did.

July 13, 2007

Deposition of Lindy Wright

Page 85

1   Q.  Was it a multiple choice type of test?
2   A.  It's a Scantron, yes.
3   Q.  What's a Scantron?  I'm not sure I know
4       what that is.
5   A.  It's a thin sheet with A, B, C, D, E, F.
6       And it was multiple choice questions, and
7       you read the question and pick the correct
8       answer.
9   Q.  And then you darken --
10  A.  Darken it.
11  Q.  With a pencil?
12  A.  Yes, sir.
13  Q.  So it's a multiple choice?
14  A.  Correct.
15  Q.  Now, and what you're saying is that Tawyna
16      Cash developed the test and determined the
17      correct answers to the questions or the
18      multiple choice questions?
19  A.  As far as I know.
20  Q.  And that while you made -- you might have
21      made a failing grade in that test or those
22      tests, you determined that the answer that
23      you gave was correct even though the answer

Page 86

1       that Tawyna Cash gave was also correct. Am
2       I hearing you right?
3   A.  Well, I never told her that her answers
4       were incorrect.  I told her that my answer
5       is not incorrect because I had nursing
6       books that had my answer as well as hers,
7       so ...
8   Q.  You never told Tawyna Cash that her answers
9       were incorrect, the answers that she used
10      as the correct answers, right?  You never
11      told her they were not right?
12  A.  Right.
13  Q.  But what I want to know is, are you saying
14      that they were not right, that Tawyna
15      Cash's answers to those multiple choice
16      questions were not right?
17  A.  Some of those were not right.
18  Q.  Okay.  How many out of how many tests?
19  A.  We only went over my final -- well, I think
20      we did go over all of them, but my final
21      was the one that was in question at the
22      very end, and we only went over one test
23      question and she refused to go over any

Page 87

1       more.
2           She asked me after that one question
3       that she changed from wrong to right, are
4       we going to do this -- are we going to keep
5       on doing this?  I said, yes, ma'am, we are
6       because these are my grades.
7   Q.  You were going over the final with Tawyna
8       Cash, correct?
9   A.  Correct.
10  Q.  Was this in December of 2005?
11  A.  Yes, sir, I think so.
12  Q.  Was it at the school?
13  A.  Yes, sir.
14  Q.  Where did y'all meet?
15  A.  In the nursing office, in her office.
16  Q.  Did you have a copy of your final exam?
17  A.  No, sir.  She provided those.
18  Q.  She provided what, now?
19  A.  She brought the tests to the school.
20      She -- I had to contact her at home, and
21      she brought the tests and things to the
22      school.
23  Q.  Tests and things, what do you mean tests

Page 88

1       and things?
2   A.  Any kind of papers that were graded.  We
3       didn't get to keep our tests or our graded
4       papers.  They took them back up and kept
5       them.
6   Q.  She brought the test -- only the final,
7       right, because that's all you went over?
8   A.  I think, if I remember correctly, we may
9       have gone over some of the tests or gone
10      through the Scantron, but that final was
11      the one that we concentrated on.  And we
12      only got to one question, and she wouldn't
13      go over any more questions because -- I
14      don't know why.  She just wouldn't.
15  Q.  When you say you may have gone through the
16      other tests --
17  A.  Uh-huh.  (Positive response.)
18  Q.  Yes?
19  A.  Yes.
20  Q.  That was in that same meeting --
21  A.  Yes, sir.
22  Q.  -- in that one meeting?
23      Did she bring all of the tests with her

22 (Pages 85 to 88)

Deposition of Lindy Wright

July 13, 2007

Page 89

1    when she came to meet with you in December?
2    A.  I don't know if she did or not.  I just
3         know she brought a box in with some of my
4         work.
5    Q.  But you think you went over some of the
6         earlier tests before the final that were
7         given during the semester; is that right?
8    A.  Right.
9    Q.  So those tests would have had a question
10        and then it would have had your Scantron
11        document, correct?
12   A.  Correct.
13   Q.  How did y'all go over those?  Did you
14        look -- both of you have a copy of the
15        question -- multiple choice question and
16        the Scantron?
17   A.  I think that we were using one and she
18        was -- I mean, we were sitting at arm's
19        length at a desk.
20   Q.  So y'all were looking on together?
21   A.  Yes, sir.
22   Q.  And y'all would go through each question --
23   A.  Yes.

Page 90

1    Q.  -- or just the wrong questions?
2    A.  Just the wrong questions.
3    Q.  So y'all would -- you would select the
4         answers that you wrote down wrong according
5         to her grading, correct?
6    A.  Uh-huh.  (Positive response.)
7    Q.  And you would talk about those, right?
8    A.  Yes.
9    Q.  All right.  You had someone with you,
10        didn't you?
11   A.  Someone with me?
12   Q.  Yes.
13   A.  With Tawyna Cash?
14   Q.  Yes.
15   A.  No.
16   Q.  So it was just you and Tawyna Cash?
17   A.  Yes.
18   Q.  So you and Tawyna Cash at this meeting in
19        December of 2005 were sitting down close to
20        one another, looking at the multiple choice
21        questions and your Scantron paper, right?
22   A.  Right.
23   Q.  Talking about the semester test and the

Page 91

1    answers you chose that were marked
2    incorrect, right?
3    A.  Right.
4    Q.  Now, how many of those, Ms. Wright, did you
5         contest; in other words, how many of those
6         did you say to Tawyna Cash about your
7         answer is wrong or my answer is right?
8    A.  Well, we only got to one because she
9         refused to go over any more.
10   Q.  But I'm talking about the semester tests,
11        the tests that were given during the
12        semester as opposed to the final exam.
13   A.  We went over the final first.
14   Q.  In other words, are you saying now that you
15        did not go over any of the tests that were
16        given during the semester?
17   A.  As far as going over the tests, going over
18        the Scantron saying this is the answer I
19        chose and just going down the Scantron
20        saying A, D, B, B, D, A, or whatever.
21   Q.  I'm not sure I understand what you meant
22        then.
23   A.  Not reading the question and saying, okay,

Page 92

1    this is the answer I chose, this is the
2    rationale.  That was never done.
3    Q.  You're talking about on the --
4    A.  Just to make sure that the Scantron
5         didn't -- when they run it through the
6         machine did not mess up.
7    Q.  I've got you.  So what you did with the
8         semester tests was you compared the answers
9         that she had marked incorrect that you had
10        made to her key?
11   A.  Correct.
12   Q.  And just to make sure that however it was
13        graded was done accurately; is that right?
14   A.  Correct.
15   Q.  And so there was no discussion about those
16        questions?
17   A.  No.
18   Q.  No discussion about her key?
19   A.  No.
20   Q.  No discussion about whether your answer on
21        those tests was right and her answer was
22        wrong?
23   A.  No.

Deposition of Lindy Wright

Page 93

1  Q.  Were there answers that were on her key for
2      any of those tests, were there any of those
3      answers that she had determined that were
4      correct, were any of those wrong or did you
5      contest her answer to any of those
6      semester –
7  A.  On the final.
8  Q.  But not on the tests given during the
9      semester?  You didn't contest any of those?
10 A.  In the classroom?
11 Q.  Did you contest in the classroom?  I'm
12     talking about –
13 A.  Yes, sir.
14 Q.  -- at any time.
15 A.  Yes, sir.
16 Q.  Did Tawyna Cash give out her semester --
17     how should we say it?  What do you call
18     those exams, the ones given during the
19     semester?  Just an exam?
20 A.  An exam.
21 Q.  We'll call those exams, and we'll call the
22     final the final.  Okay?
23         So during the exams, did Tawyna Cash go

Page 94

1      over the exams in class?
2  A.  No.
3  Q.  How did you begin talking to her or anyone
4      about the fact that she had the wrong
5      answer on the key or that her answer was
6      right, but so was yours?
7  A.  Because people in the classroom would
8      question her as well as myself, and she
9      refused to go over anything with us in the
10     classroom because it was always an argument
11     with someone in the classroom.  There was
12     always something going on.
13 Q.  Okay.
14 A.  She refused to go over the tests in class.
15 Q.  When you got a grade on an exam in Tawyna
16     Cash's class, 271, NUR 271 --
17 A.  Yes, sir.
18 Q.  -- when you took a test and you got your
19     grade, would she hand out the papers or did
20     she just give you the grade?
21 A.  She would give us the grade.  If my memory
22     is correct, she would have us come up and
23     let us look and see what our grade was in

Page 95

1      her grade book.
2  Q.  So that's all anybody got to see was just
3      the grade, correct?
4  A.  Yes, sir.
5  Q.  When an exam was given by Tawyna Cash
6      during the semester, would everyone have a
7      copy of the multiple choice questions to
8      take the exam with?
9  A.  Yes, sir.
10 Q.  And then everyone would have a Scantron in
11     order to mark the answers, correct?
12 A.  Correct.
13 Q.  And at the end of that process, would the
14     actual test with the multiple choice
15     questions be handed back in by the
16     students?
17 A.  Yes, sir.
18 Q.  And so would the Scantron cards, correct?
19 A.  Correct.
20 Q.  On the test, when you received a test with
21     the multiple choice questions on it in
22     Tawyna Cash's class, did you put your name
23     or your ID number or any identifying mark

Page 96

1      on that test?
2  A.  I'm not sure if we did in her class or
3      not.  I'm really not sure.  I don't
4      remember.
5  Q.  That's a practice, though, isn't it, that
6      schools use, is for a student to -- if they
7      get a test that's going to be taken back
8      up, they'll make some identifying mark on
9      it in accordance with what the teacher
10     tells them to do or the professor tells
11     them to do if the teacher tells them to do
12     so?  You're familiar with that practice,
13     aren't you?
14 A.  Yes, sir.
15 Q.  So everybody turned their test back in at
16     the conclusion of it?
17 A.  Yes, sir.
18 Q.  Along with the Scantron?
19 A.  Yes, sir.
20 Q.  So I guess I'm at a loss to understand how
21     students could contest her answers if they
22     didn't have the test subsequent to turning
23     it in, didn't have the Scantron and didn't

24 (Pages 93 to 96)

Page 97

1   have her key. How would they do that?
2   A.  Talk amongst each other because they
3       remembered the test questions. As soon as
4       the test was over, people would start
5       talking about, what did you get for this
6       question? Do you remember that question?
7           They would say, well, I don't think
8       that's right. And then people would open
9       their books and look through their books to
10      see if they could find a specific answer
11      for any test question that they could
12      remember.
13  Q.  Did you do that? Did you participate in
14      those discussions?
15  A.  Yes, sir.
16  Q.  I still don't know, though. I mean, how
17      did the class know what her key was?
18  A.  They didn't -- what do you mean know what
19      her key was?
20  Q.  Well, she had to have taken that test
21      herself or when she created the test, the
22      multiple choice test, she had to have
23      selected the correct answer to give that

Page 98

1   answer on the test to whoever was going to
2   grade the Scantron, however that's done,
3   whether by computer or by a person; isn't
4   that right?
5   A.  Correct.
6   Q.  Well, how did y'all know her answers? How
7       did you know Tawyna Cash's answers on those
8       exams?
9   A.  Nobody knew those answers.
10  Q.  So there's no way anyone could have made a
11      contest of the type you're describing, is
12      there?
13  A.  Yeah, you can raise a question in the
14      classroom and say, Ms. Cash, we -- you had
15      a question on there about mother/baby,
16      and -- do you breast feed, does that bring
17      the baby closer to the mother or whatever
18      that question may be. You can ask those
19      questions to her and say, well, I think
20      this answer that you -- you know, this
21      answer is correct that's in the book, but
22      you said this answer was correct.
23          I'm not going over anything was her

Page 99

1   response. I'm not doing that, because it
2   was always an argument. People would start
3   fussing in the classroom. And that would
4   be the end of that. You can schedule time
5   with me, and we can go over test questions.
6   Q.  How did the person who disagreed with
7       Tawyna Cash know what Tawyna Cash
8       determined to be the right answer on a
9       particular question?
10  A.  I don't know. I don't know.
11  Q.  I mean, did Tawyna Cash after an exam tell
12      everybody what all the right answers were?
13  A.  I don't remember her doing that.
14  Q.  Did Tawyna Cash after she gave an exam
15      during the semester go over the exam
16      afterwards and say here is the right answer
17      on that, here is the right answer on that
18      and go down it and tell everybody what the
19      right answers were?
20  A.  I think she might have once or twice going
21      through, but not reading the question and
22      just calling out the A, B, C, or D for
23      whatever question.

Page 100

1   Q.  Tell me how she would do that. How would
2       she do that?
3   A.  I'm not sure. If I remember correctly,
4       there might have been once or twice that
5       she did give a test back and read the
6       answer -- I mean the A, B, C or D, not read
7       the -- A is whatever she had written behind
8       A, read off the letters on the Scantron.
9   Q.  If I remember correctly, she might have one
10      or two times. That was your answer.
11  A.  Right.
12  Q.  So, I mean, Ms. Wright, are you sure she
13      did that?
14  A.  I'm trying to remember. I mean, it's been
15      a long time.
16  Q.  Well, this is your lawsuit.
17  A.  I know it is.
18  Q.  And you filed it, right?
19  A.  Right.
20  Q.  I need to know what happened in the class.
21      Did Tawyna Cash get the test and go over it
22      and tell everybody what the right answers
23      were during the semester?

Page 101

1　A.　I think, yes, she did.  I think she did.
2　Q.　For every test?
3　A.　I'm not sure if it was every test.
4　Q.　Can you tell me how many tests she did that
5　　　for?
6　A.　Maybe two, three.  I'm not real sure.  I'm
7　　　not even sure how many tests we had
8　　　anymore.
9　Q.　Are you saying that you're sure she did
10　　　that, but -- because you still say I think
11　　　instead of -- you don't -- you're not
12　　　saying I know she did that, right?
13　A.　Can I have a minute and let me try and
14　　　think?
15　Q.　Absolutely.  Yes, ma'am.
16　A.　Because, I mean, it's been over two years.
17　　　I think she did.
18　Q.　You think she did?
19　A.　I'll say she did.
20　Q.　How many tests did she go over in the
21　　　class?
22　A.　Two to three.
23　Q.　When she did this, Ms. Wright, did she go

Page 102

1　　　down and do every question on the test?
2　A.　As far as reading the question and
3　　　saying --
4　Q.　And the right answer.
5　A.　No, she would not.  She would say, number
6　　　one, A; number two, B; number three, C.
7　　　Would not read the question, tell you the
8　　　answer and give a rationale behind that.
9　Q.　She would not read the question.  She would
10　　　not go through the possible choices and
11　　　tell you why --
12　A.　This was wrong and why this was right, no.
13　Q.　She would just go number one is A, number
14　　　two is C and that type thing?
15　A.　Correct.
16　Q.　Talk to me about the final exam.  All
17　　　right?
18　A.　Okay.
19　Q.　The final exam was a multiple choice exam,
20　　　correct?
21　A.　Yes, sir.
22　Q.　And it had a Scantron as well, correct?
23　A.　Correct.

Page 103

1　Q.　How did you find out what your grade was on
2　　　the final in Ms. Cash's class?
3　A.　I think I called her or she -- I'm not
4　　　sure.  She was not a full-time employee
5　　　there, and she wasn't available all the
6　　　time.  And I can't recall if she came in
7　　　and gave us those grades or if she called
8　　　us.
9　Q.　Okay.
10　A.　But one way or the other, she told me what
11　　　my grade was.
12　Q.　She didn't post it on a board by social
13　　　security number or anything?  She would
14　　　actually tell you, hey, Lindy, you made
15　　　whatever on --
16　A.　Right.
17　Q.　Now, when you went in to talk to her about
18　　　the final exam, tell me exactly what was
19　　　said to the best of your knowledge and
20　　　recollection.
21　A.　When I did the grade appeal?  Because she
22　　　wasn't available to talk to until the grade
23　　　appeal.

Page 104

1　Q.　So you could not talk to Ms. Cash, and
2　　　therefore you filed a grade appeal?
3　A.　Correct.
4　Q.　Then after you filed the grade appeal, you
5　　　and Ms. Cash sat down in her office and
6　　　met, correct?
7　A.　Correct.
8　Q.　And she brought with her the test and the
9　　　Scantron, right?
10　A.　Correct.
11　Q.　And y'all were sitting close together?
12　A.　Uh-huh.  (Positive response.)
13　Q.　Going over the questions?
14　A.　Correct.
15　Q.　And just tell me what happened.
16　A.　We got to the first question, and I pointed
17　　　out in a book the answer that I chose was
18　　　right there in black and white.  And she
19　　　agreed and she said, okay, I'll change that
20　　　one.
21　　　　We flipped to the next one, and I said,
22　　　and this one right here -- she said, are we
23　　　going to do this with all of them?  I said,

Deposition of Lindy Wright
July 13, 2007

Page 105

1    yes, ma'am, we are, because these are my
2    grades.
3    Q.   On number one, question number one --
4    A.   I don't know if it was question number one
5         or what question it was. I know it was the
6         first question that we came to on the test
7         that was wrong, that she had marked wrong.
8    Q.   All you did was go over the ones that she
9         had marked wrong?
10   A.   Wrong.
11   Q.   I've got you. So whichever number that
12        was -- you don't remember what number that
13        was?
14   A.   No, I don't.
15   Q.   So you got to the first one on the test
16        that she had marked wrong?
17   A.   Uh-huh. (Positive response.)
18   Q.   And you said to her, my answer was right?
19        Is that what you said?
20   A.   And this is what page it's in in this book.
21   Q.   Huh?
22   A.   I said, this is what page it's in in this
23        book.

Page 106

1    Q.   What book are you talking about?
2    A.   It was the OB book that we were using. I
3         don't know the name of it -- now I don't.
4    Q.   Did you look up the answer on any other
5         questions on the final exam in a different
6         book?
7    A.   Yes, sir.
8    Q.   Can you tell me which books, the name of
9         all the books?
10   A.   I don't know the name of -- I don't know
11        the name and author of the books, no.
12   Q.   How did you do that? How did you find the
13        books and look for the right answers to the
14        questions -- the multiple choice questions
15        that Ms. Cash put on the final exam?
16   A.   It wasn't the exact question that she put
17        on the final exam. It was what I could
18        remember from taking that test --
19   Q.   Okay.
20   A.   -- in general.
21   Q.   All right. So you pulled other sources,
22        other books on obstetrics; is that right?
23   A.   Uh-huh. (Positive response.)

Page 107

1    Q.   Yes?
2    A.   I think there was two books.
3    Q.   You pulled other books on obstetrics,
4         right?
5    A.   Right.
6    Q.   And you used your own memory with regard to
7         what had been asked on the test, right?
8    A.   Not just mine. I mean, there was other
9         students that -- when we were trying to
10        recall the test questions.
11   Q.   When was this, now?
12   A.   Before I had to go in to talk with her
13        about the grade appeal and review the
14        test.
15   Q.   Why did y'all do that? I mean, why did
16        y'all get together and try to recall the
17        test questions after the final?
18   A.   Because those were my grades, and they were
19        saying that I made a D. I wasn't satisfied
20        with a D because I knew that some of the
21        questions that we had -- that I had
22        answered I had seen in the books, and the
23        answer that I chose was some of the answers

Page 108

1         in the book or ... some of the things that
2         I read in nursing books.
3    Q.   Was this an actual sit-down type of thing
4         where you got with other students and tried
5         to remember questions on the final?
6    A.   No.
7    Q.   How did that work?
8    A.   Just talking.
9    Q.   In person?
10   A.   Uh-huh. (Positive response.)
11   Q.   Yes?
12   A.   Yes.
13   Q.   Didn't talk to anybody on the phone?
14   A.   Sometimes.
15   Q.   Who did you speak with about that?
16   A.   Any test questions?
17   Q.   On that final that Tawyna Cash gave.
18   A.   Crystal Love.
19   Q.   Okay.
20   A.   April Gunnels.
21   Q.   Okay.
22   A.   Kim Smith.
23   Q.   Okay.

27 (Pages 105 to 108)

Page 109

1   A. Corolla Rambo.
2   Q. Is that a K?
3   A. It's a C.
4   Q. Okay.
5   A. Sandy Gunnels.
6   Q. Okay. Who else?
7   A. And there may -- I don't know the lady's
8       name. She's an instructor at Columbus
9       Tech.
10  Q. Isn't that where Sandy Gunnels is now,
11      Columbus Tech?
12  A. She is.
13  Q. So there was another instructor from
14      Columbus Tech?
15  A. Yes.
16  Q. And you can't remember her name?
17  A. I didn't. I don't remember her name.
18  Q. Had she previously worked at Chattahoochee
19      Valley Community College?
20  A. No.
21  Q. Did you sit down with -- actually meet with
22      this person, this other professor at
23      Columbus Tech?

Page 111

1   Q. So how long was it after you took Tawyna
2       Cash's final that she told you what you had
3       made?
4   A. Within the next week of class, within the
5       next -- within the next week.
6   Q. So within a week of your taking the final,
7       correct?
8   A. Correct.
9   Q. Now, I didn't understand what you meant.
10      You said within the next week of class or
11      in the next week of class. The semester
12      was not over?
13  A. It was over. When she told me my grade, it
14      was over. I'm trying to remember how long
15      it took me to sit down with her for the
16      grade appeal. That's what I was trying to
17      remember.
18  Q. Right now, we're talking about, though,
19      when Tawyna Cash told you what you made on
20      your final in obstetrics, and that was
21      within a week of your taking the final,
22      correct?
23  A. Correct.

Page 110

1   A. Yes.
2   Q. And was Sandy Gunnels there at that
3       meeting?
4   A. She was.
5   Q. Was there more than one meeting?
6   A. Yes, sir.
7   Q. After you took the final in NUR 271,
8       obstetrics, the course taught by Tawyna
9       Cash, how long was it before you had your
10      first meeting about the final with Sandy
11      Gunnels and/or this other instructor whose
12      name you cannot remember?
13  A. When she told me what my final grade was.
14  Q. Well, do you remember the date of the final
15      exam?
16  A. I don't.
17  Q. I mean, it was in December of 2005, right?
18  A. Correct.
19  Q. Was it the first of December? Middle of
20      December?
21  A. Probably, say, the first half of December,
22      maybe the first week or so. I'm not real
23      sure the exact date.

Page 112

1   Q. And was it over the phone?
2   A. I don't remember.
3   Q. But she told you?
4   A. She told me.
5   Q. It was a D, right?
6   A. Correct.
7   Q. When she told you that, did y'all have any
8       kind of discussion at all?
9   A. Not that I can recall at the time.
10  Q. You just said thank you, and y'all hung up?
11  A. Yes.
12  Q. Did you have any kind of concern, a
13      premonition that you might not have made a
14      passing grade on that final?
15  A. No.
16  Q. So how long was it after you talked to
17      Tawyna Cash and she gave you your grade in
18      obstetrics, how long was it before you
19      spoke with Sandy Gunnels?
20  A. Within the next day or so.
21  Q. Do you think it could have been more than
22      two days?
23  A. No, sir.

Page 113

1  Q.  Would it have been the same day?
2  A.  It could have been.
3  Q.  Either the same day or the very next day?
4  A.  Could have been.
5  Q.  One of those two days, the same day you
6      learned of the grade or the next day after
7      you learned; is that right?
8  A.  Right.
9  Q.  How did you reach Ms. Gunnels?
10 A.  By phone.
11 Q.  Where did you call her? Where was she?
12 A.  At work.
13 Q.  At?
14 A.  Columbus Tech.
15 Q.  Columbus Tech. Tell me what y'all said to
16     each other.
17 A.  I don't recall the whole conversation, but
18     in that conversation, I told her what I was
19     told that my grade was. And I was advised
20     to do a grade appeal by her, and that's
21     what I did.
22 Q.  How long was this conversation that you had
23     with Ms. Gunnels on the telephone?

Page 114

1  A.  Probably 30 minutes.
2  Q.  So can you tell me what all was said?
3      That's a pretty good while.
4  A.  How to go about doing the grade appeal,
5      that I needed to go talk to Dixie Peterson,
6      Dean Lowe, who to communicate things with
7      and go through the chain of command and get
8      a copy of the grade appeal process.
9          She told me that there was a sheet --
10     or it was in the -- could be in the catalog
11     or they had it up in the dean's office how
12     to fill out a grade appeal, so that's what
13     I did.
14 Q.  So how long was it after you spoke with
15     Sandy Gunnels that you filled out the grade
16     appeal?
17 A.  It was immediately. I had -- I think I
18     might have had it back to them within the
19     next day or two.
20 Q.  Now, that same semester, you also made a D
21     in another class, correct?
22 A.  Correct.
23 Q.  And that was the class taught by Lynn

Page 115

1      Harris, correct?
2  A.  Correct.
3  Q.  That was NUR 252?
4  A.  Correct.
5  Q.  What is the name of that course?
6  A.  I think that was Adult -- I think it was
7      Adult Nursing II.
8  Q.  How did you find out about the D you made
9      in Lynn Harris's class?
10 A.  She told me that I didn't make -- she told
11     me my points, what my points were and what
12     she had calculated without -- and I think I
13     gave that sheet and -- a copy of that
14     sheet. And she said without the -- even
15     without the care plan, you didn't make
16     enough points to pass.
17 Q.  Let's talk about when and how you first
18     learned of your D in NUR 252. Did you say
19     that's called Adult Nursing II?
20 A.  Adult Nursing II.
21 Q.  How did you first find out about it?
22 A.  I found out about that from Lynn Harris.
23 Q.  How long after the test? How long after

Page 116

1      the final exam?
2  A.  Maybe the next day.
3  Q.  Where were you?
4  A.  At the school in her office.
5  Q.  Okay.
6  A.  In her office.
7  Q.  You were at the school, and so was she?
8  A.  Uh-huh. (Positive response.)
9  Q.  Yes?
10 A.  Yes.
11 Q.  Was anyone else there?
12 A.  We were in a line to go in and see what our
13     grades were, and she went -- she had a
14     sheet that she wrote out our points.
15 Q.  Did everybody go in alone with her?
16 A.  Yes.
17 Q.  And the door was closed?
18 A.  Right.
19 Q.  So you could talk privately?
20 A.  Right.
21 Q.  Okay.
22 A.  I'm sorry. I'm trying to remember and I'm
23     trying to put things together. Can we go

Page 117

1    back?
2   Q.  Yes, ma'am.
3   A.  If I remember correctly, when I got that
4      grade from Tawyna Cash, if I -- there was
5      some point in time when I spoke to Dixie
6      Peterson and she told me that I did not
7      have enough points for that, that I made a
8      D in that OB class. I'm trying to remember
9      everything.
10  Q.  But, now, was that before you learned from
11     Tawyna Cash of your grade in obstetrics?
12  A.  I'm trying to remember, because I found out
13     about that one after -- yes, it was. I'm
14     sorry. Yes, it was. I think Dixie
15     Peterson is the one that told me that I
16     made a D in that one also, because Ms. Cash
17     was not coming back to the school and would
18     not be available. I'm sorry.
19  Q.  That's all right. Don't apologize.
20  A.  I'm trying to remember everything, and it's
21     just --
22  Q.  I want you to remember, and I want to give
23     you a chance to. So don't apologize. It's

Page 118

1    fine.
2   A.  Well, then, I'm not sorry. I hate that
3      it's taking me, you know, a longer period
4      of time and me -- you know, I may have said
5      this. I'm thinking about both classes at
6      the same time because there was so much
7      going on, so it's just hard to get it all
8      together.
9   Q.  Now, let's talk about Dixie Peterson.
10     Okay? Are you saying that Dixie Peterson
11     told you about your grade in NUR 252 Adult
12     Nursing II?
13  A.  No, Lynn Harris told me about that grade.
14  Q.  Did Lynn Harris tell you about that grade
15     before or after Dixie Peterson told you
16     about your grade in obstetrics?
17  A.  Before.
18  Q.  Lynn told you before.
19  A.  Lynn told me before I knew what my grade
20     was in the OB class, the 271.
21  Q.  All right. So after you learned from Lynn
22     Harris what your grade was in the OB
23     class --

Page 119

1   A.  In the adult --
2   Q.  -- I'm sorry, in the adult nursing class,
3     how long was it before Dixie told you what
4     your grade was in the OB class?
5   A.  It could have been -- I think it was a
6     couple of days because she said that
7     Ms. Cash had not turned in her grades yet.
8     I'm sorry. That is the way I found out my
9     grade was, through her.
10  Q.  Through?
11  A.  Dixie Peterson, that I made a D in this
12     class, also. So I didn't pass that second
13     semester.
14  Q.  Did you contact Tawyna Cash after you spoke
15     with Dixie and she told you that you'd made
16     a D in obstetrics?
17  A.  Yes, sir, I did. I called her at home.
18  Q.  That same day?
19  A.  I tried. I don't remember exactly what day
20     it was, but I had to track down this lady's
21     telephone number because nobody would give
22     it to me from the school and I didn't have
23     any sheets with her number on it. I knew

Page 120

1    she lived in Lanett, Valley, somewhere, so
2    I looked her up in the phone book and
3    called her.
4   Q.  So that was very shortly after Dixie told
5     you what you had made in obstetrics?
6   A.  Correct.
7   Q.  The day of? Did you call Tawyna Cash --
8   A.  I'm not sure if it was the day of because I
9     had a hard time getting her telephone
10     number.
11  Q.  Was it the next day, the day after Dixie
12     told you what your grade was in obstetrics?
13  A.  It could have been.
14  Q.  It was just as soon as possible after she
15     told you -- after Dixie told you what the
16     grade was, correct?
17  A.  Correct.
18  Q.  And then you went through the process of
19     meeting with her that you've already
20     described, correct?
21  A.  Yes, sir.
22  Q.  Is everything else the same with respect to
23     your grade in OB and your discussions with

Deposition of Lindy Wright

---

Page 121

1  Tawyna Cash other than the fact that you
2  initially learned from Dixie?
3  A.  Yes, sir.
4  Q.  So everything is correct that you've
5  testified to before with that exception?
6  A.  Yes, sir.
7  Q.  Let's go back to Lynn Harris.  Okay?  You
8  went into the office with Lynn Harris and
9  closed the door.  There was no one else
10  there with the two of you, correct?
11  A.  I don't think the door was closed because
12  all the students were in a line.
13  Q.  And Lynn Harris, did she show you what you
14  made on the final in addition to all of the
15  points for the semester?
16  A.  If my memory serves me right, yes, sir, she
17  did.  She showed me a Scantron that had red
18  writing all over it, and that was my --
19  supposed to be my final.  There was red
20  marks all in my final.
21  Q.  Your Scantron?
22  A.  Yes, sir, and all over it.
23  Q.  Do you know what your number of correct

---

Page 122

1  answers were out of whatever number that
2  was there?
3  A.  (Shakes head from side to side.)
4  Q.  You don't know?
5  A.  (Shakes head from side to side.)
6  Q.  Nevertheless, you did not pass that final,
7  correct?
8  A.  Correct.
9  Q.  When Lynn Harris totaled up your total
10  points for all of the other work that you
11  would have been doing, she said that --
12  what?
13  A.  You don't have enough points.
14  Q.  Don't have enough points?
15  A.  You get a D.
16  Q.  Did she tell you of any way that you could
17  bring -- or any way that that grade could
18  get better if you --
19  I guess what I'm asking, there were
20  several components to your grade, correct?
21  A.  Correct.
22  Q.  What?  There was at least one paper, wasn't
23  there?  There was clinical.

---

Page 123

1  A.  Yeah, there was clinical.  That was in the
2  hospital.  If you did not pass clinical,
3  you didn't pass the course.  There were
4  care plans that had to be done.
5  Q.  Right.
6  A.  There were tests.  There were computer
7  assignments.  And I'm not sure if there was
8  a paper that we had to do.  I don't
9  remember.
10  Q.  Nevertheless, whatever the components would
11  have been to that grade, did Lynn Harris
12  have all of those numbers in when you met
13  with her?
14  A.  No, sir.
15  Q.  She did not?
16  A.  No, sir.
17  Q.  What did she lack?
18  A.  There was care plans that I was told that
19  were lost, and they were giving me -- they
20  said that they would allot 23 points out of
21  25.
22  Q.  Okay.  How many care plans?
23  A.  We had to do two.

---

Page 124

1  Q.  So that would have been a total of 50
2  points?
3  A.  Yes, sir.
4  Q.  And because they were lost, you got 46 out
5  of 50?
6  A.  Yes, sir, I guess so.
7  Q.  Is that a good grade on those care plans?
8  A.  Pretty much.
9  Q.  Pretty much?
10  A.  Yeah.  I mean, that's a good grade.  I
11  think that's a B maybe.  I'm not real
12  sure.  Have to calculate it.
13  Q.  Who told you they were lost?
14  A.  Lynn Harris did.
15  Q.  Did she tell you how they got lost?
16  A.  No, she didn't give an explanation.  She
17  said that she was told that they were
18  lost.  And the instructor that did my
19  clinicals, her name was Deborah Gruber.
20  And that's the lady that we turned those
21  care plans in to in the hospital.  We
22  turned those care plans in to her.
23  And she -- there was a phone

---

Deposition of Lindy Wright

**Page 125**

1   conversation between her and Sandy
2   Gunnels. I was listening. She said she
3   turned those care plans in to Dixie.
4   Q. Deborah Gruber?
5   A. Uh-huh. (Positive response.)
6   Q. Told Sandy Gunnels that she turned your
7       care plans in to Dixie?
8   A. Yes.
9   Q. For NUR 252, Adult Nursing II, right?
10  A. Yes, sir.
11  Q. Was that the only component to the total
12      number of points that Lynn Harris did not
13      have the actual number for?
14  A. I think so.
15  Q. And Lynn Harris knew, however, that you
16      would be getting this 23 out of 25 on those
17      two care plans, correct?
18  A. That's what she told me that they were
19      going to allot for the lost care plan.
20  Q. Did anybody else have a lost care plan?
21  A. My whole group did. Just my group, my
22      clinical group.
23  Q. How many were in your clinical group?

**Page 126**

1   A. I think six.
2   Q. Who were they?
3   A. That particular time, I know Crystal Love
4       was in there, April Gunnels, Corolla
5       Rambo. I'm trying to think who else was in
6       that group.
7   Q. Where did you do your clinicals?
8   A. The Medical Center. 6 East.
9   Q. The Medical Center?
10  A. It's in Columbus, Georgia. It's --
11  Q. It's a hospital?
12  A. Yeah.
13  Q. Is it Columbus Medical Center or --
14  A. Columbus Regional Medical Center. The
15      Medical Center.
16  Q. That was on 6 East?
17  A. Yes, sir.
18  Q. Who was the -- Deborah Gruber. You've
19      already told me. Columbus Regional. All
20      right.
21         Now, did you have a discussion with
22      Lynn Harris about your grade when she told
23      you what it was?

**Page 127**

1   A. Oh, yes, sir.
2   Q. Tell me about that, exactly what was said.
3   A. I wanted to go over everything that she had
4       for me and review all the tests and look
5       for my points.
6   Q. When did you want to do that?
7   A. As soon as possible.
8   Q. All right. You say look for the points.
9       There weren't any other lost papers or
10      anything like that, were there, other than
11      those care plans?
12  A. Correct.
13  Q. What do you mean look for the points?
14  A. Look for the points. To go through all my
15      test grades and make sure that the
16      Scantrons were not messed up.
17         And they gave me the opportunity to
18      look at those tests, and she let me write
19      down -- not word for word, but she let me
20      write down some of the test questions and
21      review and try and find -- try and, I
22      guess, go to her and say, this is my
23      answer; this is correct; will you accept

**Page 128**

1   this or what.
2   Q. So when you told Lynn Harris that you'd
3       like to sit down with her and go over
4       everything, what did Lynn Harris say?
5   A. It was not very nice at that time. I mean,
6       she was not being very nice to me which,
7       you know, that -- that really is
8       irrelevant, but it was not a nice
9       situation. It was very ugly and nasty.
10  Q. Well, I'm not --
11  A. She was very defensive. She didn't want
12      you to question her or her answers. And
13      when I did so, it was not nice.
14  Q. How about in that first meeting in her
15      office where there was a line behind you
16      and she gave you the total number of points
17      and you knew it was a D and you said, I'd
18      like to meet with you and go through all of
19      this?
20  A. Don't have time right now.
21  Q. Did she set up a time for you to meet with
22      her?
23  A. I had to go to Dixie.

32 (Pages 125 to 128)

Deposition of Lindy Wright

**Page 129**

1  Q.  Now, was Lynn Harris real defensive when
2       she told you what your grade was and you
3       said I want to meet?
4  A.  No.  When she told me what my grade was,
5       no.  I said, well, I want to review
6       everything, I want to see everything,
7       that's when --
8  Q.  She was defensive then?
9  A.  (Witness nods head up and down.)
10  Q.  Yes?
11  A.  I took it as an offense -- just her
12       demeanor, the way she was acting.
13  Q.  In that very first meeting when you said I
14       want to go over everything with you, right,
15       is that --
16  A.  I want to see all my test grades.  I want
17       to see all my papers.  I want to see
18       everything.
19  Q.  Did you take that as -- that she was
20       behaving offensively at that time?
21  A.  Yes, sir.
22  Q.  So tell me exactly how that manifested.
23  A.  I don't know.  I don't know.

**Page 130**

1  Q.  What did she do that was nasty, cruel, mean
2       or whatever you said?
3  A.  Raised her voice.  I mean, her face would
4       turn red and she would just get excited.
5  Q.  What else?
6  A.  That's it.
7  Q.  Did you -- you say that you were able to
8       look at your tests in 252, that course?
9  A.  Yes, sir.
10  Q.  Adult nursing?
11       Yes?
12  A.  Yes, sir.
13  Q.  So when did you look at your tests?
14  A.  After I had filled out the papers for the
15       grade appeal, then we set a date for me to
16       come in and look at the tests and go over
17       it with her.
18  Q.  When you called Sandy Gunnels on the phone
19       about your grade in obstetrics, you knew
20       about your grade in Adult Nursing II also,
21       didn't you?
22  A.  I knew about that grade first, and I called
23       her about that one.

**Page 131**

1  Q.  First?
2  A.  First.
3  Q.  Adult Nursing II?
4  A.  Yes, sir.
5  Q.  And then you called her about obstetrics --
6  A.  When I learned that grade.
7  Q.  -- when Dixie Peterson told you about that
8       one?
9  A.  Yes, sir.
10  Q.  Now, when you talked to Sandy Gunnels about
11       Adult Nursing II, tell me about that
12       conversation.
13  A.  I told her that -- I told her about not
14       having enough points, saying they lost the
15       care plans and things like that, and she
16       told me to go through the grade appeal
17       process, just as in the OB class.  She told
18       me to do that one first because that's the
19       one I knew about first.  Then she said if
20       you're going to do that, you need to go and
21       do the OB, just do it, also.  Review
22       everything.
23  Q.  Did you tell Sandy Gunnels that you were

**Page 132**

1       receiving 23 out of 25 total points on each
2       of those care plans that were lost?
3  A.  It was only one care plan that was lost.
4       Yes, I did.
5  Q.  So you got your actual grade on one care
6       plan, correct?
7  A.  Correct.
8  Q.  And then they gave you a 23 out of 25 on
9       the other care plan that was lost, correct?
10  A.  Correct.
11  Q.  Did they do that for all six of the people
12       in your group?
13  A.  I'm not real sure.  As far as I know, they
14       did.
15  Q.  But did you tell Sandy Gunnels when you
16       talked to her the first time about the fact
17       that you were getting 23 out of 25 on that
18       lost care plan?
19  A.  Yes, sir.
20  Q.  So tell me everything you told Sandy
21       Gunnels about your Adult Nursing II grade
22       and any problems or whatever you talked to
23       her about before she said file a grade

Deposition of Lindy Wright

Page 133

1    appeal.
2    A.  As far as the whole semester?  I mean --
3    Q.  Were you talking to her the whole semester?
4    A.  Oh, yes, sir.
5    Q.  Tell me about your relationship with Sandy
6        Gunnels then during that time.
7    A.  She's a colleague, so, I mean, I kept in
8        touch with her after the LPN program as
9        well as some other instructors.
10   Q.  Let's do this.  You called Sandy Gunnels
11       right after you learned about your Adult
12       Nursing II grade, right?
13   A.  Right.
14   Q.  Before you had any kind of -- before you
15       ever talked with Lynn Harris again after
16       that first time when she told you about the
17       grade?
18   A.  Yes, sir, and that's when I filed my grade
19       appeal.
20   Q.  All right.
21   A.  She was talking me through where to go and
22       what papers to get to do it because no one
23       else would help me.

Page 135

1        about obstetrics, correct?
2    A.  Correct.
3    Q.  And you had not spoken at that time with
4        Tawyna Cash, correct?
5    A.  Correct.
6    Q.  You had not spoken subsequent to speaking
7        with Dixie when she told you what your
8        grade was to anyone else at the school
9        about your obstetrics grade, correct?
10   A.  As far as instructors?
11   Q.  Before you called Sandy Gunnels -- yes, as
12       far as instructors, as far as officials or
13       instructors or employees at the school.
14   A.  I mean, I just talked to Dixie and-- no,
15       sir, I didn't.  I didn't talk to anybody
16       else.
17   Q.  You had one conversation with Dixie.  She
18       told you what your grade was.  You called
19       Sandy Gunnels, and she said file a grade
20       appeal?
21   A.  Right.
22   Q.  And that was in obstetrics?
23   A.  Right.

Page 134

1    Q.  So you had talked to Lynn Harris once about
2        your grade, correct?
3    A.  Correct.
4    Q.  And then you called Sandy Gunnels, right?
5    A.  Correct.
6    Q.  And she told you to file a grade appeal,
7        right?
8    A.  Correct.
9    Q.  Then did you call Lynn Harris back after
10       you filed the grade appeal?
11   A.  Did I call her back?  I'm sure I did.
12   Q.  Or did you go through --
13   A.  I went through the process --
14   Q.  -- the administration at that point in
15       time?  Is that the way you do that?
16   A.  I went through everybody.  I went through
17       Dixie, Dean Lowe, the grade appeal process
18       until we -- they gave me a date to come in
19       and sit down with her to go through my
20       papers.
21   Q.  After Dixie told you your grade in
22       obstetrics, it was very -- like that day or
23       the next day that you called Sandy Gunnels

Page 136

1        MR. NIX:  Let's take a break.
2        (Lunch recess was taken.)
3        (Defendant's Exhibit 2 was marked
4        for identification.)
5    Q.  Ms. Wright, I've marked as Defendant's
6        Exhibit Number 2 the Defendants' First
7        Amended Set of Request for Production of
8        Documents which was submitted to you and
9        your attorneys and that you responded to
10       yesterday by giving me some documents and
11       that your lawyer is going to give me a
12       written response to today.
13       MR. NIX:  I just wanted to
14       establish for the Record that
15       Defendant's Exhibit 1 and
16       Defendant's Exhibit 2 ask for
17       the same documents.  There are
18       44 items in the request for
19       production, and there are 44
20       items in the notice of
21       deposition duces tecum.
22       There's a stipulation that
23       these are the same.

Page 137

1   Q.  So with that done, let me go back and ask
2       you a few more questions about what we were
3       talking about before I move on.
4           We were talking about damages, and you
5       had told me that you had humiliation.  That
6       was another thing that you mentioned, and
7       then we've been talking about your pay as
8       an LPN.  One of the things your complaint
9       says -- or that maybe you said in the
10      deposition is that you've had to -- or that
11      there have been RN jobs that you could have
12      applied for if you had your RN license.
13          What I would ask you to do for me is to
14      tell me about some of those jobs, what they
15      are and how much they pay.
16  A.  Well, I was approached by a friend that
17      works at St. Francis, and she was telling
18      me that -- she's currently working there as
19      an RN, and they're paying $35 an hour for
20      p.r.n.
21          And the employer that I was currently
22      working for, there was positions open that
23      required RN, and they were salaried

Page 138

1       positions, and they were between 20 and $25
2       an hour.
3   Q.  You say the employer that you were working
4       for.  Do you mean Doctors Hospital?
5   A.  No.
6   Q.  Or do you mean St. Francis?
7   A.  No, sir.
8   Q.  Patel?
9   A.  No.  The last was Wiregrass Hospice.
10  Q.  Oh, okay.  I didn't know about that place.
11      Now, when did you start working for
12      Wiregrass Hospice?
13  A.  August 21st, 2006.
14  Q.  How long did you work for them, or are you
15      still?
16  A.  No, I'm not working there as of June of
17      this year.
18  Q.  All right.  June '07.  Now, were you
19      working at Wiregrass Hospice on an
20      as-needed basis or were you working there
21      full-time?
22  A.  Full-time.
23  Q.  And how were you paid?

Page 139

1   A.  I was hourly in the beginning and then went
2       to a salaried position.
3   Q.  How much was the hourly rate?
4   A.  $15 an hour.
5   Q.  How long were you there before you went to
6       a salaried position?
7   A.  I think I was put on that payroll for the
8       salaried position in December of --
9   Q.  '06?
10  A.  Yes, sir.
11  Q.  What was the salary?
12  A.  45,000 plus incentives.
13  Q.  What incentives do you mean?
14  A.  It was based on referrals, the referrals
15      that I had come into the office.
16  Q.  How did you get these referrals?
17  A.  By going out and talking to families and
18      doctors, hospitals, educating them on
19      hospice benefits.
20  Q.  And what was the incentive pay?
21  A.  It was anywhere from -- it started at five
22      referrals, anywhere from 25 to -- and it
23      always started back at one.  $25 per

Page 140

1       referral up to whatever.  I mean, it could
2       have been $2,000, up to $2,000 extra a
3       month.
4   Q.  I'm not sure I understand.  $25 per
5       referral?
6   A.  Uh-huh.  (Positive response.)
7   Q.  Did it ever go higher than $25 per
8       referral?
9   A.  It could, if you brought in more than -- if
10      you had from -- one through five I think
11      was $25.  If you got up to ten, it always
12      went back to one.  It was paid from one
13      to -- started at one, and it was $25 per
14      referral, but it went up, kind of like it
15      doubled.
16  Q.  Then there was a cap on it at $2,000?
17  A.  No.
18  Q.  There's no cap?
19  A.  Huh-uh.  (Negative response.)
20  Q.  What was the highest amount of money you
21      made on referrals, incentive pay?
22  A.  I think 125, 225.  I'm not real sure.
23  Q.  Where is Wiregrass Hospice?

Deposition of Lindy Wright

Page 141

1    A.  It's in Phenix City.
2    Q.  Now, what was the name of that salaried
3        position?
4    A.  It was account executive.
5    Q.  So you were not actually practicing as an
6        LPN after you got the salaried position; is
7        that right?
8    A.  No.
9    Q.  Were you practicing as an LPN at Wiregrass
10       Hospice when you were there at $15 an hour?
11   A.  Yes, sir.
12   Q.  Why did you leave Wiregrass Hospice in
13       June?
14   A.  Because they eliminated the marketing
15       position.
16   Q.  Do you have a job now?
17   A.  Not right this minute.
18   Q.  Are you looking?
19   A.  Yes, sir.
20   Q.  How does an LPN look for a job?
21   A.  Go out and apply, I mean, just like anybody
22       else would, fill out applications and --
23   Q.  I didn't know whether there was a referral

Page 142

1        place for nurses or what.
2    A.  No.  I've placed my resume on
3        careerbuilder.com, so I've pretty much
4        gotten phone calls and people that I've met
5        in that time frame ...
6    Q.  You mentioned this one position at
7        St. Francis, an RN position, $35
8        as-needed.  Was that a position that was
9        open at some point in time?
10   A.  It's been open.
11   Q.  You've never applied for it, obviously,
12       because you don't have the RN license, but
13       was there a full-time position for an RN at
14       St. Francis?
15   A.  I'm sure there is.  There's full-time
16       positions for RNs everywhere.
17   Q.  But you don't know what a full-time
18       position would pay; is that right?
19   A.  No.
20   Q.  When you said that you -- there were jobs
21       you could have applied for if you had your
22       RN license, are you thinking of any other
23       specific jobs other than this as-needed job

Page 143

1        at St. Francis?
2    A.  Well, there was one at Wiregrass that I
3        could have applied for.
4    Q.  And that was an RN position?
5    A.  Yes, sir.
6    Q.  How much would it have paid?
7    A.  I'm not real sure.  Probably somewhere in
8        the same range as what I was making as a
9        marketer.
10   Q.  Are you thinking -- Are there any other
11       places that you can specifically tell me
12       about where an RN position may have been
13       open that you would have applied for if you
14       had had your RN license?
15   A.  Doctors Hospital.  I mean, there's --
16   Q.  Everywhere?
17   A.  Everywhere.
18   Q.  Now, let me ask you this.  You said
19       humiliation was one of your damages.  Tell
20       me about it.
21   A.  The humiliation of the class, having to
22       explain -- I mean, because you can't --
23       people say, are you going to go back to RN

Page 144

1        school?  Well, what do you tell them?  You
2        have to tell them.  I don't go into detail,
3        but I tell them briefly.
4    Q.  What do you tell them?
5    A.  I have been and I'm still working on it.
6    Q.  I'm sorry.  Is that what you tell them?
7    A.  Uh-huh  (Positive response.)  Trying to
8        get things resolved.
9    Q.  Okay.  So in other words, what you tell
10       them is, I'm working on it?
11   A.  Working on it and trying to get things
12       resolved with what I've already been
13       through as far as --
14   Q.  In terms of this lawsuit is what you're
15       saying?
16   A.  As far as classes and the class that I need
17       to take if granted.
18   Q.  So what you're saying is -- tell me what
19       you would have to do if you could get back
20       into the RN program at CVCC.  What would
21       you have to do to graduate?
22   A.  If I were granted course forgiveness like I
23       was under the impression that would be able

Page 145

1   to take place, then I would only have to
2   take that pediatric class and be done.
3   Q.  Which number was that?
4   A.  That was the 272, the last class.
5   Q.  So you'd have to take that.  Now, are you
6       saying that that's what you want to do?
7   A.  That's the only thing I wanted to do.
8   Q.  Okay.  You're saying that your goal in this
9       lawsuit is to be able to get back to CVCC,
10      get your RN certificate or your diploma
11      from there, take the State exam and become
12      an RN; is that correct?
13  A.  Pretty much.
14  Q.  Do you understand what happened or what the
15      rules are regarding course forgiveness?
16  A.  Yes, sir, I had to research that myself in
17      the course catalog.
18  Q.  Okay.  Tell me exactly what you did
19      researching that.
20  A.  From the beginning of that?
21  Q.  Sure.  Might as well start at the
22      beginning.
23  A.  Okay.  Well, when everything occurred as

Page 146

1   far as the grade appeals, I went to Dixie
2   and she made an appointment with Dean Lowe
3   for her and him to be in her office.
4       And we were discussing the things that
5   had happened.  She said, Lindy, it's not
6   like you've got course forgiveness.  And I
7   was thinking, okay, well, nobody said
8   anything -- I didn't say anything.  I said,
9   well, nobody said anything to me about
10  course forgiveness.  What is this?
11      So I took it upon myself to get the
12  course catalog and research.  And it said
13  that it's the student's responsibility to
14  ask for course forgiveness.
15      Well, they offered me Nursing 200 in
16  place of 252.  They told me that they would
17  change the -- they had to change the course
18  number due to the fact that the course
19  curriculum -- that the course was changing
20  the following year, that 252 would not be
21  offered the following year, so they would
22  change it to 200.  I said, okay.
23      I talked to an attorney about it, and

Page 147

1   she had contacted Dean Lowe.  And we
2   thought we had come to an agreement, so I
3   said, fine, because I didn't want to
4   argue.  Fine.
5   Q.  You're talking about come to an agreement
6       with regard to what?
7   A.  The 252.
8   Q.  What agreement did you think you had come
9       to with Dean Lowe?
10  A.  He told me -- his words were, the D will
11      not come off of your transcript, but it
12      will not be held against you.  So we're
13      going to offer you Nursing 200 in place of
14      252 because the course curriculum is
15      changing.  And that also came from Dixie
16      Peterson.
17  Q.  All right.  Tell me again what they said.
18      The D will not come off?
19  A.  The D will not come off of your transcript,
20      but it will not be held against you.
21  Q.  Okay.  What else?
22  A.  And we're offering 200 in place of 252.
23  Q.  All right.

Page 148

1   A.  At that point, I knew nothing about course
2       forgiveness, so Dixie had made that
3       comment.  So I went and researched in the
4       course catalog, and it stated the procedure
5       for course forgiveness.  You ask the dean
6       of students, write a letter.
7       I took a letter to Dean Hodge,
8   presented it to him and then waited for a
9   response.  Nowhere in the course catalog
10  did it say that the nursing program was
11  exempt from that.
12  Q.  It does say in the nursing portion of the
13      catalog that two failures or two courses
14      with a D disqualifies you, though, doesn't
15      it?
16  A.  Correct, it does.  But at that point, I did
17      not have two D's.  That semester, there was
18      no -- there was only one.
19  Q.  I'm not sure I understand what you're
20      saying.  You're saying -- you're talking, I
21      guess --
22  A.  Talking about the second semester, 252 and
23      271.

Deposition of Lindy Wright

Page 149

1  Q.  Right.
2  A.  The OB and the med-surge --
3  Q.  271 got changed to a C?
4  A.  Correct.
5  Q.  That was in the fall of 2005, fall
6      semester.
7  A.  Correct.
8  Q.  It was.  And then in January of 2006, you
9      entered into the spring term for 2006?
10 A.  (Witness nods head up and down.)
11 Q.  And so I guess what I'm confused about is,
12     you said at that time, I did not have two
13     D's.
14 A.  No.  I had the D in 252 that I was told
15     would not be held against me.  In return, I
16     made an A in Nursing 200, which the 200
17     replaced that 252 that I would have had to
18     take the following year.
19 Q.  When you said at that time I did not have
20     two D's, what is that time?
21 A.  That time was that second semester when I
22     took Nursing 252 and 271.  There were not
23     two D's.  That D in OB was changed to a C.

Page 150

1  Q.  Right.
2  A.  Correct.
3  Q.  Okay.  At that time, you did not
4      have ... All right.  Are you saying that
5      you had a D in 252 and that you met with
6      Dixie and Dean Lowe?
7  A.  Uh-huh.  (Positive response.)
8  Q.  And --
9  A.  In the process of the grade appeal.
10 Q.  And when was this?
11 A.  That was before that second semester -- I
12     mean that last semester had started, right
13     before -- it might have been when I got
14     confirmation that I could come back to
15     school.  It was maybe a day or two into
16     class time.
17 Q.  So late December, early January -- late
18     December '05, early January '06?
19 A.  Early January.
20 Q.  You're saying you met with Dixie Peterson
21     and Dean Lowe?
22 A.  Uh-huh.  (Positive response.)
23 Q.  And they talked to you about taking 200

Page 151

1      instead of 252 because 252 would not be
2      offered again?
3  A.  Correct.
4  Q.  And you're saying that is the time at which
5      you did not have two D's, right?
6  A.  Yes, sir.  They had told me that the C --
7      Dixie told me that it was at her discretion
8      that that C would be changed to a D because
9      Tawyna Cash did not follow up with the
10     grade appeal process.  She didn't turn in
11     some kind of paperwork that she was
12     supposed to have finished.
13 Q.  So that the D that you made in 271 was
14     changed by the school to a C?
15 A.  Uh-huh.  (Positive response.)
16 Q.  You moved into the spring semester of 2006
17     with one D in 252.  In the spring term, you
18     made a D in 272, right?
19 A.  Correct.
20 Q.  Which gives you two D's or two courses that
21     were failed; isn't that right?
22 A.  At that time, yes.  But when I asked -- I
23     called Ms. Alexander and asked her about

Page 152

1      the course forgiveness, and she told me I
2      couldn't get course forgiveness until that
3      class had been completed.  So I
4      completed --
5  Q.  Who's Ms. Alexander?  I'm sorry.
6  A.  She is the lady in -- I don't know.  She
7      works up in the business office,
8      admissions, somewhere up there.  And she
9      handles --
10 Q.  In nursing?
11 A.  No, for the school, for the college.
12 Q.  Ms. Alexander works in the main college
13     office, admissions office?
14 A.  As far as I know, yes.  I don't know
15     exactly where her office is.
16 Q.  All right.  Tell me when you called
17     Ms. Alexander.
18 A.  When I was told that I could not take a
19     class that would be offered the summer
20     semester for students that had been told
21     they failed that peds class, also, which
22     would have been 272.
23 Q.  Who told you that?

38 (Pages 149 to 152)

Page 153

1  A.  Lynn Harris.
2  Q.  Okay.
3  A.  No. I'm sorry.  She didn't tell me that.
4      The secretary told me that over the
5      telephone when I called to ask when this
6      class was going to be started.  The
7      secretary told me – of the nursing
8      program.  I guess it was the secretary.  It
9      was some lady answering the phones down
10     there. I don't know.
11 Q.  I want to get the timing right.  You're
12     talking about calling the secretary in the
13     nursing program and talking to her about a
14     course being offered in the summer of 2006?
15 A.  Correct.
16 Q.  And that course would have in your mind
17     replaced 272; is that correct?
18 A.  Correct.
19 Q.  And 272 is what again?
20 A.  The pediatric.
21 Q.  Okay. I'm catching on.
22 A.  Okay.
23 Q.  272 is pediatrics. All right.

Page 154

1      So you did a grade appeal on 272,
2      didn't you?
3  A.  Yes, sir.
4  Q.  And you met with Lynn Harris on 272 -- on
5      that course, correct?
6  A.  Correct.
7  Q.  And you met with her at the end of the
8      spring semester of 2006 and -- when she
9      told you about the grade you had made in
10     272; is that right?
11 A.  Uh-huh.  (Positive response.)
12 Q.  Is that right?
13 A.  Yes, sir.  Sorry.
14 Q.  That's all right.  So had you met with Lynn
15     Harris about your status in that course,
16     pediatrics, NUR 272, prior to the time that
17     she told you about your grade, your final
18     grade?
19 A.  For that last semester for the pediatric
20     class?
21 Q.  The spring of 2006.
22 A.  It was one to two weeks before.  And she
23     said that all you need is -- I think she

Page 155

1      said all you need is 180 points on your
2      final.
3  Q.  One or two weeks before the final exam in
4      NUR 272, you met with Lynn Harris; is that
5      right?
6  A.  Correct.
7  Q.  And she said all you need is 180 points?
8  A.  Uh-huh.  (Positive response.)
9  Q.  Is that right?
10 A.  Yes.
11 Q.  You need to say yes.
12 A.  I'm sorry.  Yes, sir.
13 Q.  That's all right.
14     Was it possible at that time to get 180
15     points?
16 A.  Oh, sure it was.
17 Q.  And how would you have done that?
18 A.  If she would have been available to go over
19     tests, go over any kind of remediation for
20     any student, not just myself, anybody.
21 Q.  How does that get you points?
22 A.  That refreshes -- refreshes for tests.
23     That just prepares you even more.

Page 156

1  Q.  What about Lindy Wright --
2  A.  I mean, if you have any questions --
3  Q.  -- preparing?  What about Lindy Wright
4      preparing for tests?
5  A.  She did.
6  Q.  I mean, isn't it the student's
7      responsibility, Ms. Wright, to study and
8      prepare for tests?
9  A.  Yes.
10 Q.  It's not the professor's responsibility to
11     study for you, is it?
12 A.  No, sir.
13 Q.  The professor outlined that course 272,
14     pediatrics; isn't that right?
15 A.  She did.
16 Q.  And there was a book?  You had a book in
17     that course?
18 A.  Yes, sir.
19 Q.  What other materials did you have to study
20     for pediatrics, NUR 272?
21 A.  Just her PowerPoints and the book.
22 Q.  Did you study those things?
23 A.  Yes, sir.

Deposition of Lindy Wright                                                July 13, 2007

Page 157

1    Q.  Did you have the same opportunity to study
2        those things as any other student in the
3        class?
4    A.  Yes.
5    Q.  And you did not make an adequate number of
6        points on your final exam to make above a D
7        in NUR 272, did you?
8    A.  That was because there were care plans that
9        were regraded that semester just in my
10       clinical group --
11   Q.  First answer my question.
12   A.  Okay.  Go ahead.
13   Q.  You did not make enough points in NUR 272,
14       pediatrics, to make above a D?
15   A.  That's what Lynn Harris told me.
16   Q.  She told you that when?
17   A.  She told me that the day that she went
18       over -- well, she didn't go over any test,
19       the day that she said we could come in and
20       see what our grades were.
21   Q.  Okay.  What day was that?
22   A.  That, I think, might have been the day of
23       the finals, that afternoon.

Page 158

1    Q.  After the final was over?
2    A.  Yes, sir.
3    Q.  Are those Scantrons graded by computer?
4    A.  As far as I know, they are.
5    Q.  So it's real quick to get the grade, I
6        guess?
7    A.  Yes.
8    Q.  And so did you go in the afternoon that you
9        took the final in pediatrics and see Lynn
10       Harris?
11   A.  Yes.
12   Q.  Tell me about that meeting.  Where were you
13       and who was present?
14   A.  Just her in her office.
15   Q.  Was there a line again?
16   A.  Yes.
17   Q.  And tell me what was said.
18   A.  That I didn't have enough points on my
19       final to pass.  And she told me not to
20       worry about it, that she was going to offer
21       a class in the summer just like she did the
22       Nursing 200 and I would be able to take
23       that class and everything would be fine.

Page 159

1    Q.  She said don't worry about it; a course
2        will be given in the summer that you can
3        take, and everything will be cool?
4    A.  Right.
5    Q.  Did she tell you what course that was?
6    A.  No.  I mean, apparently, it would be a
7        pediatric course because that was the
8        course that I apparently didn't have enough
9        points.
10   Q.  So after you spoke with Lynn Harris the
11       afternoon of the final and knew that you
12       were not making a passing grade in
13       Pediatrics 272, what did you do?
14   A.  I went home.
15   Q.  What did you do next in terms of school?
16   A.  Waited on graduation to be over with and
17       then them to come back.  And I started
18       calling the school to find out when this
19       course was going to start and what I needed
20       to do, and that's when I got the secretary
21       finally because nobody else would take my
22       calls.
23   Q.  What do you mean no one else would take

Page 160

1        your calls?
2    A.  I would ask for Dixie, Lynn Harris.  They
3        were never available.
4    Q.  Who would you ask?
5    A.  The secretary.
6    Q.  So you're saying that you called the school
7        a number of times --
8    A.  Yes, sir.
9    Q.  -- in that time frame immediately after the
10       final exam was given in 272, NUR 272?
11   A.  Yes.
12   Q.  Where did you call from?
13   A.  Home and cell phone I'm sure.
14   Q.  What's your cell number?
15   A.  706-566-4148.  That's a new cell phone
16       number.  Do you want the old one?
17   Q.  Yes.
18   A.  706-442-0128.
19   Q.  What service provider was that one with?
20   A.  T-Mobile.
21   Q.  T-Mobile.  How about this new one?
22   A.  That's Verizon.
23   Q.  What is your home phone number?

Page 161

1  A.  706-596-0365.
2  Q.  That's the one in Georgia where -- were you
3      living there at the time that you made
4      these phone calls from home? If you called
5      the school --
6  A.  Yes.
7  Q.  -- about the grade in NUR 272, that's where
8      you would have been living?
9  A.  Yes.
10 Q.  And who is the service provider for that
11     hard line?
12 A.  I guess it's BellSouth.
13 Q.  So how many times -- about how many times
14     did you call?
15 A.  At least five times.
16 Q.  What would you say?
17 A.  I need to speak to Dixie Peterson or Lynn
18     Harris. And I think it was the last time I
19     called, she asked me could she help me.
20     And I said, I need to know when this class
21     is going to start for this pediatric class
22     that Ms. Harris told me about. She said,
23     well, you're not going to be able to take

Page 162

1      it because you didn't pass. You had two
2      D's. So I said, what two D's did I have?
3  Q.  So the secretary said you can't take this
4      course in the summer of 2006 because you
5      were disqualified, basically; is that
6      right?
7  A.  Right.
8  Q.  By virtue of the fact that you had two D's,
9      right?
10 A.  Right.
11 Q.  When she told you that, what did you say to
12     her?
13 A.  I went to the school.
14 Q.  That very day?
15 A.  I think I did.
16 Q.  What part of the school? Did you go to the
17     nursing offices or --
18 A.  The nursing offices.
19 Q.  Did you see anyone?
20 A.  If I'm not mistaken, I think that's when
21     I -- I think that's when I talked to
22     Dixie. And then that's when a meeting was
23     set up with Dean Lowe, I think. You'll

Page 163

1      have to give me just a minute and let me
2      try and remember.
3          I think that's right, because I know
4      that my course forgiveness was -- that I
5      asked for, I think that was dated May 19th,
6      2006. So that's when she made the comment
7      about it's not like you've got course
8      forgiveness.
9  Q.  And that was in a meeting between you and
10     Dixie and Dean Lowe?
11 A.  And Dean Lowe in his office.
12 Q.  Okay.
13 A.  And she also told me in his office that she
14     would help me any way she could, to go ask
15     Ms. Harris if she would look over the care
17     them.
18         I did so, and Ms. Harris told me that
19     she had already spoken with Ms. Peterson
20     about doing that for any student and that
21     they had already discussed it, and that she
22     knew that they had discussed no, that that
23     would not be done.

Page 164

1  Q.  So after the meeting with Dixie and Dean
2      Lowe, you talked to Lynn Harris about
3      regrading your care plans?
4  A.  Uh-huh. (Positive response.) Went back
5      down to the nursing office.
6  Q.  Yes?
7  A.  Yes. Went back down to the nursing office
8      and asked her about care plans. I told her
9      what Dixie had said. And she said, I don't
10     know why she told you that because we had
11     already discussed it and it was no for any
12     student.
13 Q.  To regrade, okay, care plans, can't do it.
14     Cannot do it.
15         All right. Tell me. When you met with
16     Dixie and Dean Lowe -- you said that you
17     filed your course forgiveness around May
18     19, 2006, right --
19 A.  Correct.
20 Q.  -- that request? That was a letter, and
21     we'll look at that in just a minute.
22         So if that letter was May 19, 2006,
23     when did you meet with Dixie and Dean Lowe?

Page 165

1    A.  It was possibly the day before or two days
2        prior to. I'm not sure if there was a
3        weekend time in there or not, but I know
4        all faculty -- I was -- I called up there
5        to see if the dean was there so I could
6        bring my letter, and I was told that the
7        faculty wasn't in. I happened to catch him
8        coming down the stairs as I was going up.
9    Q.  Which dean are you talking about?
10   A.  Dean Hodge.
11   Q.  Shortly before May 19, a day or two or if
12       there was a weekend, you met with Dixie,
13       and Dixie said something like, it's not
14       like you have course forgiveness?
15   A.  It's not like you have course forgiveness,
16       Lindy.
17   Q.  You're very emphatic about that. It sounds
18       like those were her exact words.
19   A.  Those were her exact words.
20   Q.  What did you say in response, if anything?
21   A.  I just looked at her, and I was thinking to
22       myself, what's course forgiveness? I
23       didn't know anything about it. And that's

Page 166

1        when I went and researched my course
2        catalog.
3    Q.  But you didn't say anything and y'all
4        didn't discuss it in that meeting?
5    A.  No.
6    Q.  And Dean Lowe didn't discuss it in that
7        meeting with you?
8    A.  No.
9    Q.  So that's all that was said, was just that
10       comment --
11   A.  Correct.
12   Q.  -- about course forgiveness?
13       What else was said in that meeting?
14   A.  I don't remember everything that was said,
15       but it was basically about they would help
16       me any way they could and apologetic, sorry
17       this has happened to you, and that was
18       pretty much the basis of it.
19   Q.  And then you went to see Lynn Harris. Lynn
20       Harris said I can't regrade the care plans?
21   A.  Correct. There was some point in time, and
22       I don't remember exactly when, that Dixie
23       told me to go talk to whoever. And so I

Page 167

1        went and talked to Laurel Blackwell and
2        Dean Hodge. He came in --
3    Q.  Okay.
4    A.  -- to her office.
5    Q.  This was after your meeting with Dixie and
6        Dean Lowe?
7    A.  I think it was.
8    Q.  Was it after you filed the course for --
9        wrote the letter about course forgiveness?
10   A.  If I'm not mistaken, it was -- it was -- it
11       may have been, because I was waiting on a
12       decision from the dean about the course
13       forgiveness.
14   Q.  Dean Hodge?
15   A.  Yes.
16   Q.  So you're saying Dixie said, why don't you
17       go see who?
18   A.  She told me she didn't care who I went and
19       talked to.
20   Q.  Dixie --
21   A.  Yes.
22   Q.  -- said that? So what did you do?
23   A.  I went and talked to Laurel Blackwell, and

Page 168

1        Dean Hodge was in on that meeting. And it
2        was not a scheduled meeting. I went up and
3        sat in the office and waited on her.
4    Q.  Would this have also been in May?
5    A.  Yes, sir.
6    Q.  So what was said in that meeting?
7    A.  She basically told me that she had nothing
8        do with the academics, that it was their
9        decision, and that was the extent of that.
10   Q.  Did Dean Hodge say anything?
11   A.  I don't recall him saying anything. I
12       think he was just sitting in.
13   Q.  Okay.
14   A.  I may have asked him at that point about
15       the course forgiveness.
16   Q.  Tell me what you recall. Don't guess,
17       speculate or --
18   A.  I know there was at some point in time that
19       I did contact him by phone and ask him
20       about the course forgiveness, and he told
21       me that it had to go through some sort of
22       process -- I don't know what -- but he
23       didn't have an answer for me yet. And then

Page 169

1 I received a letter in the mail saying that
2 academic bankruptcy was not granted due to
3 the fact that the course numbers didn't
4 match.
5 Q. Do you have that letter?
6 A. Uh-huh. (Positive response.) And I think
7 there was a copy -- I'm sorry. Yes.
8 Q. Was this a letter from Dean Hodge?
9 A. Yes, sir, I believe so.
10 (Brief interruption.)
11 (Defendant's Exhibit 3 was marked
12 for identification.)
13 Q. Ms. Wright, what is your understanding of
14 course forgiveness, what it is?
15 A. Course forgiveness, it's -- my
16 understanding is if you fail a class, you
17 repeat that class. And your GPA does not
18 change, but that letter grade gets dropped
19 in place of whatever you've made on the
20 second course if you've passed it
21 successfully.
22 Q. So your understanding is that if you take a
23 course and you fail it and then you take it

Page 170

1 over again and you pass it, that the grade
2 taken -- that you got the second time
3 replaces the failure and you move forward?
4 A. Correct.
5 Q. And the failure is forgiven? Is that what
6 you're saying occurs?
7 A. Correct. And I also asked Ms. Alexander
8 about that, to clarify so I knew what was
9 going on and so my understanding would be
10 correct, if that was -- if that was
11 correct.
12 Q. So Ms. Alexander explained to you what
13 course forgiveness is?
14 A. Yes, sir.
15 Q. Is that correct?
16 A. Yes.
17 Q. Now, you say that she's in the main office,
18 correct?
19 A. Correct.
20 Q. In admissions; is that right?
21 A. I'm not sure where she's at, but Dean Hodge
22 is the one that told me that she handles
23 course forgiveness. I don't know what her

Page 171

1 duties are, but he did tell me that she
2 handles course forgiveness.
3 Q. Now, let me ask you this. I take it that
4 the idea of course forgiveness came to you
5 when Dixie Peterson commented it's not like
6 you have course forgiveness, Lindy,
7 correct?
8 A. Correct.
9 Q. But, now, she did not tell you to apply for
10 course forgiveness, did she?
11 A. No.
12 Q. And she did not tell you that course
13 forgiveness was available, did she?
14 A. No.
15 Q. And neither did Dean Lowe, did he?
16 A. No.
17 Q. And isn't it correct that you researched
18 the handbook or the listings of the various
19 people at the school and determined that
20 Dean Hodge was the one you needed to talk
21 to?
22 A. Correct.
23 Q. And you saw in reading the handbook or the

Page 172

1 catalog that it was up to a student to
2 request course forgiveness, correct?
3 A. Correct.
4 Q. And therefore, you wrote the letter of May
5 19, 2006, to Dean Hodge and requested
6 course forgiveness, right?
7 A. Right.
8 Q. And all of that was based on your own
9 research, correct?
10 A. Correct.
11 Q. And it was not based on anything that
12 anybody within the nursing department told
13 you, correct?
14 A. Correct.
15 Q. And you understand, don't you, Ms. Wright,
16 that course forgiveness is not available
17 for the nursing program?
18 A. No. There's nowhere in the catalog that it
19 states course forgiveness -- the nursing
20 program classes are exempt from course
21 forgiveness.
22 Q. Has anyone told you that course forgiveness
23 is not available in the nursing program?

Deposition of Lindy Wright

Page 173

1  A. No.
2  Q. Is my question today the first thing you've
3      heard -- ever heard about the possibility
4      that course forgiveness is not available in
5      the nursing program?
6  A. Can I ask you what you mean? Do I know of
7      anybody else that has received course
8      forgiveness for a nursing class?
9  Q. No.
10  A. Okay. Because I'm going to --
11  Q. My question is this. Is my question today
12      as we sit here right now about the fact
13      that course forgiveness does not apply to
14      the nursing program the first time you've
15      ever heard that?
16  A. With this letter that I received? No --
17      Yeah, it is. That's the first time I've
18      ever heard that, because I researched in
19      the catalog and it's not there.
20  Q. Do you know anyone in the nursing program
21      that's ever received course forgiveness?
22  A. Yes, I do.
23  Q. Who?

Page 174

1  A. Corolla Rambo.
2  Q. Okay. How do you know about her receiving
3      it?
4  A. Because she was one of the students that
5      was said to have failed Nursing 272, which
6      was the last class offered that year, the
7      pediatric class.
8  Q. Corolla Rambo was a contemporary of yours
9      in school, right?
10  A. Right.
11  Q. I mean, she was in the same progression?
12      Started the same time, was going to
13      graduate at the same time, correct?
14  A. Right.
15  Q. And you're saying y'all were in the same
16      272 class --
17  A. Correct.
18  Q. -- together?
19  A. Yes.
20  Q. With Lynn Harris, correct?
21  A. Yes.
22  Q. And that both of you made a D --
23  A. Yes.

Page 175

1  Q. -- in Nursing 272?
2  A. Yes.
3  Q. Did Corolla Rambo graduate from the RN
4      program?
5  A. Yes, she did.
6  Q. What makes you think that she received
7      course forgiveness for NUR 272?
8  A. She told me.
9  Q. In pediatrics?
10  A. She told me she did.
11  Q. When did she tell you this?
12  A. After she applied and received course
13      forgiveness. I don't know the exact times
14      and dates.
15  Q. Had she flunked another course besides 272?
16  A. Not that I'm aware of as far as a nursing
17      class.
18  Q. That's what I'm asking about.
19  A. No.
20  Q. A class that was required within the
21      nursing program that you were involved in.
22  A. Not that I'm aware of.
23  Q. Has Ms. Rambo ever shown you any letter or

Page 176

1      any document that verifies what she's
2      saying about having received course
3      forgiveness?
4  A. No, sir. I've not asked to see anything.
5  Q. Do you know where Ms. Rambo is now?
6  A. Yes, I do.
7  Q. Where?
8  A. She lives in Columbus and she works in
9      Phenix City.
10  Q. Where does she work?
11  A. She works at Canterbury Nursing Home.
12  Q. Do you know if she's married?
13  A. I think she is.
14  Q. Do you know what her husband's name is?
15  A. I don't.
16  Q. But she does live in Columbus?
17  A. Yes, sir.
18  Q. Do you know of anyone else that you believe
19      has received course forgiveness that's in
20      the nursing program?
21  A. No, sir, not course forgiveness.
22  Q. Okay. She's the only one you're aware of?
23  A. That has received course forgiveness.

44 (Pages 173 to 176)

Page 177

1  Q.  That you believe has received course
2      forgiveness?
3  A.  Correct.
4  Q.  Whatever. All right. Rambo.
5         All right. Now, you said not course
6      forgiveness, and you distinguished course
7      forgiveness from something else.  What did
8      you mean to distinguish course forgiveness
9      from?
10 A.  That has received special treatment.
11 Q.  Okay.  Special treatment.  What do you mean
12     by special treatment?
13 A.  Has been able to come back to the program
14     after two failures or has been able to
15     rectify their wrong instead of having to
16     come back the following year or pay for
17     classes or take -- repeat the class.
18 Q.  Let's take one classification of special
19     treatment at a time.  Okay?
20 A.  Okay.
21 Q.  What is your understanding of anyone in the
22     nursing program that has received what you
23     call special treatment?

Page 178

1  A.  There was a student the first half of the
2      second semester that came into one of our
3      clinical labs that was held at the school,
4      and she had not been in any of our classes
5      and --
6  Q.  You said the first half of what semester?
7  A.  The second semester.
8  Q.  Okay. I'm sorry. Go ahead.
9  A.  And not just myself, but everyone was
10     asking who the girl was.
11 Q.  Who was she?
12 A.  Her name was Arit Dan Umoh.  And she was a
13     student from the previous year that was
14     taking, I guess, a pediatric course is what
15     I was told before it was offered.  And she
16     was there that day performing clinical
17     check-offs with the rest of us in my class.
18 Q.  Was Arit Dan -- how do you say it?
19 A.  Umoh.  I think that's how you say it.
20 Q.  Was she enrolled in your clinical class?
21 A.  No, sir, she was not enrolled in my
22     clinical class.
23 Q.  But she came to that class is what you

Page 179

1      you're saying?
2  A.  She came to that clinical check-off.
3  Q.  Which clinical was that?
4  A.  It was just a check-off that we had to do.
5  Q.  But, I mean, what course did the clinical
6      go with?  Don't you have a lecture and a
7      clinical?
8  A.  It was the second -- it was the beginning
9      of the second semester, so it had to be the
10     OB and the adult nursing because I think
11     that's when we started doing our clinicals
12     in the hospital.
13 Q.  Okay.
14 A.  Before we did -- Before we started doing
15     the clinicals in the hospital, we had to do
16     a check-off, and she was there that day.
17 Q.  What did you say?  OB and what?
18 A.  The OB and the adult nursing.
19 Q.  Adult nursing.
20 A.  Yes, sir.
21 Q.  What is a check-off?
22 A.  How to start IVs, to make sure that you're
23     competent enough to start IVs.  We had to

Page 180

1      do a check-off with Foley catheters.
2      That's all I can recall from that day.
3  Q.  And a check-off, if I hear you correctly --
4      and tell me if I'm wrong.  A check-off is
5      where you perform a task, and if you
6      perform it adequately, that task is checked
7      off of the list of things you need to be
8      able to do before you become an RN; is that
9      right?
10 A.  Before you're able to go into the clinical
11     setting.
12 Q.  The actual hospital setting?
13 A.  Uh-huh. (Positive response.)  Correct.
14     But not for you to be able to sit for your
15     boards or become an RN --
16 Q.  Ultimately, though --
17 A.  Correct.
18 Q.  Ultimately, you've got to be able to do a
19     Foley catheter in order to go to the
20     hospital for your clinical and thereby get
21     to the point where you can take the license
22     exam, right?
23 A.  Correct.

Deposition of Lindy Wright

July 13, 2007

Page 181

1  Q.  Do you know what Ms. Umoh was doing in
2     terms of her check-off?  Was it the same
3     things y'all were doing?
4  A.  As far as the check-offs, yes, starting IVs
5     and sterile technique and putting in a
6     Foley.
7  Q.  Did you say she came into this clinical
8     class in the middle of the year?
9  A.  No, it was the beginning of that second
10    semester.
11 Q.  And you're saying she did not stay there,
12    correct?
13 A.  Not -- She was not in any of my clinical
14    groups or in my classroom group.  I was
15    told that she had, I guess, like a -- an
16    independent study.
17 Q.  Who told you she had an independent study?
18 A.  Sandy Gunnels, Wendy Wall and Lynn Harris
19    had made a comment about her -- well, not
20    about her -- didn't call her name
21    specifically, but said she had a student.
22    And that was the only student that was not
23    with everyone else that I knew about.

Page 182

1  Q.  Lynn Harris?
2  A.  Yes, sir.
3  Q.  Lynn Harris said I have a student that
4     what?
5  A.  That she had to do independent study with.
6  Q.  Did she say why she had to do an
7     independent study with her?
8  A.  No.
9  Q.  Do you know why she had to do an
10    independent study with her?
11 A.  Because she didn't pass from the previous
12    year.
13 Q.  Didn't pass what from the previous year?
14 A.  Didn't pass the nursing courses from the
15    previous year.
16 Q.  So you're saying that someone okayed her
17    taking this independent study or doing this
18    independent study to complete her
19    requirements for the nursing program?
20 A.  Correct.
21 Q.  Do you know who approved that?

Page 183

1  A.  No, I don't.
2  Q.  Has anyone told you who approved it?
3  A.  Yes.
4  Q.  Who told you?
5  A.  Sandy Gunnels and Wendy Wall had made a
6     comment that the dean and Dixie approved
7     her to come back.
8  Q.  Wall, W-A-L-L?
9  A.  Uh-huh.  (Positive response.)
10 Q.  Wendy Wall.  Where does Wendy Wall work?
11 A.  If I'm not mistaken, I think she's working
12    for Columbus Tech.
13 Q.  Was she working for Columbus Tech when you
14    spoke to them and they told you this?
15 A.  No, sir.  They were working for CVCC.
16 Q.  When did Sandy Gunnels leave CVCC?
17 A.  That second semester.
18 Q.  The spring of '06?
19 A.  Yes, sir.  That was the OB and the peds --
20    if that's spring.  Is that spring?
21 Q.  Tell me what month and year that Sandy
22    Gunnels left CVCC.
23 A.  Okay.  We started in May, and that went

Page 184

1     through August; is that correct?
2  Q.  I'm asking you.
3  A.  I think that's right.  I think that's
4     right.  It stopped in August.  The first
5     semester stopped in August and then picked
6     back up -- I don't know exactly the date
7     that they picked back up, but it was the
8     first week of the second semester --
9  Q.  Okay.
10 A.  -- that we did the clinical check-off.
11 Q.  Who did Sandy Gunnels say had approved the
12    independent study?
13 A.  Dixie Peterson and Dean Lowe.
14 Q.  What reason did she give for them approving
15    it?
16 A.  That she came back -- well, she came up to
17    the school with her attorney at her side
18    and they let her come back.
19 Q.  Do you know how Sandy Gunnels supposedly
20    knew this?
21 A.  The only thing I know is that she was an

Deposition of Lindy Wright

July 13, 2007

Page 185

1  Q.  Was Wendy Wall an instructor there at the
2     time?
3  A.  She was a clinical instructor.

Page 187

1     last?
2  A.  Probably about three weeks ago, two or
3     three weeks ago.

Deposition of Lindy Wright

**Page 185**

1  Q.  Was Wendy Wall an instructor there at the
2      time?
3  A.  She was a clinical instructor.
4  Q.  Clinical. Do you know a person named
5      Brenda Bellamy?
6  A.  Yes.
7  Q.  How do you know Brenda Bellamy?
8  A.  She was my instructor in the RN program at
9      CVCC the first semester starting in May.
10 Q.  Of the --
11 A.  RN program.
12 Q.  What course in the RN program?
13 A.  I'm not sure what the first courses we
14     took. I don't know the names of them right
15     off the top of my head.
16 Q.  What you're saying is, Brenda Bellamy was a
17     professor of yours?
18 A.  Yes, sir.
19 Q.  Beginning in June 2005, the summer
20     semester?
21 A.  May 2005.
22 Q.  May 2005. Have you spoken with Brenda
23     Bellamy since you finished her course?

**Page 186**

1  A.  Yes, sir.
2  Q.  Did you have Brenda Bellamy for any course
3      other than the one you took in the summer
4      semester of 2005?
5  A.  For the first -- maybe the first couple of
6      days of the second semester, and that was
7      it --
8  Q.  What course?
9  A.  -- from the first semester to the second
10     semester.
11         She would have been the teacher for, I
12     guess, the Adult Nursing II. I think the
13     course syllabus has her name on it.
14 Q.  Who took over that course?
15 A.  Lynn Harris.
16 Q.  That would have been NUR 272; is that
17     right?
18 A.  No, that was -- yeah -- well, no, that was
19     the 252.
20 Q.  Okay.
21 A.  Brenda Bellamy was the instructor for 252,
22     and then Lynn Harris took over.
23 Q.  So when did you talk to Brenda Bellamy

**Page 187**

1      last?
2  A.  Probably about three weeks ago, two or
3      three weeks ago.
4  Q.  Can you tell me about that?
5  A.  I called her because Ms. Cooley told me
6      that she would be subpoenaed to -- I guess
7      today or needed to come in today for a
8      deposition. So I called her to let her
9      know that the attorney would be contacting
10     her, and that was the extent of that
11     conversation.
12 Q.  Before that, when was the last time you
13     talked to her?
14 A.  While we were in nursing school, we ran
15     into her. Myself and some of the students
16     went to eat at TGI Friday's over in
17     Columbus, and we ran into her in the
18     restaurant.
19 Q.  Did you have any lengthy conversation with
20     her?
21 A.  Yeah, I sat down at the table with her and
22     her husband.
23 Q.  Tell me about that.

**Page 188**

1  A.  Just asking how she was doing, what was
2      going on. Told her that I'd had some
3      problems in the second semester after she
4      left, and that was the extent of that. She
5      said that she wouldn't work for CVCC again
6      and she was glad to be gone.
7  Q.  Did she say why?
8  A.  Lots of problems. We didn't go into
9      detail.
10 Q.  Do you know her husband's name?
11 A.  I do not.
12 Q.  Do you know whether Brenda Bellamy and
13     Sandy Gunnels are friends?
14 A.  I don't know that.
15 Q.  Do you know where Brenda Bellamy works now?
16 A.  Yes, I do.
17 Q.  Where?
18 A.  Doctors Hospital.
19 Q.  Do you know what she's doing?
20 A.  I think she works down in triage.
21 Q.  Has Brenda Bellamy ever helped you with any
22     course while you were at CVCC, your RN
23     courses?

Page 189

1   A.  Helped me or taught me?
2   Q.  Well, not taught you, but helped you on an
3       outside basis or an extracurricular basis.
4   A.  No.
5   Q.  Does Brenda Bellamy know anything about the
6       courses that you failed and about the
7       lawsuit that you filed?
8   A.  Yes.
9   Q.  How does she know that?
10  A.  Because in crossing at the hospital, she
11      asked me how I did and I told her that I
12      didn't pass and that I was seeking legal
13      advice.
14  Q.  Tell me when that occurred.
15  A.  Probably a year ago.
16  Q.  What did she say?
17  A.  She was sorry.
18  Q.  You were telling me about special
19      treatment, and you've told me about
20      Ms. Umoh -- or at least what you were --
21      basically what you've been told about
22      Ms. Umoh, correct?
23  A.  Correct.

Page 190

1   Q.  You don't have any personal knowledge of
2       these things; isn't that correct?
3   A.  Correct.
4   Q.  Is there anything else about Ms. Umoh that
5       you haven't told me in terms of special
6       treatment?
7   A.  Things that I've been told?
8   Q.  Yes.
9   A.  I was told that she failed in clinical and
10      in the classroom, that peds class.
11  Q.  What class?
12  A.  The pediatric class, the 272.
13  Q.  When did she do that?
14  A.  I was told that she did that the year
15      before -- the year that she was in the
16      nursing program, and I was also told that
17      she didn't pass with Ms. Harris in the
18      classroom setting. That's what somebody
19      had heard, that she did not pass in the
20      classroom setting and --
21  Q.  That was back in the 272 course that she
22      had taken previously, the one she failed?
23  A.  No, that was the year that I was there. I

Page 191

1       was told that she failed the year that she
2       was there. Then I was told that she failed
3       again when she came back.
4           And I was told that -- I think Sylvia
5       Shirley or -- I don't know the lady's
6       first -- last name. I don't know which
7       order it goes. But I was told that they
8       had her check her off in the clinical
9       setting so they could pass her and move her
10      on through.
11  Q.  Who is Sylvia Shirley?
12  A.  She was one of the clinical instructors
13      that I had for pediatrics.
14  Q.  Was she there at the school or was she in
15      the hospital?
16  A.  I saw her in the hospital.
17  Q.  Which hospital does she work in?
18  A.  If she's still there, she works at the
19      Medical Center on the pediatric floor.
20  Q.  Now, let me go back. I want to make sure I
21      understand this about Ms. Umoh. Ms. Umoh
22      the year before you took 272, NUR 272, took
23      that course and did not pass it; is that

Page 192

1       right?
2   A.  That's what I was told.
3   Q.  And then in the fall semester 2005,
4       Ms. Umoh was back; is that right?
5   A.  Correct.
6   Q.  And that's when she took the independent
7       study?
8   A.  Correct.
9   Q.  With Lynn Harris?
10  A.  Correct.
11  Q.  Did the independent study involve going to
12      class?
13  A.  She didn't come to any of our classes. She
14      just came to the clinical check-off.
15  Q.  When was it that she flunked the class
16      portion of Ms. Harris's course?
17  A.  I don't know.
18  Q.  Somebody told you that, though, right?
19  A.  Correct.
20  Q.  They told you that -- someone told you that
21      she flunked the class part and the clinical
22      part, right?
23  A.  Correct.

Page 193

1    Q. And that was the same year -- that was fall
2       of '05, right?
3    A. Correct.
4    Q. And who told you that?
5    A. Sandy Gunnels said that somebody had told
6       her that. I'm not for sure who that
7       someone was, but I think she said that
8       Wendy Wall told her that.
9    Q. Okay. So, again, Ms. Umoh did not graduate
10      is what we're saying, right?
11   A. Yeah, she graduated.
12   Q. She graduated when?
13   A. I'm not real sure. I assume that it was
14      2006, because I know she has her license
15      now.
16   Q. I thought you said that someone told you
17      that she failed again after --
18   A. She did. That's what I was told.
19   Q. By Sandy Gunnels?
20   A. Correct.
21   Q. That Ms. Umoh failed again in 2006 or 2005?
22   A. The class was given -- that particular
23      class for her was given in 2005.

Page 194

1    Q. Right, the independent study?
2    A. Correct.
3    Q. And Sandy Gunnels told you Ms. Umoh failed
4       the independent study; is that right?
5    A. Sandy told me that's what she had heard.
6    Q. So when did Ms. Umoh graduate? Did Sandy
7       Gunnels tell you that?
8    A. No, she didn't. I have no idea.
9    Q. Did Sandy Gunnels tell you anything else
10      about Ms. Umoh?
11   A. No.
12   Q. Now, that's Ms. Umoh. Let's go to another
13      situation on special treatment.
14      Apparently, there were others that you were
15      going to tell me about, right?
16   A. Yes, sir.
17   Q. Okay. Let's go.
18   A. Elise Sizemore, we were given drug
19      calculation tests and we were supposed to
20      have those tests three times. If we didn't
21      pass by the third time, then we were out of
22      the program.
23      She took drug calculation tests

Page 195

1    throughout the second semester with Lynn
2    Harris. The day of finals, I was talking
3    to Ms. Harris and she said that she didn't
4    have time because she had a student that
5    had to take a drug calculation test over,
6    and it was Elise Sizemore.
7    Q. Elise Sizemore was a contemporary of yours
8       in school, correct?
9    A. Correct.
10   Q. Y'all were in the same class together which
11      involved drug calculation tests, correct?
12   A. Correct.
13   Q. Elise Sizemore failed the drug calculation
14      part, right?
15   A. Correct.
16   Q. You're saying that Elise Sizemore was
17      allowed to take the drug calculation --
18   A. Calculation up until the day of the final,
19      and she passed the day of the final.
20   Q. Okay.
21   A. And you were supposed to have passed those
22      tests before you gave medication in the
23      clinical setting at the hospitals.

Page 196

1    Q. Are you aware of her giving medication in
2       the hospitals in the clinical setting
3       before she passed those tests?
4    A. I'm not, but she told me that she did.
5    Q. Who let her do that?
6    A. I can't remember the -- I didn't have that
7       lady for clinicals. I can't remember her
8       name. If you'll give me just a minute, I
9       might be able to recall.
10   Q. What hospital was it?
11   A. It was the Medical Center.
12   Q. What floor?
13   A. I'm not sure what floor.
14   Q. Where is Elise Sizemore now?
15   A. She works for St. Francis.
16   Q. Where? What floor?
17   A. She works, I think, two. 2 north.
18   Q. What course number would that have been?
19      252?
20   A. 252.
21   Q. Is it correct or incorrect that the drug
22      calculation part was a portion of a test,
23      not a complete or a whole test?

Page 197

1    A.  No.  The drug calculation that we took was
2        a test on its own to make sure that we knew
3        how to calculate the medications before we
4        went into the clinical setting.
5    Q.  When did y'all first take a drug
6        calculation test in NUR 252?
7    A.  We didn't have instruction for the first
8        five weeks of class, so it had to be when
9        Ms. Harris came on board.
10   Q.  Had to be after that for sure?
11   A.  A week or two after.
12   Q.  If you didn't have instruction --
13   A.  It was probably the second week that she
14       was there.
15   Q.  Did you pass your drug calculation test?
16   A.  Yes, sir.
17   Q.  Did you pass on the first time?
18   A.  I'm not sure if I passed that one the first
19       time or the second time.
20   Q.  But what you're saying is, that is a
21       separate and distinct test apart from any
22       other test; is that correct?
23   A.  Correct.

Page 198

1    Q.  Is there more than one of those?
2    A.  Yes, I think so.  I think they give -- if
3        I'm not mistaken -- I'm trying to decipher
4        between LPN and RN.  I think they give one
5        for the pediatric, also, or it may be just
6        one with -- I think it's just one with a
7        mixture of -- I think it was one with a
8        mixture of pediatric calculations as well
9        as adult.  I think it's one.
10   Q.  So you don't recall whether you passed it
11       the first time or the second time?
12   A.  I think I passed the second time because it
13       was -- it was something -- I can't remember
14       exactly what it was, but it was nothing
15       major.  I think I missed one question.
16   Q.  Do you have to get them all right?
17   A.  Correct, but I passed the second time.
18   Q.  Why were you allowed to take it again?
19   A.  Because you have three chances to pass.
20   Q.  So you could --
21   A.  If you didn't pass the first time, you got
22       a second chance.  If you didn't pass the
23       second time, you got a third chance.  If

Page 199

1        you didn't pass the third time --
2    Q.  You're out?
3    A.  Right.
4    Q.  You're out of the program?
5    A.  That's the way it reads.  You're out of
6        that specific class until the next class is
7        offered.  I don't think you're out of the
8        program, but you're out of --
9    Q.  You fail that course; is that right?
10   A.  Correct, because that's part of the
11       clinical portion.
12   Q.  And when you say that's the way it reads,
13       what are you referring?
14   A.  I think it's in the syllabus.
15   Q.  I'm going to show you Defendant's Exhibit
16       3, which is a June 30, 2006, letter from
17       David N. Hodge to you.  I'll ask you
18       whether that is the letter you received
19       from Dr. Hodge relative to your course
20       forgiveness request.
21   A.  Yes.
22   Q.  With regard to the course forgiveness, the
23       rule relative to whether a nursing student

Page 200

1        can obtain course forgiveness for any
2        nursing course is either a nursing student
3        can get course forgiveness for a nursing
4        course or a nursing student in the RN
5        program cannot get course forgiveness for a
6        nursing course, right?  It has to be one or
7        the other; isn't that right?
8    A.  Correct.
9    Q.  If it's correct that the course forgiveness
10       rule with regard to the nursing students is
11       that they cannot get course forgiveness,
12       then irrespective of what anybody said --
13       Dr. Hodge or Ms. Alexander or anybody
14       else -- that's the rule, right?
15   A.  Right.
16   Q.  Let's look at these real quick.
17           MR. NIX:  I don't know what's
18           what, but I'm going to mark
19           Nursing 252, the Adult Nursing
20           II Clinical Syllabus, as
21           Defendant's Exhibit 4.
22   A.  Do you want me to tell you what page it's
23       on?

Page 201

1  Q.  Wait a minute and let me mark this.
2        MR. NIX:  I'm going to mark
3        Nursing 252, Adult Health
4        Nursing II, as Defendant's
5        Exhibit 5.
6        (Defendant's Exhibits 4 and 5 were
7        marked for identification.)
8  Q.  I'll show you both of them.  Tell me which
9      book it's in.
10       MR. DUMBUYA:  Excuse me.  Which
11       one is number four?
12       MR. NIX:  Four is the clinical
13       syllabus, and five does not
14       say clinical on it.  It just
15       says Fall Semester, Adult
16       Health Nursing II.
17  Q.  I assume that's the -- What would you say
18     that is?  If it's not clinical, it's what?
19  A.  This is the classroom portion.
20       MS. COOLEY:  Is that 252?
21       MR. NIX:  Yes.  Exhibit 5 is the
22       classroom portion.
23  Q.  Did you say that you could show me where

Page 202

1      this is?
2  A.  Yes, sir.  It's on page five of the
3      classroom portion of Nursing 252, Adult
4      Health Nursing.  And it's also --
5  Q.  Where is it on page five?
6  A.  It's number two under course requirements.
7  Q.  Course requirements.  Students are expected
8      to attend all classes.  Number two,
9      satisfactory completion of a medication
10     dosage calculation exam.  Student will be
11     given up to three chances to achieve 100
12     percent.  Is that what you're referring to?
13  A.  Yes, sir.
14  Q.  And you're saying that it's against the
15     rules for anyone to have more than three
16     chances; is that right?
17  A.  That's what we've always been told.
18  Q.  Well, I mean, you're referring to the
19     syllabus, right?
20  A.  Correct.
21  Q.  Who's told you that?
22  A.  All of the instructors that I've had in LPN
23     school and RN school.

Page 203

1  Q.  So the only person that you're aware of
2      that ever got to take this calculation --
3      medication dosage calculation exam more
4      than three times is Elise Sizemore,
5      correct?
6  A.  Correct.
7  Q.  You know of no other person that's ever
8      been allowed to do that there, correct?
9  A.  No, sir.
10  Q.  You were allowed to take it two times,
11     right?
12  A.  Correct.
13  Q.  And you're saying that's within the
14     guideline, but Elise Sizemore was given
15     special treatment because she got to take
16     it more than three times?
17  A.  Correct.
18  Q.  How does that affect you?
19  A.  Well, or she took it three times up until
20     the day of finals, and she was allowed to
21     go into the clinical setting and give
22     medication.
23       And it says in the clinical syllabus,

Page 204

1      also, on page four --
2  Q.  Defendant's Exhibit 4 is the clinical
3      syllabus.  On page four.  Okay.  Where on
4      page four?
5  A.  Under Roman numeral three, clinical math
6      proficiency quiz.
7  Q.  The student must pass the math
8      computational quiz with 100 percent
9      accuracy in order to give medications.  If
10     the student does not pass the quiz in three
11     attempts, subsequent course failure will
12     result.
13       Now, you just said in the alternative.
14     Okay?  Either she was allowed to take it
15     three times up to the final or she was
16     allowed to take it more than three times or
17     she was allowed -- she took it three times
18     and never passed it and was allowed to give
19     medication in a clinical setting, right?
20  A.  Correct.
21  Q.  Do you know which --
22  A.  No, sir.
23  Q.  -- is correct?  You do not know?

Page 205

1   A.  No, I don't know if she was allowed to take
2       it more than three times or three times up
3       until, but we were always told that we were
4       taking these calculation tests before we
5       set foot into the clinical setting to make
6       sure that we were competent enough to do
7       the drug calculations that may be requested
8       of us by our instructors.  And those were
9       to be passed before we set foot into the
10      hospital to give medications.
11  Q.  What I want to make sure I understand is
12      this.  You do not know whether Ms. Sizemore
13      was allowed to take the exam more than
14      three times before the final exam.  Isn't
15      that correct?
16  A.  Correct.
17  Q.  And you do not know on the other hand
18      whether she was allowed to take it three
19      times up to the final, didn't pass it in
20      the third try, yet was allowed to give
21      medication in the clinical setting, right?
22  A.  Correct.
23  Q.  But you're saying one of those is true; is

Page 206

1       that what you're saying?
2   A.  Correct.
3   Q.  And that that therefore violates the rule
4       of the school in that regard?
5   A.  Correct.
6   Q.  My question to you is, how does that affect
7       you?  How does that hurt you?
8   A.  You asked me who has received special
9       treatment.
10  Q.  Right.  But I'm asking you -- Okay.  You've
11      given me this example.  How does that
12      affect you?
13  A.  Well, it affects me because if somebody
14      else can receive special treatment and the
15      rules are broken for someone else and the
16      rules are changed and it's up to their
17      discretion to make those rules, then why am
18      I in the position that I'm in because
19      somebody wouldn't change those rules for me
20      or give me special treatment as though
21      they've given someone else?
22  Q.  Give me another example of someone that got
23      special treatment.

Page 207

1   A.  Shannah Lowe.
2   Q.  Tell me about that.
3   A.  We were in pediatrics.  She was not in my
4       clinical group, but one of her friends was
5       in my clinical group.
6   Q.  This would have been the spring of '06,
7       right?
8   A.  Correct.
9   Q.  Go ahead.
10  A.  And the lady --
11  Q.  Clinical, again?
12  A.  It was the clinical, in the hospital.
13  Q.  Okay.
14  A.  The lady that spoke up and said she was
15      having problems -- her name is Jill
16      Boyette.  She was in my clinical group, and
17      she spoke up and said that Shannah Lowe did
18      not pass her clinical portion because she
19      refused to start an IV on a child.  And
20      Artemisa Harmon was that clinical
21      instructor and told her that she would not
22      be passing.  And she stated that Shannah
23      called Dixie Peterson and Dean Lowe.

Page 208

1   Q.  Let's go back.  Okay?  We're in the
2       clinical setting.  We're in pediatrics.
3       This is the spring of 2006.  Ms. Lowe --
4       Shannah Lowe is not in your clinical group,
5       correct?
6   A.  Correct.
7   Q.  But she is in Jill Boyette's clinical
8       group?
9   A.  No, sir.  That's Jill Boyette's friend.
10  Q.  And Jill Boyette is a nurse?
11  A.  She is.
12  Q.  Jill Boyette was not in class at CVCC?  She
13      was, instead, a nurse employed at, what?
14      The Medical Center, Regional Medical
15      Center?
16  A.  No, she was a student and she was in my
17      clinical group.
18  Q.  You lost me, okay, on what happened here.
19      You're saying that Shannah Lowe was in a
20      clinical setting, that she would not give a
21      child an IV?
22  A.  I was told that by Jill Boyette, that she
23      refused to -- it wasn't just me that she

Deposition of Lindy Wright

July 13, 2007

Page 209

1    was telling.  She was telling our whole
2    clinical group that she refused to start an
3    IV on a child.
4    Q.  All right.
5    A.  And Artemisa Harmon told her that she would
6    not be passing the clinical portion.  And
7    she was -- Jill Boyette said that she
8    called Dixie Peterson and Dean Lowe at that
9    time.
10        Do you want me to keep going?
11   Q.  Yeah.
12   A.  And in the process of me taking Nursing
13   200, she was seen at the school with
14   Bridgett Jackson going to the lab.  And we
15   were told that Bridgett Jackson was giving
16   her time in the lab to rectify her --
17   whatever she did in that clinical class
18   with Artemisa Harmon.
19   Q.  200 -- when did you take 200?
20   A.  In the summer.
21   Q.  Of?
22   A.  Yeah.
23   Q.  And who told you this?

Page 210

1    A.  About Shannah Lowe?  Jill Boyette.
2    Q.  Who told you that Ms. Jackson and Shannah
3    Lowe were going to the clinic at the
4    school?
5    A.  Jill Boyette and other students were
6    talking about it, and Kim Smith, also.
7    Q.  Is she a student as well?
8    A.  She was.
9    Q.  Kim Smith, Jill Boyette.  Who else?
10   A.  I think Cindy Richards told Kim Smith is
11   what Kim told me, and Cindy Richards was in
12   Shannah Lowe's clinical class.
13   Q.  Who else?
14   A.  That's all that I recall.
15   Q.  Based on what you've been told, Shannah
16   Lowe was allowed to go back and start an IV
17   on a child so that she could pass the
18   clinical portion of NUR 272; is that right?
19   A.  I was told that she was allowed to go to
20   the lab with Bridgett Jackson, not in the
21   clinical setting.
22   Q.  All right.  You were told that Shannah Lowe
23   was allowed to go to the lab with Bridgett

Page 211

1    Jackson and start an IV on a child --
2    A.  Correct.
3    Q.  -- in order to pass the clinical portion of
4    272?
5    A.  I think it was 272
6    Q.  And that is the only thing that you know of
7    that Shannah Lowe was allowed to do that
8    you think is different from what other
9    people were allowed to do; is that right?
10   A.  Correct.
11   Q.  Do you know why she would not start an IV
12   on a child?
13   A.  I have no idea.
14   Q.  Do you know where Shannah Lowe is now?
15   A.  I do not.
16   Q.  How well do you know Shannah Lowe?
17   A.  Not well at all.
18   Q.  Do you know any reason why she would be
19   allowed to go to the lab in the summer of
20   2006 and start an IV on a child in order to
21   pass the clinical portion of 272?
22   A.  I don't know any reason, but I do know that
23   Dean Lowe is her uncle, I believe.

Page 212

1    Q.  Well, do you know of any -- do you know
2    whether or not someone contends that Dean
3    Lowe is the one that allowed her to do this
4    as a favor because she was related to him?
5    Do you know of anyone that's said that?
6    A.  No, I don't.
7    Q.  Not even Sandy Gunnels?
8    A.  Not even Sandy Gunnels.
9    Q.  Give me another example of special
10   treatment.
11   A.  I can't think of any right now.
12   Q.  That's all you can think of?
13   A.  Right now.
14   Q.  If you think of anything else as we go
15   through, would you please tell me --
16   A.  Yes.
17   Q.  -- about special treatment?  Okay?
18   A.  Yes, sir.
19   Q.  Defendant's Exhibits 4 and 5 are documents
20   that you brought with you and produced;
21   isn't that right?
22   A.  Yes, sir.
23   Q.  And how about Defendant's Exhibit 3, the

Deposition of Lindy Wright

Page 213

1  letter from Dean Hodge? Is that something
2  that you brought with you and produced?
3  A. Yes, sir.
4  Q. Are there any other damages that you have
5  sustained other than emotional distress,
6  embarrassment -- humiliation, and lost
7  opportunity to make the pay of an RN?
8  A. No, sir.
9  Q. Have you ever filed a lawsuit before this
10  one?
11  A. Yes.
12  Q. What lawsuit?
13  A. The lawsuit against Total Systems.
14  Q. Is that the only one you've ever filed
15  besides this one?
16  A. Yes, sir.
17  Q. Have any of your husbands ever filed a
18  lawsuit?
19  A. No, sir, that I'm aware of.
20  Q. Have you ever been involved in any other
21  court proceedings other than this court
22  proceeding and the one having to do with
23  Total Systems?

Page 214

1  A. No, sir.
2  Q. Have you ever filed bankruptcy?
3  A. Yes, sir.
4  Q. When?
5  A. In '94, 1994, I think.
6  Q. Were you single at that time or married?
7  A. Married.
8  Q. Was the bankruptcy filed jointly with you
9  and your husband?
10  A. No.
11  Q. It was just filed by you individually?
12  A. Well, he filed his bankruptcy because he
13  was married previously, and that affected
14  my credit, so I ended up filing bankruptcy.
15  Q. So he filed bankruptcy because he had been
16  married before?
17  A. And had some stuff going on with his
18  previous marriage, and that affected my
19  credit after we got married.
20  Q. So then you filed your own separate
21  bankruptcy, right?
22  A. Correct.
23  Q. And that was in Alabama?

Page 215

1  A. No, I think that was in Georgia.
2  Q. Okay.
3  A. It may have been in Alabama. I'm not real
4  sure. I think it was filed in Alabama.
5  Q. Do you?
6  A. Yes. That's been a long time ago.
7  Q. That was '94. Was that a Title 7 or was it
8  reorganization?
9  A. It was a Title 7.
10  Q. So it was a straight bankruptcy?
11  A. Uh-huh. (Positive response.)
12  Q. Is that right?
13  A. Yeah.
14  Q. What kind of job did you have at that time?
15  A. I think I was working at Blue Cross-Blue
16  Shield.
17  Q. Okay.
18  A. If I'm not mistaken, I think I was.
19  Q. Have you ever had any other court
20  proceedings other than the bankruptcy, the
21  Total Systems and this case we're here
22  about today?
23  A. No.

Page 216

1  Q. Have you ever been arrested?
2  A. Yes.
3  Q. Tell me about that.
4  A. When I was 21, I got a DUI.
5  Q. Where was that?
6  A. That was in Columbus.
7  Q. Did you go to jail?
8  A. I went to jail.
9  Q. And so what happened with that DWI, DUI?
10  A. I had to pay a fine and go to a class to
11  get my license back.
12  Q. All right. Have you ever been arrested any
13  other time?
14  A. No, sir.
15  Q. You have said that in the fall or August --
16  well, the fall of 2005 that your class 252
17  and I guess -- would it be 271 did not have
18  instructors for the first five weeks?
19  A. Yes, sir.
20  Q. Explain that to me.
21  A. Well, Sandy Gunnels and Brenda Bellamy were
22  there for, I'd say, the first week -- or
23  the first couple of days of class, which

54 (Pages 213 to 216)

July 13, 2007

Page 217

1    was basically the first week, and they --
2    we were told by Dean Lowe -- he came down
3    to the class and said that our instructors
4    were sick, they wouldn't be in.
5         They had quit, and we didn't have
6    instructors and we had guest speakers come
7    in.
8    Q.   They were there the first couple of days of
9    class? Is that what you're saying?
10        Ms. Bellamy and Ms. Gunnels both were
11   present the first couple of days of class?
12   A.   Yes, sir.
13   Q.   And that would be the classroom portion,
14   correct? They didn't do clinical, did
15   they?
16   A.   I know they were there for that clinical
17   check-off. And I don't know if they -- if
18   we had even had a chance to do any
19   classroom.
20   Q.   So they wouldn't have been there at all?
21   They never came that semester?
22   A.   Yeah, they did. They were there for the
23   clinical check-off, and that was the first

Page 218

1    portion of that semester. We had a
2    clinical check-off the first week.
3    Q.   But you're saying that you did not have any
4    class; is that right?
5    A.   No, we had class, but we had guest
6    speakers, so it wasn't a formal class.
7    Q.   I'm sorry. I meant you did not have any
8    class where Gunnels and Bellamy taught the
9    class; is that --
10   A.   No, sir.
11   Q.   And you're saying that Dean Lowe came to
12   your classes and said, I'm sorry, your
13   instructors are sick, they'll be back --
14   what did he say?
15   A.   He said they're sick and they're not coming
16   in today, and that was the extent of that.
17   Q.   How many times did he do that?
18   A.   He did that for sure that day. There was
19   always chaos in that class. There was
20   always something going on, somebody
21   fussing.
22   Q.   Which class?
23   A.   My nursing class.

Page 219

1    Q.   That would be 252?
2    A.   That was the --
3    Q.   The whole class?
4    A.   I'm talking about the whole year and the
5    whole class.
6    Q.   The whole year. And when you say the whole
7    class, you're talking about the people in
8    the class?
9    A.   I'm talking about the people. There was
10   always something going on.
11   Q.   I hear you. I've got you. What do you
12   attribute that to?
13   A.   No instructors. Well, actually, I can't
14   say that was the whole year. The first
15   semester, we didn't have so much ruckus
16   going on.
17        When the instructors left and we didn't
18   have instruction for the first five
19   weeks -- the majority of my class was from
20   Atlanta, and they were very vocal and
21   wanted to know what was going on, where the
22   instructors were, what are you going to do
23   to replace them; I want to see my test; I

Page 220

1    want to --
2         I mean, there was something constantly
3    going on. They were very vocal.
4    Q.   And they were just that way the whole time?
5    A.   Except for the first -- the first semester,
6    it wasn't like that.
7    Q.   Okay.
8    A.   Just when nobody knew what was going on --
9    it was very unorganized after those
10   instructors left.
11   Q.   Well, why did they leave? Why did Gunnels
12   leave?
13   A.   I have no idea.
14   Q.   She's never told you about that?
15   A.   I've never really asked her why she left.
16   Q.   And you're saying that at no time did
17   Ms. Gunnels or Ms. Bellamy meet a class
18   during the fall semester of 2005, correct?
19   A.   No.
20   Q.   They did not?
21   A.   Just that clinical.
22   Q.   Just that one clinical?
23   A.   Lab clinical check-off.

55 (Pages 217 to 220)

July 13, 2007

Deposition of Lindy Wright

---

**Page 221**

1  Q.  Where was the clinical check-off?
2  A.  It was in the classroom -- I think it was
3      in the classroom that we normally met in.
4      I'm trying to figure out which side of the
5      building we were on because there's two
6      sides to that building -- there was.
7  Q.  Do you know?
8  A.  What?
9  Q.  Where was the clinical check-off?
10 A.  It wasn't down in the normal lab.  If I'm
11     not mistaken, it was -- it may have been
12     across the hall or upstairs in the
13     classroom on the same side of the
14     building.  It was either the upstairs
15     classroom or the downstairs classroom, that
16     clinical check-off was.
17 Q.  Were both Bellamy and Gunnels there for
18     that?
19 A.  I remember Wendy Wall and Sandy Gunnels
20     being in there.
21 Q.  Did Ms. Gunnels stay for that entire
22     clinical check-off?
23 A.  She did.

---

**Page 223**

1  A.  I'm sorry.  I forgot.  There was talk
2      about -- and myself was not the only one
3      that knew.  There was talk about some kind
4      of contract between her and Ms. Bellamy and
5      the school, their contracts.  I don't
6      know -- I don't know anything other than
7      that.  It was something to do with their
8      contracts is what I heard.
9  Q.  Who told you that?
10 A.  April Gunnels, which is Sandy's
11     daughter-in-law, and then other -- I mean,
12     just students talking to other students.  I
13     don't know.  I can't recall exactly which
14     one, pinpoint it.  But, I mean, it was
15     rumor all over.  Everybody -- I say
16     everybody knew.
17 Q.  Do you know what was -- what the deal was
18     about the contract?
19 A.  No, sir.
20 Q.  And Gunnels has never told you that; is
21     that right?
22 A.  I never asked her specifics.
23 Q.  Do you remember being in a class when

---

**Page 222**

1  Q.  Are you saying that was the very first
2      meeting of that particular class, was to
3      have that clinical check-off?
4  A.  Yeah, I think so.  I think that's what it
5      was.
6  Q.  And so she -- Ms. Gunnels met that clinical
7      check-off class and then never returned; is
8      that correct?
9  A.  That's correct.
10 Q.  Did you miss class very much in the fall of
11     2005?
12 A.  Miss class?
13 Q.  Yes.
14 A.  No, sir.
15 Q.  Did you miss class any in the fall of 2005?
16 A.  I had a baby in June, so that summer.  Fall
17     was August to whatever.  I think I may have
18     missed one class period.
19 Q.  Okay.  In the fall of 2005?
20 A.  No, that was the last semester that I -- I
21     know I missed one class period the last
22     semester.
23 Q.  All right.  Why did Gunnels leave?

---

**Page 224**

1      Gunnels and Bellamy were at the school and
2      they packed up their things and left on
3      that day?
4  A.  That was the day that Dean Lowe came in and
5      said our instructors were sick.  One of the
6      students came down and said that they were
7      up there packing their things.  I was told
8      that they were told not to talk to any of
9      the students.  Sandy did say she was told
10     not to talk to any of the students.  Her
11     and Brenda Bellamy said that.
12 Q.  When did they tell you that?
13 A.  In passing in the parking lot.  Because if
14     I'm not mistaken, I think the security guy
15     was out there.  I don't know his name.
16 Q.  How did you get out to the parking lot?
17     Weren't you supposed to be in class?
18 A.  If I'm not mistaken -- I don't remember.  I
19     don't remember if we were having class or
20     what was going on at that time.
21 Q.  Do you remember anybody writing something
22     on the board, the chalkboard that day?
23 A.  As far as who?

---

Page 225

1  Q.  Do you remember Sandy Gunnels writing
2     something on the chalkboard in the
3     classroom that day?
4  A.  Sandy Gunnels? No.
5  Q.  Do you remember anybody writing something
6     on the chalkboard that day?
7  A.  I remember April Gunnels writing somebody's
8     number on the chalkboard. I don't remember
9     the lady's name, but it was somebody to do
10    with the school, the school board,
11    somebody -- I think. I'm not real sure.
12 Q.  All right. Did April Gunnels tell the
13    class what she was doing and why?
14 A.  Yeah, she got up and said she was writing
15    the lady's name on the board and if they
16    wanted to complain about anything, to call
17    whoever that was.
18 Q.  Do you remember anything else that happened
19    that day?
20 A.  Huh-uh. (Negative response.) It was just
21    chaos.
22 Q.  Because the students were --
23 A.  Upset.

Page 226

1  Q.  -- from Atlanta, they were very vocal, a
2     very aggressive type of person; is that
3     right?
4  A.  Correct.
5  Q.  Let me ask you this. When did Sandy
6     Gunnels first begin helping you outside of
7     her job at CVCC, helping you with nursing
8     school?
9  A.  Outside of CVCC?
10 Q.  Right.
11 A.  In the nursing -- the RN program, outside
12    of, that's when she was at Columbus Tech.
13    She offered me tutorial help as well as
14    everybody else. She voiced that. She said
15    if anybody needs any kind of help, you can
16    call me. Here is my number, whatever.
17 Q.  Let's see. If they left in August of 2005,
18    would it be correct to say that Ms. Gunnels
19    offered that help sometime shortly after
20    August 2005?
21 A.  Yes. She always made herself available if
22    you had any kind of questions about any of
23    the courses that you were having.

Page 227

1  Q.  You're talking about like in the summer,
2     for example?
3  A.  Yes, sir.
4  Q.  Was Ms. Bellamy that way, too?
5  A.  And, in fact -- yes, she was. And, in
6     fact, in the -- I think it was the summer
7     that myself and one of the other students
8     went to Ms. Gunnels' office in the nursing
9     department, and she tutored us on some
10    pharmacology.
11 Q.  That was the summer of 2005?
12 A.  Uh-huh. (Positive response.)
13 Q.  Yes?
14 A.  Yes.
15 Q.  All right. Now, how did Ms. Gunnels offer
16    to help people at CVCC if they wanted
17    help? How did she make that known?
18 A.  She voiced it in the classroom. If you
19    don't understand, ask me. I'll help you.
20    Come to my office. These are my office
21    hours.
22 Q.  What I was talking about, though,
23    Ms. Wright, is Ms. Gunnels helped you after

Page 228

1     she left the employ of CVCC, correct?
2  A.  Correct.
3  Q.  I thought you had said that she made it
4     known that she would be glad to help
5     anybody who was having a problem with their
6     studies at CVCC even after she had left.
7     Am I wrong about that?
8  A.  Her daughter-in-law came in and voiced that
9     she was available.
10 Q.  April did?
11 A.  Uh-huh. (Positive response.)
12 Q.  Yes?
13 A.  Yes.
14 Q.  Where is April now?
15 A.  She works for the Medical Center in
16    Columbus.
17 Q.  When was this that April came in and said
18    my --
19       Is it her aunt -- her mother-in-law,
20    isn't it?
21 A.  Her mother-in-law.
22 Q.  -- my mother-in-law, Sandy Gunnels, said
23    she'd help anybody that needed help over

Deposition of Lindy Wright

---

Page 229

1    here?
2    A. After she left.
3    Q. How long after she'd left?
4    A. Probably the middle of that second
5       semester. I'm not real sure the exact
6       date.
7    Q. So when did you first take advantage of
8       that offer?
9    A. Let me think. When I started having
10      problems with -- basically with the grade
11      appeal and things like that. And she gave
12      me -- it was mainly when I started with the
13      grade appeal.
14          And if I had any questions about
15      anything that Ms. Harris was teaching in
16      the class that I didn't understand, I would
17      call Sandy and ask her. And I went over
18      there several times with her and -- Venus
19      is the lady's name at Columbus Tech. Her
20      name is Venus. I don't know what her last
21      name is.
22   Q. Venus is her first name?
23   A. Venus. I think that's what it is. It's

---

Page 230

1    something odd.
2    Q. Columbus Tech?
3    A. Uh-huh. (Positive response.)
4    Q. She would also help?
5    A. Correct.
6    Q. She's a professor at Columbus Tech, Venus
7       is?
8    A. Uh-huh. (Positive response.)
9    Q. You would go over to Columbus Tech. Where
10      would you meet with Sandy Gunnels?
11   A. In their office, either-or.
12   Q. Both Sandy Gunnels' and Venus'?
13   A. Either hers or -- yeah.
14   Q. And what would you do when you went there?
15   A. Tell her what -- this is what we're
16      studying. What do you know about it? Do
17      you have any notes? What kind of notes do
18      you have? Do you have anything that will
19      help me?
20   Q. In 252 --
21   A. That was the adult nursing.
22   Q. Right. 252 ... Was there an Adult Nursing
23      I and Adult Nursing II?

---

Page 231

1    A. I think so. I think the Adult Nursing I
2       was that first semester. I know we had --
3       I think we had assessment, pharmacology,
4       and the Adult I. And the Adult I was
5       taught by, I think, Brenda Bellamy. If I'm
6       not mistaken, I think that's correct. We
7       don't have the syllabus for that.
8    Q. What was 252?
9    A. Adult Nursing II.
10   Q. So that was in the fall of '05. Okay. And
11      then wasn't 271 in the fall of '05?
12   A. Correct.
13   Q. And that would be maternal --
14   A. Uh-huh. (Positive response.)
15   Q. -- newborn, and would that be the class
16      that Tawyna Cash taught?
17   A. Correct.
18   Q. Did you talk with or meet with Sandy
19      Gunnels about 271?
20   A. Yeah, I talked with her about it, but I
21      don't think I met with her until the end of
22      that semester.
23   Q. But you met with Sandy Gunnels before the

---

Page 232

1    end of the fall semester about 252; is that
2    right?
3    A. Huh-uh. (Negative response.) It was --
4    Q. The first time you met with her was when
5       you were doing the grade appeal?
6    A. Correct.
7    Q. Okay.
8    A. And then we went into the pediatric class,
9       and that's when she helped me with that,
10      also, with some study questions and things
11      like that. I've got it, what she gave me
12      in here somewhere.
13   Q. You do?
14   A. Yeah, it's in there.
15          (Defendant's Exhibit 6 was marked
16          for identification.)
17   Q. Defendant's Exhibit 6 is the syllabus for
18      Nursing 271, Maternal and Newborn Nursing;
19      is that right?
20   A. Yes, sir.
21   Q. And that's the class that Tawyna Cash
22      taught?
23   A. Yes.

---

Deposition of Lindy Wright

Page 229

1   here?
2   A.   After she left.
3   Q.   How long after she'd left?
4   A.   Probably the middle of that second
5        semester. I'm not real sure the exact
6        date.
7   Q.   So when did you first take advantage of
8        that offer?
9   A.   Let me think. When I started having
10       problems with -- basically with the grade
11       appeal and things like that. And she gave
12       me -- it was mainly when I started with the
13       grade appeal.
14       And if I had any questions about
15       anything that Ms. Harris was teaching in
16       the class that I didn't understand, I would
17       call Sandy and ask her. And I went over
18       there several times with her and -- Venus
19       is the lady's name at Columbus Tech. Her
20       name is Venus. I don't know what her last
21       name is.
22  Q.   Venus is her first name?
23  A.   Venus. I think that's what it is. It's

Page 230

1        something odd.
2   Q.   Columbus Tech?
3   A.   Uh-huh. (Positive response.)
4   Q.   She would also help?
5   A.   Correct.
6   Q.   She's a professor at Columbus Tech, Venus
7        is?
8   A.   Uh-huh. (Positive response.)
9   Q.   You would go over to Columbus Tech. Where
10       would you meet with Sandy Gunnels?
11  A.   In their office, either-or.
12  Q.   Both Sandy Gunnels' and Venus'?
13  A.   Either hers or -- yeah.
14  Q.   And what would you do when you went there?
15  A.   Tell her what -- this is what we're
16       studying. What do you know about it? Do
17       you have any notes? What kind of notes do
18       you have? Do you have anything that will
19       help me?
20  Q.   In 252 --
21  A.   That was the adult nursing.
22  Q.   Right. 252 ... Was there an Adult Nursing
23       I and Adult Nursing II?

Page 231

1   A.   I think so. I think the Adult Nursing I
2        was that first semester. I know we had --
3        I think we had assessment, pharmacology,
4        and the Adult I. And the Adult I was
5        taught by, I think, Brenda Bellamy. If I'm
6        not mistaken, I think that's correct. We
7        don't have the syllabus for that.
8   Q.   What was 252?
9   A.   Adult Nursing II.
10  Q.   So that was in the fall of '05. Okay. And
11       then wasn't 271 in the fall of '05?
12  A.   Correct.
13  Q.   And that would be maternal --
14  A.   Uh-huh. (Positive response.)
15  Q.   -- newborn, and would that be the class
16       that Tawyna Cash taught?
17  A.   Correct.
18  Q.   Did you talk with or meet with Sandy
19       Gunnels about 271?
20  A.   Yeah, I talked with her about it, but I
21       don't think I met with her until the end of
22       that semester.
23  Q.   But you met with Sandy Gunnels before the

Page 232

1        end of the fall semester about 252; is that
2        right?
3   A.   Huh-uh. (Negative response.) It was --
4   Q.   The first time you met with her was when
5        you were doing the grade appeal?
6   A.   Correct.
7   Q.   Okay.
8   A.   And then we went into the pediatric class,
9        and that's when she helped me with that,
10       also, with some study questions and things
11       like that. I've got it, what she gave me
12       in here somewhere.
13  Q.   You do?
14  A.   Yeah, it's in there.
15       (Defendant's Exhibit 6 was marked
16       for identification.)
17  Q.   Defendant's Exhibit 6 is the syllabus for
18       Nursing 271, Maternal and Newborn Nursing;
19       is that right?
20  A.   Yes, sir.
21  Q.   And that's the class that Tawyna Cash
22       taught?
23  A.   Yes.

Page 233

1        (Defendant's Exhibit 7 was marked
2        for identification.)
3    Q. Defendant's Exhibit 7 is the nursing
4        syllabus for 272, pediatric nursing, right,
5        and that was taught in the spring of '06 by
6        Lynn Harris, correct?
7    A. Correct.
8        (Defendant's Exhibit 8 was marked
9        for identification.)
10   Q. Defendant's 8 is the syllabus for Nursing
11       200 which you took in the summer of 2006,
12       correct?
13   A. Correct.
14   Q. All of those syllabi are syllabi that you
15       had in your files; isn't that right?  They
16       were your documents that you produced?
17   A. I didn't produce them.  The instructors
18       gave these to me and I've held on to them.
19   Q. Well, what I mean is --
20   A. Produced for today.
21   Q. Correct.  You produced those documents in
22       this lawsuit because you had them?
23   A. Correct.  The 272 and the Nursing 200, I

Page 234

1        took those classes together.
2    Q. Oh, you did?  You took 200 and 272 in the
3        spring of 2006?
4    A. Correct.  I didn't take anything in the
5        summer because they told me that --
6    Q. You were out.
7    A. -- I could not.
8    Q. Let's go back to the deposition notice.
9        Okay?
10   A. Okay.
11   Q. We're on number two.  We've talked about
12       all your damages, I take it, right?
13   A. Correct.
14   Q. Number two is all documents regarding your
15       grade appeals and request for grade and/or
16       course forgiveness.
17       This particular item also asked for
18       audio recordings, e-mails, notes or letters
19       of any kind.  Have you had any telephone
20       conversations with anyone about any part of
21       this case that you've recorded?
22   A. About the case?
23   Q. Well, about the underlying facts in the

Page 235

1        case.
2    A. No.
3    Q. Have you had a telephone conversation with
4        anyone that you've recorded, either about
5        the case or about what happened with
6        respect to the events at CVCC?
7    A. No.
8    Q. Have you taken any -- you hesitated
9        earlier.  It sounded like you had done a
10       tape recording of some telephone
11       conversation.
12   A. I was trying to understand what you were
13       asking.
14   Q. Okay.  Do you know whether your lawyers
15       have taken any telephone tape recordings of
16       conversations?
17   A. No.
18          MR. NIX:  I assume y'all would
19          have produced those if you had
20          those, correct?
21          MS. COOLEY:  (Nods head up and
22          down.)
23          MR. NIX:  You haven't.

Page 236

1    Q. Have you produced all of the documents that
2        have any relationship to your grade
3        and/or -- grade appeals and your request
4        for course forgiveness?  Have you brought
5        those?
6    A. I'm sorry.  Repeat that, please.
7    Q. Have you produced or provided to me
8        pursuant to this request for production of
9        documents number two all of the documents
10       that you have that relate to your grade
11       appeals?
12   A. Yes, sir.
13   Q. Have you produced all of the documents that
14       relate to your course forgiveness?
15   A. Yes, sir.
16   Q. Now, let's do this real quickly.
17          MR. NIX:  Do y'all want to take a
18          quick break?
19          MS. COOLEY:  Yes.
20          (Brief recess was taken.)
21   Q. Ms. Wright, let me do something real quick
22       if I can.
23          (Defendant's Exhibit 9 was marked

Page 237

1    for identification.)
2    Q.  Let me show you what I've marked as
3    Defendant's Exhibit Number 9, and let me
4    try to describe it and you tell me how I'm
5    wrong.  I'm sure I will be for the most
6    part, but ...
7         These are printouts of electronic
8    documents sent to you by one of your
9    instructors from CVCC; is that right?
10   A.  That's correct.
11   Q.  Who sent these to you?
12   A.  Lynn Harris.
13   Q.  Are they related to any one particular
14   course?
15   A.  Pediatrics, which is the 272.
16   Q.  272.  Did Lynn Harris send any electronic
17   documents of this type like Defendant's
18   Exhibit 9 for 252?
19   A.  I don't recall any for 252.
20   Q.  My understanding is you still have these
21   documents on a hard drive or your computer
22   that you can reproduce.
23   A.  (Witness nods head up and down.)

Page 238

1         MR. NIX:  I'll put these into the
2         record just so that we'll know
3         you produced these to us.
4         MS. COOLEY:  Would you mind saying
5         what class that was again.  I
6         know it came from Lynn Harris.
7         MR. NIX:  272 is the one that
8         these documents relate to,
9         Defendant's 9.
10        Kind of chopped up your
11        production a little bit.  Put
12        all of these together.
13        I'm going to mark this
14        stack of documents as
15        Defendant's Exhibit 10.
16        (Defendant's Exhibit 10 was marked
17        for identification.)
18   Q.  These documents are also documents that you
19   have produced pursuant to our request for
20   production of documents.
21        Would you take a quick look at these,
22   Ms. Wright, and just confirm that those are
23   additional documents that you produced.

Page 239

1         They're not all the rest of them that
2         you've produced because I've got some
3         others here.
4         Are they?
5    A.  Yes, sir.
6    Q.  I'm marking these as Defendant's Exhibit
7    10.  The first page here is a lot of
8    scribbling.  Can you tell me what that
9    relates to?
10   A.  That relates to Ms. Harris at the end of
11   the second semester letting me write
12   down -- not word for word -- some of the
13   test questions of some of the tests -- I'm
14   not sure which test questions or what test
15   numbers those come from.  It was all of
16   them to review --
17   Q.  Okay.
18   A.  -- and to challenge.
19        MR. DUMBUYA:  What is the caption
20        on Exhibit Number 10?
21        MR. NIX:  There's really not a
22        caption.  Defendant's 10 is a
23        group of documents produced by

Page 240

1         Ms. Wright pursuant to our
2         request for production.  It
3         just so happens that the first
4         page are some notes that she
5         took.
6    Q.  What?  In May or June of 2006?
7    A.  No.  That was the end of the second
8    semester, the 252.
9    Q.  Okay.  December of 2005, early January
10   2006?
11   A.  Correct.
12   Q.  So the first page -- and then I'm just
13   going to flip through these.  Are all of
14   these pages that have this handwritten
15   information on them -- I think there are
16   five pages -- four pages, are these four
17   pages all related to the course 252?
18   A.  Yes.
19   Q.  And Lynn Harris allowed you to look at the
20   exams that she had put together and write
21   down notes about the questions on them; is
22   that right?
23   A.  Right.

Page 241

1  Q.  Were you able to see the Scantron, your
2      Scantron showing the answers and the ones
3      she had marked wrong?
4  A.  Correct.
5  Q.  And she did this for what purpose?  Lynn
6      Harris did this for what purpose?
7  A.  To challenge those questions.
8  Q.  To allow you to know what was on the test
9      so that you could go back and look them
10     up?  Is that --
11 A.  Correct.
12 Q.  -- basically correct?
13 A.  Correct.
14 Q.  Look them up and determine whether you
15     could make some contention that your answer
16     was the right answer instead of the answer
17     that she had determined was correct?
18 A.  Correct.
19 Q.  After you -- and I'm going to put on
20     Defendant's Exhibit 10 in the bottom
21     right-hand corner on each of these four
22     pages A for the top page with a circle
23     around it, B for the second page with a

Page 242

1      circle around it, C for the third page with
2      a circle around it, and D for the fourth
3      page with a circle around it.
4          Those four pages are the pages that
5      we're talking about that relate to course
6      252?
7  A.  That's some of the questions.
8  Q.  Are these four pages, Exhibit 10-A, B, C,
9      and D, all of your notes, though?
10 A.  Those are the only notes that I was allowed
11     to write down.
12 Q.  I'm not sure I understand how you're
13     limiting the response.  Are you saying that
14     Ms. Harris would not allow you to write
15     some things down?
16 A.  Correct.
17 Q.  Like what?
18 A.  Any more test questions.  When she allowed
19     me to do that, I was communicating with
20     Sandy Gunnels and the other instructor at
21     Columbus Tech, and they were helping me
22     research through nursing books.
23          And when she realized -- She asked me,

Page 243

1      are you letting other instructors look at
2      this?  I said, yes, ma'am.  She said, no
3      more, we're not going through this
4      anymore.  That's it.  And that was it.  And
5      then --
6  Q.  What did she think you were writing them
7      down for?
8  A.  She knew what I was writing them down for,
9      was to challenge those answers and look
10     them up in nursing books because Dixie
11     Peterson told me to do that.
12 Q.  When did Dixie Peterson tell you to do
13     that?
14 A.  Within a day or so of setting the
15     appointment with Ms. Harris to come and
16     review the grades.
17 Q.  Was that at a special meeting of some type
18     that you had with Dixie Peterson?
19 A.  No.  That was at the time of reviewing my
20     test.  It was not a special meeting.  There
21     were no other students on campus.
22 Q.  Was it after you filed your grade appeal?
23 A.  Yes, sir, I think it was.

Page 244

1  Q.  I'll get to that in a minute.  We'll get to
2      the grade appeal in a minute.
3          There are four pages of notes.  About
4      how far did you get in writing down your
5      notes on exams that you were looking at?
6      How far into the exams with the incorrect
7      answers did you get?
8  A.  I don't know how far I got.  I didn't -- I
9      know I didn't get to review every test and
10     every question because she would not
11     allow ...
12 Q.  Did you take these to Sandy Gunnels --
13 A.  Yes.
14 Q.  -- these notes?
15 A.  Yes.
16 Q.  And you talked over your notes with her,
17     correct?
18 A.  Correct.
19 Q.  Why don't you do this.  Take this top
20     page -- don't take it out of the clip or
21     anything, but just take the top page and
22     tell me which question that was on which
23     exam and what the precise question was that

Page 245

1   you wrote down there.
2   A.   What question it was on which exam? I'm
3        sorry. I don't understand your question.
4   Q.   Well, I mean, apparently, it was – the top
5        of that page has notes on it, correct?
6   A.   Correct.
7   Q.   Do those notes relate to a question that
8        Lynn Harris marked your answer for as an
9        incorrect answer?
10  A.   Correct.
11  Q.   So tell me what the question was from those
12       notes.
13  A.   It looks like -- I can't read the top of
14       that one. It looks like it was cut off in
15       copying.
16       The second one, it says: Nurses
17       providing irrigation for nasogastric tube.
18       Patient's potassium level is four -- it
19       looks like four something and sodium is –
20       four milliequivalents maybe and sodium is
21       130. What would the nurse irrigate with?
22  Q.   So that was a question on –
23  A.   It's not a complete question. It's not

Page 246

1        word for word.
2   Q.   But it was marked wrong on the test,
3        correct, on your Scantron?
4   A.   Correct.
5   Q.   Did Sandy Gunnels say that your answer was
6        correct?
7   A.   It says right here, could use either. And
8        this is not precise, just Sandy Gunnels --
9        one of the other instructors was looking at
10       this also at Columbus Tech. And it says,
11       could use either, does not have to be
12       sterile. It's got C and D marked with the
13       little quotation I guess or whatever. And
14       that says, no, normal saline is isotonic
15       and will not impact the sodium level.
16  Q.   Did you talk to Lynn Harris about the fact
17       that Sandy Gunnels and this other
18       instructor said it could have been either?
19  A.   When I tried to do that, that's when she
20       refused to talk to me about any of these
21       questions or allow me to look at anything
22       else.
23  Q.   Let me ask you something. Who was your

Page 247

1        instructor for 252?
2   A.   Lynn Harris.
3   Q.   Which one of these ladies -- Ms. Bellamy or
4        Ms. Gunnels -- was supposed to have taught
5        that course?
6   A.   Brenda Bellamy.
7   Q.   Was supposed to have taught 252?
8   A.   Correct.
9   Q.   Which course was Sandy Gunnels going to
10       teach in the fall of 2005?
11  A.   271.
12  Q.   You're talking to a nurse who was a
13       professor at this school who taught various
14       courses at this school but who was not the
15       professor for your course 252, weren't you?
16  A.   Correct.
17  Q.   And you were getting their impression about
18       an answer to a question that Ms. Harris had
19       marked incorrect on your test, right?
20  A.   Correct.
21  Q.   And what you're saying is that they're
22       saying Ms. Harris wasn't really wrong, but
23       neither were you, and so she shouldn't have

Page 248

1        marked that off. Isn't that what you're
2        saying?
3   A.   Is that what I'm saying?
4   Q.   Well, I'm just asking you if that's your
5        contention in this case. Are you saying
6        that Ms. Harris, her answer was right, but
7        so was yours because Sandy Gunnels said so
8        was yours?
9   A.   Yes.
10  Q.   And you're saying that you should have been
11       given credit for that correct answer. Is
12       that what your contention is?
13  A.   But I'm not saying it's just because Sandy
14       Gunnels said so. It was in nursing books.
15  Q.   You've written down a paraphrase of a
16       question. But irrespective of that,
17       Ms. Harris was the instructor, wasn't she?
18  A.   Yes.
19  Q.   Reasonable and good professionals can
20       disagree on various things, can they not?
21  A.   Yes.
22  Q.   The professional teaching this course,
23       Ms. Harris, said the right answer for you

Page 249

1   on this test because I'm your teacher is
2   the one that I had in my key, not the one
3   you chose; isn't that right?
4   A.  No.
5   Q.  What?  Tell me --
6   A.  She never discussed any of these questions
7   with me.  She never gave me any rationale.
8   She never said this is the answer I chose,
9   it's right, you're wrong.  She never --
10  Q.  That's really not what I'm asking you.
11  You're saying she should have spent all
12  kinds of time with you doing this, even
13  though she had 30 students or however many
14  she had.  But what I'm saying is, she was
15  the teacher, not you, right?
16  A.  Right.
17  Q.  She was the teacher, not Sandy Gunnels,
18  right?
19  A.  Right.
20  Q.  She was the teacher, not this lady, Ventura
21  or whatever her name is, right?
22  A.  Right.
23  Q.  She had a key.  She put an answer down that

Page 250

1   was the right answer in her view as the
2   instructor for the course.  And you're
3   complaining because she didn't mark your
4   answer right because some other person
5   says, well, your answer is -- it could be
6   right and so is hers, right?  Isn't that
7   what you're doing?
8   A.  No.
9   Q.  Yes, it is.  Tell me what you're doing.
10  A.  I'm complaining because she didn't give me
11  the opportunity to go over these test
12  questions and give me rationale for the
13  answers that I chose.  As any of the tests
14  that she gave, she never went over anything
15  except for that last semester the day
16  before finals.  At the end of the day at
17  certain times, you could either be there or
18  not.  No, she did not go over any of this
19  stuff with me.
20  Q.  So you're not complaining, then -- I've got
21  it all wrong.  You're not complaining about
22  the fact that the test was graded the way
23  it was.  You agree with the way the way the

Page 251

1   test was graded.  It's just that she didn't
2   sit down with you and explain all of this
3   stuff, right?
4   A.  Wrong.  No, I do not --
5   Q.  How is that wrong?
6   A.  I do not agree with the way the tests were
7   graded.  From my understanding and what she
8   did was she threw out questions on some
9   people's tests and some people's she
10  didn't.  I feel like I was not graded
11  equally.
12  Q.  You filed a lawsuit, Ms. Wright, in this
13  case, and you're telling me from what I
14  understand, she threw out questions for
15  other people but not me.  You're telling me
16  that?
17  A.  That was for everybody.  There were test
18  questions that she threw out on other
19  people's tests and she didn't throw out
20  on -- she didn't do it -- overall, she
21  didn't do it for everybody.
22  Q.  And you don't know that.  It's just
23  something that you think, right?

Page 252

1   A.  From what -- that last semester --
2   Q.  How about 252?
3   A.  From 252?
4   Q.  Yeah.
5   A.  She told me.  Ms. Harris told me this.
6   Q.  Told you what?
7   A.  That she omitted -- if you'll look on the
8   back of one of these -- those are the
9   originals, and I think I made a copy of
10  that back part.  She told me she omitted
11  two of eight questions -- it's on the back
12  of one of these.
13  Q.  You're referring to Defendant's Exhibit 9?
14  A.  Uh-huh.  (Positive response.)
15  Q.  What did she tell you?
16  A.  She told me she omitted two out of eight on
17  my test and graded from that, gave me a
18  grade off of that.
19  Q.  She omitted two of your wrong answers?
20  A.  Two out of eight that she threw out.
21  Q.  Two of your wrong answers?
22  A.  She threw out questions and then she
23  omitted some questions.

Page 253

1  Q.  So she gave you a break.  She gave you a
2      break, right?  She threw out two wrong
3      answers, right?
4  A.  Right.
5  Q.  And she omitted some others that were
6      wrong, right?
7  A.  Right.
8  Q.  She gave you a break, and you're suing?
9  A.  But she didn't give me credit the way she
10     should have.
11 Q.  Oh, okay.
12 A.  According to what she was saying when
13     she -- what she told me, the calculation --
14     it didn't calculate.
15 Q.  Did Sandy Gunnels do your calculation for
16     you on that, too?
17 A.  No, she didn't.
18 Q.  Did you do that calculation?
19 A.  Can we look at that?
20 Q.  I don't have time to be honest with you.  I
21     mean, this -- what are you saying?  Just
22     tell me what you're saying.
23          MR. DUMBUYA:  Let me step in at

Page 254

1          this time.  You've introduced
2          Exhibit Number 9, so I think
3          you have a responsibility to
4          go over that exhibit from the
5          perspective of the witness.
6          Exhibit Number 9 has already
7          been introduced.
8          MR. NIX:  I know, but I don't have
9          an obligation to do anything
10         other than discover, and
11         that's what I'm doing.
12 Q.  So tell me --
13         MR. DUMBUYA:  If the witness is
14         insisting that information is
15         on Exhibit Number 9, I think
16         you have the responsibility
17         to --
18         MR. NIX:  She's told me what's on
19         it.  You can question her at
20         trial or here when I get
21         finished, whatever you want to
22         do.
23         MR. DUMBUYA:  I just want to make

Page 255

1          sure we're on the same plane
2          here.
3          MR. NIX:  I understand what you're
4          saying.  I think I understand
5          what she's saying as well, and
6          I don't think there's any need
7          to go to it.  I understand it.
8  Q.  Go to 272.  What did Lynn Harris do wrong
9      on that course?
10 A.  Lynn Harris didn't teach 272 -- yes, she
11     did.  She taught 272.  I thought you were
12     meaning 271.
13 Q.  What did Lynn Harris do wrong on 272?
14 Q.  What did she do wrong on 272?
15 Q.  Right, to you.
16 A.  To me?
17 Q.  Yeah.
18 A.  Well, she said that she was going to go
19     over test questions and give rationale for
20     every test, and she did not do that.  She
21     never went over any test except for the day
22     before finals.
23          And she told us weeks in advance she

Page 256

1          was going to give us a study guide for the
2          final.  She never did that.  She did it a
3          day before the final.  That was not
4          adequate time to study for a final.
5  Q.  What did she do wrong, though -- okay.
6      You're saying that's all she did wrong.
7      Okay?  Is that right?
8  A.  She told me that -- there were times in the
9      clinical -- there was a clinical that we
10     had to turn in care plans, and she
11     addressed the class and said that we're not
12     discussing any of the care plans.  Whoever
13     got -- well, the care plans that were
14     regraded can be redone.  You can redo your
15     care plans, and that was it.
16          And that deducted points from me, so
17     that was wrong, from my original grade that
18     I received from care plans.
19 Q.  It deducted points from you?
20 A.  Yes, sir, it did.
21 Q.  I thought she allowed you to redo a care
22     plan and you doubled your score on it.
23 A.  No, sir.

Page 257

1    Q. Did you redo a care plan and it reduced
2       your score?
3    A. Yes, sir.
4    Q. What course was that in?
5    A. That was in 272.
6    Q. And which care plan was that?
7    A. I think that was -- may have been the first
8       care plan that we did. I'm not real sure
9       exactly which one it was.
10   Q. Are you talking about the care plan that
11      was said to have been lost? Is that the
12      one you're talking about?
13   A. No.
14   Q. Talking about the other one?
15   A. Uh-huh. (Positive response.)
16   Q. Yes?
17   A. In 272.
18   Q. Yes? You're talking about another one?
19   A. Yes.
20   Q. And she said you could redo -- y'all can
21      redo your care plans if you'd like?
22   A. She addressed the class.
23   Q. She told the whole class that?

Page 258

1    A. Yes.
2    Q. So some people -- you had an option to redo
3       the care plan, correct?
4    A. Correct.
5    Q. And you chose to redo the care plan,
6       correct?
7    A. Correct.
8    Q. And you made a worse score on the care
9       plan?
10   A. No, I made a higher score than what they
11      originally -- the second time they graded.
12      I made a higher score than that.
13   Q. I don't understand. I'm sorry. You made a
14      higher score which time?
15   A. There was a care plan that third
16      semester -- there was two care plans the
17      third semester. Artemisa Harmon in our
18      clinical group gave back my original care
19      plan with my original sheet on it that
20      said -- I think it was 22 out of 25
21      points. And we had to hand those back in,
22      so I handed it back in to her.
23         Well, the next clinical session was

Page 259

1    Shirley Harmon, and she gave -- no, the
2    next session, I had Artemisa again, I
3    think. But when they handed out care plans
4    again, my original sheet was torn off and
5    there was red writing, and it was a grade
6    of a seven. And it was that same care
7    plan. They took those back up.
8       And that's when Lynn Harris said -- she
9    addressed the class and said she didn't
10   want to hear any fussing about the care
11   plans, to redo them if you wanted to redo
12   them.
13   Q. In other words, she redid the grading on
14      them, Lynn Harris did?
15   A. She said she did not.
16   Q. Lynn Harris said she did not redo the
17      grading?
18   A. Correct.
19   Q. Someone else redid the grading?
20   A. Correct.
21   Q. And gave you a lower score?
22   A. Correct.
23   Q. And then you redid the care plan?

Page 260

1    A. Correct.
2    Q. And did you make higher than a seven?
3    A. Correct.
4    Q. What was that?
5    A. I think it was a 19.
6    Q. Right. So Lynn Harris gave you a break.
7       She allowed you to redo the care plan that
8       someone else had regraded to your disliking
9       down from a 22 to a seven. Isn't that
10      right?
11   A. Lynn Harris didn't grade our care plans.
12      Our clinical instructors graded our care
13      plans and gave us those grades.
14   Q. So did Artemisa regrade it, is that what
15      you're saying, from a 22 to a seven?
16   A. Artemisa told me that Shirley -- Sylvia
17      Shirley or --
18   Q. Whatever her name is.
19   A. Whatever her name is.
20   Q. She regraded it?
21   A. Is the one that regraded it.
22   Q. And she was a clinical instructor?
23   A. Correct.

Page 261

1   Q.   Was she the clinical instructor for that
2        particular part of your clinical --
3        whatever, the one that was supposed to have
4        graded it to start with?
5   A.   It was between her and Artemisa.
6   Q.   So whatever happened, Lynn Harris said redo
7        them if you want to; if you don't, that's
8        fine.  You chose to redo it.  You made
9        higher than a seven, right?
10  A.   Correct.
11  Q.   All right.  What else did Lynn Harris do to
12       you that was different from anybody else?
13       How did she discriminate against you in a
14       negative way in such a way that it hurt
15       you?  How did she treat you differently?
16  A.   In what course?
17  Q.   272.
18  A.   In 272?  I didn't really have too much of a
19       problem with Lynn Harris in 272.
20  Q.   All right.  You agreed with the grades in
21       272?
22  A.   No.
23  Q.   Nevertheless, the grades are the grades

Page 262

1        that Lynn Harris gave you.  Do you agree
2        with that?
3   A.   Do I agree that those are the grades that
4        she gave?
5   Q.   Yes.
6   A.   Yes.
7   Q.   Now, do you say, Ms. Wright, that for some
8        reason, either Lynn Harris or some other
9        person at the school was out to get you?
10  A.   Do I believe that?
11  Q.   Are you contending that in this case?
12  A.   Yes.
13  Q.   Explain that to me.
14  A.   From what I have been told by -- do you
15       want names?  Do you want me just to explain
16       from start --
17  Q.   I want the whole deal.  Yes, ma'am.
18  A.   Start to finish?
19  Q.   You just let it rip.  Okay?  You know how
20       I'm doing.  I want as much knowledge as I
21       can get.  I really want to understand your
22       case.  Okay?
23  A.   Okay.

Page 263

1   Q.   Tell me as much as you can.
2   A.   When the ordeal happened with the second
3        semester, having the D in 252 --
4   Q.   What are you calling the ordeal?
5   A.   What am I calling an ordeal?
6   Q.   The ordeal.
7   A.   The ordeal?
8   Q.   Yes.
9   A.   When I received my grade and went through
10       the process of the grade appeal, I was
11       treated -- I feel like I was treated
12       unfairly because I didn't get the
13       opportunity to go through all of the test
14       questions, any kind of rationale or any
15       kind of questions that I would have had
16       about any of the tests that were given to
17       me, and was stopped in the process when
18       other instructors were helping me with
19       trying to -- what is it, argue my side per
20       se.
21  Q.   I'm trying to -- trying to tell the teacher
22       she's wrong?
23  A.   If that's what you want to call it.

Page 264

1   Q.   Well, that's what it is, isn't it?  I mean,
2        you -- let me ask you this.
3             Did Lynn Harris meet with every single
4        one of her students and elaborately go over
5        these tests the way you wanted to go over
6        them?
7   A.   No, she never made herself available for
8        us.
9   Q.   Okay.  Fine.  Keep going.  Okay?  You were
10       telling me how somebody is out to get you.
11  A.   When I filed for grade appeal, I was told
12       that Dixie Peterson had told two
13       instructors to -- well, I was told that she
14       asked about everybody the first semester,
15       how everybody did, what their grades were,
16       and that I was specifically picked out and
17       said that I was a weak student, that I
18       didn't pass my LPN boards the first time,
19       that I did not need to pass the second
20       semester.
21  Q.   Okay.  And that was Sandy Gunnels that told
22       you that, right?
23  A.   Correct.

Page 265

1    Q. Did anyone else tell you that?
2    A. No.
3    Q. Do you know of anyone else that supposedly
4       heard Dixie Peterson say that you should --
5       What did she say again?
6    A. Lindy doesn't need to pass next semester.
7       She's weak. She didn't pass her LPN boards
8       the first time, so she won't pass her RN
9       boards.
10   Q. And when did this occur?
11   A. The end of the first semester.
12   Q. That would be, what? August sometime,
13      2005; is that right?
14   A. Yes.
15   Q. Are you saying that Sandy Gunnels told you
16      that Dixie Peterson said that to Sandy
17      Gunnels?
18   A. And Brenda Bellamy. She said that she said
19      it to her and Brenda Bellamy.
20   Q. You've spoken with Brenda Bellamy since all
21      of this, correct?
22   A. Correct.
23   Q. Does Brenda Bellamy confirm what Sandy

Page 266

1       Gunnels said about what Dixie said?
2    A. She doesn't recall, and we didn't go
3       in-depth.
4    Q. So you asked Brenda Bellamy about it?
5    A. Has Dixie Peterson ever said anything about
6       me to you. Not that I recall was her
7       answer.
8    Q. And was this at the restaurant that night?
9    A. No.
10   Q. Where was it?
11   A. This was in passing at Doctors Hospital.
12   Q. So Sandy Gunnels, though, nevertheless says
13      that that occurred, correct?
14   A. Correct.
15   Q. If I hear you correctly, Sandy Gunnels
16      didn't say Dixie Peterson ordered me to
17      fail Lindy Wright this next semester,
18      right? What I think I heard you say -- I'm
19      asking you to tell me if I'm hearing you
20      correctly.
21      What I think I heard you say that Sandy
22      Gunnels told you was that Dixie Peterson
23      said Lindy Wright is a weak student. She

Page 267

1       did not pass her LPN licensing test -- or
2       boards the first time, and she really does
3       not need to go forward in the program or
4       does not need to pass or whatever.
5    A. Correct.
6    Q. Is that correct?
7    A. Correct.
8    Q. But she did not say to Sandy Gunnels, I
9       want you to fail her in this course, right?
10   A. I don't know exactly what she said to Sandy
11      Gunnels because I was not in the room, but
12      that's what Sandy relayed to me.
13   Q. Sandy Gunnels has never said to you that
14      Dixie Peterson said to her, I want you to
15      fail Lindy Wright in those words, has she?
16   A. No, she never said that.
17   Q. All she said was that Dixie Peterson
18      commented about you, that you were a weak
19      student and that you really did not need to
20      go forward as an RN; isn't that right?
21      Basically that. Not in those exact words,
22      but basically that, right?
23   A. Right.

Page 268

1    Q. Tell me everything else you can tell me
2       about somebody being out to get you.
3    A. And then the courses offered for the
4       Nursing 200 in place of the 252, and I feel
5       like that had been discussed between Dixie,
6       Dean Lowe and whomever has the authority to
7       do that to keep me from getting course
8       forgiveness.
9    Q. Let me make sure I understand this. Okay?
10      You're saying that when you were told that
11      you could not retake 252 because it would
12      not be offered again in view of the new
13      curriculum or the new program and that you
14      should nevertheless take 200 instead, that
15      the people who told you that -- Dixie and
16      Dean Lowe --
17   A. Um-huh. (Positive response.)
18   Q. -- had discussed the fact that you could
19      not get course forgiveness?
20   A. I feel like they did. I don't know that
21      for a fact.
22   Q. And you feel like they talked about the
23      fact that you couldn't get course

Page 269

1 forgiveness because the 252 course was not
2 the same number as the 200 course?
3 A. Correct.
4 Q. Tell me everything you can tell me that's
5 factual that you base that belief on.
6 A. Because of her comments saying it's not
7 like you've got course forgiveness. Then I
8 went to Dean Hodge and asked for course
9 forgiveness, and they're telling me that
10 the course numbers don't match up. I
11 didn't choose the course number. They
12 chose the course number. They said they
13 had to change it because of the course
14 curriculum.
15     And then the student in the – the last
16 semester that had taken the 272, they
17 didn't change her course number because she
18 would have actually had to come back the
19 following year and take whatever course it
20 is for the pediatrics. They gave her 272
21 at the time that she came back during the
22 summer to take it.
23 Q. Who is that?

Page 270

1 A. Corolla Rambo.
2 Q. Okay. What else? Keep going.
3 A. Laurel Blackwell when I had the meeting in
4 her office, she tells me that she didn't
5 have anything to do with the academics. I
6 mean, I wouldn't – I don't understand
7 that, because she's the president of the
8 college. So, I mean, she oversees
9 everything I would expect.
10 Q. So you disagree with Laurel Blackwell, too,
11 about her job, right?
12 A. Not about her job. About the way I was
13 treated there.
14 Q. Well, what you said was that she told you
15 that she had nothing to do with academics,
16 and you disagree with that?
17 A. Correct.
18 Q. And you disagree with that because she's
19 the president of the school, right?
20 A. Correct.
21 Q. And you think that the president of the
22 school is like the 500-pound parakeet?
23 They can do whatever they want to do,

Page 271

1 regardless?
2     MS. COOLEY: I'm going to object
3     to the form of that question.
4 Q. Is that what you think? The president of a
5 school can just do willy-nilly whatever
6 they want to do, whether it's in the
7 administrative part, the operations part,
8 the academic part?
9 A. From the past and the things that I've seen
10 done with other students, yes.
11 Q. So tell me everything that Dr. Blackwell
12 has done with other students that you've
13 seen in the past that leads you to believe
14 this.
15 A. Well, I've discussed three other students,
16 and I'm sure that she knew what was going
17 on with the other students because they all
18 have to communicate what's going on with
19 somebody and their livelihood as far as
20 degree and --
21 Q. So you're speculating, basically, right?
22 You're speculating that Dr. Blackwell had
23 something to do with Sizemore, with Rambo,

Page 272

1 and with Umoh, right?
2 A. Am I speculating that?
3 Q. Right.
4 A. Yes.
5 Q. Is there anything else you can tell me that
6 leads you to believe -- factual, anything
7 factual you can tell me that leads you to
8 believe that Dr. Blackwell had anything to
9 do or knew anything about the academic
10 aspects of those three people that you've
11 told me about that you say were treated --
12 that got special treatment?
13 A. No.
14 Q. Now, you were telling me about this
15 conspiracy to get you. Is there anything
16 else that relates to it that you have not
17 already told me?
18 A. Not that I can think of at this moment.
19 Q. And tell me again who is involved in the
20 conspiracy, the people that are involved in
21 the conspiracy to get you.
22 A. Dixie Peterson.
23 Q. All right.

Page 273

1   A.  Dean Lowe.
2   Q.  All right.
3   A.  Dean Hodge.
4   Q.  All right.
5   A.  Laurel Blackwell was involved.
6   Q.  All right.
7   A.  Lynn Harris was involved.
8   Q.  You're saying all these people were
9       involved in a conspiracy together to get
10      you; is that right?
11  A.  Right.
12  Q.  Anybody else?
13  A.  No.
14  Q.  I've already asked you about
15      Dr. Blackwell. And with regard to the
16      conspiracy, I guess I have not really said
17      tell me what Dixie Peterson did in the
18      course of this conspiracy to get you, but
19      tell me that.
20  A.  She offered me Nursing 200 in place of 252,
21      and I was told that she told other
22      instructors I did not need to pass because
23      I was weak, insinuating to fail me.

Page 274

1   Q.  Sandy Gunnels told you that?
2   A.  Uh-huh. (Positive response.)
3   Q.  What else?
4   A.  When I was with Ms. Harris in her office
5       the day that I was down there trying to
6       review these tests, they were having their
7       Christmas luncheon, I think. When I was
8       trying to do this, she came over and got
9       Ms. Harris and told me that I would have to
10      come back, that they had things they had to
11      do, they had a meeting, and it was to
12      progress with their luncheon and that she
13      didn't care if I dropped a bomb. She
14      didn't care what I did.
15  Q.  Didn't care if you dropped a bomb?
16  A.  Correct. Those were her words. I don't
17      care if you drop a bomb.
18  Q.  Talking about what Dixie Peterson said?
19  A.  Correct.
20  Q.  What else?
21  A.  She told me to go ask Ms. Harris to let me
22      redo care plans that last semester when, in
23      fact, her and Ms. Harris had already

Page 275

1       discussed that and she knew beforehand that
2       there was no need for me to do that because
3       they had already discussed that nobody was
4       to redo care plans --
5   Q.  All right.
6   A.  -- per Ms. Harris's comment.
7   Q.  What else?
8   A.  That's all I can think of right now.
9   Q.  How about Dean Lowe? What has he done in
10      the course of this conspiracy to get you?
11  A.  Offer the Nursing 200 as well as Dixie
12      Peterson and then told me that the D would
13      not be held against me when, in fact,
14      they're holding the D against me and not
15      letting me proceed with my career path.
16  Q.  All right. Is that it?
17  A.  Uh-huh. (Positive response.) That's all I
18      can think of right now.
19  Q.  How about Dean Hodge? What has Dean Hodge
20      done in the course of this conspiracy to
21      get you?
22  A.  When I explained to him about the Nursing
23      200 class and the 252, he just told me to

Page 276

1       turn in my grade forgiveness appeal paper,
2       and I turned that in and didn't --
3   Q.  Talking about the course forgiveness?
4   A.  Yeah, the course forgiveness. And I didn't
5       receive a response, and then I receive a
6       letter stating that the course numbers
7       didn't match, so I didn't get course
8       forgiveness because the course number that
9       they changed didn't match.
10  Q.  Anything else?
11  A.  Not right now.
12  Q.  And you've already told me everything about
13      Dr. Blackwell, correct?
14  A.  Correct.
15  Q.  What has Lynn Harris done in the course of
16      this conspiracy to get you?
17  A.  In the 252 class?
18  Q.  I don't know. I mean, it's your
19      conspiracy.
20  A.  Well, she did not let me review. She did
21      not give any rationale. She was not
22      available for me. She wasn't available.
23  Q.  Anything else?

Deposition of Lindy Wright

July 13, 2007

Page 277

1   A.  That's all I can think of right now.
2           (Defendant's Exhibit 11 was marked
3           for identification.)
4   Q.  Let me show you what I've marked as
5       Defendant's Exhibit 11. It's a letter from
6       Katie Lackey to you dated April 29, 2005.
7       It says:  Congratulations on your
8       acceptance into the ADN program.  It
9       mentions an orientation meeting Thursday,
10      May 5 at 2:00 p.m. I'm sure that would be
11      2005.  I don't know if you remember getting
12      that or not, but ...
13          That appears to be a letter to you,
14      correct?
15  A.  Correct.
16  Q.  Do you recall receiving it?
17  A.  No.
18  Q.  Any reason to think you did not receive it?
19  A.  No.
20  Q.  Is it to the correct address?  97 Green
21      Dudley Road.
22  A.  No, it should have been 7716.
23  Q.  7716 Green Dudley Road?

Page 278

1   A.  Boulder Drive, Columbus, Georgia.
2   Q.  What is 97 Green Dudley Road?
3   A.  That's where Scott McCraine lived.
4   Q.  Before y'all got married?
5   A.  Correct.
6   Q.  And then y'all moved to Columbus?
7   A.  No. That's where he lived.
8   Q.  That's where he lived after you separated?
9   A.  No. That was before we got married.
10  Q.  Before you got married?
11  A.  Correct.
12  Q.  So where did you live after you got
13      married?
14  A.  7716 Boulder Drive.
15  Q.  In Columbus?
16  A.  Yes. I have always --
17  Q.  You've always lived there?
18  A.  Correct.
19  Q.  Did Scott live there with you after you got
20      married?
21  A.  Where?
22  Q.  On that Boulder place.
23  A.  No.

Page 279

1   Q.  He never did?
2   A.  No.
3   Q.  Did y'all ever live together?
4   A.  Yes.
5   Q.  Where?
6   A.  At 1563 Lee Road 239.  That's where he
7       lives now.
8   Q.  Where is that?
9   A.  Smiths Station.
10  Q.  Smiths Station.  Is Salem close to Smiths
11      Station?
12  A.  It's probably about 15 minutes.
13  Q.  All right.  When you filed your
14      application, you must have used that
15      address is the only thing I can think of.
16      Do you know whether you did?
17  A.  I don't remember.
18  Q.  Did you go to an orientation session on May
19      5 at the school?
20  A.  I'm sure I'd remember if I did.  I don't
21      recall.
22          (Defendant's Exhibit 12 was marked
23          for identification.)

Page 280

1   Q.  Let me show you what I'm marking as
2       Defendant's Exhibit 12, Ms. Wright, to your
3       deposition.  Would you look at them and
4       tell me what they are.
5   A.  Tax returns.
6   Q.  What year or years are they?
7   A.  2004, 2002, 2003, 2005 and 2006.
8   Q.  Are those your tax returns?
9   A.  Yes, sir.
10  Q.  Do they have anyone else's income on them
11      other than your income?
12  A.  Yes.
13  Q.  Which one does?  2006 doesn't.  Five
14      doesn't.  Four, Scott McCraine --
15  A.  Yes.
16  Q.  -- and Lindy Wright, 97 Green Dudley Road,
17      Salem, Alabama.
18          Is 2003 in here?
19  A.  I think so.
20  Q.  You think so?
21  A.  I think so.  Is it back there?
22  Q.  2004 in the very back, which is out of
23      place.  2002 is here.  That is Jason Warren

70 (Pages 277 to 280)

Deposition of Lindy Wright

July 13, 2007

Page 281

1    and Lindy Warren. Were you divorced in
2    2002 from Jason Warren?
3  A. Correct. I think it was 2002.
4  Q. That lists 7716 Boulder Drive, Columbus.
5  A. Correct.
6  Q. Did you say that's your mother's house?
7  A. Uh-huh. (Positive response.)
8  Q. Yes?
9  A. Yes.
10  Q. And did you and Jason Warren live there --
11  A. Yes.
12  Q. -- together?
13     There's 2003, Lindy Warren, 7716
14    Boulder Drive. Okay. You produced these
15    pursuant to our request for production,
16    correct?
17  A. Correct.
18  Q. I'll give you a packet of material that you
19    produced to us today.
20     (Defendant's Exhibit 13 was marked
21     for identification.)
22  Q. If we could, let's go through these names,
23    please.

Page 282

1     Jill Boyette, I think you've told me
2    who she is. She was a member of your
3    clinical group?
4  A. Correct.
5  Q. What is she on this witness list for?
6  A. She is the one that brought the attention
7    to our clinical group about Shannah Lowe
8    receiving special treatment.
9  Q. Okay. Is that the only reason she's on it?
10  A. Correct.
11  Q. Is this her current residence?
12  A. As far as I know.
13  Q. Why is Brenda Bellamy on the list?
14  A. She was supposed to be one of the
15    instructors that Dixie communicated that I
16    was weak to and that I did not need to pass
17    the next semester.
18  Q. Is that the only reason?
19  A. Yes.
20  Q. Why is Wendy Wall on here?
21  A. Because she knows information about Arit
22    Dan Umoh.
23  Q. Did you say she was an instructor?

Page 283

1  A. Clinical instructor.
2  Q. Is that the only reason she's --
3  A. Correct.
4  Q. Why is Artemisa Harmon on it?
5  A. She's the clinical instructor that
6    supposedly failed Shannah Lowe in the
7    clinical setting and gave me back the
8    regraded care plan.
9  Q. Any other reason for her being on it?
10  A. No.
11  Q. Sylvia Shirley, why is she on it?
12  A. She is one of the clinical instructors that
13    I was told that regraded that care plan.
14  Q. Is that the only reason she's on it?
15  A. Yes.
16  Q. Bridgett Jackson.
17  A. Because she was one of our -- she was our
18    lead clinical instructor, and she was the
19    one that I was told that let -- well, took
20    Shannah Lowe down into the lab to rectify
21    her wrong in the clinical setting.
22  Q. Is that the only reason she's on it?
23  A. Yes.

Page 284

1  Q. Sandy Gunnels and records. What does that
2    mean, Sandy Gunnels and records?
3  A. She came in and gave a deposition and said
4    she had several records pertaining to the
5    school and the faculty and Arit.
6  Q. And what?
7  A. Arit Umoh.
8  Q. Records concerning the faculty, the school,
9    and Ms. Umoh?
10  A. Correct.
11  Q. And you don't have a copy of those?
12  A. No, I don't.
13  Q. Your lawyers don't have a copy of those?
14  A. I don't know.
15     MS. COOLEY: (Shakes head from
16     side to side.)
17  Q. Okay. Arit Umoh. The reason she's on
18    there, I guess, is because of the -- what
19    you've already told me, correct?
20  A. Correct.
21  Q. Sherika Derico?
22  A. Derico.
23  Q. Why is she on your list?

Deposition of Lindy Wright

Page 285

1　A.　She was the clinical instructor that I had
2　　　for the Nursing 200.
3　Q.　So what can she add to this?
4　A.　When I -- when myself and Elise Sizemore
5　　　were in that clinical group, she was asking
6　　　us why were we there, why did we have to
7　　　redo clinicals, and we had no explanation.
8　　　All we know was that we were told to do it.
9　Q.　When was this, now?
10　A.　The Nursing 200.
11　Q.　Is that all for her?
12　A.　Yes.
13　Q.　Shannah Lowe, you've already talked to us
14　　　about her doing the child's IV.
15　A.　Yes.
16　Q.　Is that all for her?
17　A.　Uh-huh. (Positive response.)
18　Q.　Yes?
19　A.　Yes.
20　Q.　Lynn Harris, I think we know about her.
21　　　Kim Smith gave a statement that you've
22　　　produced. Have you read her statement?
23　A.　No.

Page 286

1　Q.　Go to the next thing. It's Elise Sizemore
2　　　giving you permission to use records, my
3　　　transcripts and letter for evidence, and
4　　　then her letter is here. Have you read her
5　　　letter to Dean Hodge?
6　A.　No.
7　Q.　Do you know what the letter is about?
8　A.　No.
9　Q.　Do you have the attachments to the letter?
10　A.　Do I have attachments --
11　Q.　On page three, it lists what appear to be
12　　　some attachments, I think, anyway.
13　　　　MR. NIX: Are those attachments?
14　　　　Do y'all know?
15　A.　These look like the syllabus. You have
16　　　copies of those -- or something out of the
17　　　syllabus. I have no idea.
18　Q.　I see. She's listing all the names of the
19　　　people in the clinical group in number
20　　　three, but --
21　　　Then the very last thing is an e-mail
22　　　from Dixie Peterson to Dale Sizemore. Who
23　　　is Dale Sizemore?

Page 287

1　A.　I don't know unless that's Elise's
2　　　husband. I don't know.
3　Q.　Do you know what this e-mail is about?
4　A.　No.
5　Q.　It's a read receipt, apparently, dated
6　　　1-31-06, indicating that -- I believe it
7　　　indicates that Dixie Peterson received and
8　　　opened an e-mail from Dale Sizemore. Do
9　　　you know what that's about?
10　A.　No.
11　Q.　It may be this letter here.
12　　　　MR. DUMBUYA: What is Exhibit
13　　　　Number 13?
14　　　　MR. NIX: It's this packet of
15　　　　documents that y'all produced
16　　　　today.
17　　　　MR. DUMBUYA: Is that a list of
18　　　　witnesses?
19　　　　MR. NIX: It's several things
20　　　　actually, Peter. It's a list
21　　　　of witnesses --
22　　　　MS. COOLEY: We've got it.
23　　　　MR. DUMBUYA: I'm just trying to

Page 288

1　　　find out how you entitled it.
2　　　　MR. NIX: I don't know that I did
3　　　　really.
4　Q.　Did you receive a copy of the catalog and
5　　　handbook at some point in time before you
6　　　started school at CVCC in the RN program?
7　A.　I picked one up.
8　Q.　Before you started school?
9　A.　I'm sure I did.
10　Q.　Do you know what a Comprehensive Predictor
11　　　Exam is?
12　A.　I received it in the mail.
13　Q.　Huh?
14　A.　I received one in the mail. I think it's
15　　　the same thing.
16　Q.　Oh, really? Do I have that?
17　A.　I think that's what it is. I don't know.
18　　　　MR. NIX: Did y'all produce that?
19　　　　MS. COOLEY: I don't have that.
20　　　　THE WITNESS: This was -- I don't
21　　　　think that was asked for in
22　　　　there, but I brought it
23　　　　anyway.

Page 289

1    MR. NIX: I'll tell you what. If
2        we didn't ask for it -- we
3        asked for everything -- I
4        mean, really, it's so broad.
5    MS. COOLEY: We'll go ahead and
6        get --
7    MR. NIX: Thank you.
8  Q.  Where did that come from?
9  A.  (Indicates.)
10 Q.  It's a manila envelope with your name and
11     address and a CVCC return address. It
12     didn't come with a cover letter or note or
13     anything?
14 A.  I don't recall.
15 Q.  The postage mark says May 16, 2006. I'll
16     tell you what.
17         (Defendant's Exhibit 14 was marked
18         for identification.)
19 Q.  I'm going to mark the front of this
20     envelope that that Predictor exam came in
21     14. Defendant's 14 is the envelope, the
22     brown or the manila envelope that you
23     received that Predictor exam in, correct?

Page 290

1  A.  Yes.
2  Q.  You don't know the name of the individual
3      or the person who sent it to you --
4  A.  No.
5  Q.  -- from CVCC?
6      I want to ask you about some
7      correspondence.
8          (Defendant's Exhibit 15 was marked
9          for identification.)
10 Q.  Defendant's Exhibit 15 is a letter from a
11     person named Connie Cooper. Who is Connie
12     Cooper?
13 A.  She's an attorney in Phenix City.
14 Q.  Has she ever represented you?
15 A.  She has.
16 Q.  Does she represent you now?
17 A.  No.
18 Q.  This letter is dated January 10, 2006, from
19     Connie Cooper, Defendant's Exhibit 15, to
20     Dean James Lowe. Apparently, Connie Cooper
21     spoke with him. She writes following up on
22     a conversation. Said that she had been
23     retained to assist you in the pursuit of

Page 291

1      your due process rights regarding a grade
2      appeal of two college courses. Is that why
3      you hired Ms. Cooper?
4  A.  Yes.
5  Q.  It was to assist you in that regard?
6  A.  Yes.
7          (Defendant's Exhibit 16 was marked
8          for identification.)
9  Q.  Defendant's Exhibit 16 is a copy of your
10     letter to Dean Hodge, is that right --
11 A.  Correct.
12 Q.  -- dated May 19, 2006. And you say: Dean
13     Hodge, I would like to take this
14     opportunity to ask for course forgiveness
15     for Nursing 252. After researching the
16     student handbook, I found that it is the
17     student's responsibility to ask for course
18     forgiveness. And you cite some pages, it
19     appears, and some course numbers here.
20         Have we already talked about all of the
21     discussions you had with Dean Hodge about
22     this request for course forgiveness?
23 A.  Yes, sir, I think so.

Page 292

1  Q.  So the last paragraph of this letter,
2      Ms. Wright, says -- to Dean Hodge: I have
3      since finished the last semester of the
4      associate degree of nursing program.
5      Unfortunately, I earned a D in Pediatric
6      Nursing. I am asking for course
7      forgiveness so that I can participate in a
8      summer class to earn the credit to finish
9      this program, correct?
10 A.  Correct.
11 Q.  So that at the time you were rendered
12     disqualified from the program for failing
13     two different nursing courses, your
14     intention was to continue on in school and
15     take this course, Pediatric Nursing; is
16     that right?
17 A.  Correct.
18 Q.  And it would have taken you through an
19     additional semester; is that right?
20 A.  Correct.
21 Q.  But you did not engage in that course in
22     that semester, correct --
23 A.  Correct.

Page 293

1  Q. -- because you were rendered unqualified by
2     the school?
3  A. Correct.
4         (Defendant's Exhibit 17 was marked
5     for identification.)
6  Q. Number 17 is another letter from Connie
7     Cooper. It's dated June 7, 2006. Is that
8     what that is?
9  A. I think so. Two pages, and then a
10    signature on the back page?
11 Q. That's correct. It's to Dr. Blackwell from
12    Connie Cooper.
13       Have you read this letter?
14 A. Yes, sir.
15 Q. Did you ask Connie Cooper to write the
16    letter?
17 A. Yes.
18 Q. Do you agree with the contents of the
19    letter?
20 A. I haven't read it recently. But if I asked
21    her to do it, I'm sure I agree.
22 Q. This letter from Connie Cooper to
23    Dr. Blackwell dated June 7, 2006, which is

Page 294

1     Defendant's Exhibit 17, says in part -- I'm
2     going to start reading from the very bottom
3     right here where it says she, bottom of
4     page one.
5         She has attempted to contact Dean Lowe,
6     Ms. Dixie Peterson, and Sanquita
7     Alexander -- is that the way you say it --
8     Sanquita Alexander in order to be allowed
9     to be placed in Nursing 272.
10        That would have been for the summer
11    semester of 2006?
12 A. Right.
13 Q. She has had no response from this request.
14    She has been informed by both Dean Lowe and
15    Dixie Peterson that due to the fact that
16    she failed Nursing 252, she now has two
17    failures and cannot continue in the
18    program.
19        Do you see that?
20 A. Uh-huh. (Positive response.)
21 Q. Yes?
22 A. Yes.
23 Q. Do you agree that you were told that by

Page 295

1     Dean Lowe and Dixie Peterson?
2  A. Correct.
3  Q. When were you first told that by them?
4  A. That second semester before the grade
5     appeal and that process took place.
6  Q. I'm sorry. The second semester, which
7     would have been fall 2005?
8  A. Right.
9  Q. During the grade appeals of 271 and 252,
10    those courses, right?
11 A. Right.
12 Q. Well, the letter is referring to 272 and
13    252. Further, on page one, it says: That
14    aside, my client was willing to take --
15    retake Nursing 272 which is being offered
16    this summer in order to graduate. She also
17    turned in a request for course
18    forgiveness.
19        She has attempted to contact Dean Lowe
20    and Dixie Peterson and Sanquita Alexander
21    in order to be allowed to be placed in
22    Nursing 272. She has had no response from
23    this request. She has been informed by

Page 296

1     both Dean Lowe and Dixie Peterson that due
2     to the fact that she failed Nursing 252,
3     she now has two failures and cannot
4     continue the program.
5         Is that correct?
6  A. Correct.
7  Q. So apparently, Dean Lowe and Dixie Peterson
8     told you -- they may have told you in the
9     fall, also, but they told you sometime in
10    the spring of 2006 that a failure in 272
11    and 252 disqualified you in the program.
12 A. In the -- when was that again? When did
13    you say?
14 Q. Sometime in the spring of 2006. This
15    letter is dated June 7, 2006.
16 A. This letter was after graduation.
17    Graduation was in May. I went to her after
18    that to try and get something resolved
19    and --
20 Q. When you say her, you mean Connie Cooper?
21 A. Connie Cooper.
22 Q. Okay.
23 A. -- to get something resolved. And you're

Page 297

1  asking me --
2  Q.  All I'm saying -- I had asked you when Dean
3     Lowe and Dixie Peterson told you that two
4     failures would make you ineligible to
5     complete the program, and you said in the
6     fall of 2005.
7        What I'm asking you and what I'm saying
8     is, this letter indicates that Dixie
9     Peterson and Dean Lowe told you that in
10    relation to your failure of Nursing 272 and
11    252 --
12       And the failure of 272 did not occur
13    until the end of the spring semester of
14    2006, correct?
15  A.  Correct.  Also, when 271 was involved
16    before that grade was changed, they were
17    telling me that I had two failures and
18    could not return.  The grade appeal took
19    place.  The 271 was changed to a C, so
20    therefore I was able to move on.
21  Q.  Right.
22  A.  And they offered me Nursing 200 in place of
23    252.

Page 298

1        Well, we move onto the next semester,
2     and they said I don't have enough points in
3     272, but have finished and made an A in
4     200, which if the course number had not
5     been changed, then I should have had no
6     problem with the course forgiveness.
7        Therefore, that would have erased that
8     D from my transcript, replaced it with an
9     A.  My GPA would have stayed the same.  I
10    would have had one D and that summer been
11    able to take whatever course number they
12    wanted to create for me to take and I would
13    have been able to graduate.
14  Q.  But you failed 272 --
15  A.  Correct.
16  Q.  -- which is something that I assume you had
17    not anticipated.
18  A.  No.
19  Q.  And thereafter, apparently, Dean Lowe and
20    Dixie Peterson told you that you had failed
21    two courses, 272 and 252, and were
22    therefore no longer eligible to be in the
23    program.

Page 299

1  A.  Correct.
2  Q.  This letter also says on page two -- and
3     I'm referring now to Defendant's Exhibit
4     17, the June 7, 2006, letter of Connie
5     Cooper.  It says:  My client has personal
6     knowledge of another student who had two
7     failures in the nursing program and was
8     allowed to graduate.  Who is that?
9  A.  That would have been Arit Umoh.
10  Q.  And she was -- correct me if I'm wrong,
11    now.  She was not in any of your classes,
12    correct?
13  A.  She was in that clinical.
14  Q.  Check-off?
15  A.  Check-off.
16  Q.  But that's just like a one-day thing,
17    right?
18  A.  Correct.
19  Q.  It's like -- You've already said, I think,
20    she was not in that clinical group,
21    correct?
22  A.  She was not in any of my clinical groups.
23    She was in that clinical check-off.

Page 300

1  Q.  That one day.
2  A.  Correct.
3  Q.  And she was not in any class that you took.
4  A.  Correct.
5  Q.  I assume therefore that any knowledge you
6     have about Ms. Umoh and the allegation of
7     two failures in the nursing program came
8     from someone else other than yourself.  You
9     do not know that based upon looking at
10    documents or records at the school, right?
11  A.  Correct.
12  Q.  So who did you hear that from?
13  A.  Sandy Gunnels and Wendy Wall.
14  Q.  This letter also says, Ms. Wright, this
15    Defendant's Exhibit 17, the June 7, 2006,
16    letter of Connie Cooper -- let me read it.
17    It says:  Most importantly, my client was
18    accused of cheating, and this information
19    was relayed to other students in the
20    program.  It appears there was constant
21    turmoil in the program.
22       When were you accused of cheating?
23  A.  I think that was the last semester.

Deposition of Lindy Wright

July 13, 2007

Page 301

1  Q.  The spring of 2006?
2  A.  Yes.  Pediatrics.
3  Q.  Who made the accusation?
4  A.  Lynn Harris, Dixie Peterson, and Dean Lowe.
5  Q.  In what part of the year, what part of the
6      semester did they say that you'd cheated?
7  A.  I don't know what part of the semester.  It
8      wasn't the beginning of the semester.  It
9      wasn't the end.  Maybe middle, middle of
10     the semester.  I don't know what the exact
11     date was.
12 Q.  How did they say you had cheated?
13 A.  They said that it was brought to their
14     attention that myself and another student
15     had documentation that other students were
16     not privy to.
17 Q.  What documentation was that?
18 A.  They didn't say what documentation.
19 Q.  Do you know what documentation?
20 A.  No.
21 Q.  Who was the other student?
22 A.  April Gunnels.
23 Q.  Whatever became of the cheating accusation

Page 302

1      allegation?
2  A.  Lynn Harris made the whole class take a
3      test over.
4  Q.  Do you know what test that was?
5  A.  If I'm not mistaken, it had something to do
6      with the pediatric GI, gastrointestinal
7      tract.
8  Q.  This would have been in the spring -- we've
9      already talked about that.
10 A.  (Witness nods head up and down.)
11 Q.  And you don't know what material they said
12     you had, you and April Gunnels had the
13     other students did not have?
14 A.  They said documentation.  They didn't
15     specify.
16 Q.  Documentation related to a test?
17 A.  They didn't say related to a test.  They
18     just said documentation.
19 Q.  All right.  You say Lynn Harris gave the
20     whole class the test over?
21 A.  Correct.
22 Q.  Did you ever hear anything further about
23     that allegation of cheating after Dean Lowe

Page 303

1      and Dixie Peterson --
2      And who else did you say?
3  A.  Lynn Harris.
4  Q.  -- confronted you about it?
5  A.  Correct.
6  Q.  I mean, did you ever hear any more after
7      the first time they confronted you about
8      it?
9  A.  No, not specifically.  But when I was in
10     the meeting with Dixie Peterson and Dean
11     Lowe in his office talking about not being
12     able to go on the summer semester and
13     failing the pediatrics or -- I think that's
14     what it was, she -- I said, and then you've
15     accused me of cheating.  And I said, you
16     know, I don't do that.
17     And she said, your grade did not
18     reflect cheating, did it?  I said, no, it
19     did not.  I made probably a C on that test,
20     I think.  And then when she retested, I may
21     have gotten a point higher than what I
22     originally made.
23 Q.  Okay.

Page 304

1      (Defendant's Exhibit 18 was marked
2      for identification.)
3  Q.  Let me mark this real quick and show you
4      this.  Defendant's Exhibit 18, what is
5      that, please, ma'am?
6  A.  It says NLN Diagnostic Readiness Test
7      Performance Profile.
8  Q.  When was that taken?  Do you know?
9  A.  The last semester.
10 Q.  April '06 -- I'm sorry.  What am I saying?
11     Spring '06?
12 A.  Yes, sir.
13 Q.  You apparently received it not too long
14     after it was taken because the postmark is
15     May 16, 2006.  Would that be correct?
16 A.  Correct.
17 Q.  Did you read it?
18 A.  I looked over it.  I didn't flip through
19     it.
20 Q.  It says probability of success on NCLEX.
21     Your performance on this test was close to
22     the minimum needed to pass NCLEX.  What's
23     NCLEX?

Page 305

1   A.  That's the test you take for your boards.
2   Q.  Without serious preparation, the
3       probability that you will pass NCLEX is
4       marginal.  Use this individualized report
5       to target your specific needs.  Your score
6       was higher than 26 percent of all examinees
7       in the norming sample when they took NCLEX.
8       Your score was higher than 22 percent of
9       the examinees in the norming sample who
10      passed NCLEX.
11          What does that mean to you?  You've got
12      it there.
13  A.  What does it mean to me?  It means that I
14      would probably need to prepare before I sat
15      down and took my boards a little bit more.
16  Q.  What does marginal mean?
17  A.  Possibility that I would not pass.
18  Q.  Okay.  Is this something that's done by the
19      school for every class that is close to
20      graduating, taking their boards?
21  A.  I'm not sure if it's every class.  I know
22      it was for mine.
23  Q.  Everybody in the class took this, correct?

Page 306

1   A.  Correct.
2           (Defendant's Exhibit 19 was marked
3           for identification. )
4   Q.  Let me show you Defendant's 19.  It's the
5       June 13, 2006, letter from Dr. Blackwell to
6       Connie Cooper in response to Connie
7       Cooper's June 7 letter.  Do you have that?
8   A.  Yes, sir.  I have a copy.
9   Q.  You have it in your materials, don't you,
10      that you brought?
11  A.  Uh-huh. (Positive response.)
12  Q.  I assume that when Ms. Cooper received
13      this, she gave you a copy of this letter,
14      correct?
15  A.  Correct.
16  Q.  Did you take issue with any part of this
17      letter?
18  A.  That's when I contacted Jennifer Cooley.  I
19      was referred to her by Ms. Cooper and
20      another attorney.  I can't remember his
21      name.  Ms. Cooper had him look over some
22      things.
23  Q.  The following -- this is part of the letter

Page 307

1       from Dr. Blackwell.  It says that policy
2       number 11, students enrolled in the Nursing
3       Mobility Program must earn a C or higher in
4       all required courses in the nursing
5       curriculum in both nursing and non-nursing
6       courses.  This includes satisfactory
7       completion of the clinical components of
8       each course.  Failure of clinical
9       components results in failure of the
10      course.
11          Do you agree that that's accurately
12      stated as the policy of the school?
13  A.  Correct.
14  Q.  And that you failed NUR 252 in the fall of
15      2005, correct?
16  A.  Correct.
17  Q.  And you failed NUR 272 in the spring 2006,
18      correct?
19  A.  Correct.
20  Q.  Then Dr. Blackwell quotes policy number
21      13.  Nursing courses NUR 252, 271, 272, it
22      goes on with other numbers, may be repeated
23      only once and are to be taken the next

Page 308

1       semester a course is offered provided space
2       is available.  If the student does not pass
3       the nursing course on the second attempt,
4       that student shall be excluded from the
5       nursing program, but not the college.
6       Students who repeat those courses will be
7       encouraged to successfully complete review
8       packets for each course before retaking.
9           Do you agree that that's the policy?
10  A.  Correct.
11  Q.  And then she says:  NUR 252 would not be
12      offered again because of the implementation
13      of the standardized statewide curriculum,
14      so a substitute had to be offered in order
15      for Ms. Wright to be able to repeat the
16      course.  As a result, NUR 200 was
17      substituted for the course NUR 252 which
18      would no longer be offered, correct?
19  A.  Correct.
20  Q.  However, NUR 200 did not take away the
21      failing grade of NUR 252.  It merely
22      allowed an opportunity for Ms. Wright to
23      repeat a failed course, right?

Page 309

1   A.  Correct.
2   Q.  Isn't that what you understood to be the
3       case the whole time, is that when you're
4       given an opportunity to repeat a failed
5       course, if they had had 252, you could have
6       taken that, but the opportunity to take 200
7       is like the repeating of a failed course,
8       but it does not take away the failing grade
9       that you made initially?
10  A.  Because the course numbers don't match --
11      no, I didn't understand it that way.
12  Q.  Even if the course numbers had matched,
13      isn't it correct that the policy would not
14      allow for the failing grade in the original
15      taking of NUR 252 to be taken away?
16  A.  No, not according to course forgiveness.
17  Q.  Okay.
18  A.  It states that that letter grade would be
19      taken away, replaced by the new letter
20      grade, but your GPA would stay the same.
21  Q.  Policy 14:  The nursing student must
22      complete the entire nursing program within
23      24 months of the date he or she begins his

Page 310

1       or her studies in the program or be
2       excluded from the nursing program.  If a
3       nursing student fails two different nursing
4       courses within the 24-month period, he or
5       she will be excluded from the program and,
6       all caps, cannot reapply.
7           Do you agree that that's the policy?
8   A.  Yes.
9   Q.  You failed three courses actually, but you
10      were given a break on 271 because of a
11      problem with Tawyna Cash's not responding
12      to your grade appeal.  But the failing of
13      272 and 252 fit within that policy number
14      14, don't they, to make you non-eligible
15      for attendance in the nursing program?
16  A.  Are you asking me for yes or no?
17  Q.  Yes.
18  A.  Yes.
19  Q.  Look at the attachments to -- do you have
20      those?
21  A.  I think that's it, but I'm not sure.
22  Q.  It looks like that right there.  It says
23      Mobility Program (ADN) Admissions Criteria.

Page 311

1   A.  I don't have it.
2   Q.  Page 105, 106, and 107.  That's not
3       attached to your copy of it, I assume.
4           (Defendant's Exhibit 20 was marked
5           for identification.)
6   Q.  20 is Jennifer's letter dated July 28,
7       2006, to Dr. Blackwell.  Have you seen this
8       letter?
9   A.  Yes.
10  Q.  And this letter included attachments, all
11      of which are here.  One of the attachments
12      is the grade appeal for 252.  Tell me if
13      that's right or wrong.
14  A.  Yes.
15  Q.  Do you have that there?
16  A.  No, I don't have that with me.
17  Q.  Let me ask you this.  It looks to me like
18      this is a misprint or a misfiled --
19      mis-Xerox of what's on the next page, this.
20  A.  That is a copy of --
21  Q.  Two pages?
22  A.  I've got that.
23  Q.  Would you take a look at this.  That's one

Page 312

1       of the documents behind the July 28 letter
2       of Jennifer Cooley.  It's attached to the
3       grade appeal, 252.
4   A.  Yes, sir.
5   Q.  Is that a document that you prepared?
6   A.  Yes.
7   Q.  Is that sort of like your version of the
8       events of what occurred with regard to that
9       course?
10  A.  Yes.
11  Q.  Let's do this.  This is going to be 20.
12      I'm going to do the same thing I did on the
13      other one.  20-A page one, B page two, C is
14      page three.
15          That's the grade appeal form that you
16      completed.  You did complete that form, did
17      you not, 20-C?
18  A.  Yes.
19  Q.  20-D is what appears to me to be that kind
20      of messed up copy, and then 20-E is page
21      one of your version of the events relative
22      to 252, correct?
23  A.  Correct.

Page 313

1   Q.   20-F is the second page of it where you
2        signed; is that right?
3   A.   Right.
4   Q.   You quote a section -- or you refer to CVCC
5        Policy 6.7.2. What were you referring to?
6   A.   That had to be something out of the course
7        catalog. I don't have the course catalog
8        in hand, so I'd have to ...
9   Q.   It says that I was advised to continue with
10       the appeal process. That's Sandy Gunnels
11       advising you, right?
12  A.   Correct.
13  Q.   Page 20-E says that an instructor was not
14       assigned until week five of the semester.
15  A.   Of that second -- yes, that semester,
16       correct.
17  Q.   Did you know that Sandy Gunnels just walked
18       out, just left without a word or without
19       any prior warning?
20  A.   No.
21  Q.   It's reasonable, isn't it, that it takes
22       some time to fill a spot like that, for a
23       school to fill a space like that for a

Page 314

1        professor?
2   A.   Are you asking --
3   Q.   Yeah. Sure. I mean, it's reasonable,
4        isn't it, that it takes some time to get a
5        professor of worth to fill a spot like the
6        teaching of a nursing course, a
7        professional course?
8   A.   I don't know how long it would take them
9        to --
10  Q.   You know it has to take some time, right?
11  A.   I guess. I mean, I don't know.
12  Q.   But they did -- it says here that a guest
13       speaker was utilized until that time.
14       Guest speaker on respiratory system
15       specifically instructed the class that
16       compensatory mechanisms on ABG's would not
17       be included on the exam. Then it says:
18       Two questions directly related to
19       compensation were on the exam. Other exams
20       were not given on the dates scheduled and
21       for which students prepared. Right?
22  A.   Right.
23  Q.   Every student in the class had to deal with

Page 315

1        this if it's correct; isn't that true?
2   A.   Correct.
3   Q.   Every student in the class had to deal with
4        the same situation about when the grades
5        were posted by Ms. Harris on course number
6        252, correct?
7   A.   Correct.
8   Q.   The next attachment -- let's see. G is the
9        January 10, 2006, letter of Connie Cooper
10       that we've talked about.
11           And then H is the first page of an
12       unofficial transcript, and I is the second
13       page of an unofficial transcript. Do you
14       know how this was obtained, 20-H and I?
15  A.   This was from me -- off of my computer,
16       going to their Web site and printing it
17       off.
18  Q.   This is your entire transcript, isn't it,
19       from your whole attendance at all
20       Chattahoochee Valley Community College
21       courses, correct?
22  A.   Correct.
23  Q.   This shows your Nursing 252 grade on 20-I.

Page 316

1        Page 20-I is a D; isn't that right?
2   A.   Yes.
3   Q.   And it shows your 271 grade which Tawyna
4        Cash taught is a C, correct?
5   A.   Correct.
6   Q.   That C was put there because Ms. Cash was
7        really an employee at another school where
8        she taught nursing and did not respond to
9        your grade appeal, correct?
10  A.   That's what I was told.
11  Q.   J is the Hodge letter that you wrote to
12       Dr. Hodge. K is the June 7 Connie Cooper
13       letter. L is the June 13, 2006, letter
14       from Dr. Blackwell that we've discussed. M
15       is the June 13 letter from Dr. Blackwell we
16       discussed, and that is where I think that
17       packet ends.
18           Of course, the letter from Jennifer is
19       on top of June 28. Now, was there a
20       response to this letter of June 28 -- of
21       July 28, 2006, Exhibit 20?
22  A.   I don't know.
23           MS. COOLEY: I don't either. We

Deposition of Lindy Wright                                                    July 13, 2007

Page 317

1    don't know if there was a
2    response. We think there
3    was. We're going to look for
4    it.
5    MR. NIX: All right.
6    MS. COOLEY: You can read that.
7        Ms. Miller I believe is her
8        name.
9    MR. NIX: Tracy Miller?
10   MS. COOLEY: Uh-huh. (Positive
11       response.) Then it becomes
12       y'all.
13       For some reason, I
14       thought there was a response
15       from Dr. Blackwell.
16   MR. NIX: Let me mark that.
17   MS. COOLEY: You can have it
18       because I don't believe that
19       attorney is involved in this
20       anymore.
21       (Defendant's Exhibit 21 was marked
22       for identification.)
23   Q.  Defendant's Exhibit 21 is a letter from

Page 318

1    Tracy Miller at Maynard Cooper to Jennifer
2    that Jennifer just gave me. It just says
3    we've been employed to investigate your
4    complaint.
5    MR. NIX: I don't know what that
6        is.
7    MS. COOLEY: That goes with that.
8        That's the fax and fax
9        confirmation where she signed
10       a release for records.
11       (Defendant's Exhibit 22 was marked
12       for identification.)
13   MS. COOLEY: Chip, for the sake of
14       time, I'm assuming we're going
15       to get copies of these. That
16       way we don't have to continue
17       to make copies of little
18       things.
19   MR. NIX: That's a good idea.
20   Q.  Defendant's Exhibit 22 is a fax cover sheet
21       from Chattahoochee Valley Community College
22       to Jennifer Cooley. It says: Ms. Wright
23       has verbally consented for the release of

Page 319

1    her information; however, we will need the
2    following form completed to be placed in
3    her file. Attached is an authorization
4    that you appear to have signed, correct?
5    A.  Correct.
6    MR. NIX: Take a look at that,
7        Jennifer.
8    MS. COOLEY: (Nods head up and
9        down.)
10   MR. NIX: It looks familiar?
11   MS. COOLEY: Yes.
12   MR. NIX: I'm glad somebody else
13       has things in other parts of
14       their file besides me.
15   MS. COOLEY: Yes.
16   MR. NIX: I was going to show it
17       to her real quick.
18   MS. COOLEY: That's from
19       Ms. Miller.
20   MR. NIX: That will be Defendant's
21       23.
22       (Defendant's Exhibit 23 was marked
23       for identification.)

Page 320

1    Q.  Have you seen that correspondence?
2    A.  No.
3    Q.  Who is it signed by? The signature blank
4        states the name of the person who wrote it.
5    A.  Tracy Miller.
6    Q.  What is the date on the letter?
7    A.  January 11, 2007.
8    Q.  Have you seen the substance of this letter,
9        whether it was in a form sent by
10       Dr. Blackwell or in a form sent by Tracy
11       Miller?
12   A.  No, I don't recall.
13   MR. NIX: But you did get this,
14       Jennifer; isn't that right?
15   MS. COOLEY: It looks very
16       familiar and I do remember
17       having a discussion with Tracy
18       Miller about mediation, and I
19       believe that Peter was there.
20       But it was very brief and
21       we had a difficult time
22       getting in touch with
23       Ms. Miller. I do remember

Deposition of Lindy Wright

---

Page 321

1    that, but she was, I believe,
2    on the case a very short time.
3    MR. NIX: Okay. I'm going to mark
4        it then as Defendant's Exhibit
5        23 as the substance of the
6        correspondence sent out.
7    Q. Ms. Wright, with regard to the
8        correspondence that I've shown you that is
9        marked beginning with Defendant's Exhibit
10       15, it's correct, isn't it, that you have
11       seen, read, and you even wrote some of this
12       correspondence; isn't that right? Do you
13       want to take a look at all of it?
14   A. That's correct.
15   Q. It's fair to say, isn't it, that
16       Chattahoochee Valley Community College has
17       been responsive to the correspondence, the
18       requests that have been made regarding this
19       complaint by you?
20   A. Repeat that.
21   Q. Isn't it fair to say that Chattahoochee
22       Valley Community College has been
23       responsive to these requests that you've

---

Page 322

1    made and complaints that you've made prior
2    to the filing of this lawsuit?
3    A. That they did?
4    Q. Yeah, that they have been responsive.
5    A. Oh, yes.
6    Q. Okay. I want to go back to Ms. Gunnels.
7        Okay? The books that you had that showed
8        answers to some of these questions that
9        Lynn Harris posed on exams and maybe the
10       final exam, isn't it correct that
11       Ms. Gunnels helped you find those books?
12   A. The books that had what, now?
13   Q. What you claim are the correct answers to
14       the tests that Lynn Harris gave you.
15   A. It's nursing books that we used in class
16       and that her institution has for those
17       students.
18   Q. When you say her institution ...
19   A. Sandy Gunnels.
20   Q. So when you spoke with Sandy Gunnels about
21       the various problems you were having, like
22       the failure of these two courses in the
23       fall of 2005 and the failure of the course

---

Page 323

1    272 in the spring of 2006, she helped you
2    by advising you right away to file an
3    appeal, correct?
4    A. Correct.
5    Q. And she helped you by pulling nursing
6        treatises and pointing out various
7        arguments you could make with regard to why
8        your answers were right or could be
9        interpreted as being correct, correct?
10   A. Correct.
11   Q. She helped you by calling -- I'm trying to
12       remember the name of the person -- I think
13       it was Debbie Gruber and talking to
14       Ms. Gruber about an aspect of the clinical
15       program. I'm trying to remember exactly
16       what that was. Do you recall?
17   A. It was the care plans that --
18   Q. Right, that were lost.
19   A. That were lost.
20   Q. That's right. So that Sandy Gunnels
21       actually called -- got in touch with
22       Ms. Gruber to talk with her about that,
23       correct?

---

Page 324

1    A. Correct.
2    Q. So what else did Ms. Gunnels do for you?
3        What other steps did she take?
4    A. That's all.
5    Q. That's it?
6    A. That's all. I mean, she advised me on how
7        to do the grade appeal. She tutored me
8        when I asked her for help. That's it.
9    Q. Are you related to Sandy Gunnels?
10   A. No.
11   Q. Are any of your relatives good friends with
12       her?
13   A. No.
14   Q. Did you first meet her around May or June
15       of 2005 when you started the nursing
16       program at CVCC?
17   A. No. I first met her in LPN school at CVCC.
18   Q. Was she an instructor at that time in the
19       LPN school?
20   A. Yes.
21   Q. So how long had you known her when you
22       started the RN program at CVCC?
23   A. Since the start date of the LPN program at

---



Page 325

1    CVCC. I think that was in 2001 maybe.
2    Q. And had you been as good friends with her
3       since that time as you were in the fall of
4       2005, apparently, and 2006 -- spring of
5       2006?
6    A. Was I as good friends with her in LPN
7       school?
8    Q. Right.
9    A. Is that what you're asking?
10   Q. From 2001 on.
11   A. No. Our relationship has grown over the
12      years.
13   Q. When did your relationship begin to
14      blossom, get better, get stronger, become
15      closer?
16   A. I don't know any specific dates.
17   Q. Did it get better after Ms. Gunnels left
18      the school?
19   A. No.
20   Q. So it was real good, apparently, before she
21      left the school.
22   A. It's been good throughout.
23   Q. Isn't it correct that Sandy Gunnels left

Page 326

1       CVCC of her own accord?
2    A. I don't know.
3    Q. She's never told you that she was fired,
4       has she?
5    A. No.
6             MR. NIX: Can we take a quick
7                break and discuss what's
8                cooking real quick? I'm
9                getting close to being
10               finished.
11            (Brief recess was taken.)
12   Q. What's your mother's maiden name?
13   A. Walker.
14   Q. Walker?
15   A. Uh-huh. (Positive response.)
16   Q. Is one of your grandmothers a Webster?
17   A. That's my husband's grandmother.
18   Q. Okay. Mary Webster?
19   A. Mary Webster.
20            MR. NIX: That's all I've got.
21               Thank you.
22               I offer those exhibits.
23            (The Deposition of Lindy Wright was

Page 327

1          concluded at 5:40 p.m. EDT.)
2
3          * * * * * * * * * * * * *
4          FURTHER DEPONENT SAITH NOT
5          * * * * * * * * * * * * *
6
7          REPORTER'S CERTIFICATE
8    STATE OF ALABAMA:
9    MONTGOMERY COUNTY:
10         I, Lisa J. Nix, Registered Professional
11   Reporter and Commissioner for the State of Alabama
12   at Large, do hereby certify that I reported the
13   deposition of:
14             LINDY WRIGHT
15   who was first duly sworn by me to speak the truth,
16   the whole truth and nothing but the truth, in the
17   matter of:
18             LINDY G. WRIGHT,
19             Plaintiff,
20             Vs.
21   CHATTAHOOCHEE VALLEY COMMUNITY
22   COLLEGE (CVCC),
23             Et al.,

Page 328

1          Defendants.
2          In The U.S. District Court
3          For the Middle District of Alabama
4          Eastern Division
5          Case Number 3:06-CV-1087-WKW
6    on Friday, July 13, 2007.
7          The foregoing 327 computer printed pages
8    contain a true and correct transcript of the
9    examination of said witness by counsel for the
10   parties set out herein. The reading and signing of
11   same is hereby waived.
12         I further certify that I am neither of kin
13   nor of counsel to the parties to said cause nor in
14   any manner interested in the results thereof.
15         This 22nd day of July 2007.
16
17
18         _____
19         Lisa J. Nix, Registered
           Professional Reporter and
           Commissioner for the State
20         of Alabama at Large
21
22
23

PLAINTIFF'S
EXHIBIT

tabbies

2

# DEPOSITION OF DIXIE PETERSON

## August 16, 2007

## Pages 1 through 153

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**



Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

LINDY G. WRIGHT,
    Plaintiff,

Vs.                    CIVIL ACTION NO.
                    3:06-CV-1087-WKW

CHATTAHOOCHEE VALLEY
COMMUNITY COLLEGE (CVCC),
et al.,
    Defendants.

* * * * * * * * * * * *

DEPOSITION OF DIXIE PETERSON, taken pursuant to stipulation and agreement before Lisa J. Green, Registered Professional Reporter and Commissioner for the State of Alabama at Large, in the Law Offices of Smith & Smith, P.C., 1503 Broad Street, Phenix City, Alabama on Thursday, August 16, 2007, commencing at approximately 9:25 a.m.

* * * * * * * * * * * *

Page 2

APPEARANCES

FOR THE PLAINTIFF:
Ms. Jennifer B. Cooley
PARKER & COOLEY
Attorneys at Law
1507 Broad Street
Phenix City, AL 36867

FOR THE DEFENDANT:
Mr. H. E. Nix, Jr.
Ms. Brandy F. Price
NIX, HOLTSFORD, GILLILAND,
  HIGGINS & HITSON
Attorneys at Law
Suite 300
4001 Carmichael Road
Montgomery, AL 36106

ALSO PRESENT:
Dr. Laurel Blackwell

Page 3

EXAMINATION INDEX

DIXIE PETERSON
  BY MS. COOLEY . . . . . . . . . . 5
  BY MR. NIX . . . . . . . . . . 131

EXHIBIT INDEX

                                        MAR
DEFENDANT'S EXHIBIT
44  12/20/05 Status Letter Regarding        131
    Progression in the ADN Program
45  Section C of Grade Appeal for NUR 252   131
46  Section C of the Grade Appeal for NUR   131
    271

47  1/17/06 e-mail to Heather Chalkley from  131
    Dixie Peterson re: Lindy Wright
48  1/18/06 Grade Change Form                131
49  Authorization for Course Substitution    131

Page 4

STIPULATION

It is hereby stipulated and agreed by and between counsel representing the parties that the deposition of DIXIE PETERSON is taken pursuant to the Federal Rules of Civil Procedure and that said deposition may be taken before Lisa J. Green, Registered Professional Reporter and Commissioner for the State of Alabama at Large, without the formality of a commission, that objections to questions other than objections as to the form of the question need not be made at this time but may be reserved for a ruling at such time as the said deposition may be offered in evidence or used for any other purpose by either party provided for by the Statute.

It is further stipulated and agreed by and between counsel representing the parties in this case that the filing of said deposition is hereby waived and may be introduced at the trial of this case or used in any other manner by either party hereto provided for by the Statute regardless of the waiving of the filing of the same.

It is further stipulated and agreed by and

Deposition of Dixie Peterson                                                    August 16, 2007

Page 5

1  between the parties hereto and the witness that the
2  signature of the witness to this deposition is
3  hereby not waived.
4
5          * * * * * * * * * * * *
6
7              DIXIE PETERSON
8      The witness, after having first been duly
9  sworn to speak the truth, the whole truth and
10 nothing but the truth testified as follows:
11             EXAMINATION
12 BY MS. COOLEY:
13   Q.  Would you please state your name.
14   A.  Yes.  My name is Dixie Peterson.
15   Q.  And is that your full name, Ms. Peterson?
16   A.  Do you want middle and --
17   Q.  Yes, ma'am, please.
18   A.  Dixie Lee Webster Peterson.
19   Q.  And, Ms. Peterson, where is an address or a
20     contact address for you?
21   A.  My physical address is 88 Lee Road 581 in
22     Smiths, Alabama.
23   Q.  And what is your mailing address?

Page 6

1   A.  Mailing address is P.O. Box 3247.  It's
2     Phenix City, and of course it has a
3     different Zip Code.  36868.
4   Q.  What is a contact phone number for you?
5   A.  Probably my cell phone, and that would be
6     706-577-0003.
7   Q.  And a work address for you?
8   A.  2602 College Drive, of course Phenix City,
9     36869.
10  Q.  And a work phone number for you?
11  A.  334-214-4817.
12  Q.  And is your current employer CVCC?
13  A.  It is.
14  Q.  How long have you been employed at CVCC?
15  A.  I've been employed at Chattahoochee Valley
16    for 23 years.
17  Q.  In what capacity are you currently
18    employed?
19  A.  I'm currently employed the same that I have
20    been since 1984, and that's as nursing
21    faculty.
22  Q.  Are you the director or coordinator of
23    nursing faculty?

Page 7

1   A.  No.  That assignment has changed, but my
2     status has not changed.
3   Q.  Okay.
4   A.  It was called division chair, and that was
5     an assignment.  It was not a position, and
6     so that -- my assignment has changed from
7     that to something else, but my status has
8     not changed, and that's nurse faculty.  I
9     was hired as a nurse faculty member, and
10    that's what I am.
11  Q.  So nursing faculty since 1984.  You were
12    previously assigned the position or an
13    assignment of division chair; is that
14    correct?
15  A.  Correct.
16  Q.  How long were you with the assignment of
17    division chair?
18  A.  20 years.
19  Q.  And when did that assignment end and your
20    new assignment begin?
21  A.  August the 3rd, 2007, of course.  Actually,
22    it was probably the 6th, August the 6th,
23    2007.

Page 8

1   Q.  So do you have a new assignment?
2   A.  I do.
3   Q.  And what is your new assignment?
4   A.  My new assignment is to work with Title 3
5     grant funding and develop new health
6     science programs for the college.
7   Q.  When you were with the assignment of
8     division chair, what were some of the
9     responsibilities or roles that you
10    undertook with that assignment?
11  A.  They're pretty vast in nature.  There's
12    actually a -- I'm not sure if it's called a
13    job description.  It's more of a list of
14    duties that all division chairs of the
15    academic departments get, and they're
16    pretty much the same, things like assist in
17    scheduling classes; assist in hiring
18    faculty because, of course, at faculty
19    level, we don't have the authority to hire
20    or fire, only the president can do that; to
21    coordinate textbooks along with faculty who
22    are teaching those courses.
23        For nursing division chair, there were

2 (Pages 5 to 8)

Page 9

1  additional duties because nursing has
2  external controls, specifically the Alabama
3  Board of Nursing and the National League
4  for Nursing. So while the math and science
5  department may not have -- well, they
6  don't. They don't have an accrediting body
7  that oversees their program.
8      So while there are common duties for
9  all chairpersons, there are some additional
10  ones for the person serving as nursing
11  chair.
12  Q. One of them you mentioned — I want to make
13  sure I have a clear understanding. That
14  would be some type of either a liaison
15  status or communication status with the
16  Alabama Board of Nursing for accreditation
17  purposes; is that correct?
18  A. No, that's not correct. The Alabama Board
19  of Nursing is the immediate control of our
20  program. They oversee our progress.
21      And the National League for Nursing
22  Accrediting Commission is the accrediting
23  body that puts an extra stamp of approval

Page 10

1  on the program.
2  Q. So in the capacity when you were the
3  division chair, did you interact on a
4  regular basis with the Alabama Board of
5  Nursing?
6  A. Absolutely.
7  Q. And did you do so for things such as --
8      I'm just making some assumptions here.
9  A. Okay.
10  Q. -- for things such as board pass rates for
11  the students?
12  A. It's not necessarily a personal interaction
13  with them unless they need to come and see
14  your program.
15  Q. Okay.
16  A. But, yes, I did have a very good working
17  relationship with them, but it was not like
18  we called each other every week.
19      But, yes, they would be the body or the
20  entity that would come if there was a
21  problem.
22  Q. Did they, in fact, ever come to visit CVCC
23  during the time that you were in the

Page 11

1  position as the division chair?
2  A. Only on an informal basis once.
3      They have a series of actions that they
4  take, and those are published on the
5  Alabama Board of Nursing Web site based
6  upon if your program has had any difficulty
7  and the length of time and how your program
8  has responded.
9      So there's not an automatic anything --
10  disciplinary action I suppose is what I'm
11  trying to allude to that occurs because you
12  didn't do well one time. So, no, there's
13  not ever been a formal visit.
14  Q. But you do recall them coming? You said
15  one time there was a visit?
16  A. There was a person that I invited to come
17  and speak with us.
18  Q. So that was at your invitation?
19  A. It was at my invitation. Her name was
20  Barbara Johns. She was education
21  consultant for the Board of Nursing.
22  Q. Did Ms. Johns come and speak to the
23  students or to the faculty?

Page 12

1  A. She came to speak to me, and I believe
2  Dr. Blackwell and Dean Lowe came in. We
3  were in one of the faculty offices.
4  Q. Do you recall -- and if you don't recall
5  the exact date, that's fine. Do you recall
6  about the time that that interaction
7  occurred between Dr. Blackwell, Dean Lowe,
8  yourself and Barbara Johns?
9  A. I do not.
10  Q. Do you recall about the year that that
11  would have occurred?
12  A. It would probably be in the fall of 2005
13  when we had faculty members resign, but I
14  cannot state for sure. Of course, I
15  notified her as a courtesy and then, of
16  course, enlisted her assistance.
17  Q. And she came at your invitation; is that
18  correct?
19  A. She did.
20  Q. Was there ever a time aside from that that
21  you're aware that the Alabama Board of
22  Nursing came to visit the campus or to
23  speak with any of the individuals that you

Deposition of Dixie Peterson

August 16, 2007

Page 13

1    just mentioned -- Dr. Blackwell, Dean Lowe,
2    yourself -- regarding the nursing program?
3    A.   Years ago, there used to be a rule where
4    the board visited all programs every four
5    or five years, so it was a consistent thing
6    to all programs.  And we -- Each program
7    would prepare a self-study for the board
8    members to review.  And in that capacity,
9    they have been there, as they did with all
10   programs.
11          But I don't recall exactly how many
12   years ago, but years ago, that changed and
13   they don't do that anymore.  They only
14   visit programs officially if there are
15   problems.
16   Q.   So previously, it was an automatic thing
17   that they came on a regular basis --
18   A.   Yes.
19   Q.   -- every four to five years?
20   A.   Yes.
21   Q.   And since -- at some point it stopped, and
22   now they come only if there's been a
23   problem?

Page 14

1    A.   Exactly.
2    Q.   You've been with the college for
3    approximately 23 years.  20 years you were
4    assigned division chair.  The other three
5    years, what was your assignment?
6    A.   Nursing faculty member.  I basically
7    started teaching the day I was hired.
8    Q.   How long were you actually in the classroom
9    as well as being the division chair?
10   A.   I have pretty much been in the classroom
11   since the time that I was hired, maybe not
12   on a full-time basis.  It's varied back and
13   forth from full-time, of course, for those
14   first three years to maybe half time to
15   maybe quarter time -- when I say quarter,
16   of course, 25 percent -- or maybe a
17   particular semester none at all, depending
18   on what was going on in the department.
19          But I have always been in the classroom
20   pretty much at some point in some capacity
21   to make contact with students.
22   Q.   What education do you have to qualify you
23   in your role?

Page 15

1    A.   I hold a master's degree in nursing, and
2    that is primarily the requirement for
3    the -- that's set forth in the rules by the
4    Alabama Board of Nursing to teach nursing.
5    Q.   When did you obtain your master's degree in
6    nursing?
7    A.   1986.
8    Q.   And where did you obtain that degree from?
9    A.   Troy-Montgomery.
10   Q.   Do you have any additional certification or
11   degrees related to nursing that you have
12   obtained?
13   A.   I have postgraduate course work in nursing,
14   so I have many more graduate hours in
15   nursing than what is required for a
16   master's degree.
17   Q.   And where have you obtained those
18   additional postgraduate hours?
19   A.   At Troy in Phenix City.
20   Q.   What experience do you have to qualify you
21   to enter into the classroom when you are in
22   the classroom?
23   A.   Well, previous to my hire in 1984, I worked

Page 16

1    as a staff nurse for three -- between three
2    and four years, so in different capacities
3    for the hospital.  I worked at
4    St. Vincent's Hospital in Birmingham.  That
5    was my first job as a nurse.  And then I've
6    worked at what was then Cobb Memorial
7    Hospital in Phenix City in medical-surgical
8    nursing and cardiac intensive care.
9    Q.   Did you have any teaching experience prior
10   to coming to CVCC?
11   A.   I had taught for CVCC clinically for almost
12   a year before I came to them full-time, and
13   I also did intensive care clinicals for
14   Troy-Phenix City baccalaureate program.
15   Q.   Just to make sure I understand what the
16   clinicals are, that is the hands-on
17   experience that nursing students get in
18   some type of a clinical type environment;
19   is that correct?
20   A.   Exactly, yes, interacting with patients.
21   Q.   So you would have been a teacher or
22   instructor for that as well?
23   A.   Yes -- well, yes, when I first started.

Deposition of Dixie Peterson

August 16, 2007

**Page 17**

1  For the first three years, I did clinicals
2  and the classroom, yes.
3  Q.  You stated previously that some of the
4  duties that you had when you were division
5  chair was to assist in the hiring process;
6  is that correct?
7  A.  Yes.
8  Q.  When you say assist in the hiring process,
9  can you elaborate a little more as far as
10  hiring the potential nursing faculty
11  members?
12  A.  Sure.  It's fairly complex to explain, but
13  the Alabama College System used to have --
14  and we pretty much still follow it at the
15  college -- certain hiring procedures where
16  jobs have to be posted for a certain length
17  of time.  They have to be advertised in
18  certain places, and then there are closing
19  dates, those kinds of things, that
20  certainly are not handled at the faculty
21  level.
22  But in my position as chair, what I did
23  was potentially find people who were

**Page 18**

1  interested, people that I knew or people
2  who knew people who would be interested and
3  encourage them to apply for a job and hope
4  that they would follow through with the
5  process in order to get to the point of an
6  interview.
7  I did not have or do not have the power
8  to hire except for clinical faculty because
9  those are on a semester-by-semester basis.
10  Q.  When you would seek out these qualified and
11  possibly interested individuals to apply
12  for jobs, would you also be a part of the
13  interviewing process for those individuals?
14  A.  On some occasions I was, and some occasions
15  I was not.
16  Q.  Would it be safe to say that during the
17  course of you having been a division chair
18  at CVCC, that you would more likely than
19  not be familiar with all the instructors
20  who would have been under, I guess, your
21  supervision or control?
22  A.  Yes.  That would be true.
23  Q.  However, you may or may not have

**Page 19**

1  interviewed each and every one of them?
2  A.  Correct.
3  Q.  And if you don't know the answer to this,
4  that's fine.  You can just say.  Do you by
5  any chance know what the retention rate for
6  the nursing instructors is within the
7  nursing program at CVCC?
8  A.  At CVCC?
9  Q.  Yes, ma'am.
10  A.  I do not know a number.  No, I'm sorry.
11  Q.  Would it be safe to say that all of the
12  nursing instructors in the CVCC program
13  would report directly to you even if you
14  had not been the individual who had hired
15  them?
16  A.  Yes.  That is correct.
17  Q.  Would you do some form of an evaluation on
18  them periodically to determine if they were
19  up to par in your standards?
20  A.  Yes.
21  Q.  And how often or how frequently would you
22  conduct those evaluations of those
23  employees?

**Page 20**

1  A.  It would depend on how long they stayed.
2  Obviously, if -- it's very realistic to
3  have a clinical instructor who would only
4  be there one semester, depending on the
5  content that was being taught.  If it's a
6  full-time faculty member, then they should
7  be evaluated every year, once annually.
8  Q.  Let's say hypothetically that someone did
9  not evaluate well at the end of that year
10  process or that year-long evaluation.  What
11  would be the typical or, I guess,
12  traditional way that you would deal with
13  that?
14  A.  What would happen would be that I would
15  have been communicating with my supervisor,
16  who would be the dean of instruction, and
17  potentially the president, but absolutely
18  the dean of instruction.  And if I was
19  inclined to recommend that that person not
20  be renewed, then it would simply be that.
21  It would be a recommendation.  But that
22  doesn't mean that it would be seconded and
23  carried out ultimately by the president.

August 16, 2007

Deposition of Dixie Peterson

Page 21

1    Q.  What would be the way typically that you
2         would communicate your thoughts or opinions
3         about that faculty member to your
4         supervisor or to the individuals who would
5         be in charge of the firing process, if that
6         was even the appropriate step to take?
7    A.  Right.  Just like I said, basically inform
8         the dean of anything and -- because I would
9         not want to recommend someone for
10        non-renewal and the president had not known
11        anything about it.
12   Q.  Would you do that typically through e-mail
13        fashion or memo or phone call?
14   A.  It could be either through conversation,
15        kind of daily or weekly updates, an FYI
16        kind of thing.
17   Q.  Okay.
18   A.  I can't recall any e-mails or memos, but
19        that doesn't mean that it could not have
20        occurred.
21   Q.  All right.  During the time of 2005-2006,
22        who would have been the dean of instruction
23        that you would have reported to?

Page 22

1    A.  James Lowe.
2    Q.  Would you also be responsible for training
3         the faculty members in the nursing program?
4    A.  Training in what sense?
5    Q.  For instance, if someone had come straight
6         from the hospital environment and had not
7         taught previously but they certainly had
8         the credentials to support the knowledge
9         base, would you or someone assist them in
10        learning how to implement that knowledge to
11        teach the students?
12   A.  Yes, me or someone else, yes.
13   Q.  If not you, typically who would that
14        someone else be?
15   A.  If there were another experienced
16        instructor who was teaching that that
17        person could pair up with, get -- you know,
18        have discussions with, follow, assist,
19        those kinds of things.
20   Q.  As far as the preparation of a syllabus or
21        course curriculum, how is that typically
22        done for your nursing instructors?
23   A.  Each nursing instructor does his or her own

Page 23

1         syllabus except since the time that the
2         State of Alabama, the two-year college
3         system has implemented a standardized
4         curriculum.  Those syllabi are already done
5         now, and they're disseminated by the
6         State.
7              If a course is taught in one college,
8         the syllabus is the same there as it is at
9         any other college with the exception of
10        each instructor has his or her own autonomy
11        to select textbooks.  So textbooks may not
12        be the same, but the content of the
13        syllabus is the same.
14   Q.  When did that change occur?  When did it go
15        from having some autonomy to now it sounds
16        like it's much more regulated as far as the
17        syllabus and --
18   A.  Right.  Yes.  I believe the mandatory
19        implementation date was fall '06.
20   Q.  Did CVCC meet the requirements beginning in
21        fall of 2006?
22   A.  Yes.
23   Q.  Did they do it prior to 2006 as far as

Page 24

1         meeting the requirements?
2    A.  When you say meet the requirements --
3    Q.  And I apologize if that wasn't clear.
4              As far as the syllabus being
5         pre-created or following a set curriculum,
6         you said that CVCC began doing that in the
7         fall of 2006.
8    A.  Right.
9    Q.  Did they do it prior to 2006?  Were they
10        early to meet the deadline?
11   A.  No, because we didn't want to start a
12        standardized curriculum in the middle of a
13        program of students who had already been
14        admitted, because we had associate degree
15        students who were admitted in June of '06,
16        and we didn't change curriculums -- or June
17        of '05.
18   Q.  You stated that you were not aware of the
19        retention rate of nursing instructors.  Are
20        you aware of the rate of nursing students
21        to instructors, the ratio from 2005-2006?
22   A.  Classroom or clinical?
23   Q.  Both, if you know them.

Deposition of Dixie Peterson

August 16, 2007

Page 25

1  A.  Each -- We don't have a set number of
2      students that we admitted to each class.
3      When the standardized curriculum began, the
4      admissions process also changed.  So prior
5      to the standardized curriculum, students
6      were admitted based on a test.  They had to
7      take an entrance test, and now they do not
8      have to take an entrance test.
9  Q.  Can I stop you right there and you tell me
10     about that admissions test?
11 A.  Sure.
12 Q.  You stated that prior to.  Prior to when
13     that they took an admissions test?
14 A.  Prior to the class that was admitted in
15     fall of '06 -- summer of '06.
16 Q.  So any student in the CVCC nursing program
17     prior to being admitted into the program
18     prior to 2006, there was some type of a
19     mandatory admissions test; is that correct?
20 A.  That is correct.
21 Q.  And was that a lengthy admissions test?
22 A.  It was an admissions test and a validation
23     test.  It was a standardized exam from the

Page 26

1      National League for Nursing.  It was called
2      the Nurse Mobility Profile Exam.
3  Q.  What would be the, I guess, qualifications
4      for someone to sit for that?
5  A.  They had to be a licensed practical nurse
6      because it was a test of nursing
7      knowledge.  So a student who had not -- did
8      not have a credential could not take the
9      test.  They would not have any knowledge.
10 Q.  So one must have already obtained the
11     degree of LPN in order to sit for the
12     Nursing Mobility entrance exam --
13 A.  Yes.
14 Q.  -- prior to 2006?
15 A.  Yes.
16 Q.  How was that test scored?
17 A.  That test was scored in New York.  And
18     then, of course, it was sent to us.  Copies
19     of the scores were sent to us, and then we
20     sent them to students.
21         And it was reported in three areas:
22     There was a foundation score, which is like
23     fundamentals of nursing; and there was a

Page 27

1      maternal score, which is like obstetrics;
2      and then there was a pediatrics or nursing
3      of children score.  So there were three
4      areas.
5  Q.  And then from all three of these scores, is
6      that how the faculty or whomever made the
7      decision whether or not to admit a
8      particular student?
9  A.  Yes, the student -- we had criteria.  Those
10     criteria were set by a committee of nursing
11     and non-nursing faculty on campus.
12         MR. NIX:  I'm sorry.  Are you
13         still talking about before
14         2006?
15         MS. COOLEY:  Yes.
16         MR. NIX:  I'm sorry.
17 Q.  The test isn't administered now, so that's
18     not --
19 A.  Correct.
20 Q.  Okay.  Okay.
21 A.  The scores were tabulated.  When I say
22     tabulated, that's probably not a good
23     word.  They were ranked, because they were

Page 28

1      already scored when they came to us.  They
2      were ranked on a spreadsheet by a nursing
3      secretary, and then a committee of -- a
4      nursing admissions committee that was
5      comprised of faculty from nursing and
6      outside of nursing would meet and review
7      those scores, and then students would be
8      selected.
9  Q.  Was it strictly on the basis of the score
10     and how they ranked was how they were
11     admitted into the program?
12 A.  Yes, it was strictly on score.
13 Q.  Was foundations, maternal and pediatrics,
14     were they equally weighted or --
15 A.  They were not.  Foundations was weighted
16     more because a student -- a nurse has to
17     know more of that knowledge than they do
18     the specialized knowledge.
19 Q.  And then as far as the other two, maternal
20     and pediatrics, were those two equally
21     weighted?
22 A.  Yes.
23 Q.  If, in fact, some -- would there be a

Page 29

1    chance where someone could have been
2    admitted into the program on a conditional
3    basis?
4    A.  All of the letters that I sent once we got
5        the scores would say you have conditional
6        acceptance.  And the reason for that is
7        because the students had to -- after they
8        got that letter, they had to schedule
9        check-offs.  They had to come to the campus
10       and actually do some hands-on
11       demonstrations -- that was the second part
12       of that admissions process -- because
13       they're already nurses, and the college by
14       virtue of that test conferred credit upon
15       each student for taking that test.
16         So the test not only served as an
17       admission tool, but it was a validation
18       tool.  It validated their knowledge, and
19       the college gave them credit for taking
20       that test.  Students received college
21       credit, and it was stamped on their
22       transcript.
23    Q.  Can you give an example of what would occur

Page 30

1        during a check-off test?
2    A.  Yes.  Students would come and do --
3        demonstrate very basic skills that they
4        should know.  Perhaps it was demonstration
5        of sterile technique.  It might be in the
6        form of catheterization on a mannequin.  It
7        might be in the form of a sterile dressing
8        on the mannequin.  They might have been
9        asked to do CPR on an infant.  They might
10       have been asked to do injections in a
11       simulated environment.  Basic skills that
12       they already had mastered at the LPN level.
13    Q.  So if I'm understanding correctly, at that
14       point in time prior to 2006, summer of
15       2006, it was the admission test that was
16       the Nurse Mobility Program test?
17    A.  Yes.
18    Q.  As well as the check-off test; is that
19       correct?
20    A.  Yes.
21    Q.  Was there anything else that would make a
22       decision whether or not the student would
23       be admitted into the Nursing Mobility

Page 31

1        Program?
2    A.  No, we do not do nor have we done
3        interviews.  It's all been objective data.
4    Q.  Would it be safe to say that you would at
5        least have a working knowledge of any of
6        the potential candidates coming through the
7        program?
8    A.  It was certainly possible for me to know
9        some of the students because of having
10       worked with them or seen them or them
11       asking me about information.  But I did
12       not, I don't think, do any of the
13       check-offs.
14    Q.  Do you recall in 2005 how many – roughly
15       how many individuals would have applied and
16       then how many roughly would have been
17       accepted into the Nursing Mobility Program
18       at CVCC?
19            MR. NIX:  Don't guess.
20    A.  I'm sorry.  I do not.
21    Q.  That's fine if you don't know.
22            Would it be safe to say that not all
23       that applied got into the program?

Page 32

1    A.  Yes.
2    Q.  Are you familiar with an individual named
3        Lynn Harris?
4    A.  Yes.
5    Q.  How are you familiar with Ms. Harris?
6    A.  Well, she currently works at Chattahoochee
7        Valley Community College.  I knew her --
8        just who she was before her coming to
9        CVCC.  I knew her through a friend of mine
10       who was her supervisor and then, of course,
11       you know, her employment now.
12    Q.  Do you know approximately how long she's
13       been employed at CVCC?
14    A.  Yes.  Since September of 2005.
15    Q.  Do you know what courses Ms. Harris would
16       have taught?
17    A.  I do.  In the fall of 2005, she taught
18       Nursing 252.  In the spring of 2006, she
19       taught Nursing 272 and Nursing 200.  And in
20       the summer of 2006, she taught Nursing 272
21       and it would have been, I believe, then
22       Nursing 201.
23    Q.  When are you saying that 272 was 201?

Page 33

1  A.  It never was.
2  Q.  Okay.  Is 272 as of today's date still a
3      valid course at CVCC?
4  A.  It is not.
5  Q.  Has it been replaced with a different
6      course?
7  A.  Not exactly, because in the old curriculum,
8      courses were categorized according to
9      content:  Adult health, obstetrics,
10     pediatrics.  And now the courses are
11     integrated, so they're not separate courses
12     for each area.
13 Q.  And did that begin in fall of 2006?
14 A.  Yes.  Actually, I guess it was summer
15     2006.  I'm sorry.
16 Q.  Were you a part of the decision-making
17     process to hire Lynn Harris at CVCC?
18 A.  I'm the one who asked her to consider
19     coming there because I heard that she was
20     not teaching anywhere.
21 Q.  So you asked her to interview; is that
22     correct?
23 A.  Yes, and I -- I'm sorry, Ms. Cooley.  I

Page 34

1      asked Dean Lowe to call her, too, and I
2      believe he made a phone call to ask her if
3      she was interested.
4  Q.  Were you a part of her interview process at
5      CVCC or was that someone else?
6  A.  She didn't really have an interview process
7      because when she first started, she was
8      part-time.  She was adjunct.  She became
9      full-time -- I believe it was maybe
10     December '05.  For the first part of the
11     semester, she was there part-time while she
12     transitioned from her other job.
13 Q.  So if someone is hired in the nursing
14     program part-time, they don't go through an
15     interview process; is that correct?
16 A.  That is correct.
17 Q.  And if they progressed from part-time to
18     full-time, no interview process there
19     either?
20 A.  I don't speak for Dr. Blackwell, but she
21     has the power to hire people on a temporary
22     basis without going through the
23     full-fledged interview process for them.

Page 35

1      And after they remain a certain period of
2      time, then they are required to go through
3      an interview process.
4  Q.  To your knowledge, was Lynn Harris, did she
5      ever go through an interview process?
6  A.  She did.
7  Q.  Were you a part of that interview process
8      when she did go through it?
9  A.  I was.
10 Q.  Do you know when that interview actually
11     took place for Lynn Harris?
12 A.  I do not remember.  I remember sitting in
13     the room and watching her teaching
14     demonstration, but I don't remember exactly
15     when it was.
16 Q.  You may not know exactly when it was, but
17     do you know if it was in the year 2007?
18 A.  No, I believe it was in 2006.
19 Q.  Are you familiar with an individual named
20     Sandra Gunnels?
21 A.  I am.
22 Q.  And how are you familiar with Ms. Gunnels?
23 A.  Ms. Gunnels worked with me for a number of

Page 36

1      years as an adjunct instructor in the
2      program and then for a semester as a
3      full-time instructor.
4  Q.  Ms. Gunnels is not currently at CVCC; is
5      that correct?
6  A.  That is correct.
7  Q.  Do you know what classes Ms. Gunnels taught
8      while she was at CVCC?
9  A.  I can't name them semester by semester, but
10     she was -- she taught obstetrics and she
11     taught pediatrics because her experience
12     and her master's degree are in those
13     areas.  She also taught some pharmacology
14     to students.  That was an area that she was
15     very interested in and liked.  Most of the
16     time it was obstetrics or pediatrics
17     because those were her areas.
18 Q.  When you say those were her areas, does
19     that mean that was an area that she seemed
20     to excel in as a nurse or as a teacher?
21 A.  She had a master's degree specifically in
22     those areas, in maternal-infant nursing or
23     maternal-child nursing.

Deposition of Dixie Peterson

---

**Page 37**

1  Q. Let me backtrack since you said that real
2      quick. Did Ms. Harris have a master's
3      degree?
4  A. Yes.
5  Q. Do you know what her master's degree was
6      in?
7  A. Family nursing.
8  Q. Thank you. And Ms. Gunnels' was in
9      obstetrics; is that correct?
10 A. Maternal-infant or either maternal-child.
11     Not very many of those exist, and so it was
12     either maternal-infant or maternal-child.
13 Q. Do you know how long Ms. Gunnels was
14     employed at CVCC in the nursing program?
15         MR. NIX: Whether it was part-time
16         or full-time or --
17         MS. COOLEY: Yes.
18 Q. Just the length of her employment, if you
19     know.
20 A. I believe about five years.
21 Q. Do you know during the course of five years
22     how long she would have been employed
23     full-time in the nursing program?

---

**Page 38**

1  A. I believe it was one semester, maybe two at
2      the most.
3  Q. You referred to her as adjunct. Would she
4      also be an individual that would have
5      taught clinicals?
6  A. Yes, definitely. I'm sorry.
7  Q. Would she have been an individual that you
8      would have done the direct hiring for --
9  A. Yes.
10 Q. -- because she was a clinical person?
11 A. Yes. She walked into my office one day --
12     and I'd never met her -- to come and
13     introduce herself, yes.
14 Q. To your knowledge, did Ms. Gunnels never go
15     through an interview process?
16 A. I believe she did not.
17 Q. And that would be because she was one of
18     the clinical direct hires; is that correct?
19 A. Correct.
20 Q. Are you familiar with an individual named
21     Ms. Bellamy?
22 A. Yes.
23 Q. I'm sorry. Ms. Brenda Bellamy.

---

**Page 39**

1  A. Yes.
2  Q. And how are you familiar with Ms. Brenda
3      Bellamy?
4  A. Ms. Bellamy was a full-time nursing faculty
5      member several years ago. I do not know
6      the year. And she resigned to move to
7      Philadelphia, and she lived in
8      Philadelphia, I believe, two to three
9      years.
10     And she called me when she was coming
11     back to town and asked me if we had any
12     openings. And I encouraged her to come and
13     apply, and I asked Dr. Blackwell to
14     interview her.
15 Q. Were you a part of that interview process
16     with Ms. Brenda Bellamy?
17 A. Yes.
18 Q. Was there anyone else involved in the
19     interview process besides yourself and
20     Dr. Blackwell?
21 A. I believe Dean Lowe was there.
22 Q. Do you know the length of Ms. Brenda
23     Bellamy's employment at CVCC?

---

**Page 40**

1  A. I believe the first time she was there, she
2      was there maybe a year and a half. The
3      second time she was there, it was less than
4      a year.
5  Q. Did Ms. Brenda Bellamy have a master's
6      degree in nursing?
7  A. She did.
8  Q. And do you know what that was in?
9  A. Adult health.
10 Q. Do you know what classes Ms. Brenda Bellamy
11     taught?
12 A. I don't remember the classes she taught the
13     first semester that she was hired the
14     second time which would have been spring of
15     '05. In summer of '05, she taught the
16     Nursing 251 class and I believe she did
17     some clinicals. She was sick that
18     semester. She was out for the first few
19     weeks because she had pneumonia, and then
20     she was gone August the 31st.
21 Q. To your knowledge, did she ever teach a
22     class 252? To your knowledge.
23 A. I believe she may have started it in the

---

Page 41

1    fall semester of '05, but since she
2    resigned August 31st, it -- she would not
3    have had opportunity to teach very much.
4    Q.  Are you familiar with an individual named
5        Tawyna Cash?
6    A.  I know Tawyna, yes.  I met her when she
7        came to assist us in the fall of 2005.  I
8        did not know her prior to that.
9    Q.  When you say she came to assist us in the
10       fall of 2005, can you elaborate on what you
11       mean by that?
12   A.  Sure.  When Ms. Gunnels and Ms. Bellamy
13       resigned on August 31st, of course, that
14       left us two vacancies, one for adult health
15       and then one for the obstetrical course,
16       and so we were -- began to work immediately
17       to try to find replacements.
18          And Barbara Johns, the person to whom I
19       alluded earlier, called her.  And Dr. Laura
20       Steadman in Montgomery, who was over all
21       the health programs at that time, assisted
22       us.  And then, of course, we had local
23       contacts.

Page 42

1          And Dr. Steadman is the person who
2        found Ms. Cash at Southern Union.  She was
3        a full-time instructor at Southern Union
4        Community College in Opelika.
5    Q.  Was Ms. Cash employed on a temporary basis
6        at CVCC then; is that correct?
7    A.  Yes, temporary or part-time.  I'm not sure
8        how her contract reads.
9    Q.  Was she there to replace a full-time
10       instructor, Ms. Gunnels, or --
11   A.  Yes.
12   Q.  Was she hired temporary part-time or
13       temporary full-time?  Ms. Cash.
14   A.  I believe it was temporary part-time, but I
15       do not know.  I've not seen Ms. Cash's
16       contract.  I know that she maintained some
17       of her duties at Southern Union.  How many
18       of those, I don't know.  And then she was
19       contracted to come over and assist us as
20       well, so she did not leave her duties at
21       Southern Union.
22   Q.  So Ms. Gunnels had been full-time and left
23       in August of 2005.  Had Ms. Bellamy been

Page 43

1    full-time and left in August of 2005 as
2    well?
3    A.  Yes.  They both resigned on the same day.
4    Q.  So that was two full-time instructor
5        positions that were left vacant; is that
6        correct?
7    A.  That's correct.
8    Q.  So Ms. Tawyna Cash filled in at least
9        part-time.  Were there any other
10       individuals who were hired or who assisted
11       in that role, the roles of the two vacant
12       instructor positions?
13   A.  Well, yes.  They were part-time, but they
14       taught all of the class.  The class only
15       met once a week, so Ms. Cash taught all of
16       the class.
17          The students didn't have anyone to
18       teach except her once she came, and the
19       same for Ms. Harris.  Ms. Cash -- I can't
20       remember if she did any clinicals as well
21       as class, and I can't remember if
22       Ms. Harris did.  But they -- They both were
23       there every week for the class once they

Page 44

1    started.
2    Q.  So Ms. Cash and Ms. Harris were the two
3        individuals who basically came in to try to
4        fill the void, is that correct, for
5        Ms. Gunnels and Ms. Bellamy when they left
6        in August of 2005?
7    A.  That is correct.
8    Q.  Was there any type of a time delay from the
9        time that Ms. Gunnels and Ms. Bellamy
10       entered their resignations and the time
11       Ms. Cash and Ms. Harris began working for
12       CVCC?
13   A.  Yes, there was a brief delay.  I believe
14       classes -- the first class for the RN
15       students met on August 24th.  And I do not
16       know how many times Ms. Bellamy or
17       Ms. Gunnels may have talked to them about
18       clinically-related things, but the official
19       first day of class for fall semester was
20       August 22nd, '05.
21          Our classes for RNs have typically
22       always been on Wednesday, so the first
23       class would have been August 24th.  And

August 16, 2007

Deposition of Dixie Peterson

Page 45

1   Ms. Harris came on September the 14th, I
2   believe, and Ms. Cash came on September
3   21st. Of course, Ms. Bellamy and
4   Ms. Gunnels were there for the first two
5   weeks of the semester.
6  Q. From August 31st or 30th, 2005, until
7   September 14th, what type of instruction,
8   if any, was given to the Nursing Mobility
9   students at CVCC?
10 A. Okay. For the adult health course, the
11  course that was vacated by Ms. Bellamy's
12  resignation, there was a person in the
13  class by the name of John Christopher who
14  taught some respiratory concepts. I
15  believe he was there for a class and a
16  half.
17      And then there was a mechanism by
18  distance learning that Dr. Steadman had
19  arranged through Wallace Community College
20  in Hanceville to deliver obstetrical
21  content to the students.
22 Q. Do you know how many classes that was?
23 A. I believe that was just one because -- I'm

Page 46

1   not sure. I know one for sure. I don't
2   know if it was two because the day that
3   Ms. Gunnels and Ms. Bellamy resigned, there
4   was a guest speaker there by the name of
5   Pat Fuggatt from The Medical Center.
6  Q. And Ms. Fuggatt would have taught which
7   class, the health or the obstetrics class?
8  A. Obstetrics.
9  Q. If Ms. Cash came September 21st, that would
10  have been approximately four class
11  sessions, is that correct, until -- the
12  time that she would have entered into the
13  classroom from the time that the other
14  instructors would have left?
15      MR. NIX: Are you asking the time
16      interval between the time --
17      MS. COOLEY: The time that the
18      other instructors left, which
19      was August 30th, 2005, until
20      Ms. Cash came September 21st.
21      MR. NIX: Doesn't that speak for
22      itself, though, those days?
23      What are you asking?

Page 47

1       MS. COOLEY: How many class
2       sessions would have occurred
3       during that time.
4  Q. You said you believed that they occurred on
5   Wednesdays for the RNs.
6  A. Right.
7  Q. Would that have been roughly approximately
8   four class sessions?
9  A. No, because Ms. Gunnels, there --
10  Ms. Gunnels didn't resign until the second
11  one.
12 Q. Okay.
13 A. So the classes began August 24th, so that
14  was one week. The next week is the week
15  she resigned, so that was two of them.
16 Q. Okay.
17 A. And then one of them was distance learning,
18  that's three. So there should have only
19  been one at the most two before Ms. Cash
20  arrived.
21 Q. So Pat Fuggatt --
22 A. Well, actually one, because Pat Fuggatt was
23  there.

Page 48

1  Q. Pat Fuggatt was there, though, the day
2   Ms. Gunnels resigned; is that correct?
3  A. Yes. I'm sorry.
4  Q. Then that would have been Pat Fuggatt and
5   then a distance learning class?
6  A. Right, and I don't remember exactly what
7   week that was.
8  Q. But we know, then, that Ms. Cash would have
9   arrived on September 21st and began
10  teaching that day --
11 A. Yes.
12 Q. -- the day of employment?
13 A. Yes.
14 Q. I think previously there had been a
15  calendar that had been made of 2005, but I
16  will get to that later.
17      As far as the adult health class, you
18  stated that John Christopher taught -- was
19  that a respiratory class; is that correct?
20 A. Yes, he taught respiratory principles. He
21  was contracted as an adjunct and he was
22  also a critical care nurse, and I asked him
23  to serve in the role of a guest speaker to

Page 49

1    do those respiratory concepts for the
2    students.
3  Q.  Did Mr. Christopher -- let me backtrack.
4       To your knowledge, does Mr. Christopher
5    have a master's degree in nursing?
6  A.  I do not know what he holds now, but we
7    don't have certain qualifications for guest
8    speakers.
9  Q.  Do guest speakers create exams or tests for
10   the students in the program typically?
11 A.  In his instance he did, because we had him
12   contracted to do adjunct work and clinical
13   work as well.
14 Q.  Your adjunct professors, is that also one
15   of your requirements, that they have
16   master's degrees in the nursing program?
17 A.  If they were there for a significant length
18   of time.  We would not allow a person
19   without a master's degree to teach a
20   course, an entire course.  We couldn't
21   because that is required by the Board of
22   Nursing.
23 Q.  To your knowledge, did Mr. Christopher just

Page 50

1    create one exam; is that correct?
2  A.  That is correct.
3  Q.  To your knowledge, is that a typical
4    procedure, that guest speakers create exams
5    for nursing students?
6  A.  Well, he was really more than a guest
7    speaker.  He was an adjunct, and he shared
8    those concepts with me.  So I knew the
9    kinds of concepts that he was testing, and
10   they were -- they were appropriate.
11 Q.  Did you review the exam that John
12   Christopher --
13 A.  Not question by question, but we talked
14   about the content on the exam.
15 Q.  Since that time, have you seen the exam
16   that he administered to the students?
17 A.  I've not looked at it.  I've seen it in
18   some of the materials.
19 Q.  To your knowledge, did Pat Fuggatt
20   administer any type of exam to the students
21   when she spoke to them or taught them?
22 A.  Not to my knowledge.
23 Q.  As far as the distance learning, whatever

Page 51

1    it was that the students learned through
2    distance learning, was there any type of
3    follow-up exam or quiz or questionnaire
4    that was administered to the students?
5  A.  I don't know.
6  Q.  Nursing 271, what actually used to be the
7    name of that course?  You had said before
8    it was categorized by subject matter; is
9    that correct?
10 A.  Right.  Maternal-infant nursing or either
11   maternal-child, one or the other.  It was
12   mother-baby or mother-child.  Mother-baby,
13   maternal-infant, because we had a separate
14   pediatrics course.
15 Q.  What is the name that I should refer to it
16   in this deposition?  Mother-baby or
17   maternal-infant nursing?
18 A.  Maternal-infant.  I'm sorry.
19 Q.  Is that subject matter content, the
20   maternal-baby, is that still a part of the
21   curriculum today at CVCC Nursing Mobility
22   Program?
23 A.  Yes, it's integrated into one of the

Page 52

1    courses.
2  Q.  So it's called something different;
3    however, it has the same basic subject
4    material.  Is that correct?
5  A.  In different amounts.  Obviously, when we
6    had a course completely devoted to maternal
7    nursing, then the student took that the
8    entire semester.  Now since it's
9    integrated, the State has it based on
10   modules.  So there may be a module within a
11   course that's devoted to that content.
12 Q.  But it is safe to say that the CVCC Nursing
13   Mobility students are at least being
14   exposed to maternal-infant nursing type
15   curriculum or subject matter material
16   during the course of their instruction?
17 A.  Yes, that's a required content component by
18   the board of nursing.
19 Q.  Do you recall any type of conversation or
20   meeting that you would have had on August
21   the 26th, 2005, with Dr. Blackwell, Dean
22   Lowe, an individual named Mrs. Gruber,
23   Mrs. Gunnels and yourself to discuss the

Page 53

1   fact there were only three instructors in
2   the nursing program for approximately 90 to
3   100 incoming nursing students?
4           MR. NIX: I'm sorry. Could you go
5           through the names of the
6           people again?
7           MS. COOLEY: Sure. I'll be glad
8           to.
9   Q.  The individuals are Dr. Blackwell, Dean
10      Lowe --
11          I'm saying Gruber, but I may be
12      pronouncing it incorrectly.
13  A.  That's correct.
14  Q.  -- Mrs. Gruber, Mrs. Gunnels and yourself
15      to discuss the fact there were currently
16      only three nursing instructors for
17      approximately 90 to 100 incoming nursing
18      students.
19  A.  I do not recall a specific conversation.
20      I'm not saying it didn't occur. I just
21      don't ...
22  Q.  Sure. Do you recall any type of a meeting
23      or brainstorming session with any of these

Page 54

1   individuals at any point in August of 2005
2   to discuss strategies to try to address the
3   shortage of instructors in the nursing
4   program?
5           MR. NIX: I object to the form and
6           the use of the term shortage
7           of instructors.
8   Q.  To discuss the fact there were
9       approximately three nursing instructors for
10      90 to 100 nursing students.
11  A.  I do not remember a specific date or a
12      specific conversation, but to discuss
13      staffing with the dean and ultimately the
14      president would certainly be an appropriate
15      thing to do.
16  Q.  Do you recall any type of a formal or an
17      informal strategy to try to add additional
18      instructors to the nursing program during
19      that time for 2005, August 2005?
20          MR. NIX: You're talking about any
21          meeting now, right?
22          MS. COOLEY: Yeah.
23  Q.  Actually, I'm only interested in August of

Page 55

1   2005.
2   A.  Are you asking me for the subsequent
3       semester or just for in general, future --
4   Q.  Yes, ma'am, for any type of strategy,
5       future planning.
6   A.  Again, I don't recall anything specific,
7       but it would certainly be appropriate
8       because we have consistently talked about
9       wanting to add nursing faculty in order to
10      grow the programs.
11  Q.  Is there, in fact, to your knowledge any
12      type of a formalized or informal method to
13      achieving that, to achieving more
14      consistent hiring practices for the nursing
15      program?
16          MR. NIX: Let me object to the
17          term more consistent.
18  Q.  To consistently maintain in hiring nursing
19      instructors for the nursing program at
20      CVCC.
21  A.  I'm not sure that I really understand, and
22      I want to answer it as appropriately as I
23      know how.

Page 56

1       The process has pretty much always been
2   that if we -- if I secured someone who was
3   interested or someone was recommended to
4   me, that I would inform the dean and/or
5   inform the president and ask them to
6   interview those people.
7       If there was an immediate need, I would
8   ask them to do it right away and ask the
9   president to consider making a temporary
10  appointment until such time that interviews
11  could take place.
12  Q.  Previously when we talked about some of the
13      processes for hiring new faculty members --
14      and I want to make sure I've summarized
15      what you said previously, was that
16      positions would be posted typically for
17      some length of time?
18  A.  Correct.
19  Q.  You didn't specify a length of time. You
20      also said that typically, the position
21      would be advertised in certain places.
22  A.  Correct.
23  Q.  But you didn't say where those certain

14 (Pages 53 to 56)

Deposition of Dixie Peterson

Page 57

1    places would be. And that also as a part
2    of your job duties and responsibilities
3    when you were the division chair that you
4    would also seek out qualified and
5    interested individuals to at least apply
6    for those positions, not necessarily be
7    hired for them; is that correct?
8 A. That's correct.
9 Q. And that you may or may not be involved in
10    the interview process for those individuals
11    and that -- but you would be involved in
12    the evaluation process for individuals once
13    they were hired.
14 A. On most occasions, I'd be involved in the
15    interview process.
16 Q. Okay. So you have been involved in most of
17    the interview process then?
18 A. Yes.
19 Q. So more often than not, you have been
20    involved in the interviewing of new
21    potential hires for the nursing program at
22    CVCC?
23 A. Yes.

Page 58

1 Q. In your new position, will you be involved
2    in the potential hiring of individuals for
3    the nursing program?
4 A. I do not think so.
5 Q. Okay.
6 A. The position is evolving, as we spoke, and
7    so Dr. Blackwell has asked me to -- she's
8    told me some of the things that she wants
9    and has asked me to work on a job
10    description basically. We know some of the
11    things that have to be done, and so I do
12    not think I will be involved.
13    I will be associated with health
14    science because I'll be developing programs
15    that are of health science nature, but that
16    would be the role now of the current
17    division chair.
18 Q. Okay. Has that individual already
19    transitioned into that position, then, the
20    individual who's taken over that position?
21 A. Yes.
22 Q. Would you mind telling me who that person
23    is again? I'm sorry.

Page 59

1 A. That's Lynn Harris.
2 Q. And if you don't know this, you can say
3    that you don't know. Back on August 31st
4    of 2005, were you aware of Ms. Sandra
5    Gunnels apparently being prevented or
6    stopped from going into the classroom to
7    teach at CVCC?
8 A. I heard after that occurred that that was
9    her perception, that she was being stopped.
10 Q. But you were not present during any type of
11    an interaction between her and Dean Lowe;
12    is that correct?
13 A. That's correct.
14 Q. Did you provide a copy of the vote of no
15    confidence for Dr. Blackwell to
16    Mrs. Gunnels?
17 A. I don't know what you mean by a vote of no
18    confidence, a copy of it. I never had a
19    copy of a vote.
20 Q. Okay. Did you provide any documentation to
21    Ms. Gunnels referencing the vote of no
22    confidence that Dr. Blackwell had received?
23 A. I don't remember anything being on paper

Page 60

1    other than survey responses, but it's my
2    understanding that all faculty had those or
3    most had access. So I don't -- I don't
4    remember anything that would be called a
5    vote.
6 Q. But there's not anything as far as any
7    documentation, whether it was a newspaper
8    article or any type of summarization of
9    senate notes? You would have provided
10    anything like that to Ms. Gunnels; is that
11    correct?
12 A. No, I didn't do -- Senate minutes were kept
13    by the senate secretary, and I did not
14    serve as the senate secretary.
15 Q. Were you a member at all of that faculty
16    senate?
17 A. I was.
18 Q. Were you a part of that voting process?
19 A. I was.
20 Q. The voting process, was that tallied by an
21    individual or was that something that was
22    done -- how was that done?
23 A. It's been a while. To the best of my

Deposition of Dixie Peterson

Page 61

1    recollection, I believe that the president
2    of the faculty senate and one other faculty
3    senate member may have tallied the votes.
4    Q.  When I say this, I'm referring to the
5    faculty senate.  Is it a secret group of
6    individuals who meet?
7    A.  No, it's not a secret group of people.
8    They are elected by -- faculty members on
9    campus elect the faculty senate members.
10   Q.  So you were, in fact, elected by a group of
11   your peers, is that correct, to serve on
12   the faculty senate?
13   A.  Yes, or either I was the person
14   representing the health science division
15   because I was the only person who had
16   continued service status or tenure.
17   Q.  At what point did you gain tenure at CVCC?
18   A.  After completing three years of service and
19   being offered a fourth contract.
20   Q.  Going back to the faculty senate.  During
21   the time that the vote, I guess, began for
22   whether or not to vote confidence or no
23   confidence in Dr. Blackwell, was there any

Page 62

1    discussion or any type of presentation,
2    anything that occurred in the faculty
3    senate?
4         MR. NIX:  Let me object to the
5         question in that it calls for
6         information that I believe is
7         confidential, proprietary and
8         privileged in terms of what
9         may have gone on or may not
10        have gone on in a faculty
11        senate meeting.
12   Q.  I'd like you to still answer, because one
13   of the questions I'd posed to you was, was
14   it a group of secret individuals.  They
15   were elected.  They were elected by a group
16   of your peers or you were appointed.
17   A.  Right.
18   Q.  Certainly listen to the advice of your
19   counsel, but I am asking you to answer the
20   question.
21        MR. NIX:  Let me clarify what I'm
22        saying, Jennifer.  All of what
23        you said is correct, the way

Page 63

1    that they are voted in and all
2    that kind of stuff -- or
3    selected.
4         That doesn't change the
5    fact that a proceeding of the
6    type you're discussing with
7    discussion, with written
8    forms -- of course, I think
9    they filled those out later.
10        But the discussions that
11   they had, I think those are
12   privileged discussions.  They
13   were serving as a body --
14   official body for the faculty
15   itself.  They were addressing
16   a sensitive topic, one that
17   had a lot of -- a lot of
18   emotion probably attached to
19   it.
20        They were addressing
21   something that if it does not
22   remain confidential in terms
23   of the things that they

Page 64

1    discussed and if it does not
2    remain confidential in terms
3    of the things that were said,
4    if it does not remain
5    confidential in terms of the
6    positions of the different
7    people in that group and who
8    said what, that it would
9    completely deter people from
10   participating and it would put
11   a cold blanket on the whole
12   process.  It would create a
13   situation where they could not
14   have a meeting.
15        I think it fits perfectly
16   within the confidentiality
17   proprietary situation, and I
18   think it's privileged as
19   well.  I think it's privileged
20   because of the nature of the
21   meeting, just like many other
22   executive committee meetings
23   are privileged.

16 (Pages 61 to 64)

Page 65

1  Q.  Was your vote published at the end?  Was
2      there not something put in the Ledger
3      Inquirer whether or not the vote was to
4      vote yes or no regarding -- I mean the vote
5      of confidence, no confidence regarding
6      Dr. Blackwell?
7  A.  I don't remember anything being in the
8      Ledger Inquirer.
9  Q.  Was there anything to your knowledge in any
10     type of local paper within Phenix City as
11     far as whether or not there was a vote of
12     confidence or no confidence regarding
13     Dr. Blackwell?
14 A.  It seems to me there was something in some
15     newspaper, but I do not remember which
16     newspaper.
17 Q.  Does CVCC have any type of internal student
18     newsletter or some type of a memo that they
19     send out to the students and faculty
20     members?
21 A.  There is no student internal memo.  There's
22     a student government association, but what
23     they do, I do not know.

Page 66

1  Q.  So in your role as a faculty member, there
2      is no interaction between a faculty
3      member -- a faculty member not receiving
4      printouts or anything of that nature from
5      the student government association,
6      newsletter, memo, anything of that nature;
7      is that correct?
8  A.  I don't recall ever getting anything from
9      student government.  We get announcements
10     about what they do through Monday Morning
11     Message which is the campus-wide
12     mechanism.  It's campus-wide that comes
13     from the president's office.
14 Q.  Was there anything on a Monday Morning
15     Message to your knowledge that ever
16     referred to Dr. Blackwell receiving a vote
17     of no confidence?
18 A.  I do not recall that.
19 Q.  Do you recall in the summer of 2005 having
20     a conversation with Ms. Brenda Bellamy,
21     Ms. Sandra Gunnels regarding my client,
22     Ms. Lindy Wright, as far as her ability as
23     a nursing student?

Page 67

1  A.  I don't recall a conversation.  I've heard
2      that --
3          MR. NIX:  You don't need to say
4              anything other than what you
5              do recall about that
6              question.  Just answer the
7              question.
8  A.  I don't recall the specifics of any
9      conversations.
10 Q.  Do you recall ever referring to Ms. Lindy
11     Wright as a weak nursing student at any
12     point?
13 A.  I remember being told by Ms. Gruber who was
14     substituting for Ms. Bellamy for the first
15     few weeks of the semester that there were
16     some students who were borderline, that it
17     looked as though unless they really did
18     well throughout the rest of the semester
19     they would not pass.  I remember, as I
20     always do, asking Ms. Bellamy and
21     Ms. Gunnels did it look like anybody was
22     going to fail.  Beyond that, I do not
23     remember anything specifically

Page 68

1  Q.  So are you saying that you recall asking
2      Ms. Gruber or Ms. Bellamy --
3  A.  I'm saying Ms. Gruber informed me after her
4      interactions with the class in
5      Ms. Bellamy's absence that Lindy and a
6      couple of others were borderline at that
7      point, which is --
8          MR. NIX:  That's all you need to
9              say.  I mean, just answer her
10             question.
11 Q.  Would you describe borderline.
12 A.  I'm not sure I can quantify it exactly.
13     Not doing well, performing -- performing
14     less than satisfactory on assignments.  I
15     can't give you a number.
16 Q.  When you say not performing well on
17     assignments, would that include any type of
18     tests or exams in addition to clinicals?
19 A.  It would include tests and exams and/or
20     clinicals.  Some people do very well in
21     class and may not perform well in
22     clinicals, and vice versa.  It just
23     depends.

**Page 69**

1  Q.  Do you recall making a comment to
2      Ms. Bellamy and/or Ms. Gunnels during the
3      summer of 2005 that Ms. Wright would not
4      pass her boards, that your prediction was
5      that she would not pass her boards, her
6      nursing board exams?
7  A.  I do not remember.
8  Q.  Do you recall making a comment to
9      Ms. Bellamy and/or to Ms. Gunnels in the
10     summer of 2005 that Ms. Wright needed to
11     fail?
12 A.  I do not remember that at all.  I
13     frequently ask instructors who is
14     borderline, who is not passing.  And I have
15     made statements in the past in general that
16     students should not pass if they do not
17     have the mastery of the information.
18     That's my job -- or that was my job.  I'm
19     sorry.
20 Q.  Do you recall specifically -- because you
21     were talking about students in general.  Do
22     you recall specifically having that
23     conversation regarding my client with any

**Page 70**

1      of these instructors that I mentioned:
2      Ms. Bellamy, Ms. Gunnels, Ms. Harris, any
3      of the individuals who would have
4      instructed Ms. Wright?
5  A.  I do not remember anything specific I said
6      about Lindy Wright.
7  Q.  Do you recall any of those instructors
8      seeking you out and saying specifically
9      that they were concerned about Ms. Wright
10     and her performance in the classroom and/or
11     clinicals?
12 A.  Ms. Gruber, Deborah Gruber did.
13 Q.  And she substituted for Ms. Bellamy?
14 A.  Yes.
15 Q.  Do you know how long she substituted for
16     Ms. Bellamy?
17 A.  About three weeks I believe.  Ms. Bellamy
18     was in the hospital and/or at home sick
19     recuperating from pneumonia.
20 Q.  I have not asked about Ms. Gruber
21     previously.  Can you answer some questions
22     for me about her as far as was she, in
23     fact, an instructor at CVCC?

**Page 71**

1  A.  Yes.
2  Q.  In what capacity was Ms. Gruber employed?
3  A.  Ms. Gruber was a full-time instructor.
4  Q.  Do you know the length of employment that
5      Ms. Gruber -- what was her length of
6      employment at CVCC?
7  A.  I don't remember exactly.  Maybe close to
8      three years.  Dr. Blackwell had given
9      her -- at the time she was hired, the Board
10     of Nursing did not mandate that you had to
11     have a master's degree, and so
12     Dr. Blackwell gave her a period of time to
13     complete the master's degree.
14         And then when the new rule was
15     implemented that classroom instructors had
16     to have the master's degree and she had not
17     completed it, I believe that's when
18     Dr. Blackwell talked with her about, you
19     know, her completion possibilities and
20     those kinds of things.
21 Q.  You referred to the new rule.  When did the
22     new rule start?
23 A.  I can't remember exactly, but there -- the

**Page 72**

1      board -- whenever they enact a new rule,
2      they always give a period of time for that
3      rule to be implemented.  It's not
4      immediate.
5  Q.  You stated that Ms. Gruber was employed at
6      CVCC as a full-time instructor for
7      approximately three years.  Do you know
8      what years she was employed?
9  A.  I do not remember the year that she was
10     employed.
11 Q.  Do you know when she left CVCC?
12 A.  She left at the end of fall 2005.
13 Q.  Do you know what classes she would have
14     taught, she being Ms. Gruber?
15 A.  She was predominantly the licensed
16     practical nursing program.  That's where
17     she did most of her teaching.
18 Q.  That's LPN; is that correct?
19 A.  Yes.  I'm sorry.
20 Q.  So when she filled in for Ms. Bellamy, did
21     she fill in for adult health classes?  Is
22     that what she was filling in for?
23 A.  Yes.

Page 73

1  Q.  For, give or take, three weeks?
2  A.  Two or three.  It would have been two or
3      three classes.  I can't remember exactly.
4          MR. NIX:  Can we take a break?  Do
5          you mind?
6          MS. COOLEY:  Of course.  No
7          problem.
8          (Lunch recess was taken.)
9  Q.  Just to remind you that you're still under
10     oath from the previous --
11 A.  Right.
12         (Brief interruption.)
13 Q.  I want to verify, too, that I'm saying this
14     individual's name right.  Is it Grubear or
15     Gruber?
16 A.  Gruber.
17 Q.  Like the fish almost except make it a B
18     instead of a P, Gruber?
19 A.  Exactly.
20 Q.  Going back to Ms. Gruber.  She was a
21     full-time instructor for approximately
22     three years at CVCC; is that correct?
23 A.  About that amount of time, yes.

Page 74

1  Q.  You did not hire her.  She was hired
2      elsewhere; is that correct?
3  A.  No, I believe that -- when you say
4      elsewhere, do you mean somewhere other than
5      Chattahoochee Valley?
6  Q.  No.  I apologize for that.  By someone else
7      other than you.
8  A.  I believe she came temporary at first,
9      which is very common.  The reason that
10     people can be hired temporary is because of
11     an immediate need.  But then after they
12     stay for a while, then there has to be a
13     search.  I believe that's how she was
14     hired.  I'm not sure.
15 Q.  Did you also state that you believe that
16     she had been employed at CVCC for
17     approximately three years?
18 A.  Thereabout.  Two, three, something like
19     that.  I don't remember the exact number of
20     years.
21 Q.  During the time that she was employed at
22     CVCC, did she report to you?
23 A.  Yes.

Page 75

1  Q.  Was she the individual who did not have a
2      master's degree --
3  A.  Yes.
4  Q.  -- who was told to get a master's degree to
5      comply with the new regulations?
6  A.  Yes.  I believe Dr. Blackwell put that
7      language in her contract.
8  Q.  When did Ms. Gruber leave?  Do you know
9      when she actually left CVCC?
10 A.  It was towards the end of fall semester
11     2005.
12 Q.  Do you know why she left?
13 A.  She resigned.  That's ...
14 Q.  Do you know why Mrs. Gruber resigned?
15 A.  I do not.  I believe that it was because
16     she had not completed her master's degree
17     requirement within the time frame set forth
18     in the language, but I don't know how
19     that -- again, I believe the language was
20     in the contract --
21         MR. NIX:  Don't guess.  If you
22         don't know --
23         THE WITNESS:  Okay.

Page 76

1  Q.  But you do believe that she resigned and
2      not that she was terminated?
3  A.  She resigned.
4  Q.  She resigned.  So it was a voluntary
5      resignation to your knowledge?
6  A.  To my knowledge, all I know is that she
7      resigned.
8  Q.  What classes was Mrs. Gruber teaching at
9      the time that she left around fall of 2005?
10 A.  LPN classes, but I don't know if she
11     taught -- I can't remember what was being
12     taught that semester.  I believe it was
13     fundamentals.  The students would have been
14     new because the LPN students are admitted
15     in the fall semester.  LPN students enter
16     in the fall semester.
17 Q.  Did Mrs. Gruber ever -- was she ever
18     involved with or created anything called a
19     care plan, C-A-R-E?
20 A.  Every clinical instructor typically is
21     involved with care plans unless they have a
22     similar assignment like a health assessment
23     packet or --

Deposition of Dixie Peterson

August 16, 2007

Page 77

1      MR. NIX: She asked, though, if
2          she created a care plan. Do
3          they create --
4   A.  No, they don't create them. They grade
5       them.
6   Q.  Can you tell me what a care plan is? Is it
7       an acronym or is it -- does it stand for
8       something?
9   A.  It's not an acronym. A care plan is a
10      document that a student nurse or a nurse or
11      a faculty member could develop a plan on
12      how to care for a particular patient based
13      on the constraints of what a nurse can and
14      cannot do.
15  Q.  Are these hypothetical situations or live
16      patients?
17  A.  Both.
18  Q.  To your knowledge -- or do you know if, in
19      fact, Mrs. Gruber would have had care plans
20      during the last quarter or semester that
21      she taught at CVCC?
22  A.  I believe that Ms. Gruber did some
23      clinicals that last semester. I believe

Page 78

1       that she would have been involved with care
2       plans if she did clinicals.
3   Q.  So if, in fact, someone had a care plan --
4       someone being either a nursing student or a
5       nurse -- that would be because they either
6       had a live patient or, I guess, a
7       hypothetical situation; is that correct?
8       MR. NIX: Jennifer, are you
9           talking about in the school?
10      MS. COOLEY: Yes, in CVCC.
11  A.  Students, yes, do hypothetical care plans
12      as they're learning how to develop them.
13      And, yes, they do them as they are
14      preparing to care for the patients for whom
15      they are assigned.
16  Q.  And then are those care plans given to
17      someone for evaluation or for correction?
18  A.  How quickly -- Each instructor is
19      different, and how quickly they return them
20      I cannot say. But, yes, typically students
21      get those care plans back and see their
22      grades.
23  Q.  And then if, in fact, it is a live person

Page 79

1       that a care plan is being developed for, is
2       that one typically given to someone a
3       little bit faster than a hypothetical
4       situation? Is that done in an expedited
5       fashion if it's a real person?
6   A.  It's very hard to say because some care
7       plans are due before you care for the
8       patient if you're a student nurse. Some
9       are due after you have cared for the
10      patient.
11  Q.  Would it be safe to say each situation is
12      different and unique?
13  A.  It absolutely is.
14  Q.  Do you have any knowledge whether or not
15      Ms. Gruber would have lost some student
16      care plans during the last semester that
17      she was teaching at CVCC?
18  A.  I do not know about Ms. Gruber. I have
19      heard --
20      MR. NIX: Don't -- well, that's
21          all right. Go ahead. I'm
22          sorry. I shouldn't stop you
23          there.

Page 80

1   A.  -- obviously, from reading documents
2       related to this case, in the actual
3       complaint. I have asked faculty,
4       specifically Ms. Harris. I have not asked
5       Ms. Gruber because I haven't spoken with
6       her.
7       MR. NIX: That's in preparation
8           for this case. I mean, we did
9           that yesterday, so --
10      MS. COOLEY: Sure.
11      MR. NIX: -- don't talk about
12          that.
13  Q.  As far as when Ms. Gruber was employed at
14      CVCC and she would have reported directly
15      to you, was there ever a time where she or
16      one of her students would have come to you
17      and said she lost my care plans?
18  A.  I believe --
19      MR. NIX: During school you mean?
20      MS. COOLEY: During school.
21      MR. NIX: Before the case and all
22          that?
23      MS. COOLEY: Absolutely.

August 16, 2007

Deposition of Dixie Peterson

Page 81

1  Q.  During the time that Ms. Gruber was
2       employed at CVCC -- I want to make sure
3       we're setting up the right time frame.
4            During the time that she was employed
5       at CVCC, did either Ms. Gruber come to you
6       or a student come to you or another faculty
7       member come to you and say, Mrs. Gruber
8       somehow lost the care plans for these
9       students?
10 A.  I'm pretty sure the first time I heard
11      about it is when Lindy mentioned something
12      to me.
13 Q.  Was that after the case was filed, after
14      the lawsuit was filed?
15 A.  No, I believe it was during an appeal, but
16      I can't remember -- a grade appeal.  I
17      can't remember exactly.
18 Q.  An internal grade appeal within CVCC?
19 A.  Yes.
20 Q.  So would that be during the time frame that
21      Lindy would have still been a student at
22      CVCC?
23 A.  Yes.

Page 82

1  Q.  You said that you believed that Lindy told
2       you about that.  Do you recall any
3       conversation that you and Lindy may have
4       had --
5  A.  I can't say that she specifically told me.
6       I think she did or I heard that she said
7       some care plans were lost.  I can't
8       remember which one it was.
9  Q.  But to your knowledge, the only person that
10      even mentioned that to you at that point in
11      time would have been Lindy and not anyone
12      else; is that correct?
13 A.  That is correct.
14 Q.  Did you follow up on or do any research to
15      determine whether or not that was a rumor
16      or a fact?
17 A.  I did.
18 Q.  And what was your finding?
19 A.  I talked to Ms. Harris at length, and she
20      assured me that no care plans were lost.
21      She assured me that she had given grades
22      for -- or recorded grades for care plans
23      that instructors had given her and that she

Page 83

1       believed that the only thing that
2       potentially was lost was an assignment that
3       students had been given in the summer by
4       Mrs. Gunnels.  What that assignment was I
5       do not know.
6  Q.  And what I'm trying to figure out is, why
7       would Ms. Harris have been recording
8       Mrs. Gruber's grades?
9  A.  Because the lead instructor always does
10      that.
11 Q.  Okay.
12 A.  And he or she is in charge of the course.
13 Q.  So Ms. Harris was in charge of the course.
14      Ms. Gruber reported to Ms. Harris then?
15 A.  Or would have submitted them some way to
16      Ms. Harris, yes.
17 Q.  So Ms. Harris would have been the lead
18      instructor for that particular -- that
19      clinical course; is that correct?
20 A.  The lead instructor is in charge of the
21      class in clinicals because grades are not
22      given separately.  One grade is given for
23      the course.  And in some courses, care

Page 84

1       plans were part of grades and other courses
2       they were not.
3            So clinical instructors do not give
4       grades in a course.  They just record
5       grades for assignments in their clinical
6       areas.
7  Q.  Do they also give some type of evaluation
8       or recommendation on that student's ability
9       to perform in the clinical setting to the
10      head instructor or lead instructor on a
11      course?
12 A.  Yes.  They submit those clinical evaluation
13      plans to the lead instructor.
14 Q.  So to your knowledge, the only care plans
15      that would have potentially been lost, that
16      was only brought to your attention through
17      Lindy Wright.  And then you followed up on
18      that with Ms. Harris, and Ms. Harris
19      assured you that care plans were not lost;
20      in fact, grades had been recorded.  That if
21      anything was missing, it was an assignment
22      that had occurred that summer with the
23      students.  Is that correct?

21 (Pages 81 to 84)

Deposition of Dixie Peterson

August 16, 2007

Page 85

1    A.   That she felt that that was the only thing
2    that anybody could be talking about, that I
3    could be talking -- asking her about, that
4    she had heard from students that
5    Ms. Gunnels had given an assignment in the
6    summer and had asked students to have it
7    ready in the fall. But I've asked her
8    repeatedly if care plans have been lost,
9    and she said no.
10   Q.   And did she mention or elaborate what that
11   potential lost assignment might would have
12   been?
13   A.   She did not know.
14        MR. NIX: Talking about the summer
15        assignment?
16        MS. COOLEY: Yes, that summer
17        assignment that she mentioned
18        that had been -- that could be
19        the only potential lost.
20   Q.   Are you familiar with the course 252 in the
21   fall of 2005 which was Adult Nursing?
22   A.   Yes.
23   Q.   Are you familiar with the course in the

Page 86

1    spring of 2006 referred to as 200, Adult
2    Nursing?
3    A.   Yes.
4    Q.   Are you familiar with Lindy Wright being
5    allowed to take Adult Nursing 200 in the
6    spring of 2006?
7    A.   Yes.
8    Q.   What is your understanding of how that came
9    to be as far as her being allowed to take
10   an Adult Nursing 200 class?
11   A.   Okay. And I'm not sure if I can do this,
12   but I'll try, so just tell me if this is
13   not okay. But I believe I got a date wrong
14   earlier.
15        We actually implemented the
16   standardized curriculum in the summer of
17   2006 because it was mandatory to do so by
18   fall of 2006. We did not want to have
19   students start an old curriculum in the
20   summer and then a standardized curriculum
21   in the fall, so I may have misstated
22   earlier.
23   Q.   So in the fall of '06, mandatory new

Page 87

1    curriculum?
2    A.   Right, but since --
3        MR. NIX: No -- well, that's
4        right. Implemented in the
5        summer.
6    A.   But students are admitted in the summer,
7    and we did not want them to do what we now
8    call the old curriculum for one semester
9    and then start a new curriculum.
10   Q.   At what point in that summer did you-all
11   begin the transition period for the fall of
12   '06 mandatory curriculum?
13   A.   Immediately upon admission to the program.
14   Q.   Do you know about when that would have
15   occurred, the admission dates for summer of
16   '06?
17   A.   It would probably have been in the very
18   last week of May.
19   Q.   Okay.
20   A.   Typically the summer semester starts in the
21   last week of May every year.
22   Q.   And as far as beginning that process for, I
23   guess, streamlining your curriculum, what

Page 88

1    would that have entailed?
2    A.   There was probably about two years
3    preparation statewide or longer, two or
4    three years of statewide preparation where
5    nursing faculty, nursing chairs, nursing
6    deans came to Montgomery and actually
7    developed the standardized curriculum
8    course by course.
9    Q.   Okay. And then how was that implemented
10   from the statewide all the way down to CV?
11   What did CV do beginning in the summer of
12   '06 to begin that streamlining process for
13   the curriculum?
14   A.   There are a series of things that have to
15   be done in the academic dean's office and
16   system-wide where the courses are put onto
17   a computer system. And courses have what
18   are called CIP codes that come from
19   postsecondary. It's a classification
20   system.
21        And so those kinds of processes,
22   operational things would have taken place.
23   And then, of course, those students who

August 16, 2007

Deposition of Dixie Peterson

| Page 89 |
| --- |

1 were admitted to that program did not take
2 an entrance exam. The new admission
3 criteria would have been implemented.
4 Q. Are you saying sic as in S-I-C codes?
5 A. C-I-P, CIP.
6 Q. CIP. As far as the CIP codes, was there
7 some person or entity that did data entry
8 to make the comparison between the old
9 classes and the new classes?
10 A. I would assume so, but I don't know who
11 exactly that would be. I assume that it
12 would be someone in the computer department
13 or the dean of instruction's office or
14 both.
15 Q. Was that something that was done on a
16 statewide level and then fed to y'all in
17 some type of a data map or was that --
18 A. Yes, it was done at the statewide level,
19 exactly. And then each school -- I'm not
20 sure how the information got onto a system,
21 but ...
22       And then at the department of
23 postsecondary, these courses were added to

| Page 90 |
| --- |

1 what's called the Statewide Common Course
2 Directory.
3 Q. Going back to the 252 and 200 that we
4 referenced previously, you were going to
5 tell us about your understanding of what
6 occurred with Lindy with the Adult Nursing
7 252 in the fall of 2005 and then Adult
8 Nursing 200 in the spring of 2006.
9 A. Okay. I suppose I'll start with 252. What
10 exactly do you want me to tell you?
11 Q. Anything that's your understanding and your
12 involvement of what occurred only with
13 Lindy Wright during that time frame with
14 those particular grades.
15 A. Okay. What I understand is that Lindy at
16 the end of the semester was told that she
17 had to make a certain grade on the final,
18 which is a typical thing for instructors to
19 tell students because students want to know
20 what number of points that they need.
21       And it is my understanding -- I did not
22 witness -- that when grades were being
23 given out that Lindy, as did her fellow

| Page 91 |
| --- |

1 students, go to find out what their final
2 grades were. And she would later learn that she
3 made on the final and that her points did
4 not add up to 750.
5       From that point, my understanding is
6 that she wanted to see her test grades --
7 her tests, excuse me, not her test
8 grades -- or both and that she wanted to
9 review them.
10 Q. Okay. Are you aware of her being allowed
11 to take Nursing 200 in the spring of 2006?
12 A. Yes.
13 Q. And at that time, it was referred to as
14 Adult Nursing; is that correct?
15 A. Nursing 200 was not Adult Nursing, no.
16 Q. What was that? What was the name of that
17 class?
18 A. I'm not sure exactly what the title, but
19 the course is intended -- it's a transition
20 course for students who are coming into the
21 mobility program, so it's not an adult
22 health course.
23       It's a course whereby students are

| Page 92 |
| --- |

1 assessed immediately precedingthe program
2 in order to determine if they can progress
3 into the program. It is intended atall
4 schools and is implemented in all schools
5 to be a transition course.
6       It's a melting pot course where
7 students -- where faculty review all
8 concepts that a student should have learned
9 in an LPN program and to ensure that they
10 are ready to move on, so it takes the place
11 of an entrance test mechanism.
12 Q. In the spring of 2006, was Nursing 200 a
13 mandatory course?
14 A. Yes, for students who had not gone through
15 a statewide standardized LPN curriculum.
16 It was for new students coming into our RN
17 program who had not graduated from a
18 statewide standardized LPN program.
19 Q. To your knowledge, had Lindy graduated from
20 a statewide recognized LPN program?
21 A. No, she had not graduated from a
22 standardized curriculum.
23 Q. Okay.

Deposition of Dixie Peterson

Page 93

1    A.  And the reason that Lindy was offered 200
2        is because that was a course that was the
3        most appropriate.  In an attempt to help
4        her graduate on time, Ms. Harris and I
5        talked about it and we approached her and
6        another student and offered them the
7        opportunity to take 200 so that they could
8        graduate on time rather than come back the
9        following year and try to find a course
10       that was the most appropriate for her to
11       repeat.
12   Q.  So was 200 -- when you say being allowed to
13       graduate on time, was Nursing 200 in the
14       spring of 2006 that you and Ms. Harris
15       thought that was the best idea for Lindy to
16       take, that was done in an effort for Lindy
17       to graduate on time; is that correct?
18   A.  Absolutely.
19   Q.  When you say graduate on time, did that
20       mean that the assumption was that that
21       spring of 2006, Nursing 200, she would be
22       given credit in order to have the 750
23       points that she needed that she had lost in

Page 94

1        the 252?
2    A.  No.  What would happen is because she was
3        unsuccessful in the fall semester
4        grade-wise in 252 and 271 and her appeal --
5        we ruled in her favor on her appeal for
6        271, that meant she only had one failure,
7        so then she still had to repeat 252.
8    Q.  Okay.
9    A.  252 would not exist in the new curriculum.
10       So what would have to happen is that she
11       would have had to have been blended in with
12       another course that would not have been
13       exactly designed like 252, but we would
14       have had to have put her in one as close as
15       possible in order for her to repeat the
16       material.
17           In an effort to help her and -- so that
18       she could graduate in May of '07 -- excuse
19       me, '06, we offered her the opportunity to
20       take 200 with Ms. Harris molding the
21       assignments to the content that was in 252.
22   Q.  Okay.  So when Ms. Harris molded -- it
23       sounds like almost customized it for her.

Page 95

1        Is that what she did?
2    A.  That would be a very good word.
3    Q.  So when she customized it, did she
4        customize it to do not only the transition
5        melting pot course but also to focus or
6        carve out some of the Adult Nursing
7        concepts as well?
8    A.  Mostly to do the latter, not the former
9        because of -- Lindy would not have needed
10       that.  She was already admitted to the
11       program and we already validated that she
12       had the knowledge as an LPN, so we did
13       not -- the course was not to serve that
14       purpose.
15   Q.  So the course was, in essence, to assist
16       her with Adult Nursing then; is that
17       correct?
18   A.  That was the intent, yes.
19   Q.  So it was about as close as custom tailored
20       as you could make it for Adult Nursing for
21       Lindy?
22   A.  Yes.
23   Q.  So would it be safe to say that Nursing

Page 96

1        200, even though it was called a different
2        number -- and I'm referring to the spring
3        of 2006, the Nursing 200, in essence it
4        was, in fact, Adult Nursing, but
5        custom-tailored for Lindy?
6    A.  There were adult health concepts.  And all
7        that Ms. Harris did, I could -- I could not
8        speak for her because she was the
9        instructor of record and then she was the
10       one who decided what needed to be done in
11       the course, not me.  I just was involved at
12       the point that I would request that the
13       course be a substitute for 252 that would
14       no longer exist.
15   Q.  So, in fact, you did request that it be a
16       substitute for 252 that was no longer going
17       to exist; is that correct?
18   A.  That's correct.  Actually, my health
19       science coordinator filled out the paper.
20       It's not in my handwriting.  But I asked
21       her to do a course substitution form.
22   Q.  Okay.  And you're aware that Lindy made an
23       A in that course, in the course we're

24 (Pages 93 to 96)

Page 97

1   referring to as the spring 2006, the Adult
2   Nursing 200 that y'all basically
3   custom-tailored for Lindy; is that correct?
4   A.  Yes, I'm aware she made an A.
5   Q.  Nursing 272 in the spring of 2006, did that
6   consist of pediatrics?
7   A.  Yes, it did.
8   Q.  Was that the proper name for it?
9   A.  Yes.
10  Q.  Pediatrics?
11  A.  Uh-huh.  (Positive response.)
12  Q.  In the pediatrics course, are you aware of
13  how Lindy faired in that class in 272 in
14  the spring of 2006?
15  A.  Pretty much based on Lindy's description
16  and coming to talk to me, yes.  I think
17  that she was very close.  I don't remember
18  the number of points exactly, but a student
19  has to have 750.  I don't remember the
20  number of points.
21  Q.  Is that 750 points per class that a student
22  takes in order to progress to the next
23  level?

Page 98

1   A.  Yes.  It's 750 points, which is synonymous,
2   as you can see, with 75 percent.
3   Q.  What is your understanding of what Lindy
4   did in Nursing 272 in the spring of 2006?
5   A.  What she did in regards to --
6   Q.  Grade-wise, yes, ma'am, in the pediatrics
7   course.
8   A.  I don't know what her test grades were.  I
9   don't think they were very good, but I
10  don't -- I don't remember exactly what they
11  were.  I know what Lindy told me, and then
12  I know that there is a grade sheet, you
13  know, where students get their grade sheets
14  and the points are outlined.
15  Q.  What is your understanding of what Lindy
16  told you how she faired in 272 in the
17  spring of 2006?
18  A.  That she was close.  And, again, I don't
19  remember what she told me as far as number
20  of points, but that she was close.  And she
21  asked me about care plans.  We talked a
22  little bit about care plans and the grades
23  that she had made on some care plans.

Page 99

1   We talked in the dean's office during
2   the time that she was in appeal.  She asked
3   me to help her.  I told her I wanted to
4   help her, I said, but I'm not the
5   instructor and, you know, that's not
6   anything that I can rule on.  The only
7   thing I can tell you to do is to go back to
8   your instructor and check your points and
9   you can ask her if you -- if you can do
10  your -- redo your care plans, but I can't
11  answer for her.
12  Q.  Do you remember who she told you her
13  instructor was for 272?
14  A.  Yes.  It was Ms. Harris.
15  Q.  Ms. Harris?
16  A.  Uh-huh.  (Positive response.)
17  Q.  You said that y'all had a meeting -- or you
18  believe that y'all had a meeting in the
19  dean's office?
20  A.  Well, Lindy came by, yes, and we were in
21  the dean's office.  Yes.
22  Q.  Which dean?
23  A.  Lowe.  Lowe.

Page 100

1   She was in the midst of trying to go
2   around, looking for her things and make
3   appointments, yes.
4   Q.  Was that during the grade appeal process?
5   A.  I believe it was.
6   Q.  Do you recall the conversation that would
7   have occurred between Dean Lowe, Lindy and
8   yourself?
9   A.  Pretty much.  Lindy, again, was trying to
10  gather her information or I believe make
11  appointments with Ms. Harris and find out
12  the process again.  Again, she asked me to
13  help her, and I referred her back to the
14  instructor.
15  Q.  So you do recall Lindy requesting help from
16  you, and you referred her back to the
17  instructor, Ms. Harris?
18  A.  She said, will you help me?  And I said,
19  Lindy, I want to help you.  And we talked
20  about care plans, and I told her that I
21  could not authorize that.  I was not the
22  instructor of record.  But, I said, you can
23  go back and see, because I didn't know

August 16, 2007

Deposition of Dixie Peterson

Page 101

1  anything about the particulars of the
2  grades or what was done, what was not
3  done. So Lindy said she would do that.
4  Q. In reference to the care plans, can you
5  elaborate a little more about that? You
6  stated that came up in the conversation.
7  Was there something specific regarding care
8  plans that was mentioned?
9  A. What I recall was that I believe Lindy may
10  have told me the grades that she made on
11  the care plans, but I don't remember the
12  grades. Again, she was telling me --
13  MR. NIX: If you don't remember,
14  now, don't speculate. Okay?
15  THE WITNESS: Okay.
16  MR. NIX: If you remember, please
17  tell her, but --
18  A. I don't remember the grades.
19  Q. That's fine.
20  A. And what I remember is that she asked for
21  the help, and I referred her back to
22  Ms. Harris.
23  Q. But as far as what would have been in the

Page 102

1  care plans, you don't recall --
2  A. Absolutely not.
3  Q. Did Instructor Harris follow back up with
4  you to let you know whether or not Lindy
5  had contacted her to discuss the care
6  plans?
7  A. I'm pretty sure that she did. I can't
8  recall exactly. I believe what she said
9  was that at that time, she had not allowed
10  her students to do it and she wanted to be
11  fair and consistent.
12  Q. And Ms. Harris reported directly to you; is
13  that correct?
14  A. At that time, yes.
15  Q. Could you have authorized her to allow -- I
16  mean, was it within your supervisory power,
17  if you will, to mandate that she allow
18  Lindy to review the care plans?
19  A. I don't think it was within my power. I've
20  never done that in all of my years of being
21  chair unless there was a blatant, obvious
22  mathematical error.
23  Q. You didn't know if there had been a

Page 103

1  mathematical error or not, correct, because
2  you hadn't seen the care plans?
3  MR. NIX: Object to the form of
4  that.
5  A. Lindy had not indicated to me that there
6  was a mathematical error.
7  Q. Do you have an opinion or an understanding
8  as to what course forgiveness is at CVCC?
9  A. I absolutely know almost nothing about
10  course forgiveness. I never have dealt
11  with it before ever except when it came up
12  in this complaint.
13  Q. And this complaint, you're referring to
14  Lindy Wright's complaint?
15  A. Yes.
16  Q. So up until then, that is not something
17  that you had dealt with in your 23 years
18  at --
19  A. Ever.
20  Q. Okay. You have not dealt with it.
21  Have you had any of your students deal
22  with it with another individual and then
23  have brought you into it?

Page 104

1  A. No, never.
2  Q. So there hasn't been any contact between
3  you and another student regarding course
4  forgiveness?
5  A. Absolutely not.
6  Q. So do you have an understanding at all as
7  to what course forgiveness is as recognized
8  by CVCC?
9  MR. NIX: I object to the form.
10  She's already said she
11  doesn't --
12  MS. COOLEY: She said she didn't
13  have an opinion as to it.
14  Q. Do you have an understanding as to it?
15  MR. NIX: No. She said she knew
16  nothing about it.
17  Q. I just want to verify. You know nothing
18  about course forgiveness as it's defined at
19  CVCC; is that correct?
20  A. Just that I've read the policy in the
21  catalog.
22  Q. What about the grade appeal process at
23  CVCC? Are you familiar with that process?

26 (Pages 101 to 104)

Deposition of Dixie Peterson

August 16, 2007

Page 105

1   A.  Yes.
2   Q.  Is that something that you've been involved
3       with with your students previously?
4   A.  Yes.
5   Q.  Is that something that you've been involved
6       with on a frequent or infrequent basis with
7       your students?
8   A.  I would say infrequent.  In fact, we had to
9       report that at our recent accreditation.
10  Q.  When you say report, what does that mean?
11  A.  Actually submit the number and types of
12      grade appeals.
13  Q.  So basically it's almost like an accounting
14      type process of how many folks have
15      appealed, and you report that to -- is that
16      what you're saying?
17  A.  No, it's not an accounting process.  It was
18      part of the accreditation process when they
19      came.
20  Q.  And they being the Board of Nursing?
21  A.  The National League for Nursing Accrediting
22      Commission, yes.
23  Q.  When was that that they came recently?

Page 106

1   A.  November '06.
2   Q.  Are you familiar with a student named Arit
3       Umoh?
4   A.  Yes.
5   Q.  Was she one of the students enrolled at
6       CVCC?
7   A.  Yes.
8   Q.  To your knowledge, was she allowed course
9       forgiveness within CVCC's nursing program?
10  A.  No, not to my knowledge.
11  Q.  Are you familiar with a student Shannah
12      Lowe?
13  A.  Yes.
14  Q.  Was she a student at the CVCC nursing
15      program?
16  A.  Yes.
17  Q.  Do you know?  Was she -- or are you aware
18      that she was allowed to take a makeup lab
19      for Pediatrics 272?
20  A.  Yes, I'm aware of that.
21  Q.  Do you know Elise Sizemore?
22  A.  Yes.
23  Q.  Was she a student at CVCC's nursing

Page 107

1       program?
2   A.  Yes.
3   Q.  To your knowledge, was she allowed to
4       administer medication without having
5       completed the medication calculation test
6       successfully to your knowledge?
7   A.  My understanding is -- I don't know for
8       sure.
9   Q.  But you are aware that she was a student at
10      CVCC?
11  A.  Yes.
12  Q.  Do you know an individual named Carola
13      Rambo?
14  A.  Yes.
15  Q.  Was Ms. Rambo a student at CVCC?
16  A.  Yes.
17  Q.  To your knowledge, was she allowed course
18      forgiveness for 272?
19  A.  No.
20  Q.  Do you know an individual named Courtney
21      Kelly?
22  A.  Yes.
23  Q.  Was she a student at CVCC?

Page 108

1   A.  Yes, and she is a student now at CVCC.
2   Q.  To your knowledge, when she was a previous
3       student at CVCC, did she, in fact, fail two
4       classes at CVCC within the nursing program?
5   A.  She failed --
6           MR. NIX:  If you know.
7   A.  She failed three.
8   Q.  In the nursing program?
9   A.  Simultaneously, not three separate
10      occasions, because of not coming to class.
11      It was a failure for lack of attendance.
12  Q.  Okay.
13  A.  Failures for lack of attendance.  She did
14      not show up for class.  And because she did
15      not come and drop the classes, the
16      instructors were forced by policy to give
17      her F's.
18  Q.  And that was within the nursing program; is
19      that correct?
20  A.  Yes.
21  Q.  And she's a current student today; is that
22      correct?
23  A.  Yes, under new guidelines.  When she --

Page 109

1  When she failed due to absences of those
2  three courses simultaneously, that was the
3  old curriculum. She has since applied --
4  re-applied under the new guidelines and
5  been admitted, so she did not repeat the
6  program from a previous admission.
7  Q. When Ms. Kelly failed for lack of
8  attendance, was that seen still as a
9  failure within the program?
10 A. Absolutely. Absolutely. She had three
11 courses that she did not -- there are three
12 courses offered in the summer semester.
13 She did not show up for them, so she was
14 given -- I don't remember if she got WF's
15 or what was going on, but she was excluded
16 from the program.
17 Q. And that was the Nursing Mobility Program?
18 A. Yes.
19 Q. To your knowledge, is Courtney Kelly
20 related to anyone at CVCC?
21 A. No, not to my knowledge.
22 Q. Do you know an individual named Margaret
23 Howard?

Page 110

1  A. Yes. I know two Margaret Howards.
2  MR. NIX: Howard? Is that what
3  you're saying?
4  MS. COOLEY: Yes.
5  Q. Do you know an individual named Margaret
6  Howard who would have been a CVCC student?
7  A. Yes.
8  Q. Were there two Ms. Howards that were
9  students?
10 A. No.
11 Q. The Ms. Howard who was a student at CVCC,
12 to your knowledge, did she fail two classes
13 within the Nursing Mobility Program?
14 A. I don't think so. Of course, you
15 understand I don't remember every student's
16 status.
17 Q. Absolutely. Yes, ma'am.
18 MS. COOLEY: May we take a quick
19 break, please?
20 (Brief recess was taken.)
21 MS. COOLEY: Thank you for the
22 break.
23 Q. Are you familiar with an individual named

Page 111

1  Sherry Lifsey?
2  A. Lifsey, yes.
3  Q. And how are you familiar with Ms. Lifsey?
4  A. She was employed at Chattahoochee Valley
5  Community College.
6  Q. In what capacity was Ms. Lifsey employed at
7  CVCC?
8  A. As a nursing instructor.
9  MR. NIX: Can you spell that?
10 MS. COOLEY: I don't know how to
11 spell it.
12 THE WITNESS: L-I-F-S-E-Y.
13 Q. It's F. There's no T in it?
14 A. L-I-F-S-E-Y.
15 Q. How long was Ms. Lifsey employed at CVCC?
16 A. Maybe a year and a half.
17 Q. Do you know during what time frame
18 Ms. Lifsey was employed at CVCC?
19 A. She came in November of '05, I think,
20 November 1st, '05.
21 Q. Do you recall what classes Ms. Lifsey would
22 have taught at CVCC during the time that
23 she was employed?

Page 112

1  A. The first semester she came, she didn't
2  teach anything. She was with me because I
3  was teaching the courses in the LPN
4  program. So November and December until
5  such time we were out on Christmas break,
6  she didn't teach anything.
7  In spring semester, she would have
8  picked up with the second course in the new
9  LPN curriculum which would have been
10 Nursing 105.
11 Q. Is that the primary course that she taught
12 when she was at CVCC?
13 A. That was the primary one that semester, and
14 then there may have been another one. That
15 was the primary one. And then in summer
16 '06 would have been Nursing 107 would have
17 been her primary one.
18 Q. And those were LPN classes?
19 A. Yes.
20 Q. To your knowledge, did Ms. Lifsey ever
21 teach the Nursing Mobility students?
22 A. Not to my knowledge. She substituted for a
23 class period when Ms. Harris was out sick.

August 16, 2007

Page 113

1    Q.  Was that just one time to your knowledge
2         that she substituted?
3    A.  It might have been two classes, maybe a
4         total of five or six hours.
5    Q.  Do you know what class that would have been
6         that she would have substituted for
7         Ms. Harris?
8    A.  It was in spring '07.  It would have been
9         Nursing 203, I believe.
10   Q.  And you're saying that's spring of 2007?
11   A.  Yes, when she substituted --
12   Q.  So that would have been the spring that
13        just occurred, then?
14   A.  Yes.
15   Q.  During the time that Ms. Lifsey -- in
16        November and December of 2005, you said
17        that she was with you.  Did that mean she
18        was your assistant, or what did she do?
19   A.  She just followed me.  She did not have a
20        teaching assignment because she came
21        obviously in the middle of the semester.
22   Q.  Did Ms. Lifsey have a master's in nursing?
23   A.  Yes.

Page 114

1    Q.  Do you know what that master's was in?
2    A.  Nursing education.
3    Q.  Do you recall ever instructing Ms. Lifsey
4         to oversee a grade review between
5         Ms. Harris and Lindy Wright?
6    A.  I don't recall instructing, no.  It seems
7         like I remember Lynn asking her to witness
8         something, but I can't remember for sure.
9    Q.  And when you say Lynn, are you referring to
10        Instructor Harris?
11   A.  Yes.  I'm sorry.
12   Q.  She would have asked Ms. Lifsey to --
13   A.  Witness a review or something of that
14        nature is my understanding.
15   Q.  And that would have been a grade review
16        between Instructor Harris and Ms. Wright;
17        is that correct?
18   A.  I'm not sure if it was a grade review.  I
19        assume that's what it was, Lindy asking
20        questions to see her materials I suppose.
21   Q.  Okay.  But you did not instruct Ms. Lifsey
22        to be a part of that?
23   A.  Not to my recollection.

Page 115

1    Q.  Going back to Lindy's grade appeal for
2         Nursing 252, do you recall telling Lindy
3         that instructors from Wallace would be
4         involved in that grade appeal process as
5         far as their opinions and thoughts?
6    A.  I don't remember if I told Lindy that or
7         not.
8    Q.  Is it normal or is it ordinary in the
9         course of a grade appeal process for
10        Wallace instructors to be involved in that?
11   A.  I wouldn't say that it is commonplace, but
12        it is certainly within the guidelines of
13        the policy to seek outside help.
14   Q.  Are there particular individuals within
15        Wallace who specialize in grade appeals?
16   A.  No.  I believe what happened was -- and I
17        can't answer for Dean Lowe, that he
18        asked --
19            MR. NIX:  If you don't know, don't
20        speculate.
21   A.  I don't know.  I don't know.
22   Q.  So you don't know if there are individuals
23        at Wallace who have expertise in the grade

Page 116

1         appeal process; is that correct?
2    A.  I do not know.
3    Q.  And you also stated that it is not uncommon
4         to seek outside assistance in the grade
5         appeal process.
6    A.  Correct.
7    Q.  Had Wallace instructors previously been
8         sought in a grade appeal process for
9         nursing --
10   A.  From that particular college, no.
11   Q.  When you say that particular college, do
12        you mean the nursing college or Wallace,
13        the college itself?
14   A.  Both.
15   Q.  Is Wallace also the same --
16            MR. NIX:  Excuse me.  Let me go
17        back.  I think you misquoted
18        her.  I think you said -- you
19        quoted her as saying not
20        uncommon to have outside
21        people in the grade review
22        process but within the
23        guidelines.

Deposition of Dixie Peterson

1  MS. COOLEY:  I'll rephrase it.
2  MR. NIX:  I don't know.  Can you
3      read it back?  Do you mind
4      doing that?
5  (The following was read:
6  Question:  Is it normal or is it
7      ordinary in the course of a
8      grade appeal process for
9      Wallace instructors to be
10     involved in that?
11 Answer:  I wouldn't say that it is
12     commonplace, but it is
13     certainly within the
14     guidelines of the policy to
15     seek outside help.
16 Question:  Are there particular
17     individuals within Wallace who
18     specialize in grade appeals?
19 Answer:  No.  I believe what
20     happened was -- and I can't
21     answer for Dean Lowe, that he
22     asked --
23 MR. NIX:  If you don't know, don't

1      speculate.
2  Answer:  I don't know.  I don't
3      know.
4  Question:  So you don't know if
5      there are individuals at
6      Wallace who have expertise in
7      the grade appeal process; is
8      that correct?
9  Answer:  I do not know.
10 Question:  And you also stated
11     that it is not uncommon to
12     seek outside assistance in the
13     grade appeal process.
14 MR. NIX:  I think your question
15     was you said it is not
16     uncommon.  What Dixie said was
17     I would not say it's common,
18     but it's within the
19     guidelines.  And I don't want
20     there to be a disconnect on
21     that.
22 MS. COOLEY:  It's not uncommon, so
23     that was exactly what I'd

1      asked.  Okay.
2  MR. NIX:  Wait.  No.  Yeah, you
3      did.  You said not uncommon,
4      and she said --
5  MS. COOLEY:  And I said not
6      uncommon and she said it is
7      not.
8  MR. NIX:  -- I would not say it is
9      common.
10 MS. COOLEY:  So not common and --
11     all right.
12 MR. NIX:  What she said, I would
13     not say it is common.  What
14     you said was, it's not
15     uncommon.  That's different.
16 Q.  In the grade appeal process, is it common
17     for CVCC to seek outside counsel or outside
18     assistance in the grade appeal process?
19 A.  We've not had that many grade appeals.  I
20     believe it may have happened before, but I
21     don't remember when.  I know that I have
22     served on a grade appeal for another
23     college, for another nursing school in our

1      system.
2  Q.  Is Wallace -- is it Wallace University or
3      Wallace College?
4  A.  Wallace Community College in Dothan.
5  Q.  Is Wallace Community College a college that
6      has a good working relationship with CVCC?
7  A.  We have a relationship -- you know, a good
8      relationship with all of the colleges.  I
9      don't know anybody personally there.
10 Q.  Is Wallace Community College the same
11     entity who performed the distance learning
12     for --
13 A.  No, that was Wallace Community College in
14     Hanceville, Alabama.
15 Q.  There are different campuses for Wallace
16     Community College?
17 A.  Right.  It's not the same college and
18     different campuses.  It's actually
19     different colleges.  There's a Wallace
20     Community College in Selma.  There's a
21     Wallace Community College in Hanceville,
22     Andalusia, et cetera.
23 Q.  So the Wallace Community College who

Page 121

1    provided the distance learning for the
2    nursing program would not be the same
3    Wallace Community College who may or may
4    not have participated in the grade appeal
5    process?
6  A.  Correct.
7  Q.  To your knowledge, did, in fact, Wallace
8    Community College become involved in
9    Lindy's grade appeal process?
10  A.  Yes.
11  Q.  Was that the Wallace Community College that
12    was based in Dothan, Alabama?
13  A.  Yes.
14  Q.  Do you know how many individuals from
15    Wallace Community College were involved in
16    that process?
17  A.  Yes.  There were two.
18  Q.  Are those individuals, individuals who are
19    nursing faculty members?
20  A.  Yes.
21  Q.  Both of those individuals?
22  A.  Yes.
23  Q.  At the conclusion of the grade appeal

Page 122

1    process -- scratch that.
2      Who else was involved in reviewing
3    Lindy's grade appeal form?
4  A.  Well, the procedure is that the student
5    first speaks with the instructor, and the
6    instructor then provides a written response
7    to the student.
8      And then the next step is the student
9    if they disagree with the response that
10    they receive from the instructor submits it
11    to the division chair.
12      Then if the student disagrees with the
13    response from the division chair, then it
14    goes to the dean of instruction.
15  Q.  At what point did Wallace Community College
16    become involved in the grade appeal process
17    for Lindy?
18  A.  I'm not sure.  I believe it was at the
19    dean's level.
20  Q.  When you say dean, that's the dean of
21    instruction, and at that point in time that
22    would have been Dean Lowe?
23  A.  Correct.

Page 123

1  Q.  Are there any other individuals to your
2    knowledge besides Dean Lowe, the original
3    instructor and the two individuals from
4    Wallace who would have been involved in the
5    grade appeal process for Lindy for Course
6    252?
7  A.  Well, myself.  You didn't mention me, but
8    none other than those.
9  Q.  And so the team -- would that be like a
10    grade appeal team for her at that point?
11  A.  I don't think it would be called a grade
12    appeal team.  I just think it would be
13    considered -- according to policy, I think
14    the policy calls it outside experts.
15  Q.  Okay.  So would the two outside experts,
16    yourself, Dean Lowe, and the instructor who
17    would have been Ms. Harris --
18      Is that correct?
19  A.  Correct.
20  Q.  -- did you-all meet together to try to come
21    up with a plan or was it --
22  A.  No.
23  Q.  How was that done?

Page 124

1  A.  I believe Lindy followed the policy and saw
2    Ms. Harris first.  Ms. Harris gave me a
3    written summary of Lindy's grades and the
4    care plan grades, test grades, those kinds
5    of things.  I believe she gave me a written
6    summary.
7      And then I ruled in Ms. Harris's favor
8    based upon the information that I had, and
9    then it went to the dean.  And I don't
10    remember at what level the Wallace
11    Community College people were involved.
12  Q.  To your knowledge, did Ms. Harris provide a
13    written response back to Lindy Wright?
14  A.  I don't know.
15  Q.  Based on the outline that you provided to
16    me, I want to verify the grade appeal
17    process.  The first step is for the student
18    to go to the instructor, and then the
19    instructor provides a written response back
20    to the student; is that correct?
21  A.  I'm not sure if the policy says written
22    response, but the instructor has to respond
23    to the student in some fashion.  Lindy had

31 (Pages 121 to 124)

Deposition of Dixie Peterson

August 16, 2007

Page 125

1 done that, so she had seen the instructor.
2 She had performed the step that was
3 required prior to coming to me.
4 Q. So then she came to the division chair, and
5 at that point you received a summarization
6 of her grades, exam, care plan. From that,
7 you made a decision. Your decision was to
8 rule in the favor of Ms. Harris, which
9 would be against Lindy. And then at that
10 point, how did it escalate up to the level
11 of Dean Lowe? Did you initiate that?
12 A. No, Lindy did. That was the student's
13 responsibility.
14 Q. Was there ever a time that you were called
15 in to discuss or present your findings to
16 Dean Lowe regarding Lindy?
17 A. I forwarded the paperwork that I had to
18 Dean Lowe. I was actually the one who
19 mailed the suggestion to Dean Lowe that in
20 order to be fair to Lindy, because she was
21 very concerned that -- about her test, that
22 someone -- that he should consider someone
23 from the outside coming in to look at it.

Page 126

1 Q. And then from the time frame that you
2 proposed that to Dean Lowe, do you know how
3 long it took until the outside assistance
4 from Wallace Community College occurred?
5 A. I do not recall because I -- I didn't make
6 those arrangements. He did.
7 Q. And you do not know who those individuals
8 were at Wallace Community College? You
9 just know they were nursing faculty; is
10 that correct?
11 A. Right. I know their names now because I
12 read it, but I did not know them nor do I
13 know them now.
14 Q. So after Dean Lowe consulted with the
15 outside assistance, with the nursing
16 faculty at Wallace Community College, they,
17 in fact, made the final decision; is that
18 correct?
19 A. Again, I do not remember exactly if those
20 outside experts were there at exactly what
21 level. I just remember that I made that
22 recommendation, and he contacted whomever.
23 Q. Okay.

Page 127

1 A. And then they submitted their findings to
2 him. They may have given me a copy. I
3 don't remember. But since he contacted
4 them, I believe that they gave their
5 findings to him.
6 Q. You had stated previously that Lindy did,
7 in fact, mention that she thought that her
8 care plans had been lost; is that correct?
9 A. Yes, she mentioned them to me at some
10 point, yes.
11 Q. Were there any other fellow students in her
12 clinical group who mentioned that to you as
13 well?
14 A. Not that I recall.
15 Q. Were there any other students not within
16 her clinical group but within her nursing
17 student core group who had mentioned that
18 their care plans had been lost?
19 A. Not that I recall. What I remember is a
20 student coming and asking me where that
21 Ms. Gruber -- I believe they said that
22 Ms. Gruber had said that -- they had asked
23 Ms. Gruber where their assignments were and

Page 128

1 who was going to grade their assignments
2 that Ms. Gunnels had given them that
3 summer.
4 Q. Was that because Ms. Gunnels had resigned?
5 A. Yes.
6 Q. Can you tell me why Courtney Kelly was
7 allowed to re-enroll in the program if she
8 had failed three classes?
9 A. Yes. She did not re-enroll. She was under
10 the old curriculum, and she simultaneously
11 failed due to absences. Courtney had to
12 totally reapply and compete with other
13 students. She did not re-enroll.
14 Q. So it was considered a new enrollment if
15 she wanted to go through that program
16 again?
17 A. It was a new application procedure and she
18 had to compete, yes.
19 Q. Were her absences only at the final exam
20 that she had had the absences?
21 A. I don't recall at what point she was absent
22 because I was not her teacher in any of
23 those courses. I just remember that

32 (Pages 125 to 128)

Page 129

1    secretaries in the office repeatedly tried
2    to contact her because it was reported to
3    us that she was not showing up. And they
4    were trying to reach her in order to get
5    her to drop the classes.
6    Q. But a WF is still seen as a failure; is
7        that correct?
8    A. If a student withdraws from the program or
9        withdraws -- according to the policy at
10       that time, withdrawals are failures.
11   Q. And that was under the same curriculum that
12       Ms. Wright had when she was attending; is
13       that correct?
14   A. I assume so. I don't remember exactly the
15       year that Courtney was there. But, yes, it
16       should have been exactly -- it should have
17       been -- withdrawals are failures, yes.
18   Q. So if, in fact, Ms. Wright wanted to begin
19       the application process as a fresh student
20       at CVCC, would she be allowed to do that?
21   A. Absolutely. If the time span -- the State
22       has a time span. I believe it's two years.
23   Q. Two years, what? From the time that

Page 130

1    someone -- how does that work?
2    A. I've never had to look at it. I believe
3        that it is two years from the time that
4        they left the program. I don't have the
5        policy --
6    Q. Two years from the time that they left the
7        program, but they would still be considered
8        a -- if they were even accepted, it would
9        still be a new admission; is that correct?
10   A. Yes.
11   Q. Competing with all the same brand new
12       nursing students and basically taking
13       classes over from scratch; is that correct?
14   A. Well, they wouldn't be taking classes over
15       because now it's a totally -- the classes
16       are new and there are not as many as there
17       were before. There are only four classes
18       in the mobility program now. There's one
19       each semester except for the last
20       semester. There's a total of four.
21   Q. So those classes must be incredibly
22       concentrated then, aren't they?
23   A. They're very integrated, yes.

Page 131

1    MS. COOLEY: I have nothing
2        further. Thank you.
3    MR. NIX: We need a minute. I'm
4        going to ask some questions,
5        if you'll excuse us.
6    (Brief recess was taken.)
7    (Defendant's Exhibits 44 through 49
8    were marked for identification.)
9    MR. NIX: We have not been -- I
10       don't think we've been
11       offering our exhibits, any of
12       us have been really in the
13       depositions. Can we just
14       agree that anything offered
15       is -- at least the predicate
16       is --
17   MS. COOLEY: Sure.
18       EXAMINATION
19   BY MR. NIX:
20   Q. Ms. Peterson, earlier in this deposition,
21       Ms. Cooley asked you whether you recalled
22       certain things. She asked you whether you
23       recalled saying to Ms. Gunnels and/or

Page 132

1    Ms. Bellamy or both Ms. Gunnels and
2    Ms. Bellamy together that Lindy Wright
3    needed to fail or needed to be failed,
4    and your answer to that was emphatic,
5    although I'm not sure the record really
6    reflects the meaning of it. You said I do
7    not remember that at all.
8        So I would ask you this simply, very
9    simply. Have you ever said to any
10   instructor in the nursing program that any
11   particular or specific student needed to
12   fail?
13   A. Are you finished with the question?
14   Q. Yes.
15   A. No.
16   Q. Have you ever said to any instructor or
17       anyone in the nursing program that any
18       particular or specific student needed to be
19       failed by an instructor?
20   A. Absolutely not.
21   Q. Okay. You described at about that same
22       time in the deposition what your general
23       inquiry is with respect to students and how

Page 133

1   they're doing. Can you tell us what that
2   is again?
3   A.  Right, if I know what you're referring to,
4   is typically at interval times throughout
5   the semester and certainly at the final
6   time, I would inquire about how students
7   are doing, what grades seem to be, and what
8   students appear to be failing.
9   Q.  Okay. Can you tell me what you -- why you
10  do that?
11  A.  Well, obviously, first of all, to determine
12  how many students might be failing one
13  course or how many students might be
14  failing two courses to see if we're going
15  to lose any students or what number of
16  students are in jeopardy and --
17  Q.  Okay.
18  A.  Basically, that's -- that was my job.
19  Q.  All right. Now, let me show you what I
20  have marked as Defendant's Exhibit 44, and
21  I'll ask you to look at that and describe
22  it, please, for the record.
23  A.  This is a status letter regarding

Page 134

1   progression in the program.
2   Q.  All right. What is a status letter,
3   Ms. Peterson?
4   A.  A status letter is something that I
5   developed during my time there during the
6   time that I served as chair. And it would
7   actually be a letter that I would send to
8   students at the end of a semester to
9   document their progress or lack thereof --
10  actually, their lack of progress so that
11  they knew their progression status in the
12  program.
13  Q.  What is the date of that particular status
14  letter, Exhibit 44?
15  A.  It's dated December 20th, 2005.
16  Q.  Is that addressed to any particular person?
17  A.  It's to Lindy Wright, but there's no
18  physical address on here.
19  Q.  But it's addressed to her by name?
20  A.  Yes.
21  Q.  December 20, 2005. And what are you --
22  what does that letter say to Ms. Wright, to
23  Lindy Wright?

Page 135

1   A.  It says the purpose of this letter is to
2   inform you of your status and that you have
3   failed Nursing 252 and Nursing 271.
4   Q.  Does the letter quote part of the handbook,
5   the nursing student handbook, catalog?
6   A.  Yes.
7   Q.  Can you read the part that you quote in
8   that letter to Ms. Wright?
9   A.  Could you ask me that again.
10  Q.  Yes. Could you read the part of the
11  catalog or the handbook that's contained in
12  Exhibit 44 that you quote.
13  A.  It reads: Policy states that a student is
14  allowed a maximum of two failures in the
15  LPN or ADN program before he or she is
16  dismissed from the program and withdraws
17  from nursing course -- and withdrawals from
18  nursing courses are counted as failures
19  except in extenuating circumstances as
20  determined by the division chair. Students
21  cannot progress in the program until the
22  course failed has been successfully
23  repeated.

Page 136

1   Q.  So in that correspondence, you're saying to
2   Ms. Wright if I'm correct -- tell me if I'm
3   wrong -- that she has failed NUR 252 and
4   NUR 271 in the fall semester of 2005; is
5   that right?
6   A.  Yes.
7   Q.  And you quote for her the part of the
8   catalog or the handbook that states if you
9   fail two courses in the nursing program,
10  you're no longer eligible to continue in
11  that program?
12  A.  Yes.
13  Q.  Is there a block on that letter that tells
14  her her current status as of December 20,
15  2005?
16  A.  There is.
17  Q.  What is -- was her status at that time?
18  A.  At that time, for the grade appeal it said
19  may not re-enter.
20  Q.  Now, are you -- let me see it.
21        MR. NIX: I will offer Defendant's
22        Exhibit 44.
23  Q.  We've talked already, Ms. Peterson, about a

Page 137

1  grade appeal that was processed by
2  Ms. Wright; is that correct?
3  A.  Yes.
4  Q.  She actually made two grade appeals in the
5      fall -- or December of 2005, and that was a
6      grade appeal for number 251 or NUR 251 and
7      a grade appeal for NUR 271; is that
8      correct?
9  A.  No, it's for 252.
10 Q.  I'm sorry.  I said 251, didn't I?  She did
11     a grade appeal for NUR 252 and then one for
12     271, right?
13 A.  Yes.
14 Q.  Do you know the outcome of those two grade
15     appeals?
16 A.  Yes, I do.
17 Q.  Can you tell us what that was?
18 A.  The grade appeal for 252 was ruled in the
19     instructor's favor, and the grade appeal
20     for 271 was ruled in Lindy's favor.
21 Q.  So if a grade appeal is ruled in
22     Ms. Wright's favor or Lindy's favor, what
23     does that mean?

Page 138

1  A.  That means that that course did not count
2      as a failure and she should not receive a
3      failing grade for the course.
4  Q.  Do you know the reason that NUR 271, that
5      the grade appeal on NUR 271 was ruled in
6      favor of Lindy Wright?
7  A.  Yes.
8  Q.  What was that reason?
9  A.  Because I asked Dean Lowe to rule in her
10     favor because the instructor of record
11     during that time did not respond to her in
12     a timely manner.
13 Q.  And that instructor was Ms. Cash; is that
14     correct?
15 A.  That is correct.
16 Q.  Is it correct to say that the reason that
17     grade appeal was ruled in favor of Lindy
18     Wright was that there was an administrative
19     failure on the part of the teacher to
20     respond timely to the request made by
21     Ms. Wright that the grade be reconsidered?
22 A.  Yes.
23 Q.  Is it correct, Ms. Peterson, to say that

Page 139

1  the merits of that grade or the merits of
2  what Lindy Wright earned as a grade in NUR
3  271 were never considered, the merits of
4  her performance in NUR 271?
5  A.  Ask me that again.
6  Q.  I'm sorry.  Is it correct to say that
7      the -- Ms. Wright got a D in 271; is that
8      right?
9  A.  (Witness nods head up and down.)
10 Q.  And that's a failing grade, correct?
11 A.  Yes.
12 Q.  Is it correct to say that on the grade
13     appeal that Lindy Wright won that the
14     merits of her obtaining that grade were
15     never considered?
16 A.  That's correct.
17 Q.  It was an administrative situation, wasn't
18     it?
19 A.  Yes.
20 Q.  So that Ms. Wright could well have -- if
21     the merits had been considered could well
22     have failed out of school in December 2005;
23     is that right?

Page 140

1  A.  That is correct.
2  Q.  And then on 252, the merits were
3      considered, and the process of the grade
4      appeal was ruled against Ms. Wright; is
5      that right?
6  A.  Correct.
7  Q.  And therefore, that failing grade and that
8      course stood; is that right?
9  A.  Correct.
10 Q.  Now, let me show you what I've marked as
11     Defendant's Exhibit 45.  Can you just tell
12     us what that is, please.
13 A.  This is Section C of the grade appeal that
14     is completed by the dean of instruction.
15 Q.  All right.  And who is that?
16 A.  James Lowe.
17 Q.  All right.  What course was that for?
18 A.  Nursing 252.
19 Q.  And what was the ruling on Nursing 252 as
20     reflected in Defendant's Exhibit 45?
21 A.  Dean Lowe documented after reviewing the
22     information regarding Ms. Wright's appeal,
23     "I found no evidence that she received an

Page 141

1   inappropriate grade. I agree with the
2   grade of D that she received from
3   Ms. Harris."
4           MR. NIX: I would offer
5           Defendant's Exhibit 45.
6   Q.  And would you please look at Defendant's
7       Exhibit 46 and tell us what that is.
8   A.  This is Section C of the grade appeal for
9       Nursing 271.
10  Q.  All right. And that grade appeal was ruled
11      in favor of Ms. Wright; is that correct?
12  A.  That is correct.
13  Q.  And is that document on the same form as
14      Exhibit 45?
15  A.  Yes.
16  Q.  And Dean Lowe signed that exhibit, too, or
17      signed that document?
18  A.  He did.
19  Q.  And was Ms. Wright's grade changed in NUR
20      271 from a failing grade to a passing
21      grade?
22  A.  According to this.
23  Q.  Okay.

Page 142

1   A.  It's not a transcript, but according to
2       this.
3   Q.  According to Exhibit 46?
4   A.  Yes.
5           MR. NIX: I would offer Exhibit
6           46.
7   Q.  And then -- let me do this -- well, no.
8       Let's do that. I've just handed you
9       Defendant's Exhibit 47. What is that?
10  A.  This is an e-mail that I wrote to Heather
11      Chalkley who was then administrative
12      assistant to the dean of instruction and
13      copied to James Lowe, Saundra Noles and
14      Sanquita Alexander.
15  Q.  In that document, what are you saying to
16      the person that you're addressing?
17  A.  Letting Heather Chalkley know that Lindy
18      needed to register in the spring semester
19      for certain courses.
20  Q.  All right.
21  A.  And that she needed to repeat just one
22      course, not two.
23  Q.  What do you mean by repeat one course?

Page 143

1   A.  I'll just have to read the e-mail. Let's
2       see. I'm asking her to -- I'm letting her
3       know that Lindy is going to take Nursing
4       200 for 252 --
5   Q.  All right.
6   A.  -- in this e-mail.
7   Q.  And you've previously described for us the
8       fact that Nursing 200 was modified by
9       Ms. Harris to contain more of the content
10      of Nursing 252; is that right?
11  A.  That's correct.
12  Q.  And Nursing 200 as modified by Ms. Harris
13      was substituted or -- substituted, yes, for
14      252 so that Ms. Wright could proceed
15      through the program?
16  A.  Yes, and I'm letting her know that she was
17      scheduled to graduate in May 2006 if -- if
18      she passed everything.
19  Q.  Okay. Now, is there a difference between a
20      course substitution and course forgiveness?
21  A.  Yes.
22  Q.  What is a course substitution?
23  A.  A course substitution is requesting that

Page 144

1   one course content be utilized for another
2   course content.
3   Q.  Okay. And tell me again why Ms. Wright had
4       to take 200, that course 200 in the spring
5       of 2006.
6   A.  Well, she didn't have to. We offered it to
7       her because we were attempting to give her
8       an opportunity to graduate in May. But it
9       was a mechanism by which Ms. Harris, who
10      was the instructor that taught the course,
11      could mold the course to give her the
12      content that she needed.
13  Q.  But she had to take the content over again
14      basically of the course she failed; is that
15      correct?
16  A.  Yes, of 252, but not 271.
17  Q.  Correct. She got a passing grade
18      ultimately on 271, so she did not have to
19      learn the content of that course over by
20      taking 271 again, correct?
21  A.  Correct.
22  Q.  But she did have to learn the content of
23      252 because she had a failing grade in 252,

Page 145

1   and you worked out a mechanism whereby she
2   could take 200 in the spring and graduate
3   with her class in May?
4   A.  Yes.
5   Q.  If you had not done that, what would she
6   have done about retaking the substance of
7   252?
8   A.  Well, we would have had to have offered her
9   another course in the new curriculum to try
10  to mold it together.
11  Q.  Why is it that a nursing student that fails
12  a particular course must take it over
13  again?  Why is that?
14  A.  Why does a student have to take a course
15  over that he or she has failed?
16  Q.  Correct.
17  A.  Because the policy states they have to make
18  a C or better.
19  Q.  Okay.  Now, let me show you – and let me
20  ask you a question, Ms. Peterson.  Does
21  Exhibit 47 explain to Heather Chalkley what
22  happened with respect to Ms. Wright in her
23  grade appeal with regard to 252?

Page 146

1   A.  Yes.  I went into great detail.
2   Q.  All right.
3        MR. NIX:  I offer Exhibit 47.
4   Q.  And what is Exhibit 48?
5        MS. COOLEY:  Do you have Exhibit
6        46?
7        MR. NIX:  If I didn't offer 46, I
8        offer it now.
9   A.  Exhibit 48 is a grade change form.
10  Q.  All right.  What is a grade change form?
11  A.  A grade change form is changing one grade
12  to another grade.  And so because the
13  appeal was ruled in Ms. Lindy's favor, then the
14  grade needed to be changed to reflect such.
15  Q.  All right.  If a grade change had not been
16  made from a D to a C in 271, what would
17  have happened to Ms. Wright's eligibility
18  to continue in school?
19  A.  She would have been excluded after fall
20  semester '05.
21        MR. NIX:  I offer Exhibit 48.
22  Q.  Now I'll show you Exhibit 49, if you'll
23  tell me what that is, please.

Page 147

1   A.  This is an authorization for course
2   substitution in spring '06 because I had to
3   get it approved by the dean of instruction.
4   Q.  All right.  And did the dean of instruction
5   sign that document?
6   A.  He did.
7   Q.  And does that document describe the fact
8   that Ms. Wright is taking 200 in the place
9   of 252 so that she can learn the content of
10  that course and get a C in it or better?
11  A.  Well, it actually states that 252 would
12  substitute for -- excuse me, 200 would
13  substitute for 252, and it makes reference
14  to the statewide curriculum and that if she
15  were not offered this, then she would have
16  to take possibly more than one course
17  because the content was divided.  It was
18  not ... the content was integrated is a
19  better word, is what I meant to say.
20  Q.  Is it correct to say that you and Dean Lowe
21  and others were trying to assist Ms. Wright
22  by offering her 200 so that she could
23  graduate in May of 2006?

Page 148

1   A.  Absolutely.
2   Q.  And would Ms. Wright have graduated in May
3   2006 if she had passed all of her courses
4   in the spring of 2006?
5   A.  Yes, I believe she had already been sent a
6   letter by the admissions office about
7   graduation, but, yes.  The answer is yes.
8   Q.  And what happened to cause Ms. Wright not
9   to graduate in May 2006?
10  A.  The failure of Nursing 272.
11  Q.  Now, when a person fails a course,
12  Ms. Peterson, in the nursing program there
13  at Chattahoochee Valley Community College
14  and substitutes or takes another course or
15  takes the same course over again and passes
16  it, does the taking of that course over
17  again or the taking of a substitution
18  course and the passing of the course the
19  second time or the passing of the
20  substitution course cause the failure of
21  the course initially to go off of that
22  person's record?
23  A.  No.

August 16, 2007

---

Page 149

1  Q.  Does the failure of Nursing 252 in the fall
2      of 2005 even though 200 was substituted for
3      it in the spring of 2006 and Ms. Wright
4      passed it, does that failure of Nursing 252
5      stay on her record and count as a failure
6      toward -- or with respect to the policy of
7      a nursing student failing two courses and
8      thereby being excluded?
9  A.  Yes.
10 Q.  Is it correct, then, that the two courses
11     that Ms. Wright failed that caused her to
12     be disqualified were Nursing 252 in the
13     fall of 2005 and Nursing 272 in the spring
14     of 2006?
15 A.  Yes.
16 Q.  And is it correct -- you tell me.  Why did
17     Ms. Wright not graduate in May 2006?
18 A.  Because she did not pass Nursing 272.
19 Q.  And the second course also --
20 A.  Right.
21 Q.  She had two failures; is that right?
22 A.  Nursing 272 was the second failure after
23     the failure for 271 was removed.

---

Page 150

1  Q.  And is that the policy of the school?
2  A.  Absolutely.
3          MR. NIX:  Thank you.  That's all.
4      (Deposition concluded at 5:30 p.m.
5      EDT.)
6
7
8
9
10
11
12
13
14
15      * * * * * * * * * * * *
16      FURTHER DEPONENT SAITH NOT
17      * * * * * * * * * * * *
18
19
20
21
22
23

---

Page 151

1              REPORTER'S CERTIFICATE
2  STATE OF ALABAMA:
3  MONTGOMERY COUNTY:
4      I, Lisa J. Green, Registered Professional
5  Reporter and Commissioner for the State of Alabama
6  at Large, do hereby certify that I reported the
7  deposition of:
8              DIXIE PETERSON
9  who was first duly sworn by me to speak the truth,
10 the whole truth and nothing but the truth, in the
11 matter of:
12          LINDY G. WRIGHT,
13          Plaintiff,
14          Vs.
15 CHATTAHOOCHEE VALLEY COMMUNITY
16          COLLEGE (CVCC),
17          Et al.,
18          Defendants.
19          In The U.S. District Court
20          For the Middle District of Alabama
21          Eastern Division
22          Case Number 3:06-CV-1087-WKW
23 on Thursday, August 16, 2007.

---

Page 152

1      The foregoing 151 computer printed pages
2  contain a true and correct transcript of the
3  examination of said witness by counsel for the
4  parties set out herein.  The reading and signing of
5  same is hereby not waived.
6      I further certify that I am neither of kin
7  nor of counsel to the parties to said cause nor in
8  any manner interested in the results thereof.
9      This 4th day of September 2007.
10
11
12          _____
13          Lisa J. Green, Registered
            Professional Reporter and
            Commissioner for the State
14          of Alabama at Large
15
16
17
18
19
20
21
22
23

---

Page 153

```
1
2
3        I, Dixie Peterson, hereby certify that
4    I have read the foregoing transcript of my
5    deposition given on Thursday, August 16, 2007, and
6    it is a true and correct transcript of the
7    testimony given by me at the time and place stated
8    with the corrections, if any, and the reasons
9    therefor noted on a separate sheet of paper and
10   attached hereto.
11
12
13        _____
             Dixie Peterson
14
15
16
17        SWORN TO AND SUBSCRIBED before me this
18   _____ day of _____, 20__.
19
20
21        _____
             NOTARY PUBLIC
22
23
```



PLAINTIFF'S
EXHIBIT
tabbies
3

# DEPOSITION OF SANDRA GUNNELS

## July 24, 2007

## Pages 1 through 241

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**



**Page 1**

1       IN THE UNITED STATES DISTRICT COURT
2       FOR THE MIDDLE DISTRICT OF ALABAMA
3               EASTERN DIVISION
4
5   LINDY G. WRIGHT,
6       Plaintiff,
7   Vs.                    CIVIL ACTION NO.
                           3:06-CV-1087-WKW
8   CHATTAHOOCHEE VALLEY
    COMMUNITY COLLEGE (CVCC),
9   et al.,
10      Defendants.
11
12          * * * * * * * * * * * *
13
14      DEPOSITION OF SANDRA GUNNELS, taken
15   pursuant to stipulation and agreement before Lisa
16   J. Nix, Registered Professional Reporter and
17   Commissioner for the State of Alabama at Large, in
18   the Conference Room, Ramada Inn, Limited, 3560
19   Highway 431 North, Phenix City, Alabama on Tuesday,
20   July 24, 2007, commencing at approximately
21   9:40 a.m. EDT.
22
23          * * * * * * * * * * * *

**Page 2**

1               APPEARANCES,
2
3   FOR THE PLAINTIFF:
4   Mr. Peter A. Dumbuya
    Attorney at Law
5   Post Office Box 3302
    Phenix City, AL 36868
6
7   FOR THE DEFENDANT:
8   Mr. H. E. Nix, Jr.
    Ms. Brandy F. Price
9   NIX, HOLTSFORD, GILLILAND,
    HIGGINS & HITSON
10  Attorneys at Law
    Suite 300
11  4001 Carmichael Road
    Montgomery, AL 36106
12
13  ALSO PRESENT:
14  Dr. Laurel Blackwell
    Ms. Dixie Peterson
15
16
           * * * * * * * * * * * *
17
18
        EXAMINATION INDEX
19
20  SANDRA GUNNELS
        BY MR. NIX . . . . . . . . . . .   5
21
22
23

**Page 3**

1               EXHIBIT INDEX
2                       MAR
3   DEFENDANT'S EXHIBIT
4   24  Calendar for year 2005              143
5   25  Handwritten test questions and answers    153
        prepared by Lindy Wright (previously
6       marked DX-10A, B, C, D)
7   26  Sandra Gunnels' pediatric notes (G-1 -    153
        G-22)
8
    27  Documentation regarding vote of no        209
9       confidence for Dr. Blackwell
10  28  Documents regarding hiring of nursing     167
        instructor for CVCC
11
    29  Write-up documentation - Arit D. Umoh     213
12
    29-B Write-up documentation - Arit D. Umoh    215
13
    30  Composite exhibit comprised of academic   218
14      transcript for Sandra Gunnels from
        Florida State University, course
15      outlines, syllabi, student handouts
        etc.
16
    31  Copy of license for Sandra Gunnels        220
17
    32  Contact list for ADN class           221
18
    33  7/1/05 letter to Ms. Gunnels from Dr.     221
19      Blackwell
20  34  Subpoena to Sandra Gunnels           222
21  35  List prepared by Sandra Gunnels re:       223
        deposition documents
22
23  36  Transcript of oral deposition of Sandra   232
        Gunnels

**Page 4**

1               STIPULATION
2       It is hereby stipulated and agreed by and
3   between counsel representing the parties that the
4   deposition of SANDRA GUNNELS is taken pursuant to
5   the Federal Rules of Civil Procedure and that said
6   deposition may be taken before Lisa J. Nix,
7   Registered Professional Reporter and Commissioner
8   for the State of Alabama at Large, without the
9   formality of a commission, that objections to
10  questions other than objections as to the form of
11  the question need not be made at this time but may
12  be reserved for a ruling at such time as the said
13  deposition may be offered in evidence or used for
14  any other purpose by either party provided for by
15  the Statute.
16      It is further stipulated and agreed by and
17  between counsel representing the parties in this
18  case that the filing of said deposition is hereby
19  waived and may be introduced at the trial of this
20  case or used in any other manner by either party
21  hereto provided for by the Statute regardless of
22  the waiving of the filing of the same.
23      It is further stipulated and agreed by and

Page 5

1   between the parties hereto and the witness that the
2   signature of the witness to this deposition is
3   hereby not waived.
4
5                 * * * * * * * * * * * *
6
7               SANDRA GUNNELS
8         The witness, after having first been duly
9   sworn to speak the truth, the whole truth and
10  nothing but the truth testified as follows:
11              EXAMINATION
12  BY MR. NIX:
13  Q.  Would you state your name, please.
14  A.  Sandra Jean Wright Gunnels.
15  Q.  What is your address, Ms. Gunnels?
16  A.  11107 Rambling Trail, Midland, Georgia
17      31820.
18  Q.  And what is your telephone number there, if
19      you don't mind?
20  A.  706-565-8185.
21  Q.  Did you have a work address?
22  A.  Yes, I do.
23  Q.  What is that address?

Page 6

1   A.  I think it's 918 Manchester Expressway,
2       Columbus, Georgia 31904.
3   Q.  What's the employer?
4   A.  Columbus Technical College is my full-time
5       employment.
6   Q.  And if something is sent there, should it
7       go, like, to the nursing department or --
8   A.  Associate degree nursing.
9   Q.  Okay.  And what is -- Do you have a phone
10      number there?
11  A.  706-649-1167.
12  Q.  Ms. Gunnels, we talked about this before we
13      got on the record, but this deposition is
14      being taken pursuant to the Federal Rules
15      of Civil Procedure, and under those rules
16      when this deposition is completed,
17      Ms. Green can either send that deposition
18      to you, allow you to read over it and make
19      whatever corrections that she will indicate
20      to you that you can make and she'll have an
21      errata sheet with it, or if you want to,
22      you can waive the right to read and sign.
23  A.  I would prefer to read and sign simply for

Page 7

1   the reasons I said, because of the medical
2   terminology that might be utilized.
3   Q.  That's fine.  And I think the only
4       requirement is that you get it back within
5       30 days after you receive it.
6   A.  All right.
7   Q.  Ms. Gunnels, we're here today on a lawsuit
8       filed by Lindy Wright.  Do you know
9       Ms. Wright?
10  A.  Yes, sir, I do.
11  Q.  And she has sued Chattahoochee Valley
12      Community College, Dr. Laurel Blackwell,
13      Ms. Dixie Peterson, and Dean James Lowe.
14          Do you know the three individuals who I
15      have -- the names whom I stated?
16  A.  Yes, sir.
17  Q.  And are you familiar with Chattahoochee
18      Valley Community College?
19  A.  Yes, sir.
20  Q.  You worked there, right?
21  A.  Yes, sir.
22  Q.  And I know that you've given a statement in
23      this case; isn't that correct?

Page 8

1   A.  Yes, sir.
2   Q.  And you gave that statement to Ms. Cooley
3       and Mr. Dumbuya in -- I think it was
4       November 1, 2006.
5   A.  November 2006.  1st day of November, yes,
6       sir.
7   Q.  And that is a statement that was taken
8       where?  What physical location?
9   A.  Ms. Cooley's law office, I believe, was
10      where we were.
11  Q.  Where is that?
12  A.  Broad Street, Phenix City, Alabama.
13  Q.  Were you sworn in at that deposition?
14  A.  Yes, sir.
15  Q.  Who was present at that deposition -- or at
16      that sworn statement?
17  A.  Would be the court reporter, Courtney
18      Tillman Peters as I'm looking at her name,
19      Mr. Dumbuya, Ms. Cooley, Ms. Wright.  I
20      believe that was all that were there.
21  Q.  There was a break taken during the course
22      of this statement.
23  A.  Yes, sir.

Deposition of Sandra Gunnels

June 24, 2007

Page 9

1  Q.  And someone else I think, if I'm
2     interpreting it correctly, gave a
3     statement.  Do you know who that was?
4  A.  It was a past student, and her name is
5     Carola, but --
6  Q.  Ms. Rambo?
7  A.  Rambo.  That was it, yes, sir.
8  Q.  Was she present while you were giving your
9     statement?
10 A.  No, sir.
11 Q.  Were you present while she was giving her
12    statement?
13 A.  No, sir.
14 Q.  Now, a minute ago, you indicated that there
15    were some errors in the statement.  Tell me
16    what you meant by that.
17 A.  For example, spelling errors, nothing of
18    substance.  But I noticed where med-surg,
19    which is a short term we use for
20    medical-surgical nursing, was spelled
21    S-U-R-G-E instead of S-U-R-G.  One of the
22    instructor's names was spelled Grouper,
23    like the fish, and her name is Gruber,

Page 10

1     G-R-U-B-E-R.  So those types of -- just
2     spelling errors.
3  Q.  How many times have you met with either
4     Mr. Dumbuya or Ms. Cooley or both of them
5     about this case?
6  A.  I've only met with either one of them once
7     about this case or any other time.
8  Q.  And was that at the time you gave this
9     statement?
10 A.  Yes, sir.
11 Q.  Have you spoken with either of them on the
12    telephone about the case?
13 A.  No, sir.
14 Q.  How did you know to come to give this
15    statement?
16 A.  A federal marshal, I think it was, came to
17    my office and --
18       This one -- (indicating) -- or yours?
19    I'm sorry
20 Q.  No, the one you gave in November of '06.
21 A.  Their office called and asked me would I
22    come or did they need to subpoena me.  I
23    really don't remember.  I know they called

Page 11

1     me and asked me would I come.
2  Q.  You don't know who you spoke with?
3  A.  No, sir.
4  Q.  Did you know what it was about, what the
5     case was about when they called you?
6  A.  Yes, sir.
7  Q.  Now, you had spoken with Lindy Wright about
8     the case; isn't that right?
9  A.  Yes, sir.
10 Q.  Now, Ms. Gunnels, this is what I'd like for
11    you to do if you don't mind.  I've just got
12    some general questions for you.
13 A.  Okay.
14 Q.  Tell me your understanding of what this
15    case is about.
16 A.  I only know what Lindy has told me.  I
17    don't understand all of it I'm sure.
18       What I understand is she received a
19    failing grade in NUR -- I believe it was
20    272, was offered course forgiveness.  That
21    was, apparently, rescinded or whatever, and
22    then that there was another course -- I'm
23    sorry.  271, then 272, that she received

Page 12

1     not passing grades in both of those.
2  Q.  When you mixed those two numbers or changed
3     them, 271 and 272, I got confused.
4  A.  271 at that point in time -- and I know
5     they've changed since then, and I don't
6     know what the new numbers are.  But 271 was
7     obstetrical nursing, 272 was pediatric
8     nursing.
9  Q.  What is your understanding about Lindy
10    Wright's performance in either of those two
11    courses?
12 A.  Towards the end of the quarter --
13    semester --
14       I'm sorry.  I'm on quarter system now,
15    so ...
16 Q.  Okay.
17 A.  Substitute semester when I say quarter.
18    -- of obstetrical nursing, I know that
19    she was issued --
20 Q.  Which one is that?  That's 271?
21 A.  271 would be the obstetrical nursing course
22    that would have been due to end sometime in
23    December of -- '04 we're talking about or

Deposition of Sandra Gunnels

June 24, 2007

Page 13

1    '05?
2        That she was issued on at least one
3    test, if not another, a failing grade. She
4    had questions about some of the test
5    questions and the answers as to how they
6    were counted. She was allowed to look over
7    her test paper and copy down questions and
8    choices and --
9    Q. You're talking about 271?
10   A. Yes, sir.
11   Q. Okay. And this is -- it was, by the way,
12       just so that we're correct on this, that
13       course ended in '05, December '05.
14   A. Yes, sir.
15   Q. All right. And she had questions about --
16   A. Some of her test questions.
17   Q. Okay.
18   A. And she brought them to me and, actually,
19       another obstetrical instructor that I work
20       with and --
21   Q. Who was that?
22   A. Her name is Venius, V-E-N-I-U-S, Turner,
23       who is an obstetrical nursing instructor at

Page 14

1    CTC.
2        We went over some of the test
3    questions, found in the book where the
4    answer that was graded correct was not,
5    indeed, the correct answer and sent her
6    back to discuss that with her instructor.
7    Q. The answer that was graded correct was not
8       the correct answer?
9    A. Yes, sir. Would you like me to elaborate?
10   Q. She got credit for something that she got
11      wrong?
12   A. No. She didn't get credit for something
13      that she answered correctly according to
14      the references we had.
15   Q. Let me ask you this. When you went over
16      the questions on the test relative to NUR
17      271, what were you looking at?
18   A. As I remember -- and I'd like to say that
19      if I'd known all of this was going to be so
20      important, I would have written down dates
21      and times and that type of thing, but this
22      is going back as I remember.
23        She was allowed to copy down the

Page 15

1    questions in her handwriting on a piece of
2    paper with the four potential answers and
3    indicated what had been counted as correct
4    by the instructor and what she had answered
5    and what she had -- you know, the questions
6    that she disagreed with the answer that the
7    instructor accepted, if that makes more
8    sense.
9    Q. Now, when you looked at the copy that she
10      had copied down --
11   A. Yes, sir.
12   Q. -- was it in handwriting?
13   A. Yes, sir.
14   Q. Okay. Do you recall how many pieces of
15      paper there were?
16   A. No, sir.
17   Q. Do you recall how many questions there
18      were?
19   A. There were what I consider quite a few, and
20      this is a guess. Ten.
21   Q. Let me make sure I understand what you did.
22   A. Yes, sir.
23   Q. You and Ms. Turner -- both of you together;

Page 16

1    is that right?
2    A. She was in there for part of the time. I
3       can't remember if she was there for the
4       entire time.
5    Q. You, what? Looked at the piece of paper
6       that Ms. Wright had --
7    A. Yes, sir.
8    Q. -- or pieces of paper that had these
9       questions?
10   A. Yes, sir.
11   Q. From what test? Do you know? Was it more
12      than one test or was it --
13   A. I only remember doing that twice with
14      Lindy, one for obstetrics and one for
15      pediatrics. I can't say that it wasn't
16      more than once for obstetrics, but I don't
17      believe so.
18   Q. So you remember doing it once for
19      obstetrics?
20   A. Yes, ma'am -- Yes, sir.
21   Q. And once for pediatrics?
22   A. Yes, sir.
23   Q. When was pediatrics?

Deposition of Sandra Gunnels

June 24, 2007

Page 17

1   A.  That would be the NUR 272.  That was the
2       next semester.
3   Q.  That would have been --
4   A.  It would run from January to May.
5   Q.  Spring '06?
6   A.  '06.
7   Q.  So you remember doing this once for each of
8       these courses, obstetrics and pediatrics,
9       correct?
10  A.  Yes, sir, at least once.  I can't ...
11  Q.  At least once.  I guess, still, if you can
12      tell me, do you know which test or tests --
13  A.  I honestly do not.
14  Q.  -- she had made notes about?
15  A.  I honestly do not.  I know it was in
16      conjunction with the instructor that she
17      was allowed to do this.
18  Q.  In other words, the instructor allowed her
19      to do that, correct?
20  A.  That is what Lindy told me, yes.
21  Q.  Do you know who the instructor was?
22  A.  Ms. Harris, I believe.
23  Q.  Now, was Ms. Harris the instructor for both

Page 18

1       of these courses?
2   A.  I believe so, but I believe that
3       Ms. Peterson can answer that question
4       better.  I would go by her information.
5   Q.  Do you know Ms. Harris?
6   A.  No, I do not.  I've met her once.
7   Q.  Okay.  Do you know her to be a qualified
8       instructor?
9   A.  No, I do not.
10  Q.  You just don't know one way or the other?
11  A.  I have heard that she was not qualified for
12      some of the subjects that she was
13      teaching.  Now, this was in other
14      instructors' and students' opinions, but I
15      have no personal knowledge of her that
16      would make me say one way or the other,
17      just things I've heard.
18  Q.  So you don't know or you don't have any
19      personal knowledge --
20  A.  No, sir.
21  Q.  -- of her qualifications or anything like
22      that, correct?
23  A.  No, sir.

Page 19

1   Q.  So who have you heard from that says that
2       she was not qualified to teach some of the
3       courses she was teaching?
4   A.  Several students from the class of
5       2005-2006, if my years are right, who would
6       have graduated in 2006.
7   Q.  You're talking about Lindy's class, then?
8   A.  Lindy's class.
9   Q.  I think that's right.  That class was
10      subject to the '04-05 catalog and manual,
11      and I believe that class started -- June of
12      '05 was their first semester.
13  A.  May of '05, yes, sir.
14  Q.  Or May of '05.  May or June of '05; is that
15      right?
16  A.  Yes, sir.
17  Q.  Tell me who these students were.
18  A.  Let's see.  Crystal Love, April Gunnels,
19      Lindy Wright, Ereka Hicks.
20  Q.  Spell that.  Ereka?
21  A.  E-R-E-E-K-A, I believe, Hicks.
22  Q.  H-I-C-K-S?
23  A.  Yes, sir.  And there were several others,

Page 20

1       but I cannot remember who exactly.
2           And then I do not remember who told me,
3       but that Ms. Harris did not have a -- just
4       excellent reputation in the community.
5       That's just things I heard from
6       different -- that there had been issues
7       with her instructing.  And even I had heard
8       at one point in time she had been asked to
9       leave Southern Union, but that, like I
10      said, I'm presenting as gossip.  That is
11      just I-heard-on-the-street type thing, so I
12      cannot vouch for that.
13  Q.  Now, did you hear from any other persons
14      that -- let's go back to not qualified to
15      teach some of the courses she was teaching
16      at CVCC.  Did you hear that from any other
17      person other than the people you've already
18      told me about:  Crystal Love, April
19      Gunnels, Ereka Hicks, Lindy Wright?
20  A.  There were others, but I cannot remember
21      which students.
22  Q.  Were they all students?
23  A.  Yes, sir, in that class.

Page 21

1    Q.   Did you hear that from any instructors or
2         nursing professionals?
3    A.   The only two instructors at that point in
4         time were Ms. Harris and Ms. Gruber, I
5         believe.  And, no, I wasn't in
6         communication with either one of those.
7    Q.   So when did you hear this?
8    A.   During both of those quarters.  I had
9         several students call me and ask me for
10        clarification of information that they had
11        received that contradicted either what
12        their book said, or some of them I had had
13        as students in the LPN program, that they
14        were trying to get some correct
15        information, some about pediatric math
16        dosages and dosage and solutions.
17   Q.   Let me ask you this.
18   A.   Yes, sir.
19   Q.   You say during both of the -- you said
20        quarters again, but we know --
21   A.   I'm talking about semesters.
22   Q.   -- you're talking about semesters.  That's
23        fine.

Page 22

1    A.   Yes, sir.
2    Q.   So we're talking about the fall semester of
3         '05 and the spring semester of '06?
4    A.   Yes, sir.
5    Q.   Okay.  So who were those students that
6         called you?
7    A.   It was among those names that I've given
8         you, and then other instructors -- I mean
9         other students.
10   Q.   Okay.
11   A.   Like I said, if I had known that I was
12        going to be asked this, I would have
13        written down and kept names and times, but
14        I didn't realize --
15   Q.   I'm just asking for your recollection.
16   A.   To my recollection, I can't tell you
17        exactly who.
18   Q.   So they called you and they were doing
19        what, now?  They were asking you questions
20        about what?
21   A.   One incident that comes to mind is during
22        pediatric dosage and solution -- that would
23        have been NUR 272 -- that some of the

Page 23

1         things that Ms. Harris was instructing them
2         in they stated contradicted what I had
3         taught them in pediatrics, what their books
4         had said, and then those who had me in
5         pediatrics for LPN, how I had taught them
6         to do it earlier.  So they were asking
7         which methodology was correct.
8             There were some other instances, and I
9         can't remember exactly.  The pediatric math
10        one stands out.
11   Q.   So you're saying that they were studying
12        the very same thing in NUR 272 that you
13        taught them in LPN school?
14   A.   And also in pharmacology, certain things.
15        I taught -- This group, I taught their
16        pharmacology class and so had taught them
17        to do math problems in a specific manner,
18        and this contradicted what I had taught
19        them earlier.
20   Q.   Now, Lindy Wright was one of your students,
21        correct?
22   A.   Yes, sir.
23   Q.   You taught her in LPN school?

Page 24

1    A.   Yes, sir.
2    Q.   You taught her in the summer of 2005,
3         correct?
4    A.   Not the -- Yes, summer of 2005.
5    Q.   Did she know how to do computations and
6         calculations relative to dosages of
7         medication?
8    A.   Yes, sir.
9    Q.   When you taught her, did she know that?
10   A.   Yes, sir.
11   Q.   So you would talk to these students and
12        give them answers?
13   A.   Primarily, for example, with the
14        computation, I remember telling them that
15        even though that contradicted how I had
16        taught them and -- what I knew was that
17        Ms. Harris was teaching the class and that
18        they needed to, obviously, do it the way
19        she had taught them if they wanted to be
20        successful in the class.
21   Q.   Apparently, they told you then how she was
22        teaching them to make these calculations.
23   A.   Yes, sir.

Page 25

1  Q.  Is that right?
2  A.  Yes, sir.
3  Q.  And so do you recall the way -- Do you
4      recall whether the way she was teaching it
5      would allow the students to arrive at a
6      correct result?
7  A.  Based on what they told me -- and they
8      called me with several math problems and
9      asked me how I would figure them out.  What
10     they reported to me that Ms. Harris was
11     telling them, you know, would kind of go
12     off there -- was incorrect, and it had to
13     do with how you rounded in pediatric
14     dosages.
15 Q.  Now, would you agree with me that
16     instructors and professors are present in
17     the class to teach and instruct because
18     they have qualifications to do that and
19     that students are there to learn and obtain
20     information so that they can take their
21     tests and otherwise learn the various
22     courses they have to --
23 A.  As a general statement, yes, I would agree

Page 26

1      with that.
2  Q.  And isn't it correct -- You've been an
3      instructor; isn't that right?
4  A.  Yes, sir.
5  Q.  You're an instructor now at Columbus Tech,
6      correct?
7  A.  Yes, sir.
8  Q.  Do you ever have students that get
9      confused?
10 A.  Oh, yes, sir.
11 Q.  Do you ever have students that hear you
12     incorrectly?
13 A.  Occasionally, yes.
14 Q.  I mean, isn't it correct that students do
15     that? I mean, sometimes they hear the
16     instructor incorrectly or they even read
17     the book incorrectly in terms of what's
18     actually present in the book in terms of
19     the course?
20 A.  As a general rule, just a general
21     statement, yes --
22 Q.  Right.
23 A.  -- that can happen.

Page 27

1  Q.  Sure.  And when you talked to these
2      students, you told them, do what Ms. Harris
3      says do because she's the instructor,
4      right?
5  A.  Yes, sir.
6  Q.  Now, let's go back to -- let me pursue one
7      other thing.  You said something about her
8      reputation.
9  A.  Uh-huh.  (Positive response.)
10 Q.  What were you talking about there?
11 A.  Just in general, because Columbus is a
12     small -- Columbus, Phenix City, Opelika is
13     a small-knit nursing community, I had heard
14     that she had gone over there.  And I had
15     just been told there had -- she had had
16     issues before in some of her teachings, and
17     it was just general ...
18 Q.  She had had issues -- when you say she'd
19     gone over there, do you mean --
20 A.  To CVCC from Southern Union.
21 Q.  And you heard from somebody that she had
22     had issues --
23 A.  Yes, sir.

Page 28

1  Q.  -- in her instruction --
2  A.  Yes, sir.
3  Q.  -- at Southern Union?
4  A.  Yes, sir.
5  Q.  Who told you that?
6  A.  I cannot remember, but more than one.  I
7      honestly cannot remember.
8  Q.  Student?
9  A.  Oh, no, sir.
10 Q.  It was an adult who was a professor or a
11     nurse?  What type of person --
12 A.  I know one was up at The Medical Center on
13     pediatrics.  It was a general remark, and I
14     cannot remember who made it or who was
15     present.
16 Q.  When you say The Medical Center, what are
17     you talking about?
18 A.  The Medical Center hospital.
19 Q.  Is that -- Okay.  A facility in Columbus?
20 A.  In Columbus, yes, sir.
21 Q.  All right.
22 A.  And some other instructor had told me that,
23     and I honestly do not remember who.

June 24, 2007

Deposition of Sandra Gunnels

Page 29

1    Q.  What you're really doing is responding by
2        giving me rumor?
3    A.  Yes, sir, and I presented it as rumor,
4        gossip.
5    Q.  Right.  You did.  I know you did.
6        And the first question that I really
7        asked you when we started this was, can you
8        state whether or not Lynn Harris is a
9        qualified and good instructor or something
10       to that effect, and your answer was, no, I
11       can't, right?
12   A.  Right.
13   Q.  And therefore, the reason you can't is the
14       things that you've told me?
15   A.  Well, and, also, I've never seen her
16       resume.  I've never been present in her
17       classroom.
18   Q.  And what I want to make sure I understand,
19       Ms. Gunnels, is that you're not saying
20       she's unqualified.  You're just saying you
21       don't know?
22   A.  I'm saying I'm not in a position to judge.
23   Q.  Very good.  Now --

Page 30

1    A.  What I have presented to you is what I have
2        been told, what I have heard.  I've not
3        experienced any of that firsthand except
4        for the questions that Lindy brought me
5        that were obviously incorrect and the
6        students who called me with math problems
7        that were incorrect.
8    Q.  If they were correct.
9    A.  If they were correct.
10   Q.  And the paperwork that Lindy brought you
11       are the questions that she copied down, and
12       you say she also copied down the answers?
13   A.  Choices of answers, yes, sir.
14   Q.  And she copied down what her answer was
15       that had been marked incorrect?
16   A.  Correct.
17   Q.  And these were all questions that had been
18       marked incorrect on a test?
19   A.  Yes, sir.  I mean, that's how it was
20       presented to me, yes, sir.
21   Q.  Was this in December of 2005?  Was it in
22       May 2006?
23   A.  I cannot tell you the months  I know once

Page 31

1        during 271 and once during 272.
2    Q.  Did you keep a copy of those papers --
3    A.  No, sir.
4    Q.  -- the things that she had copied down?
5    A.  No, sir.
6    Q.  Did you know she's produced those papers?
7    A.  No, sir.  I haven't asked her.
8    Q.  Now, when you met with her -- I assume you
9        met with her and she let you see the paper,
10       or did she tell you what the questions
11       were?
12   A.  Do you mean when I met with her in my
13       office when she -- she brought paper with
14       her and said this was one of the
15       questions.  This is what I thought was the
16       answer, you know, from here in my book.
17       This is what was counted as the correct
18       answer, and my answer was counted
19       incorrectly.
20       We went through some of the references
21       that I had and found where in most cases --
22       not all of them -- Lindy's answer was what
23       the references -- the books I had said were

Page 32

1        correct.
2    Q.  But in terms -- Let's talk about 271.
3    A.  Okay.
4    Q.  That course was offered in the fall of
5        2005.
6    A.  Yes, sir.
7    Q.  Did she come to you at the end of that
8        course or in the middle of that course?  Do
9        you know when that was in the fall?
10   A.  I honestly do not remember.
11   Q.  Do you know whether she had been allowed to
12       look at the final exam in that course?
13   A.  Do you mean before the fact or --
14   Q.  No.
15   A.  -- after the fact?
16   Q.  I mean after the fact, do you know whether
17       or not these questions she copied down were
18       from her final exam or were they from
19       another test?
20   A.  I cannot remember.
21   Q.  Now, when y'all met and talked, did she
22       tell you what the question was and here is
23       what I answered and it was marked wrong, or

Page 33

1  did you actually take the piece of paper,
2  read the question and the options, see what
3  she had marked down and then respond to
4  whether or not it was right or wrong?
5  A.  I looked at the question, the responses she
6  had written down as possible responses, and
7  what she had answered and had been counted
8  incorrectly.
9  Q.  Now, I maybe wrong about this, but my
10  recollection when I talked to her in her
11  deposition -- when I asked her about these
12  questions, she said that she had been told
13  by you and Ms. Turner that her answer was
14  as correct as the answer that the teacher
15  or the instructor had selected as the
16  correct answer instead of your answer is
17  right and the answer the teacher selected
18  is wrong
19  A.  And that was true of some of the questions,
20  but some of them, as I remember, it was an
21  incorrect answer that the instructor of
22  that course was counting correct. I'd say
23  there was a mixture of them. And if I'm

Page 34

1  not mistaken, there were one or two that I
2  said, you know, I can see why she chose
3  this one, you know, as being the more
4  correct, but --
5  Q.  Now, you say there were about 10.
6  A.  As I remember.
7  Q.  Is that 10 per course, 271 and 272, or 10
8  total for both courses?
9  A.  I do not remember. If you have copies of
10  them, you know, I could look at it and
11  refresh my memory.
12  Q.  I'll let you see it in a minute.
13  A.  I remember it happening twice.
14  Q.  I want to see what your memory is first.
15  Do you know whether if on these few
16  questions -- how many do you think -- let's
17  say there were 10. How many out of 10 do
18  you think she got right that were marked
19  wrong?
20  A.  Not knowing how many questions for sure, I
21  would say 70 to 80 percent of those she
22  showed me in my opinion and the references
23  I had, she had a correct answer and credit

Page 35

1  had not been given for it.
2  Q.  And when you say 70 to 80 percent, do you
3  mean 70 to 80 percent she had answered
4  correctly and there was no other correct
5  answer, or the instructor had chosen as the
6  correct answer for that question an
7  incorrect answer?
8  Does that make sense? Because we
9  talked about --
10  A.  Could you repeat that?
11  Q.  Yeah. We talked about a situation where
12  her answer -- she told me her answer was as
13  good as the instructor's answer.
14  A.  It was as good as or more correct.
15  Q.  All right. In 70 to 80 percent of the
16  situations?
17  A.  Of the questions that she showed me.
18  Q.  As opposed to her answer was definitely
19  correct and the instructor's answer was
20  definitely wrong?
21  A.  As I remember, there were some where the
22  instructor's answer in my opinion was
23  definitely wrong, and that was one of the

Page 36

1  reasons why I had called Ms. Turner in to
2  look at it and to see if she concurred with
3  me. And we got books out at least on one
4  occasion and marked where it contradicted
5  what Ms. Harris had said was the correct
6  answer and supported what Lindy said was
7  the correct answer.
8  Q.  On one occasion or one question?
9  A.  On one occasion.
10  Q.  Let's talk about the 10 -- let's assume 10
11  or -- do your percentage if you want to.
12  That's fine.
13  Give me the percentage that you recall
14  were right as answered by Lindy and wrong
15  as answered by the instructor or as --
16  wrong as selected, the answer selected by
17  the instructor.
18  A.  And, again, going on memory, if I'm forced
19  to pick a percentage which I'm
20  uncomfortable with doing --
21  Q.  I want you to give a judgment if you can.
22  If you cannot give a judgment, that's
23  fine. If you --

Deposition of Sandra Gunnels

Page 37

1    A.  I would prefer making a judgment after I
2         saw the questions I was asked to look at.
3    Q.  You cannot give a judgment at this time?
4    A.  I can give you a guess.
5    Q.  Well, is the 70 to 80 percent a guess when
6         you gave me that?
7    A.  I'd say an educated guess, but a guess
8         without looking at the questions and going
9         through them.
10   Q.  Okay.
11   A.  Once I go through them, I could give you a
12        definite number.
13   Q.  Okay.
14   A.  And, again, I had reference books at my
15        disposal at that time, too, when I was
16        looking at those questions and going
17        through.
18   Q.  I'm going to show you Exhibit 10 to
19        Ms. Wright's deposition.  And I will tell
20        you that the pages -- I think I can show
21        you the pages that relate to what she wrote
22        down.
23   A.  Okay.

Page 38

1    Q.  I mean, this is a group of documents that
2         she produced pursuant to a subpoena, very
3         much like the one you got.  Okay?
4    A.  Okay.
5    Q.  But I did specifically ask her about them.
6         I'm going to put it like this.  Okay?  I'm
7         pretty sure that's all of them.
8            What is that?  That's not a test, is
9         it?
10   A.  I would say not, but I've never seen that
11        before, so ...
12   Q.  That wasn't one of the things she showed
13        you?
14   A.  No.
15   Q.  I've put these crossways as the ones that
16        she identified for me were her notes.
17        Let's see.  It is -- and I marked them on
18        the bottom right-hand corner as Defendant's
19        10-A, B, C, and D.
20   A.  Those were the test questions that she
21        brought?
22   Q.  Yeah.  But I'll give you that whole packet
23        just in case and tell me if that's what you

Page 39

1         looked at, at 10-A, B, C, and D.
2    A.  Well, my handwriting is on here, so ...
3            Actually, these are ones I didn't
4         remember looking at because these are not
5         obstetrical or pediatric questions.  These
6         appear to be med-surg.
7    Q.  Med-surg questions?
8    A.  Uh-huh.  (Positive response.)
9    Q.  What course would that have belonged to?
10   A.  You would have to ask Ms. Peterson or
11        Dr. Blackwell as far as what the course
12        number was, but when I --
13   Q.  But your writing is on there?
14   A.  Yes, sir.
15   Q.  Would you do this.  Would you take this
16        highlighter, and everywhere you see your
17        writing highlight it.
18   A.  Okay.  Apparently, I also showed it to my
19        med-surg instructor peers also.
20            (Brief interruption.)
21   A.  I also showed these to three of my med-surg
22        instructor peers also.
23            What if I think that could be my

Page 40

1         writing but I'm not positive because it's
2         written sideways?
3    Q.  I don't know.  I mean, if you know it's
4         your writing, mark it.
5    A.  Okay.  The ones that I'm positive are my
6         handwriting I have indicated in yellow, and
7         I believe I counted a total of 16
8         questions.
9    Q.  And are all of those med-surg questions?
10   A.  There's one that -- I was trying to look at
11        some of them.  One looks like a pediatric
12        question but could have been utilized as a
13        med-surg question.  Some of them could go
14        either way, so I cannot -- but a lot of
15        them are definitely not basic pediatric
16        questions and are not --
17            (Brief interruption.)
18   Q.  You've marked in yellow --
19   A.  Those things that I can positively identify
20        as my handwriting.
21            MR. NIX:  Lisa, you can color copy
22        these, can't you?
23            COURT REPORTER:  Yes.

10 (Pages 37 to 40)

June 24, 2007

Page 41

1   Q.   Do you know Lindy's handwriting?
2   A.   Oh, I'm sorry.
3   Q.   Do you want to look through those and see
4        if there's any other stuff that she may
5        have copied?
6   A.   Do you mean questions that she would have
7        copied or something from me or –
8   Q.   Anything that you went over with her, any
9        questions from tests --
10  A.   Just questions?
11  Q.   Questions from tests or whatever, questions
12       from tests and answers where you were
13       trying to determine for her whether she got
14       it right or wrong.
15  A.   No, sir, none of those others are test
16       questions.
17  Q.   Do you see any other paperwork in there
18       that you recognize?
19  A.   Yes, sir.  That's why I had to ask that.
20  Q.   Show me that.
21  A.   I gave her some of my old notes and
22       handouts.  Not that, but ...
23  Q.   These are yours?

Page 42

1   A.   No, those are yours.  I'm putting clips on
2        mine.
3   Q.   This is not something you gave her or --
4   A.   No, sir.
5   Q.   You didn't talk to her about it?
6   A.   Not to my ...
7   Q.   And you're putting clips on the ones that
8        you --
9   A.   The ones that came from me, yes, sir.
10  Q.   All right.
11  A.   I see forms that were mine that, obviously,
12       the college continued utilizing for
13       courses, but I didn't have anything to do
14       with filling them out or anything.
15            (Brief interruption.)
16  A.   That was also yours.  It was in this
17       group.  And then the two sets of papers
18       with the clips on them are pediatric notes
19       that I'm assuming Lindy got from me.  I
20       know I gave her some, but I don't know that
21       someone at the college didn't utilize my
22       notes and pass them out, too.  But I do
23       know I gave Lindy some pediatric notes.

Page 43

1   Q.   And the notes that you clipped are your
2        notes?
3   A.   Yes, sir, my lecture notes.  I recognize
4        them partially because of the little
5        pictures, but then also -- as what I had
6        used in the past.
7   Q.   Two groups?
8   A.   Yes, sir, that was it.  They just had
9        something sticking in between the two
10       groups.
11  Q.   Do these notes, these two groups of notes
12       go together?
13  A.   I am assuming they do, but I didn't check
14       for that.  I just recognized --
15  Q.   Can you put them together if they do go
16       together?
17  A.   I will try, because this is several
18       chapters of ... these actually go right in
19       here.
20  Q.   Put them where they belong.
21  A.   Okay.
22  Q.   Now, I'm holding in my hand the rest of
23       Exhibit 10.  I've held out 10-A, B, C, and

Page 44

1        D, and then you're giving me your pediatric
2        notes that you gave Lindy?
3   A.   Yes, sir.  I'm assuming these are the ones
4        that I gave her.
5   Q.   Okay.
6   A.   I don't know that someone didn't utilize my
7        notes and pass them out, but these are my
8        notes.
9   Q.   All right.  And the other part that I have
10       in my hand here -- the rest of Exhibit 10
11       other than 10-A, B, C, and D and your
12       pediatric notes, have you ever seen any of
13       these documents that I have in my hand here
14       that Lindy produced?
15  A.   I'll look back through those.  It's a lot
16       when you're going through them the first
17       time.
18            Now, I have seen blanks of this.  I've
19       not seen this filled out, grade appeal
20       form.
21  Q.   You've never seen the filled-out one that's
22       in Exhibit 10?
23  A.   Not to my knowledge, no, sir.

Page 45

1    I did see one nursing care plan grading
2    form, but I cannot attest to it was this
3    one. I just know that I did see one that
4    was filled out, but I don't know if it was
5    that one or not.
6  Q. If you can identify one, please do. And if
7    you cannot, just don't say anything about
8    it.
9  A. Yes, sir.
10    To my knowledge, I've never seen any of
11    these other forms. I'm sorry. That goes
12    in there.
13  Q. It does?
14  A. Yes, sir.
15  Q. Where?
16  A. Just at the back. It was just a list of
17    commonly-used abbreviations.
18  Q. I'm going to give you back these pediatric
19    notes that you gave me because I have
20    hopefully put numbers -- the letter G and
21    then a number on each page consecutively,
22    G-1 through G-22. I would just like for
23    you to verify for me that I have done

Page 46

1    that --
2  A. Okay.
3  Q. -- and that I've gotten all the pages, and
4    that all of the pages I've put a G-1, G-2,
5    G-3 all the way through G-22 are all your
6    notes and that I've marked them all
7    correctly with a G and a number.
8  A. Those are mine, and they're numbered G-1
9    through G-22.
10  Q. These are pediatric notes from your
11    lectures on pediatrics which would have
12    been --
13    Did you teach pediatrics at --
14  A. No, sir. Let me let you finish the
15    question. I'm sorry.
16  Q. Did you teach pediatrics at CVCC?
17  A. Yes, sir.
18  Q. You did?
19  A. Yes, sir.
20  Q. Do you recall the number of pediatrics --
21    the course number?
22  A. NUR 272 for the ADN students, and then I
23    also taught the LPN students MCN 124, I

Page 47

1    believe, LPN ..
2  Q. Now, which course was this from, these
3    notes, G-1 through G-22?
4  A. Those would have been notes that I utilized
5    in NUR 272 the year before when I had
6    taught that to the RN students.
7      MR. DUMBUYA: I I understand it
8        correctly, you taught the same
9        course with different numbers?
10      THE WITNESS: No. NUR 272 I
11        taught for I want to say two
12        years, but I'm not positive,
13        for CVCC, but then the LPN's
14        also had pediatrics.
15      MR. NIX: Just for order, if you
16        don't mind, Peter, could you
17        wait until the end and then
18        you can ask her whatever you
19        need to ask her.
20      MR. DUMBUYA: You were
21        interrupting and said
22        something.
23      MR. NIX: I'm sorry?

Page 48

1      MR. DUMBUYA: You were
2        interrupting and said
3        something when we took the
4        deposition of Dr. Blackwell.
5      MR. NIX: I interrupted and
6        objected --
7      MR. DUMBUYA: No, you interrupted
8        and said something, asking for
9        clarification.
10      MR. NIX: I asked you for
11        clarification. I asked
12        Jennifer for clarification,
13        depending on who was asking
14        the questions. But I didn't
15        address the witness and ask
16        questions of the witness which
17        is what I'm referring to.
18        If you don't mind, I
19        would appreciate your not
20        asking questions of the
21        witness until I'm concluded or
22        finished. Okay?
23      MR. DUMBUYA: Okay.

12 (Pages 45 to 48)

Page 49

1    MR. NIX:  Thank you.
2    MR. DUMBUYA:  I hope you don't do
3      the same thing next time.
4    MR. NIX:  Well, I've got to ask
5      clarification of you if you're
6      asking a question that needs
7      to be clarified or of Jennifer
8      if she's asking one that needs
9      to be clarified.
10        But I will not address
11      the witness until it's my turn
12      to ask questions, and that's
13      what I would hope you would do
14      and Jennifer would do as well.
15 Q.  Ms. Gunnels, you indicated initially or
16      when you looked at Exhibit 10-A, B, C, and
17      D that you did not remember looking at
18      those; is that correct?
19 A.  Not these specific questions.  As I said, I
20      knew Lindy had come by a couple of times
21      with questions.  I remember them being OB
22      and pediatric questions; obviously, at
23      least once there were medical-surgical type

Page 50

1      questions.  So that's what I was saying.
2        You know, as I told you, I remembered
3      her coming by.  I remembered pieces of
4      paper, going through reference books,
5      finding answers, that type of thing.
6 Q.  And you're certain that those other
7      documents you looked at with Lindy were
8      test questions --
9 A.  Right.
10 Q.  -- and answers that had been given and
11      other choices for answers that were
12      possible?
13 A.  As I said, I remembered looking at
14      questions.  I remembered them being
15      pediatric and obstetrical questions.
16 Q.  Okay.
17 A.  I cannot -- I know she came back -- by
18      twice with questions, and both times it was
19      with the instructor's permission that she
20      had copied down questions and answers and
21      was asking for clarification.
22 Q.  From tests?
23 A.  Uh-huh.  (Positive response.)

Page 51

1 Q.  Is that yes?
2 A.  Yes, sir.
3 Q.  Therefore, those courses would have been
4      27 -- NUR 271, which is obstetrics,
5      correct?
6 A.  Uh-huh.  (Positive response.)
7 Q.  Yes?
8 A.  Yes, sir.
9 Q.  And NUR 272, which is pediatrics, correct?
10 A.  As I said, I remembered questions from both
11      of those courses, but it might have been
12      med-surg once --
13 Q.  I'm sorry?
14 A.  It may have been merely med-surg, one of
15      those.
16 Q.  Well, I guess what I'm trying to
17      distinguish is whether you simply discussed
18      with her those courses and questions that
19      she had about them -- and I'm talking about
20      NUR 271 obstetrics, and NUR 272
21      pediatrics -- or whether she actually
22      copied down questions from tests that she
23      had taken and gotten wrong and went over

Page 52

1      them with you as opposed to going over with
2      you Exhibit 10-A, B, C, and D, which appear
3      to be questions from another course other
4      than 271 and 272.
5 A.  Could you repeat that so I make sure I
6      understand?  I want to answer correctly.
7 Q.  I'll be glad to.  Sure.
8        How many times do you think you met
9      with Lindy over the course of her tenure at
10      CVCC in the RN program or the ADN
11      program --
12        Is that what it is?  ADN?
13 A.  ADN, yes, sir.
14 Q.  Between the time you left CVCC, which I
15      believe was on or around August 31, 2005,
16      and the time she finished her last course
17      at CVCC, which was in May 2006, how many
18      times do you think you met with her about
19      nursing school?
20 A.  Two or three times.  That's as close as I
21      can get.
22 Q.  In that period of time --
23 A.  Yes, sir.

Deposition of Sandra Gunnels

Page 53

1  Q.  -- that I just stated to you?
2  A.  Uh-huh.  (Positive response.)
3  Q.  Yes?
4  A.  Yes, sir.
5  Q.  Now, was each of those times, times when
6      you went over with Lindy certain questions,
7      issues, points or subject matter of the
8      courses that she was taking at CVCC in the
9      ADN program?
10 A.  At least once, if not twice, was going over
11     questions.  Once, for example, when I gave
12     her some notes from when I had taught
13     pediatrics was that -- she was looking for
14     study aids to help her with her pediatrics
15     or in addition to what she had received
16     during the class in pediatrics.
17 Q.  All right.  I apologize to you.  That got
18     through my head without sticking.
19 A.  Okay.
20 Q.  Once or twice --
21 A.  At least once or twice with questions,
22     going over test questions.
23 Q.  Okay.  And then another time --

Page 54

1  A.  At least one other time.
2  Q.  -- where she was looking for study aids?
3  A.  Right.  Yes, sir.
4  Q.  And that's when you gave her the pediatric
5      notes, correct?
6  A.  Yes, sir.
7  Q.  All right.  This is the question I have.
8  A.  Okay.
9  Q.  Well, you said at least one or two times
10     going over test questions.
11 A.  Yes, sir.
12 Q.  Is it possible that these are the only test
13     questions you went over with her, the 10-A,
14     B, C, and D and that the other times you
15     talked to her, you were talking to her
16     about questions she had about the subject?
17 A.  It is possible.
18 Q.  It's been a good while, hasn't it?
19 A.  Well, from -- this would have been November
20     of 2005 to April or May of 2006.
21 Q.  Now, if Lindy testified that those are the
22     only documents that reflect questions she
23     copied from tests that she'd gotten wrong,

Page 55

1      would you have any reason to disagree with
2      her about that?
3  A.  No, sir.  I would defer to her.  I do know
4      we discussed OB and peds questions, but I
5      don't -- I cannot swear she brought me
6      written OB and peds questions.  I
7      remembered written questions, but ...
8  Q.  Now, this is another question I'd like to
9      ask.  With respect to any test questions
10     that she may have in your opinion gotten
11     right or that she may have -- let's do
12     this.  Let's do it this way.  Let me break
13     it down if you don't mind.
14 A.  Okay.
15 Q.  With respect to any test questions that you
16     went over with her that in your opinion she
17     was right on but was marked wrong on and
18     the instructor's answer was clearly wrong
19     as opposed to being equally as good as
20     Lindy's, okay --
21 A.  Okay.
22 Q.  -- answer, on those questions, if you take
23     just those, can you tell me whether or not

Page 56

1      if she had been given credit for those
2      questions it would have changed her grade
3      in the course that those questions related
4      to?
5  A.  No, sir, I could not say that without
6      having the test in front of me and all of
7      her possible points for that course.
8  Q.  And then the other question is, if you take
9      just the questions that you went over with
10     her where she had given an answer that in
11     your opinion was just as good as the answer
12     chosen by the instructor as the correct
13     answer but it was marked wrong on her
14     paper, first of all, as an instructor,
15     would you give a student credit for that
16     answer if it was not the answer taught in
17     the course?
18 A.  Yes, sir.
19 Q.  Why would you do that?
20 A.  I can explain to you how we do it at CTC.
21 Q.  Let me ask you this first.
22 A.  Okay.
23 Q.  Is that a discretionary call typically by

14 (Pages 53 to 56)

Deposition of Sandra Gunnels

June 24, 2007

Page 57

1  the instructor as to whether an instructor
2  is willing to give a student credit for an
3  answer that could be correct but is not the
4  answer chosen by the instructor?  Is that a
5  matter of discretion on the instructor's
6  part?
7  A.  No, that's not a good test question.  If
8      you have two equally correct answers, then
9      you would give credit for both equally
10     correct answers.
11 Q.  Well, if you have -- isn't it correct,
12     Ms. Gunnels, that in this field, in the RN
13     field, that there are issues that remain
14     controversial and where two or more
15     reasonable and conscientious professionals
16     could have a difference of opinion as to
17     the correct answer?
18 A.  In a general sense, I'm sure as with any
19     profession, yes.
20 Q.  But it's certainly true, isn't it, of the
21     nursing profession and the subjects taught
22     relative to a registered nursing course?
23 A.  I can't say that's any more true than any

Page 58

1  other professional field.
2  Q.  Well, it's true, then, is what you're
3      saying, but it's not more true than for
4      doctors or more true --
5  A.  True.
6  Q.  Is that what you're saying?
7  A.  As you're stating it, true.
8  Q.  And so my question is, if an instructor
9      taught a particular answer to a question
10     and the student gave another answer that in
11     your opinion could have been the right
12     answer but was not taught in the course,
13     wouldn't that be discretionary as to
14     whether the instructor gave credit for that
15     answer?
16 A.  To be able to say that, I would have to see
17     the syllabus.  I would have to see the
18     handouts that were given out.
19 Q.  Well, I'm asking you to assume a
20     hypothetical.  Okay?  I'm not asking you to
21     agree that that was the case.  Okay?  I'm
22     asking you to assume a hypothetical.
23     And I'm asking you to assume that an

Page 59

1  instructor asked a test question that the
2  instructor had taught a specific answer to
3  that question or had taught a specific
4  thing relative to that issue and the
5  student gave an answer that in your opinion
6  could be as correct as the instructor's
7  answer.  I'm asking you to assume that.
8  A.  Uh-huh.  (Positive response.)
9  Q.  Wouldn't it be discretionary with the
10     instructor as to whether to give the
11     student a correct answer or to not mark it
12     wrong if the student gave an answer that
13     was not taught in the class by the
14     instructor?
15 A.  If I followed you all the way through
16     correctly --
17 Q.  Yes, it was long.
18 A.  -- I would answer no.
19 Q.  Why not?
20 A.  If the student could produce evidence in
21     textbook, notes, et cetera that the
22     instructor had provided that said this was
23     an equally correct answer, then my practice

Page 60

1  has been and what I'm accustomed to in
2  academia is that credit is given for both.
3  Q.  That's your practice.
4  A.  Yes, sir.
5  Q.  But that is not everybody's practice, is
6      it?
7  A.  As I had begun to say, for example, at
8      Columbus Technical College, we run our
9      Scantrons -- we have a little more
10     sophisticated system than they had at CVCC
11     when I was there.  And it tells us what
12     percentage of questions were answered
13     correctly, incorrectly.
14        And any question that there's not a
15     majority that have, you know, answered it
16     correctly, a panel of two or three
17     instructors go over the test, we go through
18     notes, we go through the books and make a
19     decision as to whether we will accept
20     another answer.  And frequently -- I won't
21     say frequently, but often it is determined
22     that two answers are equally correct and
23     appropriate.

Page 61

1  Q.  Would you impose the Columbus Tech
2      procedure on CVCC?
3  A.  Well, I had the same procedure myself when
4      I was at CV in that I would go through my
5      tests, and if the majority missed it or if
6      someone -- I gave them an opportunity.  We
7      went over tests.  If someone challenged it
8      and could give me rationale and data as to
9      why that question should be counted
10     correctly, I considered it and most often
11     gave credit if they could prove and provide
12     me with rationale.
13 Q.  I'm not asking you what you do.
14 A.  That's the only way I can answer because
15     that would be based on my --
16 Q.  Would you impose Columbus Tech's policies
17     and procedures on CVCC?
18 A.  In that general question --
19 Q.  Would you impose and require them?
20 A.  -- in solitary questioning that, no.
21 Q.  You don't put yourself above, do you, the
22     Alabama Board of Education, the State Board
23     of Education?

Page 62

1          MR. DUMBUYA:  I would object to
2      the form of that question.
3  Q.  I'm just asking you.  Do you consider
4      yourself a higher authority than the State
5      Board of Education in Alabama in terms of a
6      nursing program and how it should be run?
7          MR. DUMBUYA:  Again, you know, I
8      would object to the form of
9      the question.
10 A.  And I would have to ask that as it depends
11     or what point we were speaking of, because
12     I frequently disagree with boards of
13     authority on certain points.
14 Q.  And do you consider yourself a higher
15     authority with regard to how a nursing
16     program should be run and operated than
17     Dixie Peterson, who is the chair of the
18     nursing program at CVCC?
19 A.  I've never been a chair, so I cannot say
20     that I do, no.
21 Q.  Now, in terms --
22 A.  I don't want to be one.
23 Q.  In terms of the notes that are taken there,

Page 63

1      10-A, B, C, and D, I know that you've
2      looked at them.  Do you know whether or not
3      Ms. Wright accurately and correctly copied
4      the actual questions and answers that were
5      set forth on the tests that she was copying
6      from?
7  A.  I was not privy to the original test, no.
8  Q.  So you do not know whether she copied them
9      accurately; would that be true?
10 A.  Yes, sir.
11 Q.  Now, you threw in a minute ago the fact
12     that you asked several of your med-surg
13     colleagues to look at this particular
14     exhibit, 10-A, B, C, and D; is that right?
15 A.  Portions of it, yes.
16 Q.  In view of the fact that you didn't even
17     remember that document, how do you know you
18     did that?
19 A.  Because I wrote down three med-surg
20     instructors picked A as an answer.
21 Q.  What are their names?
22 A.  Would have been Lisa O'Steen, Yolanda
23     Williams, and I'm making the assumption

Page 64

1      Bobbie Hunter, because those were the three
2      med-surg instructors that were employed at
3      Columbus Technical College at that time.
4  Q.  Why are you making that assumption?
5  A.  Because it says three med-surg instructors,
6      and I remember discussing it with
7      Ms. Turner and Ms. O'Steen.  And if I put
8      med-surg instructors, my assumption is
9      since neither Ms. Turner nor I, although we
10     are med-surg instructors, aren't med-surg
11     specialists --
12 Q.  Okay.
13 A.  -- that those are the two I consulted or I
14     would not have written it in that way.
15 Q.  Who's the chair of the nursing program
16     there at Columbus Tech?
17 A.  It's not set up quite that way.  My
18     immediate boss is Ken Gordon, who is
19     program director.
20 Q.  Ken Gordon?
21 A.  Yes, sir.
22 Q.  Is he a registered nurse?
23 A.  RN, MSN, yes, sir.

Page 65

1   Q.  Now, in looking at Exhibit 10-A, B, C, and
2       D, can you tell me whether or not you wrote
3       anything on those questions or on those
4       answers that would identify now which ones
5       in your opinion should have been counted
6       correctly --
7   A.  On some of them, yes, sir.
8   Q.  -- or counted correct?  I'm sorry.
9   A.  Yes, sir, on some of them, because I wrote
10      down references and where the correct
11      answer was found.
12  Q.  Tell me.  How can we identify those?  Can
13      you identify them for me?
14  A.  Where it had page numbers, 9th edition,
15      Bruner, page 1827, those types of things
16      were the references where we found them for
17      her to take back.
18  Q.  Let me ..
19          THE WITNESS:  While you're doing
20          that, could I take a little
21          break?
22          MR. NIX:  Absolutely.
23          (Brief interruption.)

Page 66

1           (Brief recess was taken.)
2   Q.  I was just looking to see.  The yellow
3       appears to have actually marked some of the
4       resources?
5   A.  Uh-huh.  (Positive response.)  Because it
6       was in my handwriting.  You told me to mark
7       everything that was in my handwriting.
8   Q.  Okay.  I'm going to give you back 10-A, B,
9       C, and D.  Let me see if I can figure out
10      something here.
11          Would you please take that pink marker
12      and highlight the resources or the -- you
13      say you put the -- someone put the
14      resources on there that constituted the
15      correct answer; is that right?
16  A.  Yes, sir, on some of them.
17  Q.  So you're putting pink highlight on those
18      places; is that right?
19  A.  Yes, sir.
20  Q.  Are you marking over some of the yellow?
21  A.  (Witness nods head up and down.)  But you
22      can tell it's yellow.
23  Q.  Okay.

Page 67

1   A.  I did it very gently.
2   Q.  Let me ask you this, Ms. Gunnels.  Do these
3       pink marks constitute questions -- let me
4       rephrase that.
5           Do these pink marks go along with all
6       of the questions that you or some other
7       person from Columbus Tech believed Lindy
8       got right?
9   A.  Ask that question again.
10  Q.  Do the pink marks, those are the
11      authorities, correct --
12  A.  Yes, sir.
13  Q.  -- for the answers that you and your
14      colleagues, I guess, believed --
15  A.  Correct.
16  Q.  -- were correct in terms of Lindy's
17      answer?
18          And I guess my question is, do those
19      marks, are they beside every one of the
20      questions and answers that you believe
21      Lindy got correct that were marked wrong?
22          Let me go about it this way.  I know
23      you're looking.

Page 68

1   A.  Yeah.
2   Q.  Isn't it correct that the reason you were
3       looking at Exhibit 10-A, B, C, and D was to
4       advise Lindy as to whether you believed she
5       got some questions right that were marked
6       wrong and then to give her some resources
7       to use in making her arguments for a change
8       in the grading of those particular
9       questions?
10  A.  That's partially correct, yes, sir.
11  Q.  What's the rest of the answer, then?
12  A.  Well, also, it was a learning experience,
13      because there were some of these that I
14      agreed that the instructor was correct and
15      spent time with Lindy explaining why her
16      answers were not correct, so ...
17  Q.  Did you or did someone mark or put on that
18      Exhibit 10-A, B, C, and D the resource
19      citation or whatever y'all call it in
20      nursing for the questions that y'all
21      believed she got right that were marked
22      wrong?
23  A.  Yes, sir.

**Page 69**

1  Q.  Did you put a resource by each one of the
2      ones that y'all believed she got right that
3      were marked wrong?
4  A.  I cannot say for sure.
5  Q.  Can you tell me out of the questions that
6      you see on those four pieces of paper,
7      10-A, B, C, and D, how many of them you
8      opine Lindy got correct where the teacher
9      was clearly wrong in marking it wrong,
10     marking Lindy's answer wrong?
11 A.  Some of them I'm having to read, so ...
12 Q.  I understand.
13 A.  From looking at this, five.
14 Q.  Looking at what?  Oh, I'm sorry.  You gave
15     me the number five.
16 A.  Yes, sir, five or six.
17 Q.  Well, is it five or six?
18 A.  Well, partially -- the copies aren't
19     excellent.  Some of the questions are cut
20     off, so I can't tell if that was a correct
21     answer or not because the question is not
22     supplied.  And there is a notation by
23     there, but I don't know what the question

**Page 70**

1      is, so I can't judge at this point exactly
2      what it means.  But one, two, three --
3  Q.  That's the way I got the documents, you
4      know.
5  A.  Five definite and potential six is what --
6      from this piece of paper.
7  Q.  Because of the cutoff?
8  A.  Uh-huh.  (Positive response.)
9  Q.  Yes?
10 A.  Yes, sir.
11 Q.  Didn't you say there were 16 total?
12 A.  16 or 15.  I can't remember at this point.
13 Q.  Now, are those five or six where you think
14     Lindy got it clearly right where the
15     teacher was clearly wrong?
16 A.  Apparently, these were the ones that I felt
17     were clearcut.
18 Q.  They are the ones you --
19 A.  Yes, sir.  I said there were five of them
20     that --
21 Q.  What I want you to do is read the question,
22     read Lindy's answer and read the teacher's
23     answer.

**Page 71**

1  A.  Okay.  If I can make it all out from
2      this -- the writing-over.  The one I cannot
3      read the question, so I cannot say for
4      sure.
5          The second one --
6  Q.  I'm talking about just the five or six
7      you --
8  A.  Okay.  The nurse is providing irrigation
9      for NG tube.  Patient's potassium level --
10         (Brief interruption.)
11 Q.  You have to go slow.
12 A.  I'm sorry.
13 Q.  Is that on 10-A?
14 A.  Yes, sir, second question.
15 Q.  The second question on 10-A, read the
16     question, please, slowly.
17 A.  The nurse is providing irrigation for
18     nasogastric tube.  The patient's potassium
19     level is four milliequivalents per liter --
20         THE WITNESS:  Is that the right
21     speed?
22         COURT REPORTER:  Thank you.
23         THE WITNESS:  I just didn't know

**Page 72**

1      how slow or how fast.
2  A.  -- and sodium is 130 per liter.  The nurse
3      would irrigate with, and from looking at
4      this Lindy picked A, which is tap water.
5          Do you want all three other options
6      or --
7  Q.  Well, Lindy picked tap water which you
8      believe is clearly correct?
9  A.  Yes, sir.
10 Q.  Is that right?
11 A.  Yes, sir.
12 Q.  Are the three other options clearly wrong,
13     or can you tell which option the teacher or
14     the instructor concluded was the correct
15     answer?
16 A.  From this piece of paper, because I don't
17     independently recollect, D is marked in red
18     on the Scantron, which is 0.9 percent
19     normal saline.
20 Q.  Is that written on that paper right there?
21 A.  Yes, sir.
22 Q.  That's what you're reading?
23 A.  Yes, sir.

Page 73

1  Q.  All right.
2  A.  And my handwriting says normal saline is
3      isotonic and would not impact the sodium
4      level.  And if I remember correctly, Lindy
5      said they had discussed this one with
6      Ms. Harris in court and she said you would
7      use normal saline because of the sodium
8      level.
9  Q.  They had discussed this with who?
10  A.  Ms. Harris.
11  Q.  In court?
12  A.  No, in class.
13  Q.  I thought you said court.
14  A.  If I said court, no.
15  Q.  I think you did say court, but anyway ...
16      So is D the answer, then, that you're
17      saying Ms. Harris --
18  A.  Chose.
19  Q.  -- chose?  Okay.  All right.
20      And then read the next one, the next
21      question that you believe is clearcut.
22  A.  Interventions, priority in the plan of care
23      for a patient with multiple myeloma.  She

Page 74

1      has that she chose B, and I'll say what
2      that is in a second.  She says Ms. Harris
3      chose A, which A was to increase the
4      fluids.  My agreement was with B, monitor
5      the red blood cells, and I have marked here
6      that that's on page 1827, 9th edition of
7      Bruner.
8  Q.  I'm sorry?
9  A.  The 9th edition of Bruner.  It's a med-surg
10      textbook.
11  Q.  Now, I didn't hear you read the whole
12      question.  Did you read the whole question?
13  A.  I read what is on here:  Intervention,
14      priority in the plan of care for the
15      patient with multiple myeloma.
16  Q.  Lindy picked B which you thought was
17      clearly correct, and Ms. Harris was A which
18      you thought was clearly wrong; is that
19      right?
20  A.  Yes, sir, with the information given in the
21      question.
22  Q.  Now, that's on 10-A?
23  A.  That's the first page, is A, yes, sir.

Page 75

1  Q.  Go to the next one.
2  A.  Patient with cancer developed complications
3      of thrombocytopenia.  Which hygiene is
4      contraindicated?  And I can't see where
5      Lindy marked what had been chosen by
6      Ms. Harris.  The question -- The answer
7      that I felt was correct or -- was correct
8      was A, brushing teeth and dental flossing
9      due to the bleeding, Chapter 303, 9th
10      edition, again, of Bruner and page 770 of
11      some other textbook.
12  Q.  Is that also on 10-A?
13  A.  Yes, sir.
14  Q.  Go to the next one.
15  A.  Okay.  Assessment of a 34 year-old patient,
16      post liver biopsy.  They have an IV of 0.9
17      percent KVO, respiration of 24, blood
18      pressure is 80 over 40, pulse 130,
19      temperature 97.  Skin is cool.  Capillary
20      refill is greater than five.  What would
21      your first action be?
22      And I have to say this is one where I
23      disagreed.  I don't know that you would --

Page 76

1      actually, I wrote on here it's a bad
2      question, because A was elevate the head of
3      the bed.  Lindy said call the physician.  C
4      is check the incision.  D was increase
5      fluids to 100 ml per hour.
6      And I disagreed with D because I felt
7      like that that wasn't even maintenance for
8      a patient of this age.  And if you went
9      through the two books that are marked
10      here ...
11  Q.  You say Lindy chose B?
12  A.  Uh-huh.  (Positive response.)
13  Q.  Yes?
14  A.  Yes, sir.  So this was one where I didn't
15      agree with Lindy, but I also didn't agree
16      with Ms. Harris.
17  Q.  So both of them got it wrong?
18  A.  In my humble opinion.
19  Q.  Okay.  We might disagree about humility,
20      but -- go to the next one.
21      That was 10-B, correct?
22  A.  That was 10-B, correct.
23  Q.  All right.

**Page 77**

1　A.　This one I'm having trouble reading, so I
2　　　can't say what the agreement or
3　　　disagreement was.
4　Q.　Well, you picked out five or six. I just
5　　　want you to tell me which ones of those --
6　A.　Yes, sir, and I'm trying to go through and
7　　　do that, so ...
8　　　　　(Brief interruption.)
9　A.　If I had longer to look at these, I
10　　　could ...
11　　　　Some of these I would have to defer to
12　　　Lindy as to what some of these notes mean
13　　　because they're not in my hand. She was
14　　　writing what I said.
15　Q.　Writing what you said?
16　A.　Uh-huh. (Positive response.)
17　Q.　Yes?
18　A.　On one of these, I thought all of the
19　　　answers would be choices.
20　Q.　Correct choices?
21　A.　Would be correct. And we do have questions
22　　　where it's pick all that are correct and
23　　　there's more than one answer. So that one

**Page 78**

1　　　I would have to defer to Lindy as to
2　　　exactly what because she wrote what.
3　Q.　But I still want you just to give -- you
4　　　told me five or six a minute ago.
5　A.　Well, I said five because the sixth one I
6　　　can't read the front, so I don't know.
7　　　And, actually, in looking at the fifth one,
8　　　I believe I told her she was wrong, so --
9　　　because it says picked D.
10　Q.　Which one was that?
11　A.　On C.
12　Q.　10-C?
13　A.　The third one down says: Caring for
14　　　patient hospitalized with acute
15　　　exacerbation of COPD. Which of the
16　　　following would the nurse expect to
17　　　evaluate on this client? Lindy picked an
18　　　incorrect answer, and I gave her the
19　　　correct answer and what page it was on.
20　Q.　So you miscounted is what you're telling
21　　　me.
22　A.　Yes, sir, in that quick brief going through
23　　　with not having the fifth one -- and one of

**Page 79**

1　　　them I said I thought she was correct, but
2　　　in looking at it I told her she was wrong.
3　Q.　Now, the one you say is cut off is on what
4　　　page?
5　A.　It's the very top of 10-A.
6　Q.　Now, let me tell you what I've got. I've
7　　　got the second question on 10-A.
8　A.　Right.
9　Q.　I've got the one about the --
10　A.　That would be the third question on 10-A
11　　　with the multiple myeloma.
12　Q.　Is that the tap water answer?
13　A.　No. I'm sorry. No. I thought you were
14　　　going down to that one. I apologize.
15　Q.　I'm just trying to recount to you.
16　A.　Right.
17　Q.　There were three on page 10-A.
18　A.　Okay.
19　Q.　Isn't that right?
20　A.　Yes, sir.
21　Q.　And then there was one on 10-B where you
22　　　said both the teacher and Lindy were wrong,
23　　　right?

**Page 80**

1　A.　That I disagreed with their answer, yes,
2　　　sir.
3　Q.　And then there was one on 10-C that you had
4　　　counted as clearly -- that Lindy got it
5　　　clearly correct and the teacher got it
6　　　clearly wrong. Now that you've looked back
7　　　over it, you've realized --
8　A.　It was the other way around.
9　Q.　-- that it was the other way around?
10　A.　Yes, sir.
11　Q.　Any others that you see on there?
12　A.　Not in looking through this selection, no,
13　　　sir. I mean, if I had more time to look at
14　　　it and read everything, I might come up
15　　　with a different answer. But in looking at
16　　　it in this time period ...
17　Q.　Well, I want you to take as much time as
18　　　you need.
19　A.　You may not want me to.
20　Q.　You've been a professor or an instructor in
21　　　nursing how long?
22　A.　I have taught for -- off and on for 30
23　　　years, so ...

Page 81

1   Q.  I mean, if you need more time, I want you
2       to take it.
3   A.  Okay.
4       Again, I don't want to answer on the
5       others because I would need Lindy here to
6       explain what some of this writing means.
7       Those four I can say with assurance. The
8       others without further consultation I could
9       not say.
10  Q.  What you're saying is, you're having a hard
11      time reading the writing on some of them?
12  A.  Some of them, yes, sir.
13  Q.  Would it be correct to say that some of
14      them where you can read the writing,
15      there's just not enough information for you
16      to tell what it means?
17  A.  Do you mean as she copied down the question
18      or as --
19  Q.  As she copied down the question and the
20      answer, right.
21  A.  Not so much as copying down the question,
22      but what is written in the margins as to
23      what we said about the question.

Page 82

1   Q.  Where she actually did the writing?
2   A.  Yes, sir.
3   Q.  Can you tell on this 10-A, B, C, and D
4       where she did the writing?
5   A.  I don't know what Lindy's handwriting looks
6       like. I'm assuming if it's not mine it was
7       hers, but that's an assumption, and that
8       the questions are written in her
9       handwriting. I just know it's not my
10      handwriting.
11  Q.  What advice did you give Lindy upon going
12      over this group of papers with her, 10-A,
13      B, C, and D?
14  A.  I referred her back to Ms. Harris.
15  Q.  To do what?
16  A.  To go back over and see if -- with the
17      references that Lindy had and the things
18      that she had, were those, indeed, questions
19      that would stand or potentially would be
20      counted correct or incorrect.
21  Q.  I guess we've determined that the questions
22      reflected on 10-A, B, C, and D do not
23      relate to NUR 271 obstetrics, or NUR 272

Page 83

1       pediatrics, correct?
2   A.  Correct.
3   Q.  And I think we've also established that
4       you're not positive that you actually went
5       over test questions on those two. You know
6       you discussed them with her at least,
7       correct?
8   A.  Correct.
9   Q.  Did you ever give Lindy any other advice
10      other than go back and talk to your
11      instructor?
12  A.  I told her -- I referred her to
13      Ms. Peterson, also.
14  Q.  For what purpose?
15  A.  On several issues, and not just Lindy. But
16      that, for example, the quarter of 271
17      started out in August with me at least for
18      the first 15 minutes of class being the
19      instructor of record, and it was my
20      syllabi, et cetera.
21      I had given them an assignment to do
22      over the break that they were to turn in,
23      which they had done, that was to be graded

Page 84

1       to use as part of the grade points in 271.
2       I left those papers when I resigned and
3       left CVCC, and the students were told that
4       those were not available. And I told them
5       where they were and advised them to go to
6       Ms. Peterson if they were not found.
7   Q.  What were those?
8   A.  It was an assignment that was given to them
9       prior to the start of the semester for them
10      to have worked over --
11  Q.  Fall semester?
12  A.  -- over the break and to have been turned
13      in. And in the syllabus, it was part of
14      the points that they were to earn for the
15      syllabus and they were to have received
16      those points. And I left those in my
17      office when I left CVCC.
18  Q.  The papers that they turned in?
19  A.  Yes, sir.
20  Q.  And so the reason you told Lindy to go see
21      Ms. Peterson was because you wanted her to
22      retrieve those?
23  A.  Well, if they were saying that those

Deposition of Sandra Gunnels

June 24, 2007

Page 85

1    couldn't be found and the points could not
2    be given to them, I referred her to
3    Ms. Peterson.
4    Q.  Were they saying that those could not be
5       found and points could not be given for
6       them?
7    A.  The students were told that those
8       assignments they had completed could not be
9       found in my office.
10   Q.  Do you know what Ms. Peterson said?
11       Actually, do you know whether Lindy
12       talked to Ms. Peterson about those papers?
13   A.  I do not know what the outcome of that was.
14   Q.  You don't know what Ms. Peterson said?
15   A.  No, sir.
16   Q.  You don't know whether Lindy talked to
17       Ms. Peterson, correct?
18   A.  I cannot remember.
19   Q.  Okay.
20   A.  And it would have been Lindy reported to me
21       whether or not she spoke with Ms. Peterson,
22       and I can't remember.
23   Q.  Did you give her any other advice, give

Page 86

1       Lindy any other advice?
2    A.  I advised her on -- that she needed to file
3       a grade appeal if she felt that she had a
4       case.  I advised her that the syllabus was
5       a legal and binding contract, and if that
6       wasn't being followed that she needed to
7       address that.  And I may have advised her
8       to contact a lawyer.
9    Q.  Did you give her the name of a lawyer?
10   A.  No, sir.  I don't know many lawyers of this
11       type.
12   Q.  Did you tell her anything about whether
13       other people had obtained a lawyer with
14       regard to a problem with CVCC?
15   A.  I honestly don't remember.  I don't know.
16       I don't think so, but I cannot recall.
17   Q.  Do you know of any other person that
18       obtained a lawyer and went to CVCC with a
19       lawyer about a nursing problem?
20   A.  Yes, sir.
21   Q.  Who?
22   A.  Arit Umoh.
23   Q.  What was that about?

Page 87

1    A.  She was a student in the class before
2       Lindy, so she would have graduated in May
3       of 2005 if my dates are correct.
4    Q.  You're right.  I think that's right.
5    A.  Okay.
6           (Brief interruption.)
7    A.  But that she was issued a failing grade in
8       clinicals in NUR 272, which was pediatric
9       nursing, and she was appealing that grade.
10   Q.  NUR 272?
11   A.  Pediatrics, yes, sir.
12   Q.  You were her clinical instructor?
13   A.  I was her didactic classroom instructor and
14       had been present in clinicals with
15       Ms. Umoh.
16   Q.  When you say didactic classroom instructor,
17       is that a different type of instructor from
18       the NUR 272 lecture instructor?
19   A.  No, that's the lecture instructor.  The
20       didactic is the classroom portion.
21   Q.  And we're talking about what semester would
22       that have been?
23   A.  That would have been spring of 2005 unless

Page 88

1       I'm incorrect.
2    Q.  Now, were you a full-time employee for the
3       spring semester of 2005?
4    A.  No, sir.  I believe I was employed -- I was
5       either temporary full-time or I had been
6       hired specifically for NUR 272 lecture and
7       clinical and MCN 124, which was the
8       pediatric LPN --
9    Q.  That would have been an LPN course?
10   A.  That would have been an LPN course.
11          (Brief interruption.)
12   A.  I don't remember what my status was.  I was
13       either temporary full-time or I had been
14       hired specifically for teaching NUR 272,
15       both lecture and clinical, and another LPN
16       course.
17   Q.  Did Ms. Umoh have a clinical instructor
18       other than you?
19   A.  Yes, sir.
20   Q.  Who?
21   A.  I believe she was officially in Ms. Wendy
22       Wall's group, but she also -- she was
23       either in Arit -- sorry, Arte Harmon,

22 (Pages 85 to 88)

Page 89

1    A-R-T-E, Harmon or Wendy Wall's group, not
2    officially in my group.
3 Q. She was giving -- given a failing grade in
4    the clinical, correct?
5 A. Yes, sir.
6 Q. But not in the didactic part?
7 A. Yes, sir.
8 Q. She made a passing grade in the didactic
9    part?
10 A. Yes, sir.
11 Q. And you taught that, correct?
12 A. Yes, sir.
13 Q. So tell me about her getting a lawyer. I
14    don't understand what you're talking about.
15 A. She had a lawyer present the campus with
16    his card and said he was acting on her
17    behalf and that she was appealing or
18    protesting her grade.
19 Q. Do you know who this lawyer was?
20 A. No, sir.
21 Q. Do you know who the lawyer spoke with?
22 A. I did not speak with him, so I do not know
23    who he spoke with.

Page 90

1 Q. Did you meet the lawyer?
2 A. Not to my knowledge or remembrance.
3 Q. Did you speak with the lawyer?
4 A. No, sir.
5 Q. How did you know that she got a lawyer?
6 A. I was told by Ms. Peterson I think
7    initially, and then Dr. Lowe.
8 Q. So you weren't in any meetings where the
9    lawyer was present, correct?
10 A. I don't believe so. I don't remember
11    anything where I was present at the same
12    time he was.
13 Q. One of the things you told Lindy in meeting
14    with her -- let me ask you this. Do you
15    recall whether that meeting would have been
16    related to Exhibit 10-A, B, C, and D, these
17    questions that you and I have been
18    discussing?
19 A. I'm sorry. You'll have to specify which
20    meeting.
21 Q. Was the meeting where you told her to do a
22    grade -- to meet with Ms. Harris, do a
23    grade appeal, get a lawyer, was that the

Page 91

1    meeting where you discussed the questions
2    on this Exhibit 10-A, B, C, and D?
3 A. I don't recall.
4 Q. Did you ever advise her to do anything
5    other than a grade appeal?
6 A. As I said, I may have, going through the
7    steps and -- probably did; said, and then
8    if not, then you can seek legal means.
9 Q. So grade appeal and legal recourse of some
10    type, correct?
11 A. Uh-huh. (Positive response.)
12 Q. Yes? You're going to have to say yes.
13 A. I'm sorry. Yes, I could have and probably
14    did. I can't say for certain I said
15    dah-dah-dah and get a lawyer, but I said
16    these are the steps.
17 Q. Do you know if she did get a lawyer?
18 A. Well, since I'm being deposed, yes, I'm
19    assuming she did get one.
20 Q. Do you know who the lawyer was?
21 A. I'm trying to recall, because in looking
22    through those papers, I saw Connie Cooper's
23    name on them and know that's a law firm

Page 92

1    that Lindy -- I honestly do not know if I
2    knew that was who her attorney was or
3    whatever. The first contact I had with an
4    attorney was with Ms. Cooley and
5    Mr. Dumbuya.
6 Q. How do you know Connie Cooper?
7 A. I saw her name on your papers you --
8 Q. You don't know her?
9 A. Oh, no, sir. No.
10 Q. And Ms. Cooper did not speak with you?
11 A. Not to my remembrance; no, I don't believe
12    so.
13 Q. Before Ms. Cooley wrote the letter that she
14    wrote to Dr. Blackwell, Ms. Cooley did not
15    speak with you?
16 A. No, sir. I mean, I'd have to know the date
17    of the letter.
18 Q. July 28 or 23, somewhere in that time
19    frame, of 2006, I believe.
20 A. To my knowledge, I can just state that I
21    never spoke with Ms. Cooley or met her
22    until I went to her office for deposition
23    or whatever you call --

June 24, 2007

Page 93

1 Q. July 28, 2006, was Ms. Cooley's letter,
2 Exhibit 20.
3 A. I do not remember speaking or meeting with
4 Ms. Cooper [sic] until I met her and talked
5 with her at the deposition.
6 Q. Okay. Did you give Lindy Wright advice on
7 more than one occasion relative to her
8 problems passing courses at CVCC?
9 A. Yes, I'm sure I did.
10 Q. Can you go through each one?
11 A. I know I spoke with her on several
12 occasions over that eight-month time
13 period, approximately -- well, I wouldn't
14 say eight months, five-month time period,
15 approximately.
16 And, you know, basically listened to
17 her concerns and addressed as best I could
18 advice, which ultimately led to the grade
19 appeal -- meeting with the instructor,
20 grade appeal, meeting with Ms. Peterson,
21 and going through the proper channels.
22 Q. What I want you to do is start with the
23 first meeting you had with her about a

Page 94

1 grade problem or a course failure and tell
2 me about each meeting you had with her.
3 A. I could not do that because I don't recall
4 dates or times or specific, you know,
5 meetings or conversations. I can give you
6 general conversations we had and she came
7 by my office a couple of times, those types
8 of things.
9 Q. I don't care about precise dates. I don't
10 care about precision in exactly what each
11 of you said. Okay?
12 A. Okay.
13 Q. I just want to know approximately when you
14 met with her. I know you met with her one
15 time, and it appears to have been in
16 December of 2005 --
17 A. Okay.
18 Q. -- relative to 10-A, B, C, and D. Okay?
19 A. (Witness nods head up and down.)
20 Q. Now, did you meet with her before this to
21 your knowledge about a problem with grades
22 at CVCC?
23 A. I do not recall.

Page 95

1 Q. All right. Did you meet with her after you
2 met with her in December 2005?
3 A. I know I did because that is when I gave
4 her the pediatric notes to help her with
5 her studying. I'm trying to think if she
6 came to the office another time. And then
7 I spoke to her on the phone a couple of
8 times.
9 Q. In December 2005, you met with her and
10 talked to her about 10 -- this Exhibit
11 10 --
12 A. You're telling me I did. I know I met with
13 her at some point --
14 Q. No, I'm representing to you that Ms. Wright
15 testified that she met with you in December
16 2005 and talked about her grades.
17 A. Then I would defer to Ms. Wright's memory
18 of when it was. I do know that I met with
19 her and we went over those.
20 Q. I'm asking you to assume your first -- not
21 your first meeting, but at least you had a
22 meeting with her --
23 A. Yes.

Page 96

1 Q. -- in December 2005 about failing grades.
2 Okay?
3 A. Yes, sir.
4 Q. And I'm asking you -- Now, was that the
5 time when you gave her the information on
6 pediatrics, your --
7 A. No, sir. There was another meeting.
8 Q. All right. Do you know when that meeting
9 was?
10 A. About -- I would have to look at the 272
11 syllabus, but they were studying GI and, I
12 think, urinary. They were studying those
13 subjects.
14 Q. And was anything else discussed other than
15 pediatrics at that meeting?
16 A. Not that I recall.
17 Q. Did you give her anything other than these
18 course notes that we've marked as 10 -- G-1
19 through G-22?
20 A. I believe I also gave her some old NCLEX
21 questions, type style questions.
22 Q. Some what?
23 A. Old NCLEX style questions. There are Web

24 (Pages 93 to 96)

Page 97

1  sites and there are books you can get NCLEX
2  questions out of. I had collected some
3  from various Web sites that are study
4  guides for the NCLEX board and where a lot
5  of instructors --
6  Q. Get their tests?
7  A. Not get their tests, but use those as
8  guidance for what types of test questions
9  you're going to ask.
10  Q. Let me show you Exhibit 9 to Ms. Wright's
11  deposition. Does that look like the NCLEX
12  material?
13  A. No, sir, those are my slides. Those are my
14  notes.
15       Except for some personal notes that are
16  in the middle of this from Lindy, which are
17  other copies of grade appeals, et cetera,
18  these are notes I provided to her on
19  pediatrics, but there are no NCLEX style
20  questions here. And I may have just given
21  her a Web site.
22  Q. Okay. So Defendant's Exhibit 9 are notes
23  and materials that you gave Lindy, except

Page 98

1  that there are some materials in here that
2  relate to --
3  A. Her grade appeal.
4  Q. -- her grade appeal?
5  A. Yeah.
6  Q. So anything related to grade appeal is
7  something that she developed or is hers?
8  A. Yes, sir.
9  Q. The rest of it is stuff that you gave her,
10  right?
11  A. Yes, sir.
12  Q. Do you know when you would have given her
13  that?
14       Is that pediatric material?
15  A. That's pediatrics, yes, sir.
16  Q. Every bit of it is?
17  A. Let me double check and make sure, but it
18  all looked like --
19       Now, some of these may have been slides
20  that Ms. Harris gave her. Some of them do
21  not look familiar, but a lot of them are my
22  slides and notes. So I can't say -- some
23  of them -- some of them are mine, and some

Page 99

1  of them I can't say that I gave them to
2  her.
3       But a large number of them are slides I
4  gave her and, also, some of them I went
5  over with her.
6  Q. When was that?
7  A. It would have been before they had a test
8  on -- I believe it was GI and urinary was
9  what I remember studying with Lindy.
10  Q. And that would be pediatrics?
11  A. Pediatrics, yes, sir.
12  Q. Let me ask you this. I want to kind of go
13  back and pick a couple of things up.
14       Give me your understanding of why Lindy
15  is no longer in the ADN program at CVCC.
16  A. My understanding is, is that she did not
17  receive a passing grade -- I thought it was
18  in 271. It could have been med-surg. I
19  honestly don't remember.
20       That she appealed, met with, was
21  offered some type of course forgiveness and
22  then was issued a non-passing grade in
23  pediatrics.

Page 100

1  Q. When you say she was offered some kind of
2  course forgiveness, what do you mean?
3  A. She took another course, and as reported --
4  per discussion with her was if this -- she
5  passed this course successfully, then that
6  would take the place of the failing grade
7  she had received in the course for fall of
8  2005.
9  Q. And so that's what she told you?
10  A. I believe so, yes, sir, to the best of my
11  memory.
12  Q. Are you familiar with the policies and
13  procedures of CVCC relative to nursing
14  students?
15  A. To a degree. It would depend on which
16  particular -- seeing that I primarily
17  worked as adjunct, I did not get involved a
18  lot in those types of situations.
19  Q. So to a degree, you have knowledge of the
20  CVCC policies and procedures for nursing
21  students, but not to a great degree? Would
22  that be correct?
23  A. Generally, yes.

Page 101

1  Q.  And I guess I'm still wondering what you
2      mean when you discuss what you have
3      discussed with me, and that is that she
4      failed a course, that she was told that she
5      could take another course and receive some
6      kind of course forgiveness, as you put it,
7      and then she failed another course, I
8      guess --
9          Did you say Pediatrics 272?
10 A.  I believe that's what it was.
11 Q.  All right.  So why would -- why would what
12     you have told me disqualify her from
13     continuing in school at CVCC?  Do you
14     understand that?
15 A.  I think I do.  Let me answer it if I've not
16     answered the question.
17 Q.  Okay.
18 A.  My understanding of the policy is a failing
19     grade in two nursing courses precludes you
20     from -- or did preclude you from
21     entering -- re-entering the nursing
22     program.
23         From what Lindy had reported to me,

Page 102

1      because there was some controversy over the
2      semester and how grades had been given,
3      that type of thing, that she was offered
4      the opportunity of taking a course, and
5      course numbers had changed, that the grade
6      that she made in that course would offset a
7      failing grade that was issued in the
8      earlier course if that makes sense.
9  Q.  So are you saying that she was disqualified
10     from attending CVCC, the nurse ADN program,
11     as you understand it, because she failed
12     two courses, or are you not saying that?
13 A.  I'm saying that it was my understanding
14     that if two courses were failed -- and
15     that's just my understanding of the nursing
16     program, but Lindy --
17         (Brief interruption.)
18         (Brief recess was taken.)
19 Q.  Ms. Gunnels, you were telling me your
20     understanding of the nursing program, is
21     that if you fail two courses, that you're
22     no longer eligible to participate, correct?
23 A.  That that was the ruling, yes.

Page 103

1  Q.  That was the policy, right?
2  A.  Right.
3  Q.  Are you saying that it's your understanding
4      that Lindy is no longer qualified to be in
5      the nursing program at CVCC because she
6      failed two nursing courses?
7  A.  No.  I am saying that Lindy presented to me
8      she was told that if she completed the
9      course and received a passing grade on it
10     that it would -- that she would at this
11     point not be considered as having failed
12     two nursing courses because she repeated
13     one and received a passing grade in it and
14     that that was -- I guess the term would be
15     forgiven.
16 Q.  Do you know how course forgiveness works at
17     CVCC?
18 A.  No, sir.
19 Q.  Do you know what it's for, the purpose of
20     it?
21 A.  I can't say that I do, no, sir.
22 Q.  Do you know what course substitution is at
23     CVCC?

Page 104

1          (Brief interruption.)
2  Q.  Ms. Gunnels, do you know what course
3      substitution is at CVCC?
4  A.  I don't know the parameters of it or the
5      definition, no, sir.
6  Q.  And you do not know its purpose?
7  A.  My -- and it's an assumption, would be if
8      you --
9  Q.  Tell me what you know.  Don't give me an
10     assumption.
11 A.  Then I know nothing.
12 Q.  And you don't know how it works, obviously,
13     at CVCC, correct?
14 A.  No.
15 Q.  Do you know what academic bankruptcy is at
16     CVCC?
17 A.  No, sir.
18 Q.  If I hear you correctly, your time at CVCC,
19     you dealt with instructing.
20 A.  Yes.
21 Q.  And that's all you got involved with was
22     instructing, correct?
23 A.  Yes, sir.  I mean, that's what my job was.

Page 105

1    Q. Dixie Peterson was the chair of the
2       nursing -- that nursing program or the
3       health sciences part or portion of CVCC's
4       curriculum; isn't that correct?
5    A. Yes, sir.
6    Q. And she was over nursing, correct?
7    A. Yes, sir.
8    Q. Do you know how many courses Lindy actually
9       failed while she was at CVCC in that ADN
10      program, let's say, between August 2005 and
11      May 2006?
12   A. Independently, no, sir.
13   Q. Does that matter?
14   A. To me?
15   Q. Yes.
16   A. No, sir. I mean, I'd need to know what you
17      mean by does it matter.
18   Q. Would it matter to you if a student in your
19      nursing program failed courses in terms of
20      that person's qualifications and ability to
21      become a nurse who was not dangerous and
22      who proficiently performed the job of a
23      registered nurse?

Page 106

1    A. It would depend on which courses they
2       failed, how frequently, what were the
3       circumstances, was it because they were not
4       a good test taker versus were they not
5       competent. There's a lot of factors that
6       go into that.
7          But I have had students who have failed
8       courses before and repeated them and did
9       exceptionally well and were outstanding
10      nurses.
11   Q. Does Columbus Tech have a policy of any
12      kind that relates to the number of courses
13      an RN student can fail and still graduate?
14   A. Yes, sir.
15   Q. What is that policy?
16   A. Policy is that absolute failure of two
17      nursing courses, you're not eligible for
18      re-admission into Columbus Technical.
19      There are cases of exceptional
20      circumstances where a grade other than F
21      will be issued so that the student is
22      eligible to come back.
23   Q. You just said that upon failure of two

Page 107

1       courses, you're not eligible for admission.
2    A. Re-entry into.
3    Q. Okay. In other words, if a nursing student
4       fails two courses at Columbus Tech, they
5       are out of the nursing program; is that
6       correct?
7    A. The ADN program, yes, sir.
8    Q. The ADN, the same program we're talking
9       about here at CVCC, correct?
10   A. It's a little bit different at CTC. That's
11      why I said ADN.
12   Q. I've got you. But that's the policy at
13      Columbus Tech, correct?
14   A. Uh-huh. (Positive response.) If they
15      receive two F's in a nursing class.
16   Q. There is a little difference, because a D
17      is an F basically at CVCC, correct?
18   A. Well, and the same -- a failing grade I
19      should have said instead of an F. A
20      failing grade.
21   Q. Because the scale is pretty much the same
22      at Columbus Tech as it is at CVCC? A D --
23   A. It's a little different, but D is a

Page 108

1       failure.
2    Q. Does Columbus Tech have anything that you
3       call course forgiveness?
4    A. I do not know.
5    Q. Does Columbus Tech have anything that you
6       call course substitution?
7    A. Yes.
8    Q. All right. What is it?
9    A. Well, as I was going to say earlier, at
10      CTC, it is only in non-nursing courses. In
11      that we require Algebra 191, whatever the
12      first college algebra is, if someone has
13      calculus because they tested out of
14      algebra, you can substitute your calculus
15      course for your algebra course.
16   Q. Okay.
17   A. So that type of course substitution.
18   Q. But you can't substitute another nursing
19      course for one you failed?
20   A. No, sir.
21   Q. Why is that?
22   A. If you have not successfully completed a --
23      if you've not successfully mastered a

Page 109

1　course, then there's an opportunity those
2　concepts would not be taught in another
3　course.
4　Q.　There's an opportunity for them to do what,
5　　　now?
6　A.　There's an opportunity that -- I really
7　　　need more information.  But, for example,
8　　　if it was a med-surg course, different
9　　　concepts would be covered than in a
10　　pharmacology course.
11　Q.　Isn't it correct that an ADN program which
12　　will allow for a person to become a
13　　registered nurse if they pass the boards is
14　　a program that requires high standards
15　　because of the nature of the work of a
16　　registered nurse?
17　A.　Generally, yes.
18　Q.　A registered nurse is a professional; isn't
19　　that correct?
20　A.　By most definitions.
21　Q.　A registered nurse deals with sick people,
22　　correct?
23　A.　Correct.

Page 110

1　Q.　A registered nurse deals with situations
2　　where if they take the wrong step or
3　　measure, they could seriously harm a
4　　patient; isn't that correct?
5　A.　Correct.
6　Q.　For that reason, taking classes to get an
7　　ADN degree and then take the State board to
8　　become a licensed registered nurse is a
9　　little bit different from taking, let's
10　　say, business administration, wouldn't you
11　　agree, in the sense that the profession of
12　　nursing will allow for the possibility of a
13　　patient actually either dying or
14　　becoming -- or being seriously harmed by
15　　the professional taking care of that
16　　person, the registered nurse taking care of
17　　that patient?
18　A.　I think I agree with that --
19　Q.　Okay.
20　A.　-- question.  It was kind of long.
21　Q.　It's important, isn't it, for a registered
22　　nurse to know what they're doing?
23　A.　Yes, sir.

Page 111

1　Q.　And the reason that most nursing schools do
2　　not allow students to continue in a program
3　　like an ADN program after two nursing
4　　course failures is because it is a
5　　profession that does have potential for
6　　danger, and it is a profession that
7　　requires a high degree of knowledge and
8　　skill?
9　A.　Was there -- I'm sorry.  Was there a
10　　question in there?
11　Q.　That was my question.  Am I correct when I
12　　say that?
13　A.　Would you repeat that?
14　Q.　Yes.
15　A.　I'm sorry.
16　Q.　Isn't it correct that most nursing schools
17　　in an ADN program of the type we've been
18　　discussing do not allow a student to
19　　continue in the program if they fail two
20　　substantive nursing courses because nursing
21　　is a profession where patients can be
22　　endangered by a nurse; isn't that true?
23　A.　Well, there's two parts of that question.

Page 112

1　　Yes, nursing is a profession where patients
2　　can be harmed.  I think the idea -- and
3　　this is my opinion -- of saying someone
4　　can't come back into a nursing program
5　　because of -- it's a little bit of a
6　　fallacy because a student could fail out of
7　　CTC and go over to CVCC and be entered or
8　　go to Columbus State and be entered and
9　　successfully complete their course.
10　　So it doesn't necessarily -- the whole
11　　purpose there is not to stop an incompetent
12　　practitioner from reaching ...
13　Q.　Are you telling me that a student could
14　　flunk -- in an ADN program at Columbus Tech
15　　could flunk two substantive nursing
16　　courses, be out of the ADN program at
17　　Columbus Tech and go across the state line
18　　to CVCC and register in that ADN program
19　　and be admitted and go through and finish
20　　up and take the board right away?
21　A.　Theoretically, yes.  And in practice, I
22　　have taught four or five students who have
23　　failed out of the CSU nursing program, then

Page 113

1  came to the CTC program and were
2  successful.
3      So there is a difference with schools
4  and -- you know, I can't say what all the
5  factors were that made students successful
6  at CTC when they were not successful at
7  other nursing schools.
8  Q.  So you're saying that Columbus Tech allows
9  a nursing student into the ADN program
10 after that student has flunked two
11 substantive nursing courses at another
12 institution in the same curriculum without
13 a passage of time or anything else?
14 A.  If they meet all other qualifications to be
15 entered into and selected into the ADN
16 program, yes, sir.
17 Q.  And a nursing school has no responsibility,
18 then, for the safety of a nurse that it
19 graduates or the competency of a nurse that
20 it graduates?  Would that be true?
21 A.  No, sir, that is --
22      MR. DUMBUYA:  Object to the form
23      of that question.

Page 114

1  Q.  Would that be true?
2  A.  No, and that's not at all what I said.
3  Q.  Well, isn't it correct that if a candidate
4  or a student flunks two substantive nursing
5  courses in an ADN program, that the reason
6  they're no longer allowed to continue in
7  that program is because they are not good
8  nursing candidates and that -- they are not
9  good nursing candidates?
10 A.  I would disagree with that.  No, sir.
11 Q.  Tell me how.
12 A.  Well, because of differences in
13 curriculums, differences in teacher
14 personality, any number of things.
15     But as I said, I've personally taught
16 students who were not successful at CSU.  I
17 don't know if there were any from CVCC, but
18 I know of three definites from CSU who did
19 not pass nursing at CSU, came to CTC, were
20 admitted, were successful, did pass boards
21 and are excellent nurses at this point.
22 Q.  Let me ask you this.  I know you've never
23 been in administration in a nursing school,

Page 115

1  correct?
2  A.  Yes, sir.
3  Q.  What you're giving me is your personal
4  opinion as an instructor from a nursing
5  school?
6  A.  My personal opinion and my experience.
7  Q.  But what is your opinion as to the reason
8  for the rule that nursing schools use, that
9  if you flunk two substantive nursing
10 courses in a program like an ADN course,
11 you can't continue until a certain period
12 of time after which you can apply for
13 re-entry, let's say?
14 A.  Since I did not write that rule, you would
15 have to ask them the reason for that.
16 Q.  Okay.  You don't know then?
17 A.  I would not want to -- you said in facts,
18 not assumptions.
19 Q.  Okay.  Very good.
20     (Brief interruption.)
21     THE WITNESS:  I said he told me he
22     wished me to deal in facts,
23     not assumptions.

Page 116

1  A.  I've never been privy or present when that
2  was --
3  Q.  Yeah, I don't want you to speculate.
4  A.  Right.
5  Q.  And that would be speculation for you,
6  wouldn't it?
7  A.  Right.
8  Q.  Do you know the result of any grade appeals
9  that Lindy filed at CVCC?
10 A.  My understanding was -- from Lindy was that
11 the appeal of whichever course she failed
12 in winter was answered through taking
13 another course and that her appeal for
14 spring was non-successful, and obviously so
15 since we're here, so ...
16 Q.  Did you know she failed two courses in the
17 fall of 2005?
18 A.  I don't know if I knew that or not to be
19 honest.
20 Q.  As we sit here today, you do not know that;
21 is that correct?
22 A.  My memory or my remembrance was that she
23 did not pass one, but I don't know or I

Page 117

1  just don't remember that she did not pass
2  two.
3  Q. Did you know she had two grade appeals in
4  December 2005?
5  A. I don't know. I mean, we spoke about grade
6  appeals in general and, you know, where to
7  find it on the Web site and the catalog and
8  those kinds of things, but not
9  specifically.
10  Q. Did you know Ms. Dumbuya when you were at
11  CVCC?
12  A. I did somewhat. I don't know that I ran
13  into her as an instructor, but I also
14  worked at St. Francis Hospital at the same
15  time she did.
16  Q. How long have you known Ms. Dumbuya?
17  A. I cannot say when I first met Ms. Dumbuya.
18  I honestly don't know. I would say five to
19  seven years, but that's a guess just based
20  on where I've worked.
21  Q. I apologize to you, but I did not catch
22  whether you did or did not know Ms. Dumbuya
23  from CVCC.

Page 118

1  A. I knew her from St. Francis Hospital. I
2  know she worked at CVCC. I do not know if
3  we worked there at the same time or not.
4  Q. Have you ever spoken with her about Lindy
5  Wright?
6  A. I don't remember.
7  Q. When did you first know that Ms. Dumbuya's
8  husband is a lawyer?
9  A. I'm trying to remember if I knew before I
10  got the -- went to the office. I think I
11  knew that just from some type of general
12  information. Until I went to be deposed, I
13  had never met him or spoken to him or
14  really knew who he was.
15  Q. Are you related to Lindy Wright?
16  A. No, sir.
17  Q. Do you know any of her relatives?
18  A. I met her mother once, and I've met her two
19  sons, but that's it -- in the course of
20  working at St. Francis or that type of
21  thing.
22  Q. Do you know where Lindy Wright works now?
23  A. I know she just changed jobs, and I think

Page 119

1  it's at one of the nursing homes, but I
2  don't know which one.
3  Q. How do you know she just changed jobs?
4  A. Because where she was working before, I had
5  a friend who was an executive. And I know
6  they had a shake-up, and my friend lost her
7  job. And I spoke with Lindy, and she
8  resigned and -- because of finances, that
9  kind of thing. She resigned and told me
10  she was going to work at one of the nursing
11  homes.
12  Q. So when did you find that out?
13  A. Two weeks ago?
14  Q. Did you talk to Lindy about the fact that
15  she was changing jobs?
16  A. In a conversation with her, it came up,
17  yes, sir.
18  Q. Was that about two weeks ago?
19  A. I think it was about two weeks ago. Ten
20  days ago, two weeks ago.
21  Q. What else did you talk about with her at
22  that time?
23  A. This deposition, that I had been deposed.

Page 120

1  Q. You say you talked to her about this
2  deposition --
3  A. This deposition.
4  Q. -- that was coming up?
5  A. Right, that I had received the
6  deposition -- the subpoena.
7  Q. All right.
8  A. She had changed her job. The person we
9  knew in common, what -- that person was
10  employed now and where, just general ...
11  Q. Was this a conversation you had with her in
12  person?
13  A. I saw her probably about a week ago in
14  person and then talked to her on the phone
15  about 10 days ago.
16  Q. So the conversation you had with her about
17  being subpoenaed for this deposition today
18  was on the telephone, correct?
19  A. Yes, sir. I called her and told her I had
20  received a subpoena.
21  Q. And you talked about the other things that
22  you've already told me about, correct?
23  A. Uh-huh. (Positive response.)

Deposition of Sandra Gunnels

June 24, 2007

Page 121

1   Q.   Yes?
2   A.   Yes, sir. I'm sorry.
3   Q.   You were real good about this at the very
4        beginning of the deposition.
5   A.   I know. I'm, like, thinking, so I
6        apologize.
7   Q.   That's all right.
8            Now, a week ago, where did you see her?
9   A.   I saw her in Ms. Cooley's parking lot.
10  Q.   All right.
11  A.   She was leaving, and I was coming in, in
12       the law office.
13  Q.   What was the day of the week? Was it a
14       Tuesday? This is Tuesday, the 24th.
15  A.   It was either Monday or Tuesday. I don't
16       remember which day exactly.
17  Q.   Okay.
18  A.   I know it was not Wednesday, Thursday or
19       Friday.
20  Q.   What was your purpose for going into
21       Ms. Cooley's office that day?
22  A.   I was taking them some copies of documents
23       that y'all had requested. I called and

Page 122

1        asked did I need to bring them the same
2        documents and was told yes. So I made
3        copies of the ones that I had found up to
4        that point and took it to their office and
5        left them with the secretary.
6   Q.   Have you met with either Mr. Dumbuya or
7        Ms. Cooley in preparation for this
8        deposition?
9   A.   No, sir.
10  Q.   Have you met with Ms. Cooley or Mr. Dumbuya
11       recently?
12  A.   No, sir. The only time I've ever met with
13       Ms. Cooley or Mr. Dumbuya is November 1st,
14       2006, for my deposition in their office --
15       her office.
16  Q.   Now, when Lindy Wright came to you about
17       her grades in December 2005 -- she talked
18       to you about her grades, right?
19  A.   Yes, sir.
20  Q.   Now, did you do anything other than speak
21       with Lindy Wright to assist her?
22  A.   When you go to -- that's called Exhibit 10
23       I think is the number.

Page 123

1   Q.   Yes.
2   A.   If that was the time I talked with her
3        about her grades, I talked with my peers at
4        CTC, but ...
5   Q.   Okay. So you talked with your peers at
6        Columbus Tech --
7   A.   Uh-huh. (Positive response.) About those
8        questions, that type of thing.
9   Q.   Did you do anything else to help her in
10       December 2005 when you met with her about
11       Exhibit 10-A, B, C, and D?
12  A.   Not that I recall. I mean, we went through
13       the appeal process, those types of things
14       where it was -- and I can't remember now if
15       it was online or getting a catalog, that
16       she needed to do that, those types ...
17  Q.   All right. Was there ever a time when you
18       discussed with Lindy a question about
19       clinical care plans or care plans?
20  A.   She brought a care plan by --
21           And I can't say if it was that time or
22       if it was before, exactly what it was.
23           -- that she was preparing and asked me

Page 124

1        to look over it and see if I had any
2        suggestions for how she could improve it.
3   Q.   Do you recall what course it was in?
4   A.   No, sir.
5   Q.   I apologize for standing up. Got a bad
6        back.
7            Do you recall about when that was?
8   A.   No, sir, I honestly don't.
9   Q.   Did you give her suggestions about how to
10       improve it?
11  A.   Yes, sir.
12  Q.   Did you ever talk to her at any other time
13       about a care plan or care plans?
14  A.   Yes, sir. I had forgotten until ...
15           There was an occasion she told me
16       about -- and I can't remember when she told
17       me or what course it was in -- where a care
18       plan was graded. She received a grade on
19       that care plan.
20           And then my understanding was it was
21       regraded to a -- and she received another
22       grade, and then they regraded again and she
23       then received yet a third grade, if I'm

Deposition of Sandra Gunnels

June 24, 2007

**Page 125**

1  remembering correctly.
2  Q. Do you recall when you spoke with her about
3     this?
4  A. No, sir.
5  Q. Do you recall whether you spoke with her in
6     person about it or on the telephone?
7  A. No, sir.
8  Q. Do you recall why she raised that with you?
9  A. It would be an assumption, but that I'm an
10    instructor and knowledgeable about grading
11    care plans.
12 Q. But, now, that's an assumption, right?
13 A. That's an assumption. You'd have to ask
14    her why she called me.
15 Q. Have you ever talked to her about any other
16    clinical program or any aspect of any
17    clinical part of a course that she was
18    taking?
19 A. Not that I recall. I mean, I would need
20    more information than that.
21 Q. Have you ever -- Has she ever told you
22    anything about any care plans or any other
23    documents related to any part of her

**Page 126**

1  clinical work that was lost or misplaced
2  or ...
3  A. I remember her commenting on -- that there
4     was -- besides the paperwork that I had
5     left in my office when I left CVCC, but
6     that one of the instructors had lost some
7     care plans. But I don't remember any
8     particulars, just the general --
9  Q. Just a comment by her?
10 A. Uh-huh. (Positive response.)
11 Q. Yes?
12 A. Yes, sir.
13 Q. Did you take any action on her behalf
14    relative to the loss-- the alleged loss of
15    the care plan?
16 A. I'm not sure what you're referring to when
17    you say action.
18 Q. Action means doing something. Did you do
19    anything on her behalf or for her relative
20    to anything she told you about a care plan
21    or care plans being lost?
22 A. Not that I remember.
23 Q. I mean, is there any reason why you would

**Page 127**

1  do anything?
2  A. Not in those circumstances, no, sir.
3  Q. Do you consider yourself her advisor in
4     terms of getting through nursing school?
5  A. I considered myself her instructor.
6  Q. But I mean now --
7  A. And I think she still saw me in that role.
8  Q. December of 2005, did you consider yourself
9     her advisor in assisting her through
10    nursing school?
11 A. Not her advisor, no, but as --
12 Q. What?
13 A. She was an old student.
14 Q. Okay.
15 A. And I still have relations with old
16    students and receive phone calls
17    periodically or visits or whatever.
18 Q. Have you ever talked to Lindy Wright about
19    entering Columbus Tech's ADN program?
20 A. I advised her if she wasn't successful in
21    her grade appeals at CVCC that she then
22    should consider applying to another
23    program, yes, sir.

**Page 128**

1  Q. Do you know whether Lindy Wright has
2     applied to another program?
3  A. To my knowledge, no, but ... no, not that
4     I'm aware of.
5  Q. She has not applied to Columbus Tech?
6  A. Not to my knowledge, no, sir.
7  Q. Do you know whether she would be accepted
8     if she did apply to Columbus Tech's ADN
9     program?
10 A. I do not know because of what the
11    qualifications are, and I don't know what
12    Lindy's -- you know, she would take a
13    different test for Columbus Tech, COMPASS
14    scores, et cetera, and get the
15    determination. What the criteria for
16    Columbus Tech is, is very different than
17    what it is for CVCC.
18 Q. Have you ever made a telephone call on
19    Lindy Wright's behalf?
20 A. As far as her grades are concerned or --
21 Q. As far as any aspect of her schooling,
22    studies or work at CVCC?
23 A. To my recollection, no.

32 (Pages 125 to 128)

Page 129

1    Q.  Have you ever called an instructor of hers
2         for any reason -- an instructor from CVCC?
3    A.  Not that I recall.
4    Q.  Have you ever called a clinical instructor
5         as opposed to a classroom lecturer from
6         CVCC on behalf of Lindy Wright?
7    A.  Not that I recall, no, sir.
8    Q.  Is there any reason you can think of why
9         you would do that?
10   A.  If I had been on friendly terms with or
11        whatever to discuss, but that would be the
12        only -- and as far as I know, I didn't
13        really know any of her clinical
14        instructors.  I don't know who she had.
15   Q.  Do you blame anyone other than Lindy,
16        Ms. Gunnels, for her failing out of the ADN
17        program at CVCC?
18   A.  Could you restate that?
19   Q.  Do you blame anyone other than Lindy for
20        Lindy failing out of the ADN program at
21        CVCC?
22   A.  That implies that I do blame Lindy, which I
23        would say I don't blame Lindy or anyone.  I

Page 130

1         don't think that the way the fall
2         quarter -- fall semester 2005 began was
3         particularly a good situation for
4         students.  And I think that was kind of a
5         not-positive-environment semester for any
6         of the students at that point just from
7         what I know of it, but I don't blame
8         anyone.
9    Q.  Do you believe that anyone is responsible
10        other than Lindy Wright for her failing out
11        of the ADN program at CVCC?
12   A.  From what I know of the situation, I don't
13        blame --
14   Q.  I said responsible.
15   A.  Don't hold anyone responsible for.
16   Q.  For her failing out of the ADN program,
17        correct?
18   A.  Correct.
19   Q.  Does that include Lindy?  I mean, you don't
20        hold Lindy responsible for her failing out
21        of the ADN program there at CVCC?
22   A.  I would have to say with the situation as I
23        know it, I think it was a combination of

Page 131

1         issues.
2    Q.  Would you please tell me what that
3         combination of issues is comprised of.
4    A.  Well, I know that Ms. Bellamy and I
5         resigned and left CTC [sic] August 31st,
6         2005, which if I'm not mistaken was the
7         RNs' first class day, and that there was
8         some time period where there was not
9         stability in some of the instruction.  And
10        then also, I know there was a lot of unrest
11        on campus and within the nursing students
12        and nursing division.
13   Q.  Now, when you say that you and Ms. Bellamy
14        resigned August 31, 2005, how did that
15        affect Lindy Wright's grade?
16   A.  Well, I think the turmoil and upheaval and
17        not having the instructor that wrote the
18        syllabus being the instructor that
19        completed the semester -- I know they had
20        some guest lecturers, some lecture by
21        long-distance, those types of things.  And
22        the campus was in somewhat of an upheaval,
23        also, at that point.

Page 132

1    Q.  Do you know how long it was before you and
2         Ms. Bellamy were replaced with other
3         permanent instructors?
4    A.  I could not tell you exactly, no, sir.
5    Q.  Full-time instructors, maybe that's a
6         better term.
7    A.  No, sir.
8    Q.  You do not know?
9    A.  I don't know a time frame, no, sir.
10   Q.  What day did you leave CVCC?
11   A.  August 31, 2005.
12   Q.  The same day you turned in your
13        resignation, correct?
14   A.  Yes, sir.
15   Q.  And there was no advance notice given by
16        you, was there, that you were going to
17        resign?
18   A.  In the circumstances, A, I had not signed a
19        contract and informed them that I was not
20        going to sign a contract if it did not have
21        certain parameters in it, and that I was
22        asked not to go to my classroom on that day
23        of class.

Page 133

1    I had initially written a resignation
2    with a date two weeks to one month after
3    that date, but after my interaction with
4    some of the administrative staff at CVCC, I
5    felt that it was wise to leave on that day.
6    Q.  Why had you not signed a contract?
7    A.  The primary reason was that the years of
8        experience that I had, had not been
9        addressed in the contract would be the
10       primary reason that I did not sign a
11       contract.
12   Q.  Would you explain that to me.
13   A.  I graduated from nursing school in June of
14       1972, and I had at that point in time 33 or
15       34 years of nursing experience, and the
16       fact that I was only being given credit one
17       semester, I think it was, 13 years and the
18       second semester it had gone down to six
19       years of credit for that nursing experience
20       as far as salaries went -- or what contract
21       I was offered.
22   Q.  When you say in the first semester you were
23       given credit for 13 years, that would have

Page 134

1        been the spring semester of 2005, right?
2    A.  I believe that would have been the summer
3        of 2005.  It was fall 2005 that was the six
4        years.
5    Q.  Got you.  So was the summer of 2005 your
6        first full-time work as a professor there,
7        instructor at CVCC?
8    A.  I was a full-time temporary instructor,
9        yes, sir.
10   Q.  In the summer of 2005, right?
11   A.  Yes, sir.
12   Q.  And that was your first full-time
13       employment at CVCC, correct?
14   A.  Yes, sir.
15   Q.  For that summer of 2005, you were given 13
16       years credit; is that right?
17   A.  Yes, sir.
18   Q.  Do you know how that was figured?
19   A.  Yes, sir.
20   Q.  How?
21   A.  There was -- and you've got copies of it.
22       In June of 2005, I was instructed to get
23       written proof of my past work experience.

Page 135

1        First off, I've never had a company or an
2        organization who hired me ask me to prove
3        my own work experience.  I expressed that
4        and was told that, you know, just to get
5        it.
6            So Katie Lackey, who was our
7        administrative assistant at that point,
8        designed a form that we faxed off.  I
9        needed to prove 25 years experience.  And
10       some of those were returned, some were
11       not.
12           At some point in time, I was told that
13       that was not the correct format, that they
14       wanted it on organization letterhead.  It
15       couldn't be on the form we had sent out and
16       asked organizations to fill out, and that I
17       needed to redo the validation of my
18       employment.
19   Q.  What kind of employment were you seeking to
20       get verification of?
21   A.  All full-time nursing employment up to a
22       total of 25 years I believe it was, was the
23       maximum.

Page 136

1    Q.  And when you say all full-time nursing
2        employment, you're not including teaching,
3        are you?
4    A.  I had never taught anywhere full-time I
5        don't believe up to that point.  It was
6        full-time nursing experience.
7    Q.  Do you know why this was necessary for you
8        to get this verification?
9    A.  Oh, I understand why it was necessary.  The
10       salary scale was that -- based on years
11       experience, and I'm quite accustomed to
12       having my employment verified.  I've just
13       never been asked to personally approach
14       organizations and request verification of
15       my employment.
16   Q.  Really?  You've never had any organization
17       you've worked for write and seek
18       verification --
19   A.  Oh, yes.
20   Q.  -- of prior employment?
21   A.  I've had them do that.  I've never had them
22       to ask me to contact and ask them to send
23       employment -- I'm very accustomed and

Deposition of Sandra Gunnels

June 24, 2007

Page 137

1  expect for my work experience to be
2  validated, but typically that's an HR
3  function.
4      And I expressed during a meeting -- at
5  least once -- that I saw that being fraught
6  with problems, that you would have someone
7  verify their own employment and provide
8  that verification to you.
9  Q.  Did you resign because you were required to
10  send off a form or to seek a written
11  verification of your prior employment?
12  A.  No, sir.
13  Q.  Tell me why you left on August 31, 2005,
14  without any kind of prior notice.
15  A.  Well, there had been some prior notice, but
16  nothing in writing.  August --
17  Q.  Stop there and tell me what prior notice.
18  A.  We need to back up further to -- if you
19  want to do that to March of 2005.  I had
20  sought full-time employment at CVCC once
21  and had been offered a position.  At that
22  point in time -- and that was back in
23  2004.  That would have been such a drastic

Page 138

1  paycut that I could not accept it.
2      I spent that time doing some things
3  financially to put myself in a position
4  where I could teach full-time and take that
5  salary cut and for a time period had been
6  attempting to gain full-time employment at
7  CVCC since that's where I had taught and
8  had experience teaching at that
9  organization the students.
10      Since that was not successful, I
11  applied at Columbus Technical College in
12  February or March of 2005 and was offered
13  full-time employment there which I
14  accepted.  I informed Ms. Peterson that I
15  was accepting full-time employment at
16  Columbus Technical College and due to their
17  non-compete clause, I would no longer be
18  available after the end of spring
19  quarter -- spring semester to -- spring
20  semester to teach classes for CVCC.  She
21  informed Dr. Blackwell and Dean Lowe at the
22  end of March of that.
23      Subsequent to that, I had several

Page 139

1  meetings with Dean Lowe, potentially with
2  Dr. Blackwell -- I can't remember exactly,
3  but I know with Dean Lowe and with
4  Ms. Peterson.  Was asked to come temporary
5  full-time to CVCC because otherwise, there
6  really wasn't an instructor to take on my
7  teaching load.
8      I approached the administration of CTC
9  and got from them -- received from them a
10  one-year grace period to teach for CVCC and
11  that I would have a position when I came
12  back to CTC in May, June of 2006, that I
13  would teach this one ADN class.
14  Q.  So you're saying that you had intended to
15  go back to Columbus Tech the whole time?
16  A.  Well, I was told I would not be offered a
17  full-time contract at CVCC.  And I may be a
18  little slow, but it only takes two years of
19  denying me full-time employment for me to
20  figure out that I'm not going to get
21  full-time employment.
22  Q.  I thought you had full-time employment.
23  A.  Full-time temporary.  There's a

Page 140

1  difference.  And I really -- based on my
2  prior relationship with Ms. Peterson and
3  with knowing what a large number of
4  students that were going to be in that ADN
5  class, wanted them to have a successful
6  year and did not want to leave the college
7  shorthanded, so I --
8  Q.  Had you already accepted at Columbus
9  Tech --
10  A.  Yes, sir.
11  Q.  -- full-time employment?
12  A.  I had an office.
13  Q.  What was the salary there?
14  A.  It was less than CVCC.  I think I started
15  at -- I either started at fifty or 55,000
16  at CTC.  I can't remember.
17  Q.  What did you start at full-time at CVCC?
18  A.  Well, I never received the appropriate
19  salary, so I don't really remember.  It's
20  in the contract what I was paid for the one
21  semester that I did sign a temporary
22  contract for the summer and provided that
23  I -- that I was signing this contract

Page 141

1　knowing my hours were not correct and that
2　my expectation would be one, you know,
3　that was -- validation of employment was
4　provided, that the contract would be
5　adjusted appropriately, provided what when
6　reading the letter from Ms. Boone I had
7　thought was appropriate validation of my
8　employment.
9　　　But then met with Dr. Blackwell, Dean
10　Lowe, I believe Ms. Peterson was present,
11　Ms. Bellamy, Ms. Gruber on the Friday
12　before August the 31st, announced my
13　intention that I would not be signing a
14　contract if I was not offered the
15　correct -- you know, if the contract did
16　not represent my professional experience.
17　　　And it was more a point of honor and
18　professionalism than it was dollars, as
19　obviously I took a position making less
20　than what I was entitled to at CVCC.  That
21　was on a Friday.  I announced, you know --
22　I mean, I said I would not sign an
23　incorrect contract.

Page 142

1　　　I was ill on Monday and Tuesday of that
2　week and had called and spoke to the
3　administrative assistant.  Came to class on
4　Wednesday, August the 31st, assuming that I
5　would be teaching that day.  Met with a
6　couple of the students before I went down
7　to class.
8　　　As I was walking to class, I met
9　Dr. Lowe in the hall who basically stated I
10　was not allowed to enter my classroom and
11　that a substitute teacher had been -- was
12　there and was going to teach.  I gave him
13　the syllabus, the handouts, et cetera, and
14　he told me he would be back up to speak
15　with me.
16　　　At that point in time, based on the
17　tone of our conversation, et cetera, I went
18　back to my office, found a contract with
19　Dr. Blackwell's signature on it and a
20　note -- I believe it was from Dr. Lowe --
21　stating that this is the contract that I
22　was going to be offered.  And at that point
23　in time, I sat down and wrote out a

Page 143

1　resignation and I think I gave two weeks'
2　notice.  It might have been a month.
3　　　Had a further interaction with Dean
4　Lowe, and based on not being allowed to
5　enter my classroom and the conversation
6　that I had with Dean Lowe changed the date
7　to that current date and delivered it to
8　Ms. Peterson who was absent from campus
9　that day and to Dr. Blackwell and Dean
10　Lowe.
11　　　　　(Defendant's Exhibit 24 was marked
12　　　　　for identification.)
13　Q.　Ms. Gunnels, let me show you what I have --
14　　　I just got it off the computer last night.
15　　　I assume it's correct.  It purports to be a
16　　　2005 calendar.  If I hear you correctly --
17　　　Okay.  Look at that and tell me if that
18　　　looks right to you.  Look at August.  I
19　　　mean --
20　A.　That's what I'm trying to get down to.
21　Q.　That's the operative month.
22　A.　Yes, sir.
23　Q.　Now, if I understand you correctly, you

Page 144

1　were in a meeting the Friday before August
2　31.
3　A.　Yes, sir.
4　Q.　And that would be August 26?
5　A.　Yes, sir.
6　Q.　And who was in that meeting?
7　A.　Dr. Blackwell, Dean Lowe, I believe
8　　　Ms. Peterson was there, Ms. Gruber -- and
9　　　that's G-R-U-B-E-R -- and Ms. Bellamy.
10　Q.　All right.  What did y'all talk about?
11　A.　Talked about the difficulties in the
12　　　nursing division in recruiting staff,
13　　　talked some about Ms. Gruber had a
14　　　particular situation.  We discussed the
15　　　verification of employment.  And I know
16　　　they have minutes, so I think they can
17　　　answer that a lot better than I could, but
18　　　those are the things that stand out and I
19　　　remember.
20　Q.　What makes you think they have minutes?
21　A.　If I'm -- I know other people took notes,
22　　　and typically they take minutes during
23　　　these or, you know, have notes.  I didn't

Deposition of Sandra Gunnels

**Page 145**

1    keep any notes or anything of that nature.
2    Q.   Was it a meeting that was held every Friday
3    or periodically?
4    A.   No. This was a special meeting.
5    Q.   I mean, are you saying that someone was
6    appointed to be secretary?
7    A.   No, sir. I was just saying I did not take
8    minutes, did not keep minutes. Remember
9    some of the conversations. Can't remember
10   if there was a computer -- a computer, a
11   recorder present in the room, which on
12   occasion there were. I don't know.
13   Q.   So you don't know if anyone really kept
14   minutes?
15   A.   Oh, no, sir. That was not what I was -- I
16   should have said notes.
17   Q.   You didn't keep any?
18   A.   (Witness shakes head from side to side.)
19   If I did, I did not keep those notes.
20   Q.   Do you know anybody specifically who did
21   keep notes?
22   A.   I know that people wrote on tablets. What
23   they were writing, what they have, I don't

**Page 146**

1    know.
2    Q.   You don't remember who, right, who was
3    writing?
4    A.   No, sir.
5    Q.   What was said about the difficulties in the
6    nursing division?
7    A.   The nursing division -- There's a nursing
8    shortage, and there's even a greater
9    shortage of master's-prepared nurses which
10   are required by the State Board of Nursing
11   to -- and the NLN to teach nursing.
12       There were, in essence, three
13   instructors for -- I don't remember how
14   many freshmen were coming in then, but
15   somewhere close to -- a guesstimate is a
16   hundred students, 90 to a hundred students
17   total. It could have been a little bit
18   more, a little bit less.
19       And I was temporary part-time.
20   Ms. Gruber was not allowed to teach in the
21   classroom because she didn't have a
22   master's, and I know those types of issues
23   were discussed.

**Page 147**

1    Q.   Any solution to them or any plan about what
2    to do about it?
3    A.   Not that I remember.
4    Q.   Did you know the status of that same
5    situation at other schools, nursing
6    schools?
7    A.   Not to that degree, but it was that common
8    that -- it was hard to acquire master's-
9    prepared instructors, that was a known
10   fact, yes, sir.
11   Q.   Now, what was said about recruiting staff
12   or recruiting, if anything?
13   A.   I just know we talked about the difficulty.
14   Q.   And then what was said about verification
15   of employment?
16   A.   And, again, I wish I had known people were
17   going to ask me questions about this
18   because I would have kept notes.
19       I believe that that came up as an
20   issue. We were discussing that.
21   Ms. Debbie Boone came in, if I'm not
22   mistaken, or some information was provided
23   that were worksheets that she had done and

**Page 148**

1    that she was now saying that the form that
2    we had designed would not meet the needs
3    and that we needed to --
4        And I think Ms. Bellamy was in -- well,
5    I don't think. I know some of her work,
6    according to her -- she was having some of
7    the issues, also.
8        And let me just -- that I personally
9    would need to go back and re-verify the
10   majority of my employment. And I expressed
11   that if I was going to be teaching a number
12   of classes and hours and the students I was
13   going to be teaching, I was not going to
14   have time to do that and did not really
15   feel it was appropriate for me to be doing
16   that.
17   Q.   Why were you going to have to verify the
18   years of employment?
19   A.   Because it was not on the hospital or
20   organization's letterhead. It was on
21   CVCC's letterhead where we had designed the
22   form. So people had said worked here
23   from -- and you've got copies.

Page 149

1  Q.  So you're saying that you had all of the
2      verification, it just wasn't on the right
3      form?
4  A.  The majority of it, yes, much more than six
5      years.
6  Q.  Are you familiar with the requirements in
7      terms of getting that kind of information?
8  A.  You would have to elaborate.
9  Q.  The requirements of the school needing that
10     information before it can --
11 A.  I know what was sent to me in a letter and
12     then told to me in one meeting.
13 Q.  Were you told that you would receive some
14     type of credit for your nursing experience?
15 A.  Yes, sir.
16 Q.  Explain what you were told.
17 A.  I was told that I would receive one year
18     teaching experience for each year of
19     nursing experience.  And at that point, I
20     had over 30 years of nursing experience.
21 Q.  You understood that it had to be a whole
22     year of nursing experience, correct --
23 A.  (Witness nods head up and down.)

Page 150

1  Q.  -- for you to get a year credit of teaching
2      experience, correct?
3  A.  Yes, sir.
4  Q.  If you got a year as credit of teaching
5      experience from having worked a year as a
6      nurse, then that put you in a different pay
7      category --
8  A.  Yes, sir.
9  Q.  -- or if you got enough of those years
10     credit; would that be correct?
11 A.  Yes.  There's a copy of the pay scale.
12     From this amount to this amount, you're on
13     this grade or scale; from this amount to
14     this amount, you receive -- so based on
15     your years experience, your salary did
16     change.
17         MR. NIX:  Can we take a real quick
18     break?
19 Q.  And one thing I'd like to do, I would like
20     to kind of compare what you brought to what
21     I'm looking at over here because I think
22     I've got it all messed up and confused.
23     That's one thing right there.  I've got

Page 151

1      that.
2  A.  And that's what I'm referring to at this
3      point.
4  Q.  Do you mind comparing them and see and
5      getting everything right, and then I've got
6      some other stuff over here that I don't
7      know if that's -- I know that's yours right
8      there.
9  A.  Yes, that's what I just gave you this
10     morning, yes, sir, and answered the items
11     on the subpoena.
12 Q.  And I know that over here, this is stuff --
13     I think I have this.  I don't know.  Do you
14     want to look at it real quick?
15 A.  I mean, I can look at it -- if you want to
16     just fan through it, I'll tell you if it's
17     anything I brought you.
18 Q.  I don't remember seeing some of that.
19 A.  The front looks familiar, but that's not
20     necessarily my subpoena.  It's somebody's
21     subpoena.
22 Q.  Yeah, that's your subpoena.  Look at it
23     real quickly and tell me if you brought

Page 152

1      that with you today.
2  A.  You asked for my education.  You asked for
3      my resume.
4  Q.  Right.
5  A.  You asked for what I had passed out in
6      271.  You asked for any other course I
7      started teaching that year.  You asked for,
8      I think in particular, NUR 272 from when I
9      had taught it before.
10 Q.  All right.
11 A.  My license.
12 Q.  All right.
13 A.  Anything I had that had anything to do with
14     the class that Lindy Wright was in.  That's
15     just a contact list.
16 Q.  Okay.
17 A.  And I gave you two copies of my transcript
18     because I was really proud of it.
19 Q.  All right.  Is there anything else then
20     that you've brought other than this
21     packet over here that --
22 A.  You have copies of everything else, so
23     those were the only things that ...

Page 153

1   Q.   This one packet that Brandy is doing.
2   A.   Uh-huh.  (Positive response.)
3        (Brief recess was taken.)
4        (Defendant's Exhibits 25 and 26
5        were marked for identification.
6        MR. NIX:  I have re-marked a
7        couple of things just for
8        identification purposes so
9        it's more clear.
10       I have re-marked what
11       we've been referring to as
12       Exhibit 10-A through D as
13       Defendant's Exhibit 25 -- 10-A
14       through D.
15       And then I've marked as
16       Defendant's Exhibit 26 what
17       we've been referring to as
18       your pediatric notes, G-1
19       through G-22.  That's 26.
20       (Brief interruption.)
21  Q.   Exhibit 24 is this calendar for the year
22       2005.
23  A.   Yes, sir.

Page 154

1   Q.   August 26th is the Friday that you were
2        involved in the meeting where you were
3        discussing various things that were going
4        on.  I'm just going to circle that August
5        26th day because it's easier to spot when
6        you do that.
7        You said you were out sick August 29th
8        and 30th; is that correct?
9   A.   Yes, sir.
10  Q.   And that August 31 was the day you
11       resigned; is that right?
12  A.   Yes, sir.
13  Q.   And you said that Dean Lowe told you not to
14       go to your class; is that right?
15  A.   Yes, sir.
16  Q.   That was on August 31?
17  A.   Yes, sir.
18  Q.   And do you know why he told you that?
19  A.   He either explained to me at that point or
20       told me in a subsequent meeting that
21       because of the meeting on Friday and that I
22       had not come to work on Monday and Tuesday
23       that they were unsure or had assumed that I

Page 155

1        would not be at work on the 31st, and there
2        was a guest lecturer.
3        I told him that was okay.  I knew the
4        guest lecturer and would go down there and
5        listen with the students and, you know,
6        pass out my syllabi, et cetera, et cetera.
7        He said, no, I'm asking you not to go to
8        your class or words to that effect.
9   Q.   Do you recall what the first day of the
10       fall semester was?
11  A.   It would have been that Monday, the 20 ...
12  Q.   Third?
13  A.   The 29th, I believe.
14  Q.   Oh, really?
15  A.   The 31st was the first time I would have
16       met with the ADN students.
17  Q.   All right.  So your recollection is that
18       the first day of class that semester would
19       be August 29?
20  A.   That would have been the first time I would
21       have been scheduled to meet with the ADN
22       students, I believe, in the classroom.
23       That's when I had the syllabi, et cetera,

Page 156

1        so --
2   Q.   Would there have been other meetings that
3        were supposed to have been held prior to
4        August 29, 2005, for that particular class,
5        whether in the classroom or not?
6   A.   I cannot answer that.  I don't recall.  I
7        just know that was when I was meeting them
8        in the classroom with the syllabi.
9   Q.   I mean, would there have been a clinical or
10       anything like that?
11  A.   There could have been.  There could have
12       been.  I don't remember.
13  Q.   But what you're saying is that the 31st was
14       the first day of class for the purpose of
15       regular class and lecture?
16  A.   Of lecturing as I recall, yes, sir.
17  Q.   It would be incorrect to say that the first
18       day of class was August 17?
19  A.   I could not say that was incorrect or
20       correct.  As I said, what I remember is
21       August 31st going down to my classroom and
22       being stopped.
23  Q.   Okay.  You see that August 17 is two

**Page 157**

1  Wednesdays before August 31. Do you see
2  that?
3  A.  Yes, sir.
4  Q.  Isn't it correct that August 17 was the
5  first day of class?
6  A.  I don't recall. I don't remember what was
7  occurring the two weeks before the 31st.
8      (Inaudible discussion.)
9      COURT REPORTER: I didn't hear any
10  of that.
11  A.  So, obviously, we would have had an
12  opportunity to meet the 24th. I don't
13  recall meeting with the students or not
14  meeting with them or whatever. But the
15  31st was when I went down to lecture with
16  the syllabi and handouts when I was stopped
17  by Dean Lowe.
18  Q.  Our whispers have determined that it was
19  August what?
20  A.  I believe the 23rd was what I heard.
21      MS. PRICE: It was the 21st --
22  A.  The 21st was a Sunday, and I don't think
23  we --

**Page 158**

1  Q.  I thought it was the 17th.
2  A.  We didn't usually have classes on Sunday,
3  so I'm assuming --
4  Q.  All right. Well, we don't know really I
5  guess is what we're saying.
6  A.  I don't know when the semester started.
7  Q.  Let me ask you this.
8  A.  I know August 31st I was going down to meet
9  with my class.
10  Q.  Had you been out sick any other days in
11  that fall semester of 2005 before August
12  29?
13  A.  I do not believe so, no, sir.
14  Q.  Had you been out any other days during the
15  term of the -- during the fall term prior
16  to August 29, out for any reason?
17  A.  You're saying the 29th would be --
18  Q.  You had said the 29th and 30th you were out
19  sick.
20  A.  That's what I remember.
21  Q.  And the 31st, you met class -- or you were
22  going to meet class and they had a guest
23  lecturer because Dean Lowe had been told

**Page 159**

1  you were not going to be there because you
2  were sick. Am I right about that?
3  A.  That's not what I said.
4  Q.  I'm wrong about that.
5  A.  Yes, sir.
6  Q.  Tell me what you said again. I apologize.
7  A.  Okay. That I had called out on the 29th
8  and spoke with Katie Lackey and told her I
9  probably would also be sick on the 30th,
10  but I would be there on the 31st.
11      I called on the 30th and left a message
12  that I was still ill. What I did not know
13  was Katie Lackey obviously was not there on
14  that day also. And that Dean Lowe stopped
15  me on the 31st and stated we weren't sure
16  if you were going to come to class,
17  dah-dah-dah, dah-dah --
18      THE WITNESS: I don't know. Can
19      you do dah-dah-dah, dah-dah?
20  A.  -- and asked me not to go to my classroom.
21  Q.  Because there was a guest lecturer there,
22  correct?
23  A.  (Witness nods head up and down.) And that

**Page 160**

1  he had determined, assumed, whatever, that
2  I wasn't going to be here. And I said, I
3  am. He said, I don't want you to go down
4  there, you know, please wait.
5  Q.  Was it your understanding that he wanted
6  the guest lecturer to proceed and did not
7  want an interruption in that class?
8  A.  No, sir. Class hadn't started at that
9  point.
10  Q.  Well, he wanted the guest lecturer because
11  he had already -- or someone had already
12  lined up the guest lecturer, they wanted to
13  allow the guest lecturer to lecture the
14  class?
15  A.  You'd have to ask him.
16  Q.  Did he not say that to you?
17  A.  He said, we have a guest lecturer, words to
18  the effect, you don't need to go down
19  there. I said, well, that's okay. I know
20  the guest lecturer and I have these
21  things. He said, I don't want you to go
22  down there. I will take those down for
23  you.

Page 161

1   Q.  Who was the guest lecturer?
2   A.  Pat Fuggatt.
3   Q.  Is that a male or a female?
4   A.  That would be a female.
5   Q.  Spell Fuggatt.
6   A.  F-U-G-G-A-T-T.  I'm not positive about the
7       T's.
8   Q.  Is Pat Fuggatt qualified to be a guest
9       lecturer in that course?
10  A.  I would probably say Pat Fuggatt was
11      qualified -- or I would say she was
12      qualified to be a guest lecturer.  What she
13      was asked to speak on was not appropriate
14      at that point in time, and I remember now I
15      expressed that to Dean Lowe.
16          But at that point in time, she was the
17      assistant nurse manager or clinical
18      coordinator of labor and delivery at The
19      Medical Center.
20  Q.  So Pat Fuggatt was qualified.  It was just
21      that on August 31, the subject matter she
22      was discussing was not appropriate for the
23      time frame in that semester; is that right?

Page 162

1   A.  Yes, sir.
2   Q.  Did Dean Lowe, was he pleasant, polite when
3       he said you don't need to go to class?
4   A.  He was polite.  I would not say pleasant.
5   Q.  Now, you say you had already drafted a
6       letter of resignation at that time?
7   A.  No, sir.  I went down -- I went over to my
8       office after speaking with him and drafted
9       a letter of resignation.
10  Q.  On August 31?
11  A.  Yes, sir.
12  Q.  That letter of resignation was turned in
13      when?
14  A.  Well, the original letter was never turned
15      in.
16  Q.  All right.  Tell me about that.
17  A.  I drafted a letter which basically says the
18      same things as the letter you have in your
19      possession now says.  Based on
20      interactions -- but the date was either two
21      or four weeks from August 31st.  After
22      further interaction, I changed that date.
23  Q.  What further interaction are you talking

Page 163

1       about?
2   A.  Dean Lowe came back to my office -- can I
3       back up for one second?
4   Q.  Yeah.
5   A.  When I went back to my office -- I cannot
6       remember.  I don't think I had opened the
7       envelope with the current contract offering
8       in it before I saw him or after the first
9       time, but did see it before I saw him the
10      second time, which based on interacting
11      with him and seeing the contract that was
12      offered to me was what prompted me to write
13      the resignation and then to change the
14      date.
15          He came back, and we had some other
16      conversation.  And I think that is when he
17      told me that Katie had been out, so nobody
18      knew I had called in and confirmed on that
19      Tuesday that I was, indeed, still ill, but
20      that I would be in class on Wednesday.
21          I believe I verbalized to him at that
22      point I would not sign the contract and
23      that I would be resigning at that point.

Page 164

1   Q.  Tell me again why you would not sign the
2       contract.
3   A.  It was incorrect as far as my years of
4       experience.  And then also -- But the
5       reason I resigned was not so much because
6       of the incorrect contract, because I just
7       would have refused to keep signing it and
8       would have negotiated more and they would
9       have either fired me or, you know,
10      whatever, but it was more based on the
11      interactions that I had with him.
12  Q.  After that?
13  A.  (Witness nods head up and down.)
14  Q.  After the --
15  A.  When he stopped me from going to my
16      classroom and when I had a conversation
17      with him after that.
18  Q.  Tell me about that conversation.
19  A.  I cannot remember the particulars, but it
20      basically was the culmination of the
21      meeting on Friday and having stated that I
22      wouldn't sign the contract, that being
23      prohibited in my opinion from going to my

**Page 165**

1    class -- those issues, and just the general
2    atmosphere on campus and lack of support.
3    Q.   That's all stuff you said to him, right?
4    A.   Yes, sir.  You asked me why did I resign.
5    Q.   Right.  I thought you said you resigned
6    because of interaction you had with him
7    after he told you not to go to your class
8    and after you went to your office and after
9    you had written the resignation that gave
10   two weeks' notice.
11   A.   Uh-huh.  (Positive response.)
12   Q.   Am I right about that?
13   A.   I think you're correct.
14   Q.   And then after that, you had some more
15   interaction with Dean Lowe, correct?
16   A.   Correct.
17   Q.   And you were saying that's why you
18   resigned?
19   A.   That's why I changed the date.
20   Q.   To an immediate resignation?
21   A.   Right.
22   Q.   So what you just told me was a bunch of
23   stuff that you said to him; is that right?

**Page 166**

1    A.   I told you some things he said also.
2    Q.   Tell me, then, what he said, because I
3    didn't hear it.
4    A.   Primarily what he said, again, was that --
5    you know, when he initially stopped me from
6    going into my classroom, came back and
7    confirmed he did not want me entering my
8    classroom teaching or interacting with
9    students on that morning that --
10   Q.   Now, this is in the second conversation
11   with him?
12   A.   Yes, sir, when he came back upstairs, I
13   believe.
14   Q.   He told you that the first time.
15   A.   The first time he stopped me from entering
16   my classroom or going to my classroom,
17   asked me to go back to my office and he
18   would come back and talk with me after he
19   had taken --
20   Q.   So he didn't tell you don't go to your
21   class the first time?
22   A.   Yes, sir.
23   Q.   He did tell you --

**Page 167**

1    A.   Yes, sir, those were primarily the first
2    words out of his mouth when --
3    Q.   And then he came up and y'all talked a
4    second time?
5    A.   Some more.
6    Q.   Tell me what was said.
7    A.   Basically, the same information.  We
8    discussed the contract.  We discussed his
9    stopping me from going to my classroom.
10   That is when he told me that -- I believe
11   that's when he told me Katie was absent and
12   so he had not known or they had not known
13   that I was going to be there on Wednesday
14   and had gotten the guest lecturer.  And I
15   can't remember any other particulars
16   besides that.
17   Q.   Let me show you what I'm going to mark as
18   Defendant's Exhibit 28.
19        (Defendant's Exhibit 28 was marked
20        for identification.)
21   Q.   It's a group of documents you brought with
22   you today.  I would ask you to take a look
23   at it if you would.  I want you to go

**Page 168**

1    through it and tell me what each one of
2    those things are.  Look at this.  Was that
3    in there?
4    A.   That was in this, yes, sir.
5    Q.   Is it in there now?  Is this an extra copy
6    that we have of it?
7    A.   It would go right here, I believe.  I don't
8    believe there's a copy in here.
9    Q.   There was also the letter from
10   Dr. Blackwell, too?
11   A.   Yes.
12   Q.   This was also in that package?
13   A.   That was just single -- That was basically
14   a letter that was sent out to all faculty
15   members.  When I was looking through my
16   things, I found it.
17   Q.   If you would, go through and tell me what
18   each of these things are.
19   A.   The first document is an intent to employ
20   that was posted at CVCC, posted April 11th,
21   2004, looking for a nursing instructor.
22   Q.   We're talking Defendant's Exhibit 28 now,
23   correct?

Page 169

1   A. Pardon?
2   Q. Defendant's Exhibit 28, correct?
3   A. Correct.
4   Q. The first one is intent to employ. Second
5       page?
6   A. The second page is a letter from Debbie
7       Boone telling me that in order to satisfy
8       legal requirements imposed, the nursing
9       instructor search was being re-advertised
10      in an effort to augment the current
11      applicant pool and that I did not need to
12      reapply.
13  Q. Was that letter correct? Anything wrong
14      with that letter or anything that occurred
15      after that letter that relates to it?
16  A. That letter? As far as I know, not, sir.
17  Q. Go to the next thing.
18  A. The next one is an e-mail from myself to
19      Debbie Boone that says --
20  Q. What's the date on it, please?
21  A. September the 9th.
22  Q. Of what year?
23  A. 2004. I'm sorry.

Page 170

1   Q. The prior letter from Debbie Boone was July
2       26, 2004, correct?
3   A. Right.
4   Q. And now we're looking at an e-mail from you
5       to Debbie Boone dated September 9, 2004,
6       right?
7   A. That references her letter of July saying
8       the search had been extended. Could you
9       please inform me of the status of my
10      request.
11  Q. Go to the next document.
12  A. This document is from Debbie Boone again,
13      dated September 4th --
14          But I obviously know that I did not
15      receive it before September 9th or I would
16      not have sent the e-mail.
17          -- stating that they were closing the
18      nursing instructor search and would
19      re-advertise at a later date.
20  Q. So this was September 4, 2004, from Debbie
21      Boone to you, informing you that they're
22      closing the nursing instructor search?
23  A. Right.

Page 171

1   Q. Did you have a problem with that letter at
2       all?
3   A. I didn't quite understand why based on the
4       information I had been given and
5       considering from everything that I had been
6       told that I was a qualified candidate and
7       had been offered employment earlier, why
8       there was the need to close that and
9       re-advertise. But as far as the letter
10      itself, no, sir.
11  Q. Had you been offered full-time employment
12      prior to September 4, 2004?
13  A. Yes, sir.
14  Q. Tell me again what month and year that was.
15  A. I honestly don't remember. I want to say
16      it was November 2003, but it might have
17      been at some other time.
18  Q. But that would have required too much of a
19      paycut?
20  A. Yes, sir.
21  Q. And so you could not take it at that time;
22      is that correct?
23  A. I regretfully declined at that point.

Page 172

1   Q. And you were working at St. Francis
2       Hospital at that time; is that correct?
3   A. Yes, sir.
4   Q. Is that right?
5   A. Yes, sir.
6   Q. Did you continue to work at St. Francis
7       Hospital at that time?
8   A. Yes, sir.
9   Q. Was that a full-time job?
10  A. Yes, sir.
11  Q. Go to the next document.
12  A. Tuesday Times dated September 14th where
13      the search was closed for nursing
14      instructor, to be re-advertised at a later
15      date.
16  Q. That is also a 2004 document, correct?
17  A. September 14th, 2004.
18  Q. Why did you put that in here?
19  A. I just was keeping with when the search
20      opened and closed. These were things I had
21      in my file when you asked for these things
22      I went through.
23  Q. All right.

Page 173

1    A.   September 30th is a letter I wrote to Roy
2         Johnson, who was the chancellor, explaining
3         that -- I questioned why I had not been
4         re-offered a position or rehired as a
5         nursing instructor --
6         (Brief interruption.)
7    A.   Met requirements, and that other
8         instructors who had not followed the
9         requirements were being interviewed and
10        offered positions.
11   Q.   So your complaint to Dr. Johnson on
12        September 30, 2004, was that you had gone
13        through the process and had not been
14        offered a job?
15   A.   No, sir.  I had gone through the process,
16        been offered a position, and now that there
17        was another one open, kept being told that
18        I was a candidate, did not need to
19        re-interview with Dr. Blackwell, merely to
20        meet with the search committee, and that
21        the requirements and the search kept
22        changing.
23   Q.   That's what you said in your letter?

Page 174

1    A.   Yes, sir.
2    Q.   Now, you mention the names of some people
3         in this letter, and one of them is Melliny
4         Macklin and another is Paige Harford,
5         H-A-R-F-O-R-D.
6         You say in this letter in paragraph
7         three, the September 30, 2004, letter that
8         Dr. Blackwell's office contacted Melliny
9         Macklin and Paige Harford and scheduled
10        each an appointment to meet with
11        Dr. Blackwell.  How did you know that?
12   A.   Melliny Macklin informed me of that, and in
13        the other case I was told by someone else.
14   Q.   Who else?
15   A.   Do I have to --
16   Q.   Yeah.
17   A.   -- give that source at this point?
18   Q.   Sure.
19   A.   Would be Dixie Peterson.
20   Q.   Give me the circumstances under which
21        Melliny Macklin told you about this -- the
22        fact that she had been contacted by
23        Dr. Blackwell's office.

Page 175

1    A.   We ran into each other and were talking,
2         and she told me that she had received a
3         call and confirmed that she had been
4         requested to put in an application or
5         offered employment to work full-time for
6         CVCC.
7    Q.   Had she gone through the application
8         process?
9    A.   No, sir, not for these --
10   Q.   How do you know that?
11   A.   -- positions.
12   Q.   Huh?
13   A.   She told me she had not.
14   Q.   Where is Melliny Macklin now?
15   A.   The last I talked with Ms. Macklin, she was
16        working at the Opelika Mental Health
17        Center.
18   Q.   How long ago was that?
19   A.   Approximately two years ago, year and a
20        half ago.
21   Q.   Where is Paige Harford?
22   A.   She works at The Medical Center.
23   Q.   Where were you when Dixie said something to

Page 176

1         you about Paige Harford having received a
2         call?
3    A.   I believe in her office.
4    Q.   Mimi Merriman?
5    A.   Yes, sir.
6    Q.   How do you know that Dr. Blackwell
7         contacted Mimi Merriman?
8    A.   Again, it came up in conversation with
9         Ms. Peterson.
10   Q.   At the same time --
11   A.   Yes, sir.
12   Q.   -- as the Paige Harford?
13   A.   Yes, sir, I believe so.
14   Q.   And then there was another name, Marla
15        Kundee.  How did you know that Marla Kundee
16        had been --
17   A.   In the same conversation.
18   Q.   Do you know where Mimi Merriman is?
19   A.   The last I saw her picture was as a new
20        employee at St. Francis, but I can't say
21        she's still employed there.
22   Q.   And then how about Marla Kundee?
23   A.   I have no idea.

Page 177

1  Q.  The last paragraph on the first page says
2      this:  Columbus-Phenix City is a close-knit
3      nursing community and it is abuzz with the
4      manner in which instructors have been hired
5      by the college.  Tell me about that.
6  A.  Well, just that it was discussed -- for
7      example, Gwen Pugh, I heard nurses
8      discussing it in the ICU at St. Francis
9      where she worked part-time, and I believe
10     she confirmed that she had been offered a
11     position there.
12 Q.  Where?  At CVCC?
13 A.  Yes, sir.
14 Q.  Where is Gwen Pugh now?
15 A.  I think she works part-time at Columbus
16     State and, I believe, still at St. Francis.
17 Q.  And you're saying that Ms. Pugh did not
18     comply with the requirements?
19 A.  Before she was offered a position, that is
20     what I believe she told me.
21 Q.  And then you say something about a $75,000
22     salary.  How did you get that information?
23 A.  That is what either she or the ICU nurses

Page 178

1      told me.
2  Q.  ICU nurses at St. Francis?
3  A.  Yes, sir.
4  Q.  Who had heard her say that she was making
5      $75,000?
6  A.  Yes, sir, that's what she'd be making.
7  Q.  As an instructor at CVCC in the nursing
8      program?
9  A.  Yes, sir.
10 Q.  What is the Ameris subsidy?
11 A.  Ameris is, I believe, the company that owns
12     Summit Hospital.  And they gave money to
13     CVCC to subsidize nursing instructor
14     salaries in order to help them acquire
15     nursing instructors because the payout for
16     teaching is so much less than working at
17     the hospital.
18 Q.  At this time, were you aware of any other
19     subsidy or any other extra money for hiring
20     nursing instructors?
21 A.  No, sir.  I was aware of that money, but --
22 Q.  The Ameris money?
23 A.  Yes, sir.  That was in the newspaper, so --

Page 179

1  Q.  Were you aware of any other money available
2      for the hiring of nursing instructors?
3  A.  No, sir.
4  Q.  Go to the first paragraph on page two.
5      Explain that paragraph to me if you would,
6      what it means.
7  A.  I met with Ms. Peterson, asking her if she
8      knew if any of these had actually been
9      hired or not in the spring 2005.  And I
10     also discussed it with Ms. Gruber, and
11     Ms. Gruber told me that Dr. Blackwell had
12     told her they had found some nursing
13     instructors.  I know one was hired, and I
14     don't remember when, who worked a total of
15     eight hours.  And I can't remember if that
16     was for that semester coming up or at
17     another time.
18 Q.  You say in that second paragraph on page
19     two:  I should have been considered a
20     viable, qualified candidate.  Is that
21     right?
22 A.  Yes.
23 Q.  And what is that based upon?

Page 180

1  A.  That I had been offered a position before
2      and nothing had changed and that I had
3      passed the search committee, passed -- my
4      chairperson wanted or expressed the desire
5      to hire me, and there really was no legal
6      reason I should not be and, yet, I could
7      not find out a reason I was not being
8      employed full-time.
9  Q.  And then the fourth paragraph on that page,
10     page two, apparently, you're giving
11     Dr. Johnson some reasons why you should be
12     hired by CVCC.  Would that be correct?
13 A.  No, sir.
14 Q.  Tell me what that one, two, and three are
15     for in that paragraph.
16 A.  That was to -- I had been involved with
17     CVCC for a long time.  I could have walked
18     to CTC or CSU or Southern Union or
19     potentially any other nursing program and
20     have been offered a job, you know,
21     immediately.
22          I felt a responsibility to
23     Ms. Peterson, to the nursing program, to my

Page 181

1　longevity there that that was -- my child
2　went to college there, that that wasa
3　place where I felt a loyalty and had been
4　supportive of CVCC.
5　Q.　All right.
6　A.　That was to show my support of CVCC.
7　Q.　You say: Furthermore, I am now concerned
8　　regarding the quality of the nursing
9　　education that will be provided by the
10　　program as neither of the newly-employed
11　　instructors are maternal-child/pediatric
12　　nurses.
13　A.　Correct. If any of those who had been
14　　offered positions had, indeed, come to
15　　work --
16　　　(Brief interruption.)
17　A.　None of the ones that were listed except
18　　for Ms. Macklin -- and she had declined. I
19　　knew that. If any of those others had
20　　maternal-child/pediatric experiences --
21　　primarily, they were medical-surgical
22　　instructors.
23　Q.　And then what's the next thing in that

Page 182

1　exhibit, Exhibit 28?
2　A.　This?
3　Q.　Isn't it 28?
4　A.　Yes, sir.
5　Q.　What's the next document?
6　A.　You don't have a copy of this, and that's
7　　just where I mailed it.
8　　　That was just the form letter back from
9　　Roy Johnson.
10　Q.　And he referred you back to Dr. Blackwell;
11　　isn't that correct?
12　A.　Right. Well, he said he forwarded a copy
13　　of my correspondence to Dr. Blackwell.
14　Q.　I had that page that you -- I don't have
15　　it. Go back to the page that's your
16　　mailing page and tell me. That's just the
17　　page where you mailed that --
18　A.　Yeah, certified. You said everything that
19　　had any names on it, so --
20　Q.　That's the certified thing to Johnson,
21　　right?
22　A.　Uh-huh. (Positive response.)
23　Q.　All right. Go ahead.

Page 183

1　A.　I did not receive a reply the first time I
2　　mailed it, so I sent it a second time
3　　certified.
4　Q.　And that's the certified slip for the
5　　second time?
6　A.　Yes, sir.
7　Q.　Which was the first time you sent it? Was
8　　it September 30, '04?
9　A.　Yes, sir. I sent the exact same letter
10　　twice.
11　Q.　That was the first time?
12　A.　Right.
13　Q.　Do you know the date of the second time?
14　A.　October the 19th.
15　Q.　And then Dr. Johnson's response to you is
16　　October 28, 2004?
17　A.　Correct.
18　Q.　What's next?
19　A.　Part-time faculty employment contract,
20　　spring semester 2005.
21　Q.　Executed by you and Dr. Blackwell, correct?
22　A.　Correct.
23　Q.　And so in the spring term of '05, you were

Page 184

1　a part-time faculty employee, correct?
2　A.　Correct. I had -- and I just didn't have
3　　copies of the other contracts. I had from
4　　August of 2001 worked every semester for
5　　CVCC in some type of capacity.
6　Q.　Go to the next thing in there. What is
7　　that?
8　A.　That is where I had discussed it with
9　　Ms. Peterson, but wrote her that I would be
10　　unavailable to teach classes for CVCC after
11　　May 13th due to Columbus Tech's no compete.
12　Q.　Was this before you were offered a job
13　　full-time by CVCC?
14　A.　This was after. I've only been offered one
15　　full-time job by CVCC, and that was in 2003
16　　or 2004. I'm not sure when. I had been
17　　trying to become employed by CVCC during
18　　this time period. Was unsuccessful.
19　Q.　We're on March 29, 2005, correct?
20　A.　Yes, sir.
21　Q.　You were offered a full-time, but you say
22　　temporary full-time job; isn't that right?
23　A.　Right.

Deposition of Sandra Gunnels

Page 185

1  Q.  But it was a full-time job as opposed to a
2      part-time faculty member; isn't that right?
3  A.  I was not offered a temporary full-time
4      position until I sent Ms. Peterson this
5      e-mail, and meetings subsequently started
6      occurring based on the fact that at that
7      point in time, there really was no one to
8      take my place.
9  Q.  After March 29, 2005 -- let's see.  You
10     actually sent your e-mail to Dixie March
11     18, 2005, and then Dixie forwarded a copy
12     of that to Dr. Blackwell and Dean Lowe.
13     And then what's the next thing in there?
14 A.  The next thing in there is dated June the
15     15th from Debbie Boone -- of 2005 -- where
16     she states that she had put an offer of
17     temporary employment in my mailbox and
18     called my home and on June 1st, sent an
19     e-mail.  And to my knowledge, I got none of
20     those.
21     That I found this when I came in to
22     work or Ms. Peterson gave it to me because
23     it had not reached me in another way,

Page 186

1      offering me temporary employment for summer
2      semester 2005.
3  Q.  Did you accept that job?
4  A.  Yes, I did.
5      The next is a contract from May 23rd,
6      2005, till August the 8th, 2005.
7  Q.  All right.  And that is executed by both
8      you and Dr. Blackwell, correct?
9  A.  Right.
10 Q.  And that is -- Do you have the terms and
11     conditions that are printed on the back
12     side of this contract?
13 A.  No, sir.  I just had a copy of it.
14 Q.  Okay.  This was for a full-time temporary
15     position; am I correct about that?
16 A.  Right, from May 23rd to August the 8th.
17 Q.  Do you know why it was for that period of
18     time?
19 A.  That would be the summer semester.
20 Q.  Did they have different or separate
21     contracts for the summer semester as
22     opposed to the fall and spring semesters?
23 A.  Yes, sir.

Page 187

1  Q.  What's the next document?
2  A.  The next item is where I will be placed on
3      Step 13, which is the 13 years of
4      experience.
5  Q.  Let me ask you this.  Were you satisfied
6      with that?
7  A.  If you'll turn the page, the next is a memo
8      to Debbie Boone from me saying I'm signing
9      this contract pending my submission of
10     documentation which should put me on a
11     different pay step and that I expected the
12     amount to be amended.
13 Q.  That's a June 17, 2005, memo from you to
14     Debbie Boone?
15 A.  Yes, sir.
16 Q.  And the signing of the contract, you say,
17     is pending submission of documentation
18     which should put you on a different pay
19     step, and that documentation would have
20     been verification of your full-time work as
21     a nurse, correct?
22 A.  Correct.
23 Q.  What's next?

Page 188

1  A.  The next couple of pages are the form where
2      Katie e-mailed my past 25 years of
3      employers -- I'm sorry, faxing them and
4      asking them to fill out the form they had
5      designed -- or she had designed.  Some
6      people did write on letterhead and fax it
7      back.
8  Q.  Tell me what the form is that you designed.
9  A.  If you'll look at that one, like two or
10     three back, that is what Katie typed up and
11     I faxed out to however many employers it
12     took to make 28 years -- 25 years.
13 Q.  And the particular document we're looking
14     at at this point is on Chattahoochee Valley
15     Community College stationery.  It says
16     employment verification at the top.  It has
17     your name, social security number, position
18     held, the dates of your work, and please
19     sign and stamp below to verify employment.
20     And that particular one was returned,
21     apparently, by Lynnette O' --
22 A.  Something.
23 Q.  -- O'Baugh, East Jefferson General

Page 189

1    Hospital, correct?
2    A.  Yes, sir.
3    Q.  That document is not on the letterhead of
4        the entity that this lady works for, right?
5    A.  Correct.
6    Q.  And that was not an appropriate or an
7        acceptable form for the employment
8        verification to be in, correct?
9    A.  That was not communicated the first time I
10       was asked to do this.  It was merely --
11   Q.  What I asked you was, that was not an
12       appropriate form for the employment
13       verification, correct?
14   A.  As of the date it was sent, yes, it was.
15   Q.  It was not accepted, was it, Ms. Gunnels?
16   A.  I was not told it was not accepted until
17       two months later.
18   Q.  It was not accepted; is that right?
19   A.  As of August the whatever, yes, sir.
20   Q.  That's right?
21   A.  Yes, sir.
22   Q.  Did you send other forms out after you
23       learned that it was not accepted?

Page 190

1    A.  No, sir, because I did not find out until
2        August it was not accepted.
3    Q.  Tell me when in August you learned it was
4        not accepted.
5    A.  I don't remember exactly, but it was close
6        to or on August the 29th.  That's when it
7        was discussed.
8    Q.  How do you remember that date?
9    A.  Because that's the date we had the meeting
10       about all the issues, including contracts
11       and salaries.
12   Q.  That's the Friday?
13   A.  Yes, sir.
14   Q.  So August 26 was that date?
15   A.  Oh, I'm sorry.  August 26.
16   Q.  Now, there was one that was sent back on
17       letterhead, Slidell Memorial Hospital.
18   A.  Two, actually.
19   Q.  There were two?
20   A.  Yes, sir.
21   Q.  What was the other one?
22   A.  St. Francis Hospital.
23   Q.  Did you ever check the status of these

Page 191

1    forms coming back from your employers
2    between the time this went out and the time
3    you got it back?
4    A.  These actually came back to the nursing
5        office and then were submitted to Debbie
6        Boone.  And I never heard back since I
7        submitted them in person.  My assumption
8        was that they were adequate.
9    Q.  Did the forms come back to you then and you
10       submitted them to Ms. Boone?
11   A.  Yes, sir -- or to the nursing office, yes,
12       sir.
13   Q.  What is this right here, this verification
14       of work experience?
15   A.  That was given to me by Debbie Boone in the
16       August 26th meeting.  It's actually a
17       two-sided document, but that was the side
18       that was given to me.  And your copy has
19       both sides.
20       When I first applied for the full-time
21       position on November the 14th, '02, I had
22       to have verification of work experience and
23       Millie Paradiso's signature from

Page 192

1    St. Francis verifying that St. Francis had
2    verified that employment for those years,
3    and that was what was required at that
4    point in time.  So this was in along with
5    the two spreadsheets that were given back
6    to me.
7    Q.  Did that mean they were accepting this 2002
8        document as verification?
9    A.  That was my assumption.  And that you would
10       have to ask them, but this was in my file
11       on what they were -- they had accepted it
12       in 2002.
13   Q.  What's the next thing in your file?
14   A.  The next is a memo from -- to myself from
15       Laurel Blackwell -- copying Laurel
16       Blackwell, Dixie Peterson, and Debbie Boone
17       from James Lowe saying here is a copy of
18       your 2005-2006 academic year contract.  As
19       we discussed in our meeting Friday, we've
20       only received verification of six years of
21       full-time.  He's recommending that I be
22       placed on Step 6 on the salary schedule.
23   Q.  Did you ever sign that contract?

Page 193

1  A. No, sir.
2  Q. Why not?
3  A. Because it was not what we had discussed
4     and what I had agreed upon.
5  Q. What had you discussed and agreed upon?
6  A. I had been fairly verbal in the meeting
7     that I did not have time to and did not
8     feel it was appropriate for me to be
9     re-verifying -- especially re-verifying my
10    own employment when I was not given
11    adequate instructions the first time as to
12    how they were wanted and that I really
13    didn't have time to do it.
14 Q. Did anybody at that meeting on the 26th of
15    August say that they would make
16    accommodation for that, that they would
17    send out a verification form on your
18    behalf?
19 A. No, sir. I was told Ms. Boone was too busy
20    to do that. Unless we could find someone
21    else, that -- I guess we were at a
22    stalemate.
23 Q. Who told you that?

Page 194

1  A. It was in the meeting with Ms. Boone -- I'm
2     assuming she was there at that point --
3     Dean Lowe and Dr. Blackwell, my chair
4     and --
5  Q. Who told you that, though? Who told you
6     that Ms. Boone was too busy?
7  A. Dr. Blackwell supported Ms. Boone when she
8     said that she just didn't have time to do
9     that.
10 Q. Ms. Boone said it is what you're saying?
11 A. And I believe that -- and I know on
12    Wednesday, the 30th, Dr. Blackwell asked me
13    had I ever gotten in touch with
14    Ms. Peterson and asked her to do it, and I
15    said I don't -- I'm quite she didn't have
16    time nor was it an appropriate role for her
17    either.
18 Q. Who did you say came up with the form that
19    was considered to be inadequate?
20 A. Katie Lackey, the administrative assistant
21    in nursing -- health sciences in trying to
22    help me.
23 Q. Katie Lackey --

Page 195

1  A. Yes, sir.
2  Q. -- came up with it is what you're saying?
3  A. Yes, sir.
4  Q. And did Katie Lackey send it out?
5  A. Yes, sir.
6  Q. You did not send it out?
7  A. I would say it was a joint effort because
8     we were looking up addresses and fax
9     numbers and faxing them out.
10 Q. What's the next document there?
11 A. Would be the copy of the contract I did not
12    sign for August 15th, 2005, ending May 12,
13    2006.
14    An e-mail that I sent to -- I'm sorry.
15    I was moving on.
16 Q. Go ahead. You're doing good.
17 A. An e-mail I sent to Rhonda Davis, telling
18    her I was leaving CVCC and there had been
19    some conflicts in the CVCC/Southern Union
20    and -- OB days.
21 Q. Who is Rhonda Davis?
22 A. She is, I believe, the chair of the nursing
23    program at Southern Union. I know she's in

Page 196

1     some managerial capacity.
2  Q. R. Davis. What is S-U-S ...
3  A. Southern Union State Community College.
4  Q. Is that where she works?
5  A. Southern Union, yes, sir.
6  Q. Hi, Rhonda. This is March 22, 2005, from
7     you --
8  A. Yes, sir.
9  Q. -- to Rhonda Davis at Southern Union. Hi,
10    Rhonda. If you are still in need of
11    clinical instructor for --
12    Peds?
13 A. Peds. Pediatrics.
14 Q. Oh, pediatrics?
15 A. Yes, sir.
16 Q. I highly recommend Arte Harmon. She's RNC,
17    BSN, and works at TMC. What's the U-S-S --
18 A. Usually in the PICU, which is pediatric
19    intensive care unit.
20 Q. I know she has some available time this
21    summer. She's awesome. I don't have her
22    phone number here with me at work but can
23    get it for you. Her e-mail address is, and

Page 197

1   it gives that. You can also reach her
2   through ...
3       Do you do OB in the summer? I have a
4   recommendation for one there also if you're
5   looking as well as med-surg if it's here in
6   Columbus.
7       And then you say: I will be leaving
8   CVCC on May 13. If you want to get
9   together prior to that and nail something
10  down about the conflicts in CVCC/SU --
11  A.  Southern Union.
12  Q.  -- OB days --
13      OB days?
14  A.  Obstetrical clinical days.
15  Q.  -- just let me know.
16  A.  Yes, sir.
17  Q.  "About the conflicts," what is that?
18  A.  In the arrangement of clinical space for
19  students to be in the different hospitals,
20  TUMC -- not TUMC, that's Tulane, TMC, The
21  Medical Center, has a meeting once a year
22  and everybody puts in when they'd like to
23  be up there.

Page 198

1       In the last meeting that I attended,
2   there were some conflicts between Southern
3   Union and CVCC. Rather than to hold up the
4   entire meeting trying to work it out,
5   Rhonda and I had said in the meeting that
6   we would get together and figure out how we
7   could both get what we needed, which we had
8   done in the past.
9       And since I was going to be leaving at
10  that point in time, I didn't want to leave
11  anything untaken care of or hanging out
12  there, so I had written her about deciding
13  who was coming at what time where on OB so
14  that there wouldn't be two groups of
15  students on one floor when there shouldn't
16  be from two different colleges.
17  Q.  All right. Now, I've actually gotten to
18  your resignation letter, August 31, 2005.
19  A.  Yes, sir.
20  Q.  Now, you refer to the August 26, 2005,
21  meeting the previous Friday in this letter,
22  correct?
23  A.  Yes, sir.

Page 199

1   Q.  And then you say -- you say: Please
2   consider this as a follow-up to our meeting
3   on Friday, August 26, 2005.
4       So it's correct, isn't it, that you had
5   decided to resign before August 31?
6   A.  No, sir, that's not true.
7   Q.  Isn't it correct that your husband and
8   Ms. Bellamy's husband were there to help
9   you get all your stuff out of the building
10  that day, August 31?
11  A.  No, sir. My husband was nowhere around.
12  He was at work.
13      I did call Ms. Bellamy – she was not
14  at work yet -- and told her about my
15  interaction with Dean Lowe and that I had
16  received my contract and that my
17  expectation was I would be resigning as
18  soon as I had my next interaction with Dean
19  Lowe.
20      And she said, do I have a contract?
21  And I said, I don't know. She asked me to
22  go in her office, open it. We had further
23  discussion, and she and her husband came up

Page 200

1   there. She had her husband come with her
2   in his truck.
3   Q.  The first paragraph starts: Please
4   consider this as follow-up to our meeting
5   on Friday, August 26, 2005. And the second
6   paragraph begins with based on our
7   interaction this morning, August 31, 2005,
8   will be my last day.
9   A.  Yes, sir.
10  Q.  And you're saying you did not make the
11  decision to resign before August 31? Is
12  that what you're saying?
13  A.  I had been considering it, especially after
14  the meeting of August the 26th. My
15  assumption was that I would resign from
16  CVCC, but my assumption also was that I
17  would be allowed to and would work out some
18  period of notice. My intent was not on the
19  morning of August 31st to resign on August
20  the 31st at the beginning of the morning.
21  Q.  After you left CVCC on August 31, when did
22  you start back work?
23  A.  The next day.

Page 201

1  Q. Where was that?
2  A. At Columbus Technical College.
3  Q. When did you first alert Columbus Technical
4     College that you would be starting back
5     there on September 1?
6  A. Let me rephrase that. I'm not positive it
7     was September 1, but there was
8     communication during that week. I think I
9     took the rest of that week off. But I was
10    also already working at St. Francis during
11    that time period, and I think I worked for
12    them some that week.
13 Q. You're saying that your first answer was
14    incorrect? You did not start at Columbus
15    Tech the very next day?
16 A. I would say that was an error. I do not
17    know the exact day I started.
18 Q. So could it have been September 1?
19 A. I don't believe so. I believe it was that
20    next week, but I did have communication
21    with Linn Storey September 1 that I was,
22    indeed, leaving or had left CVCC and did
23    she have a job for me to come back to at

Page 202

1     that point.
2  Q. You had not spoken to her or anyone else at
3     Columbus Tech before August 31, 2006, about
4     coming back -- 2005 about coming back?
5  A. Not to my knowledge, no, sir.
6  Q. April Gunnels is related to you, correct?
7  A. She was.
8  Q. She was?
9  A. She was related to me. She's my
10    ex-daughter-in-law at this point. She was
11    my daughter-in-law.
12 Q. Oh, really? She was married to your son?
13 A. Yes, sir.
14 Q. And she and Lindy Wright were friends,
15    weren't they?
16 A. Yes, sir.
17 Q. They were in the same clinical group,
18    right?
19 A. I don't know that for sure.
20 Q. Where is April now?
21 A. She works at the recovery room at The
22    Medical Center.
23 Q. Is she an RN?

Page 203

1  A. Yes, sir.
2  Q. Is she still Gunnels?
3  A. No. She is now April Dunn, D-U-N-N.
4  Q. Are you on good terms with her?
5  A. We're on speaking terms, yes, sir.
6  Q. Now, when you left that day, August 31, did
7     you go by the class?
8  A. No, sir.
9  Q. Did you see the class at all that morning?
10 A. I did -- Well, are you talking prior to my
11    resignation or after my resignation?
12 Q. Either one.
13 A. Prior to my resignation, I saw several of
14    the class members as I was coming in.
15    Exchanged pleasantries. April came to my
16    office and, in fact, she was walking to
17    class with me when Dean Lowe stopped me.
18       There was another student who had come
19    by my office. I think it was Crystal
20    Love. I cannot be absolutely positive,
21    but -- was walking a little ahead of us as
22    we were going to class.
23 Q. So April before class. Crystal Love?

Page 204

1  A. Crystal Love, I believe.
2  Q. Anybody else?
3  A. I don't remember. When I came through,
4     people were sitting out, talking. We
5     waved. We talked. We spoke.
6  Q. So April Gunnels was with you when Dean
7     Lowe said you don't need to go to your
8     class?
9  A. Yes, sir.
10 Q. Was anyone else with you?
11 A. No, sir. They had walked ahead.
12 Q. Then after that, did you see the class?
13 A. As I was loading things into my car, yes,
14    sir.
15 Q. What were they doing?
16 A. Several of them came up and spoke to me.
17    Some of them were just sitting out during a
18    break, that type of thing.
19 Q. Did you instruct or tell anybody to put any
20    writing on the board?
21 A. I did provide a phone number, yes.
22 Q. Tell me about that.
23 A. Someone contacted me, and I think it was by

Deposition of Sandra Gunnels

June 24, 2007

Page 205

1  cell phone, which all the students had my
2  cell phone number, and said -- you know, I
3  believe it was after I left, but I can't
4  swear. Wanted to know who they could
5  contact if they were unhappy about this,
6  and I told them three organizations that --
7  or one individual and two organizations
8  that if they felt their learning needs
9  weren't being met that they could contact.
10 Q.  Who did you tell them?
11 A.  Betty Peters, who was the Alabama State
12    Board representative, I guess, over CVCC,
13    the State Board of Nursing and the National
14    League of Nursing.
15 Q.  Did you give them phone numbers for all of
16    these?
17 A.  No, sir.
18 Q.  Did you give them phone numbers for any of
19    these?
20 A.  Yes.
21 Q.  Which ones?
22 A.  I gave them Betty Peters' phone number.
23 Q.  Do you know who wrote that on the board?

Page 206

1  A.  No, sir, I don't.  I wasn't present.
2  Q.  Pardon?
3  A.  I wasn't present, so no, sir, I don't.
4  Q.  But you knew it was written up there on the
5    board, didn't you?
6  A.  I don't know that I knew that or not, but I
7    know I was called and asked for.
8  Q.  Do you know what happened after you left in
9    that class?
10 A.  No, sir.
11 Q.  Nobody ever told you?
12 A.  I don't know if you mean after that actual
13    class on August the 31st or you mean the
14    class, ADN class.
15 Q.  I mean that August 31 class, that roomful
16    of people.
17 A.  I was told that Dean --
18    (Brief interruption.)
19    THE WITNESS:  We're going to have
20    to break in a few minutes.
21    MR. NIX:  Okay.
22    THE WITNESS:  I've got to go to
23    work and I've got to get

Page 207

1  something to eat.  I'm fixing
2  to pass out cold on this table
3  here.
4    MR. NIX:  We won't be much longer.
5    We're about done.
6    (Brief interruption.)
7  A.  August 31st.
8  Q.  Yeah.
9  A.  That class.
10 Q.  That roomful of people.
11 A.  Right.  One of the reasons I didn't go down
12    was security watched me pack my office and
13    said they were to escort me out to my car
14    so I would not be interacting with
15    students.
16 Q.  What did you do about --
17 A.  It was a new experience.
18 Q.  -- that roomful of people?
19    If you would answer my questions, we'd
20    be through.
21 A.  All right.
22 Q.  You've been editorializing a lot, so if
23    you'll answer my questions, we'll get

Page 208

1  through.
2  A.  All right.  That I was told that Dean Lowe
3    and Dr. Blackwell and potentially -- I
4    can't remember -- Dean Hodge had come down
5    and addressed the class.  At one point in
6    time -- and I don't know if it was the
7    first meeting or second meeting -- Dean
8    Blackwell [sic] indicated I was still ill.
9      But I do not know what was exactly said
10    in the class.  You would have to ask
11    someone who was present or who was there
12    speaking.
13 Q.  One meeting -- the first meeting or the
14    second meeting --
15 A.  Dean Blackwell -- Dean Lowe presented to
16    the class twice is my understanding.
17 Q.  And one time he said you were still ill?
18 A.  One time with -- right, and with
19    Dr. Blackwell on the second occasion,
20    potentially Dean Hodge, and I don't know
21    who else the second time.
22 Q.  Well, they knew you weren't ill, didn't
23    they?

52 (Pages 205 to 208)

Deposition of Sandra Gunnels

Page 209

1   A.   Yes, sir.
2   Q.   How did you find out that Dean Lowe said
3        you were still ill?
4   A.   Because several of the students told me
5        that he said I was still ill.  They said,
6        we saw her.
7   Q.   Let me show you what I've marked as
8        Defendant's 27.  You've got it.  Why don't
9        you pull your copy out.
10          (Defendant's Exhibit 27 was marked
11          for identification.)
12  Q.   What is that?
13  A.   That is documentation regarding the vote of
14       no confidence for Dr. Blackwell.
15  Q.   How did you obtain this?
16  A.   It was provided to me by Ms. Peterson.
17  Q.   When?
18  A.   I don't remember the exact date, but after
19       the vote took place.
20  Q.   Sometime after the vote?
21  A.   Yes, sir.
22  Q.   And the vote -- do you know when the vote
23       did take place?

Page 210

1   A.   I believe it was June 17th is what the
2        newspaper says when it took place.
3   Q.   Now, that's something else I didn't get is
4        that -- I don't think.  No, I know I
5        didn't -- no, I did.  Hold on.  I'm sorry.
6        I did, too.  This must be the one you gave
7        me today.  No, I had seen this.  I had.
8        Never mind.  Sorry.
9            So there was also a form -- there's a
10       memorandum here from Anne Messner who was
11       president of the faculty senate, right?
12  A.   Yes, sir.
13  Q.   Then it's got a feedback form, correct?
14  A.   Yes, sir.
15  Q.   And then it's got the responses on the
16       feedback -- or to the --
17  A.   Some responses.  I don't know that that's
18       all, but some responses.
19  Q.   Did you make a response?
20  A.   Yes, sir, I did.
21  Q.   Which one is yours?
22  A.   I don't think -- well, I know mine is not
23       in here.

Page 211

1   Q.   Where is it?
2   A.   And I don't have a copy of mine.
3   Q.   You don't have --
4   A.   I honestly do not.  My computer blew up,
5        and I lost everything on my hard drive
6        approximately a year and a half ago.
7        That's where I had a copy of mine.
8   Q.   But you turned it in, right?
9   A.   Yes, sir.
10  Q.   Who did you turn it in to?
11  A.   Turned it in to Ann Messner.
12  Q.   So would Anne Messner have it?
13  A.   She should, yes.  I'd have to look
14       at it and pick out which one was mine.
15  Q.   Did you sign it?
16  A.   I don't know.
17  Q.   None of these are signed.
18  A.   No, sir.
19  Q.   Is this the way you received them?
20  A.   Yes, sir.
21  Q.   Do you know why you received this?
22  A.   Ms. Peterson and I were discussing this
23       issue.

Page 212

1   Q.   What issue?
2   A.   The no confidence vote for Dr. Blackwell.
3   Q.   Have you read all of these?
4   A.   I did at one point in time.  I haven't read
5        all of them recently.
6   Q.   Does it appear to you that they all pretty
7        much say the same thing?
8   A.   There's a theme there, yes, sir.
9   Q.   It's more than a theme to me.  It's almost
10       like a script.  Wouldn't you say that
11       that's about the way it looks to you?
12  A.   I wouldn't call it a script.  Id say if
13       you have a lot of people participating and
14       experiencing the same situation, you're
15       going to get a lot of the same answers or
16       similar answers.
17  Q.   All right.  Now, this was provided by you,
18       Ms. Gunnels, Exhibit 27 was.  Was it
19       provided pursuant to the subpoena that I
20       issued?
21  A.   Beg your pardon?
22  Q.   Was this provided pursuant to the subpoena
23       I issued?

June 24, 2007

Page 213

1   A.   Yes, sir.
2   Q.   Exhibit 27.
3   A.   Uh-huh. (Positive response.) I didn't
4        even realize that I still had it until I
5        started going through a box of stuff.
6   Q.   I've got something else here. I don't know
7        if you brought this with you here today or
8        not. It's notes on Ms. Umoh.
9   A.   Uh-huh. (Positive response.) Mine just
10       looks differently. It's the same pieces of
11       paper.
12            (Defendant's Exhibit 29 was marked
13            for identification.)
14   Q.  Defendant's Exhibit 29 are those documents
15       that you've provided pursuant to the
16       subpoena. What are these?
17   A.  These are copies of write-ups on the
18       student that I discussed earlier who was
19       issued a failing grade in her pediatric
20       clinicals and appealed that grade.
21   Q.  Why did you keep this?
22   A.  Again, I didn't realize I had it until I
23       went through a box of things. When I

Page 214

1        packed on August the 31st, this was in a
2        folder marked something else. And I took
3        it with me – or a copy of it, not the
4        original, but a copy of it.
5   Q.   So it was a mistake?
6   A.   I did not mean to take it. But at one
7        point in time, I had thought about -- I
8        wouldn't say taking it, because at the time
9        this was going on, I was not thinking about
10       resigning. But I did not intentionally
11       plan on taking this with me if that's what
12       you're asking. It was in some files.
13   Q.  Why did you write this up?
14   A.  The original -- we're not on the same --
15       these were done in real time as was the
16       other handwritten documents, documentation
17       of Miss Arit's performance. I was asked to
18       type up the written –
19   Q.  I don't have one of those documents.
20   A.  You should have.
21   Q.  See the one on the top, your top one?
22   A.  You don't have that one? I gave you that
23       today.

Page 215

1        MS. PRICE: That's what we got
2            from the plaintiff's counsel's
3            office --
4   A.   Okay. I probably found this one after ...
5        I started going through stuff and spent
6        this weekend going through more stuff.
7        There you go. I think that one matches the
8        one that I've got a copy of for myself.
9            MR. NIX: I'm going to re-mark it,
10           then.
11   Q.  Looking at Exhibit 29 again, the first
12       document, the top document is what?
13   A.  That would be a copy of her clinical
14       evaluation for NUR 272, spring of '05.
15   Q.  Who filled out that evaluation?
16   A.  Mid term, Ms. Harmon and Ms. Wall. At the
17       end, because I was the lead instructor in
18       that course or the lecturer for that
19       course, I also sat in on her evaluation.
20           (Defendant's Exhibit 29-B was
21           marked for identification.)
22   Q.  Do you know why -- let me show you 29-B.
23       Look at 29-B. That is a document that

Page 216

1        Jennifer Cooley gave us, I assume, the day
2        you brought this material by her office.
3   A.   Yes. You've got --
4   Q.   I've got Exhibit 29. Okay?
5   A.   If you continue to look, I believe
6        that's --
7   Q.   Correct. But 29-B does not contain the top
8        document -- 29-B, that exhibit, that total
9        exhibit omits this top document which says
10       up here criteria in the left column, and
11       it's got some blocks drawn off. It's got
12       essential criteria on the front, assessment
13       criteria, diagnosis criteria, outcome
14       identification criteria. All of those
15       topics are addressed. On the second page,
16       implementation criteria, evaluation
17       criteria, and the date of the mid term
18       evaluation is February 11, 2004, correct?
19   A.  Yes, sir.
20   Q.  And the date of the intern evaluation is
21       March 11, 2004 [sic], correct?
22   A.  Yes, sir.
23   Q.  Who refused to sign this document?

Page 217

1    A.   Arit Umoh, the student.
2    Q.   Why?
3    A.   Because she did not agree with the failing
4         grade in clinical she was being issued.
5         She said she was not going to sign it.
6    Q.   And you're saying you didn't find the
7         evaluation form that I just spoke about
8         until recently?
9    A.   Yes, sir.
10   Q.   Were any of these documents created for the
11        purpose of addressing -- I don't know
12        whether it was a grade appeal or what.  Did
13        she file a grade appeal?
14   A.   I don't know exactly what all she did, but
15        there were multiple meetings about this
16        grade that was issued.
17   Q.   Was the April 13, 2005, memo, let's call
18        it, signed by you created for the purpose
19        of addressing Ms. Umoh's grade appeal or
20        concerns or whatever?
21   A.   Yes, sir.
22   Q.   Is there any other document among
23        Exhibits -- Exhibit 29 that was created

Page 218

1         purely for the purpose of addressing
2         Ms. Umoh's grade appeal?
3    A.   There was a typing of written notes.
4    Q.   I've got you.  Okay?
5    A.   Because these are the handwritten notes,
6         and I typed them for --
7    Q.   Okay.
8    A.   -- one of the meetings.
9    Q.   So the typed notes we have here are taken
10        from handwritten notes, and the typed notes
11        taken from the handwritten notes have dates
12        by each paragraph, correct?
13   A.   Correct.
14   Q.   This is another group of documents that you
15        brought today.
16             (Brief interruption.)
17   Q.   Let me show you these documents.  I'm
18        clipping them together and marking them as
19        Defendant's Exhibit 30.
20             (Defendant's Exhibit 30 was marked
21             for identification.)
22   Q.   Just ask you to tell me what they are.
23   A.   The first would be my unofficial academic

Page 219

1         transcript from Florida State University
2         where I received my master's degree in
3         nursing in 1989.  Do you want me just to go
4         through them?
5    Q.   No.  Just tell me, what are they
6         generally?  Well, you've got one
7         transcript.  Do you have another transcript
8         in there?
9    A.   I've got several transcripts in here.
10   Q.   All right.  And then you've got some course
11        outlines and syllabi?
12   A.   I've got course outlines, syllabi.  I have
13        my CV.
14   Q.   All right.
15   A.   The course outline for NUR 271, which is
16        the course I began teaching in August of
17        2005 for fall quarter 2005.
18             MR. DUMBUYA:  Did you say 271?
19             THE WITNESS:  271.  Yes, sir.
20   A.   Notes that I gave to -- or handouts I gave
21        to Dr. Lowe to give to the students for the
22        first lectures of NUR 271.
23             The NUR 271 worksheet study guide that

Page 220

1         the students filled out over their May
2         to -- well, no, would have been from August
3         8th to August 31st, thereabout, break that
4         they were to turn in for points.
5             A maternal-child nursing skills
6         checklist that would have been utilized
7         during that quarter of NUR 271 had I
8         continued to teach.  I don't know if they
9         used it.
10            Then there is a -- I also was scheduled
11        to teach NUR 104 to the current new LPN
12        students in August, and that would have
13        been a pharmacology course.
14            Also, I included my pediatric nursing
15        syllabus.  And when I pulled it off of my
16        disc -- obviously, I was thinking ahead
17        because I was already adjusting it for
18        spring 2005 or January.  So when you see
19        that, that would be -- and that would be
20        the last document in there.
21            (Defendant's Exhibit 31 was marked
22            for identification.)
23   Q.   Exhibit 31 is something you brought today.

Deposition of Sandra Gunnels

June 24, 2007

Page 221

1      That's your license?
2  A.  My nursing license.
3          (Defendant's Exhibit 32 was marked
4          for identification.)
5  Q.  Exhibit 32 is something you brought today.
6      What is that?
7  A.  You asked for anything that had to do with
8      that class. I found my old contact list
9      for the ADN class and members therein.
10 Q.  ADN class for --
11 A.  Started May 2005.
12 Q.  Right.
13         (Defendant's Exhibit 33 was marked
14         for identification.)
15 Q.  Exhibit 33 is a letter dated July 1, 2005,
16     from Dr. Blackwell that's addressed to
17     you. Would you look at that. You had
18     previously said that was sent to all of the
19     school faculty.
20 A.  That's my understanding.
21 Q.  And that was sent to the school faculty
22     because of the vote of no confidence?
23 A.  Yes, sir. In reading the letter, that

Page 222

1      would be my understanding.
2  Q.  And that letter was addressed to you, but
3      also addressed to all other faculty members
4      individually, correct?
5  A.  That is my understanding.
6  Q.  And therefore, that letter does not really
7      relate to or apply to any specific
8      criticism you made of Dr. Blackwell or to
9      her; wouldn't that be correct?
10 A.  That's what I would perceive it as. I
11     brought it because you asked for all
12     CVCC --
13 Q.  Pardon me?
14 A.  I said you asked me to bring any piece of
15     paper I had.
16 Q.  Yes, ma'am. I appreciate it.
17 A.  -- about CVCC, so I brought it.
18         (Defendant's Exhibit 34 was marked
19         for identification.)
20 Q.  All right. 34 is -- have you ever seen
21     that?
22 A.  That would be my subpoena here.
23 Q.  Did you come?

Page 223

1  A.  Yes, sir, I think so. I feel like I've
2      been here a while.
3  Q.  And did you look for all of the documents
4      that are on that subpoena? There's a list
5      of those documents; isn't that right?
6  A.  I believe 24 different paragraphs, yes,
7      sir.
8  Q.  And Exhibit 35 is what?
9          (Defendant's Exhibit 35 was marked
10         for identification.)
11 A.  That was a document I created for my own
12     use so that I made sure that I cut through
13     the legalese and brought in what I did have
14     and could find during the time period from
15     when I received the subpoena till now.
16 Q.  And that list corresponds to the numbers on
17     the document request; is that right?
18 A.  Yes, sir.
19 Q.  And that list tells me whether you had
20     documents that I had requested or whether
21     you did not have documents that I had
22     requested; is that correct?
23 A.  It more breaks down to -- you asked me for

Page 224

1      anything from any student. I had assumed
2      we'd go through -- I have, like, letters of
3      thanks and plaques and that kind of thing I
4      did not bring and I assumed you did not
5      want.
6          But anything that I did have in these
7      categories I brought. And if it was
8      something that would have been warehoused
9      and -- at CVCC, I marked that it should be
10     at CVCC.
11 Q.  But you made a diligent search for all the
12     documents described in there; is that
13     right?
14 A.  I have made -- yes, sir, for the time
15     period that I've had.
16 Q.  Well, do you think you may have additional
17     documents that are responsive?
18 A.  I don't think so, but I don't know. I have
19     boxes and drawers and file folders of
20     teaching things and whatever that I have
21     gone through and cleared out some things,
22     but I don't know that there's not a box
23     somewhere that I haven't found or gotten to

Deposition of Sandra Gunnels                                                June 24, 2007

Page 225

1    yet.
2    Q.  Well, if you find any other documents, as
3       soon as you do, would you mind giving me a
4       call?
5    A.  Yes, sir.
6    Q.  You have my number, I believe, don't you?
7    A.  Yes, sir, I do.
8    Q.  I would appreciate that.
9           Now, let me make sure I understand one
10      thing.  It's your position that you did not
11      know until August 29 that the form that
12      we've previously discussed that is included
13      in Exhibit ...
14   A.  And if I can correct -- I believe I said --
15      August 26th or sometime right before that.
16   Q.  I'm sorry.  Yeah, you did.  You said the
17      29th.  It was really August 26th that --
18   A.  Or sometime before that.
19   Q.  So it's your position that you did not
20      know --
21   A.  That I remember, yes, sir.
22   Q.  -- that that form that we've discussed
23      which is in Exhibit 28, the form that you

Page 226

1       say Katie Lackey faxed for you to all of
2       the folks for employment verification, you
3       didn't know that form was inadequate --
4    A.  That I recall -- no, sir, I was not told
5       that.
6    Q.  -- until the 26th of August?
7    A.  I said some point in time close to the
8       26th.
9    Q.  I thought you said you found out in the
10      meeting on the 26th.
11   A.  I said just a little bit before that, a
12      couple of days before that, I believe.
13   Q.  If you found out a couple of days before,
14      who told you?
15   A.  I don't recall.  I'm just saying I don't
16      remember exactly when I found out, but I
17      believe it was sometime that week up and to
18      the day of that meeting.
19   Q.  But you really don't know?
20   A.  No.
21   Q.  Did you bring your transcript today?  Yeah,
22      you did.  You went to your truck -- your
23      car --

Page 227

1    A.  Do you mean my --
2    Q.  That's it.
3    A.  I'm thinking college transcripts.
4    Q.  I'm sorry.  This is a sworn statement that
5       you gave; is that correct?
6    A.  Yes, sir.
7    Q.  Now, this document says -- how about that.
8       It says -- it has a style on it:  In the
9       United States District Court for the Middle
10      District of Alabama, Opelika Division,
11      Lindy Wright versus Chattahoochee Valley
12      Community College, right?
13   A.  Yes, sir.
14   Q.  Did you understand a lawsuit had been filed
15      when you gave this?
16   A.  Yes, sir.
17   Q.  There were two lawyers present --
18   A.  If I can go back.
19   Q.  Yes, ma'am.
20   A.  I understood -- I don't know if I knew one
21      had been filed or if it was in the process
22      of being filed, but I knew that lawyers
23      going back and forth, talking to each other

Page 228

1       was going on.
2    Q.  All right.  There were two lawyers present
3       at your giving of this sworn statement,
4       correct?
5    A.  Yes, sir, that I remember.
6    Q.  One of them was Jennifer Cooley.  Did you
7       know who she represents -- or who she
8       represented?
9    A.  Lindy Wright was my assumption.  I don't
10      know that --
11   Q.  She never said?
12   A.  I just assumed, and I guess I was told she
13      was Lindy's lawyer.
14   Q.  Who did Peter Dumbuya represent, then?
15   A.  My assumption was Lindy Wright.
16   Q.  Your assumption was that both of them
17      represented Lindy Wright?
18   A.  Yes, sir.
19   Q.  The court reporter was from a firm called
20      Courtney Tillman Peters; is that right?
21   A.  Looking at this, I would assume her name
22      was Courtney Tillman Peters.
23   Q.  You're right.

Deposition of Sandra Gunnels

June 24, 2007

Page 229

1   A.  And the firm was Causey & Peterson.
2   Q.  And they're from where?
3   A.  According to this, Columbus, Georgia.
4   Q.  Were you sworn in in this deposition?
5   A.  Yes, sir.
6   Q.  Look at the --
7   A.  I'm assuming I was.
8   Q.  It says you were.
9   A.  Okay.  Then I was.
10  Q.  It says -- look on page four.  Whereupon,
11      the deposition --
12  A.  Oh, yes.  Okay.
13  Q.  Having been first duly sworn, testified as
14      follows.  Okay?
15  A.  Yes, sir.
16  Q.  But do you remember being sworn in?  Do you
17      remember --
18  A.  Yes, sir.  I mean, I'm just --
19  Q.  -- raising your hand and saying I will or I
20      do, I swear I will or whatever --
21  A.  Promise to tell the truth, the whole truth
22      and nothing but the truth, so help me God.
23  Q.  All right.  Look at page 34.

Page 230

1   A.  Little page?  I've got little pages.
2   Q.  I'm sorry.  It's still page 34, but it's --
3   A.  Okay.
4   Q.  It says State of Georgia, County of
5       Muscogee.  The foregoing transcript of the
6       proceedings was taken before me as a
7       certified court reporter in and for the
8       State of Georgia and reduced to this
9       transcript under my direction and
10      supervision, and I certify that it is a
11      true and correct and complete transcript to
12      the best of my ability of the proceedings.
13          Now, you gave this in the state of
14      Alabama, didn't you?
15  A.  Yes, sir.
16  Q.  And this court reporter was a Georgia court
17      reporter; isn't that right?
18  A.  She did not tell me she was from Georgia.
19      I did not ask.  I saw this like a week ago,
20      so ...
21  Q.  I know you did not get the court reporter.
22      I know you did not.
23  A.  I have no reason to doubt that she's from

Page 231

1       Georgia since it says she's from Georgia.
2   Q.  Do you know whether she is authorized to
3       administer oaths in the state of Alabama?
4   A.  No, sir, but I don't know that she is
5       either.  (Indicating.)
6   Q.  She is.  I promise you.  All right.  Now,
7       let's go to a page --
8           (Brief interruption.)
9   Q.  Now, on page 10, would you look at page
10      10.
11  A.  Yes, sir.  Yes, sir.
12  Q.  Wait a minute.  I'm sorry.  Page 10, line
13      five, the question from Ms. Cooley:  Was
14      there ever a time that you can recall --
15          THE WITNESS:  I'm sorry.  Can I
16      stop this for one second.  I
17      apologize, but I'm fixing to
18      be ill.
19          (Brief recess was taken.)
20  Q.  Page 10, I was reading the question that
21      Ms. Cooley asked you:  Was there ever a
22      time you can recall where you had a
23      conversation with Ms. Peterson specifically

Page 232

1   regarding Ms. Wright -- Lindy Wright?  You
2   said, yes.  And she said, do you recall
3   that conversation?  You said, yes, I do.
4           MR. NIX:  Brandy, do we have a
5       clean copy of this?
6           I'm going to mark this
7       statement as Exhibit 36.  When
8       I refer to it, it will be
9       Exhibit 36.
10          (Defendant's Exhibit 36 was marked
11      for identification.)
12  Q.  That's what I'm reading from now.  I was
13  reading from page 10 of that.  Your
14  response, if you'll read along with me --
15  and I don't think we need to read every
16  word, but you say, yes, this -- it's hard
17  to say verbatim with it having been a
18  period of time, but the gist of the
19  conversation was Ms. Peterson came into the
20  faculty offices.  And as I recall, Brenda
21  Bellamy was present and potentially Deborah
22  Gruber.  Grouper here, G-R-O-U-P-E-R.
23      And then you talk about the offices and

June 24, 2007

Page 233

1 about the fact that she asked if anyone was
2 going to fail. And then there was -- I
3 think Ms. Bellamy said something about
4 Lindy Wright was close, but that she'd made
5 a C.
6     And this would have been, I guess,
7 Ms. Gunnels, for the summer of 2005; would
8 that be right?
9 A. Yes, sir.
10 Q. The last sentence in your answer is this:
11 And Ms. Peterson made a statement to the
12 effect of y'all need to flunk her, she does
13 not need to pass, she is weak, she's not
14 going to pass boards, y'all need to flunk
15 her.
16     Then the statement continues to go on,
17 and you say on page 11, it was end of
18 summer -- line three, summer semester
19 because we were averaging grades.
20     And then the question on paragraph --
21 line five, page 11: Is it a regular
22 course, I guess, of conversation for
23 Ms. Peterson, the director of the program,

Page 234

1 to come and ask all the instructors is
2 anyone going to fail?
3     Answer: That's very normal and that's
4 her responsibility. She needs to know
5 because in nursing, if they flunk a course,
6 you know, they have an opportunity to come
7 back. When -- how I was taught and how I
8 handle my classes was the fact that -- and
9 Ms. Bellamy did the same thing, was that if
10 we thought someone was not going to pass or
11 there was -- there were -- they were close
12 or, in fact, did not pass, then went we
13 back over every test, every piece of paper,
14 met with Ms. Peterson, told her who was not
15 going to pass. So then you talk about
16 the -- that answer.
17     See what the question says. Let's go
18 to page 12, Ms. Gunnels. Page 14, line
19 seven, was there a specific course that
20 Ms. Peterson said that Lindy needed to be
21 failed in is the question. And your answer
22 is: No, it was a general statement, and I
23 perceived it not as -- and I know she would

Page 235

1 not have done, asking us to go back and
2 change grades that Lindy had made. But the
3 assumption at that point in time was
4 Ms. Bellamy and I would be returning for
5 the fall semester and we would both have
6 Lindy again as a student -- myself in
7 obstetrics, Ms. Bellamy in her advanced
8 medical-surgical course work -- and it
9 was -- or I perceived it as a in-the-
10 future-this-needs-to-occur, that she
11 verbalized that she did not feel that Lindy
12 would pass the boards and would be a
13 liability and did not need to pass.
14     And then the question is: But you do
15 not -- you did not interpret that to mean
16 that you needed to go back and regrade her
17 to fail her that particular semester?
18 Answer: No, but Ms. Peterson would not
19 have asked that of me I know. Then you go
20 on to testify about that.
21     Tell me why you say Ms. Peterson would
22 not have asked you to do that.
23 A. In general, I would not expect Ms. Peterson

Page 236

1 to do that and she would not ask that of
2 me. I did not perceive it as a you-need-
3 to-go-back-and-, as I said, -regrade or
4 arrange things so that she received a
5 failing grade. She is moral enough to know
6 that I would not do that and I would not
7 expect that of her.
8 Q. Well, sure. And Ms. Peterson would not ask
9 that of you. She's not that kind of
10 person; am I right?
11 A. From my interactions with her, no.
12 Q. From your interactions with her, would you
13 say she's an honest, good chairperson of
14 that department who works in that
15 department with integrity?
16 A. That was my interaction with her.
17     THE WITNESS: I'm sorry. I'm not
18 going to be able to finish.
19 Q. Let me ask you one other question.
20 A. Yes, sir.
21 Q. Would it be correct to say that
22 Ms. Peterson was not asking you to
23 intentionally flunk Lindy Wright on any

June 24, 2007



Page 237

1   occasion, she was just commenting on the
2   fact that she was a weak student; would
3   that be true?
4   A. I'm sorry. Could you repeat that?
5   Q. Ms. Peterson was commenting on the fact
6   that Lindy Wright was a weak student, but
7   she was not asking you to in the future
8   flunk her in a course intentionally?
9   A. My perception was she was expressing her
10  appraisal of Ms. Wright's ability, and she
11  was not instructing me to flunk her in any
12  course.
13  Q. There was a question that Mr. Dumbuya asked
14  you that misstated your statement in that
15  regard. I don't know if I'm going to be
16  able to find it in time to ... I'm probably
17  not.
18      Here we go, page 18. Mr. Dumbuya is
19  asking this question, and this is what he
20  asked: Now, to the best of your
21  knowledge --
22      Are you there?
23  A. Yes, sir.

Page 238

1   Q. Line five. Now, to the best of your
2   knowledge, had Ms. Peterson made that
3   statement before concerning another
4   student, that you have to make sure that
5   she flunks?
6       That's not what you said at all
7   previously, was it?
8   A. No, sir.
9   Q. So he misinterpreted what you said, isn't
10  that right, or he either misinterpreted it
11  or he misstated it in some way, correct?
12  She never said you have to flunk her, you
13  must do it intentionally no matter what?
14  A. The question is had she ever made a
15  statement like that to me before was how I
16  perceived it, and I had never heard her say
17  that before.
18  Q. Right. And she didn't say you have to make
19  sure she flunks with respect to Lindy
20  Wright either?
21  A. No, sir.
22      MR. NIX: That's all I have.
23      Peter, do you have any

Page 239

1       questions?
2       MR. DUMBUYA: No.
3       MR. NIX: Thank you.
4       (The deposition was concluded at
5       2:40 p.m. EDT.)
6
7       * * * * * * * * * * * *
8       FURTHER DEPONENT SAITH NOT
9       * * * * * * * * * * * *
10
11      REPORTER'S CERTIFICATE
12  STATE OF ALABAMA:
13  MONTGOMERY COUNTY:
14      I, Lisa J. Nix, Registered Professional
15  Reporter and Commissioner for the State of Alabama
16  at Large, do hereby certify that I reported the
17  deposition of:
18      SANDRA GUNNELS
19  who was first duly sworn by me to speak the truth,
20  the whole truth and nothing but the truth, in the
21  matter of:
22      LINDY G. WRIGHT,
23      Plaintiff,

Page 240

1       Vs.
2   CHATTAHOOCHEE VALLEY COMMUNITY
3   COLLEGE (CVCC),
4   Et al.,
5   Defendants.
6   In The U.S. District Court
7   For the Middle District of Alabama
8   Eastern Division
9       Case Number 3:06-CV-1087-WKW
10  on Tuesday, July 24, 2007.
11      The foregoing 239 computer printed pages
12  contain a true and correct transcript of the
13  examination of said witness by counsel for the
14  parties set out herein. The reading and signing of
15  same is hereby not waived.
16      I further certify that I am neither of kin
17  nor of counsel to the parties to said cause nor in
18  any manner interested in the results thereof.
19      This 30th day of July 2007.
20
21
22      _____
        Lisa J. Nix, Registered
23      Professional Reporter and
        Commissioner for the State
        of Alabama at Large

Page 241

```
 1
 2
 3
 4        I, Sandra Gunnels, hereby certify that
 5    I have read the foregoing transcript of my
 6    deposition given on Tuesday, July 24, 2007, and it
 7    is a true and correct transcript of the testimony
 8    given by me at the time and place stated with the
 9    corrections, if any, and the reasons therefor noted
10    on a separate sheet of paper and attached hereto.
11
12
13
14        _____
              Sandra Gunnels
15
16
17
18        SWORN TO AND SUBSCRIBED before me this
19    _____ day of _____, 20___.
20
21
22        _____
              NOTARY PUBLIC
23
```

PLAINTIFF'S
EXHIBIT

4

31 August 2005

Dr. James Lowe
Dean of Instruction
Chattahoochee Valley Community College
2602 College Drive
Phenix City, Alabama 36869

Dear Dr. Lowe:

I am submitting this letter of resignation to terminate my position as nursing instructor, effective immediately. Some of the reasons, as previously discussed in numerous meetings, are cited as: contract negotiations, salary disputes, and broken verbal promises. This decision is made after numerous attempts to resolve these issues, and others, with administration, but to no avail.

Thank you for affording me the opportunity to work with Mrs. Dixie Peterson and the staff in the Health Sciences Department here at CVCC. I have never had the opportunity to work with such a knowledgeable and professional group of people. Mrs. Peterson is an outstanding leader and is highly respected by her peers and those of us fortunate enough to have worked under her guidance.

Sincerely,

Brenda L. Bellamy

Brenda L. Bellamy
RN, MSN

DEFENDANT'S
EXHIBIT

39

# Chattahoochee
Valley Community **College**

Laurel M. Blackwell, Ed.D.
President

2602 College Drive
Phenix City, Alabama 36869
1.334.291.4981
1.334.291.4944(fax)

August 31, 2005

Mrs. Brenda Bellamy
2700 Double Churches Road
Apartment 338
Columbus, GA 31909

Dear Mrs. Bellamy:

This letter serves as my official acceptance of your resignation from Chattahoochee Valley Community College effective today, August 31, 2005.

Best wishes in your future endeavors.

Sincerely,

*Laurel M Blackwell*

Laurel M. Blackwell, Ed.D.
President

LMB/db

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

COLUMBUS GA 31909

| | | |
|---|---|---|
| Postage | $ | $0.37 |
| Certified Fee | | $2.30 |
| Return Receipt Fee (Endorsement Required) | | $1.75 |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 |
| Total Postage & Fees | $ | $4.42 |

Sent To Brenda Bellamy
Street, Apt. No.; or PO Box No. 2700 Double Churches Rd Apt 338
City, State, ZIP+4 Columbus GA 31909

PS Form 3800, April 2002        See Reverse for Instructions


PLAINTIFF'S
EXHIBIT
5

# DEPOSITION OF BRENDA BELLAMY

## July 24, 2007

## Pages 1 through 94

## PREPARED BY:

Haislip, Ragan, Green, Starkie & Watson, P.C.
566 South Perry Street
Post Office Box 62
Montgomery, AL  36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net



**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  EASTERN DIVISION
4
5  LINDY G. WRIGHT,
6      Plaintiff,
7  Vs.                    CIVIL ACTION NO.
                          3:06-CV-1087-WKW
8  CHATTAHOOCHEE VALLEY
   COMMUNITY COLLEGE (CVCC),
9  et al.,
10     Defendants.
11
12         * * * * * * * * * * * *
13
14     DEPOSITION OF BRENDA BELLAMY, taken
15  pursuant to stipulation and agreement before Lisa
16  J. Nix, Registered Professional Reporter and
17  Commissioner for the State of Alabama at Large, in
18  the Conference Room, Ramada Inn, Limited, 3560
19  Highway 431 North, Phenix City, Alabama on Tuesday,
20  July 24, 2007, commencing at approximately
21  3:10 p.m. EDT.
22
23         * * * * * * * * * * * *

**Page 2**

1
2         APPEARANCES,
3  FOR THE PLAINTIFF:
4  Mr. Peter A. Dumbuya
   Attorney at Law
5  Post Office Box 3302
   Phenix City, AL  36868
6
7  FOR THE DEFENDANT:
8  Ms. Brandy F. Price
   NIX, HOLTSFORD, GILLILAND,
9  HIGGINS & HITSON
   Attorneys at Law
10 Suite 300
   4001 Carmichael Road
11 Montgomery, AL 36106
12
   ALSO PRESENT:
13
   Dr. Laurel Blackwell
14 Ms. Dixie Peterson
15
16         * * * * * * * * * * * *
17
18     EXAMINATION INDEX
19
   BRENDA BELLAMY
20     BY MS. PRICE . . . . . . . . . .  5
21
22
23

**Page 3**

1
2         EXHIBIT INDEX
3                          MAR
4  DEFENDANT'S EXHIBIT
5  38  Resume of Brenda Bellamy         30
6  39  8/31/05 letter to Dr. James Lowe from   36
       Brenda Bellamy; 8/31/05 letter to Brenda
7      Bellamy from Laurel Blackwell
8  40  8/23/05 e-mail to James Lowe and Laurel   42
       Blackwell from Brenda Bellamy
9
   41  Employment Experience Verification Form   42
10
   42  Composite exhibit - documents produced   61
11     by Brenda Bellamy consisting of
       certification cards, Master of Science
12     in Nursing certification, copy of
       nursing license
13
   43  Composite exhibit consisting of         81
14     application documents for Brenda Bellamy
15
16
17
18
19
20
21
22
23

**Page 4**

1
2         STIPULATION
3      It is hereby stipulated and agreed by and
   between counsel representing the parties that the
4  deposition of BRENDA BELLAMY is taken pursuant to
   the Federal Rules of Civil Procedure and that said
5  deposition may be taken before Lisa J. Nix,
6  Registered Professional Reporter and Commissioner
7  for the State of Alabama at Large, without the
8  formality of a commission, that objections to
9  questions other than objections as to the form of
10 the question need not be made at this time but may
11 be reserved for a ruling at such time as the said
12 deposition may be offered in evidence or used for
13 any other purpose by either party provided for by
14 the Statute.
15
16     It is further stipulated and agreed by and
17 between counsel representing the parties in this
18 case that the filing of said deposition is hereby
19 waived and may be introduced at the trial of this
20 case or used in any other manner by either party
21 hereto provided for by the Statute regardless of
22 the waiving of the filing of the same.
23     It is further stipulated and agreed by and

Page 5

1  between the parties hereto and the witness that the
2  signature of the witness to this deposition is
3  hereby not waived.
4
5                 * * * * * * * * * * * *
6
7              BRENDA BELLAMY
8      The witness, after having first been duly
9  sworn to speak the truth, the whole truth and
10  nothing but the truth testified as follows:
11                 EXAMINATION
12  BY MS. PRICE:
13  Q.  Ms. Bellamy, my name is Brandy Price.
14      We've met off the record informally.  Could
15      you state your full name for the record.
16  A.  Brenda Louise Bellamy.
17  Q.  And I know we've talked about some of the
18      protocol for the deposition.  As I
19      explained before, the court reporter is
20      going to be taking down everything we say.
21      All I would ask, if you don't understand
22      one of my questions, please let me know.
23      Okay?

Page 6

1  A.  (Witness nods head up and down.)
2  Q.  Is that a yes?
3  A.  Yes.
4  Q.  And that was one thing we talked about.
5      You're nodding your head, and she can't
6      take nods of the head down, so please make
7      sure you give me a verbal answer.
8          Additionally, I'm going to assume if
9      you answer my question that you understood
10      my question.  Is that all right?
11  A.  Yes.
12  Q.  Just to start off with, to go ahead and get
13      it out of the way, I'm going to show you --
14          Is this the subpoena that you received
15      to appear at the deposition today?
16  A.  Yes.
17  Q.  And the documents that you gave me in this
18      folder that are labeled case, those are the
19      documents that you brought with you
20      pursuant to that subpoena, correct?
21  A.  Yes, that's correct.
22  Q.  And we'll go through those in the
23      deposition and label those as exhibits.

Page 7

1          Just in general, you know we're here
2      for a lawsuit filed by Ms. Wright; is that
3      correct?
4  A.  Yes, according to the ...
5  Q.  Do you understand why you're here today?
6  A.  No.
7  Q.  Do you understand anything about the
8      lawsuit that Ms. Wright has filed?
9  A.  No.
10  Q.  Did you know that Ms. Wright had filed a
11      lawsuit against Chattahoochee Valley
12      Community College?
13  A.  Yes, when I received the deposition.
14  Q.  When you received the subpoena; is that
15      correct?
16  A.  I mean the subpoena, yes.
17  Q.  Is that the first time you knew that
18      Ms. Wright had filed a lawsuit?
19  A.  Yes.  I'm trying to think.
20  Q.  Let me go ahead and tell you.  Ms. Wright
21      has filed a lawsuit against Chattahoochee
22      Valley Community College, Dixie Peterson,
23      Dr. Laurel Blackwell and Dr. James Lowe.

Page 8

1          Did you know that she has filed the
2      lawsuit against Dr. Blackwell, Dr. Lowe,
3      and Ms. Peterson as well?
4  A.  No.
5  Q.  And you have no understanding at all as to
6      why Ms. Wright would list you as a witness
7      in this matter?
8  A.  No.
9  Q.  Prior to today, have you ever been
10      contacted by Ms. Wright's counsel or an
11      attorney for Ms. Wright about giving a
12      statement of any kind?
13  A.  No.
14  Q.  Have you been contacted by any attorney on
15      behalf of Ms. Wright?
16  A.  No.
17  Q.  Have you been contacted by Ms. Wright prior
18      to today?
19  A.  No.
20  Q.  Did Ms. Wright call you or try to call you
21      to tell you that you might be subpoenaed in
22      this case?
23  A.  Yes.

Page 9

1    Q.  Do you remember when that was?
2    A.  No, I don't.
3    Q.  Has it been in the last month?
4    A.  I can't remember when it was.
5    Q.  Do you remember any event around that time
6         that may help you narrow down the time
7         period that she may have called you?
8    A.  I was at work. I think I was at work, and
9         she called and said something about I might
10        be contacted, but no details of what --
11        what's going on.
12   Q.  Was that sometime this summer?
13   A.  Yes. Yes, definitely summer.
14   Q.  Was that all you talked about, just the
15        fact that you might be contacted --
16   A.  Yes.
17   Q.  -- for this case?
18   A.  No details.
19   Q.  Was that the first time you knew that there
20        was something going on as far as litigation
21        or legal action?
22   A.  Yes.
23   Q.  Has anyone else other than Ms. Wright

Page 10

1         mentioned this lawsuit to you?
2    A.  No.
3    Q.  Have you talked to anyone today about
4         giving -- about giving deposition
5         testimony?
6    A.  Yes.
7    Q.  Who?
8    A.  My husband. I told him I had to come, and
9         he brought me.
10   Q.  Have you talked to anyone else?
11   A.  No.
12   Q.  I assume you told your employers that you
13        had to come here.
14   A.  Yes.
15   Q.  Other than your employer and your husband,
16        there hasn't been anyone else?
17   A.  No.
18   Q.  Did Ms. Wright call you and let you know
19        that she was going to list you as a witness
20        at any point prior to this -- prior to the
21        call you received about the deposition
22        today?
23   A.  I'm not sure what you mean by witness. Do

Page 11

1         you mean if the case goes to court?
2    Q.  Yes, ma'am. And let me -- she has listed a
3         number of people, including you, as
4         possible witnesses in this case.
5             At any point previous to the scheduling
6         of your deposition and her contacting you
7         to tell you that you were going to have a
8         deposition soon, did she tell you or anyone
9         tell you that you were being listed as a
10        witness in this case?
11   A.  No, that's not what I was told.
12   Q.  When was the first time that you knew you
13        were listed as a witness in this matter?
14   A.  Now, when you say witness, are you meaning
15        if the case goes to court?
16   Q.  No, ma'am. Right now, you're considered a
17        witness right now because you're sitting
18        here giving testimony.
19   A.  Okay.
20   Q.  When was the first time you knew you were
21        going to be a witness and possibly have to
22        give testimony in this case?
23   A.  The only thing I knew about this case was

Page 12

1         when I got that call at home -- I mean at
2         work. I'm sorry.
3    Q.  From Ms. Wright?
4    A.  Yes. That was the only time.
5    Q.  And since you left CVCC, I believe the date
6         was August 31st, 2005, have you spoken to
7         Ms. Wright up until the point where she
8         called you the other day?
9    A.  No. I left in 2005. Not that I can
10        remember.
11   Q.  So that phone call that you got at work is
12        the only time you remember hearing from
13        Ms. Wright since you left CVCC?
14   A.  Yes, that's the only time I can remember.
15   Q.  And I know the nursing community here is
16        small. Have you run into her at work or at
17        any -- any nursing function or work that
18        you may have attended?
19   A.  Since I left the school, I did see her once
20        at work. She used to work there. But it
21        had nothing to do with this case, just a
22        hi, hi. I don't even think this case was
23        in effect then.

Page 13

1  Q.  Did she mention anything about her
2      situation at CVCC or the fact that she was
3      no longer attending CVCC?
4  A.  Yes.
5  Q.  Did she elaborate on that any at all?
6  A.  No.
7  Q.  Did she give any details about why she was
8      no longer attending CVCC?
9  A.  No.  I have no idea.
10  Q.  Do you have any idea how long as far as
11      length of time your conversation was with
12      her on that occasion?
13  A.  No, but it was real short.
14  Q.  Was it brief, just passing at work?
15  A.  Are you referring to when I ran into her up
16      on the floor or --
17  Q.  Yes, ma'am.
18  A.  Oh, gosh.  That was quick.  That was very
19      brief, just basically passing.
20  Q.  And did she mention -- is that the time
21      that she mentioned that she was no longer
22      attending CVCC to you?
23  A.  Yes.

Page 14

1  Q.  Was that the first time you had ever heard
2      that she was no longer attending CVCC?
3  A.  Yes.
4  Q.  Have you ever spoken with a Ms. Jennifer
5      Cooley?
6  A.  Jennifer Cooley?
7  Q.  Cooley.
8  A.  I don't know who that is.
9  Q.  And the gentleman sitting to your right is
10      Mr. Peter Dumbuya.  Have you ever met him
11      before or spoken with him before?
12  A.  I don't think so.  I don't know who he is.
13  Q.  Have you ever spoken with a lady named
14      Connie Cooper?
15  A.  No.
16  Q.  Other than Lindy Wright, have you spoken to
17      anyone else regarding Ms. Wright's lawsuit?
18  A.  No.
19  Q.  And I know Ms. Gunnels just left the room.
20      Did you speak to her about her deposition
21      after she left?
22  A.  No.
23  Q.  Have you talked to her prior to today about

Page 15

1      the depositions that were scheduled today?
2  A.  Can you repeat that?
3  Q.  I sure can.  Prior to arriving today at the
4      deposition, have you at any time spoken to
5      Ms. Gunnels about being deposed?
6  A.  Oh, still talking about her?  No.  No.
7  Q.  Now, are you and Ms. Gunnels friends?
8  A.  Yes.
9  Q.  How long have you known Ms. Gunnels?
10  A.  I honestly can't remember exactly how
11      long.  I knew her before CVCC, so I don't
12      know.
13  Q.  It's been a number of years?
14  A.  Yes, it has.
15  Q.  And how do y'all know each other?
16  A.  Well, we both used to work at St. Francis.
17  Q.  And when was the last time you spoke to
18      Ms. Gunnels prior to today?
19  A.  It's been a long time.
20  Q.  Have you spoken to her any at all this
21      summer?
22  A.  No.
23  Q.  Have you spoken to her at all this year?

Page 16

1  A.  I don't think so.
2  Q.  Let me ask you this.  Would you consider
3      Ms. Gunnels a close friend or more of an
4      acquaintance through work?
5  A.  Acquaintance through work.
6  Q.  As far as any preparation that you did for
7      the deposition today, did you do any kind
8      of preparation for the deposition?
9  A.  No.  Does that include Xeroxing those
10      things?
11  Q.  Other than preparing the documents we asked
12      for.
13  A.  No.
14  Q.  By that I mean, did you go through any
15      materials that you had or nursing books or
16      anything like that and look at any
17      materials in preparation for today?
18  A.  No.
19  Q.  And you didn't have any other files or
20      documents other than these that you thought
21      were relevant and you thought that we'd
22      requested?
23  A.  No.

Deposition of Brenda Bellamy

Page 17

1   Q. That was not a very good question, but ...
2      Do you have any knowledge at all as to
3   why you were listed as a witness in this
4   case?
5   A. No.
6   Q. Do you have any inkling of an idea why you
7   would have been listed as a witness in this
8   case?
9   A. What do you mean by inkling of an idea?
10   Q. Just any small thought that you had of why
11   you would have been listed as a witness.
12   A. Yes, I have a small thought.
13   Q. What is that?
14   A. I used to be one of her instructors.
15   Q. Tell me what courses you taught that
16   Ms. Wright was a student in.
17   A. I think it was 251, Nursing 251 and Nursing
18   252. It's been a while. I'm just trying
19   to -- I want to say 271, but I can't
20   remember.
21   Q. 251 and 252 would have been in the ADN –
22   A. I think it was med-surg.
23   Q. Did you teach Ms. Wright at all when she

Page 18

1   was receiving her LPN degree at CVCC?
2   A. No.
3   Q. So you didn't have her as a student until
4   she started in the ADN program?
5   A. Yes.
6   Q. And Nursing 251, what type of course was
7   that?
8   A. Med-surg.
9   Q. And that was -- that would have been in the
10   summer of '05?
11   A. I honestly don't remember when it was.
12   Q. Was 251 the first class that you had her as
13   a student?
14   A. Yes, I believe so. I think so.
15   Q. Is that the first time you had ever met
16   Ms. Wright was in that class?
17   A. I can't remember the dates. I'm not sure
18   if I knew her before, if she worked at
19   Doctors before or after. No, I think I
20   knew her before she started class.
21   Q. From work at Doctors?
22   A. No, I think she used to work at
23   St. Francis, I think.

Page 19

1   Q. And then you would have had her for Nursing
2   252 as well; is that correct?
3   A. Yes, that's correct.
4   Q. Now, that was -- that would have been the
5   semester that you resigned. It's my
6   understanding that she took that
7   semester -- that she took that class in the
8   fall semester of 2005, and that was the
9   semester that you resigned, I believe
10   August 31st, 2005; is that correct?
11   A. My memory ...
12   Q. Take your time. If you need to think about
13   it, that's fine. I know it's been a
14   long ...
15   A. Oh, gosh. Can I ask you a question? Am I
16   allowed to ask anybody?
17   Q. Do you mean ask me a question to clarify
18   or --
19   A. Can I speak to anybody else at the table or
20   just you?
21   Q. No, ma'am, just me for now.
22      And let me tell you this. It is
23   perfectly all right if you don't know, it

Page 20

1   is perfectly okay to say that, and we can
2   rely on something else to kind of plug that
3   in for us if we need to.
4      Let me ask you this. Are you having a
5   hard time remembering what course --
6   A. Yes.
7   Q. -- you were teaching --
8   A. Yes.
9   Q. -- when you left CVCC?
10   A. Yes. And I'm having a hard time
11   remembering what semester everything was
12   in.
13   Q. From the records, I believe you left on
14   August 31st, 2005, and that would have been
15   the fall 2005 semester.
16   A. Okay. Time flies. It don't even seem like
17   I've been gone that long.
18   Q. But, I mean, assuming we have documents to
19   support that, will you agree that your date
20   of resignation was August 31st, 2005?
21   A. Yes.
22   Q. As far as Nursing 251, which I understand
23   was med-surg, can you tell me or describe

Deposition of Brenda Bellamy

June 24, 2007

Page 21

1   to me how Lindy was as far as a student.
2   For example, how was her performance in the
3   class?
4   A.  Can you specify performance, exactly what
5   you want?
6   Q.  I understand, and I want to make sure this
7   is correct.  That class was two
8   components.  There was a clinical component
9   and an academic component.
10  A.  That's correct.
11  Q.  On the academic component, how did she
12  perform in the classroom setting
13  academically on the tests that were given,
14  quizzes that you may have given, things
15  like that?
16  A.  She passed the course.
17  Q.  Do you remember what her grade was in that
18  course?
19  A.  No.
20  Q.  Do you remember whether or not she received
21  a C in that course?
22  A.  I honestly don't remember.
23  Q.  Do you have any -- if you had to describe

Page 22

1   her as far as a student, would you describe
2   her as a weak student or was she strong
3   academically?
4   A.  Academically, that's a difficult question
5   because I don't remember what grade she
6   received.
7   Q.  A student who receives a C in a course,
8   would you describe that student as weak or
9   strong academically, just in general?
10  A.  In general?
11  Q.  Yes.  If I was a student --
12  A.  Average.
13  Q.  If I was a student in one of your courses
14  and I received a low to mid C, would you
15  consider me a weak student or an average
16  student?
17  A.  If you're referring to the A, B, C scale,
18  that would be considered weak.
19  Q.  Do you remember or have any recollection as
20  to how Ms. Wright performed in the clinical
21  setting in your class?
22  A.  Yes.  I had her in clinical group.
23  Q.  How did she perform clinically?

Page 23

1   A.  She did very well in clinicals from what I
2   can remember.
3   Q.  Did you have her in clinicals for med-surg
4   or was that a different clinical group or
5   different class that you had her in for
6   clinicals?
7   A.  No, I think she was in my med-surg
8   clinicals at St. Francis.
9   Q.  Do you have any recollection of ever
10  discussing Ms. Wright's performance with
11  Ms. Gunnels and Ms. Peterson?
12  A.  Are you referring to her performance in
13  class or performance in clinicals?
14  Q.  Her overall performance in your med-surg
15  class or any other class.
16  A.  It would be a lot easier to answer it if I
17  had her grades in front of me.
18  Q.  I understand.  Just based on your best
19  recollection, do you have any recollection
20  of discussing her performance with
21  Ms. Peterson and Ms. Gunnels -- or
22  Ms. Gunnels?
23  A.  The only thing I can actually remember is

Page 24

1   we actually discuss -- if we have students
2   that are, you know, borderline, meaning
3   barely passing or whatever, we sit down and
4   discuss ways that we can perhaps, you know,
5   assist these students, you know, like extra
6   credit -- not credit, but extra -- what
7   word am I looking for?  We have a separate
8   class where we give them extra instruction,
9   make sure they understand.
10  Q.  Like extra --
11  A.  I can't think of the word now.
12  Q.  Almost like a tutoring session?
13  A.  There you go.  That's the word I'm looking
14  for, tutoring.
15  Q.  Did you ever have any tutoring sessions
16  with Ms. Wright?
17  A.  I had study group once a week, and I was
18  trying to think if she attended it.  I
19  think she did.  I want to say she did, but
20  I'm not sure.
21  Q.  Do you remember any of the other students
22  who may have attended that study group?
23  A.  Oh, gosh.  No.

Deposition of Brenda Bellamy

Page 25

1   Q.   Would that have been a study group for the
2        med-surg class, 251?
3   A.   I think so.
4   Q.   And is that something you did for all
5        students or you made available for all
6        students?
7   A.   Yes, it was available to everyone.
8   Q.   Now, you mentioned earlier that you would
9        try to help those students that wanted help
10       through the study groups.  If you had a
11       weak student in a class, did you ever
12       inform Ms. Peterson about those weak
13       students who were kind of borderline?  I
14       believe you said those borderline students
15       earlier.
16          Is that something you would do just out
17       of the regular course as a teacher?  If
18       there was a borderline or weak student,
19       would you let Ms. Peterson know about that
20       student?
21  A.   I'm required to turn in mid semester
22       grades.  At that point, any student that
23       was barely passing or passing would be

Page 26

1        identified.  But that's part of the
2        protocol.
3   Q.   Ms. Gunnels has previously given a
4        statement in this case, and it is listed as
5        Exhibit 36, and in that, she mentioned a
6        conversation where she, you, and
7        Ms. Peterson have a conversation, and I
8        believe Ms. Gruber was there also.
9           She said: Ms. Peterson had come and
10       asked if anyone was going to fail, and we
11       said no.  And I believe it was Ms. Bellamy
12       that said Lindy had been close in her
13       course, but that she had -- her grades had
14       come up at the end and she had made a C.
15          Do you remember having any conversation
16       where that was discussed?
17  A.   I don't remember that conversation, but ...
18  Q.   And that would have been in the summer of
19       2005 regarding that course.
20  A.   I don't remember.  I don't actually
21       remember -- honestly remember the
22       conversation.
23          MS. PRICE:  For the record, I was

Page 27

1        reading off page 10 of Exhibit
2        36.
3   Q.   Was that common practice for Ms. Peterson
4        to inquire about students who may not pass
5        or who were close to not passing courses?
6   A.   Well, we had to notify her of anyone --
7        yes, she was always concerned about the
8        students.
9           MR. DUMBUYA:  Brandy, if you may,
10          would it be proper for you to
11          read what Ms. Gunnels said on
12          page number 10?  Maybe that
13          will refresh her memory and
14          maybe she can recognize --
15          MS. PRICE:  I did read part of
16          page 10.  I'm going to ask all
17          the questions I'm going to ask
18          in the deposition.  If there's
19          anything you want to go back
20          and ask ...
21  Q.   Did Ms. Peterson ever tell you to fail a
22       student?
23  A.   No.

Page 28

1   Q.   Do you remember overhearing Ms. Peterson
2        ever tell any instructor to fail a student?
3   A.   No.
4   Q.   Is that something that you would believe
5        Ms. Peterson would say?
6   A.   No.
7   Q.   How long have you known Ms. Peterson?
8   A.   Well, I've known her since I first started
9        teaching there before I moved out of town.
10  Q.   When did you first start teaching at CVCC?
11  A.   It was either '98 or '99, I think, because
12       I moved out of town in 2000.  I moved to
13       Philadelphia.
14  Q.   But then you moved back?
15  A.   Yes.
16  Q.   When did you move back?
17  A.   It will be three years in November -- or
18       four years in November?  Three or four
19       years this November.
20  Q.   When you came back, did you start teaching
21       at CVCC?
22  A.   Yes.
23  Q.   Had you taught at CVCC prior to moving to

Page 29

1    Philadelphia?
2  A.  Yes.
3  Q.  How many years --
4  A.  I'm trying to think if I actually taught
5      classes --
6  Q.  Or was it clinicals?
7  A.  -- or if I was just clinicals prior to or
8      both.
9        I don't even remember if it was -- I
10     know it was at least clinicals I know for
11     sure.  I can't remember if it was class
12     also because I started off part-time, and I
13     just -- I don't remember what year I went
14     full-time.
15 Q.  You provided a copy of your -- it looks
16     like your resume or your CV.  I assume that
17     all this information details where you were
18     when and when you were at CVCC.
19       According to it, it's got that you
20     were -- it has you there from August 2000
21     to December of 2001 as a classroom and
22     clinical instructor and then later
23     returning to CVCC in January 2005 to August

Page 30

1      2005.
2  A.  That sounds right.
3  Q.  Do you want to look at that and just make
4      sure that you agree with that.
5  A.  I'm terrible on dates.  This should be
6      accurate.
7  Q.  Okay.
8        MS. PRICE:  Let's mark that
9          Exhibit 38 just for the
10         record, her resume.
11 A.  Okay.  Yes, so it was both classroom and
12     clinicals before.  That's why I keep that
13     updated.
14       (Defendant's Exhibit 38 was marked
15         for identification.)
16 Q.  Do you know why y'all reported the grades
17     to Ms. Peterson mid semester and at the end
18     of the semester?
19 A.  She's the -- our boss.  She's the
20     department head.
21 Q.  Do you know why that information would be
22     important to her as far as students'
23     performance in classes?

Page 31

1  A.  Well, we have to keep her abreast of what's
2      going on in the program.
3  Q.  And that's important to determine how well
4      the students are doing in the courses?
5  A.  Repeat that.
6  Q.  It's important to know how well the
7      students are doing in the courses?
8  A.  Yes, I guess so.
9  Q.  And I would assume as well, it's also
10     important to know in the nursing profession
11     that you're producing competent nurses.
12 A.  That's true.
13 Q.  Would you agree with that?
14 A.  Yes, I would.
15 Q.  I mean, if a student is not performing well
16     clinically or academically, do you believe
17     that would be an indication of how they
18     would perform in the professional
19     atmosphere as a nurse?
20 A.  You're asking my personal opinion?
21 Q.  Yes, ma'am.
22 A.  Not necessarily so.
23 Q.  Please explain what you mean by that.

Page 32

1  A.  If I'm hearing you, what you're asking me
2      is if a student does poorly in school, is
3      that an indication they'll be a poor nurse;
4      is that what you're asking?  If they do
5      well in school, does that make them a great
6      nurse; is that what you're asking?
7  Q.  Do you think the performance of a student
8      in school has an effect on how they're
9      going to perform on the boards?
10 A.  On how they're going to perform on the
11     boards?
12 Q.  Yes, ma'am.
13 A.  Well, the boards are an indication of how
14     well you learn the material that you're
15     taught in school.
16 Q.  And additionally, a grading system is there
17     so that you can judge or assess how a
18     student is going to do in their profession
19     ultimately before you send them out into
20     the world to be nurses and take care of
21     people; would you agree with that?
22 A.  Say that again.
23 Q.  Do you agree in the nursing program, you

Deposition of Brenda Bellamy

June 24, 2007

Page 33

1  have grades and you determine a student's
2  performance in the classroom and clinically
3  so that you can determine whether or not
4  they're well-suited to be a nurse
5  professionally; would you agree with that?
6  A.  Yes.
7  Q.  I understand when you left on 8-31 --
8     August 31st, 2005, that the semester had
9     just started.  Do you remember that as
10     being correct?
11  A.  That's correct.
12  Q.  And it's my understanding that classes
13     started on August 22nd, 2005.
14  A.  I don't remember the exact date.
15  Q.  The day you left, it's my understanding
16     that classes had been going on for about a
17     week, week and a half.  Do you remember
18     that?
19  A.  I'm not sure the exact dates, but that
20     sounds close.  Classes hadn't been going on
21     that long.
22  Q.  Had your class met at any point prior to
23     your leaving on August 31st, 2005?

Page 34

1  A.  If classes started on the 22nd and I left
2     on the 31st --
3        Is that what you have recorded?
4  Q.  Yes, ma'am.
5  A.  -- I would have to have had at least one
6     class I would think.
7  Q.  Let me show you Exhibit 24.  It's a
8     calendar that we've already marked.  It may
9     help with some reference on dates and
10     stuff.
11  A.  Okay.
12  Q.  It's not a school calendar.  It's just a
13     general year calendar, but --
14  A.  Okay.
15  Q.  The 31st was on a Wednesday.  Classes would
16     have started on Monday, August 22nd.
17  A.  Okay.
18  Q.  So how many times would you have met with
19     your class before you left on the 31st?
20  A.  Classes are generally just -- no, it
21     depends on if it's -- gosh, is it once a
22     week or twice a week.
23  Q.  Do you remember how often your class met?

Page 35

1  I believe that was Nursing 252.
2  A.  I think it was just once.  Well, I can say
3     we had to have at least met once, at least.
4  Q.  Do you specifically remember meeting with
5     your class that one time --
6  A.  No.
7  Q.  -- prior to leaving on August 31st?
8  A.  No.
9  Q.  Did you meet with your class on August
10     31st, the day that you resigned?
11  A.  Oh, gosh.  No, I don't think I did.  I
12     don't think I met with my class on that
13     day.
14  Q.  It's my understanding that you turned in
15     your resignation on August 31st, 2005.
16  A.  Now, that I don't remember the exact date.
17  Q.  Do you remember leaving the school?
18  A.  Yes.
19  Q.  Do you remember if you turned in your
20     resignation on the same day that you left?
21  A.  I don't remember.  I would honestly have to
22     look at my resignation letter.  I would
23     have to find it and look at it.

Page 36

1  Q.  I have a copy of that, so maybe this will
2     refresh your memory, so ...
3  A.  Thank goodness.
4  Q.  What I'm handing you is a letter.  It's
5     from you and it's signed to Dean Lowe dated
6     August 31st, and also a letter from
7     Dr. Blackwell to you dated August 31st.
8     Can you look at those and ...
9  A.  Okay.
10  Q.  Do you remember those?
11  A.  Yes.
12  Q.  Is that the letter that you turned in
13     informing the Chattahoochee Valley
14     Community College that you were resigning?
15  A.  Yes, it is.
16  Q.  And the second document, is that the letter
17     that -- the letter that you received from
18     Dr. Blackwell regarding your resignation?
19  A.  Yes.
20        MS. PRICE:  Let's mark those as
21     Exhibit 39.
22        (Defendant's Exhibit 39 was marked
23     for identification.)

Deposition of Brenda Bellamy

June 24, 2007

Page 37

1       (Brief interruption.)
2   Q.  Just to read a portion of your letter, it
3       says, Dear Dr. Lowe:  I am submitting this
4       letter of resignation to terminate my
5       position as nursing instructor effective
6       immediately.  Some of the reasons, as
7       previously discussed in numerous meetings,
8       are cited as, and then you've got a list.
9           I'd like to ask you first, why did you
10      resign immediately and not give any notice?
11  A.  Could you repeat the question?  I need a
12      minute.
13  Q.  Your letter says that you were turning in
14      your resignation to terminate your position
15      effective immediately.  Why did you turn in
16      your resignation effective immediately
17      without any notice?
18  A.  Well, I stated the reasons in the letter.
19  Q.  I'll go through those.  It says:  Some of
20      the reasons, as previously discussed in
21      numerous meetings, are cited as contract
22      negotiations, salary disputes, and broken
23      verbal promises.

Page 38

1           Tell me what you mean by contract
2       negotiations.
3   A.  I didn't know I was going to be on trial.
4       MS. PRICE:  Let's go off the
5           record for just a second.
6       (Off-the-record discussion.)
7       (The following was read:
8           Question:  I'll go through those.
9           It says:  Some of the reasons,
10          as previously discussed in
11          numerous meetings, are cited
12          as contract negotiations,
13          salary disputes, and broken
14          verbal promises.
15              Tell me what you mean by
16          contract negotiations.)
17  A.  They -- There were just things that were
18      promised that did not surface.  That's the
19      only thing I can remember.
20  Q.  Do you remember any specific promises or
21      any specific thing, things that were
22      promised?
23  A.  I don't actually have a list, but the thing

Page 39

1       that sticks out the most in our mind was
2       bonuses.
3   Q.  What were you promised or -- as far as
4       bonuses were concerned?
5   A.  We were supposed to be getting a $10,000
6       bonus I think it was.
7   Q.  And who had told you that you were going to
8       be getting the $10,000 bonus?
9   A.  Well, I had heard it from several sources:
10      Dr. Lowe, Dr. Blackwell.  Several sources.
11  Q.  Do you remember anyone else that you
12      remember regarding that specific bonus?
13  A.  The only thing I remember is we were
14      promised it.  Several things we were
15      promised never surfaced.
16  Q.  Do you remember any other thing other than
17      bonuses that you feel like you were
18      promised that you didn't get?
19  A.  Oh, gosh.  To be honest, that part I just
20      kind of had tucked that whole part away.
21  Q.  What specifically do you -- do you remember
22      anything specifically about salary
23      disputes?

Page 40

1   A.  No, I just can't off the top of my head.
2   Q.  Does that have something to do with that
3       bonus as well?
4   A.  Does what?
5   Q.  The salary dispute, does part of that
6       encompass the bonus issue?
7   A.  Yes.
8   Q.  Do you remember anything else that would
9       have fallen into the salary dispute
10      category that you were mentioning?
11  A.  I would like to say raises, but I honestly
12      don't remember all the specifics.
13  Q.  I've got another e-mail from you to
14      Dr. Blackwell and Dr. Lowe.  It says
15      Ms. Peterson just gave me the information
16      regarding my verification of employment is
17      the first sentence.
18          Can you look at that and see if that
19      helps you recollect anything about what was
20      going on at the time maybe and what you
21      mean by contract negotiations, salary
22      disputes or the broken verbal promises in
23      your letter.

Page 41

1  A.  I remember this letter. This is one of the
2     reasons -- another reason why I resigned.
3  Q.  When you say it's one of the reasons, can
4     you tell me what that reason is as is
5     outlined in that letter?
6  A.  I was asked to -- this is after I had been
7     working there. I was asked to verify my
8     own employment, and I just felt like it was
9     something I shouldn't handle.
10 Q.  Can you explain to me what you mean by
11    verify your employment?
12 A.  I was asked to call -- we were all asked to
13    call all of our past employers and get them
14    to write us a letter saying how long we'd
15    worked there as a nurse, whatever, and mail
16    it to us or fax it to us or whatever and
17    then we'd turn it in to Ms. Boone. I just
18    felt like that that wasn't the instructor's
19    function. That wasn't our function.
20 Q.  I just want to make sure that I understand
21    this correctly. It's my understanding that
22    that information was necessary so they
23    could determine what pay scale you were on

Page 42

1     because you were paid accordingly to --
2     your year as a nurse would translate over
3     to a year of teaching. Is that your
4     understanding, or do I have that wrong? Is
5     that correct?
6  A.  That is correct, but all this transpired --
7     that letter -- after I had been hired on at
8     a certain level.
9  Q.  What level had you been hired on as?
10 A.  It's in my folder. I can't remember. The
11    items I turned in to you, that letter is in
12    there.
13 Q.  Okay. This one, the Employment Experience
14    Verification Form?
15 A.  Yes.
16       MS. PRICE: The e-mail from
17         Ms. Bellamy to Dr. Lowe and
18         Dr. Blackwell as Exhibit 40,
19         and we'll attach her
20         employment experience
21         verification form as 41.
22       (Defendant's Exhibits 40 and 41
23       were marked for identification.)

Page 43

1  Q.  It says here you were given appropriate
2     number of years of credit for relevant work
3     experience is 18 years.
4  A.  Yes.
5  Q.  And you were on a salary schedule of D-1;
6     is that right?
7  A.  Yes, that's what the letter stated.
8        Yes. Effective January 2005.
9  Q.  What about that particular day, August
10    31st, 2005, made you decide to resign? Did
11    anything happen or had you been planning on
12    resigning?
13 A.  Yes, I had planned on resigning after -- as
14    the letter stated, after several attempts
15    to resolve some of those issues.
16 Q.  When did you decide you were going to
17    resign? How long before you wrote that
18    letter?
19 A.  It wasn't very long before I wrote it.
20 Q.  And why did you decide? Was there anything
21    that prompted you to turn in your
22    resignation effective immediately that
23    particular day on August 31st, 2005?

Page 44

1  A.  I don't remember exactly what, but
2     something happened.
3  Q.  You're aware that Ms. Gunnels resigned that
4     same day?
5  A.  Yes, I am.
6  Q.  In Ms. Gunnels' deposition previously, she
7     mentioned that she was at the school and
8     she had given you a phone call. Do you
9     remember receiving a phone call from her
10    that day?
11 A.  Yes, I do.
12 Q.  So you weren't at the school when
13    Ms. Gunnels -- Ms. Gunnels called you from
14    the school?
15 A.  Yes, but I was en route.
16 Q.  And then you came to the school that day?
17 A.  Yes.
18 Q.  Did something happen once you arrived to
19    make you decide that you were going to turn
20    in your resignation that day, or had you
21    already made up your mind that you were
22    going to resign that day on your way to
23    work or before you got in to work that day?

Page 45

1   A.  I'm sorry.  I'm a little slow.  I just ...
2   Q.  It's okay.
3   A.  I tried to put all of this behind me.
4   Q.  We'll try to get through it as quick as we
5       can.
6   A.  I loved teaching there.  I miss it.
7           THE WITNESS:  Can I just have a
8           minute?
9           MS. PRICE:  Yeah.  Do you want to
10          take a break for a second?
11          THE WITNESS:  (Nods head up and
12          down.)
13          MS. PRICE:  Why don't we take a
14          little break.  Do you want
15          something to drink?
16          THE WITNESS:  I'm fine.  I just
17          need to step out.
18          (Brief recess was taken.)
19          MS. PRICE:  Let's go back on the
20          record.
21  Q.  Before we took a break, we were talking
22      about your resignation.  Like I said, we'll
23      get through this as quick as we can.  Okay?

Page 46

1   A.  Okay.
2   Q.  The question that we were talking about
3       before you left is, was there something
4       that happened that day, August 31st, 2005,
5       the day that you turned in your resignation
6       that made you decide to resign effective
7       immediately without giving notice?
8   A.  There was something that happened, but I'm
9       just trying to think of what it was.
10      That's the part that ...
11  Q.  Let's go through that day.  You said you
12      were on your way in to work and that you
13      received a call from Ms. Gunnels.
14  A.  (Witness nods head up and down.)
15  Q.  Is that correct?  That's a yes?
16  A.  That's correct.  Yes.
17  Q.  What did you and Ms. Gunnels talk about in
18      that telephone conversation?
19  A.  I can't remember.  Something had just
20      happened at the school.  I'm trying to
21      think of what it was specifically had
22      happened.
23  Q.  Do you remember her mentioning anything

Page 47

1       about a guest speaker or speaking with Dean
2       Lowe in that conversation?
3   A.  I remember our classes that day, there was
4       a guest speaker there.  So it was -- I
5       guess it was expected we weren't going to
6       teach.  I do remember that.
7   Q.  Do you know why there was a guest speaker
8       in your class that day?
9   A.  You know what?  Okay.  I don't remember why
10      there was a guest speaker, but I -- now I
11      remember why Ms. Gunnels called me.
12  Q.  Okay.
13  A.  Because she said she was banned from her
14      class that day, that she was told that she
15      was not allowed in her own classroom.
16  Q.  Okay.
17  A.  I do remember that now.
18  Q.  Is that all she --
19  A.  And that somebody else -- they had someone
20      else taking over her class.
21  Q.  What time was your class that day?  Was it
22      in the afternoon?
23  A.  I'm trying to think.  I don't remember what

Page 48

1       day of the week it was.
2   Q.  That was on -- that's on a Wednesday.
3   A.  Yes, I think mine -- hers was in the
4       morning and mine was in the afternoon, I
5       think.
6   Q.  And it was my understanding from her
7       deposition earlier that she had called in
8       sick for the -- prior to, like prior -- the
9       class periods that she had scheduled
10      earlier in the -- earlier at the beginning
11      of that semester.  Do you remember that,
12      her being sick or calling in sick for any
13      classes?
14  A.  I do remember her calling, yeah, one day.
15      I can remember one day.  I don't remember
16      what day it was.
17  Q.  And she had mentioned something in her
18      deposition that because she had called in
19      sick, a guest speaker had been scheduled
20      for her class, but then she came in.  Do
21      you remember her saying anything about
22      that?
23  A.  The only thing I remember her saying is

Page 49

1    that she had called in -- I want to say she
2    called in sick one day before that, but the
3    students -- she said the students had told
4    her that they were told that we were both
5    sick, and we weren't. And they were
6    surprised when we showed up at the school.
7    Q.  Had you called in sick anytime before that
8        day during that semester? And by that,
9        August 31st.
10   A.  No, I don't think so.
11   Q.  You don't have any recollection of you
12       calling in sick?
13   A.  No. I have perfect attendance in that
14       regard.
15   Q.  When you said Ms. Gunnels called you and
16       told you that she had been banned from her
17       classroom, did she elaborate on this any?
18   A.  No, she just said that she was stopped, I
19       think she said, by Dean Lowe and was told
20       that she was not allowed to enter her
21       classroom.
22   Q.  Do you specifically remember her using the
23       word banned or is that just a word that

Page 50

1    you're using and you're associating with
2    that day?
3    A.  I don't remember honestly if she said
4        banned or not allowed. I'm not sure which
5        one.
6    Q.  Did she mention anything else regarding any
7        other conversation with Dean Lowe when you
8        talked to her on the telephone?
9    A.  In reference to this?
10   Q.  Yes, ma'am.
11   A.  Nothing that I can remember.
12   Q.  Do you remember if she said anything about
13       her contract in that telephone
14       conversation?
15   A.  I do remember something in regards to her
16       contract, but I can't remember what. I'm
17       not sure if it wasn't renewed or wasn't
18       something, it wasn't offered. Something.
19       I can't remember what, the specifics.
20   Q.  You don't remember the specifics?
21   A.  I don't remember specifics.
22   Q.  So you remember her contract being
23       mentioned, but you don't remember

Page 51

1    specifically why it was mentioned; is that
2    correct?
3    A.  Right.
4    Q.  Did she mention anything to you about your
5        contract during that telephone
6        conversation?
7    A.  I don't remember, but I know neither one of
8        us had signed a contract for that semester
9        yet.
10   Q.  You, specifically, why had you not signed a
11       contract yet that semester?
12   A.  Well, a lot of times we start the semester
13       off teaching, and the contracts for
14       whatever reason aren't ready at the
15       beginning sometimes like they should. So
16       we might be a couple of weeks into the
17       semester and then once they get ready, then
18       we sign it afterwards.
19   Q.  Had you received your contract at that
20       point?
21   A.  You wouldn't by chance have a copy, would
22       you?
23   Q.  That's what I was looking for. Do you

Page 52

1    remember having received your contract at
2    that point?
3    A.  I don't remember, but I -- I know in the
4        contract -- I think this is the one our
5        bonus was supposed to be included.
6    Q.  And by that bonus, you mean that $10,000?
7    A.  $10,000, and it wasn't. I remember that.
8        I don't remember if we actually had it
9        without looking at the date.
10   Q.  Now, I know Ms. Gunnels said that she went
11       to her office that day and her contract was
12       in her office. Do you remember whether or
13       not there was a contract for you when you
14       arrived that day?
15   A.  Her contract was in her office?
16   Q.  That's what she testified earlier. I was
17       just curious. Do you remember whether or
18       not your contract was there as well?
19   A.  I don't remember, but when we got -- one --
20       we all got contracts at the same time.
21   Q.  Let me ask you this. You mentioned that
22       you were contemplating resigning prior to
23       turning in your resignation. That's

Page 53

1    correct?
2    A.   That's correct.
3    Q.   Had you spoken to anyone other than your
4         husband, I assume, regarding this
5         contemplation to turn in your resignation
6         prior to doing so?
7    A.   Yes.
8    Q.   Who had you spoken to?
9    A.   Dean Lowe.
10   Q.   Do you remember when you spoke to him?
11   A.   No, I don't remember when.
12   Q.   Was it before that semester started, that
13        fall semester of 2005?
14   A.   Yes.
15   Q.   Let's see. In your letter to Dr. Lowe, you
16        mentioned -- in your letter of resignation
17        to Dr. Lowe, you mentioned that your
18        decision was made after numerous attempts
19        to resolve these issues and others with
20        administration, but to no avail.
21             Had you actually had opportunities to
22        meet with Dr. Lowe --
23   A.   Yes.

Page 54

1    Q.   -- about anything?
2    A.   Yes.
3    Q.   On how many occasions?
4    A.   I don't remember the exact number, but I
5         know as a minimum I met in his office once,
6         and I know he's been down to the nursing
7         office. We asked him to come down and met
8         with him at least once.
9    Q.   Ms. Gunnels mentioned a meeting that took
10        place, I believe, on August 26th, 2005,
11        with you, herself, Dr. Blackwell, Dixie,
12        and Dean Lowe where y'all discussed some
13        different issues in the nursing
14        department. Do you remember that meeting?
15        That would have been right after the
16        beginning of that fall semester.
17   A.   If I'm remembering correctly, it was a
18        meeting we had -- I think it was up on the
19        hill.
20   Q.   Up on the hill, what do you mean?
21   A.   I'm sorry. In the conference room up on
22        the hill.
23   Q.   You mean in the administration --

Page 55

1    A.   In the administration office. I'm sorry.
2    Q.   Do you remember what y'all talked about in
3         that meeting?
4    A.   The same issues: Bonuses ...
5    Q.   The verification of --
6    A.   The verification of employment, I think
7         working hours. There were other things,
8         too. I just can't remember everything that
9         was -- that was said, but I know ... I know
10        that the -- it wasn't a successful
11        meeting. I know that much.
12   Q.   And when you say it wasn't successful, you
13        didn't feel like it was a successful
14        meeting?
15   A.   I don't feel like anything got solved, no.
16   Q.   Now, I know the day that you resigned,
17        Ms. Gunnels had mentioned that your husband
18        came up to the school with you.
19   A.   Yes, that's correct.
20   Q.   Was he there to drop you off or did you ask
21        him to come up with you that day?
22   A.   No, I asked him to come up there to carry
23        my box to be honest. I think that's why I

Page 56

1         asked him.
2    Q.   So you had decided to resign before you got
3         to the school that day?
4    A.   Yes.
5    Q.   And who did you turn your resignation
6         letter in to? Do you remember which
7         individual you gave it to or whether or not
8         you put it in someone's mailbox?
9    A.   No, I don't. I remember taking it to the
10        administration building, but I don't
11        remember who I gave it to.
12   Q.   Do you remember if you gave it to Dr. Lowe
13        or Dr. Blackwell?
14   A.   I'm trying to think if Dr. Blackwell was
15        there that day, but I don't remember giving
16        it to her.
17   Q.   Do you remember seeing Dr. -- I'm sorry.
18        Go ahead.
19   A.   I'm sorry. I don't think -- I'm trying to
20        think if Dr. Lowe was physically in his
21        office or if his secretary -- if I gave it
22        to him or her to give to him when he
23        returned. I don't remember which one I

Page 57

1  gave it to. It was either him or his -- I
2  think -- well, I want to say it was him,
3  but ...
4  Q. But you don't specifically remember?
5  A. No, but my husband was with me.
6  Q. Look, if you remember throughout the course
7     of the deposition at some point, you just
8     let me know. Okay?
9  A. Okay.
10 Q. Do you remember seeing Dr. Lowe down at the
11    nursing department at the time that you
12    came to pick up your stuff and turn in your
13    resignation?
14 A. I think -- yes, I think so. Let me see.
15    When I arrived, the students were
16    outside -- or they came outside. Oh,
17    gosh. Was he standing there? I'm not
18    sure.
19 Q. When you said the students were outside,
20    what do you mean by that?
21 A. I think they had been given a break or
22    something.
23 Q. By outside, you mean they weren't in the

Page 58

1  classroom?
2  A. Right. They were outside the building,
3     because they came rushing over to me.
4  Q. Did you speak to any of them at that time?
5  A. Oh, yes.
6  Q. Did you tell them you were about to resign
7     or --
8  A. Yes.
9  Q. Do you remember? Did you tell any of them
10    about why you were about to resign?
11 A. I don't think I did.
12 Q. Do you remember seeing Dr. Blackwell down
13    at the nursing department that day?
14 A. No, I don't remember seeing her.
15 Q. Earlier I had asked you if you had spoken
16    with anyone regarding your resignation or
17    the contemplation of resignation before you
18    resigned on August 31st, 2005. You said
19    Dean Lowe. Were there any other
20    individuals that you had spoken to
21    regarding your resignation?
22 A. Does my husband count as a person?
23 Q. Other than your husband.

Page 59

1  A. Okay. Okay.
2  Q. Let me ask you this. Did you talk to
3     Ms. Gunnels about --
4  A. That's what I'm trying to think, because we
5     were a close-knit group in the nursing
6     building, all of us. And I'm trying to
7     think if I had actually -- I might have
8     told her, you know. I want to say yes,
9     that I may have told her and Ms. Gruber as
10    well.
11 Q. Other than Gunnels and Gruber, were there
12    any other individuals that you think you
13    might have mentioned this to?
14 A. I'm not sure if I told Ms. Peterson or
15    not. I honestly don't know.
16 Q. Now, Ms. Gunnels resigned that same day.
17 A. (Witness nods head up and down.)
18 Q. That's a yes?
19 A. Yes.
20 Q. Did Ms. Gunnels talk to you prior to that
21    day about her consideration to resign?
22 A. Yes.
23 Q. Do you remember when she first mentioned to

Page 60

1  you that she was contemplating resigning?
2  A. No, I don't remember exactly when.
3  Q. I don't want you to guess, but can you
4     estimate how long before that day she had
5     mentioned that she may be resigning?
6  A. No. To be honest, I don't want to guess
7     and I don't remember, but there were
8     contract issues and all kinds of things,
9     you know, going ...
10 Q. Do you know why Ms. Gunnels was
11    contemplating resigning or why she
12    resigned?
13 A. Basically some of the same issues, the
14    reason I resigned.
15 Q. And by that, the contract negotiations, the
16    bonus issue?
17 A. (Witness nods head up and down.)
18 Q. Is that a yes?
19 A. Yes. I'm sorry. Yes.
20 Q. Some salary issues?
21 A. Yes, the employment verification.
22 Q. Ms. Gunnels, I want to go ahead just so
23    they're part of the record --

June 24, 2007



Page 61

1      DR. BLACKWELL:  You said Gunnels
2   Q.  I'm sorry, Ms. Bellamy.  I'm so sorry.
3      It's been a long day.
4          I'm going to go ahead and attach the
5      rest of these documents that you gave us
6      today to the deposition so that the
7      plaintiffs have them as well.  And I
8      understand that these are just -- it looks
9      like these are all your different
10     certifications.
11  A.  Certifications.
12  Q.  And your Master of Science in Nursing and
13     your Board of Nursing cards.
14         MS. PRICE:  And I think we are at
15         Exhibit 42, so I'm just going
16         to collectively go ahead and
17         put these in as Exhibit 42.
18         (Defendant's Exhibit 42 was marked
19         for identification.)
20  Q.  Do you remember a student named Arit Umoh?
21  A.  I remember the name, but I never taught
22     her.
23  Q.  I understand from conversations in other

Page 62

1      depositions that she was from Nigeria.  I
2      don't know if that would help your
3      recollection of whether or not you actually
4      met her or taught her.
5   A.  No, I never taught her.  That was while I
6      was gone, meaning when I was living up
7      North.
8   Q.  Do you have any knowledge about her
9      performance as a student?
10  A.  No.
11  Q.  Do you have any knowledge or has anyone
12     told you or mentioned to you that Ms. Umoh
13     failed any courses while attending CVCC?
14  A.  I remember the name, but that was -- I
15     wasn't even teaching there at the time, but
16     that name just rings a bell.
17  Q.  But you couldn't tell me anything
18     specifically about her as a student, could
19     you?
20  A.  No.
21  Q.  And you couldn't tell me anything about her
22     performance, whether or not she failed or
23     passed all her classes, could you?

Page 63

1   A.  No.
2   Q.  And you couldn't tell me anything about any
3      grade appeal process that she may or may
4      not have gone through, could you?
5   A.  I don't know what's going on with her --
6      what went on with her.
7   Q.  So you couldn't tell me anything about her,
8      whether or not she even ever filed a grade
9      appeal or had failed a course; is that
10     correct?
11  A.  Why that name rings a bell?  I don't
12     remember if she filed an appeal, because
13     for some reason that name sticks in my
14     mind.
15  Q.  Do you know for a fact whether or not she
16     filed an appeal?
17  A.  I don't know for a fact, but -- I don't
18     know.  I've just heard her name somewhere.
19  Q.  Even if she had filed an appeal, you
20     couldn't tell us anything about that or
21     about her as a student?
22  A.  No.
23  Q.  Has anyone ever told you that Ms. Wright

Page 64

1      failed two courses and was not allowed to
2      continue in the program at CVCC -- in the
3      ADN program?
4   A.  Failed two courses?
5   Q.  Yes, ma'am.  Were you aware that Ms. Wright
6      had failed two courses in the ADN program?
7   A.  No.  She progressed from my -- the last
8      semester I taught from what I can remember.
9   Q.  But after you left CVCC, do you have any
10     knowledge of how Lindy continued to
11     perform --
12  A.  No.
13  Q.  -- during the rest of her career as a
14     student in the nursing program at CVCC?
15  A.  No.
16  Q.  So you weren't aware that she failed
17     Nursing 252 after you left?
18  A.  No.
19  Q.  And you weren't aware that she failed
20     Nursing 272 after you left?
21  A.  No.
22  Q.  Now, I understand -- did Ms. Wright -- I
23     just want to ask because we've kind of

16 (Pages 61 to 64)

June 24, 2007

Deposition of Brenda Bellamy

Page 65

1  already talked about this. Ms. Wright
2  never contacted you after you left for any
3  help or any suggestions in any class, did
4  she?
5  A. No. You said help or suggestions in any
6  class?
7  Q. Yeah. Any advice or help as a former
8  faculty member, she never called you for
9  any outside tutorial help or anything like
10  that, did she?
11  A. No.
12  Q. Do you have any understanding of the
13  repercussions or the effect of a student in
14  the nursing program -- the ADN program at
15  CVCC failing two courses?
16  A. Yes.
17  Q. And what is your understanding of that?
18  A. If they fail two courses, it's my
19  understanding they're out of the program.
20  Q. Do you have an understanding of what course
21  forgiveness is?
22  A. No.
23  Q. And by that, you couldn't explain what

Page 66

1  course forgiveness is as applied to CVCC or
2  at CVCC, could you?
3  A. No. Could I ask you what that is?
4  Q. Not right --
5  A. I'm sorry. I'm sorry.
6  Q. It's okay.
7  A. I was just curious.
8  Q. I'm trying to find out what you know and
9  what you can testify to.
10  A. Okay.
11  Q. That's what we're going through right now.
12  A. Okay.
13  Q. Have you ever had to participate in any
14  type of grade appeal while you were
15  teaching at CVCC?
16  A. No.
17  Q. Do you have any knowledge about the grade
18  appeal policy at CVCC?
19  A. The only thing I do know is -- are you
20  referring to if a student fails a class,
21  what happens?
22  Q. Yes, ma'am. If a student fails a class and
23  that student then decides to appeal that

Page 67

1  grade in that class, do you have any
2  knowledge of that policy and procedure at
3  CVCC for that student to appeal a failed
4  course?
5  A. I'm not sure.
6  Q. What do you mean by you're not sure? Is it
7  that you don't understand my question or --
8  A. No. I understand your question, but I
9  think they have to do something in
10  writing. I think they have to put it in
11  writing if I'm not mistaken and it gets
12  turned in to -- I think to Ms. Peterson if
13  I'm not mistaken.
14  Q. Do you know what would happen to that
15  appeal after it was turned in to
16  Ms. Peterson?
17  A. (Shakes head from side to side.)
18  Q. That's a no?
19  A. I don't know who all -- I don't know who
20  all looks at it or what process -- I've
21  never had to participate in that, so I
22  don't know.
23  Q. So you never had a student appeal a failed

Page 68

1  grade in any of your courses at CVCC?
2  A. Not that I know of, no.
3  Q. Do you know any of Ms. Wright's relatives
4  or family members?
5  A. No.
6  Q. Are you familiar with where she's working
7  right now?
8  A. I know where she used to work, but I don't
9  think she works there anymore.
10  Q. Where is the last place that you knew that
11  she worked?
12  A. Doctors Hospital.
13  Q. I've got one more question or a couple more
14  questions about that day that you
15  resigned.
16       After you resigned, did you resign
17  before your class met that day, before you
18  were supposed to go meet your class that
19  day?
20  A. Yes, because I resigned in the morning. I
21  mean, I came in, packed my stuff that
22  morning.
23  Q. Do you know if there was a guest lecturer,

Page 69

1      someone to fill in for you after you
2      resigned? Do you have any knowledge about
3      that?
4    A. No, I don't.
5    Q. What did you do as far as work or what were
6      your plans to do for work after you
7      resigned?
8    A. Let me think. I was working part-time at
9      Doctors Hospital. I went full-time there
10      in the emergency room which is where I work
11      now.
12    Q. Now, I understand today is your last day of
13      work; is that correct?
14    A. (Shakes head from side to side.)
15    Q. Today is not your last day of work? Did I
16      misunderstand that?
17    A. It's my last day of this session. I work
18      seven on, seven off. This is day seven of
19      12-hour shifts in a row of seven.
20    Q. Okay. So you'll be off for seven days.
21    A. Yes. That's correct.
22    Q. I understand. I thought it was odd. I
23      thought that today was your last day of

Page 70

1      work, so ...
2    A. Oh, no. I love the emergency room.
3    Q. And that's where you work, is in the
4      emergency room?
5    A. Yes.
6    Q. Prior to Ms. Gunnels' resignation, had she
7      mentioned anything to you about accepting
8      or taking a job at Columbus Tech?
9    A. Yes. She was already working there.
10    Q. So she was working at Columbus Tech prior
11      to her resignation at CVCC?
12    A. Yes, part-time.
13    Q. Do you know what she was doing at Columbus
14      Tech prior to her resignation as far as
15      what classes she was teaching or in what
16      capacity she was teaching at Columbus Tech?
17    A. Yes, I believe she was teaching OB and
18      peds.
19    Q. Do you know when she started teaching at
20      Columbus Tech?
21    A. I don't remember exactly. I know she was
22      there part-time.
23    Q. It was your understanding that she was

Page 71

1      teaching at Columbus Tech and at CVCC at
2      the same time?
3    A. Yes.
4    Q. Do you have any knowledge as far as what
5      the class or the students were told about
6      your resignation the day you resigned, or
7      Ms. Gunnels' resignation for that fact?
8    A. About what they were told as far as us
9      resigning?
10    Q. Yes, ma'am.
11    A. No, I don't know what they were told.
12    Q. After you left that day, did you receive
13      any phone calls from any of the students
14      about your resignation?
15    A. Yes.
16    Q. Do you remember? Did Ms. Wright contact
17      you after your resignation that day?
18    A. I'm not sure if she was one of the students
19      that called me, but I received -- I know
20      several students called me, e-mailed me,
21      asked me to come back.
22    Q. But you don't specifically remember hearing
23      from Ms. Wright?

Page 72

1    A. I don't remember, no. She may have been
2      one of the students, but I just don't
3      remember because there was several of them.
4    Q. Do you know a student named April Gunnels
5      or did you know a student named April
6      Gunnels?
7    A. Yes.
8    Q. And was she one of your students?
9    A. Yes.
10    Q. It's my understanding that she was
11      Ms. Gunnels' daughter-in-law. Did you know
12      that?
13    A. Yes, I did.
14        MS. PRICE: Why don't we take a
15      quick break. Do you mind?
16        THE WITNESS: Okay.
17        (Brief recess was taken.)
18    Q. Let's go back on the record. Do you
19      remember a student named Kim Smith at CVCC?
20    A. Kim Smith.
21    Q. Yes, ma'am.
22    A. The name doesn't ring a bell.
23    Q. It does not ring a bell?

Page 73

1    A.  It doesn't.  Kim Smith.  It doesn't stick
2        out in my mind.
3    Q.  Okay.  Do you remember a student named
4        Elise Sizemore?
5    A.  Yes, I remember her name.
6    Q.  And after you left CVCC on August 31st,
7        2005, do you have any knowledge about
8        Ms. Sizemore's continued performance or --
9    A.  No.
10   Q.  -- during the nursing program?
11   A.  No.
12   Q.  So you couldn't tell us anything about any
13       classes she took or any -- any part of her
14       academic or clinical performance at CVCC
15       after you left; is that correct?
16   A.  That's correct.
17   Q.  Do you remember a student named Shannah
18       Lowe?
19   A.  Yes.
20   Q.  Can you tell me anything about Shannah
21       Lowe's performance as a student or any of
22       her clinical or academic work after you
23       left CVCC on August 31st, 2005?

Page 74

1    A.  No.
2    Q.  Ms. Bellamy, I promise.  I'm going to try
3        to get through this as quick as I can and
4        cover everything I think we need to cover.
5            Do you remember in the summer of 2005 a
6        faculty senate meeting where there was a
7        survey done regarding various issues at the
8        school?
9    A.  Yes.
10   Q.  It's my understanding and we've been
11       provided with some documents that there was
12       a number of comments turned in to the
13       faculty senate, and ultimately there was a
14       vote of no confidence issued.  Do you
15       remember all that?
16   A.  Yes.
17   Q.  Did you attend any of those senate meetings
18       about that?
19   A.  Yes.
20   Q.  Can you tell me what you remember about
21       that in particular, just about the senate
22       meeting and kind of what progressed as far
23       as how that occurred and how that came

Page 75

1        about?
2    A.  About the meeting itself?
3    Q.  Yes, ma'am.
4    A.  Basically, the faculty -- we all met and
5        discussed issues that different departments
6        were having and -- with administration.  At
7        the end, it came to a vote.  Basically to
8        sum it up, it just came to a vote.
9    Q.  And you were a member of the faculty.  Were
10       you a member of the faculty senate at that
11       time?
12   A.  No, not of the senate itself, no.
13   Q.  I'm going to give you what's been
14       previously marked as Defendant's Exhibit
15       27.  In here is the senate survey and then
16       there are some responses that we have been
17       provided.
18           Can you look through these and see if
19       you believe that any of these would be the
20       response, if you gave a response, to the
21       senate survey, if any of these are the
22       response that you gave?
23   A.  I could tell you which ones are mine?

Page 76

1    Q.  Flipping through that, if you can tell.  If
2        you can't tell, that's all right.  I'm just
3        curious if any of those responses to the
4        senate survey were yours.  I think there
5        are four or five in there total, so ...
6    A.  I can't remember which of these comments
7        are mine, if any.
8    Q.  Okay.
9    A.  Honestly, I just -- gosh, I remember
10       reading them all, though.  I just don't
11       remember which ones are mine.
12   Q.  You said you remember reading them all.
13       When did you see those before, or did you
14       see anyone else's comments?
15   A.  Some of them -- we got -- well, they
16       posted, seems like, a summary.  Maybe this
17       was it.  There was a summary.
18   Q.  I don't want you to guess if one of those
19       are yours.  I just wanted to know if you
20       knew definitely if one of those was yours
21       or not.
22   A.  Honestly, I don't know.
23   Q.  Now, let me ask you this.  You mentioned

| Page 77 |
|---|

1    that there was a summary posted. Who
2    posted the summary?
3  A.  I don't know. There was something posted.
4    I think it was just to let us know what the
5    final -- what the ultimate decision was
6    from the vote, but I don't see it here.
7  Q.  And when you mentioned -- when you said
8    they posted, do you mean the faculty senate
9    posted the summary?
10  A.  I think that's who sent it out, if I'm not
11    mistaken, because it was just -- it was a
12    summary of what the -- you know, what the
13    faculty decision -- what the decision was.
14  Q.  Okay.
15  A.  I think it was just to let everyone know
16    how the vote went.
17  Q.  Okay. Well, thank you.
18      I know earlier we were talking about
19    Dixie Peterson and any comments that she
20    had made about a student. Have you ever
21    heard her say anything negative regarding
22    Lindy Wright?
23  A.  No.

| Page 78 |
|---|

1  Q.  Do you remember ever hearing her say
2    anything negative or detrimental to any
3    nursing student at CVCC?
4  A.  No.
5  Q.  I'm going to show you what we've previously
6    marked as Exhibit 37.
7      (Brief interruption.)
8  Q.  I just want to go through all these
9    documents and make sure that we've gotten
10    everything that you may or may not have.
11    Okay?
12  A.  Okay.
13  Q.  We asked that you bring any and all e-mail,
14    correspondence, any notes or memos that you
15    had to or from anybody that worked at
16    CVCC. Did you have any of that at home?
17  A.  No.
18  Q.  That would include -- Did you have any
19    notes or anything about anyone at CVCC,
20    even if it was not directed to them or if
21    it did not come from them?
22  A.  No.
23  Q.  Do you know who Lynn Harris is?

| Page 79 |
|---|

1  A.  No.
2  Q.  Do you know who Tawyna Cash is?
3  A.  No.
4  Q.  Have you ever heard those names before?
5  A.  The Tawyna name is an odd name. Seems like
6    I've heard it somewhere, but I don't
7    remember in what capacity.
8  Q.  You don't know why that name is familiar to
9    you?
10  A.  No.
11  Q.  Did you know that Lynn Harris taught at
12    CVCC and still teaches at CVCC?
13  A.  Okay.
14  Q.  Did you know that?
15  A.  I don't know all of the faculty.
16  Q.  And you've brought all the information that
17    you would have regarding your employment at
18    CVCC; is that correct?
19  A.  Yes, because -- what other information did
20    you need?
21  Q.  Like copies of any application materials or
22    any letters that you have to CVCC about
23    your employment there, about any salary

| Page 80 |
|---|

1    issues, anything like that, any
2    correspondence regarding your employment at
3    CVCC or anything that related to your
4    employment at CVCC.
5  A.  Even the application itself? Is that what
6    you're asking?
7  Q.  Yes, ma'am.
8  A.  I might have a copy of the application.
9  Q.  All right.
10  A.  I can go home and look.
11  Q.  Let me ask you this. I might have a copy
12    of that. Let me see.
13      Let's go through this. I've got some
14    of your application materials. Let me hand
15    you this stuff. It looks like a lot of
16    this is repeated. Look through that. That
17    looks like it was application materials
18    from both stints that you had at CVCC.
19  A.  Okay.
20  Q.  If you'll just look through that and
21    confirm it.
22  A.  This is definitely my writing. Yeah, these
23    are all in my handwriting.

Page 81

1  Q.  Okay.  And the rest of these documents are
2      just documents about your employment there
3      as far as contracts and verification of
4      employment.  If you'll flip through that
5      and just make sure all that -- just look at
6      those very quickly as well.
7  A.  Okay.
8  Q.  Let's put all our application materials in
9      as our next exhibit, which is 43.
10             (Defendant's Exhibit 43 was marked
11             for identification.)
12 Q.  I'm going back through the document request
13     that we sent you.  Do you have any copies
14     of any course or clinical work or anything
15     that Lindy Wright did as part of any of
16     your classes while you were teaching her at
17     CVCC?
18 A.  No.  All of that is school property.
19 Q.  Okay.  And you haven't received any
20     correspondence -- we talked about this
21     earlier.  You haven't communicated or
22     received any correspondence from any
23     attorney or anyone in any capacity

Page 82

1      representing Ms. Wright; is that correct?
2  A.  That's correct.
3  Q.  Request number 13 was asking for any
4      documents, memos, recording or anything
5      that might relate to any student at CVCC
6      receiving special consideration or
7      treatment while they were a student at
8      CVCC.  Do you have any documents that would
9      reflect that?
10 A.  No.
11 Q.  Do you have any knowledge of any student
12     ever receiving special treatment while at
13     CVCC?
14 A.  No.
15 Q.  The request for number 14 was any documents
16     that contain or have information in them
17     regarding any nursing student's grade or
18     grades being changed when they complained
19     about their grades at CVCC.  Do you have
20     any documents that would reflect anything
21     like that?
22 A.  No.
23 Q.  Do you know of that ever happening?

Page 83

1  A.  No.
2  Q.  Do you have any correspondence to or from
3      anyone at the Alabama Department of
4      Postsecondary Education regarding your
5      employment at CVCC or while -- that was
6      written to you or that you wrote to the
7      Alabama Department of Postsecondary
8      Education while you were employed at CVCC?
9  A.  I don't have it, but I saw a letter in that
10     packet.
11 Q.  In what you just reviewed?
12 A.  Yes.
13 Q.  Regarding your employment as far as salary
14     and being hired at CVCC?
15 A.  I don't have a copy, but I saw one in
16     there.
17 Q.  Okay.  Do you have any correspondence from
18     you or to you -- from you or to you
19     regarding the National League for Nursing
20     Accreditation, the NLNAC, regarding any
21     faculty member at CVCC, any policies at
22     CVCC?
23 A.  No.

Page 84

1  Q.  Do you have any documents regarding any
2      course or clinical work of Ms. Wright for
3      Nursing 252, 271, 272 or Nursing 200?
4  A.  No.
5  Q.  And you've never reviewed any materials
6      like that for Ms. Wright; is that correct?
7  A.  What do you mean by reviewed?
8  Q.  You've never -- Ms. Wright has never given
9      you any materials from any of her courses
10     to review; is that correct?
11 A.  Correct.
12 Q.  In Ms. Gunnels' deposition, she mentioned
13     visiting the chancellor, Mr. Johnson.
14 A.  Yes.
15 Q.  Did you attend that meeting with her?
16 A.  Yes.
17 Q.  What was the purpose of that meeting?
18 A.  Some of the -- in the previous letter, some
19     of the unresolved issues in my letter of
20     resignation, we decided -- Ms. Gunnels and
21     I decided to go up there and see
22     Mr. Johnson about that.
23 Q.  Who had the idea initially to go see

Page 85

1    Mr. Johnson? Was that you or Ms. Gunnels?
2  A. I don't remember which one of us did.
3  Q. Did you actually get to see Mr. Johnson?
4  A. Yes.
5  Q. You got to discuss your concerns with him?
6  A. Yes. It was Ms. Gunnels, myself, and my
7     husband went as an uninterested party and
8     the driver.
9  Q. Did he sit in the meeting with y'all?
10  A. Yes, he did.
11  Q. Was there any resolution at that meeting?
12  A. No.
13  Q. Did you ever hear back from the chancellor
14     regarding that meeting or regarding your
15     concerns?
16  A. We didn't hear back from him directly. We
17     heard through the faculty counsel, who also
18     I believe made a visit up there, that
19     nothing was going to be resolved.
20  Q. Did you mention to anyone -- Strike that.
21     Other than Ms. Gunnels and your
22     husband, did anyone else know that you were
23     taking that trip to see Mr. Johnson?

Page 86

1  A. Yes.
2  Q. Who was that?
3  A. I think Ms. Gruber knew.
4  Q. Do you remember anyone else?
5  A. But she was -- I think she was sick or
6     something and couldn't go. Something
7     personal and she couldn't go.
8  Q. Do you believe she had contemplated going
9     with y'all up there?
10  A. Yes.
11  Q. Had she expressed interest in wanting to go
12     with y'all up there?
13  A. Yes, I think – yes.
14  Q. Did you ever receive any correspondence
15     personally from the chancellor regarding
16     any of the issues that were expressed in
17     your resignation letter or through the
18     faculty senate?
19  A. No.
20  Q. Just for the record, I wanted to get a
21     little bit of brief background information
22     from you, just for our benefit and
23     information.

Page 87

1    Can you state your current address
2     right now.
3  A. 2700 Double Churches Road, Apartment 338.
4  Q. In what city is that?
5  A. Columbus, Georgia 31909.
6  Q. And what's your phone number there?
7  A. 706-317-2391.
8  Q. Just to be clear on the record, where are
9     you currently employed?
10  A. Doctors Hospital, emergency room.
11  Q. It's my understanding you work seven on,
12     seven off.
13  A. Yes, basically, it's ...
14  Q. And you're in the emergency room?
15  A. Yes.
16  Q. Your husband's name, what is that?
17  A. David. His whole name?
18  Q. David Bellamy?
19  A. His middle name, too?
20  Q. Yes, ma'am.
21  A. David Douglas Bellamy, Jr.
22  Q. Are you from this area?
23  A. No.

Page 88

1  Q. Where did you grow up?
2  A. I actually grew up in St. Louis mostly, but
3     I'm from Indianapolis, Indiana.
4  Q. When did you first move to this area? By
5     this, I mean the Phenix City, Columbus,
6     Georgia area.
7  A. I came to Fort Benning in September 1990.
8  Q. Were you in the military?
9  A. Yes, I was.
10  Q. How long were you in the military?
11  A. A total of 11 and a half years.
12  Q. So you've been in this area for quite some
13     time?
14  A. Yes.
15  Q. Do you have any relatives in this area?
16  A. Yes.
17  Q. Who are your relatives in this area?
18  A. My daughters. They came here with me.
19     They were young then, younger.
20  Q. Are any of them married?
21  A. Yes.
22  Q. Can you give me your daughters' names?
23  A. The whole name or just the first and last?

Page 89

1  Q. Let me ask you this. Do your daughters
2     live in Alabama or Georgia?
3  A. Georgia.
4  Q. None of them live in Alabama?
5  A. No.
6  Q. Do you have any relatives that live in
7     Alabama?
8  A. No.
9  Q. Does your husband have any relatives that
10    live in Alabama?
11 A. That's a difficult question.
12 Q. Is it difficult because there are a lot of
13    relatives that he has that live here or --
14 A. No, it's difficult because he knows that he
15    does, but he doesn't know who they are on
16    his dad's side of the family.
17 Q. So he would have some relatives with the
18    last name Bellamy in Alabama; is that
19    correct?
20 A. Yes, but he doesn't know who they are.
21 Q. Do you know as far as last names of any
22    other relatives that he -- any relatives at
23    all that he might have that live in

Page 90

1     Alabama?
2  A. No.
3  Q. Other than Bellamy, that's it?
4  A. Yes.
5  Q. There was one other student I wanted to
6     mention and ask you. Do you have any
7     knowledge of a student named Corolla Rambo?
8  A. Yes.
9  Q. Would you be able to tell me anything or
10    tell anyone anything about her performance
11    or her class work as a student after you
12    left CVCC on August 31st, 2005?
13 A. No.
14 Q. Ms. Bellamy, I think right now I don't have
15    any more questions. I don't know if
16    Mr. Dumbuya does, but I'll reserve to ask
17    additional questions if necessary after he
18    asks questions if he's planning on it.
19       MR. DUMBUYA: I don't have any
20       questions. I think she's
21       already answered them.
22 Q. Because this is in federal court and you've
23    given a deposition, there is an opportunity

Page 91

1     once Ms. Nix gets the deposition printed up
2     for you to read over the deposition and
3     sign off that you've read the deposition
4     and that nothing has been misstated or
5     spelled incorrectly, you know.
6        Would you like the opportunity to do
7     that or would you want to waive that
8     opportunity? And you'll have 30 days to do
9     it if you want to.
10 A. I'd rather have that opportunity to go over
11    it.
12       (Deposition concluded at 5:40 p.m.
13       EDT.)

19       * * * * * * * * * * * * *
20       FURTHER DEPONENT SAITH NOT
21       * * * * * * * * * * * * *

Page 92

1        REPORTER'S CERTIFICATE
2  STATE OF ALABAMA:
3  MONTGOMERY COUNTY:
4        I, Lisa J. Nix, Registered Professional
5  Reporter and Commissioner for the State of Alabama
6  at Large, do hereby certify that I reported the
7  deposition of:
8        BRENDA BELLAMY
9  who was first duly sworn by me to speak the truth,
10 the whole truth and nothing but the truth, in the
11 matter of:
12       LINDY G. WRIGHT,
13       Plaintiff,
14       Vs.
15       CHATTAHOOCHEE VALLEY COMMUNITY
16       COLLEGE (CVCC),
17       Et al.,
18       Defendants.
19       In The U.S. District Court
20       For the Middle District of Alabama
21       Eastern Division
22       Case Number 3:06-CV-1087-WKW
23 on Tuesday, July 24, 2007.

Page 93

```
1        The foregoing 92 computer printed pages
2   contain a true and correct transcript of the
3   examination of said witness by counsel for the
4   parties set out herein.  The reading and signing of
5   same is hereby not waived.
6        I further certify that I am neither of kin
7   nor of counsel to the parties to said cause nor in
8   any manner interested in the results thereof.
9        This 30th day of July 2007.
10
11        _____
           Lisa J. Nix, Registered
12        Professional Reporter and
          Commissioner for the State
13        of Alabama at Large
14
15
16
17
18
19
20
21
22
23
```

Page 94

```
1
2
3        I, Brenda Bellamy, hereby certify that
4   I have read the foregoing transcript of my
5   deposition given on Tuesday, July 24, 2007, and it
6   is a true and correct transcript of the testimony
7   given by me at the time and place stated with the
8   corrections, if any, and the reasons therefor noted
9   on a separate sheet of paper and attached hereto.
10
11
12
13        _____
           Brenda Bellamy
14
15
16
17        SWORN TO AND SUBSCRIBED before me this
18   _____ day of _____, 20___.
19
20
21        _____
           NOTARY PUBLIC
22
23
```

24 (Pages 93 to 94)

PLAINTIFF'S
EXHIBIT
6

us 12-20-05
5:15p

# GRADE APPEAL FORM

Name of Student _Lindy Wright_

(Signature) _Lindy Wright_

Social Security Number _254 49 7629_

Submitted to (Division Chairperson) _Dixie Peterson_

Date _12 - 20 - 05_

## Section A:  (To be completed by the student)

I.    Course information:
- a.    Name of course _Adult Nursing II_
- b.    Course number _NUR 252_
- c.    Course section number _____
- d.    Semester course was taken _Fall 05_
- e.    Days of week course met _Wednesday_
- f.    Time of day course met _12 - 3 pm_

II.    Name of Instructor _Lynn Harris RN, MSN_

III.    Date on which the specific item in question was received by the student _12-20-05_

IV.    Date on which the student presented his/her appeal to the instructor for the respective course _12-20-05_

V.    Concise, clear description of the specific nature of the complaint with particular regard to a description of how the grade at issue was either unfair, inaccurate, or both:

_please see attached_

VI.    Description of the results of the student's discussion with his/her instructor.

_please see attached_

VII.    Date on which the results of student/instructor discussion were finalized _please see attached_

VIII.    Attachments (from the student)

**(Section A must be presented to the appropriate Division Chairperson for appeal)**

V. Concise, clear description of    specific nature of the complaint with    ticular regard to a description of how the grade at issue was either unfair, inaccurate, or both.

Test Grades:  I have been told by Ms. Harris that I have earned at least 745 points out of the available 1,000 points for a letter grade of "D".  I have several concerns regarding how the points were allocated, how exams were given, how information not covered during lecture was tested on exams, and how grades and points were communicated with students.

Some of the specific complaints regarding my grade are as follows:

Instructor was unavailable to discuss concerns at time of individual exams.  Instructor did not formally review any exams until December 13th.  Upon review and research of multiple exam questions, objective documentation was found in nursing textbooks to support the answers I chose and to refute the answers listed on the answer key.  When questioned, the instructor refused to provide the rationale for answers indicated on the key.  The instructor has been provided with this documentation.

The instructor did not post nor make available exam grades in a timely manner.  Due to lack of communication by instructor, I was unaware that I was in jeopardy of failing this class until one to two weeks before the final exam.  When questioned, the instructor stated "All you have to make is another 180 points" & you will pass.  No tutoring or remediation was offered at that point.

Clinical Instructors did not "show up" for two (2) clinicals, negatively impacting my ability to synthesize and practice the knowledge given in lecture or to receive instructor feedback on my knowledge.

Instructor was not assigned until week 5 of the semester.  A guest speaker (ADN prepared & no teaching experience) was utilized until that time. "Guest Speaker" on Respiratory System specifically instructed the class that compensatory mechanisms of ABG's would NOT be included on the exam.  Two questions directly related to compensation were on the exam. Other exams were not given on the dates scheduled and for which students prepared.

Nursing Care Plans were "unavailable" and arbitrary grades (23 of 25 points) were assigned. If these grades were arbitrary, then I am requesting the full 25 points.

There were approximately 10 drug and solution calculation questions included on the four exams during the semester.  No where in the syllabus or objectives was it indicated that drug dosage and calculation knowledge would be tested on the unit exams.  No review of drug calculations were given in class prior to the exams.

Description of the results of the student's discussion with his/her instructor.

Ms. Harris refused to discuss my grade or the documentation addressed in Section V. with me.  However, I was advised to continue with the appeal process (CVCC Policy 6.7.2) and therefore, am doing so.

Date on which the results of the student/instructor discussion were finalized.

I am unsure whether the discussions are finalized or not.  Ms. Harris has refused to allow me to review any more of my test papers and has refused to discuss the six (6) questions for which objective documentation was provided and are in dispute at this time.  Each question was valued at at least 2.5 points.

VIII. Attachments

I am hereby requesting that until the results of the appeal process, grievance process, and any litigation resulting from this matter be resolved and finalized, that I be allowed to continue participating in all aspects of the nursing program to include, but not be limited to: attending of classes and clinicals, timely assignment of preceptor, and participation in any NCLEX reviews or classes.

Respectfully submitted,

Lindy Wright

Lindy Wright



PLAINTIFF'S
EXHIBIT
7

Via e-mail and hand delivery
David N. Hodge
Dean of Student & Administrative Services
Chattahoochee Valley Community
david.hodge@cv.edu
(334) 291-4996

Reference: Elise Sizemore letter dated January 25, 2006

Dear Mr. Hodge:

I received your letter dated January 25, 2006 stating that I have too many classes to complete my requirements to graduate during Spring 2006. The following letter is to resolve the issue in question regarding my satisfactory completion of Nursing 252 (NUR 252). I do feel that this is a mistake or misunderstanding and this issue can be resolved. I have been working diligently to resolve this issue since I was first made aware of this by telephone on 12-20-05. The misunderstanding centers on the required medication math test[1] and the clinical requirement to pass medications[2]. I fully understand these requirements and believed that I had fulfilled these requirements during the Fall 2005 semester. Below is an overview of the events concerning this situation. I will be glad to meet with you and anyone else to discuss this issue further.

8-24-05-Mrs. Bellamy (assigned instructor NUR 252) either resigned or was dismissed on the first day of class. Dean Lowe and others staff members addressed the class in an attempt to explain the situation. The next couple of weeks the class did not have an assigned instructor, but was instead taught by guest speakers, one of which was (John Christopher). During this time the 1st medical math test[1] was given with little notice or preparation. I failed to achieve 100% accuracy on the first medical math test[1]. The class was informed that (approximately 75%) of the 36 students failed the test, but a second test was not yet scheduled.

Between the 1st and second test[1] my clinical group continued to go to clinical and were all allowed to pass medications by our clinical instructor, Mrs. Braden. Others in the clinical group were also allowed to give medication before passing the medical math test[1]. The six others in my clinical group are listed in footnote[3] below. CVCC records should confirm the pass-fail rate of this group. I did successfully passed medicines during my clinical and this can be confirmed through hospital records. I assumed this requirement would be considered fulfilled after I passed the medical math test[1], which I did on my 3rd attempt on 12-14-05 fulfilling all my requirements. Note: There is not a minimum requirement for how many medications are to be given giving in either the class or clinical syllabus. The only written requirement is to "Perform medication administration with 100% accuracy."

1-29-06

Mrs. Lynn Harris was assigned as the permanent instructor of (NUR 252) in September 2005. The 2nd medical math test[1] was overdue when Mrs. Harris joined the class, so she administered the test on her first day without any notice for review or preparation. I failed to achieve 100% on the second test. At this point I personally ask Mrs. Harris to review the math calculations with me. We started meeting to review the math calculations. The 3rd test was not yet scheduled. I brought it to Mrs. Harris attention that I still needed to take the 3rd math test[1]. This was on the same day that I had been allowed to take (and pass) the final exam for NUR 252 on 12-14-05. Mrs. Harris agreed to administer the 3rd math test[1], which I achieved 100% accuracy.

After the final exam and 3rd math test on 12-14-05 I left for the holiday break with no idea that there would be an issue with my NUR 252 final grade. The first notice I had that there was an issue was on 12-20-05 when I received a message to call Mrs. Harris. Mrs. Harris informed me of the issue with my NUR 252 requirements (that I had not passed enough medications during clinical) and I needed to contact Mrs. Peterson. I left messages with a secretary for Mrs. Peterson to please call me back. When my calls were not returned, I again called the office that same afternoon and spoke to a secretary that told me that Mrs. Peterson said not to worry that they would work with me to resolve this issue after the holidays. I few days later I received a status letter dated 12-20-05, the same day that I called, signed by Mrs. Peterson stating that I failed NUR 252. I had to wait until after the holidays to again make contact with Mrs. Peterson.

On 1-11-06, I again called Mrs. Peterson's office and spoke to Bridget Jackson and left a message for Mrs. Peterson to please call me before 12 pm. After I received no return call by 12pm, I went in person to Mrs. Peterson's office. Mrs. Peterson did see me, but we failed to resolve this issue because she needed more information from Mrs. Harris. Mrs. Harris was unavailable until 1-18-06 for a face-to-face meeting. Note: This was now the second week of Spring 2006 semester for which I was allowed to register and begin Spring 2006 classes. Mrs. Peterson instructed me to go ahead and attend the classes that I had registered for even though a requirement for NUR 272 is the completion of NUR 252 per the Spring 2006 syllabus.

On 1-18-06, Mrs. Harris informed me that my only options were to either take NUR 200 or wait until Fall 2006 and retake NUR 252. Retaking NUR 252 was not a viable option for me, so on 1-20-06 I contacted admissions (Ramona Gray) and she inform me that registration for NUR 200 had closed on 1-19-06, less than 24 hours after I was first told I should take this extra class in order to graduate in May.

I was and still am willing to do what ever is needed to resolve this misunderstanding. One way to rectify this issue would be for a clinical instructor to again witness me passing more medications or allow my registration into NUR 200.

2

1-29-06

As the facts above explain, I am only partially responsible for this situation. CVCC and staff should take some responsibility for this issue. To date, I have completed all of my previous requirements, paid all my tuitions in full (with no grants) and advanced to the final semester before graduation. I will not stand idly by and be failed by the apparent technicality of my record of not passing a few medications, when so many other exceptions were made during this semester that started out behind and never really caught up. I have worked very hard the last few years taking prerequisites, and working toward my goal of RN. I would like to finish the Nursing program and graduate with my class as I feel I have earned it. Please respond to this inquiry by the close of business Friday, 2-3-06.

Elise Sizemore, LPN

*Elise Sizemore, LPN*

SSN 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
35 Foliage Ct
Cataula, GA 31804
H-706-327-2024
C-706-593-8402


cc:
Dixie Peterson dixie.peterson@cv.edu
Lynn Harris (Via hand delivery Nursing office)
L-File


Notes:
1-Nursing 252 Adult Heath Nursing II, Fall Semester 2005, revised August 2005 page-5, VII-Course requirements, #2-"Satsifactory completion of medication dosage exam. (Student will be given up to 3 chances to achieve 100%)

2- Chattahoochee Valley Community Collage Nursing 252 Adult Heath Nursing II, Clinical Syllabus, Fall Semester 2005, revised August 2005 page-4, III-Clinical Math Proficiency Quiz "The student must pass the math computational quiz with 100% accuracy in order to give medications. If the student does not pass the quiz in (3) attempts, subsequent course failure will result."

3-Clinical group: Kimberly Washington, Nicole Williams Smith, Rosemary Maina, Kezia Huling, Patricia Hooey, Sherry Padgett, (Elise Sizemore).

3

**Sizemore, Dale**

| | |
|---|---|
| ɔm: | Dixie Peterson [dixie.peterson@cv.edu] |
| ɔ: | Sizemore, Dale |
| **Sent:** | Tuesday, January 31, 2006 11:09 AM |
| **Subject:** | Read: Elise Sizemore letter dated January 25, 2006 |

Your message

| | |
|---|---|
| To: | dixie.peterson@cv.edu |
| Subject: | |

was read on 1/31/2006 11:09 AM.

1

4 5

PLAINTIFF'S
EXHIBIT
8

Cheney Recv. 1/4/06
3:53 pm

# GRADE APPEAL FORM

Name of Student **Lindy Wright**          (Signature) **Lindy Wright**

Social Security Number **254 49 7629**

Submitted to (Division Chairperson) **Dixie Peterson**

Date **12-20-05**

## Section A: (To be completed by the student)

I.    Course information:
   a.    Name of course **Maternal -**
   b.    Course number **Nur 271**
   c.    Course section number
   d.    Semester course was taken **Full 05**
   e.    Days of week course met **Wednesday**
   f.    Time of day course met **9 Am - 11 Am**

II.    Name of Instructor **T. Cash**

III.    Date on which the specific item in question was received by the student **12-20-05**

IV.    Date on which the student presented his/her appeal to the instructor for the respective course **12-21-05**

V.    Concise, clear description of the specific nature of the complaint with particular regard to a description of how the grade at issue was either unfair, inaccurate, or both:

   *Please see attached*

VI.    Description of the results of the student's discussion with his/her instructor.

   *please see attached*

VII.    Date on which the results of student/instructor discussion were finalized *please see attached*

VIII.    Attachments (from the student)

**(Section A must be presented to the appropriate Division Chairperson for appeal)**

V. Concise, clear description of the specific nature of the complaint with particular regard to a description of how the grade at issue was either unfair, inaccurate, or both.

Test Grades: I have been told by Ms. T. Cash that I have earned at least 739.24 points out of instructor reported 975 points for the letter grade of "D". I have several concerns regarding how the points were allocated, how exams were given, how information not covered during lecture was tested on exams, and how grades and points were communicated with students.

Some of the specific complaints regarding my grade are as follows:

Instructor was unavailable to discuss concerns at time of individual exams. Instructor did not formally review any exams. Whereas I have not at this time been allowed to review my scantrons and exams, I have found objective documentation in nursing textbooks to support the answers I chose and to refute the answers stated by the instructor to multiple exam questions.

The instructor did not post nor make available exam grades in a timely manner. Due to lack of communication by the instructor, I was unaware that I was in jeopardy of failing this class. No tutoring was offered. The instructor was consistently late to the 9 am Wednesday class and had to leave immediately after most class sessions.

Instructor was not assigned until week 5 of the semester. A guest speaker (ADN prepared & no teaching experience) was utilized for one class period. Another guest speaker from Doctors Hospital provided blatantly incorrect information about Obstetrical patient care that differed from our textbook. On the 4th week, no lecture was provided due to a televised communication system being set up with Wallace and no make-up lecture time was provided.

There were approximately 7-10 drug and solution calculation questions included on the four exams during the semester. No where in the class course syllabus or objectives was it indicated that drug dosage and calculation knowledge would be tested on the unit exams. No review of drug calculations was given in class prior to the exams. Ms. Cash was asked to instruct the class on how to perform a drug dosage and calculation from one of the exams given and she said she could not perform the problem herself.

VI. Description of the results of the student's discussion with his/her instructor.

I informed Ms. Cash on 12/20/05 that I would be appealing my grade. Therefore, I am doing so.

VII. Date on which the results of the student/instructor discussion were finalized.

Discussions have not been finalized. When I returned to the school on 12/20/05 the instructor had her children with her and was not intending to stay at the school. The instructor was not prepared at that time to discuss my grades at length nor allow me to review my scantrons.

VIII.  Attachments

I am hereby requesting that until the results of the appeal process, grievance process, and any litigation resulting from this matter be resolved and finalized, that I be allowed to continue participating in all aspects of the nursing program to include, but not be limited to: attending of classes and clinicals, timely assignment of preceptor, and participation in any NCLEX reviews or classes.

Respectfully submitted,

Lindy Wright

PLAINTIFF'S
EXHIBIT
9

# Chattahoochee
## Valley Community College
### CLOSE TO YOU. CLOSE TO PERFECT.

## GRADE CHANGE FORM

| NAME OF STUDENT | SOCIAL SECURITY NO. | DATE |
|---|---|---|
| Lindy Wright | 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 | 1/18/2006 |

| COURSE NAME AND NUMBER | SECTION NUMBER | SEMESTER |
|---|---|---|
| NUR 271 Maternal Newborn | 1 | Fall 2005 |

To change a grade erroneously reported and to clear an "I", simply fill in the information below.

**GRADE CHANGE FROM** _____D_____ **TO** _____C_____

**REASON:** Student submitted a grade appeal request. Since the procedures for the grade appeal were not completed in the time allotted, the grade needs to be changed from a D to a C.

**NOTES: \*\*INCOMPLETE:** A Grade of "I" (Incomplete) **must be cleared by the end of the following regular semester or a final grade of "F" will automatically be recorded.** This grade will be reported to the student at the end of the semester in which the grade is changed.

_James Lowe_
Signature of Instructor

1/19/06
Date

**APPROVED BY**

_Ruie Peterson_
Signature of Department Chairperson

1-19-06
Date

**APPROVED BY**

**ADMISSIONS OFFICE**

ADMISSIONS
Received
JAN 20 2006
DRF

**COMPLETED** JAN 30 2006
Date

CVCC00834

| Main Menu | Student Records | Financial Information | Scheduling | Student Information | Log Out

**WRIGHT LINDY G**



*Chattahoochee* Valley Community *College*

<u>**View Alerts**</u>
0 Unread Alert(s)

Academic Term FALL 2006

# Unofficial Transcript

Help 

Unofficial Transcript from: CHATTAHOOCHEE VALLEY
COMMUNITY COLLEGE
2602 COLLEGE DRIVE
PHENIX CITY    AL 36869

For Student:
WRIGHT LINDY G
Academic Course Detail by Term
Current: ADN AAS    First: SU1999    Last: SP2006    Class: Sophomore
As of: 01/21/2005 DEGREE SEEKING    Status: Clear


PLAINTIFF'S EXHIBIT
10

| | | Gr | Attm | Ernd | QP Crs Status | Title | Sch Hr |
|---|---|---|---|---|---|---|---|
| SU1999 | | | | | | | |
| CIS146 | 01 | B | 3.000 | 3.000 | 9.000 | MICROCOMPUTE | 3.000 |
| | Term | | 3.000 | 3.000 | 9.000 QPA: 3.000 LIB AA | | |
| | Cum | | 3.000 | 3.000 | 9.000 QPA: 3.000 | | |
| FA1999 | | Gr | Attm | Ernd | QP Crs Status | Title | Sch Hr |
| ENG093 | 01 | S | .000 | .000 | .000 DH DEV HRS | BASIC ENGLIS | 3.000 |
| MTH090 | 02 | S | .000 | .000 | .000 DH DEV HRS | BASIC MATHEM | 3.000 |
| | Term (DEV) | | .000 6.000 | .000 6.000 | .000 QPA: .000 LIB AA (DEV) | | |
| | Cum | | 3.000 | 3.000 | 9.000 QPA: 3.000 | | |
| SP2000 | | Gr | Attm | Ernd | QP Crs Status | Title | Sch Hr |
| ENG101 | 011 | A | 3.000 | 3.000 | 12.000 | ENGLISH COMP | 3.000 |
| ENG102 | 012 | B | 3.000 | 3.000 | 9.000 | ENGLISH COMP | 3.000 |
| MTH098 | | S | .000 | .000 | .000 DH DEV HRS | ELEMENTARY A | 3.000 |
| PSY100 | 011 | B | 1.000 | 1.000 | 3.000 | ORIENTATION | 1.000 |
| | Term (DEV) | | 7.000 3.000 | 7.000 3.000 | 24.000 QPA: 3.429 LIB AA (DEV) | | |
| | Cum | | 10.000 | 10.000 | 33.000 QPA: 3.300 | | |
| FA2000 | | Gr | Attm | Ernd | QP Crs Status | Title | Sch Hr |
| BIO103 | 02 | C | 4.000 | 4.000 | 8.000 | PRINCIPLES O | 4.000 |
| PSY200 | 01 | B | 3.000 | 3.000 | 9.000 | GENERAL PSYC | 3.000 |
| | Term | | 7.000 | 7.000 | 17.000 QPA: 2.429 LIB AA | | |
| | Cum | | 17.000 | 17.000 | 50.000 QPA: 2.941 | | |
| SU2001 | | Gr | Attm | Ernd | QP Crs Status | Title | Sch Hr |
| LPN113 | 02 | B | 4.000 | 4.000 | 12.000 | BODY STRUCTU | 4.000 |
| | Term | | 4.000 | 4.000 | 12.000 QPA: 3.000 LIB AA | | |
| | Cum | | 21.000 | 21.000 | 62.000 QPA: 2.952 | | |
| FA2001 | | Gr | Attm | Ernd | QP Crs Status | Title | Sch Hr |
| LPN104A | | B | 2.000 | 2.000 | 6.000 | PHARMACOLOGY | 2.000 |
| LPN105A | | B | 6.000 | 6.000 | 18.000 | FUNDAMENTALS | 6.000 |
| | Term | | 8.000 | 8.000 | 24.000 QPA: 3.000 LPN CER | | |
| | Cum | | 29.000 | 29.000 | 86.000 QPA: 2.966 | | |
| SP2002 | | Gr | Attm | Ernd | QP Crs Status | Title | Sch Hr |
| LPN124A01 | | C | 6.000 | 6.000 | 12.000 | FAMILY CENTE | 6.000 |
| LPN152 | 01 | C | 8.000 | 8.000 | 16.000 | ADULT NURSIN | 8.000 |
| | Term | | 14.000 | 14.000 | 28.000 QPA: 2.000 LPN CER | | |
| | Cum | | 43.000 | 43.000 | 114.000 QPA: 2.651 | | |
| SU2002 | | Gr | Attm | Ernd | QP Crs Status | Title | Sch Hr |
| LPN101 | | B | 2.000 | 2.000 | 6.000 | EMERGENCY FI | 2.000 |
| LPN118 | | C | 2.000 | 2.000 | 4.000 | MENTAL HEALT | 2.000 |
| LPN140 | | A | 2.000 | 2.000 | 8.000 | NCLEX PN EXA | 2.000 |
| PN142 | | C | 7.000 | 7.000 | 14.000 | ADULT NURSIN | 7.000 |

7/28/2006

```
LPN145A      C       2.000     2.000     4.000
           Term    15.000    15.000    36.000 QPA: 2.400 LPN CER    CURRENT ISSU 2.000
           Cum     58.000    58.000   150.000 QPA: 2.586

  SU2004        Gr    Attm      Ernd
  ART100 05     W     .000      .000          QP Crs Status     Title         Sch Hr
  BIO201 01     W     .000      .000     .000 DR 07/09/2004 ART APPRECIA 3.000
  MTH100 01     W     .000      .000     .000 DR 07/09/2004 HUMAN ANATOM 4.000
              Term    .000      .000     .000 DR 07/09/2004 INTERMEDIATE 3.000
              Cum   58.000    58.000     .000 QPA:   .000 LIB AA
                                      150.000 QPA: 2.586
                                              WITHDRAWN              07/09/2004

  SP2005        Gr    Attm      Ernd
  BIO201 011 C      4.000     4.000     8.000 QP Crs Status     Title         Sch Hr
  BIO202 012 B      4.000     4.000    12.000               HUMAN ANATOM 4.000
              Term   8.000     8.000    20.000 QPA: 2.500 LIB AA HUMAN ANATOM 4.000
              Cum   66.000    66.000   170.000 QPA: 2.576

  SU2005        Gr    Attm      Ernd
  MTH100 01  C      3.000     3.000     6.000 QP Crs Status     Title         Sch Hr
  NUR131 01  B      1.000     1.000     3.000               INTERMEDIATE 3.000
  NUR242     C      2.000     2.000     4.000               HEALTH ASSES 1.000
  NUR251     C      5.000     5.000    10.000               ADVANCED PHA 2.000
              Term  11.000    11.000    23.000 QPA: 2.091 ADN AAS ADULT NURSIN 5.000
              Cum   77.000    77.000   193.000 QPA: 2.506

  FA2005        Gr    Attm      Ernd
  BIO220 01  B      4.000     4.000    12.000 QP Crs Status     Title         Sch Hr
  NUR252     D      5.000     5.000     5.000               GENERAL MICR 4.000
  NUR271     C      4.000     4.000     8.000               ADULT NURSIN 5.000
              Term  13.000    13.000    25.000 QPA: 1.923 ADN AAS MATERNAL-NEW 4.000
              Cum   90.000    90.000   218.000 QPA: 2.422
                                              NUR PROG EXCLUSION     12/20/2005

  SP2006        Gr    Attm      Ernd
  ART100 05  A      3.000     3.000    12.000 QP Crs Status     Title         Sch Hr
  NUR200 01  A      6.000     6.000    24.000               ART APPRECIA 3.000
  NUR272     D      4.000     4.000     4.000               NURSING CARE 6.000
  NUR279     B      2.000     2.000     6.000               PEDIATRIC NU 4.000
  NUR291     A      3.000     3.000    12.000               CONCEPTS OF  2.000
  NUR292     B      2.000     2.000     6.000               TRANSITION/N 3.000
  WKO101 02  S       .000      .000      .000 DH DEV HRS       NURSING LICE 2.000
              Term  20.000    20.000    64.000 QPA: 3.200 ADN AAS WORKPLACE SK 1.000
              (DEV)  1.000     1.000          (DEV)
              Cum  110.000   110.000   282.000 QPA: 2.564
                                              NUR PROG EXCLUSION     05/12/2006

Degree: LPN PRACTICAL NURSING
        CER CERTIFICATE
            CERTIFICATE
        Grad Date: 08/09/2002      Grad Term: SU2002
        Req.Met Date: 08/09/2002   Term Req.Met: SU2002
```

Transfer Course Detail by College
CVCC
                    From: 2005 To: 2005
                    Recv'd: 06/29/2005 Eval: Y Accepted:  11.000
  Course    Equivalent Gr  Attm    Ernd   QPts  Title
  NUR111 2  NUR111 2   A   4.000   4.000 16.000
  NUR121    NUR121     A                        FUNDAMENTALS OF NU
  NUR201 2  NUR201 2   A   2.000   2.000  8.000 CLINICAL NURSING S
  NUR202 3  NUR202 3   A   1.000   1.000  4.000 SPECIALIZED AREA O
  NUR203 4  NUR203 4   A   2.000   2.000  8.000 SPECIALIZED AREA O
  NUR241    NUR241     A   1.000   1.000  4.000 SPECIALIZED AREA O
                           1.000   1.000  4.000 BASIC PHARMACOLOGY

| Financial Information | Scheduling | Student Information | Log Out

**WRIGHT LINDY G**



## Chattahoochee
### Valley Community College

# Unofficial Transcript

Help 

```
Unofficial Transcript from: CHATTAHOOCHEE VALLEY
                            COMMUNITY COLLEGE
                            2602 COLLEGE DRIVE
  For Student:             PHENIX CITY    AL 36869
Academic Course Detail by Term
Current: ADN AAS   First: SU1999
As of: 01/21/2005 DEGREE SEEKING      Last: SP2006
                                           Class: Sophomore
                                           Status: Clear
  SU1999      Gr    Attm     Ernd
  CIS146 01   B    3.000    3.000    QP Crs Status      Title          Sch Hr
                 Term 3.000  3.000   9.000                   MICROCOMPUTE 3.000
                 Cum  3.000  3.000   9.000 QPA: 3.000    LIB AA
                                     9.000 QPA: 3.000

  FA1999      Gr    Attm     Ernd
  ENG093 01   S     .000     .000    QP Crs Status      Title          Sch Hr
  MTH090 02   S     .000     .000    .000 DH DEV HRS         BASIC ENGLIS 3.000
                 Term  .000   .000   .000 DH DEV HRS         BASIC MATHEM 3.000
                      6.000  6.000   .000 QPA:   .000  LIB AA
                 Cum  3.000  3.000           (DEV)
                                     9.000 QPA: 3.000

  SP2000      Gr    Attm     Ernd
  ENG101 011  A    3.000    3.000    QP Crs Status      Title          Sch Hr
  ENG102 012  B    3.000    3.000    12.000                  ENGLISH COMP 3.000
  MTH098      S     .000     .000    9.000                   ENGLISH COMP 3.000
  PSY100 011  B    1.000    1.000    .000 DH DEV HRS         ELEMENTARY A 3.000
                 Term 7.000  7.000   3.000                   ORIENTATION  1.000
                 (DEV) 3.000 3.000   24.000 QPA: 3.429 LIB AA
                 Cum  10.000 10.000        (DEV)
                                     33.000 QPA: 3.300

  FA2000      Gr    Attm     Ernd
  BIO103 02   C    4.000    4.000    QP Crs Status      Title          Sch Hr
  PSY200 01   B    3.000    3.000    8.000                   PRINCIPLES O 4.000
                 Term 7.000  7.000   9.000                   GENERAL PSYC 3.000
                 Cum  17.000 17.000  17.000 QPA: 2.429 LIB AA
                                     50.000 QPA: 2.941

  SU2001      Gr    Attm     Ernd
  LPN113 02   B    4.000    4.000    QP Crs Status      Title          Sch Hr
                 Term 4.000  4.000   12.000                  BODY STRUCTU 4.000
                 Cum  21.000 21.000  12.000 QPA: 3.000 LIB AA
                                     62.000 QPA: 2.952

  FA2001      Gr    Attm     Ernd
  LPN104A     B    2.000    2.000    QP Crs Status      Title          Sch Hr
  LPN105A     B    6.000    6.000    6.000                   PHARMACOLOGY 2.000
                 Term 8.000  8.000   18.000                  FUNDAMENTALS 6.000
                 Cum  29.000 29.000  24.000 QPA: 3.000 LPN CER
                                     86.000 QPA: 2.966

  SP2002      Gr    Attm     Ernd
  LPN124A01   C    6.000    6.000    QP Crs Status      Title          Sch Hr
  LPN152 01   C    8.000    8.000    12.000                  FAMILY CENTE 6.000
                 Term 14.000 14.000  16.000                  ADULT NURSIN 8.000
                 Cum  43.000 43.000  28.000 QPA: 2.000 LPN CER
                                     114.000 QPA: 2.651

  SU2002      Gr    Attm     Ernd
  LPN101      B    2.000    2.000    QP Crs Status      Title          Sch Hr
  LPN118      C    2.000    2.000    6.000                   EMERGENCY FI 2.000
  LPN140      A    2.000    2.000    4.000                   MENTAL HEALT 2.000
  LPN142      C    7.000    7.000    8.000                   NCLEX PN EXA 2.000
                                     14.000                  ADULT NURSIN 7.000
```

https://services.cv.edu/cgi-bin/B9436340/UTRANS.MBR/PROCESS?13:26:46.093

7/28/2006

PL 00126

LPN145A    C    2.000    2.000    4.000                    CURRENT ISSU 2.000
           Term 15.000  15.000  36.000 QPA: 2.400 LPN CER
           Cum  58.000  58.000 150.000 QPA: 2.586

| SU2004 | Gr | Attm | Ernd | QP | Crs Status | Title | Sch Hr |
|--------|----|------|------|----|----|-------|--------|
| ART100 05 | W | .000 | .000 | .000 | DR 07/09/2004 | ART APPRECIA | 3.000 |
| BIO201 01 | W | .000 | .000 | .000 | DR 07/09/2004 | HUMAN ANATOM | 4.000 |
| MTH100 01 | W | .000 | .000 | .000 | DR 07/09/2004 | INTERMEDIATE | 3.000 |
|  | Term | .000 | .000 | .000 | QPA:  .000 LIB AA |  |  |
|  | Cum | 58.000 | 58.000 | 150.000 | QPA: 2.586 |  |  |

WITHDRAWN                    07/09/2004

| SP2005 | Gr | Attm | Ernd | QP | Crs Status | Title | Sch Hr |
|--------|----|------|------|----|----|-------|--------|
| BIO201 011 | C | 4.000 | 4.000 | 8.000 |  | HUMAN ANATOM | 4.000 |
| BIO202 012 | B | 4.000 | 4.000 | 12.000 |  | HUMAN ANATOM | 4.000 |
|  | Term | 8.000 | 8.000 | 20.000 | QPA: 2.500 LIB AA |  |  |
|  | Cum | 66.000 | 66.000 | 170.000 | QPA: 2.576 |  |  |

| SU2005 | Gr | Attm | Ernd | QP | Crs Status | Title | Sch Hr |
|--------|----|------|------|----|----|-------|--------|
| MTH100 01 | C | 3.000 | 3.000 | 6.000 |  | INTERMEDIATE | 3.000 |
| NUR131 01 | B | 1.000 | 1.000 | 3.000 |  | HEALTH ASSES | 1.000 |
| NUR242 | C | 2.000 | 2.000 | 4.000 |  | ADVANCED PHA | 2.000 |
| NUR251 | C | 5.000 | 5.000 | 10.000 |  | ADULT NURSIN | 5.000 |
|  | Term | 11.000 | 11.000 | 23.000 | QPA: 2.091 ADN AAS |  |  |
|  | Cum | 77.000 | 77.000 | 193.000 | QPA: 2.506 |  |  |

| FA2005 | Gr | Attm | Ernd | QP | Crs Status | Title | Sch Hr |
|--------|----|------|------|----|----|-------|--------|
| BIO220 01 | B | 4.000 | 4.000 | 12.000 |  | GENERAL MICR | 4.000 |
| NUR252 | D | 5.000 | 5.000 | 5.000 |  | ADULT NURSIN | 5.000 |
| NUR271 | C | 4.000 | 4.000 | 8.000 |  | MATERNAL-NEW | 4.000 |
|  | Term | 13.000 | 13.000 | 25.000 | QPA: 1.923 ADN AAS |  |  |
|  | Cum | 90.000 | 90.000 | 218.000 | QPA: 2.422 |  |  |

NUR PROG EXCLUSION    12/20/2005

| SP2006 | Gr | Attm | Ernd | QP | Crs Status | Title | Sch Hr |
|--------|----|------|------|----|----|-------|--------|
| ART100 05 | A | 3.000 | 3.000 | 12.000 |  | ART APPRECIA | 3.000 |
| NUR200 01 | A | 6.000 | 6.000 | 24.000 |  | NURSING CARE | 6.000 |
| NUR272 | D | 4.000 | 4.000 | 4.000 |  | PEDIATRIC NU | 4.000 |
| NUR279 | B | 2.000 | 2.000 | 6.000 |  | CONCEPTS OF | 2.000 |
| NUR291 | A | 3.000 | 3.000 | 12.000 |  | TRANSITION/N | 3.000 |
| NUR292 | B | 2.000 | 2.000 | 6.000 |  | NURSING LICE | 2.000 |
| WKO101 02 | S | .000 | .000 | .000 | DH DEV HRS | WORKPLACE SK | 1.000 |
|  | Term | 20.000 | 20.000 | 64.000 | QPA: 3.200 ADN AAS |  |  |
|  | (DEV) | 1.000 | 1.000 |  | (DEV) |  |  |
|  | Cum | 110.000 | 110.000 | 282.000 | QPA: 2.564 |  |  |

NUR PROG EXCLUSION    05/12/2006

Degree: LPN PRACTICAL NURSING
        CER CERTIFICATE
            CERTIFICATE
        Grad Date: 08/09/2002    Grad Term: SU2002
        Req.Met Date: 08/09/2002  Term Req.Met: SU2002

Transfer Course Detail by College
CVCC
                From: 2005 To: 2005
                Recv'd: 06/29/2005 Eval: Y Accepted: 11.000

| Course | Equivalent | Gr | Attm | Ernd | QPts | Title |
|--------|------------|----|------|------|------|-------|
| NUR111 2 | NUR111 2 | A | 4.000 | 4.000 | 16.000 | FUNDAMENTALS OF NU |
| NUR121 | NUR121 | A | 2.000 | 2.000 | 8.000 | CLINICAL NURSING S |
| NUR201 2 | NUR201 2 | A | 1.000 | 1.000 | 4.000 | SPECIALIZED AREA O |
| NUR202 3 | NUR202 3 | A | 2.000 | 2.000 | 8.000 | SPECIALIZED AREA O |
| NUR203 4 | NUR203 4 | A | 1.000 | 1.000 | 4.000 | SPECIALIZED AREA O |
| NUR241 | NUR241 | A | 1.000 | 1.000 | 4.000 | BASIC PHARMACOLOGY |

| Main Menu    | Student Records    | Financial Information    | Scheduling    | Student Information    | Log Out

**WRIGHT LINDY G**



Chattahoochee
Valley Community College

<u>View Alerts</u>
0 Unread Alert(s)

Academic Term FALL 2006

## Unofficial Transcript

Help 

```
Unofficial Transcript from: CHATTAHOOCHEE VALLEY
                            COMMUNITY COLLEGE
                            2602 COLLEGE DRIVE
                            PHENIX CITY      AL 36869
For Student:                WRIGHT LINDY G
Academic Course Detail by Term
Current: ADN AAS    First: SU1999    Last: SP2006
As of: 01/21/2005   DEGREE SEEKING                  Class: Sophomore
                                                    Status: Clear
SU1999        Gr    Attm      Ernd
CIS146 01     B     3.000     3.000        QP Crs Status    Title            Sch Hr
            Term    3.000     3.000     9.000              MICROCOMPUTE 3.000
            Cum     3.000     3.000     9.000 QPA: 3.000 LIB AA
                                        9.000 QPA: 3.000

FA1999        Gr    Attm      Ernd
ENG093 01     S     .000      .000         QP Crs Status    Title            Sch Hr
MTH090 02     S     .000      .000      .000 DH DEV HRS     BASIC ENGLIS 3.000
            Term    .000      .000      .000 DH DEV HRS     BASIC MATHEM 3.000
            (DEV)   6.000     6.000     .000 QPA:  .000 LIB AA
            Cum     3.000     3.000          (DEV)
                                        9.000 QPA: 3.000

SP2000        Gr    Attm      Ernd
ENG101 011    A     3.000     3.000        QP Crs Status    Title            Sch Hr
ENG102 012    B     3.000     3.000     12.000             ENGLISH COMP 3.000
MTH098 011    S     .000      .000      9.000              ENGLISH COMP 3.000
PSY100 011    B     1.000     1.000      .000 DH DEV HRS    ELEMENTARY A 3.000
            Term    7.000     7.000     3.000              ORIENTATION 1.000
            (DEV)   3.000     3.000     24.000 QPA: 3.429 LIB AA
            Cum     10.000    10.000         (DEV)
                                        33.000 QPA: 3.300

FA2000        Gr    Attm      Ernd
BIO103 02     C     4.000     4.000        QP Crs Status    Title            Sch Hr
PSY200 01     B     3.000     3.000     8.000              PRINCIPLES O 4.000
            Term    7.000     7.000     9.000              GENERAL PSYC 3.000
            Cum     17.000    17.000    17.000 QPA: 2.429 LIB AA
                                        50.000 QPA: 2.941

SU2001        Gr    Attm      Ernd
LPN113 02     B     4.000     4.000        QP Crs Status    Title            Sch Hr
            Term    4.000     4.000     12.000             BODY STRUCTU 4.000
            Cum     21.000    21.000    12.000 QPA: 3.000 LIB AA
                                        62.000 QPA: 2.952

FA2001        Gr    Attm      Ernd
LPN104A       B     2.000     2.000        QP Crs Status    Title            Sch Hr
LPN105A       B     6.000     6.000     6.000              PHARMACOLOGY 2.000
            Term    8.000     8.000     18.000             FUNDAMENTALS 6.000
            Cum     29.000    29.000    24.000 QPA: 3.000 LPN CER
                                        86.000 QPA: 2.966

SP2002        Gr    Attm      Ernd
LPN124A01     C     6.000     6.000        QP Crs Status    Title            Sch Hr
LPN152 01     C     8.000     8.000     12.000             FAMILY CENTE 6.000
            Term    14.000    14.000    16.000             ADULT NURSIN 8.000
            Cum     43.000    43.000    28.000 QPA: 2.000 LPN CER
                                        114.000 QPA: 2.651

SU2002        Gr    Attm      Ernd
LPN101        B     2.000     2.000        QP Crs Status    Title            Sch Hr
LPN118        C     2.000     2.000     6.000              EMERGENCY FI 2.000
LPN140        A     2.000     2.000     4.000              MENTAL HEALT 2.000
LPN142        C     7.000     7.000     8.000              NCLEX PN EXA 2.000
                                        14.000             ADULT NURSIN 7.000
```

ttps://services.cv.edu/cgi-bin/B9436340/UTRANS.MBR/PROCESS?13:26:46.093

7/28/2006

PL 00128

```
LPN145A    C      2.000    2.000    4.000
          Term   15.000   15.000   36.000  QPA: 2.400 LPN CER    CURRENT ISSU 2.000
          Cum    58.000   58.000  150.000  QPA: 2.586

SU2004           Gr    Attm     Ernd         QP  Crs Status    Title         Sch Hr
ART100 05  W          .000     .000    .000  DR 07/09/2004 ART APPRECIA 3.000
BIO201 01  W          .000     .000    .000  DR 07/09/2004 HUMAN ANATOM 4.000
MTH100 01  W          .000     .000    .000  DR 07/09/2004 INTERMEDIATE 3.000
          Term         .000     .000    .000  LIB AA
          Cum    58.000   58.000  150.000  QPA:   .000
                                     QPA: 2.586
                                   WITHDRAWN                        07/09/2004

SP2005           Gr    Attm     Ernd         QP  Crs Status    Title         Sch Hr
BIO201 011 C          4.000    4.000    8.000                HUMAN ANATOM 4.000
BIO202 012 B          4.000    4.000   12.000                HUMAN ANATOM 4.000
          Term   8.000    8.000   20.000  QPA: 2.500 LIB AA
          Cum   66.000   66.000  170.000  QPA: 2.576

SU2005           Gr    Attm     Ernd         QP  Crs Status    Title         Sch Hr
MTH100 01  C          3.000    3.000    6.000                INTERMEDIATE 3.000
NUR131 01  B          1.000    1.000    3.000                HEALTH ASSES 1.000
NUR242     C          2.000    2.000    4.000                ADVANCED PHA 2.000
NUR251     C          5.000    5.000   10.000                ADULT NURSIN 5.000
          Term   11.000   11.000   23.000  QPA: 2.091 ADN AAS
          Cum   77.000   77.000  193.000  QPA: 2.506

FA2005           Gr    Attm     Ernd         QP  Crs Status    Title         Sch Hr
BIO220 01  B          4.000    4.000   12.000                GENERAL MICR 4.000
NUR252     D          5.000    5.000    5.000                ADULT NURSIN 5.000
NUR271     C          4.000    4.000    8.000                MATERNAL-NEW 4.000
          Term   13.000   13.000   25.000  QPA: 1.923 ADN AAS
          Cum   90.000   90.000  218.000  QPA: 2.422
                                   NUR PROG EXCLUSION            12/20/2005

SP2006           Gr    Attm     Ernd         QP  Crs Status    Title         Sch Hr
ART100 05  A          3.000    3.000   12.000                ART APPRECIA 3.000
NUR200 01  A          6.000    6.000   24.000                NURSING CARE 6.000
NUR272     D          4.000    4.000    4.000                PEDIATRIC NU 4.000
NUR279     B          2.000    2.000    6.000                CONCEPTS OF  2.000
NUR291     A          3.000    3.000   12.000                TRANSITION/N 3.000
NUR292     B          2.000    2.000    6.000                NURSING LICE 2.000
WKO101 02  S           .000     .000    .000  DH DEV HRS     WORKPLACE SK 1.000
          Term   20.000   20.000   64.000  QPA: 3.200 ADN AAS
          (DEV)   1.000    1.000    .000              (DEV)
          Cum  110.000  110.000  282.000  QPA: 2.564
                                   NUR PROG EXCLUSION            05/12/2006
```

Degree: LPN PRACTICAL NURSING
        CER CERTIFICATE
            CERTIFICATE
        Grad Date: 08/09/2002     Grad Term: SU2002
    Req.Met Date: 08/09/2002  Term Req.Met: SU2002


Transfer Course Detail by College
CVCC
```
                   From: 2005 To: 2005
                 Recv'd: 06/29/2005 Eval: Y  Accepted:   11.000
Course       Equivalent Gr  Attm    Ernd  QPts  Title
NUR111 2     NUR111 2   A   4.000   4.000 16.000 FUNDAMENTALS OF NU
NUR121       NUR121     A   2.000   2.000  8.000 CLINICAL NURSING S
NUR201 2     NUR201 2   A   1.000   1.000  4.000 SPECIALIZED AREA O
NUR202 3     NUR202 3   A   2.000   2.000  8.000 SPECIALIZED AREA O
NUR203 4     NUR203 4   A   1.000   1.000  4.000 SPECIALIZED AREA O
NUR241       NUR241     A   1.000   1.000  4.000 BASIC PHARMACOLOGY
```

PLAINTIFF'S
EXHIBIT
11



# Chattahoochee
## Valley Community College
### CLOSE TO YOU.  CLOSE TO PERFECT.

*2602 College Drive*
*Phenix City, Alabama 36869*

*1.334.291.4900*
*1.334.291.4994 (fax)*

January 23, 2006

Ms. Lindy Wright
7716 Boulder Drive
Columbus, GA  31909

Dear Ms. Wright:

I have reviewed your Grade Appeal for the grade you received in NUR 271 – Maternal Newborn Nursing during the Fall 2005 Semester.  Upon this review, it has been decided to change your grade from a "D" to a "C."  The proper paperwork has been filed and will be submitted to the appropriate offices to reflect this change.  You have been reinstated into the program due to the fact that the proper procedures on the grade appeal were not followed in a timely manner as required by Grade Appeal policy as stated in the Student Handbook.

Sincerely,

James Lowe
Academic Dean

cc:    Dixie Peterson
       Sanquita Alexander



ADMISSIONS
Received
APR - 6 2006
SCA

Name of Student   Lindy Wright        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

## Section C: (To be completed by the Dean of the College)

I.      Date on which the appeal was filed with the Dean of the College  January 9, 2006

II.     Actions/findings of the Dean of the College

**The instructor did not submit Section A of the appeal process in the time stated by policy.**

III.    Attachments (from the instructor and/or Dean of the College)

**No attachments**

IV.     Decision of the Dean of the College

**I have reviewed the information regarding Ms. Wright's appeal. The proper paperwork from the instructor was not submitted on time as prescribed by policy; therefore, I made a grade change from a "D" to "C" in NUR271 with the approval of the Division Chair.**

V.      Date of decision and notification (copies of Section A, B, and C) given to the student, instructor, and Division Chairperson

**January 19, 2006**

Signature _____

Dr. James Lowe, Dean of Instruction

CVCC00777

PLAINTIFF'S
EXHIBIT
12



IN THE UNITED STATES DISTRICT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

LINDY G. WRIGHT,                          )
                                          )
Plaintiff                                 )
                                          )
v.                                        )
                                          ) Civil Action No.: 3:06-cv-1087-WKW
CHATTAHOOCHE VALLEY                        )
COMMUNITY COLLEGE (CVCC),                  )
et al.,                                   )
                                          )
Defendants                                )

## AFFADAVIT OF PLAINTIFF

In May of 2004, I began attending classes in the Nursing Mobility Program for an Associates Degree in Applied Science for my RN license.  I completed the first semester from May to August successfully.  The two instructors that I had for class periods was Brenda Bellamy and Sandra Gunnels, the clinical instructor for clinicals in the hospital setting was Deborah Grubber.

At the beginning of the 2nd semester, the RN class of students met for clinical check offs, which each student had to perform IV administrations and Foley catherization, both with using proper techniques.  There was an extra student in the RN class check off, the student's name was Arit Dan Umha, a Nigerian girl that lived in Atlanta, she had been a student in the class prior to May 2004.  The first class period of the RN class I attended for the second semester had no instructors. Sandra Gunnels and Brenda Bellamy had resigned with CVCC.  The second semester classes were NUR 252 and NUR 271; 252 being Adult Nursing and 271 OB.  Dean Lowe and  President Blackwell attended the RN classroom for a brief time on the 1st day of class which I think was August 24th, 2004.  Dean Lowe told the class that our instructors were sick; but students saw the instructors packing their things from their offices.

I talked with Sandy Gunnels and Brenda Bellamy that day in the parking lot of the Nursing Building and they confirmed that they had resigned; therefore, that left the RN class with no instruction.  The nursing faculty had guest speakers come in for several class periods.  One of which was John Christopher.  He went over Respiratory Disorders to include a power point which began on 9-7-05.  He came several weeks as a guest speaker due to the fact that he was an ADN and did not have the qualifications to teach

nursing students in an Associate Degree Program. He explained to me that he had written a test for Respiratory Disorders, in which Dixie Peterson did not review. He explained this incident to me during my 3rd semester at the Medical Center during one of my preceptor dates while he was working at the Medical Center. Before giving the test on Respiratory, it was explained to our RN class that compensatory mechanism for ABG's would not be on the test for Respirator Disorders. There were several questions on the test regarding compensatory mechanism. Everyone failed the test given by John Christopher. There were bonus questions given to everyone to accumulate extra points to boost grades for this test.

At the end of September, Ms. Lynn Harris was the instructor for Adult NUR 252 and Tywana Cash was the instructor for NUR 271. These two instructors did not use the assigned nursing books for our class periods. These two instructors were not available for tutoring or any questions that the class or myself had for any given test that were administered by either instructor. I was told by Ms. Harris one to two weeks prior to the final for 252 that I only needed 180 points to pass the course. During the time frame of this course, Mrs. Deborah Gruber has resigned her position at CVCC, therefore, I was without clinical instruction for at least 2 if not 3 clinical class periods. My clinical group turned in care plans to Deborah Gruber for grades that were calculated into our final grades for the course NUR 252 prior to her resignation. Lynn Harris stated that our care plans for my clinical group were lost and she would only issue a 23 out of 25 points.

Deborah Gruber told me and Sandy Gunnels via a cell phone conversation that she turned the care plans into Dixie Peterson. After the final was graded by Lynn Harris, she stated that I did not have enough points to continue to the 3rd semester. She never gave me a total number of points at that time. I filed a grade appeal and requested to see all of my test and course work. At that time it was December, 2004, Dixie Peterson told me that I would have to come back to the Nursing Building at Ms. Harris's convenience to review any test or course work, she made a comment that " I don't care if you drop a bomb, you can go talk to whomever you think you need to".

I proceeded up to the President's office to discuss the matter of reviewing my grades and all the disturbances in the course of class since the 2nd semester had started. President Laurel Blackwell stated, "I have nothing to do with the academic portion of the college." Dean Hodge was present in my meeting with Blackwell. When I was able to review my test grades and course work, Lynn Harris and Sherry Lifsey were present. My final test score was written all over. It had red ink pen marks in the places for answers. Lynn Harris and Dixie Peterson rushed me through one test because Dixie said Lynn Harris had to attend a meeting. So she, Dixie, told me to leave and come back after lunch time to finish with my review.

I asked if I could write down some of my incorrect answers according to Lynn Harris, they agreed to let me do so. They said yes. So I wrote down several questions and A B C D answers, not word for word and took them to Sandy Gunnels and an instructor at Columbus Technical College. They reviewed and helped me find the answer I choose in Nursing Books. The answers were marked in books by page and test #. When I returned

2

to CVCC, Lynn Harris was upset that I had another instructor help me and refused to let me review any other course work. I then went to an attorney, Connie Cooper. She talked with Dean Lowe and wrote letters to Dean Lowe in reference to NUR 252. In response from Dean Lowe, he told myself and attorney Connie Cooper that I would be able to substitute 252 for a new class called NUR 200 and that the "D" in 252 would not be held against me so all parties agreed that this would by okay. I was offered NUR 200 along with another student that was allowed to go to clinicals before passing a med calculation test. The med calculation test was to be completed before clinicals started. This student was allowed to pass meds and continue class the whole second semester and take her last med calculation test on the day of finals the 2nd semester.

The 3rd semester was NUR 272, which was Pediatrics with Lynn Harris. She continued not to review test after the exams were given although she stated she would. Care plans were still a part of our final grades. I turned in my 1st Pediatric Care Plan to Sylvia Shirley the 3rd semester. It was graded and given back to me by Artimesa Harmon with a grade of 22/25, she took the Care Plans back from our group. The next clinical session I was handed my Care Plan back with a different top sheet (grade sheet) it was written in red and not in my hand writing, it had been regraded with a grade of 7/25. I questioned Artimesa Harmon and she stated, "they told us to do this, the Nursing Department". I don't know anything about the grading, you need to talk to the faculty at CVCC, Dixie and Lynn

When the classroom portion of the NUR 272 met again Lynn Harris said that the Care Plans were to be redone and that we would not discuss it anymore. Just redo them. I did redo them and received a 20/25. These were regraded 3Xs when I should have received a 22/25. The 2nd care plans were not offered to be redone in the class time by Lynn Harris. By the end of the 3rd semester after the finals, Lynn Harris stated that I did not have enough points to graduate that not to worry because I would be able to take a class the following semester, Independent Study like NUR 200 and graduate.

She allowed myself and two other students to review our grades after graduation I found 9-12 points extra that she missed. I was also told by Dixie Peterson to ask Lynn Harris if myself and another student could redo the 2nd Care Plan, in which she stated. "I have talked with Dixie about redoing care plans and we decided No, I don't know why she told you to ask me". After graduation and review of grades, I was told by Lynn Harris to call the Nursing office to find out details of the course that would be offered during the summer of 2006. When I called the Nursing office the secretary told me that I was exempt from the program that I had failed 2 classes. She told me that I failed NUR 252 and NUR 272 and would not be able to return.

Dean Lowe told myself and Connie Cooper that NUR 252 "D" would not be held against me. I in return, requested course forgiveness May 19, 2006. in which I submitted a letter to Dean Hodge. It was denied because CVCC had changed the course # of NUR 252 to course #NUR 200 because the course numbers would be different in 2006 due to the curriculum changes. Carole Rambo did not graduate and was able to take NUR 272 again after the 3rd semester was over during the Summer/Fall of 2006. I was allowed to

3

substitute NUR 200 for NUR 252 the Spring Semester, 2006, the course numbers were changed on me due to change of curriculum but not for Carole.    After I took my courses, she was able to take NUR 272 over and received course forgiveness, and I was denied.    I was told by Sandra Gunnels, that Dixie Peterson told her and Brenda Bellamy, "She   is a weak student and did not pass her LPN boards the 1[st] time, so she does not need to pass the second semester". Also Lynn Harris stated that she would review test given throughout he 3rd semester.  She did not review any tests as she told the class she would after each test.  She went over test the day before the final exam.  This was not done in a timely manner in order for the class to appropriately ask questions or get extra help if needed.

My signature indicates that the above information is stated in my own words. Moreover, my signature indicates that my statements are true and accurate to the best of my ability.

LINDY WRIGHT

Sworn to and subscribed  before me this 2nd day of November, 2007

Notary Public

4

PLAINTIFF'S
EXHIBIT
13




### CONNIE COOPER
*Attorney at Law*
P.O. Box 3110
Phenix City, AL 36868
(334) 297-9442
Fax: (334) 297-6008

January 10, 2006

Dean James Lowe
Chattahoochee Valley Community College
2602 College Drive
Phenix City, AL 36869

RE: My client, Lindy Gale Wright

Dear Dean Lowe,

I am writing to follow-up on our telephone conversation today. I have been retained to assist Ms. Wright in pursuit of her due process rights regarding her grade appeal of two college courses.

It is my understanding that you will inform Ms. Wright or myself either today or tomorrow as to whether she will be allowed to continue classes until a ruling on her appeal is rendered. In the event she is not allowed to continue classes, I understand that concessions will be made later, in the event the ruling of her appeal is successful. We are aware of other students who have been allowed to continue class pending their appeal.

Additionally, it is my understanding that this entire process will be completed within 10-15 days after receipt of the information from Ms. Peterson and a decision is rendered. My client is aware of the due process procedure and will strictly adhere to the school policy in this regard.

Thank you for your time and attention.

Sincerely,

Connie Cooper



PLAINTIFF'S
EXHIBIT
14

## Sanquita Alexander

**From:** Dixie Peterson
**Sent:** Tuesday, January 17, 2006 6:31 PM
**To:** Heather Chalkley
**Cc:** Saundra L. Noles; James Lowe; Sanquita Alexander
**Subject:** Lindy Wright

Heather,

I spoke with Lindy Wright today, and she is eligible after Dean Lowe's ruling, to return to the program. She will need to register for :Nursing 272, Nursing 279, Nursing 291, Nursing 292 and Nursing 200. I think she also has a non-nursing course to take to complete degree requirements by May. The Nursing 200 is a new course, and is being offered for the first time this semester. It is a course reserved for those new ADN students who will be admitted to our May, 2006 program. Since Ms. Wright's failure of Nursing 252 stands, it will be necessary for her to repeat that course to reach a grade of "C" or better. Since the new standardized curriculum will be implemented with the new RN class that enters in May, 2006, Nursing 252 will not exist in the new curriculum. Therefore, in order for Lindy to repeat the course in the most closely resembling manner to Nursing 252, I will allow her to register for Nursing 200 which we will substitute (by authorization of the Dean) for Nursing 252. This means that if Lindy passes everything for which she is registered in the spring of 2006, she could still possibly graduate in May, 2006.

Sanquita, I will be requesting of Dean Lowe to sign a substitution form for Nursing 200 to be accepted for Nursing 252, so Lindy will be registering for Nursing 200 to fulfill the 252 requirement. Has she filled out all graduation application forms?

Thanks,

Dixie

1/18/2006

CVCC00804

PLAINTIFF'S
EXHIBIT
15

# AUTHORIZATION FOR COURSE SUBSTITUTION

_Spring_ _____ Semester, ~~199~~ _2006_

STUDENT NAME _Lindy Wright_

SOCIAL SECURITY NUMBER _254 / 49 / 7629_

MAJOR _ADN_ DEGREE PROGRAM _____

COLLEGE CATALOG YEAR _FA 04_

RATIONALE: _stc per Ms. Peterson_

_Student failed Nur 252 in Fall 05. The new state wide curriculum takes effect in May 06. NUR 252 will not exist and the course content will actually be divided between numerous courses. NSG 200 ~~ie~~ is a combination of this course._

| COURSE(S) SUBSTITUTED | REPLACED COURSE(S) |
|---|---|
| _Nur 252_   stc. per Ms Peterson | ~~Nurs~~ _NSG 200_ |
| _____ | _____ |
| _____ | _____ |

STUDENT                                   DATE

ACKNOWLEDGED:

_[signature]_

FACULTY ADVISOR                           DATE   _1-24-06_

APPROVED:

_[signature]_

DEAN OF THE COLLEGE                       DATE   _1/26/06_

DEFENDANT'S
EXHIBIT
PENGAD 800-631-6989

CVCC 000248


PLAINTIFF'S EXHIBIT 6

Date: 1-27-06

| Evaluation Criteria | Possible #Pts | Earned Pts | Comments |
|---|---|---|---|
| A. Assessment Packet | 5 | 3 | Left Thing out Never NA or no abd seen |
| B. Nursing Diagnoses | | | |
| 1. Appropriate | 4 | 1 | |
| 2. Prioritized | 3 | 0 | |
| C. Subjective | 2 | 0 | |
| D. Patient Goals | | | |
| 1. Appropriate | 4 | 0 | Goals not Approp for this patient |
| 2. AEB | 3 | 0 | |
| E. Nursing Interventions | | | |
| 1. Appropriate | 4 | 2 | Did not Match Nursing Dimnosis |
| 2. Prioritized | 3 | 0 | |
| F. Scientific Rationale with References | 4 | 0 | where did you get this info |
| G. Evaluation of Patient Goals | 3 | 1 | |
| TOTAL | 33 25pts | | |

Grade 7

Allergies: _NKA_

Birthdate: _7/30/02_ Race: _B_ Religion: _Christian_

Information obtained from: _pt chart + family_

Chief Complaint (include what the child says, if possible): _Surgery_

History of present illness (include any home medications): _no home meds_

Past History _CMV, chitis    new onset seizure_
Birth History (#of child, type of delivery, complications): _MR    started 2 days prior to_
_child w/too premature birth w/CMV    admission_
_CMV - in utero_

Previous illnesses, injuries, or hospitalizations: _premature birth w/CMV._

Immunizations:          Current _✓_     Not Started _____    Why? _____

Growth/Development:
Stage (according to Erikson):
Specifics (Are they delayed or appropriate? Observations): _appropriate_

If in school, what grade? _daycare_     Are grades satisfactory? _____

General Appearance: _Received pt lying in bed alert, responds to touch,_
_S/s of sedation IV noted to left arm wrapped up gauze + tape, (?)_
_trach site, lungs clear, HR regular, abdomen soft, warm + dry to_
_Vital Signs: (Complete as age appropriate)_
T _98_     P _111_     R _62_     B/P _117/?_     Growth Chart Percentile: _15%_
Height: _41 inches_     Weight: _26.5 lbs_

Head Circumference, if infant: _not applicable_

Nose (discharge, history of nosebleeds, etc.):
*No discharge noted*

Ears (history of infections, hearing loss, etc.):
*No loss noted*

Mouth (mucous membranes, teeth number and condition, etc.):
*Pink & moist, teeth appear present*

Throat (history of sore throats, difficulty swallowing, etc.):
*Soft chest noted due to noodle present*

*portion SP.*

Neck (pain, stiffness, limited movement, enlarged nodes, etc.):
*No abnormalities noted*

Chest (masses, development, etc.):
*No abnormalities noted*

Respiratory (chronic cough, frequent colds, SOB, breath sounds, etc.):
*breath sounds clear & unlabored*

Cardiovascular (history of heart murmur or rheumatic fever, anemia, cyanosis or fatigue on exertion, etc):
*No abnormalities noted*

GI (appetite, food preferences, eating habits, elimination habits, etc.):

Musculoskeletal (weakness, pain or stiffness, history of fractures, scoliosis, etc.):

none noted

Neurologic (history of seizures, tremors, dizziness, loss of memory, fears, nightmares, speech disturbances):

hx of seizure for 2 days prior to admission

Endocrine (intolerance of temperature changes, excessive thirst, salty taste to skin, etc.):

none noted.

Personal/ Social (home environment, marital status of parents, type of dwelling, occupation of family members, cultural/ religious preferences, etc.):

lives w/ aunt and uncle; house. grd gaurdians work

for kodac. children.

Note observations made between family members and infant/child:

family members very concerned & caring.

MEDICATIONS: For both sections, include Brand & Generic Names, Dosage, Route, Frequency, and why the medication is being taken/given.

Multi-Disciplinary Needs of patient &/or family:

teach family about diet & occupation precaution

10 physical limitations
workrelated
new seizures

LIST OF HOME MEDICATIONS (WHAT THE PATIENT WAS TAKING PRIOR TO BEING ADMITTED INTO THE HOSPITAL) (include prescriptions, OTCs, and herbals)

no home meds.

## ABNORMAL LAB VALUES & DIAGNOSTICS ANALYSIS:

| Abnormal Lab Values/Diagnostics | Normal Range/Results |
| --- | --- |
| Significance/Rationale | |

**What is causing the abnormality & why?)**

CT of Brain, 11/9/06

· Small amount of mineralization seen in basal ganglia & left temporal lobe. This is atypical for age and is uncertain etiology or significance.

**Summary of the Health Assessment (Head-to-Toe) – (include subjective & objective data)**

eyes (PERRLA), facial symmetry intact, mucous membrane pink & moist, apical pulse 98, lung sounds even, clear & unlabored, abdomen soft, nondistended, Bowel Sounds x4, IV with D5½NS running at 45°, IV site wrapped with gauze & tape, lab appears to be infusing well, no S/S of infiltration, no edema noted

**PATHOPHYSIOLOGY** (include information about the disease process/condition, treatment and medication regimens, abnormal lab values & their meanings, and abnormal diagnostic test results & their meanings. ...

... of the brain's structural system that results by malfunction. Abnormal discharge of neurons that results by collection of Signs & Symptoms may include uncontrolled sudden drugs & unconsciousness, involuntary movements & change in perception behavior, sensation & posture. Caused by EEG. patient PATIENT PROBLEM LIST (at least three – these will be used to develop your nursing diagnoses) PRIORITIZED.

electrolytes, blood urea nitrogen ... & abnormal studies may ... CBC

This – thready ... able to take in b. At risk for

Mare

## Pediatric Nursing Care Plan #1

Nursing Diagnosis #1: At Risk for Injury R/T seizure activity w/ Risk for HYPOFIA "ABC's" first + foremost

| | | | | |
|---|---|---|---|---|
| ...tive ...nt state ...fraid ...ay will ...inself to ...another ...s blood ...i active ...i 2 day ...e ...ce | Pat will not experience any injury during 4-3 shift 1-20-06 evidence of no seizure activity.  resp distress $^2$ ... Aspiration | ① Pad objects such as crib  ② administer antiepileptic meds. Tegretol ordered per md.  ③ Educate parents + child regarding appropriate activities  ④ monitor lab values ... diagnostic test.  ⑤ Encourage adequate dietary intake + type food appropriate  ⑥ Administer O2 if needed | ✳ See reference at bottom of pg.  ① helps prevent injury.  ② Meds decrease the chances of seizure activity.  ③ if not educated further injury may result.  ④ indicators of high metabolic disturbances (diagnose less) indicators of brain lesions + neuro disfunctions.  ⑤ prevents deficiency of required nutrients.  ⑥ Supplies adequate tissue perfusion. | ... by ... acti... fam... bloc... pt to...  you... to p...  Did you ...  have ...  m ... |

wrong

Reference = ( Nursing Care of Infants + Children 7th Edition PC 11 07 )

Nursing Diagnosis #2: At Risk for Aspiration R/T motor activity + lo

Same as Risk for Injury

| | | | | |
|---|---|---|---|---|
| | ① Pt will exhibit no signs of aspiration as evidence by tolerating clear liquid well and | ① nothing in Childs mouth during seizure episode<br><br>② loosen clothing<br><br>③ Position child with head midline; not hyperextended<br><br>④ turn to side if vomits<br><br>⑤ put O2 + suction at bedside | * See reference at bottom of page all from:<br><br>① can cause injury and aspiration.<br><br>② Restricts movement or breathing<br><br>③ promotes adequate ventilation.<br><br>④ prevents aspiration.<br><br>⑤ for adequate tissue perfusion + keep oral pharynx clear of airway obstruction. | Go<br>① Pt<br>Sign<br>asp<br>risk<br>tole<br>Clea<br>wit<br>S/S o<br>Suc<br><br>Po |
| rily menses 'pt in Charriong<br><br>ld is no liquids difficulty.<br><br>suction bedside | | | | |

* ( Wong's nursing care of infants + Children
pc 11-23

Information obtained from: _Chart & pt. mother?_

Chief Complaint (Include what the child says, if possible): _Child stated cough,_
_admission to 2 weeks ago_

History of present illness (Include any home medications): _pneumonia at TMC_
_no home meds_

Past History - _Tubes in ears._
Birth History (#of child, type of delivery, complications): _3 children, normal delivery (meaning normal c-section) normal_
_normal delivery, no complications_

Previous illnesses, injuries, or hospitalizations: _tubes in ears_
_Tubes & pneumonia_

Immunizations: _____ Current __✓__ Not Started _____ Why? _____

Growth/Development:
Stage (according to Erikson): _____
Specifies (Are they delayed or appropriate? Observations: _Initiative vs Guilt_
_who follows rules to play in games_
_tries to complete tasks & act silly_
If in school, what grade? _preschool_   Are grades satisfactory? _____

General Appearance: _____

Vital Signs (Complete as age appropriate)
T _101_   P _115_   R _23_   B/P _110/64_

Height: _42 inches_   Weight: _16 lbs_   Growth Chart Percentile: _70%_

Head Circumference, if infant _n/a_

Skin (col____   ____sh, texture, deformities, etc.):   _n/a_

**Nose** (discharge, history of nosebleeds, etc.):

no discharge noted.
(good pink'ns stats) nec, EVER clear.

**Ears** (history of infections, hearing loss, etc.):

no defects noted. hearing loss?
tubes placed in ears when a baby? for ear infections

**Mouth** (mucous membranes, teeth number and condition, etc.):

moist, pink; 16 teeth, good dental health, no apparent
caries

**Throat** (history of sore throats, difficulty swallowing, etc.):

no swallowing difficulties noted, while drinking/applejuice
no redness/abnormalities noted

**Neck** (pain, stiffness, limited movement, enlarged nodes, etc.):

no pain, stiffness noted.
active range of motion noted

**Chest** (masses, development, etc.):

no abnormalities noted.
symmetrical movement during chest/respirations

**Respiratory** (chronic cough, frequent colds, SOB, breath sounds, etc.):

loose cough noted, scant          no audible wheezy
clear          mucous noted.          heard.
breath sounds even/unlabored          wheezy heard on
          auscultation

**Cardiovascular** (history of heart murmur or rheumatic fever, anemia, cyanosis, or fatigue on exertion, etc.):

apical pulse 115; no apparent problems noted
(&will up playing (ht according to WNL)

**GI** (appetite, food preferences, eating habits, elimination habits, toilet trained, etc.):

a stool no GI disorders

..................................... (weakness, pain or stiffness, history of fractures, scoliosis, etc.):

no weakness or pain noted.
moves all extremeties without difficulty.

Neurologic (history of seizures, tremors, dizziness, loss of memory, fears, nightmares, speech disturbances):

no deficits noted.
hand grasp equal & strong
eyes PERRLA, follows commands/responds appropriately.?

Endocrine (intolerance of temperature changes, excessive thirst, salty taste to skin, etc.):

no deficits noted per questions.

Personal/ Social (home environment, marital status of parents, type of dwelling, occupation of family members, cultural/religious preferences, etc.):

lives w/single mother & 1 sibling
in a town
religious preference is catholic? → both grandparents
social interaction between grandparents & our grandmother
mother not present. child & grandparents
appear to have loving relationship.

Note observations made between family members and infant/child:
Child was w/ grandmother. VSS while grandmother
out of room.

Multi-Disciplinary Needs of patient &/or family: pt within plan.
Educated grandparents to have child spit out any
mucous from coughing? to ↑ fluids. importance of
MEDICATIONS: taking all medications as
For both sections, include Brand & Generic Names, Dosage, Route, Frequency, and why the
medication is being taken/given.

A.    LIST OF HOME MEDICATIONS (WHAT THE PATIENT WAS TAKING PRIOR TO BEING ADMITTED
      INTO THE HOSPITAL) (include prescriptions, OTCs, and herbals)

      no home meds.) Child does not - Vitamins

## ABNORMAL LAB VALUES & DIAGNOSTICS ANALYSIS:

| Abnormal Lab Values/Diagnostics | Significance/Rationale | Normal Range/Results |
| --- | --- | --- |
| | **What is causing the abnormality & why?** | |

**Summary of the Health Assessment (Head-to-Toe) – (include subjective & objective data)**

**PATHOPHYSIOLOGY (include information about the disease process/condition, treatment and medication regimens, abnormal lab values & their meanings, &/or abnormal diagnostic test results & their meanings, possible sequelae of disease process/condition)**

**PATIENT PROBLEM LIST (at least three – these will be used to develop your nursing diagnoses) PRIORITIZED:**

... handled penic. Clindamycin is drug of choice, followed by penicillin w/ metronidazole. Ceftazidime plus aminoglycoside or cefoperazone is used when the infecting organism is P. aeruginosa. S. aureus is treated w/ oxacillin, nafcillin or 1st generation cephalosporins.

Teaching plan.

③ Instruct pt & family about good hand washing techniques & how this reduces the risk for spread of infection. Include them to use soap & warm water & briskly rub hand w/ soap wash water for at least 20 seconds & how to properly dry hands & then turn faucets off without contaminating.

-27-06

formation _____ 1-6-06

X ___ _____ _____ _____ _____ _____ _____

Risk for

_____ _____ Clearance RT ___ Inflammatory Process

| Subjective Data | Goal | Intervention | Rational | Implementation | Evaluation |
|---|---|---|---|---|---|
| _____ SOB onset | Pt will demonstrate behaviors to achieve airway (shift) clearance as evidence by coughing up + spitting out all secretions. Pt will display patent airway (from 7-3 shift) as evidenced by absence of cyanosis ___ ___ pt will receive | ① assess rate/ depth of Respirations + chest movement. R/E 7-3 23, 1 ABC's ② Ascultate lung fields noting areas of decreased/ absent airflow + adventitious breath sounds ③ Elevate HOB + ___ position ④ assist w/ deep breathing exercises | tachypnea, shallow respirations, + asymmetric chest movement are frequently present due to discomfort of moving chest wall +/or fluid in lung *Reference - nursing care plans marilynn E. Coenpes, mary francis moorhouse, Alice C Geissler pg 142-143 ② crackles occur in areas of fluid Crackles, wheezes + ronchi are heard on inspiration +/or expiration in response to fluid accumulation *Reference - Nursing Care Plan - marilynn E Coenpes - mary F moorhouse - Alice C Geissler Pg 142-143 ④ diaphragm, promotes chest expansion | ① assessed rate + dept of Resp + chest movement of initial assessment and _____ on shift ② Ascultated lung field __ on initial assessment. ③ Instructed the grandparents to keep childs head elevated while in bed & ____ position frequently ④ Demonstrated to child + grandparents how to do deep breathing technique | goal met pt dem ___ behaviors achiev ___ clearance evidenced coughing spitting ou mucous goal met Pt display patent ai as eviden no oxygen from 7-3 shift |
| ___ DIAGNOSTIC | Optimum Oxygen Supply. | ⑤ use pulse Ox to monitor oxygen saturation ⑥ provide O2 as prescribed. | *Reference - Nursing Care Plan - marilynn E Coenpes mary F moorhouse, Alice C Geissler pg 142-143 ④ facilitates maximum expansion of the lungs *Reference - Nursing Care Plan - marilynn E Coenpes mary F moorhouse - Alice C Geissler pg 142-143 | ⑤ monitored O2 saturation via pulse Ox ___. ⑥ ___ Rational ⑤ monitored O2 saturation ⑥ maintain good tissue perfusion | why? why? Reference Reference |



formation

X ② Lung Abscess, ③ pleural Effusion, ④ Pneumonia

Risk for Spread of Infection R/T stasis of Respiratory Secretions + presse

| Subjective Data | Goal | Intervention | Rational | Implementation | Evaluation |
|---|---|---|---|---|---|
| ults - cavity - in ○ sde. al effusion antibiotics orders. scant mucous sno. uculue um eshe Clear suction and fatee rel | Pt will remain infection free from 7-3 shift as evidence by V/S will Normia with L-23 Temp 98° Pulse 115 B/P 110/66 | ① Monitor VIS ② Instruct pt & family concerni disposition of secretions & reportir Dn color, amount + odor. ③ Demonstrate + Encourage good handwashing ④ Limit visitors as indicated | ① ○ Indicator of infection, Ex Rising ↑ pulse + Respiration * Reference - Nursing Care plans Marilym E Doenges marilym F moorhouse alice C. Geissler Pg 145. ② A in characteristics of sputum Reflect resolution of pneumonia + or secondary infection * Reference - Nursing Care plans Marilym E Doenges, May F Moorhouse alice C. Geissler pg 145. ③ Effective means of reducing/preventing * Reference Nursing Care plans - Marilym E Doenges - May F Moorhouse, alice C Geissler pg 145. ④ Reduces likelihood of exposure to other infectious pathogens * Reference Nursing Care Plans Marilynn E Doenges - May F moorhouse alice C Geissler pg 145. | ① Monitored VS Tep 98° R/R 23 P-115 B/P 110/66 ② Instructed pt & family AS of Sputum. ③ Demonstrated + Encouraged family + pt how to wash hands & why. ④ Instructed family about visitors the ↑ risk of Spread of infection ⑤ nurse on duty administered RX antibiotics that were dire. | Goal Pt VIS n Wne on 7-3 R/R - 23 T 98° P 115 B/P 110/66. goal met Pt & fam demonst & discuss the purpos of hand was |

⑤ administer RX per mDorder    ⑥ Used to combat most infection.

7-06

ation

① Lung Abcess  ② Pleural Effusion, ③ Pneumonia

e for

tivity Intolerance R/T inflammation process + imbalance between

| ective Data | Goal | Intervention | Rational | Implementation | Evaluation |
|---|---|---|---|---|---|
| aints e or n during element P 110/66 ied ned imal lbs. is on file rs is and lays | Pt will demonstrate an ↑ in tolerance to activity as evidenced by - VS will remain wnl or 7-3 shift. Pt will have ↑ tolerance to activity as evidenced by no complaints of fatigue during 7-3 shift. ✗again goals and diff. just diff. AEB | ① Evaluate Pt's response to activity. note dyspnea, ↑ waking + ↓ in VS during + after activity. ② Provide quiet environment + limit visitors. ↑ provide freq. rest periods. ③ Assist pt to assume comfort posture for rest + sleep. ④ assist w/ self care activities as needed. | ① Establishes pt's needs/capabilities + facilitates choic of intervention. & Ref. Nursing Care Plan Marilyn E. Doenges Mary F Moorhouse Alice C Geissler p. 146. ② Reduces stress + excess stimulation, promoting rest. & Ref. Nursing Care Plan p. 146. ③ Pt may be comfortable in several different positions. & Ref. Nursing Care Plan p. 147. ④ minimizes exhaustion + helps to balance O2 supply + demand. | ① Evaluated Pt's activity level throughout shift 7-3. ② Instructed family + Pt of quiet environment + how it worked to reduce stress + tension level. ③ Assisted in showing the family + child how to be comfortable in several positions. ④ assisted w/ AM care + all needs throughout 7-3 shift. | goal met VS remai wnl 7-3 shi T 98.7 P 115 B/p 110/66 P goal met pt had ↑ act level as Ev no complain fatigue durin 7-3 shift. |

monitoring appropriate pt activities based on pt capabilities. & Ref - Nursing Care Plan pg 6/06. pg 147.

| | Maximum Points | Your Score | Comments |
|---|---|---|---|
| Diagnosis/Disorder Discussion | 5 pts. | 6 | |
| Nursing Assessment | 5 pts. | 5 | |
| Nursing Intervention | 5 pts. | 5 | |
| Bibliography Typed APA format Three sources | 2 pts. | 2 | |
| Oral/Presentation Professional Eye contact with audience Verbalization, pronunciation Provides typed outline to instructor | 3 pts. | 3 | |

EARNED POINTS: 20 / 20 PTS.

ORAL EXAM _____    EARNED POINTS: 10 / 10 PTS.

TOTAL POINTS EARNED: 30 25 pts.
20 pts.
-5
25 pts.

Comments:

Instructor's Signature _____

Student's Signature: _____

Acute lymphocytic leukemia is a cancer of the white blood cells characterized by the overproduction and continuous multiplication of malignant and immature white blood cells in the bone marrow.

Acute leukemia account for nearly 11 percent more than chronic leukemia. About 30% of cancers in children ages 0-14 years are leukemia, and most common is ALL.

Incidence rates for leukemia are higher in males; males are expected to account for more than 56% Rates are higher in white children than black children. Hispanics of all races under age 20 also have higher rates of leukemia.

Cancers in children ages 1-4 year old is more than 10 times greater than young adults ages 20-24

Some doctors believe that ALL develops from a combination of genetic and environmental factors Research show that all malignancies are due to subtle or less subtle changes in DNA that lead to unimpaired cell division and breakdown of inhibitory processes.

High doses of radiation increases the risk of developing acute leukemia.

Test to diagnosis may include: CBC, bone marrow biopsy (examined for blast, cell counts and other diseases). A lumbar puncture is generally required to determine whether the malignant cells have invaded the central nervous system.

Assessment/Symptoms

Generalized weakness and fatigue
Anemia
Frequent or unexplained fever and infections
Weight loss and /or loss of appetite
Excessive bruising or bleeding from wounds, nosebleeds, petechiae
Bone pain, joint pains (caused by the spread of blast cells to the surface of the bone or into the joint from the marrow cavity)
Breathlessness
Enlarge lymph nodes, liver and/or spleen

The signs and symptoms of ALL result from the lack of normal and healthy blood cells because are crowded out by malignant and immature white blood cells. Therefore, people with ALL experience symptoms from their red blood cells, white blood cells and platelets not functioning properly.

Abnormal lab test may include CBC; renal functions; electrolytes and liver enzymes.

Treatment can include: chemotherapy, steroid, radiation therapy, intensive combined treatments including bone marrow or stem cell transplants and growth factors.

The nurse should provide emotional support for the child and the family.

Should place child in private room to reduce the risk for infection

Explain all procedures carefully at child's level of understanding.

Encourage good hygiene

Teach the parents about the disease process

Bibliography:

Wikipedia, the free encyclopedia. (2006). Acute Lymphoblastic Leukemia (ALL). [online]. http://En.wikipedia.org/wiki/Acute_lymphocytic_leukemia

The Leukemia & Lymphoma Society :Disease Information . Leukemia Facts & Statistics. [online]. http://www.leukemie-lymphoma.org/all-page?item-id=9346

Hockenberry, Wilson, Winkwlstein, Kline. (2003). Wong's Nursing Care of Infants and Children (7th ed.), St. Louis Missouri. pp. 1606-1611.

Allergies: NKA

Birthdate: 7/30/02 Race: B  Religion: Christian

Information obtained from: pt chart + family

Chief Complaint (include what the child says, if possible): Surgery

History of present illness (include any home medications): no home meds. new onset seizure, started 2 days prior to admission

Past History (#of child, type of delivery, complications): CMV; h/t w MR

Birth History (#of child, type of delivery, complications): child was premature birth w/ CMV.

Previous illnesses, injuries, or hospitalizations: CMV-in utero

Immunizations:

Current _____✓_____    Not Started _____    Why? _____

Growth/ Development:

Age (according to Erikson): Trust vs Mistrust

Specifics (Are they delayed or appropriate? Observations): child in exploration delay. developmental delay? chronological age... developmental age... progressing to autonomy

In school, what grade? _____    Are grades satisfactory?

General Appearance: Received pt lying in bed alert, responds to touch, on verbal IV noted to L arm wrapped w/ gauze + tape, no s/s of infiltration noted. moves all extremities. skin warm + dry to touch, lungs clear, HR regular. abdomen soft, non-distended. family at bedside + had good rapport during day.

Vital Signs: (Complete as age appropriate)

P 114    R 23    B/P 107/52

Height: 4 Rinks    Weight: 28.5 lb    Growth Chart Percentile: 15%

Head Circumference, if infant: not applicable

Eyes (vision)

Nose (discharge, history of nosebleeds, etc.):
no discharge noted, no hx of nose bleeds per ♀ caregivers

Ears (history of infections, hearing loss, etc.):
no loss noted

Mouth (mucous membranes, teeth number and condition, etc.):
pink & moist, all teeth appear present

Throat (history of sore throats, difficulty swallowing, etc.):
Soft diet indicated due to aspiration (precaution) ← precautions

Neck (pain, stiffness, limited movement, enlarged nodes, etc.): moves neck w/no problems.
no abnormalities noted    no limited movement noted

Chest (masses, development, etc.):
no abnormalities noted    no chest mass noted. warm, dry & pale or nonpitting noted

Respiratory (chronic cough, frequent colds, SOB, breath sounds, etc.):
breath sounds even & unlabored.

Cardiovascular (history of heart murmur or rheumatic fever, anemia, cyanosis or fatigue on exertion, etc.):
no abnormalities noted.
Apical 98.

GI (annual)
not preferences eating habits, elimination habits, toilet/trainer ...

Musculoskeletal (weakness, pain or stiffness, history of fractures, scoliosis, etc.):

none noted
moves all extremities
h/o of surgery for 2 days prior to admission

Neurologic (history of seizures, tremors, dizziness, loss of memory, fears, nightmares, speech disturbances):

Endocrine (intolerance of temperature changes, excessive thirst, salty taste to skin, etc.):

none noted.

Personal/ Social (home environment, marital status of parents, type of dwelling, occupation of family members, cultural/ religious preferences, etc.):

lives w/ aunt and uncle; has
for kodac. christian.

guardians work

Note observations made between family members and infant/child:

family members very concerned + caring.

Multi-Disciplinary Needs of patient &/or family:

teach family about diet + aspiration
precautions
Home Safety → pad crib — teach about meds + texture
as directed by Dr.

LIST OF HOME MEDICATIONS (WHAT THE PATIENT WAS TAKING PRIOR TO BEING ADMITTED
INTO THE HOSPITAL) (Include prescriptions, OTCs, and herbals)
MEDICATIONS: For both sections, include Brand & Generic Names, Dosage, Route, Frequency, and why the
medication is being taken/given.

no home meds.
no home meds.

Amoxil 400/5 1½ tsp po BID, Tylenol,

## ABNORMAL LAB VALUES & DIAGNOSTICS ANALYSIS:

### Abnormal Lab Values/Diagnostics

**Significance/Rationale**

What is causing the abnormality & why?

**Normal Range/Results**

CT of brain,    1/19/06    MCV - 13.2↑ 7w/M
MPV - 7.0↓ 7w/M
EEG ordered - no results
seen yet.

· Small amount of mineralization seen in basal
ganglia & left temporal lobe. This is atypical for
age and is uncertain etiology or significance.

---

**Summary of the Health Assessment (Head-to-Toe) — (include subjective & objective data)**

expo person(o) facial symmetry natural, mucous membrane
pink & moist, apex pulse 88, lung sounds even, clear
& unlabored, abdomen soft, nondistended, bowel sounds
x4, IV with 0.5% ½ infusion at 45, IV site wrapped with
gauze & tape, abd appeals to be infusing well, no S/S of
infiltration; PICC all extremities, no edema noted.

MUSC/SKELETAL

(intrasystem?)

**PATHOPHYSIOLOGY** (include information about the disease process/condition, possible sequelae of disease process/condition, treatment and medication regimens, abnormal lab values & their meanings, and abnormal diagnostic test results & their meanings. Supine are caused by malfunction of the brain electrical system that results from conflict & abnormal discharge. Seizures are defined as sudden & surge &
Signs & symptoms may include unccontrolled or altered
consciousness, involving awareness & change in perception
behavior, sensation & posture. (uncontrolled by EEG)

---

**PATIENT PROBLEM LIST** (at least three – these will be used to develop your nursing diagnoses)

**PRIORITIZED:**

↑ seizure activity r/t ... of infection/blood glucose – reduced hyperglycemia
fluids, blood urea nitrogen

(*diagram signatures at bottom right*)

# PEDIATRIC NURSING CARE PLAN

Seizures, dev delayed, Om

Risk for injury, hypoxia +
aspiration R/T motor activity
loss of consciousness

NAME: Lindy Wright

DATE: 2-24-06

| IT | GOALS | INTERVENTIONS | RATIONALE | EVALUATI |
|---|---|---|---|---|
| | Will not experience injury, respiratory distress or aspiration as evidence by O2 sat will stay above 90%, no visible injury noted on 7-3 shift. | Time seizure<br><br>ABC's<br><br>protect child during seizure<br>Do not restrain child or use force<br>loosen restrictive clothing<br>Do not put anything in childs mouth (eg. tongue blades, food, or fluid) position child c̄ head midline not hyperextended if possible to Pad objects such as crib, siderails or wheelchair<br><br>If child begins to vomit, turn to side<br><br>Administer O2 if needed. | to determine possible hypoxia + need for ER care. * Wongs Nursing Care of Infants + Children 7th Ed. pg 1697.<br><br>protect from what?<br>to prevent inflicting injury to child or self * Wongs Nursing Care of Infants + children 7th Ed. pg 1697<br><br>Can cause injury, obstruct breathing or be aspirated. * Wongs Nursing Care of infants + children. 7th Ed. pg 1697<br><br>promote adequate ventilation. to lessen injury. * Wongs Nursing Care of infants + children 7th Ed. pg 1697<br><br>to prevent aspiration * Wongs Nursing Care of infant + children 7th Ed. pg 1697.<br><br>Supplies adequate tissue perfusion. * Wongs Nursing Care of infants + children pg 1697<br>indicator of ... tissue | Child exhi no signs physical or injury or asp<br><br>Childs O2 S stayed abo no s/s of hy |

✓ O2 sat periodically (per childs order)
have Suction available (order obtained)

# PEDIATRIC NURSING CARE PLAN

Seizures, dev delayed, 0m

Risk for injury R/T to type of Seizure.

NAME: Lindy Wright

DATE: 2-24-06

| NT | GOALS | INTERVENTIONS | RATIONALE | EVALUAT |
|---|---|---|---|---|
| self ther ods vity ys | will not experienc Seizure activity on 7-3 Shift | Administer antiseizure medications. Tegretol ordered per md. making sure to comply c regiment times. | helps to prevent Seizure activity *Wongs Nursing Care of Infant + children. 7th Ed. pg 1692. | Child re- free of s activity o Shift as s stayed calm d |
| | will not experienc medication complications on 7-3 Shift | Avoid precaptors of seizure activity Teach family when appropriate the administration of meds. Teach to identify unfavorable reactions to meds | helps with preventin of Seizure activity + prvides knowedge for care givers. * Wongs Nursing Care of infant +children 7th ed. pg1692 | family demo an understa of unfavorable to meds as stated they would report o of Shortness of |
| | will not experience injury on 7-3 Shift | Stress Importance of compliance | helps prevent seizure activity * Wongs Nursing Care of Infant + children 7th Ed. pg 1692 | or any Abnor Signs during administ 7-3 shift. |
| | PgB? | Encourage periodic physical + laboratory assessment. | to determine possible deviations from normal findings. * Wongs Nursing Care of Children + Infants 7th Ed pg1697 | Family agree on appropriate for child on A&B status |
| | | Educate parents + child regarding appropriate activities for child. supervision during bathing | helps prevent injury * Wongs Nursing Care of Children + Infants 7th Ed. pg 1697 | would wat the child on SA with child bath and activities. |

**Pediatric Nursing Care Plan #1**

Diagnosis #1: At Risk for Injury R/T Seizure activity

Risk for Hypoxia "ABC's" first & foremost.

| | Goals/Expected Outcome/Criteria | Nursing Interventions | Rationale w/references | Eval |
|---|---|---|---|---|
| state | Pt will not experience any injury during 1-3 shift. As evidence of no seizure activity. | ① Pad objects such as crib institute seizure precaution; pad O₂, airway ② administer anti-epileptic meds, Tegretol ordered per md. ③ Educate parents & child regarding appropriate activities ④ monitor lab values & diagnostic test ⑤ Encourage adequate dietary intake + type/food appropriate ⑥ Administer O₂ if needed | * See reference at bottom of pg. ① helps prevent injury. ② meds decrease the chances of seizure activity. ③ if not educated further injury may result. ④ indicators of metabolic disturbance (disturbance test) indicators of brain lesions + nervous dysfunction ⑤ prevents deficiency of required nutrients. ⑥ Supplies adequate tissue perfusion | ① Pt ... |

Reference = ( Nursing Care of Infants & Children 7th Edition
PG 1693 )

ng Diagnosis #2: At Risk for Aspiration R/T motor activity + loss of ~~Same as Risk for Injury~~

| | | | |
|---|---|---|---|
| | ① Pt will exhibit no signs of aspiration<br><br>as evidence by tolerating clean liquid well and<br><br>...liquid only. | All these are what to do during seizure<br><br>① nothing in childs mouth during seizure episode<br><br>② loosen clothing<br><br>③ Position child with head midline; not hyperextended<br><br>④ turn to side if vomits<br><br>⑤ put O2 + suction at bedside | ✳ see reference at bottom of page all from:<br><br>① can cause injury and aspiration.<br><br>② Restricts movement or breathing<br><br>③ promotes adequate ventilation.<br><br>④ prevents aspiration.<br><br>⑤ for adequate tissue perfusion + keep oral pharnyx clear of airway obstruction. | Goal m<br>① Pt exp<br>signs of<br>aspirat<br><br>tolerate<br>Clears<br>with no<br>s/s of<br>swallo<br><br>~~First~~ |

2 hrs.
...nmay potential
...that may cause seizure
...What else could
...way (the nurse) do
...help prevent seizure
✳ Wong
...Nursing care of infants + Children
P. 1693

Pediatric Assessment Tool (5 Points Total)

| | Possible Points | Earned Points |
|---|---|---|
| Identifying Data | 0.5 | |
| Chief Complaint | 0.5 | |
| Present Illness | 0.5 | |
| Birth History | 0.5 | |
| Previous History | 0.5 | |
| Immunizations | 0.5 | |
| Growth and Development | 0.5 | |
| Assessment | 0.5 | |
| Personal/ Social | 0.5 | |
| Medication List | 0.5 | |

Narrative Head-to-Toe Assessment Note

| | Possible Points | Earned Points |
|---|---|---|
| Pathophysiology (10 points total) | 1.0 | |
| Disease process/condition statement | | |
| Sequele of disease process/ condition statement | 2 | |
| Treatment and medication regimens | 2 | |
| Abnormal lab values & their meanings | 2 | |
| Abnormal diagnostic test results & their meaning | 2 | |
| | 2 | |

Prioritized Patient Problem List (at least three)

| | Possible Points | Earned Points |
|---|---|---|
| | 1 | 1.5 |

not listed Medium (wgmp

The Care Plan (Nursing Diagnoses- at least three with four nursing interventions each) (5.5 point total)

| | Possible Points | Earned Points |
|---|---|---|
| Subjective Data | 0.5 | |
| Objective | 0.5 | |
| Nursing Diagnoses (RT, AEB) | 0.5 | |
| Patient Goals (include time frames) | 0.5 | |
| Nursing Interventions (frequency, specifics) | 0.5 | |
| Rationales | 1.0 | |
| Implementations | 1.0 | |
| Evaluation | 0.5 | |
| References Cited | 0.5 | 0.5 |
| The Teaching Plan (two topic areas, get specific) | 2.5 | |

| Total Points Possible | 25 | |

Total Points Earned _19._



Student Signature _____ Date _____

Instructor's Signature _____ Date 3/2/06

*This form must be stapled to the front of the entire assignment.

PLAINTIFF'S EXHIBIT

17

May 19, 2006

Chattahoochee Valley Community College
Attn: Dean of Students
2602 College Drive
Phenix City, AL 36869

Dean Hodge,
     I would like to take this opportunity to ask for course forgiveness for Nursing 252. After researching the student handbook, I found that it is a student's responsibility to ask for course forgiveness. The student handbook states "if a student repeats a course, the last grade awarded replaces the previous grade earned" (Page 59). I was given the opportunity to take Nursing 200 this past semester to replace Nursing 252 due to the fact this class would not be offered again. Mrs. Dixie Peterson offered this class to me, along with another student, and stated that the grade earned in Nursing 252 would not be held against me. In turn, I have earned an A in Nursing 200. This allowed me to get the credit needed to graduate.
     I have since finished the last semester of the Associate Degree of Nursing program. Unfortunately, I earned a D in Pediatric Nursing. I am asking for course forgiveness so that I can participate in a summer class to earn the credit to finish this program.

Sincerely,

Lindy Wright

6/29/06 - Course forgiveness not granted.
There is no repeat of Nur 252,
the exact same course

ADMISSIONS
Received
MAY 22 20__
SCA

received
Friday, May 19
4:05 pm



*CONNIE COOPER*
*Attorney at Law*
*P.O. Box 3110*
*Phenix City, AL 36868*
*(334) 297-9442*
*Fax: (334) 297-6008*
June 7, 2006



PLAINTIFF'S EXHIBIT
18

Dr. Laurel M. Blackwell
Chattahoochee Valley Community College
2602 College Drive
Phenix City, AL 36869

RE: My client, Lindy Gale Wright

Dear Dr. Blackwell,

I represent Ms. Lindy Gale Wright. I have previously had contact with Dean Lowe regarding problems my client has encountered as a nursing student at the school.

Ms. Wright finished the Associate Degree program this semester. In order to fully inform you of the problems, I will outline what has taken place.

Ms. Wright currently has a GPA of 3.2. She was informed she had failed Nursing 252, medical surgical nursing. Ms. Lynn Harris, instructor, informed Ms. Wright that Nursing 200 would be substituted for the Nursing 252 due to course curriculum changes in the program. Ms. Wright successfully completed this course, obtaining an A grade. Her final semester, summer 2006, she was informed she had failed Pediatric Nursing 272. Ms. Wright obtained copies of her care plans (which comprise a portion of the course grade) from Bridgette Jackson, clinical instructor. I have those care plans which appear to indicate that my client's grades were changed on three occasions. That aside, my client was willing to take re-take Nursing 272 which is being offered this summer in order to graduate. She also turned in a request for course forgiveness. She has attempted to contact Dean Lowe, Ms. Dixie Peterson and Sanquita Alexander in order to be allowed to be placed in Nursing 272. She has had no response from this request. She has been informed by both Dean Lowe and Dixie Peterson that due to the fact

that she failed Nursing 252, she now has two failures and cannot continue in the program. I personally assisted Ms. Wright with what we believed was a successful resolution of the Nursing 252 issue in that the Nursing 200 course would substitute for Nursing 252, as long as Ms. Wright successfully passed Nursing 200. It appears Dean Lowe is now denying that this was the resolution reached by all involved. There would have been no reason for my client to take Nursing 200 unless this would have assisted her to graduate.

My client has personal knowledge that there is a student currently enrolled in Nursing 272, Pediatric Nursing, who previously failed this course and is being allowed to take 272 this summer. My client should be allowed to retake Nursing 272 this summer in order to graduate.

My client has personal knowledge of another student who had two failures in the nursing program and was allowed to graduate.

Additionally, my client has informed me that there were numerous problems within the program which included that the students had no instructor for the first 5 weeks of the second semester, no instructor for clinical on two occasions, instructors were late for class, teachers were unprepared for class, instructors not following their course syllabus and most importantly my client was accused of cheating and this information was relayed to other students in the program. It appears there was constant turmoil in this program.

The only goal my client has is to graduate, sit for the nursing boards and start her career as a nurse. She contracted with your school, paid her tuition and we believed successfully completed the requirements of the nursing program. (She is willing to take Nursing 272 this summer).

This has been extremely stressful to Ms. Wright who is now in her 8th month of pregnancy. We know of no resolution if the school is unwilling to follow procedure outlined in the student handbook and the agreement reached with Dean Lowe. The only alternative is to file a lawsuit for breach of contract.

We would like to resolve this without litigation but feel that unless a resolution can be had within 7 days, we will be unable to resolve the matter.

Please contact me within 7 days if you feel there is a resolution to this matter.

PL 00121

Thank you for your prompt attention.

Sincerely,

Connie Cooper

cc: James Lowe
    Dixie Peterson

PL 00122

# Chattahoochee
## Valley Community College



*Laurel M. Blackwell, Ed.D.*
*President*

*3002 College Drive*
*Phenix City, Alabama 36869*
*(334) 291-4981*
*(334) 291-4910(fax)*

June 13, 2006

Ms. Connie Cooper, Esq.
Attorney at Law
P.O. Box 3110
Phenix City, AL 36868

Dear Ms. Cooper:

This letter is in reference to the letter received by Chattahoochee Valley Community College on June 9, 2006 regarding Ms. Lindy Gale Wright.

Ms. Wright was admitted under the Nursing Career Mobility Admission Criteria as listed in the 2004-2005 Chattahoochee Valley Community College Catalog and Student Handbook.

The following responses are based on our established institutional nursing policies published on Page 106 of the 2004-2005 Chattahoochee Valley Community College Catalog and Student Handbook:

**Policy # 11**
Students enrolled in the Nursing Mobility program must earn a "C" or higher in all required courses in the nursing curriculum, in both nursing and non-nursing courses. This includes satisfactory completion of the clinical components of each course. Failure of clinical components results in failure of the course.

- Ms. Wright failed NUR252 in Fall 2005 with an earned grade of "D".
- In Spring 2006, Ms. Wright failed NUR272 with an earned grade of "D".

**Policy # 13**
Nursing courses NUR 252, 271, 272, 279, 291, and 292 may be repeated only once and are to be taken the next semester a course is offered provided space is available. If the student does not pass the nursing course on the second attempt, that student shall be excluded from the nursing program, but not the College. Students who repeat 252, 271, 272, 291, and 292 will be encouraged to successfully complete review packets for each course before retaking.

- NUR252 would not be offered again because of the implementation of the standardized statewide curriculum, so a substitute had to be offered in order for Ms. Wright to be able to repeat the course. As a result, NUR200 was substituted for the course, NUR252, which will no longer be offered.

- However, NUR200 did not take away the failing grade of NUR252; it merely allowed an opportunity for Ms. Wright to repeat a failed course.

**Policy # 14**

The nursing student must complete the entire nursing program within twenty-four months of the date he/she begins his/her studies in the program or be excluded from the nursing program. If a nursing student fails two different nursing courses within the twenty-four-month period, he/she will be excluded from the program and CANNOT reapply. Exclusion from the nursing program does not constitute exclusion from the College.

- Ms. Wright failed NUR252 in Fall 2005 with an earned grade of "D".
- In Spring 2006, Ms. Wright failed NUR272 with an earned grade of "D".
- Ms. Wright failed two different nursing courses within a twenty-four month period, which results in her exclusion from the program. According to our policy, she will not be allowed to take any further nursing courses at Chattahoochee Valley Community College.

Attached are copies of the policies from the Nursing Career Mobility Criteria Program as listed in the 2004-2005 Catalog. These long-standing policies have guided all the actions taken in regards to Ms. Wright's enrollment at Chattahoochee Valley Community College.

Sincerely,

Laurel M. Blackwell

Laurel M. Blackwell, Ed.D.
President

LB/LH/hc

cc:    Dr. James Lowe
       Dixie Peterson



PLAINTIFF'S
EXHIBIT
20



# Chattahoochee
### Valley Community College

June 30, 2006

Lindy Wright
7716 Boulder Drive
Columbus, GA 31909

Dear Lindy:

We regret to inform you that your Request for Academic Bankruptcy was not approved for the following reason:

- You've requested course forgiveness for NUR252. Course forgiveness can only be implemented when the same course and course number has been repeated. After researching your records, we found no repeat of NUR252.

Should you have questions concerning this matter, please contact Sanquita Alexander at (334) 291-4996.

Sincerely yours,

David N. Hodge, Ed. D.
Dean of Student & Administrative Services

SCA

2602 College Drive • Phenix City, Alabama 36869 • 334.291.4900

PLAINTIFF'S
EXHIBIT
21

# DEPOSITION OF LAUREL BLACKWELL, Ed.D.

## July 17, 2007

## Pages 1 through 106

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**



**Page 1**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3        EASTERN DIVISION
4
5   LINDY G. WRIGHT,
6      Plaintiff,
7   vs.       CIVIL ACTION NO.
            3:06-CV-1087-WKW
8
9   CHATTAHOOCHEE VALLEY
   COMMUNITY COLLEGE (CVCC),
   et al.,
10
11     Defendants.
12
     * * * * * * * * * * * * *
13
14
15   DEPOSITION OF LAUREL BLACKWELL, Ed.D,
16   taken pursuant to stipulation and agreement before
17   Lyn Daugherty, Certified Shorthand Reporter and
18   Commissioner for the State of Alabama at Large, in
19   the Law Offices of Parker & Cooley, 1507 Broad
20   Street, Phenix City, Alabama, on Tuesday, July
21   17th, 2007, commencing at approximately 10:15 a.m.,
    E.D.T.
22
23      * * * * * * * * * * * * *

**Page 2**

1
2       APPEARANCES
3   FOR THE PLAINTIFF:
   Ms. Jennifer B. Cooley
   PARKER & COOLEY
4   Attorneys at Law
   1507 Broad Street
5   Phenix City, Alabama 36867
6   Mr. Peter A. Dumbuya
   Attorney at Law
7   P.O. Box 3302
   Phenix City, Alabama 36868
8
9   FOR THE DEFENDANT:
10   Mr. H.E. Nix, Jr.
   Ms. Brandy F. Price
11   NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
   Attorneys at Law
12   4001 Carmichael Road, Suite 300
   Montgomery, Alabama 36106
13
14   ALSO PRESENT: Ms. Lindy Wright
15
     * * * * * * * * * * * * *
16
17
18      EXAMINATION INDEX
19   LAUREL BLACKWELL, Ed.D.
20    BY MR. DUMBUYA . . . . . . . . . 6
21    BY MS. COOLEY . . . . . . . . . 60
22
23    (Index continued on next page)

**Page 3**

1
2       EXHIBIT INDEX
           MAR
   Plaintiff
3
   1   Letter dated June 7, 2006 to Dr. Laurel    60
4     M. Blackwell from Connie Cooper
5   2   Letter dated June 13, 2006 to Ms. Connie    61
     Cooper from Laurel M. Blackwell, Ed.D.
6
7   3   Letter dated July 28, 2006 to Dr. Laurel    64
     Blackwell from Jennifer Cooley
8
9
10
11
12
     * * * * * * * * * * * * *
13
14
15
16
17
18
19
20
21
22
23

**Page 4**

1       STIPULATIONS
2    It is hereby stipulated and agreed by and
3   between counsel representing the parties that the
4   deposition of LAUREL BLACKWELL, Ed.D. is taken
5   pursuant to the Federal Rules of Civil Procedure
6   and that said deposition may be taken before Lyn
7   Daugherty, Certified Shorthand Reporter, and
8   Commissioner for the State of Alabama at Large,
9   without the formality of a commission, that
10   objections to questions other than objections as to
11   the form of the question need not be made at this
12   time but may be reserved for a ruling at such time
13   as the said deposition may be offered in evidence
14   or used for any other purpose by either party
15   provided for by the Statute.
16    It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23    It is further stipulated and agreed by and

Deposition of Laurel Blackwell, Ed.D.

July 17, 2007

Page 5

1 between the parties hereto and the witness that the
2 signature of the witness to this deposition is
3 hereby waived.
4 * * * * * * * * * * *
5   LAUREL BLACKWELL, Ed.D.
6   The witness, after having first been duly sworn
7 to speak the truth, the whole truth and nothing but
8 the truth testified as follows:
9   MR. NIX:  Peter, let me -- I
10   apologize to you first for
11   interrupting you.  I know you
12   need to start.  But last
13   Friday I mentioned to you the
14   fact that your wife had worked
15   at Chattahoochee Valley
16   Community College.  And I just
17   wanted to make sure that, you
18   know, there's not a conflict
19   or anything like that.  And so
20   I mention it again to you and
21   just say that if you -- if you
22   do feel there's a conflict or
23   if you've discussed the case

Page 6

1   with her to the extent that
2   she's given you any policies
3   or other things that might not
4   be policy but that might be
5   proprietary to the college
6   that I'd appreciate your just
7   letting me know if she has at
8   some point in time.
9   MR. DUMBUYA:  No.  She has no such
10   information.  As a matter of
11   fact, I did speak with her.
12   She was out of there before
13   she was enrolled in the
14   program.  I think she was only
15   there for one or two
16   semesters, but she was gone
17   before Ms. Wright was enrolled
18   in the program.  She only met
19   the plaintiff at the
20   St. Francis Hospital.  Is that
21   correct?  That's where you met
22   her?
23   MS. WRIGHT:  Yes.

Page 7

1   MR. DUMBUYA:  But you never knew
2   her when she was at CVCC?
3   MS. WRIGHT:  No.
4   MR. DUMBUYA:  I spoke to her and
5   she said she never --
6   MR. NIX:  Okay.  Thank you very
7   much.
8   EXAMINATION
9 BY MR. DUMBUYA:
10 Q.  If you would, could you state your name and
11   address, please.
12 A.  My name is Laurel Blackwell.  I live at 167
13   Glenwood Way.  And the mailing address is
14   Smiths Station, Alabama.
15 Q.  And how long have you lived at this
16   address, Dr. Blackwell?
17 A.  I moved there in May two years ago.
18 Q.  And before you moved to this address two
19   years ago, what was your previous address?
20 A.  I lived in Auburn.  Auburn, Alabama.  And
21   my address was 1257 Ingleside -- that's
22   I-N-G-L-E -- Ingleside Drive.
23 Q.  And for how long were you at the address in

Page 8

1   Auburn?
2 A.  From 1998 to when we moved here in '05.
3 Q.  2005?
4 A.  Uh-huh (positive response).
5 Q.  Now, at your current address in Smiths
6   Station, who lives with you at that
7   address?
8 A.  Just my husband.
9 Q.  Your husband?
10 A.  Uh-huh (positive response).
11 Q.  And your husband has been at this
12   address -- the current address with you
13   since 2005; is that correct?
14 A.  Correct.
15 Q.  Do you have any children living with you at
16   this address?
17 A.  No.  Our children are grown.
18 Q.  Do any of your children live in Alabama?
19 A.  I have two children -- no, three children.
20   One just moved back.  I have three children
21   in Alabama.  One in Dothan and two in the
22   Huntsville area.
23 Q.  You said one of them just moved?

2 (Pages 5 to 8)

Case 3:06-cv-01087-WKW-WC    Document 21-28    Filed 11/07/2007    Page 4 of 28
Deposition of Laurel Blackwell, Ed.D.

July 17, 2007

Page 9

1  A.  Just moved to the Huntsville area from
2     Miami, Florida.
3  Q.  Oh, okay.  I thought that he moved in with
4     you.
5  A.  No.  They just moved back to Alabama from
6     Florida.
7  Q.  Dr. Blackwell, how long have you been
8     married to your husband?
9  A.  Since 1994.
10  Q.  And what is your husband's name?
11  A.  Fred A. Blackwell, Jr.
12  Q.  Is Mr. Blackwell employed at this time?
13  A.  Yes.
14  Q.  Who is employing him?
15  A.  He works for Michelin.
16  Q.  And where is he employed at this time?
17  A.  In Opelika.
18  Q.  Do you know his responsibilities at
19     Michelin in Opelika?
20  A.  He's human resources.  He oversees human
21     resources for the facility and governmental
22     affairs.
23  Q.  For how long has he been in that position?

Page 10

1  A.  He went to that position in 1997.
2  Q.  As someone in charge of the human
3     resources, what exactly does he do in that
4     position?
5  A.  He oversees a variety of things from -- he
6     oversees the hiring.  He oversees labor
7     negotiation.  He oversees safety.  He
8     oversees security, the EMTs.  I don't know
9     if I can tell you -- He's the interface
10     with the corporate office for human
11     resources.
12  Q.  Has he ever been employed by CVCC, your
13     husband?
14  A.  No.
15  Q.  Have any of your children ever been
16     employed by CVCC?
17  A.  No.
18  Q.  Do you currently have any relatives who are
19     employed by CVCC?
20  A.  No.
21  Q.  Dr. Blackwell, you are currently employed;
22     is that correct?
23  A.  That's correct.

Page 11

1  Q.  Who is your employer?
2  A.  I'm employed as the president of
3     Chattahoochee Valley Community College.  My
4     contract, though, is through -- from the
5     chancellor's office, so my supervisor is
6     the chancellor of the system.
7  Q.  This would be the chancellor of the
8     two-year --
9  A.  Alabama College System.
10  Q.  Of the Alabama College Systems?
11  A.  (Witness nods head).
12  Q.  Would this be the two-year colleges or the
13     four-year colleges?
14  A.  Two-year.  Public two-year colleges.
15  Q.  Who is the current chancellor of the
16     two-year --
17  A.  Bradley Byrne.
18  Q.  And where is the chancellor based?
19  A.  In Montgomery.
20  Q.  When did you become president of CVCC?
21  A.  I was appointed July 1st, 2002 as the
22     acting president.  In the summer of 2003 I
23     went through a national search and I was

Page 12

1     selected as the permanent president and
2     placed in that position in August of '03.
3  Q.  Now, who conducted the national search for
4     the president?
5  A.  The chancellor's office.
6  Q.  What is your term of employment?  Is it
7     five years, 10 years or --
8  A.  It's no end date in our employment.  I'm
9     not under contract.  I serve at the
10     pleasure of the chancellor and the State
11     Board of Education.
12  Q.  As president of CVCC, what are your
13     responsibilities?
14  A.  My primary responsibility is to provide
15     direction to the institution and to ensure
16     that policy and procedure established by
17     the State Board of Education and the
18     chancellor are implemented at our local
19     institution.
20  Q.  In the last five years -- You've been in
21     this position now since August of 2003; is
22     that correct?
23  A.  Permanently, yes.

Deposition of Laurel Blackwell, Ed.D.                                             July 17, 2007

| Page 13 |
|---|
| 1   Q.  And you were in the position in July 2002 |
| 2       in an acting position; is that correct? |
| 3   A.  Correct. |
| 4   Q.  Before you became acting president of CVCC, |
| 5       what other positions did you hold at CVCC? |
| 6   A.  I worked for two other colleges.  I worked |
| 7       at Southern Union State Community College |
| 8       in Opelika going there in 1998 when I moved |
| 9       to that area, to Auburn.  And prior to that |
| 10      I was at Wallace Community College in |
| 11      Dothan.  I went there in 1985. |
| 12  Q.  You went to Southern Union in '98.  When |
| 13      did you leave? |
| 14  A.  When I came to CVCC in '02. |
| 15  Q.  2003 -- 2002? |
| 16  A.  '02. |
| 17  Q.  Which positions did you hold at Southern |
| 18      Union? |
| 19  A.  I was in charge of work force development |
| 20      at Southern Union. |
| 21  Q.  What does that mean, work force |
| 22      development? |
| 23  A.  Preparing the work force.  It was a very |

| Page 14 |
|---|
| 1       external role working with business and |
| 2       industry, ensuring that our programs |
| 3       aligned with the needs of the region. |
| 4   Q.  Did you have any teaching positions at |
| 5       Southern Union? |
| 6   A.  I didn't teach at Southern Union, no. |
| 7   Q.  You said before that you were employed by |
| 8       Wallace Community College? |
| 9   A.  Uh-huh (positive response). |
| 10  Q.  Where is Wallace based? |
| 11  A.  In Dothan.  Dothan, Alabama. |
| 12  Q.  And Southern Union is in Opelika; is that |
| 13      correct? |
| 14  A.  That's correct. |
| 15  Q.  And what was your position at Wallace? |
| 16  A.  I had a number of positions over the years |
| 17      I was there.  But I went there in 1985, so |
| 18      over those years I did grant writing, grant |
| 19      implementation, advising, recruiting, some |
| 20      teaching.  As many years as I was there my |
| 21      responsibilities and roles grew and were |
| 22      diversified while I was there. |
| 23  Q.  You said you did some teaching? |

| Page 15 |
|---|
| 1   A.  I did some teaching. |
| 2   Q.  Which courses did you teach? |
| 3   A.  I did -- I taught a communications class. |
| 4       I taught some orientation classes, I |
| 5       believe some job search courses. |
| 6   Q.  And when did you leave Wallace Community |
| 7       College? |
| 8   A.  That's not an easy answer because I worked |
| 9       simultaneously for Wallace College and |
| 10      Southern Union.  I had an overlapping time |
| 11      period.  So I'll have to think if I can |
| 12      come up with that date.  Probably -- |
| 13      Probably February of 2000, although I'm not |
| 14      absolutely certain of that.  I believe it |
| 15      was February of 2000.  I believe I had |
| 16      about 18 months of overlapping where I |
| 17      worked for both institutions, for both |
| 18      Wallace and Southern Union. |
| 19  Q.  Were you employed full-time at Southern as |
| 20      well as at Wallace at the same time? |
| 21  A.  I was employed -- During that overlapping |
| 22      time I was employed by Wallace College and |
| 23      subcontracted by Southern Union.  So I was |

| Page 16 |
|---|
| 1       working half time at Wallace and half time |
| 2       at Southern Union. |
| 3   Q.  And why did you leave Wallace Community |
| 4       College? |
| 5   A.  Because my husband was transferred to |
| 6       Opelika. |
| 7   Q.  And why did you leave Southern Union? |
| 8   A.  For a promotion to presidency. |
| 9   Q.  And this would be the presidency at CVCC; |
| 10      correct? |
| 11  A.  That's right. |
| 12  Q.  Before your promotion to the presidency at |
| 13      CVCC, had you held any administrative |
| 14      positions? |
| 15  A.  I had been in administrative roles ever |
| 16      since I went into the college system in |
| 17      1985.  All my jobs were primarily |
| 18      administrative.  When I taught, I taught |
| 19      part-time, Mr. Dumbuya.  Most of my roles |
| 20      have always been administrative. |
| 21  Q.  Had you been head of department at Southern |
| 22      Union or Wallace? |
| 23  A.  Yes. |

Deposition of Laurel Blackwell, Ed.D.

**Page 17**

1   Q.  Had you been dean?
2   A.  No, I had not.
3   Q.  Now, Dr. Blackwell, what is your level of
4       education? I'm just going to limit you to
5       the college university level. What is your
6       highest degree that you have earned?
7   A.  My highest degree, I have an Ed.D. from the
8       University of Alabama. It's in
9       administration of higher education.
10  Q.  And when did you earn your Ed.D.?
11  A.  1994.
12  Q.  Did you specialize or did you take any
13      particular courses for you to earn the
14      Ed.D.?
15  A.  Well, the degree was administration of
16      higher education, so all of my course work
17      was -- all my course work was regarding
18      college administration.
19  Q.  Is there any particular specialty within
20      the administration courses?
21  A.  No.
22  Q.  It's just general administration?
23  A.  College administration, yes.

**Page 18**

1   Q.  And you earned this degree in 1994; is that
2       correct?
3   A.  Correct.
4   Q.  Did you have to write a dissertation or a
5       thesis?
6   A.  Yes, I did. I wrote a dissertation.
7   Q.  What was the title or subject of your
8       thesis?
9   A.  My dissertation was student satisfaction in
10      a community college setting.
11  Q.  And after you had earned your Ed.D., who
12      was your very first employer?
13  A.  I was employed at Wallace College during
14      that time. The entire time I was working
15      on my doctorate I was employed and working
16      on my doctorate simultaneously.
17  Q.  Do you have any other qualifications --
18      academic qualifications that --
19  A.  Well, I have -- if you mean credentials, I
20      have an associate degree of arts from
21      Cottey College, I have a bachelor of arts
22      from the University of Northern Iowa, and I
23      have a master's degree from the University

**Page 19**

1       of South Florida.
2   Q.  Have you taken any certificate programs
3       since you earned your Ed.D.?
4   A.  No.
5   Q.  Any other credentials that you have,
6       academic credentials?
7   A.  No. Much professional development, but not
8       academic credentials.
9   Q.  Do you have any continuing education
10      credits or things of that nature?
11  A.  I've done a great deal of professional
12      development and conference attendance, but
13      I've never requested CEUs.
14  Q.  Now, let me ask you, these are general
15      questions because this case is based in
16      this district of the U.S. District Court.
17      Are you a member of any civic
18      organizations?
19  A.  Yes.
20  Q.  Which ones do you belong to?
21  A.  I'm a member of the Rotary Club.
22  Q.  And for how long have you been a member of
23      that organization?

**Page 20**

1   A.  '02.
2   Q.  What do the Rotaries do generally?
3   A.  It's a civic organization designed to
4       contribute to the community.
5   Q.  Any particular contributions that you make
6       as a member of the organization?
7   A.  Those contributions are fund-raising to
8       help nonprofit entities, that sort of
9       thing.
10  Q.  Is that the only organization -- civic
11      organization you belong to?
12  A.  I belong to Chambers of Commerce and those
13      sorts of things that are work-related and I
14      have a church affiliation. But as far as
15      civic, that's probably the only civic
16      organization.
17  Q.  Which religious organizations do you belong
18      to?
19  A.  We're associated with Epworth United
20      Methodist Church here in Phenix City.
21  Q.  And how long have you been a member of this
22      particular church?
23  A.  I didn't say member. I said we're

**Page 21**

1      associated.

2   Q. Associated. Okay.

3   A. Because our membership is still in Dothan.

4      We've been associated with Epworth since we

5      moved -- before we moved to this

6      community. Give me just a moment. January

7      of '04 was when we affiliated. Prior to

8      that we were affiliated with First

9      Methodist Church in Opelika.

10   Q. Do you belong to any political

11      organizations?

12   A. No.

13   Q. Do you belong, Dr. Blackwell, to any

14      professional organizations?

15   A. Uh-huh (positive response). I'm a member

16      of AEA and NEA, Alabama Education

17      Association and National Education

18      Association. I'm a member of the Alabama

19      Presidents Association. That would be the

20      college presidents.

21   Q. Do you make any presentations to these

22      professional organizations in your capacity

23      as president?

**Page 22**

1   A. No.

2   Q. Dr. Blackwell, have you ever made any

3      application for any type of disability

4      benefit?

5   A. No.

6   Q. Have you been sued before?

7   A. Yes.

8   Q. In what capacity?

9   A. In my capacity as president.

10   Q. And what was -- just generally what was the

11      nature of that lawsuit?

12   A. It was an employee who was not selected for

13      advancement, was not selected for another

14      position.

15   Q. Was that the only lawsuit?

16   A. I think so.

17   Q. What was the outcome of that lawsuit?

18   A. Summary judgment in favor of the college.

19   Q. And when was that lawsuit filed? Do you

20      remember?

21   A. '02 or '03. Either '02 or early '03.

22   Q. Have you sued anyone before, Dr. Blackwell?

23   A. No.

**Page 23**

1   Q. Ever filed for bankruptcy before?

2   A. No.

3   Q. Have you given a deposition before,

4      Dr. Blackwell?

5   A. Yes.

6   Q. How many depositions have you given before?

7   A. I think two.

8   Q. Were those depositions in connection with

9      the lawsuit by the employee who was not

10      given a position?

11   A. Yes. I'm not sure the other one was,

12      Mr. Dumbuya. I'm trying to remember. I

13      can't tell you. If you need that

14      information, I could check. But I just --

15      I don't recall any better than that.

16   Q. Thank you very much.

17      Dr. Blackwell, you testified a moment

18      ago that you have been the permanent

19      president of CVCC since August of 2003; is

20      that correct?

21      MR. NIX: Did you say prominent?

22      MR. DUMBUYA: Permanent.

23      MR. NIX: Permanent. I'm sorry.

**Page 24**

1   A. Since August of 2003, yes.

2   Q. Dr. Blackwell, have you had occasion for

3      the faculty at CVCC to pass any votes --

4   A. Yes.

5   Q. -- on your position as president?

6   A. Yes.

7   Q. What was the nature of the vote?

8   A. That was in summer of '05 there was a

9      no-confidence vote --

10   Q. This is summer of --

11   A. -- from the faculty senate.

12   Q. And why did the faculty senate pass a vote

13      of no-confidence?

14   A. Well, I suppose you would have to ask them

15      that.

16   Q. But they never explained to you why that

17      happened?

18   A. They forwarded that letter to the

19      chancellor and then the chancellor

20      interacted with the faculty senate on that

21      matter.

22   Q. But the faculty senate never sent you a

23      copy of that correspondence; am I correct?

July 17, 2007

Deposition of Laurel Blackwell, Ed.D.

Page 25

1  A. They hand-carried me the letter that they
2     had written to Dr. Johnson, and there was
3     no correspondence between them and me.
4  Q. Do you have a copy of that correspondence?
5  A. Yes. It just says simply one sentence, I
6     believe. We regret to inform you that a
7     vote of no-confidence was -- something like
8     that. A one-sentence letter.
9  Q. Would you make a copy of that available to
10    us?
11 A. Certainly.
12    MR. NIX: You can -- Well, if you
13        don't mind, Peter, request --
14        if you want something, request
15        it through me. I'll be glad
16        to consider it and either
17        object to it, produce it or
18        whatever. But I would like to
19        pass on anything that is
20        produced or that is requested.
21    MR. DUMBUYA: Sure enough.
22 A. Certainly I'd defer to my counsel.
23    MR. DUMBUYA: I mean, you can --

Page 26

1        we'll make a request
2        accordingly.
3  Q. Who makes up the faculty senate at CVCC?
4  A. It is faculty members that they select.
5     It's a self-selecting body. It's not an
6     official part of the college, so I don't
7     provide any oversight to that. It's a
8     self-selecting process.
9  Q. Dr. Blackwell, as part of your
10    responsibilities as president, do you often
11    meet with students who have a problem at
12    CVCC?
13 A. No, I do not. That would not be something
14    that I would normally do.
15 Q. But have you met with any students in the
16    past, you know, since you've become
17    president?
18 A. Upon occasion.
19 Q. On those occasions in which students came
20    to you, what was the nature of the
21    discussions?
22    MR. NIX: You mean every one?
23 Q. Any example would suffice of students

Page 27

1     coming to your office to talk to you.
2     MR. NIX: An example? Is that
3        what you want?
4     MR. DUMBUYA: Yeah.
5  A. Well, a student might come to see me from a
6     range of reasons from they want a letter of
7     reference to they're unhappy with a faculty
8     member. But those visits with me from a
9     student are rare.
10 Q. Have you ever met with the plaintiff in
11    this case, Ms. Wright?
12 A. Yes. Ms. Wright came to see me.
13 Q. How many times did she come to see you?
14 A. Only once.
15 Q. Do you remember when that was?
16 A. No. Huh-uh (negative response).
17 Q. Do you remember why she came to see you?
18 A. Ms. Wright was coming because she was
19    dissatisfied with a decision that had been
20    made regarding her attendance at the
21    college, in the nursing program
22    specifically.
23 Q. You say you don't recall when she came to

Page 28

1     see you?
2  A. No. I don't remember which semester it
3     was, if it was -- if it was at the first
4     semester where she failed courses or if it
5     was the second semester when she failed the
6     courses.
7  Q. Do you remember any particular course that
8     she came to talk to you about?
9  A. No. I don't remember the specifics of our
10    conversation.
11 Q. You don't have any recollections of that?
12 A. No. I do not remember specifics of our
13    conversation.
14 Q. Do you have a present recollection of how
15    that particular issue was resolved when she
16    came to see you?
17    MR. NIX: I'm sorry?
18 Q. What was resolved when Ms. Wright came to
19    see you?
20    MR. NIX: If anything.
21 Q. If anything.
22 A. Nothing was resolved when Ms. Wright came
23    to see me.

Deposition of Laurel Blackwell, Ed.D.

Page 29

1  Q.  Dr. Blackwell, do heads of departments
2      report to your office?
3  A.  No.
4  Q.  Do deans report to your office?
5  A.  Deans report to my office.
6  Q.  And would those reports include any reports
7      from heads of departments?
8  A.  Let me back up and talk about the
9      organizational chart, because there are
10     some exceptions to what I just said. An
11     organizational chart would look like this;
12     the State Board of Education, the
13     chancellor and then me and then my direct
14     reports that include two deans, and then
15     the instructional part of the college
16     reports to the dean of instruction. The
17     dean of student and administrative services
18     has another tier of people that report to
19     him. I have a few reports that are
20     directors, but -- would you like me to show
21     you?
22  Q.  Well, all of those reports having to do
23     with anything --

Page 30

1  A.  To do with instruction?
2  Q.  -- to do with the instruction of the
3      nursing program regarding this particular
4      plaintiff?
5          MR. NIX:  Regarding -- I'm sorry.
6      You're asking her to describe
7      for you reports that she would
8      obtain or that she did obtain
9      regarding Ms. Wright?
10         MR. DUMBUYA:  No.  Generally
11     whether she did receive
12     reports from the deans of the
13     various colleges.
14         MR. NIX:  So this is not
15     specifically related to --
16         MR. DUMBUYA:  No, not yet.  I'm
17     working my way through.
18  A.  Two deans report to my office, the dean of
19     instruction and the dean of student and
20     administrative services.  Two deans.
21  Q.  Are those the only two deans you have at
22     CVCC?
23  A.  The only two deans we have at the college,

Page 31

1      yes.
2  Q.  So they report to you?
3  A.  Yes.
4  Q.  Would the deans' report include reports
5      from the heads of their departments?
6  A.  The heads of the departments report to
7      those deans, yes.  Department chairs report
8      to the dean, instructional department
9      chairs, if that's what you're asking.
10  Q.  And then the deans report to you; is that
11     correct?
12  A.  Yes.  Uh-huh (positive response).
13  Q.  Now, in any of those reports since you've
14     been president, have those reports included
15     any information about the plaintiff in this
16     case, Ms. Wright?
17         MR. NIX:  You mean a written
18     report from a dean?
19  A.  Are you talking about a written report?
20  Q.  Any written reports.
21  A.  No.  Not that I -- Not that I have any
22     recollection of a written report.
23  Q.  But has any of the deans or the heads of

Page 32

1      programs or departments ever come to your
2      office to discuss the plaintiff in this
3      case?
4  A.  Yes.  At the end of fall 2004 --
5          MR. NIX:  We're talking deans now?
6  Q.  Deans or heads of departments or programs.
7  A.  Dean Lowe discussed with me at the end of
8      fall 2004 that there was a nursing student
9      that had two failures.  That was just by
10     matter of -- by manner of letting me know
11     that there was a problem.  I don't think I
12     knew the student's name at that time.
13  Q.  Did Dean Lowe mention the two failures in
14     terms of course numbers?
15  A.  I doubt it.
16  Q.  So Dean Lowe never mentioned the student's
17     name; is that correct?
18         MR. NIX:  She did not say that.  I
19     object to the form of the
20     question in that you seem to
21     be quoting something that --
22         MR. DUMBUYA:  (Shakes head).
23         MR. NIX:  You're not.  Okay.

Deposition of Laurel Blackwell, Ed.D.

July 17, 2007



**Page 33**

1　　　　MR. DUMBUYA: She mentioned that
2　　　　there was no name given. I'm
3　　　　just trying to make sure that
4　　　　I heard what she said. She
5　　　　mentioned that she didn't
6　　　　think Dean Lowe mentioned a
7　　　　name.
8　Q.　Is that correct?
9　A.　I really don't recall something that was in
10　　　2004 that at that time didn't have any
11　　　particular significance. It was just a
12　　　passing notification to me that we had a
13　　　nursing student that had failed two
14　　　courses.
15　Q.　But the dean never mentioned which two
16　　　courses?
17　A.　I wouldn't remember that.
18　Q.　Did any of the heads of departments -- I'm
19　　　calling them heads of departments. Is that
20　　　how you call them at CVCC?
21　A.　They're department chairs if they're a
22　　　faculty member. If it's instruction,
23　　　they're a faculty chair.

**Page 34**

1　Q.　Department chair?
2　A.　Uh-huh (positive response).
3　Q.　Did any department chairs ever mention the
4　　　plaintiff to you?
5　　　　MR. NIX: You're talking about in
6　　　　what time frame, Peter?
7　　　　MR. DUMBUYA: 2004
8　　　　MR. NIX: And let me just say,
9　　　　you're not asking her about
10　　　　discussions she's had with
11　　　　us --
12　　　　MR. DUMBUYA: No, no, no.
13　　　　MR. NIX: -- where there may have
14　　　　been a department person or
15　　　　anything like that? You're
16　　　　talking about just in the
17　　　　ordinary course of --
18　　　　MR. DUMBUYA: Department chairs.
19　　　　MR. NIX: -- ordinary course of
20　　　　business?
21　　　　MR. DUMBUYA: Right.
22　A.　I don't think I had any interaction with
23　　　the nursing chair at that time.

**Page 35**

1　Q.　This is 2004 in the fall semester?
2　A.　Right. At Christmas. As we were finishing
3　　　the semester.
4　　　　MR. NIX: I know y'all are talking
5　　　　'04, but you know that it's
6　　　　not '04.
7　　　　MR. DUMBUYA: I'm sorry?
8　A.　Oh, it's my mistake.
9　　　　MR. NIX: You know you're talking
10　　　　'04? It's not -- It's not a
11　　　　big deal.
12　A.　It's '05.
13　Q.　2005.
14　A.　Excuse me. It's '05.
15　Q.　In the spring semester of 2006, did Dean
16　　　Lowe talk to you again about a student
17　　　failing in the nursing program?
18　A.　Yes. Because that's where the graduation
19　　　ceremony is. And so if there's a nursing
20　　　student that does not make it through the
21　　　progression, they'll let me know that
22　　　there's someone that's not going to
23　　　graduate. I'm the -- I preside over

**Page 36**

1　　　graduation, so I'll know in that context.
2　Q.　Did Dean Lowe mention any particular names
3　　　of students who are not going to graduate?
4　A.　I'm sure he did.
5　Q.　Did he mention the name of the plaintiff,
6　　　Lindy Wright, to you on that occasion?
7　A.　I don't know that for certain. I assume
8　　　that if a student was not going to qualify
9　　　for graduation and I was not going to award
10　　　them a credential I would have known the
11　　　name. But I don't have any recollection of
12　　　that.
13　Q.　Now, who is in charge of -- or who is the
14　　　department chair for the nursing program at
15　　　CVCC?
16　A.　That's Dixie Peterson.
17　Q.　Do you know how long she has been in that
18　　　position?
19　A.　Mrs. Peterson has been a nursing faculty
20　　　member for more than 20 years at CVCC. 22
21　　　or 23, something like that.
22　Q.　Do you know when she became chair of that
23　　　department?

Case 3:06-cv-01087-WKW-WC    Document 21-28    Filed 11/07/2007    Page 11 of 28
Deposition of Laurel Blackwell, Ed.D.

July 17, 2007

Page 37

1  A.  It predated me, and I don't know how many
2      years ago.
3  Q.  So she's been there as chair of the
4      department before you were employed as
5      president; is that correct?
6  A.  Yes.  And I believe maybe almost 20 years
7      as chair, but I really don't know that for
8      certain.
9  Q.  How many faculty members are in that
10     program since you've been president?
11         MR. NIX:  In the nursing program?
12         MR. DUMBUYA:  In the nursing
13     program, yes.
14 A.  You want to know full-time?
15 Q.  If you can break it down to full-time,
16     part-time.
17 A.  I can't do part-time because I don't hire
18     the clinical instructors myself.
19     Technically I sign the contract, but
20     Mrs. Peterson selects -- recruits and
21     selects the clinical instructors and
22     part-time instructors, so I couldn't speak
23     to that.  I think we have five full-time

Page 38

1      nursing faculty right now and then we use a
2      number of part-time and clinical
3      instructors each semester.
4  Q.  So your responsibility as president, if I
5      understand you correctly, is limited to
6      signing their contracts; is that correct?
7  A.  For part-time people?
8  Q.  For part-time people.
9  A.  Yes.  I don't select -- I don't recruit or
10     select part-time faculty.  That's up to the
11     department chair and the dean to consent --
12     consents on that.  Then I offer the
13     contract.
14 Q.  Since you've been president -- full-time
15     permanent president of the program -- this
16     is the nursing program -- has it ever been
17     placed on probation?
18 A.  I don't know if probation is the technical
19     term, and so I wouldn't want to speak to
20     whether that's the right term.  One
21     semester one year our board passage scores
22     were below what the state board required
23     and so we were in a -- we had a period of

Page 39

1      time to rectify that and bring those board
2      passage rates above the minimum standard.
3  Q.  What is the minimum standard on the board
4      passage rate?
5  A.  It's 80 percent at this time.  It was
6      previously 75 percent.
7  Q.  Was it 75 percent at the time when you were
8      hired as a full-time president?
9  A.  Yes.  Uh-huh (positive response).  It's
10     changed since I've been there.
11 Q.  To 80 percent now?
12 A.  Uh-huh (positive response).
13 Q.  And has the program met the 80 percent
14     threshold at this time?
15 A.  Yes.
16 Q.  So it's no longer on probation or whatever
17     the technical term may be; is that correct?
18 A.  No.
19 Q.  When was the probationary period for the
20     nursing program?
21 A.  I'm not certain I could answer that,
22     Mr. Dumbuya.  It was a one-year period and
23     I don't think I can answer that.

Page 40

1  Q.  Now, Dr. Blackwell, since you've been
2      president of CVCC, have you been aware of
3      any problems in terms of faculty in the
4      nursing program?
5  A.  Yes.
6  Q.  Any shortages in the number of faculty
7      required in the program?
8  A.  Well, I would not answer yes to that
9      question.  When we've had courses offered,
10     we've always had adequate faculty.  That's
11     required by the State Board of Education
12     and also our accrediting agency that we
13     always have adequate faculty in the
14     program.
15 Q.  What is adequate for the program to
16     continue to exist?  I mean, how many number
17     of faculty do you need to satisfy the
18     requirements?
19         MR. NIX:  You're talking nursing
20     program still?
21         MR. DUMBUYA:  The nursing program.
22 A.  I don't know that there's a number,
23     Mr. Dumbuya.  You have to have people as

Deposition of Laurel Blackwell, Ed.D.

**Page 41**

1  required to teach the lecture portion and
2  faculty properly credentialed and then you
3  have to have the number of faculty required
4  to provide the clinical component. There's
5  two components and you have to have all
6  those courses covered. I do not believe
7  there's a specific number that anybody
8  requires of us.
9  Q. Dr. Blackwell, have you had occasion since
10  you became president to visit any of the
11  nursing classrooms yourself?
12  A. Yes.
13  Q. Did you have occasion to visit any of those
14  nursing classrooms in which the plaintiff
15  was a student?
16  A. Yes, I did.
17  Q. Do you remember which one you visited?
18  A. I know exactly the date. It was August 31,
19  2000 and -- make sure I get my year right
20  this time – 6 -- no, 5. August 31, 2005.
21  Q. Do you remember the particular nursing
22  course that you visited?
23  A. No, I do not.

**Page 42**

1  Q. What was the reason for you to visit that
2  particular class?
3  A. I went to that class with Dean Lowe because
4  we had -- we had some problems in the
5  department that day and Mrs. Peterson was
6  off campus. We could not reach her.
7  Normally it would be something
8  Mrs. Peterson as department chair would
9  have managed, but she was not available
10  that day.
11  Q. What type of problem was it?
12  A. It was my understanding that the faculty
13  members were resigning that day. They were
14  leaving their positions that they were
15  contracted for and the students were
16  upset. So I went down with Dean Lowe in
17  the absence of Mrs. Peterson to ascertain
18  what was happening and to talk with the
19  students and to see the faculty.
20  Q. Who are the faculty members who were
21  resigning on this occasion?
22  A. Sandy Gunnels and Brenda Bellamy.
23  Q. Approximately how long after the beginning

**Page 43**

1  of the semester in 2005 -- the fall
2  semester in 2005 did these two faculty
3  members resign?
4  A. I'm sorry. Ask that question again.
5  Q. How soon after the fall semester began did
6  Ms. Gunnels and Ms. Bellamy resign?
7  A. I don't remember what the date was, the
8  first date on their contract. The first
9  date of classes was August 21st. Normally
10  the faculty's contract starts the week
11  before that, so I would -- I'm sure a week
12  prior to August 21st they went under
13  contract with the college for that year,
14  for that nine-month period, and they left
15  their positions on August 31st.
16  Q. Was there any particular reason or reasons
17  given for them leaving that you're aware of?
18  A. I was notified that they had -- one or both
19  had turned in a letter of resignation to HR
20  that day. And that was the first notice I
21  had that they were leaving and breaking
22  their contract.
23  Q. Were there any replacements for these two

**Page 44**

1  faculty members, Ms. Gunnels and
2  Ms. Bellamy?
3  A. We immediately began working on that. We
4  contacted the chancellor's office. This
5  was an anomaly to have faculty leave in the
6  midst of a contract. So we contacted the
7  chancellor's office because there is a
8  director of health programs, for the lack
9  of a better word -- I'm not sure that's
10  exact title -- but to seek his guidance and
11  hers because she oversees the health
12  programs throughout the state and the
13  system and began working on a resolution.
14  She came over immediately to begin helping
15  us work toward filling those positions,
16  and, in fact, the chancellor told her that
17  if she had to teach those classes herself
18  that that was to be the resolution. So we
19  began immediately to fill those slots.
20  Q. How soon were you able to fill those two
21  positions?
22  A. One of them was filled by September 14th
23  and the other was filled September 21st.

Page 45

1  Q.  In the meantime between the resignations
2     and the replacements, did you have anyone
3     teaching those courses for which these two
4     former faculty members were responsible?
5  A.  Well, one of those classes met one time
6     between the time there was a resignation,
7     and that would have been the 7th, because
8     they only met once a week.  And the other
9     class met twice, the 7th and the 14th,
10    before there was a replacement.  In each
11    case we had a substitute teacher there, as
12    we would always aspire to do when you have
13    a vacancy -- when you have a teacher's
14    absence.  Oftentimes classes are canceled
15    when a faculty member is sick or can't be
16    there.  In that case we arrange substitutes
17    instead of canceling the class.
18 Q.  And did these substitutes attend those
19    classes regularly as scheduled?
20 A.  Yes.
21 Q.  Whether it's once a week or twice a week --
22 A.  Only once a week.  Those classes met on
23    Wednesday.  So we had a substitute there on

Page 46

1     the 7th for the one teacher that resigned,
2     and we had a substitute there on the 7th
3     and the 14th for the other teacher that
4     resigned.
5  Q.  Were these substitutes also known as guest
6     speakers?
7  A.  Yes.  I believe that's what Ms. Peterson
8     arranged, yes, guest speakers.
9  Q.  And these are people trained in the nursing
10    program?
11 A.  I know that they were trained in the area
12    that Mrs. Peterson wanted lectures given
13    on, what she determined was appropriate
14    instruction, and so she arranged those
15    guests to come and provide instruction.
16 Q.  Do you have any present recollection of the
17    credentials of these substitutes that were
18    hired?
19 A.  No.  Because providing substitute teachers
20    would not be something that I would
21    normally be involved in.
22 Q.  Do you know for how long Ms. Gunnds was
23    employed at CVCC?

Page 47

1  A.  She was a part-time employee prior to my
2     arrival for a period of time.  And she was
3     a part-time employee some after I arrived
4     and then she was a full-time employee for
5     maybe just one semester.  Summer, summer
6     '05.
7  Q.  I'm sorry?
8  A.  Summer '05.
9  Q.  Do you know why Ms. Gunnds left CVCC?
10 A.  I do not.
11 Q.  Had you ever met with Ms. Gunnels herself?
12 A.  The day she was packing her office I went
13    to see her.
14 Q.  And was that the very first time you met
15    with her?
16 A.  No.  I've met with Ms. Gunnels as I offered
17    her employment.  Is that what you mean?
18    Yes.  Met with Ms. Gunnels well before I
19    offered her employment.  In 2002 I met her
20    first when I first was at the college and I
21    interviewed her and met her then.  And then
22    I saw Ms. Gunnels off and on during her
23    employment at the college.

Page 48

1  Q.  You also mentioned that Ms. Brenda Bellamy
2     also resigned?
3  A.  Yes.
4  Q.  Do you know why she resigned?
5  A.  No, I do not.
6  Q.  During any of the courses --
7  A.  Let me state I could go back to the
8     personnel file and see if there is a reason
9     in the letters of resignation, but I don't
10    recall that there is anything in the letter
11    of resignation.  Excuse me.
12 Q.  I was going to ask you about Ms. Bellamy.
13    Do you know for how long she was employed
14    at CVCC?  Brenda Bellamy?
15 A.  Ms. Bellamy had been employed at the
16    college prior to my arrival and then she
17    and her husband moved to another part of
18    the country.  She returned and we rehired
19    her full-time in January of '05.  I believe
20    she worked part-time some for the college
21    also.
22 Q.  Do you know any of the courses Ms. Gunnels
23    was teaching?

July 17, 2007

Deposition of Laurel Blackwell, Ed.D.

Page 49

1  A.  No.  I really don't assign instruction
2      within the department.  That's really what
3      the chair does.  So probably I don't know
4      what courses she taught, Mr. Dumbuya?
5  Q.  And would the same apply to Ms. Bellamy?
6  A.  Uh-huh (positive response).
7  Q.  Do you know -- You were here the last time
8      for the deposition of Ms. Wright.  There
9      was mention of a Tawanna Cash as an
10     instructor.  Do you know who this
11     individual is?
12 A.  I do.
13 Q.  Was she employed in the nursing program?
14 A.  She was.
15 Q.  Did you employ her?  Was she there before
16     you arrived?
17 A.  Ms. Cash was an employee at Southern Union
18     and she served as an interim -- an interim
19     contract with us after the resignations of
20     Mrs. Gunnels and Mrs. Bellamy.
21 Q.  Did you know which course she was
22     teaching?  Ms. Cash?
23 A.  I think she taught 271, but I'm not

Page 50

1      certain.
2  Q.  Would this be in the fall of 2005?
3  A.  That's correct.
4  Q.  This would be after the resignation of
5      Ms. Gunnels and Ms. Bellamy; is that
6      correct?
7  A.  That's correct.
8  Q.  Dr. Blackwell, were you aware of any
9      problems -- at least you sat in on the
10     depositions last Friday.  Were you aware of
11     any problems with the course Ms. Cash was
12     teaching in the fall 2005?
13 A.  Are you asking if there were problems with
14     Ms. Cash's instruction?
15 Q.  With the course itself, yes.
16 A.  I don't think I understand that question.
17     Are you asking if there were problems with
18     Ms. Cash's instruction in the course?
19 Q.  Yes.
20     MR. NIX:  Her instruction to the
21     students?
22 Q.  To the students.  You sat in on the
23     deposition on Friday.  She was mentioned as

Page 51

1      one of the instructors for Nursing 271?
2  A.  Correct.
3  Q.  Was it ever brought to your attention by
4      Mrs. Peterson that there was a problem in
5      her class?  Ms. Cash?
6  A.  No.
7  Q.  So you are not aware of the problems
8      relative to the plaintiff in Nursing 271 as
9      mentioned last Friday?
10 A.  I do not think I knew anything about any
11     problems with Mrs. Cash's provision of
12     instruction.
13 Q.  Now, Dr. Blackwell, you said you met with
14     Ms. Lindy Wright at least once; is that
15     correct?
16 A.  Yes.
17 Q.  You said -- But you could not give me
18     definite date or time as to when you met
19     her; is that correct?
20 A.  No, I cannot.
21 Q.  When did you become aware that she was
22     having problems in the nursing program?
23     Ms. Lindy Wright?

Page 52

1  A.  I expect that was at the end of fall
2      semester 2005 when she failed two courses.
3      MR. DUMBUYA:  Excuse me for just a
4      minute.
5      (Brief pause.)
6  Q.  You said you became aware of the problem.
7      Do you remember which semester it was?
8  A.  It would be at the end of fall 2005 when
9      she failed two courses.
10 Q.  Which two courses did she fail?
11 A.  I don't believe I knew that at the time.  I
12     think since then I would understand it was
13     Nursing 252 and Nursing 271.
14 Q.  You listened to the deposition on Friday.
15     271 was eventually awarded a grade of C?
16 A.  Administratively.
17 Q.  Administratively?
18 A.  Because Ms. Cash didn't provide a 10-day
19     turnaround on her response about
20     Ms. Wright's grades because she was
21     employed full-time at Southern Union, so
22     she was not under my supervision and
23     direction.  We didn't get her response in a

Page 53

1  timely manner. So administratively
2  Dr. Lowe determined that he should change
3  that D to a C since he didn't have
4  documentation from Ms. Cash.
5  Q. So that was at 271 and 252 in the fall
6  semester of 2005; is that correct?
7  A. Uh-huh (positive response).
8  Q. Were you aware of any other problems in the
9  next semester, which would have been spring
10  semester of 2006 with Ms. Wright?
11  A. I know that in 2006 -- spring of '06 I
12  would have learned that she would have
13  failed -- that she failed another course,
14  272.
15  Q. You would have known that in your position
16  as president of the college; is that
17  correct?
18  A. Correct.
19  Q. Were you aware of any attempts by
20  Ms. Wright to ask for grade forgiveness
21  regarding Nursing 252?
22  A. I think Dean Lowe mentioned that to me in a
23  meeting that Ms. Wright was requesting

Page 54

1  course forgiveness.
2  Q. Was that the extent of your knowledge about
3  that process?
4  A. In the course forgiveness, yes, I think
5  that's all I know.
6      MR. NIX: In the what forgiveness?
7  A. Course forgiveness.
8      MR. NIX: I thought you were
9          talking about grade
10          forgiveness. Were you asking
11          for grade --
12  Q. Is it called grade --
13  A. Grade forgiveness.
14  Q. Grade forgiveness.
15  A. Yeah. We need to make sure we're using the
16  right terms.
17      MR. NIX: Which were you asking
18          about? I'm sorry.
19  A. Yeah. I'm afraid I might have gotten lost
20  too.
21      MS. PRICE: Didn't you ask about
22          course 252?
23      MR. DUMBUYA: 252 was for grade

Page 55

1      forgiveness.
2  Q. It's mentioned variously as course
3  forgiveness.
4  A. It depends on which dean we're talking
5  about.
6      MR. NIX: You're looking at --
7  Q. This is Dean Hodge. He mentioned course
8  forgiveness. And then there is a grade
9  appeal form.
10      MR. NIX: I got you. So you're
11          referring to a file and some
12          documents and reading from
13          those and then asking about
14          the terms in those; correct?
15      MR. DUMBUYA: Yeah. Which
16          documents were introduced last
17          week, Plaintiff's Exhibits --
18          especially Defendant's Exhibit
19          Number 17, Defendant's Exhibit
20          Number 19 and Defendant's
21          Exhibit Number 20 there is
22          mentioned interchangeably
23          grade appeal, course

Page 56

1      forgiveness.
2      MR. NIX: Right. But you don't
3          expect even me to remember
4          which documents are 17, 18 or
5          whatever, do you?
6      MR. DUMBUYA: 17 was the letter
7          from Ms. Cooper. Those
8          documents will be introduced,
9          but they've already been
10          introduced last --
11      MR. NIX: I'm asking, though, you
12          don't expect anybody or
13          Dr. Blackwell to remember even
14          what document is Exhibit 17,
15          18 or 19, do you?
16      MR. DUMBUYA: Well, we'll mention
17          that in a few minutes.
18      MR. NIX: I mean, I'm just asking,
19          you're not asking her --
20      MR. DUMBUYA: I cannot vouch for
21          her respectfully.
22      MR. NIX: Well, I'm just asking
23          you -- I mean, you haven't

Page 57

1   referred to what the documents
2   are. You said they were
3   introduced by me, which is
4   correct. I did introduce a
5   number of documents during the
6   deposition of Ms. Wright. But
7   what you're doing at this
8   point is simply saying that
9   one of the documents says
10  something about course appeal,
11  one -- or grade appeal, one
12  says course forgiveness.
13  You're not questioning her is
14  what I'm asking you about what
15  Exhibit 17 is or what Exhibit
16  18 is or what the content of
17  those two documents are?
18  MR. DUMBUYA. No. The issue here
19  is whether it is course
20  forgiveness or grade
21  forgiveness.
22  MR. NIX: That's all I wanted to
23  make sure. I just want the

Page 58

1   record to be clear.
2   Q.  Again, that's -- I mean, you being the
3       president, but I've seen course forgiveness
4       or grade forgiveness. I didn't know which
5       one --
6   A.  There's -- Now I don't remember what the
7       question was. Can we go back to what the
8       question was?
9   Q.  The question was, on Nursing 252 you didn't
10      take part in any of that process in which
11      Ms. Wright was trying to appeal a grade?
12  A.  No. That would be done at a dean level.
13  Q.  And the same thing would apply for 272.
14      You would have no academic role to play in
15      the grade -- course forgiveness or grade
16      appeal process?
17  A.  No.
18  Q.  And that would be done by whom?
19  A.  You're talking about two different
20      processes, so that's important that we
21      differentiate.
22  Q.  Okay.
23  A.  A grade forgiveness process is done through

Page 59

1   Dean Hodge's office. That course process
2   of being able to repeat a course in the
3   nursing program happens with Ms. Peterson
4   and Dr. Lowe would be involved in that
5   process.
6   Q.  So these are two different processes?
7   A.  Two different processes involving two
8       different deans and neither of which I
9       would have been involved in. They happened
10      at dean level. Appeals happen at the dean
11      level -- the department chair and the dean
12      level.
13      MR. DUMBUYA: Excuse me just a
14      minute.
15      (Brief pause.)
16      MR. DUMBUYA: Mr. Nix, I have to
17      step out for an hour or two.
18      Ms. Cooley is going to
19      continue with the
20      questioning. I have another
21      assignment to take care of at
22      this time. Do you have any
23      problems with that?

Page 60

1   MR. NIX: I'm not used to it, but,
2       I mean, I'll try to
3       accommodate you if I can. I
4       mean, what's the -- are you
5       going to come back? Is that
6       what you're saying?
7       MR. DUMBUYA: Yes. We'll come
8       back. I will come back in the
9       afternoon. But I have to run
10      to Fort Valley and then come
11      back. But, yes, I will be
12      here in the afternoon if we
13      still have anything else to
14      do. But Ms. Cooley is going
15      to --
16      MR. NIX: Let me ask you this.
17      The notice itself established
18      a two-hour window for the
19      deposition. Is that something
20      that you anticipate will be
21      accurate?
22      MS. COOLEY: It will be. We
23      started at 10:20 and so we'll

Case 3:06-cv-01087-WKW-WC    Document 21-28    Filed 11/07/2007    Page 17 of 28
Deposition of Laurel Blackwell, Ed.D.

July 17, 2007

Page 61

1   go -- we can --
2   MR. DUMBUYA: It's now 11:23.
3   MR. NIX: That's fine. Peter,
4       thank you very much.
5   (Brief recess was taken.)
6   (Plaintiff's Exhibit 1 was marked
7       for identification.)
8   EXAMINATION
9   BY MS. COOLEY:
10  Q. This has previously been admitted as
11      Defendant's Exhibit 17. This would be
12      Plaintiff's Exhibit Number 1. And you were
13      present, Dr. Blackwell, during the
14      deposition. Y'all have copies of it. I've
15      already made two copies -- two additional
16      copies, which you already have the copies
17      again from Friday as well. Do you recall
18      receiving that letter?
19  A. I do.
20  Q. Did you have a response to Ms. Cooper?
21  A. Yes.
22  Q. Do you recall just initially or some type
23      of an overview of what your response back

Page 62

1       to Ms. Cooper was?
2   A. The broad overview of that correspondence
3       is that it is my belief that we followed
4       policy and procedure that's established
5       through our catalog that governs the
6       nurse's program.
7   Q. Would this be, in fact, the letter that you
8       would have sent back to her?
9   A. That's correct.
10      (Plaintiff's Exhibit 2 was marked
11          for identification.)
12  Q. And that letter was previously marked as
13      Defendant's Exhibit 19. That's going to be
14      our Plaintiff's Exhibit 2. And while
15      you're looking at that letter, were you
16      present when Lindy Wright was actually told
17      by Dean Lowe and Dixie Peterson that
18      Nursing 200 would replace 252?
19      MR. NIX: Object to the form of
20          the question.
21  Q. You can still answer. Were you, in fact,
22      present during that time that there was a
23      conversation between Dean Lowe, Dixie

Page 63

1   Peterson and Ms. Cooper regarding Lindy
2   Wright taking 252 to replace -- I'm
3   sorry -- 200 to replace 252?
4   A. And Ms. Cooper, I've never met Ms. Cooper.
5   Q. So you were not present --
6       MR. NIX: Object to the form.
7   Q. -- during that conversation?
8   A. (Witness shakes head).
9   Q. Were you told of that conversation
10      subsequently?
11  A. I knew that there was a proposed
12      substitution, yes.
13  Q. Were you aware or unaware that Nursing 252
14      would not be offered after 2005?
15      MR. NIX: Aware when? When were
16          you asking her whether she was
17          aware?
18  Q. Were you aware ever?
19      MR. NIX: Ever?
20      MS. COOLEY: Ever from 2005 from
21          that conversation on.
22      MR. NIX: Which conversation?
23      MS. COOLEY: Conversation that I

Page 64

1   just referenced with Dean
2   Lowe, Dixie Peterson, Connie
3   Cooper. She said she was told
4   subsequently of a
5   conversation, but she was not
6   present during the
7   conversation.
8   MR. NIX: It's not established
9       when the conversation took
10      place. She was told --
11  Q. From the point of that letter that you sent
12      back to Ms. Cooper. And you've got the
13      letter in your hand. So whatever the date
14      on there is.
15      MR. NIX: What's the date on that
16          letter?
17  A. This is June 13th, 2006 that I responded to
18      Ms. Cooper.
19      I knew that 200 was proposed as a
20      substitute for 252 because of the statewide
21      common course process.
22  Q. Thank you.
23  A. Uh-huh (positive response).

Page 65

1      (Plaintiff's Exhibit 3 was marked
2           for identification.)
3   Q.  This is Plaintiff's Exhibit Number 3,
4       previously marked as Defendant's Exhibit
5       Number 20.  Do you recall receiving that
6       letter from me?
7   A.  Yes, I do.
8   Q.  And was there any action taken on your part
9       as a result of receiving that letter?
10  A.  I asked -- I asked for input from the
11      nursing faculty and Dean Lowe, and
12      ultimately we involved Anthony Joseph as
13      legal counsel to respond.
14  Q.  Is Anthony Joseph in any way connected to
15      Tracy Miller?
16  A.  Anthony Joseph and Tracy Miller worked in
17      the same law firm, yes.
18  Q.  How long were they, in fact, retained by
19      your -- either CVCC or by yourself?
20          MR. NIX:  For this purpose?
21          MS. COOLEY:  For this purpose.
22  A.  I don't think I have an answer to that.  I
23      don't think I know that.  Sometime after

Page 66

1       the receipt of this letter.  That's what
2       initiated the conversation with them.
3   Q.  Are they, in fact, retained for purposes of
4       this particular lawsuit?
5   A.  No.  Because when the college is sued, it
6       becomes a State of Alabama issue and the
7       attorney general becomes involved and so we
8       cannot retain private counsel in that
9       regard.  These folks were named by the
10      attorney general's office.
11  Q.  And the folks -- you're referring to your
12      legal counsel present with you today?
13  A.  Thank you.
14  Q.  Were you ever present in Nursing 252 during
15      the fall 2005 class of 252?  Were you ever
16      present in that class?
17  A.  In fall?
18  Q.  Yes, ma'am.
19  A.  Yes.  Either 252 or 271.  I don't know
20      which one it was.
21  Q.  But one of those classes --
22  A.  Yes.
23  Q.  -- you do recall being present in the

Page 67

1       class?
2   A.  I do.
3   Q.  You obviously were not there as a pupil?
4   A.  That's correct.
5   Q.  You were there in the capacity as
6       president?
7   A.  Yes.
8   Q.  Is that normal for a president to come into
9       or visit one of the nursing classes?  Is
10      that part of your normal --
11  A.  No.
12  Q.  What was the purpose for you being present
13      in either 252 or 271 during the fall of
14      2005?
15  A.  I went to the nursing department in the
16      absence of the chair, Mrs. Peterson.  Dean
17      Lowe and I went to talk with the students
18      because we understood the students were
19      upset.
20  Q.  And when you entered that class, again,
21      either being 252 or 271 in the fall of
22      2005, were you able to speak or address any
23      of the student concerns that day?

Page 68

1   A.  We listened to the concerns and I remember
2       speaking to -- I'm going to have to say
3       broadly -- their concerns that we would
4       provide instruction -- we were committed to
5       providing instruction to the students --
6       and that we would make the necessary
7       arrangements to replace their instructors.
8   Q.  How long did it take from the time that you
9       and the dean were in that class -- again,
10      whether it was 252 or 271 in the fall of
11      2005 -- from the time that you spoke to
12      those students until the time that a
13      permanent replacement was found for that
14      class?
15  A.  One class it was one week and the other
16      class it was two weeks of instruction.
17  Q.  Was there ever a period to your knowledge
18      of five weeks of not having an instructor
19      for a class?
20  A.  No.  That's not so.
21  Q.  During the time, whether it was the
22      one-week or two-week period, to your
23      knowledge were any of those temporary

Deposition of Laurel Blackwell, Ed.D.

July 17, 2007

**Page 69**

1  instructors allowed to administer exams to
2  the nursing students? And if you don't
3  know, that's fine to say you don't know,
4  Dr. Blackwell.
5  A.  I would say that would not be something I
6  would know.
7  Q.  Is that something that you believe Dixie
8  Peterson would know?
9  A.  Yes. I would assume Mrs. Peterson.
10  Q.  You previously stated that the minimum, I
11  guess, nursing pass rates for the boards
12  when you came to the college was 75
13  percent. Later it sounds like the bar was
14  raised by the State to be 80 percent.
15  A.  That would be correct.
16  Q.  Do you know approximately what the passage
17  rate is for the nursing program currently?
18  A.  I know that I looked yesterday for the
19  class that Ms. Wright was in and it was 81
20  percent.
21  Q.  Would that be --
22  A.  Or the year that she would have normally
23  taken board.

**Page 70**

1  Q.  The 2005 to 2006 pass rate?
2  A.  It's very confusing to start talking about
3  years because the academic year and the
4  board year don't span the same time period.
5  Q.  So, for instance, someone could graduate in
6  2005 in December but not take the boards
7  until 2006? Would that be an example?
8  A.  Yes. And they don't all have to sit for
9  the board at the same time. So it's a
10  little bit confusing, and I would defer to
11  someone else to explain that.
12  Q.  To your knowledge, though, it was only one
13  year since you've been president that the
14  nursing program was on any type of academic
15  probation, for lack of a better word?
16  A.  And I don't know that that's the right
17  term. But where we fell below the minimum
18  standards established by the State Board
19  of -- by the nursing entity.
20  Q.  What happens in a process such as that as
21  far as the involvement, if any, from the
22  State? Do they come in and review records
23  or speak to instructors?

**Page 71**

1  A.  Again, that would not be something I would
2  normally have a personal participation in.
3  I do know that we had the nursing board
4  lead person -- I don't know if her title is
5  chair or director. I think it's
6  director -- came and I visited with her.
7  Mrs. Peterson visited with her. I believe
8  that was an informal visit, not a formal
9  visit. But we -- I don't think I can
10  answer with any more assurance that I'm
11  saying the -- that I'm recalling the events
12  properly because I don't remember dates.
13  Q.  Do you feel like the more appropriate
14  person to answer those specifics regarding
15  the bar -- not the bar passage rate --
16  A.  Board.
17  Q.  -- but the board passage rate would be
18  Dixie Peterson?
19  A.  Yes.
20  Q.  Are you aware of the retention rate for the
21  nursing instructors within the CVCC nursing
22  program? Are you aware of any type of
23  retention rate?

**Page 72**

1  A.  No. There's not -- That's not something we
2  would normally compute, a retention rate.
3  Q.  So, for instance, it's not something that
4  would be brought to your attention that
5  you've had an employee for 22 or 23 years
6  within the nursing program as opposed to
7  someone who may or may not have come in for
8  eight days, something like that?
9  A.  Could you ask that again?
10  Q.  As far as retention rate, such as an
11  employee retention rate, for instance, it
12  sounds like I believe you had said that
13  Dixie Peterson has been with CVCC for
14  approximately 22 to 23 years?
15  A.  Uh-huh (positive response).
16  Q.  Is that the norm to have instructors in the
17  nursing program that long?
18  A.  It is not the norm, because the nursing
19  field, when you have a master's prepared
20  requirement for credentialing, is an
21  extremely competitive environment.
22  Q.  Would you say that your average instructor
23  in the nursing program stays less than five

18 (Pages 69 to 72)

Page 73

1    years?
2    A.  Yes.
3    Q.  Would you say they stay less than two
4    years?
5    A.  Yes.
6    Q.  Would you say they stay less than one year?
7    A.  On average?
8    Q.  Yes, ma'am.
9    A.  I don't think I can say that.  I don't
10   think I know that.
11   Q.  Do you feel like that's a question better
12   suited for Dixie Peterson --
13        MR. NIX:  I object to the form.  I
14        mean, I --
15   Q.  -- as far as the knowledge of the retention
16   rate for the employees that it sounds like
17   Dixie Peterson would be directly
18   supervising?
19        MR. NIX:  I object to the form of
20        the question.
21   Q.  That's fine.  You've stated that sounds
22   like that's something that's getting a
23   little more detailed than what you would

Page 74

1    deal with on a daily basis, if I'm
2    understanding correctly?
3    A.  Or more specifically computing how long an
4    employee stays with us.
5    Q.  But you do agree that there are individuals
6    who stay -- it sounds like several of those
7    individuals stay less than five and perhaps
8    even less than two?
9    A.  Yes.  And that is -- That's not uncommon in
10   the system because private industry pays
11   nurses more than we pay faculty members.
12   Q.  Do you know approximately how much an
13   individual who would be a nursing
14   instructor with a master's level that you
15   said -- apparently it sounds like you have
16   to have to be employed?
17   A.  Yes.  Oh, to teach the classroom?
18   Q.  Yes, ma'am.  To teach the classroom.  Do
19   you know approximately a base salary for someone
20   like that who has those credentials, the
21   master's level --
22   A.  In our environment?
23   Q.  I'm sorry.  In the nursing program only.

Page 75

1    A.  It's the same.
2    Q.  So it doesn't matter if they're a nursing
3    instructor or if they are --
4    A.  Or an English instructor.
5    Q.  All right.  Do you know what that base is?
6    A.  It probably starts around 40,000.
7    Q.  And you said that for nursing instructors
8    that's a highly competitive environment; is
9    that correct?
10   A.  Yes.
11   Q.  So it sounds like in private industry they
12   could make significantly more than 40,000?
13   A.  Twice as much is what I understand.
14   Q.  And, again, that's for master's level
15   nursing instructors?
16   A.  Yes.  That's correct.
17        MR. NIX:  Let me object to the
18        form of the question.  I'm not
19        sure she limits that to
20        master's level nursing
21        instructors.  If you're asking
22        her how much nurses or
23        master's level nurses are paid

Page 76

1    in industry and she said twice
2    as much, then I object to the
3    characterization that those
4    people would be necessarily
5    employed as professors in
6    nursing somewhere else.
7        MS. COOLEY:  Okay.
8        MR. NIX:  I think she --
9    A.  I didn't mean that.
10   Q.  But when you said private industry, I
11   assumed that to mean working for a private
12   company, not necessarily going to teach at
13   another institution.
14   A.  I meant working in a hospital environment.
15   Q.  That's what I assumed that you meant.
16   Thank you.
17        Your husband that you married back in I
18   believe you said 1994 or '95, does that
19   individual -- is he related to or have any
20   type of a relationship with the previous
21   chancellor, Roy Johnson?
22   A.  No.
23   Q.  So he's not related to that individual?

Deposition of Laurel Blackwell, Ed.D.

July 17, 2007

Page 77

1   A.  No.
2   Q.  Did he ever work with Chancellor Johnson?
3   A.  No.  In an employment relationship?
4   Q.  Yes, ma'am.
5   A.  No.
6   Q.  Did they ever -- To your knowledge, did
7       they ever have -- And, again, I'm referring
8       to the previous chancellor who would have
9       been the chancellor during the time that
10      Ms. Wright was there.  Did your husband
11      ever have a social relationship with that
12      chancellor?
13  A.  No.
14  Q.  Were they ever members of civic clubs
15      together?
16  A.  No.
17  Q.  To your knowledge, did they even know one
18      another?
19  A.  Yes.  They knew one another.
20  Q.  How was it that they knew one another?
21  A.  Michelin has a training center at Southern
22      Union.  They have an actual physical
23      presence at Southern Union.  So training is

Page 78

1       under the umbrella of the
2       responsibilities -- my husband has a large
3       umbrella of responsibilities.  Training is
4       something that he would provide oversight
5       to.  He wouldn't directly do that, but he
6       would have oversight to the training
7       function, so he knew Dr. Johnson in that
8       capacity that Michelin had a training
9       facility that they were in partnership with
10      Southern Union regarding --
11  Q.  But it wasn't that Dr. Johnson and your
12      husband worked together on a daily basis?
13  A.  No.  Huh-uh (negative response).
14  Q.  You stated previously that while you're not
15      involved in the academic daily affairs, you
16      are, however, the individual who signs the
17      contracts for employment -- is that
18      correct -- for all of your faculty members?
19  A.  Yes.
20  Q.  Is that also for the individuals who would
21      be considered your directors or managers?
22  A.  I sign contracts for everybody that works
23      for the college.

Page 79

1   Q.  So any employee that comes through -- Would
2       that also be the case for someone who is a
3       maintenance person?  Would that also be
4       someone that you would do from the
5       maintenance person --
6   A.  Yes.
7   Q.  -- all the way to the dean?
8   A.  Yes.
9   Q.  Has there ever been a time that you have
10      given out or distributed contracts to
11      faculty members in a nontimely manner from
12      the time that they would have started a
13      semester?
14  A.  I think an example might be when we hire
15      part-time clinical people because they
16      start after the semester.  Sometimes
17      they're even contracted after the semester
18      starts and so their contracts might be
19      created at a different -- in a different
20      batch.  They'd be part-time and they would
21      just be processed through HR, through the
22      department chair, the dean and HR in a
23      different process.

Page 80

1   Q.  So -- And I'm only referring to the nursing
2       program again.  In the nursing program,
3       would Dixie Peterson be an individual who
4       would actually be a part of the hiring
5       selection process?
6   A.  If it was clinical instructors, yes.
7   Q.  Clinical instructors?
8   A.  Right.
9   Q.  Clinical instructors who could also be
10      considered part-time instructors; is that
11      correct?
12  A.  That's correct.
13  Q.  So is it possible that someone in the
14      nursing program -- and I'm not referring,
15      of course, to the example that you've
16      already given with 271 and 252.  We know
17      about that one where you had --
18  A.  Uh-huh (positive response).
19  Q.  Are there additional times, to your
20      knowledge, where a semester would have
21      started and there would not have been
22      instructors for the classroom hired at that
23      point when the semester began for the

Deposition of Laurel Blackwell, Ed.D.

July 17, 2007

Page 81

1    nursing program?
2    A.  I don't have any recollection of that
3        except for the clinical instructors, as I
4        said.  I don't have any recollection of
5        that.
6    Q.  Would the clinical instructors -- Is that
7        something that's a common practice, that
8        you're able to get your clinical
9        instructors after the semester begins?
10       Does that happen on a regular or frequent
11       basis?
12   A.  It's my understanding that because clinical
13       instruction doesn't start the first day of
14       classes that those -- the students don't go
15       directly to the hospital the first day.  So
16       that's why I used that example.
17   Q.  So they have to get classroom training
18       first prior to doing the clinical
19       instruction during the semester?
20   A.  You would want to talk to Mrs. Peterson
21       about how all those classes are arranged.
22   Q.  I will refer to her.  Thank you.
23       Are you aware of or do you know an

Page 82

1        individual named Sherry Lifsey,
2        L-I-F-S-E-Y?
3    A.  S-E-Y.  Yes, I do.
4    Q.  And how do you know Ms. Lifsey?
5    A.  She came to work for us at the college as
6        a -- with a master's degree and came to
7        work as a faculty member in the nursing
8        department.
9    Q.  So she was a nursing instructor?
10   A.  Uh-huh (positive response).
11   Q.  Do you know how long Ms. Lifsey was an
12       employee of CVCC?
13   A.  I don't know.  I employed her and I -- and
14       I would have to look at her personnel file
15       to tell you how long.  I can't tell you
16       that.
17   Q.  To your knowledge, was Ms. Lifsey employed
18       as an instructor during the time that
19       Ms. Wright was a student?  And I'm not
20       referring to when Ms. Wright was a student
21       the first time.  I mean the second time
22       when she was back for the Nursing Mobility
23       Program 2005 to 2006.

Page 83

1    A.  I don't know that.  I don't know when she
2        was contracted.
3    Q.  Do you know or are you familiar with a
4        secretary at CVCC named Katie Lackey?
5    A.  She wasn't a secretary.  I know Katie.  I
6        employed her.
7    Q.  In what capacity is Ms. Lackey employed?
8    A.  Past tense.  She's no longer at the
9        college.  Ms. Lackey was employed -- She's
10       a degreed person.  She was hired in a
11       capacity -- a professional capacity to
12       provide program coordination and advisement
13       to students.
14   Q.  Was she, in fact, an adviser to the nursing
15       students at all?
16   A.  That was what she was employed to do.  Her
17       title, I believe, was health sciences
18       coordinator slash advisor.
19   Q.  So was she specifically geared toward the
20       nursing students, then?
21   A.  Her job was only in the nursing department.
22   Q.  Do you know if she would have been present
23       to take minutes during the individual that

Page 84

1    we previously referred to back in -- back
2    on Friday, Arit Umoh's case?
3    A.  I wouldn't know anything about that.
4        MR. NIX:  I'm sorry.  I
5        apologize.  Did Katie Lackey
6        take minutes during what?
7        MS. COOLEY:  Arit Umoh.  And I
8        might be saying her name
9        incorrectly, the student we
10       referred to back on Friday.
11       But Dr. Blackwell has already
12       answered she wouldn't have
13       known that if Katie Lackey
14       would have been present and
15       taking minutes during the
16       grade appeal or the course
17       forgiveness process with Arit
18       Umoh.
19       MR. NIX:  You said case and that
20       kind of threw me a little bit.
21       MS. COOLEY:  And I did say case
22       and I apologize because I
23       don't know if there was a

Deposition of Laurel Blackwell, Ed.D.

July 17, 2007

Page 85

1   case. All we know is that she
2   had an attorney. I don't
3   know.
4   Q.  But, Dr. Blackwell, do you believe if
5   anyone would know, is it a possibility that
6   Dixie Peterson perhaps would know that?
7       MR. NIX:  Object to the form.
8   A.  Yes.
9   Q.  Are you familiar with or do you know a
10      Saquita Alexander?
11  A.  It's Sanquita.
12  Q.  Sanquita?
13  A.  She's an employee of the college.
14  Q.  Is she a current employee of the college?
15  A.  She is.
16  Q.  And in what capacity was Ms. Alexander
17      employed during 2005-2006?
18  A.  She was in admissions. And I can't tell
19      you her title because she's had a title
20      change, so I don't know when that happened.
21  Q.  When you say admissions, is that admissions
22      for the entire university -- for CVCC?
23  A.  Admissions of record, yes, for the college.

Page 86

1   Q.  So she would not have been specifically the
2       admissions person or point of contact for
3       the nursing program?
4   A.  No. She does not oversee admissions for
5       the nursing program. Admission and records
6       to the college.
7   Q.  And I just want to verify again how many
8       individuals report to you. Based on our
9       previous conversation it looks like you
10      have five direct reporting people and
11      perhaps between 15 and 20 indirect
12      reporting. Is that correct?
13      MR. NIX:  I object to the form of
14      indirect reporting, to that
15      term.
16  Q.  And when I say indirect reporting, what
17      I mean is a second line of command or a
18      second chain of command. They go through
19      an additional individual to get to you for
20      reporting purposes.
21      MR. NIX:  Still object to the
22      definition of indirect
23      reporting. I think her

Page 87

1   testimony has been contrary,
2   Jennifer, to your definition.
3   Q.  As far as there are -- there is a baseline
4   of individuals who report to you. I want
5   to verify that those individuals -- that it
6   is approximately six individuals who report
7   to you. And there's the one that I should
8   have placed right here –
9   A.  That's correct.
10  Q.  -- administrative assistant. So that would
11  be six individuals who report to you --
12  A.  That's correct.
13  Q.  -- on a -- whether you call it a direct
14  basis or individuals who, if they had to
15  say who their supervisor was, they would
16  say it was Dr. Blackwell; is that correct?
17  A.  That's correct.
18  Q.  Underneath those individuals there are
19  other employees, whether they're department
20  heads or managers, who report to them; is
21  that correct?
22  A.  Yes.
23  Q.  I refer to those as a second line of

Page 88

1   command. However it is that you refer to
2   them I would like to know so that I'm using
3   the proper definition in the world of
4   academics.
5       MR. NIX:  Let me tell you about
6       the basis of my concern about
7       the definition was is that
8       if -- it's not related to
9       academics necessarily. It's
10      just that it seemed as though
11      you were saying in your
12      question that the second line
13      of people also reported to
14      Dean Blackwell and I object to
15      the form. And then you asked
16      whether they reported to her
17      through the other people,
18      which is -- that was the
19      problem I had with it is the
20      way that was described.
21  Q.  The individuals who would be individuals
22  such as four department chairs and
23  individuals who are referred to as

22 (Pages 85 to 88)

Deposition of Laurel Blackwell, Ed.D.                                                July 17, 2007

Page 89

1    directors, not referring to the three
2    directors who report to you in a direct
3    line, but directors -- the approximate 10
4    directors slash managers who report
5    directly to the dean of student
6    administration, those individuals, are
7    there reports or any type of communication
8    devices that ever would come directly from
9    them to you without passing through their
10   direct supervisors?
11   A.  It would be rare, but there are some
12       occasions.  For example, the director of
13       financial aid.  And that's dean of student
14       and administrative services.  It's two
15       different functions, the dean of students
16       and dean of administrative services.  So
17       dean of student and administrative
18       services.  For example, federal financial
19       aid is prepared at a director level, but
20       it's millions and millions of dollars.
21       That comes directly to me.  She prepares
22       the report for the federal government,
23       comes directly to me and I sign off on it.

Page 90

1    Q.  Would it be a natural or ordinary course of
2        business that even though it comes directly
3        to you that -- as you said her, whoever
4        that individual is -- that the dean of
5        student and administrative services is
6        courtesy copied on that report?
7    A.  I don't know whether she reviews that with
8        him or not.  But normally -- And on the
9        dean of student instruction area, there's
10       10 direct reports under him.  Four of them
11       are faculty specific chairs.  So there's a
12       line of about 20 individuals that report to
13       the two deans.  And normally the reporting
14       structure is directly to the dean.
15   Q.  You did say that there are occasions where
16       there might have been information that was
17       passed to you -- directly to you from the
18       department chairs or the directors.  And
19       you gave the example of the financial aid
20       report that sounds like it's a federal
21       report that obviously has to be done on an
22       annual basis.  Would there ever be a time
23       that you can recollect that Dixie Peterson

Page 91

1    would have communicated with you directly
2    regarding Lindy Wright during the time that
3    Lindy Wright was a student, 2005 to 2006,
4    where she would have communicated with you
5    and not Dean Lowe or Dean Hodge regarding
6    Lindy Wright's potential failures in
7    classes?
8         MR. NIX:  Object to the form.
9            You're talking about before
10           the lawsuit was filed?
11           MS. COOLEY:  Yes.  Prior to --
12   Q.  And I am in no way asking you to tell me
13       what you've communicated with your legal
14       counsel.  I'm referring strictly to any
15       communication -- possible communication
16       that would have occurred between Dixie
17       Peterson and not coming from the dean where
18       Dixie Peterson would have communicated
19       directly with you either by phone, e-mail,
20       letter, memo regarding Lindy Wright between
21       2005, 2006?
22   A.  I can't tell you that for certain.
23           MR. NIX:  Let me also just

Page 92

1            mention, Jennifer, the fact
2            that Maynard-Cooper was also
3            involved as counsel for the
4            school, you know, at a point
5            in time.  I don't know the
6            date or anything.  But they
7            were too.  But then there were
8            the letters that were sent and
9            that sort of thing, which I
10           think Maynard-Cooper responded
11           to.
12   Q.  I am not referring to anything that you
13       would have communicated to your counsel.
14       That is not what I'm asking you.  I am only
15       asking if you can recall any correspondence
16       that you would have received in 2005 to
17       2006, not copies to your counsel, that
18       would have been communication from Dixie
19       Peterson to you, either verbal, phone call
20       or in person, an e-mail, a memo or a letter
21       regarding Lindy Wright from Dixie Peterson?
22           MR. NIX:  And you're asking just
23               in the normal course of doing

July 17, 2007

Page 93

1    business at the school?
2        MS. COOLEY: Yes, sir.
3    Q.  In the normal course of business or maybe
4        it would be abnormal.  I don't know Dixie
5        Peterson's relationship with you, whether
6        it would be normal for her to call you on
7        the phone in your office and say I want to
8        talk to you about a student.
9    A.  That would certainly not be the normal
10       course of business.  And I can't tell you
11       whether there was a phone call or not
12       because I simply wouldn't have any reason
13       to remember that.  The normal course of
14       business is if I had an issue that a
15       faculty member needed to talk to me about
16       that we would involve the dean or if a
17       director needed to talk to me about that
18       we'd involve the dean.  Normally I would
19       see the dean with their direct report
20       together if there was an issue that needed
21       my attention.
22   Q.  You've already stated that you recall
23       meeting with Ms. Wright.  You don't know

Page 94

1        the date or the time, but you do recall
2        meeting with her.  Which dean was present
3        during that meeting?
4    A.  I believe it was Dean Hodge.
5    Q.  Was, in fact, his direct report, Dixie
6        Peterson, present in that meeting as well?
7    A.  No.  She doesn't report to Dean Hodge.
8        She's instruction.  It was -- I believe
9        that I met with Dean Hodge because of the
10       request for that grade forgiveness process,
11       because that's the only way that Dean Hodge
12       would be involved in this issue because
13       it's an instructional issue.  But once you
14       request the forgiveness process, that
15       course forgiveness, then that involves the
16       admissions and student services side of the
17       college.  And Dean Hodge makes the decision
18       on those matters, so there wouldn't be
19       somebody else for us to meet with.
20   Q.  I guess my next question would be Dean
21       Hodge, who wouldn't know anything about --
22       and I'm referring just in general now --
23       Dean Hodge or whomever the dean of student

Page 95

1        and administrative services, he would be
2        making decisions based on a student's
3        course forgiveness or grade forgiveness
4        without knowing anything about that
5        person's academic background?
6    A.  It's an administrative function to do
7        course forgiveness.  And we can look at it
8        in the catalog if you'd like to.  Course
9        forgiveness is not an instructional issue.
10       It's a transcript issue.  It's exclusively
11       admissions and record transcript issue and
12       doesn't have anything to do with
13       instruction.
14   Q.  What additional information would Dean
15       Hodge or whomever is in that capacity of
16       making the decision for course forgiveness
17       or grade forgiveness, what additional
18       information would they need without knowing
19       the student or knowing their academic
20       background to make a decision?
21           MR. NIX: Let me object to the
22       form again.
23   A.  I'll do the best I can to explain the

Page 96

1        function that somebody else supervises.
2    Q.  Sure.
3    A.  The college provides a way for a student to
4        get a grade off -- off their GPA by letting
5        them when they failed a course retake the
6        course.  And when they've retaken the
7        course, then we -- and they request that we
8        initiate grade forgiveness for them.  The
9        student has to initiate it.  Then we remove
10       their original grade from their GPA
11       computation.  It's simply a way for
12       students to improve their GPA when they've
13       retaken a course.
14   Q.  Is there a process to your knowledge if --
15       if the same course is offered but it's
16       given a different number, how would someone
17       who is in the capacity of a dean of student
18       and administrative services be made aware
19       of that if that's something that occurs in
20       the classroom as far as the level of
21       instruction that's given if it's the same
22       course content if they are only looking at
23       numbers?

24 (Pages 93 to 96)

Deposition of Laurel Blackwell, Ed.D.

July 17, 2007



Page 97

1   A.   That is such an anomaly that it's hard to
2        describe. I'm not sure that that's -- I'm
3        not sure that that's happened in any other
4        time since I've been at the college to my
5        knowledge where we've given a course a
6        different number to retake it, because we
7        have a common course directory that comes
8        out of Montgomery out of postsecondary, and
9        these are the courses that the two-year
10       college system is allowed to teach. And
11       when 252 was removed and 200 was
12       substituted, that was the greatest of
13       unusual circumstances. At least it's never
14       risen to the level of my awareness in the
15       five years I've been there.
16  Q.   Do you just know by -- because it doesn't
17       seem anyone knows why that occurred from
18       252 to 200. And if you don't know, that's
19       fine to say that.
20  A.   I do know.
21  Q.   Okay.
22            MR. NIX: Excuse me. Let me
23            object to the statement that

Page 98

1        you made it doesn't seem that
2        anyone knows why 252 and 200
3        are those numbers. I think
4        there are a lot of people who
5        know. But I just object to
6        the form.
7   A.   I'll answer that to the best of my ability,
8        but Mrs. Peterson is the expert there. The
9        State developed a common nursing
10       curriculum. And I told you there's a
11       common course guide at the State level.
12       All those old nursing course numbers went
13       away and we now have a new course sequence
14       that every school in the system teaches.
15       So there is no longer a 252 available. So
16       to allow a student to retake 252 we had to
17       assign -- this is my understanding from
18       Mrs. Peterson and Dean Lowe -- we had to
19       assign a number that was available to
20       retake the course, and so we used 200 and
21       taught the content of 252.
22  Q.   Okay. Are you and Mrs. Peterson related in
23       any capacity?

Page 99

1   A.   No.
2   Q.   Did y'all work together in any capacity
3        prior to you being employed as the
4        president of CVCC?
5   A.   No.
6   Q.   Did you have any knowledge or even know
7        Dixie Peterson prior to coming to CVCC?
8   A.   No.
9   Q.   Ms. Peterson reports to the dean of
10       instruction; is that correct?
11  A.   That's correct.
12  Q.   Would you say that you have frequent or
13       infrequent contact with Dixie Peterson?
14            MR. NIX: Lately? Since this
15            lawsuit was filed? Since
16            these letters started coming
17            in?
18  Q.   Let me backtrack. I am not referring to
19       currently. Would you state that in 2005
20       and 2006 that you had frequent or
21       infrequent contact with Dixie Peterson? So
22       that would have been approximately a year
23       ago.

Page 100

1   A.   I would say we have a faculty of 35
2        people. I don't have infrequent contact
3        with any faculty member with such a small
4        faculty.
5   Q.   Are you and Dixie Peterson in any civic
6        organizations together?
7   A.   Rotary.
8   Q.   And does Rotary meet every Monday?
9   A.   It does.
10  Q.   At lunchtime --
11  A.   Yes.
12  Q.   -- at the Senior Activity Center?
13  A.   It's not the right name, but ...
14  Q.   Are there any additional organizations that
15       you and Dixie Peterson are enrolled in
16       together?
17  A.   No.
18  Q.   So she does not attend the church you're
19       affiliated with currently?
20  A.   No.
21  Q.   She does not -- She's not involved in any
22       of the additional organizations you stated
23       you're involved in?

Page 101

1  A. I have no personal relationship with
2     Mrs. Peterson.
3  Q. You've already stated that you do recall
4     receiving a vote of no-confidence from the
5     faculty senate of CVCC in 2005; is that
6     correct?
7  A. That's correct.
8  Q. And then in that you've also stated that
9     you did not see or hear of any of the
10    comments made. You simply received a
11    letter that stated that you had received a
12    vote of no-confidence; is that correct?
13 A. That's what I received.
14 Q. Do you recall ever receiving an e-mail that
15    was sent out to all of the CVCC faculty and
16    staff requesting feedback to begin the
17    process of receiving information from
18    faculty and staff regarding the leadership
19    at CVCC?
20 A. I don't think that was the way it was
21    phrased. I knew that that survey was being
22    taken, but it was being taken in such a
23    positive way what was communicated, ways to

Page 102

1     grow the institution or improve the
2     institution, that I had -- I did not have
3     any reservations about the process
4     happening.
5  Q. But you were given a copy of that or you
6     did receive an e-mail copy of that to your
7     knowledge?
8         MR. NIX: Do you know?
9  A. I don't know.
10 Q. And that's fine if you don't know.
11 A. I don't know.
12 Q. You've also stated previously that you
13    believe that the faculty senate is a body
14    where they are -- apparently they elect
15    themselves among themselves; is that
16    correct?
17 A. That's correct.
18 Q. Are you aware of any of the members who
19    would have been on the senate during the
20    2005 time that that vote of no-confidence
21    came to be?
22 A. I know who the president was at that time
23    was Anne Messner.

Page 103

1  Q. Is it a secret body or is it something
2     that --
3  A. It's not secret, but it's nothing that
4     involves the administration of the college.
5  Q. Are you aware or unaware if Dixie Peterson
6     would have been on the senate during that
7     time?
8  A. I believe Ms. Peterson has a permanent seat
9     on that -- it appears permanent because she
10    represents the nursing program.
11 Q. So they're elected it sounds like, but
12    additionally are they automatically on it
13    if they are a department chair or they
14    represent --
15 A. I believe that they have -- I believe they
16    have representation from the different
17    academic areas in the college, but, no, not
18    chairs. And probably -- that extends
19    probably about as far as I know about the
20    faculty senate. If you have other
21    questions, I'll try. Again, it's not
22    something I normally have any contact with,
23    other than I do meet with them on a regular

Page 104

1     basis. It's just not something that I have
2     anything to do with the formation of that
3     group.
4  Q. How often would you say that you met with
5     them in 2005?
6  A. I did not. In recent months I meet monthly
7     with the president and the vice president
8     of the faculty senate.
9  Q. And you said in recent months. How recent
10    would you say that you have begun those
11    meetings with them?
12 A. I don't know. Six to eight months ago. I
13    meet with three groups on a monthly basis
14    to ensure that we are moving communication
15    effectively; president and vice president
16    of the faculty senate, AEA and ESP. And
17    those are also elected bodies on campus.
18 Q. Is ESP in any way connected to the nursing
19    program?
20 A. No.
21 Q. AEA connected to --
22 A. No, they're not. They're education, AEA.
23        MS. COOLEY: Thank you,

July 17, 2007

Deposition of Laurel Blackwell, Ed.D.

Page 105

1    Dr. Blackwell.  We're
2    finished.
3    (Deposition was concluded at
4    approximately 12:15 p.m., E.D.T.)
5
6    * * * * * * * * * * * * * *
7    FURTHER DEPONENT SAITH NOT
8    * * * * * * * * * * * * * *
9
10    REPORTER'S CERTIFICATE
11    STATE OF ALABAMA:
12    MONTGOMERY COUNTY:
13    I, Lyn Daugherty, Certified Shorthand
14    Reporter and Commissioner for the State of Alabama
15    at Large, do hereby certify that I reported the
16    deposition of:
17    LAUREL BLACKWELL, Ed.D.
18    who was duly sworn by me to speak the truth, the
19    whole truth and nothing but the truth, in the
20    matter of:
21    LINDY G. WRIGHT,
22    Plaintiff,
23    vs.

Page 106

1    CHATTAHOOCHEE VALLEY COMMUNITY
2    COLLEGE (CVCC), et al.,
3    Defendants.
4    IN THE UNITED STATES DISTRICT COURT
5    FOR THE MIDDLE DISTRICT OF ALABAMA
6    EASTERN DIVISION
7    Civil Action No. 3:06-CV-1087-WKW
8    on Tuesday, July 17th, 2007.
9    The foregoing 105 computer-printed pages
10    contain a true and correct transcript of the
11    examination of said witness by counsel for the
12    parties set out herein.  The reading and signing is
13    hereby waived.
14    I further certify that I am neither of kin
15    nor of counsel to the parties to said cause nor in
16    any manner interested in the results thereof.
17    This 23rd day of July 2007.
18
19
20    _____
      Lyn Daugherty,
21    Certified Shorthand Reporter
      And Commissioner for the
22    State of Alabama at Large
23

27 (Pages 105 to 106)



IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

OPELIKA DIVISION


LINDY WRIGHT,                    )
                                 )
          Plaintiff,             )
                                 )
vs.                              )
                                 )
CHATTAHOOCHEE VALLEY             )
COMMUNITY COLLEGE,               )
                                 )
          Defendant.             )

ORIGINAL


     Oral Deposition of **MS. SANDRA GUNNELS**, Witness,

called by the Plaintiff, before Courtney Tillman Peters,

Certified Court Reporter and Notary Public for the State

of Alabama, taken at the law offices of Parker & Cooley,

1507 Broad Street, Phenix City, Alabama 36867 on the 1st

day of November, 2006, commencing at 8:35 a.m. EST.

**COURTNEY TILLMAN PETERS**
Certified in Alabama & Georgia
**CAUSEY & PETERSON CERTIFIED COURT REPORTERS**
Post Office Box 81
Columbus, Georgia  31902
(706) 317-3111

2

1

## APPEARANCES OF COUNSEL

2

3    For the Plaintiff:            MS. JENNIFER B. COOLEY
                                   Parker & Cooley
3                                  1507 Broad Street
4                                  Phenix City, Alabama 36867

5                                  DR. PETER A. DUMBUYA
                                   Attorney at Law
6                                  Post Office Box 3302
                                   Phenix City, Alabama 36868
7

8

9

10

11

12              ## INDEX TO EXAMINATIONS

13   WITNESS/ATTY           EXAM           REEXAM

14   Gunnels (Cooley)         4             29

15   Gunnels (Dumbuya)       16

16

17

18              ## INDEX OF EXHIBITS

19

     INDEX NO.                              PAGE
20   There were no exhibits marked for identification.

21

22

23

24

25

# STIPULATIONS

IT IS STIPULATED AND AGREED by and between counsel appearing for the respective parties that:

1) The oral deposition of **MS. SANDRA GUNNELS**, Witness, called by the Plaintiff, taken before Courtney Tillman Peters, Certified Court Reporter and Notary Public for the State of Alabama, at 1507 Broad Street, Phenix City, Alabama 36867 commencing at 8:35 a.m. EST, on the 1st of November, 2006;

2) ALL FORMALITIES with reference to notice of taking, notice of time and place of taking, qualifications of the Court Reporter, and all other matters precedent to the taking of depositions are WAIVED;

3) ALL OBJECTIONS, EXCEPT as to the form of the question and responsiveness of the answer, are RESERVED to the time of the hearing of the case;

4) ALL FORMALITIES with reference to the filing of depositions, including notice of filing, etc., are WAIVED;

5) With the consent of deponent, the reading and signing of the deposition by deponent is WAIVED;

— — — — — — — — — — — — —

WHEREUPON, the deposition of Ms. Sandra Gunnels,

beginning at 8:35 a.m. EST, occurred as follows:

MS. SANDRA GUNNELS

having been first duly sworn, testified upon examination,

as follows:

**EXAMINATION**

BY MS. COOLEY:

Q.   Please state your name.

A.   Sandra Jean Gunnels, G-U-N-N-E-L-S.

Q.   And, Ms. Gunnels, where do you reside?

A.   11107 Rambling, R-A-M-B-L-I-N-G, Trail, Midland, Georgia 31820.

Q.   And where are you currently employed?

A.   Columbus Technical college.

Q.   Prior to -- prior to being employed at Columbus Technical -- if you can just hold on for a moment.

(Off-the-record discussion.)

Q.   (BY MS. COOLEY)  Prior to being employed at Columbus Technical College, where were you previously employed?

A.   Chattahoochee Valley Community College.

Q.   And how long were you employed at CVCC?

A.   Between my part-time employment and full-time employment, approximately five years, six years, five years.

1    Q.    And do you know the dates of that term of

2    employment?

3    A.    I can give you a guesstimate, but I can get the

4    exact from my resume.  August of 2001 to August, September

5    of 2005.  So four years.

6    Q.    During the time that you were employed at CVCC,

7    what were your roles or in what capacity were you

8    employed?

9    A.    When I worked part-time for them at the

10   beginning, I was a clinical instructor, which meant I took

11   students to the hospital and monitored their clinical

12   practice, actually taking care of patients, giving

13   injections, staring IVs, that type of thing.  At some

14   point in time, I was employed for them -- and I don't know

15   the exact date -- they didn't have enough instructors and

16   asked me would I start lecturing.  And so I began doing

17   part-time lectures, then really full-time lectures for

18   them even when I was employed full-time by St. Francis.

19   And Christmas of 2005 I was -- had resigned my position at

20   St. Francis Hospital and sought full-time employment at

21   CVCC.

22   Q.    And when you were full-time at CVCC after you

23   resigned at St. Francis, were you a full-time lecturing

24   instructor or clinical instructor?

25   A.    Primarily lecturing, did both.  But it requires a

1  master's degree in nursing to lecture, and primarily I

2  lectured because I have a master's in nursing and then

3  what we call adjunct faculty, those with bachelors degrees

4  according to the State Board of Nursing can do the

5  clinical portion of the course.  And so adjunct

6  instructors would do the clinical portion, actually going

7  to the hospitals with groups of students.

8      Q.  You stated that you have a master's in nursing.

9  What additional qualifications do you have to put yourself

10  in this type of position?

11      A.  Well, I have a masters in nursing from Florida

12  State University.  I have a bachelor's in nursing from the

13  University of South Alabama.  I have an associate degree

14  in nursing from Columbus -- what was then College, now

15  Columbus State University.  I have been a nurse for 34

16  years.  I have taught for approximately off and on 10 of

17  those years and for various institutions.  My husband's

18  retired military, we moved around quite a bit until we

19  came back to Columbus.

20      Q.  During the time that you were employed at CVCC,

21  which would have been the years approximately 2001 to

22  2005, did you ever have reason to know a student by the

23  name of Lindy Wright?

24      A.  Yes, I did.  She was a student in the LPN program

25  who consequently went to work at St. Francis Hospital

1    while I was employed there full-time, so I knew her in a

2    professional capacity.  And then she came back to the ADN

3    program to acquire her ADN degree as an RN.

4        Q.    When you say ADN degree, is that an additional

5    degree on top of the LPN degree?

6        A.    Right.  There's several different categories of

7    nursing.  LPN is a licensed practical nurse, requires

8    approximately one year of education.  And the board of

9    each state delineates what practice items an LPN can do.

10   For a ADN, it's typically a two-year program.  So what

11   CVCC has is what's called a bridge program, one year for

12   LPN, one year for the second half of an associate degree

13   program.  And so at the end of an additional year of

14   education, an associate degree, you then can sit for the

15   registered nurse professional board, which an RN has many

16   more duties, responsibilities, privileges, and a higher

17   salary.

18       Q.    During the time that you knew Ms. Wright at St.

19   Francis, was that also at the same time, did you, in fact,

20   become her instructor?  I apologize if that question is

21   confusing.

22       A.    I was her instructor first.  On graduation, she

23   came to work at St. Francis, and so I worked not really

24   alongside her because I was director of case management

25   but I was up on the floor a lot, saw her, had known her

1    from school, et cetera, and just continued the

2    relationship.

3        Q.    During the time that she went back to school for

4    her ADN degree, were you her instructor during that time

5    as well?

6        A.    I was her instructor for one quarter or one

7    semester because that is -- at the end of that quarter was

8    at when I left CVCC.

9        Q.    During the time that you were there when Ms.

10   Wright was pursuing her ADN degree during that quarter or

11   semester that you were there, were you, in fact, her

12   direct instructor?

13       A.    Yes.

14       Q.    For what class?

15       A.    I taught her pharmacology class and her health

16   assessment, physical assessment class.

17       Q.    What type of student was she in those classes?

18       A.    She was a -- book-wise, an average student;

19   clinical hands on, an above average student.

20       Q.    Are you able to recall, if any, what types of

21   grades she received in either one of those classes?

22       A.    I believe she made a C in one and a B in the

23   other, but I would have to go back and look.

24       Q.    That's fine.

25       A.    I have 40, you know, students per class.

1     Q.   Right.  Certainly.

2     A.   Trying to remember.  I do know she passed.  She

3  struggled a little bit with some of the academics, but

4  passed the test.  And I believe it was a B and a C is what

5  she got from me.

6     Q.   And I just want to make sure I'm understanding

7  too.  When you say in regards to her clinical ability, you

8  are saying that she is above average from what you

9  observed from her clinical abilities?

10    A.   Yes.  From what I observed, she was above

11 average, very proficient.  The health assessment course

12 had a hands-on component.  And at CVCC the RNs or ADNs

13 typically have nursing classes one day a week, and so in

14 that program I would interact with the students pretty

15 much from 8:00 in the morning till 5:00 p.m. every

16 Wednesday was our class day.  And so you really, you know,

17 get to know people, spending time in labs, check offs.

18 It's not just a large classroom, I lecture, they soak up,

19 take tests, and leave.  It's we're interacting, discussing

20 situations because these are LPNs who have been out in the

21 practice world, so they're contributing experiences and

22 things that they have -- they have come across and how

23 they handled those things and questioning, so it's a very

24 interactive environment.

25    Q.   When you were at CVCC, who did you directly

1  report to?

2      A.    Dixie Peterson who was the department -- I

3  believe she's called the department chair, Chair of Health

4  Sciences.

5      Q.    Was there ever a time that you can recall where

6  you would have had a conversation with Ms. Peterson

7  specifically regarding Ms. Lindy Wright?

8      A.    Yes.

9      Q.    Do you recall that conversation?

10     A.    Yes, I do.

11     Q.    And can you elaborate on what went on in that

12  discussion?

13     A.    Yes.   This -- it's hard to say verbatim with it

14  having been a time period but the gist of the conversation

15  was Ms. Peterson came into the faculty offices and as I

16  recall Ms. Brenda Bellamy was present and potentially

17  Debra Grouper.   We had offices and Ms. Peterson was kind

18  of going back and forth and in between.   And she had come

19  by and asked was anyone going to fail.   And we said, no.

20  And I believe it was Ms. Bellamy said that Lindy had been

21  close in her course but that she had -- her grades had

22  come up at the end and she had made a C.   And Ms. Peterson

23  made a statement to the effect of y'all need to flunk her,

24  she does not need to pass, she is weak, she's not going to

25  pass boards, y'all need to flunk her.

1    Q.   And do you recall that conversation being some

2    time close to either a testing period or a --

3    A.   It was at the end of the summer semester because

4    we were averaging grades.

5    Q.   Okay.  Is it a regular course, I guess, of

6    conversation for Ms. Peterson, the director of the

7    program, to come and ask all of the instructors is anyone

8    going to fail?

9    A.   That's very normal and that's her responsibility.

10   She needs to know because in nursing if they flunk a

11   course, you know, they have an opportunity to come back.

12   When -- how I was taught and how I handled my classes was

13   the fact that -- and Ms. Bellamy did the same thing -- was

14   that if we thought someone was not going to pass or there

15   was -- they were close or, in fact, did not pass, then we

16   went back over every test, every piece of paper, met with

17   Ms. Peterson, told her who was not going to pass.  And she

18   was kind of coming in for a preliminary report of, you

19   know, y'all have done the first calculation, is there

20   anybody we're going to look at closer-type thing.  And we

21   said, no, everybody passed and that Lindy was close.

22   Q.   So this was apparently a regular course of

23   conduct for Ms. Peterson to come in at grading period

24   times to do an initial assessment with all the instructors

25   and say is anyone on the line or is anyone absolutely not

1    going to pass?

2       A.    Yes.  Well, in my experience, she had come to me

3    when I been teaching there and then this was the first

4    time I ever had an office.  So that Ms. Bellamy and I, she

5    came in and addressed us together because our offices

6    were -- cubicles were next to each other.

7       Q.    But during the time that you were there, which

8    was approximately four almost five years, this was a

9    regular course of conduct for her to come and ask, okay,

10   who's looking like they're close on the line or who

11   possibly will fail?

12      A.    Yes.

13      Q.    And if I'm understanding you correctly, she came

14   to you while other instructors were there and said, is

15   anyone close, does anyone look like they're going to fail?

16   And everyone said, no one is going to fail, there was one

17   that was close but she did not fail; is that correct?

18      A.    That's correct.  There was actually more than one

19   that was close but ...

20      Q.    But that's the student that you --

21      A.    Right.

22      Q.    Okay.

23      A.    Lindy and then there were one or two others that

24   were a little shaky there too, and particularly in med

25   surge.

1    Q.   But I just want to understand if -- make sure

2    that I don't want to say anything that you haven't said.

3    A.   Yeah.

4    Q.   Was that Lindy's name was mentioned, but it was

5    not that she had failed a course, it was that she had been

6    close but, in fact, she had passed the course already?

7    A.   Yes.

8    Q.   And at that point, Ms. Peterson addressed all the

9    instructors who were there.  And the ones that you recall

10   were you, instructor Bellamy --

11   A.   And potentially instructor Grouper.

12   Q.   Okay.  And that's because y'all are all on the

13   same vicinity?

14   A.   Right.

15   Q.   And said -- and she said, and I quote, y'all need

16   to fail her, she is weak, she will not pass the boards?

17   A.   Right.  Words to that affect.  I can't say that

18   those are the exact words, but that was definitely the

19   gist of the message and what she was communicating to me

20   and to the other instructor, yes.

21   Q.   When you heard that or when the other instructors

22   heard that, was there any conversation following up on

23   that?

24   A.   Ms. Bellamy and I both said words to the effect

25   that sometimes it took Lindy a little longer or, you know,

1    she had struggled with some of the textbook concepts but

2    once she got it, she got it and that she was very good

3    clinically and that we felt good about her passing and

4    continuing on.

5        Q.    To also pass the board; is that correct?

6        A.    Right.

7        Q.    Okay.  Just a moment, please.  Was there a

8    specific course that Ms. Peterson said that Lindy needed

9    to be failed in?

10       A.    No.  It was a general statement, and I perceived

11   it not as -- and I know she would not have done, asking us

12   to go back and change grades that Lindy had made but the

13   assumption at that point in time was Ms. Bellamy and I

14   would be returning for the fall semester and we would both

15   have Lindy again as a student, myself in obstetrics, Ms.

16   Bellamy in her advance medical surgical coursework.  And

17   it was -- or I perceived it as a, in the future this needs

18   to occur, that she verbalized that she did not feel that

19   Lindy would pass boards and would be a liability and did

20   not need to pass.

21       Q.    But you do not -- you did not interpret that to

22   mean that you needed to go back and regrade her to fail

23   her that particular semester?

24       A.    No.  But Ms. Peterson would not have asked that

25   of me, I know.

1    Q.   In regards to instructor Bellamy, did you and

2    instructor Bellamy have a discussion after or outside of

3    the presence of Ms. Peterson after Ms. Peterson left,

4    after she made that statement, y'all need to fail her, and

5    then did she walk away?  What did she do?

6    A.   She stayed for a few more minutes and we talked

7    about some other things.  And at some point in time,

8    Brenda Bellamy and I discussed the fact that, again, that

9    Lindy sometimes had problems with the academic book work

10   and, you know, needed extra studying and extra help; but

11   that when she got it, she got and that we felt -- both Ms.

12   Bellamy and I felt that she would pass boards.

13   Q.   Was there ever a conversation between you and

14   instructor Bellamy to the effect that -- I know you said

15   that you did not feel like it was a direct instruction for

16   you to go back and regrade Ms. Wright's coursework for

17   that semester.  Did Ms. Bellamy also, in your opinion, did

18   she seem to have that same understanding?

19   A.   I would say yes.  And this is my perception.  The

20   fact that both Ms. Bellamy and I are super ethical and

21   walk the line as far as how things should be done, so I --

22   my assumption would be that if that was in Ms. Peterson's

23   thought process, even she would not have asked us because

24   she knows we would not have done it.

25   Q.   So you do believe that it was a direct

1  instruction, her being your supervisor, you being her

2  subordinate, her telling you, in the future you must fail

3  her?

4       A.   I did not feel she was telling me to fail Lindy

5  if she passed.  It was a more you need to make it hard

6  enough that Lindy won't pass.  If she's having difficulty,

7  then y'all need to handle this and not make it so that she

8  can get it.  That was my perception of the message.

9       Q.   Okay.  Aside from that conversation, was there

10  ever a conversation or a directive from the -- Ms.

11  Peterson or anyone else who would have been perceived as

12  someone who would have been in a higher rank of authority

13  than you instructing you or telling you anything regarding

14  Lindy Wright?

15       A.   Not that I recall.

16       Q.   Do you recall any type of an incident at

17  graduation regarding Ms. Lindy Wright and Ms. Peterson?

18  It would have been a graduation exercise for the LPN

19  degree, not the ADN degree.

20       A.   No, I don't remember any incident.

21       MS. COOLEY:  Okay.  I don't have anything further

22       for you; however, Dr. Dumbuya may.

23       THE WITNESS:  Okay.

                              EXAMINATION

24

25  BY DR. DUMBUYA:

1    Q.    Going back, Ms. Gunnels.    Going back to the

2    statement allegedly made by Ms. Peterson that you have to

3    fail her.    Was this after a particular course that you had

4    taught to Ms. Wright that she told you you have to make

5    sure that she fails?

6    A.    Uh-huh.    It was the end of summer quarter.    They

7    started school in May and this would have been whenever

8    that particular quarter ended in August, a semester.    CVCC

9    is on semester system, I apologize.    I'm dealing with

10   quarter systems right now.    And Ms. Bellamy and I were in

11   the office computing final grades for the course that she

12   taught, which was the med surge course and the two courses

13   I had taught Lindy, which was the pharmacology and the

14   physical health assessment course.    And as I remember,

15   Lindy was what we call close in her med surge course.    And

16   depending on how well she had done on her final was going

17   determine whether she made a C or not; and she did, as I

18   recall, very well on her final, which is a comprehensive

19   testing of all the knowledge that's been presented over a

20   three-month time period so we put a lot of emphasis.    It's

21   weighted higher because it is comprehensive over the

22   entire -- everything we have taught for that semester goes

23   on that final.    Because as a nurse, you can't afford to

24   store things in your short-term memory, it has to become

25   knowledge base.    And so that's the most important thing to

1    us is at the end of semester, does the student have the

2    knowledge they need to move on to the next level.  And so

3    that is -- as I recall, Lindy did well on her final, her

4    grade was not close to being a D, it was a middle, low C.

5        Q.    Now, to the best of your knowledge, had Ms.

6    Peterson made that statement before concerning another

7    student that you have to make sure that she flunks?

8        A.    No.  I have never been told that before.  I'd

9    heard Ms. Peterson express concerns about students at

10    times.  Board results are very important to nursing

11    programs.  Depending on the state -- and I can't remember

12    exactly what Alabama's is now.  Georgia, it's 80 percent.

13    If 80 percent of your students do not pass boards, the

14    state board of nursing comes in and investigates your

15    program, you can be put on suspension, get a slap on the

16    hand.  Because if the propensity of your students or a

17    majority of your students are not passing boards, then it

18    is the fault of -- it is perceived to be the fault of the

19    program, either in their admission criteria or how they

20    are presenting the information or how they are testing.

21    And so you're -- you are audited every so often anyway.

22    State Board of Nursing comes in, National League of

23    Nursing comes in and looks at your program.

24        But, for example, the Alabama State Board of Nursing

25    just sent out their annual report for last year, 2005.  So

1    the class that Lindy Wright was a part of would not be
2    reflected in that.  And CVCC is on a suspension type.
3    They've got an asterisk by their name, which means the
4    State Board of Nursing has talked to them about their pass
5    rate, that they've had -- not had the appropriate numbers
6    of student -- percentage of students passing boards on
7    their first try.
8        And so I know Ms. Peterson was very concerned about
9    that and wanted to make sure that this class had a very
10   high pass rate, and she had verbalized that concern.
11       Q.   Having said that, you know, why would Ms.
12   Peterson therefore instruct, or at least tell those of you
13   within the confines of the office that you all need to,
14   you know, flunk her?
15       A.   Because she said, she -- Ms. Peterson said,
16   expressed the opinion, Lindy would not pass boards once
17   she finished the program.  And she said, she's weak,
18   y'all, she's not going to pass boards or words to that
19   effect.
20       You are not rated or looked at by the State Board of
21   Nursing or the governing bodies as to your attrition rate
22   in your course.  The measurement is how many of your
23   students that you graduated and said received the proper
24   education has the proper knowledge passes the national
25   exam because all nurses take the exact same exam whether

```
 1    you go to CVCC or whether you go to Yale for nursing
 2    school.  The initial exam is exactly the same to be able
 3    to place RN behind your name.  And so there's a base of
 4    knowledge that all RNs or candidates to take the NCLEX
 5    (phonetic) and become an RN are supposed to have.
 6        And she expressed the opinion that in May, when
 7    Lindy -- or August, when Lindy would -- May when Lindy
 8    would graduate, that she would not pass boards.
 9        Q.   So essentially what you are saying, Ms. Peterson
10    had made a predetermination that she's not going pass the
11    board exams and as such, she ought not to be graduated
12    essentially?
13        A.   That was my impression.  Lindy did not pass her
14    practical nursing boards the first time she took them.
15    And I know that she received some tutoring from another
16    instructor and I helped a little bit, and she passed them
17    with flying colors the second time.  And that's not that
18    unusual for you to have a student who is not a good test
19    taker to sit once to get the feel for it and see what
20    types of questions.  Because as much as we try to explain
21    in the classroom what it's going to be like -- and I'm
22    sure you have the same type thing with the bar -- that you
23    go and sit in front of a computer, you may get 85
24    questions, you may get 275 questions and neither are
25    really an indicator of whether you have passed or not.  So
```

1    it's a draining experience, nerve racking, computerized.

2    And so we -- you plan on a certain number of students not

3    passing boards the first time just because of the anxiety

4    and the new type of experience.  And so most programs,

5    that's why 80 percent is our goal, not 100 percent.

6        Q.   Now, when Ms. Peterson made the statement that

7    you all need to flunk her, did any of you respond to her?

8        A.   We did.  I know I did.  And Ms. Bellamy said

9    essentially as I remember the same thing I did, sometimes

10   it takes her a little bit longer, sometimes she needs some

11   extra help, but she'll get it and she gets its and she's

12   got this and so, you know, we feel good about her moving

13   on.

14       Q.   Okay.  Now, Ms. Gunnels, did you have occasion to

15   teach a student by the name of Urich Uma (phonetic)?

16       A.   Yes.

17       Q.   Uma.

18       A.   Uma.  Sir, I did.

19       Q.   And do you recall which semester it was that you

20   had this particular student?

21       A.   It would have been -- and I'm guesstimating

22   here -- the -- well, I had her the year before Lindy

23   Wright's class, so they would have started in May of 2004

24   with graduation in May of 2005.

25       Q.   Okay.  And which particular course did this

1    student take from you, if you know?

2        A.   I taught pharmacology, obstetrics and pediatrics.

3    I was her lecturer and sometimes clinical instructor.

4        Q.   Okay.  Would that course or any of those two

5    courses be NUR-272?

6        A.   That would be pediatrics, yes, sir.

7        Q.   That would be pediatrics, okay.

8        A.   NUR-271 is OB, and I can't remember

9    pharmacology's number.

10       Q.   Do you remember the course number of the other

11   course that she took from you?

12       A.   271 would be the obstetrical course.  And if

13   you -- I could get the number for the pharmacology course.

14   I have it in my records.  I just off the top of my head

15   cannot remember but it would have been a 200-level nursing

16   course.

17       Q.   So all in all she took three courses from you?

18       A.   Three courses and it would have been over a year

19   time period that I was her instructor.

20       Q.   Okay.  Now, do you recall the grade on 272, the

21   pediatric course?

22       A.   Yes.  She made an F.

23       Q.   She made an F?

24       A.   Yes, sir.

25       Q.   Okay.

1    A.    I take that back.  It may have legally been a D.

2    As I recall, she had a C in her course work, but she made

3    an F in her clinical grade.  And according to the school

4    policy, I believe that gave her an overall D for the

5    course but insured that she would have to retake the

6    course to graduate.

7    Q.    Okay.  So she earned a D in --

8    A.    Probably the grade -- if you looked at her grade

9    report, it would reflect a D.

10   Q.    A D.  That would be the overall grade for that

11   particular course?

12   A.    Right.  With a C being her course work and an F

13   being her clinical grade, the grade she got on her

14   performance actually in the hospital --

15   Q.    Okay.

16   A.    -- take caring of patients.

17   Q.    Taking care of patients.  So overall, she failed

18   272; is that correct?

19   A.    272, yes, sir.

20   Q.    Do you have any present recollection as to

21   whether she was allowed to retake 272?

22   A.    I have been told that she took a variant of 272

23   during a semester when 272 was not officially offered.

24   And so as I understand, they set up a special independent

25   course for her.

1    MS. COOLEY:  Instructor Gunnels, if we could

2    pause, we've got somebody who's got to be somewhere if

3    we can just do 10 minutes with her real quick.

4                    (Recess was taken.)

5        A.    You were asking me about Urich Uma and the 272

6    grade; right?

7        Q.    (BY DR. DUMBUYA)  And the 272 she failed and she

8    was allowed to retake 272; is that correct?

9        A.    I was told -- because at that point, I had left

10   Chattahoochee Valley.  But I was told that they had set up

11   an independent study with Ms. Harris and she did some type

12   of clinicals with an instructor named Sylvia Shirley and

13   then had to do remediation with Ms. Harris and.  This was

14   told to me by various nurses and instructors, so I can't

15   attest to the validity.  That's what I was told.  But

16   there was not a 272 being offered at the time that she

17   took it, so for the first time to my knowledge or in the

18   history of CVCC, they allowed a student to come back, not

19   make them wait for the next rotation of the NUR-272.

20       Q.    And to the best your knowledge or to the best of,

21   you know, the information you received, this was not an

22   equivalent 272 course but something that was made up?

23       A.    It was an independent study for the course work

24   and an abbreviated clinical experience and more

25   remediation in the lab, not the syllabus required work for

272.

Q.   Okay.   What about 271?   Did she receive a passing grade for it?

A.   She made a C in that course, I believe.   She was actually a B/C student in the classroom.   It was in the clinical arena she was very, very, very weak to the point of dangerous.

In 271, that is obstetrics, so deficiencies usually aren't picked up there because the students are working in well-baby nursery, they are working with mom's who just had babies getting them up, giving them showers, that kind of thing.   272, even though it's pediatrics or maybe because it is pediatrics, they are taking care of very ill children on the floor, small babies with IVs, you know, really sick kids, that type of thing.   And her clinical deficiencies just came out when she started working on pediatrics with myself and another clinical instructor.

Q.   Okay.   Now, you don't have a course number for the clinicals, do you?

A.   It's the same course.   In -- at Chattahoochee Valley, you either receive a pass/fail for your clinicals.   And if you pass clinicals, then the letter grade that you receive on your grade report is what you've received in the classroom plus care plans, that type of thing.   If you fail the clinical portion and you fail the classroom

1    portion, you get an F.  If you fail the clinical portion

2    but pass the classroom portion, you receive a D to ensure

3    that you come back because you have those clinical

4    deficiencies.

5        Q.   Now, under CVCC policy at the time when Ms. Uma

6    failed 272, was she out of the program, the nursing

7    program?

8        A.   That was the first course and only course she had

9    failed.  And how it should have been handled or how it had

10   been handled in the past or what the policy was is that

11   she would wait a year and come back the next January when

12   272 was offered again and take it with the next class of

13   students.  And, in fact, we had students coming back, for

14   example, in OB.  It's -- I don't want to say it's not

15   unusual; but if someone does not pass, then they have the

16   really nine-month wait till it starts again and then they

17   retake that class again and either pass or fail.

18       Q.   Well, in this case, she was allowed to take a

19   make-up course before the nine-month lapse --

20       A.   Yes.

21       Q.   -- had taken place?

22       A.   She had obtained a lawyer and had come to the

23   school.  The lawyer had come to the school.  And Ms. Uma

24   was Nigerian, was Black, and there was conversation about

25   the racial ethnic issue of with her race and her ethnicity

that the college was going to have to be very careful.

And, in fact, I was -- I had to defend -- I'm the one that issued the F. I had to defend the grade that I issued and the two clinical instructors who were working with me because -- I didn't even want to rely just on my opinion. So two other instructors, pediatric instructors, worked with her. We all came to the exact same opinion that she should not pass, she was dangerous clinically. I informed Ms. Peterson that she was going to fail, issued the F. I had to defend my grade in a meeting with the biology teacher, who is also an RN -- and her first name is Jane. I can't remember her last name. I can find out. -- Ms. Peterson; Ms. Bellamy, who was not involved in that course, and explained, present all my documentation, et cetera, et cetera. And at one point in time, they even said, oh, you're not going to be able to fail her because at one point in time you had too many students on the floor. And I had to prove to them that I had stayed within the state standards of how many students per instructor were actually on the floor.

I consequently had another meeting with Dean Lowe and Ms. Peterson. And it was Dean Lowe's -- Dean Lowe could have overridden my decision to assign Ms. Uma an F, and indicated that he was going to override my decision to give Ms. Uma an F. I informed him that I would drive to

1    the State Board of Nursing in Montgomery and take my

2    records with me, and that I would tell the State Board of

3    Nursing that she was dangerous and should not be allowed

4    to take boards and that I had been overruled.  And I feel

5    only because of that was she finally issued the F.

6    Because she went through an appeal process and I met

7    several times, more times than I care to count, and had to

8    defend my grade.  And I had pages and pages of

9    documentation, time, witnesses, that type of thing.  And

10        Dean Lowe, in essence, told me that I could not assign

11    her an F because of her ethnicity.  And I told him that if

12    he overruled my decision that I would inform the State

13    Board of Nursing and everybody else I could think of who

14    needed to know.  And that if anything came of it, that,

15    you know, I would be a witness for whoever, that I would

16    tell them what, you know, had happened in those meetings.

17        Q.    Now, when Ms. Uma showed up with the attorney,

18    was it before or after she was allowed to take a make-up

19    course --

20        A.    Oh, it was before.

21        Q.    -- 272?  Before.

22        A.    There was -- she would have failed in May.  I

23    still worked for the college that summer, and that is when

24    she was appealing it, and, you know, all of this was

25    occurring.  And then I left in August and my understanding

1    is they let her come back right after I left and take the

2    special independent-type study course.  And that right had

3    been denied other students.  They had to wait until the

4    course was again offered in sequence.

5        Q.    And to the best of your knowledge, do you know

6    whether Ms. Uma finally did receive her degree, ADN

7    degree?

8        A.    My understanding is that after remediation in the

9    lab with Ms. Harris, I was told that Ms. Shirley had again

10   failed her clinically or had not felt like she was strong

11   enough; and that the instructor, Lynn Harris, had worked

12   with her in the lab and they had decided that she had

13   learned what she needed to know and issued a passing grade

14   in pediatrics.

15             DR. DUMBUYA:  All right.  I don't have anymore.

16             MS. COOLEY:  I do now.  I'm sorry.

17             THE WITNESS:  That's okay.

18                          RE-EXAMINATION

19   BY MS. COOLEY:

20       Q.    Something that you just said, I want to make sure

21   I understand.  She was issued a second failing grade but

22   then Instructor Harris overrode that and worked with her

23   individually?

24       A.    I don't know that she actually received on a

25   grade report an F.  I was told that Ms. Shirley in

1    clinicals did not feel like she was capable of being --

2    passing clinicals, and so Ms. Harris took her to the lab

3    and worked with her.  And things were done till the point

4    where she was capable of performing basic nursing care and

5    was given a passing grade.

6        The things that Ms. Uma failed when I failed her were

7    basic, basic safe nursing techniques:  Catheterization,

8    sterile technique asepsis, numerous medication errors that

9    had she not been with an instructor she would have killed

10   a child, to the degree -- and I said earlier, I don't take

11   failing a student lightly.  I see myself as being there to

12   make sure that if they're going to be a competent nurse,

13   that they're prepared and, you know, I will tutor, blah,

14   blah, blah.  There in my opinion, Ms. Uma was so unsafe

15   that there was no tutoring.

16       We brought her back at the beginning of each group for

17   the LPNs to RNs -- we have a clinical lab day were they

18   come in -- our assumption is because they're LPNs, they

19   can start an IV, they can give an injection, they can put

20   in a Foley catheter because those are things that they've

21   been doing in their practice field.  But when they go on

22   the floor as a student, they're working under my license.

23   They're not working under their LPN license, and I am

24   responsible for the practice and for the care that they

25   give.

1    So we bring them in and it's set up with mannequins

2    and stations and those types of things. And I know one of

3    the skills we call them is catheterization. Ms. Uma

4    flunked catheterization like four times that day, five

5    times that day and with three different instructors to the

6    point they came and got me and said, come, you know, watch

7    her. And I said, okay, we've spent enough time, you are

8    going to have to come back separate and special. And this

9    was to get her ready to come into this special class. And

10   so they sent her through with the group of students that

11   was there to do this clinical day and this clinical check

12   off, and she could not pass that, which is basic, basic

13   nursing skills.

14       Q.    And when you say basic, again, those are skill

15   sets that she should have already learned being an LPN,

16   not even reaching to the level of an ADN?

17       A.    These are first quarter, taking people off the

18   street, spending five hours with them. And if I spent two

19   hours with you, you could do this particular skill that

20   she could not pass.

21       Q.    Had she gotten her LPN from CVCC?

22       A.    No. She -- I'm not sure where -- she came from

23   Atlanta to CVCC for her LPN to RN bridge, and was an LPN

24   practicing in some type of special unit at Grady.

25       Q.    All right. Going back to Ms. Wright,

1    specifically regarding the board exams.  The closest it

2    sounds like simulation process that you-all have for the

3    ADNs to get them ready for the RN is a simulation board

4    exam; is that correct?

5        A.    Right.  They take that at the end of --

6        Q.    And the first time that Ms. Wright took the

7    simulation board exam, she failed it; is that correct?

8        A.    I'm not aware of that because I had left the

9    college at that point.

10       Q.    Okay.  The board exam that you said that she

11   failed initially, was that the LPN board exam?

12       A.    That was the first time she sat for her practical

13   nursing boards.

14       Q.    Okay.  The second time that she took it, however,

15   she passed and received her LPN degree; is that correct?

16       A.    Correct.

17       Q.    Would that be if -- if not utilizing the services

18   of a practical or simulation exam for RN, would the

19   closest thing that she would have taken prior to that

20   would have been the LPN exam?

21       A.    It's similar, yes.

22       Q.    And she did, in fact, pass that the second time?

23       A.    She did.

24            MS. COOLEY:  All right.  I have nothing further.

25       Thank you so much for your time.

33

1      DR. DUMBUYA:  I don't think I have anymore

2  questions.

3      THE WITNESS:  You are welcome.

4      MS. COOLEY:  Is the best way to reach you on the

5  address that you gave to us?

6      THE WITNESS:  In writing, yes.

7      MS. COOLEY:  Okay, great.  Thank you.

8      **WHEREUPON, the deposition of Ms. Sandra Gunnels**

9          **concluded at 9:30 a.m. EST.**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF GEORGIA

2   COUNTY OF MUSCOGEE

3

4                    **C E R T I F I C A T E**

5

6        The foregoing transcript of the proceedings was

7   taken before me as a Certified Court Reporter in and for

8   the State of Georgia and reduced to this transcript under

9   my direction and supervision, and I certify that it is a

10  true and correct and complete transcript to the best of my

11  ability of the proceedings.

12

13       This 20th day of November, 2006.

14

15

16

17                    *Courtney Tillman Peters*

18                    Courtney Tillman Peters
                      Certified Court Reporter
19                    Certificate No. B-2329

20

21

22

23

24

25

PLAINTIFF'S
EXHIBIT
23

DEFENDANT'S
EXHIBIT
10

321.94
173.46
250.00

1ed
mark
B
choose
d

1) Surgs site for ∅ signs of infection
3) bandage for drainage
C) ability to peal, correct also.
4) Support head to prevent stress on suture lin   (Nursing action

Fundamentals pg 1117

— not leaving it in

nurse is providing irrigation for Nasogastri tub.

4) Mr pts K⁺ Level 4 meq/l & Sodium 130 meg/l the

3 Med Sarg
Instructor
picked
A

nurse would irrigate w/

A) tap H₂o
B) sterile water
} could use either doesn't have to be sterile.

C) 0.25% NS
d) 0.9% NS
} NO — NS is isotonic & will not impact Na level—

Pg 1117

intervention be provide in the plan of care for pt w/ multiple myeloma

choose B
Amswer
in Red

A) ↑ Fluids
B) monitor RBC   p. 1827 — last version
C) cough & deep breath
D) frequent oral care

" Renal failure (complicat would give ↓ fluid. "

p. 909  10th ed.
1st line

pt w/ CA developed complication of thrombocytopenia
hygiene contraindicate

bleeding

50) correct A) Brushing teeth & dental floss.
b) showing w/ hot water
c) taking lukewarm sponge bath
d) using bubble bath

bleeding
Chap
7303

pg 770

Ⓐ

success for treatment of prostetic en.

6) two antigen on scan from
key on paper
E - kidney
F stomach
G liver
H heart

this was to be graded by hand. per instructor

Client is taking a nonselective beta-adrenergic agent for asthma check which organ for effects of the drug.

assessment of 34 yr. old pt

Fundamentals Book Past Day Clw

post liver biopsy.
reveals IV 0.9% KVD - rep 24 - b/P 80/40
pulse 130. Temp 97° skin cool. cap refill @ >5

1st action post

Danger pick

↓ HOB 30°
B) call physician.
c) check incision site.
D. decrease fluids to 100ml/hr → not even maintenance

Bad question
D. do you have an order? 100 ml is too little to via post

providing care for Nephrotic Syndrome.

A) pruritis wide spread edem
B) ↑ protein serum levels
c) low serum triglyceride level
d. weight loss over the last several months.

CHF client order lasix 60g IV.
½ hr. later she wants to go to bathroom
ofr bedpan, becomes upset won't toilet
Select all infor. you can let her use bedside
commode. A) O2 96%   B) B/P 130/84 Resp 20
c) ∅ pedal edema   D) color pink, skin warm
                      E. Pulse 104 +
                      irreg.
B

preparing to administer oxygen the
nurse should explain the type of mask that provides the
most accurate method of oxygen delivery is

A) Non rebreather air mask
B) Aerosol mask
C) Venturi mask
D) Simple mask

What are correct interpretation
of following blood gas value

PH 7.36 N   Pa CO2 24   HCO3 14 ↓        Compensation ?
                                         total was
                                         not on
                                         test

A) Resp alkalosis
B) Compensated resp alkalosis
C) metabolic alkalosis
D) compensated metabolic acidosis

caring for pt hospitalized w/ acute exacerbation of
chronic obstr. (COPD) which of the following would
the nurse expect to find evaluating this client

picked
D
A) ↑ O2 sat w/ exercise
B) Hypocapnia
C) hyper inflated chest x-ray
D) widen diaphragm noted on chest xray.

2
a
instructing a hospitalized client w/a diag of emphysema
about measures that will enhance the effectiveness
of breathing during dyspneic periods. Which of the following
positions will nurse instruct client to assume?

A) side lying in bed.
B) Sitting in a recliner chair
C) Sitting up in bed.
D) sitting up in bed lean over bed side table

Ⓒ

the fluctuation of $H_2O$ seal contact stop. The most
probable cause of the fly is.

loose
A    A) the tubing is loose at the insertion site.
answer  B) the lung has reexpanded
        C) there is a leakage of air in the seal.
        D    the tubing needs to be irrigated

It is necessary to supply humidity through a tracheostomy

because.

A. periods of dyspnea will occur as $O_2$ dries lugs
answer — B the nose + pharynx are by passed & $O_2$ dries secretions
C. Periods of apnea + mouth will be dry
D    all of above

loose
A client has adult respiratory disease syndrome
The lowest fraction of inspired $O_2$ possible for optimum
gas exchange is used. The nurse explains to the
family the reason for this precaution is to
        A) Avoid resp depression
        B) Prevent $O_2$ toxicity.
        C) Increase lung compliance
        D) Promote production of surfactant

Which of the following occurs w/ aplastic anemia

A) leukocytosis
B) anemia            Choose
C) polycythemia        C & D      not C but e answer
D) leukopenia
E. thrombocytopenia

D

A) Surgey site for ∅ signs of infection          321.94

B) bandage for drainage          173.46

C) ability to speak, correct also          250.00

D) Support head to preven stress on suture line    ↓Nursing action

Fundamentals pg 1117    — not leaving it in

A nurse is providing irrigation for Nasogastric tub.

(B)

A pts K⁺ level 4 meq/l & Sodium 130 meg/l the

3 Med Surg nurse would irrigate w/          Pg 1117
Instru ctors picked A

A) tap H2O
B) Sterile water          } could use either
                          doesn't have to be sterile.

C) 0.25% NS
D) 0.9% NS          } NO — NS is isotonic & will not impact Na level —

Interventions be priority in the plan of care for
pt w/ multiple myeloma

A) ↑ Fluids                         9th ed
B) monitor RBC   p. 1827 — last version Burman    " Renal failure (complication
C) cough & deep breath  X ↓↓↓        would give ↓fluid. "
D) frequent oral care     p. 909 10th ed.
                          1st line

pt w/ CA developed complication of thrombocytopenia    bleeding
hygiene contraindicated          — bleeding    9th ed
(54) Correct A) Brushing teeth & dental floss.    Chap p 303    Pg 770
B) showering w/ hot water
C) taking lukewarm sponge bath
D) using bubble bath

PL 00113

Success for treatment of ___

this was to be graded by hand. per instructor

(Grow antigen on scan then Ren on paper
E kidney
F stomach
G liver
H heart

Cliend is taken a nonselective beta-adrenergic agonist for asthma check which organ for effects of the drug.

assessment of ___ 34 yr. old pt   Fundamentals Book Page pg ___

post liver biopsy. reveals IV 0.9% KVO - resp 24 - b/P 80/40
pulse 130 - temp 97° skin cool. cap refill ⊙ > 5
1st action post ___ response ___
__ at order drs
2 L O₂ bowel drs need 7500#

① ↓ HOB 30°
Ⓑ call physician.
c) check incision site
D. Increase fluids to 100ml/hr → not even maintenance

Bad question
D. do you have an order? 100 ml is too little to run past

P8. 431
orange measure normal care.
providing care ⊙ for Nephrotic Syndrome.

A) pressure? wide spread edema
Ⓑ ↑ protein serum levels
c) low serum triglyceride level
d. weight loss over the last several months.

CHF client order lasix 60mg IV.
1½ hr. later she wants to go to bath room on bedpan, becomes upset wait bathroom
Select all infor. you can let her use bedside
Commode. A) O₂ 96%   3) B/P 130/84 Resp 20
c) ∅ pedal edema   D) color pink, skin warm
& dry ⑤ Pulse 108 & irreg.

PL 00114

nurse should explain the type of mask that provides most accurate method of oxygen delivery is

A) Non rebreather air mask
B) Aerosol mask
C) Venturi mask
D) Simple mask

What are correct interpretation of follow blood gas value

PH 7.36^N   PaCO²  24   HCO³ 14 ↓

Compensation?
total was not on test

A) Resp alkalosis
B) Compensated resp alkalosis
C) metabolic alkalosis
D) Compensated metabolic acidosis

caring for pt hospitalized w/ acute exacerbation of chronic obstr. (COPD) which of the follow would the nurse expect to evaluate this client

picked A) ↑ O2 Sat w/ exercise
D
B) Hypocapnia                Pg 454
C) hyper inflated chest x-ray
D) widen diaphragm noted on chest x-ray.

instructing a hospitalized client w/a diag of emphysema about measures that will enhance the effectiveness of breathing during dyspneic periods. Which of the follow positions will nurse instruct client to assume?

A) side lying in bed.
B) Sitting in a recliner chair
C) Sitting up in bed.
D) sitting up in bed & leans over bed side table

the fluctuation of vac...

choose probable cause of the fig is.

A) the tubing is loose at the insertin site.

answer (B) the lug has re expanded

C) there is a leakage of air in the seal.

D the tubing needs to be irrigated

It is necessary to supply humidity through a tracheostomy

because.

A. periods of dyspnea will occur as O2 dries lugs

answer B. The nose + pharynx are by passed + O2 dries secretions

C. Periods of apnea + mouth will be dry

D all of above

choose A client has adult respiratory disease syndrome
the lowest fraction of inspired O2 possible for optimum
gas exchange is used. The nurse explains to the
family the reason for this precaution is to

A) Avoid resp depression

B) Prevent O2 toxicity

C) Increase lug compliance

D Promote production of surfactant

Which of the following occurs w/ aplastic anemia

A leukocytosis      Choose      not C but E answer
B anemia            B + D
C polycythemia
D lukopenia
E. thrombocytopenia

PL 00116

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

OPELIKA DIVISION

PLAINTIFF'S
EXHIBIT
24

LINDY WRIGHT,                    )
                                 )
        Plaintiff,               )
                                 )
vs.                              )
                                 )
CHATTAHOOCHEE VALLEY             )
COMMUNITY COLLEGE,               )
                                 )
        Defendant.               )

ORIGINAL

Oral Deposition of **MS. CAROLLA RAMBO**, Witness, called

by the Plaintiff, before Courtney Tillman Peters,

Certified Court Reporter and Notary Public for the State

of Alabama, taken at the law offices of Parker & Cooley,

1507 Broad Street, Phenix City, Alabama 36867 on the 1st

day of November, 2006, commencing at 9:00 a.m. EST.

**COURTNEY TILLMAN PETERS**
Certified in Alabama & Georgia
**CAUSEY & PETERSON CERTIFIED COURT REPORTERS**
Post Office Box 81
Columbus, Georgia  31902
(706) 317-3111

2

## APPEARANCES OF COUNSEL

For the Plaintiff:            MS. JENNIFER B. COOLEY
                              Parker & Cooley
                              1507 Broad Street
                              Phenix City, Alabama 36867

                              DR. PETER A. DUMBUYA
                              Attorney at Law
                              Post Office Box 3302
                              Phenix City, Alabama 36868


## INDEX TO EXAMINATIONS

WITNESS/ATTY                  EXAM              REEXAM

Rambo (Cooley)                 4


## INDEX OF EXHIBITS

INDEX NO.                                       PAGE
There were no exhibits marked for identification.

1    **S T I P U L A T I O N S**

2

3        IT IS STIPULATED AND AGREED by and between counsel

4    appearing for the respective parties that:

5

6        1)   The oral deposition of **MS. CAROLLA RAMBO**,

7    Witness, called by the Plaintiff, taken before Courtney

8    Tillman Peters, Certified Court Reporter and Notary Public

9    for the State of Alabama, at 1507 Broad Street, Phenix

10   City, Alabama 36867 commencing at 9:00 a.m. EST, on the

11   1st of November, 2006;

12       2)   ALL FORMALITIES with reference to notice of

13   taking, notice of time and place of taking, qualifications

14   of the Court Reporter, and all other matters precedent to

15   the taking of depositions are WAIVED;

16       3)   ALL OBJECTIONS, EXCEPT as to the form of the

17   question and responsiveness of the answer, are RESERVED to

18   the time of the hearing of the case;

19       4)   ALL FORMALITIES with reference to the filing of

20   depositions, including notice of filing, etc., are WAIVED;

21       5)   With the consent of deponent, the reading and

22   signing of the deposition by deponent is WAIVED;

23                   – – – – – – – – – – – – – –

24

25

1          **WHEREUPON, the deposition of Ms. Carolla Rambo,**

2          **beginning at 9:00 a.m. EST, occurred as follows:**

3                          **MS. CAROLLA RAMBO**

4     having been first duly sworn, testified upon examination,

5     as follows:

6                            **EXAMINATION**

7     BY MS. COOLEY:

8          Q.    Please state your name.

9          A.    Carolla Rambo.

10         Q.    And, Ms. Rambo, where do you live?

11         A.    6900 Flexstone Drive, Columbus, Georgia 31907.

12         Q.    And where are you employed?

13         A.    Oak and Pine Manor.

14         Q.    And in what capacity are you employed?

15         A.    I'm a restorative supervisor.

16         Q.    And is that in any way connected to being a nurse

17    or having a nursing degree?

18         A.    Yes.

19         Q.    And where did you obtain your nursing degree?

20         A.    I obtained my LPN at Columbus Technical College.

21         Q.    And were you ever at any point in time enrolled

22    at Chattahoochee Valley Community College?

23         A.    Yes.

24         Q.    And during what time were you enrolled at

25    Chattahoochee Valley?

1    A.    From May 2005 until August 2006.

2    Q.    Did you receive any type of a degree from CVCC?

3    A.    Yes.

4    Q.    And what degree was that?

5    A.    ADN.

6    Q.    And your ADN degree, did that take approximately

7    exactly the year that you said that you were there, the

8    May until the August?

9    A.    Yes.

10    Q.    During the time that you were a student at CVCC

11    for your ADN degree, did you become familiar or become

12    acquainted with another student named Lindy Wright?

13    A.    I did.

14    Q.    And did you have any classes with Lindy Wright?

15    A.    I did.

16    Q.    And did you have several classes or just one or

17    two with her?

18    A.    Several.

19    Q.    During the time that you had classes with Lindy

20    Wright, did you-all either at some point fail a class at

21    the same time or retake a class together?

22    A.    We failed a class at the same time.

23    Q.    And what class was it that you failed?

24    A.    Pediatrics 272.

25    Q.    And were you, in fact, allowed to retake that

1  course?

2     A.    I did.

3     Q.    And what course was it that you actually retook?

4     A.    Nursing 272.

5     Q.    And when was it that you took Nursing 272?

6     A.    In the Summer of 2007.

7     Q.    In the Summer of 2007?

8     A.    2006.

9     Q.    Okay.  And was that prior to graduating in August

10  of 2006?

11    A.    Yes.

12    Q.    And was that your only fail or your second

13  failure?

14    A.    The only.

15    Q.    So you only made one nonpassing grade during the

16  time that you were there?

17    A.    Yes.

18    Q.    The class that you actually took, the Nursing 272

19  when you retook it, who was your instructor?

20    A.    Ms. Harris.

21    Q.    And who was your instructor for the 272 that you

22  failed?

23    A.    Ms. Harris.

24    Q.    Were you the only student who was allowed to

25  retake Nursing 272 during the time that you retook it?

1    A.    No, there was another student.

2    Q.    And what was that student's name?

3    A.    Tiffany -- I believe her last name is Marshall.

4    I'm not sure about the last name.

5    Q.    Okay.  Was she in the same program with you?

6    A.    She was.

7    Q.    Was she in the same program with you during the

8    duration, the entire time that you were there?

9    A.    She was.

10    Q.    It's my understanding that as a class, everyone

11    starts at the same time and ends at the same time.  Do I

12    have a correct understanding of that for your nursing

13    program that you were in?

14    A.    That's correct.

15    Q.    Did you graduate with the class that you entered

16    with?

17    A.    I did not.

18    Q.    Okay.  What class did you graduate with?

19    A.    I graduated after the pediatrics class.  I

20    finished -- I completed the requirements for graduation

21    and I'm receiving my degree in May 2007, but my

22    requirements I met for graduation.  So for the Nursing

23    Board on my transcripts it states degree requirement met,

24    degree awarded ADN.  But to walk the stage and get my

25    papers, it's going to be in May 2007 because they only

1    printing the degrees the week prior to graduation.

2        Q.    So you will walk, in essence, in 2007?

3        A.    Yes.

4        Q.    But you've already met the requirements?

5        A.    I met the requirements.

6        Q.    But you were not allowed to graduate with your

7    class; is that correct?

8        A.    No, I was not.

9        Q.    But you were, in fact, allowed to actually retake

10   this class?

11       A.    Yes, I was.

12       Q.    And you did retake it with another individual.

13   And that individual was Tiffany, you believe her last name

14   was --

15       A.    She was allowed to retake the class; but before

16   she retook the class, we were allowed to look at our

17   grades again and our points.  And as she did so with Ms.

18   Harris, she found out that she did, in fact, pass the

19   Nursing 272 prior to retaking it but she did not walk with

20   the class.  I have no idea if she didn't receive the

21   degree.  And she did not receive it with the class, she

22   was not allowed to walk the stage because it was believed

23   that she did not pass the Nursing 272.  She was allowed,

24   like me, to relook all the grades up for the Nursing 272

25   and at all the tests and found that there was some hidden

1    points that was not calculated right.  So she did, in

2    fact, pass the Nursing 272, and she was reimbursed for the

3    money for the Nursing 272.  And I was the only student who

4    took the class as an independent study.  I did not have

5    any class time or any instruction time.  I was doing some

6    computer programs and I had to do clinicals again.

7         Q.    Okay.

8         A.    And took a final and passed the class in May.

9         Q.    Is the best way to get in touch with you the

10   address that you've previously read out for us?

11        A.    Yes.

12        Q.    Okay.  And as I know that you are already aware,

13   Ms. Wright, we believe, has been treated unfairly at CVCC

14   and there is a possibility that this could become a

15   lawsuit.  We would like to list you up as a witness and

16   you would possibly be subpoenaed to do that.  I just want

17   to make sure that you understand that as well.  And that

18   you are giving this deposition as voluntarily and of your

19   own free will; Is that correct?

20        A.    Yes.

21        Q.    Do you have concerns that you want to express to

22   us about CVCC's nursing program?

23        A.    Not at this time.

24        Q.    Have you ever had or heard any conversations from

25   any of the instructors regarding Ms. Lindy Wright?  Have

10

1   you ever personally heard or observed them talking in any

2   capacity about Lindy Wright?

3       A.    Not the instructors directly.

4            MS. COOLEY:  Okay.  Okay.  Do you have questions?

5            DR. DUMBUYA:  No, I don't have any.

6            MS. COOLEY:  Okay.  Thank you very much, and

7   thank you for your time.

8            **WHEREUPON, the deposition of Ms. Carolla Rambo**

9                    **concluded at 9:10 a.m. EST.**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF GEORGIA

2    COUNTY OF MUSCOGEE

3

4                        C E R T I F I C A T E

5

6        The foregoing transcript of the proceedings was

7    taken before me as a Certified Court Reporter in and for

8    the State of Georgia and reduced to this transcript under

9    my direction and supervision, and I certify that it is a

10   true and correct and complete transcript to the best of my

11   ability of the proceedings.

12

13       This 20th day of November, 2006.

14

15

16

17                    _Courtney Tillman Peters_

18                    Courtney Tillman Peters
                      Certified Court Reporter
19                    Certificate No. B-2329

20

21

22

23

24

25

## 1

1 - 3:6
1507 - 1:18, 2:3, 3:9
1st - 1:18, 3:11

## 2

2 - 3:12
2005 - 5:1
2006 - 1:19, 3:11, 5:1, 6:8, 6:10, 11:13
2007 - 6:6, 6:7, 7:21, 7:25, 8:2
20th - 11:13
272 - 5:24, 6:4, 6:5, 6:18, 6:21, 6:25, 8:19, 8:23, 8:24, 9:2, 9:3

## 3

3 - 3:16
317-3111 - 1:24
31902 - 1:23
31907 - 4:11
3302 - 2:6
36867 - 1:18, 2:4, 3:10
36868 - 2:6

## 4

4 - 2:14, 3:19

## 5

5 - 3:21

## 6

6900 - 4:11

## 7

706 - 1:24

## 8

81 - 1:23

## 9

9:00 - 1:19, 3:10, 4:2
9:10 - 10:9

## A

ability - 11:11
acquainted - 5:12
address - 9:10
Adn - 5:5, 5:6, 5:11, 7:24
Agreed - 3:3
Alabama - 1:2, 1:17, 1:18, 1:22, 2:4, 2:6, 3:9, 3:10
allowed - 5:25, 6:24, 8:6, 8:9, 8:15, 8:16, 8:22, 8:23
answer - 3:17
Appearances - 2:1
appearing - 3:4
Attorney - 2:5
August - 5:1, 5:8, 6:9
awarded - 7:24
aware - 9:12

## B

B-2329 - 11:19
become - 5:11, 9:14
beginning - 4:2
best - 9:9, 11:10

between - 3:3
Board - 7:23
Box - 1:23, 2:6
Broad - 1:18, 2:3, 3:9

## C

calculated - 9:1
capacity - 4:14, 10:2
Carolla - 1:14, 3:6, 4:1, 4:3, 4:9, 10:8
case - 3:18
Causey - 1:22
Certificate - 11:19
Certified - 1:16, 1:22, 3:8, 11:7, 11:18
certify - 11:9
Chattahoochee - 1:9, 4:22, 4:25
City - 1:18, 2:4, 2:6, 3:10
class - 5:20, 5:21, 5:22, 5:23, 6:18, 7:10, 7:15, 7:18, 7:19, 8:7, 8:10, 8:15, 8:16, 8:20, 8:21, 9:4, 9:5, 9:8
classes - 5:14, 5:16, 5:19
clinicals - 9:6
College - 1:9, 4:20, 4:22
Columbus - 1:23, 4:11, 4:20
commencing - 1:19, 3:10
Community - 1:9, 4:22
complete - 11:10
completed - 7:20
computer - 9:6
concerns - 9:21
concluded - 10:9
connected - 4:16
consent - 3:21
conversations - 9:24
Cooley - 1:17, 2:2, 2:3, 2:14, 4:7, 10:4, 10:6
correct - 7:12, 7:14, 8:7, 9:19, 11:10
counsel - 3:3
Counsel - 2:1
County - 11:2
course - 6:1, 6:3
Court - 1:1, 1:16, 1:22, 3:8, 3:14, 11:7, 11:18
Courtney - 1:15, 1:21, 3:7, 11:18
Cvcc - 5:2, 5:10, 9:13
Cvcc's - 9:22

## D

Defendant - 1:10
degree - 4:17, 4:19, 5:2, 5:4, 5:6, 5:11, 7:21, 7:23, 7:24, 8:21
degrees - 8:1
deponent - 3:21, 3:22
Deposition - 1:14
deposition - 3:6, 3:22, 4:1, 9:18, 10:8
depositions - 3:15, 3:20
directly - 10:3
District - 1:1, 1:2
Division - 1:3
Dr - 2:5, 10:5
Drive - 4:11
duly - 4:4
Dumbuya - 2:5, 10:5
duration - 7:8
during - 4:24, 6:15, 6:25, 7:7
During - 5:10, 5:19

## E

either - 5:20
employed - 4:12, 4:14
ends - 7:11
enrolled - 4:21, 4:24
entered - 7:15
entire - 7:8
essence - 8:2
Est - 1:19, 3:10, 4:2, 10:9
etc - 3:20
exactly - 5:7
Exam - 2:13
examination - 4:4
Examination - 4:6
Examinations - 2:12
Except - 3:16
Exhibits - 2:18
exhibits - 9:21
express - 9:21

## F

fact - 5:25, 8:9, 8:18, 9:2
fail - 5:20, 6:12
failed - 5:22, 5:23, 6:22
failure - 6:13
familiar - 5:11
filing - 3:19, 3:20
final - 9:8
finished - 7:20
first - 4:4
Flexstone - 4:11
follows - 4:2, 4:5
foregoing - 11:6
form - 3:16
Formalities - 3:12, 3:19
free - 9:19

## G

Georgia - 1:22, 1:23, 4:11, 11:1, 11:8
grade - 6:15
grades - 8:17, 8:24
graduate - 7:15, 7:18, 8:6
graduated - 7:19
graduating - 6:9
graduation - 7:20, 7:22, 8:1

## H

Harris - 6:20, 6:23, 8:18
heard - 9:24, 10:1
hearing - 3:18
hidden - 8:25

## I

idea - 8:20
identification - 2:20
including - 3:20
independent - 9:4
Index - 2:12, 2:18, 2:19
individual - 8:12, 8:13
instruction - 9:5
instructor - 6:19, 6:21
instructors - 9:25, 10:3

## J

Jennifer - 2:2

## L

last - 7:3, 7:4, 8:13
Law - 2:5
law - 1:17
lawsuit - 9:15
Lindy - 1:6, 5:12, 5:14,

5:19, 9:25, 10:2
list - 9:15
live - 4:10
look - 8:16
Lpn - 4:20

## M

Manor - 4:13
marked - 2:20
Marshall - 7:3
matters - 3:14
met - 7:22, 7:23, 8:4, 8:5
Middle - 1:2
money - 9:3
Muscogee - 11:2

## N

name - 4:8, 7:2, 7:3, 7:4, 8:13
named - 5:12
nonpassing - 6:15
Notary - 1:16, 3:8
notice - 3:12, 3:13, 3:20
November - 1:19, 3:11, 11:13
nurse - 4:16
nursing - 4:17, 4:19, 7:12, 9:22
Nursing - 6:4, 6:5, 6:18, 6:25, 7:22, 8:19, 8:23, 8:24, 9:2, 9:3

## O

Oak - 4:13
Objections - 3:16
observed - 10:1
obtain - 4:19
obtained - 4:20
occurred - 4:2
Office - 1:23, 2:6
offices - 1:17
one - 5:16, 6:15
Opelika - 1:3
oral - 3:6
Oral - 1:14
own - 9:19

## P

Page - 2:19
papers - 7:25
Parker - 1:17, 2:3
parties - 3:4
pass - 8:18, 8:23, 9:2
passed - 9:8
Pediatrics - 5:24
pediatrics - 7:19
personally - 10:1
Peter - 2:5
Peters - 1:15, 1:21, 3:8, 11:18
Peterson - 1:22
Phenix - 1:18, 2:4, 2:6, 3:9
Pine - 4:13
place - 3:13
Plaintiff - 1:7, 1:15, 2:2, 3:7
point - 4:21, 5:20
points - 8:17, 9:1
possibility - 9:14
possibly - 9:16
Post - 1:23, 2:6
precedent - 3:14
previously - 9:10
printing - 8:1
proceedings - 11:6, 11:11
program - 7:5, 7:7, 7:13,

9:22
**programs** - 9:6
**Public** - 1:16, 3:8

## Q

**qualifications** - 3:13
**questions** - 10:4

## R

**Rambo**- 1:14, 2:14, 3:6,
4:1, 4:3, 4:9, 4:10, 10:8
**read** - 9:10
**reading** - 3:21
**receive** - 5:2, 8:20, 8:21
**receiving** - 7:21
**reduced** - 11:8
**Reexam**- 2:13
**reference** - 3:12, 3:19
**regarding** - 9:25
**reimbursed** - 9:2
**relook** - 8:24
**Reporter**- 1:16, 3:8, 3:14,
11:7, 11:18
**Reporters**- 1:22
**requirement** - 7:23
**requirements** - 7:20, 7:22,
8:4, 8:5
**Reserved**- 3:17
**respective** - 3:4
**responsiveness** - 3:17
**restorative** - 4:15
**retake** - 5:21, 5:25, 6:25,
8:9, 8:12, 8:15
**retaking** - 8:19
**retook** - 6:3, 6:19, 6:25,
8:16

## S

**second** - 6:12
**several** - 5:16
**Several** - 5:18
**signing** - 3:22
**stage** - 7:24, 8:22
**starts** - 7:11
**State** - 1:16, 3:9, 11:1, 11:8
**state** - 4:8
**states** - 7:23
**States** - 1:1
**Stipulated** - 3:3
**Street** - 1:18, 2:3, 3:9
**student** - 5:10, 5:12, 6:24,
7:1, 9:3
**student's** - 7:2
**study** - 9:4
**subpoenaed** - 9:16
**Summer** - 6:6, 6:7
**supervision** - 11:9
**supervisor** - 4:15
**sworn** - 4:4

## T

**Technical**- 4:20
**testified** - 4:4
**tests** - 8:25
**Tiffany**- 7:3, 8:13
**Tillman** - 1:15, 1:21, 3:8,
11:18
**together** - 5:21
**took** - 6:5, 6:18, 9:4, 9:8
**touch** - 9:9
**transcript** - 11:6, 11:8,
11:10
**transcripts** - 7:23
**treated** - 9:13
**true** - 11:10
**two** - 5:17

**type** - 5:2

## U

**under** - 11:8
**unfairly** - 9:13
**United** - 1:1
**up** - 8:24, 9:15

## V

**Valley** - 1:9, 4:22, 4:25
**voluntarily** - 9:18
**vs** - 1:8

## W

**Waived** - 3:15, 3:20, 3:22
**walk** - 7:24, 8:2, 8:19, 8:22
**week** - 8:1
**Witness** - 1:14, 3:7
**witness** - 9:15
**Witness/atty** - 2:13
**Wright**- 1:6, 5:12, 5:14,
5:20, 9:13, 9:25, 10:2

## Y

**year** - 5:7
**you-all** - 5:20



PLAINTIFF'S
EXHIBIT
25

4/13/05

Ms. Wall, Ms. Harmon and I met on 4/12/05 to discuss and consider Ms. Umoh's appeal of her clinical grade.  Based on any one of the documented incidents, a failing grade is justified in the clinical arena.  However, the failing grade is reflective of and based on a trend of repeating the same type of error.

During her clinical experience, Ms. Umoh was afforded multiple opportunities to demonstrate she had corrected her previous errors and was competent.  At the midterm evaluation, all errors and steps needed to remedy the consistent errors were presented and discussed at length with Ms. Umoh.  However; even on the last day of clinical, Ms. Umoh was not able to demonstrate the level of critical thinking or nursing skills expected of an ADN student at the end of the program.

Of note, Ms. Umoh has consistently demonstrated a consistent lack of willingness to accept responsibility for her errors.  She always "blames" someone else for her errors.  She has documented that she has felt "picked on" and persecuted.

In the meeting Ms. Umoh alleged that:
1.) Ms. Gunnels was not present on certain clinical days when she was indeed there.  Witnesses to my presence can be produced.
2.) She had not received any of the multiple voice mails and messages that Ms. Harmon had left.  Ms. Harmon has witnesses to several of her attempts.
3.) She had not called Ms. Wall multiple times at home when she had indeed.  Ms. Wall's home and cell phone logs contradict the allegation.  Ms. Umoh has also called Ms. Wall's workplace to the point that it was disruptive and Ms. Wall was instructed by her superior to put a stop to Ms. Umoh's calling.
4.) She had not been counseled appropriately after each incident.  The instructors dispute this allegation.

When the total clinical experience is reviewed, we cannot in good conscience issue Ms. Umoh a passing grade.  We feel that she is clinically unsafe and must not be allowed to pass the clinical portion of NUR 272.

Sandra Gunnels, RN, MSN on behalf of

S. Gunnels, RN, MSN
A. Harmon, RNC, BSN
W. Wall, RN, BSN

**4/1/05**    After reviewing Arit Umoh's clinical performance evaluation and grade, Ms. Umoh has demonstrated a consistent lack of knowledge, critical thinking skills, and clinical judgment. Please see attached documentation of clinical performance issues.

**1/21/05**    On this date, Ms. Umoh did not do noon vital signs within a timely manner. Ms. Umoh was found in the report room around 1300 looking at a patient chart. When asked by Mrs. Wall if noon vital signs were obtained, Ms. Umoh replied she was awaiting the machine (BP machine). Mrs. Wall informed Ms. Umoh that noon vital signs did not consist of a BP per peds policy (as also previously instructed with fellow students in pre conference). On this date Ms. Umoh also had to be instructed that she would not be giving meds (was found in med room looking up meds to give) this day since in pre-conference 2 other students were chosen to administer meds. Though these early encounters are minor, we feel they need to be reviewed as they set the basis for a pattern of behavior.

**1/28/05**    Ms. Umoh was chosen to administer meds for the unit on this particular day. Though able to voice her rights of med administration accurately, Ms. Umoh did not practice those rights consistently during this clinical day. Ms. Umoh had to be prompted consistently to check patient ID bands before administering meds. At one point she was questioned why she did not check a particular patients ID band. Ms Umoh replied that she had already given this patient a medicine previously. Ms. Wall instructed Ms. Umoh that this was a busy floor and that it was critical to check ID bands on all patients before every medicine administration to avoid possible error. Also on this day, Ms. Umoh took it upon herself to time out Vancomycin IV  (and in doing so, med would be given) on a patient. The actual order was for Vanc to be given IF patient spiked a fever (which patient had not). Ms. Umoh did not recognize it was a prn order even after extensive questioning by Mrs. Wall. Both Mrs. Wall and Mrs. Gunnels witnessed these events. Ms. Umoh was given ample opportunities to figure this problem out on her own before being corrected. Ms. Umoh was informed that she would be pulled again to administer meds.

**2/4/05**    Ms. Umoh was pulled again this day to administer medicine and performed well. Did follow rights of medicine administration. Ms. Umoh discontinued an IV without wearing gloves. Ms. Umoh was made aware of mistake.

**2/11/05**    Ms. Umoh had the opportunity to administer p.o. Tylenol to a patient (her assigned patient). Ms. Umoh needed help with safe dosage calculation. A dose of 40 cc was calculated erroneously, and Ms. Umoh had to be told that dose was wrong. This patient was a small child. Ms. Umoh did not follow up on her patients response to the medicine. She was counseled on this matter. Ms. Umoh did perform a in and out cath on a 3 week old male demonstrating good technique. Ms. Umoh did have to be prompted on simple things like wearing gloves, and controlling catheter after withdrawal. The catheter

was not well controlled upon withdrawal, and urine splattered causing possible body fluid exposure to assistants.

**2/18/05 & 2/25/05**    Good clinical experiences. No incidences.

**3/4/05**    Please see T. Smith attached report of incident. Ms. Umoh was counseled on this matter and made aware of possible effects on patient. Made aware that she could go to anyone on the pediatric floor with patient issues requiring immediate action. Mrs. Gunnels questioned Ms. Umoh regarding the incident. Ms. Umoh stated that Ms. Smith was in report and she was unable to locate either of her 2 instructors once she realized the IV was infiltrated. Mrs. Gunnels questioned Ms. Umoh on why she did not notify the charge nurse or another TMC nurse. Her reply was that there were no nurses available as " everyone was in report ". Ms. Gunnels further questioned Ms. Umoh on why she did not knock on the door of the report room and ask for help as this was an issue requiring immediate attention. Ms. Umoh was totally unaware of how dangerous this situation had been or that the baby could have had to have her arm surgically repaired or even amputated based on this lack of action.

Also on this day Ms. Umoh was pulled to administer a p.o. medicine. She required prompting on safe dosage calculation. Upon administering this medicine to a 15 month old patient, Ms. Umoh squirted the entire contents into the child's mouth with out allowing time to swallow. The child was upset during this time posing the threat of aspiration with administration. Ms. Umoh was counseled on proper medicine administration. Ms. Umoh did double check the medicine order on the chart (was a new order) before administering.

Sandra J Gunnels (for) MSN

Patemier (Harris) RNC, DSN

Wendy Wall RN, BSN

2nd Care Plan  3

NAME: Arit Umoh

| DATE | MEDS *Right! | ROLL | BEHAVIOR *Confidentially, interaction w/ others, ethics, responsibility, recognizes own limits & seeks help | TEACHING *Appropriate info. level of communication w/pt. & family | SKILLS *Critical thinking, assessment, safety, procedures, responses to situations |
|---|---|---|---|---|---|
| 1-21-05 | Ø med | P | Told to do vis after lecture on Pt. She went in w/ report room to look at chart w/ her family | | I feel there is a language barrier Problem. She describes to understand them what she hears. Doesn't pay attention to what I like orders. lacks critical thinking and safety consistently |
| 1-28-05 | floor meds | P | Very stiff with family | Bad to be told again + again | D/C ICU (no gloves) Recieved sub D/C eye screen beads |
| 2-4-05 | Ø | P | | | D/C clocks |
| 2-11-05 | Ø | P | Give o.j. Tylenol to fever | fail needed to p/c | Performed to color on succeral mucus + technique good but needs prompting on simple thing like remembering gloves, not washing |
| 2-18-05 | | P | Very good connection but did not realize it the very good interaction w/ a mother. People with child | | |
| 2-25-05 | | P | | | |
| 3-4-05 | med. needed anaphylaxic sympt. to connection but finally did it | | administered 5 ing. ir. PB mouth ess of 5 mg. off | | VS, Am Care, linen change |
| 3-11-05 | | | excellent good on verbal presentation. | withdrew in 5 pt to swallow | VS/ I/O Check. (claims assisted c Justin check off the order close change) |

Assessment ↙

2/11/05  Tylenol administration → Arit calculated 40cc of Tylenol on a child - needed to be told of the dose was wrong.

asked of her. Continiusly needs to be told what to do several times. xmple. we made ass.sment that morning. Told Student 2 would give meds for the whole floor. Arit was in the med room looking at MAR to see what med were to be given. I'm not sure why so I asked her what was she doing and she was rrized to learn 2 other Students had been giving meds all day. She didn't understand that the other Student were giving meds for the whole floor. I'm still not sure she understands. WalRN

.28 Arit had been given meds for over 2 hours with mrs Herman. Had been told the code to get into med Drawer. mrs Harmon Asked me to go with her to give a P.O med. Arit asked me what the code was. I Asked her Didn't she have the code herself. She forgot it but had been Continiusly giving meds for 2 hours. When we complete giving the P.O med. She came back to the room (med) to mark off that she had given med. she wrote a time down on the MAR for a different drug and marked it off like she had given it. When I questioned her about it she didn't know she marked the wrong med and Still wanted to give it this med (that was PRN) to the pt. she didn't understand it was PRN and I had to get her to read the Print (orders) on MAR. copy of MAR will be given also. Mrs Gunnels witnessed me questioning Arit About this mistake. WWALRN

.id not check Pt Arm band, said she had given Pt meds Before. I reminded her she was giving meds for the whole floor and she most check all arm bands.

• Had to be told to look at order to see if septra was given orally (order change) the she did look it up but charted on the MAR that she save it IV. When I corrected her on this she wrote times for orally BID with out checking order.

• Told to do V/S when she got back from lunch then look up meds to give. She didn't do this. She went to look up meds and didn't do V/S until almost 13:00.

|11 0815   Took Temp 102 | Nurse had to be
              save motrin ?  | reminded to retake temp @ 1440 to see if med
                             | worked. Nurse not happy with Student.

4 Please see attached info regarding the infiltration of an IV in an infant. This was a serious safety issue (the infant could have surgical intervention up to and including skin grafts amputation of the arm).