**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | |
|---|---|
| **LINDY G. WRIGHT,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No. 3:06-cv-1087-WKW** |
| **v.** ) | |
| ) | |
| **CHATTAHOOCHEE VALLEY** ) | |
| **COMMUNITY COLLEGE (CVCC),** ) | |
| ***et al.*,** ) | |
| ) | |
| **Defendants.** ) | |

**DEFENDANTS' OBJECTIONS AND MOTION TO STRIKE**
**PORTIONS OF PLAINTIFF LINDY WRIGHT'S EVIDENTIARY SUBMISSIONS**
**CONTAINED IN PLAINTIFF'S OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

COME NOW the Defendants, Chattahoochee Valley Community College (hereinafter "CVCC"), Dr. Laurel Blackwell, Dr. James Lowe and Mrs. Dixie Peterson and file this Motion to Strike certain evidentiary submissions of Plaintiff Lindy Wright contained in Plaintiff's Response to Defendants' Motion for Summary Judgment and Supporting Brief. As grounds for this Motion, Defendants state as follows:

## I.      LEGAL ARGUMENT

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify in matters stated therein." Fed. R. Civ. P. 56(e). Rule 56(e) also applies to deposition testimony. Macuba v. Deboer, 193 F.3d 1316, 1325 (11th Cir. 1999) quoting Randle v. LaSalle Telecommunications, Inc., 876 F.2d 563, 570 n.4 (7th Cir. 1989). It is clear from Rule 56(e)

that any statement from an affidavit or deposition used to support a motion for summary judgment must be made on personal knowledge.  The personal knowledge requirement of Rule 56(e) prevents a party opposing a motion for summary judgment from relying on affidavits or deposition testimony that are based, in part, "upon information and belief – instead of only knowledge." Pace v. Capobianco, 283 F.3d 1275, 1278 (11th Cir. 2002).  "Likewise, an affidavit [or deposition] stating only that the witness 'believes' a certain fact exists is insufficient to defeat a summary judgment by creating a genuine issue of fact about the existence of a certain fact." Id. at 1278-1279 citing Jameson v. Jameson, 176 F.2d 58, 60 (D.C. Cir. 1949) ("Belief, no matter how sincere is not equivalent to knowledge.").

Additionally, evidence that is inadmissible under the Federal Rules of Evidence cannot be considered to defeat a motion for summary judgment.

In Macuba, the Eleventh Circuit discussed hearsay statements of witnesses offered by Plaintiff in an attempt to defeat a Defendant's Motion for Summary Judgment and ruled that the trial court erred in considering hearsay deposition testimony and affidavit testimony of a witness.  The Court stated the testimony of the witness who related that he had heard other individuals make statements that were integral to defeat Defendant's Motion for Summary Judgment were (1) "rank hearsay," (2) the statements did not fall under any hearsay exception to Rule 802 of the Federal Rules of Evidence and (3) even though a statement may be admissible to impeach, it would not be admissible as substantive evidence. Macuba, 193 F.3d at 1322-1325.  See also Reeves v. Thigpen, 879 F. Supp. 1153, 1162 (M.D. Ala. 1995) (striking portions of an affidavit providing evidence in opposition to a motion for summary judgment as based on inadmissible hearsay.), aff'd 103 F.3d 147 (11th Cir. 1996).

Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment relies on statements and exhibits that constitute inadmissible evidence for consideration of summary judgment under Rule 56(e) of the Federal Rules of Civil Procedure and the Federal Rules of Evidence.  As indicated more specifically below, the majority of statements and documents relied upon by Plaintiff to defeat summary judgment are merely Ms. Wright's beliefs which the court has deemed "insufficient to defeat summary judgment."  Further, Ms. Wright has relied upon and submitted inadmissable statements and documents that are conclusory, hearsay, speculative or irrelevant.

Based on the above legal authorities, Defendants move that the Court strike the following exhibits and statements which Ms. Wright relies upon in support of her motion for summary judgment.

## II.    STATEMENTS FROM DEPOSITION OF LINDY WRIGHT

In Ms. Wright's response to Defendants' Motion for Summary Judgment, Ms. Wright relies upon a number of statements from her deposition that are not based on her personal knowledge and are rank hearsay.  There are other statements that merely state a factually unsupported belief of Ms. Wright which is insufficient to defeat summary judgment.  Pages from Ms. Wright's deposition containing the controverted statements are attached as Exhibit "1" to this Motion.

Specifically, the following statements from Ms. Wright's deposition should be stricken:

### A.    Lindy Wright deposition, pp. 123:18 - 126:20

The statements from Ms. Wright's deposition contained on pages 123:18 - 126:20 are not admissible.  Within this excerpt, Ms. Wright asserts her belief that her clinical care plans in Nursing 252 were lost.  In support of her assertion that these care plans were lost, she relies upon statements she "overheard" in a conversation that she contends took place between Sandy Gunnels and Ms.

Wright's clinical instructor, Deborah Gruber. At the time of this supposed conversation, neither Ms. Gunnels nor Ms. Gruber was employed at CVCC. Ms. Wright's statements regarding the "lost care plans" based upon this conversation she "heard" are not based upon her personal knowledge and are not admissible.

### B. LINDY WRIGHT DEPOSITION, P. 264:11-20 and P. 265

Lindy Wright has also alleged that Defendant Dixie Peterson made certain comments instructing Ms. Wright's classroom instructors (Gunnels and Bellamy – neither of whom gave Lindy Wright any grade in any course subsequent to the alleged statements) that Lindy was a "weak student" and as Ms. Wright has stated in her own words, should not be allowed to pass the ADN program. To support her contention that Ms. Peterson stated that she was a weak student, Ms. Wright offered testimony regarding a conversation that allegedly took place between Sandy Gunnels, Brenda Bellamy, and Dixie Peterson. See Exhibit "1", pp. 264:11 - 267:23. Ms. Wright's testimony regarding this "conversation" reveals that Ms. Wright had no personal knowledge of this conversation. She specifically states that she "heard" about this conversation from Sandy Gunnels at the end of the fall 2005 semester. See Exhibit "1", p. 264:21-23; p. 265:15-19. Ms. Wright begins her statements by saying, "I was told that Dixie Peterson...." Exhibit "1", p. 264:11-12. Ms. Wright further stated, "I don't know exactly what she [Dixie Peterson] said to Sandy Gunnels because I was not in the room, but that's what Sandy relayed to me." Exhibit "1", p. 267:10-12.

It is evident that Ms. Wright was not present during this alleged conversation and has no personal knowledge regarding the conversation. Everything regarding the alleged conversation between Sandy Gunnels, Brenda Bellamy, and Dixie Peterson that Ms. Wright states in her deposition is rank hearsay and inadmissible. Exhibit "1", pp. 264:9 - 267:23. Moreover, at the time

Ms. Gunnels supposedly told Ms. Wright of this alleged conversation, Ms. Gunnels was not employed by CVCC. As such, Ms. Gunnels would not be considered an agent of CVCC and the statement was not made within the scope of Ms. Gunnels' employment at CVCC. Fed. R. Evid. 801(d)(2). As such, Ms. Wright's statements regarding the supposed statements Ms. Peterson made are not admissible evidence that Ms. Wright can use in support of her opposition to Defendants' Motion for Summary Judgment and this testimony should be stricken.

### III.    STATEMENTS OF SANDRA GUNNELS REGARDING EVENTS AT CVCC AFTER AUGUST 31, 2005

Plaintiff also uses statements from Sandra Gunnels deposition that are not admissible.[1] Specifically, Plaintiff relies upon a number of statements made by Ms. Gunnels regarding events that occurred at CVCC after Ms. Gunnels resigned as an instructor from CVCC on August 31, 2005. Exhibit "2", p. 131:4-6. Ms. Gunnels was no longer an employee at CVCC and did not have personal knowledge regarding the classroom instruction, clinical instruction, decisions, happenings or students at CVCC.

Plaintiff relies upon the following inadmissible statement as a fact:

"there was some time period where there was no stability in some of the instruction. And also, I know there was a lot of unrest on campus and within the nursing student division."

---

[1] Plaintiff has attached two depositions given by Sandra Gunnels in support of her Response in Opposition to Defendants' Motion for Summary Judgment. The first deposition was given on November 1, 2006 prior to the filing of this complaint. The second deposition was taken on July 24, 2007. The only individuals in attendance at the November 1, 2006 deposition were Jennifer Cooley and Peter Dumbuya for Plaintiff. Defendants were not notified that the November 1, 2006 deposition was taking place and were not given an opportunity to appear. Plaintiff failed to comport with Federal Rules of Civil Procedure 27 and 30 in scheduling this deposition. As such and later argued by Defendants, the deposition given by Ms. Gunnels on November 1, 2006 should be excluded.

Exhibit "2", p. 131:7-12. Plaintiff prefaces this statement in her response by stating, "Gunnels stated **after** her resignation and that of Bellamy...." Plaintiff's Response to Defendants' Motion for Summary Judgment, p. 18. From Plaintiff's response alone, it is clear that Ms. Gunnels was not at CVCC after August 31, 2007 and had no personal knowledge regarding what occurred at CVCC after her resignation. Moreover, this statement is irrelevant to the issues presented in this action. As such, this statement, as well as any other statement made by Ms.Gunnels regarding events at CVCC after August 31, 2007, is inadmissible and should be stricken and not be considered by the Court for purposes of Defendants' Motion for Summary Judgment.

**IV.    STATEMENTS AND EXHIBITS REGARDING AND RELATED TO SANDRA GUNNELS' REVIEW OF LINDY WRIGHT'S TESTS**

Plaintiff asserts as a fact the following:

"Additionally, Gunnels was the one who reviewed Wright's NUR 252 final exam and concluded that there were at least sixteen (16) 'clear cut' instances in which Harris marked wrong answers Wright got right. Gunnels Depo, p. 70:12-17, Plaintiff's Exhibits 3 and 23."

Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment, p. 21.

Exhibit 23 to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment are inexact handwritten questions that Ms. Wright wrote after being allowed by her instructor, Ms. Harris, to review tests that Ms. Wright had taken. Ms. Wright testified that she personally copied certain, but not all test questions. She admitted that her handwritten copy was not reflective of the test questions word for word. Moreover, she stated she copied questions from various tests, not just the final. Exhibit "1", p. 239:10-16. Ms. Gunnels' testified in her deposition that Ms. Wright brought her handwritten copies of test questions to her for review and advice. Exhibit "2", p. 49:15-50:23; 54:21-7.

In their Brief in Opposition, Plaintiff's counsel stated, "Gunnels reviewed Wright's final exam." Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment, p. 21. Plaintiff's counsel has asserted in brief that the Plaintiff's Exhibit "23" is a true, accurate copy of Ms. Wright's final examination in NUR 252. <u>Id.</u>  This is incorrect.  It is evident from Plaintiff's testimony that at best it is a handwritten paraphrase of some but not all of the test questions.  This jumble of handwritten notes is not an accurate reflection of her test and was not word for word. Therefore, it cannot be said that it is a true and correct copy of her final examination.  The document itself is irrelevant, inaccurate, and constitutes hearsay, and should be excluded as inadmissible evidence.

Moreover, any statement Ms. Gunnels has made during discovery regarding her assessment and opinion about the correctness of the paraphrased questions and Ms. Wright's answers is also unreliable, inaccurate, hearsay, and irrelevant.  There is no predicate offered and, in fact, none could be offered for the reason that the paraphrase of the test is inherently unreliable.  Ms. Gunnels is also not competent to testify as to her opinions for lack of predicate and her lack of standing herein as an expert witness.  It is evident that Ms. Gunnels did not review Ms. Wright's final exam.  She merely reviewed 16 paraphrased questions by the Plaintiff.  As testified by Ms. Wright who generated the document, the questions and answers she provided Ms. Gunnels were not word for word.  In other words, Ms. Gunnels DID NOT review Ms.  Wright's true final in its entirety.  The document Ms. Gunnels reviewed is itself hearsay upon admission of the Plaintiff.

Exhibit "23" is also inadmissible and would be even if it was the true and correct final examination, because it is irrelevant and should not be considered by the Court in reviewing Defendants' Motion for Summary Judgment and Plaintiff's Response in Opposition to Defendants'

Motion.  As such, Ms. Gunnels' testimony regarding her review of Ms. Wright's final is not admissible based on the fact that the test questions Ms. Gunnels reviewed are unreliable, inaccurate, hearsay, and irrelevant.

Finally, Ms. Gunnel testifies that the test questions she reviewed were from NUR 271 which is not one of the courses which Ms. Wright has made an issue of in this lawsuit. Exhibit "2", p. 50:13 - 51:12.  As such, they are not relevant and admissible as to the claims and defenses presented in this action.[2]

## V.    ALLEGED "SIMILARLY SITUATED STUDENTS"

Plaintiff purports that students Carolla Rambo, Arit Umoh and Shannah Lowe were "similarly situated" to Ms. Wright and "were given 'course forgiveness' or allowed to retake previously failed courses." See Plaintiff's Response to Defendants' Motion for Summary Judgment, p. 23. Ms. Wright was excluded from the Nursing Program at CVCC because she failed two courses at CVCC.  This consequence of two course failures is clearly stated in the CVCC ADN Program Admissions Criteria which are found in the Catalog and Handbook. Book of Exhibits, Exhibit "A", p. 106, ¶ 14 to the Defendant's Brief in Support of Their Motion for Summary Judgment.  Based upon Ms. Wright's Complaint and deposition testimony these Defendants assert that the correct definition of a "similarly situated" student is a CVCC ADN student who was excluded from the ADN program because of failing two nursing courses in the ADN program.  Plaintiff has not

_____

[2] Ms. Gunnels was deposed twice.  Plaintiff deposed Ms. Gunnels on November 1, 2006 before this action was filed. See Exhibit "22" to Plaintiff's Opposition to Defendants' Motion for Summary Judgment.  The statements referred to above were from the July 24, 2007 deposition taken in this action. Exhibit "3" to Plaintiff's Opposition to Defendants' Motion for Summary Judgment.  Defendants have filed an objection to Plaintiff's use of the November 1, 2007 deposition due to Plaintiff's failure to comply with Federal Rules regarding prelitigation depositions and notice requirements.

provided any admissible evidence to support her contention that these three students were "similarly situated." For the following reasons, the evidence offered regarding Carolla Rambo, Arit Umoh, and Shannah Lowe should be excluded.

### 1.    STUDENT CAROLLA RAMBO

Plaintiff asserts that Carolla Rambo failed NUR 272 in the spring semester 2006, but was allowed to retake it in the summer of 2006. In support of this, Plaintiff offered a deposition of Ms. Rambo taken by Plaintiff's counsel on November 1, 2006 before a court reporter. (See Exhibit "24" to Plaintiff's Response to Defendants' Motion for Summary Judgment). This action was not filed until December 7, 2006. (See Plaintiff's Complaint.) Ms. Rambo's deposition was taken before Plaintiff filed this action without any notice given to Defendants pursuant to Rules 27 and 30 of the Federal Rules of Civil Procedure.

Ms. Rambo's deposition is inadmissible and should be stricken. Plaintiff did not comport with the Federal Rules of Civil Procedure 27 and 30 in the scheduling, noticing, and taking of Ms. Rambo's deposition. Rule 27 of the Federal Rules of Civil Procedure clearly lays out the requirements a party must follow in order to take pre-litigation depositions. Rule 27 requires that a person who desires to "perpetuate testimony regarding any matter that may be cognizable in any court of the United States may file a verified petition in the United States district court in the district of the residence of any expected adverse party." It further states:

> The petition shall be entitled in the name of the petitioner and shall show: 1. that the petitioner expects to be a party in an action cognizable in the court of the United States but is presently unable to bring it or cause it to be brought, 2. the subject matter of the expected action and the petitioner's interest there, 3. the facts which the petitioner desires to establish by the proposed testimony and the reasons for desiring to perpetuate it, 4. the names and the description of the persons the petitioner expects will be adverse parties and their addresses so far as known, and 5. the names and

> addresses of the persons to be examined and the substance of the testimony which the petitioner expects to elicit from each, and shall ask for an order authorizing the petitioner to take the depositions of the persons to be examined named in the petition, for the purposes of perpetuating their testimony."

Fed. R. Civ. P. 27(a)(1).

Rule 27 also contains a notice requirement which provides that "at least 20 days before the hearing date, the petitioner must serve each expected adverse party with a copy of the petition and notice stating the time and place of hearing." After the Court conducts a hearing on the matter, Rule 27 provides that the Court, after reviewing the petition and making a determination regarding whether the pre-litigation deposition should go forward, "shall make an order" identifying who may be deposed and in what manner the depositions are to be taken. Fed. R. Civ. P. 27(a)(3). The Rule provides that once the court has approved and ordered the depositions to take place, the depositions may then be taken in accordance with the Federal Rules of Civil Procedure. Id.

Plaintiff failed to comply with any of the requirements of Rule 27. Plaintiff failed to file a petition with the court regarding the pre-litigation deposition of Rambo. Additionally, Plaintiff also failed to comply with the notice requirement of Rule 30(b) which states that "a party desiring to take the deposition of any person...shall give reasonable notice in writing to every other party to the action." The only individuals with knowledge that Ms. Rambo's deposition was taking place were Plaintiff's counsel, Jennifer Cooley and Peter Dumbuya. Defendants were not given any notice of the deposition Plaintiff scheduled and took on November 1, 2007 of Carolla Rambo.

It is clear that Plaintiff failed to comply with the Federal Rules of Civil Procedure requiring Plaintiff to request an order from the court allowing pre-litigation discovery depositions. Moreover, after failing to comply with Federal Rules of Civil Procedure, Plaintiff failed to provide notice to

Defendants regarding taking the deposition of Ms. Rambo as required by Rule 30. Defendants were not given the opportunity to appear at Ms. Rambo's deposition and question Ms. Rambo. As such, Ms. Rambo's deposition should be stricken.

Further, even if an otherwise admissible document or some type of direct testimony were presented to the affect that Ms. Rambo failed NUR 272 in the spring 2006 at the same time Ms. Wright failed NUR 272 and that Ms. Rambo was thereafter allowed to retake NUR 272 in the summer 2006, this otherwise admissible form of the information should be disallowed as evidence because there is no evidence that Ms. Rambo's failure of NUR 272 in the spring 2006 constituted her second failed nursing course thereby disqualifying her from the ADN Program. Ms. Wright failed NUR 272 in the spring 2006 and was not allowed to take NUR 272 in the summer 2006 because the spring 2006 NUR 272 was Ms. Wright's second failure and she was therefore excluded from the ADN Program. She was ineligible to take any further courses in the ADN Program. As such, these two student were not "similarly situated." Evidence related to Ms. Rambo is irrelevant, and therefore, inadmissible.

## 2. STUDENT ARIT UMOH

Plaintiff asserts in her Opposition to Defendants' Motion for Summary Judgment that Arit Umoh received special treatment at CVCC. Ms. Wright's belief that Ms. Umoh is similarly situated is inadmissible. Moreover, Ms. Wright's assertion that Ms. Umoh received special treatment is supported by nothing more than inadmissible hearsay statements.

Specifically, Plaintiff asserts in her opposition to Defendants' Motion for Summary Judgment that:

"Arit D. Umoh would have graduated in May 2005, had she not failed the clinical portion of NUR 272 taught by Gunnels. (Exhibit 24). According to what Dean Lowe and Peterson told Gunnels, Umoh showed up at CVCC with a lawyer to appeal or protest her grade, and was allowed to retake NUR 272 as an independent study course. (Gunnels Depo. pp.86-90, Plaintiff's Exhibit 3). CVCC allowed Umoh to retake NUR 272 even though it scheduled the course to be offered in the 2006/07 academic year. Umoh again failed NUR 272 in the fall semester 2005, making it two failures in the same course. Umoh graduated in 2006."

Wright Depo. pp. 178, 190-193, Plaintiff's Exhibit "1" to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment. Plaintiff supports her belief that Ms. Umoh received special treatment by referring to statements in her own deposition (See Exhibit "1", pp. 178-193) and the deposition testimony of Sandy Gunnels (See Exhibit "2", pp. 86-90).[3]

Ms. Wright says that Ms. Umoh received special treatment because (1) Ms. Umoh was allowed to take an independent study in the fall of 2005 after Ms. Umoh received a failing grade in NUR 272, (2) Ms. Umoh failed her second attempt to pass NUR 272 in the fall of 2005, and (3) Ms. Umoh was allowed to graduate after receiving two failures.

There is no admissible factual basis or support in the record for these assertions by Ms. Wright or any other witness. Specifically, these statements about Ms. Umoh are not based upon any witnesses' personal knowledge. The statements about Ms. Umoh are unreliable and unsupported hearsay, conjectural, and speculative.

Ms. Wright relies upon statements of Sandra Gunnels in an effort to support her contentions regarding Ms. Umoh. First, Ms. Wright contends that Ms. Umoh would have graduated in May 2005 had Umoh not failed the clinical portion of NUR 272. There are no admissible facts supporting any

---

[3] Plaintiff has referred to Exhibit "24" to her opposition to Defendants' Motion for Summary Judgment which is a deposition statement of Carolla Rambo. As Defendants' later assert, Ms. Rambo's deposition should be stricken in its entirety. However, Ms. Rambo's deposition does not refer to or mention Arit Umoh and is not relevant to this particular issue.

part of this contention, but even if there were facts that could otherwise pass the test for admissibility, the alleged facts are irrelevant to this action.  She additionally asserts that Umoh was allowed to retake NUR 272 as an independent study.  There is nothing in the record supporting this statement.  Ms. Wright refers to Exhibit "24" (Carolla Rambo's deposition) to support this contention.  Not only is Ms. Rambo's deposition inadmissible for the reasons set forth above, but additionally, Ms. Rambo does not offer any statement related to Ms. Umoh.  Ms. Wright also refers to deposition testimony of Sandra Gunnels. Exhibit "2", p. 86:17 - 90:12.  In her statement, Ms. Gunnels does not offer any testimony regarding the potential graduation date of Ms. Umoh and does not offer any statement regarding Ms. Umoh retaking NUR 272 as an independent study course at CVCC.  In fact, there is no mention at all of Ms. Umoh and an independent study course of any type by Mrs. Gunnels. Exhibit "2", p. 86:17 - 90:12.  However, even if admissible evidence were presented by the Plaintiff that Ms. Umoh was allowed to retake NUR 272 as an independent study, this would not show special treatment.  Ms. Wright failed NUR 252 in the fall of 2005 and lost her grade appeal regarding that course.  NUR 252 would no longer be offered because of a curriculum change implemented state-wide.  Therefore, in an effort help Ms. Wright and another student who failed NUR 252, Dixie Peterson, Dr. Lowe and Lynn Harris considered the options and agreed to allow Ms. Wright to substitute NUR 200 for the purpose of fulfilling the ADN requirement that she retake and pass a failed course.  Mrs. Peterson, Dr. Lowe, and Ms. Harris, two of whom have been sued in this case, allowed this accommodation to Ms. Wright so that, if she passed all of her spring 2006 courses, she could graduate with her class.  Only two students took NUR 200 in the spring 2006.  Both were allowed to take it because they had failed NUR 252.

When questioned about Ms. Umoh, Ms. Wright begins her statements related to Ms. Umoh by explaining why she believes Ms. Umoh received special treatment. Ms. Wright states, "I was told [Arit Umoh] had an independent study." When asked who told her this, Ms. Wright responded, "Sandy Gunnels, Wendy Wall and Lynn Harris had made a comment about her – didn't call her name specifically, but said she had a student. And that was the only student that was not with everyone else that I knew about." Exhibit "1", p.181:13-22. Not only is the information Ms. Wright "heard" hearsay, but Ms. Wright admits that Ms. Umoh's name was not mentioned specifically. She admits she assumed that this reference was regarding Ms. Umoh. This testimony is speculative and, therefore, inadmissible.

Further, Ms. Wright stated that she did not have any personal knowledge regarding Ms. Umoh's course work and/or retaking of NUR 272 at CVCC. Exhibit "1", p. 190. Moreover, Ms. Wright continues to rely on hearsay statements to support her assertion that Ms. Umoh failed NUR 272 twice.

Q:      When was it that she flunked the class portion of Ms. Harris' course?

Wright:   I don't know.

Q:      Somebody told you that, though, right?

A.      Correct.

Q.      They told you that — someone told you that she flunked the class portion and the clinical part, right?

A.      Correct.

Q.      And that was the same year– that was the fall of '05, right?

A.      Correct.

Q.      And who told you that?

A.      Sandy Gunnels said that somebody had told her that.  I'm not for sure who that someone was, but I think she said that Wendy Wall told her that.

Exhibit "1", p.192:15 – 193:8.

Q.      I thought you said someone told you that she failed again, after ---

A.      She did.  That's what I was told.

Q.      By Sandy Gunnels?

A.      Correct.

Q.      That Ms. Umoh failed again in 2006 or 2005?

A.      The class was given – that particular class for her was given in 2005.

Q.      Right, the independent study?

A.      Correct.

Q.      And Sandy Gunnels told you Ms. Umoh failed the independent study; is that right?

A.      Sandy told me that's what she heard.

Exhibit "1", p. 193:16 – 194:5.

Additionally, regarding Ms. Wright's statements about Ms. Umoh's alleged second failure of NUR 272 in the fall of 2005 above, Ms. Wright continuously states that she was told by Sandy Gunnels that Ms. Umoh failed NUR 272 in the fall of 2005.  Ms. Gunnels was not an instructor at CVCC during the fall semester of 2005 and would have no personal knowledge regarding any students or any events at CVCC at that time.  See Exhibit "2", p. 131:4-6.  Additionally, it is evident from Ms. Wright's statements, that she did not believe Ms. Gunnels had first hand knowledge of any supposed failure by Ms. Umoh.  Exhibit "1", p. 194:5.

Every statement Ms. Wright makes regarding Arit Umoh begins with her prefacing the statement by "I was told" or with her explaining that she "was told" this information by someone else. See also Exhibit "1", pp.181:17-23; 183:4-7; 184:11-23; 189:18-191:10; 191:20-192:2; 192:15-194:5.

There is no doubt that Ms. Wright, as she admitted, did not have personal knowledge regarding any failure and/or repeat of any course by Ms. Umoh. All of Ms. Wright's statements regarding the belief that Ms. Umoh received special treatment are based on comments Ms. Wright "heard" from other individuals which constitute nothing more than rank hearsay. Moreover, Ms. Wright's statement regarding Ms. Umoh's supposed second failure is hearsay. Ms. Wright admitted that she "heard" Ms. Umoh failed NUR 272 twice from Ms. Gunnels. At that time, Ms. Gunnels was no longer at CVCC. She resigned effective August 31, 2005 which was the date the second class of the fall 2005 semester was to meet. Ms. Gunnels did not have personal knowledge regarding Ms. Umoh and Ms. Umoh's performance in the CVCC nursing program after August 31, 2005. As such, all the statements Ms. Wright made regarding Arit Umoh are hearsay and should be stricken.

Finally, Ms. Wright makes the contention that Ms. Umoh received "course forgiveness" which is also not supported factually in the record. As such, any statement related to Ms. Umoh receiving "course forgiveness" should be stricken. In an attempt to support this contention, Ms. Wright refers to the deposition of Dixie Peterson and states, "during her deposition, Ms. Peterson denied knowledge of 'course forgiveness' for Umoh." Ms. Peterson actually stated that according to her knowledge as Nursing Department Chair at CVCC, Ms. Umoh did not receive course forgiveness. See Exhibit "3", p. 106:8-10. Ms. Wright's unfounded belief that Ms. Umoh received

"course forgiveness" is in no way supported by the factual record and should not be considered by

the Court in reviewing Plaintiff's Opposition to Defendants' Motion for Summary Judgment.

### 3.  STUDENT SHANNAH LOWE

Plaintiff states the following in an attempt to factually support her allegation that student

Shannah Lowe received special treatment while attending CVCC:

> "Shannah Lowe according to Jill Boyette (in Wright's spring 2006 NUR 272 clinical
> group), failed the clinical portion of the course taught by Artemisa Harmon. But after
> calling Dean Lowe, whom Wright believed was her uncle, and Peterson, another
> clinical instructor, Bridgett Jackson, took Lowe to the lab to redo her clinicals.
> Wright Depo, pp. 207 - 211.  During her deposition Peterson did not dispute the fact
> that Lowe was allowed to take a makeup lab for NUR 272. (Peterson Depo., p. 106,
> Exhibit 2)."

Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment, p.24.

It is clear that Plaintiff's assertion that Ms. Lowe received special treatment, which begins,

"Shannah Lowe, according to Jill Boyette," is rank hearsay.   Plaintiff's deposition statement

regarding this states:

> "The lady that spoke up and said she [Shannah Lowe] was having problems – her
> name is Jill Boyette.  She was in my clinical group, and she spoke up and said that
> Shannah Lowe did not pass her clinical portion because she refused to start an IV on
> a child.  And Artemisa Harmon was that clinical instructor and told her that she
> would not be passing.  And she stated that Shannah called Dixie Peterson and Dean
> Lowe."

Exhibit "1", p. 207:14-23. Ms. Wright went on to say in response to questions regarding Ms. Lowe,

"I was told that by Jill Boyette, that [Shannah Lowe] refused to – it wasn't just me that she was

telling.  She was telling our whole clinical group that [Shannah] refused to start an IV on the child."

Ms. Wright continued:

Wright:     And in the process of me taking Nursing 200, she was seen at the school
            with Bridgett Jackson going to the lab.  And we were told that Bridgett

Jackson was giving her time in the lab to rectify her – whatever she did in that clinical class with Artemisa Harmon.

Q.      200 – when did you take 200?

A.      In the summer.

Q.      Of?

A.      Yeah.

Q.      And who told you this?

A.      About Shannah Lowe?  Jill Boyette.

Q.      Who told you that Ms. Jackson and Shannah Lowe were going to the clinic at the school?

A.      Jill Boyette and other students were talking about it, and Kim Smith also.

Exhibit "1", pp. 209:12-210:5.

Ms. Wright's statement describing who told her this information continues to page 211 of her deposition.  Nothing in Ms. Wright's statement indicates Ms. Wright has personal knowledge regarding any alleged special treatment of Ms. Lowe.  Ms. Wright's statements are not based on her personal knowledge.  It is based upon statements made by a fellow student, Jill Boyette and Ms. Wright's testimony in this regard is rank hearsay.

Additionally, in her deposition Ms. Wright attempted to bolster her argument about special treatment received by Shannah Lowe by giving testimony that Shannah Lowe is Dean Lowe's niece.  There is no factual support in the record for this "belief" of Ms. Wright.  She further stated as fact that Shannah "called Dean Lowe" and was then allowed to retake a lab.  She offers no proof, only hearsay and speculation that any such call was made.  She has no personal knowledge regarding her belief and no factual support to prove that Shannah Lowe is in any way related to Defendant Dean

Lowe.  In fact, the portion of the Plaintiff's Response Brief quoted previously indicates that Ms. Wright "believed" that Dr. Lowe was Shannah Lowe's uncle, which appears to indicate that Ms. Wright no longer holds this belief.

Because Ms. Wright's statements regarding Ms. Lowe are not based on her personal knowledge and amount to nothing more than hearsay and speculation, these statements are inadmissible and should be excluded.

## VI.   LETTER FROM ELISE SIZEMORE TO DAVID HODGE ATTACHED AS PLAINTIFF'S EXHIBIT 7 TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Ms. Wright offers a letter from Elise Sizemore to David Hodge as Exhibit 7 to her Response in Opposition to Defendants' Motion for Summary Judgment.  This document is inadmissible as evidence in that (1) Plaintiff has failed to provide proper authentication of this document as required under Fed. R. Evid. 901, (2) the document is irrelevant to the claims and defenses in this action and (3) the document is hearsay under Fed. R. Evid. 801.

First, Plaintiff has attached Ms. Sizemore's letter as an Exhibit to her Response in Opposition to Defendants' Motion for Summary Judgment.  This document has not been authenticated by affidavit, deposition or otherwise.  Fed. R. Evid. 901.  Generally, courts ruling on Rule 56 motions may consider only admissible evidence.  See Denney v. City of Albany, 247 F.3d 1172, 1189 n. 10 (11th Cir. 2001) ("In considering a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in admissible form").  Documents must generally be properly authenticated to be considered at summary judgment, unless it is apparent that those documents can be reduced to admissible, authenticated form at trial.  Bozeman v. Orum, 199 F.Supp.2d 1216, 1222 (M.D.Ala. 2002).  There exists no evidence that the letter was received by Dr.

Hodge.  Moreover, no other witness has authenticated this document.  It is clear that the requirement of authentication has not been followed regarding Ms. Sizemore's letter attached as Exhibit 7 to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment.

Additionally, Exhibit 7 cannot be reduced to admissible form.   It is not relevant under Fed. R. Evid. 401,  and the introduction of this statement would only lead to confusion of the issues in this case and mislead the jury.  Further, Ms. Sizemore's letter is hearsay.

Ms. Sizemore's letter is not relevant to this action in that it does not make the existence of any fact that is of consequence to this matter more probable or less probable than would be without the introduction of the letter.  Fed. R. Evid. 401.  Moreover, Ms. Sizemore's letter has no relation between the evidence and any matter properly provable in this action.  Even assuming that Sizemore and Wright were in the same position, which they were not, the fact that Sizemore was allowed to register before Ms. Wright adds nothing of legal significance to the Plaintiff's allegations.  Specifically, Plaintiff contends that Ms. Sizemore was afforded an opportunity that the Plaintiff was not afforded.  There is no evidence that Wright and Sizemore were similarly situated, i.e., Ms. Sizemore did not fail two courses as Ms. Wright did.

We know from the CVCC records produced regarding Ms. Wright's academic problems that she failed two courses in the fall 2005 semester.  She appealed and lost the grade appeal for NUR 252, but she won her grade appeal for NUR 271 because the instructor for that course did not respond to the grade appeal.  However, until the ruling was made in Ms. Wright's grade appeal on NUR 271, Ms. Wright having failed two nursing courses was excluded from the program and was ineligible to register for the spring semester.  The ruling was released on NUR 271 in her favor on January 23, 2006, which gave her the privilege of registering. See Dean Lowe Affidavit, Exhibit "K",

Attachment "5", Book of Exhibits to Defendants' Motion for Summary Judgment. There is no evidence presented by Ms. Wright that Ms. Sizemore failed more than NUR 252 and with one failure a student is not prohibited from registering. See Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment, p. 9 and attached Exhibit "7".

The only similarity between Ms. Wright and Ms. Sizemore is that both failed NUR 252. See Lynn Harris Affidavit, Book of Exhibits, Exhibit "H", p. 11 to Defendants' Motion for Summary Judgment. At the end of the spring 2005 semester, Ms. Wright had failed two courses – NUR 252 and NUR 271. See Book of Exhibits, Exhibit "K", Attachment "2", Bates ID CVCC000381, to Defendants' Motion for Summary Judgment. There is nothing in the record indicating Ms. Sizemore failed any other course.

As a result of her failure of NUR 252 and NUR 271 at the end of the Fall 2005 semester, Ms. Wright was considered to be entirely excluded from the Nursing Program and not allowed to continue in the Nursing Program in the spring of 2006. See Book of Exhibits, Exhibit "A", p. 106, ¶ 14 to Defendants' Motion for Summary Judgment. Ms. Sizemore, only failing one course, was not precluded from continuing to take classes in the Spring Semester according to policy. Id. In other words, Ms. Wright's situation and the situation of Ms. Sizemore were in no way similar.

Ms. Wright subsequently filed two grade appeals for each of the failed courses, NUR 252 and NUR 271. She was allowed to return and take classes after the ruling of NUR 271. Exhibit "14" to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment; Exhibit "2", pp. 141:6-142:22 to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment . As we also know from her later failure of NUR 272, she was allowed to enroll in NUR 272 despite failing NUR 252. After winning her appeal in NUR 271 and losing her appeal in NUR

252, she only had one failure on her transcript and was allowed to continue in the program during the spring 2006 semester. Id.

Because the document offered as Exhibit 7 to Plaintiff's Response to Defendants' Motion for Summary Judgment is clearly irrelevant in that Ms. Sizemore and Ms. Wright are not similarly situated, it is not admissible evidence and should not be considered for purposes of Defendants' Motion for Summary Judgment. Additionally, it is clear that this document would only lead to confusion of the issues and mislead the jury and should not be considered as admissible evidence.

Finally, this document is clearly hearsay. In general, Plaintiff offers Ms. Sizemore's letter to prove and support her contention that Ms. Sizemore's grade was incorrect, Ms. Sizemore was a similarly situated student, and Ms. Sizemore received some consideration and/or special treatment that Ms. Wright did not. This entire document is offered for the truth of the matter. There is no substantiation for the overall assertion in this document that Ms. Sizemore should have passed NUR 252 and that there was some type of misunderstanding regarding Ms. Sizemore's grade. Moreover, as clearly indicated before, there is also no indication that Ms. Sizemore was similarly situated and that Ms. Sizemore received some special treatment Ms. Wright was not afforded. Moreover, the exhibit contains a number of statements which are hearsay.

Specifically, the statements which Plaintiff relies upon in an attempt to defeat summary judgment are hearsay. For instance, Plaintiff has relied on the following statement from Exhibit 7: "Mrs. Peterson instructed me to go ahead and attend the classes that I had registered for even though a requirement for NUR 272 is the completion of NUR 252 per the spring 2006 syllabus." As indicated in her response, Plaintiff offers this statement to prove that Ms. Sizemore was allowed to register for a course without having completed the prerequisite. According to the CVCC Catalog

and Student Handbook, Prerequisites for NUR 272 were NUR 131, NUR 242, NUR 251, and BIO

201 and BIO 202.  NUR 252 is not a prerequisite for NUR 272.  See Exhibit "4", pp. 145 and 160,

Bates ID #CVCC00047 and CVCC000162.  Plaintiff has asserted, as a fact, that NUR 252 was a

prerequisite according to CVCC policy for the purposes of taking NUR 272 based on Elise

Sizemore's statement which is hearsay and which is not supported by facts in the record.

As such, not only should the above-listed statement be considered inadmissible and not

considered for purposes of the motion for summary judgment, but the entire exhibit should be

considered inadmissible for all of the foregoing reasons.

## VII.    AFFIDAVIT OF PLAINTIFF LINDY WRIGHT (PLAINTIFF'S EXHIBIT 12 TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT)

Plaintiff Lindy Wright gave sworn deposition testimony in this matter on July 13, 2007.

Subsequent to her deposition and after Defendants' filed their Motion for Summary Judgment,

Plaintiff Lindy Wright signed an affidavit on November 2, 2007.

Regarding the admissibility of subsequent affidavits, the Eleventh Circuit has held that "when

a party has given clear answers to unambiguous questions which negate the issue of any material

fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts,

without explanation, previously given clear testimony."  Van T. Junkins and Associates, Inc. v. U.S.

Industries, Inc., 736 F.2d 656, 657 (11th Cir. 1984).  Further, "Plaintiff's affidavit testimony to the

contrary presented after [the Plaintiff] gave sworn statements in [her] deposition, is wholly

unavailing and cannot 'impeach' [her] prior and inconsistent sworn testimony."  Davis v. NPC Pizza

Hut, 447 F. Supp. 2d 1260, 1268 n. 8 (N.D. Ala. 2006).  In other words, a Plaintiff cannot rely on

subsequent affidavit testimony that is directly contradicted by the Plaintiff's previous deposition

testimony. McCormick v. City of Ft. Lauderdale, 333 F.3d 1234 (11th Cir. 2003) ("Under the law of this Circuit, we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is a direct contradiction of deposition testimony.").

Additionally, Federal Rules of Civil Procedure describes the requirements for affidavits submitted in support of summary judgment filings. An affidavit must: (a) be based on personal knowledge; (b) set forth such facts that would be admissible in evidence; (c) show that the affiant is competent to testify to the matters stated therein; (d) be signed by the affiant; and (e) be accompanied by a certificate of acknowledgment executed in the manner provided by law by a notary public. Fed. R. Civ. P. 56(e); Fed R. Evid. 902(8). "The requirements of Rule 56 makes it clear that affidavits which set forth conclusory arguments rather than statements of fact based on personal knowledge are improper." Thomas v. Alabama Council on Human Relations, Inc., 248 F.Supp.2d 1105, 1112 (M.D. Ala. 2003). Additionally, an affidavit which states that the affiant "believes" a certain fact exists is insufficient to defeat a motion for summary judgment. Pace, 283 F.3d at 1278. As such, affidavits which fall short of these standards are subject to be excluded from evidence pursuant to a motion to strike. Thomas, 248 F. Supp.2d at 1112.

Plaintiff has filed her affidavit signed and notarized on November 2, 2007 for purposes of opposing Defendants' Motion for Summary Judgment. As stated previously, Plaintiff had previously been deposed on July 13, 2007 in this same action. Plaintiff's affidavit offers additional and contradictory testimony to that of her deposition. In general, Plaintiff has taken a number of statements from her deposition that were clearly hearsay and not based on her personal knowledge and has attempted to rephrase, restate or add additional information to give the appearance that these statements are not hearsay and that Ms. Wright may have personal knowledge of the events without

any explanation of why her statement has changed.   Additionally, Plaintiff's affidavit contains numerous statements and assertions that are irrelevant, conclusory, hearsay, and not based on Ms. Wright's personal knowledge.  Indeed, there are few, if any, statements contained in Ms. Wright's affidavit that are admissible.  The affidavit is contradictory and the overwhelming majority of statements in Ms. Wright's affidavit are inadmissible pursuant to the Federal Rules of Evidence. and Rule 56(e) of the Federal Rules of Civil Procedure.  Although many of these statements may not be substantive evidence regarding summary judgment, the overwhelming majority of inadmissible statements demonstrates that Ms. Wright's affidavit, as a whole, should be stricken.

A.    The second paragraph of Plaintiff's affidavit states:

There was an extra student in the RN class check-off, the student's name was Arit Dan Umoh, a Nigerian girl that lived in Atlanta, she had been a student in the class prior to May 2004.  The first class period of the RN class I attended for the second semester had no instructors.  Sandra Gunnels and Brenda Bellamy had resigned with CVCC.  The second semester classes were NUR 252 and NUR 271; 252 being Adult Nursing and 271 OB.  Dean Lowe and President Blackwell attended the RN classroom for a brief time on the 1st day of class which I think was August 24th, 2004. Dean Lowe told the class that our instructors were sick; but students saw the instructors packing things from their offices."

This is contradictory to Plaintiff's previously given deposition testimony.  Further, Plaintiff offers no explanation for the contradictions between her deposition testimony and affidavit.  Specifically, Plaintiff states that check-offs occurred the first week of class during the Fall 2005 semester in her deposition:

Wright:    Well, Sandy Gunnels and Brenda Bellamy were there for, I'd say, the first week – or the first couple of days of class, which was basically the first week.....

Exhibit "1", pp. 216:21 - 217:1.

Q.      They were there the first couple of days of class?  Is that what you're saying?  Ms. Bellamy and Ms. Gunnels both were present the first couple of days of class?

A.      Yes, sir.

Q.      And that would be the classroom portion, correct?  They didn't do clinical, did they?

A.      I know they were there for that clinical check-off.  And I don't know if they – if we had even had a chance to do any classroom.

Q.      So they wouldn't have been there at all?  They never came that semester?

A.      Yeah, they did.  They were there for the clinical check-off, and that was the first portion of the semester.  We had a clinical check-off the first week.

Exhibit "1", pp. 217:8 - 218:2.  In Ms. Wright's affidavit, she states, "The first class period of the RN class I attended for the second semester had no instructors." which directly contradicts the above deposition testimony.  Exhibit "12" to Plaintiff's Opposition to Defendants' Motion for Summary Judgment.

Further, in the above paragraph of Ms. Wright's affidavit, she states that she "thinks" Lowe and Blackwell attended class, etc.  Ms. Wright's belief of when she "thinks" Lowe and Blackwell attended class and thus when Gunnels and Bellamy resigned is an obvious guess by Ms. Wright and is not a fact.  It is clear from various sources that Gunnels and Bellamy resigned on August 31, 2005 not August 24, 2007 as Ms. Wright attempted to assert in her affidavit.

B.      In the second paragraph of Ms. Wright's affidavit statement, she states regarding Arit Umoh, "she had been a student in the class prior to May 2004."  The facts as presented by these Defendants are clear that Ms. Wright was not in the Nursing Program in May of 2004.  It is clear in the record that Ms. Wright entered the ADN program in the Summer of 2005.  Ms. Wright has no

**Page 26 of  43**

personal knowledge regarding Ms. Umoh's course work or matriculation through the ADN program as has been previously argued and established.  Such an assertion is a conclusory statement not supported by the record and is hearsay.  As such, this statement is inadmissible.

**C.**    In paragraph 3 of her affidavit (Wright affidavit p. 2- 3), Ms. Wright states, "...they confirmed they resigned; therefore, that left the RN class with no instruction."  This is contrary to Ms. Wright's deposition testimony that guest speakers were utilized to provide instruction to the class before a full-time class room instructor was hired.  Ms. Wright quoted from her grade appeal form in her deposition the following statement she had written, ".... a guest speaker was utilized until that time."  Not only is it contradictory, but Ms. Wright's statement that no instruction was provided for students is conclusory.  In the period of time that a full time instructor was not available for the class, the school did utilize guest speakers from various fields and expertise to instruct the class.

**D.**    Regarding guest speaker John Christopher, Ms. Wright states, "He went over Respiratory Disorders to include a power point which began on 9-7-05.  He came several weeks as a guest speaker due to the fact that he was an ADN and did not have the qualifications to teach nursing students in an Associate Degree Program."

First, the above statement is not reliable and would only prejudice Defendants and confuses the issues.  It is evident from the record that Ms. Gunnels and Ms. Bellamy left CVCC on Wednesday, August 31, 2007. See Exhibit "2", p. 131:4-6.  Classes in the nursing program were each Wednesday.  See Book of Exhibits, Exhibit "J" to Defendants' Motion for Summary Judgment.  The first class after Ms. Gunnels and Ms. Bellamy left CVCC would have been Wednesday, September 7, 2007.  Ms. Harris began teaching as the full-time instructor for CVCC on September 14, 2007.  See Deposition of Laurel Blackwell, Exhibit "N", p. 44:20-23, to Defendants' Motion for Summary

Judgment and Affidavit of Lynn Harris, Exhibit "J", p. 3, to Defendants' Motion for Summary Judgment. Ms. Cash began teaching as the full-time instructor for CVCC on September 21, 2007. See Deposition of Laurel Blackwell, Exhibit "N", p. 44:20-23, to Defendants' Motion for Summary Judgment. As such, NUR 252 would have been without an official instructor and utilized an guest instructor for only two class periods – August 31, 2007 and September 14, 2007. NUR 271 would have been without an official instructor for only three class periods. Not the "several class" periods that Ms. Wright contends.

Second, Ms. Wright makes the conclusory statement that Mr. Christopher was not qualified to teach nursing students in the ADN program as a guest speaker. Ms. Wright has offered no opinion other than her own assertion. There is nothing in the record supporting her statement that Mr. Christopher was not qualified. In fact, Ms. Wright has not provided any information at all regarding Mr. Christopher's qualifications other than her belief that he was not qualified. As such, Ms. Wright's statement regarding the qualifications of Mr. Christopher are unfounded and based upon her own belief. Therefore, this statement is not admissible.

Ms. Wright also states,

"He [John Christopher] explained to me that he had written a test for Respiratory Disorders, in which Dixie Peterson did not review. He explained this incident to me during my 3d semester at the Medical Center during one of my preceptor dates while he was working at the Medical Center."

Wright Affidavit, p. 2. Again, Ms. Wright's statement above is nothing more than hearsay. It is based not on her personal knowledge but based on what she "heard" someone else say. Moreover, this statement in no way is relevant to this action.

Finally in paragraph 3 of her affidavit, she makes the unsupported assertion that "Everyone failed the test given by John Christopher."  There is nothing offered to support his assertion other than the belief of Ms. Wright that no student passed this test.  Any information Ms. Wright had regarding any other student's performance on the test would be hearsay and not admissible. Moreover, this statement is irrelevant to this action.  Ms. Wright's belief that everyone, that is all students in that course, failed this test is not admissible for purposes of determining Defendants' Motion for Summary Judgment.  Moreover, if everyone failed, she got the same treatment.

**E.**    In paragraph 4 of Ms. Wright's affidavit (Wright Affidavit, p. 2), Ms. Wright states, "These two instructors were not available for tutoring or any questions that the class or myself had for any given test that were administered by either instructor."  Again, Ms. Wright has no personal knowledge of the help and/or assistance that Harris or Cash may have given to other classmates. Moreover, this is contrary to Ms. Wright's previous deposition testimony contained on pages 93:23 - 102:14.  During this part of Ms. Wright's deposition, she testifies that Ms. Cash provided grades to her students in class. Wright Depo., p. 94:21-95:1.  She also said that although Ms. Cash would not go over the rationale for the answers to tests in class, due to the turmoil it caused in the classroom, Ms. Cash would read the correct answers to the tests. Wright Depo., p. 99:14 - 102:15.  Additionally, Ms. Wright stated that Ms. Cash informed the class that students could schedule time with her to go over test questions. Wright Depo. p. 99:3-4.  Ms. Wright's assertion in her affidavit that Ms. Cash was not available to go over tests is clearly contradictory to her previous deposition testimony in which Ms. Wright stated that Ms. Cash gave grades to her students, went over the correct answers, and made herself available to students outside of class if they wished to discuss the tests.

She makes the same assertion that Ms. Harris was not available for review of tests. See Lindy Wright Affidavit, p. 2. In her deposition testimony Ms. Wright stated regarding Harris, "As any of the tests that she gave, she never went over anything except for that last semester the day before finals. At the end of the day and at certain times, you could either be there or not." Wright Depo., Exhibit "1", p. 250:13-19 and p. 255:20-22. Ms. Wright stated in her depositions that Ms. Harris did review tests and do a review study course prior to the final examination that was given. Additionally, she stated that Harris did have times available to meet with students "at the end of the day and certain times." This indicated that Harris definitely made herself available to her students after her classes if they asked for help, contrary to Ms. Wright's assertion in her affidavit. Because Wright's affidavit is contrary to her deposition testimony and Ms. Wright has offered no explanation in her affidavit for the contradictions, Ms. Wright's testimony as outlined above is not admissible in determination of the issues presented in Defendants' Motion for Summary Judgment.

F.    Ms. Wright additionally asserts that both care plans were lost in her affidavit. See Wright Affidavit, p. 2. In her deposition testimony, she stated that only one care plan was lost. Wright Deposition, Exhibit "1", p. 132:3, 5-7. She testified that she earned 23/25 points on the other care plan. Again, Ms. Wright's statements are contradictory. Additionally, whether or not the care plans were lost is irrelevant to the issue of whether or not Ms. Wright was denied due process. As it has been clearly laid out in the record, Ms. Wright only received 741.1 points in NUR 252 and she needed 750 to pass. Even if Ms. Wright had received the full 25 points on the allegedly lost care plan, she would have only attained 473.1 points and would have still failed the course due to her poor performance on her tests. Because the statements Ms. Wright has made in her affidavit

regarding her care plans are contradictory to her deposition testimony and the statements regarding

lost care plans are irrelevant, the statements are inadmissible as to summary judgment.

**G.**    Ms. Wright also states the following in her affidavit:

"Deborah Gruber told me and Sandy Gunnels via a cell-phone conversation that she
turned the care plans into Dixie Peterson."

Wright Affidavit, p.2.  She notes that this conversation occurred after Gruber resigned. Id.  Ms.

Wright again makes a statement that is nothing more than hearsay.  As such, it is not admissible

under Fed. R. Evid. 801 and Fed. R. Civ. P. 56(e) for purposes of determining Defendants' Motion

for Summary Judgment.

**H.**    Ms. Wright also describes in her affidavit a meeting with Dr. Laurel Blackwell and

Dean Hodge.  Ms. Wright indicates in her affidavit that this meeting took place after learning of her

grade in NUR 252 in the fall semester of 2005. Wright Affidavit, p. 2.  Again, the time line of events

is important due to Ms. Wright's claims of conspiracy among Defendants Blackwell, Peterson, and

Lowe.  The information she provides is contradictory and differs from her previous deposition

testimony.  Specifically, she states in her deposition that the conversation with Dr. Blackwell and

Dean Hodge took place not after she learned of her failing grade in NUR 252 in the fall of 2005, but

that she spoke with Dr. Blackwell and Dean Hodge after learning of her failing grade in NUR 272

in the spring of 2006.

> Wright:    I went and talked to Laurel Blackwell, and Dean Hodge was in on that
> meeting.  And it was not a scheduled meeting.  I went up to the office and
> waited on her.
>
> Q.        Would that have been in May?
>
> A.        Yes, sir.

Wright Deposition, Exhibit "1", p.167:23 - 168:5.

    **I.**    Ms. Wright also states the following in her affidavit:

> "I was offered NUR 200 along with another student that was allowed to go to clinicals before passing a med calculation test. The med calculation test was to be completed before clinicals started. This student was allowed to pass meds and continue class the whole second semester and take her med calculation test on the day of finals the 2nd semester."

Wright Affidavit, p. 3. Again, Ms. Wright is relying upon hearsay statements and unsupported beliefs to support her opposition of Defendants' Motion for Summary Judgment. Ms. Wright has not identified the student to whom she refers, she has not offered any basis that she has personal knowledge regarding this student, and offers the statement as for the truth of the matter. Her statements regarding this student are rank hearsay and not supported in the record. As such, the statement from her affidavit above, is not admissible for purposes of determining the Motion for Summary Judgment.

    **J.**    Ms. Wright makes an assertion as fact in her affidavit that is inadmissible under the Fed. R. Civ. P. 56(e) and Fed. R. Evid. She states:

> "Care plans were still a part of our final grades. I turned in my 1st Pediatric Care Plan to Sylvia Shirley the 3rd semester. It was graded and given back to me by Artimesa Harmon with a grade of 22/25, she took the Care Plans back up from our group. The next clinical session I was handed my Care Plan back with a different top sheet (grade sheet) it was written in red and not in my handwriting, it had been regraded with a grade of 7/25. I questioned Artimesa Harmon and she stated, "they told us to do this, the Nursing Department. I don't know anything about the grading, you need to talk to the faculty at CVCC. Dixie and Lynn."

Wright's Affidavit, p. 3. She later states, "These were graded 3xs when I should have received a 22/25." Id. Again, Ms. Wright has offered additional hearsay to support her opposition to Defendants' Motion for Summary Judgment which are not admissible. First, Ms. Wright's assertion

that she received a grade sheet with 22/25 written on it is hearsay. This is a statement made by Ms. Wright regarding the contents of a document which has not been offered into evidence.[4]

Additionally, the statements that Ms. Wright "heard" from Artimesa Harmon are hearsay and not admissible. Ms. Wright again has relied upon inadmissible hearsay statements in an effort to defeat Defendants' Motion for Summary Judgment. Her belief that her CarePlan in NUR 272 was regraded three times is unsupported by the record and insufficient to be used as evidence to defeat a Motion for Summary Judgment.

**K.**     Ms. Wright also asserts as fact that there were 9-12 points on her tests and/or her final exams that she found that Ms. Harris missed. Wright affidavit, p. 3. Again, this is nothing more than Ms. Wright's belief. Presumably, Ms. Wright contends that she is a greater authority on the subject NUR 272 than her instructor – a bizarre and backwards notion that, if accepted, would turn this country's education system on its head. It is based on hearsay in that there is no documentary evidence to support her statement. Ms. Wright relies upon her statement as a "fact", not an unsupported assertion which cannot be supported by any information and/or documentary evidence in the record. Ms. Wright has not proved herself to be a qualified individual to determine whether or not her test answers were correct or wrong. As such, her assertion that she was not credited 9-12

---

[4] Ms. Wright has not attached any documents to her affidavit supporting this, or any other statement she has made. Ms. Wright did attach CarePlans from NUR 272 to her Response in Opposition to Defendants' Motion for Summary Judgment as Exhibit 16; however, the documents attached to her response are not complete copies of the documents/CarePlans. Plaintiff has copied vertical pages as horizontal pages cutting off information written on those documents. Before filing this Motion to Strike, Defendants did locate complete copies of these CarePlans which have been produced. See Exhibit "5", Bates ID CVCC000393-000419. Nowhere on the CarePlans is there any indication that there was at any time a grade of 22/25. In fact, the only grade on the sheet is the 7/25 and a notation which indicates that Ms. Wright "redid" this CarePlan.

points on a test or exam, is not admissible under the Federal Rules of Civil Procedure and Federal

Rules of Evidence for purposes of summary judgment.

**L.**     As for the reasons set forth previously in Defendants' Motion to Strike, any statement

made regarding Carolla Rambo's studies and progression at CVCC in the Nursing Program are

inadmissible.  Ms. Wright states in her affidavit:

> "Carolla Rambo did not graduate and was able to take NUR 272 again after the 3rd
> semester was over during the Summer/Fall of 2006.  I was allowed to substitute NUR
> 200 for NUR 252 the Spring Semester of 2006, the course numbers were changed on
> me due to the change of curriculum, but not for Carolla.  After I took my courses, she
> was able to take NUR 272 over and received course forgiveness, and I was denied."[5]

Wright Affidavit, p. 4.  As before, Ms. Wright does not have personal knowledge regarding Ms.

Rambo's studies at CVCC.  Additionally, there is no evidence that Ms. Wright and Ms. Rambo are

similarly situated and that the statements by Ms. Wright are relevant at all to the issues in this action.

Ms. Wright has offered statements that she "believes" are true with no support – that Ms. Rambo was

given some advantage that she was not, and that Ms. Rambo was given course forgiveness.  None

of the statements by Ms. Wright are supported by factual basis in the record and constitute nothing

more than hearsay and a belief of Ms. Wright that is insufficient to defeat a motion for summary

judgment.

**M.**     Finally, Ms. Wright again refers to a statement she "heard" from Sandy Gunnels well

after Sandy Gunnels had resigned from CVCC.  "I was told by Sandra Gunnels that Dixie Peterson

told her and Brenda Bellamy, ' She is a weak student and did not pass the LPN boards the [first]

---

[5] Defendants are not contesting that Wright was allowed to substitute NUR 200 for NUR
252 spring of 2006 or that Wright was denied course forgiveness.  See Hodge Affidavit, Book of
Exhibits, Exhibit H, p. 206.  Defendants argument that this statement is inadmissible is based on
Wright's intertwined statements regarding Rambo and her assertion that Rambo is similarly
situated.

time, so she does not need to pass the second semester.'"  Again, this statement, which Ms. Wright also made in her deposition testimony as outlined above, is hearsay and not admissible for purposes of defeating Defendants' Motion for Summary Judgment.  As such, it should be stricken.

N.     It is clear that Ms. Wright's subsequent affidavit as a whole is contradictory, full of hearsay, conclusory, speculative, and irrelevant to the issues in this action.  Moreover, few of the statements made by Plaintiff are based on her personal knowledge.  To introduce the affidavit in its entirety is unfairly prejudicial and could be highly misleading to the jury due to the large amount of inadmissible information and statements contained therein.  Because of this, Defendants request that the Court strike Plaintiff Lindy Wright's affidavit in its entirety.  However, if the Court determines that the affidavit as a whole should not be stricken, Defendants move that the Court strike each specific statement as outlined in sections A - M for the reasons outlined in each section.

## VIII.   CORRESPONDENCE FROM CONNIE COOPER TO CVCC (PLAINTIFF'S EXHIBITS 13 AND 18 TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT)

Federal Rule of Evidence 408 clearly states that evidence of an offer to compromise a claim or possible claim is not receivable in evidence as an admission of the validity or invalidity of a claim.  Armstrong v. HRB Royalty, 392 F. Supp 2d 1302, 1304 (S.D. Ala. 2005).  Additionally, evidence of conduct or statements made in compromise negotiations is likewise not admissible.  Reynolds v. Roberts, 202 F.3d 1303, 1318 (11th Cir. 2000).

Plaintiff offers two letters written by Connie Cooper to CVCC.  Both letters are admitted to prove certain facts with statements made in each letter.  See Exhibits 13 and 19 attached to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment.

For example, Plaintiff attaches two letters written by her attorney Ms. Cooper on January 10, 2007 and June 7, 2006 to prove the validity of her claims. Both letters assume first that Ms. Wright's due process rights have been violated. Second, the letters assume that there are similarly situated students to Ms. Wright. Third, they assume and assert as a fact that Ms. Wright has been treated differently from these other alleged students. The letter should be excluded because it is offered to prove that Ms. Wright's due process rights were violated and that she was treated differently from other *similarly situated students*, when Ms. Wright has offered no proof that any student was similarly situated.

There is no indication that Ms. Wright's due process rights have been violated. Ms. Cooper's assertion that Ms. Wright's rights have been violated is the legal conclusion which is the ultimate issue in this action. Plaintiff is attempting to use Ms. Cooper's letters to prove the truth of the matter – that there were other *similarly situated* students to Lindy Wright in the nursing program. As we have argued *ad nauseum*, Ms. Wright has not shown that there were any other students who were similarly situated, i.e., that there were any other students who had failed two courses and were allowed to continue in the nursing program. Ms. Cooper's and Ms. Wright's beliefs asserted in an attempt to negotiate Ms. Wright's re-entry into the Nursing Program at CVCC at the beginning of the spring 2006 semester and after Ms. Wright's exclusion from the Nursing Program are irrelevant, conclusory, and based on Ms. Wright's insufficient beliefs, not facts that are supported in the record. Under Fed. R. Evid. 408, a statement made in offering to compromise or accepting compromise cannot be used to prove the validity of a party's claims, as Plaintiff has attempted to do. As such, the letters are inadmissible and should be excluded.

IX.    **DEPOSITION OF SANDRA GUNNELS DATED NOVEMBER 1, 2006 (PLAINTIFF'S EXHIBIT 22 TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT) AND CERTAIN STATEMENTS CONTAINED THEREIN**

   A.    **Ms. Gunnels' November 1, 2006 Deposition should be stricken in its entirety as Plaintiff did not comply with Federal Rules of Civil Procedure 27 and 30.**

   Ms.Gunnels' deposition taken on November 1, 2006 is inadmissible and should be stricken. See Exhibit 22 of Plaintiff's  Response in Opposition to Defendants' Motion for Summary Judgment.  Plaintiff did not comport with the Fed. R. Civ. P. 27 and 30 in the scheduling, noticing and taking of Ms. Gunnel's deposition.  Rule 27 of the Federal Rules of Civil Procedure clearly lays out the requirements a party must follow in order to take pre-litigation depositions.  Rule 27 requires that a person who desires to "perpetuate testimony regarding any matter that may be cognizable in any court of the United states may file a verified petition in the United States district court in the district of the residence of any expected adverse party."  It further states:

   > The petition shall be entitled in the name of the petitioner and shall show: 1, that the petitioner expects to be a party in an action cognizable in the court of the United States but is presently unable to bring it or cause it to be brought, 2, the subject matter of the expected action and the petitioner's interest there, 3, the facts which the petitioner desires to establish by the proposed testimony and the reasons for desiring to perpetuate it, 4, the names and the description of the persons the petitioner expects will be adverse parties and their addresses so far as known, and 5, the names and addresses of the persons to be examined and the substance of the testimony which the petitioner expects to elicit from each, and shall ask for an order authorizing the petitioner to take the depositions of the persons to be examined named in the petition, for the purposes of perpetuating their testimony."

Fed. R. Civ. P. 27(a)(1).

   Rule 27 also contains a notice requirement which provides that "at least 20 days before the hearing date, the petitioner must serve each expected adverse party with a copy of the petition and notice stating the time and place of hearing."  After the Court conducts a hearing on the matter, Rule

27 provides that the Court, after reviewing the petition and making a determination regarding whether the pre-litigation deposition should go forward, "shall make an order" identifying who may be deposed and what manner the depositions are to be taken. Fed. R. Civ. P. 27(a)(3). The Rule provides that once the court has approved and ordered the depositions to take place, the depositions may then be taken in accordance with the Federal Rules of Civil Procedure. Id.

Plaintiff failed to comply with any of the requirements of Rule 27. Plaintiff failed to file a petition with the court regarding the pre-litigation deposition of Gunnels. Additionally, Plaintiff also failed to comply with the notice requirement of Rule 30(b) of the Federal Rules of Civil Procedure which states that "a party desiring to take the deposition of any person....shall given reasonable notice in writing to every other party to the action." The only individuals with knowledge that Ms. Gunnel's deposition was taking place were Plaintiff's counsel, Jennifer Cooley and Peter Dumbuya. Defendants were not given any notice of the deposition Plaintiff scheduled and took on November 1, 2007 of Sandra Gunnels.

It is clear that Plaintiff failed to comply with the Federal Rules of Civil Procedure requiring Plaintiff to request an order from the court allowing pre-litigation discovery depositions. Moreover, after failing to comply with Federal Rules of Civil Procedure, Plaintiff failed to provide notice to Defendants regarding taking the deposition of Ms. Rambo as required by Fed. R. Civ. P. 30. Defendants were not given the opportunity to appear at Ms. Gunnel's deposition and question Ms. Gunnels. As such, Ms.Gunnels' deposition should be stricken.

**B.**    **Certain Statements Relied upon By Plaintiff from Gunnels' November 1, 2006 Deposition are Inadmissible and Should Be Excluded for Purposes of Determining Defendants' Motion For Summary Judgment**

Plaintiff relies upon the following statement from Ms. Gunnels' November 1, 2006 deposition:

"Ms. Peterson came into the faculty offices and as I recall Ms. Brenda Bellamy was present and potentially Debra Grouper. We had offices and Ms. Peterson was kind of going back and forth and in between. And she had come by and asked was anyone going to fail. And we said, no. And I believe it was Ms. Bellamy said that Lindy had been close in her course, but that she had – her grades had come up a the end and she had made a C. And Ms. Peterson made a statement to the effect of y'all need to flunk her, she does not need to pass, she is weak, she's not going to pass boards, y'all need to flunk her. Gunnels Oral Depo., p. 10:15-25, Exhibit 22 to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment.

"It was a general statement, and I perceived it not as – and I know she would not have done, asking us to go back and change grades that Lindy had made but the assumption at that point in time was Ms. Bellamy and I would be returning for the fall semester and we would both have Lindy again as a student, myself in obstetrics, Ms. Bellamy in her advance medical surgical coursework. And it was – or I perceived it as a, in the future this needs to occur, that she verbalized that she did not feel that Lindy would pass boards and would be a liability and did not need to pass." Gunnels Oral Deposition, p. 14:10-20, Exhibit 22 of Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment.**"**

Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment, pp. 19-20.

Plaintiff also stated in her response that "Gunnels acknowledged these statements during her deposition."[6] Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment, p. 20.

---

[6]Plaintiff cites "Gunnels Depo. pp. 232-238, Exhibit 22" to her Response in Opposition to Defendants' Motion for Summary Judgment. However, the deposition attached as Exhibit 22 to Plaintiff's Response is the deposition taken November 1, 2007 and only contains 34 pages. We assume Plaintiff is referring to Exhibit 3 attached to her deposition which is Ms. Gunnels' deposition taken before all parties on July 24, 2007.

Plaintiff incorrectly asserts that Ms. Gunnels' "acknowledged these statements" in her July 24, 2007 deposition. In fact, Ms. Gunnels recanted her previous statements.

> Q.    Would it be correct to say that Ms. Peterson was not asking you to intentionally flunk Lindy Wright on any occasion, she was just commenting on the fact that she was a weak student; would that be true?
>
> A.    I'm sorry. Could you repeat that?
>
> Q.    Ms. Peterson was commenting on the fact that Lindy Wright was a weak student, but she was not asking you to, in the future, flunk her in a course intentionally?
>
> A.    My perception was she was expressing her appraisal of Ms. Wright's ability, and she was not instructing me to flunk her in any course.

Gunnels July 24, 2007 Deposition, p.236:21 - 237:12.

> Q.    There was a question that Mr. Dumbuya asked you that misstated your statement in that regard. . . . Here we go p. 18 (referring to page 18 of Gunnels November 1, 2006 deposition). Mr. Dumbuya is asking this question, and this is what he asked: Now, to the best of your knowledge –
>
> Are you there?
>
> A.    Yes, sir.
>
> Q.    Line five. 'Now, to the best of your knowledge, had Ms. Peterson made that statement before concerning another student, that you have to make sure that she flunks?' That's not what you said at all previously, was it?
>
> A.    No, sir.
>
> Q.    So, he misinterpreted what you said, isn't that right, or he either misinterpreted it or he misstated it in some way, correct? [Dixie Peterson] never said, 'you have to flunk her, you must do it intentionally no matter what?'
>
> A.    The question is had she ever made a statement like that to me before was how I perceived it, and I had never heard her say that before.

> Q.    Right.  And she didn't say you have to make sure she flunks with respect to Lindy Wright either?
>
> A.    No, sir.

Gunnels July 24, 2007 Deposition, p.236:21 - 237:12.

It is evident from Plaintiff's counsel's questions that he previously misstated what Ms. Gunnels later testified she meant.  Ms. Gunnels recanted and explained any previous statement she had made in her November 1, 2006 deposition that was taken without the presence of other counsel. Ms. Gunnels' previous testimony is inadmissible and should not be considered for purposes of Defendants' Motion for Summary Judgment.  Moreover, her statements are irrelevant to this action.

## X.    PLAINTIFF'S EXHIBIT NO. 25 TO PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff also attempts to introduce as admissible evidence supporting her motion for summary judgment documents regarding a grade appeal of Arit Umoh.  See Exhibit "25" attached to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment.  Ms. Gunnels provided copies of these documents in her deposition taken on July 24, 2007.  Exhibit "2", Gunnels Deposition, pp. 214-216.  However, Plaintiff's Exhibit "25" is irrelevant, hearsay, and not admissible for purposes of summary judgment.

As previously argued, Ms. Wright has failed to show that Ms. Umoh was a similarly situated student.  As such, any information related to one failure by Ms. Umoh is irrelevant to this action and inadmissible for the purposes of Defendants' Motion for Summary Judgment.  There is no indication from this document the nature of Ms. Umoh's grade appeal, the outcome of Ms. Umoh's grade appeal, or the outcome of any additional course work of Ms. Umoh that offer any factual basis that

Ms. Umoh was a similarly situated student to that of Ms. Wright.  As such, Exhibit 25 should be stricken.

## XI.    CONCLUSION

It is clear that the much of the evidence comprised of statements from depositions, affidavits, and exhibits that Ms. Wright relies upon in order to defeat summary judgment are inadmissible in that they do not meet the requirements of Rule 56(e) of the Federal Rules of Civil Procedure or the Federal Rules of Evidence as outlined above.  As such, the statements, exhibits, affidavits and deposition testimony as outlined above should be stricken for purposes of summary judgment.

Respectfully submitted,


/s/ H.E. NIX, JR.
H.E.Nix, Jr. (NIX007)
Brandy F. Price (PRI 079)


OF COUNSEL:
Nix, Holtsford, Gilliland, Higgins & Hitson, P.C.
Post Office Box 4128
Montgomery, Alabama 36103-4128
(334) 215-8585
(334) 215-7101 facsimile

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that an exact copy of the foregoing instrument has been served on the following individual(s) either by e-mail from the Court Clerk or by placing a copy of same in the United States Mail, postage prepaid and properly addressed on this 26th day of November, 2007.

Jennifer B. Cooley, Esq.
Parker & Cooley, LLC
1507 Broad Street
Phenix City, Alabama 36867

Peter A. Dumbuya, Esq.
Post Office Box 3302
Phenix City, Alabama 36868

Joan Davis, Esq.
Dept. Of Post Secondary Education
401 Adams Avenue, Suite 280
Montgomery, AL 36130

/s/ H. E. NIX, JR.
OF COUNSEL

# DEPOSITION OF LINDY WRIGHT

## July 13, 2007

## Pages 1 through 328

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
566 South Perry Street
Post Office Box 62
Montgomery, AL  36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net



DEFENDANT'S
EXHIBIT

I

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE MIDDLE DISTRICT OF ALABAMA
 3              EASTERN DIVISION
 4
 5   LINDY G. WRIGHT,
 6        Plaintiff,
 7   Vs.            CIVIL ACTION NO.
                    3:06-CV-1087-WKW
 8   CHATTAHOOCHEE VALLEY
     COMMUNITY COLLEGE (CVCC),
 9   et al.,
10        Defendants.
11
12
            * * * * * * * * * * * * *
13
14
15        DEPOSITION OF LINDY WRIGHT, taken pursuant
16   to stipulation and agreement before Lisa J. Nix,
17   Registered Professional Reporter and Commissioner
18   for the State of Alabama at Large, in the Law
19   Offices of Parker & Cooley, 1507 Broad Street,
20   Phenix City, Alabama on Friday, July 13, 2007,
21   commencing at approximately 9:40 a.m. EDT.
22
23        * * * * * * * * * * * * *
```

Page 2

```
 1              APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4   Ms. Jennifer B. Cooley
     PARKER & COOLEY
 5   Attorneys at Law
     1507 Broad Street
 6   Phenix City, AL  36867
 7   Mr. Peter A. Dumbuya
     Attorney at Law
 8   Post Office Box 3302
     Phenix City, AL  36868
 9
10   FOR THE DEFENDANT:
11   Mr. H. E. Nix, Jr.
     Ms. Brandy F. Price
12   NIX, HOLTSFORD, GILLILAND,
       HIGGINS & HITSON
13   Attorneys at Law
     Suite 300
14   4001 Carmichael Road
     Montgomery, AL 36106
15
16   ALSO PRESENT:
17   Dr. Laurel Blackwell
     Ms. Dixie Peterson
18
19      * * * * * * * * * * * * *
20         EXAMINATION INDEX
21
     LINDY WRIGHT
22     BY MR. NIX  . . . . . . . . . .  6
23
```

Page 3

```
 1
 2              EXHIBIT INDEX
 3                  MAR
 4   DEFENDANT'S EXHIBIT
 5   1   Notice of Second Amended Deposition      31
         Duces Tecum
 6
 7   2   Defendants' First Amended Set of        136
 7       Requests for Production of Documents
 8   3   6/30/05 letter to Lindy Wright from     169
         David Hodge
 9
     4   Nursing 252 Adult Nursing II Clinical   201
10       Syllabus - Fall Semester 2005
11   5   Nursing 252 Adult Health Nursing II -   201
         Fall Semester 2005 course outline
12
     6   NUR271 - Maternal - Newborn Nursing     232
13       course outline
14   7   Nursing 272 - Pediatric Nursing course  233
         outline
15
     8   NUR 200 Nursing Career Mobility         233
16       Assessment course outline
17   9   Printout of electronic document sent to 236
         Lindy Wright from instructor at CVCC
18
     10  Documents produced by Lindy Wright      238
19
     11  4/29/05 letter to Linday Wright from    277
20       Katie Lackey
21   12  Income tax returns                      279
22
23
```

Page 4

```
 1           INDEX OF EXHIBITS (Continued)
 2
 3   13  Names and addresses of witnesses with   281
         attachments
 4
     14  Envelope addressed to Lindy Wright from 289
 5       CVCC postmarked 5/16/06
 6   15  1/10/06 letter to Dean James Lowe from  290
         Connie Cooper
 7
     16  5/19/06 letter to Dean of Students from 291
 8       Lindy Wright
 9   17  6/7/06 letter to Dr. Laurel Blackwell   293
         from Connie Cooper
10
     18  NLN Diagnostic Readiness Test           304
11       Performance Profile
12   19  6/13/06 letter to Connie Cooper from    306
         Laurel Blackwell, Ed.D. with attachment
13
     20  7/28/06 letter to Dr. Laurel Blackwell  311
14       from Jennifer Cooley with attachments
15   21  10/10/06 letter to Jennifer Cooley from 317
         Tracy Miller
16
     22  Composite exhibit consisting of         318
17       documents relating to authorization to
         release information
18
     23  10/25/06 letter to Jennifer Cooley from 319
19       Tracy Miller
20
21
22
23
```

Deposition of Lindy Wright
July 13, 2007

| Page 5 |
| --- |

1           STIPULATION

2           It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of LINDY WRIGHT is taken pursuant to the
5    Federal Rules of Civil Procedure and that said
6    deposition may be taken before Lisa J. Nix,
7    Registered Professional Reporter and Commissioner
8    for the State of Alabama at Large, without the
9    formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16          It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23          It is further stipulated and agreed by and

| Page 6 |
| --- |

1    between the parties hereto and the witness that the
2    signature of the witness to this deposition is
3    hereby waived.
4
5           * * * * * * * * * * * * *
6
7           LINDY WRIGHT
8           The witness, after having first been duly
9    sworn to speak the truth, the whole truth and
10   nothing but the truth testified as follows:
11          EXAMINATION
12   BY MR. NIX:
13   Q.   Would you state your name, please.
14   A.   Lindy L. Wright.
15   Q.   Where do you live, Ms. Wright?
16   A.   7716 Bolder Drive, Columbus, Georgia.
17   Q.   I have seen your name stated as Lindy
18        Warren.
19   A.   Correct.
20   Q.   Is that your maiden name?
21   A.   No, that was a previous marriage.
22   Q.   Previous marriage.  So who were you married
23        to?

| Page 7 |
| --- |

1    A.   Jason Michael Warren.
2    Q.   Did you get divorced?
3    A.   Uh-huh.  (Positive response.)
4    Q.   When you answer --
5    A.   Yes.
6    Q.   -- if you could, thank you, say yes or no.
7    A.   Okay.
8    Q.   Have you ever given a deposition before?
9    A.   Yes, sir.
10   Q.   When was that?
11   A.   I don't know the precise year.  It's many
12        years ago.  Probably in '93, '94 maybe,
13        '93.
14   Q.   What was it about?
15   A.   Job-related.
16   Q.   All right.  Were you a party in the case?
17   A.   Yes, sir.
18   Q.   What was the case?
19   A.   Termination of a position.
20   Q.   And you filed a lawsuit against your
21        employer?
22   A.   Yes.
23   Q.   Who was your employer?

| Page 8 |
| --- |

1    A.   Total Systems.
2    Q.   Total?
3    A.   Systems.
4    Q.   Where were they located?
5    A.   In Columbus.
6    Q.   Are they still there?
7    A.   They are.
8    Q.   Was the suit filed in Georgia?
9    A.   I think -- yes, sir.
10   Q.   Who was your lawyer in that?
11   A.   It was the State.
12   Q.   The State?
13   A.   Equal Employment Opportunity Commission.
14        It was an attorney from them.
15   Q.   It was the federal government, EEOC?
16   A.   Yes.
17   Q.   You filed a -- what kind of suit was it?
18        You were terminated.  I hear you saying
19        that, but do you know what type of suit it
20        was?
21   A.   No, I don't.
22   Q.   Do you remember how the suit was instituted
23        or started?

Page 93

1  Q. Were there answers that were on her key for
2     any of those tests, were there any of those
3     answers that she had determined that were
4     correct, were any of those wrong or did you
5     contest her answer to any of those
6     semester –
7  A. On the final.
8  Q. But not on the tests given during the
9     semester? You didn't contest any of those?
10 A. In the classroom?
11 Q. Did you contest in the classroom? I'm
12    talking about --
13 A. Yes, sir.
14 Q. -- at any time.
15 A. Yes, sir.
16 Q. Did Tawyna Cash give out her semester --
17    how should we say it? What do you call
18    those exams, the ones given during the
19    semester? Just an exam?
20 A. An exam.
21 Q. We'll call those exams, and we'll call the
22    final the final. Okay?
23        So during the exams, did Tawyna Cash go

Page 94

1     over the exams in class?
2  A. No.
3  Q. How did you begin talking to her or anyone
4     about the fact that she had the wrong
5     answer on the key or that her answer was
6     right, but so was yours?
7  A. Because people in the classroom would
8     question her as well as myself, and she
9     refused to go over anything with us in the
10    classroom because it was always an argument
11    with someone in the classroom. There was
12    always something going on.
13 Q. Okay.
14 A. She refused to go over the tests in class.
15 Q. When you got a grade on an exam in Tawyna
16    Cash's class, 271, NUR 271 --
17 A. Yes, sir.
18 Q. -- when you took a test and you got your
19    grade, would she hand out the papers or did
20    she just give you the grade?
21 A. She would give us the grade. If my memory
22    is correct, she would have us come up and
23    let us look and see what our grade was in

Page 95

1     her grade book.
2  Q. So that's all anybody got to see was just
3     the grade, correct?
4  A. Yes, sir.
5  Q. When an exam was given by Tawyna Cash
6     during the semester, would everyone have a
7     copy of the multiple choice questions to
8     take the exam with?
9  A. Yes, sir.
10 Q. And then everyone would have a Scantron in
11    order to mark the answers, correct?
12 A. Correct.
13 Q. And at the end of that process, would the
14    actual test with the multiple choice
15    questions be handed back in by the
16    students?
17 A. Yes, sir.
18 Q. And so would the Scantron cards, correct?
19 A. Correct.
20 Q. On the test, when you received a test with
21    the multiple choice questions on it in
22    Tawyna Cash's class, did you put your name
23    or your ID number or any identifying mark

Page 96

1     on that test?
2  A. I'm not sure if we did in her class or
3     not. I'm really not sure. I don't
4     remember.
5  Q. That's a practice, though, isn't it, that
6     schools use, is for a student to -- if they
7     get a test that's going to be taken back
8     up, they'll make some identifying mark on
9     it in accordance with what the teacher
10    tells them to do or the professor tells
11    them to do if the teacher tells them to do
12    so? You're familiar with that practice,
13    aren't you?
14 A. Yes, sir.
15 Q. So everybody turned their test back in at
16    the conclusion of it?
17 A. Yes, sir.
18 Q. Along with the Scantron?
19 A. Yes, sir.
20 Q. So I guess I'm at a loss to understand how
21    students could contest her answers if they
22    didn't have the test subsequent to turning
23    it in, didn't have the Scantron and didn't

Deposition of Lindy Wright                                    July 13, 2007

Page 97

1      have her key. How would they do that?
2   A.  Talk amongst each other because they
3      remembered the test questions. As soon as
4      the test was over, people would start
5      talking about, what did you get for this
6      question? Do you remember that question?
7         They would say, well, I don't think
8      that's right. And then people would open
9      their books and look through their books to
10     see if they could find a specific answer
11     for any test question that they could
12     remember.
13  Q.  Did you do that? Did you participate in
14     those discussions?
15  A.  Yes, sir.
16  Q.  I still don't know, though. I mean, how
17     did the class know what her key was?
18  A.  They didn't -- what do you mean know what
19     her key was?
20  Q.  Well, she had to have taken that test
21     herself or when she created the test, the
22     multiple choice test, she had to have
23     selected the correct answer to give that

Page 98

1      answer on the test to whoever was going to
2      grade the Scantron, however that's done,
3      whether by computer or by a person; isn't
4      that right?
5   A.  Correct.
6   Q.  Well, how did y'all know her answers? How
7      did you know Tawyna Cash's answers on those
8      exams?
9   A.  Nobody knew those answers.
10  Q.  So there's no way anyone could have made a
11     contest of the type you're describing, is
12     there?
13  A.  Yeah, you can raise a question in the
14     classroom and say, Ms. Cash, we -- you had
15     a question on there about mother/baby,
16     and -- do you breast feed, does that bring
17     the baby closer to the mother or whatever
18     that question may be. You can ask those
19     questions to her and say, well, I think
20     this answer that you -- you know, this
21     answer is correct that's in the book, but
22     you said this answer was correct.
23        I'm not going over anything was her

Page 99

1      response. I'm not doing that, because it
2      was always an argument. People would start
3      fussing in the classroom. And that would
4      be the end of that. You can schedule time
5      with me, and we can go over test questions.
6   Q.  How did the person who disagreed with
7      Tawyna Cash know what Tawyna Cash
8      determined to be the right answer on a
9      particular question?
10  A.  I don't know. I don't know.
11  Q.  I mean, did Tawyna Cash after an exam tell
12     everybody what all the right answers were?
13  A.  I don't remember her doing that.
14  Q.  Did Tawyna Cash after she gave an exam
15     during the semester go over the exam
16     afterwards and say here is the right answer
17     on that, here is the right answer on that
18     and go down it and tell everybody what the
19     right answers were?
20  A.  I think she might have once or twice going
21     through, but not reading the question and
22     just calling out the A, B, C, or D for
23     whatever question.

Page 100

1   Q.  Tell me how she would do that. How would
2      she do that?
3   A.  I'm not sure. If I remember correctly,
4      there might have been once or twice that
5      she did give a test back and read the
6      answer -- I mean the A, B, C or D, not read
7      the -- A is whatever she had written behind
8      A, read off the letters on the Scantron.
9   Q.  If I remember correctly, she might have one
10     or two times. That was your answer.
11  A.  Right.
12  Q.  So, I mean, Ms. Wright, are you sure she
13     did that?
14  A.  I'm trying to remember. I mean, it's been
15     a long time.
16  Q.  Well, this is your lawsuit.
17  A.  I know it is.
18  Q.  And you filed it, right?
19  A.  Right.
20  Q.  I need to know what happened in the class.
21     Did Tawyna Cash get the test and go over it
22     and tell everybody what the right answers
23     were during the semester?

Page 101

1    A.  I think, yes, she did.  I think she did.
2    Q.  For every test?
3    A.  I'm not sure if it was every test.
4    Q.  Can you tell me how many tests she did that
5        for?
6    A.  Maybe two, three.  I'm not real sure.  I'm
7        not even sure how many tests we had
8        anymore.
9    Q.  Are you saying that you're sure she did
10       that, but -- because you still say I think
11       instead of -- you don't -- you're not
12       saying I know she did that, right?
13   A.  Can I have a minute and let me try and
14       think?
15   Q.  Absolutely.  Yes, ma'am.
16   A.  Because, I mean, it's been over two years.
17       I think she did.
18   Q.  You think she did?
19   A.  I'll say she did.
20   Q.  How many tests did she go over in the
21       class?
22   A.  Two to three.
23   Q.  When she did this, Ms. Wright, did she go

Page 102

1        down and do every question on the test?
2    A.  As far as reading the question and
3        saying --
4    Q.  And the right answer.
5    A.  No, she would not.  She would say, number
6        one, A; number two, B; number three, C.
7        Would not read the question, tell you the
8        answer and give a rationale behind that.
9    Q.  She would not read the question.  She would
10       not go through the possible choices and
11       tell you why --
12   A.  This was wrong and why this was right, no.
13   Q.  She would just go number one is A, number
14       two is C and that type thing?
15   A.  Correct.
16   Q.  Talk to me about the final exam.  All
17       right?
18   A.  Okay.
19   Q.  The final exam was a multiple choice exam,
20       correct?
21   A.  Yes, sir.
22   Q.  And it had a Scantron as well, correct?
23   A.  Correct.

Page 103

1    Q.  How did you find out what your grade was on
2        the final in Ms. Cash's class?
3    A.  I think I called her or she -- I'm not
4        sure.  She was not a full-time employee
5        there, and she wasn't available all the
6        time.  And I can't recall if she came in
7        and gave us those grades or if she called
8        us.
9    Q.  Okay.
10   A.  But one way or the other, she told me what
11       my grade was.
12   Q.  She didn't post it on a board by social
13       security number or anything?  She
14       actually tell you, hey, Lindy, you made
15       whatever on --
16   A.  Right.
17   Q.  Now, when you went in to talk to her about
18       the final exam, tell me exactly what was
19       said to the best of your knowledge and
20       recollection.
21   A.  When I did the grade appeal?  Because she
22       wasn't available to talk to until the grade
23       appeal.

Page 104

1    Q.  So you could not talk to Ms. Cash, and
2        therefore you filed a grade appeal?
3    A.  Correct.
4    Q.  Then after you filed the grade appeal, you
5        and Ms. Cash sat down in her office and
6        met, correct?
7    A.  Correct.
8    Q.  And she brought with her the test and the
9        Scantron, right?
10   A.  Correct.
11   Q.  And y'all were sitting close together?
12   A.  Uh-huh.  (Positive response.)
13   Q.  Going over the questions?
14   A.  Correct.
15   Q.  And just tell me what happened.
16   A.  We got to the first question, and I pointed
17       out in a book the answer that I chose was
18       right there in black and white.  And she
19       agreed and she said, okay, I'll change that
20       one.
21       We flipped to the next one, and I said,
22       and this one right here -- she said, are we
23       going to do this with all of them?  I said,

Deposition of Lindy Wright                                                July 13, 2007

---

**Page 121**

1  Tawyna Cash other than the fact that you
2  initially learned from Dixie?
3  A.  Yes, sir.
4  Q.  So everything is correct that you've
5  testified to before with that exception?
6  A.  Yes, sir.
7  Q.  Let's go back to Lynn Harris.  Okay?  You
8  went into the office with Lynn Harris and
9  closed the door.  There was no one else
10  there with the two of you, correct?
11  A.  I don't think the door was closed because
12  all the students were in a line.
13  Q.  And Lynn Harris, did she show you what you
14  made on the final in addition to all of the
15  points for the semester?
16  A.  If my memory serves me right, yes, sir, she
17  did.  She showed me a Scantron that had red
18  writing all over it, and that was my --
19  supposed to be my final.  There was red
20  marks all in my final.
21  Q.  Your Scantron?
22  A.  Yes, sir, and all over it.
23  Q.  Do you know what your number of correct

**Page 122**

1  answers were out of whatever number that
2  was there?
3  A.  (Shakes head from side to side.)
4  Q.  You don't know?
5  A.  (Shakes head from side to side.)
6  Q.  Nevertheless, you did not pass that final,
7  correct?
8  A.  Correct.
9  Q.  When Lynn Harris totaled up your total
10  points for all of the other work that you
11  would have been doing, she said that --
12  what?
13  A.  You don't have enough points.
14  Q.  Don't have enough points?
15  A.  You get a D.
16  Q.  Did she tell you of any way that you could
17  bring -- or any way that that grade could
18  get better if you --
19      I guess what I'm asking, there were
20  several components to your grade, correct?
21  A.  Correct.
22  Q.  What?  There was at least one paper, wasn't
23  there?  There was clinical.

**Page 123**

1  A.  Yeah, there was clinical.  That was in the
2  hospital.  If you did not pass clinical,
3  you didn't pass the course.  There were
4  care plans that had to be done.
5  Q.  Right.
6  A.  There were tests.  There were computer
7  assignments.  And I'm not sure if there was
8  a paper that we had to do.  I don't
9  remember.
10  Q.  Nevertheless, whatever the components would
11  have been to that grade, did Lynn Harris
12  have all of those numbers in when you met
13  with her?
14  A.  No, sir.
15  Q.  She did not?
16  A.  No, sir.
17  Q.  What did she lack?
18  A.  There was care plans that I was told that
19  were lost, and they were giving me -- they
20  said that they would allot 23 points out of
21  25.
22  Q.  Okay.  How many care plans?
23  A.  We had to do two.

**Page 124**

1  Q.  So that would have been a total of 50
2  points?
3  A.  Yes, sir.
4  Q.  And because they were lost, you got 46 out
5  of 50?
6  A.  Yes, sir, I guess so.
7  Q.  Is that a good grade on those care plans?
8  A.  Pretty much.
9  Q.  Pretty much?
10  A.  Yeah.  I mean, that's a good grade.  I
11  think that's a B maybe.  I'm not real
12  sure.  Have to calculate it.
13  Q.  Who told you they were lost?
14  A.  Lynn Harris did.
15  Q.  Did she tell you how they got lost?
16  A.  No, she didn't give an explanation.  She
17  said that she was told that they were
18  lost.  And the instructor that did my
19  clinicals, her name was Deborah Gruber.
20  And that's the lady that we turned those
21  care plans in to in the hospital.  We
22  turned those care plans in to her.
23      And she -- there was a phone

Page 125

1    conversation between her and Sandy
2    Gunnels. I was listening. She said she
3    turned those care plans in to Dixie.
4  Q.  Deborah Gruber?
5  A.  Uh-huh. (Positive response.)
6  Q.  Told Sandy Gunnels that she turned your
7    care plans in to Dixie?
8  A.  Yes.
9  Q.  For NUR 252, Adult Nursing II, right?
10 A.  Yes, sir.
11 Q.  Was that the only component to the total
12   number of points that Lynn Harris did not
13   have the actual number for?
14 A.  I think so.
15 Q.  And Lynn Harris knew, however, that you
16   would be getting this 23 out of 25 on those
17   two care plans, correct?
18 A.  That's what she told me that they were
19   going to allot for the lost care plan.
20 Q.  Did anybody else have a lost care plan?
21 A.  My whole group did. Just my group, my
22   clinical group.
23 Q.  How many were in your clinical group?

Page 126

1  A.  I think six.
2  Q.  Who were they?
3  A.  That particular time, I know Crystal Love
4    was in there, April Gunnels, Corolla
5    Rambo. I'm trying to think who else was in
6    that group.
7  Q.  Where did you do your clinicals?
8  A.  The Medical Center. 6 East.
9  Q.  The Medical Center?
10 A.  It's in Columbus, Georgia. It's --
11 Q.  It's a hospital?
12 A.  Yeah.
13 Q.  Is it Columbus Medical Center or --
14 A.  Columbus Regional Medical Center. The
15   Medical Center.
16 Q.  That was on 6 East?
17 A.  Yes, sir.
18 Q.  Who was the -- Deborah Gruber. You've
19   already told me. Columbus Regional. All
20   right.
21      Now, did you have a discussion with
22   Lynn Harris about your grade when she told
23   you what it was?

Page 127

1  A.  Oh, yes, sir.
2  Q.  Tell me about that, exactly what was said.
3  A.  I wanted to go over everything that she had
4    for me and review all the tests and look
5    for my points.
6  Q.  When did you want to do that?
7  A.  As soon as possible.
8  Q.  All right. You say look for the points.
9    There weren't any other lost papers or
10   anything like that, were there, other than
11   those care plans?
12 A.  Correct.
13 Q.  What do you mean look for the points?
14 A.  Look for the points. To go through all my
15   test grades and make sure that the
16   Scantrons were not messed up.
17      And they gave me the opportunity to
18   look at those tests, and she let me write
19   down -- not word for word, but she let me
20   write down some of the test questions and
21   review and try and find -- try and, I
22   guess, go to her and say, this is my
23   answer; this is correct; will you accept

Page 128

1    this or what.
2  Q.  So when you told Lynn Harris that you'd
3    like to sit down with her and go over
4    everything, what did Lynn Harris say?
5  A.  It was not very nice at that time. I mean,
6    she was not being very nice to me which,
7    you know, that -- that really is
8    irrelevant, but it was not a nice
9    situation. It was very ugly and nasty.
10 Q.  Well, I'm not --
11 A.  She was very defensive. She didn't want
12   you to question her or her answers. And
13   when I did so, it was not nice.
14 Q.  How about in that first meeting in her
15   office where there was a line behind you
16   and she gave you the total number of points
17   and you knew it was a D and you said, I'd
18   like to meet with you and go through all of
19   this?
20 A.  Don't have time right now.
21 Q.  Did she set up a time for you to meet with
22   her?
23 A.  I had to go to Dixie.

Deposition of Lindy Wright

Page 129

1   Q.  Now, was Lynn Harris real defensive when
2       she told you what your grade was and you
3       said I want to meet?
4   A.  No.  When she told me what my grade was,
5       no.  I said, well, I want to review
6       everything, I want to see everything,
7       that's when --
8   Q.  She was defensive then?
9   A.  (Witness nods head up and down.)
10  Q.  Yes?
11  A.  I took it as an offense -- just her
12      demeanor, the way she was acting.
13  Q.  In that very first meeting when you said I
14      want to go over everything with you, right,
15      is that --
16  A.  I want to see all my test grades.  I want
17      to see all my papers.  I want to see
18      everything.
19  Q.  Did you take that as -- that she was
20      behaving offensively at that time?
21  A.  Yes, sir.
22  Q.  So tell me exactly how that manifested.
23  A.  I don't know.  I don't know.

Page 130

1   Q.  What did she do that was nasty, cruel, mean
2       or whatever you said?
3   A.  Raised her voice.  I mean, her face would
4       turn red and she would just get excited.
5   Q.  What else?
6   A.  That's it.
7   Q.  Did you -- you say that you were able to
8       look at your tests in 252, that course?
9   A.  Yes, sir.
10  Q.  Adult nursing?
11      Yes?
12  A.  Yes, sir.
13  Q.  So when did you look at your tests?
14  A.  After I had filled out the papers for the
15      grade appeal, then we set a date for me to
16      come in and look at the tests and go over
17      it with her.
18  Q.  When you called Sandy Gunnels on the phone
19      about your grade in obstetrics, you knew
20      about your grade in Adult Nursing II also,
21      didn't you?
22  A.  I knew about that grade first, and I called
23      her about that one.

Page 131

1   Q.  First?
2   A.  First.
3   Q.  Adult Nursing II?
4   A.  Yes, sir.
5   Q.  And then you called her about obstetrics --
6   A.  When I learned that grade.
7   Q.  -- when Dixie Peterson told you about that
8       one?
9   A.  Yes, sir.
10  Q.  Now, when you talked to Sandy Gunnels about
11      Adult Nursing II, tell me about that
12      conversation.
13  A.  I told her that -- I told her about not
14      having enough points, saying they lost the
15      care plans and things like that, and she
16      told me to go through the grade appeal
17      process, just as in the OB class.  She told
18      me to do that one first because that's the
19      one I knew about first.  Then she said if
20      you're going to do that, you need to go and
21      do the OB, just do it, also.  Review
22      everything.
23  Q.  Did you tell Sandy Gunnels that you were

Page 132

1       receiving 23 out of 25 total points on each
2       of those care plans that were lost?
3   A.  It was only one care plan that was lost.
4       Yes, I did.
5   Q.  So you got your actual grade on one care
6       plan, correct?
7   A.  Correct.
8   Q.  And then they gave you a 23 out of 25 on
9       the other care plan that was lost, correct?
10  A.  Correct.
11  Q.  Did they do that for all six of the people
12      in your group?
13  A.  I'm not real sure.  As far as I know, they
14      did.
15  Q.  But did you tell Sandy Gunnels when you
16      talked to her the first time about the fact
17      that you were getting 23 out of 25 on that
18      lost care plan?
19  A.  Yes, sir.
20  Q.  So tell me everything you told Sandy
21      Gunnels about your Adult Nursing II grade
22      and any problems or whatever you talked to
23      her about before she said file a grade

Page 165

1    A.  It was possibly the day before or two days
2        prior to.  I'm not sure if there was a
3        weekend time in there or not, but I know
4        all faculty -- I was -- I called up there
5        to see if the dean was there so I could
6        bring my letter, and I was told that the
7        faculty wasn't in.  I happened to catch him
8        coming down the stairs as I was going up.
9    Q.  Which dean are you talking about?
10   A.  Dean Hodge.
11   Q.  Shortly before May 19, a day or two or if
12       there was a weekend, you met with Dixie,
13       and Dixie said something like, it's not
14       like you have course forgiveness?
15   A.  It's not like you have course forgiveness,
16       Lindy.
17   Q.  You're very emphatic about that.  It sounds
18       like those were her exact words.
19   A.  Those were her exact words.
20   Q.  What did you say in response, if anything?
21   A.  I just looked at her, and I was thinking to
22       myself, what's course forgiveness?  I
23       didn't know anything about it.  And that's

Page 166

1        when I went and researched my course
2        catalog.
3    Q.  But you didn't say anything and y'all
4        didn't discuss it in that meeting?
5    A.  No.
6    Q.  And Dean Lowe didn't discuss it in that
7        meeting with you?
8    A.  No.
9    Q.  So that's all that was said, was just that
10       comment --
11   A.  Correct.
12   Q.  -- about course forgiveness?
13          What else was said in that meeting?
14   A.  I don't remember everything that was said,
15       but it was basically about they would help
16       me any way they could and apologetic, sorry
17       this has happened to you, and that was
18       pretty much the basis of it.
19   Q.  And then you went to see Lynn Harris.  Lynn
20       Harris said I can't regrade the care plans?
21   A.  Correct.  There was some point in time, and
22       I don't remember exactly when, that Dixie
23       told me to go talk to whoever.  And so I

Page 167

1        went and talked to Laurel Blackwell and
2        Dean Hodge.  He came in --
3    Q.  Okay.
4    A.  -- to her office.
5    Q.  This was after your meeting with Dixie and
6        Dean Lowe?
7    A.  I think it was.
8    Q.  Was it after you filed the course for --
9        wrote the letter about course forgiveness?
10   A.  If I'm not mistaken, it was -- it was -- it
11       may have been, because I was waiting on a
12       decision from the dean about the course
13       forgiveness.
14   Q.  Dean Hodge?
15   A.  Yes.
16   Q.  So you're saying Dixie said, why don't you
17       go see who?
18   A.  She told me she didn't care who I went and
19       talked to.
20   Q.  Dixie --
21   A.  Yes.
22   Q.  -- said that?  So what did you do?
23   A.  I went and talked to Laurel Blackwell, and

Page 168

1        Dean Hodge was in on that meeting.  And it
2        was not a scheduled meeting.  I went up and
3        sat in the office and waited on her.
4    Q.  Would this have also been in May?
5    A.  Yes, sir.
6    Q.  So what was said in that meeting?
7    A.  She basically told me that she had nothing
8        to do with the academics, that it was their
9        decision, and that was the extent of that.
10   Q.  Did Dean Hodge say anything?
11   A.  I don't recall him saying anything.  I
12       think he was just sitting in.
13   Q.  Okay.
14   A.  I may have asked him at that point about
15       the course forgiveness.
16   Q.  Tell me what you recall.  Don't guess,
17       speculate or --
18   A.  I know there was at some point in time that
19       I did contact him by phone and ask him
20       about the course forgiveness, and he told
21       me that it had to go through some sort of
22       process -- I don't know what -- but he
23       didn't have an answer for me yet.  And then

Page 177

1   Q.  That you believe has received course
2       forgiveness?
3   A.  Correct.
4   Q.  Whatever. All right. Rambo.
5           All right. Now, you said not course
6       forgiveness, and you distinguished course
7       forgiveness from something else. What did
8       you mean to distinguish course forgiveness
9       from?
10  A.  That has received special treatment.
11  Q.  Okay. Special treatment. What do you mean
12      by special treatment?
13  A.  Has been able to come back to the program
14      after two failures or has been able to
15      rectify their wrong instead of having to
16      come back the following year or pay for
17      classes or take -- repeat the class.
18  Q.  Let's take one classification of special
19      treatment at a time. Okay?
20  A.  Okay.
21  Q.  What is your understanding of anyone in the
22      nursing program that has received what you
23      call special treatment?

Page 178

1   A.  There was a student the first half of the
2       second semester that came into one of our
3       clinical labs that was held at the school,
4       and she had not been in any of our classes
5       and --
6   Q.  You said the first half of what semester?
7   A.  The second semester.
8   Q.  Okay. I'm sorry. Go ahead.
9   A.  And not just myself, but everyone was
10      asking who the girl was.
11  Q.  Who was she?
12  A.  Her name was Arit Dan Umoh. And she was a
13      student from the previous year that was
14      taking, I guess, a pediatric course is what
15      I was told before it was offered. And she
16      was there that day performing clinical
17      check-offs with the rest of us in my class.
18  Q.  Was Arit Dan -- how do you say it?
19  A.  Umoh. I think that's how you say it.
20  Q.  Was she enrolled in your clinical class?
21  A.  No, sir, she was not enrolled in my
22      clinical class.
23  Q.  But she came to that class is what you

Page 179

1       you're saying?
2   A.  She came to that clinical check-off.
3   Q.  Which clinical was that?
4   A.  It was just a check-off that we had to do.
5   Q.  But, I mean, what course did the clinical
6       go with? Don't you have a lecture and a
7       clinical?
8   A.  It was the second -- it was the beginning
9       of the second semester, so it had to be the
10      OB and the adult nursing because I think
11      that's when we started doing our clinicals
12      in the hospital.
13  Q.  Okay.
14  A.  Before we did -- Before we started doing
15      the clinicals in the hospital, we had to do
16      a check-off, and she was there that day.
17  Q.  What did you say? OB and what?
18  A.  The OB and the adult nursing.
19  Q.  Adult nursing.
20  A.  Yes, sir.
21  Q.  What is a check-off?
22  A.  How to start IVs, to make sure that you're
23      competent enough to start IVs. We had to

Page 180

1       do a check-off with Foley catheters.
2       That's all I can recall from that day.
3   Q.  And a check-off, if I hear you correctly --
4       and tell me if I'm wrong. A check-off is
5       where you perform a task, and if you
6       perform it adequately, that task is checked
7       off of the list of things you need to be
8       able to do before you become an RN; is that
9       right?
10  A.  Before you're able to go into the clinical
11      setting.
12  Q.  The actual hospital setting?
13  A.  Uh-huh. (Positive response.) Correct.
14      But not for you to be able to sit for your
15      boards or become an RN --
16  Q.  Ultimately, though --
17  A.  Correct.
18  Q.  Ultimately, you've got to be able to do a
19      Foley catheter in order to go to the
20      hospital for your clinical and thereby get
21      to the point where you can take the license
22      exam, right?
23  A.  Correct.

Deposition of Lindy Wright

July 13, 2007

Page 181

```
1    Q.  Do you know what Ms. Umoh was doing in
2        terms of her check-off?  Was it the same
3        things y'all were doing?
4    A.  As far as the check-offs, yes, starting IVs
5        and sterile technique and putting in a
6        Foley.
7    Q.  Did you say she came into this clinical
8        class in the middle of the year?
9    A.  No, it was the beginning of that second
10       semester.
11   Q.  And you're saying she did not stay there,
12       correct?
13   A.  Not -- She was not in any of my clinical
14       groups or in my classroom group.  I was
15       told that she had, I guess, like a -- an
16       independent study.
17   Q.  Who told you she had an independent study?
18   A.  Sandy Gunnels, Wendy Wall and Lynn Harris
19       had made a comment about her -- well, not
20       about her -- didn't call her name
21       specifically, but said she had a student.
22       And that was the only student that was not
23       with everyone else that I knew about.
```

Page 182

```
1    Q.  Lynn Harris?
2    A.  Yes, sir.
3    Q.  Lynn Harris said I have a student that
4        what?
5    A.  That she had to do independent study with.
6    Q.  Did she say why she had to do an
7        independent study with her?
8    A.  No.
9    Q.  Do you know why she had to do an
10       independent study with her?
11   A.  Because she didn't pass from the previous
12       year.
13   Q.  Didn't pass what from the previous year?
14   A.  Didn't pass the nursing courses from the
15       previous year.
16   Q.  So you're saying that someone okayed her
17       taking this independent study or doing this
18       independent study to complete her
19       requirements for the nursing program?
20   A.  Correct.
21   Q.  Do you know who approved that?
22   A.  No, I don't know who approved it.
23   Q.  Do you know why it was approved?
```

Page 183

```
1    A.  No, I don't.
2    Q.  Has anyone told you who approved it?
3    A.  Yes.
4    Q.  Who told you?
5    A.  Sandy Gunnels and Wendy Wall had made a
6        comment that the dean and Dixie approved
7        her to come back.
8    Q.  Wall, W-A-L-L?
9    A.  Uh-huh.  (Positive response.)
10   Q.  Wendy Wall.  Where does Wendy Wall work?
11   A.  If I'm not mistaken, I think she's working
12       for Columbus Tech.
13   Q.  Was she working for Columbus Tech when you
14       spoke to them and they told you this?
15   A.  No, sir.  They were working for CVCC.
16   Q.  When did Sandy Gunnels leave CVCC?
17   A.  That second semester.
18   Q.  The spring of '06?
19   A.  Yes, sir.  That was the OB and the peds --
20       if that's spring.  Is that spring?
21   Q.  Tell me what month and year that Sandy
22       Gunnels left CVCC.
23   A.  Okay.  We started in May, and that went
```

Page 184

```
1        through August; is that correct?
2    Q.  I'm asking you.
3    A.  I think that's right.  I think that's
4        right.  It stopped in August.  The first
5        semester stopped in August and then picked
6        back up -- I don't know exactly the date
7        that they picked back up, but it was the
8        first week of the second semester --
9    Q.  Okay.
10   A.  -- that we did the clinical check-off.
11   Q.  Who did Sandy Gunnels say had approved the
12       independent study?
13   A.  Dixie Peterson and Dean Lowe.
14   Q.  What reason did she give for them approving
15       it?
16   A.  That she came back -- well, she came up to
17       the school with her attorney at her side
18       and they let her come back.
19   Q.  Do you know how Sandy Gunnels supposedly
20       knew this?
21   A.  The only thing I know is that she was an
22       instructor there, and she was that girl's
23       instructor.
```

Deposition of Lindy Wright                                                          July 13, 2007

Page 185

1  Q.  Was Wendy Wall an instructor there at the
2      time?
3  A.  She was a clinical instructor.
4  Q.  Clinical. Do you know a person named
5      Brenda Bellamy?
6  A.  Yes.
7  Q.  How do you know Brenda Bellamy?
8  A.  She was my instructor in the RN program at
9      CVCC the first semester starting in May.
10 Q.  Of the --
11 A.  RN program.
12 Q.  What course in the RN program?
13 A.  I'm not sure what the first courses we
14     took. I don't know the names of them right
15     off the top of my head.
16 Q.  What you're saying is, Brenda Bellamy was a
17     professor of yours?
18 A.  Yes, sir.
19 Q.  Beginning in June 2005, the summer
20     semester?
21 A.  May 2005.
22 Q.  May 2005. Have you spoken with Brenda
23     Bellamy since you finished her course?

Page 186

1  A.  Yes, sir.
2  Q.  Did you have Brenda Bellamy for any course
3      other than the one you took in the summer
4      semester of 2005?
5  A.  For the first -- maybe the first couple of
6      days of the second semester, and that was
7      it --
8  Q.  What course?
9  A.  -- from the first semester to the second
10     semester.
11     She would have been the teacher for, I
12     guess, the Adult Nursing II. I think the
13     course syllabus has her name on it.
14 Q.  Who took over that course?
15 A.  Lynn Harris.
16 Q.  That would have been NUR 272; is that
17     right?
18 A.  No, that was -- yeah -- well, no, that was
19     the 252.
20 Q.  Okay.
21 A.  Brenda Bellamy was the instructor for 252,
22     and then Lynn Harris took over.
23 Q.  So when did you talk to Brenda Bellamy

Page 187

1      last?
2  A.  Probably about three weeks ago, two or
3      three weeks ago.
4  Q.  Can you tell me about that?
5  A.  I called her because Ms. Cooley told me
6      that she would be subpoenaed to -- I guess
7      today or needed to come in today for a
8      deposition. So I called her to let her
9      know that the attorney would be contacting
10     her, and that was the extent of that
11     conversation.
12 Q.  Before that, when was the last time you
13     talked to her?
14 A.  While we were in nursing school, we ran
15     into her. Myself and some of the students
16     went to eat at TGI Friday's over in
17     Columbus, and we ran into her in the
18     restaurant.
19 Q.  Did you have any lengthy conversation with
20     her?
21 A.  Yeah, I sat down at the table with her and
22     her husband.
23 Q.  Tell me about that.

Page 188

1  A.  Just asking how she was doing, what was
2      going on. Told her that I'd had some
3      problems in the second semester after she
4      left, and that was the extent of that. She
5      said that she wouldn't work for CVCC again
6      and she was glad to be gone.
7  Q.  Did she say why?
8  A.  Lots of problems. We didn't go into
9      detail.
10 Q.  Do you know her husband's name?
11 A.  I do not.
12 Q.  Do you know whether Brenda Bellamy and
13     Sandy Gunnels are friends?
14 A.  I don't know that.
15 Q.  Do you know where Brenda Bellamy works now?
16 A.  Yes, I do.
17 Q.  Where?
18 A.  Doctors Hospital.
19 Q.  Do you know what she's doing?
20 A.  I think she works down in triage.
21 Q.  Has Brenda Bellamy ever helped you with any
22     course while you were at CVCC, your RN
23     courses?

Page 189

1  A.  Helped me or taught me?
2  Q.  Well, not taught you, but helped you on an
3      outside basis or an extracurricular basis.
4  A.  No.
5  Q.  Does Brenda Bellamy know anything about the
6      courses that you failed and about the
7      lawsuit that you filed?
8  A.  Yes.
9  Q.  How does she know that?
10 A.  Because in crossing at the hospital, she
11     asked me how I did and I told her that I
12     didn't pass and that I was seeking legal
13     advice.
14 Q.  Tell me when that occurred.
15 A.  Probably a year ago.
16 Q.  What did she say?
17 A.  She was sorry.
18 Q.  You were telling me about special
19     treatment, and you've told me about
20     Ms. Umoh -- or at least what you were --
21     basically what you've been told about
22     Ms. Umoh, correct?
23 A.  Correct.

Page 190

1  Q.  You don't have any personal knowledge of
2      these things; isn't that correct?
3  A.  Correct.
4  Q.  Is there anything else about Ms. Umoh that
5      you haven't told me in terms of special
6      treatment?
7  A.  Things that I've been told?
8  Q.  Yes.
9  A.  I was told that she failed in clinical and
10     in the classroom, that peds class.
11 Q.  What class?
12 A.  The pediatric class, the 272.
13 Q.  When did she do that?
14 A.  I was told that she did that the year
15     before -- the year that she was in the
16     nursing program, and I was also told that
17     she didn't pass with Ms. Harris in the
18     classroom setting. That's what somebody
19     had heard, that she did not pass in the
20     classroom setting and --
21 Q.  That was back in the 272 course that she
22     had taken previously, the one she failed?
23 A.  No, that was the year that I was there. I

Page 191

1      was told that she failed the year that she
2      was there. Then I was told that she failed
3      again when she came back.
4          And I was told that -- I think Sylvia
5      Shirley -- I don't know the lady's
6      first -- last name. I don't know which
7      order it goes. But I was told that they
8      had her check her off in the clinical
9      setting so they could pass her and move her
10     on through.
11 Q.  Who is Sylvia Shirley?
12 A.  She was one of the clinical instructors
13     that I had for pediatrics.
14 Q.  Was she there at the school or was she in
15     the hospital?
16 A.  I saw her in the hospital.
17 Q.  Which hospital does she work in?
18 A.  If she's still there, she works at the
19     Medical Center on the pediatric floor.
20 Q.  Now, let me go back. I want to make sure I
21     understand this about Ms. Umoh. Ms. Umoh
22     the year before you took 272, NUR 272, took
23     that course and did not pass it; is that

Page 192

1      right?
2  A.  That's what I was told.
3  Q.  And then in the fall semester 2005,
4      Ms. Umoh was back; is that right?
5  A.  Correct.
6  Q.  And that's when she took the independent
7      study?
8  A.  Correct.
9  Q.  With Lynn Harris?
10 A.  Correct.
11 Q.  Did the independent study involve going to
12     class?
13 A.  She didn't come to any of our classes. She
14     just came to the clinical check-off.
15 Q.  When was it that she flunked the class
16     portion of Ms. Harris's course?
17 A.  I don't know.
18 Q.  Somebody told you that, though, right?
19 A.  Correct.
20 Q.  They told you that -- someone told you that
21     she flunked the class part and the clinical
22     part, right?
23 A.  Correct.

Page 193

1  Q.  And that was the same year -- that was fall
2      of '05, right?
3  A.  Correct.
4  Q.  And who told you that?
5  A.  Sandy Gunnels said that somebody had told
6      her that. I'm not for sure who that
7      someone was, but I think she said that
8      Wendy Wall told her that.
9  Q.  Okay. So, again, Ms. Umoh did not graduate
10     is what we're saying, right?
11 A.  Yeah, she graduated.
12 Q.  She graduated when?
13 A.  I'm not real sure. I assume that it was
14     2006, because I know she has her license
15     now.
16 Q.  I thought you said that someone told you
17     that she failed again after --
18 A.  She did. That's what I was told.
19 Q.  By Sandy Gunnels?
20 A.  Correct.
21 Q.  That Ms. Umoh failed again in 2006 or 2005?
22 A.  The class was given -- that particular
23     class for her was given in 2005.

Page 194

1  Q.  Right, the independent study?
2  A.  Correct.
3  Q.  And Sandy Gunnels told you Ms. Umoh failed
4      the independent study; is that right?
5  A.  Sandy told me that's what she had heard.
6  Q.  So when did Ms. Umoh graduate? Did Sandy
7      Gunnels tell you that?
8  A.  No, she didn't. I have no idea.
9  Q.  Did Sandy Gunnels tell you anything else
10     about Ms. Umoh?
11 A.  No.
12 Q.  Now, that's Ms. Umoh. Let's go to another
13     situation on special treatment.
14     Apparently, there were others that you were
15     going to tell me about, right?
16 A.  Yes, sir.
17 Q.  Okay. Let's go.
18 A.  Elise Sizemore, we were given drug
19     calculation tests and we were supposed to
20     have those tests three times. If we didn't
21     pass by the third time, then we were out of
22     the program.
23     She took drug calculation tests

Page 195

1      throughout the second semester with Lynn
2      Harris. The day of finals, I was talking
3      to Ms. Harris and she said that she didn't
4      have time because she had a student that
5      had to take a drug calculation test over,
6      and it was Elise Sizemore.
7  Q.  Elise Sizemore was a contemporary of yours
8      in school, correct?
9  A.  Correct.
10 Q.  Y'all were in the same class together which
11     involved drug calculation tests, correct?
12 A.  Correct.
13 Q.  Elise Sizemore failed the drug calculation
14     part, right?
15 A.  Correct.
16 Q.  You're saying that Elise Sizemore was
17     allowed to take the drug calculation --
18 A.  Calculation up until the day of the final,
19     and she passed the day of the final.
20 Q.  Okay.
21 A.  And you were supposed to have passed those
22     tests before you gave medication in the
23     clinical setting at the hospitals.

Page 196

1  Q.  Are you aware of her giving medication in
2      the hospitals in the clinical setting
3      before she passed those tests?
4  A.  I'm not, but she told me that she did.
5  Q.  Who let her do that?
6  A.  I can't remember the -- I didn't have that
7      lady for clinicals. I can't remember her
8      name. If you'll give me just a minute, I
9      might be able to recall.
10 Q.  What hospital was it?
11 A.  It was the Medical Center.
12 Q.  What floor?
13 A.  I'm not sure what floor.
14 Q.  Where is Elise Sizemore now?
15 A.  She works for St. Francis.
16 Q.  Where? What floor?
17 A.  She works, I think, two. 2north.
18 Q.  What course number would that have been?
19     252?
20 A.  252.
21 Q.  Is it correct or incorrect that the drug
22     calculation part was a portion of a test,
23     not a complete or a whole test?

Page 205

1   A.  No, I don't know if she was allowed to take
2       it more than three times or three times up
3       until, but we were always told that we were
4       taking these calculation tests before we
5       set foot into the clinical setting to make
6       sure that we were competent enough to do
7       the drug calculations that may be requested
8       of us by our instructors.  And those were
9       to be passed before we set foot into the
10      hospital to give medications.
11  Q.  What I want to make sure I understand is
12      this.  You do not know whether Ms. Sizemore
13      was allowed to take the exam more than
14      three times before the final exam.  Isn't
15      that correct?
16  A.  Correct.
17  Q.  And you do not know on the other hand
18      whether she was allowed to take it three
19      times up to the final, didn't pass it in
20      the third try, yet was allowed to give
21      medication in the clinical setting, right?
22  A.  Correct.
23  Q.  But you're saying one of those is true; is

Page 206

1       that what you're saying?
2   A.  Correct.
3   Q.  And that that therefore violates the rule
4       of the school in that regard?
5   A.  Correct.
6   Q.  My question to you is, how does that affect
7       you?  How does that hurt you?
8   A.  You asked me who has received special
9       treatment.
10  Q.  Right.  But I'm asking you -- Okay.  You've
11      given me this example.  How does that
12      affect you?
13  A.  Well, it affects me because if somebody
14      else can receive special treatment and the
15      rules are broken for someone else and the
16      rules are changed and it's up to their
17      discretion to make those rules, then why am
18      I in the position that I'm in because
19      somebody wouldn't change those rules for me
20      or give me special treatment as though
21      they've given someone else?
22  Q.  Give me another example of someone that got
23      special treatment.

Page 207

1   A.  Shannah Lowe.
2   Q.  Tell me about that.
3   A.  We were in pediatrics.  She was not in my
4       clinical group, but one of her friends was
5       in my clinical group.
6   Q.  This would have been the spring of '06,
7       right?
8   A.  Correct.
9   Q.  Go ahead.
10  A.  And the lady --
11  Q.  Clinical, again?
12  A.  It was the clinical, in the hospital.
13  Q.  Okay.
14  A.  The lady that spoke up and said she was
15      having problems -- her name is Jill
16      Boyette.  She was in my clinical group, and
17      she spoke up and said that Shamah Lowe did
18      not pass her clinical portion because she
19      refused to start an IV on a child.  And
20      Artemisa Harmon was that clinical
21      instructor and told her that she would not
22      be passing.  And she stated that Shannah
23      called Dixie Peterson and Dean Lowe.

Page 208

1   Q.  Let's go back.  Okay?  We're in the
2       clinical setting.  We're in pediatrics.
3       This is the spring of 2006.  Ms. Lowe --
4       Shannah Lowe is not in your clinical group,
5       correct?
6   A.  Correct.
7   Q.  But she is in Jill Boyette's clinical
8       group?
9   A.  No, sir.  That's Jill Boyette's friend.
10  Q.  And Jill Boyette is a nurse?
11  A.  She is.
12  Q.  Jill Boyette was not in class at CVCC?  She
13      was, instead, a nurse employed at, what?
14      The Medical Center, Regional Medical
15      Center?
16  A.  No, she was a student and she was in my
17      clinical group.
18  Q.  You lost me, okay, on what happened here.
19      You're saying that Shannah Lowe was in a
20      clinical setting, that she would not give a
21      child an IV?
22  A.  I was told that by Jill Boyette, that she
23      refused to -- it wasn't just me that she

52 (Pages 205 to 208)

Page 209

1   was telling. She was telling our whole
2   clinical group that she refused to start an
3   IV on a child.
4   Q. All right.
5   A. And Artemisa Harmon told her that she would
6     not be passing the clinical portion. And
7     she was -- Jill Boyette said that she
8     called Dixie Peterson and Dean Lowe at that
9     time.
10       Do you want me to keep going?
11  Q. Yeah.
12  A. And in the process of me taking Nursing
13    200, she was seen at the school with
14    Bridgett Jackson going to the lab. And we
15    were told that Bridgett Jackson was giving
16    her time in the lab to rectify her --
17    whatever she did in that clinical class
18    with Artemisa Harmon.
19  Q. 200 -- when did you take 200?
20  A. In the summer.
21  Q. Of?
22  A. Yeah.
23  Q. And who told you this?

Page 210

1   A. About Shannah Lowe? Jill Boyette.
2   Q. Who told you that Ms. Jackson and Shannah
3     Lowe were going to the clinic at the
4     school?
5   A. Jill Boyette and other students were
6     talking about it, and Kim Smith, also.
7   Q. Is she a student as well?
8   A. She was.
9   Q. Kim Smith, Jill Boyette. Who else?
10  A. I think Cindy Richards told Kim Smith is
11    what Kim told me, and Cindy Richards was in
12    Shannah Lowe's clinical class.
13  Q. Who else?
14  A. That's all that I recall.
15  Q. Based on what you've been told, Shannah
16    Lowe was allowed to go back and start an IV
17    on a child so that she could pass the
18    clinical portion of NUR 272; is that right?
19  A. I was told that she was allowed to go to
20    the lab with Bridgett Jackson, not in the
21    clinical setting.
22  Q. All right. You were told that Shannah Lowe
23    was allowed to go to the lab with Bridgett

Page 211

1   Jackson and start an IV on a child --
2   A. Correct.
3   Q. -- in order to pass the clinical portion of
4     272?
5   A. I think it was 272.
6   Q. And that is the only thing that you know of
7     that Shannah Lowe was allowed to do that
8     you think is different from what other
9     people were allowed to do; is that right?
10  A. Correct.
11  Q. Do you know why she would not start an IV
12    on a child?
13  A. I have no idea.
14  Q. Do you know where Shannah Lowe is now?
15  A. I do not.
16  Q. How well do you know Shannah Lowe?
17  A. Not well at all.
18  Q. Do you know any reason why she would be
19    allowed to go to the lab in the summer of
20    2006 and start an IV on a child in order to
21    pass the clinical portion of 272?
22  A. I don't know any reason, but I do know that
23    Dean Lowe is her uncle, I believe.

Page 212

1   Q. Well, do you know of any -- do you know
2     whether or not someone contends that Dean
3     Lowe is the one that allowed her to do this
4     as a favor because she was related to him?
5     Do you know of anyone that's said that?
6   A. No, I don't.
7   Q. Not even Sandy Gunnels?
8   A. Not even Sandy Gunnels.
9   Q. Give me another example of special
10    treatment.
11  A. I can't think of any right now.
12  Q. That's all you can think of?
13  A. Right now.
14  Q. If you think of anything else as we go
15    through, would you please tell me --
16  A. Yes.
17  Q. -- about special treatment? Okay?
18  A. Yes, sir.
19  Q. Defendant's Exhibits 4 and 5 are documents
20    that you brought with you and produced;
21    isn't that right?
22  A. Yes, sir.
23  Q. And how about Defendant's Exhibit 3, the

Page 217

1    was basically the first week, and they --
2    we were told by Dean Lowe -- he came down
3    to the class and said that our instructors
4    were sick, they wouldn't be in.
5        They had quit, and we didn't have
6    instructors and we had guest speakers come
7    in.
8  Q.  They were there the first couple of days of
9    class? Is that what you're saying?
10   Ms. Bellamy and Ms. Gunnels both were
11   present the first couple of days of class?
12 A.  Yes, sir.
13 Q.  And that would be the classroom portion,
14   correct? They didn't do clinical, did
15   they?
16 A.  I know they were there for that clinical
17   check-off. And I don't know if they -- if
18   we had even had a chance to do any
19   classroom.
20 Q.  So they wouldn't have been there at all?
21   They never came that semester?
22 A.  Yeah, they did. They were there for the
23   clinical check-off, and that was the first

Page 218

1    portion of that semester. We had a
2    clinical check-off the first week.
3  Q.  But you're saying that you did not have any
4    class; is that right?
5  A.  No, we had class, but we had guest
6    speakers, so it wasn't a formal class.
7  Q.  I'm sorry. I meant you did not have any
8    class where Gunnels and Bellamy taught the
9    class; is that --
10 A.  No, sir.
11 Q.  And you're saying that Dean Lowe came to
12   your classes and said, I'm sorry, your
13   instructors are sick, they'll be back --
14   what did he say?
15 A.  He said they're sick and they're not coming
16   in today, and that was the extent of that.
17 Q.  How many times did he do that?
18 A.  He did that for sure that day. There was
19   always chaos in that class. There was
20   always something going on, somebody
21   fussing.
22 Q.  Which class?
23 A.  My nursing class.

Page 219

1  Q.  That would be 252?
2  A.  That was the --
3  Q.  The whole class?
4  A.  I'm talking about the whole year and the
5    whole class.
6  Q.  The whole year. And when you say the whole
7    class, you're talking about the people in
8    the class?
9  A.  I'm talking about the people. There was
10   always something going on.
11 Q.  I hear you. I've got you. What do you
12   attribute that to?
13 A.  No instructors. Well, actually, I can't
14   say that was the whole year. The first
15   semester, we didn't have so much ruckus
16   going on.
17     When the instructors left and we didn't
18   have instruction for the first five
19   weeks -- the majority of my class was from
20   Atlanta, and they were very vocal and
21   wanted to know what was going on, where the
22   instructors were, what are you going to do
23   to replace them; I want to see my test; I

Page 220

1    want to --
2      I mean, there was something constantly
3    going on. They were very vocal.
4  Q.  And they were just that way the whole time?
5  A.  Except for the first -- the first semester,
6    it wasn't like that.
7  Q.  Okay.
8  A.  Just when nobody knew what was going on --
9    it was very unorganized after those
10   instructors left.
11 Q.  Well, why did they leave? Why did Gunnels
12   leave?
13 A.  I have no idea.
14 Q.  She's never told you about that?
15 A.  I've never really asked her why she left.
16 Q.  And you're saying that at no time did
17   Ms. Gunnels or Ms. Bellamy meet a class
18   during the fall semester of 2005, correct?
19 A.  No.
20 Q.  They did not?
21 A.  Just that clinical.
22 Q.  Just that one clinical?
23 A.  Lab clinical check-off.

Deposition of Lindy Wright                                        July 13, 2007

Page 237

1       for identification.)
2   Q.  Let me show you what I've marked as
3       Defendant's Exhibit Number 9, and let me
4       try to describe it and you tell me how I'm
5       wrong.  I'm sure I will be for the most
6       part, but ...
7           These are printouts of electronic
8       documents sent to you by one of your
9       instructors from CVCC; is that right?
10  A.  That's correct.
11  Q.  Who sent these to you?
12  A.  Lynn Harris.
13  Q.  Are they related to any one particular
14      course?
15  A.  Pediatrics, which is the 272.
16  Q.  272.  Did Lynn Harris send any electronic
17      documents of this type like Defendant's
18      Exhibit 9 for 252?
19  A.  I don't recall any for 252.
20  Q.  My understanding is you still have these
21      documents on a hard drive or your computer
22      that you can reproduce.
23  A.  (Witness nods head up and down.)

Page 238

1       MR. NIX:  I'll put these into the
2           record just so that we'll know
3           you produced these to us.
4       MS. COOLEY:  Would you mind saying
5           what class that was again.  I
6           know it came from Lynn Harris.
7       MR. NIX:  272 is the one that
8           these documents relate to,
9           Defendant's 9.
10          Kind of chopped up your
11          production a little bit.  Put
12          all of these together.
13          I'm going to mark this
14          stack of documents as
15          Defendant's Exhibit 10.
16      (Defendant's Exhibit 10 was marked
17          for identification.)
18  Q.  These documents are also documents that you
19      have produced pursuant to our request for
20      production of documents.
21          Would you take a quick look at these,
22      Ms. Wright, and just confirm that those are
23      additional documents that you produced.

Page 239

1       They're not all the rest of them that
2   you've produced because I've got some
3   others here.
4       Are they?
5   A.  Yes, sir.
6   Q.  I'm marking these as Defendant's Exhibit
7       10.  The first page here is a lot of
8       scribbling.  Can you tell me what that
9       relates to?
10  A.  That relates to Ms. Harris at the end of
11      the second semester letting me write
12      down -- not word for word -- some of the
13      test questions of some of the tests -- I'm
14      not sure which test questions or what test
15      numbers those come from.  It was all of
16      them to review --
17  Q.  Okay.
18  A.  -- and to challenge.
19      MR. DUMBUYA:  What is the caption
20          on Exhibit Number 10?
21      MR. NIX:  There's really not a
22          caption.  Defendant's 10 is a
23          group of documents produced by

Page 240

1       Ms. Wright pursuant to our
2   request for production.  It
3   just so happens that the first
4   page are some notes that she
5   took.
6   Q.  What?  In May or June of 2006?
7   A.  No.  That was the end of the second
8       semester, the 252.
9   Q.  Okay.  December of 2005, early January
10      2006?
11  A.  Correct.
12  Q.  So the first page -- and then I'm just
13      going to flip through these.  Are all of
14      these pages that have this handwritten
15      information on them -- I think there are
16      five pages -- four pages, are these four
17      pages all related to the course 252?
18  A.  Yes.
19  Q.  And Lynn Harris allowed you to look at the
20      exams that she had put together and write
21      down notes about the questions on them; is
22      that right?
23  A.  Right.

Deposition of Lindy Wright

July 13, 2007

Page 249

1  on this test because I'm your teacher is
2  the one that I had in my key, not the one
3  you chose; isn't that right?
4  A.  No.
5  Q.  What?  Tell me --
6  A.  She never discussed any of these questions
7  with me.  She never gave me any rationale.
8  She never said this is the answer I chose,
9  it's right, you're wrong.  She never --
10  Q.  That's really not what I'm asking you.
11  You're saying she should have spent all
12  kinds of time with you doing this; even
13  though she had 30 students or however many
14  she had.  But what I'm saying is, she was
15  the teacher, not you, right?
16  A.  Right.
17  Q.  She was the teacher, not Sandy Gunnels,
18  right?
19  A.  Right.
20  Q.  She was the teacher, not this lady, Ventura
21  or whatever her name is, right?
22  A.  Right.
23  Q.  She had a key.  She put an answer down that

Page 250

1  was the right answer in her view as the
2  instructor for the course.  And you're
3  complaining because she didn't mark your
4  answer right because some other person
5  says, well, your answer is -- it could be
6  right and so is hers, right?  Isn't that
7  what you're doing?
8  A.  No.
9  Q.  Yes, it is.  Tell me what you're doing.
10  A.  I'm complaining because she didn't give me
11  the opportunity to go over these test
12  questions and give me rationale for the
13  answers that I chose.  As any of the tests
14  that she gave, she never went over anything
15  except for that last semester the day
16  before finals.  At the end of the day at
17  certain times, you could either be there or
18  not.  No, she did not go over any of this
19  stuff with me.
20  Q.  So you're not complaining, then -- I've got
21  it all wrong.  You're not complaining about
22  the fact that the test was graded the way
23  it was.  You agree with the way the way the

Page 251

1  test was graded.  It's just that she didn't
2  sit down with you and explain all of this
3  stuff, right?
4  A.  Wrong.  No, I do not --
5  Q.  How is that wrong?
6  A.  I do not agree with the way the tests were
7  graded.  From my understanding and what she
8  did was she threw out questions on some
9  people's tests and some people's she
10  didn't.  I feel like I was not graded
11  equally.
12  Q.  You filed a lawsuit, Ms. Wright, in this
13  case, and you're telling me from what I
14  understand, she threw out questions for
15  other people but not me.  You're telling me
16  that?
17  A.  That was for everybody.  There were test
18  questions that she threw out on other
19  people's tests and she didn't throw out
20  on -- she didn't do it -- overall, she
21  didn't do it for everybody.
22  Q.  And you don't know that.  It's just
23  something that you think, right?

Page 252

1  A.  From what -- that last semester --
2  Q.  How about 252?
3  A.  From 252?
4  Q.  Yeah.
5  A.  She told me.  Ms. Harris told me this.
6  Q.  Told you what?
7  A.  That she omitted -- if you'll look on the
8  back of one of these -- those are the
9  originals, and I think I made a copy of
10  that back part.  She told me she omitted
11  two of eight questions -- it's on the back
12  of one of these.
13  Q.  You're referring to Defendant's Exhibit 9?
14  A.  Uh-huh.  (Positive response.)
15  Q.  What did she tell you?
16  A.  She told me she omitted two out of eight on
17  my test and graded from that, gave me a
18  grade off of that.
19  Q.  She omitted two of your wrong answers?
20  A.  Two out of eight that she threw out.
21  Q.  Two of your wrong answers?
22  A.  She threw out questions and then she
23  omitted some questions.

Page 253

1    Q. So she gave you a break. She gave you a
2        break, right? She threw out two wrong
3        answers, right?
4    A. Right.
5    Q. And she omitted some others that were
6        wrong, right?
7    A. Right.
8    Q. She gave you a break, and you're suing?
9    A. But she didn't give me credit the way she
10       should have.
11   Q. Oh, okay.
12   A. According to what she was saying when
13       she -- what she told me, the calculation --
14       it didn't calculate.
15   Q. Did Sandy Gunnels do your calculation for
16       you on that, too?
17   A. No, she didn't.
18   Q. Did you do that calculation?
19   A. Can we look at that?
20   Q. I don't have time to be honest with you. I
21       mean, this -- what are you saying? Just
22       tell me what you're saying.
23           MR. DUMBUYA: Let me step in at

Page 254

1        this time. You've introduced
2        Exhibit Number 9, so I think
3        you have a responsibility to
4        go over that exhibit from the
5        perspective of the witness.
6        Exhibit Number 9 has already
7        been introduced.
8            MR. NIX: I know, but I don't have
9        an obligation to do anything
10       other than discover, and
11       that's what I'm doing.
12   Q. So tell me --
13           MR. DUMBUYA: If the witness is
14       insisting that information is
15       on Exhibit Number 9, I think
16       you have the responsibility
17       to --
18           MR. NIX: She's told me what's on
19       it. You can question her at
20       trial or here when I get
21       finished, whatever you want to
22       do.
23           MR. DUMBUYA: I just want to make

Page 255

1        sure we're on the same plane
2        here.
3            MR. NIX: I understand what you're
4        saying. I think I understand
5        what she's saying as well, and
6        I don't think there's any need
7        to go to it. I understand it.
8    Q. Go to 272. What did Lynn Harris do wrong
9        on that course?
10   A. Lynn Harris didn't teach 272 -- yes, she
11       did. She taught 272. I thought you were
12       meaning 271.
13   Q. What did Lynn Harris do wrong on 272?
14   A. What did she do wrong on 272?
15   Q. Right, to you.
16   A. To me?
17   Q. Yeah.
18   A. Well, she said that she was going to go
19       over test questions and give rationale for
20       every test, and she did not do that. She
21       never went over any test except for the day
22       before finals.
23           And she told us weeks in advance she

Page 256

1        was going to give us a study guide for the
2        final. She never did that. She did it a
3        day before the final. That was not
4        adequate time to study for a final.
5    Q. What did she do wrong, though -- okay.
6        You're saying that's all she did wrong.
7        Okay? Is that right?
8    A. She told me that -- there were times in the
9        clinical -- there was a clinical that we
10       had to turn in care plans, and she
11       addressed the class and said that we're not
12       discussing any of the care plans. Whoever
13       got -- well, the care plans that were
14       regraded can be redone. You can redo your
15       care plans, and that was it.
16           And that deducted points from me, so
17       that was wrong, from my original grade that
18       I received from care plans.
19   Q. It deducted points from you?
20   A. Yes, sir, it did.
21   Q. I thought she allowed you to redo a care
22       plan and you doubled your score on it.
23   A. No, sir.

Deposition of Lindy Wright                                                July 13, 2007

Page 261

1   Q.  Was she the clinical instructor for that
2       particular part of your clinical --
3       whatever, the one that was supposed to have
4       graded it to start with?
5   A.  It was between her and Artemisa.
6   Q.  So whatever happened, Lynn Harris said redo
7       them if you want to; if you don't, that's
8       fine.  You chose to redo it.  You made
9       higher than a seven, right?
10  A.  Correct.
11  Q.  All right.  What else did Lynn Harris do to
12      you that was different from anybody else?
13      How did she discriminate against you in a
14      negative way in such a way that it hurt
15      you?  How did she treat you differently?
16  A.  In what course?
17  Q.  272.
18  A.  In 272?  I didn't really have too much of a
19      problem with Lynn Harris in 272.
20  Q.  All right.  You agreed with the grades in
21      272?
22  A.  No.
23  Q.  Nevertheless, the grades are the grades

Page 262

1       that Lynn Harris gave you.  Do you agree
2       with that?
3   A.  Do I agree that those are the grades that
4       she gave?
5   Q.  Yes.
6   A.  Yes.
7   Q.  Now, do you say, Ms. Wright, that for some
8       reason, either Lynn Harris or some other
9       person at the school was out to get you?
10  A.  Do I believe that?
11  Q.  Are you contending that in this case?
12  A.  Yes.
13  Q.  Explain that to me.
14  A.  From what I have been told by -- do you
15      want names?  Do you want me just to explain
16      from start --
17  Q.  I want the whole deal.  Yes, ma'am.
18  A.  Start to finish?
19  Q.  You just let it rip.  Okay?  You know how
20      I'm doing.  I want as much knowledge as I
21      can get.  I really want to understand your
22      case.  Okay?
23  A.  Okay.

Page 263

1   Q.  Tell me as much as you can.
2   A.  When the ordeal happened with the second
3       semester, having the D in 252 --
4   Q.  What are you calling the ordeal?
5   A.  What am I calling an ordeal?
6   Q.  The ordeal.
7   A.  The ordeal?
8   Q.  Yes.
9   A.  When I received my grade and went through
10      the process of the grade appeal, I was
11      treated -- I feel like I was treated
12      unfairly because I didn't get the
13      opportunity to go through all of the test
14      questions, any kind of rationale or any
15      kind of questions that I would have had
16      about any of the tests that were given to
17      me, and was stopped in the process when
18      other instructors were helping me with
19      trying to -- what is it, argue my side per
20      se.
21  Q.  I'm trying to -- trying to tell the teacher
22      she's wrong?
23  A.  If that's what you want to call it.

Page 264

1   Q.  Well, that's what it is, isn't it?  I mean,
2       you -- let me ask you this.
3           Did Lynn Harris meet with every single
4       one of her students and elaborately go over
5       these tests the way you wanted to go over
6       them?
7   A.  No, she never made herself available for
8       us.
9   Q.  Okay.  Fine.  Keep going.  Okay?  You were
10      telling me how somebody is out to get you.
11  A.  When I filed for grade appeal, I was told
12      that Dixie Peterson had told two
13      instructors to -- well, I was told that she
14      asked about everybody the first semester,
15      how everybody did, what their grades were,
16      and that I was specifically picked out and
17      said that I was a weak student, that I
18      didn't pass my LPN boards the first time,
19      that I did not need to pass the second
20      semester.
21  Q.  Okay.  And that was Sandy Gunnels that told
22      you that, right?
23  A.  Correct.

Page 265

1  Q.  Did anyone else tell you that?
2  A.  No.
3  Q.  Do you know of anyone else that supposedly
4      heard Dixie Peterson say that you should --
5          What did she say again?
6  A.  Lindy doesn't need to pass next semester.
7      She's weak. She didn't pass her LPN boards
8      the first time, so she won't pass her RN
9      boards.
10 Q.  And when did this occur?
11 A.  The end of the first semester.
12 Q.  That would be, what? August sometime,
13     2005; is that right?
14 A.  Yes.
15 Q.  Are you saying that Sandy Gunnels told you
16     that Dixie Peterson said that to Sandy
17     Gunnels?
18 A.  And Brenda Bellamy. She said that she said
19     it to her and Brenda Bellamy.
20 Q.  You've spoken with Brenda Bellamy since all
21     of this, correct?
22 A.  Correct.
23 Q.  Does Brenda Bellamy confirm what Sandy

Page 266

1      Gunnels said about what Dixie said?
2  A.  She doesn't recall, and we didn't go
3      in-depth.
4  Q.  So you asked Brenda Bellamy about it?
5  A.  Has Dixie Peterson ever said anything about
6      me to you. Not that I recall was her
7      answer.
8  Q.  And was this at the restaurant that night?
9  A.  No.
10 Q.  Where was it?
11 A.  This was in passing at Doctors Hospital.
12 Q.  So Sandy Gunnels, though, nevertheless says
13     that that occurred, correct?
14 A.  Correct.
15 Q.  If I hear you correctly, Sandy Gunnels
16     didn't say Dixie Peterson ordered me to
17     fail Lindy Wright this next semester,
18     right? What I think I heard you say -- I'm
19     asking you to tell me if I'm hearing you
20     correctly.
21        What I think I heard you say that Sandy
22     Gunnels told you was that Dixie Peterson
23     said Lindy Wright is a weak student. She

Page 267

1      did not pass her LPN licensing test -- or
2      boards the first time, and she really does
3      not need to go forward in the program or
4      does not need to pass or whatever.
5  A.  Correct.
6  Q.  Is that correct?
7  A.  Correct.
8  Q.  But she did not say to Sandy Gunnels, I
9      want you to fail her in this course, right?
10 A.  I don't know exactly what she said to Sandy
11     Gunnels because I was not in the room, but
12     that's what Sandy relayed to me.
13 Q.  Sandy Gunnels has never said to you that
14     Dixie Peterson said to her, I want you to
15     fail Lindy Wright in those words, has she?
16 A.  No, she never said that.
17 Q.  All she said was that Dixie Peterson
18     commented about you, that you were a weak
19     student and that you really did not need to
20     go forward as an RN; isn't that right?
21     Basically that. Not in those exact words,
22     but basically that, right?
23 A.  Right.

Page 268

1  Q.  Tell me everything else you can tell me
2      about somebody being out to get you.
3  A.  And then the courses offered for the
4      Nursing 200 in place of the 252, and I feel
5      like that had been discussed between Dixie,
6      Dean Lowe and whomever has the authority to
7      do that to keep me from getting course
8      forgiveness.
9  Q.  Let me make sure I understand this. Okay?
10     You're saying that when you were told that
11     you could not retake 252 because it would
12     not be offered again in view of the new
13     curriculum or the new program and that you
14     should nevertheless take 200 instead, that
15     the people who told you that -- Dixie and
16     Dean Lowe --
17 A.  Um-huh. (Positive response.)
18 Q.  -- had discussed the fact that you could
19     not get course forgiveness?
20 A.  I feel like they did. I don't know that
21     for a fact.
22 Q.  And you feel like they talked about the
23     fact that you couldn't get course

Page 325

1      CVCC. I think that was in 2001 maybe.
2  Q.  And had you been as good friends with her
3      since that time as you were in the fall of
4      2005, apparently, and 2006 -- spring of
5      2006?
6  A.  Was I as good friends with her in LPN
7      school?
8  Q.  Right.
9  A.  Is that what you're asking?
10  Q.  From 2001 on.
11  A.  No. Our relationship has grown over the
12      years.
13  Q.  When did your relationship begin to
14      blossom, get better, get stronger, become
15      closer?
16  A.  I don't know any specific dates.
17  Q.  Did it get better after Ms. Gunnels left
18      the school?
19  A.  No.
20  Q.  So it was real good, apparently, before she
21      left the school.
22  A.  It's been good throughout.
23  Q.  Isn't it correct that Sandy Gunnels left

Page 326

1      CVCC of her own accord?
2  A.  I don't know.
3  Q.  She's never told you that she was fired,
4      has she?
5  A.  No.
6          MR. NIX: Can we take a quick
7            break and discuss what's
8            cooking real quick? I'm
9            getting close to being
10            finished.
11         (Brief recess was taken.)
12  Q.  What's your mother's maiden name?
13  A.  Walker.
14  Q.  Walker?
15  A.  Uh-huh. (Positive response.)
16  Q.  Is one of your grandmothers a Webster?
17  A.  That's my husband's grandmother.
18  Q.  Okay. Mary Webster?
19  A.  Mary Webster.
20          MR. NIX: That's all I've got.
21          Thank you.
22         I offer those exhibits.
23        (The Deposition of Lindy Wright was

Page 327

1        concluded at 5:40 p.m. EDT.)
2
3      * * * * * * * * * * * * *
4      FURTHER DEPONENT SAITH NOT
5      * * * * * * * * * * * * *
6
7      REPORTER'S CERTIFICATE
8  STATE OF ALABAMA:
9  MONTGOMERY COUNTY:
10      I, Lisa J. Nix, Registered Professional
11  Reporter and Commissioner for the State of Alabama
12  at Large, do hereby certify that I reported the
13  deposition of:
14      LINDY WRIGHT
15  who was first duly sworn by me to speak the truth,
16  the whole truth and nothing but the truth, in the
17  matter of:
18      LINDY G. WRIGHT,
19      Plaintiff,
20      Vs.
21      CHATTAHOOCHEE VALLEY COMMUNITY
22      COLLEGE (CVCC),
23      Et al.,

Page 328

1      Defendants.
2      In The U.S. District Court
3      For the Middle District of Alabama
4      Eastern Division
5      Case Number 3:06-CV-1087-WKW
6  on Friday, July 13, 2007.
7      The foregoing 327 computer printed pages
8  contain a true and correct transcript of the
9  examination of said witness by counsel for the
10  parties set out herein. The reading and signing of
11  same is hereby waived.
12      I further certify that I am neither of kin
13  nor of counsel to the parties to said cause nor in
14  any manner interested in the results thereof.
15      This 22nd day of July 2007.
16
17
18
      _____
      Lisa J. Nix, Registered
19      Professional Reporter and
      Commissioner for the State
20      of Alabama at Large
21
22
23

# DEPOSITION OF SANDRA GUNNELS

## July 24, 2007

## Pages 1 through 241

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**



DEFENDANT'S
EXHIBIT

π

Page 1

1      IN THE UNITED STATES DISTRICT COURT
2     FOR THE MIDDLE DISTRICT OF ALABAMA
3           EASTERN DIVISION
4
5 LINDY G. WRIGHT,
6     Plaintiff,
7 Vs.           CIVIL ACTION NO.
             3:06-CV-1087-WKW
8 CHATTAHOOCHEE VALLEY
  COMMUNITY COLLEGE (CVCC),
9 et al.,
10     Defendants.
11
12      * * * * * * * * * * * * *
13
14     DEPOSITION OF SANDRA GUNNELS, taken
15 pursuant to stipulation and agreement before Lisa
16 J. Nix, Registered Professional Reporter and
17 Commissioner for the State of Alabama at Large, in
18 the Conference Room, Ramada Inn, Limited, 3560
19 Highway 431 North, Phenix City, Alabama on Tuesday,
20 July 24, 2007, commencing at approximately
21 9:40 a.m. EDT.
22
23      * * * * * * * * * * * * *

Page 2

1       APPEARANCES,
2
3 FOR THE PLAINTIFF:
4 Mr. Peter A. Dumbuya
  Attorney at Law
5 Post Office Box 3302
  Phenix City, AL 36868
6
7 FOR THE DEFENDANT:
8 Mr. H. E. Nix, Jr.
  Ms. Brandy F. Price
9 NIX, HOLTSFORD, GILLILAND,
    HIGGINS & HITSON
10 Attorneys at Law
   Suite 300
11 4001 Carmichael Road
  Montgomery, AL 36106
12
13 ALSO PRESENT:
14 Dr. Laurel Blackwell
  Ms. Dixie Peterson
15
16     * * * * * * * * * * * * *
17
18
     EXAMINATION INDEX
19
20 SANDRA GUNNELS
   BY MR. NIX . . . . . . . . . . . 5
21
22
23

Page 3

1      EXHIBIT INDEX
2          MAR
3 DEFENDANT'S EXHIBIT
4 24 Calendar for year 2005     143
5 25 Handwritten test questions and answers   153
    prepared by Lindy Wright (previously
6     marked DX-10A, B, C, D)
7 26 Sandra Gunnels' pediatric notes (G-1 -   153
    G-22)
8
  27 Documentation regarding vote of no   209
9     confidence for Dr. Blackwell
10 28 Documents regarding hiring of nursing   167
    instructor for CVCC
11
  29 Write-up documentation - Arit D. Umoh   213
12
  29-B Write-up documentation - Arit D. Umoh   215
13
  30 Composite exhibit comprised of academic   218
14     transcript for Sandra Gunnels from
    Florida State University, course
15     outlines, syllabi, student handouts
    etc.
16
  31 Copy of license for Sandra Gunnels   220
17
  32 Contact list for ADN class   221
18
  33 7/1/05 letter to Ms. Gunnels from Dr.   221
19     Blackwell
20 34 Subpoena to Sandra Gunnels   222
21 35 List prepared by Sandra Gunnels re:   223
    deposition documents
22
  36 Transcript of oral deposition of Sandra   232
23     Gunnels

Page 4

1       STIPULATION
2     It is hereby stipulated and agreed by and
3 between counsel representing the parties that the
4 deposition of SANDRA GUNNELS is taken pursuant to
5 the Federal Rules of Civil Procedure and that said
6 deposition may be taken before Lisa J. Nix,
7 Registered Professional Reporter and Commissioner
8 for the State of Alabama at Large, without the
9 formality of a commission, that objections to
10 questions other than objections as to the form of
11 the question need not be made at this time but may
12 be reserved for a ruling at such time as the said
13 deposition may be offered in evidence or used for
14 any other purpose by either party provided for by
15 the Statute.
16     It is further stipulated and agreed by and
17 between counsel representing the parties in this
18 case that the filing of said deposition is hereby
19 waived and may be introduced at the trial of this
20 case or used in any other manner by either party
21 hereto provided for by the Statute regardless of
22 the waiving of the filing of the same.
23     It is further stipulated and agreed by and

Deposition of Sandra Gunnels

**Page 5**

1  between the parties hereto and the witness that the
2  signature of the witness to this deposition is
3  hereby not waived.
4
5  \* \* \* \* \* \* \* \* \* \* \* \* \*
6
7  SANDRA GUNNELS
8  The witness, after having first been duly
9  sworn to speak the truth, the whole truth and
10  nothing but the truth testified as follows:
11  EXAMINATION
12  BY MR. NIX:
13  Q.  Would you state your name, please.
14  A.  Sandra Jean Wright Gunnels.
15  Q.  What is your address, Ms. Gunnels?
16  A.  11107 Rambling Trail, Midland, Georgia
17     31820.
18  Q.  And what is your telephone number there, if
19     you don't mind?
20  A.  706-565-8185.
21  Q.  Did you have a work address?
22  A.  Yes, I do.
23  Q.  What is that address?

**Page 6**

1  A.  I think it's 918 Manchester Expressway,
2     Columbus, Georgia 31904.
3  Q.  What's the employer?
4  A.  Columbus Technical College is my full-time
5     employment.
6  Q.  And if something is sent there, should it
7     go, like, to the nursing department or --
8  A.  Associate degree nursing.
9  Q.  Okay.  And what is -- Do you have a phone
10     number there?
11  A.  706-649-1167.
12  Q.  Ms. Gunnels, we talked about this before we
13     got on the record, but this deposition is
14     being taken pursuant to the Federal Rules
15     of Civil Procedure, and under those rules
16     when this deposition is completed,
17     Ms. Green can either send that deposition
18     to you, allow you to read over it and make
19     whatever corrections that she will indicate
20     to you that you can make and she'll have an
21     errata sheet with it, or if you want to,
22     you can waive the right to read and sign.
23  A.  I would prefer to read and sign simply for

**Page 7**

1  the reasons I said, because of the medical
2  terminology that might be utilized.
3  Q.  That's fine.  And I think the only
4     requirement is that you get it back within
5     30 days after you receive it.
6  A.  All right.
7  Q.  Ms. Gunnels, we're here today on a lawsuit
8     filed by Lindy Wright.  Do you know
9     Ms. Wright?
10  A.  Yes, sir, I do.
11  Q.  And she has sued Chattahoochee Valley
12     Community College, Dr. Laurel Blackwell,
13     Ms. Dixie Peterson, and Dean James Lowe.
14        Do you know the three individuals who I
15     have -- the names whom I stated?
16  A.  Yes, sir.
17  Q.  And are you familiar with Chattahoochee
18     Valley Community College?
19  A.  Yes, sir.
20  Q.  You worked there, right?
21  A.  Yes, sir.
22  Q.  And I know that you've given a statement in
23     this case; isn't that correct?

**Page 8**

1  A.  Yes, sir.
2  Q.  And you gave that statement to Ms. Cooley
3     and Mr. Dumbuya in -- I think it was
4     November 1, 2006.
5  A.  November 2006.  1st day of November, yes,
6     sir.
7  Q.  And that is a statement that was taken
8     where?  What physical location?
9  A.  Ms. Cooley's law office, I believe, was
10     where we were.
11  Q.  Where is that?
12  A.  Broad Street, Phenix City, Alabama.
13  Q.  Were you sworn in at that deposition?
14  A.  Yes, sir.
15  Q.  Who was present at that deposition -- or at
16     that sworn statement?
17  A.  Would be the court reporter, Courtney
18     Tillman Peters as I'm looking at her name,
19     Mr. Dumbuya, Ms. Cooley, Ms. Wright.  I
20     believe that was all that were there.
21  Q.  There was a break taken during the course
22     of this statement.
23  A.  Yes, sir.

Deposition of Sandra Gunnels

Page 49

```
1       MR. NIX: Thankyou.
2       MR. DUMBUYA: I hope you don't do
3          the same thing next time.
4       MR. NIX: Well, Ive got to ask
5          clarification of you if you're
6          asking a question that needs
7          to be clarified or of Jennifer
8          if she's asking one that needs
9          to be clarified.
10         But I will not address
11         the witness until it's my turn
12         to ask questions, and that's
13         what I would hope you would do
14         and Jennifer would do as well.
15   Q.  Ms. Gunnels, you indicated initially or
16         when you looked at Exhibit 10-A, B, C, and
17         D that you did not remember looking at
18         those; is that correct?
19   A.  Not these specific questions. As I said, I
20         knew Lindy had come by a couple of times
21         with questions. I remember them being OB
22         and pediatric questions; obviously, at
23         least once there were medical-surgical type
```

Page 50

```
1        questions. So that's what I was saying.
2          You know, as I told you, I remembered
3        her coming by. I remembered pieces of
4        paper, going through reference books,
5        finding answers, that type of thing.
6   Q.  And you're certain that those other
7        documents you looked at with Lindy were
8        test questions --
9   A.  Right.
10  Q.  -- and answers that had been given and
11        other choices for answers that were
12        possible?
13  A.  As I said, I remembered looking at
14        questions. I remembered them being
15        pediatric and obstetrical questions.
16  Q.  Okay.
17  A.  I cannot -- I know she came back -- by
18        twice with questions, and both times it was
19        with the instructor's permission that she
20        had copied down questions and answers and
21        was asking for clarification.
22  Q.  From tests?
23  A.  Uh-huh. (Positive response.)
```

Page 51

```
1   Q.  Is that yes?
2   A.  Yes, sir.
3   Q.  Therefore, those courses would have been
4        27 -- NUR 271, which is obstetrics,
5        correct?
6   A.  Uh-huh. (Positive response.)
7   Q.  Yes?
8   A.  Yes, sir.
9   Q.  And NUR 272, which is pediatrics, correct?
10  A.  As I said, I remembered questions from both
11        of those courses, but it might have been
12        med-surg once --
13  Q.  I'm sorry?
14  A.  It may have been merely med-surg, one of
15        those.
16  Q.  Well, I guess what I'm trying to
17        distinguish is whether you simply discussed
18        with her those courses and questions that
19        she had about them -- and I'm talking about
20        NUR 271 obstetrics, and NUR 272
21        pediatrics -- or whether she actually
22        copied down questions from tests that she
23        had taken and gotten wrong and went over
```

Page 52

```
1        them with you as opposed to going over with
2        you Exhibit 10-A, B, C, and D, which appear
3        to be questions from another course other
4        than 271 and 272.
5   A.  Could you repeat that so I make sure I
6        understand? I want to answer correctly.
7   Q.  I'll be glad to. Sure.
8          How many times do you think you met
9        with Lindy over the course of her tenure at
10        CVCC in the RN program or the ADN
11        program --
12          Is that what it is? ADN?
13  A.  ADN, yes, sir.
14  Q.  Between the time you left CVCC, which I
15        believe was on or around August 31, 2005,
16        and the time she finished her last course
17        at CVCC, which was in May 2006, how many
18        times do you think you met with her about
19        nursing school?
20  A.  Two or three times. That's as close as I
21        can get.
22  Q.  In that period of time --
23  A.  Yes, sir.
```

Deposition of Sandra Gunnels

Page 53

1   Q.  -- that I just stated to you?
2   A.  Uh-huh.  (Positive response.)
3   Q.  Yes?
4   A.  Yes, sir.
5   Q.  Now, was each of those times, times when
6       you went over with Lindy certain questions,
7       issues, points or subject matter of the
8       courses that she was taking at CVCC in the
9       ADN program?
10  A.  At least once, if not twice, was going over
11      questions.  Once, for example, when I gave
12      her some notes from when I had taught
13      pediatrics was that -- she was looking for
14      study aids to help her with her pediatrics
15      or in addition to what she had received
16      during the class in pediatrics.
17  Q.  All right.  I apologize to you.  That got
18      through my head without sticking.
19  A.  Okay.
20  Q.  Once or twice --
21  A.  At least once or twice with questions,
22      going over test questions.
23  Q.  Okay.  And then another time --

Page 54

1   A.  At least one other time.
2   Q.  -- where she was looking for study aids?
3   A.  Right.  Yes, sir.
4   Q.  And that's when you gave her the pediatric
5       notes, correct?
6   A.  Yes, sir.
7   Q.  All right.  This is the question I have.
8   A.  Okay.
9   Q.  Well, you said at least one or two times
10      going over test questions.
11  A.  Yes, sir.
12  Q.  Is it possible that these are the only test
13      questions you went over with her, the 10-A,
14      B, C, and D and that the other times you
15      talked to her, you were talking to her
16      about questions she had about the subject?
17  A.  It is possible.
18  Q.  It's been a good while, hasn't it?
19  A.  Well, from -- this would have been November
20      of 2005 to April or May of 2006.
21  Q.  Now, if Lindy testified that those are the
22      only documents that reflect questions she
23      copied from tests that she'd gotten wrong,

Page 55

1       would you have any reason to disagree with
2       her about that?
3   A.  No, sir.  I would defer to her.  I do know
4       we discussed OB and peds questions, but I
5       don't -- I cannot swear she brought me
6       written OB and peds questions.  I
7       remembered written questions, but ...
8   Q.  Now, this is another question I'd like to
9       ask.  With respect to any test questions
10      that she may have in your opinion gotten
11      right or that she may have -- let's do
12      this.  Let's do it this way.  Let me break
13      it down if you don't mind.
14  A.  Okay.
15  Q.  With respect to any test questions that you
16      went over with her that in your opinion she
17      was right on but was marked wrong on and
18      the instructor's answer was clearly wrong
19      as opposed to being equally as good as
20      Lindy's, okay --
21  A.  Okay.
22  Q.  -- answer, on those questions, if you take
23      just those, can you tell me whether or not

Page 56

1       if she had been given credit for those
2       questions it would have changed her grade
3       in the course that those questions related
4       to?
5   A.  No, sir, I could not say that without
6       having the test in front of me and all of
7       her possible points for that course.
8   Q.  And then the other question is, if you take
9       just the questions that you went over with
10      her where she had given an answer that in
11      your opinion was just as good as the answer
12      chosen by the instructor as the correct
13      answer but it was marked wrong on her
14      paper, first of all, as an instructor,
15      would you give a student credit for that
16      answer if it was not the answer taught in
17      the course?
18  A.  Yes, sir.
19  Q.  Why would you do that?
20  A.  I can explain to you how we do it at CTC.
21  Q.  Let me ask you this first.
22  A.  Okay.
23  Q.  Is that a discretionary call typically by

| | Page 69 |
|---|---|
| 1 | Q. Did you put a resource by each one of the |
| 2 | ones that y'all believed she got right that |
| 3 | were marked wrong? |
| 4 | A. I cannot say for sure. |
| 5 | Q. Can you tell me out of the questions that |
| 6 | you see on those four pieces of paper, |
| 7 | 10-A, B, C, and D, how many of them you |
| 8 | opine Lindy got correct where the teacher |
| 9 | was clearly wrong in marking it wrong, |
| 10 | marking Lindy's answer wrong? |
| 11 | A. Some of them I'm having to read, so ... |
| 12 | Q. I understand. |
| 13 | A. From looking at this, five. |
| 14 | Q. Looking at what? Oh, I'm sorry. You gave |
| 15 | me the number five. |
| 16 | A. Yes, sir, five or six. |
| 17 | Q. Well, is it five or six? |
| 18 | A. Well, partially -- the copies aren't |
| 19 | excellent. Some of the questions are cut |
| 20 | off, so I can't tell if that was a correct |
| 21 | answer or not because the question is not |
| 22 | supplied. And there is a notation by |
| 23 | there, but I don't know what the question |

| | Page 70 |
|---|---|
| 1 | is, so I can't judge at this point exactly |
| 2 | what it means. But one, two, three -- |
| 3 | Q. That's the way I got the documents, you |
| 4 | know. |
| 5 | A. Five definite and potential six is what -- |
| 6 | from this piece of paper. |
| 7 | Q. Because of the cutoff? |
| 8 | A. Uh-huh. (Positive response.) |
| 9 | Q. Yes? |
| 10 | A. Yes, sir. |
| 11 | Q. Didn't you say there were 16 total? |
| 12 | A. 16 or 15. I can't remember at this point. |
| 13 | Q. Now, are those five or six where you think |
| 14 | Lindy got it clearly right where the |
| 15 | teacher was clearly wrong? |
| 16 | A. Apparently, these were the ones that I felt |
| 17 | were clearcut. |
| 18 | Q. They are the ones you -- |
| 19 | A. Yes, sir. I said there were five of them |
| 20 | that -- |
| 21 | Q. What I want you to do is read the question, |
| 22 | read Lindy's answer and read the teacher's |
| 23 | answer. |

| | Page 71 |
|---|---|
| 1 | A. Okay. If I can make it all out from |
| 2 | this -- the writing-over. The one I cannot |
| 3 | read the question, so I cannot say for |
| 4 | sure. |
| 5 | The second one -- |
| 6 | Q. I'm talking about just the five or six |
| 7 | you -- |
| 8 | A. Okay. The nurse is providing irrigation |
| 9 | for NG tube. Patient's potassium level -- |
| 10 | (Brief interruption.) |
| 11 | Q. You have to go slow. |
| 12 | A. I'm sorry. |
| 13 | Q. Is that on 10-A? |
| 14 | A. Yes, sir, second question. |
| 15 | Q. The second question on 10-A, read the |
| 16 | question, please, slowly. |
| 17 | A. The nurse is providing irrigation for |
| 18 | nasogastric tube. The patient's potassium |
| 19 | level is four milliequivalents per liter -- |
| 20 | THE WITNESS: Is that the right |
| 21 | speed? |
| 22 | COURT REPORTER: Thank you. |
| 23 | THE WITNESS: I just didn't know |

| | Page 72 |
|---|---|
| 1 | how slow or how fast. |
| 2 | A. -- and sodium is 130 per liter. The nurse |
| 3 | would irrigate with, and from looking at |
| 4 | this Lindy picked A, which is tap water. |
| 5 | Do you want all three other options |
| 6 | or -- |
| 7 | Q. Well, Lindy picked tap water which you |
| 8 | believe is clearly correct? |
| 9 | A. Yes, sir. |
| 10 | Q. Is that right? |
| 11 | A. Yes, sir. |
| 12 | Q. Are the three other options clearly wrong, |
| 13 | or can you tell which option the teacher or |
| 14 | the instructor concluded was the correct |
| 15 | answer? |
| 16 | A. From this piece of paper, because I don't |
| 17 | independently recollect, D is marked in red |
| 18 | on the Scantron, which is 0.9 percent |
| 19 | normal saline. |
| 20 | Q. Is that written on that paper right there? |
| 21 | A. Yes, sir. |
| 22 | Q. That's what you're reading? |
| 23 | A. Yes, sir. |

Page 85

1     couldn't be found and the points could not
2     be given to them, I referred her to
3     Ms. Peterson.
4  Q.  Were they saying that those could not be
5     found and points could not be given for
6     them?
7  A.  The students were told that those
8     assignments they had completed could not be
9     found in my office.
10  Q.  Do you know what Ms. Peterson said?
11     Actually, do you know whether Lindy
12     talked to Ms. Peterson about those papers?
13  A.  I do not know what the outcome of that was.
14  Q.  You don't know what Ms. Peterson said?
15  A.  No, sir.
16  Q.  You don't know whether Lindy talked to
17     Ms. Peterson, correct?
18  A.  I cannot remember.
19  Q.  Okay.
20  A.  And it would have been Lindy reported to me
21     whether or not she spoke with Ms. Peterson,
22     and I can't remember.
23  Q.  Did you give her any other advice, give

Page 86

1     Lindy any other advice?
2  A.  I advised her on -- that she needed to file
3     a grade appeal if she felt that she had a
4     case. I advised her that the syllabus was
5     a legal and binding contract, and if that
6     wasn't being followed that she needed to
7     address that. And I may have advised her
8     to contact a lawyer.
9  Q.  Did you give her the name of a lawyer?
10  A.  No, sir. I don't know many lawyers of this
11     type.
12  Q.  Did you tell her anything about whether
13     other people had obtained a lawyer with
14     regard to a problem with CVCC?
15  A.  I honestly don't remember. I don't know.
16     I don't think so, but I cannot recall.
17  Q.  Do you know of any other person that
18     obtained a lawyer and went to CVCC with a
19     lawyer about a nursing problem?
20  A.  Yes, sir.
21  Q.  Who?
22  A.  Arit Umoh.
23  Q.  What was that about?

Page 87

1  A.  She was a student in the class before
2     Lindy, so she would have graduated in May
3     of 2005 if my dates are correct.
4  Q.  You're right. I think that's right.
5  A.  Okay.
6     (Brief interruption.)
7  A.  But that she was issued a failing grade in
8     clinicals in NUR 272, which was pediatric
9     nursing, and she was appealing that grade.
10  Q.  NUR 272?
11  A.  Pediatrics, yes, sir.
12  Q.  You were her clinical instructor?
13  A.  I was her didactic classroom instructor and
14     had been present in clinicals with
15     Ms. Umoh.
16  Q.  When you say didactic classroom instructor,
17     is that a different type of instructor from
18     the NUR 272 lecture instructor?
19  A.  No, that's the lecture instructor. The
20     didactic is the classroom portion.
21  Q.  And we're talking about what semester would
22     that have been?
23  A.  That would have been spring of 2005 unless

Page 88

1     I'm incorrect.
2  Q.  Now, were you a full-time employee for the
3     spring semester of 2005?
4  A.  No, sir. I believe I was employed -- I was
5     either temporary full-time or I had been
6     hired specifically for NUR 272 lecture and
7     clinical and MCN 124, which was the
8     pediatric LPN --
9  Q.  That would have been an LPN course?
10  A.  That would have been an LPN course.
11     (Brief interruption.)
12  A.  I don't remember what my status was. I was
13     either temporary full-time or I had been
14     hired specifically for teaching NUR 272,
15     both lecture and clinical, and another LPN
16     course.
17  Q.  Did Ms. Umoh have a clinical instructor
18     other than you?
19  A.  Yes, sir.
20  Q.  Who?
21  A.  I believe she was officially in Ms. Wendy
22     Wall's group, but she also -- she was
23     either in Arit -- sorry, Arte Harmon,

Page 89

1    A-R-T-E, Harmon or Wendy Wall's group, not
2    officially in my group.
3  Q.  She was giving -- given a failing grade in
4    the clinical, correct?
5  A.  Yes, sir.
6  Q.  But not in the didactic part?
7  A.  Yes, sir.
8  Q.  She made a passing grade in the didactic
9    part?
10  A.  Yes, sir.
11  Q.  And you taught that, correct?
12  A.  Yes, sir.
13  Q.  So tell me about her getting a lawyer.  I
14    don't understand what you're talking about.
15  A.  She had a lawyer present the campus with
16    his card and said he was acting on her
17    behalf and that she was appealing or
18    protesting her grade.
19  Q.  Do you know who this lawyer was?
20  A.  No, sir.
21  Q.  Do you know who the lawyer spoke with?
22  A.  I did not speak with him, so I do not know
23    who he spoke with.

Page 90

1  Q.  Did you meet the lawyer?
2  A.  Not to my knowledge or remembrance.
3  Q.  Did you speak with the lawyer?
4  A.  No, sir.
5  Q.  How did you know that she got a lawyer?
6  A.  I was told by Ms. Peterson I think
7    initially, and then Dr. Lowe.
8  Q.  So you weren't in any meetings where the
9    lawyer was present, correct?
10  A.  I don't believe so.  I don't remember
11    anything where I was present at the same
12    time he was.
13  Q.  One of the things you told Lindy in meeting
14    with her -- let me ask you this.  Do you
15    recall whether that meeting would have been
16    related to Exhibit 10-A, B, C, and D, these
17    questions that you and I have been
18    discussing?
19  A.  I'm sorry.  You'll have to specify which
20    meeting.
21  Q.  Was the meeting where you told her to do a
22    grade -- to meet with Ms. Harris, do a
23    grade appeal, get a lawyer, was that the

Page 91

1    meeting where you discussed the questions
2    on this Exhibit 10-A, B, C, and D?
3  A.  I don't recall.
4  Q.  Did you ever advise her to do anything
5    other than a grade appeal?
6  A.  As I said, I may have, going through the
7    steps and -- probably did; said, and then
8    if not, then you can seek legal means.
9  Q.  So grade appeal and legal recourse of some
10    type, correct?
11  A.  Uh-huh.  (Positive response.)
12  Q.  Yes?  You're going to have to say yes.
13  A.  I'm sorry.  Yes, I could have and probably
14    did.  I can't say for certain I said
15    dah-dah-dah and get a lawyer, but I said
16    these are the steps.
17  Q.  Do you know if she did get a lawyer?
18  A.  Well, since I'm being deposed, yes, I'm
19    assuming she did get one.
20  Q.  Do you know who the lawyer was?
21  A.  I'm trying to recall, because in looking
22    through those papers, I saw Connie Cooper's
23    name on them and know that's a law firm

Page 92

1    that Lindy -- I honestly do not know if I
2    knew that was who her attorney was or
3    whatever.  The first contact I had with an
4    attorney was with Ms. Cooley and
5    Mr. Dumbuya.
6  Q.  How do you know Connie Cooper?
7  A.  I saw her name on your papers you --
8  Q.  You don't know her?
9  A.  Oh, no, sir.  No.
10  Q.  And Ms. Cooper did not speak with you?
11  A.  Not to my remembrance, no, I don't believe
12    so.
13  Q.  Before Ms. Cooley wrote the letter that she
14    wrote to Dr. Blackwell, Ms. Cooley did not
15    speak with you?
16  A.  No, sir.  I mean, I'd have to know the date
17    of the letter.
18  Q.  July 28 or 23, somewhere in that time
19    frame, of 2006, I believe.
20  A.  To my knowledge, I can just state that I
21    never spoke with Ms. Cooley or met her
22    until I went to her office for deposition
23    or whatever you call --

Page 129

1  Q.  Have you ever called an instructor of hers
2      for any reason -- an instructor from CVCC?
3  A.  Not that I recall.
4  Q.  Have you ever called a clinical instructor
5      as opposed to a classroom lecturer from
6      CVCC on behalf of Lindy Wright?
7  A.  Not that I recall, no, sir.
8  Q.  Is there any reason you can think of why
9      you would do that?
10 A.  If I had been on friendly terms with or
11     whatever to discuss, but that would be the
12     only -- and as far as I know, I didn't
13     really know any of her clinical
14     instructors.  I don't know who she had.
15 Q.  Do you blame anyone other than Lindy,
16     Ms. Gunnels, for her failing out of the ADN
17     program at CVCC?
18 A.  Could you restate that?
19 Q.  Do you blame anyone other than Lindy for
20     Lindy failing out of the ADN program at
21     CVCC?
22 A.  That implies that I do blame Lindy, which I
23     would say I don't blame Lindy or anyone.  I

Page 130

1      don't think that the way the fall
2      quarter -- fall semester 2005 began was
3      particularly a good situation for
4      students.  And I think that was kind of a
5      not-positive-environment semester for any
6      of the students at that point just from
7      what I know of it, but I don't blame
8      anyone.
9  Q.  Do you believe that anyone is responsible
10     other than Lindy Wright for her failing out
11     of the ADN program at CVCC?
12 A.  From what I know of the situation, I don't
13     blame --
14 Q.  I said responsible.
15 A.  Don't hold anyone responsible for.
16 Q.  For her failing out of the ADN program,
17     correct?
18 A.  Correct.
19 Q.  Does that include Lindy?  I mean, you don't
20     hold Lindy responsible for her failing out
21     of the ADN program there at CVCC?
22 A.  I would have to say with the situation as I
23     know it, I think it was a combination of

Page 131

1      issues.
2  Q.  Would you please tell me what that
3      combination of issues is comprised of.
4  A.  Well, I know that Ms. Bellamy and I
5      resigned and left CTC [sic] August 31st,
6      2005, which if I'm not mistaken was the
7      RNs' first class day, and that there was
8      some time period where there was not
9      stability in some of the instruction.  And
10     then also, I know there was a lot of unrest
11     on campus and within the nursing students
12     and nursing division.
13 Q.  Now, when you say that you and Ms. Bellamy
14     resigned August 31, 2005, how did that
15     affect Lindy Wright's grade?
16 A.  Well, I think the turmoil and upheaval and
17     not having the instructor that wrote the
18     syllabus being the instructor that
19     completed the semester -- I know they had
20     some guest lecturers, some lecture by
21     long-distance, those types of things.  And
22     the campus was in somewhat of an upheaval,
23     also, at that point.

Page 132

1  Q.  Do you know how long it was before you and
2      Ms. Bellamy were replaced with other
3      permanent instructors?
4  A.  I could not tell you exactly, no, sir.
5  Q.  Full-time instructors, maybe that's a
6      better term.
7  A.  No, sir.
8  Q.  You do not know?
9  A.  I don't know a time frame, no, sir.
10 Q.  What day did you leave CVCC?
11 A.  August 31, 2005.
12 Q.  The same day you turned in your
13     resignation, correct?
14 A.  Yes, sir.
15 Q.  And there was no advance notice given by
16     you, was there, that you were going to
17     resign?
18 A.  In the circumstances, A, I had not signed a
19     contract and informed them that I was not
20     going to sign a contract if it did not have
21     certain parameters in it, and that I was
22     asked not to go to my classroom on that day
23     of class.

Page 213

1   A.  Yes, sir.
2   Q.  Exhibit 27.
3   A.  Uh-huh.  (Positive response.)  I didn't
4       even realize that I still had it until I
5       started going through a box of stuff.
6   Q.  I've got something else here.  I don't know
7       if you brought this with you here today or
8       not.  It's notes on Ms. Umoh.
9   A.  Uh-huh.  (Positive response.)  Mine just
10      looks differently.  It's the same pieces of
11      paper.
12          (Defendant's Exhibit 29 was marked
13          for identification.)
14  Q.  Defendant's Exhibit 29 are those documents
15      that you've provided pursuant to the
16      subpoena.  What are these?
17  A.  These are copies of write-ups on the
18      student that I discussed earlier who was
19      issued a failing grade in her pediatric
20      clinicals and appealed that grade.
21  Q.  Why did you keep this?
22  A.  Again, I didn't realize I had it until I
23      went through a box of things.  When I

Page 214

1       packed on August the 31st, this was in a
2       folder marked something else.  And I took
3       it with me – or a copy of it, not the
4       original, but a copy of it.
5   Q.  So it was a mistake?
6   A.  I did not mean to take it.  But at one
7       point in time, I had thought about -- I
8       wouldn't say taking it, because at the time
9       this was going on, I was not thinking about
10      resigning.  But I did not intentionally
11      plan on taking this with me if that's what
12      you're asking.  It was in some files.
13  Q.  Why did you write this up?
14  A.  The original -- we're not on the same --
15      these were done in real time as was the
16      other handwritten documents, documentation
17      of Miss Arit's performance.  I was asked to
18      type up the written –
19  Q.  I don't have one of those documents.
20  A.  You should have.
21  Q.  See the one on the top, your top one?
22  A.  You don't have that one?  I gave you that
23      today.

Page 215

1           MS. PRICE:  That's what we got
2           from the plaintiff's counsel's
3           office --
4   A.  Okay.  I probably found this one after ...
5       I started going through stuff and spent
6       this weekend going through more stuff.
7       There you go.  I think that one matches the
8       one that I've got a copy of for myself.
9           MR. NIX:  I'm going to re-mark it,
10          then.
11  Q.  Looking at Exhibit 29 again, the first
12      document, the top document is what?
13  A.  That would be a copy of her clinical
14      evaluation for NUR 272, spring of '05.
15  Q.  Who filled out that evaluation?
16  A.  Mid term, Ms. Harmon and Ms. Wall.  At the
17      end, because I was the lead instructor in
18      that course or the lecturer for that
19      course, I also sat in on her evaluation.
20          (Defendant's Exhibit 29-B was
21          marked for identification.)
22  Q.  Do you know why -- let me show you 29-B.
23      Look at 29-B.  That is a document that

Page 216

1       Jennifer Cooley gave us, I assume, the day
2       you brought this material by her office.
3   A.  Yes.  You've got --
4   Q.  I've got Exhibit 29.  Okay?
5   A.  If you continue to look, I believe
6       that's --
7   Q.  Correct.  But 29-B does not contain the top
8       document -- 29-B, that exhibit, that total
9       exhibit omits this top document which says
10      up here criteria in the left column, and
11      it's got some blocks drawn off.  It's got
12      essential criteria on the front, assessment
13      criteria, diagnosis criteria, outcome
14      identification criteria.  All of those
15      topics are addressed.  On the second page,
16      implementation criteria, evaluation
17      criteria, and the date of the mid term
18      evaluation is February 11, 2004, correct?
19  A.  Yes, sir.
20  Q.  And the date of the intern evaluation is
21      March 11, 2004 [sic], correct?
22  A.  Yes, sir.
23  Q.  Who refused to sign this document?

Page 233

1    about the fact that she asked if anyone was
2    going to fail. And then there was -- I
3    think Ms. Bellamy said something about
4    Lindy Wright was close, but that she'd made
5    a C.
6        And this would have been, I guess,
7    Ms. Gunnels, for the summer of 2005; would
8    that be right?
9    A.   Yes, sir.
10   Q.   The last sentence in your answer is this:
11       And Ms. Peterson made a statement to the
12       effect of y'all need to flunk her, she does
13       not need to pass, she is weak, she's not
14       going to pass boards, y'all need to flunk
15       her.
16           Then the statement continues to go on,
17       and you say on page 11, it was end of
18       summer -- line three, summer semester
19       because we were averaging grades.
20           And then the question on paragraph --
21       line five, page 11: Is it a regular
22       course, I guess, of conversation for
23       Ms. Peterson, the director of the program,

Page 234

1    to come and ask all the instructors is
2    anyone going to fail?
3           Answer: That's very normal and that's
4    her responsibility. She needs to know
5    because in nursing, if they flunk a course,
6    you know, they have an opportunity to come
7    back. When -- how I was taught and how I
8    handle my classes was the fact that -- and
9    Ms. Bellamy did the same thing, was that if
10   we thought someone was not going to pass or
11   there was -- there were -- they were close
12   or, in fact, did not pass, then went we
13   back over every test, every piece of paper,
14   met with Ms. Peterson, told her who was not
15   going to pass. So then you talk about
16   the -- that answer.
17          See what the question says. Let's go
18   to page 12, Ms. Gunnels. Page 14, line
19   seven, was there a specific course that
20   Ms. Peterson said that Lindy needed to be
21   failed in is the question. And your answer
22   is: No, it was a general statement, and I
23   perceived it not as -- and I know she would

Page 235

1    not have done, asking us to go back and
2    change grades that Lindy had made. But the
3    assumption at that point in time was
4    Ms. Bellamy and I would be returning for
5    the fall semester and we would both have
6    Lindy again as a student -- myself in
7    obstetrics, Ms. Bellamy in her advanced
8    medical-surgical course work -- and it
9    was -- or I perceived it as a in-the-
10   future-this-needs-to-occur, that she
11   verbalized that she did not feel that Lindy
12   would pass the boards and would be a
13   liability and did not need to pass.
14          And then the question is: But you do
15   not -- you did not interpret that to mean
16   that you needed to go back and regrade her
17   to fail her that particular semester?
18   Answer: No, but Ms. Peterson would not
19   have asked that of me I know. Then you go
20   on to testify about that.
21          Tell me why you say Ms. Peterson would
22   not have asked you to do that.
23   A.   In general, I would not expect Ms. Peterson

Page 236

1    to do that and she would not ask that of
2    me. I did not perceive it as a you-need-
3    to-go-back-and-, as I said, -regrade or
4    arrange things so that she received a
5    failing grade. She is moral enough to know
6    that I would not do that and I would not
7    expect that of her.
8    Q.   Well, sure. And Ms. Peterson would not ask
9    that of you. She's not that kind of
10   person; am I right?
11   A.   From my interactions with her, no.
12   Q.   From your interactions with her, would you
13   say she's an honest, good chairperson of
14   that department who works in that
15   department with integrity?
16   A.   That was my interaction with her.
17          THE WITNESS: I'm sorry. I'm not
18              going to be able to finish.
19   Q.   Let me ask you one other question.
20   A.   Yes, sir.
21   Q.   Would it be correct to say that
22       Ms. Peterson was not asking you to
23       intentionally flunk Lindy Wright on any

Page 237

1    occasion, she was just commenting on the
2    fact that she was a weak student; would
3    that be true?
4  A.  I'm sorry. Could you repeat that?
5  Q.  Ms. Peterson was commenting on the fact
6    that Lindy Wright was a weak student, but
7    she was not asking you to in the future
8    flunk her in a course intentionally?
9  A.  My perception was she was expressing her
10    appraisal of Ms. Wright's ability, and she
11    was not instructing me to flunk her in any
12    course.
13  Q.  There was a question that Mr. Dumbuya asked
14    you that misstated your statement in that
15    regard. I don't know if I'm going to be
16    able to find it in time to ... I'm probably
17    not.
18      Here we go, page 18. Mr. Dumbuya is
19    asking this question, and this is what he
20    asked: Now, to the best of your
21    knowledge --
22      Are you there?
23  A.  Yes, sir.

Page 238

1  Q.  Line five. Now, to the best of your
2    knowledge, had Ms. Peterson made that
3    statement before concerning another
4    student, that you have to make sure that
5    she flunks?
6      That's not what you said at all
7    previously, was it?
8  A.  No, sir.
9  Q.  So he misinterpreted what you said, isn't
10    that right, or he either misinterpreted it
11    or he misstated it in some way, correct?
12    She never said you have to flunk her, you
13    must do it intentionally no matter what?
14  A.  The question is had she ever made a
15    statement like that to me before was how I
16    perceived it, and I had never heard her say
17    that before.
18  Q.  Right. And she didn't say you have to make
19    sure she flunks with respect to Lindy
20    Wright either?
21  A.  No, sir.
22    MR. NIX: That's all I have.
23    Peter, do you have any

Page 239

1    questions?
2    MR. DUMBUYA: No.
3    MR. NIX: Thank you.
4    (The deposition was concluded at
5    2:40 p.m. EDT.)
6
7    * * * * * * * * * * * * *
8    FURTHER DEPONENT SAITH NOT
9    * * * * * * * * * * * * *
10
11    REPORTER'S CERTIFICATE
12  STATE OF ALABAMA:
13  MONTGOMERY COUNTY:
14    I, Lisa J. Nix, Registered Professional
15  Reporter and Commissioner for the State of Alabama
16  at Large, do hereby certify that I reported the
17  deposition of:
18    SANDRA GUNNELS
19  who was first duly sworn by me to speak the truth,
20  the whole truth and nothing but the truth, in the
21  matter of:
22    LINDY G. WRIGHT,
23    Plaintiff,

Page 240

1    Vs.
2    CHATTAHOOCHEE VALLEY COMMUNITY
3    COLLEGE (CVCC),
4    Et al.,
5    Defendants.
6    In The U.S. District Court
7    For the Middle District of Alabama
8    Eastern Division
9    Case Number 3:06-CV-1087-WKW
10  on Tuesday, July 24, 2007.
11    The foregoing 239 computer printed pages
12  contain a true and correct transcript of the
13  examination of said witness by counsel for the
14  parties set out herein. The reading and signing of
15  same is hereby not waived.
16    I further certify that I am neither of kin
17  nor of counsel to the parties to said cause nor in
18  any manner interested in the results thereof.
19    This 30th day of July 2007.
20
21    _____
    Lisa J. Nix, Registered
22    Professional Reporter and
    Commissioner for the State
23    of Alabama at Large

# DEPOSITION OF DIXIE PETERSON

## August 16, 2007

## Pages 1 through 153

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**



DEFENDANT'S
EXHIBIT
LLL

Deposition of Dixie Peterson

August 16, 2007

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF ALABAMA
3                  EASTERN DIVISION
4
5    LINDY G. WRIGHT,
6           Plaintiff,
7    Vs.                    CIVIL ACTION NO.
                            3:06-CV-1087-WKW
8    CHATTAHOOCHEE VALLEY
     COMMUNITY COLLEGE (CVCC),
9    et al.,
10          Defendants.
11
12            * * * * * * * * * * * * *
13
14
15        DEPOSITION OF DIXIE PETERSON, taken
16    pursuant to stipulation and agreement before Lisa
17    J. Green, Registered Professional Reporter and
18    Commissioner for the State of Alabama at Large, in
19    the Law Offices of Smith & Smith, P.C., 1503 Broad
20    Street, Phenix City, Alabama on Thursday, August
21    16, 2007, commencing at approximately 9:25 a.m.
22
23            * * * * * * * * * * * * *
```

**Page 3**

```
1
2                    EXAMINATION INDEX
3    DIXIE PETERSON
4       BY MS. COOLEY . . . . . . . . . . 5
        BY MR. NIX   . . . . . . . . . . 131
5
6
7
8
9
10                    EXHIBIT INDEX
11                                        MAR
     DEFENDANT'S EXHIBIT
     44  12/20/05 Status Letter Regarding    131
12       Progression in the ADN Program
13   45  Section C of Grade Appeal for NUR 252  131
14   46  Section C of the Grade Appeal for NUR  131
         271
15
16   47  1/17/06 e-mail to Heather Chalkley from  131
         Dixie Peterson re: Lindy Wright
17   48  1/18/06 Grade Change Form             131
18   49  Authorization for Course Substitution  131
19
20
21
22
23
```

**Page 2**

```
1               APPEARANCES
2
3    FOR THE PLAINTIFF:
4    Ms. Jennifer B. Cooley
     PARKER & COOLEY
5    Attorneys at Law
     1507 Broad Street
6    Phenix City, AL  36867
7
8    FOR THE DEFENDANT:
9    Mr. H. E. Nix, Jr.
     Ms. Brandy F. Price
10   NIX, HOLTSFORD, GILLILAND,
        HIGGINS & HITSON
11   Attorneys at Law
     Suite 300
12   4001 Carmichael Road
     Montgomery, AL  36106
13
14   ALSO PRESENT:
15   Dr. Laurel Blackwell
16
17
18
19
20
21
22
23
```

**Page 4**

```
1                  STIPULATION
2        It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of DIXIE PETERSON is taken pursuant to
5    the Federal Rules of Civil Procedure and that said
6    deposition may be taken before Lisa J. Green,
7    Registered Professional Reporter and Commissioner
8    for the State of Alabama at Large, without the
9    formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16       It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23       It is further stipulated and agreed by and
```

Deposition of Dixie Peterson

Page 5

1   between the parties hereto and the witness that the
2   signature of the witness to this deposition is
3   hereby not waived.
4
5   * * * * * * * * * * * * *
6
7   DIXIE PETERSON
8   The witness, after having first been duly
9   sworn to speak the truth, the whole truth and
10  nothing but the truth testified as follows:
11  EXAMINATION
12  BY MS. COOLEY:
13  Q.  Would you please state your name.
14  A.  Yes.  My name is Dixie Peterson.
15  Q.  And is that your full name, Ms. Peterson?
16  A.  Do you want middle and --
17  Q.  Yes, ma'am, please.
18  A.  Dixie Lee Webster Peterson.
19  Q.  And, Ms. Peterson, where is an address or a
20  contact address for you?
21  A.  My physical address is 88 Lee Road 581 in
22  Smiths, Alabama.
23  Q.  And what is your mailing address?

Page 6

1   A.  Mailing address is P.O. Box 3247.  It's
2   Phenix City, and of course it has a
3   different Zip Code.  36868.
4   Q.  What is a contact phone number for you?
5   A.  Probably my cell phone, and that would be
6   706-577-0003.
7   Q.  And a work address for you?
8   A.  2602 College Drive, of course Phenix City,
9   36869.
10  Q.  And a work phone number for you?
11  A.  334-214-4817.
12  Q.  And is your current employer CVCC?
13  A.  It is.
14  Q.  How long have you been employed at CVCC?
15  A.  I've been employed at Chattahoochee Valley
16  for 23 years.
17  Q.  In what capacity are you currently
18  employed?
19  A.  I'm currently employed the same that I have
20  been since 1984, and that's as nursing
21  faculty.
22  Q.  Are you the director or coordinator of
23  nursing faculty?

Page 7

1   A.  No.  That assignment has changed, but my
2   status has not changed.
3   Q.  Okay.
4   A.  It was called division chair, and that was
5   an assignment.  It was not a position, and
6   so that -- my assignment has changed from
7   that to something else, but my status has
8   not changed, and that's nurse faculty.  I
9   was hired as a nurse faculty member, and
10  that's what I am.
11  Q.  So nursing faculty since 1984.  You were
12  previously assigned the position or an
13  assignment of division chair; is that
14  correct?
15  A.  Correct.
16  Q.  How long were you with the assignment of
17  division chair?
18  A.  20 years.
19  Q.  And when did that assignment end and your
20  new assignment begin?
21  A.  August the 3rd, 2007, of course.  Actually,
22  it was probably the 6th, August the 6th,
23  2007.

Page 8

1   Q.  So do you have a new assignment?
2   A.  I do.
3   Q.  And what is your new assignment?
4   A.  My new assignment is to work with Title 3
5   grant funding and develop new health
6   science programs for the college.
7   Q.  When you were with the assignment of
8   division chair, what were some of the
9   responsibilities or roles that you
10  undertook with that assignment?
11  A.  They're pretty vast in nature.  There's
12  actually a -- I'm not sure if it's called a
13  job description.  It's more of a list of
14  duties that all division chairs of the
15  academic departments get, and they're
16  pretty much the same, things like assist in
17  scheduling classes; assist in hiring
18  faculty because, of course, at faculty
19  level, we don't have the authority to hire
20  or fire, only the president can do that; to
21  coordinate textbooks along with faculty who
22  are teaching those courses.
23      For nursing division chair, there were

Deposition of Dixie Peterson                                                    August 16, 2007

Page 105

1    A.  Yes.
2    Q.  Is that something that you've been involved
3        with with your students previously?
4    A.  Yes.
5    Q.  Is that something that you've been involved
6        with on a frequent or infrequent basis with
7        your students?
8    A.  I would say infrequent. In fact, we had to
9        report that at our recent accreditation.
10   Q.  When you say report, what does that mean?
11   A.  Actually submit the number and types of
12       grade appeals.
13   Q.  So basically it's almost like an accounting
14       type process of how many folks have
15       appealed, and you report that to -- is that
16       what you're saying?
17   A.  No, it's not an accounting process. It was
18       part of the accreditation process when they
19       came.
20   Q.  And they being the Board of Nursing?
21   A.  The National League for Nursing Accrediting
22       Commission, yes.
23   Q.  When was that that they came recently?

Page 106

1    A.  November '06.
2    Q.  Are you familiar with a student named Arit
3        Umoh?
4    A.  Yes.
5    Q.  Was she one of the students enrolled at
6        CVCC?
7    A.  Yes.
8    Q.  To your knowledge, was she allowed course
9        forgiveness within CVCC's nursing program?
10   A.  No, not to my knowledge.
11   Q.  Are you familiar with a student Shannah
12       Lowe?
13   A.  Yes.
14   Q.  Was she a student at the CVCC nursing
15       program?
16   A.  Yes.
17   Q.  Do you know? Was she -- or are you aware
18       that she was allowed to take a makeup lab
19       for Pediatrics 272?
20   A.  Yes, I'm aware of that.
21   Q.  Do you know Elise Sizemore?
22   A.  Yes.
23   Q.  Was she a student at CVCC's nursing

Page 107

1        program?
2    A.  Yes.
3    Q.  To your knowledge, was she allowed to
4        administer medication without having
5        completed the medication calculation test
6        successfully to your knowledge?
7    A.  My understanding is -- I don't know for
8        sure.
9    Q.  But you are aware that she was a student at
10       CVCC?
11   A.  Yes.
12   Q.  Do you know an individual named Carola
13       Rambo?
14   A.  Yes.
15   Q.  Was Ms. Rambo a student at CVCC?
16   A.  Yes.
17   Q.  To your knowledge, was she allowed course
18       forgiveness for 272?
19   A.  No.
20   Q.  Do you know an individual named Courtney
21       Kelly?
22   A.  Yes.
23   Q.  Was she a student at CVCC?

Page 108

1    A.  Yes, and she is a student now at CVCC.
2    Q.  To your knowledge, when she was a previous
3        student at CVCC, did she, in fact, fail two
4        classes at CVCC within the nursing program?
5    A.  She failed --
6            MR. NIX: If you know.
7    A.  She failed three.
8    Q.  In the nursing program?
9    A.  Simultaneously, not three separate
10       occasions, because of not coming to class.
11       It was a failure for lack of attendance.
12   Q.  Okay.
13   A.  Failures for lack of attendance. She did
14       not show up for class. And because she did
15       not come and drop the classes, the
16       instructors were forced by policy to give
17       her F's.
18   Q.  And that was within the nursing program; is
19       that correct?
20   A.  Yes.
21   Q.  And she's a current student today; is that
22       correct?
23   A.  Yes, under new guidelines. When she --

27 (Pages 105 to 108)

August 16, 2007

Deposition of Dixie Peterson

Page 153

```
1
2
3        I, Dixie Peterson, hereby certify that
4    I have read the foregoing transcript of my
5    deposition given on Thursday, August 16, 2007, and
6    it is a true and correct transcript of the
7    testimony given by me at the time and place stated
8    with the corrections, if any, and the reasons
9    therefor noted on a separate sheet of paper and
10   attached hereto.
11
12
13        _____
            Dixie Peterson
14
15
16
17        SWORN TO AND SUBSCRIBED before me this
18   _____ day of _____, 20___.
19
20
21        _____
            NOTARY PUBLIC
22
23
```

# Chattahoochee Valley Community College

## 2004-2005

## One Place – Endless Possibilities

ORIGINAL

## Catalog & Student Handbook

DEFENDANT'S
EXHIBIT

IV

CVCC 000001

# CAMPUS DIRECTORY

GENERAL INFORMATION ...................................... Wilson Hall ...................... 291-4900
Academic Division Chairpersons:
    Athletics .................................................................. Key Hall 203 ...................... 214-4880
    Business, Computer Science, and
      Social Sciences ................................................... Brassell Hall 218 .............. 291-4965
    Language, Speech and Fine Arts ............................ Brassell Hall 216 ............ 291-4975
    Mathematics and Science ...................................... Brassell Hall 204 ............ 291-4966
    Nursing, EMS, Health Sciences, Child
      Care and Public Service Technology ................... Key Hall 202 ...................... 291-4925
Admissions Office ........................................................ Wallace Hall ...................... 291-4929
Affirmative Action Coordinator ................................ Brassell Hall 204 ............ 291-4966
American with Disabilities Act (ADA) Coordinator ........ Wilson Hall ...................... 214-4845
Auxiliary Services ....................................................... Maintenance Bldg ............ 291-4997
Business Office ............................................................ Wallace Hall ...................... 291-4937
Center for Workforce Development ........................... 1104-C 280 Bypass .......... 214-4826
College/Community Relations .................................... Owen Hall ........................ 291-4992
Dean of Instruction .................................................... Wallace Hall ...................... 291-4946
Dean of Student and Administrative Services .............. Wallace Hall ...................... 214-4865
Extended Day Office .................................................. Wilson Hall ...................... 291-4947
Human Resources Office ............................................ Wallace Hall ...................... 291-4927
Institutional Advancement ......................................... Wallace Hall ...................... 291-4939
Learning Resource Center .......................................... Owen Hall ........................ 291-4978
Management Information Systems .............................. Wallace Hall ...................... 291-4922
Office of Student Services ........................................... Wilson Hall ...................... 291-4941
    Recruiter/Student Activities Coordinator ................ Wilson Hall ...................... 291-4913
    Counseling Services ............................................... Wilson Hall ...................... 291-4905
    Financial Aid ......................................................... Wilson Hall ...................... 291-4915
Planning and Development Office .............................. Wallace Hall ...................... 291-4939
President ...................................................................... Wallace Hall ...................... 291-4981
Security Office ............................................................ Security Kiosk .................. 291-4950
Student and Technology Center/COMPASS/ WorkKeys .... Owen Hall ........................ 291-4984
Title IX Coordinator .................................................. Brassell Hall 217 .............. 291-4918

It is the official policy of the Alabama Department of Postsecondary Education, including all postsecondary education institutions under control of the State Board of Education, that no person in Alabama shall, on the grounds of race, color, disability, sex, religion, creed, national origin, age or marital or parental status, be excluded from participation in or be denied the benefits of or be subjected to discrimination under any program, activity, or employment.

Chattahoochee Valley Community College is committed to this policy of non-discrimination and complies with the non-discrimination regulations under Title VI and Title VII of the Civil Rights Act of 1964; Title IX, Education Amendments of 1972; Section 503 and 504, Rehabilitation Act of 1973; and Americans with Disabilities Act of 1990.

Inquiries concerning this policy may be directed to the Office of the President, George C. Wallace Administration Building, 2602 College Drive, Phenix City, Alabama, 36869, (334) 291-4981 or to the Title IX Coordinator, Dr. Ellen Gunter, 2602 College Drive, Phenix City, Alabama, 36869, (334) 291-4918.

Published annually by Chattahoochee Valley Community College (Volume 27, No. 1).

CVCC 000002

# CATALOG/STUDENT HANDBOOK
## 2004-2005

# CHATTAHOOCHEE VALLEY
# COMMUNITY COLLEGE
## 2602 COLLEGE DRIVE
### PHENIX CITY, ALABAMA 36869
### (334) 291-4900

## ACCREDITATION

Chattahoochee Valley Community College is accredited by the Commission on Colleges of the Southern Association of Colleges and Schools (1866 Southern Lane, Decatur, Georgia 30033-4097/Telephone number: 770-679-4501) to award the Associate in Arts, Associate in Science, and Associate in Applied Science degrees.

The Associate Degree Nursing (RN) is accredited by the National League for Nursing Accrediting Commission, 61 Broadway, New York, NY 10006, Telephone number 212-363-5555, ext. 153.

The Practical Nursing and Associate Degree Nursing Programs are approved by the Alabama State Board of Nursing.

## MEMBER OF

Alabama College Association
League of Innovation
American Association Community Colleges
National Council for Workforce Education

This Catalog & Student Handbook, which becomes effective September 1, 2004, is for information only and does not constitute a contract. **The College reserves the right to change, modify, or alter without notice policies, fees, charges, expenses, and costs of any kind and further reserves the right to add or delete without notice any course offerings or information in this Catalog/Student Handbook.**

**Policy statements and program requirements in this catalog are subject to change.** Except when students change their programs of study, they may follow requirements of the catalog under which they enter the College for a period of four years at which time, if they have not completed their program of study, they must change to the current catalog. Exceptions must be approved by the Dean of Student and Administrative Services. **When students change their programs of study, they must change to the catalog that is current at the time of the program change.**

CVCC 000003

# COURSE DESCRIPTIONS

CVCC 000113



CVCC 000114

# COURSE DESCRIPTIONS

Courses are arranged in alphabetical order by subject area. The course descriptions include a course designation, followed by a course number, course title, and an indication of the number of lecture, laboratory, and semester hours of credit, e.g. ANT 200. Introduction to Anthropology (3-0-3).

Following the course title or prerequisite, if any, will be an indicator of the semester when courses will be offered: F, Sp, Su. If no term is listed, the course will be offered on a need basis. **The College reserves the right to change the listed schedule of course offerings during any semester.**

# ABBREVIATIONS

The following are the official catalog course abbreviations used by Chattahoochee Valley Community College.

| | |
|---|---|
| ACC | Accounting |
| ANT | Anthropology |
| ART | Art |
| BIO | Biology |
| BUS | Business |
| CHM | Chemistry |
| CHD | Child Care |
| CIS | Computer Information Systems |
| CRJ | Criminal Justice |
| ECO | Economics |
| EDU | Education |
| EMS | Emergency Medical Technology/Technician |
| ENG | English |
| FSC | Fire Science |
| GEO | Geography |
| HED | Health Education |
| HIS | History |
| MST | Management and Supervision |
| MTH | Mathematics |
| MUL | Music Ensembles |
| MUP | Music Performance |
| MUS | Music |
| NUR | Nursing |
| LPN | Practical Nursing |
| OAD | Office Administration |
| ORI | Orientation |
| ORT | Orientation for Career Students |
| PHL | Philosophy |
| PED | Physical Education |
| PHS | Physical Science |
| PHY | Physics |
| POL | Political Science |
| PSY | Psychology |
| RDG | Reading |
| SOC | Sociology |
| SPA | Spanish |
| SPH | Speech |
| THR | Theatre Arts |
| VCM | Visual Communications |

111

CVCC 000115

# DESCRIPTIONS

Catalog numbers ending with the number one (as ENG 101) indicate that the course is ordinarily to be considered as the first part of a continuation course consisting of two semester's work; the catalog number of the second part of the course ends with the number two (as ENG 102). Granting credit in these courses is sequence. However, to satisfy requirements in such subjects, it is generally necessary to take the continuation course.

Courses numbered 001-099 are institutional credit courses. These courses are not designed to transfer and do not count toward graduation. Courses numbered 100 through 199 are primarily for freshmen; courses numbered 200 through 299 are primarily for sophomores. Courses requiring no prerequisites are open to all students regardless of the catalog number.

The Alabama College System Course Directory lists common course names, numbers, and descriptions used by all of Alabama's two-year colleges. Courses that satisfy Areas I-IV of the General Studies curriculum at all public Alabama colleges and universities are indicated with the appropriate Area notation. Other courses that may transfer and may meet requirements for articulated programs have the following codes:

Code A - AGSC-approved transfer courses in Areas I-IV that are common to all institutions.

Code B - Area V that are deemed appropriate to the degree and pre-major requirements of individual students.

Code C - Potential Area V transfer courses that are subject to approval by respective receiving institutions.

The college reserves the right to withdraw any course for which the demand is insufficient. The term "credit" indicates the number of "semester hours' credit" granted upon the successful completion of a course.

Prerequisites or co-requisite requirements of courses are listed with the course description in the catalog. It is the responsibility of the student to know these requirements and follow them when registering. The instructor of the course and the appropriate division chair must approve any waiver of these requirements.

A complete list of the courses being offered is published each term in the class schedule.

# ACCOUNTING

## ACC 115. COLLEGE ACCOUNTING (3-1-4)
Prerequisite: None
On Demand
This course introduces basic accounting principles for a sole proprietorship. Topics include the complete accounting cycle with end-of-period statements, bank reconciliation, payrolls, and petty cash. Upon completion, students should be able to demonstrate an understanding of accounting principles and apply those skills to a business organization. **Code C**

## ACC 129. INDIVIDUAL INCOME TAXES (2-1-3)
Prerequisite: None
On Demand
This course introduces the relevant laws governing individual income taxation. Emphasis is placed on filing status, exemptions for dependents, gross income, adjustments, deductions, and computation of tax. Upon completion, students should be able to complete various tax forms pertaining to the topics covered in the course. **Code C**

CVCC 000116

**(MUP) INDIVIDUAL PERFORMANCE INSTRUCTION (0-2-1)**
Prerequisite: Permission of the instructor
F, Sp
Individual performance instruction is available in keyboard instruments, voice, strings, wood-winds, brass, percussion, and fretted instruments. Emphasis is placed on developing technique, repertoire and performance skills commensurate with the student's educational goals. Students are required to practice a minimum of five hours per week for each credit hour. Upon completion, students should be able to effectively perform assigned repertoire and technical studies in an appropriate performance evaluation setting. **Code B**

| | |
|---|---|
| MUP 101-02; 201-02 | **PRIVATE PIANO I, II, III, IV** |
| MUP 103-04; 203-04 | **PRIVATE ORGAN I, II, III, IV** |
| MUP 105-06; 205-06 | **PRIVATE HARPSICHORD I, II, III, IV** |
| MUP 111-12; 211-12 | **PRIVATE VOICE I, II, III, IV** |
| MUP 121-22; 221-22 | **PRIVATE VIOLIN I, II, III, IV** |
| MUP 123-24; 223-24 | **PRIVATE VIOLA I, II, III, IV** |
| MUP 125-26; 225-26 | **PRIVATE CELLO I, II, III, IV** |
| MUP 127-28; 227-28 | **PRIVATE DOUBLE BASS I, II, III, IV** |
| MUP 131-32; 231-32 | **PRIVATE HARP I, II, III, IV** |
| MUP 133-34; 233-34 | **PRIVATE GUITAR I, II, III, IV** |
| MUP 135-36; 235-36 | **PRIVATE FRETTED INSTRUMENTS (OTHER THAN GUITAR)** |
| MUP 141-42; 241-42 | **PRIVATE FLUTE I, II, III, IV** |
| MUP 143-44; 243-44 | **PRIVATE CLARINET I, II, III, IV** |
| MUP 145-46; 245-46 | **PRIVATE SAXOPHONE I, II, III, IV** |
| MUP 151-52; 251-52 | **PRIVATE OBOE I, II, III, IV** |
| MUP 153-54; 253-54 | **PRIVATE BASSOON I, II, III, IV** |
| MUP 161-62; 261-62 | **PRIVATE TRUMPET I, II, III, IV** |
| MUP 163-64; 263-64 | **PRIVATE FRENCH HORN I, II, III, IV** |
| MUP 165-66; 265-66 | **PRIVATE MELLOPHONE I, II, III, IV** |
| MUP 171-72; 271-72 | **PRIVATE TROMBONE I, II, III, IV** |
| MUP 173-74; 273-74 | **PRIVATE EUPHONIUM I, II, III, IV** |
| MUP 175-76; 275-76 | **PRIVATE TUBA I, II, III, IV** |
| MUP 181-82; 281-82 | **PRIVATE PERCUSSION I, II, III, IV** |

# NURSING (ADN)

See pages 159-160 for ADN prerequisites and corequisites.

**NUR 111. FUNDAMENTALS OF NURSING (4-0-4)**
Prerequisite: Permission of the instructor
This course presents concepts and theories related to the art and science of nursing. Emphasis is placed on the application of the nursing process to provide and manage care as a member of the discipline of nursing. Students are introduced to the concepts of needs, growth and development, safety communication, teaching and learning, critical thinking, ethical-legal, nursing history, and the program's philosophy of nursing. Students should be able to demonstrate beginning competence in providing care for individuals with common health alterations. (Clinical required) **CORE Not offered at the College in the Nursing Mobility Program. Credit awarded by validation exam only.**

**NUR 121. CLINICAL NURSING SKILLS (0-6-2)**
Prerequisite: Permission of the instructor
This course presents psychomotor nursing skills needed to assist individuals in meeting basic

143

human needs. Skills necessary for maintaining microbial, physical, and psychological safety are introduced along with skills needed in therapeutic interventions. Students will demonstrate beginning level of competency in performing basic nursing skills. (Lab/clinical required) **CORE Not offered at the College in the Nursing Mobility Program. Credit awarded by validation exam only.**

### NUR 131. HEALTH ASSESSMENT (0-3-1)
Prerequisite: Permission of the instructor
Su
This course is designed to provide students the opportunity to learn and practice history-taking and physical examination skills with individuals of all ages. The focus is on symptoms analysis along with physical, psychosocial, and growth and development assessment. Students will be able to utilize critical thinking skills in identifying health alterations, formulating nursing diagnosis and documenting findings appropriate to nursing. (Lab required) **CORE**

### NUR 201. SPECIALIZED AREA OF STUDY (1-0-1)
Prerequisite: Permission of the instructor
This course is directed toward the specialized study of theory and experiences in a selected area as determined by students, employers, and/or the program. Emphasis is placed on the development of knowledge in an area of interest to the student. The student should be able to meet the objectives of the course as approved by the instructor. Not offered at the College in the Nursing Mobility Program. Credit awarded by validation exam only.

### NUR 202. SPECIALIZED AREA OF STUDY (2-0-2)
Prerequisite: Permission of the instructor
F
This course is directed toward the specialized study of nursing experiences in a selected area as determined by students, employers, and/or the program. Emphasis is placed on the development of knowledge and skills in an area of interest to the student. The student should be able to meet the theoretical and skill objectives of the course as approved by the instructor.

### NUR 203. SPECIALIZED AREA OF STUDY (0-3-1)
Prerequisite: Permission of the instructor
This course is directed toward the application of clinical experiences in a selected area as determined by students, employers, and/or the program. Emphasis is placed on the development of the knowledge and skills in an area of interest to the student. The student should be able to meet the theoretical and skill objectives of the course as approved by the instructor/preceptor. (Clinical required) **Not offered at the College in the Nursing Mobility Program. Credit awarded by validation exam only.**

### NUR 241. BASIC PHARMACOLOGY (0-3-1)
This course introduces the student to basic principles of pharmacology and the skills necessary to safely administer medications. Areas of emphasis include concepts of legal implications, pharmacokinetics, pharmacodynamics, calculation of drug dosages, and medication administration. Students will be able to demonstrate accurate dosage calculations, correct medication administration and knowledge of drug classification. (Lab required) **CORE Not offered at the College in the Nursing Mobility Program. Credit awarded by validation exam only.**

### NUR 242. ADVANCED PHARMACOLOGY (2-0-2)
Prerequisite: Admission to the A.D. N. Program and completion of validation process.
Corequisites: NUR 131, NUR 251, ENG 102 and BIO 201
Su
This course is designed to provide the student comprehensive knowledge of drug classifications and applications of pharmacology. Emphasis is placed on nursing responsibility, accountability, and application of the nursing process regarding drug therapy. The actions, dosages, side effects,

144

CVCC 000146

...se reactions are presented for drug prototypes from each classification of drugs. The stu-
...will be able to synthesize knowledge of drug therapy in a variety of settings with individ-
...across the life span. CORE

**NUR 251. ADULT NURSING I (3-6-5)**
...requisite: Admission to the A.D.N. Program (Corequisites: NUR 131, 242, ENG
...and BIO 201)
...is course provides an opportunity to utilize the provider of care and manager of care roles to
...et nursing needs of adults in a variety of settings. Emphasis is placed on the aging process as
...applies to normal developmental changes and alterations in health commonly occurring in the
...ult. Students should be able to apply the nursing process in caring for adults in a variety of
... settings. (Clinical required) CORE

**NUR 252. ADULT NURSING II (3-6-5)**
Prerequisite: NUR 131, 242, 251, and BIO 201 (Corequisite: BIO 202)
...This course introduces concepts related to the nursing care of individuals experiencing acute and
...chronic alterations in health. Emphasis is placed on utilizing the nursing process as a framework
...for providing and managing nursing care to individuals. Student should be able to apply the
...nursing process to individuals experiencing acute and chronic health alterations in a variety of
...settings. (Clinical required)

**NUR 271. MATERNAL-NEWBORN NURSING (2-6-4)**
Prerequisite: NUR 131, 242, 251, and BIO 201 (Corequisite: BIO 202)
F
This course provides a family centered approach to the nursing care of the childbearing family.
Emphasis is placed on concepts related to the antepartal, intrapartal, post-partal, and neonatal
periods. The student should be able to manage and provide care to the childbearing family in a
variety of health care settings. (Clinical required)

**NUR 272. PEDIATRIC NURSING (2-6-4)**
Prerequisite: NUR 131, 242, 251, and BIO 201, 202 (Corequisite: BIO 220)
Sp
This course provides a family-centered approach to the nursing of children from infancy through
adolescence. Emphasis is placed on concepts, growth and development, health promotion, and
alterations in health. The student should be able to utilize the nursing process in providing and
managing nursing care to the family in a variety of health care setting. (Clinical required)

**NUR 279. CONCEPTS OF PSYCHOSOCIAL NURSING II (1-3-2)**
Prerequisite: NUR 131, 242, 251, and BIO 201, 202 (Corequisite: BIO 220)
Sp
This course provides expanded concepts related to the psychosocial needs of individuals.
Emphasis is on common and acute alteration in mental health and the related intervention
modalities. The student should be able to apply the concepts of individuals experiencing acute
and chronic alterations in mental health in a variety of settings.
(Clinical required)

**NUR 291. TRANSITION INTO NURSING PRACTICE (2-5-3)**
Prerequisite: Permission of the instructor and completing last semester coursework
Sp
This course prepares the student for transition into nursing practice. Emphasis is placed on the
roles of the professional nurse, concepts of leadership and management, and trends and issues
in health care delivery. The student will apply these concepts in the preceptor experience.
(Preceptorship required.)

145

CVCC 000147

# APPENDIX
## NURSING COURSE DIRECTORY
## ADN COURSES

| COURSE TITLE | PREREQUISITES | COREQUISITE |
|---|---|---|
| **NUR 111-** Fundamentals of Nursing | Validation Exam ENG 101, PSY 200, BIO 103 | Validation Exam NUR 121, 241, 201, 202, 203 |
| **NUR 121-** Clinical Nursing Skills | Validation Exam ENG 101, PSY 200, BIO 103 | Validation Exam NUR 111, 241, 201, 202, 203 |
| **NUR 241-** Basic Pharmacology | Validation Exam ENG 101, PSY 200, BIO 103 | Validation Exam NUR 111, 121, 201, 202, 203 |
| **NUR 201-** Specialized Area of Study | ENG 101, PSY 200, BIO 103 | NUR 111, 121, 202, 203, 241 |
| **NUR 202-** Specialized Area of Study | ENG 101, PSY 200, BIO 103 | NUR 111, 121, 241, 201, 203 |
| **NUR 203-** Specialized Area of Study | ENG 101, PSY 200, BIO 103 | NUR 111, 121, 241, 201, 202 |
| **NUR 131-** Health Assessment | ENG 101, PSY 200, BIO 103, NUR 111, 121, 241, 201, 202, 203 | BIO 201, ENG 102, NUR 242, 251 |
| **NUR 242-** Advanced Pharmacology | ENG 101, PSY 200, BIO 103 Validation Courses, NUR 111, 121, 241, 201, 202, 203 | BIO 201, ENG 102, NUR 131, 251 |
| **NUR 251-** Adult Nursing I | ENG 101, PSY 200, BIO 103 Validation Courses, NUR 111, 121, 241, 201, 202, 203 | BIO 201, ENG 102, NUR 131, 242 |
| **NUR 252-** Adult Nursing II | ENG 101, 102, BIO 103, NUR 131, 242, 251, PSY 200 | BIO 201, BIO 202, MTH 100, SPH 107, NUR 271 |

159

CVCC 000161

| | | |
|---|---|---|
| **NUR 271-**<br>Maternal-Newborn Nursing | ENG 101, 102, BIO 103, BIO 201, PSY 200, Validation Courses, NUR 131, 242, 251 | BIO 202, MTH 100, SPH 107, NUR 252 |
| **NUR 272-**<br>Pediatric Nursing | ENG 101, 102, BIO 103, 201, 202, PSY 200, Validation Courses, NUR 131, 242, 251 | BIO 220, NUR 279, 291, 292 |
| **NUR 279-**<br>Concepts of Psychosocial Nursing | ENG 101, 102, BIO 103, 201, 202 PSY 200, Validation Courses, NUR 131, 242, 251 | BIO 220, NUR 272, 291, 292 |
| **NUR 291-**<br>Transition into Nursing Practice | ENG 101, 102, BIO 103, 201, 202 PSY 200, Validation Courses, NUR 131, 242, 251 | BIO 220, NUR 272, 279, 292 |
| **NUR 292-**<br>Nursing Licensure Examination Review | ENG 101, 102, BIO 103, 201, 202 PSY 200, Validation Courses, NUR 131, 242, 251 | BIO 220, NUR 272, 279, 291 |

CVCC 000162



May 28, 2006

Reference: Lindy Wright's Care Plans

Ms. Harris,

I'm enclosing this letter to get you up to date regarding the request made by the Nursing office to get the Care Plans to the school for review.

I was left a voice mail on Friday May 26, 2006 of which I received at 6:00 PM regarding my Care Plans. The message was from Saundra (Nursing Secretary) stating Ms. Peterson wanted me to come to the school with my Care Plans to be reviewed by you and Ms. Peterson. Once I reviewed the message I called the school and did not receive an answer. I also called Ms. Peterson on her cell phone and did not get an answer.

On Sunday May 28, 2006 a conversation was held with Ms. Peterson. Ms. Peterson stated she did not want to be responsible for them and that they would need to go to Ms. Harris because she would be the one that needed to review them.

I attempted to call you on your cell phone at 706-402-2727 Sunday afternoon of which I received a message stating the call could not be completed as dialed, please check the number.

Enclosed you will find a copy of the Care Plans the Nursing office requested. Once you have reviewed the Care Plan, please get with Dean Lowe regarding your findings and have him contact my attorney Connie Cooper @ 334-297-9442, since I'm working through her to get this resolved.

You time is greatly appreciated in helping get this matter to a resolution that will be satisfactory and fair to all parties involved.


Sincerely,
Lindy Wright

*Lindy Wright*
cc: Connie Cooper

**DEFENDANT'S EXHIBIT**
V

NUR 272 Pediatric Nursing Assessment/ Care Plan/ Case Study/ Teaching Plan
*Grading Criteria (Care Plan #1 & 2)

Student's Name _Lindy Whi[g]ht_   Date _2-10-06_

Pediatric Assessment Tool (5 Points Total)

| | Possible Points | Earned Points |
|---|---|---|
| Identifying Data | 0.5 | 0.5 |
| Chief Complaint | 0.5 | 0.5 |
| Present Illness | 0.5 | 0.75 |
| Birth History | 0.5 | 0.3 |
| Previous History | 0.5 | 0.3 |
| Immunizations | 0.5 | 0.5 |
| Growth and Development | 0.5 | 0.5 |
| Assessment | 0.5 | 0.3 |
| Personal/ Social | 0.5 | 0.5 |
| Medication List | 0.5 | 0.25 |
| Narrative Head-to-Toe Assessment Note | 1.0 | 0.75 |

Pathophysiology (10 points total)

| | | |
|---|---|---|
| Disease process/condition statement | 2 | 2 |
| Sequelae of disease process/ condition statement | 2 | 2 |
| Treatment and medication regimens | 2 | -only listed medicine regimen |
| Abnormal lab values & their meanings | 2 | 2 |
| Abnormal diagnostic test results & their meaning | 2 | 1.5 |
| Prioritized Patient Problem List (at least three) | 1 | 1 |

The Care Plan (Nursing Diagnoses- at least three with four nursing interventions each) (5.5 point total)

| | | |
|---|---|---|
| Subjective Data | 0.5 | 0.5 |
| Objective | 0.5 | 0.4 |
| Nursing Diagnoses (RT, AEB) | 0.5 | 0.5 |
| Patient Goals (include time frames) | 0.5 | 0.5 |
| Nursing Interventions (frequency, specifics) | 1.0 | 0.5 |
| Rationales | 1.0 | 0.4 |
| Implementations | 0.5 | 0.4 |
| Evaluation | 0.5 | 0.5 |
| References Cited | 0.5 | 0.5 |
| The Teaching Plan (two topic areas, get specific) | 2.5 | 1.75 |

Total Points Possible        25

Total Points Earned _20.1_

Student Signature _____ Date _____

Instructor's Signature _Naumon, RN_ Date _3-6-06_

*This form must be stapled to the front of the entire assignment.

NUR 272 Pediatric Nursing Assessment Tool -To be submitted with Care Plan          Page 1 of 4

Student's Name _Lindy Wright_                                    Date of Care _1-27-06_

Patient's Initials: _JF_      Age: _4_    Sex: _M_    Nickname: "_JT_"

Admission Date: _1-6-06_   Diagnosis: _Lung Abcess; (R) Pleural Effusion; Rt Pneumonia_

Allergies: _NKA_                          Birthdate: _10/05/2001_  Race: _AA_   Religion: _Baptist_

Information obtained from: _Chart & pt, family?_

Chief Complaint (include what the child says, if possible):
_Child states cough,_
_admission tk 2 weeks ago pneumonia at TMC. She was here 3 weeks ago, admitted with this infection, & so this is his 3rd admission, same admission_

(History of present illness) (include any home medications):
_no home meds. ill when did symptoms start etc..._

Past History - _Tubes in ears_
Birth History (#of child, type of delivery, complications): _(meaning normal c-section, normal vaginal, normal no complications)_
_3 children, normal delivery_

Previous illnesses, injuries, or hospitalizations:
_tubes in ears_
_2 weeks ago pneumonia_

Immunizations:        Current  _✓_      Not Started _____      Why? _____

Growth/ Development:
Stage (according to Erikson): _Initiative vs Guilt_
Specifics (Are they delayed or appropriate? Observations): _appropriate_
_was active, talkative + playing video games._
_(tried to complete tasks + fed self_
If in school, what grade? _preschool._     Are grades satisfactory? _____

General Appearance: _received child alert, talking to nurse + grandfath_
_Eyes perrla, lung sounds equal unlabored, wheezing heard to_
_lower two lobe, iv infusing NS at KVO to left hand, no_
_s/s of Redness or swelling noted (at rec?) active BX4. denies difficulty_
_Vital Bi edema noted to extremeties, loose cough noted, gardean stat_
Vital Signs: (Complete as age appropriate) _clear mucus coughed up_
T _98_   P _115_   R _23_   B/P _scant_ _110/06_

Height: _42 inches_     Weight: _16.6kg_  Growth Chart Percentile: _70th_

Head Circumference, if infant: _n/a_

Skin (color, rash, texture, deformities, etc.):
_warm, dry to touch._
_no deformities noted_

CVCC 000395

Head (headaches, dizziness, history of injury, etc.):

no hx of headaches or injury per grandfather.

Eyes (visual problems, history of infections, etc.):

Eyes perrla. symmetrical bilaterally

Nose (discharge, history of nosebleeds, etc.):

no discharge noted.
grandparents states no. nose bleeds.

Ears (history of infections, hearing loss, etc.):

no defects noted. of hearing loss?
tubes placed in ears when a baby. for ear infections

Mouth (mucous membranes, teeth number and condition, etc.):

moist, pink, 16 teeth, good dental health, no apparent
caries

Throat (history of sore throats, difficulty swallowing, etc.):

no swallowing difficulties noted, while drinking apple jui
no nodules deformities noted.

Neck (pain, stiffness, limited movement, enlarged nodes, etc.):

no pain, stiffness noted.
active range of motion noted.

Chest (masses, development, etc.):

no abnormalities noted.
Symmetrical movement dury chest expansion.

Respiratory (chronic cough, frequent colds, SOB, breath sounds, etc.):

loose cough noted, scant        no audible wheezing
                                heard.
clear        mucous noted.      Wheezing heard on
Breath Sounds even, unlabored.   auscultation.

Cardiovascular (history of heart murmur or rheumatic fever, anemia, cyanosis or fatigue on exertion, etc):

apical pulse 115; no apparent problems noted.
        while up playing (all according to Wm

GI (appetite, food preferences, eating habits, elimination habits, toilet-trained, etc.):

appetite good, per grandmother

CVCC 000396

drinking + eating well.
abdomen soft; Bowel sounds x4; BM yesterday

GU (history of UTI's, pain, frequency, urgency, hematuria, toilet-trained, etc.):

voiding X5 this AM., GM reports has v'd as while Grandmother was ill

GYN (onset of menarche, last period, discharge, etc.):

N/A. this is male 4 yr old pt.

Musculoskeletal (weakness, pain or stiffness, history of fractures, scoliosis, etc.):

no weakness or pain noted. moves all extremeties without difficulty.

Neurologic (history of seizures, tremors, dizziness, loss of memory, fears, nightmares, speech disturbances):

no deficits noted. hand grips equal & strong eyes equal & follows commands? Responds appropriately?

Endocrine (intolerance of temperature changes, excessive thirst, salty taste to skin, etc.):

no deficits noted per grandparents.

Personal/ Social (home environment, marital status of parents, type of dwelling, occupation of family members, cultural/ religious preferences, etc.):

lives w/single mother & his Sibling in a house. religious preferences is Baptist. Support → both Grandparents & one great grandmother

Note observations made between family members and infant/child:  VSS while I was present

good interaction between grandparents & child mother not present. Child & grandparents appear to have loving relationship.

Multi-Disciplinary Needs of patient &/or family: see teaching plan.

Educated grandparents to have child spit out any mucous from coughing, to ↑ fluids, importance of taking all medications

MEDICATIONS: For both sections, include Brand & Generic Names, Dosage, Route, Frequency, and why the medication is being taken/given.

A.    LIST OF HOME MEDICATIONS (WHAT THE PATIENT WAS TAKING PRIOR TO BEING ADMITTED INTO THE HOSPITAL) (Include prescriptions, OTCs, and herbals)

no home meds, Child does not take vitamins

CVCC 000397

CVCC 000398

Date 1-27-06

Patient Information JF m admission 1-6-06

Medical DX (R) Lung Abscess (L) Pleural Effusion (R) Pneumonia

NSG DX Risk for Ineffective Airway Clearance RT Inflammatory Process

| Objective/Subjective Data | Goal | Intervention | Rational | Implementation | Evaluation |
| --- | --- | --- | --- | --- | --- |
| O- [illegible] mild breath sounds [illegible] on ausculation. O- Productive cough w/ clear sputum. S: grandfather states "spitting up clear mucous". O RR 23 normal range for age. P 115. O Pulse Ox: 98% on R/A while playing | Pt will demonstrate behaviors to achieve airway (7-3 shift) clearance as evidenced by coughing up & spitting out all secretions. Pt will display patent airway from (7-3 shift) as evidenced by absence of dyspnea. pt will receive oxygen supplement | (1) Assess Rate/depth of Respiration + chest movement. R/R=23, \| ABG's ° (2) auscultate lung fields noting areas of decreased/absent airflow + adventitious breath sounds (3) Elevate HOB, + Δ position (4) Assist w/ deep breathing exercises (5) use pulse ox to monitor oxygen saturation (6) Provide O2 as prescribed | Tachypnea, shallow respirations, + asymmetric chest movements are frequently present due to discomfort of moving chest wall +/or fluid in lung. * Reference - Nursing care plans - marilynn E. Doenges, mary frances moorhouse alice C Geissler pg 142-143 (2) ↓ airflow occurs in areas w/ fluid. Crackles, wheezes + ronchi are heard on inspiration +/or expiration in response to fluid accumulation. * Reference - Nursing care plans - marilynn E Doenges - mary F moorhouse - alice C Geissler pg 142-143 (3) ↓ diaphragm, promoting chest expansion * Reference - Nursing Care Plans - marilynn E. Doenges mary F moorhouse, alice C Geissler pg 142 143 (4) facilitates maximum expansion of the lung. * Reference - Nursing Care Plans - marilynn E Doenges, mary F moorhouse - alice C Geissler pg 142 - 143 | (1) assessed rate + dept of Resp. + chest movement of initial assessment and [illegible] on shift 7-3 (2) auscultated lung fields on initial assessment. (3) Instructed the grandparents to keep childs head elevated [illegible] [illegible] position [illegible]. (4) Demonstrated to child + grandparents how to do deep breathing technique. (5) monitored O2 saturation [illegible] pulse ox. ?? Rational (5) monitor O2 saturation (6) maintain good tissue perfusion | goal met. pt demonstrated behavior to achieve airway clearance evidenced by coughing + spitting out mucous from 7-3 shift. Goal met Pt displayed patent airway as evidence by no dyspnea from 7-3 shift! |

HO

but why?

Reference - Wong's Essentials of pediatric [illegible] pg 825

Reference: Wong's E[illegible] [illegible]

[illegible] Initial Diagnostic [illegible]

B.    LIST OF MEDICATIONS BEING ADMINISTERED DURING HOSPITALIZATION:

- Clafaran 900mg every 6 hours.     flagyl 100mg TID IV
- Vancomycin 360mg every 8 hours     Protonix 8mg q12h IV
- Tylenol 250mg PRN pain/fever PO
- Albuterol (Proventil) PRN wheezing   HFN     BRAND or GENERIC
- Robitussin 5mg PRN cough PO                NAMES, Indicator
- Motrin 130mg PRN every 6 hours PO

ABNORMAL LAB VALUES & DIAGNOSTICS ANALYSIS:

| Abnormal Lab Values/Diagnostics Significance/Rationale What is causing the abnormality & why? | Normal Range/Results |
|---|---|

CT scan of Chest   *inhaler?*
Cavity lesion in ® ↑      no lesions or effusion
lobe, probably representing
lung abscess.
® pleural effusion.

all labs normal last taken on 1-11-06
Vanc trough 5-10 (normal) level 9       *on auscultation*

Summary of the Health Assessment (Head-to-Toe) – (Include subjective & objective data)
Received pt alert, talking to grandparent + nurse.
Eyes perrla, mucous membranes pink, moist. Even width
respirations noted, wheezing heard ® ↓ lobes. HR regular. IV
infusing NS at KVO to left hand, no S/S of infiltration, wrapped with k
+ tape. abdomen soft non distended, BSx4; no difficulty voiding
BM yesterday per grandfather. Tolerating po well; capillary re
< 3 seconds. no edema noted; moves all extremities.
no complaints voiced.

PATHOPHYSIOLOGY (include information about the disease process/condition, possible sequelae of disease process/condition, treatment and medication regimens, abnormal lab values & their meanings, and abnormal diagnostic test results & their meanings.  most lung abscesses are
complication of bacterial pneumonia or are caused by
aspiration of oral anaerobes into the lung. Also may occur
secondary to mechanical or functional obstruction of the bronchi
by a tumor, foreign body, or bronchial stenosis or from
necrotizing pneumonias, TB, pulmonary embolism, or chest trauma.
productive cough w/ moderate to copious amounts of foul-smelling, bloody
sputum. Fever +cough may develop. Confirming diagnosis is made by
x-ray + sputum culture.

PATIENT PROBLEM LIST (at least three – these will be used to develop your nursing diagnosis)
PRIORITIZED:
    Ineffective Airway Clearance due to sputum production
    coughing w/ clear mucous production.
    possible infection due to medical Dx                CVCC 000399

Teaching Plan for Pt (two topic areas) to keep childs head

in some cases fiberoptic bronchoscopy. Chest x-ray will reveal an infiltrate with an air-fluid level. A CT scan of the chest may be required to provide more detailed pictures of different cross-sectional areas of the lung.

IV antimicrobial therapy depends on the results of the sputum culture & sensitivity & is administered for an extended period. Clindamycin is drug of choice, followed by penicillin w/ metronidazole. Ceftazidime plus aminoglycoside or cefoperazone is used when the infecting organism is P. aeruginosa. S. aureus is treated w/ oxacillin, nafcillin or 1st generation cephalosporin.

Teaching plan.

⑤ Instructed pt & family about good hand washing technique & how this reduces the risk for spread of infection. Instructed them to use soap & warm water & briskly rub hand w/ soap under water for at least 20 seconds & how to properly dry hands & then turn faucets off without contamination.

Patient Information

Date 1-27-06

Medical DX

NSG DX

| Objective/Subjective Data | Goal | Intervention | Rational | Implementation | Evaluation |
|---|---|---|---|---|---|

CVCC 000401

| Date | 1-27-06 | | | | |
|---|---|---|---|---|---|
| Patient Information | | | | | |

Medical DX: (1) Lung abscess (2) Pleural Effusion (3) Pneumonia

| NSG DX Objective/Subjective Data | Goal | Intervention | Rational | Implementation | Evaluation |
|---|---|---|---|---|---|
| (1) Activity intolerance R/T imbalance between O2 supply + demand | | | | | |
| (1) No complaints of fatigue or exhaustion during ADLs. AEB exhaustion. | Pt will demonstrate ↑ activity tolerance to activity AEB by VS WNL + after activity | (1) Evaluate Pt's response to activity; note + facilitate signs of intolerance of lab, VS during + after activity. | (1) Establishes Pt's need/capabilities + facilitates choice of interventions. If lab, ↓ nursing care plan mgr. F Morehouse Alice C Blaustein p.146 | (1) Instructed Pts activity level was 7-3 shift out T98 P115 | Goal met VS remained ↑ wnl 7-3 shift as evid by T98 P115 6/11/06/c @ 27 |
| (2) VS WNL BP 118/86 P115 T987 | VS will remain WNL BP/P 118/86 T 987. During 7-3 shift. | (2) Provide quiet environment + limit visitors | (2) Reduces stress + stimulation, promotes rest. Nursing Care Plan Alice C Blaustein p.146 | (2) Instructed family + Pt to provide environment that would reduce stress + noise level. | Goal met VS remained ↑ wnl activity level as evid by no complaints of fatigue during 7-3 shifts. |
| (3) No SOB noted or complaints of SOB by Pt. | Pt will have ↑ tolerance to activity by end of Pt. | (3) Provide rest periods + list periods | (3) Pt may be more comfortable in surgical different position. Nursing Care Plan p.147 | (3) Assisted in showing the family + child how to be comfortable in surgical position. | |
| (4) no complaints of fatigue by Pt. | As evidenced by no complaints of fatigue during 7-3 shift. | (4) Assist Pt to assume comfortable position for rest + sleep. | (4) Pt may be more comfortable in surgical different position. flat Nursing Care Plan p.147 | (4) Assisted the care + all meds surgical positions. 7-3 shift. | |
| (5) Pulse OX 98% on room air while sleeping. | | | | | |
| (5) Pt stated he is not tired and who not to sleep. (1) | Kardex p.115 7-3 shift. (1) | (4) Assist w/self care activities as needed. | (4) Diminishes ... which helps to reduce O2 | (4) Assisted w/the care + all meds throughout 7-3 shift. | |

JMcB
JMcB

plan Lung abscess Ms surgery + demand
activities activities to tolerate O2
P-capabilities Nursing Care Plan
as Group
PG 147

NUR 272  Maternal – Newborn Nursing
Nursing Care Plan #1

Student: _Lindy Wright_ _____

Instructor: _Harmon, Shirley_    Date: _1-27-06_

| Evaluation Criteria | Possible #Pts | Earned Pts | Comments |
|---|---|---|---|
| A. Assessment Packet | 5 | 3 | Left Thing out  Never NA or No abd Seen |
| B. Nursing Diagnoses | | | |
| 1. Appropriate | 4 | 1/4 | |
| 2. Prioritized | 3 | 0/3 | |
| C. Subjective | 2 | 0/2 | |
| D. Patient Goals | | | |
| 1. Appropriate | 4 | 0/4 | Goals Not Approp for |
| 2. AEB | 3 | 0/3 | This patient |
| E. Nursing Interventions | | | |
| 1. Appropriate | 4 | 2/3 | Did Not Match |
| 2. Prioritized | 3 | 0/2 | Nursing Diagnosis |
| F. Scientific Rationale with References | 4 | | Where did you get This Info |
| G. Evaluation of Patient Goals | 3 | 1/3 | |
| TOTAL | ~~30~~ 25 pts | /30 | |

Grade (7)

Redo Work      30

20 pts

Page 1 of 4

NUR 272 Pediatric Nursing Assessment Tool -To be submitted with Care Plan

Student's Name __Lindy Wright__      Date of Care __1-20-06__

Patient's Initials: __DD__    Age: __3__    Sex: __m__    Nickname: _____

Admission Date: __1-19-06__    Diagnosis: __Seizures; dev. delayed; OM__

Allergies: __NKA__    Birthdate: __7/30/02__ Race: __B__    Religion: __Christian__

Information obtained from: __pt chart + family__

Chief Complaint (include what the child says, if possible):

__Seizures__

History of present illness (include any home medications):
__no home meds    new onset seizures.__
__Started 2 days prior to admission__

Past History __CMV - in utero; MR__

Birth History (#of child, type of delivery, complications):
__○ child was premature birth w/ CMV.__

Previous illnesses, injuries, or hospitalizations:
__CMV - in utero__

Immunizations:    Current __✓__    Not Started _____    Why? _____

Growth/ Development:
Stage (according to Erikson): __Trust vs mistrust__
Specifics (Are they delayed or appropriate? Observations): __appropriate due__
__to mental retardation__

If in school, what grade? __daycare__    Are grades satisfactory? _____

General Appearance: __Received pt lying in bed alert, responds to touch;__
__non verbal, IV noted to left arm wrapped w/ gauze + tape; no__
__s/s of infiltration noted. moves all extremities, skin warm + dry to__
__touch, lungs clear, abd. regular, abdom soft non distended, family__
__states (wet?) diapers + had BM previous day.__

Vital Signs: (Complete as age appropriate)
T __98__    P __114__    R __23__    B/P __107/56__
Height: __42 inches__    Weight: __28.5 lbs__ Growth Chart Percentile: __15%__

Head Circumference, if infant: __not applicable__

Skin (color, rash, texture, deformities, etc.):
__warm + dry to touch.__

CVCC 000404

ld (headaches, dizziness, history of injury, etc.):

CNM in utero - neurological defects, seizures.
no abnormalities visible.

Eyes (visual problems, history of infections, etc.):

Eyes perrel;

Nose (discharge, history of nosebleeds, etc.):

no discharge noted

Ears (history of infections, hearing loss, etc.):

no loss noted

Mouth (mucous membranes, teeth number and condition, etc.):

pink + moist, all teeth appear present.

Throat (history of sore throats, difficulty swallowing, etc.):

Soft diet indicated due to aspiration (percation. SP)

Neck (pain, stiffness, limited movement, enlarged nodes, etc.):

no abnormalities noted

Chest (masses, development, etc.):

no abnormalities noted.

Respiratory (chronic cough, frequent colds, SOB, breath sounds, etc.):

breath sounds even + unlabored.

Cardiovascular (history of heart murmur or rheumatic fever, anemia, cyanosis or fatigue on exertion, etc):

no abnormalities noted.
Apical 98.

GI (appetite, food preferences, eating habits, elimination habits, toilet-trained, etc.):

Baby food        \ has to be feed
Pediasure        \ wears diapers.
soft diet

(history of UTI's, pain, frequency, urgency, hematuria, toilet-trained, etc.):

*wears diapers*

GYN (onset of menarche, last period, discharge, etc.):

*not applicable*

Musculoskeletal (weakness, pain or stiffness, history of fractures, scoliosis, etc.):

*none noted*
*moves all extremities*

Neurologic (history of seizures, tremors, dizziness, loss of memory, fears, nightmares, speech disturbances):

*hx of seizures for 2 days prior to admission*

Endocrine (intolerance of temperature changes, excessive thirst, salty taste to skin, etc.):

*none noted.*

Personal/ Social (home environment, marital status of parents, type of dwelling, occupation of family members, cultural/ religious preferences, etc.):

*lives w/ aunt and uncle; house.   guardians work for Kodac.  christians.*

Note observations made between family members and infant/child:

*family members very concerned + caring.*

*is this all you need to teach about New onset seizure*

Multi-Disciplinary Needs of patient &/or family:

*teach family about dis? + aspiration precautions*

MEDICATIONS:  For both sections, include Brand & Generic Names, Dosage, Route, Frequency, and why the medication is being taken/given.

LIST OF HOME MEDICATIONS (WHAT THE PATIENT WAS TAKING PRIOR TO BEING ADMITTED INTO THE HOSPITAL) (Include prescriptions, OTCs, and herbals)

*no home meds.*

CVCC 000406

LIST OF MEDICATIONS BEING ADMINISTERED DURING HOSPITALIZATION:

Ativan 1mg IV PRN for Seizure

Tegretol (100 mg/5mL) ÷ tsp po BID.

Amoxil 400/5 1½ tsp po BID.

ABNORMAL LAB VALUES & DIAGNOSTICS ANALYSIS:

Abnormal Lab Values/Diagnostics
        Significance/Rationale
What is causing the abnormality & why?)

Normal Range/Results

Ø is this the only abnormal Lab or Diagnostic test you observed

CT of Brain, 1/19/06
.. small amount of mineralization seen in basal ganglia + left temporal lobe. This is atypical for age and is uncertain etiology or significance.

Summary of the Health Assessment (Head-to-Toe) – (Include subjective & objective data)

[handwritten text, largely illegible] facial symmetry, natal, mucous ... pink moist, apex pulse 98, lung sounds even, clear unlabored, Abdomen soft, nondistended, Bowel sounds x4, IV with D5¼NS infusing at 1/5, IV site wrapped with gauze + tape, all appears to be infusing well, no s/s of infiltration (redness or swelling), moves all extremities, no edema noted.

PATHOPHYSIOLOGY (include information about the disease process/condition, possible sequelae of disease process/condition, treatment and medication regimens, abnormal lab values & their meanings, and abnormal diagnostic test results & their meanings. Seizures are caused by malfunction of the brain electrical system ... cortical ... neuronal discharge. Seizures ... determined ... Signs ... Symptoms of seizure may include uncontrolled ... attack of emotions, uncontrolled ... movements of change in perception ... [illegible] ... (recorded by staff) ... ... Blood ...

PATIENT PROBLEM LIST (at least three – these will be used to develop your nursing diagnoses) PRIORITIZED:

This - thread is not a problem list

# Pediatric Nursing Care Plan #1

Nursing Diagnosis #1: Mut about Risk for Hypoxia  r/t seizure activity AEB pt's first seizure at home

| Assessment: Subjective | Goals and Expected Outcomes: AEB | Nursing Interventions | Rationale w/references | Evaluation |
|---|---|---|---|---|
| Subjective: Parent state ... | ... experiences seizures during 1-3 days ... no seizure activity. | ① Pad objects such as crib | * See reference at bottom of pg. | ① ... 1-3 days on 1.20.08 ... |
|  | Reflection ... | ② ... min ... r/u Tegretol ordered per Md. | ① Helps prevent injury. | Did/how pt stream only ... Goals not met ... |
|  |  | ③ Educate ... | ② ... | Metabolized TWO |
|  |  | ④ ... | ③ ... | |
|  |  | ⑤ Administer $O_2$ if needed | ④ ... metabolic disturbances ... nuro ... | |
|  |  |  | ⑤ Prevent to prevent ... | |
|  |  |  | ⑥ Supplie adequate tissue perfusion. | |

Reference —

Nursing Diagnosis #2: ___Pt Risk for Aspiration R/T resp or nutrit. impaired decreased___

Assessment: Same as Risk for Pneum

| Assessment: Subjective | Goals and Expected Outcomes AEB | Nursing Interventions | Rationale w/references | Evaluation |
|---|---|---|---|---|
| | ① Patient will remain free of signs of aspiration | ① will turn & check mouth during tube feeds | * see reference at bottom of page for citations | Goal met. Pt unable to swallow secretions. |
| | at risk for aspiration, clear airway AEB: vent | ② Keep suctioning | ① ___ vagus and not aspiration | Tolerating clear liquid with no s/s of difficulty swallowing. |
| | | ③ position ___ with head ___ not hyperextend | ② reduce ___ | Throat |
| | | ④ turn to side if vomits | ③ promote adequate ventilation | |
| | | ⑤ put O2 & suction at bedside | ④ ___ aspiration | |
| ① ___ | | | ⑤ for adequate ___ & oral ___ keep oral Pharynx clear of airway obstruction | |
| ② child & ___ | | | | |
| ③ O2 & suction at bedside | | | | |

* More ___

CVCC 000409

272 Pediatric Nursing Assessment Tool -To be submitted with Care Plan

Student's Name __Lindy Wright_____ Date of Care _1-20-06_____

Patient's Initials: _DD__ Age: _3_ Sex: _m_ Nickname: _____

Admission Date: _1-19-06_ Diagnosis: _Seizures; dev. delayed; OM_

Allergies: _NKA_____ Birthdate: _7/30/02_ Race: _B_ Religion: _Christian_

Information obtained from: _pt chart + family_____

Chief Complaint (include what the child says, if possible):

_Seizures_

History of present illness (include any home medications):

_no home meds   new onset seizures._
_Started 2 days prior to_
_admission_

Past History _CmV; MR_ in utero

Birth History (#of child, type of delivery, complications):

_child was premature birth w/ CmV._

Previous illnesses, injuries, or hospitalizations:

_CmV - in utero_

Immunizations:     Current ___✓___  Not Started _____  Why?_____

Growth/ Development:
Stage (according to Erikson): _Trust vs Mistrust_
Specifics (Are they delayed or appropriate? Observations): _appropriate due_
_to mental retardation. Delayed for chronological age._
_due to extreme MR. will never progress to autonomy_
In school, what grade? _daycare_     Are grades satisfactory?_____

General Appearance: _Received pt lying in bed alert, responds to touch;_
_non verbal, IV noted to left arm wrapped up gauze + tape; no_
_s/s of infiltration noted, moves all extremities, skin warm + dry to_
_touch, lungs clear, HR regular, abdomin soft non distended, family_
_states child had BM previous day._
Vital Signs: (Complete as age appropriate)
T _98_  P _114_  R _23_  B/P _107/56_
Height: _42 inches_  Weight: _28.5 lbs_  Growth Chart Percentile: _15%_

Head Circumference, if infant: _not applicable_

Skin (color, rash, texture, deformities, etc.):

_warm + dry to touch._

d (headaches, dizziness, history of injury, etc.):

CNM in utero - neurological defects, seizures.
no abnormalities visible.

yes (visual problems, history of infections, etc.):

Eyes parrel;

ose (discharge, history of nosebleeds, etc.):

no discharge noted, no hx of nose bleeds per
caregivers

ars (history of infections, hearing loss, etc.):

no loss noted

Mouth (mucous membranes, teeth number and condition, etc.):

pink + moist; all teeth appear present

hroat (history of sore throats, difficulty swallowing, etc.):

Soft diet indicated due to aspiration / precautions

Neck (pain, stiffness, limited movement, enlarged nodes, etc.):

no abnormalities noted    moves neck w/no problems.
no limited movement noted

Chest (masses, development, etc.):

no abnormalities noted.    no chest mass noted.
even rise + fall on
respirations noted.

Respiratory (chronic cough, frequent colds, SOB, breath sounds, etc.):

breath sounds even + unlabored.

Cardiovascular (history of heart murmur or rheumatic fever, anemia, cyanosis or fatigue on exertion, etc):

no abnormalities noted.
Apical 98.

GI (appetite, food preferences, eating habits, elimination habits, toilet-trained, etc.):

Baby food \ has to be feed
Pediasure / wears diapers.

CVCC 000411

(history of UTI's, pain, frequency, urgency, hematuria, toilet-trained, etc.):

*wears diapers*

GYN (onset of menarche, last period, discharge, etc.):

*not applicable*

Musculoskeletal (weakness, pain or stiffness, history of fractures, scoliosis, etc.):

*none noted*
*moves all extremities*

Neurologic (history of seizures, tremors, dizziness, loss of memory, fears, nightmares, speech disturbances):

*hx of seizures for 2 days prior to admission*

Endocrine (intolerance of temperature changes, excessive thirst, salty taste to skin, etc.):

*none noted.*

Personal/ Social (home environment, marital status of parents, type of dwelling, occupation of family members, cultural/ religious preferences, etc.):

*lives w/ aunt and uncle; house. - guardians work for Kodac. christians.*

Note observations made between family members and infant/child:

*family members very concerned + caring.*

Multi-Disciplinary Needs of patient &/or family:

*teach family about diet + aspiration precautions. Home safety → pad crib - Teach about meds + to give a directly*

MEDICATIONS: For both sections, include Brand & Generic Names, Dosage, Route, Frequency, and why the medication is being taken/given.

LIST OF HOME MEDICATIONS (WHAT THE PATIENT WAS TAKING PRIOR TO BEING ADMITTED INTO THE HOSPITAL) (Include prescriptions, OTCs, and herbals)

*no home meds.*

LIST OF MEDICATIONS BEING ADMINISTERED DURING HOSPITALIZATION:

Ativan 1mg IV PRN for Seizure

Tegretol (100 mg /5mL) ÷ tsp po BID.

Amoxil 400/5 1½ tsp po BID.

Brand + Gener. names
why?

ABNORMAL LAB VALUES & DIAGNOSTICS ANALYSIS:

Abnormal Lab Values/Diagnostics
Significance/Rationale
What is causing the abnormality & why?)

Normal Range/Results

mCV - 73.2 ↓ why
m PV - 7.0 ↓
EEG ordered - no results back yet.

CT of Brain, 1/19/06 .. Small amount of mineralization seen in basal ganglia + left temporal lobe. This is atypical for age and is uncertain etiology or significance.

Summary of the Health Assessment (Head-to-Toe) – (Include subjective & objective data)
eyes PERRLA, facial symmetry noted, mucous membrane pink + moist, apical pulse 98, lung sounds even, clear + unlabored, Abdomen soft, nondistended, Bowel Sounds x4, IV with 05½ NS infusing at 45, IV site wrapped with gauze + tape, site appears to be infusing well, no s/s of infiltration (redness or swelling); move all extremities, no edema noted ..

PATHOPHYSIOLOGY (include information about the disease process/condition, possible sequelae of disease process/condition, treatment and medication regimens, abnormal lab values & their meanings, and abnormal diagnostic test results & their meanings. Seizures are caused by malfunction of the brain's electrical system that results from cortical neuronal discharge. Seizures are determined by site of origin + signs + symptoms, may include unconsciousness or altered consciousness, involuntary movements + changes in perception, behaviors, sensations + posture. (recorded by EEG) Blood glucose - evidence of hyperglycemia venous level on WBC S/S of infection) Blood glucose - evidence of hypoglycemia

CVCC 000413

PATIENT PROBLEM LIST (at least three – these will be used to develop your nursing diagnoses)
PRIORITIZED:

electrolytes; blood urea nitrogen, calcium + other blood studies may indicate metabolic disturbances.
lumbar puncture can confirm mnt

(1) (at risk for)

(2) at risk Hypoxia

# PEDIATRIC NURSING CARE PLAN

NAME: Lindy Wright
DATE: 2-24-06

MEDICAL Dx / NURSING Dx: Seizures, dev delayed, Om
Risk for injury r/t motor activity + hypoxic +
✓ loss of consciousness
aspiration r/t motor activity
✓ loss of consciousness

| ASSESSMENT | GOALS | INTERVENTIONS | RATIONALE | EVALUATION |
|---|---|---|---|---|
| Care giver state "I'm afraid he will hurt himself if he has another seizure." | Will not experience injury, respiratory distress or aspiration as evidence by O2 sat will stay above 90%, no visible seizure activity. | Time seizure.    PRC'S | to determine possible hy periods of care. *Wongs Nursing care of infants + children. 7th Ed. pg 1697. | Child exhibits no signs of physical or mental injury or aspiration. |
| Care giver stated "seizure activity started 2 days ago." O2 Sat 94% | Maintained on 7-3 shift. | protect child during seizure Do not restrain child or use 100% non restrictive clothing Do not put anything in childs mouth (eg. tounge blades, food, or fluids) | protection what? to prevent inflicting injury to child or self. *Wongs Nursing care of infants + children 7th Ed. pg 1697 | |
| Care giver states child is eating cheerios, tolerating liquids without difficulty. O2 + suction at bedside. | | position child ō hyperextend, if possible, to lessen injury. Pad objects such as crib, siderails, or wheelchair | Can cause injury, obstruct breathing, or be aspirated. *Wongs Nursing Care of infants + children 7th Ed. pg 1697 | Childs O2 Sat stayed above 90%, no S/s of hypoxia. |
| | | If child begins to vomit, turn to side | to prevent aspiration *Wongs Nursing Care of infants + children 7th Ed. pg 1697. | |
| | | Administer O2 if needed Administer O2 periodically to childs (to childs correct SaO2 ) V O2 Sat available with suction | Supplies oxygen to tissue perfusion. *Wongs Nursing care of infant + children | |

# PEDIATRIC NURSING CARE PLAN

MEDICAL DX: Seizures, dev delayed, Om

NURSING DX: Risk for injury R/T to type of siezure.

NAME: Lindy Wright

DATE: 2-24-06

| ASSESSMENT | GOALS | INTERVENTIONS | RATIONALE | EVALUATION |
|---|---|---|---|---|
| Caregivers state "I'm afraid he will hurt himself if he has another seizure." Care giver state seizure activity started 2 days ago." | will not experience seizure activity per med. Admin. MB? will not experience injury on 7-3 shift | Admin. prescribed anti-seizure medications. Teach the administration of meds, which to identify the unfavorable reactions to meds Stress Importance of compliance | helps to prevent seizure activity & allows Nursing care of Infant & children. Tab Ed., pg 1697. helps with preventing of seizure activity & provides knowledge for cure & wrong nursing care of infant & children Tab Ed., pg 1697. helps prevent seizure activity, & Wongs Nursing care of Infant & children Tab Ed., pg 1692. | Child remained free of seizure activity on 7-3 shift as evb staged calm from 7-3 family demonstrated an understanding of unfavorable response of meds, as evb to meds stated they would report any reaction or any abnormal signs during meds administration on 7-3 shift. |
| Caregivers state "I'm afraid he will hurt himself if he has another seizure." | will not experience injury on 7-3 shift | comply & recognize if spr/reactivity Teach family when appropriate | | |
| | | Encourage periodic physical & laboratory assessment | to determine possible deviations from normal findings & Wongs Nursing care of children & infants Tab Ed pg 1697 | |
| | | Educate parents & child regarding appropriate activities for child & supervision during bathing | helps prevent injury All Wongs Nursing care of children & infants Tab Ed. pg 1697 | Family agreed on appropriate activities for child on 7-3 shift as evb stated they would watch the child during bath and closely activities. |

Nursing Diagnosis #1: At Risk for Injury R/T Seizure activity

Pediatric Nursing Care Plan #1

| Assessment: Subjective | Goals and Expected Outcomes: AEB: | Nursing Interventions | Rationale w/references | Evaluation |
|---|---|---|---|---|
| Subjective: | ① Pat will not experience any injury during 7-3 shift, evidence by no seizure activity. | ① Pad object such as bed rails & set up seizure precaution; pad, pg. oxygen, suctioning equip. | ★ Set reference at bottom of pg. | ① Pt continues uninjured 7-3 shift in no seizure activity noted. |
| ① Parents state "I'm afraid my baby may hurt himself if he has another seizure." | | ② antipsychotic/antidepressant meds; Tegretol ordered per MD. | ① helps prevent injury. | |
| ② Parent states afraid seizure activity started 1 day prior to admission. | Risk for stress 2° aspiration | ③ Educate parents & child regarding appropriate actions | ① Meds decrease CNS changes during seizure activity. | |
| What about risk for Hyperthermia | | ④ monitor lab results | ① if not educated... | |
| | | ⑤ encourage adequate diet | ⑤ education on metabolic acidosis (dysrhythmia?) circulation of... | |
| | | | ⑤ prevent deficiency of required nutrients. | |
| | | ⑥ Supplied adequate diet as required nutrients. | | |

(marginal comments circled and written across page:)
According to NANDA, you do not have "at risk", given a medical diagnosis

Why  Why

This has nothing to do with Nursing

Did you PT have any abs. That indicated This

you need to protect pt from injury

Comments or if wrong

Reference = ( Nursing care of children & children 7th Edition ) PC 11.93

**Nursing Diagnosis #2:** At Risk for Aspiration R/T motor control & loss of cough...

| Assessment: Subjective | Goals and Expected Outcomes AEB | Nursing Interventions | Rationale/References | Evaluation: |
|---|---|---|---|---|
| Same as Risk for Pneu... | | | | |
| ① family member states child is eating [Cheerios], coughing | ① Pt will exhibit no sign of aspiration during seizure episode | ★ do these per ... the dosing regimen ① nothing in child's mouth during seizure episode | ★ See reference at bottom of page all from ① Pt exposed to ↑ risk of aspiration... signs of aspiration or difficulty... | Goal met ① Pt exhibited no signs of aspiration or difficulty... |
| ② child is tolerating liquids, eating differently | ② Child will tolerate clear liquids well and ... | ② loosen clothing ③ Position child with head midline, not hyperextended | ② tolerating liquid, clear fluid, with no s/s of difficulty swallowing. |  ② tolerating clear liquid with no s/s of difficulty swallowing. |
| ③ O2 & suction at bedside | | ④ turn to side if vomits ⑤ put O2 & suction at bedside | ② restricts movement of breathing ③ promotes adequate ventilation ④ prevents aspiration ⑤ for adequate aspiration, to avoid pervious + keep oral pharanx clear of airway obstruction | [signature] |

NUR 272 CVCC    Pediatric Patient Info Sheet

CVCC 000418

**Student:** _[illegible]_

| Patient's Initials: DD | Age: 3 yrs | Age Group: Toddler | SS#: _7631_ | Sex: M | Date: 1-30-06 |

**Diagnosis:** Seizures, dev Delayed, OM

**Date of Admission:** 1-19-06

**Surgery/Date:**

**Allergies:** NKA

**Height:** _____    **Wt.** 28.5 lbs / 12.8 kg    **HC** (<24 mos):

**Past Med/Surg History:** previous illnesses and/or hospitalizations:

CMV in utero.

**Lab data, x-rays, tests:** Interpret abnormal values and nursing implications related to abnormal findings.

CBC
MCV- 73.2
mcv - 7.0-
EEG ordered and completed on 1-19-
(no results)

What does this mean —

**Social/cultural information:** Include family members, religion, culture, medical insurance, school attendance, etc.

Medicaid    in daycare

allergies — christian

day care.

_[circled handwritten text:]_ Need More Information

are you sure?

**Current Hospitalization:** Signs and symptoms description, definition and medical/surgical management of diagnosis: Document information pertinent to diagnosis using Peds textbook.

_[large block of handwritten notes, partly illegible]_

you keep mentioning
metabolic disturbance
but can you document
this is your pts prob

Immunizations: Identify recommended immunizations for specific age & indicate if immunizations are current for this child. Include history R/T communicable diseases.

Growth & Development:  Be specific:  State normal growth and development for age and compare this child with normals.  Identify what effects the illness/hospitalization has had on normal growth and development. (Include Erikson, Piaget, Kohlberg)

Vitals: Identify normal vitals for age and significant deviations in your patient.

Treatments: Why indicated - Expected outcomes:

CVCC 000419