**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

LINDY G. WRIGHT,                      )
                                      )
    Plaintiff,                        )
                                      )    **Civil Action No. 3:06-cv-1087-WKW**
v.                                    )
                                      )
CHATTAHOOCHEE VALLEY                  )
COMMUNITY COLLEGE (CVCC),             )
et al.,                               )
                                      )
    Defendants.                       )

## BRIEF OF DEFENDANTS IN REPLY TO THE PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT WITH BRIEF

COME NOW the Defendants herein and submit this reply to the Plaintiff's Opposition to these Defendants' Motion for Summary Judgment and Brief as follows:

### INTRODUCTION

The Plaintiff's Brief and Exhibits contain inaccuracies, some of which counsel for these Defendants have tried to address or point out in this Brief. Additionally, the Plaintiff's Brief contains and Plaintiff's Exhibits constitute or contain inadmissible hearsay or irrelevant information which should not be considered on the Motion for Summary Judgment and concerning which these Defendants have filed a Motion to Strike. However, by presenting the referenced inaccuracies and evidentiary objections, these Defendants have not created any issues of material fact related to their lawful right to Summary Judgment herein. The reason for filing the Motion to Strike is to eliminate unreliable information. The reason for pointing out certain inaccuracies in Plaintiff's Response is to avoid confusion and to assist in allowing for a fair and unclouded assimilation of the

1

undisputed facts. The inaccuracies pointed out in this brief consist, for the most part, of simple things that should not be contested by the Plaintiff. For example, the Plaintiff's Brief confuses the term "course forgiveness" with the term "grade appeal" or "grade forgiveness." The proper terms are set forth and defined in the school catalogue. These Defendants aver that, irrespective of any of the inaccuracies or the evidentiary objections, Defendants are entitled to prevail on this Summary Judgment Motion based upon uncontroverted facts. These facts have been supported by the portions of the record submitted with the Defendants' Brief in Support of their Motion for Summary Judgment.

## **LIST OF UNDISPUTED FACTS**

1.     Lindy Gale Wright is a white female born on January 28, 1971. (Book of Exhibits, Exhibit "H", Hodge Attachment "8"). She was 34 years of age at the time of her first class in the Nursing Mobility ADN Program in May of 2005. (Book of Exhibits, Exhibit "A", Bates ID # CVCC000011; Book of Exhibits, Exhibit "L", p. 38:11-23).

2.     Ms. Wright took NUR 252, Adult Nursing II, in the fall semester 2005 and she made a failing grade of "D" in that course. (Book of Exhibits, Exhibit "J", p. 6-8; Book of Exhibits, Exhibit "K", p. 3-4; Book of Exhibits, Exhibit "L", p. 81:5-82:3; p. 114:20-7; Book of Exhibits, Exhibit "Y").

3.     Ms. Wright took NUR 271, Pediatrics, in the fall semester 2005, and she made a failing grade of "D" in that course. (Exhibit "3", p. 137:4-13 to Plaintiff's Opposition to Defendants' Motion for Summary Judgment; Book of Exhibits, Exhibit "K", p. 4; Book of Exhibits, Exhibit "L", p. 81:5-82:3; Book of Exhibits, Exhibit "Y").

4.     Ms. Wright filed a grade appeal in NUR 252 on December 20, 2006. (Book of Exhibits, Exhibit "J", p. 9 and Harris Attachment "3"; Book of Exhibits, Exhibit "K", p. 6

2

and Lowe Attachment #6, Bates ID # CVCC000351-353; Exhibit "3", p. 137:4-13 to Plaintiff's Opposition to Defendants' Motion for Summary Judgment).

     5.     At the end of the fall semester 2005, Ms. Dixie Peterson, in her capacity as Chair, sent Lindy Wright a letter advising her that she was excluded from the program because of two failures in nursing courses. (Book of Exhibits, Exhibit "Y"). At that time, Ms. Wright was considered to be out of the nursing program or excluded from it by virtue of the Admission Criteria for the Mobility Program (ADN). (Book of Exhibits, Exhibit "A", Bates ID # CVCC000100, ¶ 14). Paragraph 14 of the Nursing Program Criteria clearly sets out the two failure exclusion rule as follows: "If a nursing student fails two different nursing courses within the twenty-four month period, he/she will be excluded from the program and CANNOT reapply." (*Id.*).

     6.     Ms. Wright also filed a grade appeal in NUR 271. (Book of Exhibits, Exhibit "K", p. 4-5; Book of Exhibits, Exhibit "L", pp. 82:4-15, 104:107, 114:14-19; Exhibit "3", p. 137:4-13 to Plaintiff's Opposition to Defendants' Motion for Summary Judgment).

     7.     With regard to the grade appeal in NUR 271, the instructor, Tawyna Cash, who was on loan from another state nursing school, did not make a written response to Ms. Wright's grade appeal for NUR 271 which would allow Dr. Lowe to consider the entire matter and rule in accordance with the grade appeal policy. Dr. Lowe, therefore, in the exercise of his discretion, ruled in Ms. Wright's favor. (Book of Exhibits, Exhibit "K", p. 5; Book of Exhibits, Exhibit "L", p. 82:1-20; and Exhibit "3", pp. 137:18-139:19 to Plaintiff's Opposition to Defendants' Motion for Summary Judgment). This grade appeal ruling for NUR 271, resulted in the changing of Ms. Wright's grade from a failing grade of "D" to a passing grade of "C". (Book of Exhibits, Exhibit "M",pp. 135-141; Book of Exhibits, Exhibit

"K", p. 5 and Lowe Attachment "5"; and Exhibit "3", p. 138:4-12 to Plaintiff's Opposition to Defendants' Motion for Summary Judgment).  Dr. Lowe consulted with Dixie Peterson in making this discretionary ruling.  (Book of Exhibits, Exhibit "K", p. 5; and Exhibit "3", p. 138:4-12 to Plaintiff's Opposition to Defendants' Motion for Summary Judgment).  Ms. Peterson, the Chair of the Nursing Department at that time, also recommended to Dr. Lowe, in the exercise of her discretion as Department Chair, that the grade appeal in NUR 271 be granted and that Ms. Wright's grade be changed to a "C".  (*Id.*).

8.    The grade appeal process initiated by Ms. Wright regarding NUR 252, Adult Nursing II, followed the procedure established and set forth in the CVCC Catalog and Handbook and was denied by Dean Lowe, the final decision maker, after he had duly considered the grade appeal record and file.  (Book of Exhibits, Exhibit "A", Bates ID # CVCC000202 -204; and Book of Exhibits, Exhibit "K", p. 7-8).

    i.    The final exam in NUR 252 was given on December 14, 2005.  (Book of Exhibits, Exhibit "J", p. 8).

    ii.    After the final examination grading was completed on that same day (December 14, 2005), Lynn Harris met with all students, including Lindy Wright, to inform them of their grades. (*Id.*).

    iii.    Ms. Wright failed NUR 252.  She only achieved 741.1 of the required 750 points needed to pass NUR 252.  (Book of Exhibits, Exhibit "J", p. 7-8 and Harris Attachment "2", Bates ID # CVCC000891; Book of Exhibits, Exhibit "D", Bates ID # Wright-00120).

4

iv.    On December 20, 2005, Wright filed her formal appeal. (Book of Exhibits, Exhibit "K", p. 6 and Lowe Attachment "6", Bates ID # CVCC000351-353; Book of Exhibits, Exhibit "J", p. 9 and Harris Attachment "3").

v.    The college was closed from December 22, 2005 through January 2, 2006 for the holiday season. (Book of Exhibits, Exhibit "B", p. 16, Bates ID # CVCC00528); Book of Exhibits, Exhibit "J", p. 9).

vi.    Harris responded to Wright's appeal explaining why the grade of "D" should stand on January 4, 2006. (Book of Exhibits, Exhibit "J", p. 9 and Harris Attachment "3", Bates ID # CVCC000370).

vii.    The appeal was then filed with Division Chairperson Dixie Peterson on January 4, 2006. (Book of Exhibits, Exhibit "J", Harris Attachment "3", Bates ID # CVCC000372).

viii.    On January 10, 2006, Dixie Peterson issued her findings regarding Ms. Wright's grade appeal and stated, "the review of the appeal supports the grade given by Ms. Harris, the classroom instructor. Based upon [Ms. Wright's] failure of every test and no evidence of erroneous grading or discrimination the grade should stand." (Book of Exhibits, Exhibit "K", p. 6 and Lowe Attachment "8", Bates ID # CVCC000372).

ix.    Ms. Peterson notified Ms. Wright of her determination on January 10, 2006. (*Id.*).

x.    The appeal was filed with Dean Lowe on January 9, 2006. (Book of Exhibits, Exhibit "K", Lowe Attachment "8", Bates I. D. # CVCC000372).

xi.     On January 13, 2006, Ms. Carol Williams and Candace Short, nursing instructors from Wallace Community College in Dothan, Alabama, traveled to CVCC to review the course materials and course tests in NUR 252 in order to provide an outside evaluation regarding whether the grade of "D" received by Wright should stand or be changed. (Book of Exhibits, Exhibit "K", p. 6-7 and Lowe Attachment "9", Bates ID # CVCC000357).   The instructors recommended that the grade of "D" stand and not be changed based on their evaluation. (*Id.*).

xii.    On January 17, 2006, Lowe wrote to Wright informing her of his decision to deny her grade appeal for NUR 252. (Book of Exhibits, Exhibit "K", p. 8, Lowe Attachment "10", Bates ID # CVCC000304).

9.      The grade appeal procedure is set forth in Exhibit "A," Bates ID #s CVCC000203 and CVCC000204.

10.     The decision of Dean Lowe is the final decision in the grade appeal process. (Book of Exhibits, Exhibit "A," p. 203, Bates ID # CVCC000204).

11.     On January 17, 2006, Dixie Peterson spoke with Lindy Wright notifying her that she was eligible to return to the Nursing Program and that Dean Lowe was ruling in her favor regarding NUR 271. (Exhibit "14" and Exhibit "2", p. 141:6-142:22 to Plaintiff's Opposition to Defendant's Motion for Summary Judgment). That same day, Dixie Peterson notified Heather Chaulkley that Ms. Wright was eligible, after Dean Lowe's ruling in NUR 271, to return to the Nursing Program. (*Id.*). Ms. Wright was allowed to return to the program after Dean Lowe's ruling regarding NUR 271 as she only had one failed grade on her transcript, not two, and was no longer excluded from the program. (Exhibit "2", p.

6

141:6-142:22 and Exhibit "14" to Plaintiff's Opposition to Defendant's Motion for Summary Judgment; Book of Exhibits, Exhibit "A", p. 104, ¶ 14; Book of Exhibits, Exhibit "K", ¶ 8 and Lowe Attachments "4" and "5"; Book of Exhibits, Exhibit "L", p. 82:1-20). But for the ruling in Ms. Wright's favor on the grade appeal in NUR 271, she would have been excluded from the Nursing Program because she would have had two failures in the nursing courses at that time, which was not allowed according to the CVCC Nursing Handbook. (Book of Exhibits, Exhibit "A", p. 106, Bates ID # CVCC000110).

        12.    As stated previously, Dixie Peterson began the process for Ms. Wright to register for spring 2006 after the grade appeal on NUR 271 was granted on January 17, 2006.  On January 18, 2006, a grade change form was filled out indicating that Ms. Wright's grade in NUR 271 would be changed from a "D" to a "C."  Dr. Lowe and Dixie Peterson signed and authorized this grade change on January 19, 2006 and the Admissions Office received and processed this request on January 20, 2006. (Book of Exhibits, Exhibit "K", Lowe Attachment "4").  Dr. Lowe forwarded formal correspondence to Ms. Wright indicating that her grade appeal had been granted and that her grade would be changed from a "D" to a "C."  In his letter, he indicated that the proper paperwork had been filed in order that this change was reflected on her transcript.  Ms. Wright was also formally notified in this January 23 letter, that she had been reinstated to the program based on the granting of this grade appeal. (Book of Exhibits, Exhibit K, Lowe Attachment "5", Bates ID # CVCC000359).

        12.    The Mobility Program (ADN) requires that each nursing course be taken and passed.  If a student fails a nursing course like NUR 252, the student must retake that course and pass it. (Book of Exhibits,  Exhibit "A", Bates ID # CVCC000110, ¶¶ 11 and

7

13). The failure of NUR 252 alone in the Nursing Program would not be held against a student for purposes of graduating if that student successfully repeats the course failed and successfully completes the remaining course requirements of the Nursing Program. (Book of Exhibits, Exhibit "A", Bates ID # CVCC000110, ¶14).

13.    Ms. Wright had not satisfactorily completed NUR 252 with her earned grade of "D". Nursing Program policy states:

> "Students enrolled in the Nursing Mobility program must earn a 'C' or higher in all required courses in the nursing curriculum, in both nursing and non-nursing courses. This includes satisfactory completion of the clinical components of each course. Failure of the clinical components results in failure of the course.

> "Nursing courses NUR 252, 271, 272, 279, 291, and 292 may be repeated only once and are to be taken the next semester a course is offered provided space is available. If the student does not pass the course on the second attempt, that student shall be excluded from the nursing program, but not the College. Students who repeat 252, 271, 272, 291 and 292 will be encouraged to successfully complete review packets for each course before retaking."

(Book of Exhibits, Exhibit "A", Bates ID # CVCC000110, ¶¶ 11 and 13; Book of Exhibits, Exhibit "T"). Because Ms. Wright had failed to satisfactorily complete the course work in NUR 252 and, had lost her grade appeal regarding that course, she had to satisfactorily complete and receive academic credit for the substance of this course work before she could receive an Associate's Degree in Nursing from CVCC. (Book of Exhibits, Exhibit "A", Bates ID # CVCC000110, ¶¶11 and 13; Exhibit "K", p. 8; and Exhibit "M", pp. 144:22-145:18).

14.    However, due to a mandatory statewide curriculum change that had to be implemented by the Fall of 2006 for all State Nursing Programs, NUR 252 would not be offered as a course again at CVCC or any other Alabama State Education Institution.

8

(Book of Exhibits, Exhibit "K", pp. 8-9; Exhibit "2", p. 86:8-89:3). In other words, the Nursing curriculum and course of study would be the same at every college or university where nursing was taught. (Exhibit "2", pp. 86:8-89:3 and 94:9-21 to Plaintiff's Opposition to Defendants' Motion for Summary Judgment). One of the changes in the new curriculum that was being implemented at CVCC in the Fall of 2006, involved the termination of the course NUR 252. (Id.).

15.     Therefore, Dean Lowe and Dixie Peterson decided to allow Ms. Wright to take a new course that students would typically take in preparation for the Associate Degree in Nursing Program using the new curriculum so that Ms. Wright could attempt to successfully complete the program and graduate with her class in May of 2006. (Book of Exhibits, Exhibit "H", pp. 5-6; Book of Exhibits, Exhibit "K", pp. 8-9; Book of Exhibits, Exhibit "L", p. 146:15 - 22; Exhibit "2", pp. 86:8-89:3, 94:9-21, 142:15-143:18 and Exhibit "14" to Plaintiff's Opposition to Defendants' Motion for Summary Judgment). This course was NUR 200. (Id.) It was well-suited to be a substitution course for the now obsolete NUR 252 because it could be adapted by the instructor to fit and to teach the same or similar course material as the material studied in NUR 252. (Book of Exhibits, Exhibit "M", 143:7-145:18). Ms. Wright was advised of this decision in early January 2006. (Book of Exhibits, Exhibit "K", p. 9; Book of Exhibits, Exhibit "L", p. 146:15-22).

16.     Ms. Wright testified that she met with Dean Lowe and Dixie Peterson regarding her failure of NUR 252 and the fact she had to repeat the course content of NUR 252. (Book of Exhibits, Exhibit "L", 147:5-20). Ms. Wright explained that she was told that because NUR 252 was no longer being offered, she was being offered NUR 200 as a substitute. (Id.). She also stated regarding her understanding of this meeting that the "D"

9

she earned in NUR 252 would not come off her transcript, but that it would not be held against her. (*Id.*).

17.     The failing grade made by Ms. Wright in NUR 252 remained on her transcript and was considered one failure of a course for purposes of determining compliance with CVCC ADN graduation consideration. (Book of Exhibits, Exhibit "A", p.49, Bates ID #CVCC000052 and p. 106, Bates ID #CVCC000110; Book of Exhibits, Exhibit "H", pp. 3-5; Book of Exhibits, Exhibit "J", p. 15; Book of Exhibits, Exhibit "K", pp. 9-10; Exhibit "2", pp. 148:8 - 149:15 to Plaintiff's Opposition to Defendants' Motion for Summary Judgment). Specifically, according to CVCC policy, once a grade has been recorded, "it cannot be expunged from the student's permanent record." (Book of Exhibits, Exhibit "A", p.49, Bates ID #CVCC000052; Book of Exhibits, Exhibit "H", p. 3-5; Book of Exhibits, Exhibit "J", p. 15; Book of Exhibits, Exhibit "K", pp. 9-10).

18.     On January 17, 2006, Ms. Peterson emailed Heather Chaulkley, the secretary to Dean Lowe, advising Ms. Chaulkley that NUR 200 would be a substitute for NUR 252 for Ms. Wright.

> "The Nursing 200 is a new course, and is being offered for the first time this semester. It is a course reserved for those new ADN students who will be admitted to our May, 2006 program. Since Ms. Wright's failure of Nursing 252 stands, it will be necessary for her to repeat that course to reach a grade of "C" or better. Since the new standardized curriculum will be implemented with the new RN class that enters in May, 2006, Nursing 252 will not exist in the new curriculum. Therefore, in order for Lindy to repeat the course in the most closely resembling manner to Nursing 252, I will allow her to register for Nursing 200 which we will substitute (by authorization of the Dean) for Nursing 252. This means that if Lindy passes everything for which she is registered in the spring of 2006, she could still possibly graduate in May, 2006."

10

(Exhibit "14" to Plaintiff's Opposition to Defendants' Motion for Summary Judgment). On January 26, 2006, Dean Lowe officially approved the substitution of NUR 200 for NUR 252. (Book of Exhibits, Exhibit "K", p. 9; Exhibit "15" to Plaintiff's Opposition to Defendants' Motion for Summary Judgment). As such, Ms. Wright's failed grade of "D" in NUR 252 was not held against Ms. Wright for the purpose of graduating, assuming Ms. Wright successfully completed all of her Spring 2006 course work. (Book of Exhibits, Exhibit "K", p. 10; Exhibit "2", pp. 147:20 - 148:7 and Exhibit "14" to Plaintiff's Opposition to Defendants' Motion for Summary Judgment).

19.   Dixie Peterson asked Lynn Harris to use NUR 200 as a course platform and to structure NUR 200 to comport with the content of NUR 252 so that NUR 200 would be Ms. Wright's "repeat" of NUR 252 so that Ms. Wright had the opportunity to progress in the ADN program. (Book of Exhibits, Exhibit "J", p. 11).   Therefore, in the spring semester 2006, Ms. Wright took NUR 200 under Ms. Harris' instruction. (*Id.*).   This allowed Ms. Wright an opportunity to graduate in May of 2006 if she passed everything that she was registered for the spring of 2006. (Book of Exhibits, Exhibit "A", Bates ID # CVCC000110; Exhibit "14" to Plaintiff's Opposition to Defendants' Motion for Summary Judgment; Exhibit "2", p. 147:20 - p. 148:7). Ms. Wright made an "A" in NUR 200 satisfactorily completing the course content of NUR 252. (*Id.*).

20.   In addition to registering for NUR 200, which was Ms. Wright's repeat of NUR 252, Ms. Wright was also registered for NUR 272, NUR 279, and NUR 292. (Exhibits "10"

and "14" to Plaintiff's Opposition to Defendants' Motion for Summary Judgment). NUR 272 was taught by Lynn Harris.[1] (Book of Exhibits, Exhibit "J", p. 11).

21.    Even though Ms. Wright successfully completed NUR 200 in the spring of 2006, she only accumulated 747.25 points in NUR 272 when 750 points were needed to pass NUR 272. (Book of Exhibits, Exhibit "J", p. 14 and Harris Attachment "4"). Wright failed three of the four tests given in NUR 272 throughout the semester. (See Book of Exhibits, Exhibit "J", pp. 12-15 and Harris Attachment "4"). The final examination in NUR 272 was given on May 10, 2006. (Book of Exhibits, Exhibit "J", p. 10). Prior to the final and throughout the semester, Ms Wright had been provided the grades she had earned on tests and other course work. (Id.). After taking the final on May 10, 2006, Ms. Wright was told she failed the final examination and the course. (Id.).

22.    The failing grade received by Ms. Wright in NUR 252 remained on her transcript and was considered one failure of a course for purposes of determining compliance with CVCC ADN graduation consideration.[2] (Book of Exhibits, Exhibit "A", p.49,

---

[1] NUR 252 is listed on the syllabus as a prerequisite for NUR 272; however, the prerequisites listed in the Catalog and Handbook for NUR 272 are NUR 131, NUR 242, NUR 251 and BIO 201and 202. The syllabus for NUR 272, Pediatric Nursing, lists numerous prerequisites that are not found in the Catalog and Handbook. (Book of Exhibits, Exhibit "A", Bates ID #s CVCC000147 and CVCC000162; Book of Exhibits, Exhibit "E"). As indicated by Dean Hodge, the Catalog is based upon the requirements of the Alabama State Board of Education and sets forth the correct and official prerequisites for the courses in the ADN program and other programs at CVCC. (Hodge Affidavit attached hereto as Exhibit 1-Hodge).   The catalog takes precedence and priority over the classroom syllabus. (Id.). As such, in registering for nursing programs in the spring of 2006, the registration process was governed by the Catalog and not by the Syllabus. (Id.).

[2] According to CVCC policy, once a grade has been recorded, "it cannot be expunged from the student's permanent record." (Book of Exhibits, Exhibit "A", p. 49,

Bates ID # CVCC000052 and p. 106, Bates ID CVCC000110; Book of Exhibits, Exhibit "H", p. 3-5; Book of Exhibits, Exhibit "J", p. 15; Book of Exhibits, Exhibit "K", pp. 9-10; Exhibit "2", pp. 148:8-149:15 to Plaintiff's Opposition to Defendants' Motion for Summary Judgment). Because Ms. Wright had won the grade appeal in NUR 271, instead of three failed courses, she had two failed courses, NUR 252 and NUR 272, reflected on her permanent transcript. (Book of Exhibits, Exhibit "K", pp. 9-10; Exhibit "2", pp. 148:8-149:15). Under CVCC Nursing Mobility Admissions Criteria, two failed courses meant that Ms. Wright was excluded from the program. (Book of Exhibits, Exhibit "A", p. 106, ¶14).

23.     According to the nursing academic policies that were in effect at the time, Ms. Wright was excluded from the program unless, once again, she filed a successful grade appeal for NUR 272 and a failed course was changed to a passed course. (Book of Exhibits, Exhibit "A", Bates ID #s CVCC000049, CVCC000055, CVCC000110 (¶14), and CVCC000203-000204; Book of Exhibits, Exhibit "K", p. 11; Book of Exhibits, Exhibit "H", pp. 5-7).

24.     Grade appeal policy requires that a student first speak with her instructor regarding any concern regarding a final grade within seven calendar days of learning of the grade. If the conflict is not resolved with the instructor and the student wishes to appeal the grade further, the student must then file the "appropriate form" to the Division Chairperson or in some instances, the Dean of Instruction, "stating her concern regarding the grade and discussing the prior discussion with the instructor." (Book of Exhibits, Exhibit "A", p. 202, Bates ID CVCC000203).

---

Bates ID # CVCC000052).

25.    Ms. Wright learned of her grade in NUR 252 on May 10, 2006. (Book of Exhibits, Exhibit "J", p. 10; Book of Exhibits, Exhibit "L", p. 157:13-23). Eighteen days later on May 28, 2007, Ms. Wright sent Ms. Harris a letter requesting that Ms. Harris re-grade her Care Plans. (Book of Exhibits, Exhibit "J", p. 15 and Harris Attachment "7"). After review of Ms. Wright's request, Ms. Harris stated that it was her professional judgment based on Ms. Wright's poor performance in class and the opportunity Ms. Wright had already been given to redo the care plans, that Ms. Wright's grade of "D" in NUR 272 should stand. (Book of Exhibits, Exhibit "J", p. 16).  Ms. Wright stated that she was informed verbally by Ms. Harris that her care plans would not be regraded and that her grade would stand. (Book of Exhibits, Exhibit "L", p. 164:7- 14).

26.    Ms. Wright did not file a grade appeal for NUR 272. (Book of Exhibits, Exhibit "K", p. 11; Book of Exhibits, Exhibit "J", p. 16).

27.    Instead, Ms. Wright sought course forgiveness for NUR 252. On May 19, 2006, Ms. Wright filed her request for "course forgiveness" requesting her grade in NUR 200 replace her grade in NUR 252 with Dean David Hodge.[3] (Book of Exhibits, Exhibit "H" and Hodge Attachment "1"; Book of Exhibits, Exhibit "K", p. 11).

28.    According to CVCC policy, "course forgiveness"relates only to the manner in which the grade earned on the student's second attempt at a failed course would be viewed for GPA purposes. The policy specifically states: "If a student repeats a course,

---

[3] Ms. Wright's letter to Dean Hodge incorrectly quotes the "course forgiveness" policy.  She states, "The student handbook states, ' if *[sic]* a student repeats the *[sic]* course, the last grade awarded *[sic]* replaces the previous grade earned *[sic]*".  As noted by Dean Hodge in his October 15, 2007 affidavit, Ms. Wright fails to provide that the "last grade awarded replaces the previous grade in the **computation of the grade point average."**  (Book of Exhibits, Exhibit "H", pp. 3-4).

14

the last grade awarded (excluding grades of W) replaces the previous grade in the computation of the cumulative grade point average." (Book of Exhibits, Exhibit "A", p. 52, Bates ID # CVCC000055). Course forgiveness does not relate to erasing a failed course from a student's transcript. (Book of Exhibits, Exhibit "A", p. 52, Bates ID # CVCC000055; Book of Exhibits, Exhibit "H", p. 3).

29.    On May 19, 2006, Ms. Wright met with Dean Hodge regarding her request for course forgiveness. (Book of Exhibits, Exhibit "H", p. 2; Book of Exhibits, Exhibit "L", p. 164:15-19). Dean Hodge explained to Ms. Wright that according to CVCC policy, "course forgiveness" only allows for the improvement of a student's cumulative grade point average, and that it does not take away or erase a failing grade. (Book of Exhibits, Exhibit "A", p. 52, Bates ID # CVCC000055; Book of Exhibits, Exhibit "H", p. 3; Book of Exhibits, Exhibit "L", p. 148:7 - 9). He also explained to Ms. Wright that her failing grade in NUR 252 would not come off her permanent record, even if course forgiveness was applicable to her situation. (Book of Exhibits, Exhibit "H", p. 4).

30.    Dean Hodge also explained that even if Ms. Wright had been granted course forgiveness, it would NOT erase the failed grade of "D" she received in NUR 252. (Book of Exhibits, Exhibit "H", p. 5). As such, even if she had received "course forgiveness" and NUR 200 had replaced NUR 252 for the purposes of calculating her GPA, Ms. Wright would still have two failures on her permanent transcript and still be excluded from the Nursing Program. (Book of Exhibits, Exhibit "A", p. 52, Bates ID # CVCC000055; Book of Exhibits, Exhibit "K", p. 11; Book of Exhibits, Exhibit "H", p. 5).

31.    It is undisputed that Ms. Wright was informed and received copies of CVCC's policies and procedures. (Book of Exhibits, Exhibit "K", Lowe Attachment "12"; Book of

15

Exhibits, Exhibit "L", pp. 134:16-20; 145:14-17; 146:11-14; 148:3-6; 148:12-16; 165:22-166:2; 171:17-172:10; 306:23-307:18; 307:20-308:10; 308:20-309:1; 309:21-310:8; 310:9-18; and 313:4-8). She stated throughout her deposition that she was aware of and had "researched" CVCC policy and procedure. (Book of Exhibits, Exhibit "L", pp. 134:16-20; 145:14-17; 146:11-14; 148:3-6; 148:12-16; 165:22-166:2; 171:17-172:10; 306:23-307:18; 307:20-308:10; 308:20-309:1; 309:21-310:8; 310:9-18; and 313:4-8). She was well aware that two failures in the Nursing Program resulted in disqualification or exclusion from the Nursing Program. (Book of Exhibits, Exhibit "L", pp. 148:12 -16 and 306:23-307:18). She followed grade appeal policy and procedure as demonstrated by her filing of grade appeals for NUR 252 and NUR 271 at the end of the fall 2005 semester. In fact, she was successful regarding her NUR 271 grade appeal. Ms. Wright also stated she researched the course forgiveness policy and spoke to Dean Hodge regarding course forgiveness. (Book of Exhibits, Exhibit "L", p. 148:4-6).

32. After being excluded from the nursing program, Ms. Wright filed this action. She alleges that Defendants violated her Fourteenth Amendment Due Process Rights as guaranteed by federal law, particularly 42 USC §1981 and §1983, Alabama contract and tort laws, and that Defendants engaged in a civil conspiracy against her. In support of her claims, she alleges without any factual support or basis, that other Chattahoochee Valley nursing students, whom she believes also failed courses and had "similar" academic experiences to those she had, were given special and/or preferential treatment allowing them to continue in the program and graduate.

16

## PREFACE TO ARGUMENT

This matter is not complex or difficult to understand. However, the factual aspects of this case and the Plaintiff's legal theories and allegations are very difficult to understand if one only reads the Complaint. It is, therefore, important to understand the facts of the case by distinguishing and separating the "wheat from the chaff". That is one of the objectives of this Brief.

Further, the Respondent's Brief is also confusing in some respects because of the use of terminology that is inconsistent with the terminology set forth in the CVCC Catalog and Student Handbook. For example, various terms are used in the Plaintiff's Brief like "grade forgiveness". "Grade forgiveness" is not a term that is used or defined in the CVCC Catalog. There are two terms, however, that are important to an understanding of the facts of this matter that are set forth and defined in the Catalog. One of those terms is "grade appeal". A "grade appeal" was filed by Ms. Wright in December 2005 with respect to two different courses that Ms. Wright failed in the fall semester of 2005. She filed a grade appeal in NUR 252, Adult Nursing II, and in NUR 271, Maternal Newborn Nursing. The Grade Appeal Procedure is set forth in an attachment to the Defendant's Brief on Motion for Summary Judgment at Exhibit "A," Bates I.D. #s CVCC 000203 and CVCC 000204.

Another term used and defined in the Catalog is "course forgiveness". The definition and requirements of "course forgiveness" are also set forth in the Catalog. (Book of Exhibits, Exhibit "A", CVCC 000055; Book of Exhibits, Exhibit "H", p. 2-4) A grade appeal and course forgiveness are two entirely different things.

There is also a fact that needs to be clarified from the standpoint of documents produced by CVCC. In the course syllabus for NUR 272, Pediatric Nursing, taught by Lynn

17

Harris, NUR 252, Adult Nursing II, is listed as a prerequisite. The Court will notice in that exhibit, which is Exhibit "E" to the Defendants' Brief on Motion for Summary Judgment, that virtually every course in the ADN curriculum is set forth in the syllabus. Nevertheless, the syllabus is incorrect in listing NUR 252, Adult Nursing II, as a prerequisite for NUR 272, Pediatric Nursing. The additional affidavit of Dr. David Hodge, the official at CVCC who is most competent to testify regarding this matter, is attached to this Brief as Exhibit 1-Hodge. In this affidavit, Dr. Hodge explains that the Catalog establishes these prerequisites to the various ADN courses. The Catalog is based upon the requirements of the Alabama State Board of Education. Dr. Hodge identifies the identification numbers of the pages contained in Exhibits "A" and "B" to these Defendants' Brief on Motion for Summary Judgment that demonstrate that NUR 252 is not a prerequisite to NUR 272.

Additionally, at page 10 of the Plaintiff's Brief in Response, Ms. Wright's testimony concerning NUR 272, the Pediatric Nursing course that she failed in the spring of 2006, is both referenced and quoted as follows:

> "Also in the spring semester 2006, Wright enrolled in NUR 272, Pediatric Nursing, taught by Harris. Wright testified during her deposition that a week before the final exam, she met with Harris who told her she needed 180 points to pass the course (Wright Depo. pp. 154-155, Exhibit 1). Wright got a "D" grade in NUR 272. Wright avers that she would have earned the necessary 180 points if Harris had 'been available to go over tests, go over any kind of remediation for any student, not just myself, anybody' and that such remediation would have prepared her to pass the course."

(Wright Depo. p. 155:18-23, Exhibit 1; Plaintiff's Opposition to Defendants' Motion for Summary Judgment, p. 10).

While Plaintiff quotes only a small portion of this testimony, when Ms. Wright's deposition was taken, she was asked other questions and provided additional information to the information provided above. Attached to this Brief is page 155 of Ms. Wright's

18

deposition (See Exhibit 2-Wright) which sets forth the following question and answer series:

> "Q.    One or two weeks before the final exam in NUR 272, you met with Lynn Harris; is that right?
>
> A.    Correct.
>
> Q.    And she said all you need is 180 points?
>
> A.    Uh-huh.  (Positive response.)
>
> Q.    Is that right?
>
> A.    Yes.
>
> Q.    You need to say yes.
>
> A.    I'm sorry.  Yes, sir.
>
> Q.    That's all right.  Was it possible at that time to get 180 points?
>
> A.    Oh, sure it was.
>
> Q.    And how would you have done that?
>
> A.    If she would have been available to go over tests, go over any kind of remediation for any student, not just myself, anybody.
>
> Q.    How does that get you points?
>
> A.    That refreshes- - refreshes for tests.  That just prepares you even more."

However, when Ms. Wright filed her grade appeal in NUR 252 on December 20, 2005, approximately six months prior to the time referred to in her testimony above regarding NUR 272, she made the following statement which is found in the Plaintiff's Brief, p. 6, ¶ 2:

> "The instructor did not post nor make available exam grades in a timely manner.  Due to lack of communication by instructor, I was unaware that I

19

was in jeopardy of failing this class until one to two week(sic) before the final exam. When questioned, the instructor stated 'all you have to make is another 180 points' and you will pass. No tutoring or remediation was offered at that point."

These two statements, one of which relates to NUR 272, which supposedly occurred in May 2006, and the other of which relates to NUR 252 and supposedly occurred in December 2005, are virtually identical. Counsel for the Defendants suggests that there is little likelihood that both of these statements are correct or occurred.

These Defendants, of course, adopt the arguments and exhibits set forth in or attached to their initial Brief. Defendants' initial Brief responded to and sought Summary Judgment regarding the Complaint's specific counts which set forth three basic theories of action which include: Count I - Violation of Due Process; Count II - Civil Conspiracy and Violation of 42 USC §1981; and Count III - Tort of Outrage. In the Plaintiff's Brief at page 25, the Plaintiff's counsel makes the following statement: "A prima facie case of conspiracy under §§1981, 1983 and 1985 requires a violation of Plaintiff's federal rights and an agreement among Defendants to violate those rights." The undersigned has not yet found any other reference to §1985 in the Plaintiff's Brief. There is no reference to §1985 in the Plaintiff's Complaint. With all due respect to the Plaintiff's attorneys, the Complaint itself is a rambling, factually and chronologically confused document. Pleadings should be "simple, concise and direct." Fed. R. Civ. P. 8(e)(1). With regard to cases involving §1983 and potentially other civil rights statutory provisions like §1981, the court has tightened and heightened the pleading requirements "in an effort to eliminate nonmeritorious claims on the pleadings and to protect public officials from protracted litigation involving specious claims." *Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1485 (11th Cir. 1992); *Arnold*

20

*v. Board of Education of Escambia County*, 880 F.2d 305, 309 (11th Cir. 1989). Of course,

a Motion to Dismiss was not filed in the instant case. However, these Defendants should

be entitled to rely upon the Plaintiff's statement of claims or causes of action in the

Complaint, particularly in view of the fact that this is primarily a §1983 case and the

pleading requirements are more stringent. Nevertheless, counsel for Defendants will

respond to the heretofore unstated §1985 reference as though it were a stated theory of

action pled in the Complaint, in view of the fact that Plaintiff did at least mention it in her

Brief, and in view of the fact that §1985(3) does deal with certain types of conspiracy

claims.

The above Preface, having been set forth for clarification purposes, these

Defendants make the following arguments and reply to the Plaintiff's Response Brief.

## ARGUMENT

**I.     There Is No Genuine Issue of Material Fact Regarding the Plaintiff's Due Process Claim and The Defendants Are Entitled To Judgment As a Matter Of Law.**

The Plaintiff's Brief makes it clear that the Plaintiff seeks a reconsideration of the

grade appeals that she filed in December 2005 after failing NUR 252, Adult Nursing II, and

NUR 271, Maternal-Newborn Nursing. These Defendants submit that the only issue

regarding any grade appeal is whether the process itself was adequate.

The Grade Appeal Procedure found in Exhibit "A", CVCC 000203 and CVCC

000204, does not provide and contains no provision mandating that the Dean of Instruction

find in favor of the student because of the failure of an instructor to submit a written

response. Dean Lowe, in Ms. Wright's case, ruled in her favor for NUR 271 because the

instructor of that course did not provide a written response and Dean Lowe, therefore, could not, in his opinion, adequately consider the appeal within the fourteen day time period allotted to him under the procedure. The Division Chairperson for Nursing, Dixie Peterson, recommended to Dean Lowe that he rule in favor of Ms. Wright and change her grade in NUR 271 from a "D" to a "C". Therefore, Ms. Wright won her grade appeal on NUR 271 and was allowed to remain in the Nursing Program by virtue of her grade being changed to a "C".

The Court will recall that Dixie Peterson, on December 20, 2005, sent a letter to Ms. Wright advising her that she was at that time excluded from any further participation in the Nursing Program. (Book of Exhibits, Exhibit "K", Lowe Attachment "1", ¶14 and Lowe Attachment "2"). That letter states in part as follows:

> "The policy states that a student is allowed a maximum of two failures in the L.P.N. or A.D.N. Program before he/she is dismissed from the program, and withdrawals from nursing courses are counted as failures except in the extenuating circumstances as determined by the Division Chair Person. A student cannot progress in the program until the course failed has been successfully repeated."

(Book of Exhibits, Exhibit "K", Lowe Attachments "1" and "2"; Exhibit "2", pp. 133:19-136:19 to Plaintiff's Opposition to Defendants' Motion for Summary Judgment).

This partial quote from the letter, which is addressed to Lindy Wright and dated December 20, 2005, clearly states that a student who fails a course cannot progress in the program until the course failed has been successfully repeated. Additionally, the letter is clear in stating that two failures require dismissal from the program. This letter is consistent with ADN policy (Book of Exhibits, Exhibit "A", p. 106 ¶14, Bates I.D. #CVCC 000110). Specifically, see the following paragraphs of this document which is entitled Mobility Program ADN Admissions Criteria:

22

"11.    Students enrolled in the Nursing Mobility program must earn a 'C' or higher in all required courses in the nursing curriculum, in both nursing and non-nursing courses.  This includes satisfactory completion of the clinical components of each course.  Failure of clinical components results in failure of the course.

12.    Nursing courses 131, 242, and 251 may be taken only once.  A student who fails to earn a 'C' in any one of these courses must reapply to the nursing program. If a student fails to earn a 'C' in two or more of the courses listed above, he/she will be excluded from the program and unable to reapply.

13.    Nursing courses NUR 252, 271, 272, 279, 291, and 292 may be repeated only once and are to be taken the next semester a course is offered provided space is available.  If the student does not pass the nursing course on the second attempt, that student shall be excluded from the nursing program, but not the College.  Students who repeat 252, 271, 272, 291, and 292 will be encouraged to successfully complete review packets for each course before retaking.

14.    The nursing student must complete the entire nursing program within twenty-four months of the date he/she begin(sic) his/her studies in the program or be excluded from the nursing program.  If a nursing student fails two different nursing courses within the twenty-four-month period, he/she will be excluded from the program and CANNOT reapply.  Exclusion from the nursing program does not constitute exclusion from the College.

(Book of Exhibits, Exhibit "A", p. 106, Bates I.D. #CVCC 000110).

As the Court knows, Ms. Wright received a copy of the Catalog and signed for her copy of the Catalog on April 7, 2005.  (Book of Exhibits, Exhibit "K", Lowe Attachment 12.) Ms. Wright had access at all material times to a copy of the Catalog. (See ¶31, p. 16 of Defendants' Reply, *supra*).  The Catalog contained a number of sections requiring that the student be responsible for the student's schooling and compliance with admissions criteria.

"9.    Once a student is admitted to the Nursing Mobility program, he/she will be responsible for accurately following the admissions criteria and the nursing curriculum design.

10.    Once provisionally admitted to the program, the student must complete all course work at the college, unless written approval is obtained from the Division Chairperson and the Dean of Instruction.

20.    In addition to the above specification, students in the Nursing Mobility program must fulfill the same requirements and regulations expected of all students who are admitted to the College and outlined in the Nursing Student Handbook."

(Book of Exhibits, Exhibit "A", p. 106-107, Bates I.D. #CVCC 000110-000111).

Based upon all of the above, Ms. Wright knew or should have known the significance of two failures, the benefit of being awarded a "C" in NUR 271 and the significance and essential nature of the other decisions made by CVCC throughout her tenure at CVCC.  (See ¶31, p.16 of Defendants' Reply, *supra*).Further, Ms. Wright knew or should have known the importance of study and preparation and the necessity of taking responsibility for her conduct and diligence in the ADN Program.  Nursing is a profession of significance.  The wellbeing and health of patients is an awesome responsibility and one which should not be taken lightly or gained by virtue of "degree by lawyer".

### NUR 252

Ms. Wright also filed a grade appeal in December 2005 with regard to NUR 252, Adult Nursing II, which Ms. Wright also failed in the fall semester of 2005.  The facts stated in the above Undisputed Facts section of this Brief demonstrate that Ms. Wright received more than adequate due process in this Grade Appeal Procedure.  Not only did Ms. Wright file a written grade appeal which set forth all of her complaints, but Ms. Harris, the instructor for NUR 252, filed a statement, Dixie Peterson, the Division Chairperson, reviewed this material and filed a recommendation to Dean Lowe that the grade in NUR 252 remain as given and not be changed to a passing grade.  After Dean Lowe received

24

the grade appeal, he commissioned two independent experts to review all material related to the grading of Ms. Wright's material in NUR 252. These two experts traveled to Phenix City, Alabama from the nursing school at which they were instructors of the same or a similar course, and reviewed this material. These two experts, Carol Williams and Candace Short, provided Dean Lowe with a handwritten report and recommendation on January 13, 2006, which included the following statement: "Again, after careful review of the course syllabus, student exams and documentation from Ms. Harris and the student, we recommend the final grade of 'D' remain." (Book of Exhibits, Exhibit "K", Lowe Attachment "9", Bates I.D. #CVCC 000357).

After reviewing all of the material provided to him and otherwise fulfilling the Grade Appeal Procedure, Dean Lowe ruled that the failing grade of "D" in NUR 252 should stand. A letter dated January 17, 2006 was sent to Ms. Wright by Dean Lowe advising her that her grade appeal in NUR 252 was denied. (Book of Exhibits, Exhibit "K", Lowe Attachment "10", Bates I.D. #CVCC 000304).

In addition to the law cited in the Defendants' initial Brief, these Defendants also provide the following case law supportive of their position that more than adequate due process was provided to Ms. Wright with regard to NUR 252 and all other aspects of the matters which resulted in her being excluded from further participation in the ADN Program in May 2006 upon her failure of NUR 272. In *Hammond v. Auburn University*, 669 F.Supp. 1555 (M.D. Ala.1987), Judge Joel Dubina, at that time a United Stated District Court Judge, considered a case where an Auburn engineering student was refused graduation and further participation in the engineering program where Auburn changed certain

25

requirements in its Bulletin regarding graduation from the engineering program. Judge Dubina granted Summary Judgment in favor of Auburn University.

One of the bases for this ruling was that the Bulletin applicable to the student, Hammond, contained a *caveat* on the first page wherein Auburn reserved the right to make changes "as required in course offerings, curricula, academic policies and other rules and regulations affecting students, to be effective whenever determined by the University." *Hammond,* 669 F.Supp. at 1557.

The CVCC Catalog applicable to Ms. Wright contains the following provision: "The college reserves the right to change, modify, or alter, without notice, the policies, fees, charges, expenses and costs of any kind and further reserves the right to add or delete, without notice, any course offerings or information in this Catalog/Student Handbook. . . Policy statements and program requirements in this Catalog are subject to change." (Book of Exhibits, Exhibit "A", Bates I.D. #CVCC 000003). In fact, Auburn did make a change with regard to its engineering program regarding graduation requirements. *Hammond,* at 1557. This change was made two years after Mr. Hammond entered the engineering program. *Id.* The change implemented a more rigid GPA requirement. *Id.* Mr. Hammond did not meet this requirement. *Id.,* at 1555. His academic situation was reviewed by Engineering Department professors at Auburn. *Id.* These professors recommended that he be suspended from the program. *Id.* The head of the College of Engineering spoke informally with other Auburn officials and, thereafter, informed Mr. Hammond that his work was unsatisfactory and that he would no longer be permitted to register for electrical engineering classes. *Id.*

26

Mr. Hammond was permitted to pursue other curricula at Auburn, but not engineering. *Id.* Mr. Hammond filed a formal written appeal with the Auburn Student Academic Grievance Committee. *Id.* The committee heard the matter and agreed with the electrical engineering faculty. *Id.* Mr. Hammond made further appeal with no success. *Id.*

In granting Summary Judgment, Judge Dubina, of course, relied upon the case of *Board of Curators University of Missouri v. Horowitz*, 435 U.S. 78 (1978). *Hammond,* at 1560. He also relied upon *Regents of University of Michigan v. Ewing*, 474 U.S. 214 (1985). *Hammond,* at 1561. Both of these cases are cited in the Defendants' initial Brief. In making his ruling, Judge Dubina made the following statement:

> ". . . the language supports the court's theory in *Horowitz, supra*, that the widest possible range of discretion must be offered university faculties in their evaluation of a student's academic performance and eligibility to promotion or graduation. Clearly, this court can only review an academic decision in light of whether or not the person or committee responsible did not actually exercise professional judgment."

*Hammond*, at 1561.

Judge Dubina also considered a contract theory raised by Hammond. *Id.,* at 1561-62. He did not find that a contract existed based upon the Bulletin applicable to Hammond but, instead, assumed arguendo that some sort of educational contract did exist by virtue of the Bulletin. *Id.,* at 1562. He, thereafter, found that there was no contract breach. *Id.* In making this finding, Judge Dubina cited the *caveat* on the first page of the Auburn Bulletin, which is virtually the same *caveat* quoted above and found in the CVCC Catalog. *Id.* With regard to Ms. Wright, assuming arguendo that same sort of educational contract existed, there was no contract breach.

27

Judge Dubina cited *Mahavongsanan v. Hall*, 529 F.2d 448 (5th Cir. 1976). *Hammond,* at 1560. The *Hall* case is particularly relevant to the instant case. In *Hall*, Georgia State University refused to award the plaintiff a Master's Degree in Education. *Hall,* 529 F.2d at 449. The Plaintiff claimed she was denied procedural and substantive due process and claimed breach of contract. *Id.* The District Court permanently enjoined Georgia State from withholding the degree sought by the plaintiff. However, the Fifth Circuit reversed the case. One of the important points discussed by the Fifth Circuit in reversing the District Court was Georgia State University's right to eliminate an ongoing stigma created by the erosion of their reputation for integrity in the academic certification process. *Id.* Georgia State argued that its academic integrity would be jeopardized if the Court ordered the granting of a diploma to the plaintiff because a diploma constitutes the School's public endorsement of the plaintiff's competence and achievement which would be unmerited. *Id.*

Ms. Wright, in the instant case, complained that Dixie Peterson, the Division Chair of the Nursing Program at CVCC, commented to two instructors that Ms. Wright was a "weak" student. The Plaintiff argued, without submitting any proof, that the reason for Ms. Peterson's making this comment was that she was concerned about the school's retaining its certification from the Alabama Board of Nursing. The Plaintiff argues that this concern is somehow sinister or inappropriate. However, the *Hall* case puts this argument to rest. Schools of higher education have rights with regard to their academic standing, their integrity as an institution and their continuing ability to maintain academic freedom in the decision-making process with regard to their students.

28

## NUR 272, PEDIATRIC NURSING

The Plaintiff, Lindy Wright, was allowed to move forward in the Nursing Program in the spring semester of 2006. The ADN rules previously cited require that a nursing student who fails NUR 252 is allowed one additional chance to pass it by retaking the course. NUR 252 was not being offered again in the fall of 2006 which was its normal time for being offered. A new curriculum would be taking the place of the curriculum in existence when Ms. Wright entered the ADN Program. Therefore, pursuant to the discretion allowed and for the benefit of Lindy Wright, Dixie Peterson, Dr. James Lowe and Lynn Harris agreed that she would be allowed to take NUR 200, which was a course in the new nursing curriculum, and which could be readily adapted to cover the NUR 252 material. The best explanation of this decision is set forth in Ms. Peterson's January 17, 2006 email to Heather Chalkley. (Book of Exhibits, Exhibit "H", Affidavit of David N. Hodge, Attachment 4, CVCC 000249). Ms. Wright testified in deposition with regard to the substitution of NUR 200 "in the place of 252" the following:

> "I talked to an attorney about it, and she had contacted Dean Lowe. And we thought we had come to an agreement, so I said, fine, because I didn't want to argue. Fine.

Q.    You're talking about come to an agreement with regard to what?

A.    The 252.

Q.    What agreement did you think you had come to with Dean Lowe?

A.    He told me- - his words were, the 'D' will not come off of your transcript, but it will not be held against you. So we're going to offer you Nursing 200 in place of 252 because the course curriculum is changing. And that also came from Dixie Peterson.

Q.    All right. Tell me again what they said. The 'D' will not come off?

A.     The 'D' will not come off of your transcript, but it will not be held against you."

(Exhibit "L", Deposition of Lindy Wright, page 146, line 23 through page 147, line 20.)

Ms. Wright went on to testify as follows:

"A.     At that point, I knew nothing about course forgiveness, so Dixie had made that comment. So I went and researched in the course catalog, and it stated the procedure for course forgiveness. You ask the dean of students, write a letter. I took a letter to Dean Hodge, presented it to him and then waited for a response. Nowhere in the course catalog did it say that the nursing program was exempt from that.

Q.     It does say in the nursing portion of the catalog that two failures or two courses with a 'D' disqualifies you, though, doesn't it?

A.     Correct, it does. But at that point, I did not have two 'D's. That semester, there was no - - there was only one.

Q.     I'm not sure I understand what you're saying. You're saying - - you're talking, I guess - -

A.     Talking about the second semester, 252 and 271.

Q.     Right.

A.     The OB and the med-surge - -

Q.     271 got changed to a C?

A.     Correct.

Q.     That was in the fall of 2005, fall semester.

A.     Correct.

Q.     It was. And then in January of 2006, you entered into the spring term for 2006?

A.     (Witness nods head up and down.)

Q.     And so I guess what I'm confused about is, you said at that time, I did not have two 'D's.

30

A.   No. I had the 'D' in 252 that I was told would not be held against me. In return, I made an A in Nursing 200, which the <u>200 replaced that 252 that I would have had to take the following year</u>.

Q.   When you said at that time I did not have two D's, what is that time?

A.   That time was that second semester when I took Nursing 252 and 271. There were not two 'D's. That 'D' in OB was changed to a 'C'.

Q.   Right.

A.   Correct.

Q.   Okay. At that time, you did not have. . . All right. Are you saying that you had a 'D' in 252 and that you met with Dixie and Dean Lowe?

A.   Uh-huh. (Positive response.)

Q.   And - -

A.   In the process of the grade appeal.

Q.   And when was this?

A.   That was before that second semester - - I mean that last semester had started, right before - - it might have been when I got confirmation that I could come back to school. It was maybe a day or two into class time.

Q.   So late December, early January - - late December '05, early January '06?

A.   Early January.

Q.   You're saying you met with Dixie Peterson and Dean Lowe?

A.   Uh-huh. (Positive response.)

Q.   And they talked to you about taking 200 instead of 252 because 252 would not be offered again?

A.   Correct.

Q.   And you're saying that is the time at which you did not have two 'D's, right?

31

A.      Yes, sir.  They had told me that the 'C' - - Dixie told me that it was at
        her discretion that that 'C' would be changed to a 'D' because Tawyna
        Cash did not follow up with the grade appeal process.  She didn't turn
        in some kind of paperwork that she was supposed to have finished.

Q.      So that the 'D' that you made in 271 was changed by the school to a
        'C'?

A.      Uh-huh.  (Positive response.)

Q.      You moved into the spring semester of 2006 with one 'D' in 252.  In
        the spring term, you made a 'D' in 272, right?

A.      Correct.

Q.      Which gives you two 'D's or two courses that were failed; isn't that
        right?

A.      At that time, yes." (This answer continues.)

(Exhibit "L", Wright Depo., page 148, line 1 through page 151, line 22.)

It seems quite clear that the "agreement" described by Ms. Wright is consistent with
the Catalog.  If Dean Lowe said, "the 'D' will not come off of your transcript," that is
absolutely correct.  The Catalog states that same fact as previously cited in these
Defendants' initial Brief and repeated again here in Defendants' Undisputed Facts.  The
Catalog was available at all times to Ms. Wright and she even states that she had never
heard about course forgiveness.  She heard about course forgiveness after Dean Lowe
and Ms. Wright made the "agreement" as she calls it.  As previously cited in these
Defendants' initial Brief, the course forgiveness definition and procedure is stated in the
Catalog.  The Court will recall that on May 19, 2006, Ms. Wright delivered a letter to Dean
Hodge, the Dean of Student and Administrative Services, which speaks volumes
concerning Ms. Wright's understanding of course forgiveness. The course forgiveness

policy as set forth by Ms. Wright in her May 19 letter and quoted by Dean Hodge in his affidavit at page 3, (Book of Exhibits, Exhibit "H", p. 3), is an unfortunate paraphrase by Ms. Wright of a portion of the course forgiveness policy that was incomplete, as quoted, and that ends at a critical place in the "quoted" sentence. Ms. Wright ended the quote just before the part of the sentence which demonstrates that course forgiveness is not defined the way Ms. Wright wanted it to be defined. She understood and she could not bring herself to finish the sentence. Ms. Wright appears to have been grasping at straws at this point. (See Book of Exhibits, Exhibit "H", pp. 2-4, and Hodge Attachments "1" and "2".)

The failing grade of "D" earned by Ms. Wright in NUR 272 in the spring semester of 2006 constituted her second official failure and required her exclusion from the program. While Ms. Wright did make an "A" in her repeat of NUR 252 by way of being allowed to substitute NUR 200 for that course, for the purpose of complying with ADN requirements, she simply did not pass NUR 272, Pediatric Nursing. Ms. Wright took every measure that is conceivable in an effort to remain in school after failing NUR 272, with the exception of filing a grade appeal in that course, but to no avail. For example, Ms. Wright sent Ms. Harris, the instructor in NUR 272, her clinical care plans and requested that Ms. Harris review them and re-grade them so Ms. Wright could pass the course. (Book of Exhibits, Exhibit "J", p. 15-16, and Harris Attachment "7"). Of course, Ms. Harris had not originally graded these clinical care plans. Ms. Harris was the supervising instructor and the classroom teacher. Ms. Wright was supervised and graded in the clinical part of NUR 272 by two other instructors. (Book of Exhibits, Exhibit "J", p. 14). Ms. Harris made her determination based upon all of the information available to her with regard to Ms. Wright's academic work, including her failure of three out of four classroom tests and the earning

33

of only five points above a failing grade on the fourth test. Ms. Harris also considered the fact that Ms. Wright had been given an opportunity to redo both of her clinical care plans and had chosen to redo only one of them on which she made a much higher grade. Ms. Harris determined that Ms. Wright's failing grade of "D" was appropriate and commensurate with Ms. Wright's understanding and grasp of the course materials and their application and that, in Ms. Harris's professional judgment, the failing grade of "D" was an accurate measurement of Ms. Wright's lack of conformance with and failure to meet NUR 272's course requirements. (Book of Exhibits, Exhibit "J", pp. 15-17). The grade of "D" earned by Ms. Wright and fully considered a second time by Ms. Harris, the instructor, was allowed to stand. Ms. Wright did not file a grade appeal with regard to NUR 272, which ended consideration of her grade in that course. (Book of Exhibits, Exhibit "K", p. 11; Book of Exhibits, Exhibit "J", p. 16).

Ms. Wright was notified that she was excluded from the Nursing Program, but she was not excluded from the College. As set forth in the ADN Admission Criteria, Ms. Wright could have enrolled in another curriculum at CVCC and continued her education. (Book of Exhibits, Exhibit "A", p. 106). She apparently chose not to do so. Additionally, as per the affidavits of Dean Hodge and Lynn Harris, Ms. Wright can re-enroll in the ADN Program at CVCC after the passage of two years from the date of her exclusion from the program. (Book of Exhibits, Exhibit "H", p. 6-7 and Hodge Attachment "7"; Book of Exhibits, Exhibit "J", p. 17-18 and Harris Attachment "8"). Therefore, Ms. Wright may, if she chooses, seek to apply for admittance in the ADN Program at CVCC in the future.

Based upon all undisputed facts and the law related to the issues concerning due process, it seems clear that Ms. Wright was not denied due process in any way with regard

34

to her academic performance at CVCC; therefore, in view of the fact that the fundamental basis of Ms. Wright's Complaint has no merit, the entire Complaint should be dismissed and these Defendants should be granted Summary Judgment herein.

**II.    §§1981 and 1985 Do Not Apply and Provide No Basis For A Cause of Action in Favor of Ms. Wright.**

These Defendants, in their initial Brief, have already argued that 42 USC §1981 requires an allegation of race discrimination. There is no such allegation here. The undersigned cannot tell from the Plaintiff's Brief whether the Plaintiff disagrees with this argument or not. Nevertheless, it is a correct interpretation of §1981 that an allegation of race discrimination is required and proof of race discrimination is necessary for Plaintiff to recover under its provisions. *McDonald v. Santa Fe Trail Transport Co.,* 427 U.S. 273 (1976). The term "race" has been defined somewhat broadly for purposes of §1981. For example, the Court has held that, if a defendant's animus is directed toward these groups, a cause of action can be stated under the Act in favor of both Jews and Arabs. *The Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617 (1987); *St. Francis College v. Al-Khazraji,* 481 U.S. 604, 613 (1987). These cases were decided at a time when race was considered to includ certain ethnic groups. Nevertheless, the Court held in these cases that plaintiffs should plead race discrimination, rather than discrimination based solely on national origin or religion in order to fit under the §1981 scheme. *Shaare Tefila,* 481 U.S. at 617-618; *Al-Khazraji,* 481 U.S. at 613. In order to prove a case under §1981 for discrimination, the plaintiff must prove intentional discrimination. *General Building Contractors Ass'n, Inc., v. Pennsylvania,* 458 U.S. 375, 382-383 (1982).

35

With regard to §1985(3), virtually the same requirement exists with respect to race. The only difference in a §1985(3) claim is that, in addition to race, a §1985(3) conspiracy claim may be filed where class-based animus is exhibited. *L.Q.A., by and through, Arrignton v. Ebberhart,* 920 F. Supp. 1208, 1228 (M.D. Ala. 1996), citing *United Brotherhood of Carpenters and Joiners of America,* Local 610, *AFL-CIO v. Scott*, 463 U.S. 825, 828-29 (1983). This means that where a class of plaintiffs recognized under this statute are the victims of discrimination, instead of an individual, in some situations §1985(3) may be used to provide a remedy. However, the plaintiff class must show invidiously discriminatory animus behind the conspirators' action. *Griffin v. Breckinridge,* 403 U.S. 88, 101-102 (1971); *L.Q.A., by and through, Arrington v.Ebberhart*, 920 F.Supp. 1208, 1229 (M.D. Ala. 1996); *United Brotherhood of Carpenters and Joiners of America,* Local 610, *AFL-CIO v. Scott*, 463 U.S. 825-826 (1983); *Jacobson v. Industrial Foundation of the Permian Basis,* 456 F.2d 258, 259 (5th Cir. 1972). The main focus of §1985(3) is on racial discrimination.

There is no allegation in the Complaint of race discrimination. Additionally, there is no allegation in the Complaint of any class-based invidiously discriminatory animus. Certainly, there is no proof of these allegations. For these reasons alone, §1985(3) is inapplicable.

Further, there can be no conspiracy under §1985(3) where there is no underlying wrong. *United States v. Guest,* 383 U.S. 745, 755 (1966). Additionally, see *L.Q.A.* supra.

Additionally, a conspiracy theory under §1985(3), §1981 or §1983 fails in the instant case because an entity cannot conspire with itself or its agents. *Hilliard v. Ferguson,* 30

36

F.3d 649, 653 (5th Cir. 1994). In this §1983 case, Hilliard brought a suit against the school superintendent and the school board, arising from their denial of employment to him. *Hilliard*, 30 F.3d at 651. Hilliard claimed a conspiracy existed between the superintendent and the school board. *Id.* The Fifth Circuit Court of Appeals disagreed that Hilliard had a cause of action for conspiracy, stating that a corporation cannot conspire with itself any more than a private individual can and that the general rule provided that the acts of the agent are the acts of the corporation. *Id.,* at 653. The court applied this rule to the superintendent and the school board. *Id.* In like fashion, CVCC and its employees cannot conspire with one another and all conspiracy theories of any kind whatsoever in this case must be dismissed. See also *Hartman v. Board of Trustees of Community College District 508,* 4 F.3d 465, 470-471 (7th Cir. 1993).

For the above reasons, the theories of action and claims based upon §1981, and §1985 should be dismissed and these Defendants should be granted Summary Judgment on them.

## III.    There Is No Culpable Intent To Deprive The Plaintiff of Any Right.

There is no evidence of an intention to deprive Ms. Wright of any right, privilege or immunity and, in fact, she has not been deprived. The only potential argument that the Plaintiff hints at with regard to intention to deprive the Plaintiff of any rights occurred in early August 2005. Exhibit "A" to the Defendants' Brief contains the schedule of classes for the summer semester of 2005. (Book of Exhibits, Exhibit "A", Bates I.D. CVCC 000008 - 000015). This exhibit demonstrates that final examinations were given between August 3 and August 5, 2005. (Book of Exhibits, Exhibit "B", CVCC 000011). The deposition of

Sandra Gunnells, one of the former instructors at CVCC who abruptly quit and walked off

the job on August 31, 2005, after fall semester classes had begun, not only helped the

Plaintiff research other possible answers to the Plaintiff's handwritten paraphrases of test

questions in December 2005 for her grade appeals, but she also incited the Plaintiff by

telling her the Plaintiff had been singled out as a "weak" student. (Exhibit "2", p. 131:4-6

to Plaintiff's Opposition to Defendants' Motion for Summary Judgment; Book of Exhibits,

Exhibit "L", p. 264:11-267:12). However, these Defendants have moved to strike a

deposition given by Ms. Gunnells prior to the filing of this lawsuit wherein Ms. Gunnells

gave a statement about a conversation that she says occurred before the end of the

summer semester 2005. Even though the other person that Gunnells says was present

when this conversation occurred, Brenda Bellamy, says that she recalls no such

conversation and, even though Dixie Peterson flatly denies that she ever said that Ms.

Gunnells or Ms. Bellamy or any other instructor should flunk any student, whether Lindy

Wright or another, when viewing this matter in a light most favorable to Lindy Wright, we

must deal with the unfounded contention of Plaintiff's counsel that Ms. Gunnells' testimony

somehow creates an issue with regard to an intentional conspiracy or some other type of

breach of duty. (Book of Exhibits, Exhibit "P", p. 26:3-28:3)(Exhibit "2", p. 131:20-133:18

to Plaintiff's Opposition to Defendants' Motion for Summary Judgment). Plaintiff's counsel

flatly contends in Brief at page 20 that Ms. Gunnells "acknowledged" her prior statement

(given before this suit was filed) when she gave her deposition in this lawsuit. This prior

statement by Ms. Gunnels is one of the subjects of Defendants' Motion to Strike. The

Plaintiff's lawyer stated that Gunnels "acknowledgement" is found at pages 232 through

238 of the Gunnells' deposition. However, this flat contention is misleading and wrong.

Pages 232 through 235 do, however, constitute a simple refreshing of the recollection of Ms. Gunnells with regard to the pre-suit statement so the undersigned could ask questions about it. Of note is the fact that the answers <u>to the questions asked by the undersigned do not in any way confirm the Plaintiff's interpretation</u> of Ms. Gunnells' pre-suit statement. For example, please note the following:

> "And then the question is: But you do not - - you did not interpret that to mean that you needed to go back and re-grade her to fail her that particular semester?

A.   No, but Ms. Peterson would not have asked that of me I know.

Q.   Then you go on to testify about that. Tell me why you say Ms. Peterson would not have asked you to do that.

A.   In general, I would not expect Ms. Peterson to do that and she would not ask that of me. I did not perceive it as a you need to go back and, as I said re-grade or arrange things so that she received a failing grade. She is moral enough to know that I would not do that and I would not expect that of her.

Q.   Well sure. And Ms. Peterson would not ask that of you. She's not that kind of person; am I right?

A.   From my interactions with her, no.

Q.   From your interactions with her, would you say she is an honest, good chairperson of that department who works in that department with integrity?

A.   That was my interaction with her.

Q.    Let me ask you one other question.

A.    Yes, sir.

Q.    Would it be correct to say that Ms. Peterson was not asking you to intentionally flunk Lindy Wright on any occasion, she was just commenting on the fact that she was a weak student; would that be true?

A.    I'm sorry. Could you repeat that?

Q.    Ms. Peterson was commenting on the fact that Lindy Wright was a weak student, but she was not asking you to in the future flunk her in a course intentionally?

A.    My perception was she was expressing her appraisal of Ms. Wright's ability and she was not instructing me to flunk her in any course.

Q.    There was a question that Mr. Dumbuya asked you that misstated your statement in that regard. I don't know if I'm going to be able to find it in time to . . .I'm probably not. . .Here we go. Page 18. Mr. Dumbuya is asking this question and this is what he asked:

      [Now to the best of your knowledge - - are you there?

      A.    Yes, sir.

      Q.    Now to the best of your knowledge, had Ms. Peterson
            made that statement before concerning another student
            that you have to make sure that she flunks?]

Q.    That's not what you said at all previously, was it?

A.    No sir.

40

Q.    So he misinterpreted what you said, isn't that right, or he either
      misinterpreted it or he misstated it in some way.  Correct?  She never
      said you have to flunk her, you must do it intentionally, no matter
      what?

A.    The question is had she ever made a statement like that to me before
      was how I perceived it, and I have never heard her say that before.

Q.    Right.  And she didn't say you have to make sure she flunks with
      respect to Lindy Wright either?

A.    No sir."

(Gunnells Depo., page 235, line 14 through page 238, line 21.)

Mr. Dumbuya, does not make a correct representation concerning the true import of the conversation discussed by Ms. Gunnells with Plaintiff's counsel in her voluntary statement in representing that Ms. Gunnells acknowledged the statement when she gave her deposition in this case.  His argumentative refusal to correctly state Ms. Gunnells' testimony in this regard when she gave her deposition does not make or create a fact issue. (Exhibit "3" to Plaintiff's Opposition to Defendants' Motion for Summary Judgment). The truth of the matter is that, if a conversation of any kind occurred, it was a conversation about students in general and, potentially, Ms. Wright, in particular.  Ms. Peterson may well have said that Lindy Wright is a weak student.  This would be true.  Lindy Wright clearly was a weak student.  Nevertheless, even if the very worst interpretation is put on these alleged statements by Ms. Peterson, they still do not create an issue of fact for a jury.

Additionally, Mr. Dumbuya, in his Brief, continues to provide parts of testimony related to this topic that he believes helps Plaintiff's case.  He does not provide or cite parts

41

of testimony about the same topic that round out and complete a true picture of the facts.

Mr. Dumbuya quotes some answers by Ms. Peterson to the questions in her deposition. At page 20 of his Brief, Mr. Dumbuya quotes about five lines from page 67 of Ms. Peterson's deposition and about six lines from page 69 of Ms. Peterson's deposition. He then argues that statements Ms. Peterson made to nursing instructors about Wright being a weak student during the summer semester 2005 prejudiced Wright's property interest in an education. He states that this was especially true when she appealed her final grade in NUR 252 and asked for course forgiveness at the end of the spring semester 2006. (See Plaintiff's Opposition to Defendants' Motion for Summary Judgment, p. 20-21). Of course, there is utterly no evidence whatsoever cited by Mr. Dumbuya for this expansive and conclusory argument. There is no causal link even suggested. There are no other discussions of a similar type cited between Ms. Peterson and any other instructor. There are no similar discussions cited after early August 2005.

Pages 66, 67, 68, 69 and 71, 131, 132 and 133 of Dixie Peterson's deposition are attached hereto as Exhibit 3 - Peterson. The first few pages beginning at page 66 and running through page 71 contain questions by the Plaintiff's lawyer to Ms. Peterson. The second group of pages beginning at 131 and running through 133 contain questions by the undersigned to Ms. Peterson. The meaning drawn from these pages in terms of Ms. Peterson's testimony about anything that might have been said in the summer of 2005 concerning Lindy Wright is the following:

1.      Ms. Peterson does not remember a conversation of the type described by Ms. Gunnells in response to the Plaintiff's lawyers' questions in her pre-suit statement.

42

She did know at the time of this deposition that allegations had been made about some type of conversation. (Exhibit 3-Peterson, p. 66:19-67:9).

2.    Ms. Peterson remembered an instructor who was standing in for Ms. Bellamy named Gruber stating at some point in time during the first few weeks of the summer 2005 semester that there were some students who were borderline.  Ms. Gruber specifically mentioned Lindy Wright.  (Exhibit 3-Peterson, p. 67:13-68:23).

3.    Ms. Peterson also recalls asking Ms. Bellamy and Ms. Gunnells whether it looked as though anyone would fail.  (Exhibit 3-Peterson, p. 67:19-22).

4.    At page 69, after Ms. Peterson had already testified that she did not recall the specifics of any conversations, Plaintiff's counsel asked whether she recalled a comment of a specific nature about whether Ms. Wright would pass the Boards.  Ms. Peterson responded that she did not remember.  (Exhibit 3-Peterson, p. 69:1-7).

5.    Plaintiff's counsel also asked if Ms. Peterson recalled making a comment to Ms. Bellamy or Ms. Gunnells that Ms. Wright needed to fail.  She responded that she did not remember that at all.  She also stated that she frequently asked instructors who was borderline or who was not passing and that she had made statements in the past in general that students should not pass if they do not have the mastery of the information. "That was my job."  (Exhibit 3-Peterson, p. 69:8-19).

6.    Ms. Peterson was next asked by Plaintiff's counsel whether she recalled talking about Lindy Wright with any of the instructors, including Bellamy, Gunnells, Harris, or any individuals who would have instructed Ms. Wright.  Ms. Peterson responded again that she did not remember anything specific about Ms. Wright.  (Exhibit 3-Peterson, p. 69:20-70:6).

43

7.    Ms. Peterson was asked whether she recalled any instructor seeking her out and saying anything specific about Ms. Wright and her performance.   Ms. Peterson answered that Ms. Gruber did.  Ms. Peterson went on to testify in the deposition that Ms. Gruber left her teaching position at the school toward the end of the fall semester 2005. (Exhibit 3-Peterson, p. 70:7-14;75:8-20).

8.    The undersigned asked Ms. Peterson at page 132 of her deposition whether she had ever said to any instructor in the Nursing Program that any particular or specific student needed to fail?  Her answer was that she had not.  (Exhibit 3-Peterson, p. 131:20-132:20).

9.    The undersigned next asked Ms. Peterson whether or not she had ever said to any instructor or anyone in the Nursing Program that a particular student needed to be failed by an instructor?  Her answer was, "Absolutely not." *Id.*

Clearly, the impression given on page 20 of the Plaintiff's Brief is inaccurate and does not correctly, truly or faithfully set forth the real nature of Ms. Peterson's testimony in this regard.  The true substance of Ms. Peterson's testimony concerning Gunnells' pre-suit statement which was given to the Plaintiff without defense counsel present, was that she never said to anyone that they should fail a student.  In fact, Ms. Gunnells testified that Ms. Peterson would not do that.  (Exhibit 3, p. 232-238:21).  Yet, the Plaintiff's Brief attempts to convince the Court with an argument that does not accurately and completely portray the testimony.  This partial quoting of pinpoint lines by Plaintiff's counsel is not the creation of a genuine issue of material fact.

Further, the Plaintiff's Brief at page 20 goes on to make the following statement:

44

"Peterson prejudged Wright's ability to complete the ADN Program successfully. In her concern to maintain an 80%, as opposed to a 75%, pass rate on the Nursing Board Certification exams for CVCC graduates (Blackwell Depo., page 39, Exhibit 21), Peterson sought to weed out supposedly weak students from the ADN Program." The way these sentences are structured would make it appear as though Dr. Blackwell's testimony is being cited for the statements preceding the deposition cite, which would include "Peterson prejudged Wright's ability" and "in her concern to maintain and 80%, as opposed to a 75%, pass rate, Peterson sought to weed out weak students." Dr. Blackwell did not say that Ms. Peterson prejudiced Wright's ability. Additionally, Dr. Blackwell did not say that Ms. Peterson, in her concern to maintain an 80% pass rate, sought to weed out weak students. Attached hereto as Exhibit 4 - Blackwell, is the complete page 39 from Dr. Blackwell's testimony. The only subject matter of page 39 relates to the minimum pass rate for a nursing program in the State Board of Nursing requirements. Ms. Peterson's name is not mentioned on this page. Ms. Peterson's position as Division Chair is not referenced on this page. There is nothing on page 39 of Dr. Blackwell's deposition about Ms. Peterson's state of mind or "concern". There is nothing on page 39 of Dr. Blackwell's deposition about Ms. Peterson prejudging Ms. Wright. In fact, there is nothing on page 39 about Ms. Wright.

There is no evidence from any person that Ms. Peterson ever said that any student, much less Ms. Wright, needed to be failed. The instructors who were supposedly present, according to Ms. Gunnells, when the discussion referenced by her occurred were Ms. Gunnells, Ms. Bellamy and Ms. Peterson. Ms. Bellamy does not recall such a comment. Ms. Gunnells said that Ms. Peterson would never ask her to fail anyone. Further, Ms. Peterson mentioned Ms. Gruber but there is no testimony and there is no affidavit from Ms.

45

Gruber. Of the three instructors who may have been present or may have talked about or had a conversation about Lindy Wright being a weak student, two of them never graded Ms. Wright again in any course. Ms. Bellamy and Ms. Gunnells did not teach the fall semester of 2005 or any course thereafter at CVCC. Ms. Gruber had resigned from CVCC by mid to late fall 2005 and never graded any other course or subject taken by Ms. Wright. How can there possibly be a conspiracy to intentionally deprive Lindy Wright of some kind of right or privilege? There cannot be. There was not such a conspiracy and there was no such intent. There is simply no evidence. There is only half-truth, innuendo and vaporous argument.

In view of the failure of the Plaintiff to present evidence which establishes a genuine issue of material fact with regard to any allegation of bad faith or intent, these Defendants respectfully suggest that the Court should find in their favor with regard to these matters.

## IV.    Supervisory Liability Under §1983.

Plaintiff apparently contends that Dr. Blackwell, Dr. Lowe and Dixie Peterson are all guilty of supervisory liability under §1983. Again, this is a new allegation as far as counsel for these Defendants can tell. Nevertheless, the allegation is not meritorious and should be disregarded or dismissed on Summary Judgment by the Court. Merely negligent conduct by state officials is not sufficient to state a due process claim under §1983. *Daniels v. Williams,* 474 U.S. 327, 328 (1986). Additionally, the Doctrine of *Respondeat Superior* is not sufficient to create liability under §1983. *Monell v. Dept. of Social Services of the City of New York,* 436 U.S. 658, 691-692 (1978). Additionally, supervisory liability under §1983 may only be shown in certain circumstances and where either the

46

supervisor's personal participation in the acts that comprised the constitutional violation or the existence of a causal connection linking the supervisor's action with the violation of a constitutional right will subject one to liability under a theory of supervisory liability. *Hewett v. Jarrard,* 786 F.2d 1080, 1086-1087 (11th Cir. 1986). Further, even where a supervisor is found to have participated in a decision or some activity that is alleged to have deprived one of a constitutional right, the plaintiff must prove reckless indifference or intent to violate that right. *Davidson v. Cannon,* 474 U.S. 344, 347-348 (1986). As previously demonstrated, the proof shows that the Defendants provided more than due process to Ms. Wright and did not deprive Ms. Wright of any right, privilege or immunity with either reckless disregard or intent to do so.

Therefore, supervisory liability under §1983 is not applicable in this case.

## V.    Tort of Outrage.

The Plaintiff's Brief included a section on the tort of outrage. While counsel for the Defendants feels certain a response is probably unnecessary in view of the initial Brief filed by these Defendants and the lack of proof herein, the undersigned would cite again to the Court *Horne v. Russell County Commission,* 379 F.Supp. 2d 1305, 1340 (M.D. Ala. 2005), wherein Judge Albritton discusses, not only the tort of outrage under Alabama law in the context of a §1983 action, but also discusses state law immunity and its applicability to these state common law claims. *Horne,*F.Supp.2d at 1334-1337. State law immunity is applicable to state theories pled in federal court in a §1983 case as is demonstrated by Judge Albritton's opinion in *Horne,* supra.

47

Counsel for these Defendants believes that all possible theories of the Plaintiff have been addressed, either in the initial Brief or in this Brief. However, if by some chance the Plaintiff contends that another theory not addressed by these Defendants exists and is pled in the Complaint, then counsel for these Defendants would respectfully request the right to address any such theory. The rule regarding pleadings in §1983 cases does require specific pleading because of the elements of a §1983 case. The undersigned has in good faith attempted to address every theory that has been pled or has been raised in Brief by the Plaintiff. Nevertheless, if the Court does hear argument or receive documents from the Plaintiff contending otherwise and if the Court agrees that some other theory might be raised in the Complaint, these Defendants respectfully request the right to very briefly address it.

## CONCLUSION

These Defendants adopt any law set forth by the Plaintiff concerning immunity under the Eleventh Amendment to the United States Constitution. These Defendants believe that argument concerning immunity is unnecessary in view of the clear absence of facts demonstrating any valid theory of action in favor of the Plaintiff, but raised state immunities in Brief because of the manner in which the Complaint is pled and the difficulty of counsel in ascertaining common law theories pled in the Complaint. Nevertheless, it is correct that immunities discussed by the Plaintiff in her Brief under the Eleventh Amendment to the Constitution of the United States do shield these Defendants from damages, including CVCC and the individual Defendants, in both their official and individual capacities.

48

These Defendants respectfully request that the Court grant their Motion for Summary Judgment for the reasons set forth above.

Respectfully submitted,

/s/ H.E. NIX, JR.
H.E.Nix, Jr. (NIX007)
Brandy F. Price (PRI 079)

OF COUNSEL:
Nix, Holtsford, Gilliland, Higgins & Hitson, P.C.
Post Office Box 4128
Montgomery, Alabama 36103-4128
(334) 215-8585
(334) 215-7101 facsimile

## CERTIFICATE OF SERVICE

I hereby certify that an exact copy of the foregoing instrument has been served on the following individual(s) either by email from the Court Clerk or by placing a copy of same in the United States Mail, postage prepaid and properly addressed on this 15th day of October, 2007.

Jennifer B. Cooley, Esq.
Parker & Cooley, LLC
1507 Broad Street
Phenix City, Alabama 36867

Peter A. Dumbuya, Esq.
Post Office Box 3302
Phenix City, Alabama 36868

Joan Davis, Esq.
Dept. Of Post Secondary Education
401 Adams Avenue, Suite 280
Montgomery, AL 36130

/s/ H. E. NIX, JR.
OF COUNSEL

49

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

LINDY G. WRIGHT,                    )
                                    )
        Plaintiff,                  )
                                    )        Civil Action No. 3:06-cv-1087-WKW
v.                                  )
                                    )
CHATTAHOOCHEE VALLEY                )
COMMUNITY COLLEGE (CVCC),           )
et al.,                             )
                                    )
        Defendants.                 )

### AFFIDAVIT OF DAVID N. HODGE

STATE OF ALABAMA        )
                        )
COUNTY OF RUSSELL       )

Before me, the undersigned notary public, personally appeared Dr. David N. Hodge,

who after having been identified to me and after having been sworn, deposed and testified

as follows:

"My name is David N. Hodge. I am the Dean of Student and Administrative Services

at Chattahoochee Valley Community College (hereinafter "CVCC"), a college in the

Alabama Department of Post-Secondary Education College system. I have previously

given an Affidavit in this case. I have reviewed the syllabus for NUR 272 - Pediatric

Nursing - which is Exhibit "E" to Chattahoochee Valley Community College's Motion for

Summary Judgment Brief, and have reviewed the prerequisites listed and the co-

prerequisites listed in that syllabus. One of the prerequisites listed in the syllabus is NUR

252. I have also reviewed the Catalog for 2004/2005, which is Exhibit "A" to the Motion for

1


DEFENDANT'S
EXHIBIT
I - Hodge

Summary Judgment Brief of Chattahoochee Valley Community College, and I have reviewed the Catalog for the years 2005/2006 for Chattahoochee Valley Community College which is Exhibit "B" to CVCC's Motion for Summary Judgment Brief. Pages numbered CVCC 000147 and CVCC 000162 of Exhibit "A" and pages CVCC 000660 and CVCC 000676 of Exhibit "B" set forth the correct prerequisite for NUR 272 - Pediatric Nursing. NUR 252 - Adult Nursing II - is not a prerequisite for NUR 272. Neither the 2004/2005 Catalog, nor the 2005/2006 Catalog lists NUR 252 as a prerequisite for NUR 272.

The Catalog sets forth the official prerequisites for the courses in the ADN program and other programs at CVCC. The Catalog is based upon the requirements of the Alabama State Board of Education. The syllabus, which is Exhibit "E", listing NUR 252 as a prerequisite is not correct in that respect. NUR 252 was not a prerequisite for NUR 272. The Catalog takes priority and precedence over the syllabus in this respect.

The above is based upon my personal knowledge and my professional knowledge in the position which I hold at Chattahoochee Valley Community College. I am the official most competent to testify concerning the above matters at Chattahoochee Valley Community College.

FURTHER, AFFIANT SAYETH NOT."

_____
David N. Hodge

2

STATE OF ALABAMA            )
                           )
COUNTY OF Russell           )

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that David N. Hodge, whose name is signed to the foregoing, and who is known to me, acknowledged before me, on this day, that being informed of the contents of said document, he executed the same voluntarily on the day the same bears date.

Given under my hand and seal this *21st* day of *November, 2007*, 2007.

[SEAL]                         *Darlene Hart Thomps*
                               NOTARY PUBLIC
                               My Commission Expires:_____

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: July 1, 2008
BONDED THRU NOTARY PUBLIC UNDERWRITERS

3

# DEPOSITION OF LINDY WRIGHT

## July 13, 2007

## Pages 1 through 328

### PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
566 South Perry Street
Post Office Box 62
Montgomery, AL 36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net



DEFENDANT'S
EXHIBIT
# Wright

Deposition of Lindy Wright                                July 13, 2007

---

**Page 1**

1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF ALABAMA
3                    EASTERN DIVISION
4
5    LINDY G. WRIGHT,
6        Plaintiff,
7    Vs.            CIVIL ACTION NO.
                     3:06-CV-1087-WKW
8    CHATTAHOOCHEE VALLEY
     COMMUNITY COLLEGE (CVCC),
9    et al.,
10       Defendants.
11
12
            * * * * * * * * * * * * *
13
14
15       DEPOSITION OF LINDY WRIGHT, taken pursuant
16   to stipulation and agreement before Lisa J. Nix,
17   Registered Professional Reporter and Commissioner
18   for the State of Alabama at Large, in the Law
19   Offices of Parker & Cooley, 1507 Broad Street,
20   Phenix City, Alabama on Friday, July 13, 2007,
21   commencing at approximately 9:40 a.m. EDT.
22
23          * * * * * * * * * * * * *

---

**Page 2**

1                    APPEARANCES
2
3    FOR THE PLAINTIFF:
4    Ms. Jennifer B. Cooley
     PARKER & COOLEY
5    Attorneys at Law
     1507 Broad Street
6    Phenix City, AL 36867
7    Mr. Peter A. Dumbuya
     Attorney at Law
8    Post Office Box 3302
     Phenix City, AL 36868
9
10   FOR THE DEFENDANT:
11   Mr. H. E. Nix, Jr.
     Ms. Brandy F. Price
12   NIX, HOLTSFORD, GILLILAND,
         HIGGINS & HITSON
13   Attorneys at Law
     Suite 300
14   4001 Carmichael Road
     Montgomery, AL 36106
15
16   ALSO PRESENT:
17   Dr. Laurel Blackwell
     Ms. Dixie Peterson
18
            * * * * * * * * * * * * *
19
20            EXAMINATION INDEX
21
     LINDY WRIGHT
22      BY MR. NIX  . . . . . . . . . .  6
23

---

**Page 3**

1
2                 EXHIBIT INDEX
3                       MAR
4    DEFENDANT'S EXHIBIT
5    1   Notice of Second Amended Deposition      31
         Duces Tecum
6
     2   Defendants' First Amended Set of        136
7        Requests for Production of Documents
8    3   6/30/05 letter to Lindy Wright from     169
         David Hodge
9
     4   Nursing 252 Adult Nursing II Clinical   201
10       Syllabus - Fall Semester 2005
11   5   Nursing 252 Adult Health Nursing II -   201
         Fall Semester 2005 course outline
12
     6   NUR271 - Maternal - Newborn Nursing     232
13       course outline
14   7   Nursing 272 - Pediatric Nursing course  233
         outline
15
     8   NUR 200 Nursing Career Mobility         233
16       Assessment course outline
17   9   Printout of electronic document sent to 236
         Lindy Wright from instructor at CVCC
18
     10  Documents produced by Lindy Wright      238
19
     11  4/29/05 letter to Linday Wright from    277
20       Katie Lackey
21   12  Income tax returns                      279
22
23

---

**Page 4**

1          INDEX OF EXHIBITS (Continued)
2
3    13  Names and addresses of witnesses with   281
         attachments
4
     14  Envelope addressed to Lindy Wright from 289
5        CVCC postmarked 5/16/06
6    15  1/10/06 letter to Dean James Lowe from  290
         Connie Cooper
7
     16  5/19/06 letter to Dean of Students from 291
8        Lindy Wright
9    17  6/7/06 letter to Dr. Laurel Blackwell   293
         from Connie Cooper
10
     18  NLN Diagnostic Readiness Test           304
11       Performance Profile
12   19  6/13/06 letter to Connie Cooper from    306
         Laurel Blackwell, Ed.D. with attachment
13
     20  7/28/06 letter to Dr. Laurel Blackwell  311
14       from Jennifer Cooley with attachments
15   21  10/10/06 letter to Jennifer Cooley from 317
         Tracy Miller
16
     22  Composite exhibit consisting of         318
17       documents relating to authorization to
         release information
18
     23  10/25/06 letter to Jennifer Cooley from 319
19       Tracy Miller
20
21
22
23

---

Deposition of Lindy Wright

July 13, 2007

**Page 5**

1          STIPULATION
2          It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of LINDY WRIGHT is taken pursuant to the
5    Federal Rules of Civil Procedure and that said
6    deposition may be taken before Lisa J. Nix,
7    Registered Professional Reporter and Commissioner
8    for the State of Alabama at Large, without the
9    formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16         It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23         It is further stipulated and agreed by and

**Page 6**

1    between the parties hereto and the witness that the
2    signature of the witness to this deposition is
3    hereby waived.
4
5          * * * * * * * * * * * * *
6
7          LINDY WRIGHT
8          The witness, after having first been duly
9    sworn to speak the truth, the whole truth and
10   nothing but the truth testified as follows:
11        EXAMINATION
12   BY MR. NIX:
13   Q.   Would you state your name, please.
14   A.   Lindy L. Wright.
15   Q.   Where do you live, Ms. Wright?
16   A.   7716 Bolder Drive, Columbus, Georgia.
17   Q.   I have seen your name stated as Lindy
18        Warren.
19   A.   Correct.
20   Q.   Is that your maiden name?
21   A.   No, that was a previous marriage.
22   Q.   Previous marriage. So who were you married
23        to?

**Page 7**

1    A.   Jason Michael Warren.
2    Q.   Did you get divorced?
3    A.   Uh-huh. (Positive response.)
4    Q.   When you answer --
5    A.   Yes.
6    Q.   -- if you could, thank you, say yes or no.
7    A.   Okay.
8    Q.   Have you ever given a deposition before?
9    A.   Yes, sir.
10   Q.   When was that?
11   A.   I don't know the precise year. It's many
12        years ago. Probably in '93, '94 maybe,
13        '93.
14   Q.   What was it about?
15   A.   Job-related.
16   Q.   All right. Were you a party in the case?
17   A.   Yes, sir.
18   Q.   What was the case?
19   A.   Termination of a position.
20   Q.   And you filed a lawsuit against your
21        employer?
22   A.   Yes.
23   Q.   Who was your employer?

**Page 8**

1    A.   Total Systems.
2    Q.   Total?
3    A.   Systems.
4    Q.   Where were they located?
5    A.   In Columbus.
6    Q.   Are they still there?
7    A.   They are.
8    Q.   Was the suit filed in Georgia?
9    A.   I think -- yes, sir.
10   Q.   Who was your lawyer in that?
11   A.   It was the State.
12   Q.   The State?
13   A.   Equal Employment Opportunity Commission.
14        It was an attorney from them.
15   Q.   It was the federal government, EEOC?
16   A.   Yes.
17   Q.   You filed a -- what kind of suit was it?
18        You were terminated. I hear you saying
19        that, but do you know what type of suit it
20        was?
21   A.   No, I don't.
22   Q.   Do you remember how the suit was instituted
23        or started?

July 13, 2007

Deposition of Lindy Wright

Page 153

1  A.  Lynn Harris.
2  Q.  Okay.
3  A.  No. I'm sorry.  She didn't tell me that.
4      The secretary told me that over the
5      telephone when I called to ask when this
6      class was going to be started.  The
7      secretary told me – of the nursing
8      program.  I guess it was the secretary.  It
9      was some lady answering the phones down
10     there.  I don't know.
11 Q.  I want to get the timing right.  You're
12     talking about calling the secretary in the
13     nursing program and talking to her about a
14     course being offered in the summer of 2006?
15 A.  Correct.
16 Q.  And that course would have in your mind
17     replaced 272; is that correct?
18 A.  Correct.
19 Q.  And 272 is what again?
20 A.  The pediatric.
21 Q.  Okay.  I'm catching on.
22 A.  Okay.
23 Q.  272 is pediatrics.  All right.

Page 154

1      So you did a grade appeal on 272,
2      didn't you?
3  A.  Yes, sir.
4  Q.  And you met with Lynn Harris on 272 -- on
5      that course, correct?
6  A.  Correct.
7  Q.  And you met with her at the end of the
8      spring semester of 2006 and -- when she
9      told you about the grade you had made in
10     272; is that right?
11 A.  Uh-huh (Positive response.)
12 Q.  Is that right?
13 A.  Yes, sir.  Sorry.
14 Q.  That's all right.  So had you met with Lynn
15     Harris about your status in that course,
16     pediatrics, NUR 272, prior to the time that
17     she told you about your grade, your final
18     grade?
19 A.  For that last semester for the pediatric
20     class?
21 Q.  The spring of 2006.
22 A.  It was one to two weeks before.  And she
23     said that all you need is -- I think she

Page 155

1      said all you need is 180 points on your
2      final.
3  Q.  One or two weeks before the final exam in
4      NUR 272, you met with Lynn Harris; is that
5      right?
6  A.  Correct.
7  Q.  And she said all you need is 180 points?
8  A.  Uh-huh (Positive response.)
9  Q.  Is that right?
10 A.  Yes.
11 Q.  You need to say yes.
12 A.  I'm sorry.  Yes, sir.
13 Q.  That's all right.
14     Was it possible at that time to get 180
15     points?
16 A.  Oh, sure it was.
17 Q.  And how would you have done that?
18 A.  If she would have been available to go over
19     tests, go over any kind of remediation for
20     any student, not just myself, anybody.
21 Q.  How does that get you points?
22 A.  That refreshes -- refreshes for tests.
23     That just prepares you even more.

Page 156

1  Q.  What about Lindy Wright --
2  A.  I mean, if you have any questions --
3  Q.  -- preparing?  What about Lindy Wright
4      preparing for tests?
5  A.  She did.
6  Q.  I mean, isn't it the student's
7      responsibility, Ms. Wright, to study and
8      prepare for tests?
9  A.  Yes.
10 Q.  It's not the professor's responsibility to
11     study for you, is it?
12 A.  No, sir.
13 Q.  The professor outlined that course 272,
14     pediatrics; isn't that right?
15 A.  She did.
16 Q.  And there was a book?  You had a book in
17     that course?
18 A.  Yes, sir.
19 Q.  What other materials did you have to study
20     for pediatrics, NUR 272?
21 A.  Just her PowerPoints and the book.
22 Q.  Did you study those things?
23 A.  Yes, sir.

**Page 325**

1    CVCC. I think that was in 2001 maybe.
2    Q. And had you been as good friends with her
3    since that time as you were in the fall of
4    2005, apparently, and 2006 -- spring of
5    2006?
6    A. Was I as good friends with her in LPN
7    school?
8    Q. Right.
9    A. Is that what you're asking?
10    Q. From 2001 on.
11    A. No. Our relationship has grown over the
12    years.
13    Q. When did your relationship begin to
14    blossom, get better, get stronger, become
15    closer?
16    A. I don't know any specific dates.
17    Q. Did it get better after Ms. Gunnels left
18    the school?
19    A. No.
20    Q. So it was real good, apparently, before she
21    . left the school.
22    A. It's been good throughout.
23    Q. Isn't it correct that Sandy Gunnels left

**Page 326**

1    CVCC of her own accord?
2    A. I don't know.
3    Q. She's never told you that she was fired,
4    has she?
5    A. No.
6    MR. NIX: Can we take a quick
7    break and discuss what's
8    cooking real quick? I'm
9    getting close to being
10    finished.
11    (Brief recess was taken.)
12    Q. What's your mother's maiden name?
13    A. Walker.
14    Q. Walker?
15    A. Uh-huh. (Positive response.)
16    Q. Is one of your grandmothers a Webster?
17    A. That's my husband's grandmother.
18    Q. Okay. Mary Webster?
19    A. Mary Webster.
20    MR. NIX: That's all I've got.
21    Thank you.
22    I offer those exhibits.
23    (The Deposition of Lindy Wright was

**Page 327**

1    concluded at 5:40 p.m. EDT.)
2
3    * * * * * * * * * * * *
4    FURTHER DEPONENT SAITH NOT
5    * * * * * * * * * * * *
6
7    REPORTER'S CERTIFICATE
8    STATE OF ALABAMA:
9    MONTGOMERY COUNTY:
10    I, Lisa J. Nix, Registered Professional
11    Reporter and Commissioner for the State of Alabama
12    at Large, do hereby certify that I reported the
13    deposition of:
14    LINDY WRIGHT
15    who was first duly sworn by me to speak the truth,
16    the whole truth and nothing but the truth, in the
17    matter of:
18    LINDY G. WRIGHT,
19    Plaintiff,
20    Vs.
21    CHATTAHOOCHEE VALLEY COMMUNITY
22    COLLEGE (CVCC),
23    Et al.,

**Page 328**

1    Defendants.
2    In The U.S. District Court
3    For the Middle District of Alabama
4    Eastern Division
5    Case Number 3:06-CV-1087-WKW
6    on Friday, July 13, 2007.
7    The foregoing 327 computer printed pages
8    contain a true and correct transcript of the
9    examination of said witness by counsel for the
10    parties set out herein. The reading and signing of
11    same is hereby waived.
12    I further certify that I am neither of kin
13    nor of counsel to the parties to said cause nor in
14    any manner interested in the results thereof.
15    This 22nd day of July 2007.
16
17
18    _____
19    Lisa J. Nix, Registered
19    Professional Reporter and
Commissioner for the State
20    of Alabama at Large
21
22
23

# DEPOSITION OF DIXIE PETERSON

## August 16, 2007

## Pages 1 through 153

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**



DEFENDANT'S
EXHIBIT
III - Peterson

Deposition of Dixie Peterson



Page 1

```
1      IN THE UNITED STATES DISTRICT COURT
2       FOR THE MIDDLE DISTRICT OF ALABAMA
3                  EASTERN DIVISION
4
5   LINDY G. WRIGHT,
6        Plaintiff,
7    Vs.              CIVIL ACTION NO.
                       3:06-CV-1087-WKW
8   CHATTAHOOCHEE VALLEY
    COMMUNITY COLLEGE (CVCC),
9   et al.,              ·
10       Defendants.
11
12        * * * * * * * * * * * * *
13
14
15      DEPOSITION OF DIXIE PETERSON, taken
16  pursuant to stipulation and agreement before Lisa
17  J. Green, Registered Professional Reporter and
18  Commissioner for the State of Alabama at Large, in
19  the Law Offices of Smith & Smith, P.C., 1503 Broad
20  Street, Phenix City, Alabama on Thursday, August
21  16, 2007, commencing at approximately 9:25 a.m.
22
23        * * * * * * * * * * * * *
```

Page 2

```
1             APPEARANCES
2
3   FOR THE PLAINTIFF:
4   Ms. Jennifer B. Cooley
    PARKER & COOLEY
5   Attorneys at Law
    1507 Broad Street
6   Phenix City, AL  36867
7
8   FOR THE DEFENDANT:
9   Mr. H. E. Nix, Jr.
    Ms. Brandy F. Price
10  NIX, HOLTSFORD, GILLILAND,
       HIGGINS & HITSON
11  Attorneys at Law
    Suite 300
12  4001 Carmichael Road
    Montgomery, AL  36106
13
14  ALSO PRESENT:
15  Dr. Laurel Blackwell
16
17
18
19
20
21
22
23
```

Page 3

```
1           EXAMINATION INDEX
2
3   DIXIE PETERSON
    BY MS. COOLEY . . . . . . . . . . 5
4   BY MR. NIX  . . . . . . . . . . 131
5
6
7
8
9
10
                    MAR
11  DEFENDANT'S EXHIBIT
    44  12/20/05 Status Letter Regarding    131
12      Progression in the ADN Program
13  45  Section C of Grade Appeal for NUR 252  131
14  46  Section C of the Grade Appeal for NUR  131
        271
15
    47  1/17/06 e-mail to Heather Chalkley from  131
16      Dixie Peterson re: Lindy Wright
17  48  1/18/06 Grade Change Form       131
18  49  Authorization for Course Substitution  131
19
20
21
22
23
```

Page 4

```
1             STIPULATION
2       It is hereby stipulated and agreed by and
3   between counsel representing the parties that the
4   deposition of DIXIE PETERSON is taken pursuant to
5   the Federal Rules of Civil Procedure and that said
6   deposition may be taken before Lisa J. Green,
7   Registered Professional Reporter and Commissioner
8   for the State of Alabama at Large, without the
9   formality of a commission, that objections to
10  questions other than objections as to the form of
11  the question need not be made at this time but may
12  be reserved for a ruling at such time as the said
13  deposition may be offered in evidence or used for
14  any other purpose by either party provided for by
15  the Statute.
16      It is further stipulated and agreed by and
17  between counsel representing the parties in this
18  case that the filing of said deposition is hereby
19  waived and may be introduced at the trial of this
20  case or used in any other manner by either party
21  hereto provided for by the Statute regardless of
22  the waiving of the filing of the same.
23      It is further stipulated and agreed by and
```

**Page 5**

1  between the parties hereto and the witness that the
2  signature of the witness to this deposition is
3  hereby not waived.
4
5  * * * * * * * * * * * *
6
7  DIXIE PETERSON
8  The witness, after having first been duly
9  sworn to speak the truth, the whole truth and
10  nothing but the truth testified as follows:
11  EXAMINATION
12  BY MS. COOLEY:
13  Q.  Would you please state your name.
14  A.  Yes.  My name is Dixie Peterson.
15  Q.  And is that your full name, Ms. Peterson?
16  A.  Do you want middle and --
17  Q.  Yes, ma'am, please.
18  A.  Dixie Lee Webster Peterson.
19  Q.  And, Ms. Peterson, where is an address or a
20  contact address for you?
21  A.  My physical address is 88 Lee Road 581 in
22  Smiths, Alabama.
23  Q.  And what is your mailing address?

**Page 6**

1  A.  Mailing address is P.O. Box 3247.  It's
2  Phenix City, and of course it has a
3  different Zip Code.  36868.
4  Q.  What is a contact phone number for you?
5  A.  Probably my cell phone, and that would be
6  706-577-0003.
7  Q.  And a work address for you?
8  A.  2602 College Drive, of course Phenix City,
9  36869.
10  Q.  And a work phone number for you?
11  A.  334-214-4817.
12  Q.  And is your current employer CVCC?
13  A.  It is.
14  Q.  How long have you been employed at CVCC?
15  A.  I've been employed at Chattahoochee Valley
16  for 23 years.
17  Q.  In what capacity are you currently
18  employed?
19  A.  I'm currently employed the same that I have
20  been since 1984, and that's as nursing
21  faculty.
22  Q.  Are you the director or coordinator of
23  nursing faculty?

**Page 7**

1  A.  No.  That assignment has changed, but my
2  status has not changed.
3  Q.  Okay.
4  A.  It was called division chair, and that was
5  an assignment.  It was not a position, and
6  so that -- my assignment has changed from
7  that to something else, but my status has
8  not changed, and that's nurse faculty.  I
9  was hired as a nurse faculty member, and
10  that's what I am.
11  Q.  So nursing faculty since 1984.  You were
12  previously assigned the position or an
13  assignment of division chair; is that
14  correct?
15  A.  Correct.
16  Q.  How long were you with the assignment of
17  division chair?
18  A.  20 years.
19  Q.  And when did that assignment end and your
20  new assignment begin?
21  A.  August the 3rd, 2007, of course.  Actually,
22  it was probably the 6th, August the 6th,
23  2007.

**Page 8**

1  Q.  So do you have a new assignment?
2  A.  I do.
3  Q.  And what is your new assignment?
4  A.  My new assignment is to work with Title 3
5  grant funding and develop new health
6  science programs for the college.
7  Q.  When you were with the assignment of
8  division chair, what were some of the
9  responsibilities or roles that you
10  undertook with that assignment?
11  A.  They're pretty vast in nature.  There's
12  actually a -- I'm not sure if it's called a
13  job description.  It's more of a list of
14  duties that all division chairs of the
15  academic departments get, and they're
16  pretty much the same, things like assist in
17  scheduling classes; assist in hiring
18  faculty because, of course, at faculty
19  level, we don't have the authority to hire
20  or fire, only the president can do that; to
21  coordinate textbooks along with faculty who
22  are teaching those courses.
23  For nursing division chair, there were

Deposition of Dixie Peterson                                                    August 16, 2007

Page 65

1  Q.  Was your vote published at the end?  Was
2      there not something put in the Ledger
3      Inquirer whether or not the vote was to
4      vote yes or no regarding -- I mean the vote
5      of confidence, no confidence regarding
6      Dr. Blackwell?
7  A.  I don't remember anything being in the
8      Ledger Inquirer.
9  Q.  Was there anything to your knowledge in any
10     type of local paper within Phenix City as
11     far as whether or not there was a vote of
12     confidence or no confidence regarding
13     Dr. Blackwell?
14 A.  It seems to me there was something in some
15     newspaper, but I do not remember which
16     newspaper.
17 Q.  Does CVCC have any type of internal student
18     newsletter or some type of a memo that they
19     send out to the students and faculty
20     members?
21 A.  There is no student internal memo.  There's
22     a student government association, but what
23     they do, I do not know.

Page 66

1  Q.  So in your role as a faculty member, there
2      is no interaction between a faculty
3      member -- a faculty member not receiving
4      printouts or anything of that nature from
5      the student government association,
6      newsletter, memo, anything of that nature;
7      is that correct?
8  A.  I don't recall ever getting anything from
9      student government.  We get announcements
10     about what they do through Monday Morning
11     Message which is the campus-wide
12     mechanism.  It's campus-wide that comes
13     from the president's office.
14 Q.  Was there anything on a Monday Morning
15     Message that ever referred to Dr. Blackwell receiving a vote
16     referred to Dr. Blackwell receiving a vote
17     of no confidence?
18 A.  I do not recall that.
19 Q.  Do you recall in the summer of 2005 having
20     a conversation with Ms. Brenda Bellamy,
21     Ms. Sandra Gunnels regarding my client,
22     Ms. Lindy Wright, as far as her ability as
23     a nursing student?

Page 67

1  A.  I don't recall a conversation.  I've heard
2      that --
3          MR. NIX:  You don't need to say
4              anything other than what you
5              do recall about that
6              question.  Just answer the
7              question.
8  A.  I don't recall the specifics of any
9      conversations.
10 Q.  Do you recall ever referring to Ms. Lindy
11     Wright as a weak nursing student at any
12     point?
13 A.  I remember being told by Ms. Gruber who was
14     substituting for Ms. Bellamy for the first
15     few weeks of the semester that there were
16     some students who were borderline, that it
17     looked as though unless they really did
18     well throughout the rest of the semester
19     they would not pass.  I remember, as I
20     always do, asking Ms. Bellamy and
21     Ms. Gunnels did it look like anybody was
22     going to fail.  Beyond that, I do not
23     remember anything specifically

Page 68

1  Q.  So are you saying that you recall asking
2      Ms. Gruber or Ms. Bellamy --
3  A.  I'm saying Ms. Gruber informed me after her
4      interactions with the class in
5      Ms. Bellamy's absence that Lindy and a
6      couple of others were borderline at that
7      point, which is --
8          MR. NIX:  That's all you need to
9              say.  I mean, just answer her
10             question.
11 Q.  Would you describe borderline.
12 A.  I'm not sure I can quantify it exactly.
13     Not doing well, performing -- performing
14     less than satisfactory on assignments.  I
15     can't give you a number.
16 Q.  When you say not performing well on
17     assignments, would that include any type of
18     tests or exams in addition to clinicals?
19 A.  It would include tests and exams and/or
20     clinicals.  Some people do very well in
21     class and may not perform well in
22     clinicals, and vice versa.  It just
23     depends.

Deposition of Dixie Peterson

August 16, 200

Page 69

1  Q.  Do you recall making a comment to
2      Ms. Bellamy and/or Ms. Gunnels during the
3      summer of 2005 that Ms. Wright would not
4      pass her boards, that your prediction was
5      that she would not pass her boards, her
6      nursing board exams?
7  A.  I do not remember.
8  Q.  Do you recall making a comment to
9      Ms. Bellamy and/or to Ms. Gunnels in the
10     summer of 2005 that Ms. Wright needed to
11     fail?
12  A.  I do not remember that at all.  I
13     frequently ask instructors who is
14     borderline, who is not passing.  And I have
15     made statements in the past in general that
16     students should not pass if they do not
17     have the mastery of the information.
18     That's my job -- or that was my job.  I'm
19     sorry.
20  Q.  Do you recall specifically -- because you
21     were talking about students in general.  Do
22     you recall specifically having that
23     conversation regarding my client with any

Page 70

1      of these instructors that I mentioned:
2      Ms. Bellamy, Ms. Gunnels, Ms. Harris, any
3      of the individuals who would have
4      instructed Ms. Wright?
5  A.  I do not remember anything specific I said
6      about Lindy Wright.
7  Q.  Do you recall any of those instructors
8      seeking you out and saying specifically
9      that they were concerned about Ms. Wright
10     and her performance in the classroom and/or
11     clinicals?
12  A.  Ms. Gruber, Deborah Gruber did.
13  Q.  And she substituted for Ms. Bellamy?
14  A.  Yes.
15  Q.  Do you know how long she substituted for
16     Ms. Bellamy?
17  A.  About three weeks I believe.  Ms. Bellamy
18     was in the hospital and/or at home sick
19     recuperating from pneumonia.
20  Q.  I have not asked about Ms. Gruber
21     previously.  Can you answer some questions
22     for me about her as far as was she, in
23     fact, an instructor at CVCC?

Page 71

1  A.  Yes.
2  Q.  In what capacity was Ms. Gruber employed?
3  A.  Ms. Gruber was a full-time instructor.
4  Q.  Do you know the length of employment that
5      Ms. Gruber -- what was her length of
6      employment at CVCC?
7  A.  I don't remember exactly.  Maybe close to
8      three years.  Dr. Blackwell had given
9      her -- at the time she was hired, the Board
10     of Nursing did not mandate that you had to
11     have a master's degree, and so
12     Dr. Blackwell gave her a period of time to
13     complete the master's degree.
14         And then when the new rule was
15     implemented that classroom instructors had
16     to have the master's degree and she had not
17     completed it, I believe that's when
18     Dr. Blackwell talked with her about, you
19     know, her completion possibilities and
20     those kinds of things.
21  Q.  You referred to the new rule.  When did the
22     new rule start?
23  A.  I can't remember exactly, but there -- the

Page 72

1      board -- whenever they enact a new rule,
2      they always give a period of time for that
3      rule to be implemented.  It's not
4      immediate.
5  Q.  You stated that Ms. Gruber was employed at
6      CVCC as a full-time instructor for
7      approximately three years.  Do you know
8      what years she was employed?
9  A.  I do not remember the year that she was
10     employed.
11  Q.  Do you know when she left CVCC?
12  A.  She left at the end of fall 2005.
13  Q.  Do you know what classes she would have
14     taught, she being Ms. Gruber?
15  A.  She was predominantly the licensed
16     practical nursing program.  That's where
17     she did most of her teaching.
18  Q.  That's LPN; is that correct?
19  A.  Yes.  I'm sorry.
20  Q.  So when she filled in for Ms. Bellamy, did
21     she fill in for adult health classes?  Is
22     that what she was filling in for?
23  A.  Yes.

18 (Pages 69 to 72)

Page 129

1  secretaries in the office repeatedly tried
2  to contact her because it was reported to
3  us that she was not showing up. And they
4  were trying to reach her in order to get
5  her to drop the classes.
6  Q. But a WF is still seen as a failure; is
7  that correct?
8  A. If a student withdraws from the program or
9  withdraws -- according to the policy at
10  that time, withdrawals are failures.
11  Q. And that was under the same curriculum that
12  Ms. Wright had when she was attending; is
13  that correct?
14  A. I assume so. I don't remember exactly the
15  year that Courtney was there. But, yes, it
16  should have been exactly -- it should have
17  been -- withdrawals are failures, yes.
18  Q. So if, in fact, Ms. Wright wanted to begin
19  the application process as a fresh student
20  at CVCC, would she be allowed to do that?
21  A. Absolutely. If the time span -- the State
22  has a time span. I believe it's two years.
23  Q. Two years, what? From the time that

Page 130

1  someone -- how does that work?
2  A. I've never had to look at it. I believe
3  that it is two years from the time that
4  they left the program. I don't have the
5  policy --
6  Q. Two years from the time that they left the
7  program, but they would still be considered
8  a -- if they were even accepted, it would
9  still be a new admission; is that correct?
10  A. Yes.
11  Q. Competing with all the same brand new
12  nursing students and basically taking
13  classes over from scratch; is that correct?
14  A. Well, they wouldn't be taking classes over
15  because now it's a totally -- the classes
16  are new and there are not as many as there
17  were before. There are only four classes
18  in the mobility program now. There's one
19  each semester except for the last
20  semester. There's a total of four.
21  Q. So those classes must be incredibly
22  concentrated then, aren't they?
23  A. They're very integrated, yes.

Page 131

1  MS. COOLEY: I have nothing
2  further. Thank you.
3  MR. NIX: We need a minute. I'm
4  going to ask some questions,
5  if you'll excuse us.
6  (Brief recess was taken.)
7  (Defendant's Exhibits 44 through 49
8  were marked for identification.)
9  MR. NIX: We have not been -- I
10  don't think we've been
11  offering our exhibits, any of
12  us have been really in the
13  depositions. Can we just
14  agree that anything offered
15  is -- at least the predicate
16  is --
17  MS. COOLEY: Sure.
18  EXAMINATION
19  BY MR. NIX:
20  Q. Ms. Peterson, earlier in this deposition,
21  Ms. Cooley asked you whether you recalled
22  certain things. She asked you whether you
23  recalled saying to Ms. Gunnels and/or

Page 132

1  Ms. Bellamy or both Ms. Gunnels and
2  Ms. Bellamy together that Lindy Wright
3  needed to fail or needed to be failed,
4  and your answer to that was emphatic,
5  although I'm not sure the record really
6  reflects the meaning of it. You said I do
7  not remember that at all.
8  So I would ask you this simply, very
9  simply. Have you ever said to any
10  instructor in the nursing program that any
11  particular or specific student needed to
12  fail?
13  A. Are you finished with the question?
14  Q. Yes.
15  A. No.
16  Q. Have you ever said to any instructor or
17  anyone in the nursing program that any
18  particular or specific student needed to be
19  failed by an instructor?
20  A. Absolutely not.
21  Q. Okay. You described at about that same
22  time in the deposition what your general
23  inquiry is with respect to students and how

Deposition of Dixie Peterson

Page 133

1    they're doing. Can you tell us what that
2    is again?
3  A.  Right, if I know what you're referring to,
4    is typically at interval times throughout
5    the semester and certainly at the final
6    time, I would inquire about how students
7    are doing, what grades seem to be, and what
8    students appear to be failing.
9  Q.  Okay. Can you tell me what you -- why you
10   do that?
11 A.  Well, obviously, first of all, to determine
12   how many students might be failing one
13   course or how many students might be
14   failing two courses to see if we're going
15   to lose any students or what number of
16   students are in jeopardy and --
17 Q.  Okay.
18 A.  Basically, that's -- that was my job.
19 Q.  All right. Now, let me show you what I
20   have marked as Defendant's Exhibit 44, and
21   I'll ask you to look at that and describe
22   it, please, for the record.
23 A.  This is a status letter regarding

Page 134

1    progression in the program.
2  Q.  All right. What is a status letter,
3    Ms. Peterson?
4  A.  A status letter is something that I
5    developed during my time there during the
6    time that I served as chair. And it would
7    actually be a letter that I would send to
8    students at the end of a semester to
9    document their progress or lack thereof --
10   actually, their lack of progress so that
11   they knew their progression status in the
12   program.
13 Q.  What is the date of that particular status
14   letter, Exhibit 44?
15 A.  It's dated December 20th, 2005.
16 Q.  Is that addressed to any particular person?
17 A.  It's to Lindy Wright, but there's no
18   physical address on here.
19 Q.  But it's addressed to her by name?
20 A.  Yes.
21 Q.  December 20, 2005. And what are you --
22   what does that letter say to Ms. Wright, to
23   Lindy Wright?

Page 135

1  A.  It says the purpose of this letter is to
2    inform you of your status and that you have
3    failed Nursing 252 and Nursing 271.
4  Q.  Does the letter quote part of the handbook,
5    the nursing student handbook, catalog?
6  A.  Yes.
7  Q.  Can you read the part that you quote in
8    that letter to Ms. Wright?
9  A.  Could you ask me that again.
10 Q.  Yes. Could you read the part of the
11   catalog or the handbook that's contained in
12   Exhibit 44 that you quote.
13 A.  It reads: Policy states that a student is
14   allowed a maximum of two failures in the
15   LPN or ADN program before he or she is
16   dismissed from the program and withdraws
17   from nursing course -- and withdrawals from
18   nursing courses are counted as failures
19   except in extenuating circumstances as
20   determined by the division chair. Students
21   cannot progress in the program until the
22   course failed has been successfully
23   repeated.

Page 136

1  Q.  So in that correspondence, you're saying to
2    Ms. Wright if I'm correct -- tell me if I'm
3    wrong -- that she has failed NUR 252 and
4    NUR 271 in the fall semester of 2005; is
5    that right?
6  A.  Yes.
7  Q.  And you quote for her the part of the
8    catalog or the handbook that states if you
9    fail two courses in the nursing program,
10   you're no longer eligible to continue in
11   that program?
12 A.  Yes.
13 Q.  Is there a block on that letter that tells
14   her her current status as of December 20,
15   2005?
16 A.  There is.
17 Q.  What is -- was her status at that time?
18 A.  At that time, for the grade appeal it said
19   may not re-enter.
20 Q.  Now, are you -- let me see it.
21        MR. NIX: I will offer Defendant's
22        Exhibit 44.
23 Q.  We've talked already, Ms. Peterson, about

Deposition of Dixie Peterson

---

Page 149

1   Q. Does the failure of Nursing 252 in the fall
2      of 2005 even though 200 was substituted for
3      it in the spring of 2006 and Ms. Wright
4      passed it, does that failure of Nursing 252
5      stay on her record and count as a failure
6      toward -- or with respect to the policy of
7      a nursing student failing two courses and
8      thereby being excluded?
9   A. Yes.
10  Q. Is it correct, then, that the two courses
11     that Ms. Wright failed that caused her to
12     be disqualified were Nursing 252 in the
13     fall of 2005 and Nursing 272 in the spring
14     of 2006?
15  A. Yes.
16  Q. And is it correct -- you tell me. Why did
17     Ms. Wright not graduate in May 2006?
18  A. Because she did not pass Nursing 272.
19  Q. And the second course also --
20  A. Right.
21  Q. She had two failures; is that right?
22  A. Nursing 272 was the second failure after
23     the failure for 271 was removed.

---

Page 150

1   Q. And is that the policy of the school?
2   A. Absolutely.
3       MR. NIX: Thank you. That's all.
4      (Deposition concluded at 5:30 p.m.
5      EDT.)
6
7
8
9
10
11
12
13
14     * * * * * * * * * * * *
15
16   FURTHER DEPONENT SAITH NOT
17     * * * * * * * * * * * *
18
19
20
21
22
23

---

Page 151

1       REPORTER'S CERTIFICATE
2 STATE OF ALABAMA:
3 MONTGOMERY COUNTY:
4     I, Lisa J. Green, Registered Professional
5 Reporter and Commissioner for the State of Alabama
6 at Large, do hereby certify that I reported the
7 deposition of:
8      DIXIE PETERSON
9 who was first duly sworn by me to speak the truth,
10 the whole truth and nothing but the truth, in the
11 matter of:
12     LINDY G. WRIGHT,
13     Plaintiff,
14     Vs.
15 CHATTAHOOCHEE VALLEY COMMUNITY
16 COLLEGE (CVCC),
17     Et al.,
18     Defendants.
19     In The U.S. District Court
20     For the Middle District of Alabama
21     Eastern Division
22     Case Number 3:06-CV-1087-WKW
23 on Thursday, August 16, 2007.

---

Page 152

1     The foregoing 151 computer printed pages
2 contain a true and correct transcript of the
3 examination of said witness by counsel for the
4 parties set out herein. The reading and signing of
5 same is hereby not waived.
6     I further certify that I am neither of kin
7 nor of counsel to the parties to said cause nor in
8 any manner interested in the results thereof.
9     This 4th day of September 2007.
10
11
12
     _____
13     Lisa J. Green, Registered
     Professional Reporter and
     Commissioner for the State
14     of Alabama at Large
15
16
17
18
19
20
21
22
23

---

Deposition of Dixie Peterson                                                                August 16, 2007

Page 153

1
2
3        I, Dixie Peterson, hereby certify that
4   I have read the foregoing transcript of my
5   deposition given on Thursday, August 16, 2007, and
6   it is a true and correct transcript of the
7   testimony given by me at the time and place stated
8   with the corrections, if any, and the reasons
9   therefor noted on a separate sheet of paper and
10  attached hereto.
11
12
13        _____
          Dixie Peterson
14
15
16
17       SWORN TO AND SUBSCRIBED before me this
18  _____ day of _____, 20___.
19
20
21        _____
          NOTARY PUBLIC
22
23

# DEPOSITION OF LAUREL BLACKWELL, Ed.D.

## July 17, 2007

## Pages 1 through 106

## PREPARED BY:

Haislip, Ragan, Green, Starkie & Watson, P.C.
566 South Perry Street
Post Office Box 62
Montgomery, AL  36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net



DEFENDANT'S
EXHIBIT
IV - Blackwell

July 17, 2007

Deposition of Laurel Blackwell, Ed.D.

**Page 1**

```
1       IN THE UNITED STATES DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF ALABAMA
3                 EASTERN DIVISION
4
5     LINDY G. WRIGHT,
6              Plaintiff,
7        vs.           CIVIL ACTION NO.
                       3:06-CV-1087-WKW
8
      CHATTAHOOCHEE VALLEY
9     COMMUNITY COLLEGE (CVCC),
      et al.,
10
         Defendants.
11
12        * * * * * * * * * * * *
13
14        DEPOSITION OF LAUREL BLACKWELL, Ed.D,
15   taken pursuant to stipulation and agreement before
16   Lyn Daugherty, Certified Shorthand Reporter and
17   Commissioner for the State of Alabama at Large, in
18   the Law Offices of Parker & Cooley, 1507 Broad
19   Street, Phenix City, Alabama, on Tuesday, July
20   17th, 2007, commencing at approximately 10:15 a.m.,
21   E.D.T.
22        * * * * * * * * * * * *
23
```

**Page 3**

```
1              EXHIBIT INDEX
2                   MAR
     Plaintiff
3
     1  Letter dated June 7, 2006 to Dr. Laurel    60
4       M. Blackwell from Connie Cooper
5     2  Letter dated June 13, 2006 to Ms. Connie   61
        Cooper from Laurel M. Blackwell, Ed.D.
6
     3  Letter dated July 28, 2006 to Dr. Laurel    64
7       Blackwell from Jennifer Cooley
8
9
10
11
12        * * * * * * * * * * * *
13
14
15
16
17
18
19
20
21
22
23
```

**Page 2**

```
1              APPEARANCES
2     FOR THE PLAINTIFF:
3     Ms. Jennifer B. Cooley
      PARKER & COOLEY
4     Attorneys at Law
      1507 Broad Street
5     Phenix City, Alabama 36867
6     Mr. Peter A. Dumbuya
      Attorney at Law
7     P.O. Box 3302
      Phenix City, Alabama 36868
8
9     FOR THE DEFENDANT:
10    Mr. H.E. Nix, Jr.
      Ms. Brandy F. Price
11    NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
      Attorneys at Law
12    4001 Carmichael Road, Suite 300
      Montgomery, Alabama 36106
13
14    ALSO PRESENT: Ms. Lindy Wright
15        * * * * * * * * * * * *
16
17
         EXAMINATION INDEX
18
19    LAUREL BLACKWELL, Ed.D.
20      BY MR. DUMBUYA . . . . . . . . . . . 6
21      BY MS. COOLEY . . . . . . . . . 60
22
         (Index continued on next page)
23
```

**Page 4**

```
1              STIPULATIONS
2        It is hereby stipulated and agreed by and
3     between counsel representing the parties that the
4     deposition of LAUREL BLACKWELL, Ed.D. is taken
5     pursuant to the Federal Rules of Civil Procedure
6     and that said deposition may be taken before Lyn
7     Daugherty, Certified Shorthand Reporter, and
8     Commissioner for the State of Alabama at Large,
9     without the formality of a commission, that
10    objections to questions other than objections as to
11    the form of the question need not be made at this
12    time but may be reserved for a ruling at such time
13    as the said deposition may be offered in evidence
14    or used for any other purpose by either party
15    provided for by the Statute.
16       It is further stipulated and agreed by and
17    between counsel representing the parties in this
18    case that the filing of said deposition is hereby
19    waived and may be introduced at the trial of this
20    case or used in any other manner by either party
21    hereto provided for by the Statute regardless of
22    the waiving of the filing of the same.
23       It is further stipulated and agreed by and
```

Deposition of Laurel Blackwell, Ed.D.                                    July 17, 2007

Page 5

1   between the parties hereto and the witness that the
2   signature of the witness to this deposition is
3   hereby waived.
4                 * * * * * * * * * * * *
5          LAUREL BLACKWELL, Ed.D.
6       The witness, after having first been duly sworn
7   to speak the truth, the whole truth and nothing but
8   the truth testified as follows:
9          MR. NIX:  Peter, let me -- I
10             apologize to you first for
11             interrupting you.  I know you
12             need to start.  But last
13             Friday I mentioned to you the
14             fact that your wife had worked
15             at Chattahoochee Valley
16             Community College.  And I just
17             wanted to make sure that, you
18             know, there's not a conflict
19             or anything like that.  And so
20             I mention it again to you and
21             just say that if you -- if you
22             do feel there's a conflict or
23             if you've discussed the case

Page 6

1              with her to the extent that
2              she's given you any policies
3              or other things that might not
4              be policy but that might be
5              proprietary to the college
6              that I'd appreciate your just
7              letting me know if she has at
8              some point in time.
9          MR. DUMBUYA:  No.  She has no such
10             information.  As a matter of
11             fact, I did speak with her.
12             She was out of there before
13             she was enrolled in the
14             program.  I think she was only
15             there for one or two
16             semesters, but she was gone
17             before Ms. Wright was enrolled
18             in the program.  She only met
19             the plaintiff at the
20             St. Francis Hospital.  Is that
21             correct?  That's where you met
22             her?
23          MS. WRIGHT:  Yes.

Page 7

1          MR. DUMBUYA:  But you never knew
2              her when she was at CVCC?
3          MS. WRIGHT:  No.
4          MR. DUMBUYA:  I spoke to her and
5              she said she never --
6          MR. NIX:  Okay.  Thank you very
7              much.
8                 EXAMINATION
9   BY MR. DUMBUYA:
10   Q.  If you would, could you state your name and
11       address, please.
12   A.  My name is Laurel Blackwell.  I live at 167
13       Glenwood Way.  And the mailing address is
14       Smiths Station, Alabama.
15   Q.  And how long have you lived at this
16       address, Dr. Blackwell?
17   A.  I moved there in May two years ago.
18   Q.  And before you moved to this address two
19       years ago, what was your previous address?
20   A.  I lived in Auburn.  Auburn, Alabama.  And
21       my address was 1257 Ingleside -- that's
22       I-N-G-L-E -- Ingleside Drive.
23   Q.  And for how long were you at the address in

Page 8

1              Auburn?
2   A.  From 1998 to when we moved here in '05.
3   Q.  2005?
4   A.  Uh-huh (positive response).
5   Q.  Now, at your current address in Smiths
6       Station, who lives with you at that
7       address?
8   A.  Just my husband.
9   Q.  Your husband?
10   A.  Uh-huh (positive response).
11   Q.  And your husband has been at this
12       address -- the current address with you
13       since 2005; is that correct?
14   A.  Correct.
15   Q.  Do you have any children living with you at
16       this address?
17   A.  No.  Our children are grown.
18   Q.  Do any of your children live in Alabama?
19   A.  I have two children -- no, three children.
20       One just moved back.  I have three children
21       in Alabama.  One in Dothan and two in the
22       Huntsville area.
23   Q.  You said one of them just moved?

2 (Pages 5 to 8)

Deposition of Laurel Blackwell, Ed.D.                                    July 17, 2007

Page 37

1   A.  It predated me, and I don't know how many
2       years ago.
3   Q.  So she's been there as chair of the
4       department before you were employed as
5       president; is that correct?
6   A.  Yes.  And I believe maybe almost 20 years
7       as chair, but I really don't know that for
8       certain.
9   Q.  How many faculty members are in that
10      program since you've been president?
11          MR. NIX:  In the nursing program?
12          MR. DUMBUYA:  In the nursing
13          program, yes.
14  A.  You want to know full-time?
15  Q.  If you can break it down to full-time,
16      part-time.
17  A.  I can't do part-time because I don't hire
18      the clinical instructors myself.
19      Technically I sign the contract, but
20      Mrs. Peterson selects -- recruits and
21      selects the clinical instructors and
22      part-time instructors, so I couldn't speak
23      to that.  I think we have five full-time

Page 38

1       nursing faculty right now and then we use a
2       number of part-time and clinical
3       instructors each semester.
4   Q.  So your responsibility as president, if I
5       understand you correctly, is limited to
6       signing their contracts; is that correct?
7   A.  For part-time people?
8   Q.  For part-time people.
9   A.  Yes.  I don't select -- I don't recruit or
10      select part-time faculty.  That's up to the
11      department chair and the dean to consent --
12      consents on that.  Then I offer the
13      contract.
14  Q.  Since you've been president -- full-time
15      permanent president of the program -- this
16      is the nursing program -- has it ever been
17      placed on probation?
18  A.  I don't know if probation is the technical
19      term, and so I wouldn't want to speak to
20      whether that's the right term.  One
21      semester one year our board passage scores
22      were below what the state board required
23      and so we were in a -- we had a period of

Page 39

1       time to rectify that and bring those board
2       passage rates above the minimum standard.
3   Q.  What is the minimum standard on the board
4       passage rate?
5   A.  It's 80 percent at this time.  It was
6       previously 75 percent.
7   Q.  Was it 75 percent at the time when you were
8       hired as a full-time president?
9   A.  Yes.  Uh-huh (positive response).  It's
10      changed since I've been there.
11  Q.  To 80 percent now?
12  A.  Uh-huh (positive response).
13  Q.  And has the program met the 80 percent
14      threshold at this time?
15  A.  Yes.
16  Q.  So it's no longer on probation or whatever
17      the technical term may be; is that correct?
18  A.  No.
19  Q.  When was the probationary period for the
20      nursing program?
21  A.  I'm not certain I could answer that,
22      Mr. Dumbuya.  It was a one-year period and
23      I don't think I can answer that.

Page 40

1   Q.  Now, Dr. Blackwell, since you've been
2       president of CVCC, have you been aware of
3       any problems in terms of faculty in the
4       nursing program?
5   A.  Yes.
6   Q.  Any shortages in the number of faculty
7       required in the program?
8   A.  Well, I would not answer yes to that
9       question.  When we've had courses offered,
10      we've always had adequate faculty.  That's
11      required by the State Board of Education
12      and also our accrediting agency that we
13      always have adequate faculty in the
14      program.
15  Q.  What is adequate for the program to
16      continue to exist?  I mean, how many number
17      of faculty do you need to satisfy the
18      requirements?
19          MR. NIX:  You're talking nursing
20          program still?
21          MR. DUMBUYA:  The nursing program.
22  A.  I don't know that there's a number,
23      Mr. Dumbuya.  You have to have people as

Deposition of Laurel Blackwell, Ed.D.                                      July 17, 2007

Page 105

1        Dr. Blackwell.  We're
2        finished.
3        (Deposition was concluded at
4        approximately 12:15 p.m., E.D.T.)
5
6        * * * * * * * * * * * * * *
7        FURTHER DEPONENT SAITH NOT
8        * * * * * * * * * * * * * *
9
10       REPORTER'S CERTIFICATE
11  STATE OF ALABAMA:
12  MONTGOMERY COUNTY:
13       I, Lyn Daugherty, Certified Shorthand
14  Reporter and Commissioner for the State of Alabama
15  at Large, do hereby certify that I reported the
16  deposition of:
17       LAUREL BLACKWELL, Ed.D.
18  who was duly sworn by me to speak the truth, the
19  whole truth and nothing but the truth, in the
20  matter of:
21       LINDY G. WRIGHT,
22       Plaintiff,
23       vs.

Page 106

1        CHATTAHOOCHEE VALLEY COMMUNITY
2        COLLEGE (CVCC), et al.,
3        Defendants.
4        IN THE UNITED STATES DISTRICT COURT
5        FOR THE MIDDLE DISTRICT OF ALABAMA
6        EASTERN DIVISION
7        Civil Action No. 3:06-CV-1087-WKW
8  on Tuesday, July 17th, 2007.
9        The foregoing 105 computer-printed pages
10  contain a true and correct transcript of the
11  examination of said witness by counsel for the
12  parties set out herein.  The reading and signing is
13  hereby waived.
14       I further certify that I am neither of kin
15  nor of counsel to the parties to said cause nor in
16  any manner interested in the results thereof.
17       This 23rd day of July 2007.
18
19
20       _____
         Lyn Daugherty,
21       Certified Shorthand Reporter
         And Commissioner for the
22       State of Alabama at Large
23

27 (Pages 105 to 106)